## No. 24-3831

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

SIERRA CLUB, et al.,
*Petitioners*

v.

UNITED STATES ARMY CORPS OF ENGINEERS,
et al.,
*Respondents*

On Petition for Review from the
United States Army Corps of Engineers's
Department of Army Permit LRN-2021-00866 (July 25, 2024)

## PETITIONERS' EMERGENCY MOTION FOR STAY PENDING REVIEW

JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org

DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES
PO BOX 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email: dteaney@appalmad.org

O.W. "TREY" BUSSEY
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
Email: tbussey@selctn.org                    *Counsel for Petitioners*

## **INTRODUCTION**

This stay motion seeks to prevent imminent irreparable harm to Tennessee's streams and forests from methane pipeline construction under an unlawful Clean Water Act permit. Pending before this Court is a petition for review of Department of the Army Permit LRN-2021-00866 under Clean Water Act §404 (the "404 Permit") issued by the United States Army Corps of Engineers (the "Corps") to Tennessee Gas Pipeline Company, LLC ("TGP"), for its Cumberland Pipeline (the "Pipeline"). Ex. 1. TGP intends to commence construction in mid-October 2024. Ex. 2. Accordingly, pursuant to FRAP 18(a), Petitioners respectfully request the Court grant this emergency stay motion on or before October 14, 2024.[1]

---

[1] Petitioners began attempting to obtain additional 404 Permit documents August 16, 2024. Ex. 3; Ex. 4. Stymied by opposing parties in those efforts for over a month, Petitioners asked the Corps to stay the 404 Permit pending judicial review on September 23, 2024, based on flaws apparent on the face of available documents. Ex. 5. Also on September 23, 2024, the Corps provided a long-overdue response to a February 2024 404 Permit-related Freedom of Information Act request ("FOIA"). Ex. 6. On September 26, 2024, the Corps declared that it would not provide a response to Petitioners' stay request until October 3, 2024. Ex. 7. On September 27, 2024, the Corps released additional documents as part of a "partial rolling release response" to an August 16, 2024 FOIA request. Ex. 8. Based on those documents, Petitioners supplemented their administrative stay request on September 30, 2024. Ex. 9. The Corps denied the administrative stay request on October 3, 2024 for the reasons in Exhibit 10. This stay motion—which could have been filed earlier had the Corps and/or TGP provided permit documents earlier—followed.

## LEGAL FRAMEWORK

CWA §404 authorizes the Corps to issue permits to discharge dredged or fill material "at specific disposal sites." 33 U.S.C. §1344. Congress directed the Environmental Protection Agency ("EPA") and the Corps to together develop regulatory guidelines to implement §404. *Id.* §1344(b)(1). Those regulations are the "404(b)(1) Guidelines." 40 C.F.R., Part 230.

Among other things, the 404(b)(1) Guidelines prohibit permit issuance "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem," or if the activity will cause or contribute to water quality standards violations. 40 C.F.R. §§230.10(a)-(b).

The 404(b)(1) Guidelines also impose a presumption of available alternatives for projects that are not water dependent. For such projects, practicable alternatives to discharge into special aquatic sites—such as wetlands and streams with riffle-and-pool complexes—"are presumed to be available, unless clearly demonstrated otherwise." *Id.* §230.10(a)(3).

Moreover, the 404(b)(1) Guidelines require the Corps to consider an activity's effects on suspended particulates and turbidity when making factual determinations and compliance findings. 40 C.F.R. §230.21; *Id.*, Subpart C NOTE.

Finally, the 404(b)(1) Guidelines require the Corps to make factual findings about cumulative effects on the aquatic ecosystem. 40 C.F.R. §230.11(g).

CWA §401(a) requires applicants for federal permits for activities that will discharge into jurisdictional waters to obtain "a certification from the State in which the discharge originates … that any such discharge will comply with" water quality requirements. 33 U.S.C. §1341(a). States can waive that requirement affirmatively or through inaction. 40 C.F.R. §§121.7, 121.9. Corps regulations prohibit §404 permit issuance until §401 certification has been obtained or waived. 33 C.F.R. §325.2(b)(ii).

## FACTUAL BACKGROUND

TGP proposes to construct the Pipeline to serve a planned methane power plant in Cumberland City, Tennessee. Ex. 11 at 1. The Pipeline would cross scores of Middle Tennessee waterbodies. *Id.*, tbl. 2.1-1. Pipeline developers cross waterbodies in two main ways. *Sierra Club v. W. Va. Dep't of Envtl. Prot.*, 64 F.4th 487, 494 (4th Cir. 2023). The developer can trench *through* the waterbody (an open-cut crossing), or it can tunnel *under* the waterbody (a trenchless crossing). *Id.* Here, TGP proposes to trench through all but four streams in the Pipeline's path with open-cut crossings. Ex. 6 at 8. TGP would construct those crossings by blasting or excavating a 4.5 to 8-feet-deep and 4 to 5-feet-wide trench through streambeds to bury a 30" diameter pipe. *Id.* at 21-22. Such open-cut crossings can choke miles of a waterway with sediment. *See, e.g.*, Ex. 12.

Because Pipeline construction would require fill material discharge into jurisdictional waters, the CWA required TGP to obtain a §404 permit. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d 251, 255 (4th Cir. 2020). TGP applied for such a permit in July 2022, Ex. 11, and the Corps issued that permit on July 25, 2024, Ex. 1. This petition for review followed.

## STANDARD OF REVIEW

Four questions govern stays pending review:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Those four factors are not strict prerequisites, but instead are considerations for the court to balance. *Kentucky v. Biden*, 23 F.4th 583, 593 (6th Cir. 2022).

In Natural Gas Act ("NGA") proceedings reviewing §404 permits, federal circuit courts apply the Administrative Procedure Act. *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 643 (4th Cir. 2018). Under that statute, courts must set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

## ARGUMENT

### I.    Petitioners Are Likely To Succeed on the Merits.

#### A.    The Corps Failed to Apply the Presumption of Practicable Alternatives.

The 404(b)(1) Guidelines require the Corps to provide extra protections for "special aquatic sites" like wetlands and riffle-and-pool complexes.[2] 40 C.F.R. §§230.41, 230.45. Among those protections is a presumption of practicable alternatives for non-water-dependent projects like the Pipeline. Specifically, the 404(b)(1) Guidelines provide that,

> Where the activity associated with a discharge which is proposed for a special aquatic site … is not "water dependent" … practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

*Id.* §230.10(a)(3).

"The presumption of practicable alternatives is very strong." *Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d 1341, 1344 (8th Cir. 1994) (cleaned up). Where the presumption applies, "the Corps may not issue a §404 permit unless the applicant, with independent verification by the [Corps], provides detailed, clear and convincing

---

[2]    The 404(b)(1) Guidelines describe riffle-and-pool complexes at 40 C.F.R. §230.45(a).

information proving that an alternative with less adverse impact is impracticable." *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004) (cleaned up).

Here, the Corps correctly "assumed each stream crossed by the proposed pipeline" would have riffle-and-pool complexes because of regional geography. Ex. 13, app. B at 6. But that is the last thing the Corps got right in its riffle-and-pool analysis.

TGP bore the burden to rebut the presumption at each disposal site based on clear evidence independently verified by the Corps. And, because the 404(b)(1) Guidelines expressly recognize that activities that do not require fill material discharges into waters of the United States—like trenchless crossings[3]—are practicable alternatives (40 C.F.R. §230.10(a)(1)(i)), TGP bore the burden to clearly demonstrate that trenchless methods like conventional boring were impracticable. The Corps bore the burden to independently verify TGP's contentions. Neither TGP nor the Corps did its job.

Neither TGP's application (Ex. 11) nor its supplemental materials responding to a Corps question about conventional bore (Ex. 14) demonstrated conventional boring was infeasible on a crossing-by-crossing basis. The Corps failed in its

---

[3]   Ex. 13 at 3.

evaluations as well. It rejected "Onsite Alternative 3"—the use of horizontal directional drilling ("HDD")[4] at every crossing—because "the additional cost and time of construction is not reasonable and not a practicable alternative." Ex. 13 at 25-26.

HDD is only one type of trenchless crossing however; conventional bore is another.[5] Ex. 11 at 33-34. As FERC has observed, "[t]he conventional bore method is a technology that has been used for decades to install natural gas pipelines." Ex. 15 at 8. The method has several environmental advantages over HDD, including reduced workspace requirements (*id.* at 9), no risk of drilling fluid spills (*id.* at 92), and reduced time and cost requirements (Ex. 14 at 15; Ex. 16).

Expert engineer Starr Silvis warned the Corps that conventional boring should be considered at each crossing because TGP proposed that method "for multiple road crossings … indicating that this trenchless method is appropriate for substrates found along the project length." Ex. 17 at 6. After receiving Silvis's comments, the Corps asked TGP to evaluate conventional boring. Ex. 13 at 17. Even then, TGP failed to clearly demonstrate that conventional boring was impracticable at *any* (let alone every) crossing location. *See generally* Ex. 14.

---

[4]  HDD uses pressurized slurry to pilot boreholes under streams, which are then widened for pulling pipeline into place. Ex.11 at 33.

[5]  Conventional boring uses bore pits on either side of a stream to "jack" pipelines through boreholes under streams without using pressurized slurry. Ex. 15 at 9.

The Corps asserts that TGP evaluated the practicability of HDD at every crossing. Ex. 13 at 25-26 & app. B at 5. Even if that were true, it still falls short of what the 404(b)(1) Guidelines require: a clear demonstration that the presumption of practicable alternatives is wrong. Here, that required a crossing-by-crossing analysis of conventional boring feasibility, not just HDD. Neither the Corps nor TGP conducted such an evaluation.

The Corps concluded that the "additional cost and time of construction" of "using HDD at every crossing" is "not reasonable and is therefore not a practicable alternative." *Id.* at 25-26. There is no similar conclusion about conventional boring. Even if there were, it would be arbitrary and capricious because it would not be supported by the record. TGP told the Corps that conventional "bores generally do not take the same amount of time as would a[n] HDD." Ex. 14 at 15. As for cost, TGP failed to evaluate the cost of a conventional bore for any single crossing, let alone for each crossing—something that other pipeline companies have done. *See, e.g.*, Ex. 15 at 93. Even the high-level cost information TGP provided in its application, however, shows that conventional boring is at least 25% less expensive than HDD. Ex. 16. In any event, just because an alternative costs more does not mean it is impracticable. *See Delaware Riverkeeper Network v. U.S. Army Corps of Eng'rs*, 869 F.3d 148, 159 (3d Cir. 2017).

Finally, the generalized information TGP provided about conventional boring was insufficient to carry its burden. Ex. 11 at 33-35; Ex. 14 at 12-15. Nonetheless, the Corps blindly (and unlawfully) accepted it without independent verification. *Hintz*, 800 F.2d at 834, 836.

TGP's generalizations about conventional boring were demonstrably wrong. Ex. 17 at 5-7. For example, TGP's assertion that the topography and geology of the region precludes the use of conventional bore is fatally undermined by two record facts entirely ignored by the Corps. ***First***, TGP intends to use conventional boring for multiple road crossings. *Id.* at 5. ***Second***, another methane gas pipeline operator installed an interstate pipeline through the steep slopes of Appalachia by using conventional boring to cross more than 150 features, including at least 117 streams. Ex. 15 at 7, 9. Because the presumption of practicable alternatives has not been rebutted by detailed, clear and convincing evidence, Petitioners are likely to succeed on the merits.

### B.      The Corps Failed to Determine the Least Environmentally Damaging Practicable Rock Removal Alternative.

In relevant part, the 404 Permit's Special Condition 9 provides, "For each crossing, the permittee shall select the least impactful trenching technique practicable, as described in the application submitted August 22, 2022." Ex. 1, ex. A at 6. That condition violates the legal requirements that *the Corps* select the least

environmentally damaging practicable alternative and independently verify an applicant's submissions.

An applicant bears the burden to demonstrate its proposed alternative is the least environmentally damaging practicable alternative, or "LEDPA." In performing the LEDPA analysis, the Corps has "an obligation to independently verify the information supplied to it." *Friends of the Earth v. Hintz*, 800 F.2d 822, 835 (9th Cir. 1986). Consequently, it is the Corps's responsibility—not a permittee's—to "analyze alternatives and *select* the least environmentally damaging practicable alternative." *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 911 (9th Cir. 2018) (cleaned up; emphasis added). Because no §404 permit can issue except for the LEDPA, the Corps must select the LEDPA *before* permit issuance. 40 C.F.R. §230.10(a). "Practicability is thus a threshold determination." *Hillsdale Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1168 (10th Cir. 2012).

Because TGP anticipates encountering bedrock while trenching through Tennessee's streams, it included in its application's alternatives analysis a list of various rock removal techniques it might use. Ex. 11 at 13, 30-32. TGP proposed allowing its construction contractor to select one of five techniques based on what the contractor encounters in the field. *Id.* at 30. Those five techniques, in order of least environmentally damaging to most environmentally damaging, are:

1. Conventional excavation with an excavator;

2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;

3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;

4. Removal by rock trencher; or

5. Controlled blasting and excavation with a backhoe.

*Id.* Each of those techniques poses escalating risks, including streambed fracturing leading to stream dewatering. *Id.* at 30-31.

Expert engineer Starr Silvis reviewed TGP's application and alerted the Corps to serious deficiencies in TGP's treatment of rock removal methods. Silvis opined that "[g]eologic investigations to determine the trenching technique to be used at each crossing site should be conducted prior to permitting" because "allowing contractors to make decisions on the fly results in increased probability of negative impacts to aquatic resources." Ex. 17 at 8. Nonetheless, the Corps impermissibly assigned LEDPA selection to TGP's construction crews, as established by Special Condition 9. Ex. 1, ex. A at 6.

By delaying the LEDPA determination until *after* permit issuance, and by authorizing the permittee to choose the LEDPA on the fly and without Corps supervision, the Corps violated the 404(b)(1) Guidelines. Because agencies must

follow their own regulations, *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004), Petitioners are likely to succeed on the merits.

### C.    The Corps Arbitrarily and Capriciously Interpreted the Scope of Tennessee's §401 Certification.

The Corps cannot issue a §404 permit for a disposal site without §401 certification or waiver thereof.  33 C.F.R. §325.2(b)(ii). The Tennessee Department of Environment and Conservation ("TDEC") issued a §401 certification to TGP on July 21, 2023.[6] Ex. 18. But that certification does not cover stream crossings TGP identified after that certification was issued. TDEC had not reviewed those stream crossings as of July 21, 2023, and they do not appear in the table of "Authorized Work" in the July 21, 2023 certification. Ex. 18, tbl. 1.

On August 24, 2023, TGP provided TDEC with notice that it had completed fieldwork in previously unsurveyed areas. Ex. 19. That letter identified additional stream crossings that were not part of TGP's previous applications to either the Corps or TDEC. *See* Ex. 20 at 1, 5-6.

TDEC could not certify stream crossings on July 21, 2023, for which it lacked information until August 24, 2023. Accordingly, on November 28, 2023, TDEC confirmed to the Corps that an additional §401 certification would be needed for the

---

[6]    That certification is the subject of Petition for Review Number 23-3682 pending before this Court.

newly identified crossings. Ex. 21. The Corps then began pressing TDEC to issue such an additional §401 certification. Ex. 22.

On January 30, 2024, TDEC released a draft permit in which it indicated its intent to waive §401 certification authority for the new stream crossings. Ex. 20 at 22, 32. On February 22, 2024, Petitioners warned the Corps of that waiver's consequences. Ex. 23.

Shortly thereafter, the Corps's Nashville District met with headquarters leadership to discuss litigation risk from TDEC's waiver and a path forward. Exs. 24-25. The Corps has not disclosed what its plan entailed, but if it involved TGP seeking an additional §401 certification, it was quickly thwarted when, in late March 2024, TGP informed the Corps that it would not delay its construction schedule to submit a new §401 application. Ex. 26.

On April 11, 2024, the Corps began rewriting the July 21, 2023 certification's history. It told TDEC that it construed the July 21, 2023 certification as the only valid §401 action. Ex. 27. But TDEC disputed the Corps's contention and informed the Corps it was committed to a §401 waiver for the newly identified streams. *Id.* On April 23, 2024, the Corps sent a letter to TDEC reiterating the fiction that, contrary to (1) the plain language of the July 21, 2023 §401 certification, (2) TDEC's draft modification, and (3) TDEC's clearly communicated disagreement with the Corps, the July 21, 2023 certification was "valid for the entire 32-mile pipeline." Ex.

28. The very next day, however, TDEC issued a final modification reiterating—twice—that TDEC was waiving the §401 certification requirement for the new crossings. Ex. 29 at 22, 32.

On July 25, 2024, the Corps issued the 404 Permit, Ex. 1, relying on the July 21, 2023 §401 certification's existence to support its finding of water quality standards compliance at every crossing, notwithstanding that the certification did not cover every crossing. Ex. 13 at 40.

The Corps does not permit pipeline projects as a whole, and States do not certify them as a whole either. Congress authorized the Corps to issue §404 permits for "specified disposal sites." 33 U.S.C. §1344(a). The Corps agrees. Twice in its decision document, the Corps acknowledges each stream crossing is a separate disposal site. Ex. 13 at 27 & app. B at 11. And Corps regulations treat "each crossing of a separate water of the United States" as a "single and complete project." 33 C.F.R. §330.2(i). Thus, although pipeline operators might apply for and receive a single "individual permit" under §404, that permit in fact authorizes numerous disposal sites, each subject to individualized scrutiny under the 404(b)(1) Guidelines. Likewise, under §401, a state must certify each individual disposal site proposed for authorization under a §404 permit. *See, e.g.*, 40 C.F.R. §121.1.

Because TDEC waived §401 certification for newly identified crossings not addressed in the July 21, 2023 §401 certification, there is no certification for those

crossings. Nonetheless, in issuing the 404 Permit, the Corps reiterated its misinterpretation of the July 21, 2023 §401 certification and relied on it repeatedly to support its conclusions about water quality standards compliance. Ex. 13 at 30, 40, 49, 65-66 & app. B at 16-17, 21. Indeed, the Corps dismissed comments that it must evaluate water standards quality compliance, pointing to the July 21, 2023 certification and stating "TDEC is the authority in determining whether the proposed project would violate water quality standards." *Id.*, app. B at 16-17, 21.

The Corps's explanation runs counter to the record because TDEC never certified the newly identified crossings. *See Ohio v. Becerra*, 87 F.4th 759, 772 (6th Cir. 2023). Where an agency "rest[s] its determination, at least in part, on [an] infirm … ground," the action is arbitrary and capricious, *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 329-30 (D.C. Cir. 2006), unless "the agency would have acted on [an alternative valid ground] even if the [infirm ground] were unavailable," *AES Sparrows Point LNG v. Wilson*, 589 F.3d 721, 730 (4th Cir. 2009). Here, the Corps did not identify "independent and alternative grounds" for its water quality determinations. *Id.* at 726, 730. Rather, it repeatedly and mistakenly relied on the July 21, 2023 water quality certification for every crossing. Because that ground is infirm, Petitioners are likely to succeed on the merits. *Williams Gas*, 475 F.3d at 329-30.

Alternatively, if the Corps's position were correct that TDEC could not waive §401 certification in response to TGP's modification application because that submission "was not a new 401 request requiring state action" (Ex. 27 at 2), then the 404 Permit would still be unlawful. Because TDEC could not and did not certify the newly identified stream crossings in July 2023, if TDEC did not waive that authority then there is neither a §401 certification nor a waiver for those crossings. In that case, the Corps unlawfully issued the 404 Permit in violation of  33 C.F.R. §325.2(b)(ii) because it authorized discharges at disposal sites without §401 certification or valid waiver thereof.

**D.      The Corps's Decision Relied on Its Mistaken Belief in a Nonexistent Permit.**

Under the 404(b)(1) Guidelines, the Corps must evaluate the activity's effects on suspended particulates and turbidity. 40 C.F.R. §230.21; *id.*, Subpart C NOTE. Here, the Corps committed a fatal factual error in that evaluation. When an agency "offer[s] an explanation for its decision that runs counter to the evidence before the agency," its decision is arbitrary and capricious. *Ohio*, 87 F.4th at 772.

Here, the Corps relied, at least in part, on its belief in a nonexistent National Pollution Discharge Elimination System ("NPDES") permit under CWA §402 (33 U.S.C. §1342) to conclude effects from suspended particulates and turbidity would be negligible. Ex. 13 at 29-30. In its Memorandum for Record, the Corps states, "Discharges from installation of the pipe and other attendant structures are subject

to TDEC NPDES permitting. The NPDES permit contains limits on the amount of total suspended solids." *Id.* at 30. The problem is there is no such NPDES permit and no such limit on total suspended solids. Nor could there be. Under *Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*, 557 U.S. 261, 273-74 (2009), discharges subject to §404 permitting—like those associated with open-cut crossings—cannot also be subject to a §402 NPDES permit.[7] Moreover, the CWA exempts many discharges from gas pipeline construction from NPDES permitting requirements. 33 U.S.C. §1342(l)(2).[8]

When an agency relies on a demonstrably false impression about other permitting regimes as part of its water quality analysis, it acts arbitrarily and

---

[7] In its denial of Petitioners' administrative stay request, the Corps incredulously intimates it might have been referring to an authorization under a general NPDES permit for construction stormwater. Ex. 10 at 14. But then the Corps admits it could not have been referring to that permit because it did not exist when the 404 Permit issued. *Id.* Moreover, that permit does not include numeric limits on total suspended solids (see permit available at https://tinyurl.com/2smacnxe), so the Corps could not have been anticipating that permit. In any event, general construction stormwater permits do not regulate the instream construction activities the Corps was evaluating, so even if the Corps was referring to that permit, reliance on it would be arbitrary and capricious. *See W. Va. Dep't of Envtl. Prot.*, 64 F.4th at 507-08.

[8] *Coeur Alaska* and 33 U.S.C. §1342(l)(2) definitively establish that the Corps's *post-hoc* explanation of its references to NPDES permitting as "expository statements that the proposed project that is sucject to the Corps regulatory authority is also subject to other applicable federal and state laws and regulations" (Ex. 10 at 14) is demonstrably wrong, arbitrary, and capricious, and "betray[s] the [Nashville District's] ignorance" of the regulation of interstate gas pipelines. *W. Va. Dep't of Envtl. Prot.*, 64 F.4th at 508.

capriciously. *Sierra Club*, 64 F.4th at 508. The Corps's reliance on an imaginary NPDES permit "betrayed the [Corps's] ignorance" and its arbitrary and capricious false impression. *Id.* Furthermore, whether the nonexistent permit was one ground among many is irrelevant. The Corps did not offer independent bases, and where a determination rests even in part on an infirm ground it is arbitrary and capricious. *AES Sparrows*, 589 F.3d at 726, 730; *Williams Gas*, 475 F.3d at 329-30.

**E.    The Corps Entirely Failed to Consider an Important Aspect of the Problem.**

An important aspect of the problem presented by TGP's application was the cumulative effect of multiple crossings of the same stream. The 404(b)(1) Guidelines require a cumulative effects determination. 40 C.F.R. §230.11(g)(2). Such impacts "are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material." *Id.* §230.11(g)(1). And, "[a]lthough the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems." *Id.*

The scientific literature before the Corps warned of permanent detrimental effects that aggregate from multiple crossings of the same stream. Ex. 30 at 407. In its response to comments about those aggregate effects, the Corps directed readers to its "evaluation" of cumulative impacts "in Section 9.0 of the Corps decision

document." Ex. 13, app. B at 22. But nothing in Section 9.0—or any other section of the Corps decision document—addresses impacts to streams that would be crossed by the Pipeline multiple times. *See generally* Ex. 13. Where an agency entirely fails to address an important aspect of the problem, its action is arbitrary and capricious. *Ohio*, 87 F.4th at 772.

## II.    Petitioners Will Suffer Irreparable Harm.

TGP intends to complete all stream crossings by March 5, 2025. Ex. 2. Thus, TGP will have ample time to conduct the activities the 404 Permit authorizes before this petition is resolved. Those circumstances justify a stay pending review. *Sierra Club*, 981 F.3d at 264.

Environmental harms, "by [their] nature, can seldom be adequately remedied by money damages and [are] often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). And, as the Fourth Circuit has observed, pipeline stream crossings "that may occur while the Court decides the case cannot be undone and, if the end result is that [the permit should not have issued], irreparable harm will have occurred in the meantime." *Sierra Club*, 981 F.3d at 264 (cleaned up); *see also U.S. v. Bayshore Assocs., Inc.*, 934 F.2d 1391, 1398 (6th Cir. 1991) (recognizing fill activities "foreseeably cause irreparable harm").

TGP's proposed stream crossings threaten "significant permanent impacts" to streams in the Pipeline's path. Ex. 17 at 2. As expert engineer Starr Silvis warned the Corps:

> Damage to aquatic ecosystems associated with installation of pipelines include: immediate mortality of fish and benthic macroinvertebrates in the area of active construction, downstream increases in turbidity and suspended sediment, downstream deposition of sediment, sedimentation from disturbance of stream banks, temperature increases, and increases in stormwater runoff due to change in runoff from upslope areas.

*Id.* And FERC has recognized that in-stream blasting, like that proposed by TGP, "has the potential to injure or kill aquatic organisms, displace organisms during blast-hole drilling operations, and temporarily increase stream turbidity." FERC, *Mountain Valley Project and Equitrans Expansion Project: Final Environmental Impact Statement* 4-140 (June 2017), available at https://www.ferc.gov/sites/default/files/2020-05/Final-Environmental-Impact-Statement_1.pdf.

Those imminent irreparable consequences of Pipeline construction strike close to home for Petitioners' members. For example, the Pipeline would cross several creeks with open-cut methods on Robert Connor's multi-generational family farm. Ex. 31, ¶¶5, 8. Connor enjoys hiking and seeing wildlife around those creeks and has expended significant resources obtaining grant money to improve habitat on his farm. *Id.*, ¶¶ 6, 13. TGP plans to trench through Connor's creeks and clearcut 1.1

acres of his improved forestland. *Id.*, ¶¶8, 13. Increased sedimentation in those creeks will cause "long-term harm to water quality and aquatic life" and "disrupt wildlife habitat," and such effects constitute irreparable harm. *Id.*, ¶9. Moreover, "[a]ll of the work that [he] did to improve that forestland will be wasted if the area is cleared for construction[.]" *Id.*, ¶13.

TGP plans to cross Yellow Creek and its tributaries multiple times upstream from Charles Crow's home. Ex. 32, ¶7. Buying his home on Yellow Creek "has been the realization of a dream," and Crow "get[s] so much joy" from spending time with family and friends swimming and fishing in Yellow Creek and hosting cookouts on its banks. *Id.*, ¶¶8, 9, 14. Crow's interests in Yellow Creek will be harmed by sedimentation from pipeline construction. *Id.*, ¶11. In fact, Crow does not believe "any amount of money would compensate losing [his] use and enjoyment of Yellow Creek in its current state." *Id.*, ¶¶11, 18.

Jerry Steven Shafer regularly takes his grandchildren swimming at the confluence of Gafford Branch and Peabody Branch. Ex. 33, ¶¶4, 5. Gafford Branch is hemmed in by steep and wooded terrain, and TGP's plans to clearcut this area and to cross Gafford Branch and its tributaries upstream from the family swimming spot will pollute the creek with sediment. *Id.*, ¶¶6, 7. Shafer will not take his grandchildren there to swim after that pollution occurs. *Id.*, ¶¶7, 8.

There simply "is no adequate remedy at law to compensate the public for the harm caused by the disposal of fill material into waters … or in wetlands." *U.S. v. Malibu Beach, Inc.*, 711 F.Supp. 1301, 1313 (D.N.J. 1989). The loss of mature forests—which will occur imminently on Conner's property—is not compensable by money, rendering that type of loss quintessentially irreparable. *See, e.g.*, *W. Land Exch. Project v. Dombeck*, 47 F.Supp.2d 1216, 1218 (D. Or. 1999). Finally, the Pipeline construction's lethal effect on aquatic life "is, by definition, irreparable." *Humane Soc'y v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008).

## III.    Preliminary Relief Will Not Substantially Harm the Corps or TGP.

A stay would not substantially injure the Corps. "[T]he effect of an injunction on [an agency's] interests [in defending its permits] seems rather inconsequential." *Ohio Valley Envtl. Coalition v. U.S. Army Corps of Eng'rs*, 528 F.Supp.2d 625, 632 (S.D. W. Va. 2007).

Moreover, any economic harm to TGP would not outweigh the irreparable environmental harm in the balance of the equities. *Sierra Club*, 981 F.3d at 264-65; *see also Baker v. Adams County/Ohio Valley School Bd.*, 310 F.3d 927, 930 (6th Cir. 2002) (discounting economic harm in the balance of equities).

## IV.    The Public Interest Favors Preliminary Relief.

The "public has an interest in the integrity of the waters of the United States, and in seeing that administrative agencies act within their statutory authorizations

and abide by their own regulations." *Ohio Valley Envtl. Coalition v. Bulen*, 315 F.Supp.2d 821, 831 (S.D. W. Va. 2004). Moreover, "the NGA yields to the CWA" in the public interest analysis. *Sierra Club*, 981 F.3d at 264-65. Finally, "the public's *true* interest lies in the correct application of the law." *Tenn. v. Dep't of Educ.*, 104 F.4th 577, 614 (6th Cir. 2024) (cleaned up).

## CONCLUSION

For the foregoing reasons, this Court should stay the 404 Permit. Petitioners request expedited resolution of this motion by October 14, 2024.

Dated:    October 4, 2024

Respectfully submitted,

**/s/ JAMES S. WHITLOCK**                              **/S/ DEREK O. TEANEY**
JAMES S. WHITLOCK                              DEREK O. TEANEY
SOUTHERN ENVIRONMENTAL LAW CENTER        APPALACHIAN MOUNTAIN ADVOCATES
48 Patton Avenue, Suite 304                   P.O. Box 507
Asheville, NC 28801-3321                      Lewisburg, WV 24901
Telephone: (828) 258-2023                     Telephone: (304) 646-1182
Email: jwhitlock@selcnc.org                   Email: dteaney@appalmad.org

O.W. "TREY" BUSSEY
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
Email: tbussey@selctn.org

*Counsel for Petitioners*

- 23 -

**CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMIT**

This motion complies with the type-face requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) and the type-volume limits of Federal Rule of Appellate Procedure 27(d)(2)(A), because this motion contains 5,199 words and has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

**/s/ JAMES S. WHITLOCK**
JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org

## CERTIFICATE OF SERVICE

I hereby certify that, on October 4, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

**/s/ JAMES S. WHITLOCK**
JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org