Exhibit 15



**Office of
Energy Projects**

**August 2021**

**Mountain Valley Pipeline, LLC**                    **Docket No. CP21-57-000**

# Mountain Valley Pipeline Amendment Project

# Environmental

# Assessment

Cooperating Agency:



**U.S. Army
Corps of
Engineers**

**Washington, DC  20426**

**FEDERAL ENERGY REGULATORY COMMISSION**
WASHINGTON, D.C. 20426

OFFICE OF ENERGY PROJECTS

<u>In Reply Refer To</u>:
OEP/DG2E/Gas 3
Mountain Valley Pipeline, LLC
Mountain Valley Pipeline
Amendment Project
Docket No. CP21-57-000

TO THE INTERESTED PARTY:

The staff of the Federal Energy Regulatory Commission (FERC or Commission) has prepared an environmental assessment (EA) for the Mountain Valley Pipeline Amendment Project (Amendment Project), proposed by Mountain Valley Pipeline, LLC (Mountain Valley) in the above-referenced docket. Mountain Valley requests authorization to change the crossing method of specific waterbodies and wetlands from open-cut dry crossings (as authorized by its October 13, 2017 Certificate of Public Convenience and Necessity [Certificate]) to trenchless methods (conventional bore, guided conventional bore, or Direct Pipe®[1]). In addition, Mountain Valley requests authorization for two minor route adjustments to avoid wetlands and waterbodies and authorization to conduct nighttime construction at eight trenchless crossings.

The EA assesses the potential environmental effects of the construction and operation of the Amendment Project in accordance with the requirements of the National Environmental Policy Act (NEPA). The FERC staff concludes that approval of the proposed project, with appropriate mitigating measures, would not constitute a major federal action significantly affecting the quality of the human environment.

The U.S. Army Corps of Engineers (COE) is a federal cooperating agency who assisted us in preparing this EA because they have jurisdiction by law or special expertise with respect to impacts to waters of the U.S. The COE may adopt the EA per 40 CFR 1501.8 if, after an independent review of the document, it concludes that their requirements and/or regulatory responsibilities have been satisfied. However, the COE would present its own conclusions and recommendations in its respective and applicable records of decision or determinations. Otherwise, it may elect to conduct its own supplemental environmental analyses.

---

1    Direct Pipe® is a construction method developed by Herrenknecht AG that combines microtunneling and horizontal direction drill (HDD).

- 2 -

The proposed Amendment Project includes the following:

- 120 trenchless crossings (117 conventional bores, 2 guided conventional bores, and 1 Direct Pipe®) of 47 wetlands and 136 streams in Wetzel, Lewis, Webster, Nicholas, Greenbrier, Summers, and Monroe counties, West Virginia and Giles, Montgomery, Roanoke, Franklin, and Pittsylvania, counties, Virginia;
- avoidance of one wetland via a shift in the permanent operational right-of-way at MP 0.70;
- avoidance of one waterbody due to a route adjustment at MP 230.8; and
- 24-hour construction activities at the previously authorized Gauley River and Roanoke River, two guided conventional bore crossings, the Direct Pipe® crossing, and three conventional bore locations.

The Commission mailed a copy of the *Notice of Availability* to federal, state, and local government representatives and agencies; elected officials; environmental and public interest groups; Native American tribes; potentially affected landowners and other interested individuals and groups; and newspapers and libraries in the project area.  The EA is only available in electronic format.  It may be viewed and downloaded from the FERC's website (www.ferc.gov), on the natural gas environmental documents page (https://www.ferc.gov/industries-data/natural-gas/environment/environmental-documents).  In addition, the EA may be accessed by using the eLibrary link on the FERC's website.  Click on the eLibrary link (https://elibrary.ferc.gov/eLibrary/search), select "General Search" and enter the docket number in the "Docket Number" field, (i.e. CP21-57).  Be sure you have selected an appropriate date range.  For assistance, please contact FERC Online Support at FercOnlineSupport@ferc.gov or toll free at (866) 208-3676, or for TTY, contact (202) 502-8659.

The EA is not a decision document.  It presents Commission staff's independent analysis of the environmental issues for the Commission to consider when addressing the merits of all issues in this proceeding.  Any person wishing to comment on the EA may do so.  Your comments should focus on the EA's disclosure and discussion of potential environmental effects, reasonable alternatives, and measures to avoid or lessen environmental impacts.  The more specific your comments, the more useful they will be.  To ensure that the Commission has the opportunity to consider your comments prior to making its decision on this project, it is important that we receive your comments in Washington, DC on or before 5:00pm Eastern Time on **September 13, 2021.**

For your convenience, there are three methods you can use to file your comments to the Commission.  The Commission encourages electronic filing of comments and has

- 3 -

staff available to assist you at (866) 208-3676 or FercOnlineSupport@ferc.gov.  Please carefully follow these instructions so that your comments are properly recorded.

(1)    You can file your comments electronically using the eComment feature on the Commission's website (www.ferc.gov) under the link to FERC Online. This is an easy method for submitting brief, text-only comments on a project;

(2)    You can also file your comments electronically using the eFiling feature on the Commission's website (www.ferc.gov) under the link to FERC Online. With eFiling, you can provide comments in a variety of formats by attaching them as a file with your submission.  New eFiling users must first create an account by clicking on "eRegister."  You must select the type of filing you are making.  If you are filing a comment on a particular project, please select "Comment on a Filing"; or

(3)    You can file a paper copy of your comments by mailing them to the Commission.  Be sure to reference the project docket number (CP21-57-000) on your letter.  Submissions sent via the U.S. Postal Service must be addressed to: Kimberly D. Bose, Secretary, Federal Energy Regulatory Commission, 888 First Street NE, Room 1A, Washington, DC  20426. Submissions sent via any other carrier must be addressed to: Kimberly D. Bose, Secretary, Federal Energy Regulatory Commission, 12225 Wilkins Avenue, Rockville, Maryland 20852.

Filing environmental comments will not give you intervenor status, but you do not need intervenor status to have your comments considered.  Only intervenors have the right to seek rehearing or judicial review of the Commission's decision.  At this point in this proceeding, the timeframe for filing timely intervention requests has expired.  Any person seeking to become a party to the proceeding must file a motion to intervene out-of-time pursuant to Rule 214(b)(3) and (d) of the Commission's Rules of Practice and Procedures (18 CFR 385.214(b)(3) and (d)) and show good cause why the time limitation should be waived.  Motions to intervene are more fully described at https://www.ferc.gov/ferc-online/ferc-online/how-guides.

Additional information about the project is available from the Commission's Office of External Affairs, at **(866) 208-FERC**, or on the FERC website (www.ferc.gov) using the eLibrary link.  The eLibrary link also provides access to the texts of all formal documents issued by the Commission, such as orders, notices, and rulemakings.

- 4 -

In addition, the Commission offers a free service called eSubscription which allows you to keep track of all formal issuances and submittals in specific dockets. This can reduce the amount of time you spend researching proceedings by automatically providing you with notification of these filings, document summaries, and direct links to the documents. Go to https://www.ferc.gov/ferc-online/overview to register for eSubscription.

# MOUNTAIN VALLEY PIPELINE AMENDMENT PROJECT
## ENVIRONMENTAL ASSESSMENT

## TABLE OF CONTENTS

SECTION             PAGE NUMBER

**SECTION A – PROPOSED ACTION** ................................................................. 1
1.0   Introduction .......................................................................................... 1
2.0   Purpose and Need ................................................................................ 3
3.0   Public Review and Comment .............................................................. 4
4.0   Proposed Facilities and Land Requirements ...................................... 7
     4.1   24-Hour Construction ................................................................. 7
5.0   Trenchless Crossing Construction Procedures .................................... 8
     5.1   Conventional Bore ...................................................................... 8
     5.2   Guided Conventional Bore ......................................................... 12
     5.3   Direct Pipe® ............................................................................... 13
     5.4   Microtunneling ........................................................................... 14
     5.5   Trenchless Crossing Contingency Plans .................................... 15
     5.6   Trenchless Crossing Schedule .................................................... 15
6.0   Equipment Bridges .............................................................................. 15
7.0   Environmental Compliance Inspection and Monitoring ..................... 16
8.0   Permit Approvals and Regulatory Consultations ................................ 17

**SECTION B – ENVIRONMENTAL ANALYSIS** ........................................... 19
1.0   Geologic Hazards, and Soils ............................................................... 22
2.0   Water Resources .................................................................................. 26
     2.1   Groundwater ............................................................................... 26
     2.2   Surface Water ............................................................................. 33
     2.3   Wetlands ..................................................................................... 38
3.0   Fisheries, Vegetation, and Wildlife .................................................... 41
     3.1   Fisheries and Aquatic Resources ............................................... 41
     3.2   Vegetation .................................................................................. 43
     3.3   Wildlife ...................................................................................... 45
     3.4   Migratory Birds .......................................................................... 47
     3.5   Special Status Species ................................................................ 48
4.0   Land Use .............................................................................................. 54
     4.1   Environmental Justice ................................................................ 55
5.0   Cultural Resources .............................................................................. 57

i

5.1    Consultations ................................................................ 59

5.2    Identification of Historic Properties ............................... 62

5.3    Assessment of Effects .................................................. 64

5.4    Unanticipated Discoveries ........................................... 66

5.5    Compliance with the NHPA ......................................... 66

6.0    Air Quality and Noise ............................................................ 67

6.1    Air Quality ................................................................. 67

6.2    Noise ......................................................................... 75

7.0    Reliability and Safety ............................................................ 88

**SECTION C – ALTERNATIVES** .............................................. **90**

1.0    No-Action Alternative .......................................................... 90

2.0    Alternative Crossing Techniques ........................................... 92

2.1    Screening Criteria ....................................................... 94

2.2    Alternative Crossing Techniques Conclusion .................. 97

3.0    Conclusion ........................................................................... 98

**SECTION D – STAFF'S CONCLUSIONS AND RECOMMENDATIONS** ............ **99**

**SECTION E – REFERENCES** .................................................. **103**

**SECTION F – LIST OF PREPARERS** ...................................... **105**

## LIST OF TABLES

| TABLE | PAGE NUMBER |
|---|---|

Table 1  Issues Identified From Agency and Public Comments ......................... 6

Table 2  Estimated Number of Crews and Duration by Spread for the Amendment Project ................................................................ 12

Table 3  Crossings Requiring Installation of New Equipment Bridges ............................ 16

Table 4  Foreseeable and Planned Activities within the Amendment Project Area ......... 21

Table 5.  Waterbodies in the Project Area Subject to Section 10 of the Rivers and Harbors Act ................................................................ 40

Table 6  Total Construction Emissions Comparison for All Open-Cut and Trenchless Crossings (tons) ................................................................ 69

ii

## LIST OF FIGURES

**FIGURE**                                                                **PAGE NUMBER**

Figure 1   Predicted 48.6 dBA $L_n$ Contour for the Mitigated Little Stony Creek
           Conventional Boring Site..................................................................... 79
Figure 2   Predicted 48.6 dBA $L_n$ Contour for the Elk River Guided Conventional
           Bore Crossing.......................................................................... 80
Figure 3   Predicted Mitigated 48.6 dBA $L_n$ Contour for the Greenbrier River Direct
           Pipe® Crossing ........................................................................ 81
Figure 4   Predicted 48.6 dBA $L_n$ Contour for the E-012 Railroad Crossing ................. 82
Figure 5   Predicted Mitigated 48.6 dBA $L_n$ Contour for the H-016 Railroad Guided
           Conventional Bore Crossing Site.................................................. 83
Figure 6   Predicted Unmitigated 48.6 dBA $L_n$ Contour for the H-020 Railroad
           Guided Conventional Bore Crossing .......................................... 84
Figure 7   Predicted Unmitigated 48.6 dBA $L_n$ Contour for the Roanoke River
           Microtunnel Crossing................................................................ 86
Figure 8   Predicted Unmitigated 48.6 dBA $L_n$ Contour for the Gauley River
           Microtunnel Crossing................................................................ 87

## APPENDICES

Appendix A:  Proposed Trenchless Crossings
Appendix B:  Project Location Maps
Appendix C:  Construction, Restoration, and Mitigation Plans for the Mountain Valley
             Pipeline Project and Amendment Project
Appendix D:  Estimated Bore Pit Spoil Volumes
Appendix E:  Bore Pit Underlying Geology, Depths, Aquifer Characteristics, Duration,
             and Estimated Groundwater Drawdown
Appendix F:  Current Environmental Justice Community Data

## TECHNICAL ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| AFM | acid forming material |
| AFM Plan | Acid Forming Materials Mitigation Plan |
| Amendment Project | Mountain Valley Pipeline Amendment Project |
| APE | area of potential effects |
| BGEPA | Bald and Golden Eagle Protection Act |
| BIA | Bureau of Indian Affairs |
| CAA | Clean Air Act |
| Certificates | Order Issuing Certificates |
| CFR | Code of Federal Regulations |
| $CH_4$ | methane |
| CO | carbon monoxide |
| $CO_2$ | carbon dioxide |
| $CO_2e$ | carbon dioxide equivalents |
| COE | U.S. Army Corps of Engineers |
| Commission | Federal Energy Regulatory Commission |
| CWA | Clean Water Act |
| dB | decibels |
| dBA | decibels on the A-weighted scale |
| DWWM | Division of Water and Waste Management |
| EA | environmental assessment |
| EPA | U.S. Environmental Protection Agency |
| ESA | Endangered Species Act |
| EI | environmental inspector |
| EEP | Equitrans Expansion Project |
| Equitrans | Equitrans, L.P. |
| EO | Executive Order |
| FERC | Federal Energy Regulatory Commission |
| FEIS | final environmental impact statement |
| FHWA | Federal Highway Administration |
| FWS | U.S. Fish and Wildlife Service |
| GHG | greenhouse gases |
| GPM | gallons per minute |
| HAP | hazardous air pollutants |
| $L_{dn}$ | day-night sound level |
| $L_{eq}$ | equivalent sound level |
| MBTA | Migratory Bird Treaty Act |

| | |
|---|---|
| MP | mileposts |
| Mountain Valley | Mountain Valley Pipeline, LLC |
| N$_2$O | nitrous oxide |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| NGA | National Gas Act |
| NHPA | National Historic Preservation Act |
| NLAA | not likely to adversely affect |
| NOA | Notice of Application and Establishing Intervention Deadline |
| NOS | Scoping Notice |
| NOSS | Notice of Supplemental Scoping |
| NO$_x$ | oxides of nitrogen |
| NRCS | Natural Resources Conservation Service |
| NRHP | National Register of Historic Places |
| NSA | Noise Sensitive Area |
| OEP | Office of Energy Projects |
| Order | Order Issuing Certificates |
| PA | Programmatic Agreement |
| PEM | Palustrine Emergent |
| PFO | Palustrine Forested |
| Plan | *Upland Erosion Control, Revegetation, and Maintenance Plan* |
| PM$_{2.5}$ | particles with an aerodynamic diameter less than or equal to 2.5 microns |
| PM$_{10}$ | particles with an aerodynamic diameter less than or equal to 10 microns |
| Procedures | *Wetlands and Waterbody Construction and Mitigation Procedures* |
| PSS | Palustrine Scrub-shrub |
| RCNM | Roadway Construction Noise Model |
| SO$_2$ | sulfur dioxide |
| SPCC | Spill Prevention, Control, and Countermeasures Plan |
| SHPO | State Historic Preservation Office |
| SSURGO | Soil Survey Geographic Database |
| U.S.C | U.S. Code |
| USGCRP | U.S. Global Change Research Program |
| VDEQ | Virginia Department of Environmental Quality |
| VADHR | Virginia Department of Historic Resources |
| VOC | volatile organic compounds |
| WVDEP | West Virginia Department of Environmental Protection |
| WVDNR | West Virginia Department of Natural Resources |

WVDCH          West Virginia Division of Culture and History

**SECTION A – PROPOSED ACTION**

**1.0     Introduction**

The staff of the Federal Energy Regulatory Commission (Commission or FERC) prepared this environmental assessment (EA) to assess the environmental impacts of the proposed Mountain Valley Pipeline Amendment Project (Amendment Project).  On October 13, 2017, the FERC published an Order Issuing Certificates (Order) to Mountain Valley Pipeline, LLC (Mountain Valley) and Equitrans, L.P. (Equitrans) to construct and operate pipeline, compression and metering facilities, and their related infrastructure as part of the Mountain Valley Pipeline Project and Equitrans Expansion Project (EEP).[1] The authorized Mountain Valley Pipeline Project facilities consist of approximately 304 miles of new natural gas pipeline and multiple aboveground facilities in West Virginia and Virginia.

Mountain Valley was authorized to begin construction of the Mountain Valley Pipeline Project in January 2018.  Since that date, Mountain Valley has installed and backfilled approximately 81 percent of the pipeline, and more than 52 percent of the Project right-of-way has been fully restored.  Due to permitting challenges, Mountain Valley has not been able to complete construction.  Mountain Valley has subsequently engaged in a comprehensive analysis of each remaining aquatic feature proposed to be crossed.[2]

On February 19, 2021, Mountain Valley, pursuant to section 7(c) of the Natural Gas Act (NGA), in FERC Docket No. CP21-57-000, filed an application seeking to amend the Certificate of Public Convenience and Necessity (Certificate) granted in Docket No. CP16-10-000 for its Mountain Valley Pipeline Project.  Mountain Valley proposes to change the crossing method of specific waterbodies and wetlands from open-cut dry crossings (as authorized by the Certificate) to trenchless methods (conventional bore, guided conventional bore, or Direct Pipe®[3])  Specifically, Mountain Valley proposes to use trenchless methods at 120 locations to cross 183 waterbodies and wetlands that the Commission originally authorized as open-cut dry crossings.  Five

---

1       The Amendment Project would not impact Equitrans or EEP facilities; therefore, Equitrans and EEP are not discussed further.

2       Approximately 460 streams and 183 wetlands remain to be crossed.

3       Direct Pipe® is a construction method developed by Herrenknecht AG that combines microtunneling and horizontal direction drill (HDD).

waterbodies in the Project area would be subject to Section 10 of the Rivers and Harbors Act. These waterbodies are discussed further in section B.2.3.1 of this EA.

On February 19, 2021, Mountain Valley also voluntarily requested the U.S. Army Corps of Engineers (COE) administratively revoke its September 25, 2020 Nationwide Permit 12 verifications for the Mountain Valley Pipeline Project. The COE granted Mountain Valley's request and revoked the Nationwide Permit 12 verifications for the Mountain Valley Pipeline Project on March 2, 2021 (Pittsburgh and Huntington Districts) and March 3, 2021 (Norfolk District). On March 4, 2021, Mountain Valley submitted a Department of the Army application to the COE Huntington, Pittsburgh, and Norfolk Districts requesting an Individual Permit, pursuant to Section 404 of the Clean Water Act (CWA) and Section 10 of the Rivers and Harbors Act, to complete the remaining crossings that Mountain Valley would complete via the open-cut method (i.e., the remaining crossings not covered by the amendment application). This method is consistent with the Certificate.[4] In the Individual Permit application, Mountain Valley proposes to permanently discharge dredged and/or fill material into 1,198 linear feet of streams and 0.5 acre of wetlands, to temporarily discharge dredged and/or fill material into 38,332 linear feet of streams and 13.92 acres of wetlands, including the permanent conversion of 3.7 acres of palustrine forested (PFO) and palustrine scrub-shrub (PSS) wetlands to palustrine emergent (PEM) wetlands, and to work in navigable waters of the U.S.

We[5] prepared this EA in compliance with the requirements of the National Environmental Policy Act (NEPA), the Council on Environmental Quality's (CEQ) regulations for implementing NEPA (Title 40 Code of Federal Regulations (CFR), Parts 1500-1508 [40 CFR 1500-1508])[6], and the Commission's regulations for implementing NEPA at 18 CFR 380.

The FERC is the lead federal agency for authorizing interstate natural gas transmission facilities under the NGA, and the lead federal agency for preparation of this EA, in accordance with NEPA (40 CFR 1501) and the Energy Policy Act of 2005. The COE is a federal cooperating agency who assisted us in preparing this EA because they

---

4    The Individual Permit would include all Section 10 streams including those that would be crossed via a trenchless method (see section B.2.3.1).

5    "We," "us," and "our" refer to the environmental staff of the FERC's Office of Energy Projects.

6    On July 16, 2020, the Council on Environmental Quality issued a final rule, Update to the Regulations Implementing the Procedural Provisions of the NEPA (Final Rule, 85 Fed. Reg. 43,304), which was effective as of September 14, 2020. Therefore, we are using the new regulations in the preparation of this EA.

have jurisdiction by law or special expertise with respect to impacts to waters of the U.S. The COE may adopt this EA per 40 CFR 1501.8 if, after an independent review of the document, it concludes that their requirements and/or regulatory responsibilities have been satisfied. However, the COE would present its own conclusions and recommendations in its respective and applicable records of decision or determinations. Otherwise, it may elect to conduct its own supplemental environmental analyses.

The assessment of environmental impacts is an integral part of the Commission's decision-making process to determine whether to authorize Mountain Valley's proposal. Our principal purposes in preparing this EA are to:

- identify and assess potential impacts on the natural and human environment that could result from implementation of the proposed action;

- identify and recommend reasonable alternatives and specific mitigation measures, as necessary, to avoid or minimize project-related environmental impacts; and

- facilitate public involvement in the environmental review process.

The trenchless crossing methods, a small route adjustment at milepost (MP) 230.8 and alignment shift at MP 0.7, and a requested modification to allow nighttime noise activities at certain crossings were not considered in the June 23, 2017 final environmental impact statement (FEIS) issued in FERC Docket No. CP16-10-000. In the FEIS, staff assessed the impacts that would result from open-cut dry crossings of the 183 waterbodies and wetlands considered here. The FEIS concluded that no long-term or significant impacts on surface waters were anticipated and that impacts on wetlands would not be significant.

## 2.0    Purpose and Need

On October 13, 2017, the Commission issued a Certificate to Mountain Valley to construct and operate pipeline, compression and metering facilities, and their related infrastructure as part of the Mountain Valley Pipeline Project. In its amendment application, Mountain Valley states it has re-evaluated the approved Mountain Valley Pipeline Project facilities and construction methods and now proposes certain modifications (which are more specifically described below) to facilitate completion of the Mountain Valley Pipeline Project.

This EA supplements the Commission staff's June 23, 2017 FEIS for the Mountain Valley Pipeline Project. As previously mentioned, the purpose of the proposed amendment is to allow Mountain Valley to change the crossing method for specific wetlands and waterbodies that remain to be crossed from open-cut dry crossings that

were authorized by the Certificate to trenchless crossing methods.  In addition, Mountain Valley would complete a route adjustment and a minor alignment shift to avoid specific wetlands and waterbodies.  Lastly, the Amendment Project's purpose includes the ability to complete nighttime construction at certain previously approved and newly proposed trenchless crossings.

Mountain Valley states that the reason for the change in crossing method, the alignment shift, and the route adjustment is to avoid certain waters of the U.S.  As further explained below, Mountain Valley states that it conducted a detailed review of the waterbodies and wetlands that remain to be crossed on the Mountain Valley Pipeline Project route to determine whether the features could feasibly be crossed using a trenchless method or would be more practicable to use the previously authorized open-cut dry crossing method.  Open-cut dry crossings of the waterbodies and wetlands were authorized by the Certificate and do not require additional Commission authorization.  As mentioned above, Mountain Valley has separately submitted a joint Department of the Army Individual Permit application package to the COE Huntington, Pittsburgh, and Norfolk Districts requesting authorization to cross these open-cut crossings under Section 404 of the CWA and Section 10 of the Rivers and Harbors Act (as applicable).

Under section 7(c) of the NGA, the Commission determines whether interstate natural gas transportation facilities are in the public convenience and necessity and, if so, grants a Certificate to construct and operate them.  The Commission bases its decisions on both economic issues, including need, and environmental impacts.

### 3.0    Public Review and Comment

Commission Staff issued four notices soliciting public comment during the NEPA process for the Amendment Project.  On March 1, 2021, the Commission issued a *Notice of Application and Establishing Intervention Deadline* (NOA).  The NOA established a 21-day comment and intervention period and requested comments on specific concerns about the Amendment Project or issues that should be considered during the preparation of the EA.  The comment period ended on March 22, 2021.

On March 16, 2021, the Commission issued a *Notice of Scoping Period and Requesting Comments on Environmental Issues for the Proposed Amendment to the Certificate of Public Convenience and Necessity for the Mountain Valley Pipeline Project* (NOS).  The NOS established a 30-day comment period to assist with the identification of the scope of issues to address in the EA.  The scoping comment period ended on April 15, 2021.

On July 1, 2021, the Commission issued a *Notice of Supplemental Scoping Period for the Proposed Amendment to the Certificate of Public Convenience and Necessity for the Mountain Valley Pipeline Project and Request for Comments on Environmental Issues* (NOSS). The NOSS established a second 30-day scoping period. The supplemental scoping comment period ended on August 2, 2021.

On August 13, 2021, we issued a *Notice of Availability of the Environmental Assessment for the Proposed Mountain Valley Pipeline Amendment Project* that established a 30-day comment period on the EA. The EA comment period will end on September 13, 2021.

In response to the NOA, NOS, and NOSS, the Commission received approximately 398 discrete comments from individuals, environmental non-profit groups, and an industry group. We also received 1,092 form letters from individuals. Several commenters request the original scoping comment period be extended. We have reviewed all comment letters submitted prior to issuance of this EA, regardless of whether comments were received during or after the comment periods identified in the notices.

The pertinent[7] comments received in response to the NOA, NOS, and NOSS are summarized in table 1 below and are further addressed, as applicable, in the relevant sections of this EA. However, other comments received that are outside the scope of our NEPA analysis are not addressed further in this EA because they are not specific to environmental resources that may be affected by the actions requested in Mountain Valley's amendment application. Such topics may be addressed, as appropriate, in the subsequent Commission Order in this proceeding. These comments:

- address the need for the Mountain Valley Pipeline Project and associated amendments and express opposition to fossil fuels in favor of renewable energy;

- request that a Supplemental Environmental Impact Statement be prepared for the Amendment Project;

- request a performance bond for completion of the Project or restoration if the Project is canceled or abandoned;

---

7    As stated previously, the purposes for preparing this EA are to identify and assess potential impacts on the natural and human environment and identify and recommend reasonable alternatives and specific mitigation measures, as necessary, to avoid or minimize project-related environmental impacts. Comments that inform this analysis are considered pertinent.

- address the potential for community spread of COVID-19 by construction workers;

- request that the Commission not issue a Certificate for the Amendment Project until Mountain Valley obtains all permits necessary for completion of the entire Mountain Valley Pipeline Project, including a permit under Section 404 of the CWA for the COE-jurisdictional activities; and

- determination of whether a Section 401 certification is required for the Amendment Project.

Table 1

**Issues Identified From Agency and Public Comments**

| Issue | EA Section Addressing Issue |
|---|---|
| Air quality, greenhouse gases, climate change (including fugitive emissions) | section B.6 Air Quality and Noise |
| Aquatic resources (including sedimentation impacts) | section B.3.1 Fisheries and Aquatic Resources |
| Cultural resources (including adherence to Section 106 of the National Historic Preservation Act [NHPA]) | section B.5 Cultural Resources |
| Geology (including karst; trenchless crossing constructability; blasting; steep terrain; and acid-producing rock) | section B.1 Geologic Hazards and Soils |
| Environmental Justice | section B.4.1 Environmental Justice |
| Noise | section B.6.2 Noise |
| Safety | section B.7 Reliability and Safety |
| Soils (including spoil storage, sedimentation, and constructability) | section B.1 Geologic Hazards and Soils |
| Surface water, groundwater, and wetlands (including water quality, sedimentation, subsidence, dewatering, and riparian buffers) | section B.2 Water Resources |
| Vegetation and wildlife (including riparian impacts) | section B.3 Fisheries, Vegetation, and Wildlife |
| Threatened and endangered species | section B.3.5 Special Status Species |

### 4.0    Proposed Facilities and Land Requirements

Mountain Valley proposes to conduct 120 trenchless crossings (117 conventional bores, 2 guided conventional bores, and 1 Direct Pipe®) of 47 wetlands and 136 streams in Wetzel, Lewis, Webster, Nicholas, Greenbrier, Summers, and Monroe counties, West Virginia and Giles, Montgomery, Roanoke, Franklin, and Pittsylvania, counties, Virginia. Appendix A of this EA provides a list of each of these crossings.  Appendix B includes maps of each of the crossings.  The change in crossing methods would not result in a change of land requirements as authorized by the October 13, 2017 Certificate.  However, Mountain Valley proposes to avoid one wetland, W-A2a, via a shift in the permanent operational right-of-way at MP 0.70, which would modify 0.23 acre that was certificated as temporary construction workspace to permanent workspace.  This is a minor shift that would occur entirely within the previously approved construction workspace and would move the pipeline closer to an existing meter station adjacent to the construction right-of-way.  The total amount of permanent certificated workspace at MP 0.70 would not change.  Mountain Valley also proposes to adjust the originally certificated pipeline centerline to avoid one waterbody (S-OO11) at MP 230.8.  This route adjustment, which also includes the H-016 railroad crossing, would require 0.13 acre for construction right-of-way and 0.04 acre of new permanent operational right-of-way.  The route adjustment at MP 230.8 would not affect new landowners and Mountain Valley has acquired the necessary land rights.

### 4.1    24-Hour Construction

As part of its amendment application, Mountain Valley requests that the Commission allow nighttime microtunneling activities at the Gauley River and Roanoke River crossings.[8]  Commission staff previously authorized Mountain Valley to change the crossing method for the Gauley and Roanoke Rivers to a microtunneling technique under variances D-35 and H-21, respectively.[9]  Additional information regarding these streams can be found in sections B.2.3.1 and B.2.4 of this EA.

Mountain Valley also proposes to conduct 24-hour trenchless crossing activities at both guided conventional bore crossings (Elk River and Little Stony Creek crossings), the Direct Pipe® crossing (Greenbrier River), and three conventional bore locations which also include railroad crossings (E-012, H-016, and H-020).  Mountain Valley states that nighttime trenchless activities would be necessary at these locations in order to reduce the

---

8    See Mountain Valley's April 27, 2021 Response to Environmental Information Request #3 at 7.

9    See accession numbers 20200518-3008 and 20200527-3040.

length of time that the pit excavations would remain open.  Crossings E-012, H-016[10], and H-020 would cross railroads operated by CSX, Roanoke Valley Resource Authority, and Norfolk Southern, respectively.  The owners of these railroads require boring operations to progress on a 24-hour basis, without stopping, until complete.  Nighttime activities would only include boring and welding of the pipe.  Pit excavations at all of these crossings would not occur at night.

### 5.0     Trenchless Crossing Construction Procedures

In contrast to open-cut dry trenching, the use of a trenchless crossing method to cross an environmental resource such as a waterbody or wetland avoids direct impacts associated with working directly within the sensitive resource.  Trenchless crossing methods allow for uninterrupted existing streamflow and undisturbed wetland soils, scrub-shrub, and herbaceous vegetation, thereby minimizing impacts on aquatic resources and wetland and wildlife habitat.  Additionally, the proposed trenchless crossings would result in reduced in-stream sedimentation as compared to the in-water construction approved for the Mountain Valley Pipeline Project.  This reduction results from less disturbance of the riparian areas adjacent to the waterbodies and avoidance of impacts on the streambed.  Lastly, trenchless crossings would avoid the ground disturbance associated with trenching and backfilling in the subject wetlands and reduce longer-term impacts by accelerating the post-construction revegetation period.

Mountain Valley provided plan and profile views of topographic conditions at each of the planned crossings relative to borehole and bore pit depths below the resource, which provides information concerning bank conditions, the depth of the pipe, and the positioning of the bore pits.[11]  Provided below is a summary of the techniques proposed.

### 5.1     Conventional Bore

As previously stated, the conventional bore method would be used for the majority (about 98 percent) of the trenchless crossings.  The conventional bore method is a technology that has been used for decades to install natural gas pipelines.  Mountain

---

10     According to Mountain Valley, the railroad at H-016 is owned by Roanoke Valley Resource Authority and operated under contract with Norfolk Southern.  This railroad provides rail service to the Smith Gap Landfill.  Mountain Valley's current permit requires a bored crossing and 24-hour boring operations.  Roanoke Valley Resource Authority is currently paving over the railroad tracks.  As of July 29, 2021 a base layer of asphalt has been installed.  Mountain Valley is currently working with the Roanoke Valley Resource Authority to modify its permit to eliminate 24-hour boring.

11     See Appendix C of accession number 20210219-5176.

Valley has already successfully completed 52 conventional bores without incident.  The conventional bore method requires excavation of launching and receiving bore pits located within upland areas of the existing construction right-of-way on each side of the feature(s) being crossed.  We received multiple comments concerning bore pit collapse and maintaining the integrity of the bore pits during construction activities.  The bore pit excavations would be sloped, shored, or shielded to comply with all local, state, and federal safety regulations, including the Occupational Safety and Health Administration (OSHA) regulations for excavations, which would minimize the possibility of collapse or a lack of integrity.  According to Mountain Valley, relatively narrow excavations may use trench boxes while larger excavations may require specially designed shoring systems such as sheet pile walls, soldier pile walls, or secant pile walls.  An excavation competent person, as defined by the OSHA, would determine if excavations within stable rock require supports.  A registered professional engineer would design shoring for excavations greater than 20 feet deep.

Once the bore pits are excavated, the construction crew, working from the launching side, would advance a jacking pipe and a rotating cutting head that is attached to the leading edge of the auger string.  The spoil would be transported back by the rotation of auger flights within the steel jacking pipe.  The conventional bore method is non-steerable.

Conventional boring can be used to install pipes ranging from 4 to 60 inches in diameter and spanning lengths of up to several hundred feet.  The major advantage of conventional auger borings over other boring technologies is that the drill pipe is installed as the boring is advanced and the line pipe is installed immediately behind the bore pipe once the boring is completed, leaving no unsupported borehole.  Because the borehole is continuously supported by pipe throughout the process, the risk of bore collapse is minimized.  Accordingly, the circulation of drilling fluids to transport drill cuttings and to support the wall of the borehole is generally not necessary for the drilling of conventional bores.  However, in some situations, especially in long conventional bores or in conventional bores through mixed ground or clay, Mountain Valley may use small amounts of bentonite or polymer-based lubricant on the cutting head and exterior casing to reduce friction and to increase the success of the crossing.  If the conventional auger bore encounters excessively hard rock, an air-driven rock hammer drill can be deployed at the bore face, as needed.  Boulders and cobbles up to one third of the diameter of the installed pipe can be accommodated.

Conventional auger boring typically requires the least amount of areal footprint (workspace) of mechanical trenchless technologies because large tanks and drilling fluid-mixing systems are not required.  Cuttings (spoil) generated by boring operations would

be stockpiled temporarily at the site but would ultimately be reused to backfill the bore pits. Prior to boring operations, wetlands and waterbodies adjacent to each work site would be protected using the erosion and sediment control devices and best management practices appropriate to the specific site (as discussed in section B.2 of this EA).

We received multiple comments regarding the potential for deflection of the bore intersecting the bottom of the resource (i.e., streambed). A bore deflection that would breach the stream bottom is very unlikely to occur, for the following reasons. Mountain Valley indicates that in order to breach the streambed an average bore length (less than 95 feet) would either have to be misaligned at least 10 percent at initial set up or deflect at least 10 percent due to encountering a large rock, cobble, or interface between two rock types. Bore operators thoroughly check the line and grade prior to beginning bore operations so as to prevent a misalignment.

A deflection of at least 10 percent would measurably increase bore machine resistance which would be detectable by the bore operator. A deflection of this magnitude would also likely damage the auger and halt any forward progress. Bore operators can also detect increased resistance in the bore machine due to deflections smaller than 10 percent for longer than average bores (greater than 95 feet). Additionally, bore operators can change the cutting heads during the bore process in order to select the appropriate cutting head for the expected substrate. Potential impacts on streambeds are further discussed in section B.2.2 of this EA.

We also received comments concerning protection of the external coating of the pipe from damage during installation via a trenchless crossing method. Mountain Valley states that pipe utilized at the trenchless crossings would have an abrasion resistant overlay (ARO) over the standard fusion bonded epoxy (FBE) coating used on all pipe. Most locations would use a mill-applied Powercrete ARO coating. ARO coatings are more durable than FBE coating and designed to protect the pipe from abrasions and gouging. Mountain Valley states that ARO coatings are commonly used in trenchless crossings.

Crews would coat welds with a field-applied Powercrete coating for crossings that would require more than a standard joint of pipe, generally more than about 40 feet long. According to Mountain Valley, the field-applied Powercrete coating is designed for field application and would provide the same protection as a mill-coated ARO. Mountain Valley would check the pipe and weld coatings for pinhole defects immediately prior to installation.

Bore pit dewatering would be required to provide for a dry workspace at all trenchless crossing locations. Dewatering would be conducted in accordance with all existing plans and procedures reviewed and approved for the Mountain Valley Pipeline Project. Mountain Valley would utilize 3-inch to 6-inch diameter submersible pumps in each of the bore pits. These pumps have the ability to control groundwater infiltration rates up to 2,750 gallons per minute, although anticipated infiltration rates are substantially less (see section B.2.1 of this EA for more discussion). In some instances, pumping may require 24-hour operation to keep up with water infiltration and ensure personnel are able to enter the bore pits safely and efficiently when beginning bore activities each day. Mountain Valley provided a qualitative estimate of dewatering conditions encountered at 54 previously completed trenchless crossing locations. Dewatering was not previously necessary at 19 of the 54 locations, while minimal dewatering was necessary at 13 locations. The remaining 22 locations required continuous dewatering with 2 locations reporting extensive dewatering. Any dewatering associated with the Amendment Project would be completed in accordance with the FERC's *Wetlands and Waterbody Construction and Mitigation Procedures* (Procedures), as well as West Virginia Department of Environmental Protection (WVDEP) and Virginia Department of Environmental Quality (VADEQ) specifications. Additional information regarding dewatering can be found in section B.2.1 of this EA.

Based on Mountain Valley's estimates, the average length of time required for a conventional bore (including pit excavation and boring) would be just over 2.5 weeks (18 days), with a median duration of slightly less (13 days). More than half (about 60 percent) of the conventional bores would be completed within 2 weeks. About 26 percent would be completed within 4 weeks, 7 percent would be completed within 4 to 6 weeks, and 7 percent would be completed within 5 to 10 weeks. One conventional bore may require 72 days (10.3 weeks) to complete. Mountain Valley's duration estimates are based primarily on the length of the bore. The actual duration could increase to some extent by weather delays or slow boring rates due to unexpectedly hard rock or changing geological makeup that may necessitate equipment change-outs. Mountain Valley estimates 41 crews would be working on the nine construction spreads[12] to complete all of trenchless crossings in about 4 months. Concurrent work within each spread would occur between 3 (Spreads A and B) and 13 (Spread I) locations (see table 2).

---

[12]    Construction of the Mountain Valley Pipeline Project is split into nine construction spreads ranging in length from 26.6 miles to 49.2 miles.

Table 2

**Estimated Number of Crews and Duration by Spread for the Amendment Project**

| Spread | Total Miles | Bore Crews | Duration (months) |
|--------|-------------|------------|-------------------|
| A & B | 65.4 | 3 | 4 |
| C & D | 62.8 | 7 | 4 |
| E & F | 66.9 | 4 | 4 |
| G | 32.3 | 8 | 4 |
| H | 26.6 | 6 | 4 |
| I | 49.2 | 13 | 4 |
| **Total** | **303.1** | **41** | **4** |

## 5.2    Guided Conventional Bore

The guided conventional bore method is a variation of the conventional bore method as discussed in section A.5.1 of this EA.  Following preparation of the bore pits (as discussed in section A.5.1 of this EA), a small diameter "guided pilot" would be installed first.  The drill string is attached to the front of the conventional auger during the final hole opening phase.  Placing the pilot in front of the auger keeps the path of the auger on its intended trajectory during the hole opening phase.

The pilot hole can be created using a small diameter self-propelled, hydraulic steerable drill unit with a tri-cone cutting head.  The tri-cone head is about 6 to 12 inches in diameter and is guided using a bottom-hole assembly.  The bottom-hole assembly includes an electronic communication device (sonde) which provides location and orientation information to the operator.

The guided conventional bore method may require the use of bentonite drilling fluid to bring drill cuttings back to the surface and to help stabilize the bore hole.  Shorter guided conventional bores can use only water to carry cuttings back and cool the cutting head.  Extremely hard rock may require an air hammer to create the pilot hole.  An air hammer uses air to remove cuttings.  Where bentonite drilling fluids are used, fluids are pressurized at levels that are much lower than those used for horizontal directional drills (HDD).  However, because the depth of the drill profile below the ground surface is less than what is typical for an HDD, the down-hole pressure would be monitored at the drill rig when drilling fluid or water are used to carry back cuttings and the surface is visually inspected for inadvertent returns.

Following completion of the pilot hole across the length of the crossing, the drill string remains in place and the conventional auger machine completes the bore to the required diameter attaching to the drill stem to keep the auger in line. The risk of bore hole collapse is minimized as the drill string remains in place. The stems are then removed on the exit side as the auger advances from the launching side.

We received multiple comments concerning the storage and use of drilling fluids and the possibility of contamination in resources. Drilling fluids would be stored in tanks on the right-of-way. Secondary containment (such as soil berms, straw bales with liners, or prefabricated liners) would be installed around the drilling fluid tanks. Mountain Valley would utilize vacuums and pumps to remove all fluids from the bore pit. All drilling fluids would be disposed of at an approved local waste management facility.

Guided conventional bores typically require 24-hour operation to avoid potential collapse of the bore or freezing up of the pipe within the bore. To reduce potential impacts from 24-hour operation, Mountain Valley would perform as much work as possible during daylight hours, including preparation of the workspace, excavation of bore pits, and moving heavy equipment to the crossing locations.

The two guided conventional bores would require 33 to 79 days to complete. As stated above, the actual duration could increase to some extent by weather delays or slow boring rates due to unexpectedly hard rock or changing geological makeup that may necessitate equipment change-outs.

### 5.3    Direct Pipe®

Direct Pipe® is a trenchless construction method that can be used to install pipelines underneath rivers or roads without surface impacts. It is a combination of a micro-tunneling process, described below, and HDD. Direct Pipe® crossings are completed using an articulated, steerable micro-tunnel boring machine (MTBM) mounted on the leading end of the pipe or casing. A bentonite slurry is used to increase lubrication and advance the MTBM. The pipeline is pre-fabricated and welded in sections to the back of subsequent sections as the MTBM advances. Because the product pipe is attached to and advances with the MTBM, like microtunneling, it benefits from a continuously supported hole during the drilling process, and allows for the product pipe to be installed in varying formations such as boulders and rock. Additionally, the bentonite lubrication system used to lubricate the annulus between the product pipe and the excavation is introduced at a relatively low pressure, reducing the potential for hydraulic fracture and inadvertent drilling fluid returns. Because the drilled hole is continuously supported and the risk of hydraulic fracture is low, the Direct Pipe®

alignment can be designed much shallower than is typical for an HDD.  During drilling, Mountain Valley will implement its approved contingency plan for inadvertent returns which includes downhole pressure monitoring.  Installation of a Direct Pipe® typically requires 24-hour operation to avoid freezing up of the pipe within the bore.  To reduce potential impacts from 24-hour operation, Mountain Valley would perform as much work as possible during daylight hours, including the preparation of the workspace, the excavation of bore pits, and moving heavy equipment to the crossing locations.

As with the guided conventional bore, drilling fluids would be stored in tanks on the right-of-way.  Secondary containment (such as soil berms, straw bales with liners, or prefabricated liners) would be installed around the drilling fluid tanks.  Mountain Valley would utilize vacuums and pumps to remove fluids from the bore pit.  All drilling fluids would be disposed of at an approved local waste management facility.

The Direct Pipe® crossing of the Greenbrier River is estimated to require about 103 days total for pit excavation and boring.  As stated above, the actual duration could increase to some extent by weather delays or slow boring rates due to unexpectedly hard rock or changing geological makeup that may necessitate equipment change-outs.

### 5.4    Microtunneling

No crossings utilizing microtunneling are proposed for the Amendment Project. Mountain Valley would utilize microtunneling to cross the Gauley River and the Roanoke River as previously approved under variances D-35 and H-21, respectively.

In a microtunnel crossing, a pipe is jacked behind a remotely controlled, steerable, guided, and articulated MTBM.  Microtunneling can be used in many soil types, including boulders and rock.  Boulders and cobbles up to one third of the diameter of the installed pipe can be accommodated.  The microtunnel technique can range from 10 to 136 inches in diameter and span 200 feet to 1,500 feet.  This technique is often used in longer trenchless crossings because the advanced control and guidance system allows for precise line and grade tolerances.  This technique requires only one bore pass and the bore hole is continuously supported minimizing the chance of a collapse.  A small amount of bentonite drilling fluid is used to cool and lubricate the cutting head.  A dedicated drilling fluid return pipe carries cuttings through the installed line pipe at a low pressure.  The closed drilling fluid return system and pressure-control features at the cutting head minimize inadvertent returns.  In addition, during drilling, Mountain Valley will implement its approved contingency plan for inadvertent returns which includes downhole pressure monitoring.  Microtunneling typically requires 24-hour operation to

avoid any potential for collapse above the bore or freezing up of the pipe within the bore hole.[13]

### 5.5    Trenchless Crossing Contingency Plans

Mountain Valley states that it would implement a contingency plan should insurmountable issues be encountered while using trenchless crossing methods, including excessive torqueing, poor cutting returns, mechanical failure of the drill string or bit assembly, deviation from the planned bore path, and unanticipated geological or hydrological conditions.  Should Mountain Valley encounter one or more of these issues, it would notify the appropriate FERC compliance monitor and attempt another bore 10 feet to either side of the original bore path within the existing right-of-way.  Should the failure involve a stuck pipe and a standard recovery fails, the pipeline in this area would be abandoned in place and backfilled with grout.  Should all attempts at the trenchless crossing fail, Mountain Valley would seek necessary variances or approvals from FERC and any applicable agency including the COE, to revise the crossing method.

### 5.6    Trenchless Crossing Schedule

Mountain Valley would begin trenchless crossings upon receipt of all necessary federal approvals and authorizations and a notice to proceed from the Commission. Mountain Valley estimates 41 crews would be working on the nine spreads to complete all of the trenchless crossings in about 4 months.

### 6.0    Equipment Bridges

Mountain Valley states that 19 crossings still require the installation of equipment bridges to allow for the passage of equipment across the sensitive resource.  Mountain Valley anticipates that the equipment bridges, listed in table 3, would be installed at the 19 crossings.  These actions would be conducted in accordance with Mountain Valley's Procedures and any applicable agency approvals.  Impacts associated with the installation and removal of equipment bridges, including those listed in table 3, were analyzed in the FEIS.

---

13    The shallow depth profile could lead to ground settlement due to over-excavation by the MTBM leading to the loss of stability at the tunnel face and the formation of empty space above the tunnel.

Table 3

**Crossings Requiring Installation of New Equipment Bridges**

| Crossing Number | Waterbody or Wetland Features to be Bridged | Anticipated Equipment Bridge Type |
|---|---|---|
| E-009 | W-M18 | Timber mat |
| F-022 | S-19 | Clear span bridge |
| G-009 | S-G35 | Bridge |
| G-010 | S-SS4 | Bridge |
| G-017 | S-Y3 | Bridge |
| G-19B | S-E25-downstream and upstream | Bridge |
| H-030 | S-IJ82 | Bridge |
| H-031 | S-IJ83, S-IJ88, S-IJ84 | Bridge |
| H-032 | S-IJ89, S-IJ90 | Bridge |
| H-040 | S-ST9b | Bridge |
| H-042 | S-KL55 | Bridge |
| H-043 | S-IJ12 | Bridge |
| H-044 | S-EF44 | Bridge |
| H-045 | S-IJ43 | Bridge |
| H-046 | S-Y9, S-Y7, S-Y8 | Bridge |
| H-047A | S-B22, S-B23 | Bridge |
| H-048A | S-B25 | Bridge |
| H-054 | S-D11 | Bridge |
| I-121 | S-EF26 | Mat bridge[a] |
| a | As stated in the joint Department of the Army Individual Permit application, the mat bridge would have a temporary discharge of 20 linear feet (0.0092 acres) due to supports located within the ordinary high water mark.  A timber mat is used in wetlands to avoid compaction. | |

## 7.0   Environmental Compliance Inspection and Monitoring

We received multiple comments on environmental compliance and issues surrounding erosion and sediment control during construction activities associated with the Mountain Valley Pipeline Project.  Mountain Valley personnel and its contractors would be required to comply with any conditions of a FERC Order and the existing Mountain Valley Pipeline Project certificate, all mitigation measures identified in its application, and any other federal permits and authorizations.  At least one environmental inspector (EI) per spread would be responsible for Mountain Valley's environmental

compliance. The EIs performing environmental oversight would serve to monitor the implementation of all environmental requirements during construction. The EIs would have the authority to enforce compliance with permit conditions, the environmental conditions of a FERC Order, and environmental requirements in landowner agreements. The FERC third-party compliance monitoring program would also continue to be implemented.[14] Under this program, a contractor is selected by, managed by, and reports solely to the FERC staff to provide environmental compliance monitoring services. The FERC Compliance Monitors would provide daily reports to the FERC Project Manager on compliance issues and make recommendations on how to deal with compliance issues and construction changes, should they arise.

Mountain Valley would construct the Amendment Project in accordance with the methods described in the Mountain Valley Pipeline Project FEIS, including implementing its *Erosion and Sediment Control Plan*, our *Upland Erosion Control, Revegetation, and Maintenance Plan (*Plan) and its Procedures, its *Spill Prevention, Control, and Countermeasures Plan (*SPCC*)*, its *General Blasting Plan*, and its *Acid Forming Materials Mitigation Plan* (AFM Plan). Other resource-specific plans have been developed for the larger Mountain Valley Pipeline Project (see appendix C) and would be implemented as needed for the Amendment Project.

### 8.0 Permit Approvals and Regulatory Consultations

As discussed above, on March 4, 2021, Mountain Valley submitted a joint Department of the Army Individual Permit application package to the COE Huntington, Pittsburgh, and Norfolk Districts to complete the remaining open-cut crossings and to permanently discharge dredged and/or fill material into 1,198 linear feet of streams and 0.5 acre of wetlands, to temporarily discharge dredged and/or fill material into 38,332 linear feet of streams and 13.92 acres of wetlands, including the permanent conversion of 3.7 acres of PFO and PSS wetlands to PEM wetlands, and to work in navigable waters of the U.S.

We received many comments regarding the information contained within Mountain Valley's application to the COE for an Individual Permit. Review of the application for an Individual Permit and consideration of associated comments will be conducted by the COE and does not fall under the jurisdiction of the Commission. As mentioned above, the FERC has already analyzed and approved the open-cut dry

---

14    Under the current third-party compliance monitoring program for the Mountain Valley Pipeline Project, nine compliance monitors (one for each construction spread) typically inspect portions of the Project six days a week.

crossings for the waterbodies and wetlands contained within the requested COE Individual Permit.

Mountain Valley would be required to continue compliance with all authorizations issued for the original Mountain Valley Pipeline Project under Section 7 of Endangered Species Act (ESA), Section 106 of the NHPA, and the pending FERC certificate, if the amendment application is approved. Additional information regarding Section 7 of the ESA can be found in section B.3 of this EA, and information regarding Section 106 of the NHPA can be found in section B.5 of this EA.

**SECTION B – ENVIRONMENTAL ANALYSIS**

We incorporate by reference the environmental analyses contained in the FEIS in Docket No. CP16-10-000.  The Amendment Project would continue to be designed, operated, and maintained in accordance with the U.S. Department of Transportation (DOT) pipeline safety regulations, 49 CFR 192 and all applicable permits, as identified in the FEIS.

*Environmental Trends and Planned Activities*

According to the most recent Mountain Valley Pipeline Project weekly construction report from the reporting period of July 24, 2021 to July 30, 2021[15] the construction completeness of the pipeline right-of-way for all spreads is approximately 100 percent for tree felling, 95 percent for vegetation clearing, 95 percent for upland right-of-way-preparation, and 90 to 94 percent for trenching, stringing, welding, and coating and wrapping.  According to the status report, approximately 81 percent of the right-of-way has been backfilled and approximately 52 percent is in the final restoration stage.  Mountain Valley states that at areas of waterbody crossings, trees were cleared but a 50-foot riparian buffer of other vegetation was maintained.  These areas currently consist of tree stumps along with scrub-shrub and herbaceous vegetation.

Previously in the construction process and prior to filing the amendment application, Mountain Valley requested changes in crossing methods from open-cut dry crossings to trenchless techniques for over 70 wetlands and waterbodies.  Commission staff reviewed and approved each of those changes, determining that the change in crossing methods provided an equal or greater protection of resources than the previously proposed open-cut dry crossings.  As a result, Mountain Valley has completed 52 conventional bore crossings of 67 waterbodies and wetlands as part of the Mountain Valley Pipeline Project.  In addition, Mountain Valley completed one Direct Pipe® crossing of two waterbodies and one HDD of four wetlands and waterbodies.  Mountain Valley has completed all of these crossings in the construction workspaces granted by the Certificate for the Mountain Valley Pipeline Project.

As discussed in the FEIS, West Virginia has a humid continental climate while Virginia has a humid coastal climate.  Based on information gathered from the National Centers for Environmental Information during the period 1985 through 2014, average monthly precipitation was about 3.8 inches in West Virginia and 3.7 inches in Virginia. Construction of the Mountain Valley Pipeline Project began during the winter of 2018.

---

15      See accession number 20210811-5021.

By the end of 2018, about 88 percent of the construction right-of-way for the Mountain Valley Pipeline Project had been cleared. The region was subjected to unusually high precipitation totals around this time. For example, Roanoke County, Virginia averages about 42 inches of precipitation annually, but Roanoke County received about 63 inches of rain in 2018. Lewis County in West Virginia also exceeded its annual average precipitation (about 48 inches) during this period by 21 inches. Overall 2019 precipitation was very close to average. However, in 2020, Roanoke County received about 23 inches above average rainfall, while Lewis County received only 8 inches above average rainfall.

Overall, for the period of construction of the Mountain Valley Pipeline Project (February 2018 to June 2021), Roanoke County received about 191 inches of rain, which exceeds the historical average by about 48 inches. Lewis County received 190 inches of rain exceeding its average by almost 31 inches. (NOAA NCEI, 2021)

We received several comments stating that a cumulative impact analysis was needed for the Amendment Project. As mentioned above, the Amendment Project would be constructed within the existing Mountain Valley Pipeline Project construction and permanent right-of-way except for one minor route adjustment that would be constructed adjacent to the current right-of-way. This right-of-way has been the site of active construction and maintenance/restoration since 2018. Current reasonably foreseeable planned actions in the Amendment Project area include logging/tree trimming operations, coal mining activities, the conversion of existing railroad tracks to a roadway, and the installation of a solar farm (see table 4).

Table 4

**Foreseeable and Planned Activities within the Amendment Project Area**

| Spread | Milepost(s) | Entity | Proposed/Current Activity |
|---|---|---|---|
| C | 74.9 – 87.4 | Unknown | Non-Project related logging operations that utilize Project access roads (MVP-BR-103.01, MVP-BR-104, MVP-BR-104.01, MVP-WB-119, and County Road 7). |
| D | 98.6 – 128.2 | Unknown | Non-Project related logging activities across the Spread. |
| D | 127.0 | Quinwood Coal Company | Longwall mining using Project access road AR-161. |
| F | 154.8 | Unknown | Non-project related logging activities near Springdale Dawson Road. |
| F | 155.6 – 156.5 | Local power company | Tree trimming near Project access roads MVP-GR-193 and MVP-GR-194. |
| H | 230.9 | Roanoke Valley Resource Authority | Conversion of existing railroad tracks to a roadway. This activity crosses the Project right-of-way and Project access road MVP-MN-275. |
| I | 292.4 – 294.0 | Dominion Energy | Construction of the 1,200-acre Maplewood Solar Project. The project includes sites adjacent to one or both sides of the Mountain Valley Pipeline Project limits of disturbance. |
| A-I | 0.0-304 | Mountain Valley | Completing construction of the pipeline, including open-cut crossings of streams included in the COE permit application. |

A cumulative impacts analysis was completed for the Mountain Valley Pipeline Project in the FEIS. This analysis concluded that when added to other past, present, and reasonably foreseeable future actions, the Mountain Valley Pipeline Project would not have significant adverse cumulative impacts on environmental resources within the geographic scope affected by the Mountain Valley Pipeline Project. As further discussed under each of the resource sections in this EA, the Amendment Project would largely reduce impacts on a number of environmental resources, including minimizing direct impacts on surface water resources, wetlands, aquatic resources, and riparian habitat. However, the Amendment Project would lead to changes in construction emissions and construction noise (see sections B.6 and B.7 of this EA).

As discussed in the FEIS, concurrent construction, including the proposed Amendment Project, could contribute to noise impacts in the area proximal to the proposed action if noise is generated at the same time as other projects within 0.25 mile of the Mountain Valley Pipeline Project right-of-way. However, the majority of the noise impacts from the Amendment Project and other projects in the area would be limited to

21

the periods of construction, and most of this construction would occur during daytime hours.  As discussed in section B.7 of this EA, there are limited locations where Mountain Valley anticipates 24-hour boring operations.  Mountain Valley conducted noise assessments for each of these sites and determined that mitigation would be required at three locations (F-021, G-013, and H-016).  In addition, as detailed in section B.7 of this EA, we are recommending Mountain Valley notify all landowners within 0.5 mile of nighttime trenchless crossing activities.  As such, the Amendment Project would only temporarily contribute to elevated increases in daytime and nighttime construction noise as compared to the certificated Mountain Valley Pipeline Project.

As further discussed in section B.6 of this EA, the Amendment Project would also lead to an increase in construction emissions compared to the Mountain Valley Pipeline Project.  These emissions may contribute to other emissions occurring within the Amendment Project area if projects are constructed simultaneously.  However, the increased emissions from the Amendment Project would be temporary and would be spaced along the entirety of the Mountain Valley Pipeline Project right-of-way.  As discussed in section B.6 of this EA, the Amendment Project does not require a General Conformity analysis for consistency with the applicable state implementation plans.

Based on the information above, we conclude that the impacts from the Amendment Project on emissions and noise in the vicinity of the Mountain Valley Pipeline Project right-of-way would exceed those analyzed in the FEIS but would not be significant.  As such, the conclusions from the FEIS remain appropriate based on the substance and scale of the Amendment Project and are adopted by reference.

The Amendment Project would not result in any changes to the following resources that were analyzed in the Mountain Valley Pipeline Project FEIS and certificated by the FERC in the Certificate:  mineral resources; hazardous waste sites; wellhead protection areas, sole source aquifers, or public surface water intakes; federally owned or managed lands; National or state wild or scenic rivers, national trails, nature preserves, wilderness areas, registered natural landmarks, or Native American reservations; and socioeconomics.  Therefore, these resources are not addressed further in this analysis.

### 1.0    Geologic Hazards, and Soils

Geologic resources and hazards along the Mountain Valley Pipeline Project's alignment are discussed in section 4.1 of the FEIS.  The bedrock lithology along the proposed trenchless crossings consists of sedimentary or metamorphic bedrock comprised primarily of shales, sandstone, siltstone, limestone and dolomite, granulite,

granitic gneiss, biotite gneiss, charnockite gneiss and actinolite schist. The rock is primarily of the Pennsylvanian, Mississippian, Ordovician, Cambrian, Mesoproterozoic, and Neoproterozoic Periods. The primary geologic groups represented include Dunkard, Monongahela, Conemaugh, Pottsville, Mauch Chunk, Blue Ridge Basement Complex, Lynchburg, and Smith River. Additionally, unconsolidated materials consisting of Holocene-age alluvium are present along streams, as well as residual, weathered bedrock material overlying competent bedrock. Five of the trenchless crossings (G-017, G-023, G-024, H-017, and H-020 – north side bore pit only) would occur in areas that may include karst terrain developed in carbonate bedrock, including Cambrian through Ordovician-age dolomite and limestone. These five crossings would cross eight streams and two wetlands as listed in appendix A. Four of these crossing locations would also be associated with conventional bores for road crossings. Karst terrain is addressed in the following section.

We received several comments regarding the feasibility of using trenchless crossing methods through subsurface material that may contain boulders, mixed face (overburden and bedrock along the drill path), flowing/heaving sand, and artesian groundwater flow. We also received comments regarding the adequacy of the information provided by Mountain Valley, the need for site-specific characterization of the subsurface material at each individual crossing, and depths to bedrock based on U.S. Department of Agriculture Natural Resources Conservation Service (NRCS) Soil Survey Geographic database (SSURGO) data.

Mountain Valley used NRCS SSURGO data to estimate depths to bedrock, which it determined would be encountered at depths greater than 7 feet at 73 percent of the crossings. Depth to bedrock was measured to be approximately 18 to 20 feet below the ground surface for select sites based on previously submitted geotechnical reports.[16] Based on this information, along with information obtained from previously installed pipeline, and given the proximity of the planned bore pits adjacent to the waterbody crossings, Mountain Valley expects that at most of the proposed crossings, the bore pits would be excavated within overburden material consisting of heterogeneous valley fill deposits of poorly graded silt, sand, gravel, cobbles, and boulders.

Based on experience from the trenchless crossings already completed for the certificated Mountain Valley Pipeline Project, Mountain Valley may encounter boulders and mixed-face conditions while conducting the proposed bores and would mitigate their potential impact through the use of appropriate conventional bore tooling and technology. In order to anticipate these conditions and to address them should they occur, Mountain Valley would use available geologic data, site-specific observations during excavation of

---

16    See filings in Docket No. CP16-10 under accession number 20201013-5344.

bore pits, and assessment of drill cuttings from the bores to modify boring tools and techniques, if needed. Mountain Valley states that its contractors have access to a variety of cutter heads to overcome anticipated subsurface conditions, including all-purpose heads, rock-cutting heads, and mixed-ground heads. Mountain Valley may also utilize alternative boring machines to bore through solid rock, such as an air hammer instead of a conventional track auger machine.

Also, based on familiarity with the regional geology from bores and excavations completed to date, and information from the NRCS SSURGO database, Mountain Valley does not anticipate encountering flowing sands or artesian conditions at any of the proposed bore locations.

The proposed trenchless crossings would occur entirely within the previously authorized workspace and would not result in a change in general impacts on or from geologic hazards or to soils compared to the Mountain Valley Pipeline Project. The minor route adjustment proposed at MP 230.8 to avoid waterbody S-OO11 would impact 0.13 acre of new workspace, but would not affect soil types with soil limitations and contaminated soils, acid forming material (AFM), or oil and gas wells were not identified at that location. The proposed alignment shift at MP 0.7 to avoid wetland W-A2a would occur within the same certificated workspace as the Mountain Valley Pipeline Project with no change to soils or geological hazards.

As discussed in section A.5 of this EA, the trenchless crossings would require excavation of bore pits on each side of the resource crossing. Individual bore pits may be excavated to depths as shallow as 3 to 8 feet (at crossing I-103) or as deep as 35 to 49 feet (at crossing C-022), depending on resource attributes and local topography immediately adjacent to the individual bore pit location. In some cases, bore pit excavation could encounter shallow bedrock consisting of potential AFM[17] such as coal seams, and other sulfide-rich materials such as pyrite-bearing shales and sandstone.

In the event that AFM is encountered during excavation of the bore pits, Mountain Valley would implement its AFM Plan. As outlined in the plan, field assessments would be conducted to identify potential AFM. A Mountain Valley EI would be deployed on-site during excavation of the bore pits and any land disturbance to conduct field observations of the bore pit and excavated materials. The EI, as appropriate, would conduct an evaluation of the soil horizon and strata, depths and colors (hue/value/chroma), depth and thickness of partially weathered "saprolite" zone, and would identify whether one or more coal seams are encountered (coal possesses the highest susceptibility for acid

---

17    AFM is discussed in section 4.1 of the FEIS.

forming characteristics in the local and regional geological formations likely to be encountered by bore-pit excavation). Additionally, where deemed necessary by Mountain Valley, the EI would analyze field samples to determine moderate- and high-risk AFM and identify corresponding lime (acid-neutralizing material) application rates. A 30 percent hydrogen peroxide test is well-documented for rapid determination in the field of potentially reactive AFM (i.e., rapidly oxidizes sulfidic materials) via evolution of heat, vigorous frothing, and water vapor. A moderate reaction would be characterized as representing moderate-risk AFM, while highly reactive results would be characterized as high-risk AFM. As appropriate, Mountain Valley would apply agricultural lime to bore pit walls, floor, and spoils at a rate commensurate with either moderate- or high-risk AFM per its AFM Plan.

Once applied, the treated material would be used as normal backfill, with final land reclamation covering the treated material. Return of treated AFM to the bore-pit backfill would be compacted to limit internal permeability. The upper 12 to 18 inches of backfill would be left loosened to support plant growth for post-construction reclamation.

Excess AFM material that cannot be returned to the pit backfill due to construction factors or concerns over net swell, would be bulk-blended with agricultural lime at the applicable moderate-risk or high-risk rate and placed in accordance with Mountain Valley's standard practice for excess spoils, and managed per Mountain Valley's AFM and standard erosion and sediment control measures. In order to contain run-off and leachate, excess AFM would not be placed within an area that may become saturated as per the Project's *Erosion and Sediment Control Plans*. Bulk blending with lime would mitigate acidic leachate generated when exposed to surface elements such as rainfall. Additionally, Mountain Valley would conduct routine post-reclamation site inspections and would evaluate the potential for acidic leachate runoff, typically indicated by orange-discolored soil staining, and would apply spot-blending with agricultural lime as necessary.

Construction of the bore pits and stockpiling of soils could be impacted by the presence of steep slopes. The estimated volume of spoil for each bore pit is provided in appendix D. In areas containing steep slopes, Mountain Valley would relay bore-pit spoils away from the bore site and up or down the right-of-way to a nearby flat section of pipeline right-of-way or additional temporary workspace. In steep terrain, equipment may need to be winched down to and back from the bore pit site to remove spoil material. Where possible, Mountain Valley would temporarily spread spoil along those flatter portions of the limit of disturbance to avoid creating large stockpiles until bore operations are complete and the bore pits can be backfilled.

25

Mountain Valley would protect against slope failure resulting from the weight of spoil stockpiles by placing stockpiles away from slopes and on flatter terrain.  Mountain Valley would implement the Project's *Erosion and Sediment Control Plans* to enhance stockpile stability and protect environmental resources downstream of bore pits and stockpiles.  Protective measures include installation of silt fence or super silt fence and temporary mulching of stockpiles.  Bore pits would be backfilled as soon as practicable upon completion of the bores to avoid having stockpiles exposed to excessive precipitation and erosional forces and to minimize the time over which existing slopes are subjected to additional loading.  Lastly, in the event that bedrock is encountered that cannot be excavated by standard construction practices and blasting becomes necessary, Mountain Valley would conduct any blasting required to establish bore pits according to its *General Blasting Plan* approved in the certificated Mountain Valley Pipeline Project.  During final restoration, Mountain Valley would restore any disturbed upland areas and soils in accordance with the FERC's Plan and its Procedures including backfilling the bore pits with the removed and stored soil.  Based on these measures, we do not anticipate long-term or significant impacts on geological or soil resources as a result of construction or operation of the Amendment Project.

## 2.0    Water Resources

### 2.1    Groundwater

Aquifer conditions along Mountain Valley's pipeline alignment are thoroughly discussed in the FEIS.  Bedrock aquifers predominate in the Amendment Project area with minor surficial alluvial aquifers occurring along streams.  Bedrock aquifers consist of the Appalachian Plateau Regional, Valley and Ridge Regional, and the Blue Ridge and Piedmont Crystalline-Rock aquifer systems.  With the exception of the sandstone aquifers, primary porosity and permeability in these bedrock aquifers are for all practical purposes negligible. Groundwater flow is predominantly through secondary permeability such as bedding planes, bedrock fractures and joints, as well as the potential for conduit flow through karst-developed carbonate bedrock aquifers.

Groundwater flow within the bedrock aquifers occurs within small, localized drainage basins where flow originates in groundwater recharge areas within and along hilltops and hillsides, and discharges to local streams.  Aquifers in the Amendment Project area are typically characterized by small groundwater capture areas.[18]  However, there are exceptions, and wells completed in close proximity to streams may be affected by induced recharge from the stream when the stream is within the radius of influence of

---

18     Three-dimensional volumetric portion of a groundwater-flow field that discharges water to a well.

groundwater pumping (Kozar and Paybins, 2016).  As discussed above in section B.1 of this EA, Mountain Valley expects that based on the NRCS SSURGO data, the bore pits at most of the proposed crossings would be excavated within bedrock overburden and alluvium material consisting of heterogeneous valley fill deposits of poorly graded silt, sand, gravel, cobbles, and boulders, as well as decomposed bedrock regolith.

The proposed Amendment Project conventional bore crossings range between 20 and 405 feet in length.  Mountain Valley prepared feasibility analyses for four conventional bores (C-035, H-017, H-031, I-121) that would exceed 300 feet in length, as well as for the two proposed guided conventional bores and the proposed 1,250-foot-long Direct Pipe® crossing.[19]  The desktop feasibility assessments for the four conventional bores that would exceed 300 feet and the guided conventional bore at Stony Creek (crossing G-013) concluded that the bores were feasible.  Mountain Valley completed test borings and resistivity imaging studies for the proposed guided conventional bore for the Elk River (crossing C-022) and the proposed Direct Pipe® crossing of the Greenbrier River (crossing F-021).  Based on the more detailed evaluations, the Elk River and Greenbrier River crossings also would be feasible and would reduce impacts on the waterbodies with minimal risk.

Mountain Valley also completed feasibility studies for the Gauley River and the Roanoke River (along with an adjacent braid of the Roanoke River), Section 10 streams.  Both would be crossed by microtunneling.  These two crossings have already been approved by the FERC staff through our variance process.

We received comments regarding the bore pit dewatering and boring activities potentially impacting the local groundwater systems and local drinking water wells and springs.  The proposed trenchless crossings could result in a minor, temporary change to the impacts on shallow groundwater compared to the Mountain Valley Pipeline Project as a result of the bore-pit dewatering.  As discussed in section A.5.1 of this EA, Mountain Valley has the capacity to utilize 3-inch to 6-inch diameter submersible pumps in each of the bore pits with the capability to control groundwater infiltration rates up to 2,750 gallons per minute (gpm).  Pumping may be required 24 hours-per-day for several days depending upon site conditions.  However, given the low permeability constraints of the fractured bedrock aquifers and of the overburden material, the depths of the borings and bore pits, and local aquifer boundary conditions (i.e., alluvium valleys in contact with the bedrock over a short lateral distance), much lower pumping rates are expected to maintain dry working conditions in the drill pits.

---

19    See accession numbers 20210219-5176 (Appendix F) and 20210427-5306 (Attachment 1).

Mountain Valley has successfully completed 52 conventional bore crossings of streams in similar terrain for the Mountain Valley Pipeline Project using the drill-pit dewatering methodology.  Mountain Valley provided a qualitative assessment of these crossings and states that many of the bore pits for these trenchless crossings were either dry or required pumping of minimal continuous flow of groundwater into the pits.  In many of these cases, 3-inch diameter pumps with a maximum capacity of 300 gpm were all that was needed to maintain dry working conditions in the drill pit.  Based on Mountain Valley's experience, we expect that many of the bore pits associated with the Amendment Project would not require dewatering except for stormwater and/or seasonally high water-table conditions.

Commenters also stated that drinking water wells may be impacted by boring operations.  Mountain Valley stated that although no known public or private groundwater wells or springs are located within 150 feet of the Amendment Project, private wells could be located within 150 feet of the proposed bore pits at MPs 203.6 (near a residence at crossing G-009) and 270.6 (near a structure at crossing I-040).  As outlined in its *Water Resources Identification and Testing Plan,*[20] Mountain Valley would identify and assess private water supplies within 150 feet, or 500 feet in karst terrain, of the Amendment Project.

Groundwater withdrawal during bore pit dewatering could potentially result in short-term water-level drawdown of shallow groundwater in wells within the vicinity of the bore pits, and in the temporary reduction in the discharge rate of nearby springs.  The magnitude and lateral distance of water-level drawdown, and spring-flow impacts would depend on the existing groundwater levels at each site at the time of construction and site-specific aquifer characteristics.  However, any groundwater-level drawdown and related impacts would be short-term and temporary and levels would be expected to recover to non-pumping conditions following construction.

Mountain Valley estimated the areal extent or radius of pumping influence ($r_0$) of groundwater drawdown using standard analytical methods for well and aquifer evaluation (Walton, 1962), and by utilizing published aquifer hydrogeologic characteristic data (hydraulic conductivity (K), Transmissivity (T) and Storativity (S)[21] for each of the

---

20    See accession number 20171101-5042.

21    Hydraulic Conductivity (K) is the rate of flow of water through a cross section of aquifer (i.e. one square foot) under a unit hydraulic gradient; Transmissivity (T) is the rate at which groundwater can flow through a unit width of an aquifer's saturated thickness (b) under a unit hydraulic gradient (T=Kb); and Storativity (S) is a dimensionless measure of the volume of water that will

underlying rock types and formations present at each crossing. The estimated depth to bedrock/thickness of overburden, the depth of the bore pit, the saturated thickness of the drill pit, and the duration of drilling for each specific crossing were input variables to the quantitative estimates developed for each of the planned conventional drills.

The selection of hydraulic conductivity values began with a review of the USGS *Water Resource Investigation Report and Scientific Investigations Report* (Kozar and Mathas, 2001 and USGS, 2016, respectively), as well as the USGS Open File Report *Documentation of Spreadsheets for the Analysis of Aquifer-Test and Slug-Test Data* (USGS, 2002). Selected hydraulic conductivity values were considered conservative, based on the review of the above documents, and reasonably valid based on previous boring logs and available subsurface geotechnical information performed by Mountain Valley.[22]

Utilizing information from the Greenbrier River geotechnical analysis, the depth to the water table for deeper pits (greater than 12 feet) was estimated to be 6 feet. For pits less than 12 feet in depth, the water table was estimated to be 2 feet below the surface as these bore pits are expected to be topographically closer to the waterbody being crossed. Saturated thickness was estimated to be the depth of the bore pit minus the water table for the pits in the alluvium. The bore pits in bedrock were assigned a saturated thickness of 50 feet. By assigning a saturated thickness to bedrock crossings of 50 feet, the transmissivity used in the analysis of the bedrock crossings is considered to be conservative and most likely more representative of the upper portion of the West Virginia stratigraphy. These data were applied to the reverse distance-drawdown calculator based on the Cooper-Jacob (1946) equations available from the North Carolina Division of Water Resources (2021).

The calculated radius of pumping influence ranged from 10 feet to 393 feet, and groundwater drawdown impacts ranged from a maximum at the bore pit face (the difference in feet between pit depth and groundwater depth [full pit saturated thickness]) to zero feet at the outer limit of the radius of influence as shown in appendix E. These calculations are considered conservative and the actual areal extent of potential temporary groundwater drawdown is reasonably assumed to be less than the values shown in appendix E as the calculations assume a totally flat water table of infinite extent. However, the Amendment Project area hydraulic gradient is steep with numerous

---

be discharged from an aquifer per unit area of the aquifer and per unit reduction in hydraulic head. For a confined aquifer, storativity results only from the rock and fluid compressibility.

22    Boring logs and/or subsurface geotechnical information was available for the proposed crossings at C-035, G-013, H-017, H-031, I-121, and the Elk (C-022) and Greenbrier (F-021) Rivers.

aquifer boundary conditions, which would contain effects on groundwater levels from bore pit dewatering. For example, alluvium valleys in contact with the bedrock over a short lateral distance from the center of pumping.

The radius of influence analysis can be used to estimate potential impacts on groundwater users near the proposed bore pits. A groundwater well at the very limit of the calculated radius of influence would show no change (zero feet) in groundwater level and no impact, while a well located within the calculated radius of influence would show some groundwater drawdown. The analysis shows that for a majority of the proposed crossings, about 74 percent, potential temporary dewatering effects on groundwater levels would be limited to within 150 feet of bore pits. With the exception of two crossings, the C-022 and D-041 crossings, where groundwater drawdown is estimated to be 8 feet and 7 feet, respectively, the analysis showed that groundwater drawdown would be in the range of 0 to 3 feet outside of the 150-foot radius, which is within the range of natural water table fluctuations.

Further, the average distance between the proposed trenchless crossings is 11,000 feet and if simultaneous bore pit dewatering was required, the calculated pumping radius of influence for each crossing shows that there would be no overlap except for at three locations. At those three locations, involving crossings D-011 and D-012, F-014 through F-017, and H-047A and H-048A, the crossings are located close enough together such that potential groundwater impacts could overlap if simultaneous bore-pit dewatering were required. However, at these locations, because of right-of-way access logistics, the crossings would be completed sequentially and not simultaneously. Therefore, if bore pit dewatering is required during any of these crossings, there would be no overlap of groundwater impacts and no cumulative drawdown impacts.

Calculated rates of pumping for the crossings ranged from less than 1 gpm to a maximum of 35 gpm, which is consistent with the observed dewatering at the crossings completed by Mountain Valley. Mountain Valley has already completed 52 crossings of 67 waterbodies and wetlands using conventional bores without any known impact on wells or springs. Based on this experience, and without any direct recharge (rainfall) events, it is anticipated that groundwater levels would recover to pre-pumping background conditions within 60 percent of the elapsed time that pumping occurred.

Mountain Valley would notify all potential groundwater users, both well and potable spring users, within the pumping radius of influence provided in appendix E of the initiation of dewatering activities.

Mountain Valley would construct the Amendment Project in accordance with the methods described in the FEIS, including Mountain Valley's commitments to protecting drinking water of nearby residents. As discussed in the FEIS, in the event of landowner complaints that nearby wells or springs are impacted by the dewatering activities, Mountain Valley would evaluate any complaints and identify a suitable solution with the landowner. If it is determined by Mountain Valley through the use of qualified groundwater and surface water scientists and engineers that suitable potable water is no longer available due to construction related activities, Mountain Valley would provide adequate quantities of potable water during repair or replacement of the damaged water supply. In the event that an impact occurs to a livestock well, Mountain Valley would provide a temporary water source to sustain livestock while a new water supply well is constructed. Mountain Valley would also need to continue to fully comply with its *Water Resources Identification and Testing Plan* for identifying and assessing water supplies in the vicinity of the Amendment Project.

The U.S. Environmental Protection Agency (EPA) requested the identification of mitigation measures to prevent water movement along the alignment where trenchless crossing methods would be used below the seasonal high water table. Additionally, we received comments from stakeholders concerned with the potential for creating preferential groundwater flow conduits from the drilling and installation of the pipeline, permanent changes to groundwater flow patterns, and the potential for the permanent loss of surface water (leakage) to these preferential flow conduits.

All of the crossings are positioned with their entry and exit points adjacent to the resource, outside of the high water mark for streams, and outside of the wetland areas. The drilling of the borehole and installation of the product pipeline would not permanently alter the groundwater flow or groundwater/surface water interactions near the resource. These interactions are governed by the location of the resource, relative to the course of recharge-discharge flow pattern within the basin. For example, stream sections that are characterized by perennial flow, intermittent flow, or ephemeral flow would remain as such following construction, and would not be permanently altered by the drilling and pipeline construction. Although the borehole and pipeline may represent a small linear permeability contrast relative to the surrounding aquifer matrix, its presence begins and terminates into undisturbed aquifer material on each side of the resource. An aquifer's thickness and lateral extent varies, but is much greater than the space that would be occupied by the pipeline proposed for the Amendment Project. The physical pipeline would occupy only a negligible portion of the aquifer and have no permanent influence on groundwater flow.

31

Mountain Valley's design also includes the installation of trench breakers on slopes and at all waterbodies to impede flow of water along the buried pipeline. Trench breakers would be constructed from earthen fill, sand, or concrete-filled sacks and would be a minimum of 24 inches to 36 inches thick and in accordance with the FERC's *Plan*. Trench breakers would be installed at both ends of a bored crossing. These measures have been implemented on the bores that have been successfully completed to date on the certificated Mountain Valley Pipeline Project.

Further, during the boring process, and in conjunction with bore pit dewatering, there is the potential for temporary, pumping-induced infiltration of surface water to enter the borehole through the bottom of the streambed and into the bore pits. This may lead to a temporary reduction in stream flow or wetland saturation. However, any water entering the bore hole would be pumped from the bore pits and into sediment-removal structures constructed within the same drainage basin. As such, any water pumped from the bore pits during dewatering activities would be discharged and infiltrated back into the same drainage basin and would not constitute a consumptive use of groundwater from the basin, or lead to a permanent impact on surface-water flow or wetland saturation.

Discharge of construction-related water within and in the near vicinity of the right-of-way in karst areas would be managed according to Mountain Valley's *Karst Mitigation Plan,*[23] which, among other things, prevents direct discharge to a karst feature. Specific to dewatering/filtering, these dewatering devices would be located within, or in the near vicinity of the right-of-way that has been cleared and graded and inspected for karst features. Notification and offers of pre- and post-construction testing of wells and springs located within 500 feet of work in karst areas would be provided to landowners in accordance with Mountain Valley's *Water Resources Identification and Testing Plan*.

Mountain Valley's *Karst Mitigation Plan* requires that karst inspectors be present in karst areas during construction to surveil potential karst feature formation. The inspectors have stop-work authority, and if a cover-collapse type feature is activated during dewatering/filtering, the karst inspector would notify Mountain Valley to stop work, assess the feature, and mitigate discharge directed toward the feature. The feature would be stabilized according to the *Karst Mitigation Plan*. Further discharge would be re-directed away from the karst feature. Five of the proposed conventional bores (crossings G-017, G-023, G-024, H-017, and H-020), located between MP 206.6 to 235.5, would be in areas that may exhibit karst features. Mountain Valley would implement its *Karst Mitigation Plan* for these crossings.

---

[23]    See Docket No. CP16-10 accession number 20171101-5042.

We also received multiple comments discussing the possibility of off right-of-way sedimentation caused by dewatering activities. As noted in the FEIS, water would be discharged through sediment-removal devices in well-vegetated upland areas away from waterbodies and wetlands. As discussed above, any water pumped from the bore pits during dewatering activities would be released back into the same drainage basin and would not be a consumptive use of groundwater from the basin, or a permanent impact on surface water flow.

Based on these measures and the others described previously, we do not anticipate long-term or significant impacts on groundwater resources as a result of construction or operation of the Amendment Project.

## 2.2   Surface Water

The Amendment Project would require the crossing of 136 surface waterbodies, which are described in appendix A. The Amendment Project would entirely avoid stream S-OO11 at MP 230.8, which was approved in the certificated Mountain Valley Pipeline Project as an open-cut dry crossing, through implementation of a minor route adjustment. The proposed alignment shift at MP 0.7 would not affect waterbodies.

The conventional bore crossings range in length from 20 feet to 405 feet. The guided conventional bores range from 296 feet (Elk River) to 331 feet (Little Stony Creek) in length. The Direct Pipe® crossing of the Greenbrier River would be 1,250 feet long. The actual waterbody crossing widths, which are shorter than the bore lengths, were listed in the FEIS.[24] Installing the pipeline beneath these waterbodies via the three trenchless methods described previously (section A.5 of this EA) would avoid all in-water construction at these locations. Associated waterbody stream beds and banks would also not be disturbed.

During scoping and preparation of the EA, we received comments about surface water resources concerning bore feasibility, bore hole collapse and subsidence, water quality impacts, spills and inadvertent releases, dewatering, and surface water withdrawals. As appropriate, these comments are addressed herein.

Using trenchless crossing methods greatly reduces potential effects on surface waterbodies, particularly compared to open-cut crossings. In general, typical pipeline effects on waterbodies are avoided with trenchless methods. However, using these techniques, as proposed in the Amendment Project, could still affect water quality. We

---

24     Waterbody crossing lengths are listed in appendix F-1 of the FEIS.

received multiple comments concerning the possibility of erosion and off right-of-way sedimentation due to the storage of spoil from the bore pits and from the boring activities. The excavated material to create the bore pits would be placed in spoil piles within the existing pipeline right-of-way.  Stockpiled soils would be stored away from existing slopes, in flatter locations or along ridges, and placed such that they do not exceed a stable angle of repose.  Mountain Valley would implement the Project's *Erosion and Sediment Control Plans* to enhance stockpile stability and protect environmental resources downstream of bore pits and stockpiles.  Such measures would include installation of silt fence or super silt fence and temporary mulching of stockpiles.  Any spoil remaining following the completion of the bore and the backing filling of the bore pits would be evenly spread on the right-of-way.  Thus, off right-of-way sedimentation should be unlikely to occur.  Mountain Valley would use an off-site disposal facility for excess spoil as a last resort.  In addition, equipment needed for these crossings could leak, resulting in adverse effects on water quality.  To avoid and reduce these potential impacts on surface waterbodies, Mountain Valley would implement measures within its SPCC, including locating hazardous material storage and equipment refueling activities at least 100 feet from waterbodies.  These measures would reduce the potential for hazardous materials to enter waterbodies.

Regarding bore feasibility, based on available geologic data (Appendix I of Mountain Valley's amendment application[25]) and Mountain Valley's site-specific feasibility studies for the two proposed guided conventional bores (see section B.2.1 of this EA), we conclude that the Direct Pipe® crossing, and all three conventional bores that would be longer than 300 feet are feasible.  Conventional bores less than 300 feet long would be within acceptable soil types and crossing lengths for conventional boring technology and would also be feasible.  Further, Mountain Valley has already successfully completed 54 trenchless crossings of 73 waterbodies and wetlands, including 67 waterbodies and/or wetlands crossed via 52 conventional bores.  Additionally, Mountain Valley successfully crossed the Meadow River and an unnamed tributary to the Meadow River via a single Direct Pipe®, and crossed four additional waterbodies and wetlands via a single HDD at the Pigg River.  Should Mountain Valley encounter difficulties during a trenchless crossing, such as excessive torqueing, poor cutting returns, mechanical failure, deviation of the bore path, or unanticipated site conditions, Mountain Valley would implement contingency measures including shifting the bore entry point over and re-attempting the bore.  Mountain Valley would be required to seek any

---

25     See accession number 20210219-5176.

necessary authorizations and agency approvals before modifying the proposed crossing method.

Water that would infiltrate into the bore pits would be pumped out as needed (see section B.2.1 of this EA). During construction, water removed from the bore pits would be discharged through sediment removal devices such as filter bags and hay bale-lined dewatering structures[26] and directed to vegetated land surfaces (where available) to control erosion and runoff unless the water was used for boring purposes as described below. Mountain Valley would continuously monitor the structure, flow rate, and volume so as not to cause erosion, compromise the dewatering structures, or result in sediment-laden water entering a sensitive resource. The discharges of water from bore pits would flow back into the same watershed. Implementation of these measures would minimize potential local and temporary effects from turbidity and sedimentation. Dewatering of bore pits would occur in lieu of trench dewatering, which was approved as part of the Mountain Valley Pipeline Project.

Bore or drill hole collapse and resulting impacts on stream bottoms would be very unlikely to occur. As the conventional bore or Direct Pipe® is advanced, the pipeline is installed immediately behind the drill pipe, thereby greatly reducing the potential for borehole collapse or subsidence. There would not be an unsupported hole during these boring or drilling activities. A pilot hole would be bored first for guided conventional bores. The potential for hole collapse would be minimized since the main bore auger would be connected to the in-place pilot hole drill string after completion of the pilot hole. The main bore hole would then be completed with the hole supported at all times. In the unlikely chance of drill or borehole collapse, the overlying streambed could subside. Subsidence of the stream bank or channel could cause erosion or sedimentation, increased turbidity, and altered flow patterns.

A bore deflection that would breach the stream bottom is also very unlikely. As previously stated, in order to breach the streambed, an average bore length (less than 95 feet) would either have to be misaligned at least 10 percent at initial set up or deflect at least 10 percent due to encountering a large rock, cobble, or interface between two rock types. Bore operators thoroughly check the line and grade prior to beginning bore operations so as to prevent a misalignment. Bore operators can also detect increased resistance in the bore machine due to deflections of less than 10 percent for bores greater

---

26    See Appendix C-2_ESCP VA AS&S_113017_Part 1.pdf and Appendix C-2_ESCP VA AS&S_113017_Part 2.pdf at accession number 20171206-5004 for filter bag and dewatering structure typical drawings.

than 95 feet in length. Deflections were not encountered during the 52 previously performed conventional bores.

In the event that a conventional bore deflected substantially enough to potentially breach the stream bottom, this condition would be readily observed by the bore operator and timely corrections could be made. However, if a deflection were to breach the stream bottom, surface water would then flow into the borehole and into the bore pits. If this were to happen and the water flow could be controlled through pumping, Mountain Valley would grout the hole and reattempt the bore crossing at an adjacent location. If too much water were to enter the bore pit to maintain a dry workspace, Mountain Valley would work with the appropriate agencies to establish a repair methodology. This would most likely include grouting the bore hole and rebuilding the streambed. The guided conventional bore is steerable, thereby greatly reducing the potential for deflection during installation of the pilot hole. The Direct Pipe® also uses an advanced guidance system for steering, thereby effectively limiting the possibility of deflection.

An inadvertent release of drilling fluids could impact surface water quality. An inadvertent release of drilling fluids into a waterbody would increase turbidity and sedimentation within the affected waterbody. The use of conventional bores greatly reduces the potential for an inadvertent return as no high-pressure drilling fluid slurry would be needed. The majority of the conventional bore crossings proposed in the Amendment Project would not require the use of any drilling fluids; however, for some conventional bore crossings, like the longer conventional bores or the conventional bores through mixed ground or clay, Mountain Valley may use small amounts of bentonite or polymer-based lubricants on the cutting head and exterior casing to reduce friction and to increase the success of the crossing. Because the borehole is not filled with drilling fluids under pressure with a conventional bore, hydraulic fracturing leading to an inadvertent release would not occur. However, there is a small chance these drillings fluids could enter surface waterbodies incidentally as a result of an inadvertent spill at a workspace adjacent to the waterbody. Mountain Valley states that the drilling fluids would be of small quantities and would be non-petrochemical-based, non-hazardous, NSF-60 compliant, and that ecotoxicity data would be provided to the FERC staff, and thus are not expected to negatively impact waterbodies. Mountain Valley would submit a request to the FERC for the use of any polymer-based lubricants prior to their use.

A water-bentonite-based drilling mud mixture would be used during installation of the Direct Pipe® crossing. However, for Direct Pipe®, the drilling fluids are utilized only at the cutting face. A pressurized fluid-filled borehole is not required for Direct Pipe® drilling as the product pipe is advanced with the drill bit providing support for the drilled hole and eliminating the potential for hydraulic fracturing of the borehole and an

inadvertent release of drilling fluids.  The drill cuttings suspended in the drilling fluid returns are delivered back to the surface via umbilical piping inside the advancing installation pipe.

For the guided bore crossings (pilot hole drilling phase only), pressurized water or water/bentonite slurry is pumped through drill stem to pilot drill head to facilitate removal of formation cuttings.  An inadvertent surface return could occur during the pilot hole drilling phase dependent on geologic strata, down-hole pressure, and overburden confining pressure.  However, the drilling fluid pressures would be relatively low. Monitoring of downhole drilling pressure would be conducted by utilizing an annular pressure probe during pilot hole drilling for the guided bore method.

During construction, Mountain Valley would implement the construction practices outlined in its Procedures and its *Direct Pipe® and Horizontal Directional Drilling Contingency Plan* to reduce the potential for an impact to occur.  Inadvertent releases that could occur with the pilot hole phase of the guided conventional bore or during drilling by Direct Pipe® would be much smaller compared to other trenchless methods such as HDD, where the volume of drilling fluids under pressure used is considerably higher.  As with the conventional bores, any additives used for guided conventional bores and Direct Pipe® would be non-petrochemical-based, non-hazardous, NSF-60 compliant, and that ecotoxicity data would be provided to the FERC staff, and thus are not expected to negatively impact waterbodies.

Pits or containment structures could be constructed around the drilling fluid tanks to contain drilling fluid that may accidently spill on the surface of the ground, and a pump may be required to transfer the released drilling fluid from the pit or structure to a containment vessel.  All drilling fluids would be disposed of at an approved local waste management facility.

The guided conventional bores of the Elk River and Little Stony Creek (40,000 gallons each) and the Direct Pipe® crossing of the Greenbrier River (600,000 gallons) would require water to prepare the slurry described above.  Mountain Valley states that where possible it would obtain water to prepare the slurry from the bore pits (dewatering) and then store it in aboveground tanks.  Mountain Valley stated that the Greenbrier River would serve as a backup source of water for the Greenbrier crossing if the volume obtained from the bore pits is not sufficient.  Mountain Valley would coordinate with the West Virginia DEP's Division of Water and Waste Management (DWWM) and West Virginia Department of Natural Resources (WV DNR) regarding guidance, time of year restrictions, and other stream criteria if the backup water source is used.  Mountain Valley would use DWWM's water withdrawal guidance tool, limit water withdrawal

from the stream to 10 percent of instantaneous flow, and would not withdraw water during low flow or drought conditions. Mountain Valley would use municipal water supply as a backup water source for the proposed crossings of the Elk River and Little Stony Creek.

The EPA commented that Mountain Valley should implement a water quality monitoring plan. Mountain Valley is in the process of installing water quality monitoring equipment on streams containing or feeding into aquatic habitat supporting listed fish species, in compliance with the U.S. Fish and Wildlife Service's (FWS) September 2020 Biological Opinion (BO).

The Amendment Project would reduce impacts on waterbodies and water quality as compared to the certificated Mountain Valley Pipeline Project. Therefore, given the analyses above, we conclude that the Amendment Project would not have a significant impact on surface waters and would result in a reduction of the impacts already disclosed and analyzed in the FEIS.

## 2.3 Wetlands

The Amendment Project would require the crossing of 47 wetlands, including 37 conventional bore crossings (46 wetlands) and one guided conventional bore crossing. The bore lengths to cross these wetlands range in length from 31 feet to 405 feet. The actual wetland crossing widths, which would be shorter than the bore lengths, were listed in the FEIS.[27] Installing the pipeline across these wetlands via trenchless methods would avoid all in-wetland construction and disturbance (reducing wetland impacts by 4.2 acres). Additionally, the Amendment Project would avoid wetland W-A2a at MP 0.7 entirely through implementation of an alignment shift and the proposed new workspace associated with a minor route adjustment at MP 230.8 would not affect wetlands. The Amendment Project would avoid disturbance and trenching of a variable buffer between the edge of the bore pits and the wetland boundary, unlike the open-cut dry crossing methods associated with the certificated Mountain Valley Pipeline Project.

Using trenchless crossing techniques greatly reduces impacts on wetlands. However, as described previously, trenchless crossing techniques could result in an underlying borehole collapse and/or subsidence or deflection of the bore path resulting in breaching of the wetland bottom. As discussed in the preceding section, the potential for borehole collapse and/or subsidence and deflection is low. Subsidence or breaching of the wetland bottom would be unlikely, but could result in increased turbidity or modified

---

27    Wetland crossing lengths are listed in appendix G-1 of the FEIS.

hydrology. If these impacts were to occur, Mountain Valley would restore the wetland as necessary. Additionally, using conventional bores to cross wetlands avoids the risk of inadvertent returns as there is no high-pressure drilling fluid slurry. The risk of inadvertent release of drilling fluids from the guided conventional bore would be low and would be minimized and potential incidents mitigated as described above for surface water resources. Bore pit dewatering could temporarily affect wetland hydrology and subsequently wetland soils and vegetation. However, these effects would be minor and temporary, not unlike the natural within season variability experienced by wetlands based on fluctuations in precipitation.

To further reduce impacts on wetlands, Mountain Valley would implement measures in our Plan and its Procedures. This includes the installation of erosion and sediment controls. Mountain Valley would also adhere to measures within its SPCC, including locating hazardous material storage and equipment refueling activities at least 100 feet from wetlands. Therefore, given the analyses above and the implementation of impact minimization measures, we conclude that the Amendment Project would not have a significant impact on wetlands and would result in a reduction of the impacts already disclosed and analyzed in the FEIS.

### 2.3.1   U.S. Army Corps of Engineers Jurisdiction

Mountain Valley submitted a joint application to the COE Huntington, Pittsburgh, and Norfolk Districts for Individual Permits for crossings of waterbodies and wetlands per Section 10 of the Rivers and Harbors Act and Section 404 of the CWA. In association with its permit application to the COE, Mountain Valley applied to the WVDEP and the VADEQ for water quality certifications per Section 401 of the CWA.

The proposed open-cut dry crossings for waterbodies and wetlands described in the COE permit application are not a part of the Amendment Project, as the FERC has already analyzed those impacts in our FEIS and authorized the crossings for the certificated Mountain Valley Pipeline Project. Other waterbody and wetland crossings that would be modified from open-cut dry crossings as described in the FEIS to trenchless crossings are analyzed in this EA.

Five waterbodies in the Project area would be subject to Section 10 of the Rivers and Harbors Act. These waterbodies are described in table 5.

Table 5.

**Waterbodies in the Project Area Subject to Section 10 of the Rivers and Harbors Act**

| Waterbody Name (ID) | COE District | County, State | Original/Currently Certificated Crossing Method | Proposed Crossing Method a/ | Notes |
|---|---|---|---|---|---|
| Elk River (S-E68) | Huntington | Webster County, WV | Open-cut Dry | Guided Conventional Bore | |
| Gauley River (S-J29) | Huntington | Nicholas County, WV | Original: Open-cut Dry; Current: Microtunnel | Microtunnel | The FERC authorized the use of a microtunnel on May 18, 2020 per variance D-35 |
| Greenbrier River (S-I8) b/ | Huntington | Summers County, WV | Open-cut Dry | Direct Pipe® | |
| Roanoke River (two crossings – S-NN16 and S-NN16-Braid) | Norfolk | Montgomery County, VA | Original: Open-cut Dry; Current: Microtunnel | Microtunnel | The FERC authorized the use of a microtunnel on May 27, 2020 per variance H-21 |
| Blackwater River (S-F11) | Norfolk | Franklin County, VA | Open-cut Dry | Open-cut Dry | |
| a      See section A of this EA for a description of the guided conventional bore, Direct Pipe®, and microtunnel crossing methods.  Microtunnel is a trenchless crossing method that was approved by the Commission's variance process.  A description of the open-cut dry crossing method can be found in the FEIS. | | | | | |
| b      Included within the Amendment Project | | | | | |

Proposed modifications to the Elk River and Greenbrier River crossing methods are included in the analysis in this EA.  The crossing method changes for the Gauley River and Roanoke River were already authorized by the FERC staff as part of our variance process, and the crossing method for the Blackwater River has not changed (additional discussion regarding the Blackwater River is include in section C of this EA).

As noted in table 5 above, the change in crossing methods for the Gauley River and Roanoke River were already authorized by the FERC staff as part of our variance

process. However, to support the COE's review of the joint application for the Section 10 regulated streams, we have included information concerning the crossings of these waterbodies in this EA. A discussion of the microtunnel construction technique is included in section A.5.4 of this EA. A summary of the expected construction emissions associated with the microtunnel crossings is included in section B.6.1 of this EA. In addition, the crossings for these waterbodies are included in appendix A; the estimated bore pit spoils from the crossings are included in appendix D; and the bore pit underlying geology, depths, duration, and estimated groundwater drawdowns associated with the microtunnel crossings are included in appendix E.

As stated in our variance approvals[28] for the Gauley River and Roanoke River change in crossing methods, the use of a microtunnel construction technique would result in a reduction on impacts on aquatic resources in these waterbodies by avoiding impacts on the stream banks and channels. The changes in these crossing methods would not affect historic properties and were considered in the 2020 BO issued by the FWS.

Lastly, as mentioned in section A above, as part of the Amendment Project, Mountain Valley is requesting the use of 24-hour construction at these locations. Information concerning nighttime noise impacts for these crossings is discussed in section B.6.2 below.

### 3.0    Fisheries, Vegetation, and Wildlife

### 3.1    Fisheries and Aquatic Resources

We received multiple comments regarding potential impacts on aquatic resources from the Amendment Project. In general, the proposed trenchless crossings would result in less impact on fisheries and aquatic resources in the subject waterbody crossings as compared to open-cut crossings. Trenchless crossings would occur at 47 wetlands and 136 streams. Completing the waterbody crossings using trenchless crossing methods would avoid in-water construction and the associated short-term impacts on fisheries and aquatic species that are described in the FEIS for the Mountain Valley Pipeline Project. Additionally, the proposed route adjustment at MP 230.8 would avoid waterbody S-OO11 and associated impacts on the waterbody and aquatic resources.

The use of trenchless crossing methods to cross an environmental resource, such as a waterbody or wetland, avoids direct impacts associated with working directly within the resource. Trenchless crossing methods allow for uninterrupted existing streamflow

---

28    See accession numbers 20200518-3008 and 20200527-3040.

and undisturbed wetland soils and scrub-shrub and herbaceous vegetation, thereby minimizing impacts on aquatic resources and wetland and wildlife habitat. Additionally, the proposed trenchless crossings would result in reduced in-stream sedimentation as compared to the in-water construction approved for the Mountain Valley Pipeline Project. Lastly, trenchless crossings would result in less disturbance of the riparian areas adjacent to the waterbodies. As a result, habitat for many aquatic and semi-aquatic species would not be affected.

The bore pits needed to accomplish these trenchless crossing methods may act as a sediment trap for upland sediment, thereby reducing sediment loading into the subject streams. As described in the FEIS, increased sediment loads into streams has the potential to alter aquatic habitat and affect aquatic species both physiologically and behaviorally. Dewatering would be necessary if water accumulates in the bore-pits. To minimize impacts, such as sediment loading into the waterbodies, dewatering would be conducted in accordance with all existing plans and procedures reviewed and approved for the Mountain Valley Pipeline Project. The water would pass through a pumped-water filter bag within an appropriately sized dewatering structure. Additionally, dewatering structures would be located within vegetated upland areas, where practicable. Mountain Valley would continuously monitor the structure, flow rate, and volume so as not to cause erosion, compromise the dewatering structures, or result in sediment-laden water entering a sensitive resource.

Construction activities for the proposed trenchless crossings could result in an inadvertent release of fuel, oil, or other hazardous materials from construction equipment into waterbodies that could have impacts on fish and aquatic species. A leak of hazardous material into a waterbody could result in direct mortality to aquatic species, altered behavior, changes in physiological processes, or effects on food sources. As described in the FEIS, Mountain Valley would implement its SPCC, which would include preventive measures such as personnel training, equipment inspection, and refueling procedures to reduce the likelihood of spills, as well as mitigation measures such as containment and cleanup to minimize potential impacts should a spill occur. Adherence to the SPCC would prevent a spill from occurring near surface waters because construction equipment fueling, and bulk hazardous material storage would be prohibited within 100 feet of the waterbody banks. In addition, portable equipment such as water pumps would be placed in secondary containment structures in order to contain any leaks or spills.

In order to protect all waterbody and wetland habitat near the areas where ground disturbance would occur, Mountain Valley would implement erosion, sediment, and spill control measures in compliance with the Plan and its Procedures, *Erosion and Sediment*

*Control Plans*, and SPCC. Additionally, Mountain Valley would restore riparian areas that would be disturbed once boring operations are completed. Given all factors discussed above, we conclude that Mountain Valley's proposed Amendment Project would not result in significant impacts on fisheries and aquatic resources.

### 3.2    Vegetation

The proposed trenchless crossings would occur almost entirely within previously authorized workspace. Impacts on vegetation within these workspaces would not substantially differ from the impacts considered in the FEIS, excluding the minimization of impacts on riparian scrub-shrub and herbaceous vegetation.

Mountain Valley proposes to conduct a total of 120 trenchless crossings consisting of 117 conventional bores, 2 guided conventional bores, and 1 Direct Pipe® at 47 wetlands and 136 streams.[29] Some vegetation clearing would be required between the proposed bore pits. Vegetation clearing and bore pit excavations would be located within the existing already certificated construction right-of-way. Vegetation clearing in the areas between the proposed bore pits was analyzed in the FEIS as this and additional clearing would be necessary for the completion of the open-cut dry crossings at these locations.

The proposed route adjustment at MP 230.8 would result in impacts on 0.13 acre of upland herbaceous vegetation outside of the certificated right-of-way for temporary construction right-of-way and workspace. The route adjustment would also result in 0.04 acre of permanent operational impacts on herbaceous upland vegetation. No tree felling would be required as part of the proposed route adjustment. These areas were not analyzed as impacts in the FEIS. The proposed alignment shift at MP 0.7 would result in a change in the location of the permanent right-of-way, within the certificated construction right-of-way, but the overall acreage of permanent right-of-way would not change. All areas at this alignment shift location were analyzed as impacts in the FEIS.

---

29    On April 27, 2021, Mountain Valley requested the Commission allow nighttime microtunneling activities at the Gauley River and Roanoke River. The Commission previously authorized Mountain Valley to change the crossing method to a microtunnel technique as part of our variance process. Therefore, only new impacts associated with Mountain Valley's request to conduct 24-hour microtunneling activities at these locations are analyzed (see sections B.3.3 and B.6.2 of this EA). As these waterbodies are also Section 10 streams they are also discussed in section B.2.3.1 of this EA. In addition, Mountain Valley would utilize a conventional bore at the H-016 railroad crossing as authorized by the Certificate. Nighttime noise associated with conventional boring activities at this location are evaluated as part of the Amendment Project.

As described in the FEIS, areas of temporary right-of-way and workspace would be allowed to revegetate to pre-construction conditions. Herbaceous and scrub-shrub areas are expected to be fully restored within 1 to 3 years. In upland areas, the 50-foot-wide permanent right-of-way would be maintained in an herbaceous state. In wetland areas, native vegetation would be allowed to regenerate; however, to facilitate periodic corrosion/leak surveys, a corridor centered on the pipeline and up to 10 feet wide may be cleared at a frequency necessary to maintain the 10-foot corridor in an herbaceous state. In addition, trees that are located within 15 feet of the pipeline that have roots that could compromise the integrity of the pipeline coating may be cut and removed from the permanent right-of-way. Impacts of the route adjustment on the additional 0.13 acre of herbaceous uplands would be minimized by implementing the measures contained in the FERC Plan and Mountain Valley's Project-specific *Erosion and Sediment Control Plans*. Mountain Valley would continue to reduce the potential introduction and spread of non-native invasive plant and weed species by following the measures outlined in its Project-specific *Exotic and Invasive Species Control Plan*.

### 3.2.1   Riparian Areas

Riparian areas are functionally defined as three-dimensional ecotones of interaction that include terrestrial and aquatic ecosystems along perennial stream corridors. All riparian areas possess some similar ecological characteristics such as energy flow, hydrologic function, nutrient cycling, and plant and animal habitat. These functions give riparian areas unique values relative to the surrounding landscape. Riparian ecosystems are extremely productive and have diverse habitat values for wildlife. The linear nature of riparian ecosystems provides migration and dispersal corridors and connects habitats for wildlife. The presence and movement of the surface and groundwater enhance the recycling of nutrients and other chemical reactions beneficial to plant growth within the riparian zone.

Throughout construction, Mountain Valley has maintained, as feasible, a 50-foot riparian buffer on each side of the surface waterbodies. Mountain Valley has already cleared vegetation at 109 of the proposed trenchless crossings. Grading, in addition to clearing, has also occurred between the bore pits at three locations, along with grading for travel lanes at 95 locations. The certificated Mountain Valley Pipeline Project authorized impacts on approximately 28.4 acres of riparian buffer located within the Amendment Project work areas, of which approximately 4.5 acres of this buffer have been affected by already installed travel lanes. The remaining 23.9 acres of riparian buffer consist of tree stumps, where trees were previously felled, and a mix of herbaceous and shrub species. The Amendment Project would reduce impacts on the riparian buffer from 28.4 acres to a total of 17.7 acres (4.5 acres from already installed travel lanes, 2.0 acres of new travel

lanes, and 11.2 acres of impacts from bore pits). Approximately 10.7 acres of riparian vegetation that would have been affected by the certificated open-cut dry crossings would remain undisturbed as a result of the proposed trenchless crossing methods.

As stated, all of the clearing and grading between the proposed bore pits that has already been completed was analyzed in the FEIS. Apart from the activities discussed above, Mountain Valley does not anticipate the need to conduct any other vegetation clearing within the riparian buffer between the bore pits for the installation of the trenchless crossings. However, if additional vegetation clearing is needed within certificated workspaces due to surveying or engineering concerns, clearing would be conducted via hand tools or mowing and without ground disturbance. As mentioned above, impacts on riparian vegetation would be reduced compared to those already disclosed and analyzed in the FEIS. No additional clearing outside of what was already analyzed in the FEIS would take place as a result of the Amendment Project.

Mountain Valley would conduct restoration activities in accordance with landowner agreements, permit requirements, and written recommendations on seeding mixes, rates, and dates obtained from the Wildlife Habitat Council and measures outlined in Mountain Valley's *Exotic and Invasive Species Control Plan* and *Migratory Bird Conservation Plan*. In riparian areas, the FERC Procedures require Mountain Valley to allow a riparian strip of at least 25 feet to permanently revegetate with native species during post-construction maintenance.

Because the majority of vegetation clearing, including all tree clearing, has already occurred in the proposed workspaces and Mountain Valley would follow restoration protocols outlined in the FERC Plan and in accordance with all permits and recommended seeding requirements, we conclude that the Amendment Project would not result in a significant impact on vegetation.

### 3.3    Wildlife

We received multiple comments regarding potential impacts on wildlife from the Amendment Project. Because the majority of the Amendment Project would occur entirely within previously authorized workspace, with the exception of 0.13 acre of herbaceous habitat that was included in previous biological surveys for the Mountain Valley Pipeline Project, the impacts and mitigation for wildlife would generally be the same as compared to the Mountain Valley Pipeline Project as described in the FEIS.

Mountain Valley would install orange construction safety fencing around unoccupied bore pits to prevent entrapment of animals. Mountain Valley's EIs would

inspect the bore pits for entrapped animals prior to restarting work each day. The EIs would remove any animals from the bore pits.

Construction work for the two guided conventional bore crossings, the one Direct Pipe® crossing, three conventional bore crossings which include railroads (E-012, H-016, and H-020), dewatering activities at all trenchless crossings, and the microtunnel crossings of the Gauley River and Roanoke River, could require 24-hour operations resulting in additional noise and light pollution impacts on wildlife. Noise from dewatering activities would be similar to general construction noise. The FEIS described potential impacts on wildlife from construction related noise in section 4.5.2.3. In addition, based on noise studies conducted by Mountain Valley for the Elk River crossing, the Gauley River crossing, the Roanoke River crossing, and two railroad crossings (E-012 and H-020), the proposed nighttime activities would not require additional mitigation in order to meet sound levels identified in the FERC guidance. Noise studies conducted for the guided conventional bore crossing of Little Stony Creek, the Direct Pipe® crossing of the Greenbrier River, and the railroad crossing at H-016 indicate that sound levels would exceed levels identified in the FERC guidance. Therefore, Mountain Valley would install noise barriers around these sites to reduce noise to acceptable levels. Additional information regarding noise can be found in section B.6.2 of this EA.

Wildlife generally relies on hearing for courtship and mating, prey location, predator detection, and/or homing. These behaviors and interactions could be affected by noise resulting from construction activities. Specifically, construction noise could lead to nest abandonment, egg failure, reduced juvenile growth and survival, or malnutrition or starvation of the young. During construction, the effects of noise on wildlife would be greatest immediately adjacent to the construction work areas. Wildlife inhabiting the areas surrounding the trenchless crossings might be temporarily displaced due to noise during construction but would be able to return to the area after the trenchless crossings are completed. To reduce potential impacts from 24-hour operations, Mountain Valley would perform as much work as possible during daylight hours, including preparation of the workspace, excavation of bore pits, and moving heavy equipment to the crossing locations.

Another impact that the trenchless crossings would have on wildlife during nighttime construction is ecological light pollution. Construction work for dewatering, guided conventional bores, Direct Pipe® crossing, railroad crossings, and microtunneling occurring at night would need artificial lighting. As described in the FEIS, artificial lighting could affect natural patterns of light and dark in ecosystems, which in turn may affect wildlife. The effects of ecological light pollution may include causing

disorientation in nocturnal animals, disrupting migratory patterns of birds, altering seasonal day-length cues, which some wildlife may rely on as a trigger for critical behavior (e.g., migration).

To reduce potential noise and lighting impacts from nighttime activities, Mountain Valley committed to install noise barriers at the crossing of Little Stony Creek, Greenbrier River, and the H-016 railroad crossing. Mountain Valley would also use "full cut-off" lighting fixtures to maximize shielding to prevent unintentional lighting of surrounding areas. With these proposed measures, in consideration of the noise studies conducted, and the fact that noise and light pollution would be temporary and localized to the immediate areas surrounding the trenchless crossings, we conclude that impacts on wildlife would be minimal and not significant.

### 3.4    Migratory Birds

Migratory birds are species that nest in the United States and Canada during the summer and then migrate to and from tropical regions of Mexico, Central and South America, and the Caribbean for the non-breeding season. Migratory birds are protected under the Migratory Bird Treaty Act (16 U.S Code [U.S.C.] 703-711) (MBTA); bald and golden eagles are additionally protected under the Bald and Golden Eagle Protection Act (16 U.SC. 668-668d). Executive Order (EO) 13186 (66 FR 3853) directs federal agencies to identify where unintentional take is likely to have a measurable negative effect on migratory bird populations and to avoid or minimize adverse impacts on migratory birds through enhanced collaboration with the FWS.

On March 20, 2011, the FWS and the Commission entered into a Memorandum of Understanding that focuses on avoiding or minimizing adverse effects on migratory birds and strengthening migratory bird conservation though enhanced collaboration between the two agencies. This voluntary Memorandum of Understanding does not waive legal requirements under the MBTA, ESA of 1973, NGA, or any other statutes and does not authorize the take of migratory birds.

As stated above, the Mountain Valley Pipeline Project has completed approximately 100 percent of tree felling, 95 percent of vegetation clearing, and 95 percent of upland right-of-way-preparation. Mountain Valley states that at areas of trenchless crossings, trees and vegetation on the right-of-way were cleared but a 50-foot buffer of riparian vegetation was maintained, as feasible. These areas currently consist of tree stumps along with the scrub-shrub and herbaceous vegetation. No tree felling would be required as part of the Amendment Project. If clearing were required during nesting

season, Mountain Valley would conduct nest surveys prior to clearing, as outlined in its current *Migratory Bird Conservation Plan*.

Impacts on migratory birds and Mountain Valley's mitigation measures to protect migratory birds during construction and operation were discussed and evaluated in the FEIS. Noise and ground-disturbing activities from the trenchless crossings could affect birds that might be nesting, foraging, or sheltering nearby. Bird species inhabiting the surrounding area could be temporarily displaced during construction but would be able to return to the area after the trenchless crossing are completed. Mountain Valley would follow its *Migratory Bird Conservation Plan* to minimize any potential impacts on migratory birds. No bald or golden eagle nests were identified in the vicinity of the trenchless crossings. Based on Mountain Valley's proposed measures, we conclude that the Amendment Project would not result in population-level impacts on migratory birds or significant measurable negative impacts on their habitat.

### 3.5    Special Status Species

Special status species are those species for which state or federal agencies afford an additional level of protection by law, regulation, or policy. Special status species include federally listed species protected under the ESA, species proposed or candidates for listing by the FWS or the National Marine Fisheries Service, and those species that are state-listed as threatened or endangered, or other special status. Section 7(a)(2) of the ESA requires the Commission to ensure that any action it authorizes, funds, or carries out would not jeopardize the continued existence of federally listed or proposed listed species, or result in the adverse modification or destruction of critical habitat for federally listed and proposed species.

The areas affected by the Amendment Project are areas previously analyzed for the certified Mountain Valley Pipeline Project. However, the proposed route adjustment at MP 230.8 includes an additional 0.13 acre of disturbance of herbaceous ground cover habitat that was not analyzed as an impact for the certificated Mountain Valley Pipeline Project. This area was included in species surveys for ESA Section 7 consultation because Mountain Valley used a 300-foot-wide buffer to conduct biological surveys for the Mountain Valley Pipeline Project. We received multiple comments stating that special status species may be impacted due to the Amendment Project. These impacts are addressed below.

#### 3.5.1    Federally Listed Species

We have determined that the Amendment Project would not result in additional impacts on federally listed species that would necessitate reinitiation of formal

consultation under Section 7 of the ESA as outlined in our June 4, 2021 letter to the FWS.[30]  Impacts on species as a result of the Amendment Project were already considered and analyzed during the ESA Section 7 consultation for the certificated Mountain Valley Pipeline Project in 2020, which was concluded with the FWS's 2020 BO and Conference Opinion, issued on September 4, 2020, and FWS concurrence letter, issued on July 9, 2020.  We conclude that the Amendment Project would not alter our prior effects determinations (made as part of the 2020 ESA section 7 consultation process)[31] or the analysis or conclusions in the 2020 BO.

We have also determined that our prior determination (of may affect, likely to adversely affect) for candy darter critical habitat analyzed in the Conference Opinion (as part of the 2020 BO) would not change.  The trenchless crossing methods, previously authorized by the FERC and assessed in the 2020 BO and Conference Opinion, of the Gauley River (microtunnel and water withdrawal) and Stony Creek (conventional bore), which do have designated critical habitat, have not changed.  As such, there would be no significant changes with respect to the designated critical habitat in the action as planned or in the information used to develop the Conference Opinion.  On May 14, 2021, the FWS confirmed the September 4, 2020 Conference Opinion as the BO for candy darter critical habitat.[32]

The Amendment Project includes changes to the Mountain Valley Pipeline Project in areas containing potential habitat for the following species:  Virginia big-eared bat, gray bat, clubshell, snuffbox, Indiana bat, northern long-eared bat, Roanoke logperch, and Virginia spiraea.[33]  As previously stated, all workspaces associated with the

---

[30]    See accession number 20210604-3030 – FERC letter to FWS re: Section 7 Consultation.

[31]    On July10, 2017, the FERC initiated formal consultation under Section 7 of the ESA for the certificated Mountain Valley Pipeline Project.  The FWS issued a BO on November 21, 2017.  In 2020, the FERC reinitiated Section 7 consultation to evaluate the impacts on the newly listed as endangered candy darter as well as new/additional impacts that occurred since the 2017 BO.  In response to the reinitiation, Mountain Valley submitted a Supplement to the Biological Assessment (SBA), which reassessed impacts on federally listed species potentially affected by the certificated Mountain Valley Pipeline Project.  The FWS issued a new BO on September 4, 2020.  The FWS also provided a letter of concurrence on July 9, 2020 for the species for which the FERC determined that the certificated Mountain Valley Pipeline Project may affect, but would not likely adversely affect.  We refer to the conclusions regarding effects determinations made in the most recent 2020 ESA Section 7 consultation process.

[32]    See accession number 20210514-3026.

[33]    For the other species included in the 2020 ESA Section 7 consultation process, the activities requested in the Amendment Project would not occur within areas that support these species.

Amendment Project would be within areas that were previously authorized by the FERC and analyzed during the 2020 ESA consultation, except for 0.13 acre of herbaceous habitat that would be affected by the slight route adjustment at MP 230.8. The 0.13 acre of herbaceous habitat was included in prior surveys for ESA consultation for the Mountain Valley Pipeline Project due to its proximity to the original certificated pipeline route. Therefore, there are no new areas that would be affected by the Amendment Project that have not been included in previous survey efforts for federally listed species. Overall, the Amendment Project would eliminate construction within potentially affected waterbodies and wetlands. Trenchless crossing methods would reduce the potential of any direct impacts on the streams and reduce impacts on stream banks and riparian areas, which would reduce the impacts of sedimentation on aquatic species as discussed above in section B.3.1 of this EA. Potential impacts and our determinations of effect for the eight species that are within the action area of the proposed Amendment Project are described below.

### Virginia Big-eared Bat and Gray Bat

As described in the FEIS and the supplement to the Biological Assessment (SBA)[34], no individuals of either species were captured during surveys and no habitat was found in the areas affected by the Mountain Valley Pipeline Project. However, as stated in the FEIS, there is a small chance for construction activities to affect bats migrating in the general Mountain Valley Pipeline Project area between summer roost sites and winter hibernacula. On July 9, 2020, the FWS concurred with the FERC's determination of "may affect, but is not likely to adversely affect" (NLAA) for these species. Because the areas affected by the Amendment Project would be within the workspaces previously authorized by the FERC and analyzed in the 2020 ESA Section 7 consultation for the Mountain Valley Pipeline Project, with the exception of 0.13 acre of new upland herbaceous vegetation that was included in prior surveys, we have determined that the Amendment Project would not change our overall effect determination (NLAA) for the Virginia big-eared bat and the gray bat, which we made in the 2020 ESA consultation for the Mountain Valley Pipeline Project.

### Clubshell and Snuffbox

Streams that potentially support snuffbox and clubshell mussel populations in the Mountain Valley Pipeline Project area include the Elk River, the Little Kanawha River, Meathouse Fork, and Leading Creek. The Little Kanawha River and Leading Creek crossings are already complete and are not part of the Amendment Project. During the

---

34    See accession number 20200702-5305.

2020 ESA Section 7 consultation, Mountain Valley proposed to cross the Elk River using a trenchless method called microtunneling and the headwaters of Meathouse Fork using an open-cut dry crossing method. On July 9, 2020, the FWS concurred with the FERC's determination that the Mountain Valley Pipeline Project is NLAA the snuffbox and clubshell mussels. This determination was made due to presumed absence of these species in the streams subject to potential impacts from the Mountain Valley Pipeline Project. Additionally, sediment modeling that Mountain Valley conducted for the SBA in 2019 and 2020[35] indicated that sediment impacts would not extend to areas with a potential to contain clubshell and snuffbox mussels.

As part of the Amendment Project, Mountain Valley proposes to cross the Elk River using a guided conventional bore and the headwaters of Meathouse Fork using a conventional bore. As compared to the open-cut dry crossing of Meathouse Fork, a conventional bore crossing would eliminate direct in-water work and reduce sedimentation impacts in the immediate area of the crossing and downstream. Regarding the Elk River, microtunneling and guided conventional bores are similar crossing methods with similar risks of an inadvertent return as discussed in table 12 of the 2020 BO. Given these factors, we have determined that the Amendment Project would not change our overall effect determination (NLAA) for clubshell and snuffbox mussels, which we made in the 2020 ESA consultation for the Mountain Valley Pipeline Project.

### Indiana Bat and Northern Long-eared Bat

The 2020 BO concluded that the Mountain Valley Pipeline Project is likely to adversely affect (LAA) the Indiana bat and northern long-eared bat. There would be no additional impacts on Indiana bats and northern long-eared bats as a result of the Amendment Project that were not already considered in the 2020 BO. We note that tree felling has already occurred in all the workspaces required for the Amendment Project, and this tree removal was already accounted for in the 2020 BO. Additionally, Mountain Valley would avoid construction during hibernation season at the 10 proposed trenchless crossings where there are known/assumed occupied Indiana bat and northern long-eared

---

35      See accession number 20200702-5305.

bat hibernacula[36] within two miles of the work spaces that could experience noise levels above ambient levels due to construction activities at the trenchless crossings.[37]

Nighttime construction might be necessary at six of the proposed trenchless crossings, which would cause minor short-term noise and lighting effects that could impact active bats at night.[38]  These six crossings include two guided bores crossings, one Direct Pipe®, and three conventional bore crossings discussed in the FEIS associated with railroad crossings.  In addition, Mountain Valley proposes to conduct nighttime work at the previously approved, but yet to be completed, microtunnel crossings of the Roanoke River and Gauley River.  The potential for these noise impacts were discussed in the 2020 BO as noted below.  As discussed in the FEIS and Mountain Valley's SBA, dewatering activities may require 24-hour work for limited periods.  Mountain Valley states that it would conduct most work during daylight hours and use cut off fixtures to reduce lighting impacts if night work is required.  The 2020 BO states that "bats are not likely to be exposed to consequences as a result of increased noise, lighting, or dust within the areas of habitat removal."[39]  Because all tree removal has already occurred in the areas where nighttime work might occur, impacts on bats as a result of noise and lighting are not likely.[40]

Given the factors discussed above, we have determined that Amendment Project would not change the overall conclusions of the 2020 BO or the associated Incidental Take Statement for the Indiana bat and northern long-eared bat.

### Roanoke Logperch

We received multiple comments regarding potential impacts on the Roanoke logperch as a result of the Amendment Project.  Streams that potentially support Roanoke logperch in the Mountain Valley Pipeline Project area include Harpen Creek, Bradshaw

---

36    These features include Tawney's Cave, Phlegars Cave, John Smith Cave, Kanodes Pit, Eight Point Cave, P-BTH-001, Pighole Cave, Spruce Run Mountain Cave, and Links Cave.  In the 2020 BO, FWS determined that portal P-BTH-001 is not a suitable hibernacula for the Indiana bat.

37    Mountain Valley's noise impact study included in its SBA concluded that hibernacula more than 2 miles from the trenchless crossings would not experience sound levels above ambient.

38    Nighttime work may be required due to stipulations of the crossing agreement (railroads and roadways), particular geologic conditions, or the particular method being used (guided conventional bore, microtunneling, and Direct Pipe®).

39    See pages 115 and 131.

40    See also email communication from Cindy Schulz (FWS) and Jennifer Fink (FERC) dated November 4, 2020 at accession number 20210604-303.

Creek, Roanoke River, North Fork Roanoke River, and Pigg River. Mountain Valley has already completed the crossings of the North Fork Roanoke River and Pigg River, which were analyzed in the 2020 BO. The 2020 BO also analyzed the crossing of the Roanoke River as a trenchless method (microtunneling). Because this crossing method was previously approved and analyzed in the 2020 BO, it is not included as part of the Amendment Project except for the request to conduct nighttime construction as discussed above. Mountain Valley is proposing to change the crossing methods from open-cut dry crossings to trenchless conventional bore crossings for Harpen Creek and Bradshaw Creek as part of the Amendment Project.

The 2020 BO concluded that the Mountain Valley Pipeline Project is LAA the Roanoke logperch. Although trenchless methods would eliminate direct impacts on the streams and reduce potential effects of sedimentation, we have determined that Amendment Project would not change the overall conclusions of the 2020 BO and the associated Incidental Take Statement for the Roanoke logperch.

### Virginia Spiraea

In the 2020 BO, FWS presumed that the Virginia spiraea is present on one 0.05-acre parcel along the Greenbrier River in Summers County, West Virginia.[41] The FWS concluded that Mountain Valley Pipeline Project construction would permanently remove all Virginia spiraea plants, seeds, and habitat in the 0.05 acre. As part of the Amendment Project, Mountain Valley proposes to change the Greenbrier River crossing to a Direct Pipe®, which would result in the same workspace requirements and impacts on this species as identified in the 2020 BO. Therefore, the impacts associated with the Amendment Project on the Virginia spiraea were fully analyzed and considered in the 2020 BO and Incidental Take Statement.

### Conclusion

As stated above, trenchless crossing methods would reduce the potential of any direct impacts on the streams and reduce impacts on stream banks and riparian areas. Therefore, we expect that any impacts associated with the crossing method changes at streams containing federally listed species would be insignificant and discountable and less than what was described in the FEIS. In addition, Mountain Valley would implement erosion and sediment control measures to minimize any sedimentation that could result from the trenchless crossing methods.

---

41      See pages 65 to 66 of the September 4, 2020 BO.

Given these factors, we conclude that the scope of impacts on federally listed species associated with the Amendment Project are fully considered in the 2020 BO and the 2020 ESA Section 7 consultation process for the Mountain Valley Pipeline Project. Although impacts on aquatic species would be reduced, we are not altering our determinations of effect on federally listed species that were concluded for the Mountain Valley Pipeline Project. On July 29, 2021, we received a response from the FWS to our June 4, 2021 letter requesting additional information regarding our determinations;[42] therefore, we recommend that:

- **Mountain Valley should <u>not commence construction activities</u> associated with the Amendment Project <u>until</u> Commission staff completes consultation with the FWS regarding potential impacts on federally listed species.**

### 3.5.2   Other Special Status Species

Impacts on state-listed and other species designated as sensitive were identified and described for the Mountain Valley Pipeline Project in the FEIS. The proposed trenchless crossings would not result in any new or additional impacts other than an increase in the amount of noise and light pollution occurring at night. As described above, the trenchless crossings would lessen the impact on aquatic species that may occur in and around the subject streams. Bore pits would occur in upland areas and Mountain Valley would erect erosion and sediment control devices to protect waterbodies and any surrounding wetland habitat that could provide habitat for state-listed or special status sensitive species. In addition, because tree clearing has already occurred in the subject areas, the impacts on any sensitive bird species potentially inhabiting the surrounding area would be limited to temporary displacement due to noise from construction as discussed above. For these reasons, we conclude that the proposed Amendment Project would not result in significant impacts on special status species.

### 4.0   Land Use

As described previously, the majority of the work associated with the Amendment Project would occur within the previously authorized limits of disturbance, which consists of disturbed right-of-way. Impacts on land use resulting from the proposed trenchless crossings would be similar in nature to impacts addressed in the FEIS. The Amendment Project would not result in any additional land requirements, except for 0.13 acre, consisting of agricultural land (0.07 acre) and residential land (0.06 acre) that would

---

42     See accession number 20210803-3020.

be affected by the route adjustment at MP 230.8, nor would there be a change in land requirements.

The trenchless crossing activities would result in short-term impacts on adjacent residential areas, including increased construction-related traffic on local roads, as well as dust, lighting, and noise generated during construction. As previously stated, nighttime construction may be necessary at six of the proposed trenchless crossings, and at the previously approved Gauley River and Roanoke River crossings, which would cause minor short-term noise and lighting effects. Mountain Valley states that it would conduct as much work as possible during daylight hours. Noise modeling conducted by Mountain Valley indicated that the proposed nighttime activities at five locations would not require additional mitigation in order to meet sound levels identified in the FERC guidance. Noise modeling indicated noise mitigation would be required at three locations to reduce noise to acceptable levels. Additional information regarding noise can be found in section B.6.2 of this EA. In addition, Mountain Valley would use cut off fixtures to reduce lighting impacts if night work is required.

Mountain Valley would minimize potential impacts through implementation of mitigation measures specified in its *Site-Specific Residential Construction Plans* for residences within 50 feet of the right-of-way. However, based on a review of alignment sheets, no residences appear to be located within 50 feet of the proposed trenchless crossings.

We received comments that the Amendment Project would impact recreational resources in the Amendment Project area. The areas affected by the Amendment Project were previously analyzed in the FEIS for the certificated Mountain Valley Pipeline Project. Impacts and mitigation on recreational and visual resources as discussed in the FEIS are expected to be similar for the Amendment Project. The proposed trenchless crossing methods would avoid in-stream work and construction would be temporary. As such, with the exception of the possible exclusion of recreation in the immediate vicinity of construction, no impacts on waterbodies used as recreational resources is expected.

No significant additional impacts would occur outside of the already certificated Mountain Valley Pipeline Project right-of-way. We do not anticipate significant impacts on land use as a result of the Amendment Project.

### 4.1    Environmental Justice

Executive Order 12898 encourages independent agencies to identify and address, as part of their NEPA review, "disproportionately high and adverse human health or environmental effects" of their actions on minority and low-income populations. Section

4.9.1.8 of the FEIS provides an analysis of minority and low-income populations in the vicinity of the larger Mountain Valley Pipeline Project. In section 4.9.2.8 of the FEIS, we concluded that none of the counties or census blocks crossed by the Mountain Valley Pipeline Project have minority populations exceeding 50 percent nor have minority populations meaningfully greater than the minority population percentage in their respective states. However, we note that low-income communities do exist along the Mountain Valley Pipeline route and that these populations may be affected by construction and operation of the larger Mountain Valley Pipeline Project.

The Amendment Project is a subset of the previously evaluated and authorized Mountain Valley Pipeline Project. All of the communities that would be affected by the Amendment Project are the same as those reviewed in the FEIS. However, to address public concern regarding the Amendment Project, Mountain Valley provided an updated analysis of the FEIS data using 2021 Census data.[43] We have verified the updated data and found that the updated analysis is not materially changed from the analysis provided in the FEIS (appendix F).

We received several comments discussing concerns with outreach efforts, including the reliance on internet services, to potential environmental justice communities along the Mountain Valley Pipeline Project route. The Amendment Project would not affect any new landowners and Mountain Valley has been in communication via telephone, U.S. mail, e-mail, and in-person meetings, with affected landowners. Communications with affected landowners began before Mountain Valley filed a request to enter into the Commission's pre-filing environmental process for the Mountain Valley Pipeline Project on October 27, 2014. Mountain Valley has also conducted local outreach efforts throughout the construction of the Mountain Valley Pipeline Project. For the Amendment Project, Mountain Valley mailed all affected landowners a written copy of the Notice of Application as well as the Commission's "An Interstate Natural Gas Facility On My Land? What Do I Need To Know?" pamphlet.

With the exception of a 0.13-acre temporary construction workspace, the Amendment Project would be located entirely within the already certificated limits of disturbance. This area consists of a disturbed right-of-way that has been under intermittent construction since 2018. Mountain Valley estimates 41 crews would be working on the nine construction spreads to complete all of the trenchless crossings in about 4 months. As mentioned in section 5.1, based on Mountain Valley's estimates, the average length of time required for a conventional bore (including pit excavation and boring) would be about 18 days. It is predicted that around 60 percent of the

---

43      See accession number 20210427-5306.

conventional bores would be completed within 2 weeks and an additional 26 percent would be completed within 4 weeks. Fourteen percent of the remaining bores would be completed within 10 weeks while one conventional bore is estimated may require 72 days.

As stated in section 6.1.2 below, the bore crossing would result in higher levels of emissions per crossing. However, these increases would be dispersed over almost 304 miles of construction right-of-way and there would be no changes in operational emissions due to the Amendment Project. In addition, as further discussed in section 6.2.2, the Amendment Project would have two distinct phases of construction that would generate high levels of noise: 1) excavation of entry and exit bore pits; and 2) active boring. Most locations would involve conventional boring and noise impacts would occur during the day and would not significantly differ in intensity from those previously analyzed in the FEIS. However, eight crossings may include 24-hour boring operations. The noise impacts from those crossings would be temporary and we have included a recommendation that Mountain Valley notify all landowners within 0.5 miles of nighttime trenchless crossing activities prior to the start of these activities. Additional information concerning nighttime construction work can be found in section 6.2.2.

As stated above, the impacts associated with the Amendment Project would be temporary and do not involve the construction of any permanent, aboveground structures. While the proposed route adjustment will result in a minor addition of 0.04 acre of operational impacts, overall, impacts from the Amendment Project would be temporary in nature. We conclude that the Amendment Project would not result in a disproportionately high and adverse impact on environmental justice populations.

## 5.0 Cultural Resources

The NHPA is the cornerstone of the federal government's historic preservation program. Section 101(d)(6) of the NHPA states that properties of traditional religious and cultural importance to Indian tribes[44] may be determined eligible for the National Register of Historic Places (NRHP).

---

44  Indian tribes are defined in 36 CFR 800.16(m) as: "an Indian tribe, band, nation, or other organized group or community, including a Native village, Regional Corporation, or Village Corporation, as those terms are defined in Section 3 of the Alaska Native Claims Settlement Act (43 U.S.C. 1602), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their special status as Indians."

Section 106 of the NHPA requires that the FERC take into account the effect of its undertakings[45] (including authorizations under Section 7 of the NGA) on historic properties,[46] and afford the Advisory Council on Historic Preservation (ACHP) an opportunity to comment. Mountain Valley, as a non-federal applicant, is assisting the FERC staff in meeting our obligations under Section 106 by providing data, analyses, and recommendations in accordance with Title 36 CFR Part 800.2(a)(3) and the FERC's regulations at 18 CFR Part 380.12(f). Cultural resources[47] information was gathered for Mountain Valley by its consultants. However, the FERC staff remains responsible for all final determinations made under the NHPA.

The FERC staff examined the 120 proposed bore locations to determine if those activities may have impacts on historic properties. As indicated in our FEIS, and the Programmatic Agreement (PA) executed December 15, 2017, for the Mountain Valley Pipeline Project in Docket No. CP16-10-000, the areas where the bores are proposed were previously inventoried for cultural resources. The FEIS also documented our consultations with the West Virginia and Virginia State Historic Preservation Offices (SHPO), interested Indian tribes, and other consulting parties for the Mountain Valley Pipeline Project. The PA was signed by the SHPOs and the ACHP. Below we identify the cultural resources previously recorded in proximity to the bores, provide their NRHP status, and assess the Amendment Project effects.

The regulations for implementing Section 106 of the NHPA, at 36 CFR 800.9, encourage the integration of the Section 106 compliance process with the NEPA process; and we have done that in this section of the EA. This section is divided into several

---

45    "Undertaking means a project activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; those requiring a Federal permit, license or approval; and those subject to state or local regulation administered pursuant to a delegation or approval by a Federal agency," as defined in 36 CFR 800.16(y).

46    Historic properties include prehistoric or historic sites, districts, buildings, structures, objects, landscapes, or properties of traditional religious or cultural importance listed on or eligible for listing on the National Register of Historic Places, as defined in 36 CFR 800.16(l).

47    Cultural resources are locations of human activity, occupation, or use. According to the FERC's Office of Energy Projects "Guidelines for Reporting on Cultural Resources Investigations for National Gas Projects," cultural resources include any prehistoric or historic archaeological site, district, object, cultural feature, building or structure, cultural landscape, or traditional cultural property. Although "cultural resources" are not defined in 36 CFR 800, it is a "term-of-art" in the field of historic preservation and archaeological research. Some Indian tribes believe that cultural resources could include natural resources, such as plants and animals of traditional cultural or religious importance to tribes, topographic features that may be sacred, and viewsheds.

subsections that mirror the Section 106 compliance process. The process includes consultations; identification of historic properties; assessment of effects; and resolution of adverse effects, if necessary. Lastly, we reach conclusions about the status of our compliance with the NHPA.

### 5.1    Consultations

The FERC sent copies of our March 16, 2021 NOS and July 1, 2021 NOSS for the Amendment Project to a wide range of stakeholders, including other federal agencies, such as the ACHP, the COE, the EPA, the U.S. Department of the Interior Bureau of Indian Affairs (BIA), and the National Park Service (NPS), state and local government agencies, such as the SHPOs of West Virginia and Virginia, affected landowners, and Indian tribes that may have an interest in the Amendment Project area. The NOS contained a paragraph about Section 106 of the NHPA, which stated that we use the notice to initiate consultations with the SHPOs as well as to solicit their views and those of other government agencies, interested Indian tribes, and the public on the Amendment Project's potential effects on historic properties.

### 5.1.1    Consultations with the SHPOs

With a cover letter dated March 9, 2021, Mountain Valley sent copies of its *Desktop Review and Effects Analysis* reports (Dye et al., 2021a; Dye et al., 2021b) for the Amendment Project to the SHPOs of West Virginia and Virginia, and requested that their comments on the reports be filed with the FERC.

In a letter dated April 21, 2021, the West Virginia SHPO offered its review of Mountain Valley's *Desktop Review and Effects Analysis* report. That review stated that the West Virginia SHPO concurred "… that the proposed Amendment Project will have no effect on unevaluated and archaeological historic resources. We also concur that no further survey or evaluation is needed." With regard to standing structures and architectural resources, the West Virginia SHPO indicated that: "… it is our opinion that use of the proposed change in crossing methods will have no effect on the characteristics that qualify properties for inclusion in the National Register of Historic Places."

A response from the Virginia SHPO has not been received. The concurrence of the Virginia SHPO is assumed, under the stipulations of the PA, when more than 30 days have passed with no response after submittal of a report.

### 5.1.2    Consultations with Indian Tribes

The FERC sent our NOS to 30 federally-recognized Indians tribes that may have an interest in the Amendment Project.

Via cover letters dated March 10, 2021, Mountain Valley sent copies of its *Desktop Review and Effects Analysis* reports for the Amendment Project to interested Indian tribes, together with a request for tribes to file comments on the report with the FERC.  Mountain Valley sent copies of reports to the Cherokee Nation of Oklahoma, Cheyenne River Sioux Tribe of South Dakota, Delaware Nation of Oklahoma, Eastern Band of Cherokee Indians in North Carolina, Eastern Shawnee Tribe of Oklahoma, Peoria Tribe of Oklahoma, Rosebud Sioux Tribe of South Dakota, and United Keetoowah Band of Cherokee Indians in Oklahoma.

In response to our NOS, in a filing on April 15, 2021, the Monacan Indian Nation, through its attorney Cultural Heritage Partners, requested to be a consulting party in this proceeding.  We grant that request.  On June 2, 2021, Mountain Valley provided copies of documents submitted to the SHPOs for the Amendment Project to the Monacan Indian Nation.

### 5.1.3    Communications with Other Consulting Parties and the Public

Mountain Valley sent copies of its *Desktop Review and Effects Analysis* reports to other consulting parties, via a cover letter dated March 10, 2021, with a request that comments on the reports be filed with the FERC.  The parties contacted included the Summers County Historic Landmark Commission; Committee for Appalachian and Piedmont Preservation; Preservation Virginia; Historical Society of Western Virginia; Roanoke County Board of Supervisors; Roanoke Valley Preservation Foundation; Giles County Board of Supervisors; Giles County Administration, Greater Newport Rural Historic District Committee; Montgomery County Board of Supervisors; and Preserve Montgomery County, Virginia.

On March 19, 2021, Roanoke County Board of Supervisors filed a request to be a consulting party in the Section 106 process for the Amendment Project.  We grant the request.

In a March 22, 2021 filing of a motion to intervene, Ms. Grace Terry, who is one of the landowners of the Coles-Terry Rural Historic District, and a representative of the Committee for Appalachian and Piedmont Preservation, requested consulting party status in Docket No. CP21-57.  We grant Ms. Terry's request.

In response to our March 16, 2021 NOS, we received six other letters that commented on cultural resources issues.  In a March 22, 2021 filing, Ms. Desiree Shelley stated that: "Many Eastern Siouxan historical and cultural sites, especially burial mounds, are located along waterbodies along the MVP route."  We acknowledge that peoples associated with the Monacan, Sappony, Tutelo, Occaneehi, Sara, and Catawba tribes historically occupied or utilized portions of the Mountain Valley Pipeline Project area.  No Native American burial mounds have been recorded along the Mountain Valley Pipeline route.

Preserve Giles County, in a filing on March 22, 2021, stated that the "pipeline route bisects the Historic Village of Newport."  The Mountain Valley Pipeline route skirts but does not cross the boundaries of the Newport Historic District.

Also on March, 22, 2021, Mr. Fred Vest commented that he resides within the Bent Mountain Apple Orchard Rural Historic District, and that Mountain Valley seeks to use his driveway for an access road.  Mr. Vest states that his driveway is part of an old network of historic roads within the District.  Mr. Vest indicated that the Rosebud and Cheyenne River Sioux tribes had representatives visit the area.  Mountain Valley conducted archaeological excavations across Mill Creek from his property in 2018, and returned artifacts to his possession.  Mr. Vest is concerned that:  "[b]oring may further disrupt, waste and destroy fields of as yet undiscovered Native and historical artifacts."  No trenchless crossings are proposed on Mr. Vest's property.  The closest crossing to Mr. Vest's property is H-044, which is approximately 250 feet away, and no cultural resource sites were recorded in this area by Mountain Valley's consultants.

Ms. Lois Waldron Martin, in a letter filed March 22, 2021, stated: "…we have found several Native American arrowheads throughout the years, leading us to believe that our land could have been a hunting ground.  Therefore, we conclude the farm could have Native Americans buried in unmarked graves, possibly in, or near, MVP's right-of-way."  Ms. Martin identified the steam crossing on her property as "S-EF44," which corresponds to Mountain Valley's bore number H-044.  This area was previously inventoried for cultural resources by Mountain Valley's consultants, and no archaeological sites were recorded nearby.

In a filing dated March 20, 2021, Kathy and James Chandler stated that "MVP is not acknowledging the amount of workspace necessary; cultural and spiritual resources are present and at risk."  They are concerned with impacts on Historic Green Hollow Drive[48], within the Bent Mountain Apple Orchard Rural Historic District.  However, the

---

48    Green Hollow Drive is located adjacent to bore H-046.

road was not recorded as a contributing resource to the District, and was not assigned a state site number. Amendment Project related impacts on the Bent Mountain Apple Orchard Rural Historic District are discussed below. The Chandlers also mention a "Native American Burial site" recorded by Ben Rhodd of the Rosebud Sioux and Steve Vance of the Cheyenne River Sioux. In past correspondence with Mr. Vance, the FERC staff requested that he file information about the site, but this information has not been provided. Mountain Valley had its professional archaeological consultants investigate the area and found a "push pile," or bulldozed dirt and rocks, but not a burial mound.[49] Mountain Valley installed a 10-foot buffer and jersey barriers around the push pile. In addition, Mountain Valley shifted the pipeline to the east. The push pile is outside the limits of disturbance adjacent to bore H-045. Bores H-045 and H-046 would be located on the Chandler's parcels.

In a filing on April 16, 2021, Elizabeth Terry Reynolds expressed concern that bores H-042 and H-043 could potentially impact archaeological sites 44RN400 and 44RN401. As discussed below, both these sites were found eligible for the NRHP, could not be avoided by the Mountain Valley Pipeline Project, and impacts were mitigated through data recovery programs in accordance with the PA.

## 5.2    Identification of Historic Properties

### 5.2.1    Area of Potential Effect

In our FEIS for the Mountain Valley Pipeline Project, we defined the direct area of potential effect (APE) as a 300-foot-wide corridor along the pipeline route (150 feet on each side of centerline), a 100-foot-wide corridor along access roads, and the limits of ground disturbance at aboveground facilities, yards, and other extra workspaces. The indirect APE was defined as 0.25-mile (1,320 feet) on each side of the pipeline centerline. We adopt these definitions for the Amendment Project as well.

### 5.2.2    Inventory Results

Roanoke County expressed concerns about potential Amendment Project impacts on the NRHP-listed Blue Ridge Parkway and the eligible Appalachian Trail. There are no bores proposed within the boundaries of the Blue Ridge Parkway Historic District (Virginia historic site number 80-5161) in the vicinity where the Mountain Valley Pipeline Project crosses the Blue Ridge Parkway. Nor are there any bores associated

---

[49]    See accession number 20180511-5205.

with the Amendment Project proposed in the vicinity of the Appalachian National Scenic Trail near the Mountain Valley Pipeline Project crossing.

As part of its application to the FERC, Mountain Valley filed *Appendix H, Cultural Resources Site Information* which listed all cultural resources within 1,320 feet of the bore locations, recorder, and NRHP status. On March 12, 2021, Mountain Valley filed its *Desktop Review and Effects Analysis* reports.

Based on *Appendix H* and the *Desktop Review* reports, staff identified all cultural resources recorded within the APE. At 35 bore locations, there are no cultural resources nearby. Cultural resources were recorded near 85 bore locations and the two route realignments (MPs 0.7 and 230.8).

There are 144 resources in the indirect APE that are located between 150 and 1,320 feet of the bore locations. Of these, 101 sites were evaluated as not eligible for nomination to the NRHP. Outside of Historic Districts, three historic architectural sites in the indirect APE for the Amendment Project were evaluated as eligible for the NRHP. These are WZ-0154 (Mobley School) near the alignment shift at MP 0.7 (799 feet away), SU-0446 (Wiseman Residence) near bore F-021 (718 feet away), and 033-5304 (Clear View Dairy Farm) near bore I-067 (1,098 feet).

There are two bore locations (G-023 and G-024) inside the boundaries of the Greater Newport Rural Historic District (site number 35-412), which is listed on the NRHP. Within this Historic District, there are nine contributing properties located between 150 and 1,320 feet from the bores.

One bore (G-024) is in proximity to the Newport Historic District (site number 35-151), which is listed on the NRHP. Within 150 and 1,320 feet from this bore, there are 15 contributing properties to this Historic District.

There are three bore locations (H-030, H-031, and H-032) within the boundaries of the Coles-Terry Rural Historic District (80-5689), which has been determined eligible for the NRHP. Between 150 and 1,320 feet from those bores, there are three resources that contribute to the District.

There is one bore (H-040) within the Bent Mountain Rural Historic District (80-5677), which has been determined eligible for the NRHP. Within 150 and 1,320 feet from that bore, there are two resources that contribute to the District.

Within the Bent Mountain Apple Orchard Rural Historic District (80-5731), which has been determined eligible for the NRHP, there are seven bore locations (H-042, H-

043, H-044, H-045, H-046, H-047, and H-048).  Between 150 and 1,320 feet from those bores, there are five historic architectural sites that are contributing elements to the Bent Mountain Rural Historic District.

There are 36 archaeological sites in the direct APE for the Amendment Project. Of these, 23 are not eligible for the NRHP.

There are 12 archaeological sites (46NI847, 46NI848, 46SU147, 46SU722, 46SU740, 46SU767, 44FR355, 44FR370, 44GS230, 44RN400, 44RN401, and 44RN408) within 150 feet of a bore that are either unevaluated or eligible for the NRHP.  As further discussed below under effects, eight of those archaeological sites were avoided during installation of the Mountain Valley Pipeline Project.  Four archaeological sites could not be avoided, and impacts were mitigated through data recovery programs.

Outside of Historic Districts, there is one eligible historic site (060-5170) within 150 feet of a bore.  See section B.5.3 below for further details.

Within the Bent Mountain Apple Orchard Rural Historic District, there are two historic architectural sites (80-5677-9 [House] and 80-5677-6 [Hale Cabin]) that are contributing elements to the Bent Mountain Rural Historic District and the Bent Mountain Apple Orchard Rural Historic District within 150 feet of the bores.  See section B.5.3 below for further details.

### 5.3    Assessment of Effects

The Amendment Project would have no effect under Section 106 on sites that are not eligible for nomination to the NRHP.  Stipulation IIB of the Mountain Valley Pipeline Project PA states: "Those cultural resources which the FERC staff determines do not meet the NRHP criteria, after consultations with [the SHPO] (and federal land managing agencies for sites on federal lands, interested Indian Tribes, and other consulting parties, as appropriate), will require no further considerations."

We do not believe that the Amendment Project would have any adverse impacts on archaeological sites that may be unevaluated, listed on the NRHP, or eligible but are located more than 150 feet from an individual bore.  It is possible for the Amendment Project to have impacts on historic architectural sites between 150 and 1,320 feet of a bore location, where the bore may have visual or auditory effects that may alter the characteristics that contribute to elements that make a site eligible for the NRHP.

The pipeline would be installed underground, and once the right-of-way is restored, visual impacts would be reduced.  Likewise, construction noise would be

temporary during pipeline installation.  The Amendment Project should not have adverse long-term impacts on the three historic properties (sites WZ-0154, 033-5304, and SU-0446) outside of Historic Districts, which are located more than 150 feet away from Amendment Project facilities.  The Mobley School is about 800 feet from the alignment shift at MP 0.7; the Wiseman Residence is about 718 feet from the F-022 bore; and Clear View Dairy Farm is about 1,000 feet from the I-067 bore.

The Mountain Valley Pipeline Project right-of-way crosses through the boundaries of the Greater Newport Rural Historic District and the Coles-Terry Rural Historic District.  However, there are no contributing properties within the Greater Newport Rural Historic District or the Coles-Terry Rural Historic District that are closer than 150 feet from any bore for the Amendment Project.

We identified eight archaeological sites (46NI847, 46NI848, 46SU147, 46SU722, 46SU740, 44GS230, 44RN408, and 44FR355) evaluated as eligible for the NRHP located within 150 feet of a bore, which would be avoided by pipeline construction. Mountain Valley previously filed avoidance plans for these sites that were accepted by the SHPOs and FERC staff.  Stipulation IIIA1 of the PA states that: "FERC staff and [the SHPO] (and federal land managing agencies for sites on federal lands) agree that the Mountain Valley [Pipeline Project] would have no effect (in accordance with 36 CFR 800.4(d)(l)) upon historic properties that are avoided."

There are four archaeological sites (46SU767, 44RN400, 44RN401, and 44FR370) that are eligible for the NRHP, located within 150 feet of a bore, and that cannot be avoided by pipeline construction.  For those sites, we concluded that the historic properties would be adversely affected by the Mountain Valley Pipeline Project.  In all these cases, impacts were mitigated by data recovery excavations, as outlined in filed Treatment Plans approved by the SHPO's and FERC's staff, in accordance with Stipulation IIIB1 of the PA.

There is one historic site (60-5170, Norfolk and Southern Railroad) outside of Historic Districts, within 150 feet of a bore (H-020).  Because the pipeline would be installed under the railroad using a bore, the Amendment Project would have no adverse effects on this historic property, in accordance with Stipulation IIIA2 of the PA.

Within the boundaries of the Bent Mountain Apple Orchard Rural Historic District and the Bent Mountain Rural Historic District, there are two historic architectural sites (80-5677-9 [House] and 80-5677-6 [Hale Cabin]) within 150 feet of two bores (H-043 and H-046) that are contributing elements to the Districts.  Site 80-5677-9 is located

outside of the limits of disturbance.  The Hale Cabin was fenced and would be avoided and monitored during construction.

The PA for the Mountain Valley Pipeline Project indicated that FERC staff agreed with the Virginia SHPO that the Mountain Valley Pipeline Project would have adverse effects on the Bent Mountain Rural Historic District and Bent Mountain Apple Orchard Rural Historic District.  In accordance with Stipulation IIIB1 of the PA, Mountain Valley previously filed Treatment Plans to mitigate impacts on the Bent Mountain Rural Historic District and Bent Mountain Apple Orchard Rural Historic District, and these plans were approved by the Virginia SHPO and FERC staff.  Mountain Valley implemented the Treatment Plans when it filed a Preliminary Information Form for the Bent Mountain Rural Historic District and an NRHP Nomination Form for the Bent Mountain Apple Orchard Rural Historic District, which were accepted by the SHPO, and distributed Preservation Funds to Roanoke County.  The Amendment Project does not require changes to the PA; and the original Treatment Plans are still applicable.

### 5.4    Unanticipated Discoveries

It is possible that during the excavation of the bores for the Amendment Project, currently unknown and unanticipated cultural resources could be discovered.  In its application for the Amendment Project, Mountain Valley stated that it would "use the same approved plan for unanticipated historic properties and human remains as for the Certificated Project."  Further, the 19th whereas clause of the PA executed for the Mountain Valley Pipeline Project on December 15, 2017 states that…"if any such discoveries are made during data recovery excavations or construction, the remains shall be treated in accordance with Mountain Valley's *Plan for Unanticipated Historic Properties and Human Remains* (Discovery Plan), discussed below in Stipulation I.E."  Stipulation I.E. of the PA reads: "Mountain Valley produced a Discovery Plan that has been reviewed and approved by FERC staff and the West Virginia Division of Culture and History (WVDCH) and Virginia Department of Historic Resources (VADHR).  The Discovery Plan includes procedures to be followed if human remains or unanticipated historic properties are discovered during identification or evaluation studies, data recovery excavations, or construction."

### 5.5    Compliance with the NHPA

No traditional cultural properties or properties of religious or cultural importance to Indian tribes were identified in the APE by Mountain Valley or its consultants, the SHPOs of West Virginia and Virginia, the BIA, the NPS, or Indian tribes contacted.  Therefore, we have complied with the intent of Section 101(d)(6) of the NHPA.

We agree with the West Virginia SHPO, in its April 21, 2021 review of Mountain Valley's *Desktop* report, that the Amendment Project would have no adverse impacts on archaeological and historic architectural sites in the direct APE. The concurrence of the Virginia SHPO is assumed, under the stipulations of the PA when more than 30 days have passed with no response after submittal of a report.

The PA executed for the Mountain Valley Pipeline Project required mitigation for historic properties that could not be avoided and may be adversely affected by the Mountain Valley Pipeline Project. As stated above, the Amendment Project does not require changes to the PA. Based on all of the above, we have complied with Section 106 of the NHPA.

## 6.0    Air Quality and Noise

### 6.1    Air Quality

The Amendment Project would result in emissions of regulated air pollutants and other air contaminants during construction. There would be no operational emissions from the Amendment Project except very minor fugitive methane emissions previously identified in the FEIS.

#### 6.1.1    Air Quality Regulations

The Clean Air Act (CAA) of 1970, as amended in 1977 and 1990, is the basic federal statute governing air quality. The provisions of the CAA that are potentially relevant to the Amendment Project include National Ambient Air Quality Standards (NAAQS) and General Conformity.

Federal and state air quality standards are designed to protect human health. The EPA has developed NAAQS for criteria air pollutants such as oxides of nitrogen (NOx) and carbon monoxide (CO), sulfur dioxide ($SO_2$), and inhalable particulate matter ($PM_{2.5}$ and $PM_{10}$). $PM_{2.5}$ includes particles with an aerodynamic diameter less than or equal to 2.5 micrometers, and $PM_{10}$ includes particles with an aerodynamic diameter less than or equal to 10 micrometers. The NAAQS were set at levels the EPA believes are necessary to protect human health and welfare. Volatile organic compounds (VOC) are regulated by EPA primarily to prevent the formation of ozone, another criteria pollutant included in the NAAQS and a constituent of photochemical smog. Many VOCs form ground-level ozone by reacting with sources of oxygen molecules such as NOx in the atmosphere in the presence of sunlight. NOx and VOCs are referred to as ozone precursors. Hazardous air pollutants (HAP) are also emitted during fossil fuel combustion and are suspected or known to cause serious health effects as well as adverse environmental effects.

Greenhouse gases (GHG) are gases that trap heat in the atmosphere and have been determined by the EPA to be the primary cause of climate change. Fossil fuel combustion primarily emits GHGs such as carbon dioxide ($CO_2$), methane ($CH_4$), and nitrous oxide ($N_2O$). Emissions of GHGs are typically expressed in terms of $CO_2$ equivalents ($CO_2e$) where the atmospheric heating potential of each gas is expressed as a multiple of the atmospheric heating potential of $CO_2$.

If measured ambient air pollutant concentrations for a subject area remain below the NAAQS criteria, the area is considered to be in attainment with the NAAQS. The proposed trenchless crossings are located in the counties of Wetzel, Harrison, Doddridge, Lewis, Webster, Nicholas, Greenbrier, Summers, and Monroe, West Virginia and Giles, Montgomery, Roanoke, Franklin, and Pittsylvania, Virginia. All counties where the trenchless crossings would be located are in attainment with the NAAQS for all criteria pollutants. Therefore, a CAA General Conformity Analysis is not required.

No county or local air quality regulations have been identified as being potentially applicable to the Amendment Project.

### 6.1.2 Construction Emissions and Impacts

During construction, a temporary reduction in ambient air quality would result from criteria pollutant emissions and fugitive dust generated by construction equipment. The quantity of fugitive dust emissions would depend on the moisture content and texture of the soils that would be disturbed. Dust suppression techniques, such as watering the right-of-way and working area may be used as necessary in construction zones near residential and commercial areas to minimize the impacts of fugitive dust on sensitive areas. In addition, Mountain Valley has committed to implementing the same measures to reduce construction emissions as described in the FEIS.

Mountain Valley conducted an analysis of estimated emissions from the proposed trenchless crossing methods compared to open-cut dry crossings. The bore crossings would result in higher levels of emissions per crossing. As discussed in section A.4 of this EA, Mountain Valley has already received authorization to microtunnel at the Gauley and Roanoke Rivers, but, as part of the Amendment Project, proposes to conduct nighttime microtunneling activities at those waterbodies. Table 6 below shows the original emissions estimate for open-cut dry crossings from the FEIS, as well as the estimated emissions for the crossings proposed in the Amendment Project and the Gauley and Roanoke River crossings.

Table 6

**Total Construction Emissions Comparison for All Open-Cut and Trenchless Crossings (tons)**

| | NOx | CO | SO2 | VOC | PM10 | PM2.5 | CO2e |
|---|---|---|---|---|---|---|---|
| **Open-Cut Dry (FEIS)** | 50.37 | 17.26 | 0.13 | 0.42 | 2.97 | 2.87 | 17,136.81 |
| **Proposed Bore Type [a]** | | | | | | | |
| **Conventional Bore** | 93.83 | 29.38 | 0.19 | 0.73 | 4.90 | 4.75 | 25,480.10 |
| **Guided Conventional Bore** | 7.85 | 2.01 | 0.01 | 0.06 | 0.35 | 0.34 | 1,429.18 |
| **Direct Pipe®** | 6.57 | 2.03 | 0.01 | 0.05 | 0.34 | 0.33 | 1,551.70 |
| **Microtunnel [b]** | 15.74 | 4.73 | 0.03 | 0.12 | 0.78 | 0.76 | 3,301.85 |
| **Total Proposed** | 123.99 | 38.15 | 0.24 | 0.96 | 6.37 | 6.18 | 31,762.83 |
| **Emissions Increase** | **73.62** | **20.89** | **0.11** | **0.54** | **3.40** | **3.31** | **14,626.02** |

| | |
|---|---|
| a | Emissions include both the bore pit excavation and boring. |
| b | Commission staff authorized Mountain Valley to change the crossing method to a microtunnel under variances D-35 and H-21, respectively. Although the proposed action for the Amendment Project is only evaluating the modification to nighttime construction this estimate includes 24-hour emissions. |

The Amendment Project would result in increases in construction emissions. However, those emissions would only occur during construction activities and would be dispersed over the 304 miles of the pipeline route. The Amendment Project would not result in any change in operational emissions for the Mountain Valley Pipeline Project. We conclude that there would be minor temporary impacts on localized air quality due to increases in criteria pollutants, VOC, and fugitive dust in the areas of trenchless crossing activity. Based on the above, we conclude that there would not be significant impacts associated with construction emissions from the Amendment Project.

### 6.1.3   Climate Change

We received comments regarding the Mountain Valley Pipeline Project's impact on climate change. Specifically, the GHG emissions from the Mountain Valley Pipeline Project, as well as exploration, production, transport, and downstream end use combustion emissions from natural gas. However, our analysis here is limited to construction emissions resulting from the Amendment Project, as there would be no

change to operational or downstream emissions of the Mountain Valley Pipeline Project as a result of the Amendment Project.

Climate change is the variation in climate (including temperature, precipitation, humidity, wind, and other meteorological variables) over time and cannot be characterized by an individual event or anomalous weather pattern. For example, a severe drought or abnormally hot summer in a particular region is not a certain indication of climate change. However, a series of severe droughts or hot summers that statistically alter the trend in average precipitation or temperature over decades may indicate climate change. Recent research has begun to attribute certain extreme weather events to climate change (U.S. Global Change Research Program [USGCRP], 2018).

The leading U.S. scientific body on climate change is the USGCRP, composed of representatives from 13 federal departments and agencies.[50] The Global Change Research Act of 1990 requires the USGCRP to submit a report to the President and Congress no less than every 4 years that "1) integrates, evaluates, and interprets the findings of the USGCRP; 2) analyzes the effects of global change on the natural environment, agriculture, energy production and use, land and water resources, transportation, human health and welfare, human social systems, and biological diversity; and 3) analyzes current trends in global change, both human-induced and natural, and projects major trends for the subsequent 25 to 100 years." These reports describe the state of the science relating to climate change and the effects of climate change on different regions of the United States on various societal and environmental sectors, such as water resources, agriculture, energy use, and human health.

In 2017 and 2018, the USGCRP issued its *Climate Science Special Report: Fourth National Climate Assessment*, Volumes I and II (Fourth Assessment Report) (USGCRP, 2017; and USGCRP, 2018, respectively). The Fourth Assessment Report states that climate change has resulted in a wide range of impacts across every region of the country. Those impacts extend beyond atmospheric climate change alone and include changes to water resources, transportation, agriculture, ecosystems, and human health. The U.S. and the world are warming; global sea level is rising and acidifying; and certain weather events are becoming more frequent and more severe. These changes are driven by accumulation of GHG in the atmosphere through combustion of fossil fuels (coal,

---

50    The USGCRP member agencies are: Department of Agriculture, Department of Commerce, Department of Defense, Department of Energy, Department of Health and Human Services, Department of the Interior, Department of State, Department of Transportation, Environmental Protection Agency, National Aeronautics and Space Administration, National Science Foundation, Smithsonian Institution, and U.S. Agency for International Development.

petroleum, and natural gas), combined with agriculture, clearing of forests, and natural sources. These impacts have accelerated throughout the end of the 20th and into the 21st century (USGCRP, 2018). The FEIS discussed the existing and estimated future climate change impacts in the Mountain Valley Pipeline Project area.

GHGs were identified by the EPA as pollutants in the context of climate change. GHG emissions do not result in proportional local and immediate impacts; it is the combined concentration in the atmosphere that affects the global climate system. These are fundamentally global impacts that feedback to local and regional climate change impacts. Thus, the geographic scope for cumulative analysis of GHG emissions is global, rather than local or regional. For example, a project 1 mile away emitting 1 ton of GHGs would contribute to climate change in a similar manner as a project 2,000 miles distant also emitting 1 ton of GHGs.

Climate change is a global phenomenon; however, for this analysis we will focus on the existing and potential climate change impacts in the general Amendment Project area. The USGCRP's Fourth Assessment Report notes the following observations of environmental impacts are attributed to climate change in the Northeast and Southeast regions of the United States[51] (USGCRP, 2017; USGCRP, 2018):

Northeast

- increases in annual average temperatures across the Northeast range from less than 1 °F (0.6 °C) in West Virginia to about 3 °F (1.7 °C) or more in New England since 1901;

- from 1958 to 2016, the Northeast experienced a 55 percent increase in the amount of precipitation falling in heavy events (the greatest increase in the nation) and 5 to 20 percent increase in average winter precipitation;

- warming during the winter–spring transition has led to earlier snowmelt-related runoff in areas of the Northeast with substantial snowpack; and

- ocean and coastal ecosystems are being affected by large changes in a variety of climate-related environmental conditions.

Southeast

- The decade of 2010 through 2017 has been warmer than any previous decade since 1920 for average daily maximum and average daily minimum temperature;

---

51    West Virginia is located in the Northeast region, while Virginia is located in the Southeast.

- since 1960, there have been lower numbers of days above 95°F compared to the pre-1960 period but during the 2010's the number of nights above 75°F has been nearly double the average over 1901 – 1960. The length of the freeze free season was 1.5 weeks longer on average in the 2010s compared to any other historical period on record;

- number of days with 3 or more inches of rain has been historically high over the past 25 years. The 1990s, 2000s and 2010s rank first, third and second, respectively in number of events; and

- summers have been either increasingly dry or extremely wet, depending on location.

The USGCRP's Fourth Assessment Report notes the following projections of climate change impacts in the Project region (Northeast and Southeast US) with high or very high level of confidence[52] (USGCRP, 2018):

Northeast

- precipitation in the Northeast is projected to be about 1 inch greater for December through April by end of century (2070–2100) under the higher scenario;

- temperatures are projected to increase by 5.1°F by the 2090s under the worst case scenario (continually increasing emissions) and would increase by 4.0°F if emissions were decreased;

- by the middle of the century, the freeze-free period across much of the Northeast is expected to lengthen by as much as two weeks under the lower scenario and by two to three weeks under the higher scenario. By the end of the century, the freeze-free period is expected to increase by at least three weeks over most of the region;

- higher than average sea level rise along the Northeastern coast will occur due to land subsidence; and

---

52    The report authors assessed current scientific understanding of climate change based on available scientific literature. Each "Key Finding" listed in the report is accompanied by a confidence statement indicating the consistency of evidence or the consistency of model projections. A high level of confidence results from "moderate evidence (several sources, some consistency, methods vary and/or documentation limited, etc.), medium consensus." A very high level of confidence results from "strong evidence (established theory, multiple sources, consistent results, well documented and accepted methods, etc.), high consensus." https://science2017.globalchange.gov/chapter/front-matter-guide.

- much of the infrastructure in the Northeast, including drainage and sewer systems, flood and storm protection assets, transportation systems, and power supply, is nearing the end of its planned life expectancy; climate-related disruptions will only exacerbate existing issues with aging infrastructure.

Southeast

- climate models project nighttime temperatures above 75°F and daytime maximum temperatures above 95°F will become the summer norm. Nights above 80°F and days above 100°F, which are now relatively rare, would become common;

- lowland coastal areas are expected to receive less rainfall on average but experience more frequent intense rainfall events followed by longer drought periods; and

- tropical storms and hurricanes may become more intense.

It should be noted that while the impacts described above taken individually may be manageable for certain communities, the impacts of compound extreme events (such as simultaneous heat and drought, or flooding associated with high precipitation on top of saturated soils) can be greater than the sum of the parts (USGCRP, 2018).

The GHG emissions associated with construction of the Amendment Project were identified and quantified in section B.6.1.2 above. The change from open-cut dry to trenchless crossings would result in increases in GHG emissions during construction equaling approximately 14,626.02 tons (13,268.5 metric tons) of $CO_2e$. This amount of emissions from construction of the Amendment Project would increase the atmospheric concentration of GHGs in combination with past, current, and future emissions from other sources globally and contribute incrementally to future climate change impacts. In order to assess impacts on climate change associated with the Project, Commission staff considered whether it could identify discrete physical impacts resulting from the Amendment Project's GHG emissions or compare the Amendment Project's GHG emission to established targets designed to combat climate change.

To date, staff has not identified a methodology to attribute discrete, quantifiable, physical effects on the environment to the Amendment Project's incremental contribution to GHGs. We have looked at atmospheric modeling used by the EPA, National Aeronautics and Space Administration, the Intergovernmental Panel on Climate Change, and others, and we found that these models are not reasonable for Project-level analysis for a number of reasons. For example, these global models are not suited to determine the incremental impact of individual projects, due to both scale and overwhelming complexity. We also reviewed simpler models and mathematical techniques to determine

global physical effects caused by GHG emissions, such as increases in global atmospheric $CO_2$ concentrations, atmospheric forcing, or ocean $CO_2$ absorption. We could not identify a reliable, less complex model for this task and thus staff could not determine specific localized or regional physical impacts from GHG emissions from the Amendment Project. Without the ability to determine discrete resource impacts, Commission staff are unable to assess the Amendment Project's contribution to climate change through any objective analysis of physical impact attributable to the Amendment Project.

Additionally, Commission staff have not been able to find an established threshold for determining the Amendment Project's significance when compared to established GHG reduction targets at the state or federal level. We note that there have been a series of recent administrative changes and we continue to evaluate their impact on our review process. For example, on January 20, 2021, President Biden issued the *Executive Order on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis* (EO 13990) and on January 27, 2021, the *Executive Order on Tackling the Climate Crisis at Home and Abroad* (EO 14008). Amongst other objectives, the Executive Orders call for a net-zero emission economy and a carbon-free electricity sector. In addition, on January 20, 2021, President Biden announced that the U.S. will rejoin the Paris Climate Agreement (Agreement), enabling the U.S. to be a party to the Agreement on February 19, 2021. The Agreement aims to limit global warming to well below 2 degrees Celsius, and preferably to 1.5 degrees Celsius, compared to pre-industrial levels.[53] On April 20, 2021, the U.S. proposed establishing a U.S. economy-wide target of reducing net GHG emissions by 50-52 percent below 2005 levels by 2030.[54] In 2020, Virginia enacted legislation establishing as an energy policy objective creating reduction goals necessary to achieve a statutory target of net-zero GHGs across economic sectors by 2045 (NCSL, 2021). West Virginia currently does not have GHG emissions reduction targets.

In order to provide context of the Amendment Project emissions on a national level, we compare the Amendment Project's construction GHG emissions to the total GHG emissions of the United States as a whole. At a national level, 5,769.1 million

---

53    Additional information is available at https://unfccc.int/process-and-meetings/the-paris-agreement/the-paris-agreement. Accessed May 19, 2021.

54    The United States of America Nationally Determined Contribution (Apr. 20, 2021). Available at https://www4.unfccc.int/sites/ndcstaging/PublishedDocuments/United%20States%20of%20America%20First/United%20States%20NDC%20April%2021%202021%20Final.pdf.

metric tons of $CO_2e$ were emitted in 2019 (inclusive of $CO_2e$ sources and sinks).[55]  The construction-related emissions of this Project could potentially increase $CO_2e$ emissions based on the 2019 national levels by 0.0002 percent.

In order to provide context of the Amendment Project emissions on a state level, we compare the Amendment Project's construction GHG emissions to the state GHG inventories.  At the state level, energy related $CO_2$ emissions in 2018 were 90.0 million metric tons in West Virginia, and 107.8 million metric tons in Virginia.[56]  Construction emissions from the Amendment Project could potentially increase $CO_2e$ emissions based on the West Virginia 2018 levels by 0.0069 percent.  Construction related emissions from the Amendment Project could potentially increase $CO_2e$ emissions based on the Virginia 2018 levels by 0.0066 percent.

Based on our analysis in this EA, we are unable to assess the Amendment Project's contribution to climate change through any objective analysis of physical impacts attributable to the Amendment Project or an established threshold when compared to state or federal GHG reduction targets.  However, in a recent order, the Commission considered a project emitting a total of 20,006 metric tons of $CO_2e$ during construction and operation and determined the project's contribution to climate change would not be significant.[57]  The Amendment Project's emissions would be less (13,268.5 metric tons $CO_2e$) than the emissions in that proceeding and fall below the level that the Commission has previously determined would not be significant.

### 6.2    Noise

The noise environment can be affected both during construction and operation of a project.  The magnitude and frequency of environmental noise may vary considerably over the course of the day, throughout the week, and across seasons, in part due to changing weather conditions and the effects of seasonal vegetative cover.  For the Amendment Project, there would be no additional permanent (operational) noise that would result from the change in pipeline installation methods.

---

55    U.S. Environmental Protection Agency, *Inventory of U.S. Greenhouse Gas Emissions and Sinks 1990-2019* at ES-9 (Table ES-2) (2021).  Available at https://www.epa.gov/sites/production/files/2021-04/documents/us-ghg-inventory-2021-main-text.pdf.  Accessed June 2021.

56    U.S. Energy Information Administration, *Table 1, State Energy-Related Carbon Dioxide Emissions by Year, Unadjusted: West Virginia and Virginia*.  Available at https://www.eia.gov/environment/emissions/state/.  Accessed July 2021.

57    See Northern Natural Gas Company, 174 FERC ¶ 61,189, at P 29 (2021).

### 6.2.1   Noise Characteristics and Regulations

Decibels (dB) are the units of measurement used to quantify the intensity of noise. To account for the human ear's sensitivity to low level noises the dB values are corrected to weighted values known as dB on the A-weighted scale (dBA). The A-weighting scale was developed and has been shown to provide a good correlation with the human response to sound and is the most widely used descriptor for community noise assessments. The faintest sound that can be heard by a healthy ear is about 0 dBA, while an uncomfortably loud sound is about 120 dBA. A 3 dBA change of sound level is considered to be barely perceivable by the human ear, a 5 or 6 dBA change of sound level is considered noticeable, and a 10 dBA increase is perceived as if the sound intensity has doubled.

Two measures used by the FERC relate the time-varying quality of environmental noise with its known effect on people are the equivalent continuous sound level ($L_{eq}$) and the day-night average sound level ($L_{dn}$). The preferred single value figure to describe sound levels that vary over time is $L_{eq}$, which is defined as the sound pressure level of a noise fluctuating over a period of time, expressed as the amount of average energy. $L_{dn}$ is defined as the 24-hour average of the equivalent average of the sound levels during the daytime ($L_d$ – from 7:00 a.m. to 10:00 p.m.) and the equivalent average of the sound levels during the nighttime ($L_n$ – 10:00 p.m. to 7:00 a.m.). Specifically, in the calculation of the $L_{dn}$, late night and early morning (10:00 p.m. to 7:00 a.m.) noise exposures are increased by 10 dB to account for people's greater sensitivity to sound during nighttime hours. In general, if the sound energy does not vary over the given time period, the $L_{dn}$ level will be equal to the $L_{eq}$ level plus 6.4 dB. The 6.4 dB difference between the $L_{dn}$ and the $L_{eq}$ is a result of the 10 dB nighttime addition for the $L_{dn}$ calculation.

The EPA has indicated that an $L_{dn}$ of 55 dBA protects the public from outdoor activity interference. We have adopted this criterion and use it to evaluate the potential noise impacts from construction and operation of projects.

The FERC guidelines require that the sound attributable to new or modified compressor equipment, or LNG-related equipment not exceed an $L_{dn}$ of 55 dBA at any nearby noise sensitive area (NSA) such as a residence, hospital, place of worship, etc. Also, a sound level of 55 dBA ($L_{dn}$) can be used as a benchmark sound criterion or guideline for assessing the noise impact of other sources of noise, such as certain construction noise, including drilling or boring noise. As a result of the nighttime penalty, a constant sound level at 48.6 dBA $L_{eq}/L_n$ for 24-hours will result in an $L_{dn}$ of 55 dBA. We have not identified any state or local regulations or ordinances as being potentially applicable to the proposed Amendment Project.

### 6.2.2   Noise Impacts

The Amendment Project will have two distinct phases of construction that would generate high levels of noise:  1) excavation of entry and exit bore pits; and 2) active boring.  Noise from backfilling would be similar to excavation, although it would be for a much shorter duration.  The bore pits and adjacent upland trench tie-in locations would be backfilled at the same time.  In terms of the total volume of spoil material subject to movement by construction equipment, bore pit backfilling would be similar to the amount that was previously analyzed for open-cut dry crossings.

Mountain Valley proposes to use trenchless crossing methods at 120 locations along the pipeline route.  Most locations would involve conventional boring, which would occur in daily shifts that would typically last about 12 hours.  Consequently, noise impacts would occur during the day for these crossings and would not differ significantly from those previously analyzed in the FEIS.  However, Mountain Valley expects that the two guided conventional bores, the Direct Pipe® bore, the three conventional bores associated with railroad crossings, and the two microtunnel crossings of the Roanoke and Gauley Rivers would include 24-hour boring operations.[58]  As discussed in section A of this EA, nighttime microtunneling is necessary to minimize opportunities for the bore hole to settle around the drill pipe, which would require additional energy to restart boring, or for the bore machine to become stuck.  Crossings E-012, H-016,[59] and H-020 would cross railroads operated by CSX, Roanoke Valley Resource Authority, and Norfolk Southern, respectively.  The owners of these railroads require boring operations to progress on a 24-hour basis, without stopping, until complete.

Mountain Valley conducted construction noise assessments for the two guided conventional bores, the Direct Pipe® crossing, the three conventional bores associated with railroad crossings, and the two microtunnel bores.  A noise model was developed using the Cadna/A version 2020 MR 1 noise model (noise model).  The noise model used bore equipment specified by Mountain Valley for each trenchless crossing type and

---

58    Commission staff authorized Mountain Valley to change the crossing method of the Gauley and Roanoke Rivers to a microtunnel under variances D-35 and H-21, respectively.

59    According to Mountain Valley, the railroad at H-016 is owned by Roanoke Valley Resource Authority and operated under contract with Norfolk Southern.  This railroad provides rail service to the Smith Gap Landfill.  Mountain Valley's current permit requires a bored crossing and 24-hour boring operations.  Roanoke Valley Resource Authority is currently paving over the railroad tracks.  As of July 29, 2021 a base layer of asphalt has been installed.  Mountain Valley is currently working with the Roanoke Valley Resource Authority to modify its permit to eliminate 24-hour boring.

construction phase and estimated bore pit size and depth.  The model assumed that only boring equipment would be located inside the bore pit for each of the sites and that all other equipment would be arranged at grade surrounding the pit.  Additionally, a boring noise model was developed for the analyses using U.S. Federal Highway Administration (FHWA) Roadway Construction Noise Model (RCNM) noise data for the expected construction equipment that would be used during boring.  Mountain Valley used the noise model to predict the boring sound level contribution at the NSAs.  To be conservative, foliage was not included in the model.  Mountain Valley provided noise levels at a specific distance of 500 feet from the bore pits.

As noted elsewhere, excavation activities would be limited to daytime hours only, so Mountain Valley only assessed nighttime noise levels associated with the proposed nighttime boring activities.  Where nighttime noise is predicted to exceed the Commission's noise threshold, Mountain Valley commits to physical and operational mitigation measures that would decrease noise levels below the Commission's threshold. Mountain Valley would coordinate with affected and adjacent landowners regarding boring plans and nighttime boring activities.  The results of the modeling for each of the eight modeled locations where nighttime activities would occur are summarized below. Best estimates were used for the duration of construction activities; however, site-specific conditions could require the use of longer durations for completing construction.

<u>Little Stony Creek Guided Conventional Boring Site</u>

The Little Stony Creek site would be located at MP 204.2 along the Mountain Valley Pipeline route (crossing number G-013).  Excavation of the bore pits is anticipated to occur 12 hours per day (daytime only) for 30 days total.  Boring operations would run 24 hours per day for a total of 3 days.

Predicted sound levels during the 3 nights of boring operations would exceed 48.6 dBA $L_{eq}$, however, with mitigation, the predicted nighttime sound levels during boring operations would be lower than 48.6 dBA $L_{eq}$ for all NSAs, and less than 55 dBA $L_{eq}$ for daytime activities.  In order to lower nighttime sound levels, Mountain Valley would install barriers around the conventional boring equipment, ranging in height from 24 feet for the southern barrier to 26 feet for the northern barrier.  Additionally, Mountain Valley would house welding rigs, trash pumps, and slurry pumps within three-sided enclosures with a roof.  The open side of all enclosures would face west along the pipeline corridor. Additionally, Mountain Valley would only operate one excavator at night, which would assist with the guided conventional boring process, including lowering pipe sections into the bore pit.  With these mitigations in place, the noise model predicts that sound levels at

Little Stony Creek would be lower than 48.6 dBA $L_{eq}$ during nighttime boring operations at all surrounding NSAs (see figure 1).



**Figure 1     Predicted 48.6 dBA $L_n$ Contour for the Mitigated Little Stony Creek Conventional Boring Site**

Elk River Guided Conventional Boring Site

The Elk River site would be located at MP 87.3 along the Mountain Valley Pipeline route (crossing number C-022). Excavation of the bore pits is anticipated to occur 12 hours per day (daytime only) for 44 days total. Boring operations would run 24 hours per day for a total of 35 days.

Predicted sound levels during all boring activities would be lower than 48.6 dBA $L_{eq}$ at all NSAs; therefore, mitigation would not be required (see figure 2).



**Figure 2**      **Predicted 48.6 dBA $L_n$ Contour for the Elk River Guided Conventional Bore Crossing**

<u>Greenbrier River Direct Pipe® Boring Site</u>

The Greenbrier River site would be located at MP 171.4 along the Mountain Valley Pipeline route (crossing number F-021). Excavation of the bore pits is anticipated to occur 12 hours per day (daytime only) for 62 days total. Boring operations would run 24 hours per day for a total of 41 days

Predicted sound levels during boring operations would exceed 48.6 dBA $L_{eq}$, however, with mitigation, the predicted sound levels during boring operations would be lower than 48.6 dBA $L_{eq}$ for all NSAs. Mountain Valley would install a 24-foot-tall U-shaped noise barrier along the northwest, northeast, and southeast sides of the work area. Additionally, Mountain Valley would house welding rigs, trash pumps, and slurry pumps within three-sided enclosures with a roof. The open side of all enclosures would face southwest along the pipeline corridor. With this mitigation in place, the noise model predicts that sound levels at the Greenbrier River would be lower than 48.6 dBA $L_{eq}$ during nighttime boring operations at all surrounding NSAs (see figure 3).

80



**Figure 3    Predicted Mitigated 48.6 dBA $L_n$ Contour for the Greenbrier River Direct Pipe® Crossing**

E-012 Railroad Conventional Bore Crossing Site

The E-012 railroad conventional bore crossing would be located at MP 140.4 along the Mountain Valley Pipeline route (crossing number E-012).  Excavation of the bore pits is anticipated to occur 12 hours per day (daytime only) for 8 days total.  Boring operations would run 24 hours per day for a total of 9 days.

Predicted sound levels during all conventional boring would be lower than 48.6 dBA $L_{eq}$ at all surrounding NSAs therefore, mitigation is not required (see figure 4).



**Figure 4         Predicted 48.6 dBA L$_n$ Contour for the E-012 Railroad Crossing**

<u>H-016 Railroad Conventional Bore Crossing Site</u>

The H-016 site is located at MP 230.8 along the Mountain Valley Pipeline route. Excavation of the bore pits is anticipated to occur 12 hours per day (daytime only) for 21 days.  Boring operations would run 24 hours per day for a total of 10 days.

Predicted sound levels during the 10 nights of nighttime boring operations would exceed 48.6 dBA L$_{eq}$, however, with mitigation, the predicted sound levels during all operations would be lower than 48.6 dBA L$_{eq}$ for all NSAs.  Mountain Valley would install two 24-foot-tall barriers on the north side of the work area and on the south/southwest side.  Additionally, Mountain Valley would house welding rigs, trash pumps, and slurry pumps within three-sided enclosures with a roof.  The open side of all enclosures would face east along the pipeline corridor.  With this mitigation in place, the noise model predicts that sound levels at the H-016 railroad site would be lower than 48.6 dBA L$_{eq}$ during nighttime boring operations at all surrounding NSAs (see figure 5).



**Figure 5      Predicted Mitigated 48.6 dBA L$_n$ Contour for the H-016 Railroad Guided Conventional Bore Crossing Site**

<u>H-020 Railroad Conventional Bore Crossing Site</u>

The H-020 railroad crossing site would be located at MP 235.5 along the Mountain Valley Pipeline route. Excavation of the bore pits is anticipated to occur 12 hours per day (daytime only) for 36 days. Boring operations would run 24 hours per day for a total of 3 days.

The H-020 railroad conventional bore work areas would be located next to a four-lane divided highway and two double track railroad corridors. Accordingly, the background sound levels in the area are typically higher than 55 dBA Ldn due to noise from these nearby transportation sources. Mountain Valley estimated background noise levels due to traffic and railroad noise at the NSAs surrounding the H-020 railroad crossing using the U.S. Department of Housing and Urban Development (HUD) Day/Night Noise Level (DNL) Calculator. The HUD DNL Calculator is a nationally standardized method used to estimate environmental noise from railroads and highways for housing projects. Based on a site evaluation at the H-020 railroad crossing, Mountain

Valley determined that traffic and railroad noise would be the prominent ambient sound sources at the NSAs for this crossing. As a result, the HUD DNL Calculator is appropriate for estimating the ambient sound levels at the closest NSAs to the bore site. The estimated existing background sound levels are above 55 dBA $L_{dn}$ or 48.6 dBA $L_{eq}$ at all NSAs.

Because the background sound levels at all NSAs exceed 55 dBA $L_{dn}$, the FERC guidance recommends that noise mitigation be implemented to reduce noise levels to no more than 10 dB over background levels. Predicted sound levels during construction operations would be less than a 10 dB increase at nighttime at all NSAs, therefore, no mitigation would be needed (see figure 6).



**Figure 6        Predicted Unmitigated 48.6 dBA $L_n$ Contour for the H-020 Railroad Guided Conventional Bore Crossing**

<u>Roanoke River Microtunnel Boring Site</u>

The Roanoke River microtunnel site is located at MP 235.4 along the Mountain Valley Pipeline route. Commission staff already authorized Mountain Valley to change

the crossing method of the Roanoke River to a microtunnel under variance H-21.  As part of the Amendment Project, Mountain Valley proposes to conduct nighttime microtunneling activities at the Roanoke River.  Therefore, a discussion of the Roanoke River crossing has been included in this EA in order to address impacts from 24-hour microtunneling activities and at the request of the COE because it is a Section 10 stream.  Excavation of the bore pits is anticipated to occur 12 hours per day (daytime only) for 33 days.  Boring operations would run 24 hours per day for a total of 90 days.

The Roanoke River microtunnel crossing work areas are located next to a four-lane divided highway and two double track railroad corridors.  Accordingly, the background sound levels in the area are typically higher than 55 dBA $L_{dn}$ due to noise from these nearby transportation sources.  Mountain Valley estimated background noise levels due to traffic and railroad noise at the NSAs surrounding the river crossing using the HUD DNL Calculator.  Based on a site evaluation at the Roanoke River crossing, Mountain Valley determined that traffic and railroad noise would be the prominent ambient sound sources at the NSAs for this crossing and that the HUD DNL Calculator was appropriate for assessing ambient sound levels at the closest NSAs to the bore sites.  The estimated existing background sound levels are above 55 dBA $L_{dn}$ or 48.6 dBA $L_{eq}$ at all NSAs.

Because the background sound levels at all NSAs exceed 55 dBA $L_{dn}$, FERC guidance recommends that noise mitigation be implemented to reduce noise levels to no more than 10 dB over background.  Predicted sound levels during construction operations would be less than a 10 dB increase at nighttime at all NSAs, therefore, no mitigation would be needed (see figure 7).



**Figure 7**    **Predicted Unmitigated 48.6 dBA L_n Contour for the Roanoke River Microtunnel Crossing**

<u>Gauley River Microtunnel Boring Site</u>

The Gauley River microtunnel site is located at MP 118.9 along the Mountain Valley Pipeline route.  Commission staff authorized Mountain Valley to change the crossing method of the Gauley River to a microtunnel under variance D-35.  As part of the Amendment Project, Mountain Valley proposes to conduct nighttime microtunneling activities at the Gauley River.  Therefore, a discussion of the Gauley River crossing has been included in this EA in order to address impacts from 24-hour microtunneling activities and at the request of the COE because it is a Section 10 stream.  Excavation of the bore pits is anticipated to occur 12 hours per day (daytime only) for 28 days.  Boring operations would run 24 hours per day for a total of 90 days.

Predicted sound levels during boring operations would be below 48.6 dBA $L_{eq}$ with the exception of NSA C (a regularly unoccupied hunting cabin) and therefore, noise mitigation would not be required during boring operations (see figure B.6–8).



**Figure 8    Predicted Unmitigated 48.6 dBA L$_n$ Contour for the Gauley River Microtunnel Crossing**

As discussed in section B.2.2, bore pit dewatering would be required to provide for a dry workspace at all trenchless crossing locations. Dewatering would be conducted in accordance with all existing plans and procedures reviewed and approved for the Mountain Valley Pipeline Project. In some instances, pumping may require 24-hour operation to keep up with water infiltration and ensure personnel are able to enter the bore pits safely and efficiently when beginning bore activities each day. Bore pit dewatering pumps would generate noise.

The trenchless crossing activities proposed in the Amendment Project would be temporary and would not result in a change to the operational noise of the Mountain Valley Pipeline Project as compared to that discussed in the FEIS. However, the bore activities would be stationary and would take place over several days to several months, and thus may impact NSAs for a longer period than the formerly proposed open-cut dry construction at the same locations.

Mountain Valley has committed to coordinate with directly affected and adjacent landowners regarding trenchless crossing plans. However, because noise impacts could extend farther than directly affected and adjacent landowners, **we recommend that:**

- **Prior to commencing any nighttime construction activities associated with the eight trenchless crossing locations where nighttime construction is proposed, Mountain Valley should notify all landowners within 0.5 mile of nighttime (7:00 pm to 7:00 am) trenchless crossing activities (boring and pipe welding) prior to the start of these activities. Mountain Valley should confirm its compliance with the required notification in its construction status reports.**

Nighttime noise from construction of the Amendment Project could include activities such as bore pit excavation/backfill, active boring, and dewatering (as needed). Each of these individually or cumulatively could result in nighttime noise impacts on nearby NSAs. However, to confirm that the noise from the nighttime construction would not exceed our noise criterion, **we recommend that:**

- **During any nighttime construction activities associated with the trenchless crossings, Mountain Valley should monitor noise levels, document the noise levels in the weekly status reports, and restrict the noise attributable to nighttime construction activities associated with the trenchless crossings to no more than an $L_{dn}$ of 55 dBA, or no more than a 10 dB increase over background levels where existing noise levels exceed 55 dBA $L_{dn}$, at any NSAs.**

Because of the temporary nature of construction activities, and with Mountain Valley's proposed mitigation measures and our recommendation, we conclude that no significant noise impacts are anticipated from construction of the proposed Amendment Project.

### 7.0    Reliability and Safety

The transportation of natural gas by pipeline involves some risk to the public in the event of an accident and subsequent release of gas. The greatest hazard is a fire or explosion following a major pipeline rupture. Methane, the primary component of natural gas, is colorless, odorless, and tasteless. It is not toxic, but is classified as a simple asphyxiate, possessing a slight inhalation hazard. If breathed in high concentration, oxygen deficiency can result in serious injury or death.

The pipeline facilities associated with the Amendment Project must be designed, constructed, operated, and maintained in accordance with the DOT Minimum Federal Safety Standards in 49 CFR Part 192 and other applicable federal and state regulations.

The regulations are intended to ensure adequate protection for the public and to prevent natural gas facility accidents and failures. The DOT pipeline standards are published in Parts 190-199 of Title 49 of the CFR. For example, Part 192 of 49 CFR specifically addresses natural gas pipeline safety issues, prescribes the minimum standards for operating and maintaining pipeline facilities, and incorporates compressor station design, including emergency shutdowns and safety equipment. Part 192 also requires a pipeline operator to establish a written emergency plan that includes procedures to minimize the hazards in a natural gas pipeline emergency.

The operator must also establish a continuing education program to enable customers, the public, government officials, and those engaged in excavation activities to recognize a gas pipeline emergency and report it to appropriate public officials. As discussed in section 4.12.1 of the FEIS, Mountain Valley would provide the appropriate training to local emergency service personnel before the facilities are placed in service.

We received several comments concerning the integrity of the pipeline coating on portions of the pipeline that have been exposed to the elements. As the Commission noted in its October 9, 2020 *Order Partially Lifting Stop Work Order and Allow Certain Construction to Proceed*, Mountain Valley has stated previously that the coating thickness on its stored pipes is above the manufacturer's recommendation, and the coating on each pipe segment is inspected for damage and thickness before the pipe is installed in the trench. As discussed in section A.5 of this EA, we received comments concerning protection of the external coating of the pipe from damage during installation via trenchless crossing methods. Mountain Valley states that pipe utilized at the trenchless crossings would have an ARO over the standard FBE coating used on all pipe.

Further, based on Commission staff's review of the FBE chalking analysis submitted by Mountain Valley and all other pertinent materials[60], we found no basis for supplementing the FEIS to analyze potential toxicity associated with FBE coating or including an analysis in this EA.

Mountain Valley's use of trenchless crossing methods in lieu of the certificated and typical open-cut dry techniques would offer the pipeline an equivalent level of protection. We conclude there would be no increase in risk to the public.

---

60    Letters to the Virginia Department of Health, the VADEQ, and the North Carolina Department of Health and Human Services' for both the Mountain Valley Pipeline and the Atlantic Coast Pipeline regarding FBE coatings. Accession numbers 20201008-3000 and 20201008-3001, October 8, 2020.

**SECTION C – ALTERNATIVES**

In accordance with NEPA and Commission policy, we consider and evaluate alternatives to the proposed action, including the no-action alternative.  These alternatives are evaluated using a specific set of criteria.  The evaluation criteria applied to each alternative include a determination whether the alternative:

- meets the objective of the proposed Amendment Project;

- is technically and economically feasible and practical; and

- offers a significant environmental advantage over the proposed Amendment Project.

Through environmental comparison and application of our professional judgment, each alternative is considered (in the sequence identified above) to a point where it becomes clear if the alternative could or could not meet the three evaluation criteria.  An alternative that cannot achieve the purpose for the Amendment Project cannot be considered as an acceptable replacement for the Amendment Project.

Because the proposed action does not involve the siting and construction of new facilities, our alternatives analyses are limited to considering the no-action alternative and an assessment of alternative crossing techniques.

### 1.0     No-Action Alternative

The no-action alternative is a Commission decision to not authorize the proposal presented by the project proponent in its application.  Selecting the no-action alternative means that the impacts resulting from the proposed action of the Amendment Project and disclosed in this EA would not occur, at the cost of not meeting the purpose, need, and goals of the proposed action.  If the no-action alternative is selected, Mountain Valley would not be authorized to change the crossing technique from open-cut dry to conventional bore, guided conventional bore, or Direct Pipe® for the 120 trenchless crossings of 183 waterbodies and wetlands.[61]  Further, Mountain Valley would not be

---

61     As part of the Amendment Project, Mountain Valley also requests that the Commission allow nighttime microtunneling activities at the Gauley River and Roanoke River.  Commission staff previously authorized Mountain Valley to change the crossing method for the Gauley and Roanoke Rivers to a microtunnel technique as part of our variance process.  If the no-action alternative is selected, then Mountain Valley would not be authorized to conduct 24-hour microtunneling activities at these locations.  Additionally, the Certificate authorized Mountain Valley to utilize a conventional bore at the H-016 railroad crossing.  If the no-action *cont'd*

authorized to implement a minor route adjustment at MP 230.8 to avoid waterbody S-OO11 or a minor alignment shift at MP 0.7 within the previously authorized workspace to avoid wetland W-A2a. As a result of the Commission selecting the no-action alternative, Mountain Valley could conduct the crossings via open-cut dry crossing techniques following appropriate additional Federal approvals; modify and resubmit an application for a similar or different crossing technique(s); or not construct the crossings. Given the status of construction of the Mountain Valley Pipeline Project (approximately 81 percent of the pipeline has been installed and backfilled), it is unlikely that Mountain Valley would choose to not complete the crossings. Consequently, use of the already authorized open-cut dry crossing technique is the likeliest outcome of the Commission selecting the no-action alternative.

As discussed in sections A and B above, the conventional bore, guided conventional bore, and Direct Pipe® crossings would not change the overall footprint of the Mountain Valley Pipeline Project as all trenchless crossing activities, including the bore pit excavations and Direct Pipe® staging areas, would occur entirely within the Mountain Valley Pipeline Project's already certificated right-of-way. The impacts of performing the open-cut dry crossings were discussed in the FEIS, which include temporary increases in sediments mobilized downstream due to in-stream impacts and the clearing and grading of stream banks and wetlands. As indicated in the FEIS,[62] no long-term or significant impacts on surface waters are anticipated from open-cut crossings because Mountain Valley would:

- not permanently affect the designated water uses and would bury the pipeline beneath the bed of all waterbodies;

- implement erosion and sedimentation controls;

- adhere to crossing guidelines in its Procedures; and

- restore the streambanks and streambed contours as close as practical to pre-construction conditions.

For wetland impacts, the FEIS concludes[63] that while adverse and long-term impacts on wetlands would occur, with the implementation of best management practices (BMPs) and mitigation proposed by Mountain Valley, as well as our recommendations,

---

alternative is selected, then Mountain Valley would not be authorized to conduct nighttime conventional boring activities at this location.

62    FEIS at page 4-149.

63    FEIS at page 4-163.

impacts on wetlands would not be significant. We maintain that these conclusions would apply should the no-action alternative be adopted.

However, as indicated in section B of this EA, the conventional bore, guided conventional bore, and Direct Pipe® crossing techniques would reduce environmental impacts on surface waterbodies, wetlands, and aquatic resources, as compared to the no-action alternative, because trenchless crossing methods do not result in impacts associated with constructing directly in waterbodies and wetlands, including increased turbidity and disruption to stream bank and wetland vegetation. The conventional bore, guided conventional bore, and Direct Pipe® crossings would cause increases in air emissions and noise during the excavation and boring activities as compared to the no-action alternative; however, these impacts would be temporary and would persist for only the short duration required to complete the bores.

There would be no risk of inadvertent release of drilling fluids with the 117 conventional bores because the majority of those crossings would not require the use of drilling fluids and for those limited few that would require drilling fluids, the fluids would be of small volume and not pressurized. Although there is a risk of inadvertent release of drilling fluids into waterbodies or wetlands with the guided conventional bore (two crossings) and Direct Pipe® (one crossing) methods, the risk is small and potential impacts would be reduced due to use of non-hazardous additives and down-hole pressure monitoring. Further, the comparatively lower drilling pressures and smaller amounts of slurry needed compared to other trenchless crossing methods such as HDD, would also reduce the potential for impacts due to inadvertent releases from the guided conventional bores and the Direct Pipe®.

Neither the no-action alternative nor the proposed Amendment Project are anticipated to result in significant environmental impacts. Therefore, we have determined that the no-action alternative would not offer a significant environmental advantage over the proposed Amendment Project.

## 2.0    Alternative Crossing Techniques

We received multiple comments concerning the selection of a trenchless crossing method for each waterbody and wetland crossing. We also received comments noting that Mountain Valley previously rejected boring of waterbodies and wetlands as too costly and risky during the application process for the Mountain Valley Pipeline Project.

As mentioned previously, various legal, regulatory, and permitting challenges have prevented Mountain Valley from completing construction of the Mountain Valley Pipeline Project as previously certificated. As such, Mountain Valley reevaluated the

crossing method for all remaining crossings. As part of its Individual Permit application,[64] Mountain Valley provided an explanation, including cost information, for each crossing method determination.

Mountain Valley evaluated a total of eight alternative stream and wetland pipeline crossing methods. The crossing methods can be generally categorized as either open-cut methods—meaning that a trench is excavated in the stream or wetland to install the pipe—or trenchless methods—meaning the pipe is installed with specialized equipment that bores or tunnels under or bridges over the resource.

As previously indicated, other trenchless technologies, besides the conventional bore methodology, were selected for some streams. Mountain Valley indicated that a guided conventional bore was selected for the Elk River because there are large boulders within the crossing, the stream depth would reduce available workspace if the stream was diverted for a dry-ditch open-cut crossing, and a trenchless crossing would further minimize impacts on mussel species. A guided conventional bore was selected for Little Stony Creek and its tributaries because it would minimize impacts on the streams. Direct Pipe® technology was selected for the Greenbrier River because the stream depth would reduce available workspace if the stream was diverted for a dry-ditch open-cut crossing and a trenchless crossing would further minimize impacts on mussel species.

As discussed in section B.2.2, the Mountain Valley Pipeline Project would cross five Section 10 streams. All of these streams, except for the Blackwater River, would be crossed via a trenchless crossing method. We have included the following discussion in order to support the COE's review of the joint application for Section 10 regulated streams. At the Blackwater River crossing, Mountain Valley stated that site conditions do not provide adequate space to stockpile spoil from bore pits that would be almost 40-feet-deep. We reviewed the Blackwater River crossing location and confirmed that there may not be space for spoil storage within the limits of disturbance and the slope on one side of the stream may not be conducive to a trenchless crossing.

Although differences exist in the specific construction techniques and associated risks with each type of trenchless crossings, the avoidance of in-stream construction and its protective nature on the sensitive resources and associated riparian zones are generally the same. As such, we have determined the use of one trenchless crossing method does not offer a significant environmental advantage when compared to another trenchless

---

[64]     See MVP COE Individual Permit application (table 15) at accession number 20210304-5122.

crossing method. As such, alternatives relating to the specific trenchless techniques proposed by Mountain Valley based on the screening criteria below were not considered.

## 2.1    Screening Criteria

The construction method proposed for each crossing in the Amendment Project was the result of a feasibility analysis conducted by Mountain Valley to compare trenchless methods, predominantly conventional and guided bores, with the previously approved open-cut crossing methods for the sensitive resources. The factors evaluated include bore pit depths, the presence of steep slopes on one or both sides of the crossing, stream width and depth, the presence of karst terrain, other feasibility concerns, and workspace constraints such as the presence of existing utilities and infrastructure. These factors are more fully described in Mountain Valley's Individual Permit application, and are summarized below.

### Bore Pit Depth

For each crossing, Mountain Valley determined the depth of the two bore pits that would be necessary to complete the crossing. That determination accounted for the pipe installation depth below the stream or wetland, the steepness and length of the slopes on both sides of the crossing, and the difference in elevation between the launch and receiving bore pit. Mountain Valley also evaluated the volume of material to be excavated against the available working area to determine the approximate available workspace. As discussed below, the compounding effect of limited workspace for material storage and site access hindered by long and steep slopes requiring winching of materials, equipment, and trench spoils, was evaluated with respect to its impact on the overall construction time and costs, and potential safety concerns.

Deep bore pits require a greater workspace area for equipment and spoils from the excavations the sides of the bore pit would need to have one or a series of horizontal levels or steps (benching) to create a safe working environment for work crew and equipment. Additionally, deeper bore pits can expose a greater thickness of saturated subsurface material below the water table necessitating additional dewatering to keep the bore pits dry for the duration of the drill. If site conditions are acceptable, trenchless crossing methods are generally considered technically and logistically achievable for any crossing where adequate workspace for equipment and trench spoil storage is available. However, technical and logistical challenges associated with deeper bore pits, along with the resultant additional construction timing and costs when weighed against traditional open-cut crossings, can make conventional bore crossings less practicable.

**Steep Slopes**

Mountain Valley evaluated each crossing to determine if the presence of steep slopes on one or both approaches to the stream or wetland would make trenchless crossing methods impracticable.  That evaluation primarily accounted for two criteria: slope steepness and slope length.  Slopes with grades generally in excess of 30 percent typically require winching of equipment to work safely on the slope.  Winching can be utilized on shorter slopes to conduct many pipeline construction activities.  As slope lengths increase, additional pieces of heavy machinery must be winched together and anchored to the top of the slope, in daisy-chain fashion down the hillside.  Based on generally accepted standard industry construction practices and professional pipeline construction experience, operating the equipment necessary to excavate a bore pit on slopes that require winching presents additional complicating factors.  In particular, operating excavation equipment on the edge of a bore pit while winched to multiple pieces of equipment presents a heightened safety risk to equipment operators and other crew members.

Similarly, moving and storing spoil piles on steep slopes presents an additional layer of logistical challenges, as well as compounding safety and environmental risks.  If there was not sufficient workspace adjacent to a crossing to store excavated materials, Mountain Valley evaluated the logistics of hauling materials to a suitable location for staging.  The use of daisy-chained winch tractors to haul excavation materials across steep slopes for long distances requires an increased quantity of equipment.  For example, due to limitations in winch cable length, hauling a load of spoil across a steep slope more than 400 feet in length would require four pieces of heavy equipment – one to hold the load and three to winch in daisy-chained fashion.  The site logistics of winching multiple pieces of equipment on a 75-foot to 125-foot right-of-way could render such an operation impracticable.  This deployment of multiple pieces of equipment on a steep slope increases worker safety risk.  In addition, hauling excavation spoils across a steep slope creates an environmental risk of dropping spoils down the slope and potentially off right-of-way.

Therefore, Mountain Valley considered excavating bore pits on steep slopes greater than 30 percent to be generally possible, but would introduce additional safety and environmental risk.  However, the compounding effect of unavailable storage space for bore pit excavation materials, steep slopes, and long winch hills over 400 feet generally make a conventional bore crossing in these scenarios impracticable.

**Stream Depth**

Stream depth may be a limiting factor on the use of the dry-ditch open-cut method. The technical, logistical, and safety challenges for the dry-ditch open-cut crossing method increase with stream depth. Based on generally accepted standard industry construction practices, professional pipeline construction experience, and, most significantly, the limited workspace available for Project crossings, Mountain Valley concluded that it is not advisable and may not be practicable, in most cases, to use the dry-ditch open-cut crossing method for streams deeper than 36 inches.

A dry-ditch, open-cut crossing can be accomplished using dam and pump, flume pipe diversion, or cofferdam methods to dewater the stream for pipeline installation. With any of these methods, a dam structure is needed to keep the stream from flowing through the workspace. In order to reduce impacts, the construction right-of-way for stream crossings is reduced from the normal 125-foot-width to 75 feet. Thus, sufficient room for the dam, pump, and construction activities is limited. The dam must be at least as tall as the depth of the stream plus a minimum amount of freeboard to ensure safe working conditions. For deeper streams, such as those greater than 36 inches, the most common and commercially available type of dam utilized is a bladder dam. Based on manufacturer's specifications, a four-foot-tall dam can support a maximum water depth of 36 inches. The footprint and manufacturer recommended clearance for a dam this size is 22-feet-wide. In a non-cofferdam installation, the dam on the back side can usually be lower and constructed with sandbags and is estimated to occupy a 9-foot-wide footprint. After allowing for space for a pump and discharge structure, a 34-foot workspace remains within the reduced 75-foot-wide right-of-way to install the pipe. Assuming the pipe is installed a minimum of five-feet-deep, in type C soil conditions,[65] and performing installation with equipment from an adjacent bridge, this workspace is just sufficient to excavate a trench and lower in pipe. For water depths greater than 36 inches, a larger dam would be necessary, which increases the footprint and manufacturer recommended clearance—further intruding into the limited workspace available.

For these reasons, Mountain Valley concluded that the dry-ditch open-cut crossing method is not a practicable alternative for stream depths greater than three feet deep. Stream depth is not a relevant consideration for trenchless crossing methods as long as it

---

65    Type C soil is the least stable type of soil. Type C includes granular soils in which particles don't stick together and cohesive soils with a low unconfined compressive strength; 0.5 tons per square foot or less. United States Department of Labor – Occupational Health and Safety Administration Soil Classification Transcript. Accessed at: https://www.osha.gov/dts/vtools/construction/soil_testing_fnl_eng_web_transcript.html.

is feasible to excavate bore pits for conventional bores to the proper depth to allow for crossing under the stream.

**Karst**

Mature karst bedrock aquifers are characterized by conduit flow systems and rapid transit times for groundwater, which can introduce sediment and surface contamination at long distance over short time frames downgradient from a work area. Additionally, greater rates of pumping may be necessary in these aquifers to keep the bore pits dry for the duration of the bore. However, the risk of boring through karst can be mitigated through avoidance of subsurface karst features that can be identified using geophysical methods.

Work conducted in karst terrain is more easily identified in a dry-ditch open-cut crossing than in a bore. Preference is given to dry-ditch open-cut crossings through karst geology to the extent an open-cut crossing is practicable. However, when a trenchless crossing method is used through karst terrain, any potential karst voids are observable during the trenching process and therefore, immediate mitigation measures can be implemented.

## 2.2     Alternative Crossing Techniques Conclusion

We have reviewed Mountain Valley's feasibility analysis and agree that the trenchless crossing techniques selected for the Amendment Project waterbodies and wetlands are feasible and appropriate.

According to Mountain Valley:

- eight sites were chosen for a conventional bore because they were adjacent to already approved bores of railroads and/or roadways and only required increasing the length of the bores;

- another 35 sites were selected for a conventional bore crossing to avoid direct aquatic impacts on possible orangefin madtom habitat, Roanoke logperch habitat, and/or because the waterbody is considered a trout stream;

- one site was chosen as a conventional bore because it is a wide and deep river with high flow conditions;

- two sites were chosen as guided conventional bore because of large boulders, stream depth, and to avoid direct aquatic impacts on mussel species;

- one site was chosen as a Direct Pipe® due to stream depth and to avoid direct aquatic impacts on mussel species; and

- the remaining 73 conventional bore locations did not have a significant constraint regarding installation method or a significant environmental impact relevant to the available installation methods.

As such, we have determined that completing the 120 trenchless crossings of 183 waterbodies and wetlands by open-cut dry methods would not offer a significant environmental advantage over the proposed Amendment Project and do not recommend any alternatives to the proposed action.

Waterbodies and wetlands originally approved as open-cut dry crossings that remained open-cut dry crossings following the feasibility analysis were evaluated in the FEIS. As stated in the FEIS, open-cut dry crossing methods would appropriately minimize turbidity and sedimentation and no long-term or significant impacts on surface waters are anticipated as a result of the Mountain Valley Pipeline Project. The features designated for open-cut dry crossings are included in Mountain Valley's Individual Permit application currently under review by the COE.

### 3.0    Conclusion

After reviewing the alternatives to the proposed Amendment Project, we conclude that none of the alternatives would satisfy the evaluation criteria. In summary, we have determined that the proposed action, as modified by our recommended mitigation measures, is the preferred alternative to meet the Amendment Project's objectives.

## SECTION D – STAFF'S CONCLUSIONS AND RECOMMENDATIONS

Based on the analysis in this EA, we have determined that if Mountain Valley completes the waterbody and wetland crossings via trenchless crossing methods in accordance with its application and supplements, and the staff's recommended mitigation measures below, approval of the Amendment Project would not constitute a major federal action significantly affecting the quality of the human environment.  As described in section B of this EA, the Amendment Project would result in less direct impacts on a number of resources than the action considered in the FEIS and authorized by the Certificate.  The Amendment Project would lead to an increase in construction emissions and construction noise.  While we conclude that impacts from the Amendment Project on emissions and noise would exceed those analyzed in the FEIS, we conclude that these temporary and short-term increases would not be significant.  Therefore, we recommend that the Commission Order contain a finding of no significant impact and include the measures listed below as conditions in any authorization the Commission may issue to Mountain Valley.  We also recommend that Mountain Valley continue to comply with applicable environmental conditions set forth in Appendix C of the Mountain Valley Pipeline Certificate Order.

1. Mountain Valley shall follow the construction procedures and mitigation measures described in its amendment application and supplements including responses to staff data requests and as identified in the environmental assessment, unless modified by the Order.  Mountain Valley must:

    a. request any modification to these procedures, measures, or conditions in a filing with the Secretary;

    b. justify each modification relative to site-specific conditions;

    c. explain how that modification provides an equal or greater level of environmental protection than the original measure; and

    d. receive approval in writing from the Director of OEP, or the Director's designee, **before using that modification**.

2. The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of environmental resources during construction of the Amendment Project.  This authority shall allow:

    a. the modification of conditions of the Order;

    b. stop-work authority; and

c. the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental impact resulting from Amendment Project construction.

3. Mountain Valley shall continue to comply with environmental conditions set forth in Appendix C of the October 13, 2017 Order in Docket No. CP16-010-000.

4. The authorized facility locations shall be as shown in the EA, as supplemented by filed alignment sheets. **As soon as they are available, and before the start of construction**, Mountain Valley shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the Order. All requests for modifications of environmental conditions of the Order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

5. Mountain Valley shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP, or the Director's designee, **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by the Commission's Plan and/or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

a. implementation of cultural resources mitigation measures;

b.  implementation of endangered, threatened, or special concern species mitigation measures;

c.  recommendations by state regulatory authorities; and

d.  agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.  **Within 60 days of the acceptance of the authorization and before construction of the Amendment Project begins**, Mountain Valley shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP, or the Director's designee.  Mountain Valley must file revisions to the plan as schedules change.  The plan shall identify:

a.  how Mountain Valley will implement the construction procedures and mitigation measures described in its amendment application and supplements (including responses to staff data requests), identified in the EA, and required by the Order;

b.  how Mountain Valley will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;

c.  the number of EIs assigned, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

d.  company personnel, including EIs and contractors, who will receive copies of the appropriate material;

e.  the location and dates of the environmental compliance training and instructions Mountain Valley will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change);

f.  the company personnel (if known) and specific portion of Mountain Valley's organization having responsibility for compliance;

g.  the procedures (including use of contract penalties) Mountain Valley will follow if noncompliance occurs; and

h.  for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

    1.  the completion of all required surveys and reports;

    2.  the environmental compliance training of onsite personnel;

    3.  the start of construction; and

4.    the start and completion of restoration.

7.    Mountain Valley must receive written authorization from the Director of OEP, or the Director's designee, **before commencing construction of any Amendment Project facilities**.  To obtain such authorization, Mountain Valley must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

8.    Mountain Valley shall **not commence construction activities** associated with the Amendment Project **until** Commission staff completes consultation with the U.S. Fish and Wildlife Service regarding potential impacts on federally listed species.

9.    **Prior to commencing any nighttime construction activities associated with the eight trenchless crossing locations where nighttime construction is proposed**, Mountain Valley shall notify all landowners within 0.5 mile of nighttime (7:00 pm to 7:00 am) trenchless crossing activities (boring and pipe welding) prior to the start of these activities.  Mountain Valley shall confirm its compliance with the required notification in its construction status reports.

10.    **During any nighttime construction activities associated with the trenchless crossings**, Mountain Valley shall monitor noise levels, document the noise levels in the weekly status reports, and restrict the noise attributable to nighttime construction activities associated with the trenchless crossings to no more than a day-night average sound level ($L_{dn}$) of 55 dBA, or no more than a 10 dB increase over background levels where existing noise levels exceed 55 dBA $L_{dn}$, at any noise sensitive areas.

## SECTION E – REFERENCES

Cooper, H.H., Jr. and Jacob, C.E.  1946.  A Generalized Graphical Method for Evaluating Formation Constants and Summarizing Well-Field History.  Eos, Transactions, American Geophysical Union, Volume 27, Number 4.

Driscoll, F.G.  1987.  Groundwater and Wells, Johnson Division Second Edition.

Dunnfield.  G.M.  2020.  Representative Values of Hydraulic Properties.  Aquifer Testing 101.  AQTESOLV Home Aquifer Testing 101, Hydraulic Properties.  Available at http://www.aqtesolv.com/aquifer-tests/aquifer_properties.htm.

Dye. H. et al.  2021a.  Desktop Review and Effects Analysis for the Mountain Valley Pipeline Amendment Project, West Virginia.  Tetra Tech, Pittsburgh.

Dye. H. et al.  2021b.  Desktop Review and Effects Analysis for the Mountain Valley Pipeline Amendment Project, Virginia.  Tetra Tech, Pittsburgh.

Kozar, M.D. and Mathes, Melvin V.  2001.  Aquifer-Characteristics Data for West Virginia.  United States Geological Survey Water Resource Investigation Report 01-4036.  Available at https://pubs.usgs.gov/wri/wri01-4036/pdf/aquifer_report.pdf.

Kozar, M.D. and Paybins, K.S.  2016.  Assessment of Hydrogeologic Terrains, Well-Construction Characteristics, Groundwater Hydraulics, and Water-Quality and Microbial Data for Determination of Surface-Water-Influenced Groundwater Supplies in West Virginia (ver. 1.1, October 2016):  U.S. Geological Survey Scientific Investigations Report 2016–5048, 55 p.  Available at http://dx.doi.org/10.3133/sir20165048.

National Conference of State Legislatures (NCSL).  2021.  Greenhouse Gas Emissions Reduction Targets and Market-based Policies, Virginia. 11 March.  Retrieved on 12 May 2021.  Available at https://www.ncsl.org/research/energy/greenhouse-gas-emissions-reduction-targets-and-market-based-policies.aspx.

National Oceanic and Atmospheric Administration (NOAA) National Centers for Environmental Information (NCEI).  Climate at a Glance:  County Time Series, published July 2021, retrieved on July 18, 2021.  Available at https://www.ncdc.noaa.gov/cag/.

North Carolina Division of Water Resources.  2021.  Simple Groundwater Modeling - Reverse Distance Drawdown Analysis.  Available at https://www.ncwater.org/?page=21.

Powers, J.P.  1981.  *Construction Dewatering, A Guide To Theory and Practice*.  John Wiley and Sons.

United Nations Framework Convention on Climate Change (UNFCCC).  2021.  The United States of America Nationally Determined Contribution, Reducing Greenhouse Gases in the United States:  A 2030 Emissions Target.  22 April.

U.S. Geological Survey (USGS).  2002.  Documentation of Spreadsheets for the Analysis of Aquifer-Test and Slug-Test Data.  United States Geological Survey Open File Report OFR-02-197.  Available at https://pubs.usgs.gov/of/2002/ofr02197/spreadsheets.html.

USGS.  2020.  Groundwater Watch, Site Number 380653080155301 - Poc-0256.  Available at https://groundwaterwatch.usgs.gov/AWLSites.asp?S=380653080155301&ncd=.

U.S. Global Change Research Program (USGCRP).  2017:  Climate Science Special Report: Fourth National Climate Assessment, Volume I [Wuebbles, D.J., D.W. Fahey, K.A. Hibbard, D.J. Dokken, B.C. Stewart, and T.K. Maycock (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, 470 pp., doi: 10.7930/J0J964J6.

U.S. Global Change Research Program (USGCRP).  2018:  Impacts, Risks, and Adaptation in the United States:  Fourth National Climate Assessment, Volume II [Reidmiller, D.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, K.L.M. Lewis, T.K. Maycock, and B.C. Stewart (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, 1515 pp. doi: 10.7930/NCA4.2018.

Walton, W.C.  1962.  Selected Analytical Methods for Well and Aquifer Evaluation.  Illinois State Water Survey, State of Illinois Department of Registration and Education Bulletin 49.  Available at https://www.isws.illinois.edu/pubdoc/B/ISWSB-49.pdf.

## SECTION F – LIST OF PREPARERS

### Federal Energy Regulatory Commission

**Fink, Jennifer – Environmental Project Manager, Proposed Action, Land Use**
    M.S., Environmental Policy, 2016, George Washington University
    B.S., Environmental Science, 2010, University of Delaware

**Friedman, Paul – Cultural Resources**
    M.A., History, 1980, University of California at Santa Barbara
    B.A., Anthropology and History, 1976, University of California at Santa Barbara

**Jeudy, Harry –Environmental Engineer – Air Quality and Reliability & Safety**
    B.S., Mechanical Engineering, 2000, The Pennsylvania State University

**Mardiney, Amanda –Fisheries, Vegetation, and Wildlife**
    M.A., Environmental Resource Policy, 2012, George Washington University
    B.S. Biology, 2009, University of Maryland, College Park

**Peconom, John – Surface Water Resources**
    B.S., Environmental Biology and Management, 2000, University of California at Davis

**Rana, Tony – Geology, Soils, and Groundwater Resources**
    M.S., International Development, 2012, Tulane University
    B.S., Geology, 1984, New Jersey City University
    Graduate Studies, Hydrogeology and Geochemistry, 1988, Oklahoma State University

**Tomasi, Eric – Air Quality, Noise**
    B.S. Aerospace Engineering, 1994, Boston University

### Cardno, Inc.

**DiSanto, Lavinia – Project Manager, Proposed Action**
    B.A., Biological Sciences, University of Delaware, 1999

**Mooneyhan, Douglas – Deputy Project Manager, Geology, Soils, Water Resources, and Alternatives**

     M.S., Biology, Tennessee Technological University, Cookeville, 1989

     B.S., Wildlife & Fisheries Science, University of Tennessee, Knoxville, 1987

**Hamilton, Lesley – Air and Noise**

     B.A., Chemistry, Mary Baldwin College, 1988

**Koonjebeharry, Amanda – Fisheries, Vegetation, Wildlife, and Land Use**

     B.S., Zoology and Botany, University of the West Indies, 2000

---

*Cardno, Inc. is a third party contractor assisting the Commission staff in reviewing the environmental aspects of the project application and preparing the environmental documents required by NEPA. Third party contractors are selected by Commission staff and funded by project applicants. Per the procedures in 40 CFR 1506.5(b)(4), third party contractors execute a disclosure statement specifying that they have no financial or other conflicting interest in the outcome of the project. Third party contractors are required to self-report any changes in financial situation and to refresh their disclosure statements annually. The Commission staff solely directs the scope, content, quality, and schedule of the contractor's work. The Commission staff independently evaluates the results of the third-party contractor's work and the Commission, through its staff, bears ultimate responsibility for full compliance with the requirements of NEPA.*

---

**Appendix A**

Appendix A

**Proposed Trenchless Crossings**

| Spread | State | County | Crossing Number | MP | Crossing Length (feet) | Waterbody or Wetland Crossed | Crossing Type |
|--------|-------|--------|-----------------|-----|------------------------|------------------------------|---------------|
| A | WV | Wetzel | A-008 | 6.41 | 85 | S-A120, S-A119, W-A34 | Conventional Bore |
| B | WV | Lewis | B-012 | 58.5 | 148 | W-H103, S-H160 | Conventional Bore |
| B | WV | Lewis | B-015A | 61.21 | 193 | S-CD16, W-CD17, S-VV13 | Conventional Bore |
| C | WV | Webster | C-013A | 81.6 | 124 | S-A100 | Conventional Bore |
| C | WV | Webster | C-018 | 82.28 | 92 | S-F40 | Conventional Bore |
| C | WV | Webster | C-022 | 87.33 | 296 | S-E68 | Guided Conventional Bore |
| C | WV | Webster | C-024 | 87.32 | 272 | S-H111, S-H114, S-H112 | Conventional Bore |
| C | WV | Webster | C-028 | 89.56 | 267 | S-H110 | Conventional Bore |
| C | WV | Webster | C-035 | 95.25 | 312 | W-H60, W-H61 | Conventional Bore |
| D | WV | Webster | D-004 | 106.35 | 59 | S-B32, W-B30 | Conventional Bore |
| D | WV | Nicholas | D-010 | 109.94 | 59 | S-E46 | Conventional Bore |
| D | WV | Nicholas | D-011 | 111 | 174 | W-F12, W-F13, W-F15 | Conventional Bore |
| D | WV | Nicholas | D-012 | 111.09 | 104 | S-F20, W-F11 | Conventional Bore |
| D | WV | Nicholas | D-019 | 113.11 | 47 | S-B28, W-B27 | Conventional Bore |
| D | WV | Nicholas | D-020 | 113.39 | 158 | W-FF6-PEM, W-FF6-PSS | Conventional Bore |
| D | WV | Nicholas | D-022 | 114.17 | 117 | S-J32 | Conventional Bore |

| Spread | State | County | Crossing Number | MP | Crossing Length (feet) | Waterbody or Wetland Crossed | Crossing Type |
|--------|-------|--------|-----------------|-----|------------------------|------------------------------|---------------|
| D | WV | Nicholas | D-028 | 114.95 | 92 | W-A14, S-A72, S-A71, S-A71-Braid | Conventional Bore |
| D | WV | Nicholas | D-034 | 116.69 | 40 | S-N15 | Conventional Bore |
| D | WV | Nicholas | D-035 | 117.02 | 44 | S-N14 | Conventional Bore |
| D | WV | Nicholas | D-036 | 117.1 | 73 | S-I43, W-I7 | Conventional Bore |
| D | WV | Nicholas | D-037 | 117.28 | 32 | S-I44 | Conventional Bore |
| D | WV | Nicholas | D-038 | 117.4 | 20 | S-I45 | Conventional Bore |
| D | WV | Nicholas | D-040 | 118.24 | 35 | S-148 | Conventional Bore |
| D | WV | Nicholas | D-041 | 118.9 | 367 | S-J29 (Gauley River) | Microtunnel **a/** |
| D | WV | Nicholas | D-048 | 122.55 | 30 | S-EE1 | Conventional Bore |
| E | WV | Nicholas | E-005 | 132.36 | 56 | S-V3 | Conventional Bore |
| E | WV | Greenbrier | E-009 | 136.7 | 223 | W-M18 | Conventional Bore |
| E | WV | Greenbrier | E-012 | 140.44 | 255 | S-J20 | Conventional Bore |
| E | WV | Greenbrier | E-015 | 141.17 | 41 | S-I27 | Conventional Bore |
| F | WV | Summers | F-014 | 169.76 | 106 | S-N3 | Conventional Bore |
| F | WV | Summers | F-015 | 169.78 | 48 | S-N2 | Conventional Bore |
| F | WV | Summers | F-016 | 169.81 | 128 | S-CD23 | Conventional Bore |
| F | WV | Summers | F-017 | 169.84 | 99 | S-N4, W-EF40 | Conventional Bore |
| F | WV | Summers | F-021 | 171.44 | 1,250 | S-18 | Direct Pipe® |
| F | WV | Summers | F-022 | 171.77 | 91 | S-I9 | Conventional Bore |
| F | WV | Summers | F-027 | 173.14 | 30 | S-J4 | Conventional Bore |
| F | WV | Monroe | F-032 | 184.08 | 32 | S-D25 | Conventional Bore |

| Spread | State | County | Crossing Number | MP | Crossing Length (feet) | Waterbody or Wetland Crossed | Crossing Type |
|--------|-------|--------|-----------------|-----|------------------------|-----------------------------|---------------|
| F | WV | Monroe | F-039 | 190.03 | 83 | S-G43, W-MN1 | Conventional Bore |
| G | VA | Giles | G-009 | 203.59 | 139 | S-G35 | Conventional Bore |
| G | VA | Giles | G-010 | 203.71 | 30 | S-SS4 | Conventional Bore |
| G | VA | Giles | G-011 | 203.88 | 48 | S-Z9 | Conventional Bore |
| G | VA | Giles | G-012 | 204 | 47 | S-Z7, S-Z7-Braid-1 | Conventional Bore |
| G | VA | Giles | G-013 | 204.18 | 331 | S-Z10, S-Z11, S-Z12-EPH, W-Z3, S-Z13 | Guided Conventional Bore |
| G | VA | Giles | G-014 | 204.35 | 53 | S-Z14 | Conventional Bore |
| G | VA | Giles | G-017 | 206.59 | 246 | S-Y3, S-Y2 | Conventional Bore |
| G | VA | Giles | G-019B | 207.9 | 92 | S-E25-Downstream | Conventional Bore |
| G | VA | Giles | G-023 | 211.17 | 140 | S-NN17 | Conventional Bore |
| G | VA | Giles | G-024 | 213 | 133 | S-RR2, S-YZ6, W-RR1b | Conventional Bore |
| H | VA | Montgomery | H-009 | 229.48 | 40 | S-MM31 | Conventional Bore |
| H | VA | Montgomery | H-015 | 230.55 | 90 | S-C21 | Conventional Bore |
| H | VA | Montgomery | H-016 | 230.8 | 280 | None (Roanoke Valley Resource Authority Railroad) | Conventional Bore **b/** |
| H | VA | Montgomery | H-017 | 234.19 | 360 | S-OO16 | Conventional Bore |
| H | VA | Montgomery | H-019 | 235.4 | 316 | S-NN16 (Roanoke River) | Microtunnel **a/** |
| H | VA | Montgomery | H-020 | 235.53 | 280 | S-I1, S-AB16, W-AB7 | Conventional Bore |

A-3

| Spread | State | County | Crossing Number | MP | Crossing Length (feet) | Waterbody or Wetland Crossed | Crossing Type |
|---|---|---|---|---|---|---|---|
| H | VA | Montgomery | H-021 | 235.9 | 38 | S-CD12b | Conventional Bore |
| H | VA | Montgomery | H-022 | 235.9 | 114 | W-KL58 | Conventional Bore |
| H | VA | Roanoke | H-030 | 241.93 | 73 | S-IJ82 | Conventional Bore |
| H | VA | Roanoke | H-031 | 242.06 | 362 | W-IJ94-PEM, W-IJ95-PSS, S-IJ83, S-IJ88, S-IJ84, W-IJ102 | Conventional Bore |
| H | VA | Roanoke | H-032 | 242.28 | 108 | S-IJ89, S-IJ90 | Conventional Bore |
| H | VA | Roanoke | H-040 | 243.6 | 179 | W-EF46, S-ST9b | Conventional Bore |
| H | VA | Roanoke | H-042 | 243.9 | 202 | W-KL49-PEM, W-KL51-PEM, S-KL55, W-KL51-PSS | Conventional Bore |
| H | VA | Roanoke | H-043 | 244.1 | 87 | W-MN7-PEM, S-IJ12 | Conventional Bore |
| H | VA | Roanoke | H-044 | 244.5 | 45 | S-EF44, W-EF44 | Conventional Bore |
| H | VA | Roanoke | H-045 | 244.7 | 282 | W-IJ36, S-IJ43 | Conventional Bore |
| H | VA | Roanoke | H-046 | 245.05 | 140 | S-Y7, W-Y2, S-Y8 | Conventional Bore |
| H | VA | Roanoke | H-047A | 245.64 | 64 | S-B22 | Conventional Bore |
| H | VA | Roanoke | H-048A | 245.8 | 253 | W-B25-PSS-2, S-B25 | Conventional Bore |
| H | VA | Franklin | H-054 | 248.81 | 81 | S-D11 | Conventional Bore |
| H | VA | Franklin | H-060 | 252.35 | 43 | S-RR08 | Conventional Bore |
| I | VA | Franklin | I-001A | 258.23 | 22 | S-GH3 | Conventional Bore |
| I | VA | Franklin | I-009 | 260.56 | 60 | S-RR15 | Conventional Bore |

| Spread | State | County | Crossing Number | MP | Crossing Length (feet) | Waterbody or Wetland Crossed | Crossing Type |
|--------|-------|--------|-----------------|-----|------------------------|------------------------------|----------------|
| I | VA | Franklin | I-014 | 262.09 | 62 | S-C17 | Conventional Bore |
| I | VA | Franklin | I-016 | 262.5 | 94 | W-CD6 | Conventional Bore |
| I | VA | Franklin | I-020 | 264.53 | 72 | S-KL35, W-EF48 | Conventional Bore |
| I | VA | Franklin | I-021 | 264.66 | 39 | S-KL36 | Conventional Bore |
| I | VA | Franklin | I-034 | 268.9 | 52 | S-C20 | Conventional Bore |
| I | VA | Franklin | I-038 | 270.19 | 47 | S-F10 | Conventional Bore |
| I | VA | Franklin | I-039 | 270.5 | 66 | S-F9a | Conventional Bore |
| I | VA | Franklin | I-040 | 270.65 | 53 | S-GG4 | Conventional Bore |
| I | VA | Franklin | I-042 | 271.39 | 78 | S-A38 | Conventional Bore |
| I | VA | Franklin | I-044A | 272.65 | 103 | S-GH36, S-KL17 | Conventional Bore |
| I | VA | Franklin | I-046 | 273.09 | 217 | S-GH44, S-GH38, S-IJ47, W-GH16 | Conventional Bore |
| I | VA | Franklin | I-048 | 274.37 | 62 | S-G20 | Conventional Bore |
| I | VA | Franklin | I-053 | 277.13 | 169 | S-H38, W-H17 | Conventional Bore |
| I | VA | Franklin | I-055 | 277.58 | 84 | S-H36, W-H16 | Conventional Bore |
| I | VA | Franklin | I-056 | 277.75 | 32 | S-H34 | Conventional Bore |
| I | VA | Franklin | I-057 | 277.96 | 46 | S-H32 | Conventional Bore |
| I | VA | Franklin | I-060B | 278.5 | 82 | S-A20 | Conventional Bore |
| I | VA | Franklin | I-061A | 278.93 | 52 | S-A22 | Conventional Bore |
| I | VA | Franklin | I-062 | 279.2 | 54 | S-MM44 | Conventional Bore |
| I | VA | Franklin | I-063 | 279.51 | 83 | S-MM48 | Conventional Bore |
| I | VA | Franklin | I-064 | 279.9 | 31 | S-H25, W-H9 | Conventional Bore |

A-5

| Spread | State | County | Crossing Number | MP | Crossing Length (feet) | Waterbody or Wetland Crossed | Crossing Type |
|---|---|---|---|---|---|---|---|
| I | VA | Franklin | I-065 | 279.73 | 79 | S-H24 | Conventional Bore |
| I | VA | Franklin | I-067 | 280.29 | 54 | S-A13 | Conventional Bore |
| I | VA | Franklin | I-069A | 280.88 | 61 | S-A7 | Conventional Bore |
| I | VA | Franklin | I-070 | 281.45 | 51 | S-SS8 | Conventional Bore |
| I | VA | Franklin | I-073 | 281.88 | 81 | S-DD3 | Conventional Bore |
| I | VA | Franklin | I-074 | 282.04 | 53 | S-G16 | Conventional Bore |
| I | VA | Franklin | I-076 | 282.78 | 42 | S-G13 | Conventional Bore |
| I | VA | Pittsylvania | I-078 | 284.3 | 43 | S-D23 | Conventional Bore |
| I | VA | Pittsylvania | I-080 | 284.48 | 54 | S-D2, W-D3 | Conventional Bore |
| I | VA | Pittsylvania | I-085 | 286.03 | 44 | S-A6 | Conventional Bore |
| I | VA | Pittsylvania | I-086 | 286.83 | 65 | S-C7 | Conventional Bore |
| I | VA | Pittsylvania | I-087 | 289.58 | 126 | S-C4, S-C3 | Conventional Bore |
| I | VA | Pittsylvania | I-091 | 291.71 | 74 | S-G4 | Conventional Bore |
| I | VA | Pittsylvania | I-092 | 291.87 | 39 | S-G3 | Conventional Bore |
| I | VA | Pittsylvania | I-093 | 292.11 | 52 | S-CC16 | Conventional Bore |
| I | VA | Pittsylvania | I-094 | 293.34 | 110 | W-CC2-PEM, SCC13, S-CC14 | Conventional Bore |
| I | VA | Pittsylvania | I-095 | 293.5 | 39 | S-MM8, W-MM5 | Conventional Bore |
| I | VA | Pittsylvania | I-096 | 293.62 | 33 | S-CC15 | Conventional Bore |
| I | VA | Pittsylvania | I-097 | 294.2 | 78 | S-CC8, S-CC5 | Conventional Bore |
| I | VA | Pittsylvania | I-101A | 295.03 | 35 | W-MM9 | Conventional Bore |
| I | VA | Pittsylvania | I-103 | 295.28 | 47 | S-P5 | Conventional Bore |

| Spread | State | County | Crossing Number | MP | Crossing Length (feet) | Waterbody or Wetland Crossed | Crossing Type |
|--------|-------|--------|-----------------|------|------------------------|------------------------------|---------------|
| I | VA | Pittsylvania | I-105 | 296.1 | 48 | S-Q4 | Conventional Bore |
| I | VA | Pittsylvania | I-106A | 296.36 | 51 | S-Q2 | Conventional Bore |
| I | VA | Pittsylvania | I-111A | 298.32 | 33 | S-DD4 | Conventional Bore |
| I | VA | Pittsylvania | I-114 | 299.86 | 122 | S-G2, W-G2 | Conventional Bore |
| I | VA | Pittsylvania | I-115 | 300.53 | 40 | S-B2 | Conventional Bore |
| I | VA | Pittsylvania | I-116 | 300.92 | 40 | S-H55 | Conventional Bore |
| I | VA | Pittsylvania | I-117 | 301.13 | 56 | S-H54 | Conventional Bore |
| I | VA | Pittsylvania | I-121 | 302.84 | 405 | S-EF26, W-IJ22-PFO, W-IJ22-PEM | Conventional Bore |
| I | VA | Pittsylvania | I-122 | 302.89 | 68 | S-H44 | Conventional Bore |
| I | VA | Pittsylvania | I-123 | 303.16 | 43 | S-H42 | Conventional Bore |

a   On April 27, 2021, Mountain Valley requested the Commission allow nighttime microtunneling activities at the Gauley River and Roanoke River. The Commission previously authorized Mountain Valley to change the crossing method to a microtunnel technique as part of our variance process. Therefore, only new impacts associated with Mountain Valley's request to conduct 24-hour microtunneling activities at these locations are analyzed (see sections B.3.3 and B.6.2). As these waterbodies are also Section 10 streams they are also discussed in section B.2.3.1.

b   Mountain Valley would utilize a conventional bore at the H-016 railroad crossing as authorized by the Certificate. Nighttime noise associated with conventional boring activities at this location are evaluated as part of the Amendment Project.

**Appendix B**

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N          1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 1 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

- XXX  Proposed Trenchless Crossing Number
- ○  Milepost
- ◄►  Mainline Block Valve
- —— Surveyed Waterbody*
- —— Surveyed Wetland*
- —— Certificated Route
- —— Existing Equitrans H-302 Line
- □ Laydown Yard
- □ Parking Area
- □ Rock Disposal

**Certificated Compressor Station**
- □ Bradshaw Station

**Certificated Meter Station Location**
- Equitrans Mobley Interconnect receipt
  Permanent Area of Disturbance

ALIGNMENT SHIFT

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

Mountain **Valley**
PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 2 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX  Proposed Trenchless Crossing Number
○  Milepost
▨  Proposed Bore Pit
—  Surveyed Waterbody*
▨  Surveyed Wetland*
—  Certificated Route
▢  Parking Area

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

0    0.5    1
Miles

**Mountain Valley** PIPELINE

**Appendix B-1
Wetland and Waterbodies
Proposed Trenchless Crossings**

Page 3 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX  Proposed Trenchless Crossing Number
○    Milepost
▪    Proposed Bore Pit
━    Surveyed Waterbody*
▬    Surveyed Wetland*
━    Certificated Route
▭    Additional Parking
▭    Staging Area

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 4 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
XXX  Proposed Trenchless Crossing Number
○  Milepost
■  Proposed Bore Pit
━━  Surveyed Waterbody*
━━  Surveyed Wetland*
━━  Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N          1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 5 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
XXX  Proposed Trenchless Crossing Number
○    Milepost
▪    Proposed Bore Pit
━    Surveyed Waterbody*
▪    Surveyed Wetland*
━    Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

**Appendix B-1
Wetland and Waterbodies
Proposed Trenchless Crossings**

Page 6 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

- XXX Proposed Trenchless Crossing Number
- Milepost
- ◄► Mainline Block Valve
- Proposed Bore Pit
- Surveyed Waterbody*
- Surveyed Wetland*
- Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

**Mountain Valley** PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 7 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

NAD 1983 UTM 17N        1:24,000

0    0.5    1 Miles

**Legend**
XXX  Proposed Trenchless Crossing Number
○  Milepost
▶◀  Mainline Block Valve
■  Proposed Bore Pit
──  Surveyed Waterbody*
──  Surveyed Wetland*
──  Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

0    0.5    1 Miles

## Mountain Valley PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 8 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

- XXX Proposed Trenchless Crossing Number
- ○ Milepost
- ►◄ Mainline Block Valve
- ■ Proposed Bore Pit
- — Surveyed Waterbody*
- ▬ Surveyed Wetland*
- — Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 9 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

- XXX Proposed Trenchless Crossing Number
- Milepost
- Proposed Bore Pit
- Surveyed Waterbody*
- Surveyed Wetland*
- Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N          1:24,000

0          0.5          1
Miles

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 10 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

- XXX  Proposed Trenchless Crossing Number
- ○  Milepost
- ►◄  Mainline Block Valve
- ■  Proposed Bore Pit
- —  Surveyed Waterbody*
- ▬  Surveyed Wetland*
- —  Certificated Route
- ▭  Laydown Yard

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 11 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX Proposed Trenchless Crossing Number
○ Milepost
▪ Proposed Bore Pit
— Surveyed Waterbody*
■ Surveyed Wetland*
— Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

0    0.5    1 Miles

**Mountain Valley** PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 12 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX  Proposed Trenchless Crossing Number
○  Milepost
►◄  Mainline Block Valve
■  Proposed Bore Pit
—  Surveyed Waterbody*
■  Surveyed Wetland*
—  Certificated Route

*Surveys conducted prior to 10/15/20



**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

**Appendix B-1
Wetland and Waterbodies
Proposed Trenchless Crossings**

Page 13 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

- ▩ Proposed Trenchless Crossing Number
- ○ Milepost
- ►◄ Mainline Block Valve
- ▦ Proposed Bore Pit
- ▬ Surveyed Waterbody*
- ▬ Surveyed Wetland*
- ▬ Certificated Route
- ▭ Laydown Yard

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

Mountain Valley
PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 14 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX  Proposed Trenchless Crossing Number
○  Milepost
►◄  Mainline Block Valve
▪  Proposed Bore Pit
—  Surveyed Waterbody*
—  Surveyed Wetland*
—  Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

**Mountain Valley** PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 15 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX Proposed Trenchless Crossing Number
○ Milepost
►◄ Mainline Block Valve
■ Proposed Bore Pit
— Surveyed Waterbody*
▬ Surveyed Wetland*
— Certificated Route

*Surveys conducted prior to 10/15/20



**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 16 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
- XXX Proposed Trenchless Crossing Number
- ○ Milepost
- ◼ Proposed Bore Pit
- ▬ Surveyed Waterbody*
- ▬ Surveyed Wetland*
- ▬ Certificated Route
- ▬ Appalachian National Scenic Trail
- ▭ Laydown Yard
- ▭ U.S. Forest Service (National Forest) Lands

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

0    0.5    1 Miles

**Mountain Valley** PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 17 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
- XXX Proposed Trenchless Crossing Number
- ○ Milepost
- ◼ Proposed Bore Pit
- — Surveyed Waterbody*
- — Surveyed Wetland*
- — Certificated Route
- U.S. Forest Service (National Forest) Lands

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N          1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 18 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX Proposed Trenchless Crossing Number
○ Milepost
►◄ Mainline Block Valve
▪ Proposed Bore Pit
— Surveyed Waterbody*
— Surveyed Wetland*
— Certificated Route
U.S. Forest Service (National Forest) Lands

*Surveys conducted prior to 10/15/20



**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N          1:24,000

**Appendix B-1
Wetland and Waterbodies
Proposed Trenchless Crossings**

Page 19 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX  Proposed Trenchless Crossing Number
○    Milepost
▪    Proposed Bore Pit
▬    Surveyed Waterbody*
▬    Surveyed Wetland*
▬▬  Certificated Route
▭    Pipe Yard

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

**Mountain Valley**
PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 20 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX  Proposed Trenchless Crossing Number
○  Milepost
◄►  Mainline Block Valve
■  Proposed Bore Pit
—  Surveyed Waterbody*
—  Surveyed Wetland*
—  Certificated Route
▭  Pipe Yard

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

**Mountain Valley**
PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 21 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
XXX  Proposed Trenchless Crossing Number
○  Milepost
■  Proposed Bore Pit
—  Surveyed Waterbody*
  Surveyed Wetland*
—  Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N     1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 22 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

- **XXX** Proposed Trenchless Crossing Number
- ○ Milepost
- ►◄ Mainline Block Valve
- ■ Proposed Bore Pit
- ━━ Surveyed Waterbody*
- ▨ Surveyed Wetland*
- ━━ Certificated Route
- ━━ Blue Ridge Parkway

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

0    0.5    1 Miles

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 23 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
XXX  Proposed Trenchless Crossing Number
○    Milepost
▬    Proposed Bore Pit
▬    Surveyed Waterbody*
▬    Surveyed Wetland*
▬    Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

0    0.5    1
Miles

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 24 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
XXX   Proposed Trenchless Crossing Number
○   Milepost
►◄   Mainline Block Valve
■   Proposed Bore Pit
━   Surveyed Waterbody*
■   Surveyed Wetland*
━   Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 25 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX  Proposed Trenchless Crossing Number
○  Milepost
►◄  Mainline Block Valve
■  Proposed Bore Pit
—  Surveyed Waterbody*
—  Surveyed Wetland*
—  Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

**Mountain Valley**
PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 26 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX Proposed Trenchless Crossing Number
○ Milepost
◄► Mainline Block Valve
▪ Proposed Bore Pit
— Surveyed Waterbody*
■ Surveyed Wetland*
— Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N          1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 27 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
- XXX Proposed Trenchless Crossing Number
- Milepost
- Proposed Bore Pit
- Surveyed Waterbody*
- Surveyed Wetland*
- Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N    1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 28 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018,
Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX  Proposed Trenchless Crossing Number
○  Milepost
▪  Proposed Bore Pit
—  Surveyed Waterbody*
▪  Surveyed Wetland*
—  Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 29 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

- XXX  Proposed Trenchless Crossing Number
- ○  Milepost
- ►◄  Mainline Block Valve
- ▪  Proposed Bore Pit
- ▬  Surveyed Waterbody*
- ▬  Surveyed Wetland*
- ▬  Certificated Route
- ▭  Laydown Yard

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N          1:24,000

**Mountain Valley** PIPELINE

**Appendix B-1
Wetland and Waterbodies
Proposed Trenchless Crossings**

Page 30 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX  Proposed Trenchless Crossing Number
○  Milepost
▬  Proposed Bore Pit
▬  Surveyed Waterbody*
▬  Surveyed Wetland*
▬  Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 31 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**
XXX Proposed Trenchless Crossing Number
○ Milepost
►◄ Mainline Block Valve
▪ Proposed Bore Pit
— Surveyed Waterbody*
▪ Surveyed Wetland*
— Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

**Mountain Valley**
PIPELINE

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 32 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX  Proposed Trenchless Crossing Number
○  Milepost
►◄  Mainline Block Valve
□  Proposed Bore Pit
▬  Surveyed Waterbody*
▬  Surveyed Wetland*
▬  Certificated Route

*Surveys conducted prior to 10/15/20

**Mountain Valley Pipeline Project**

NAD 1983 UTM 17N

1:24,000

0    0.5    1 Miles

**Appendix B-1**
**Wetland and Waterbodies**
**Proposed Trenchless Crossings**

Page 33 of 33

June 2021

Data Sources: ESRI Streaming Data, 2020, ESRI, 2018, Ventyx, 2014, USDA 2017, NPS 2017, ATC 2019, USGS 2019.

**Legend**

XXX Proposed Trenchless Crossing Number
○ Milepost
►◄ Mainline Block Valve
■ Proposed Bore Pit
━━ Surveyed Waterbody*
▨ Surveyed Wetland*
━━ Certificated Route
━━ Existing Transco Pipeline

**Certificated Meter Station Location**
▨ Transco Interconnect delivery Permanent Area of Disturbance

*Surveys conducted prior to 10/15/20

**Appendix C**

Appendix C

**Construction, Restoration, and Mitigation Plans for the Mountain Valley Pipeline Project and Amendment Project**

| Title | Location |
|-------|----------|
| Adopted the FERC Plan | https://www.ferc.gov/industries-data/natural-gas/environment/environmental-guidelines. |
| Modifications from the FERC Procedures | https://www.ferc.gov/industries-data/natural-gas/environment/environmental-guidelines. Modifications discussed in the FEIS. |
| *Erosion and Sediment Control Plans* | Mountain Valley's supplemental filing (Appendix C) filed December 6, 2017 (accession number 20171206-5004). |
| *Karst Hazards Assessment Report* | Mountain Valley's supplemental filing (Attachment RR2-4a) filed October 14, 2016 (accession number 20161014-5022). |
| *Karst Mitigation Plan* | Mountain Valley's Implementation Plan (Attachment IP-20) filed November 1, 2017 (accession number 20171101-5042). |
| *Karst-Specific Erosion and Sediment Control Plan* | Mountain Valley's supplemental filing filed February 26, 2016 (accession number 20160226-5404). |
| *Landslide Mitigation Plan* | Mountain Valley's Implementation Plan (Attachment IP-19) filed November 1, 2017 (accession number 20171101-5042). |
| *Water Resources Identification and Testing Plan* | Mountain Valley's Implementation Plan (Attachment IP-21) filed November 1, 2017 (accession number 20171101-5042). |
| *Vertical Scour and Lateral Channel Erosion Analysis* | Mountain Valley's variance request MVP-006 and H-9 filed September 21, 2018 (accession number 20180921-5228). |
| *Site-Specific Residential Construction and Mitigation Plans* | Mountain Valley's supplemental filing (Attachment D) filed May 3, 2018 (accession number 20180503-5127). |
| *Organic Farm Protection Plan* | Mountain Valley's filing on July 23, 2019 (accession number 20190723-5152). |
| *Spill Prevention, Control, and Countermeasures Plan (SPCCP) and Unanticipated Discovery of Contamination Plan for Construction Activities in West Virginia and Virginia* | Mountain Valley's supplemental filing (Attachment DR5 General 1e-1 and General 1e-2) filed March 30, 2017 (accession number 20170330-5339). |

| Title | Location |
|---|---|
| *General Blasting Plan* | Mountain Valley's variance request MVP-1 filed March 27, 2018 (accession number 20180327-5029). |
| *Compensatory Wetland Mitigation Plan* | Mountain Valley's supplemental filing (Attachments General 1e-1, 1e-2, and 1e-3) filed February 26, 2016 (accession number 20160226-5404). |
| *Migratory Bird Conservation Plan* | Mountain Valley's supplemental filing (Attachment DR5 General 1b1) filed May 11, 2017 (accession number 20170511-5018). |
| *Exotic and Invasive Species Control Plan* | Mountain Valley's supplemental filing (Attachment DR3 Vegetation-5) filed July 18, 2016 (accession number 20160718-5161). |
| *Traffic and Transportation Management Plan* | Mountain Valley's variance request H-9 and MVP-006 filed September 21, 2018 (accession number 20180921-5229). |
| *Fire Prevention and Suppression Plan* | Mountain Valley's supplemental filing (Attachment RR1-4) filed January 15, 2016 (accession number 20160119-5076). |
| *Mining Area Construction Plan* | Mountain Valley's supplemental filing (Attachment DR2 General-5b) filed April 21, 2016 (accession number 20160422-5012). |
| Avoidance Plans filed July 18, 2016.<br>Individual Site Testing Plans for West Virginia included in county survey reports, variously filed.<br>Testing Plans for Virginia archaeological sites filed July 22, 2016.<br>Treatment Plans, variously filed. | N/A |
| *Plan for Unanticipated Historic Properties and Human Remains* | Mountain Valley's supplemental filing (Appendix O) filed December 6, 2017 (accession number 20171206-5004). |
| *Plan for Unanticipated Discovery of Paleontological Resources* | Mountain Valley's supplemental filing (Attachment 1-m) filed January 15, 2016 (accession number 20160119-5076). |
| *Fugitive Dust Control Plan* | Mountain Valley's supplemental filing (Attachment 1-g) filed January 15, 2016 (accession number 20160119-5076). |
| *Winter Construction Plan* | Mountain Valley's supplemental filing (Attachment RR1-30) filed January 15, 2016 (accession number 20160119-5076). |

| Title | Location |
|---|---|
| *Plan of Development (POD)*__a__/ | https://eplanning.blm.gov/eplanning-ui/project/2000356/570. |
| *Unanticipated Mine Pool Mitigation Plan* | Mountain Valley's supplemental filing (Attachment DR4 Geology 12) filed February 17, 2017 (accession number 20170217-5199). |
| *Stormwater Pollution Prevention Plan (SWPPP)* | Mountain Valley's supplemental filing (Appendix F of Attachment F) filed June 24, 2016 (accession number 20160624-5244). |
| *Annual Standards and Specifications for Virginia* | https://www.mountainvalleypipeline.info/wp-content/uploads/2020/12/Mountain-Valley-Pipeline-LLC-ASS-January-2020_Revised-APRIL-2020-V4.pdf. |
| *Acid Forming Materials Mitigation Plan* | Mountain Valley's supplemental filing (Attachment DR5 General 1c) filed May 9, 2017 (accession number 20170509-5108). |
| *Habitat Mitigation Plan* | Mountain Valley's supplemental filing (Attachment DR5 Vegetation) filed May 11, 2017 (accession number 20170511-5018). |
| *Direct Pipe® and Horizontal Directional Drilling Contingency Plan* | Mountain Valley's supplemental filing filed January 16, 2019 (accession number 20190116-5132). |
| N/A = Not Applicable The table has been updated to reflect, as necessary, revisions and updates to plans since issuance of the FEIS. a    The Amendment Project would not impact U.S. Forest Service lands. ||

C-3

**Appendix D**

Appendix D

**Estimated Bore Pit Spoil Volumes**

| Crossing Number | Bore Pit #1 | | | | | Bore Pit #2 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Bore Pit Depth, Face | Bore Pit Depth, Back | Bore Pit Length | Bore Pit Width | Bore Pit Volume | Bore Pit Depth, Face | Bore Pit Depth, Back | Bore Pit Length | Bore Pit Width | Bore Pit Volume |
| A-008 | 19 ft | 29 ft | 55 ft | 16 ft | 785 cy | 22 ft | 29 ft | 29 ft | 16 ft | 440 cy |
| B-012 | 17 ft | 24 ft | 35 ft | 16 ft | 430 cy | 17 ft | 17 ft | 55 ft | 16 ft | 555 cy |
| B-015A | 22 ft | 25 ft | 46 ft | 16 ft | 645 cy | 19 ft | 20 ft | 39 ft | 16 ft | 455 cy |
| C-013A | 18 ft | 24 ft | 55 ft | 16 ft | 685 cy | 19 ft | 18 ft | 60 ft | 16 ft | 660 cy |
| C-018 | 16 ft | 29 ft | 35 ft | 16 ft | 470 cy | 16 ft | 17 ft | 55 ft | 16 ft | 540 cy |
| C-022 | 40 ft | 44 ft | 60 ft | 20 ft | 1,870 cy | 35 ft | 49 ft | 40 ft | 20 ft | 1,245 cy |
| C-024 | 14 ft | 14 ft | 55 ft | 16 ft | 460 cy | 18 ft | 15 ft | 60 ft | 16 ft | 590 cy |
| C-028 | 21 ft | 22 ft | 35 ft | 16 ft | 450 cy | 11 ft | 5 ft | 55 ft | 16 ft | 265 cy |
| C-035 | 11 ft | 13 ft | 35 ft | 16 ft | 250 cy | 16 ft | 15 ft | 55 ft | 16 ft | 510 cy |
| D-004 | 13 ft | 15 ft | 55 ft | 16 ft | 460 cy | 16 ft | 20 ft | 35 ft | 16 ft | 375 cy |
| D-010 | 17 ft | 17 ft | 55 ft | 16 ft | 555 cy | 20 ft | 27 ft | 35 ft | 16 ft | 490 cy |
| D-011 | 13 ft | 15 ft | 35 ft | 16 ft | 295 cy | 11 ft | 11 ft | 55 ft | 16 ft | 360 cy |
| D-012 | 15 ft | 15 ft | 55 ft | 16 ft | 490 cy | 18 ft | 19 ft | 35 ft | 16 ft | 385 cy |
| D-019 | 15 ft | 18 ft | 55 ft | 16 ft | 540 cy | 17 ft | 15 ft | 35 ft | 16 ft | 335 cy |
| D-020 | 14 ft | 19 ft | 35 ft | 16 ft | 345 cy | 13 ft | 15 ft | 55 ft | 16 ft | 460 cy |
| D-022 | 16 ft | 21 ft | 55 ft | 16 ft | 605 cy | 18 ft | 23 ft | 35 ft | 16 ft | 430 cy |
| D-028 | 13 ft | 22 ft | 55 ft | 16 ft | 575 cy | 17 ft | 22 ft | 35 ft | 16 ft | 405 cy |
| D-034 | 13 ft | 17 ft | 55 ft | 16 ft | 490 cy | 13 ft | 23 ft | 35 ft | 16 ft | 375 cy |
| D-035 | 16 ft | 17 ft | 35 ft | 16 ft | 345 cy | 13 ft | 14 ft | 55 ft | 16 ft | 440 cy |
| D-036 | 12 ft | 18 ft | 55 ft | 16 ft | 490 cy | 13 ft | 20 ft | 35 ft | 16 ft | 345 cy |
| D-037 | 13 ft | 19 ft | 35 ft | 16 ft | 335 cy | 13 ft | 14 ft | 55 ft | 16 ft | 440 cy |
| D-038 | 13 ft | 19 ft | 35 ft | 16 ft | 335 cy | 12 ft | 13 ft | 55 ft | 16 ft | 410 cy |
| D-040 | 13 ft | 12 ft | 55 ft | 16 ft | 410 cy | 12 ft | 14 ft | 35 ft | 16 ft | 270 cy |
| D-041 (Gauley R.) | 40 ft | 57 ft | 50 ft | 20 ft | 1,800 cy | 42 ft | 56 ft | 60 ft | 20 ft | 2,180 cy |
| D-048 | 11 ft | 15 ft | 55 ft | 16 ft | 425 cy | 12 ft | 15 ft | 35 ft | 16 ft | 280 cy |
| E-005 | 12 ft | 18 ft | 35 ft | 16 ft | 315 cy | 15 ft | 23 ft | 55 ft | 16 ft | 620 cy |
| E-009 | 16 ft | 17 ft | 35 ft | 16 ft | 345 cy | 16 ft | 9 ft | 55 ft | 16 ft | 410 cy |
| E-012 | 15 ft | 18 ft | 55 ft | 16 ft | 540 cy | 32 ft | 37 ft | 35 ft | 16 ft | 720 cy |
| E-015 | 11 ft | 15 ft | 55 ft | 16 ft | 425 cy | 12 ft | 18 ft | 35 ft | 16 ft | 315 cy |
| F-014 | 13 ft | 14 ft | 35 ft | 16 ft | 280 cy | 13 ft | 15 ft | 55 ft | 16 ft | 460 cy |
| F-015 | 14 ft | 15 ft | 35 ft | 16 ft | 305 cy | 14 ft | 14 ft | 55 ft | 16 ft | 460 cy |
| F-016 | 15 ft | 15 ft | 55 ft | 16 ft | 490 cy | 12 ft | 12 ft | 35 ft | 16 ft | 250 cy |

| Crossing Number | Bore Pit #1 | | | | | Bore Pit #2 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Bore Pit Depth, Face | Bore Pit Depth, Back | Bore Pit Length | Bore Pit Width | Bore Pit Volume | Bore Pit Depth, Face | Bore Pit Depth, Back | Bore Pit Length | Bore Pit Width | Bore Pit Volume |
| F-017 | 14 ft | 16 ft | 35 ft | 16 ft | 315 cy | 14 ft | 15 ft | 55 ft | 16 ft | 475 cy |
| F-021 | 10 ft | 10 ft | 20 ft | 20 ft | 150 cy | 13 ft | 13 ft | 80 ft | 20 ft | 775 cy |
| F-022 | 13 ft | 11 ft | 55 ft | 16 ft | 395 cy | 14 ft | 18 ft | 35 ft | 16 ft | 335 cy |
| F-027 | 9 ft | 16 ft | 35 ft | 16 ft | 260 cy | 16 ft | 19 ft | 55 ft | 16 ft | 575 cy |
| F-032 | 13 ft | 18 ft | 55 ft | 16 ft | 510 cy | 13 ft | 19 ft | 35 ft | 16 ft | 335 cy |
| F-039 | 14 ft | 19 ft | 35 ft | 16 ft | 345 cy | 17 ft | 15 ft | 55 ft | 16 ft | 525 cy |
| G-009 | 21 ft | 26 ft | 20 ft | 15 ft | 265 cy | 18 ft | 30 ft | 50 ft | 20 ft | 890 cy |
| G-010 | 13 ft | 17 ft | 20 ft | 15 ft | 170 cy | 10 ft | 10 ft | 40 ft | 20 ft | 300 cy |
| G-011 | 16 ft | 27 ft | 20 ft | 15 ft | 240 cy | 12 ft | 17 ft | 40 ft | 20 ft | 430 cy |
| G-012 | 12 ft | 19 ft | 50 ft | 20 ft | 575 cy | 10 ft | 10 ft | 20 ft | 15 ft | 115 cy |
| G-013 | 16 ft | 15 ft | 60 ft | 20 ft | 690 cy | 21 ft | 23 ft | 45 ft | 15 ft | 550 cy |
| G-014 | 9 ft | 15 ft | 60 ft | 20 ft | 535 cy | 9 ft | 12 ft | 20 ft | 15 ft | 120 cy |
| G-017 | 11 ft | 11 ft | 20 ft | 15 ft | 125 cy | 24 ft | 37 ft | 60 ft | 20 ft | 1,360 cy |
| G-019B | 13 ft | 14 ft | 20 ft | 15 ft | 150 cy | 13 ft | 19 ft | 30 ft | 20 ft | 360 cy |
| G-023 | 15 ft | 25 ft | 20 ft | 20 ft | 300 cy | 23 ft | 22 ft | 60 ft | 20 ft | 1,000 cy |
| G-024 | 15 ft | 27 ft | 40 ft | 20 ft | 625 cy | 23 ft | 28 ft | 20 ft | 15 ft | 285 cy |
| H-009 | 9 ft | 10 ft | 40 ft | 25 ft | 355 cy | 10 ft | 11 ft | 40 ft | 25 ft | 390 cy |
| H-015 | 23 ft | 26 ft | 55 ft | 25 ft | 1,250 cy | 16 ft | 16 ft | 55 ft | 25 ft | 815 cy |
| H-016 | 9 ft | 5 ft | 60 ft | 16 ft | 250 cy | 19 ft | 21 ft | 40 ft | 16 ft | 475 cy |
| H-017 | 19 ft | 30 ft | 40 ft | 20 ft | 730 cy | 23 ft | 39 ft | 40 ft | 20 ft | 920 cy |
| H-019 (Roanoke R.) | 26 ft | 31 ft | 50 ft | 20 ft | 1,060 cy | 22 ft | 22 ft | 60 ft | 20 ft | 980 cy |
| H-020 | 12 ft | 12 ft | 40 ft | 20 ft | 360 cy | 14 ft | 16 ft | 40 ft | 20 ft | 445 cy |
| H-021 | 11 ft | 10 ft | 50 ft | 25 ft | 490 cy | 9 ft | 10 ft | 50 ft | 25 ft | 440 cy |
| H-022 | 12 ft | 12 ft | 60 ft | 25 ft | 670 cy | 11 ft | 10 ft | 50 ft | 25 ft | 490 cy |
| H-030 | 20 ft | 27 ft | 50 ft | 25 ft | 1,090 cy | 13 ft | 15 ft | 60 ft | 25 ft | 780 cy |
| H-031 | 17 ft | 18 ft | 45 ft | 25 ft | 730 cy | 14 ft | 28 ft | 60 ft | 25 ft | 1,170 cy |
| H-032 | 14 ft | 19 ft | 65 ft | 25 ft | 995 cy | 15 ft | 22 ft | 50 ft | 25 ft | 860 cy |
| H-040 | 12 ft | 14 ft | 60 ft | 25 ft | 725 cy | 12 ft | 21 ft | 50 ft | 25 ft | 765 cy |
| H-042 | 15 ft | 17 ft | 60 ft | 25 ft | 890 cy | 15 ft | 22 ft | 50 ft | 20 ft | 690 cy |
| H-043 | 18 ft | 20 ft | 50 ft | 25 ft | 880 cy | 16 ft | 25 ft | 50 ft | 25 ft | 950 cy |
| H-044 | 15 ft | 20 ft | 25 ft | 25 ft | 410 cy | 13 ft | 21 ft | 30 ft | 25 ft | 475 cy |
| H-045 | 18 ft | 24 ft | 50 ft | 25 ft | 975 cy | 14 ft | 30 ft | 50 ft | 25 ft | 1,020 cy |
| H-046 | 21 ft | 25 ft | 35 ft | 25 ft | 750 cy | 13 ft | 23 ft | 50 ft | 25 ft | 835 cy |
| H-047A | 12 ft | 14 ft | 60 ft | 25 ft | 725 cy | 13 ft | 10 ft | 77 ft | 25 ft | 820 cy |
| H-048A | 10 ft | 10 ft | 60 ft | 25 ft | 560 cy | 11 ft | 11 ft | 50 ft | 25 ft | 510 cy |

D-2

| Crossing Number | Bore Pit #1 | | | | | Bore Pit #2 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Bore Pit Depth, Face | Bore Pit Depth, Back | Bore Pit Length | Bore Pit Width | Bore Pit Volume | Bore Pit Depth, Face | Bore Pit Depth, Back | Bore Pit Length | Bore Pit Width | Bore Pit Volume |
| H-054 | 14 ft | 14 ft | 50 ft | 25 ft | 650 cy | 14 ft | 22 ft | 65 ft | 25 ft | 1,085 cy |
| H-060 | 12 ft | 15 ft | 60 ft | 25 ft | 750 cy | 11 ft | 15 ft | 45 ft | 25 ft | 545 cy |
| I-001A | 12 ft | 14 ft | 60 ft | 20 ft | 580 cy | 12 ft | 14 ft | 50 ft | 20 ft | 485 cy |
| I-009 | 16 ft | 16 ft | 60 ft | 20 ft | 715 cy | 18 ft | 20 ft | 50 ft | 20 ft | 705 cy |
| I-014 | 15 ft | 20 ft | 50 ft | 20 ft | 650 cy | 13 ft | 16 ft | 60 ft | 20 ft | 645 cy |
| I-016 | 11 ft | 10 ft | 50 ft | 20 ft | 390 cy | 10 ft | 9 ft | 60 ft | 20 ft | 425 cy |
| I-020 | 12 ft | 16 ft | 60 ft | 20 ft | 625 cy | 12 ft | 14 ft | 50 ft | 20 ft | 485 cy |
| I-021 | 12 ft | 17 ft | 60 ft | 20 ft | 645 cy | 12 ft | 16 ft | 50 ft | 20 ft | 520 cy |
| I-034 | 13 ft | 8 ft | 50 ft | 20 ft | 390 cy | 17 ft | 17 ft | 60 ft | 20 ft | 760 cy |
| I-038 | 11 ft | 4 ft | 50 ft | 20 ft | 280 cy | 12 ft | 16 ft | 50 ft | 20 ft | 520 cy |
| I-039 | 12 ft | 20 ft | 50 ft | 20 ft | 595 cy | 12 ft | 15 ft | 60 ft | 20 ft | 600 cy |
| I-040 | 10 ft | 11 ft | 60 ft | 20 ft | 470 cy | 12 ft | 17 ft | 50 ft | 20 ft | 540 cy |
| I-042 | 15 ft | 20 ft | 50 ft | 20 ft | 650 cy | 12 ft | 11 ft | 60 ft | 20 ft | 515 cy |
| I-044A | 14 ft | 19 ft | 60 ft | 20 ft | 735 cy | 14 ft | 11 ft | 50 ft | 20 ft | 465 cy |
| I-046 | 10 ft | 10 ft | 60 ft | 20 ft | 445 cy | 16 ft | 20 ft | 50 ft | 20 ft | 670 cy |
| I-048 | 12 ft | 15 ft | 60 ft | 20 ft | 600 cy | 12 ft | 14 ft | 50 ft | 20 ft | 485 cy |
| I-053 | 19 ft | 22 ft | 50 ft | 20 ft | 760 cy | 15 ft | 19 ft | 60 ft | 20 ft | 760 cy |
| I-055 | 17 ft | 30 ft | 50 ft | 20 ft | 875 cy | 10 ft | 21 ft | 60 ft | 20 ft | 690 cy |
| I-056 | 12 ft | 16 ft | 60 ft | 20 ft | 625 cy | 11 ft | 24 ft | 50 ft | 20 ft | 650 cy |
| I-057 | 14 ft | 26 ft | 50 ft | 20 ft | 745 cy | 12 ft | 20 ft | 60 ft | 20 ft | 715 cy |
| I-060B | 13 ft | 17 ft | 50 ft | 30 ft | 835 cy | 24 ft | 39 ft | 60 ft | 20 ft | 1,400 cy |
| I-061A | 13 ft | 16 ft | 37 ft | 20 ft | 400 cy | 12 ft | 16 ft | 60 ft | 20 ft | 625 cy |
| I-062 | 22 ft | 36 ft | 50 ft | 20 ft | 1,075 cy | 10 ft | 11 ft | 60 ft | 20 ft | 470 cy |
| I-063 | 17 ft | 29 ft | 50 ft | 20 ft | 855 cy | 10 ft | 17 ft | 60 ft | 20 ft | 600 cy |
| I-065 | 12 ft | 20 ft | 60 ft | 20 ft | 715 cy | 12 ft | 26 ft | 50 ft | 20 ft | 705 cy |
| I-064 | 15 ft | 28 ft | 60 ft | 20 ft | 960 cy | 16 ft | 27 ft | 50 ft | 20 ft | 800 cy |
| I-067 | 13 ft | 20 ft | 50 ft | 20 ft | 615 cy | 13 ft | 19 ft | 60 ft | 20 ft | 715 cy |
| I-069A | 12 ft | 19 ft | 60 ft | 20 ft | 690 cy | 16 ft | 16 ft | 50 ft | 20 ft | 595 cy |
| I-070 | 14 ft | 26 ft | 50 ft | 20 ft | 745 cy | 16 ft | 27 ft | 60 ft | 20 ft | 960 cy |
| I-073 | 13 ft | 13 ft | 60 ft | 20 ft | 580 cy | 12 ft | 16 ft | 50 ft | 20 ft | 520 cy |
| I-074 | 16 ft | 31 ft | 50 ft | 20 ft | 875 cy | 13 ft | 18 ft | 60 ft | 20 ft | 690 cy |
| I-076 | 13 ft | 20 ft | 60 ft | 20 ft | 735 cy | 17 ft | 26 ft | 50 ft | 20 ft | 800 cy |
| I-078 | 11 ft | 16 ft | 60 ft | 20 ft | 600 cy | 10 ft | 14 ft | 50 ft | 20 ft | 445 cy |
| I-080 | 13 ft | 13 ft | 50 ft | 20 ft | 485 cy | 12 ft | 19 ft | 60 ft | 20 ft | 690 cy |
| I-085 | 12 ft | 22 ft | 60 ft | 20 ft | 760 cy | 10 ft | 17 ft | 50 ft | 20 ft | 500 cy |
| I-086 | 14 ft | 19 ft | 60 ft | 20 ft | 735 cy | 15 ft | 16 ft | 50 ft | 20 ft | 575 cy |

D-3

| Crossing Number | Bore Pit #1 | | | | | Bore Pit #2 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Bore Pit Depth, Face | Bore Pit Depth, Back | Bore Pit Length | Bore Pit Width | Bore Pit Volume | Bore Pit Depth, Face | Bore Pit Depth, Back | Bore Pit Length | Bore Pit Width | Bore Pit Volume |
| I-087 | 15 ft | 15 ft | 60 ft | 20 ft | 670 cy | 14 ft | 27 ft | 50 ft | 20 ft | 760 cy |
| I-091 | 20 ft | 32 ft | 50 ft | 20 ft | 965 cy | 13 ft | 13 ft | 60 ft | 20 ft | 580 cy |
| I-092 | 12 ft | 19 ft | 60 ft | 20 ft | 690 cy | 13 ft | 20 ft | 50 ft | 20 ft | 615 cy |
| I-093 | 11 ft | 15 ft | 60 ft | 20 ft | 580 cy | 11 ft | 16 ft | 50 ft | 20 ft | 500 cy |
| I-094 | 17 ft | 23 ft | 60 ft | 20 ft | 890 cy | 15 ft | 21 ft | 50 ft | 20 ft | 670 cy |
| I-095 | 12 ft | 17 ft | 60 ft | 20 ft | 645 cy | 12 ft | 19 ft | 50 ft | 20 ft | 575 cy |
| I-096 | 11 ft | 18 ft | 50 ft | 20 ft | 540 cy | 10 ft | 16 ft | 60 ft | 20 ft | 580 cy |
| I-097 | 11 ft | 12 ft | 60 ft | 20 ft | 515 cy | 14 ft | 14 ft | 50 ft | 20 ft | 520 cy |
| I-101A | 10 ft | 18 ft | 60 ft | 20 ft | 625 cy | 9 ft | 16 ft | 49 ft | 20 ft | 455 cy |
| I-103 | 8 ft | 3 ft | 50 ft | 20 ft | 205 cy | 10 ft | 11 ft | 60 ft | 20 ft | 470 cy |
| I-105 | 14 ft | 19 ft | 60 ft | 20 ft | 735 cy | 13 ft | 19 ft | 50 ft | 20 ft | 595 cy |
| I-106A | 16 ft | 15 ft | 49 ft | 20 ft | 565 cy | 12 ft | 14 ft | 60 ft | 20 ft | 580 cy |
| I-111A | 12 ft | 15 ft | 60 ft | 20 ft | 600 cy | 12 ft | 14 ft | 50 ft | 20 ft | 485 cy |
| I-114 | 12 ft | 19 ft | 60 ft | 20 ft | 690 cy | 11 ft | 21 ft | 50 ft | 20 ft | 595 cy |
| I-115 | 11 ft | 18 ft | 50 ft | 20 ft | 540 cy | 10 ft | 17 ft | 60 ft | 20 ft | 600 cy |
| I-116 | 11 ft | 16 ft | 50 ft | 20 ft | 500 cy | 10 ft | 11 ft | 60 ft | 20 ft | 470 cy |
| I-117 | 13 ft | 15 ft | 50 ft | 20 ft | 520 cy | 13 ft | 16 ft | 60 ft | 20 ft | 645 cy |
| I-121 | 16 ft | 19 ft | 50 ft | 20 ft | 650 cy | 15 ft | 19 ft | 60 ft | 20 ft | 760 cy |
| I-122 | 13 ft | 14 ft | 60 ft | 20 ft | 600 cy | 13 ft | 17 ft | 50 ft | 20 ft | 560 cy |
| I-123 | 16 ft | 23 ft | 50 ft | 20 ft | 725 cy | 13 ft | 17 ft | 60 ft | 20 ft | 670 cy |
| ft = feet, cy = cubic yards | | | | | | | | | | |

D-4

**Appendix E**

Appendix E

**Bore Pit Underlying Geology, Depths, Aquifer Characteristics, Duration, and Estimated Groundwater Drawdown**

| Crossing Number | Milepost | Underlying Rock Type | Underlying Formation | SSURGO Estimated Depth to Bedrock (ft) | Depth of Bore Pit Analyzed (ft) a/ | Saturated Pit Depth (ft) b/ | Bore Duration (days) | Hydraulic Conductivity (ft/day) | Saturated Thickness (ft) | Transmissivity (ft b/day) | Storage | Pumping Rate (gpm) c/ | (R₀) Radius of Influence (ft) d/ | Drawdown at 150 ft from Bore Pit (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A-008 | 6.56 | sandstone | Greene, Washington | 5.8 | 22 | 16 | 11 | 1 | 50 | 50 | 0.12 | 16 | 102 | 0 |
| B-012 | 58.53 | sandstone | Uniontown, Pittsburg | >7 | 17 | 11 | 17 | 1 | 50 | 50 | 0.12 | 10 | 126 | 0 |
| B-015A | 61.21 | Shale | Casselman, Glenshaw | 6.3 | 22 | 16 | 18 | 1 | 50 | 50 | 0.12 | 14 | 130 | 0 |
| C-013A | 81.6 | Sandstone | Kanawha | 6.3 | 19 | 13 | 27 | 1 | 50 | 50 | 0.12 | 10 | 159 | 0.2 |
| C-018 | 82.28 | Sandstone | Kanawha | >7 | 16 | 10 | 15 | 1 | 50 | 50 | 0.12 | 9 | 119 | 0 |
| C-022 | 87.33 | Sandstone | New River | >7 | 40 | 34 | 79 | 1 | 50 | 50 | 0.12 | 22 | 272 | 7 |
| C-024 | 87.32 | Sandstone | New River | >7 | 15 | 9 | 36 | 1 | 50 | 50 | 0.12 | 7 | 184 | 0.8 |
| C-028 | 89.56 | Shale | Casselman, Glenshaw | >7 | 21 | 15 | 26 | 1 | 50 | 50 | 0.12 | 12 | 156 | <0.1 |
| C-035 | 95.45 | Sandstone | Allegheny | >7 | 15 | 9 | 28 | 1 | 50 | 50 | 0.12 | 7 | 162 | 0.5 |
| D-004 | 106.35 | Sandstone | Kanawha | >7 | 16 | 10 | 13 | 1 | 50 | 50 | 0.12 | 10 | 110 | 0 |
| D-010 | 109.94 | Sandstone | Kanawha | >7 | 20 | 14 | 18 | 1 | 50 | 50 | 0.12 | 13 | 130 | 0 |
| D-011 | 111 | Sandstone | Kanawha | >7 | 13 | 7 | 18 | 20 | 7 | 140 | 0.21 | 15 | 164 | 0.5 |
| D-012 | 111.09 | Sandstone | Kanawha | >7 | 18 | 12 | 17 | 1 | 50 | 50 | 0.12 | 11 | 126 | 0 |
| D-019 | 113.11 | Sandstone | Kanawha | >7 | 15 | 9 | 24 | 1 | 50 | 50 | 0.12 | 7 | 212 | 1 |
| D-020 | 113.39 | Sandstone | Kanawha | >7 | 14 | 8 | 20 | 20 | 8 | 160 | 0.21 | 19 | 185 | 0.8 |
| D-022 | 114.17 | Sandstone | Kanawha | >7 | 18 | 12 | 16 | 1 | 50 | 50 | 0.12 | 11 | 122 | 0 |
| D-028 | 114.95 | Sandstone | Kanawha | >7 | 17 | 11 | 14 | 1 | 50 | 50 | 0.12 | 11 | 115 | 0 |
| D-034 | 116.69 | Sandstone | Kanawha | 6 | 13 | 7 | 12 | 1 | 50 | 50 | 0.12 | 7 | 106 | 0 |
| D-035 | 117.02 | Sandstone | Kanawha | 4.7 | 16 | 10 | 9 | 1 | 50 | 50 | 0.12 | 11 | 92 | 0 |
| D-036 | 117.1 | Sandstone | Kanawha | >7 | 13 | 7 | 17 | 20 | 7 | 140 | 0.21 | 15 | 160 | 0.5 |
| D-037 | 117.28 | Sandstone | Kanawha | >7 | 13 | 7 | 9 | 20 | 7 | 140 | 0.21 | 18 | 116 | 0 |
| D-038 | 117.4 | Sandstone | Kanawha | >7 | 13 | 7 | 9 | 20 | 7 | 140 | 0.21 | 18 | 116 | 0 |
| D-040 | 118.24 | Sandstone | Kanawha | >7 | 12 | 10 | 7 | 20 | 10 | 200 | 0.21 | 35 | 122 | 0 |

E-1

| Crossing Number | Milepost | Underlying Rock Type | Underlying Formation | SSURGO Estimated Depth to Bedrock (ft) | Depth of Bore Pit Analyzed (ft) a/ | Saturated Pit Depth (ft) b/ | Bore Duration (days) | Hydraulic Conductivity (ft/day) | Saturated Thickness (ft) | Transmissivity (ft b/day) | Storage | Pumping Rate (gpm) c/ | ($R_0$) Radius of Influence (ft) d/ | Drawdown at 150 ft from Bore Pit (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D-041 | 118.9 | Sandstone | Kanawha | >7 | 42 | 36 | 78 | 1 | 50 | 50 | 0.12 | 21 | 270 | 8 |
| D-048 | 122.55 | Sandstone | Kanawha | >7 | 12 | 10 | 7 | 20 | 10 | 200 | 0.21 | 35 | 122 | 0 |
| E-005 | 132.36 | Sandstone | New River | 4.7 | 15 | 9 | 11 | 1 | 50 | 50 | 0.12 | 10 | 102 | 0 |
| E-009 | 136.72 | sandstone | New River | >7 | 16 | 10 | 23 | 1 | 50 | 50 | 0.12 | 8 | 147 | 0 |
| E-012 | 140.44 | Sandstone | New River | >7 | 32 | 26 | 17 | 1 | 50 | 50 | 0.12 | 23 | 126 | 0 |
| E-015 | 141.17 | Sandstone | New River | >7 | 12 | 10 | 9 | 20 | 10 | 200 | 0.21 | 34 | 139 | 0 |
| F-014 | 169.76 | shale / sandstone | Bluefield | >7 | 13 | 7 | 31 | 20 | 7 | 140 | 0.21 | 13 | 216 | 1.4 |
| F-015 | 169.78 | shale / sandstone | Bluefield | >7 | 14 | 8 | 14 | 20 | 8 | 160 | 0.21 | 20 | 155 | 0 |
| F-016 | 169.81 | shale / sandstone | Bluefield | >7 | 15 | 9 | 14 | 1 | 50 | 50 | 0.12 | 9 | 115 | 0 |
| F-017 | 169.84 | shale / sandstone | Bluefield | >7 | 14 | 8 | 16 | 20 | 8 | 160 | 0.21 | 20 | 166 | 0.5 |
| F-021 | 171.44 | shale / sandstone | Bluefield | >7 | 13 | 7 | 103 | 20 | 7 | 140 | 0.21 | 11 | 393 | 2.5 |
| F-022 | 171.77 | shale / sandstone | Bluefield | >7 | 14 | 8 | 12 | 20 | 8 | 160 | 0.21 | 21 | 143 | 0 |
| F-027 | 173.14 | shale / sandstone | Bluefield | >7 | 16 | 10 | 8 | 1 | 50 | 50 | 0.12 | 11 | 87 | 0 |
| F-032 | 184.08 | shale / sandstone | Bluefield | 3.4 | 13 | 7 | 9 | 1 | 50 | 50 | 0.01 | 7 | 92 | 0 |
| F-039 | 190.03 | shale / sandstone | Bluefield | 3.4 | 15 | 9 | 10 | 1 | 50 | 50 | 0.12 | 11 | 97 | 0 |
| G-009 | 203.59 | silt, shale, sand | Martinsburg | 0 | 21 | 15 | 18 | 1 | 50 | 50 | 0.12 | 0.7 | 101 | 0 |
| G-010 | 203.71 | silt, shale, sand | Martinsburg | 0 | 13 | 7 | 6 | 1 | 50 | 50 | 0.01 | 9 | 75 | 0 |
| G-011 | 203.88 | silt, shale, sand | Martinsburg | 0 | 16 | 10 | 10 | 1 | 50 | 50 | 0.12 | 10 | 97 | 0 |
| G-012 | 204 | silt, shale, sand | Martinsburg | >7 | 12 | 10 | 8 | 20 | 10 | 200 | 0.21 | 35 | 131 | 0 |

| Crossing Number | Milepost | Underlying Rock Type | Underlying Formation | SSURGO Estimated Depth to Bedrock (ft) | Depth of Bore Pit Analyzed (ft) a/ | Saturated Pit Depth (ft) b/ | Bore Duration (days) | Hydraulic Conductivity (ft/day) | Saturated Thickness (ft) | Transmissivity (ft b/day) | Storage | Pumping Rate (gpm) c/ | ($R_0$) Radius of Influence (ft) d/ | Drawdown at 150 ft from Bore Pit (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| G-013 | 204.34 | silt, shale, sand | Martinsburg | >7 | 21 | 15 | 33 | 1 | 50 | 50 | 0.12 | 11 | 176 | 0.7 |
| G-014 | 204.35 | silt, shale, sand | Martinsburg | >7 | 9 | 7 | 9 | 20 | 7 | 140 | 0.21 | 19 | 116 | 0 |
| G-017 | 206.59 | dolomite (k) | Undivided | 6.8 | 24 | 18 | 33 | 0.1 | 50 | 5 | 0.14 | 1.5 | 51 | 0 |
| G-019B | 207.9 | silt, shale, sand | Martinsburg | >7 | 13 | 7 | 72 | 20 | 7 | 140 | 0.21 | 12 | 329 | 2.5 |
| G-023 | 211.17 | limestone (k) | Undivided | >7 | 22 | 16 | 25 | 0.1 | 50 | 5 | 0.14 | 2 | 45 | 0 |
| G-024 | 213 | dolomite (k) | Honaker | >7 | 23 | 17 | 18 | 0.1 | 50 | 5 | 0.14 | 2 | 38 | 0 |
| H-009 | 229.48 | shale | Millboro / Needmore | 3.2 | 10 | 8 | 8 | 1 | 50 | 50 | 0.01 | 9 | 87 | 0 |
| H-015 | 230.55 | shale / sandstone | Bralier | 3.2 | 23 | 17 | 13 | 1 | 50 | 50 | 0.12 | 18 | 87 | 0 |
| H-016 | 230.8 | shale | Bralier | 3.2 | 19 | 13 | 42 | 1 | 50 | 50 | 0.12 | 23 | 198 | 3 |
| H-017 | 234.15 | dolomite/lime (k) | Elbrook | >7 | 23 | 17 | 34 | 0.1 | 50 | 5 | 0.14 | 1.5 | 52 | 0 |
| H-019 | 235.4 | dolomite/lime (k) | Elbrook | >7 | 26 | 20 | 36 | 0.05 | 50 | 5 | 0.14 | 3.5 | 54 | 0 |
| H-020 | 235.58 | dolomite/lime (k) | Elbrook | >7 | 14 | 8 | 39 | 20 | 8 | 160 | 0.21 | 17 | 259 | 1.5 |
| H-021 | 235.9 | shale | Rome | >7 | 10 | 8 | 7 | 20 | 8 | 160 | 0.21 | 25 | 110 | 0 |
| H-022 | 235.9 | shale | Rome | >7 | 12 | 10 | 13 | 20 | 10 | 200 | 0.21 | 31 | 167 | 0.5 |
| H-030 | 241.93 | granulite | Pyroxene Granulite | 5.3 | 20 | 14 | 8 | 0.05 | 50 | 2.5 | 0.01 | 0.9 | 67 | 0 |
| H-031 | 242.06 | granulite | Pyroxene Granulite | 5.3 | 17 | 11 | 62 | 0.05 | 50 | 2.5 | 0.01 | 0.4 | 187 | 1.5 |
| H-032 | 242.28 | granulite | Pyroxene Granulite | 5.3 | 15 | 9 | 13 | 0.05 | 50 | 2.5 | 0.01 | 0.5 | 86 | 0 |
| H-040 | 243.55 | granulite | Pyroxene Granulite | >7 | 12 | 10 | 19 | 20 | 10 | 200 | 0.21 | 28 | 202 | 0.8 |
| H-042 | 243.83 | granitic gneiss | Charnockite | 4.8 | 15 | 9 | 22 | 0.05 | 50 | 2.5 | 0.01 | 0.45 | 111 | |

| Crossing Number | Milepost | Underlying Rock Type | Underlying Formation | SSURGO Estimated Depth to Bedrock (ft) | Depth of Bore Pit Analyzed (ft) a/ | Saturated Pit Depth (ft) b/ | Bore Duration (days) | Hydraulic Conductivity (ft/day) | Saturated Thickness (ft) | Transmissivity (ft b/day) | Storage | Pumping Rate (gpm) c/ | ($R_0$) Radius of Influence (ft) d/ | Drawdown at 150 ft from Bore Pit (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| H-043 | 243.97 | granitic gneiss | Charnockite | 5.5 | 18 | 12 | 14 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 89 | 0 |
| H-044 | 244.5 | granitic gneiss | Charnockite | 5.3 | 15 | 9 | 10 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 75 | 0 |
| H-045 | 244.7 | granitic gneiss | Charockite | 5.3 | 18 | 12 | 33 | 0.05 | 50 | 2.5 | 0.01 | 0.5 | 136 | 0 |
| H-046 | 245.05 | granitic gneiss | Charockite | 5.3 | 21 | 15 | 18 | 0.05 | 50 | 2.5 | 0.01 | 0.7 | 101 | 0 |
| H-047A | 245.64 | granitic gneiss | Charnockite | 5.3 | 12 | 10 | 30 | 0.05 | 50 | 2.5 | 0.01 | 0.45 | 130 | 0 |
| H-048A | 245.8 | granitic gneiss | Charnockite | 5.3 | 11 | 9 | 25 | 1 | 50 | 50 | 0.01 | 0.4 | 119 | 0 |
| H-054 | 248.81 | granulite / gneiss | Biotite Gneiss | 4.8 | 14 | 8 | 10 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 75 | 0 |
| H-060 | 252.35 | granitic gneiss | Charnockite | >7 | 12 | 10 | 8 | 20 | 10 | 200 | 0.21 | 35 | 131 | 0 |
| I-001A | 258.23 | felsic gneiss | Augen Gneiss | >7 | 12 | 10 | 8 | 20 | 10 | 200 | 0.21 | 35 | 131 | 0 |
| I-009 | 260.56 | augen & flaser gneiss | Lovingston massif | >7 | 18 | 12 | 10 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 75 | 0 |
| I-014 | 262.09 | biotite gneiss | Ashe | >7 | 15 | 9 | 10 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 75 | 0 |
| I-016 | 262.5 | biotite gneiss | Ashe | >7 | 10 | 8 | 12 | 20 | 8 | 160 | 0.21 | 21 | 143 | 0 |
| I-020 | 264.53 | biotite gneiss | Ashe | >7 | 12 | 10 | 10 | 20 | 10 | 200 | 0.21 | 33 | 146 | 0 |
| I-021 | 264.66 | biotite gneiss | Ashe | >7 | 12 | 10 | 8 | 20 | 10 | 200 | 0.21 | 35 | 131 | 0 |
| I-034 | 268.9 | biotite gneiss | Ashe | >7 | 17 | 11 | 9 | 0.05 | 50 | 2.5 | 0.01 | 0.7 | 71 | 0 |
| I-038 | 270.19 | biotite gneiss | Ashe | 4.8 | 12 | 10 | 7 | 0.05 | 50 | 2.5 | 0.01 | 0.5 | 63 | 0 |
| I-039 | 270.5 | biotite gneiss | Ashe | >7 | 12 | 10 | 8 | 20 | 10 | 200 | 0.21 | 35 | 131 | 0 |

E-4

| Crossing Number | Milepost | Underlying Rock Type | Underlying Formation | SSURGO Estimated Depth to Bedrock (ft) | Depth of Bore Pit Analyzed (ft) a/ | Saturated Pit Depth (ft) b/ | Bore Duration (days) | Hydraulic Conductivity (ft/day) | Saturated Thickness (ft) | Transmissivity (ft b/day) | Storage | Pumping Rate (gpm) c/ | ($R_0$) Radius of Influence (ft) d/ | Drawdown at 150 ft from Bore Pit (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-040 | 270.65 | biotite gneiss | Ashe | 5.1 | 12 | 10 | 7 | 0.05 | 50 | 2.5 | 0.01 | 0.5 | 63 | 0 |
| I-042 | 271.39 | biotite gneiss | Ashe | 6.3 | 15 | 9 | 14 | 0.05 | 50 | 2.5 | 0.01 | 0.5 | 89 | 0 |
| I-044A | 272.65 | biotite gneiss | Ashe | >7 | 14 | 8 | 25 | 8 | 20 | 160 | 0.21 | 18 | 207 | 1 |
| I-046 | 273.09 | biotite gneiss | Ashe | 4.8 | 16 | 10 | 55 | 0.05 | 50 | 2.5 | 0.01 | 0.4 | 176 | 1 |
| I-048 | 274.37 | actinolite schist | Alligator Back | 4.8 | 12 | 10 | 10 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 75 | 0 |
| I-053 | 277.13 | actinolite schist | Alligator Back | >7 | 19 | 13 | 22 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 111 | 0 |
| I-055 | 277.58 | actinolite schist | Alligator Back | >7 | 17 | 11 | 18 | 0.05 | 50 | 2.5 | 0.01 | 0.55 | 101 | 0 |
| I-056 | 277.75 | actinolite schist | Alligator Back | >7 | 12 | 10 | 8 | 10 | 20 | 200 | 0.21 | 35 | 131 | 0 |
| I-057 | 277.96 | actinolite schist | Alligator Back | >7 | 14 | 8 | 11 | 8 | 20 | 160 | 0.21 | 22 | 137 | 0 |
| I-060B | 278.5 | actinolite schist | Alligator Back | >7 | 24 | 18 | 19 | 0.05 | 50 | 2.5 | 0.01 | 0.9 | 10 | 0 |
| I-061A | 278.93 | actinolite schist | Alligator Back | >7 | 13 | 7 | 8 | 7 | 20 | 140 | 0.21 | 19 | 110 | 0 |
| I-062 | 279.2 | actinolite schist | Alligator Back | >7 | 22 | 16 | 16 | 0.05 | 50 | 2.5 | 0.01 | 0.9 | 95 | 0 |
| I-063 | 279.51 | actinolite schist | Alligator Back | >7 | 17 | 11 | 14 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 89 | 0 |
| I-064 | 279.9 | actinolite schist | Alligator Back | >7 | 12 | 10 | 14 | 10 | 20 | 200 | 0.21 | 30 | 173 | 0.5 |
| I-065 | 279.73 | actinolite schist | Alligator Back | >7 | 16 | 10 | 14 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 89 | 0 |
| I-067 | 280.29 | actinolite schist | Alligator Back | >7 | 13 | 7 | 11 | 7 | 20 | 140 | 0.21 | 17 | 128 | 0 |
| I-069A | 280.88 | actinolite schist | Alligator Back | >7 | 16 | 10 | 10 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 75 | 0 |

| Crossing Number | Milepost | Underlying Rock Type | Underlying Formation | SSURGO Estimated Depth to Bedrock (ft) | Depth of Bore Pit Analyzed (ft) a/ | Saturated Pit Depth (ft) b/ | Bore Duration (days) | Hydraulic Conductivity (ft/day) | Saturated Thickness (ft) | Transmissivity (ft b/day) | Storage | Pumping Rate (gpm) c/ | ($R_0$) Radius of Influence (ft) d/ | Drawdown at 150 ft from Bore Pit (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-070 | 281.45 | actinolite schist | Alligator Back | >7 | 16 | 10 | 10 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 75 | 0 |
| I-073 | 281.88 | actinolite schist | Alligator Back | >7 | 13 | 7 | 11 | 7 | 20 | 140 | 0.21 | 17 | 128 | 0 |
| I-074 | 282.04 | actinolite schist | Alligator Back | >7 | 16 | 10 | 13 | 0.05 | 50 | 2.5 | 0.01 | 0.6 | 85 | 0 |
| I-076 | 282.78 | actinolite schist | Alligator Back | >7 | 17 | 11 | 44 | 0.05 | 50 | 2.5 | 0.01 | 0.4 | 157 | 1 |
| I-078 | 284.13 | amphibolite | Bassett | >7 | 11 | 9 | 10 | 9 | 20 | 180 | 0.21 | 27 | 146 | 0 |
| I-080 | 284.48 | biotite gneiss | Bassett | >7 | 13 | 7 | 22 | 7 | 20 | 140 | 0.21 | 15 | 182 | 0.7 |
| I-085 | 286.03 | amphibolite | Bassett | >7 | 12 | 10 | 10 | 10 | 20 | 200 | 0.21 | 33 | 146 | 0 |
| I-086 | 286.83 | mica schist | Fork Mountain | >7 | 15 | 9 | 13 | 0.05 | 50 | 2.5 | 0.01 | 0.5 | 86 | 0 |
| I-087 | 289.58 | mica schist | Fork Mountain | >7 | 15 | 9 | 13 | 0.05 | 50 | 2.5 | 0.01 | 0.5 | 86 | 0 |
| I-091 | 291.71 | biotite gneiss | Bassett | >7 | 20 | 14 | 13 | 0.05 | 50 | 2.5 | 0.01 | 0.8 | 86 | 0 |
| I-092 | 291.87 | biotite gneiss | Bassett | >7 | 13 | 7 | 10 | 7 | 20 | 140 | 0.21 | 18 | 122 | 0 |
| I-093 | 292.11 | biotite gneiss | Bassett | >7 | 11 | 9 | 10 | 9 | 20 | 180 | 0.21 | 27 | 146 | 0 |
| I-094 | 293.25 | biotite gneiss | Bassett | >7 | 17 | 11 | 48 | 0.05 | 50 | 2.5 | 0.01 | 0.4 | 164 | 1 |
| I-095 | 293.5 | biotite gneiss | Bassett | >7 | 12 | 10 | 11 | 10 | 20 | 200 | 0.21 | 32 | 154 | <0.1 |
| I-096 | 293.62 | mica schist | Fork Mountain | >7 | 11 | 9 | 10 | 9 | 20 | 180 | 0.21 | 27 | 146 | 0 |
| I-097 | 293.9 | biotite gneiss | Bassett | >7 | 14 | 8 | 22 | 8 | 20 | 160 | 0.21 | 18 | 194 | 0.8 |
| I-101A | 295.03 | mica schist | Fork Mountain | >7 | 10 | 8 | 60 | 8 | 20 | 160 | 0.21 | 15 | 321 | 2.2 |

E-6

| Crossing Number | Milepost | Underlying Rock Type | Underlying Formation | SSURGO Estimated Depth to Bedrock (ft) | Depth of Bore Pit Analyzed (ft) a/ | Saturated Pit Depth (ft) b/ | Bore Duration (days) | Hydraulic Conductivity (ft/day) | Saturated Thickness (ft) | Transmissivity (ft b/day) | Storage | Pumping Rate (gpm) c/ | (R₀) Radius of Influence (ft) d/ | Drawdown at 150 ft from Bore Pit (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I-103 | 295.28 | mica schist | Fork Mountain | >7 | 10 | 8 | 10 | 8 | 20 | 160 | 0.21 | 22 | 131 | 0 |
| I-105 | 296.1 | Granite | Leatherwood Granite | >7 | 14 | 8 | 10 | 8 | 20 | 160 | 0.21 | 23 | 131 | 0 |
| I-106A | 296.36 | Granite | Leatherwood Granite | >7 | 15 | 9 | 65 | 0.05 | 50 | 2.5 | 0.01 | 0.3 | 196 | 1 |
| I-111A | 298.2 | mica schist | Fork Mountain | >7 | 12 | 10 | 31 | 10 | 20 | 200 | 0.21 | 25 | 258 | 1.5 |
| I-114 | 299.86 | mica schist | Fork Mountain | >7 | 12 | 10 | 49 | 10 | 20 | 200 | 0.21 | 23 | 324 | 2.5 |
| I-115 | 300.53 | mica schist | Fork Mountain | >7 | 11 | 9 | 10 | 9 | 20 | 180 | 0.21 | 27 | 146 | 0 |
| I-116 | 300.92 | Granite | Leatherwood Granite | >7 | 11 | 9 | 10 | 9 | 20 | 180 | 0.21 | 27 | 146 | 0 |
| I-117 | 301.13 | Granite | Leatherwood Granite | >7 | 13 | 7 | 14 | 7 | 20 | 140 | 0.21 | 16 | 145 | 0 |
| I-121 | 302.9 | mica schist | Fork Mountain | >7 | 16 | 10 | 45 | 0.05 | 50 | 2.5 | 0.01 | 0.4 | 159 | 0.4 |
| I-122 | 302.89 | mica schist | Fork Mountain | >7 | 13 | 7 | 14 | 7 | 20 | 140 | 0.21 | 16 | 145 | 0 |
| I-123 | 303.16 | sandstone, siltstone | Leakesville | >7 | 16 | 10 | 10 | 1 | 50 | 50 | 0.12 | 10 | 97 | 0 |

a    From appendix C, the deepest bore pit at each crossing was selected for analysis. Bore pits excavated on a slope will have different front and back face depths in which case the shallower face depth  is used here since it defines the maximum depth of water that can be retained in the bore pit.
b    Saturated depth is pit depth minus the water table. For pits less than 12 feet, depth to water assumed at 2 feet. For pits greater than 12 feet, depth to water assumed at 6 feet.
c    Q = In gallons per minute (gpm) adjusted to meet drawdown to full depth of bore pit at max time.
d    Distance from bore pit at which estimated groundwater drawdown reaches zero. Calculation inputs include the following:
   **Saturated Thickness** was estimated to be the saturated depth of the bore pit in the alluvium. The bore pits estimated to be in the bedrock were assigned a saturated thickness of 50 feet.
   **Hydraulic Conductivity** from USGS (2002) likely maximum value in feet/day:
   •Alluvium (Fine Sand from borings) = 20
   •Sedimentary Rock (Fine Sandstone) = 1
   •Limestone = 0.1
   •Crystalline = 0.05
   **Specific Storage:**
   •Alluvium (Fine Sand from borings) = 0.21
   •Sedimentary Rock (Siltstone) = 0.12
   •Limestone = 0.14
   •Crystalline = 0.01 r = 10 feet

**Appendix F**

**Appendix F**

**Current Environmental Justice Community Data**

| Geographic Area | No. of Crossings | Crossing Number | Total Population | White (%) a/ | African American/Black (%) a/ | American Indian/Alaska Native (%) a/ | Asian (%) a/ | Native HI & Other Pacific Islander (%) a/ | Some Other Race (%) a/ | Two or More Races (%) a/ | Hispanic Origin (any race) (%) a/ | Total Minority Populations (%) a/ | Households in Poverty (%) b/ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **WEST VIRGINIA** | | | 1,817,305 | 92.0% | 3.6% | 0.2% | 0.8% | 0.0% | 0.2% | 1.6% | 1.6% | 8.0% | 17.3% |
| **Wetzel County** | | | 15,436 | 96.9% | 1.1% | 0.0% | 0.0% | 0.0% | 0.3% | 0.9% | 0.9% | 3.1% | 18.3% |
| Block Group 5, Census Tract 305 | 1 | A-008 | 666 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 26.3% |
| **Lewis County** | | | 16,166 | 96.3% | 0.2% | 0.5% | 0.5% | 0.0% | 0.0% | 1.2% | 1.2% | 3.7% | 19.1% |
| Block Group 2, Census Tract 9676 | 1 | B-012 | 899 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 28.0% |
| Block Group 3, Census Tract 9676 | 1 | B-015A | 1,679 | 97.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 2.1% | 0.4% | 2.5% | 13.6% |
| **Webster County** | | | 8,386 | 99.6% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.3% | 0.1% | 0.4% | 26.0% |
| Block Group 1, Census Tract 9701 | 1 | C-013A | 684 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 29.4% |
| Block Group 2, Census Tract 9701 | 2 | C-018, C-022* | 1,001 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 18.8% |
| Block Group 4, Census Tract 9701 | 4 | C-022*, C-024, C-028, C-035 | 1,515 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 27.3% |
| Block Group 1, Census Tract 9703 | 1 | D-010 | 2,147 | 99.1% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.6% | 0.2% | 0.9% | 19.9% |
| **Nicholas County** | | | 25,078 | 96.9% | 0.7% | 0.4% | 0.2% | 0.0% | 0.0% | 1.0% | 0.8% | 3.1% | 17.5% |
| Block Group 1, Census Tract 9504 | 4 | D-022, D-028, D-034, D-035 | 986 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 8.2% |
| Block Group 2, Census Tract 9504 | 4 | D-036, D-037, D-038, D-040 | 1,437 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 23.4% |
| Block Group 3, Census Tract 9504 | 4 | D-011, D-012, D-019, D-020 | 1,939 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 13.2% |
| Block Group 3, Census Tract 9506 | 1 | D-048 | 1,798 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 15.8% |
| Block Group 1, Census Tract 9507 | 1 | E-005 | 288 | 84.0% | 0.0% | 16.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 16.0% | 27.5% |
| **Greenbrier County** | | | 35,155 | 92.2% | 2.8% | 0.0% | 0.6% | 0.0% | 0.5% | 1.8% | 2.0% | 7.8% | 16.6% |
| Block Group 1, Census Tract 9503 | 3 | E-009, E-012, E-015 | 632 | 100.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 46.5% |
| **Summers County** | | | 12,848 | 91.9% | 4.5% | 0.0% | 0.0% | 0.0% | 0.0% | 2.2% | 1.5% | 8.1% | 21.2% |
| Block Group 1, Census Tract 6 | 4 | F-014, F-015, F-016, F-017 | 516 | 87.8% | 10.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 1.7% | 12.2% | 34.8% |
| Block Group 2, Census Tract 6 | 3 | F-021, F-022, F-027 | 1,845 | 84.1% | 11.2% | 0.0% | 0.0% | 0.0% | 0.0% | 1.5% | 3.2% | 15.9% | 16.8% |
| **Monroe County** | | | 13,401 | 96.3% | 0.9% | 0.5% | 0.0% | 0.0% | 0.0% | 1.4% | 0.9% | 3.7% | 15.3% |
| Block Group 4, Census Tract 9502 | 1 | F-032 | 729 | 94.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 5.1% | 0.0% | 5.1% | 4.7% |
| Block Group 2, Census Tract 9503 | 1 | F-039 | 2,861 | 99.6% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.3% | 0.4% | 13.7% |
| **VIRGINIA** | | | 8,454,463 | 61.8% | 18.8% | 0.2% | 6.3% | 0.1% | 0.3% | 3.1% | 9.4% | 38.2% | 10.3% |
| **Giles County** | | | 16,772 | 94.9% | 2.2% | 0.0% | 0.1% | 0.2% | 0.0% | 0.9% | 1.7% | 5.1% | 9.6% |
| Block Group 1, Census Tract 9301 | 4 | G-017*, G-019B, G-023, G-024 | 1,035 | 99.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.5% | 0.5% | 8.5% |
| Block Group 3, Census Tract 9302 | 7 | G-09, G-010, G-011, G-012, G-013, G-014, G-017* | 1,258 | 93.2% | 4.1% | 0.0% | 0.0% | 0.0% | 0.0% | 1.8% | 0.9% | 6.8% | 13.4% |
| **Montgomery County** | | | 98,140 | 83.3% | 4.4% | 0.4% | 6.6% | 0.0% | 0.6% | 1.5% | 3.2% | 16.7% | 20.0% |
| Block Group 2, Census Tract 213 | 3 | H-009, H-015, H-017 | 939 | 96.8% | 0.0% | 0.6% | 0.0% | 0.0% | 0.0% | 1.5% | 1.1% | 3.2% | 5.7% |
| Block Group 1, Census Tract 214 | 2 | H-017, H-020* | 714 | 81.7% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 18.3% | 18.3% | 10.1% |
| Block Group 2, Census Tract 214 | 3 | H-020*, H-021, H-022 | 1,856 | 92.7% | 4.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 3.1% | 7.3% | 43.6% |
| **Roanoke County** | | | 93,823 | 85.8% | 5.9% | 0.2% | 3.1% | 0.0% | 0.1% | 1.8% | 3.1% | 14.2% | 8.1% |
| Block Group 3, Census Tract 306 | 11 | H-030, H-031, H-032, H-040, H-042, H-043, H-044, H-045, H-046, H-047A, H-048A | 789 | 89.6% | 0.0% | 0.0% | 1.5% | 0.0% | 0.0% | 8.9% | 0.0% | 10.4% | 5.0% |
| **Franklin County** | | | 56,187 | 87.2% | 7.4% | 0.3% | 0.5% | 0.0% | 0.3% | 1.5% | 2.8% | 12.8% | 13.4% |
| Block Group 1, Census Tract 201.02 | 1 | I-048 | 1,070 | 86.5% | 6.8% | 0.0% | 0.6% | 0.0% | 0.0% | 6.1% | 0.0% | 13.5% | 4.8% |
| Block Group 1, Census Tract 202 | 1 | I-034 | 1,582 | 93.4% | 4.4% | 0.0% | 0.0% | 0.0% | 0.0% | 2.2% | 0.0% | 6.6% | 6.9% |

**Appendix F**

**Current Environmental Justice Community Data**

| Geographic Area | No. of Crossings | Crossing Number | Total Population | White (%) a/ | African American/Black (%) a/ | American Indian/Alaska Native (%) a/ | Asian (%) a/ | Native HI & Other Pacific Islander (%) a/ | Some Other Race (%) a/ | Two or More Races (%) a/ | Hispanic Origin (any race) (%) a/ | Total Minority Populations (%) a/ | Households in Poverty (%) b/ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Block Group 2, Census Tract 202 | 6 | I-038, I-039, I-040, I-042, I-044A, I-046 | 1,392 | 87.7% | 7.4% | 0.5% | 0.0% | 0.0% | 0.0% | 0.0% | 4.4% | 12.3% | 6.9% |
| Block Group 1, Census Tract 205 | 3 | H-054, H-060, I-001A | 1,861 | 98.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 1.1% | 0.0% | 1.1% | 8.5% |
| Block Group 4, Census Tract 205 | 5 | I-009, I-014, I-016, I-020, I-021 | 2,169 | 87.5% | 6.6% | 0.0% | 1.6% | 0.0% | 0.0% | 2.9% | 1.4% | 12.5% | 11.1% |
| Block Group 1, Census Tract 209 | 16 | I-053, I-055, I-056, I-057, I-060B, I-061A, I-062, I-063, I-064, I-065, I-067, I-069A, I-070, I-073, I-074, I-076 | 928 | 76.6% | 19.2% | 0.0% | 2.2% | 0.0% | 0.0% | 2.0% | 0.0% | 23.4% | 17.7% |
| **Pittsylvania County** | | | **61,256** | 74.1% | 20.0% | 0.1% | 0.4% | 0.0% | 0.0% | 2.8% | 2.6% | 25.9% | 15.7% |
| Block Group 4, Census Tract 103 | 8 | I-078, I-080, I-085, I-086, I-087, I-091, I-092, I-093 | 630 | 58.3% | 40.0% | 0.0% | 0.0% | 0.0% | 0.0% | 1.7% | 0.0% | 41.7% | 29.1% |
| Block Group 1, Census Tract 105 | 8 | I-111A, I-114, I-115, I-116, I-117, I-121, I-122, I-123 | 1,147 | 60.4% | 38.4% | 0.0% | 1.1% | 0.0% | 0.0% | 0.0% | 0.0% | 39.6% | 12.7% |
| Block Group 3, Census Tract 105 | 4 | I-101A, I-103, I-105, I-106A | 2,267 | 54.2% | 38.2% | 0.0% | 1.4% | 0.0% | 0.0% | 1.6% | 4.5% | 45.8% | 14.2% |
| Block Group 2, Census Tract 106 | 4 | I-094, I-095, I-096, I-097 | 1,712 | 78.0% | 18.3% | 0.0% | 0.0% | 0.0% | 0.0% | 2.6% | 1.1% | 22.0% | 14.6% |

a Percent of Total Population (Table B03002 - Hispanic or Latino Origin by Race American Community Survey. 2019 ACS 5-Year Estimates Detailed Tables. U.S. Census Bureau, 2015-2019 American Community Survey 5-Year Estimates: https://api.census.gov/data/2019/acs/acs5). Accessed: May 13, 2021

b Percent of Households (Table B17017 - Poverty Status in the Past 12 months by Household Type by Age of Householder. 2019 ACS 5-Year Estimates Detailed Tables.  U.S. Census Bureau, 2015-2019 American Community Survey 5-Year Estimates: https://api.census.gov/data/2019/acs/acs5). Accessed: May 13, 2021

* Crossing occurs in more than one Block Group