**Case No. 24-3831**

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

———————◆———————

**APPALACHIAN VOICES AND SIERRA CLUB,**
*PETITIONERS,*

**V.**

**UNITED STATES ARMY CORPS OF ENGINEERS, ET AL.,**
*RESPONDENTS.*

———————◆———————

On Petition for Review of
Department of the Army Permit No. LRN-2021-00866

———————◆———————

**PROPOSED-INTERVENOR
TENNESSEE GAS PIPELINE COMPANY, L.L.C.'S
OPPOSITION TO MOTION FOR STAY PENDING REVIEW**

———————◆———————

Scott Burnett Smith
BRADLEY ARANT BOULT CUMMINGS LLP
200 Clinton Avenue West
Huntsville, AL 35801
(256) 517-5100
ssmith@bradley.com

David A. Super
Ann D. Navaro
Kevin A. Ewing
BRACEWELL LLP
2001 M Street, NW, Suite 900
Washington, D.C. 20036
Telephone: (202) 828-5800
Facsimile: (800) 404-3970
Email: david.super@bracewell.com
       ann.navaro@bracewell.com
       kevin.ewing@bracewell.com

*Counsel for Proposed-Intervenor
Tennessee Gas Pipeline Company, L.L.C.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

TABLE OF EXHIBITS .....................................................................vi

INTRODUCTION .............................................................................1

BACKGROUND ...............................................................................2

ARGUMENT ....................................................................................4

    I.     Sierra Club Is Unlikely To Succeed On The Merits. ...........................5

          A.     USACE Properly Relied On TDEC's CWA 401 Certification. ...............................................................5

          B.     USACE Properly Evaluated Alternatives. .................8

    II.    Sierra Club Cannot Show Irreparable Harm. ....................................12

    III.   A Stay Will Cause Substantial Harm To TGP And Others. ...............17

    IV.   A Stay Is Not In The Public Interest. ..................................................20

    V.    If A Stay Is Granted, The Court Should Require a Bond. ..................22

CONCLUSION ................................................................................22

CERTIFICATE OF COMPLIANCE .........................................................24

CERTIFICATE OF SERVICE .............................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACT, Inc. v. Worldwide Interactive Network, Inc.*,
    46 F.4th 489 (6th Cir. 2022) ...................................................................18

*Ala. Ass'n Realtors v. Dep't of Health and Human Servs.*,
    594 U.S. 758 (2021)...............................................................................19

*Alcoa Power Generating Inc. v. FERC*,
    643 F.3d 963 (D.C. Cir. 2011) ..................................................................8

*Amoco Prod. Co. v. Village of Gambell, AK*,
    480 U.S. 531 (1987)...............................................................................19

*Appalachian Voices v. TVA*,
    No. 3:23-CV-00604 (M.D. Tenn.).............................................................1

*Baker v. Adams Cnty/Ohio Valley Sch. Bd.*,
    310 F.3d 927 (6th Cir. 2002) ..................................................................19

*City of Olmsted Falls, Ohio v. EPA.*,
    435 F.3d 632 (6th Cir. 2006) ....................................................................6

*City of Tacoma v. FERC*,
    460 F.3d 53 (D.C. Cir. 2006) ....................................................................7

*Daniels Health Sci., LLC v. Vascular Health Sci., LLC*,
    710 F.3d 579 (5th Cir. 2013) ..................................................................18

*Ellis v. Gallatin Steel Co.*,
    390 F.3d 461 (6th Cir. 2004) ..................................................................12

*Hamlin Testing Lab'ys, Inc. v. U.S. Atomic Energy Comm'n*,
    337 F.2d 221 (6th Cir. 1964) ..................................................................20

*Huron Mountain Club v. USACE*,
    545 F. App'x 390 (6th Cir. 2013) ............................................................16

*Keating v. FERC*,
    927 F.2d 616 (D.C. Cir. 1991)..................................................................8

*Kentuckians for the Commonwealth v. USACE*,
  746 F.3d 698 (6th Cir. 2014) ................................................................3

*Ky. Waterways Alliance v. Johnson*,
  540 F.3d 466 (6th Cir. 2008) ................................................................5

*Mexichem Specialty Resins, Inc. v. EPA*,
  787 F.3d 544 (D.C. Cir. 2015)...........................................................12

*Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*,
  945 F.2d 150 (6th Cir. 1991) ................................................................4

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
  915 F.3d 197 (4th Cir. 2019) ..............................................................19

*NAACP v. Fed. Power Comm'n*,
  425 U.S. 662 (1976)............................................................................21

*Nat'l Lifeline Ass'n v. Fed. Commc'n Comm'n*,
  No. 18-1026, 2018 WL 4154794 (D.C. Cir. Aug. 10, 2018) ............19

*Nken v. Holder*,
  556 U.S. 418 (2009)..............................................4, 5, 12, 18, 19, 20

*Performance Unlimited, Inc. v. Questar Publishers*,
  52 F.3d 137 (6th Cir. 1995) ................................................................19

*Sherwood v. TVA*,
  No. 3:12-cv-156, 2012 WL 2212971 (E.D. Tenn. June 15, 2012)....16

*Sierra Club v. FERC*,
  No. 24-1099 (D.C. Cir.)........................................................................1

*Sierra Club v. Slater*,
  120 F.3d 623 (6th Cir. 1997) ................................................................9

*Sierra Club v. TDEC*,
  No. 23-3682 (6th Cir.) ....................................................................1, 17

*Sierra Club v. USACE*,
  990 F. Supp. 2d 9 (D.D.C. 2013)........................................................16

*State of Ohio ex rel. Celebrezze v. Nuclear* Regul. *Comm'n*, 812 F.2d
    288 (6th Cir. 1987)................................................................................4

*Tenn. Gas Pipeline*,
    186 FERC ¶61,046, 2024 WL 211603 ...................................3, 17, 21

*W.R. Grace & Co. v. Local Union 759*,
    461 U.S. 757 (1983)............................................................................22

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)............................................................................4, 12

**Statutes**

33 U.S.C. § 403 ....................................................................................3

33 U.S.C. § 1311(a) ............................................................................3

33 U.S.C. § 1341 ..................................................................................5

33 U.S.C. § 1344(a) ............................................................................3

33 U.S.C. § 1344(a), (e) ....................................................................3

33 U.S.C. § 1362(7) ............................................................................3

Clean Water Act § 401 ................................................1, 3, 5, 6, 7, 10, 15

Clean Water Act § 404 ........................................................................3

Natural Gas Act, 15 U.S.C. § 7(c) ................................................3, 21

Natural Gas Act, 15 U.S.C. § 717f(c)(1) ..........................................3

Rivers and Harbors Act § 10................................................................3

**Rules**

Fed. R. App. P. 18..............................................................................22

**Regulations**

18 C.F.R. § 157.20(a)........................................................................21

33 C.F.R. § 320.2(b), (f) ......................................................................3

33 C.F.R. § 320.4(a)(1) ..................................................................8

33 C.F.R. § 325.4 ........................................................................11

33 C.F.R. § 328.3(a) ......................................................................3

40 C.F.R. § 121.2 ..........................................................................5

40 C.F.R. § 121.6 ..........................................................................5

40 C.F.R. §§ 121.7(a), (b), (e)(3) ..................................................5

40 C.F.R. § 121.9 ..........................................................................5

40 C.F.R. § 121.9(a)(2) ..................................................................6

40 C.F.R. § 121.10 ........................................................................5

40 C.F.R. § 230.10 ........................................................................8

40 C.F.R. § 230.10(a)(3) ................................................................8

40 C.F.R. § 230.45 ........................................................................8

Tenn. Comp. R. & Regs. 0400-40-07-.04(3) ..................................5

**Administrative Authorities**

*Tenn. Gas Pipeline*,
    Acceptance of Certificate, dated February 15, 2014 ............................21

*Tenn. Gas Pipeline*,
    Letter Order, Dkt. #CP22-493 ........................................................3, 15

# TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit A | USACE Permit No. LRN-2021-00866 (excerpted) |
| Exhibit B | USACE Permit Memorandum for Record |
| Exhibit C | USACE Permit Application (excluding Attachments, except for Attachment 11 |
| Exhibit D | TGP's Response to USACE's Request for Additional Information (August 24, 2023) |
| Exhibit E | TDEC Notice of Determination, ARAP NRS22.192 |
| Exhibit F | TDEC ARAP NRS22.192 (excluding cite maps) |
| Exhibit G | TDEC ARAP NRS22.192 Modification |
| Exhibit H | TDEC ARAP NRS22.192 Modification Notice of Determination |
| Exhibit I | USACE Letter re ARAP Modification (April 23, 2024) |
| Exhibit J | TDEC General Permit for Discharges of Stormwater Associated with Construction Activities No. TNR100000 |
| Exhibit K | Declaration of Samuel B. Vinson (October 7, 2024) |
| Exhibit L | Declaration of David E. Jackson (October 8, 2024) |
| Exhibit M | Declaration of Kevin A. Mosley (October 8, 2024) |
| Exhibit N | Declaration of H. Preston Troutman (October 9, 2024) |

## **INTRODUCTION**

Sierra Club and Appalachian Voices (collectively "Sierra Club") move for a stay ("Motion") of the permit issued to Tennessee Gas Pipeline Company, L.L.C. ("TGP") by the U.S. Army Corps of Engineers ("USACE").  This is Sierra Club's second stay motion in three weeks: On September 18, Sierra Club sought a stay, which is pending, in its challenge to the Tennessee Department of Environment and Conservation's ("TDEC") issuance of a certification under the Section 401 of the Clean Water Act ("Certification").  *Sierra Club v. TDEC*, No. 23-3682 (6th Cir.). Like the prior stay request, the Motion effectively seeks to prevent TGP from commencing construction (scheduled to begin on October 15, 2024) of the roughly $185 million Cumberland Project ("Project"), a 32-mile natural gas pipeline that will provide transportation capacity for a new natural-gas-fueled combined cycle plant that Tennessee Valley Authority ("TVA") is currently constructing ("TVA Plant").

Besides the two actions in this Court, Sierra Club has filed two other lawsuits challenging actions related to the Project and the TVA Plant: one challenging TVA's decision to build the TVA Plant, *Appalachian Voices v. TVA*, No. 3:23-CV-00604 (M.D. Tenn.), and another challenging the certificate of public convenience and necessity issued by the Federal Energy Regulatory Commission ("FERC") for the Project, *Sierra Club v. FERC*, No. 24-1099 (D.C. Cir.).  Notably, Sierra Club has

not sought a stay in either of those actions, even though FERC authorized the Project's construction, and the TVA Plant needs the gas transported by the Project.

The Motion should be denied. First, Sierra Club is unlikely to succeed on the merits. All of its arguments are refuted by USACE's analysis. Second, Sierra Club cannot show irreparable harm because the harm it alleges is speculative and overstated. In contrast, a stay would substantially harm TGP, TVA, and the public interests served by the Project. Any delay in construction would jeopardize the viability of the Project—which FERC already found is in the public interest—and would result in enormous unrecoverable financial losses to TGP and hamper TVA's progress on the TVA Plant as described in the Declaration by its General Manager of Major Projects, submitted herewith.

TGP requests a ruling on the Motion by October 14, 2024, to prevent disruption to the Project's work schedule, which is critical for the timely delivery of contracted transportation capacity services.

## **BACKGROUND**

The Project will provide up to 245,040 dekatherms per day of firm natural gas transportation capacity to the TVA Plant, which replaces coal-fired generation and is more than 50% constructed. Declaration of Samuel B. Vinson ("Vinson Decl.") ¶7 (Ex.K). The Project is subject to the authority of FERC, which has exclusive authority to approve the siting, construction, and operation of facilities used to

transport natural gas in interstate commerce under Section 7(c) of the Natural Gas Act ("NGA"). 15 U.S.C. §717f(c)(1). On January 18, 2024, FERC issued a certificate order that authorized the construction and operation of the Project. *Tenn. Gas Pipeline*, 186 FERC ¶61,046, 2024 WL 211603. On August 29, 2024, after TGP demonstrated compliance with pre-construction conditions, FERC issued the Notice to Proceed ("NTP"), which allowed TGP to commence construction of the Project. *Tenn. Gas Pipeline*, Letter Order, Dkt. #CP22-493. Sierra Club did not comment on the request for the NTP or challenge its issuance.

USACE has authority over certain impacts to waters along the Project's route pursuant to Section 404 of the Clean Water Act ("CWA") and Section 10 of the Rivers and Harbors Act ("RHA"). The CWA prohibits the discharge of any "pollutant," including dredged or fill material, into "navigable waters" without a permit. *See* 33 U.S.C. §§1311(a), 1344(a). "[N]avigable waters" include, by regulation, certain streams and wetlands. *Id.* §1362(7); 33 C.F.R. §328.3(a). Section 10 of the RHA, 33 U.S.C. §403, prohibits actions that may affect the "course, location, condition, or capacity" of traditional navigable waters. USACE authorizes otherwise prohibited activities through permits. *See* 33 U.S.C. §1344(a), (e); 33 C.F.R. §320.2(b), (f). USACE's permitting authority is narrow and limited to the categories of activities regulated by the CWA and RHA. *See Kentuckians for the Commonwealth v. USACE*, 746 F.3d 698, 707-08 (6th Cir. 2014).

USACE issued the permit ("Permit") subject to certain conditions. It authorizes "the temporary discharge of fill into 2.39 acres of streambed and 0.69 acres of wetlands...." Permit at 1 (Ex.A). Among many other conditions, construction activity must be "isolated from active streamflow," and all waters must be restored to pre-construction contours. Permit Memorandum For Record ("MFR") at 2 (Ex.B).

## ARGUMENT

The Motion is tantamount to a motion for preliminary injunction. *State of Ohio ex rel. Celebrezze v. Nuclear* Regul*. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987). A stay is an "extraordinary remedy that may only be awarded upon a *clear showing* that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis added).

A court will consider four factors:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009); *see also Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). These factors overwhelmingly support denying a stay.

-4-

I.    **Sierra Club Is Unlikely To Succeed On The Merits.**

To obtain a stay, "[i]t is not enough that the chance of success on the merits be better than negligible." *Nken*, 556 U.S. at 434.  Sierra Club's burden is heavy because this Court can only overturn the Permit if the decision to grant it was arbitrary and capricious. *See Ky. Waterways Alliance v. Johnson*, 540 F.3d 466, 474 (6th Cir. 2008).

A.    **USACE Properly Relied On TDEC's CWA 401 Certification.**

Sierra Club asserts that USACE unlawfully issued the Permit because it wrongly interpreted the scope of the Certification issued by TDEC.  Motion at 12.  USACE properly relied on TDEC's action.

The Certification (or its waiver) is a predicate to issuance of federal permits that allow for construction in waters subject to the CWA.[1]  *See* 33 U.S.C. §1341; 40 C.F.R. § 121.2.  TDEC has four options under Section 401: waive certification, grant certification, grant certification with conditions, or deny certification, which it may do for lack of information.  40 C.F.R. §§121.7(a), (b), (e)(3); 121.9.

USACE's responsibility under the law is limited to (1) setting a "reasonable period of time" for TDEC to act; and (2) incorporating the Certification's conditions into TDEC's permit.  40 C.F.R. §§121.6, 121.10.  USACE may not second-guess

---

[1] TDEC acts on Certification applications jointly with review of the State's Aquatic Resource Alteration Permit ("ARAP").  TENN. COMP. R. & REGS. 0400-40-07-.04(3).

the Certification. *See City of Olmsted Falls, Ohio v. EPA.*, 435 F.3d 632, 636 (6th Cir. 2006) (USACE must rely on state agency action under §401; USACE analysis of whether state followed §401 rules would undermine state's role).

Here, TGP applied for a Certification for all waterbody crossings associated with the Project subject to the CWA, including a limited number for which TGP had desktop data but not field data. TDEC Notice of Determination ("NOD") (Ex.E). FERC, the lead federal agency, set the "reasonable period of time" for TDEC to act, which expired on July 22, 2023. If TDEC had not acted within that time frame, the Certification would have been waived as a prerequisite to issuing a federal permit. 40 C.F.R. §121.9(a)(2).

On July 21, 2023, TDEC issued the Certification with conditions. One condition required TGP to seek a modified ARAP based on a supplemental field review of certain streams. ARAP at 11 (Ex.F). No condition required modifying or supplementing the Certification, and TDEC expressly declined to do so.[2] *Id*; ARAP Modification at 22 (Ex.G). USACE's obligation was to understand whether TDEC had taken action on the Certification application and, if so, to incorporate TDEC's

---

[2] In its ARAP Modification, TDEC stated: "This modification affects only the state aquatic resource alteration permit, and does not constitute a modification of the Section 401 certification issued on July 21, 2023. The Department has waived its authority under Section 401 with respect to the new impacts to be authorized by this state permit modification that were not included in the July 21, 2023 section 401 certification." ARAP Modification at 22 (Ex.G).

conditions into the USACE permit.  *See City of Tacoma v. FERC*, 460 F.3d 53, 67-68 (D.C. Cir. 2006) (federal agency's "role is limited to awaiting, and then deferring to, the final decision of the state.").  USACE fulfilled its responsibilities.  Permit at 5 (Ex.A).

Sierra Club makes much of the questions USACE posed to TDEC, and USACE's internal dialogue (Motion at 6-9), but these show USACE confirming that TDEC had completed its action under Section 401.  TDEC explicitly confirmed that the Certification was complete and was the only Section 401 action it would take for the Project.  TDEC stated "*by the end of July 2023, the project had a complete 401 authorization, and no further review under Section 401 is required*."  ARAP Modification NOD at 2 (Ex.H) (emphasis added).  As it must, USACE accepted that TDEC had acted under Section 401, documenting its understanding in a letter to TDEC.  USACE Letter (Ex.I).  TDEC's clear description of its action refutes Sierra Club's assertion that USACE "re-wrote" the history of the Certification.[3]

---

[3] Sierra Club points to a 2023 email to USACE from TDEC suggesting that an updated 401 permit would be required, as well as various other emails documents internal to USACE.  Motion at 12-13.  These reflect dialogue, not decisions, internal to the agencies as USACE sought to understand TDEC's actions.  Whether USACE thought well or ill of TDEC's action, for example whether TDEC waived further action under §401, is ultimately irrelevant to reviewing the validity of USACE's action.  USACE's action was based on TDEC's plainly stated representation that it had closed its review of the Project's discharges under Section 401.

To the extent Sierra Club believes TDEC's Certification is defective, its remedy is to pursue a challenge to *TDEC's* action, which Sierra Club has done, although its challenge is baseless.  USACE is precluded from second-guessing the scope of the Certification.  *See Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 971 (D.C. Cir. 2011) (affirming validity of 401 certification despite condition requiring subsequent action); *Keating v. FERC*, 927 F.2d 616, 625 (D.C. Cir. 1991) (federal agency only has authority to determine whether certification exists).

### B.    USACE Properly Evaluated Alternatives.

Sierra Club argues that USACE violated the CWA's 404(b)(1) regulatory Guidelines by failing to properly consider alternatives.  Motion at 5-12.  USACE complied with the regulations.

USACE reviews permit applications under the Section 404(b)(1) Regulatory Guidelines.    33  C.F.R.  §320.4(a)(1).    The  Guidelines  set  forth  analytical requirements relating to alternatives.  40 C.F.R. §230.10.  The Guidelines prohibit a permit  unless  the  proposed  discharge  is  the  least  environmentally  damaging practicable alternative ("LEDPA").  *Id*. at §230.10(a).  In the case of "special aquatic sites," including "riffle and pool" complexes, there is a rebuttable presumption that a practicable alternative is available.[4]  *Id*. at §§230.10(a)(3), 230.45.

---

[4] USACE considered potential effects on riffle and pool complexes and found those impacts  "negligible"  based  on  temporary  disturbance  that  will  soon  be  restored,

USACE identified the LEDPA as the 32-mile pipeline route approved by FERC after conducting an "independent review" of alternatives. MFR at 20-27 (Ex.B). In determining the LEDPA, USACE properly concluded that TGP had rebutted the presumption that a practicable alternative is available. *Id.* at 27; *see Sierra Club v. Slater*, 120 F.3d 623, 638-37 (6th Cir. 1997) (USACE not arbitrary in weighing and rejecting alternatives). TGP addressed trenchless crossing methods, including conventional bore, in its application and in response to USACE questions.[5] Permit Application at 33-35 (Ex.C); MFR at 17 (Ex.B). Both "HDD *and related methods* (e.g., conventional boring, microtunneling, directional microtunneling)" were considered. RAI Response at 12 (Ex.D) (emphasis added).

TGP explained the limiting factors for boring, the logistical challenges, cost constraints, and practicability in detail. *See* Permit Application at 33-35 (Ex.C); RAI Response at 14-16 (Ex.D).[6] Logistical challenges would result in increased safety risks as well as "additional environmental risks associated with construction

___

concluding that "the major channel processes that form and maintain riffle and pool complexes and other stream-channel features will remain intact." MFR at 34-35, 87, 89-90 (Ex.B); *see also* TGP's Response to Request for Additional Information ("RAI Response") at 43-45 (Ex.D).

[5] Horizonal Directional Drilling ("HDD") involves drilling a pilot hole, enlarging it, and then pulling the pipeline into the hole. Conventional boring involves lowering a boring machine into a pit and using an auger to cut a tunnel. Permit Application at 33-34 (Ex.C).

[6] TGP selected HDD for Jones Creek, Yellow Creek, Wells Creek, and an unnamed tributary to Yellow Creek. *Id.*

stormwater sediment releases, tree clearing, grading, and drilling mud staging and preparation." RAI Response at 14 (Ex.D). Analyzing this information, USACE explained that HDD and other types of trenchless crossings, including conventional bore, are not practicable at each crossing; not only are they more expensive, unsuited logistically, and more impactful in certain respects, but they take anywhere from eight days to one month *longer* than dry trenching to complete each crossing with accompanying sustained disruption. MFR at 85-86 (Ex.B). The record belies Sierra Club's assertion of insufficient consideration.

Sierra Club also declares that conventional boring is practicable because TGP plans to use it to cross under roadways and because a different project used it in a different region. Motion at 9. But Sierra Club never explained to USACE how conventional boring would be a practicable choice for these waterbody crossings or how its theoretical opinion undermines USACE's expert opinion. USACE complied with the regulations.

Finally, Sierra Club is wrong that the Permit violates the CWA by imposing strict requirements on the choice of rock removal technique in the field. Motion at 10. First, USACE identified the LEDPA as the 32-mile route–not the rock removal technique necessary to facilitate trenching along the 32-mile route. MFR at 27 (Ex.B). Second, to further minimize the already minimal environmental impacts of the Project and to ensure the use of least impactful construction techniques at

waterbody crossings, Special Condition 9 of the Permit requires TGP to use the least invasive non-blasting technique for removal of rocks before seeking USACE's approval for controlled blasting, if necessary.[7]  Permit at 6 (Ex.A); *see also* MFR at 29 (Ex.B); RAI Response at 13, 16 (Ex.D).  The technique must be based on site-specific conditions encountered during construction, and each technique will be evaluated at each stream crossing, including attempting less impactful techniques first.[8]  MRF at 68-69 (Ex.B)  This approach comports with USACE's regulations allowing the imposition of special conditions related to the impacts of the proposal. 33 C.F.R. §325.4 (conditioning of permits).  For all these reasons, Sierra Club cannot show a likelihood of success on the merits.[9]

---

[7] Sierra Club relies on the Silvis Report to argue that USACE should have investigated the geological conditions at each crossing.  Motion at 11.  But that position has no legal support and is based on incorrect conclusions regarding stream impacts.  The Silvis Report mischaracterizes the expected impacts and uses studies that recommend using the exact measures planned by TGP to avoid the impacts of concern.  Jackson Decl. ¶23 (Ex.L).

[8] The four techniques are conventional excavation, ripping, hammering, and rock trenching.  Permit Application at 31 (Ex.C).  These techniques would have similar impacts on water quality with regard to sediment releases  *See* Jackson Decl. ¶9 (Ex.L).

[9] Sierra Club makes two additional arguments, regarding cumulative effects and a stormwater discharge permit.  Motion at 16-18.  TGP anticipates that the federal defendants will fully address these arguments.  In short, the Project is subject to the referenced stormwater discharge permit as required by applicable law and the ARAP.  *See* TDEC General Permit (Ex.J).  With respect to cumulative effects, USACE considered such effects using, in part, detailed information submitted by TGP.  *See* RAI Response (Ex.D).

## II.    Sierra Club Cannot Show Irreparable Harm.

Sierra Club bears the burden of establishing irreparable harm. *Nken*, 556 U.S. at 434-35. "[S]imply showing some possibility of irreparable injury fails to satisfy the second factor." *Id.* (cleaned up). To constitute "irreparable harm," the injury alleged must be "both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (cleaned up); *see also Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 475-76 (6th Cir. 2004) (citation omitted). "[P]ossibility of irreparable harm" is not enough. *Winter*, 555 U.S. at 22. Sierra Club's assertions are based on nothing more than speculation, exaggeration, and presumptions that fail to satisfy this standard.

Sierra Club alleges that the open-cut crossings "can choke miles of a waterway with sediment" and that the crossings will disrupt habitat and harm aquatic life. Motion at 3, 21. But these allegations are founded solely on Sierra Club's speculation of what "can" occur in unfettered construction not subject to the requirements applicable to this Project. Moreover, the Project's limited impacts to waterbodies will be temporary. *See* Jackson Decl. ¶¶3, 21 (Ex.L).

The Permit authorizes only *dry* open-cut crossings, which are used to avoid "chok[ing]" or "pollut[ing]" waterbodies with sediment. MFR at 3-4 (Ex.B). Dry open-cut crossings temporarily divert stream flow away from the work area to

minimize contact between stream flow and excavation and to minimize sediment mobilization during trench excavation, pipeline installation, and backfill activities.[10] Jackson Decl. ¶8 (Ex.L). No work is authorized in water that could result in the effects Sierra Club claims.

Further, the Permit includes numerous safeguards to reduce or avoid impacts to the crossed waterbodies. For example, to avoid impacts to water quality, all surface water flowing towards or from the construction activity must be diverted using flume or dam-and-pump methods. Jackson Decl. ¶18 (Ex.L). The temporary diversion channels must be protected by non-erodible material and lined to the expected high-water level. *Id.* The Permit requires that "[a]ll streams and stream banks will be restored to original contours immediately following pipeline installation." *Id.* TGP must also take measures to avoid erosion and downstream impacts from tree clearing, such as installing sediment barriers prior to ground-disturbing activities and stabilizing the right-of-way ("ROW") with mats. *Id.* ¶27.

Nor will TGP's crossing methods result in permanent or long-term impacts to waterbodies. The Sierra Club's Silvis report cites to a 2007 Levesque and Dube

---

[10] Jackson's Declaration attaches photographs of the typical stream to be crossed under by HDD versus those waterbodies to be crossed using the dry trenching method. Jackson Decl. ¶14 (Ex.L).

study, which addresses pipeline crossings without protective mitigation.  *Id*. ¶23.[11] The study *supports* the Project's construction methods by noting that the impacts of concern to Sierra Club are avoided by the exact kinds of measures incorporated into the Project design and the Permit.  *Id.*  The study also found that while there were temporary increases in suspended sediment concentrations associated with the installation of dams and flumes, these increases were: "[o]f relatively short duration, with rapid return to background levels as in-stream activities came to completion (e.g., within approximately 1 to 10 h[ours] of cessation of in-stream activities).  Fine-textured sediments that accumulated on the channel beds were cleared by subsequent stream flows."  *Id*.

The Levesque study is consistent with the stream hydrology in the Project region, where sediment transport and accumulation are dynamic, and tend to be short-lived events, limiting impacts to water quality as both localized and temporary. *Id.* ¶3.  The accumulation of sediments capable of being cleared by stream flows within a matter of hours does not cause long-term harm to water quality and is reparable.  The Permit requires that TGP restore streams and stream banks to their original condition, which will, in turn, maintain riffle and pool complexes and other

---

[11] USACE considered a full analysis of the Silvis report, outlining exactly why the harms described by Silvis are not expected to occur.  *See* RAI Response at 17-21 (Ex.D).

stream-channel features.  *Id*. ¶21.  Any alleged "harm" expected to occur from the Project's construction will be repaired.

Sierra Club alleges that the Project will cause "long-term harm to water quality and aquatic life" and, as a result, its members will be prevented from swimming and fishing in local creeks and branches.  Motion at 21.  That is incorrect.  As explained, construction impacts will be temporary.  *See supra* at 13-15.  USACE concluded in the MFR that TGP's construction activities would have "no effects" on fisheries or water-related recreation.  MFR at 36 (Ex.B).

Similarly, with no more than generalized assertions, Sierra Club also alleges that Project activities will impact wildlife and "disrupt wildlife habitat."  Motion at 20-21.  However, USACE considered the Project's impacts and concluded that, overall, the Project would have negligible impacts on wildlife.[12]  MFR at 47 (Ex.B)  The Project's impacts on wildlife are expected to be temporary in nature and may result in short-term displacement of wildlife from construction areas.  *Id.* at 46.  Limited permanent impacts on wildlife could occur due to tree and shrub clearing needed for the pipeline's ROW and occasional maintenance activities when the

---

[12] USACE "tiered" from the FERC Environmental Impact Statement ("EIS") and focused its review, primarily, on impacts within its CWA jurisdiction.  MFR at 83-84 (Ex.B).  FERC's EIS addresses, among other environmental issues, impacts from clearing the ROW and related wildlife impacts.  *Id.* at 32-33; *see also Tenn. Gas Pipeline*, Final EIS, Dkt. #CP22-493.

pipeline is operational, but these impacts would not irreparably harm Sierra Club's members by foreclosing their ability to view wildlife. *See id.*

TGP has adopted mitigation measures designed to minimize these impacts. *Id.* at 32-34. TGP's mitigation measures include (1) locating the Project adjacent or generally parallel to an existing TVA powerline easement and other utility easements, therefore avoiding additional clearing along approximately 80% of the route; (2) restricting time periods for ROW maintenance to minimize effects to birds; and (3) avoiding maintenance mowing activities between April 1 and October 15 to benefit bats. *Id.* At 6, 32-34. Sierra Club's allegations are speculative at best, and the measures taken to minimize harm undercut those allegations. *See Sherwood v. TVA*, No. 3:12-cv-156, 2012 WL 2212971, at *9 (E.D. Tenn. June 15, 2012) (plaintiffs failed to show irreparable harm, in part, due to measures undertaken to minimize any harm from tree clearing).

Sierra Club fails to carry its burden of proving irreparable harm. *See Huron Mountain Club v. USACE*, 545 F. App'x 390, 397 (6th Cir. 2013) (no irreparable harm where agency determined that the environmental harms are not likely to occur); *Sierra Club v. USACE*, 990 F. Supp. 2d 9, 39-40 (D.D.C. 2013) (Sierra Club exaggerated extent and effect of pipeline construction which had extensive mitigation and restoration plans).

## III.    A Stay Will Cause Substantial Harm To TGP And Others.

A stay would have extraordinary consequences for the Project and the public interest.  The construction commencement date of October 15, 2024, is carefully calibrated to allow TGP to meet the September 1, 2025, in-service date for the pipeline, established by TGP's contract with TVA.[13]  Declaration of Kevin A. Mosley ("Mosley Decl.") ¶18-21 (Ex.M).  A stay would likely delay the construction start date by ten to fifteen months during this appeal (depending on the Court's schedule) and would cause TGP to miss the in-service date.  Declaration of H. Preston Troutman ("Troutman Decl.") ¶16 (Ex.N).[14]  As just one example of the cascading impact caused by a months-long delay: to meet federal requirements for protected species and habitat, TGP's construction schedule calls for TGP to commence and complete tree felling work within a narrow five-month window

---

[13] The FERC Certificate Order allows TGP until January 18, 2027, to complete construction and make the Project facilities available for service.  186 FERC ¶61,046, Ordering ¶B.1.  This timeline establishes a window of construction for FERC's purposes, but does not change TGP's contractual obligation to TVA to place the Project in service by September 1, 2025.  While Sierra Club may argue that the contract allows either party to cancel the agreement under specific conditions, the existence of contingent contractual terms does not alter the primary legal obligation, and contract cancellation vitiates the benefits of the contract to both parties.

[14] In *Sierra Club v. TDEC*, No. 23-3682 (6th Cir.), TGP explained damages that could result of a stay of construction of six to nine months.  Dkt. #72-1 at 16.  Unlike in that case, this matter has not yet been briefed on the merits so TGP expects a stay would be in place for longer.

ending in March 2025.[15]  Mosley Decl. ¶21 (Ex.M).  A lengthy stay would prevent TGP's completion of tree clearing within this period.  *Id.*

Such a delay would inflict "substantial harm" to TGP.  *Nken*, 556 U.S. at 434. Each week of delay beginning October 15, 2024, would result in delay costs of at least $210,000 related to tree felling activities.  Mosley Decl. ¶24 (Ex.M).  A delay of ten-to-fifteen months would result in delay costs of up to $5 million per month related to construction activities that follow tree felling.  *Id.*  Missing the September 2025 in-service date, likely by many months, would jeopardize TGP's ability to place the Project in service as required by the agreement with TVA.  *Id.* ¶25.

In addition, TGP will suffer reputational harm and negative effects on its ability to negotiate future commercial transactions if a stay causes TGP to fail to meet the Project in-service date.  *Id.*  Such harm is irreparable.  *See, e.g.*, *ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503-04 (6th Cir. 2022) (observing that "interference with customer relationships and damage to reputation are precisely the sorts of injuries [that] are difficult to quantify monetarily, and thus constitute irreparable harm"); *accord Daniels Health Sci., LLC v. Vascular Health Sci., LLC*, 710 F.3d 579, 585 (5th Cir. 2013).

---

[15] *See* Permit at 6 (Ex.A).

Sierra Club seeks to downplay TGP's harms as merely "economic." Motion at 23. But TGP's economic harms are both substantial and *irreparable*, because there is no mechanism in place by which TGP will recover the millions of dollars it will lose as a result of a stay, much less the losses from placing the Project in jeopardy. Courts have long recognized that economic losses may constitute irreparable harm where such losses are not recoverable.[16] Sierra Club's reliance (Motion at 22) on the discussion of irreparable harm in *Baker v. Adams Cnty/Ohio Valley Sch. Bd.*, 310 F.3d 927, 930 (6th Cir. 2002), is misplaced because the Court was addressing the *movant's* harm, not the harm to the party opposing the stay. It is Sierra Club, *not TGP*, that must show irreparable harm. *See Performance Unlimited, Inc. v. Questar Publishers*, 52 F.3d 137, 1382 (6th Cir. 1995) (party *moving* for injunction had to show that challenged action threatened 'business' existence"). TGP's *substantial* harms are legally sufficient to defeat the stay. *Nken*, 556 U.S. at 426.

A stay would also harm TVA and, by extension, the public TVA serves. TVA's plan to retire one of the coal units at the Cumberland Fossil Plant and replace

---

[16] *See, e.g., Ala. Ass'n Realtors v. Dep't of Health and Human Servs.*, 594 U.S. 758, 765 (2021) (finding irreparable injury where financial impact of agency action had no guarantee of recovery); *accord Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 544-45 (1987), *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 218 (4th Cir. 2019), *Nat'l Lifeline Ass'n v. Fed. Commc'n Comm'n*, No. 18-1026, 2018 WL 4154794 (D.C. Cir. Aug. 10, 2018).

it with a natural gas-fired unit is dependent on the timely completion of the Project to supply natural gas. *See* Vinson Decl. ¶¶4-5, 11-12 (Ex.K). A delay in TVA's scheduled retirement of the coal units at the Cumberland Fossil Plant will lead to additional construction, repairs, maintenance upgrades, and costs to maintain reliability and comply with environmental regulatory requirements. *Id.* ¶¶11-12. The stay would also jeopardize tens of millions of dollars in benefits resulting from the Project to Tennessee and three local counties. *See* Troutman Decl. ¶19 (Ex.N). A stay would cause substantial harm to TGP and the other stakeholders in the Project, which weighs heavily against the stay. *Nken*, 556 U.S. at 434.

## IV.    A Stay Is Not In The Public Interest.

The public interest strongly favors denying a stay. The Project will allow TGP to provide natural gas transportation service to TVA's new gas-fired power plant, which will, in turn, allow TVA to provide electric supply needs to thousands of Tennesseans. Vinson Decl. ¶5 (Ex.K). Thus, staying the Project will have significant disruptive consequences for TVA and the citizens of Tennessee. *Id.*; *see also Hamlin Testing Lab'ys, Inc. v. U.S. Atomic Energy Comm'n*, 337 F.2d 221, 222 (6th Cir. 1964) ("In litigation involving administration of regulatory statutes designed to promote the public interest, this factor necessarily becomes crucial. The

interest of private litigants must give way to the realization of public purposes.")
(citation omitted).

Moreover, Sierra Club overlooks that, in authorizing the Project, FERC found
the Project will serve the public interest because it would enable TGP to serve TVA's
new natural gas-fired power plant, demonstrating a need for the Project. 186 FERC
¶61,046, ¶¶77-78. FERC balanced this need against the impacts of the Project and
ultimately decided to authorize the Project, recognizing that the Project "is an
environmentally acceptable action" and will "have minimal impacts on the interests
of landowners and surrounding communities...." *Id.* ¶¶49, 77-78. FERC found,
under Section 7(c) of the NGA, that the public convenience and necessity requires
approval of the Project. *Id.* ¶77. TGP, pursuant to FERC's regulations, accepted the
certificate of public convenience and necessity authorizing the Project, and is
therefore obligated to construct and operate the Project pursuant to the terms and
conditions of the certificate. 18 C.F.R. §157.20(a); *Tenn. Gas Pipeline*, Acceptance
of Certificate, dated February 15, 2014.

The public interest supports honoring Congress's mandate in the NGA that
the Nation continue to benefit from "the orderly development of plentiful supplies
of ... natural gas at reasonable prices." *NAACP v. Fed. Power Comm'n*, 425 U.S.
662, 669-70 (1976). Sierra Club provides no reason why one alleged public interest

should trump the other significant public interests served by the Project.  The public interest favors denying a stay.

## V.     If A Stay Is Granted, The Court Should Require a Bond.

Rule 18 authorizes the Court to condition any stay on the filing of a bond.  If the Court grants a stay here (and it should not), Sierra Club should be required to post a substantial bond.  *See W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 770, n.14 (1983).  Sierra Club should not avoid the bond requirement by asserting that it is a public-interest advocate.  Sierra Club is one of the largest environmental groups in the Nation with total revenues of over $104 million and assets of over $167 million as of year-end 2023.  The Court should require a substantial bond should a stay issue.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

Date:  October 9, 2024

Respectfully submitted,

Scott Burnett Smith
BRADLEY ARANT BOULT CUMMINGS LLP
200 Clinton Avenue West
Huntsville, AL 35801
(256) 517-5100
ssmith@bradley.com

_/s/ David A. Super_

David A. Super
Ann D. Navaro
Kevin A. Ewing
BRACEWELL LLP
2001 M Street, NW, Suite 900
Washington, D.C. 20036
Telephone: (202) 828-5800
Facsimile: (800) 404-3970
Email: david.super@bracewell.com
        ann.navaro@bracewell.com
        kevin.ewing@bracewell.com

***Counsel for Proposed-Intervenor***
***Tennessee Gas Pipeline Company, L.L.C.***

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This document complies with the type-volume limits of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains **5,171 words**.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman.

Date:   October 9, 2024                          /s/ David A. Super
                                                 David A. Super

                                                 *Counsel for Proposed-Intervenor*
                                                 *Tennessee Gas Pipeline Company, L.L.C.*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule 25(d) of the Federal Rules of Appellate Procedure, Rule 25(c) of the Circuit Rules, I hereby certify that on this 9th day of October 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

        */s/ David A. Super*

David A. Super

***Counsel for Proposed-Intervenor***
***Tennessee Gas Pipeline Company, L.L.C.***