No. 24-3831

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

APPALACHIAN VOICES; SIERRA CLUB,
*Petitioners*,

v.

UNITED STATES ARMY CORPS OF ENGINEERS; CHRISTINE
WORMUTH, Secretary of the United States Army; LIEUTENANT
GENERAL WILLIAM H. GRAHAM, JR., Chief of Engineers; ROBERT
W. GREEN, District Engineer; JOSHUA FROST, Chief, Regulatory
Division,
*Respondents*.

On Petition for Review of a Permit by the U.S. Army Corps of Engineers

## UNITED STATES' OPPOSITION TO
## MOTION FOR STAY PENDING REVIEW

TODD KIM
Assistant Attorney General
BRIAN C. TOTH
JUSTIN HEMINGER
REBECCA JAFFE
Attorneys
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-0402
rebecca.jaffe@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ......................................................... iii

GLOSSARY ............................................................................... vi

INTRODUCTION ........................................................................ 1

BACKGROUND ........................................................................... 2

    A.    Statutes and Regulations ............................................. 2

           1.    Natural Gas Act .............................................. 2

           2.    Clean Water Act .............................................. 2

    B.    Factual Statement ....................................................... 3

           1.    FERC issued a certificate of public convenience and necessity. ............................. 3

           2.    Tennessee issued a Section 401 certification. .................................................... 4

           3.    The Corps issued a Section 404 permit. ......... 5

    C.    Procedural Background ................................................ 6

STANDARD OF REVIEW .......................................................... 7

    A.    Stays Pending Review .................................................. 7

    B.    Section 404 Permits ..................................................... 9

ARGUMENT ............................................................................. 10

I.    Petitioners are unlikely to succeed on the merits ......................... 10

A.    The Corps required the least environmentally damaging practicable alternative. ............................. 10

    1.    Building the pipeline with trenching was the LEDPA. .................................. 10

    2.    The Corps required the least impactful rock removal methods. .................................. 15

B.    The Corps correctly relied on Tennessee's Section 401 certification and also independently assessed water-quality impacts. ................................. 17

    1.    The Corps correctly relied on Tennessee's Section 401 certification. ............................. 17

    2.    The Corps independently assessed water-quality impacts. ....................................... 23

C.    The Corps reasonably analyzed cumulative impacts. ............... 25

D.    The Corps reasonably noted that the project is subject to other pollution control requirements. ....................... 27

II.    Petitioners fail to establish irreparable harm. ............................. 28

III.    The balance of equities and the public interest favor the United States. ......................................................... 29

CONCLUSION ....................................................................... 30

CERTIFICATE OF COMPLIANCE ........................................ 32

# TABLE OF AUTHORITIES

## Cases

*Am. Rivers, Inc. v. FERC,*
129 F.3d 99 (2d Cir. 1997) ...................................................................... 20

*Amoco Prod. Co. v. Vill. of Gambell,*
480 U.S. 531 (1987) ................................................................................ 28

*Appalachian Voices v. TVA,*
Civ. No. 3:23-cv-604 (M.D. Tenn. filed June 14, 2023) ......................... 7

*Baltimore Gas & Elec. Co. v. NRDC,*
462 U.S. 87 (1983) .................................................................................... 9

*City of Olmsted Falls v. EPA,*
435 F.3d 632 (6th Cir. 2006) ............................................................. 9, 20

*City of Olmsted Falls v. FAA,*
292 F.3d 261 (D.C. Cir. 2002) .............................................................. 14

*City of Tacoma, Washington v. FERC,*
460 F.3d 53 (D.C. Cir. 2006) ................................................................ 19

*D.T. v. Sumner Cnty. Sch.,*
942 F.3d 324 (6th Cir. 2019) .................................................................. 8

*Davis v. Pension Benefit Guar. Corp.,*
571 F.3d 1288 (D.C. Cir. 2009) .............................................................. 8

*Del. Riverkeeper Network v. FERC,*
857 F.3d 388 (D.C. Cir. 2017) .............................................................. 23

*Del. Riverkeeper Network v. Sec'y Pennsylvania Dep't of Env't Prot.,*
833 F.3d 360 (3d Cir. 2016) .................................................................... 2

*Kentuckians for the Commonwealth v. USACE,*
746 F.3d 698 (6th Cir. 2014) ................................................................ 14

*Kentucky v. Biden,*
   23 F.4th 585 (6th Cir. 2022) ................................................................. 8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,*
   463 U.S. 29 (1983) ................................................................................ 9

*Nken v. Holder,*
   556 U.S. 418 (2009) ......................................................................... 7, 28

*Sierra Club v. FERC,*
   No. 24-1099 (D.C. Cir. filed Apr. 29, 2024) ........................................ 7

*Sierra Club v. Tenn. Dep't Env't & Conservation,*
   No. 23-3682 (6th Cir. filed Aug. 18, 2023) ................................ 7, 20, 29

*Sierra Club v. USACE,*
   981 F.3d 251 (4th Cir. 2020) .............................................................. 29

*Starbucks Corp. v. McKinney,*
   144 S. Ct. 1570 (2024) .......................................................................... 8

*United States v. Oakland Cannabis Buyers' Co-op.,*
   532 U.S. 483 (2001) ............................................................................ 30

*Waterkeepers Chesapeake v. FERC,*
   56 F.4th 45 (D.C. Cir. 2022) .............................................................. 18

*Winter v. NRDC,*
   555 U.S. 7  (2008) ................................................................................. 8

## Statutes

5 U.S.C. § 706(2)(A) ................................................................................. 9

15 U.S.C. § 717(a) ................................................................................... 29

15 U.S.C. § 717b(d)(3) ............................................................................ 29

15 U.S.C. § 717f(c)(1)(A) .......................................................................... 2

15 U.S.C. § 717n(b)(1) .............................................................................. 2

iv

15 U.S.C. § 717r(d)(1) ........................................................ 30

15 U.S.C. § 717r(d)(5) ........................................................ 30

33 U.S.C. § 1341 ................................................................. 18

33 U.S.C. § 1341(a)(1) ........................................... 3, 18, 21, 22

33 U.S.C. § 1341(d) .................................................. 3, 18, 21

33 U.S.C. § 1344(a) ............................................................... 2

33 U.S.C. § 1362(7) ............................................................... 2

## Regulations

40 C.F.R. § 121.1 ................................................................ 25

40 C.F.R. § 230 ..................................................................... 2

40 C.F.R. § 230.10(a) ........................................................... 3

40 C.F.R. § 230.10(a)(2) ..................................................... 12

40 C.F.R. § 230.10(a)(3) ..................................................... 12

40 C.F.R. § 230.10(b)(1) ..................................................... 27

40 C.F.R. § 230.11 ........................................................ 27, 28

40 C.F.R. § 230.45 ............................................................. 12

## Rules

Fed. R. App. P. 27(d)(2)(A) ............................................... 32

Fed. R. App. P. 32(a)(5) ...................................................... 32

Fed. R. App. P. 32(a)(6) ...................................................... 32

Fed. R. App. P. 32(f) ........................................................... 32

# GLOSSARY

CWA      Clean Water Act

FERC      Federal Energy Regulatory Commission

HDD      Horizontal Directional Drilling

LEDPA      Least Environmentally Damaging Practicable Alternative

NGA      Natural Gas Act

NPDES      National Pollution Discharge Elimination System

TGP      Tennessee Gas Pipeline Company

TVA      Tennessee Valley Authority

## INTRODUCTION

The Tennessee Gas Pipeline Company (TGP) plans to build a 32-mile pipeline to transport natural gas to the Tennessee Valley Authority (TVA), which proposes to replace one of its coal-fired plants with a gas plant. The Federal Energy Regulatory Commission (FERC) approved the project. The Army Corps of Engineers issued TGP a permit under the Clean Water Act (CWA) authorizing TGP to discharge dredge or fill material in streams and wetlands. Petitioners challenge the Corps' permit and seek a stay pending review.

The Court should deny Petitioners' motion. They cannot establish any of the required factors and, in particular, they are unlikely to succeed on the merits. The Corps extensively considered alternatives to the proposed discharge and permitted the least environmentally damaging practicable alternative. The Corps also correctly relied on Tennessee's CWA certification of the project and thoroughly considered water-quality impacts.

## BACKGROUND

**A.    Statutes and Regulations**

**1.    Natural Gas Act**

Under the Natural Gas Act (NGA), companies must obtain a certificate of public convenience and necessity from FERC before constructing natural gas pipelines. 15 U.S.C. § 717f(c)(1)(A). Other federal authorizations may also be required. *Del. Riverkeeper Network v. Sec'y Pennsylvania Dep't of Env't Prot.*, 833 F.3d 360, 368 (3d Cir. 2016). FERC serves as "the lead agency for the purposes of coordinating all applicable Federal authorizations." *Id.* § 717n(b)(1).

**2.    Clean Water Act**

**a.    CWA Section 404**

CWA Section 404 authorizes the Corps to issue permits for discharges of "dredged or fill material" into waters of the United States. 33 U.S.C. §§ 1344(a), 1362(7). Section 404 permits must comply with regulations called the "Section 404(b)(1) Guidelines," codified at 40 C.F.R. Part 230. Under the Guidelines, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other

2

significant adverse environmental consequences." 40 C.F.R. § 230.10(a).
This requirement identifies the least environmentally damaging
practicable alternative (LEDPA).

### b.    CWA Section 401

To obtain a Section 404 permit, an applicant must comply with
CWA Section 401, which requires any applicant for a federal permit to
conduct an activity that "may result in any discharge" into waters of the
United States to "provide the ... permitting agency a certification from
the State in which the discharge originates." 33 U.S.C. § 1341(a)(1). The
state must certify compliance with water-quality requirements,
including state water-quality standards. *Id.* § 1341(a)(1), (d). If a state
includes any conditions in its certification, those requirements "shall
become a condition" of the federal permit. *Id.* § 1341(d).

### B.    Factual Statement

### 1.    FERC issued a certificate of public convenience and necessity.

In 2022, TGP applied to FERC for authorization to build a 32-
mile-long, 30-inch-diameter pipeline to deliver natural gas to TVA,
which plans to retire its coal-fired Cumberland Fossil Plant and replace
it with a gas-fueled plant. USA-Appx-104–05. The pipeline would

3

connect existing pipelines in Dickson, Tennessee to TVA's new plant. USA-Appx-2.

After preparing a 576-page environmental impact statement and soliciting public input 10 times, USA-Appx-12–14, FERC granted TGP a certificate of public convenience and necessity. USA-Appx-106.

### 2.    Tennessee issued a Section 401 certification.

In July 2022, TGP applied to Tennessee for a Section 401 certification on the Section 404 permit and a state permit, called an Aquatic Resource Alteration Permit. Tennessee issued a combined Section 401 certification and state permit in July 2023. USA-Appx-107. Tennessee's Section 401 certification contained several conditions, including requiring TGP to submit updated information about certain parcels that it had been unable to access and to obtain a modified state permit after submitting the new information. USA-Appx-110. In August 2023, after accessing the properties and doing field surveys, TGP submitted additional information to Tennessee. USA-Appx-107. In April 2024, Tennessee issued a modified state permit incorporating the new information; Tennessee did not modify the Section 401 certification. USA-Appx-114.

4

### 3.    The Corps issued a Section 404 permit.

In July 2022, TGP applied to the Corps for a Section 404 permit. USA-Appx-4. The Corps solicited public comment twice and, after requiring TGP to minimize impacts in various ways, issued a permit in July 2024. USA-Appx-12, USA-Appx-117–124; *see also* USA-Appx-1–76 (explaining decision).

To minimize impacts, eighty percent of the pipeline route is co-located with existing TVA easements for power lines or other utilities. USA-Appx-3, USA-Appx-33. Only 0.6 percent of the construction will be in waters of the United States. USA-Appx-8. The pipeline will cross 146 waters of the United States, including 139 streams and seven wetlands. USA-Appx-3. During construction, there will be temporary discharges of fill material into 0.69 acres of wetlands and 2.39 acres of streambeds. USA-Appx-3. All impacts will be temporary except for converting 0.03 acres of forested wetland to emergent vegetation to maintain the right-of-way. USA-Appx-3. TGP will restore all areas to pre-construction contours and minimize any adverse effects during construction by, for example, using sediment and erosion controls. USA-Appx-5.

Four crossings will be constructed with horizontal directional drilling (HDD), which passes underneath waters of the United States and does not discharge fill into them. USA-Appx-3. The remaining crossings will be constructed with dry open-cut trenching. USA-Appx-3. TGP originally proposed wet construction methods, meaning that it would not divert stream flow before trenching through crossings. USA-Appx-18. But the Corps determined that wet construction methods would not minimize adverse impacts because they would increase sedimentation. USA-Appx-18, USA-Appx-29. Instead, the Corps required TGP to install small dams upstream of construction areas and route stream flow around trenches. USA-Appx-29.

### C.    Procedural Background

On September 23, 2024, Petitioners asked the Corps to stay its decision and supplemented its request on September 30, 2024. The Corps denied Petitioners' stay request in an 18-page letter on October 3, 2024. USA-Appx-125–142.

Petitioners filed this petition for review on September 26, 2024, and filed their stay motion on October 4, 2024. ECF Nos. 1, 9.

Petitioners have also challenged TVA's decision to replace the coal-fired plant with a gas plant, *Appalachian Voices v. TVA*, Civ. No. 3:23-cv-604 (M.D. Tenn. filed June 14, 2023); FERC's issuance of a certificate of public convenience and necessity for the pipeline, *Sierra Club v. FERC*, No. 24-1099 (D.C. Cir. filed Apr. 29, 2024); and Tennessee's Section 401 certification for the pipeline, *Sierra Club v. Tenn. Dep't Env't & Conservation*, No. 23-3682 (6th Cir. filed Aug. 18, 2023). Petitioners asked this Court to stay Tennessee's Section 401 certification, and that motion is fully briefed.

## STANDARD OF REVIEW

### A.    Stays Pending Review

To obtain a stay, Petitioners must show that: (1) they are likely to succeed on the merits, (2) they will be irreparably injured absent a stay, (3) the stay will not substantially injure the other parties, and (4) the public interest favors a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009). When the government opposes a stay motion, the last two factors merge. *Id.* at 435.

Petitioners contend that these factors are "considerations for the court to balance." Mot. 4 (citing *Kentucky v. Biden*, 23 F.4th 585, 593

(6th Cir. 2022)). However, in *Winter v. NRDC*, the Supreme Court rejected a similar balancing test that allowed courts to grant a preliminary injunction based on a strong showing of likely success on the merits but only a "possibility" of irreparable harm. 555 U.S. 7, 21 (2008). That balancing test was "inconsistent with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

This Court has not "explicitly discussed whether *Winter* affected [its] test." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 328–29 (6th Cir. 2019) (Nalbandian, J., concurring). Because *Winter* rejected a similar balancing test, it supersedes this Court's precedent that contemplates balancing the four factors against each other. *See Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295–96 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (questioning how *Winter* affects the D.C. Circuit's sliding-scale test and noting that "[i]t appears that a party moving for a preliminary injunction must meet four independent requirements"); *see also Starbucks Corp. v. McKinney,* 144 S. Ct. 1570, 1576 (2024) ("[A] plaintiff seeking a preliminary injunction must make

*a clear showing* that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest." (emphasis added) (cleaned up)).

Petitioners' motion fails under either standard.

### B.    Section 404 Permits

Because the CWA and NGA do not articulate a standard of review, the Court reviews Section 404 permits under the Administrative Procedure Act. *City of Olmsted Falls v. EPA*, 435 F.3d 632, 636–37 (6th Cir. 2006). The Court reviews whether an agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). This scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). When examining agencies' "scientific determination[s]," the Court "must generally be at its most deferential." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983).

## ARGUMENT

## I.    Petitioners are unlikely to succeed on the merits.

### A.    The Corps required the least environmentally damaging practicable alternative.

Petitioners contend that the Corps failed to select the LEDPA, but they ignore the Corps' extensive analysis. In addition, they also misconstrue the special permit condition the Corps imposed regarding rock removal.

### 1.    Building the pipeline with trenching was the LEDPA.

The Corps reasonably determined that the LEDPA was building the 32-mile-long, 30-inch-diameter pipeline with trenching. Petitioners argue that the Corps did not choose the LEDPA and in particular did not consider conventional boring. Mot. 5–9. But the Corps considered many alternatives, including conventional boring, and reasonably employed its technical expertise to determine the LEDPA.

An alternative is only the LEDPA if it is "practicable," which means that it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). When, as here, an activity is not "water dependent" and would discharge pollutants into a "special

aquatic site," the regulations presume that practicable alternatives not involving special aquatic sites are available, "unless clearly demonstrated otherwise." 40 C.F.R. §§ 230.10(a)(3), 230.45.

Petitioners argue that the Corps did not rebut this presumption because it did not show that trenchless methods, like conventional boring, were impracticable. Mot. 6. But the Corps showed that there were no practicable alternatives available that would avoid special aquatic sites.

In determining whether the proposed discharge was the LEDPA, the Corps first considered whether it was even necessary to build the pipeline. It considered alternatives like transporting gas by rail, water, or highway, but none of those options were viable. USA-Appx-20. In addition, given the region's dense drainage network, it was not possible to route a pipeline to avoid *all* waters of the United States. USA-Appx-21. The Corps then considered other alternatives, like using existing pipelines. USA-Appx-21. Those alternatives were impracticable because the existing pipelines lacked sufficient (if any) capacity to supply the new plant. USA-Appx-21.

11

The Corps then considered whether there were less environmentally damaging practicable alternatives to construct the pipeline. For example, the Corps considered a smaller-diameter pipeline but that would require a booster station and thus would be unreasonably costly and disturb more land. USA-Appx-24–25.

The Corps considered whether TGP could drill underneath every stream crossing and avoid any discharge into waters of the United States. USA-Appx-25. There are two primary methods for drilling underneath aquatic resources—HDD and conventional boring. USA-Appx-25. HDD creates a small hole from the entry point to the exit point, widens the hole using drilling fluids, and pulls the pipeline into position. USA-Appx-144. With conventional boring, a bore pit and a receiving pit must be excavated and both pits must be deeper than the trench depth. USA-Appx-150. A boring machine then cuts a hole between the two pits. USA-Appx-150.

Petitioners argue that the Corps "failed" in evaluating conventional boring, but the record shows the Corps' extensive analysis. Mot. 6–7. The Corps considered both HDD and conventional boring, required TGP to submit additional information, and then concluded

12

that it was not practicable to require TGP to drill beneath every crossing. USA-Appx-25. HDD can involve inadvertent releases of drilling fluid, particularly in the geologic formations present here, and such releases can degrade stream habitats. USA-Appx-25. Additionally, each HDD crossing would require minimum borings of 1,300 feet, which is not possible in this steeply sloped terrain. USA-Appx-151, USA-Appx-25.

Conventional boring requires geologic conditions that are conducive to safely excavating the pits and successfully boring the tunnel. USA-Appx-151. The pits are up to 50 feet wide and 150 feet long, and it is not feasible to safely construct pits of that size in this area, which has steep slopes and shallow groundwater. USA-Appx-154. Boring works when there is loose sediment, free of rock, boulders, and cavities, and when the terrain is mostly level. USA-Appx-151. Those conditions are largely not present in this project area. USA-Appx-151.

In addition, each crossing done with conventional boring or HDD would take ten days to one month, as opposed to trenching, which takes one to two days for each crossing. USA-Appx-25. And HDD and conventional boring are each five times more expensive than trenching.

13

USA-Appx-25, USA-Appx-151. The Corps reasonably determined that it was not practicable for TGP to drill beneath every crossing—either with conventional boring or HDD. USA-Appx-26.

After considering all those alternatives, the Corps selected the LEDPA: building the 32-mile, 30-inch-diameter pipeline by trenching. USA-Appx-27. The Corps' analysis was reasonable and is entitled to deference. *See Kentuckians for the Commonwealth v. USACE*, 746 F.3d 698, 713 (6th Cir. 2014) ("[G]iven the various interrelated factors and possible assessment metrics that could be used ..., the choice ... requires the exercise of complex scientific judgment and deference to the Corps' expertise is appropriate.").

Petitioners argue that its expert "warned the Corps that conventional boring should be considered at each crossing." Mot. 7. But the Corps analyzed conventional boring (as well as many other alternatives) and reasonably explained that it was not the LEDPA. Petitioners may disagree, but the Corps "is entitled to rely upon its" own analysis "and to credit the views of its own experts ... over [Petitioners'] contrary views." *City of Olmsted Falls v. FAA*, 292 F.3d 261, 272 (D.C. Cir. 2002). Petitioners are unlikely to succeed on the

14

merits in arguing that the Corps acted arbitrarily, capriciously, or inconsistently with the CWA in choosing the LEDPA and, in particular, by failing to consider conventional boring.

### 2. The Corps required the least impactful rock removal methods.

Petitioners also argue that the Corps failed to choose the LEDPA because it did not specify the methods TGP must use to excavate trenches at each crossing. Mot. 9–12. But Petitioners misunderstand the Corps' analysis. The LEDPA is building the 32-mile-long, 30-inch-diameter pipeline with trenching. USA-Appx-27. Where rock removal is required to construct the pipeline, the Corps mandated the least impactful, practicable trenching technique. USA-Appx-68. Its analysis was reasonable.

TGP anticipated, based on the area's geology, that it would encounter shallow bedrock during construction. USA-Appx-29. The potential methods for removing bedrock include: conventional excavation, ripping with a conventional excavator equipped with a ripping tooth, hammering with a pointed backhoe attachment or pneumatic rock hammer, using a rock trencher machine, or—only as a "last resort"—controlled blasting. USA-Appx-29. Depending on the

15

circumstances, certain methods would be impracticable. USA-Appx-147–48. For example, conventional excavation is effective when the streambed contains unconsolidated substrate materials but is impracticable when tougher substrate materials are present. USA-Appx-147–48. Rock trenching uses a large trenching machine and is impracticable in locations with tight space or steep slopes. USA-Appx-148.

In Special Condition 9 of the permit, the Corps required TGP "to select the least impactful trenching technique practicable." USA-Appx-68. The conditions at each crossing site, such as relative hardness, fracture susceptibility, and volume of bedrock, will determine the rock removal methods. USA-Appx-29, USA-Appx-157. If other techniques do not work to trench through the bedrock, then TGP may submit written justification and site-specific blasting plans and ask the Corps to approve blasting. USA-Appx-68–69. No blasting can occur unless the Corps concurs in writing. USA-Appx-69. And the Corps prohibited all blasting in karst-prone areas where there are risks of hydrologic losses. USA-Appx-68.

16

Petitioners contend that the Corps "authoriz[ed] the permittee to choose the LEDPA on the fly and without Corps supervision," Mot. 11, but Petitioners are incorrect. The LEDPA is building the 32-mile-long, 30-inch-diameter pipeline with trenching. And, in any event, TGP cannot blast without submitting a justification to the Corps *and* obtaining the Corps' prior written concurrence. USA-Appx-68–69.

**B.  The Corps correctly relied on Tennessee's Section 401 certification and also independently assessed water-quality impacts.**

Petitioners contend that the Corps' permit is invalid because Tennessee's certification is incomplete, but Petitioners misunderstand both the facts and the law regarding Section 401 certifications. Mot. 12–16. TGP applied for and obtained a Section 401 certification for the project. The Corps correctly relied on that certification as fulfilling the Section 401 requirement. And the Corps separately and independently evaluated water-quality impacts, satisfying its Section 404 obligations.

**1.  The Corps correctly relied on Tennessee's Section 401 certification.**

Petitioners contend that Tennessee's certification is incomplete because it did not cover certain stream crossings, Mot. 12, but the Corps correctly determined that Tennessee certified the entire project.

17

Under Section 401, Section 404 permit applicants must "provide" the Corps "a certification from the State." 33 U.S.C. § 1341(a)(1). If the state "fails or refuses to act" within "one year," the certification requirements "shall be waived." *Id.* "No license or permit shall be granted if certification has been denied by the State." *Id.* If the state includes any conditions in its certification, those requirements "shall become a condition" of the permit. *Id.* § 1341(d). Thus, states have only three options under Section 401: First, they can deny the certification request; second, they can grant the request, either in full or with specified conditions; or third, they can waive their right to certify. *Waterkeepers Chesapeake v. FERC*, 56 F.4th 45, 47 (D.C. Cir. 2022).

Here, the Corps correctly concluded that Tennessee certified the pipeline project in July 2023. USA-Appx-65. On July 22, 2022, TGP applied to Tennessee for a Section 401 certification and a state permit. USA-Appx-107. Tennessee issued a combined Section 401 certification and state permit on July 21, 2023 (one day before the one-year deadline). USA-Appx-107. It said, "Tennessee hereby certifies pursuant to 33 U.S.C. § 1341 ..., the activity described below." USA-Appx-109. Then Tennessee described the project. The "authorized work"

18

encompassed various impacts to wetlands and streams "associated with the construction of a 32-mile 30-inch diameter natural gas pipeline." USA-Appx-109. Tennessee then listed the starting and ending GPS coordinates for the pipeline and specified the watersheds through which it would pass. USA-Appx-109.

Thus, TGP applied for a Section 401 certification for its 32-mile, 30-inch diameter pipeline project, and Tennessee issued a certification for that project. The Corps correctly concluded that Tennessee certified the project under Section 401. USA-Appx-65.

Petitioners contend, however, that the Corps erred because Tennessee's certification "does not cover stream crossings TGP identified after that certification was issued." Mot. 12. This argument fails.

First, the Corps may not scrutinize the substance of state certifications, including whether states adequately reviewed every waterbody crossing. The Corps' "role is limited to awaiting, and then deferring to, the final decision of the state." *City of Tacoma, Washington v. FERC*, 460 F.3d 53, 67 (D.C. Cir. 2006). It "may determine whether the proper state has issued the certification or whether a state has

19

issued a certification within the prescribed period," but the Corps "does not possess a roving mandate to decide that substantive aspects of" state certifications "are inconsistent with" Section 401. *Am. Rivers, Inc. v. FERC*, 129 F.3d 99, 110–11 (2d Cir. 1997).

This Court has similarly rejected the notion that the Corps must review states' procedures under Section 401 when deciding whether to issue a Section 404 permit. If the Corps "cannot rely on the state agency to properly follow its own laws and regulations," Section 401 "would, in effect, require [the Corps] to engage in an analysis of each states' rules and regulations" and "come to an independent assessment as to whether the state agency followed those rules." *City of Olmsted Falls*, 435 F.3d at 636. "Such a procedure, in addition to being cumbersome and duplicative of effort, would undermine the role that state environmental agencies play in the Section 401 process." *Id.* Petitioners are free to (and are) challenging the substance of Tennessee's certification elsewhere, but the Corps' role is not to scrutinize the certification's substance. *See Sierra Club*, No. 23-3682 (Petitioners' challenge to Tennessee's certification).

20

Second, TGP's submission of additional information after Tennessee issued the certification shows that TGP complied with Tennessee's conditions, not that the certification is invalid. Before the one-year deadline, TGP could not do field surveys on six properties in the pipeline corridor because the landowners denied access. USA-Appx-107. So Tennessee conditioned its certification and state permit on TGP surveying those properties. USA-Appx-110. In August 2023, TGP complied with that condition by submitting additional information. USA-Appx-107. In April 2024, Tennessee issued a modified state permit to TGP using that new information. USA-Appx-113. TGP complied with the condition in the certification, which is exactly what Congress intended with Section 401. *Cf.* 33 U.S.C. § 1341(d).

Tennessee stated in the modified state permit that it was not modifying the Section 401 certification, USA-Appx-114, but said it waived its authority "to the extent that Tennessee's 401 Water Quality Certification for the additional impacts has not already been waived," USA-Appx-116. The Corps correctly determined that this language did not affect Tennessee's certification. As explained above, states must act under Section 401 within one year. 33 U.S.C. § 1341(a)(1). Here, the

one-year period ended in July 2023, so Tennessee could not further act on the certification request after that deadline.

Petitioners contend—without legal support—that "under § 401, a state must certify each individual disposal site" and so "there is no certification" for the crossings for which TGP did field surveys after the one-year mark. Mot. 14. This argument fails because states certify the activity associated with the permit. 33 U.S.C. § 1341(a)(1). Here, Tennessee's certification covered the entire project, i.e., the waterbody impacts from constructing the entire 32-mile, 30-inch diameter pipeline. The certification conditions show that Tennessee intended its certification to cover the entire project, including the additional field-survey areas. *See* USA-Appx-110 (requiring TGP to amend the "project aquatic resources inventory" to "address parcels not previously inventoried" and to obtain "a modified [state permit] covering all proposed impacts to aquatic resources for the entire pipeline project").

The only legal citation Petitioners offer to support their assertion that states must certify each individual crossing is 40 C.F.R. § 121.1, Mot. 14, which defines various terms, such as "Federal agency" or "Certifying authority," in the Section 401 regulations. Those definitions

22

do not mandate or even discuss that a state must distinctly certify each individual crossing. *See* 40 C.F.R. § 121.1.

Finally, the Corps' conclusion here aligns with the purpose of Section 401, which is to give states an opportunity to opine on—or even block—projects based on water-quality considerations. In Section 401, "Congress sought to ... reinforc[e] the role of States as the prime bulwark in the effort to abate water pollution" by giving them "the power to block, for environmental reasons, local water projects that might otherwise win federal approval." *Del. Riverkeeper Network v. FERC*, 857 F.3d 388, 393–394 (D.C. Cir. 2017) (cleaned up). Here, Tennessee had an opportunity to opine on or block the project, yet it chose to certify. The Corps correctly concluded that Tennessee certified the project under Section 401.

### 2. The Corps independently assessed water-quality impacts.

Doubling down on its erroneous arguments about Tennessee's Section 401 certification, Petitioners argue that the Corps failed to evaluate the proposed discharge's impacts on water quality because it merely relied on Tennessee's "infirm" certification. Mot. 15. The Corps correctly relied on Tennessee's certification under Section 401 (as

explained above), and, under Section 404, the Corps also met its independent obligation to assess water-quality impacts.

Before issuing a Section 404 permit, the Corps must make factual determinations about "the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment." 40 C.F.R. § 230.11. The Corps shall not permit a discharge that "[c]auses or contributes ... to violations of any applicable State water quality standard." *Id.* § 230.10(b)(1).

The Corps complied with those requirements. It reviewed every crossing, including the crossings for which TGP submitted additional information after Tennessee issued the certification. USA-Appx-158–59; *see also* USA-Appx-77–80 (crossing-by-crossing analysis); USA-Appx-28–31 (evaluation of impacts on physical and chemical characteristics); USA-Appx-57–60 (evaluation of cumulative effects on aquatic ecosystem). After evaluating that information, the Corps reasonably determined that the proposed discharge would not "[c]ause or contribute to violations of any applicable water quality standards." USA-Appx-40.

The Corps also reviewed Tennessee's modified state permit for the project. It noted that Tennessee mandated various conditions to ensure that TGP would minimize water-quality impacts. USA-Appx-49. And it noted that, based on Tennessee's permit, "the Corps has determined that the proposed project would have a neutral (mitigated) impact on water quality." USA-Appx-49. Tennessee is primarily responsible for implementing state water-quality standards under the CWA, USA-Appx-113, and it was reasonable for the Corps to review Tennessee's permit in making its own determination. The Corps reasonably evaluated water-quality impacts.

### C.    The Corps reasonably analyzed cumulative impacts.

Petitioners make an additional argument regarding the Corps' water-quality analysis, contending that the Corps failed to assess the cumulative effect of multiple crossings of the same stream under 40 C.F.R. § 230.11. Mot. 18–19. But Petitioners ignore the Corps' extensive analysis.

The Corps analyzed cumulative impacts. USA-Appx-57–60. It explained that any disturbed streams would be restored to pre-construction conditions, which should restore any functions lost during

25

the short construction period. USA-Appx-57. Sedimentation would be minimized through best management practices and erosion controls. USA-Appx-57. And the Corps analyzed cumulative effects by watershed, examining the watersheds through which the pipeline will pass. USA-Appx-58–59. The Corps explained that temporarily excavating and then backfilling streams for trenched crossings would not affect watershed-scale factors. USA-Appx-89.

Petitioners point to a study about pipeline crossings, but this study actually supports the Corps' analysis. Mot. 18. For example, the study says that construction methods where "the stream channel is isolated for construction, with water temporarily diverted downstream" will "more effectively mitigate increased sediment-loading" than methods where "crossing construction occurs without diversion of stream flow." USA-Appx-161. That is what the Corps required here by mandating that all trenched crossings must be dry, with streams diverted during construction. USA-Appx-29. The study also notes that other mitigation measures like those required here (such as erosion controls) are "effective in reducing impacts of pipeline crossing construction to levels that [are] not significant." USA-Appx-162. The

26

Corps' water-quality analysis, including its cumulative-effects analysis, was reasonable.

### D.    The Corps reasonably noted that the project is subject to other pollution control requirements.

In another attack on the Corps' water-quality analysis, Petitioners contend that the Corps relied on a "nonexistent" National Pollution Discharge Elimination System (NPDES) permit "to conclude effects from suspended particulates and turbidity would be negligible." Mot. 16. This argument fails for two reasons.

First, the Corps evaluated suspended particulates and turbidity. Importantly, it noted that the dry trenching methods that "isolat[e] stream flows from the open trench excavation" would minimize increases in turbidity and suspended solids. USA-Appx-29; *see also* USA-Appx-38–39 (analyzing turbidity and suspended particulates); USA-Appx-48–49, USA-Appx-54–55 (noting best management practices to minimize erosion and turbidity).

Second, the Corps did not rely on a nonexistent permit but rather simply noted that the project is subject to NPDES permit requirements, such as having a Stormwater Pollution Prevention Plan. USA-Appx-32, USA-Appx-48. Only 0.6 percent of the project is located in waters of the

United States; the remainder occurs within uplands. USA-Appx-8.

Operators of construction sites larger than one acre (which this project

is) must have stormwater discharge construction permits. *See* USA-

Appx-111 (Tennessee state permit mandating compliance with the

General Permit for Discharges of Stormwater Associated with

Construction Activities). The Corps' reference to this requirement does

not render its decision arbitrary.

## II.   Petitioners fail to establish irreparable harm.

Petitioners must also show that they "will be irreparably injured

absent a stay." *Nken*, 556 U.S. at 434. To be irreparable, any injury

must be "permanent or at least of long duration." *Amoco Prod. Co. v.

Vill. of Gambell*, 480 U.S. 531, 545 (1987). Here, the Corps has

authorized only temporary impacts except for converting 0.03 acres of

forested wetland to emergent vegetation to maintain the right-of-way.

USA-Appx-3. And the Corps ensured that even temporary impacts

would be minimized. *E.g.*, USA-Appx-5.

## III. The balance of equities and the public interest favor the United States.

Petitioners must also show that a stay would serve the public interest and that the equities weigh in their favor. *Nken*, 556 U.S. at 435. They cannot satisfy this requirement.

The permit requires various mitigation and minimization measures. USA-Appx-4–5. But even if those measures do not fully mitigate any alleged harm to Petitioners' interests, any residual harm must be weighed against the harm to TGP of delaying the project and against the harm to the public interest.

Petitioners argue that the NGA yields to the CWA in the public interest analysis, but that is incorrect. Mot. 23. Petitioners cite *Sierra Club v. USACE*, where the pipeline proponent had not obtained a Section 401 certification from West Virginia. 981 F.3d 251, 261 (4th Cir. 2020). That case noted that the NGA "yields to" the CWA because the NGA provides that "nothing in this chapter affects the rights of States under" the CWA. *Id.* at 264–265 (quoting 15 U.S.C. § 717b(d)(3)). Here, TGP *did* obtain a Section 401 certification, and Petitioners are hardly vindicating Tennessee's rights in this suit. Indeed, they separately

29

challenged Tennessee's Section 401 certification. *See Sierra Club*, No. 23-3682.

In the NGA, Congress established that "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest." 15 U.S.C. § 717(a); *see also United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) ("A court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation." (cleaned up)). The NGA also provides for direct, expedited review in the appeals courts, *see* 15 U.S.C. § 717r(d)(1), (d)(5), reflecting Congress's desire that litigation should not unduly delay implementation of the Corps' decisions.

The balance of equities and the public interest do not favor the stay.

## CONCLUSION

For these reasons, Petitioners' motion for a stay pending review should be denied.

TODD KIM
*Assistant Attorney General*

<u>*/s/ Rebecca Jaffe*</u>
BRIAN C. TOTH
JUSTIN HEMINGER
REBECCA JAFFE
October 9, 2024                    Attorneys
90-5-1-7-17726                    Environment and Natural Resources
                                   Division
                                   U.S. Department of Justice
                                   Post Office Box 7415
                                   Washington, D.C. 20044
                                   (202) 598-0402
                                   rebecca.jaffe@usdoj.gov

# CERTIFICATE OF COMPLIANCE

I hereby certify:

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Rule 32(f), this document contains 5,192 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

/s/ Rebecca Jaffe
REBECCA JAFFE
Counsel for the United States

32

## CERTIFICATE OF SERVICE

I certify that on October 9, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I also certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*/s/ Rebecca Jaffe*
REBECCA JAFFE
Counsel for the United States