

# Appalachian Mountain Advocates

<u>West Virginia</u>
Post Office Box 507
Lewisburg, WV 24901
(304) 645-9006

<u>Virginia</u>
415 Seventh Street NE
Charlottesville, VA 22902
(434) 529-6787

www.appalmad.org

Great Horned Owl © Estate of Roger Tory Peterson. All rights reserved.

## SOUTHERN ENVIRONMENTAL LAW CENTER

1033 Demonbreun Street, Suite 205
Nashville, TN 37203

Telephone 615-921-9470
Facsimile 615-921-8011



**EXHIBIT**

**REPLY A**

May 10, 2023

**<u>Sent by Electronic Mail to amy.m.robinson@usace.army.mil</u>**
United States Army Corps of Engineers, Nashville District
ATTN: Amy Priest
Public Notice No. 23-13, File No. LRN-2021-00866
3701 Bell Road
Nashville, TN 37214

> **Re:** **Public Comments on Public Notice No. 23-13, File No. LRN-2021-00866: Tennessee Gas Pipeline Company's Application for a Department of the Army Permit Under Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act**

Dear Ms. Priest:

The United States Army Corps of Engineers (the "Corps") has solicited public comments on an application by Tennessee Gas Pipeline Company ("Tennessee Gas") for a Department of the Army ("DA") permit under Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act (Public Notice Number 23-13; File Number LRN-2021-00866). Appalachian Mountain Advocates and Southern Environmental Law Center, on behalf of Sierra Club and Appalachian Voices, and together with Center for Biological Diversity (collectively, the "Conservation Groups"), respectfully

submit the following comments on Tennessee Gas's application and request a public hearing pursuant to 33 U.S.C. §1344(a) and 33 C.F.R. §327.4(b).[1]

## INTRODUCTION

Tennessee Gas seeks an individual permit under Section 404 for discharges of dredged and/or fill material associated with its proposed Cumberland Pipeline in Dickson, Houston, and Stewart Counties in Tennessee (the "Cumberland Pipeline").[2] In addition to impacts on one Section 10 river, the permit sought would authorize crossings of 155 streams (115 of which would be constructed using a dry-ditch, open-cut method) and seven wetlands.[3]

For the reasons set forth below, the Corps cannot issue the applied-for individual Section 404 permit application. Because the proposed discharges cannot comply with the 404(b)(1) Guidelines, and because the project is not in the public interest, the Corps must deny the permit application. Moreover,

---

[1] We incorporate into our comments by reference, as if they were fully set forth herein, the exhibits cited herein.

There are a total of 49 exhibits to these comments, some of which are rather large electronic files. Because attempting to provide them via email is fraught with potential technical difficulties, including potential "bounce back" due to file-size issues, we have uploaded the exhibit files to the "DoD SAFE" ftp site you provided.

[2] Tennessee Gas Pipeline Co., LLC, Cumberland Project: Section 404 Clean Water Act/Section 10 Rivers and Harbors Act Dredge and Fill – Individual Permit Application (July 22, 2022) [hereinafter, "IP Application"].

[3] Table 3 (rev. Mar. 2023).

given the scale of the project and its controversial nature, the Corps should hold a public hearing in connection with its consideration of the application.

## I. THE CORPS MUST ALLOW SUFFICIENT TIME FOR MEANINGFUL PUBLIC REVIEW AND COMMENT ON ALL RELEVANT INFORMATION.

"[U]nder Section 404 of the CWA, the opportunity to comment and the right to a hearing both necessarily require that the Army present for public scrutiny the rationale and pivotal data underlying its proposed action *before* the close of the comment and hearing period."[4] When such rationales and pivotal data are only included "in the administrative record *after* the close of the comment and hearing period," it has "the effect of shielding essential data and the agency's rationale from public hearing and comment."[5] Rationales and pivotal data that support the Corps' factual determinations under the Section 404(b)(1) Guidelines are among the types of information that must be subjected to public comment.[6]

Much of the pivotal data that will be crucial to the factual determinations made by the Corps under the Section 404(b)(1) Guidelines—

---

[4] *Ohio Valley Envtl. Coalition v. U.S. Army Corps of Eng'rs*, 674 F.Supp.2d 783, 805 (S.D. W. Va. 2009) (quoting *Nat'l Wildlife Fed. v. Marsh*, 568 F.Supp. 985, 994 (D.D.C. 1983) (emphasis in *Marsh*)).

[5] *Marsh*, 568 F.Supp. at 994 (emphasis original).

[6] *Ohio Valley Envtl. Coalition*, 674 F.Supp.2d at 805 (holding that data critical to Corps' finding of no significant degradation must be subjected to public notice and comment).

and any findings of compliance or noncompliance therewith—has not yet been publicly noticed and subjected to public comment. Indeed, much of that information may not even exist at this time. Accordingly, to comply with its CWA obligations, the Corps must make additional data and information available to the public and allow meaningful public comment before making a decision on Tennessee Gas's application. Such data and information include, but are not limited to:

- ***Least Environmentally Damaging Practicable Alternative ("LEDPA") Rationales.*** Any additional information that Tennessee Gas submits to supplement its deficient LEDPA analyses must be subjected to public comment because it will be fundamental to the Corps' findings of compliance or noncompliance with the Section 404(b)(1) Guidelines.[7]

- ***Cumulative Effects Analyses.*** Any additional information that Tennessee Gas submits to remedy its deficient cumulative effects analysis must be subjected to public comment because it will be pivotal in the Corps' Section 404(b)(1) Guidelines analysis.[8]

- ***Baseline Water Quality Data for Each Discharge Location***.

- ***Evaluation of the Presence and/or Absence of Riffle-and-Pool Complexes at Each Discharge Site***.

- ***Discharge-site information gathered if Tennessee Gas gains access to survey portions of its route that are presently unsurveyed.***[9]

---

[7] *Id.* at 805.

[8] *Id.*

[9] The Corps rightfully determined that its February 14, 2023 public notice of Tennessee Gas's application was premature because the applicant had failed to identify all of the stream crossings that its proposed pipeline would require. Letter from Timothy C. Wilder, Chief, West Branch of the Regulatory Division of the Nashville District, U.S. Army Corps of Eng'rs, to Gina Dorsey, Kinder

- ***Compensatory Mitigation.*** Any additional information that Tennessee Gas submits regarding compensatory mitigation must be subjected to public comment because "information on proposed mitigation . . . must be . . . released for public review and comment *before* the close of comment on a [section] 404 permit[.]"[10]

- ***Any and all documents submitted by the applicant after the expiration of the April 11, 2023 Public Notice that includes information or pivotal data that is foundational either to the Corps' review of the application or to any determinations or findings the Corps would make under the Section 404(b)(1) Guidelines.***

Again, such information and data are pivotal because they will serve as the foundation for the factual determinations and findings of compliance or noncompliance that the Corps must make.

---

Morgan, Inc. Re: File No. LRN-2021-00866, Request for Additional Information for the Proposed Tennessee Gas Pipeline, Natural Gas Line crossing multiple streams and wetlands from Dickson to Cumberland City, in Dickson, Houston, and Steward Counties, Tennessee (Latitude: 36.266637; Longitude: - 87.426619) (Mar. 10, 2023).

Although the Nashville District did not cite the applicable Corps regulation, its reasoning for deeming the application incomplete squarely tracks 33 C.F.R. §325.1(d), which requires that a Corps application include "a complete description of the proposed activity" and that the District Engineer "reject, as incomplete, any permit application which fails to" include "[a]ll activities which the applicant plans to undertake which are reasonably related to the same project for which a DA permit would be required[.]" 33 C.F.R. §325.1(d).

Even assuming that Tennessee Gas's efforts to supplement its incomplete application with information from a "desktop" style review were sufficient to justify the April 11, 2023 reissuance of a public notice (they were not), those efforts are clearly insufficient to support permit issuance—partial or otherwise.

[10] *Id.*

Respectfully, the Corps has an interest in ensuring a meaningful opportunity for robust public comments on all aspects of this controversial permit. Federal courts have repeatedly emphasized the importance of the opportunities for public participation under the Clean Water Act.[11] As a result, it is in the Corps' interest—as well as the public's—to ensure additional meaningful opportunities for public participation in this permitting process.

The Corps reissuance of a public notice of Tennessee Gas's application should have waited for the submission **and** public availability of information missing from Tennessee Gas's application beyond information about undisclosed stream crossings. It did not.

The Corps' Huntington District recently faced a similar situation—an applicant for Department of the Army ("DA") permits related to an interstate methane gas pipeline submitted voluminous additional pivotal information well after the Expiration Date of the public notice of the application. In an effort to comply with the Clean Water Act's public participation requirements and ensure a meaningful opportunity for public comment, the Huntington District issued a Supplemental Public Notice for the application, and referred the public to the applicant's website to obtain the supplemental information.[12]

---

[11] *See, e.g., Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 654 (4th Cir. 2018) (noting "the critical importance of notice-and-comment requirements throughout the Clean Water Act," and citing *United States v. Smithfield Foods, Inc.*, 191 F.3d 516 (4th Cir. 1999)).

[12] Public Notice Nos. LRH-2015-00592-GBR, LRP-20150798, and NAO-201500898 for Department of the Army Permit Under Section 10 of the Rivers

The Huntington District extended the Expiration Date of that supplemental public notice to allow the public 60 days to review and comment on the voluminous supplemental information.[13] Then, when it was revealed that the applicant had failed to post all of the relevant supplemental information to its website, the Corps extended the public comment period an additional 15 days to allow the public to access the omitted information and submit comments on it.[14]

Because no decision on the permits at issue has been made, it is yet to be seen whether the Huntington District successfully made available all of the pivotal information or allowed sufficient opportunity for meaningful comment. Nonetheless, that District's efforts show that the Corps' public participation processes can be accompanied by greater transparency.

---

and Harbors Act of 1899 and Section 404 of the Clean Water Act for the Mountain Valley Pipeline Project (Dec. 12, 2022), https://www.lrh.usace.army.mil/Missions/Regulatory/Public-Notices/Article/3243440/lrh-2015-00592-gbr-lrp-2015-798-nao-2015-0898/.

[13] Supplemental Public Notice Nos. LRH-2015-00592-GBR, LRP-20150798, and NAO-201500898 for Department of the Army Permit Under Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act for the Mountain Valley Pipeline Project (Dec. 20, 2022), https://www.lrh.usace.army.mil/Missions/Regulatory/Public-Notices/Article/3250140/lrh-2015-00592-gbr-lrp-2015-798-nao-2015-0898/.

[14] Supplemental Public Notice Nos. LRH-2015-00592-GBR, LRP-20150798, and NAO-201500898 for Department of the Army Permit Under Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act for the Mountain Valley Pipeline Project (Feb. 10, 2023), http://www.lrh.usace.army.mil/Missions/Regulatory/Public-Notices/Article/3295080/lrh-2015-00592-gbr-lrp-2015-798-nao-2015-0898/.

In short, the Nashville District must ensure that all the relevant materials—including those that Tennessee Gas must submit to fill the data gaps discussed in these comments—are made publicly available and allow a reasonable period for meaningful public comment before it makes a decision on Tennessee Gas's application.

## II.    TENNESSEE GAS'S PROPOSED DISCHARGES CANNOT COMPLY WITH THE SECTION 404(B)(1) GUIDELINES.

The 404(b)(1) Guidelines govern the Corps' analysis of an application for an individual permit. The guidelines prohibit permit issuance where, among other things, the proposed discharges are not the least environmentally damaging practicable alternative, would cause or contribute to water quality standards violations, would cause or contribute to significant degradation of the waters of the United States, or are not appropriately minimized.[15] As at least one federal appellate court has held, "[t]he burden of proof to demonstrate compliance with the §404(b) permit Guidelines rests with the Applicant; where insufficient information is provided to determine compliance, the Guidelines require that no permit be issued."[16] As discussed below, Tennessee Gas has not

---

[15] 40 C.F.R. §230.10(a)–(d).

[16] *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1187 (10th Cir. 2002), *modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003) (citing 61 Fed. Reg. 30,990, 30,998 (June 18, 1996); 40 C.F.R. §230.12(a)(3)(iv)); *see also* Memorandum to the Field, Subject: Appropriate Level of Analysis Required for Evaluating Compliance with the Section 404(b)(1) Guidelines Alternatives Requirements (Aug. 23, 1993), *available at* 62 Fed. Reg. 31,492, 31,497–99 (June 9, 1997).

provided sufficient information to demonstrate compliance and cannot show that its proposed discharges will comply with the Section 404(b)(1) Guidelines.

A.  **THE CORPS MUST DENY TENNESSEE GAS'S APPLICATION BECAUSE THE APPLICANT HAS NOT ESTABLISHED THAT DRY-DITCH, OPEN-CUT CROSSINGS ARE THE LEAST ENVIRONMENTALLY DAMAGING PRACTICABLE ALTERNATIVE.**

The 404(b)(1) Guidelines prohibit the issuance of a Section 404 permit where "there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem[.]" [17] "[P]racticable alternatives include, but are not limited to, (i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States . . . [and] (ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters[.]"[18] This is commonly referred to as the "least environmentally damaging practicable alternative"—or "LEDPA"— analysis. The burden to demonstrate that the proposed alternative is the least environmentally damaging practicable alternative lies on the applicant.[19] In

---

[17] 40 C.F.R. §230.10(a).

[18] *Id.* §230.10(a)(1).

[19] *Utahns for Better Transp.*, 305 F.3d at 1187; *see also Alliance for Legal Action v. U.S. Army Corps of Eng'rs*, 314 F.Supp.2d 534, 543 (M.D.N.C. 2004) (holding "the burden to clearly demonstrate a lack of practicable alternatives lies with the project applicant").

As EPA explains it, "[t]he burden of proof to establish compliance with the Guidelines rest with the applicant; where insufficient information is provided to determine compliance, the Guidelines require no permit be issued." Memorandum to the Field, Subject: Appropriate Level of Analysis Required for

performing the LEDPA analysis, the Corps has "an obligation to independently verify the information supplied to it" by the applicant.[20]

As explained below, Tennessee Gas's LEDPA analysis is wholly inadequate. EPA instructs that, in order to comply with the Section 404(b)(1) Guidelines,

> the record [for an individual Section 404 permit] must contain sufficient information to demonstrate that the proposed discharge complies with the requirements of Section 230.10(a) of the Guidelines. The amount of information needed to make such a determination and the level of scrutiny required by the Guidelines is commensurate with the severity of the environmental impact (as determined by the functions of the aquatic resource and the nature of the proposed activity) and the scope/cost of the project.[21]

---

Evaluating Compliance with the Section 404(b)(1) Guidelines Alternatives Requirements (Aug. 23, 1993), *available at* 62 Fed. Reg. 31,492, 31,497–99 (June 9, 1997).

Indeed, in a May 2022 Pre-Application Meeting, the Nashville District "stressed that alternative analysis should be provided that would demonstrate LEDPA with quantitively [sic] criteria and in accordance with 404(b)(1) guidelines." U.S. Army Corps of Eng'rs, Nashville District, Memo. for Record, Subject: Pre-Application Meeting, File No. LRN-2021-00866 at 2 (24 May 2022).

[20] *Friends of the Earth v. Hintz*, 800 F.2d 822, 835 (9th Cir. 1986).

[21] Memorandum to the Field, Subject: Appropriate Level of Analysis Required for Evaluating Compliance with the Section 404(b)(1) Guidelines Alternatives Requirements (Aug. 23, 1993), *available at* 62 Fed. Reg. 31,492, 31,497–99 (June 9, 1997).

Here, the literature establishes that the potential environmental impacts could be severe and permanent.[22] Moreover, as discussed below, the cost of the project is nearly $200,000,000 and the proposed route involves a significant number of crossings.[23] Accordingly, a tremendous amount of information and scrutiny are required for the LEDPA analysis for this project. The application falls short of those requirements.

Under the Section 404(b)(1) Guidelines, there are at least two classes of practicable alternatives that must be considered:

(i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters; [and]

(ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters.[24]

For purposes of considering Tennessee Gas's application, alternatives under Subsection 230.10(a)(1)(i) should be considered "construction method alternatives," and alternatives under Subsection 230.10(a)(1)(ii) should be considered "routing alternatives." Tennessee Gas's presentation of both types of alternatives is so severely flawed that it borders on nonexistent, and the Corps must deny Tennessee Gas's application.

---

[22] *See generally* Section II.B.1, *infra.*

[23] Tenn. Gas Pipeline Co., L.L.C.; Notice of Application and Establishing Intervention Deadline, 87 Fed. Reg. 47,736, 47,736 (Aug. 4, 2022).

[24] 40 C.F.R. §230.10(a)(1)(i)–(ii).

## 1. TENNESSEE GAS HAS NOT REBUTTED THE PRESUMPTIONS APPLICABLE TO SPECIAL AQUATIC SITES.

As a threshold matter, it must be noted that Tennessee Gas has failed to rebut the presumptions of available alternatives applicable to special aquatic sites. For projects (like the Cumberland Pipeline) that are not water dependent, alternatives to discharges into special aquatic sites—which include, among other things, wetlands and streams with riffle-and-pool complexes—"are presumed to be available, unless clearly demonstrated otherwise."[25]

"The presumption of practicable alternatives 'is *very* strong[.]"[26] "The presumption for a non-water dependent project that a practicable alternative exists is not an automatic bar of issuance of a permit, but it does require that an applicant make a persuasive showing concerning the lack of alternatives."[27] Where that presumption applies, "the Corps may not issue a § 404 permit unless the applicant, 'with independent verification by the [Corps], . . . provide[s] detailed, clear and convincing information *proving*' that an

---

[25] *Id.* §230.10(a)(2).

[26] *Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d 1341, 1344 (8th Cir. 1994) (quoting *Buttrey v. United States*, 690 F.2d 1170, 1180 (5th Cir. 1982) (emphasis original)).

[27] *Utahns for Better Transp.*, 305 F.3d at 1163 (emphasis added).

alternative with less adverse impact is 'impracticable.'"[28] "[T]he burden is on the Applicant . . . , with independent verification by the [Corps] to provide detailed, clear and convincing information *proving* impracticability."[29] And the Corps must take a "hard look at the [applicant's] proposals" to determine whether the presumption of practicable alternatives has been overcome.[30]

Under the Section 404(b)(1) Guidelines, special aquatic sites include wetlands and streams with riffle and pool complexes.[31] Tennessee Gas's proposed activities would impact wetlands at seven locations.[32] The presumption of practicable alternatives applies to each wetland crossing.[33] Regarding riffle-and-pool complexes, the Section 404(b)(1) Guidelines state:

> (a)    Steep gradient sections of streams are sometimes characterized by riffle and pool complexes. Such stream sections are recognizable by their hydraulic characteristics. The rapid movement of water over a coarse substrate in riffles results in a rough flow, a turbulent surface, and high dissolved oxygen levels in the water. Pools are deeper areas associated with riffles. Pools are characterized by a slower stream velocity, a steaming flow, a

---

[28] *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004) (quoting *Utahns for Better Transp.*, 305 F.3d at 1186–87; modifications and emphasis in *Greater Yellowstone Coal.*).

[29] *Utahns for Better Transp.*, 305 F.3d at 1186 (emphasis original).

[30] *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156,1168 (10th Cir. 2012).

[31] 40 C.F.R. §§230.41, 230.45.

[32] Table 3 (rev. Mar. 2023).

[33] 40 C.F.R. §230.10(a)(2).

smooth surface, and a finer substrate. Riffle and pool complexes are particularly valuable habitat for fish and wildlife.

(b)    Possible loss of values: Discharge of dredged or fill material can eliminate riffle and pool areas by displacement, hydrologic modification, or sedimentation. Activities which affect riffle and pool areas and especially riffle/pool ratios, may reduce the aeration and filtration capabilities at the discharge site and downstream, may reduce stream habitat diversity, and may retard repopulation of the disposal site and downstream waters through sedimentation and the creation of unsuitable habitat. The discharge of dredged or fill material which alters stream hydrology may cause scouring or sedimentation of riffles and pools. Sedimentation induced through hydrological modification or as a direct result of the deposition of unconsolidated dredged or fill material may clog riffle and pool areas, destroy habitats, and create anaerobic conditions. Eliminating pools and meanders by the discharge of dredged or fill material can reduce water holding capacity of streams and cause rapid runoff from a watershed. Rapid runoff can deliver large quantities of flood water in a short time to downstream areas resulting in the destruction of natural habitat, high property loss, and the need for further hydraulic modification.[34]

The special protections afforded riffle-and-pool complexes by the Section 404(b)(1) Guidelines are well warranted. As Tennessee stream expert Barry Sulkin observes, riffle-and-pool complexes are

ecologically important to the quality of a stream. The riffle or drop section provides the greatest aeration and thus elevates dissolved oxygen (DO) in the stream—an essential component and measure of stream health for fish and other aquatic life—as well as habitat for some species with a preference for such sites. The aerated pools following the riffles provide habitat for species, such as fish, where they live, eat, seek shelter, and reproduce. Pools below riffles also provide preferential locations for fishing and other recreational activities such as wading and swimming.[35]

---

[34] *Id.* §230.45.

[35] Barry Sulkin, *Evaluation of Impacts to Riffle-and-Pool Complexes from the Proposed Cumberland Pipeline Project* 2 (Mar. 20, 2023) (attached as Exhibit

Tennessee Gas has made little to no effort to quantify the impacts its proposed activities will have on riffle-and-pool complexes or to distinguish in its various stream impact tables which streams have riffle-and-pool complexes at the crossing locations. Indeed, Tennessee Gas's application does not state whether riffle-and-pool complexes are present or absent at its proposed crossing locations.[36] Despite that omission, information in the applicant's hydrological determination supports the conclusion that such complexes are present at many of the proposed crossings.

Tennessee Gas used a "Hydrologic Determination Field Data Sheet" produced by the Tennessee Division of Water Pollution Control to identity water resources along the proposed route of the Cumberland Pipeline.[37] That field sheet includes a "Secondary Field Indicator Evaluation," which in turn

---

1); *see also* Rebecca Johansen, PhD, *Field Assessment of Big Bartons Creek, Located in Cumberland Furnace Tennessee* 2 (2023) (attached as Exhibit 2); Angela Mummaw, *Field assessment of seven crossing sites of the proposed methane gas pipeline by Tennessee Gas Pipeline Company, L.L.C. (TGP) for the Cumberland Project* (2023) (attached as Exhibit 3).

[36] The exception may be in Table 1's description of the crossing location of Bartons Creek, which is described as having a "ripple/run/pool complex." Table 1 (rev. Mar. 2023) at 6. As established in Dr. Rebecca Johansen's field report, there is a riffle-and-pool complex at the proposed crossing location of Bartons Creek, making it likely that the term "ripple" in its description of the Bartons Creek crossing location, was meant by Tennessee Gas to mean "riffle." Johansen at 1–2 (2023).

[37] *See, e.g.*, IP Application, att. 2, app. B at 3–4.

asks the user to evaluate "In-channel structure: riffle-pool sequences" on the following scale:

> 0 = Absent
> 1 = Weak
> 2 = Moderate
> 3 = Strong.[38]

Tennessee Department of Environment and Conservation guidance on the use of that field sheet defines the levels on that scale this way:

> *Strong* – Demonstrated by an even and frequent number of riffles followed by pools (every 5 – 7 channel widths or more frequent) along the entire reach. There is an obvious transition between riffles and pools.

> *Moderate* – Represented by a less frequent number of riffles and pools (every 10-14 channel widths). Distinguishing the transition between riffles and pools may be more difficult.

> *Weak* – Channels show occasional hydraulic diversity, but mostly exhibit long reaches of uniform hydraulics.

> *Absent* – There is no sequence exhibited.[39]

At minimum, then, a ranking of "Moderate" or "2" on riffle-and-pool complexes in the Secondary Field Indicator Evaluation should indicate the presence of those complexes.

---

[38] *See, e.g.*, *id.* at 4.

[39] Tennessee Department of Environment and Conservation, Division of Water Resources, *Guidance for Making Hydrologic Determinations v. 1.5* at 32 (April 2020) [hereinafter, "TDEC HD Guidance"] (attached as Exhibit 4).

Tennessee Gas's field agents did not even bother to fill out the Secondary Field Indicator Evaluation for at least 24 of the streams assessed.[40] And in at least 30 instances, the field agent was dissatisfied with the ranking system designed by the state agency, and created in-between categories by circling the line between the given rankings[41]—a method that does not appear to be sanctioned by the field sheet's guidance.[42] Accordingly, the limited data in Tennessee Gas's hydrologic determination cannot be used to define the universe of proposed stream locations where riffle-and-pool complexes are present.

What the available data do show, however, is that riffle-and-pool complexes are present at many of the proposed stream locations. Tennessee Gas's field agents ranked the riffle-and-pool complexes at 10 proposed discharge sites as "Moderate," ranked one proposed discharge site in between "Moderate" and "Strong," and ranked one proposed discharge site as "Strong."[43]

---

[40] *See generally* IP Application, att. 2, app. B.

[41] *Id.*

[42] *See generally* TDEC HD Guidance at 32.

[43] *See generally* IP Application, att. 2, app. B. The "Moderate" riffle-and-pool structures were observed at Porters Branch, Harris Branch, Miller Branch, Nesbitt Branch, two unnamed tributaries of Williamson Branch (SHNW003a and SHNW004a), Indian Branch, an unnamed tributary from Guices Branch (SHNE003), and an unnamed tributary to Guices Creek (SHNB030). *Id.* The "Moderate" to "Strong" riffle-and-pool complex was observed in Guices Creek, and the "Strong" riffle-and-pool complex was observed in an unnamed tributary to Bartons Creek (SDKA042). *Id.*

Those rankings establish that even Tennessee Gas should acknowledge that riffle-and-pool complexes are present at its proposed discharge sites. Nonetheless, the applicant makes no effort to rebut the presumption of available less damaging practicable alternatives applicable to such sites.

The short-shrift Tennessee Gas gives riffle-and-pool complexes is striking given Tennessee Gas's obligation to *avoid* impacting those special aquatic sites.[44] Because Tennessee Gas has treated riffle-and-pool complexes so dismissively in its application, the full extent to which Tennessee Gas is proposing to discharge into riffle and pool complexes cannot be determined. As a result, the Corps cannot yet know to which stream crossings the special aquatic site presumptions apply. **Accordingly, the Corps must require Tennessee Gas to evaluate every stream discharge location for the presence or absence of riffle-and-pool complexes before the Corps can process Tennessee Gas's application; otherwise the Corps will not be able to properly apply the special aquatic site presumptions.**

Tennessee stream expert Barry Sulkin reviewed Tennessee Gas's application and, based on his familiarity with the watersheds at issue and the topography and geology of the project area, concluded that "many or most of the streams proposed to be crossed by the Cumberland Pipeline Project are

---

[44] 40 C.F.R. §230.10(a)(2) (presuming availability of practicable alternatives); *see also Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 202 (4th Cir. 2009) (recognizing that an applicant must first *avoid* impacts, before turning to minimization and mitigation).

likely characterized by riffle-and-pool complexes." [45] Accordingly, the presumptions of less environmentally damaging practicable alternatives apply to "many or most" of Tennessee Gas's proposed stream crossings.

Sulkin examined Tennessee Gas's field sheets and photographs in its Hydrologic Determination. [46] Based on that review, Sulkin identified 16 discharge sites that appeared to have characteristics of riffle-and-pool complexes. [47] Those discharge sites include the following:

- Upper Sugarcamp Branch (SDKA023; proposed for two dry-ditch, open-cut crossings);

- Jordan Branch (SDKA026); [48]

- UT to Jordan Branch (SDKA027);

- Porters Branch (SDKA058);

- UT to Jones Creek (SDKA049);

- Gafford Branch (SDKA013);

- Miller Branch (SDKB001);

---

[45] Sulkin (2023) at 2.

[46] *Id.*

[47] *Id.* at 2–3.

[48] In its desktop review of unsurveyed portions of the pipeline route—conducted *after* Sulkin generated his report on an apparently incomplete application, Tennessee Gas identified a second crossing of Porters Branch. Table 1 (rev. Mar. 2023) at 2. The Corps should presume that there are also riffle-and-pool complexes at the additional Porters Branch discharge site because of its proximity to the previously proposed Porters Branch crossing.

- Bartons Creek (SDKB002);

- Furnace Creek (SDKB009);

- Dry Hollow Branch (SDKB011);

- Leatherwood Creek (SDKB026);

- Guices Creek (SHNA001);

- Lickskillet Branch (SHNB033; proposed for three dry-ditch, open-cut crossings).[49]

Moreover, Sulkin reviewed photographs and field reports from visits to a selection of streams in March 2023 coordinated by a biology professor from Austin Peay State University.[50] Based on his review of those photographs and field reports, Sulkin concluded that they confirmed the presence of riffle-and-pool complexes at each of the field studied locations. Those streams include:

- Bartons Creek;[51]

- Jordan Branch (SDKA026);[52]

- Gafford Branch (SDKA013);[53]

---

[49] Sulkin (2023) at 3.

[50] *Id.* at 4 (citing Mummaw (2023); Johansen (2023)).

[51] *Id.*; *see also* Johansen (2023) at 1–2.

[52] Sulkin (2023) at 4; *see also* Mummaw (2023) at 1–2.

[53] Sulkin (2023) at 4; *see also* Mummaw (2023) at 2–3.

- Furnace Creek (SDKB009);[54]

- Leatherwood Creek (SDKB026);[55] and

- Lickskillet Branch (SHNB033) (proposed for three dry-ditch, open-cut crossings).[56]

At minimum, the Corps must apply the presumption of an available LEDPA to the streams discussed in the Sulkin, Johansen, and Mummaw reports.[57] Sulkin's review also confirms that, before it can process Tennessee Gas's application, the Corps must require Tennessee Gas to evaluate each proposed stream crossing location for the presence or absence of riffle-and-pool complexes.[58] And the Corps must independently verify Tennessee Gas's claims about the presence or absence of riffle-and-pool complexes at every proposed stream crossing.[59]

The 404(b)(1) Guidelines' presumptions applicable to the wetlands and riffle-and-pool complexes in the Tennessee Gas's path are twofold. As the

---

[54] Sulkin (2023) at 4; *see also* Mummaw (2023) at 3–4.

[55] Sulkin (2023) at 4; *see also* Mummaw (2023) at 5–6.

[56] Sulkin (2023) at 4; *see also* Mummaw (2023) at 7–8.

[57] Sulkin (2023) at 4; Johansen (2023) at 1–2; Mummaw (2023) at 1–8.

[58] As Sulkin observes, that process may entail multiple site visits to each proposed crossing location. Sulkin (2023) at 2. Although the *presence* of riffle-and-pool complexes can be confirmed through a single site visit, "a negative finding requires follow-up during times when there is likely to be flow." *Id.*

[59] *See, e.g., Greater Yellowstone Coalition*, 359 F.3d at 1269.

Huntington District explains to applicants in its "Checklist for Preparing an Alternatives Analysis Under Section 404 of the Clean Water Act":

> The Guidelines include two rebuttable presumptions for projects with discharges of dredged and/or fill material into waters of the U.S. which involve special aquatic sites⧫ that do not require access to or siting within the special aquatic site(s) to achieve their basic essence (basic project purpose). All practicable alternatives not involving a discharge into special aquatic sites are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise. The **first presumption** states that alternatives that do not affect special aquatic sites are presumed to be available. The **second presumption** states that practicable alternatives located in non-special aquatic sites (e.g., other waters, uplands, etc.) have less adverse impact on the aquatic ecosystem. **It is the applicant's responsibility to clearly demonstrate to the Corps that both of these presumptions have been rebutted in order to pass the alternatives portion of the Guidelines.**[60]

Here, Tennessee Gas has failed to carry its burden to rebut either presumption.

Where Tennessee Gas proposes to use dry-ditch, open-cut crossings through wetlands and streams with riffle-and-pool complexes, Tennessee Gas has failed to clearly demonstrate that it can rebut the presumption that there are practicable alternatives that do not affect wetlands or streams with riffle-and-pool complexes. Tennessee Gas must rebut that presumption on a crossing-by-crossing basis. It has not done so either by clearly demonstrating that there are (1) no practicable "construction method alternatives" under

---

[60] Checklist for Preparing an Alternatives Analysis Under Section 404 of the Clean Water Act, Buffalo District – Regulatory Branch, Pittsburgh District – Regulatory Division, Huntington District – Regulatory Division (May 13, 2020) [hereinafter, "404 Alternatives Analysis Checklist"] (Exhibit 5) (emphasis original; internal footnote omitted).

Subsection 230.10(a)(1)(i) or (2) no practicable "routing alternatives" under Subsection 230.10(a)(1)(ii).

With regard to "construction method alternatives," as discussed elsewhere in these comments,[61] Tennessee Gas's application falls woefully short of establishing that a dry-ditch, open-cut crossing—as opposed to a trenchless crossing—is the LEDPA at any location, regardless of whether special aquatic sites are present. For those same reasons, Tennessee Gas has failed to clearly demonstrate that a practicable trenchless method is not available at any of the seven wetland impact sites or at any stream reach with riffle-and-pool complexes.

With regard to "routing alternatives," Tennessee Gas's conclusory and categorical statements in its application about alignment and right-of-way adjustments are insufficient to "clearly demonstrate"—at each and every wetland and stream with a riffle-and-pool complex—that there is no routing alternative available. Tennessee Gas must clearly demonstrate on a crossing-by-crossing basis that there are not routing changes that would allow it to avoid special aquatic sites.[62] On streams with riffle-and-pool complexes, such

---

[61] *See* Section II.A.2, *infra*.

[62] Section 404 of the Clean Water Act authorizes the Corps to issue permits for discharges at "specified disposal sites," and requires the Corps to specify—and therefore evaluate—"*each* such disposal site" through the application of the 404(b)(1) Guidelines. 33 U.S.C. §1344(a)–(b) (emphasis added); *see also Wild Bainbridge v. Mainlander Servs. Corp.*, 544 F. Supp. 2d 1159, 1163 (W.D. Wash. 2008) ("*Each* disposal site for which the Corps issues an individual permit must be specified in accordance with guidelines developed by the

a demonstration would entail showing that there are not upstream or downstream stream reaches without riffle-and-pool complexes across which the Cumberland Pipeline could be routed, and for wetlands such a demonstration would entail showing that wetland features cannot be avoided through minor alignment variations.

That particular failure has implications for the second presumption applicable to special aquatic sites. Not only do the Section 404(b)(1) Guidelines presume that there are practicable alternatives available to discharges in special aquatic sites, they also presume that discharges into waters of the United States at non-special aquatic site locations have fewer adverse environmental impacts.[63] Accordingly, as applied to the Cumberland Pipeline and streams with riffle-and-pool complexes, there are presumptions that (1) Tennessee Gas could avoid riffle-and-pool complexes through realignment to cross the feature outside of the riffle-and-pool complexes and (2) crossings in such locations would have fewer adverse environmental impacts. Because of the deficiencies in its application regarding riffle-and-pool complexes, Tennessee Gas has not clearly demonstrated that it can rebut those presumptions. Consequently, the Corps must deny its application.

---

Administrator of the Environmental Protection Agency in conjunction with the Corps." (emphasis added)).

[63] 404 Alternatives Analysis Checklist.

2. **TENNESSEE GAS CANNOT ESTABLISH THAT THERE ARE NOT LESS ENVIRONMENTALLY DAMAGING PRACTICABLE CONSTRUCTION METHOD ALTERNATIVES TO ITS PROPOSED DRY-DITCH, OPEN-CUT CROSSINGS.**

Tennessee Gas asks the Corps to allow it to use a dry-ditch, open-cut crossing to blast or trench through every stream that the Cumberland Pipeline would cross, except for four streams that would be crossed by three Horizontal Directional Drill ("HDD") crossings.[64] For the following reasons, Tennessee Gas has failed to carry its burden to establish that its proposed dry-ditch, open-cut crossings are the LEDPA at each proposed location.

### a. Tennessee Gas Fails To Consider A "No-Permit" Alternative On a Crossing-by-Crossing Basis.

Under the Section 404(b)(1) Guidelines, Tennessee Gas must show—**on a crossing-by-crossing basis**—that there is neither (1) a practicable "construction method alternative" for that crossing that would allow it to avoid discharges under Subsection 230.10(a)(1)(i), nor (2) a practicable "routing alternative" that would still involve discharges, but at "other locations" and

---

[64] IP Application at 35. The streams that Tennessee Gas would cross using HDD are Jones Creek, Yellow Creek and one of its unnamed tributaries, and Wells Creek. *Id.* Tennessee Gas's Resource Reports to FERC state that the company will use HDD to cross three additional streams—all unnamed tributaries to Jones Creek—because of their impaired status. Tennessee Gas Pipeline Co., LLC, Final Resource Report 2: Water Use and Quality, Cumberland Project, Docket No, CP22-)))-000 at 2-14 (July 2022) (attached as Exhibit 6). Inexplicably, Tennessee Gas's Section 404 permit application proposes dry-ditch, open-cut crossings for all of the unnamed tributaries of Jones Creek. Table 1 (rev. Mar. 2023) at 2–3. Tennessee Gas must explain that discrepancy before the Corps can act on its Section 404 application.

with fewer adverse impacts on the aquatic ecosystem under Subsection 230.10(a)(1)(ii).[65] In other words, the alternatives analysis, correctly framed, should ask whether Tennessee Gas can construct each of its 155 stream crossings and seven wetlands crossings without a Section 404 permit, either by implementing a crossing method that would not involve the discharge of dredged and/or fill material, or by selecting a minor alignment variation that entirely avoids the stream or wetland at issue.[66]

---

[65] Step 3 in the Huntington and Pittsburgh District's Checklist for Preparing an Alternatives Analysis Under Section 404 of the Clean Water Act—which requires that "the criteria used to establish [practicability] screens and how an alternative passes or fails the screen needs to be clearly elucidated and supported," and recommends a detailed alternatives comparison matrix and accompanying narrative—supports the requirement of a robust crossing-by-crossing analysis. 404 Alternatives Analysis Checklist.

[66] As noted above, Section 404 authorizes the Corps to issue permits for discharge at "specified disposal sites," and requires the Corps to specify—and therefore evaluate—"*each* such disposal site" through the application of the 404(b)(1) Guidelines. 33 U.S.C. §1344(a)–(b) (emphasis added); *see also Wild Bainbridge*, 544 F. Supp. 2d at 1163 ("*Each* disposal site for which the Corps issues an individual permit must be specified in accordance with guidelines developed by the Administrator of the Environmental Protection Agency in conjunction with the Corps." (emphasis added)).

The Section 404(b)(1) Guidelines require detailed information **about each disposal site**, and Tennessee Gas simply has not met that requirement. The 404(b)(1) Guidelines provide that "[d]ocumentation to demonstrate knowledge about . . . the candidate disposal site is an essential component of guideline application." 40 C.F.R. §230.6(a).

> **b. *Trenchless Crossing Methods Are The Least Environmentally Damaging Pipeline Crossing Methods. Tennessee Gas Has Failed to Establish on a Crossing-by-Crossing Basis That They Are Not Practicable at Locations Where it Proposes Dry-Ditch, Open-Cut Crossings.***

The Corps' analysis of Tennessee Gas's preferred crossing methods must start with this fundamental premise: "In general, avoidance of stream and wetland disturbances using trenchless methods is the least damaging alternative for waterbody crossings absent special site-specific conditions."[67] Silvis (2023) explains that trenchless methods are the "preferred method for pipelines to cross streams and wetlands to reduce negative environmental impacts … absent special site-specific factors."[68]

Silvis reaches that conclusion because "[t]renchless methods are associated with fewer short-term and long-term negative effects on aquatic ecosystems."[69] Silvis continues:

> [T]renchless construction allows the pipeline to cross streams and wetlands without disrupting riparian vegetation, stream bed substrate, wetland soils, and flow in streams and rivers, thereby reducing short- and long-term fish and macroinvertebrate mortality, and allows streams and wetlands to remain intact,

---

[67] Starr Silvis, *Evaluation of Tennessee Gas Pipeline Company, LLC's Application for a Department of the Army Permit for the Cumberland Project* 2 (May 10, 2023) (attached as Exhibit 7).

[68] *Id.* at 5.

[69] *Id.* at 2.

thereby reducing turbidity, suspended and settled sediment impacts.[70]

Silvis's conclusions are consistent with those of the pipeline regulatory community. For example, the New York State Department of Environmental Conservation ("NYSDEC") denied a Section 401 certification for open-cut pipeline stream and wetland crossings because the applicant refused to provide sufficient information about alternative trenchless crossing methods.[71] In its denial letter, NYSDEC concluded:

> Open trenching is a highly impactful construction technique involving significant disturbance of the existing stream bed and potential long-term stream flow disruption, destruction of riparian vegetation and establishment of a permanent cleared corridor. Comparatively, trenchless methods present significantly fewer environmental impacts to the regulated resource.[72]

The Federal Energy Regulatory Commission ("FERC") has reached similar conclusions on the environmental protection offered by trenchless crossings when compared to dry-ditch, open-cut crossings. Regarding the same pipeline for which NYSDEC denied a Section 401 Certification on the ground

---

[70] *Id.* at 5.

[71] *Constitution Pipeline Co., LLC v. N.Y. State Dept. of Envtl. Conservation*, 868 F.3d 87 (2d Cir. 2017). The United State Court of Appeals held that the state's denial of the Section 401 certification on those grounds was supported and permissible. *Id.* at 103.

[72] Letter from John Ferguson, N.Y. State Dept. of Envtl. Conservation, to Lynda Schubring, Constitution Pipeline Company, LLC, Re: Joint Application: DEC Permit # 0-9999-00181/00024 Water Quality Certification/Notice of Denial (Apr. 22, 2016) (attached as Exhibit 8).

that the applicant had not sufficiently considered trenchless crossings, FERC

concluded that

> [t]he potential impacts on waterbodies associated with the use of
> conventional bore or Direct Pipe trenchless crossing methods are
> considered minimal when compared to other crossing methods,
> The waterbody and its banks, and typically the entire immediate
> riparian zone, would not be disturbed by clear or trench; rather,
> the pipe would be installed below the feature.[73]

And in a recent Environmental Assessment of the effects of 120 proposed

trenchless pipeline crossings, FERC stated:

> In contrast to open-cut dry trenching, the use of a trenchless
> crossing method to cross an environmental resource such as a
> waterbody or wetland avoids direct impacts associated with
> working directly within the sensitive resource. Trenchless
> crossing methods allow for uninterrupted existing streamflow
> and undisturbed wetland soils, scrub-shrub, and herbaceous
> vegetation, thereby minimizing impacts on aquatic resources and
> wetland and wildlife habitat. Additionally, the proposed
> trenchless crossings would result in reduced in-stream
> sedimentation as compared to [dry-ditch, open-cut crossings].
> This reduction results from less disturbance of the riparian areas
> adjacent to the waterbodies and avoidance of impacts on the
> streambed. Lastly, trenchless crossings would avoid the ground
> disturbance associated with trenching and backfilling in the

---

[73] *Constitution Pipeline Co.*, 868 F.3d at 94 (quoting FERC Final
Environmental Impact Statement for the Constitution Pipeline, emphasis in
*Constitution Pipeline Co.*).

subject wetlands and reduce longer-term impacts by accelerating the post-construction revegetation period.[74]

FERC also determined in that same Environmental Assessment that, "[i]n general, typical pipeline effects on waterbodies are avoided with trenchless methods."[75]

### c. Tennessee Gas Has Failed to Establish on a Crossing-by-Crossing Basis That Trenchless Crossings Are Not Practicable at Locations Where it Proposes Dry-Ditch, Open-Cut Crossings.

Tennessee Gas has failed to carry its burden to establish that its proposed dry-ditch, open-cut crossings are exceptions to the general rule recognized by Silvis. Indeed, Tennessee Gas has utterly failed to justify its selections on a crossing-by-crossing basis, as it must, to satisfy the Section 404(b)(1) Guidelines. Silvis—an environmental engineering expert with extensive regulatory experience—reviewed Tennessee Gas's application and concluded that the absence of site-specific analysis of the feasibility of trenchless methods requires denial of the application.[76] As Silvis observes,

- "Tennessee Gas has not substantiated that any of the proposed crossings for which the company seeks a permit are the least environmentally

---

[74] Fed. Energy Regul. Comm'n, Mountain Valley Pipeline Amendment Project: Environmental Assessment 8 (Aug. 2021) [hereinafter, "FERC MVP EA"] (attached as Exhibit 9).

[75] *Id.* at 33.

[76] Silvis (2023) at 5–7.

damaging practicable alternative … . One of the most striking defects in Tennessee Gas's application is the company's failure to address the technical, logistical, and cost practicability of trenchless construction on a crossing-by-crossing basis for any of the proposed crossings beyond three HDD sites."[77]

- Because Tennessee Gas does not substantiate its crossing determinations with adequate information, it is Silvis's "professional opinion that trenchless methods are likely practicable for many more of the streams and wetlands that would be crossed by the pipeline than Tennessee Gas identifies. At a minimum, the deficiencies [in] the permit application make it impossible to conclude that Tennessee Gas's proposal is, in fact, the LEDPA. Accordingly, it is my professional opinion that Tennssee Gas has not demonstrated that any of its proposed open-cut crossings represent the least environmentally damaging practicable alternative."[78]

- "Since trenchless crossing methods are the least damaging to aquatic resources it is my professional opinion that trenchless crossing methods must, at a minimum, be evaluated on a crossing-by-crossing basis for use at all crossings. The application's failure to undertake this

---

[77] *Id.* at 5.

[78] *Id.* at 7.

individualized evaluation compels the conclusion that Tennessee Gas has not shown its proposed crossings are the LEDPA."[79]

- "Although the application at times suggests that Tennessee Gas may have developed an internal rationale for its proposed method at each crossing, those individual rationales are not provided in the application or other materials. These are glaring omissions because an individualized LEDPA analysis is required under the Section 404(b)(1) Guidelines, and because it is an industry standard in applications for individual DA permits to evaluate trenchless crossing alternatives prior to proposing trenched crossings such as dry open-cut crossings, in order to reduce potential water quality and stream impacts."[80]

- "[C]onventional boring is not evaluated for any waterbody crossings in the application."[81]

As Silvis notes,

> the application overlooks the apparent practicability of trenchless methods across the route as evidenced by statements in the application and associated materials. For example, conventional boring is proposed for multiple road crossings shown in Attachment 3 to Tennssee Gas's application, indicating that this trenchless method is appropriate for substrates found along the

---

[79] *Id.* at 5–6.

[80] *Id.* at 5.

[81] *Id.* at 6.

project length. However, conventional boring is not evaluated for any waterbody crossing in the application.[82]

That high level discussion of the technology is insufficient for the Corps to conclude that Tennessee Gas's application establishes that a dry-ditch, open-cut crossing is the LEDPA for any of the crossings where the applicant intends to employ it, however. Given the absence of site-by-site application of those factors, the Corps cannot independently verify—as it must—that Tennessee Gas's proposed activities are the LEDPA under the Section 404(b)(1) Guidelines.[83]

As the Huntington and Pittsburgh Districts make clear in their "Checklist for Preparing an Alternatives Analysis Under Section 404 of the Clean Water Act" ("Checklist"), "[t]he criteria used to establish [practicability screens] and how an alternative passes or fails the screen needs to be clearly elucidated and supported."[84] To accomplish this, the Checklist encourages applicants to use an alternatives-comparison matrix, with a detailed narrative.[85]

Because, as established above, trenchless crossings have fewer adverse environmental effects on streams and wetlands than open-cut crossings,

---

[82] *Id.* at 6.

[83] *Id.* at 5.

[84] 404 Alternatives Analysis Checklist.

[85] *Id.*

Tennessee Gas must either (1) employ a trenchless method at each crossing, or (2) present sufficient information to the Corps to allow the agency to independently verify that trenchless crossings are impracticable on a crossing-by-crossing basis. Tennessee Gas has not done so. That alone justifies denying the pending application.

### d. Tennessee Gas Has Not Evaluated All Trenchless Crossing Techniques.

Tennessee Gas's assessment of trenchless crossing methods is also deficient because it limits its consideration to only two trenchless crossing methods: horizontal directional drilling and conventional bore.[86] But there are additional trenchless methods that Tennessee Gas must consider as less environmentally damaging alternatives at each crossing. Four such methods are (1) guided conventional boring, (2) microtunneling, (3) Direct Pipe®, and (4) directional microtunneling.

**Guided conventional boring** is a variation of the conventional boring technique that uses pilot tubes to guide the auger.[87] Like conventional boring,

---

[86] IP Application at 28. Attachment 11 to Tennessee Gas's application briefly addresses Direct Pipe®, but that method is not discussed elsewhere in the application beyond Attachment 11, which Tennessee Gas admits it borrows from a 10-year-old application for a pipeline that was cancelled for insufficient consideration of trenchless crossings.

[87] Raymond L. Sterling, *Developments & Research Directions in Pipe Jacking and Microtunneling*, UNDERGROUND SPACE (BEIJING) VOLUME 5 at 4 (2020) [hereinafter "Sterling (2020)"] (attached as Exhibit 10), https://www.sciencedirect.com/science/article/pii/S2467967418301065/pdfft?m

this method is commonly used in waterbody crossings for natural gas pipelines.[88] Water can frequently be used in guided conventional boring to return drill cuttings and keep the cutting head cool, and where bentonite drilling fluids are used it is at a much lower pressure than with HDD.[89]

**Microtunneling** allows pipe jacking with accurate guidance, remote operation, and continuous support of the bore hole.[90] The technique has been used to construct natural gas pipeline crossings beneath valuable aquatic resources such as streams protected by the Wild and Scenic Rivers Act.[91] As FERC has observed, "microtunneling can be used in many soil types, including boulders and rock," and can "span 200 to 1500 feet."[92] Microtunneling "is often used in longer trenchless crossings because the advanced control and guidance

---

d5=6bbb7dc48a705e7bf1acc4b5a0f7a459&pid=1-s2.0-S2467967418301065-main.pdf.

[88] Williams Field Servs. Co., LLC et al., Application for a Certificate of Environmental Compatibility and Public Need to Construct an Approximately 9.5-Mile Natural Gas Gathering Line, New York Mainline Loop Natural Gas Pipeline Project, Case 13-T-____ at 17 (Dec. 2, 2013), https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={769A8A9D-418C-409C-9DD9-DC58FE8E6288}; FERC MVP EA at 12–13.

[89] FERC MVP EA at 12–13.

[90] Sterling (2020) at 2.

[91] *See, e.g.*, Rockies Express Pipeline LLC, 123 FERC ¶61234, ¶ 131 (May 30, 2008).

[92] FERC MVP EA at 14.

system allows for precise line and grade tolerances."[93] The technique uses little bentonite drilling fluid and at low pressure, minimizing inadvertent returns.[94]

***Direct Pipe®*** "is a hybrid technique combining aspects of microtunneling and HDD."[95] But, unlike HDD, "the borehole is never only mud supported" in this technique.[96] The risk of inadvertent return from Direct Pipe® installation is much lower than with HDD because of low pressures on the small quantities of drilling fluid used.[97] Because the borehole is continuously supported, and because of the low risk of hydraulic fracture, "the Direct Pipe® alignment can be designed much shallower than is typical for an HDD."[98] This method has been used to construct natural gas pipelines under waterbodies inhabited by species listed as threated under the ESA.[99]

***Directional microtunneling***, or curved microtunneling, "incorporate[s] the advantages of microtunneling, cartridge style feed of the pipe at entry and balancing earth pressures in a continuously cased tunnel,

---

[93] *Id.*

[94] *Id.*

[95] Sterling (2020) at 5.

[96] *Id.*

[97] FERC MVP EA at 13.

[98] *Id.*

[99] Transcontinental Gas Pipe Line Company, LLC, 141 FERC ¶ 61091, ¶¶ 53, 57 (Nov. 2, 2012).

with the curved alignment of a [Direct Pipe®] to reduce entry and exit pit excavation requirements."[100] Tennessee Gas used that method to complete a trenchless crossing for a methane pipeline in Pennsylvania.[101] The method has previously allowed Tennessee Gas to use a trenchless crossing method "in an area with geotechnical constraints that made traditional crossing methods high risk or prohibitively expensive."[102]

Despite the established use of guided conventional bore, microtunneling, Direct Pipe®, and directional microtunneling in natural gas pipeline resource crossings, and despite their environmental advantages over both dry-ditch, open-cut crossings and HDD, Tennessee Gas did not consider them as crossing method alternatives for the Cumberland Pipeline. Nor did the applicant provide an explanation for their omission. But it should have evaluated them for *every* crossing.[103] Because it did not, Tennessee Gas Company's LEDPA analysis is deficient, and the application should be rejected.

---

[100] Jonathan L. Robison & Jim Elmore, *Innovative Directional Microtunnel Garners Success for Crucial Trenchless Crossing*, PIPELINES 2014: FROM UNDERGROUND TO THE FOREFRONT OF INNOVATION AND SUSTAINABILITY 760 (2014), *available at* https://ascelibrary.org/doi/epdf/10.1061/9780784413692.069.

[101] *Id.* at 758.

[102] *Id.* at 768.

[103] The need for an analysis of alternative trenchless crossings extends also to Tennessee Gas's planned HDD crossings. As Silvis notes in her report, Tennessee Gas's feasibility study for the proposed HDD crossing of Yellow Creek notes the presernce of karst geology, increasing the risks of the loss of drilling fluid and "mak[ing] it crucial to evaluate the feasibility of other

### e. Tennessee Gas's Generalizations About Conventional Boring Are Unsupported And Cannot Justify Eliminating It As A Crossing Method On The Cumberland Pipeline.

Rather than engage in a thorough, site-specific analysis of trenchless crossing methods, Tennessee Gas chose to identify a only handful of general factors that *might* go into a site-specific analysis (had it conducted one) and to make various (and frequently unsupported) generalizations about HDD and conventional boring.[104] Those efforts fall short of what is required of a LEDPA analysis under the Section 404(b)(1) Guidelines.

Out the outset of the "Construction Methods Alternatives" section of its application, Tennessee Gas speaks of "preliminary geotechnical and geological studies" that it claims were undertaken.[105] But the application fails to include any site-specific discussion about how those "studies" might limit the availability of trenchless crossing methods at any particular location.

As FERC recently recognized, "[t]he conventional bore method is a technology that has been used for decades to install natural gas pipelines."[106] Nonetheless, Tennessee Gas dismisses its use for the Cumberland Pipeline based on a general and unsupported discussion of three factors Tennessee Gas

---

trenchless methods to minimize potential environmental impacts." Silvis (2023) at 20.

[104] IP Application, §2.7.5.

[105] *Id.* at 27.

[106] FERC MVP EA at 8.

claims limits the use of the technology. In each case, Tennessee Gas does so in the abstract, without any site-specific context.

*First*, Tennessee Gas maintains that crossing distances on the Project may preclude the use of conventional bore because, in Tennessee Gas's view, "[b]oring operations typically occur over a crossing distance of 50 to 60 feet" and "[t]he maximum length a bore could achieve in ideal soil conditions typically does not exceed 400 feet."[107] Tennessee Gas provides no citation to support those claims. Even if they were assumed to be true, however, they would remain unpersuasive because ***the widest stream that Tennessee Gas proposes to cross with an dry-ditch, open-cut crossing is Bartons Creek, with a span of 62.5 feet***.[108] As Silvis (2023) concludes, the width of the streams that Tennessee Gas proposes to cross "does not preclude the use of conventional boring at any proposed open-cut crossing."[109]

*Second*, Tennessee Gas insinuates that "subsurface soil and geologic conditions" might "limit the success of a boring operation under waterbodies for the project."[110] Tennessee Gas does not refer to the subsurface soil or geologic conditions at any particular crossing location, but instead generalizes

---

[107] IP Application at 34.

[108] Table 1 (rev. Mar. 2023) at 6; *see also* Silvis (2023) at 6.

[109] Silvis (2023) at 6.

[110] IP Application at 33.

about preferences for "[l]oose packed soil, free of rock material."[111] Tennessee Gas's *ipse dixet* assertion contradicts recent descriptions of the capabilities of conventional boring technology by FERC, where that agency concluded that "[b]oulders and cobbles up to one third of the diameter of the installed pipe can be accommodated" in conventional boring.[112]

In any event, there are certainly subsurface soil and rock conditions in the Project area that are conducive to conventional boring because Tennessee Gas has committed to using that method to install its proposed pipeline under paved roads in the Project area.[113] Tennessee Gas should be required to provide crossing-specific evidence of adverse geological conditions that contraindicate conventional bore before it is allowed to afford fewer protections to Tennessee's aquatic resources than it does to paved roads.

***Third***, Tennessee Gas asserts (again without support) that "[t]he topographic conditions for most waterbody crossing locations on this Project also limit the use of [conventional bore], as preferred locations are generally consistent with level or moderately convex terrain, such that the depth of the bore pit does not present concerns relative to constructability or safety

---

[111] *Id.*

[112] FERC MVP EA at 9.

[113] Fed. Energy Regul. Comm'n, Draft Environmental Impact Statement for the Cumberland Project at tbl. 2.4-3 (Feb. 2023) [hereinafter, "DEIS"].

concerns."[114] As Silvis notes, however, Tennessee Gas has failed to meet industry standards of providing topographic information in its site plan mapping.[115] Without such topographical information, "[i]t is impossible to verify grades or stream crossing locations" to confirm Tennessee Gas's general assertion of impracticable topography any particular crossing location.[116] Moreover, Tennessee Gas's asserted topographical limitations on the use of conventional bore on the Cumberland Pipeline are undermined by FERC's approval of the use of that technique on a project in the steep slopes of Central Appalachia. That project will involve bore pits as deep as 57 feet on grades that could exceed 30% (so long as the slope was less than 400 feet long).[117]

Following its inadequate and unsupported description of the conventional bore technique, Tennessee Gas purports to offer a contrast of "*HDD/Conventional Bore Methods versus Conventional Dry Open Cut Crossing Methods.*"[118] That section of Tennessee Gas's application appears to have been written as a contrast between just HDD and dry-ditch, open-cut

---

[114] IP Application at 34.

[115] Silvis (2023) at 21 ("Industry standard is to provide topographic information and stream locations on site plan mapping.").

[116] *Id.*

[117] FERC MVP EA at 95, app. D

[118] IP Application at 34–35.

crossings, with conventional boring added as an afterthought and without consideration of the differences between HDD and conventional boring.

For example, Tennessee Gas tries to emphasize the comparative risks of inadvertent returns between open-cut crossings and trenchless crossings, stating, "[t]here are no risks of inadvertent returns for a conventional open cut crossing," while suggesting that there is a high risk of such returns from conventional bore.[119] Not so. FERC recently concluded that "[t]here would be *no risk of inadvertent release of drilling fluids*" from conventional bores proposed for a different methane gas pipeline project.[120] That is because during a conventional bore, "the borehole is continuously supported by pipe throughout the process," rendering unnecessary "the circulation of drilling fluids to transport drill cuttings and to support the walls of the borehole."[121]

Moreover, although Tennessee Gas sets out six factors it claims to have considered "when evaluating the use of trenchless HDD or conventional bore crossing methods versus a dry open-cut method for Project waterbody crossings," its application is absolutely devoid of any evidence that Tennessee Gas applied those factors on a crossing-by-crossing basis, as opposed to just

---

[119] *Id.*

[120] FERC MVP EA at 92.

[121] *Id.* at 9. Risks of inadvertent return are similarly low with the trenchless crossing methods Tennessee Gas failed to consider, such as guided conventional bore, microtunneling, and Direct Pipe®. *Id.* at 12–14.

making generalizations about the technologies and choosing a method based on its own convenience. As Silvis notes, "[a]lthough the application at times suggests that Tennessee Gas may have developed an internal rationale for its proposed method at each crossing, those individual rationales are not provided in the application or other available materials."[122] As discussed above, and emphasized by Silvis, "[t]he preferred method for pipelines to cross streams and wetlands to reduce negative environmental impacts is through trenchless construction absent site-specific factors."[123] Because of the site-specific nature of the analysis, "[o]ne of the most striking defects in Tennessee Gas's application is the company's failure to address the technical, logistical, and cost practicability of trenchless construction on a crossing-by-crossing basis[.]"[124]

Moreover, the notion that Tennessee Gas might have done a crossing-by-crossing evaluation of trenchless methods and rejected those methods because of technical impracticability is fatally undermined by the company's statement that it may use trenchless methods if it encounters adverse flow conditions at proposed dry-ditch, open-cut crossings.[125] As Silvis observes,

> These statements indicate that Tennessee Gas prioritized trenched crossings except where they are impracticable instead of the other way around, starting with trenchless techniques for all

---

[122] Silvis (2023) at 5.

[123] *Id.*

[124] *Id.*

[125] IP Application at 34.

sites unless they are shown to be impracticable. As stated above, trenchless crossings are less environmentally damaging than open-cut (*i.e.* trenched) crossings absent special site-specific circumstances. Therefore they should be the first option evaluated when determining the LEDPA.[126]

Finally, Tennessee Gas's generalizations about the cost of trenchless crossing methods are insufficient to justify their rejections. Tennessee Gas asserts that "[c]osts associated with a HDD and conventional bore, in general, may be five (5) times more per foot than costs for a conventional crossing using open cut methods, which can become prohibitive to the Project budget" and directs the Corps to Attachment 11 to support that claim.[127] As discussed further below, Attachment 11 is a decade-old, high-level summary of trenchless methods developed for a different project—a pipeline that was ultimately cancelled after it could not obtain permits because of its proponent's failure to evaluate and implement trenchless crossings more broadly. Because the summary in Attachment 11 is a decade old, and does not support Tennessee Gas's "five (5) times more per foot" assertion in any event, Tennessee Gas must provide additional information before it can reject trenchless crossings on the basis of cost.

---

[126] Silvis (2023) at 7.

[127] IP Application at 34.

As EPA has emphasized, "[g]enerally, as the scope/cost of the project increases, the level of analysis should also increase."[128] The Cumberland Project is expected to cost nearly $200,000,000 and will bring guaranteed and substantial revenue to Tennessee Gas. Accordingly, the level of analysis required to determine whether the costs of trenchless crossings are practicable is substantial.

In the context of the Project's overall budget, the costs of the trenchless crossings Tennessee Gas has rejected may be insignificant. Tennessee Gas asserts, without support, that the costs may "become prohibitive to the project budget."[129] But, on an industry-wide basis, it is acknowledged that the "direct costs of various [stream] crossing techniques are difficult to predict" because of, among other things, necessary contingency factors.[130]

As EPA explained in its August 23, 1992 Memorandum to the Field, Subject: Appropriate Level of Analysis Required for Evaluating Compliance with the Section 404(b)(1) Guidelines Alternatives Requirements, "[t]he

---

[128] Memorandum to the Field, Subject: Appropriate Level of Analysis Required for Evaluating Compliance with the Section 404(b)(1) Guidelines Alternatives Requirements (Aug. 23, 1993), *available at* 62 Fed. Reg. 31,492, 31,497–99 (June 9, 1997).

[129] IP Application at 34.

[130] Canadian Ass'n of Petroleum Producers et al., Pipeline Associated Watercourse Crossings 3rd Ed., §4.4.1 (2005), *available at* http://registry.mvlwb.ca/Documents/MV2010L1-0001/MV2010L1-0001%20-%20Pipeline%20Associated%20Watercourse%20Crossings%20-%20May12-10.pdf.

determination of what constitutes an unreasonable expense should generally consider whether the projected cost is substantially greater than the costs normally associated with the particular type of project. Generally, as the scope/cost of the project increases, the level of analysis should also increase."[131] EPA further explained that "[i]t is important to emphasize . . . that it is not a particular applicant's financial standing that is the primary consideration for determining practicability, but rather characteristics of the project and what constitutes a reasonable expense for these projects that are most relevant to practicability determinations."[132]

Oil and gas pipelines are frequently multi-million-dollar affairs, and their capital costs have been increasing in recent years.[133] Stream crossings "strongly affect pipeline construction costs."[134] Because the cost practicability component must be evaluated in the context of natural gas pipelines generally, and because such pipelines frequently cost hundreds of millions of dollars to

---

[131] That memorandum is available from multiple sources, including in the Federal Register at 62 Fed. Reg. 31,492, 31,498–99 (June 9, 1997), and at https://www.epa.gov/cwa-404/memorandum-appropriate-level-analysis-required-evaluating-compliance-cwa-section-404b1.

[132] *Id.*

[133] *Oil and Gas Pipeline Construction Costs*, Global Energy Monitor Wiki, https://www.gem.wiki/Oil_and_Gas_Pipeline_Construction_Costs#cite_note-source1-1.

[134] *Id.* (citing *Natural Gas Pipeline Profits, Construction Both Up*, OIL & GAS JOURNAL (Sept. 5, 2016)).

build—with significant construction costs turning on the frequency of stream crossings—the cost increase that would result from implementing trenchless crossings are highly unlikely to render such methods impracticable from a cost standpoint. Indeed, FERC recently approved a request by a natural gas pipeline to construct more than 100 stream crossings using conventional bore, establishing that natural gas pipelines maintain financial viability even with frequent use of trenchless crossings.[135]

In any event, the materials submitted by Tennessee Gas to date—without crossing-by-crossing comparisons of the projected costs of trenchless crossings to dry-ditch, open-cut crossings—are certainly insufficient to support a conclusion that additional trenchless crossings are impracticable because of cost. As with other aspects of the LEDPA analysis, the Corps has a duty to independently verify the applicant's assertions.[136] On this record, the Corps cannot conclude that trenchless crossings are impracticable on the basis of cost.

### f. Tennessee Gas Relies on A Stale and Unpersuasive Document to Support Its Contentions About Crossing Methods.

In an attempt to justify its unsupported rejection of trenchless crossing methods for the overwhelming majority of its proposed crossings, Tennessee Gas includes a one-page table that generally describes three trenchless

---

[135] *Mountain Valley Pipeline, LLC*, 179 FERC ¶61,013, 2022 WL 1058057 (Apr. 8, 2022).

[136] *See, e.g., Hintz*, 800 F.2d at 835.

methods as Attachment 11 to its Section 404 application.[137] The source for Attachment 11 is a November 2013 effort by the proponent of the since-cancelled Constitution Pipeline to avoid using trenchless methods to the degree requested by regulatory authorities.[138] Attachment 11 is unpersuasive for a number of reasons.

*First*, it is outdated and stale. Attachment 11 is a decade old, yet Tennessee Gas holds it out as an authority on the technical and cost limitations on conventional bore, HDD, and Direct Pipe®.[139] It cannot bear the weight Tennessee Gas would put on it by dint of its age alone.

*Second*, Attachment 11 is inherently unpersuasive because of its source. Indeed, Tennessee Gas's reliance on any aspect of the trenchless crossing analysis from the Constitution Pipeline is surprising. State regulators found the stubborn refusal of proponents of that pipeline to even evaluate trenchless crossings so unsubstantiated that they denied a Section 401 certification for the pipeline's proposed open-cut crossings, and a federal

---

[137] IP Application, attachment 11.

[138] *Id.*; *see generally Const. Pipeline Co.*, 868 F.3d at 102–03.

[139] IP Application, att. 11.

appellate court upheld that reasoning.[140] Like Tennessee Gas does here,[141] the proponents of the Constitution Pipeline cited "industry recognized standard[s]" in refusing to further evaluate trenchless crossing methods.[142] New York regulators and the United States Court of Appeals for the Second Circuit alike rejected that reasoning. As the Second Circuit explained, "Industry preferences do not circumscribe environmental relevance."[143]

### g. *Tennessee Gas Has Not Presented A Sufficient LEDPA Review of Rock Removal Alternatives.*

Even if Tennessee Gas were to establish that a dry-ditch, open-cut crossing were the LEDPA for any particular crossings (which it has not), its application would still fail to establish that its proposed *trenching* or rock removal methods are the LEDPA at each site.[144]

---

[140] *See generally Const. Pipeline Co.*, 868 F.3d at 102–03; *see also* Letter from John Ferguson, N.Y. State Dept. of Envtl. Conservation, to Lynda Schubring, Constitution Pipeline Company, LLC, Re: Joint Application: DEC Permit # 0-9999-00181/00024 Water Quality Certification/Notice of Denial (Apr. 22, 2016) (attached as Exhibit 8).

[141] IP Application at 28 ("TGP evaluated various waterbody crossing alternatives that meet accepted pipeline construction using TGP standards and industry practices.").

[142] *Const. Pipeline Co.*, 868 F.3d at 102.

[143] *Id.* at 103.

[144] Silvis (2023) at 7.

Tennessee Gas has designated blasting as the rock removal method for 29 stream crossings, and identified 20 additional locations as being "Candidate[s] for Blasting."[145] But, as Silvis observes, in-stream blasting

> is the most destructive and potentially environmentally damaging of all waterbody crossing methods. Blasting causes permanent changes to stream channel roughness, composition, and function, and may cause deposition of rock debris in channel. Blasting also may cause fissures, crack, and other alteration of subsurface structure that can lead to hydrologic losses. Additionally, blasting creates dust that may deposit in-stream and contribute to increased turbidity and sedimentation.[146]

Because of the Section 404(b)(1) LEDPA requirements, and because of the devastating impacts of in-stream blasting, the Corps cannot authorize Tennessee Gas to blast trenches through the streams in its path without an independently verified demonstration that no other rock removal options are practicable.[147]

Tennessee Gas's application does not even try to make that demonstration. Instead, it seeks to allow field construction contractors to make decisions about blasting on the fly.[148] That delegation of LEDPA analysis to crews in the field is extremely alarming. In expert environmental engineer

---

[145] *See generally* IP Application, tbl. 2.7-3 & att. 3; *see also* Silvis (2023) at 9–11 (synthesizing tbl. 2.7-3 & att. 3).

[146] Silvis (2023) at 7.

[147] *Id.* at 7–12.

[148] *Id.* at 8.

Silvis's "professional opinion, allowing contractors to make decision on the fly results in increased probability of negative impacts to aquatic resources."[149]

The Section 404 application identifies five options for rock removal: conventional excavation with an excavator, ripping with an excavator equipped with a ripping tooth, hammering, use of a rock trencher, or blasting.[150] Even Tennessee Gas concedes that, because of its environmental risks, blasting "is not generally considered to be the LEDPA at locations where other methods are feasible and practicable."[151] Nonetheless, Tennessee Gas does not present the Corps with a crossing-by-crossing analysis of whether the other identified methods are practicable. Instead, Tennessee Gas says it will leave that task to its construction contractor.[152]

As a result, the Corps cannot issue the permit sought by Tennessee Gas. The time to identify the LEDPA is in the permit application and review process—not on the bank of a stream with the key to an excavator in one hand and an explosive in the other. Tennessee Gas would have the Corps delegate its obligation to verify the LEDPA to its construction crews—who will be far more susceptible to time and cost pressures in their on-the-fly evaluation of

---

[149] *Id.*

[150] IP Application at 30.

[151] *Id.* at 32.

[152] *Id.* at 30.

what is "practicable." Fortunately for the streams in the path of the Cumberland Pipeline, the Corps cannot so-delegate its responsibilities under the Section 404(b)(1) Guidelines.

Moreover, Tennessee Gas's scheme to allow its construction crew to evaluate and attempt a minimum of *one* alternative rock-removal method before resorting to blasting [153] is inconsistent with what the Tennessee Department of Environment and Conservation ("TDEC") expects and requires. In its November 3, 2022 request for additional information, TDEC told Tennessee Gas that review of its application could not resume until, among other things, Tennessee Gas accepted TDEC's requirement "that the contractor evaluate and attempt *all* non-blasting techniques at each stream crossing[.]"[154] In its response to TDEC, Tennessee Gas reserved the right to unilaterally deem a non-blasting technique as impracticable based on its contractors' evaluation of technical considerations *and cost*.[155] That response further emphasizes that Tennessee Gas is uninterested in evaluating the practicability of alternatives to blasting during the application and permitting process, and wants to

---

[153] *Id.*

[154] Letter from Claire Wainwright, PhD, Natural Resources Unit, Tenn. Dept. of Envt. & Conservation, to Gina Dorsey, Tennessee Gas Pipeline, LLC, Re: Request for Additional Information at 3 (Nov. 3, 2022) (attached as Exhibit 11).

[155] Letter from Blake Amos, Tennessee Gas Pipeline Company, LLC, to Claire Wainright, PhD, Tenn. Dept. of Envl. & Conservation, Re: Request for Additional Information Response, Enclosure at 14 (Dec. 1, 2022) (attached as Exhibit 12).

maintain the flexibility to allow construction contractors to make on-the-fly judgment calls based on their perceptions of "cost," notwithstanding the technical practicability of the alternatives. The Section 404(b)(1) Guidelines, however, require the LEDPA to be determined *before* a permit is issued, and do not permit that evaluation to be deferred to a later date, or deferred to the discretion of an unaccountable construction contractor.

### 3. TENNESSEE GAS CANNOT ESTABLISH THAT THERE ARE NOT LESS ENVIRONMENTALLY DAMAGING PRACTICABLE ROUTE VARIATIONS.

As discussed elsewhere in these comments, Tennessee Gas's limited discussion of routing alternatives does not provide the requisite level of detail for the Corps' alternatives analysis. Tennessee Gas must examine whether there are routing alternatives that will allow it to avoid certain resources, including by crossing waterbodies at locations that would have fewer impacts.

Subpart H of the Section 404(b)(1) Guidelines imposes an obligation on the applicant to consider actions to minimize adverse effects.[156] For example, the applicant must reduce the effects of the discharge through its choice of disposal site.[157] Applicants must also select discharge sites to minimize adverse effects on plant and animal populations.[158] Accordingly, Tennessee

---

[156] *See* Section II.D, *infra*, for discussion of other minimization issues with Tennessee Gas's application.

[157] 30 C.F.R. §230.70.

[158] *Id.* §230.75.

Gas is obligated to evaluate routing alternatives that would avoid stream reaches with sensitive plant and animal species, special aquatic sites, and other sensitive resources. And it must do so on a crossing-by-crossing basis. That is, it must look at each crossing and determine whether modest alignment changes would allow it to select a crossing location with fewer environmental impacts or avoid the aquatic resource entirely. For most stream and wetland resources, there is no evidence in the application that Tennessee Gas has done so.

Tennessee Gas's Section 404 application presents only 13 "minor route variations."[159] Of those 13, only three discuss *avoidance* of aquatic resources, but the descriptions of those resources make it unclear whether they are waters of the United States.[160] Two other minor route variations appear to address minimization of impacts to aquatic resources because their stated purpose was to allow "more perpendicular" dry-ditch, open-cut stream crossings.[161] Although insufficient to constitute a complete alternatives analysis because they only address a handful of streams, those minor route

---

[159] IP Application at 23–27. Only ten minor route variations are addressed in FERC's DEIS. *See* Section II.A.5.c, *infra*.

[160] A route variation at milepost 12.5 avoids a "pond," a route variation at milepost 16.5 avoids a "spring," and a route variation at milepost 25 "avoids difficult side slope and stream construction." IP Application at 25–26.

[161] A route variation at milepost 22.7 allows for more perpendicular crossings of two unnamed tributaries of Yellow Creek and a route variation at milepost 26 allows for a more perpendicular crossing of Guices Creek. *Id.* at 26.

variations nonetheless establish that Tennessee Gas can avoid or minimize impacts to aquatic resources through minor route variations. For example, the route variation at milepost 12.5 to avoid a pond adds only *38 feet* to the length of the Cumberland Pipeline.[162]

Moreover, Tennessee Gas says in its application that it "will continue to consider multiple minor route variations" and that it "continues to refine the pipeline route and address route variations."[163] Thus, Tennessee Gas in essence concedes that additional minor route variations to avoid or minimize effects on waters of the United States that are practicable and less environmentally damaging may exist. Tennessee Gas should have evaluated minor route variations at each crossing *before* it submitted its Section 404 application. Because Tennessee Gas did not do so, its application fails to provide sufficient detail to determine whether there are practicable routing alternatives under 30 C.F.R. §230.10(a)(1)(ii). Accordingly, the Corps should deny the application.

### 4. TENNESSEE GAS'S APPLICATION IS INCOMPLETE BECAUSE IT FAILS TO ENGAGE IN A LEDPA ANALYSIS FOR ROAD CROSSINGS.

Another fatal deficiency in Tennessee Gas's application is that it presents no crossing-by-crossing determination of whether the proposed road

---

[162] *Id.* at 25.

[163] *Id.* at 23–24.

crossings use the least environmentally damaging practicable alternative or are at the least environmentally damaging location.

Tennessee Gas has proposed 18 access road crossings of streams, and one of a wetland.[164] Although Tennessee Gas asserts that it "is not proposing to install any permanent culverts or permanent installation of gravel or rock into waterbodies or wetlands crossed by the Project's access road," it reserves the right to "temporarily" (a term without definition) install gravel or rock in waterbodies or wetlands.[165] Moreover, although Tennessee Gas appears to contemplate "temporary equipment bridges" for road crossings, it does not clarify whether those bridges will span aquatic resources from bank to bank, or whether they will be placed on streambeds or in wetlands.[166] And Tennessee Gas's application provides no site-specific information about road crossing methods.

Silvis (2023) concludes that "[t]he preferred access road method for avoidance of environmental impacts is spanning from dry ground beyond the existing top-of-bank on both sides of stream."[167] Tennessee Gas provides no alternatives analysis of the practicability of spanning each of its proposed road

---

[164] Table 3 (rev. Mar. 2023); IP Application, tbl. 2.1-1.

[165] IP Application at 64.

[166] *Id.*

[167] Silvis (2021) at 13.

crossings. As Silvis observes, "Tennessee Gas provides no detail on how its road crossings would be accomplished nor how the non-bridging options would be designed to reduce the likelihood of permanent impacts."[168] Silvis further identifies the advantages and disadvantages of a series of road crossing alternatives.[169]

Without explaining what technique it will use at each road crossing, and justifying that selection as the least environmentally damaging practicable alternative at each crossing, Tennessee Gas cannot carry its burden to provide sufficient information to establish that the proposed discharges associated with its road crossings comply with the 404(b)(1) Guidelines. This is particularly true with respect to its road crossings in special aquatic sites like wetlands and streams with riffle and pool complexes, where there are presumptions that practicable alternatives exist and the applicant must clearly demonstrate that it can rebut those presumptions before being allowed to proceed.[170]

---

[168] *Id.*

[169] *Id.*, tbl. 3.

[170] *See* Section II.A.1, *supra.*

**5. THE CORPS MUST PREPARE A SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT ("EIS") OR INSIST ON SIGNIFICANT CHANGES TO AND ADDITIONAL COMMENT ON FERC'S DRAFT EIS ("DEIS") BECAUSE THAT NEPA DOCUMENT DOES NOT CONTAIN ADEQUATE INFORMATION TO ALLOW THE CORPS TO DETERMINE THE LEAST ENVIRONMENTALLY DAMAGING PRACTICABLE ALTERNATIVE OR SATISFY NEPA'S REQUIREMENTS WITH REGARD TO THE ENVIRONMENTAL EFFECTS OF THE PROPOSED STREAM AND WETLAND CROSSINGS.**

As discussed above, the Corps cannot determine the least environmentally damaging practicable alternative without analyzing significant outstanding information regarding the potential for Tennessee Gas to avoid and minimize aquatic impacts through the use of alternative construction methods—including the practicability of using trenchless crossing methods at all waterbody crossings—and minor route variations. [171] In assessing the practicability and impacts of employing such construction methods and route variations, the Corps may not rely on FERC's EIS because, like Tennessee Gas's Section 404 application, the DEIS indicates it will lack the essential information. Unless the Corps insists on major changes in the final FERC EIS and FERC obliges, the Corps must prepare, either on its own or in conjunction with FERC, a Supplemental EIS ("SEIS").[172]

---

[171] *See* Sections II.A.1, II.A.2, and II.A.3, *supra.*

[172] The flaws in FERC's DEIS that preclude the Corps' reliance on it are in addition to the fatal defects in the DEIS's climate change evaluations discussed in section III.B.

Corps regulations explain that "the analysis of alternatives required for NEPA environmental documents, including supplemental Corps NEPA documents, will in most cases provide the information for the evaluation of alternatives under these Guidelines."[173] However, "[o]n occasion, these NEPA documents . . . may not have considered the alternatives in sufficient detail to respond to the requirements of these Guidelines," such that it is "necessary to supplement these NEPA documents with this additional information."[174]

Tennessee Gas's pending application presents just such a situation, such that supplemental NEPA analysis is required. Consideration of alternatives "is the heart of the environmental impact statement."[175] The "discussion of alternatives must rigorously explore and objectively evaluate all reasonable alternatives."[176] The obligation to consider alternatives flows from the NEPA statute itself and exists for any proposal, such as the Cumberland Pipeline, "which involves unresolved conflicts concerning alternative uses of available resources."[177]

---

[173] 40 C.F.R. §230.10(a)(4).

[174] *Id.*

[175] *Id.* §1502.14.

[176] *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 568 (D.C. Cir. 2016).

[177] 42 U.S.C. §4332(2)(E).

The Corps is a cooperating agency on FERC's EIS.[178] The DEIS acknowledges that the Corps must complete an independent review of the DEIS before adopting it, and that the Corps "must consider whether the proposed projects represent the least environmentally damaging practicable alternative."[179]

Because the alternatives analysis in FERC's DEIS does not analyze the feasibility or impacts of crossing waterbodies using trenchless crossing techniques such as conventional boring, microtunneling, DirectPipe®, or directional microtunnelling, and does not evaluate the potential for minor, crossing-specific route variations to avoid aquatic impacts—including impacts to special aquatic sites— the DEIS did not satisfy the Corps' NEPA obligations and it appears the EIS will be similarly deficient, requiring the Corps to conduct additional NEPA review. Again, the Section 404(b)(1) Guidelines make clear that the Corps cannot simply treat FERC's alternatives analysis in the DEIS as conclusive. Section 230.10(a)(4) requires the Corps to ensure that NEPA documents are supplemented to include sufficient detail to respond to the requirements of the Guidelines.[180] And Section 230.10(a)(5) requires alternatives analysis considered by another permitting authority to be

---

[178] DEIS at 1-5.

[179] *Id.*

[180] 40 C.F.R. §230.10(a)(4).

supplemented when less complete than the analysis contemplated under Section 230.10(a).[181] Those regulations combine here to require the Corps to give closer scrutiny to alternative stream-crossing methods and route variations affecting streams and wetlands than FERC provided in the DEIS. Under these circumstances, it would be arbitrary and capricious for the Corps to rely on FERC's DEIS to satisfy its NEPA and Clean Water Act obligations.[182] As at least one federal appellate court has held, "an agency may only adopt [another agency's NEPA document] if it 'meets the standards for an adequate statement' under the applicable regulations."[183] If a NEPA document precludes meaningful analysis of an issue, then the potential adopting agency must conduct an independent review of that issue.[184] And if an agency acquiesces to

---

[181] *Id.* §230.10(a)(5).

[182] *See Cowpasture River Pres. Ass'n v. U.S. Forest Serv.*, 911 F.3d 150, 168 (4th Cir. 2018) (holding that the U.S. Forest Service wrongfully relied on the alternatives analysis in FERC's EIS for the Atlantic Coast Pipeline, which evaluated only whether a listed alternative "confers a significant environmental advantage over the proposed route," where the U.S. Forest Service had an independent legal obligation to analyze alternatives to determine whether "the proposed use *cannot reasonably be accommodated* off of National Forest System lands" (emphasis in original)), *reversed on other grounds*, 140 S.Ct 1837 (2020).

[183] *Id.* at 170.

[184] *Id.*

an inadequate alternatives analysis, such an action is arbitrary and capricious.[185]

### a. FERC's Alternatives Analysis Methodology in the DEIS Is Not Consistent with the Analysis of Alternatives Necessary for the Corps to Determine the Least Environmentally Damaging Practicable Alternative.

The criteria that FERC used to evaluate alternatives are not co-extensive with the criteria the Corps must consider when determining whether a proposed project is the least environmentally damaging practicable alternative. FERC considered only (1) the ability of alternatives "to meet Project objectives," (2) the "reasonableness, practicality, and technical and economic feasibility of the alternative," and (3) "whether [an] alternative would have a significant environmental advantage over the Proposed Action."[186] The Corps' LEDPA analysis, in contrast, focuses on whether an alternative would have "less adverse impact on the aquatic ecosystem."[187]

### b. FERC's DEIS Did Not Analyze the Feasibility or Impacts of Crossing Waterbodies Using Trenchless Methods Such as the Conventional Bore.

As explained above, the Corps cannot determine the least environmentally damaging practicable alternative based on Tennessee Gas's application because the application does not allow the Corps to meaningfully

---

[185] Id. at 173.

[186] DEIS at 3-1.

[187] 40 C.F.R. §230.10(a).

assess the practicability of employing trenchless waterbody crossing methods, such as the conventional bore, at each crossing. FERC's DEIS likewise lacks sufficient information to make such a determination.

In the DEIS, FERC determined that Tennessee Gas would employ only two waterbody crossing methods: the dry-ditch, open-cut method for the overwhelming majority of its stream and wetland crossings and the HDD method for three crossings.[188] These were the only methods evaluated in FERC's discussion of the Cumberland Pipeline's potential impacts on water quality.[189] FERC briefly mentions boring, but only in the context of road crossings and without evaluating impacts to hydrology or aquatic resources.[190] FERC's alternatives analysis in the DEIS focused primarily on system alternatives (e.g., making use of existing pipeline infrastructure to accomplish the project purpose), major route alternatives, and a limited set of minor route variations, the majority of which were unrelated to avoiding water resources.[191] Accordingly, the DEIS did not consider construction method

---

[188] DEIS at 4-34.

[189] *See id.* at 4-29 to 4-39.

[190] *See id.* at 2-16 to 2-17.

[191] *Id.* at 3-2 to 3-4 & tbl. 3.5-1.

alternatives that would avoid or greatly reduce impacts to aquatic resources for all proposed crossings, as the Corps must in its LEDPA analysis.[192]

The only discussion of the feasibility of using trenchless crossing methods is severely limited and not sufficient for the Corps to satisfy its obligations. FERC acknowledged Tennessee Gas's HDD Feasibility Studies for three proposed crossings.[193] That is, despite purporting to be interested in the feasibility of alternatives,[194] the FERC DEIS addresses only the feasibility of using the HDD method, not conventional bore or other trenchless methods, and only at three crossings.[195] The Corps, on the other hand, must assess the feasibility of avoiding impacts to aquatic resources through the use of trenchless techniques beyond just HDD at *each crossing*.[196]

### c. FERC's DEIS Failed to Analyze Minor Route Variations That Could Avoid Impacts to Aquatic Resources, Including Special Aquatic Sites.

As explained above, Tennessee Gas's application fails to establish that there are not practicable route variations that would cause less damage to

---

[192] *See* 40 C.F.R. §230.10(a)(i).

[193] DEIS at 4-12.

[194] *Id.* at 3-1.

[195] Those crossings are of Jones Creek, Yellow Creek and one of its unnamed tributaries, and Wells Creek. *Id.*, tbl. 4.1-1.

[196] *See* Sections II.A.2.d & II.C, *supra*.

aquatic resources.[197] FERC's DEIS suffers from the same flaw, such that additional NEPA analysis by the Corps of minor alternative route variations that would avoid or lessen impacts to waterbodies is required.

The DEIS's alternatives analysis does not assess the feasibility of avoiding or minimizing impacts to aquatic resources at each crossing location. Rather, FERC's assessment of minor routing variations listed only ten such variations.[198] Only three of those variations addressed avoiding surface water resources, and only two others addressed achieving perpendicular stream crossings, presumably to minimize impacts to those resources.[199] Thus, the DEIS falls short of what is required for the Corps' NEPA analysis.

In sum, FERC's DEIS is wholly inadequate to support the Corps' independent obligations under NEPA and the Clean Water Act. Corps reliance on the DEIS would thus be arbitrary and capricious.[200] The Corps cannot grant Tennessee Gas's application without seeing major changes to the final FERC EIS or preparing a supplemental EIS that includes sufficient information to allow the Corps to rationally apply the 404(b)(1) Guidelines, including selection of the least environmentally damaging practicable alternative.

---

[197] *See* Section II.A.3, *supra*.

[198] *Id.*, tbl. 3.5-1.

[199] *Id.*

[200] *See Cowpasture*, 911 F.3d at 168.

### d. The Corps Must Prepare An SEIS That Examines the Environmental Impacts of Dry-Ditch, Open-Cut Crossings on Surface Water Resources.

Like Tennessee Gas's application, FERC's DEIS asserts, without analysis or support, that impacts from Tennessee Gas's proposed stream and wetlands crossings "would be temporary and minor."[201] But the overwhelming weight of the scientific literature discussed in Section II.B.1, *infra*, fatally undermines and precludes the Corps from relying on FERC's *ipse dixet* statements in the DEIS.

Moreover, EPA Region 3 recently warned a different Corps district examining an application for an individual Section 404 permit with similar dry-ditch, open-cut crossing to those proposed by Tennessee Gas that "the direct, secondary, and cumulative impacts from the discharges associated with this project . . . may result in significant degradation of the waters of the United States and reduce the ability for remaining aquatic resources to maintain hydrologic, geochemical, and biologic functions."[202] Regarding dry-ditch, open-cut crossings, EPA Region 3 concluded that, "[w]hile many of the discharges of fill material associated with the proposed construction may be

---

[201] DEIS at 4-34.

[202] Letter from Jeffrey Lapp, Chief, Wetlands Branch, U.S. Envtl. Prot. Agency Region 3, to Michael Hatten, Chief, Regul. Branch, Huntington Dist., U.S. Army Corps of Eng'rs, Re: LRH-2015-00592-GBR, LRP-2015-798, NAO-2015-0898, Mountain Valley Pipeline, LLC; Mountain Valley Pipeline, Wetzel County, West Virginia to Pittsylvania County, Virginia at 2 (May 27, 2021) (attached as Exhibit 13) [hereinafter "Lapp Letter"].

considered temporary, **the impacts from those discharges may have lasting effects**[.]"[203]

### e. The NEPA Documents For Any Corps Permit Issued for the Cumberland Pipeline Must Examine the Aggregate Effects of the Scores of Crossings Proposed by Tennessee Gas.

Among the factual findings that the Corps must make under the Section 404(b)(1) Guidelines is a "[d]etermination of the cumulative effects on the aquatic ecosystem."[204] Cumulative effects must also be evaluated as part of the factual determinations of the effects of the proposed discharge on the physical substrate, the effects of suspended particulates and turbidity, and the effects on the structure and function of the aquatic ecosystem and organisms."[205]

FERC's DEIS is entirely silent on the cumulative or aggregate impacts from Tennessee Gas's proposed stream crossings. Accordingly, it would arbitrary and capricious for the Corps to adopt and rely on the DEIS; rather the Corps must independently review the cumulative and aggregate impacts

---

[203] *Id.* at 4; *see also* Silvis (2023) at 2–5.

[204] 40 C.F.R. §230.11(g).

[205] *Id.* §230.11(a), (c), & (e).

of Tennessee Gas's proposed stream and wetlands crossings on aquatic resources.[206]

Here, to lawfully support any permit issued by the Corps, the NEPA document must include a detailed statement of the cumulative and aggregate environmental effects of all of the proposed crossings. That is so because:

(1) the Corps, as a cooperating agency, has to ensure that the information in the NEPA document produced for this Project is adequate to fulfill the Corps' statutory requirements, including the requirements of Section 404(b)(1) of the Clean Water Act,[207]

(2) NEPA's implementing regulations require an examination of cumulative effects,[208] and

(3) Tennessee Gas's proposed crossings are all "connected actions" whose impacts require review under NEPA's implementing regulations.[209]

The 404(b)(1) Guidelines recognize that, "[a]lthough the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of

---

[206] *Cowpasture River*, 911 F.3d at 170–73; *see also Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 594–96 (4th Cir. 2018).

[207] 40 C.F.R. §§230.10(a)(4)–(5).

[208] 40 C.F.R. §1508.1(g)(3).

[209] *Id.* §1501.9(e)(1).

existing aquatic ecosystems." [210] That description of cumulative effects remarkably tracks the conclusions of the scientific literature on the significant cumulative effects of dry-ditch, open-cut crossings, like those proposed by Tennessee Gas:

> The potential for cumulative effects associated with pipeline crossing construction should be taken into consideration in assessing the impacts of these activities on rivers and streams. Construction of a single crossing on a stream or river, or within a watershed, may not have significant effects on fish and fish habitat in that system. **Construction of multiple crossings on a stream or river, or within a watershed, however, has the potential for cumulative effects on that system. In such cases, the capacity of the system to recover from impact may be exceeded, and the detrimental effects of crossing construction permanent. The same may be said for the frequency of crossing construction within a given system; rivers and streams will have limited capacities to recover from multiple impacts.**[211]

As discussed in Section II.C of these comments, despite the Section 404(b)(1) Guidelines' requirements for factual findings regarding cumulative effects, and despite the scientific literature's clear predictions of significant effects, Tennessee Gas's application to the Corps is devoid of any analysis of the cumulative effects of its proposed crossings. A similar absence of such information from an application for an individual Section 404 permit for dry-

---

[210] *Id.* §230.11(g).

[211] Lévesque and Dubé, *Review of the Effects of In-stream Pipeline Crossing Construction on Aquatic Ecosystems and Examination of Canadian Methodologies for Impact Assessment*, 132 ENVTL. MONITORING & ASSESSMENT 406–07 (2007) (attached as Exhibit 14).

ditch, open-cut pipeline crossings raised concerns for EPA.[212] As a result, EPA recommended "a conclusive evaluation at watershed scale (i.e. HUC 12) be provided to ensure that measures are undertaken to avoid and minimize the potential of cumulative impacts,"[213] and asked the Corps to require special provisions applicable to streams and wetlands impacted multiple times by construction of that pipeline.[214]

Section II.C of these comments details the cumulative effects that the Corps and FERC must consider, including the streams and watersheds that the Cumberland Pipeline would cut multiple times with its proposed open-cut trenches. If the Corps and FERC ignore those comments, they would do so at their peril. Any NEPA review that omits examination of the cumulative effects of Tennessee Gas's crossings will be insufficient to support an agency action on the company's pending applications.

Furthermore, also missing from the DEIS and Tennessee Gas's application to the Corps is any examination of the cumulative and aggregated impacts that would result from the combination of Tennessee Gas's upland activities and proposed stream crossings. Tennessee Gas's upland activities threaten to contribute substantial sediment loads to streams along the

---

[212] Lapp Letter at 1 (noting an "insufficient assessment of secondary and cumulative impacts").

[213] *Id*. at 8.

[214] *Id*. at 7.

proposed route of the Cumberland Pipeline. Expert Starr Silvis predicts these impacts from upland disturbances:

> The conversion of forested land to maintained right-of-way increases runoff volumes, which will change stream morphology. Lack of intact forest cover has been found to change stream morphology for two to four years post-disturbance (Reid & Anderson 1999). Methods to maintain the right-of-way include the use of pesticides and herbicides which can be mobilized in stormwater runoff and cause degradation of aquatic ecosystems. The construction of temporary and permanent access roads also increases runoff volumes and increases turbidity and sediment migration from upland areas to water bodies. The increases in stormwater runoff volumes can alter stream morphology and stream bed composition. There are also long-term increases in temperature associated with the reduction of forested canopy for both streams and wetlands.[215]

As a result, the NEPA documents for this project must evaluate the cumulative and aggregate effects on the aquatic ecosystems of sedimentation from Tennessee Gas's proposed open-cut stream crossings and sedimentation and runoff from Tennessee Gas's upland construction activities.

In sum, because of the requirements of the Section 404(b)(1) Guidelines, the scientific literature establishing potentially permanent impacts to watersheds from multiple trenched crosses in the same watershed, the inadequacy of the DEIS and Tennessee Gas's application on those issues, and the connected nature of the actions that would occur under the sought FERC certificate and Corps permits, FERC and the Corps must take a hard look at the combined effects of Tennessee Gas's proposed crossings in their NEPA

---

[215] Silvis (2023) at 4.

documents. The DEIS does not do so. Accordingly, it cannot support any agency action authorizing Tennessee Gas to trench through waterbodies in its path.

### f. The DEIS Fails To Address All Of The Impaired Streams That Tennessee Gas Intends to Trench Through.

FERC's DEIS is also deficient because its identification of impaired streams is incomplete. Section 4.3.2.2 of the DEIS recognizes that the State of Tennessee lists streams "that fail to meet their designated beneficial use(s)" on its list of impaired waters under Section 303(d) of the Clean Water Act—the "303(d) List."[216] The DEIS then claims that the Cumberland Pipeline will only affect five waterbodies listed on Tennessee's 303(d) List—Wells Creek, Jones Creek, and three unnamed tributaries to Jones Creek.[217] But there is a sixth.

Neither Tennessee Gas's Section 404 application nor the DEIS acknowledge or discuss the impaired status of that sixth stream. Tennessee's 2022 Section 303(d) list identifies Leatherwood Creek in the Harpeth River Watershed as impaired for unknown causes.[218] Tennessee Gas proposes dry-ditch, open-cut crossings of Leatherwood and eight of its unnamed tributaries

---

[216] DEIS at 4-31.

[217] *Id.*

[218] Final 2022 List of Impaired and Threatened Waters, TENN. DEP'T OF ENV'T & CONSERVATION (Apr. 2022) [hereinafter, "Tennessee 303(d) List"] (attached as Exhibit 15), available at https://www.tn.gov/content/dam/tn/environment/water/watershed-planning/wr_wq_303d-2022-final.xlsx.

in its Section 404 application.[219] Tennessee Gas proposes two dry-ditch, open-cut crossings of one of those unnamed tributaries.[220] And Tennessee Gas proposes an access road crossing and a workspace crossing for two of those unnamed tributaries, in addition to the proposed right-of-way crossings.[221] The DEIS's failure to acknowledge or discuss the impaired status of Leatherwood Creek is yet another reason the Corps cannot rely on the DEIS.

### g. Tennessee Gas's Section 404 Permit Application Contradicts FERC's Assertions About Blasting In the DEIS.

Another flaw in FERC's DEIS that prevents the Corps from adopting it to satisfy its NEPA obligations is its assertion that "Tennessee [Gas] has indicated that controlled blasting would not be attempted in Waters of the U.S. or in TDEC-jurisdictional waters."[222] Tennessee Gas contradicts that categorical statement in its Section 404 permit application.[223] For example, in Table 2.7.3 of its application, Tennessee Gas identifies 28 stream crossings as "Candidate[s] for Blasting."[224] And in Attachment 3 to its Section 404

---

[219] Table 1 (rev. Mar. 2023) at 10–11.

[220] *Id.* at 10 (proposing two crossings of Stream ID No. SDKB025).

[221] *Id.* at 10 (access road crossing of Stream ID No. SDKA047); *id.* at 11 (workspace crossing of Stream ID No. SDKB028).

[222] DEIS at 4-17.

[223] IP Application at 14.

[224] *Id.* at 36–53.

application, Tennessee Gas expressly identifies blasting as the trenching method for 29 dry-ditch, open-cut crossings.[225] Only eight of those crossings appear on both lists—SDKA006, SDKA008, SDKA058, SDKA050, SDKA051, SDKA049, SDKA053, and SDKA055.[226] Accordingly, Tennessee Gas's Section 404 application targets 49 streams for blasting, notwithstanding the statement in the DEIS that Tennessee Gas would not use blasting in waters of the United States.

Moreover, the DEIS asserts that, "[i]n no event would controlled blasting be used in locations characterized by karst-prone geology, wetlands, or with an unacceptable risk of hydrologic loss."[227] Tennessee Gas's Section 404 application also contradicts that categorical statement. Neither the DEIS nor Tennessee Gas's Section 404 application define "an unacceptable risk of hydrologic loss." Nonetheless, Tennessee Gas identifies Nesbitt Branch (Stream ID No. SDKA008) as a stream with at "high" risk of hydrologic loss from a dry-ditch, open-cut crossing, and yet names it as a "Candidate for

---

[225] *Id.*, attachment 3. Those streams are SDKA023 (2 crossings), SDKA024, SDKA026, SDKA027, SDKA004, SDKA006, SDKA008, SDKA058, SDKA050, SDKA051, SDKA049, SDKA053, SDKA055, SDKA033, SDKA034, SDKA036, SDKA037, SDKA038 (2 crossings), SDKA040, SDKA041, SDKA042, SDKB001, SDKB002, SDKB009, SDKB011, SDKB023, and SDKB028. *Id.*

[226] *Compare* IP Application, tbl. 2.7-3 *with* IP Application, attachment 3.

[227] DEIS at 2-12.

Blasting" anyway.[228] And Tennessee Gas identifies six other streams as "Candidate[s] for Blasting" that have a "medium" risk of hydrologic loss.[229]

Attachment 3 to Tennessee Gas's Section 404 application also contradicts the DEIS's statement.[230] In that attachment, Tennessee Gas identifies blasting as the trenching method for 29 crossings, 21 of which have the potential for karst and 20 of which have a "high" or "medium" potential for hydrologic loss.[231] Moreover, Attachment 3 leaves open the possibility for blasting at 78 crossings, 62 of which have the potential for karst, and 13 of which have a "high" or "medium" potential for hydrologic loss.[232]

Tennessee Gas's plans to blast through a significant number of streams in its path has implications for the Corps' LEDPA analysis (as explained in Section II.A.2.g) and for its consideration of the potential for water quality standards violations and significant degradation from the proposed activities because of the significant adverse impacts of blasting on aquatic resources (as described by Silvis (2023) at 7–12; see Section II.B). But the applicant's blasting plans also reveal a serious deficiency in the DEIS. Because FERC

---

[228] IP Application at 42.

[229] *Id.* at 37–38.

[230] *Id.*, attachment 3.

[231] *Compare* IP Application, tbl. 2.7-3 *with* IP Application, attachment 3.

[232] *Id.*, attachment 3.

assumed that Tennessee Gas would not use blasting in waters of the United States, and "[i]n no event" would blasting occur in karst-prone geology or in waters with an "unacceptable risk of hydrologic loss,"[233] the DEIS does not describe or evaluate the potential effects of in-stream blasting. Accordingly, the DEIS cannot satisfy the obligations of either FERC or the Corps to take a hard look at the environmental effects of Tennessee Gas's proposed crossings.

### h. FERC's DEIS Erroneously Predicted That Tennessee Gas Would Use Compensatory Mitigation to Offset The Adverse Effects Of Its Wetlands Construction Plans.

In its consideration of wetland impacts from the Cumberland Pipeline, FERC's DEIS acknowledged that "long-term and permanent effects on wetlands would occur."[234] But it predicted that "Tennessee [Gas] would develop a Project-specific compensatory wetland mitigation plan to address Project impacts on wetlands, which would be completed prior to construction and is subject to approval by the [Corps] as part of Tennessee[ Gas]'s USACE Individual Permit application."[235] FERC further stated:

> We anticipate that if the [Corps] issues a Section 404 permit for the Project, it would be conditioned upon Project-related adverse impacts on Waters of the United States being effectively offset by wetland mitigation. Permanent impacts on wetlands would include the conversion of less than an acre of PFO wetland to

---

[233] DEIS at 2-12, & 4-17.

[234] *Id.* at 4-38.

[235] *Id.*

PEM/PSS wetland within the maintained permanent pipeline easement.[236]

FERC's prediction of mitigation was wrong.

Tennessee Gas's Section 404 application makes clear that the applicant does not think it needs to even "propose compensatory mitigation for impacts to streams or wetlands."[237] Accordingly, the DEIS's reliance on mitigation to offset the permanent conversion of PFO wetlands to PEM/PSS wetlands is misplaced, and if it is not addressed, it will constitute arbitrary and capricious agency action.

When an agency finds that an alternative will have no significant impact on the basis of mitigation, it "shall state any enforceable mitigation requirements or commitments that will be undertaken to avoid significant impacts."[238] "[M]itigation measures must be developed to a reasonable degree," and "[a] perfunctory description or mere listing of mitigation measures, without supporting analytical data, is insufficient to support a finding of 'no significant impact.'"[239]

---

[236] *Id.*

[237] IP Application at 55–56.

[238] 40 C.F.R. §1501.6(c).

[239] *Nat'l Parks Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir. 2001) (cleaned up).

Here, FERC's DEIS finds that there will be long-term and permanent impacts to wetlands from the Cumberland Pipeline, but assumes that Tennessee Gas will use compensatory mitigation to "offset" those effects.[240] The DEIS's conclusion that there will not be significant impacts to wetlands is thus unsupported.[241] And given the "longstanding national goal of 'no net loss' of wetland acreage and function,"[242] the conclusion of no significant impact cannot be supported absent mitigation. Accordingly, either the NEPA documents for this project must acknowledge Tennessee Gas's refusal to mitigate its wetlands conversions and evaluate the impacts of that refusal, or the Corps and FERC must require mitigation from Tennessee Gas.

**B. THE CORPS MUST DENY TENNESSEE GAS'S REQUEST FOR AN INDIVIDUAL PERMIT BECAUSE THE PROPOSED DISCHARGES WILL CAUSE OR CONTRIBUTE TO WATER QUALITY STANDARDS VIOLATIONS AND SIGNIFICANT DEGRADATION OF THE WATERS OF THE UNITED STATES.**

Under the 404(b)(1) Guidelines, no discharge of dredged or fill material can be permitted if it will, among other things, (1) cause or contribute to

---

[240] DEIS at 4-38.

[241] *Nat'l Parks Conservation Ass'n*, 241 F.3d at 734.

[242] Compensatory Mitigation for Losses of Aquatic Resources, 73 Fed. Reg. 19,594, 19,594 (Apr. 10, 2008), *cited in Butte Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 947 (9th Cir. 2010).

violations of applicable water quality standards or (2) cause or contribute to significant degradation of the waters of the United States.[243]

The applicable standards at issue here include the narrative water quality criteria adopted by the State of Tennessee to protect uses such as the propagation and maintenance of aquatic life and the enjoyment of scenic and aesthetic qualities of waters, as well as Tennessee's antidegradation policies.[244] The 404(b)(1) Guidelines provide that "significant degradation" includes significant adverse effects on: municipal water supplies; fish; shellfish; special

---

[243] 40 C.F.R. §230.10(b)–(c).

[244] Specifically, and as discussed further below, those water quality standards include, *inter alia*:

- Tennessee's designated uses such as "sources of water supply for domestic and industrial purposes; propagation and maintenance of fish and other aquatic life; recreation in and on the waters including the safe consumption of fish and shellfish; livestock watering and irrigation; navigation; generation of power; propagation and maintenance of wildlife; and the enjoyment of scenic and aesthetic qualities of waters." TN ADC §0400-40-3-.02(2);

- Tennessee water quality criteria that prohibit distinctly visible solids, the formation of bottom deposits, and turbidity and total suspended solids. *See, e.g.*, TN ADC §0400-40-03-.03(1)(e)–(f); *id.* §0400-40-03-.03(2)(e)–(f); *id.* §0400-40-03-.03(3)(c)–(d); *id.* §0400-40-03-.03(4)(c)–(d); *id.* §0400-40-03-.03(5)(d); *id.* §0400-40-03-.03(6)(d); *id.* §0400-40-03-.03(7)(a); and

- Tennessee's antidegradation statement. TN ADC §0400-40-03-.06.

aquatic sites; life stages of aquatic life and other wildlife; and aquatic ecosystem diversity, productivity, and stability.[245]

As explained below, because Tennessee Gas's discharges will cause or contribute to both water quality standards violations and impermissible significant degradation to waters of the United States, the 404(b)(1) Guidelines prohibit the Corps from issuing the permit sought by Tennessee Gas.[246]

### 1. TENNESSEE GAS UNDERSTATES THE IMPACTS ON WATER QUALITY, AQUATIC LIFE, AND AQUATIC ECOSYSTEMS FROM DRY-DITCH, OPEN-CUT CROSSINGS.

Tennessee Gas asserts, without support, that "[c]onstruction of the Project will potentially result in *minor, short-term* impacts, including *temporary localized* increases in turbidity levels and downstream sediment deposition in the waterbodies crossed" [247] and that "[s]treams or wetland activities associated with this Project will result in no more than *de minimis* degradation and no appreciable permanent loss of resource values."[248] But, those categorical assertions are not supported by either Tennessee Gas's own application or the rest of the literature on the ecological effects of dry-ditch,

---

[245] 40 C.F.R. §230.10(c)(1)–(3).

[246] *Id.* §230.10(b)–(c).

[247] IP Application at 16 (emphasis added).

[248] *Id.* at 55.

open-cut stream crossings.[249] Contrary to Tennessee Gas's repetition of the common industry refrain, the adverse environmental effects of dry-ditch, open-cut crossings are measured in years, not in days.[250]

On another proposed natural gas pipeline, the United States Fish and Wildlife Service ("FWS") reviewed the literature and recently concluded, in a February 2023 Biological Opinion ("BiOp") for the proposed Mountain Valley Pipeline project, that it should assume that "effects to benthic invertebrates in aquatic areas that receive significant increased sedimentation as a result of the MVP project will persist for up to four years."[251] That conclusion stands in

---

[249] As one journal article that examined pipeline crossing effects concluded, "before authoritative statements concerning environmental impact can be made[,] it is essential to have knowledge of the natural variation associated to be expected in streams of differing characteristics." P. D. Armitage & R. J. M. Gunn, *Differential Response of Benthos to Natural and Anthropogenic Disturbances in 3 Lowland Streams*, 81 INT'L REV. HYDROBIOLOGY 161 (1996) (attached as Exhibit 16).

[250] *See, e.g.*, U.S. Fish and Wildlife Serv., Mountain Valley Pipeline, LLC; Revised Biological Opinion 191 (Feb. 28, 2023) [hereinafter "BiOp"] (attached as Exhibit 17) (assuming sedimentation effects on benthics to persist for up to four years). Others have found adverse effects that persist "2-4 years after the construction of water crossings in areas with open forest canopies." Scott M. Reid & Paul G. Anderson, *Effects of Sediment Released During Open-Cut Pipeline Water Crossings*, 24 CANADIAN WATER RES. J. 235, 243 (1999) (attached as Exhibit 18). And Silvis concludes that the impacts associated with sediment deposits from dry-ditch, open-cut crossings can be permanent. Silvis (2023) at 2–5.

[251] BiOp at 191.

---

stark contrast to Tennessee Gas's prediction of "short term" and "temporary" impacts.[252]

A West Virginia-based FWS biologist examining proposed natural gas pipeline stream crossings once grew so frustrated by the industry refrain that "crossings have only temporary impacts to the stream" that she felt it necessary to develop her own literature review to push back against that refrain.[253] The following is her summary of the literature:

> Pipeline stream crossings can affect fish habitat; food availability; and fish behavior, health, reproduction and survival. The most immediate effect of instream construction is the creation of short term pulses of highly turbid water and total suspended sediments (TSS) downstream of construction (Levesque & Dube 2007, pp. 399-400). Although these pulses are usually of relatively short duration and there is typically a rapid return to background conditions after activities cease, **instream construction has been shown to have considerable effects on stream substrates and benthic invert[ebrate] communities that persist after construction has been completed** (Levesque & Dube 2007, p. 396-397). Commonly documented effects include substrate compaction and silt deposition within the direct impact area and downstream that fills interstitial spaces in gravel substrates and reduces water flow through the substrate, this increases substrate embeddedness and reduces habitat quality (Levesque & Dube 2007, pp. 396-397; Penkal & Phillips 2011, pp. 6-7; Reid & Anderson 1999, p. 243). Construction also directly alters stream channels, beds, and banks resulting in changes in cover, channel morphology, and sediment transport dynamics.

---

[252] IP Application at 16.

[253] Email from Barbara Douglas, Sr. Endangered Species Biologist, W. Va. Field Office, U.S. Fish & Wildlife Serv., to Cindy Shulz, U.S. Fish & Wildlife Serv. (Dec. 11, 2019, 11:44 AM) (attached as Exhibit 19).

Streambank alterations can lead to increased water velocities, stream degradation, and migrations in stream channel. Removal of vegetation from the banks can change temperature regimes, and increase sediment and nutrient loads (Penkal & Phillips 2011, pp. 6-7).

These instream changes not only directly affect the suitability of fish habitat, they also affect the availability and quality of fish forage altering the composition and reducing the density of benthic invertebrate communities within and downstream of the construction area (Levesque & Dube 2007, pp. 396-399; Penkal & Phillips 2011, pp. 6-7; Reid & Anderson 1999, pp. 235, 244). **Various studies have documented adverse effects to the benthic community that have been apparent for between six months and four years post-construction** (Levesque & Dube 2007, pp. 399-400; Reid & Anderson 1999, pp. 235, 244). Stream crossings have also been shown to affect fish physiology, survival, growth, and reproductive success (Levesque & Dube 2007, p. 399). Studies have found decreased abundance of fish downstream of crossings, as well as signs of physiological stress such as increased oxygen consumption and loss of equilibrium in remaining fish downstream of crossings (Levesque & Dube 2007, pp. 399-401; Reid & Anderson 1999, pp. 244-245). Increased sediment deposition and substrate compaction from pipeline crossings can degrade spawning habitat, result in the production of fewer and smaller fish eggs, impair egg and larvae development, limit food availability for young-of-year fish, and increase stress and reduce disease resistance of fish, (Levesque & Dube 2007, pp. 401-402; Reid & Anderson 1999, pp. 244- 245).

The duration and severity of these effects depends on factors such as the duration of disturbance, the length of stream segment directly impacted by construction, and whether there were repeated disturbances (Yount & Niemi 1999, p. 557). Most studies documented recovery of the affected stream reach within one to three years after construction (Reid & Anderson 1999, p. 247; Yount & Niemi 1999, pp. 557-558, 562). **However caution should be used when interpreting results of short-term studies. Yount & Niemi (1999, p. 558) cite an example of one**

**study that made a preliminary determination of stream recovery within one year, but when the site was re-examined six years later, fish biomass, fish populations, macroinvertebrate densities, and species composition were still changing. It was suspected that shifts in sediment and nutrient inputs to the site as a result of construction in and around the stream contributed to the long-term lack of recovery. In another study, alterations in channel morphology, such as increased channel width and reduced water depth, were evident two to four years post-construction at sites that lacked an intact forest canopy** (Reid & Anderson 1999, p. 243). There is also the potential for cumulative effects. **While a single crossing may have only short-term or minor effects, multiple crossings or multiple sources of disturbance and sedimentation in a watershed can have cumulative effects on fish survival and reproduction that exceed the recovery capacity of the river, resulting in permanent detrimental effects** (Levesque & Dube 2007, pp. 406-407). Whether or how quickly a stream population recovers depends on factors such as the life history characteristics of the species, and the availability of unaffected populations upstream and downstream as a source of organisms for recolonization (Yount & Niemi 1999, p. 547). Species such as the diamond darter that are particularly susceptible to the effects of sedimentation and substrate embeddedness, and that have limited distribution and population numbers are likely to be more severely affected by instream disturbances than other more common and resilient species.[254]

And yet another FWS scientist (J.M. Castro) similarly concluded that there are significant and long-term effects from dry-ditch, open-cut pipeline crossings in 2015, stating, "Based on past experience at pipeline crossings, the potential for both short and long-term negative impacts on aquatic habitat and

---

[254] *Id.* (emphasis added).

species is substantial."[255] Such impacts

> include both short-term, construction related impacts, such as increased turbidity, direct modification of aquatic habitat, and the potential for hydrocarbons to enter the stream through equipment failures and spills (Reid and Anderson, 1999; Reid *et al*, 2002a, 2002b), and long-term impacts that are more directly associated with the stream's response potential, such as channel incision and lateral migration (Thorne *et al.*, 2014).[256]

Among other things, Castro concludes that "the effects of proposed and existing pipeline crossings on aquatic systems are significant because each pipeline may have hundreds or even thousands of stream crossings (Levy, 2009)[.]"[257]

These FWS scientists' conclusions are well-supported by the scientific literature. Open-cut, trenched crossings have long-term and substantial effects on water quality, stream structure, and aquatic life. As early as 1984, scientists recognized the substantial effects on water quality and aquatic life that open-cut trenches through streams can have. Penkal and Phillips (1984) state, "Because of the magnitude of pipeline projects, the number of waterways involved, the high quality of fishery resources in many of these waterways, and the potential for impacts to fisheries from spills or construction activities,

---

[255] J.M. Castro et al., *Risk-Based Approach to Designing and Reviewing Pipeline Stream Crossings to Minimize Impacts to Aquatic Habitats and Species*, River Rsch. & Applications 31, 767 (2015) (attached as Exhibit 20).

[256] *Id.*

[257] *Id.*

safeguards must be adopted to protect these important resources."[258] They further state,

> Fishery habitat may be adversely affected by sedimentation from pipeline construction. Sedimentation can occur from (1) trenching to lay pipeline beneath the stream channel, (2) runoff at construction sites, (3) erosion resulting from construction of culverts, roads, bridges, or fords, and (4) hydrostatic testing. Additionally, silt or sand deposition can fill interstices in gravel and reduce water flow through substrate. Equipment operating in the stream can compact substrate, create sediment, and eliminate spawning habitat.[259]

Accordingly, they ultimately conclude that "[c]onstruction and operation of pipelines can cause significant damage to aquatic habitats and fishery resources."[260]

The seminal, peer-reviewed article on the effects of dry-ditch, open-cut crossings reaches similar conclusions. Lévesque and Dubé, in their 2007 *Review of the Effects of In-Stream Pipeline Crossing Construction on Aquatic Ecosystems and Examination of Canadian Methodologies for Impact Assessment*, found the following:

- "Pipeline crossing construction is shown to not only compromise the integrity of the physical and chemical nature of fish habitat, but also to affect biological habitat (e.g., benthic invertebrates and invertebrate drift), and fish behavior and physiology. Indicators of effect include: water quality (total suspended solids TSS), physical habitat (substrate particle size, channel

---

[258] Russ F. Penkal & Glenn R. Phillips, *Construction and Operation of Oil and Gas Pipelines*, 9 FISHERIES 6 (1984) (attached as Exhibit 21).

[259] *Id.*

[260] *Id.* at 8.

morphology), benthic invertebrate community structure and drift (abundance, species composition, diversity, standing crop), and fish behavior and physiology (hierarchy, feeding, respiration rate, loss of equilibrium, blood hematocrit and leukocrit levels, heart rate and stroke volume)."[261]

- "Construction activities alter river and stream channel beds and banks, directly and indirectly affecting fish and fish habitat."[262]

- "[Dry-ditch, open-cut methods] may impact watercourse ecosystems both during, and for potentially some time after, construction. All in-stream construction activities, particularly trench excavation and pipeline installation and backfill, result in disturbance of channel bed and banks, and have the potential to alter suspended sediment concentration and sedimentation."[263]

- "[A]ny in-stream construction activity has the potential to impact aquatic ecosystems through alteration of stream and river bed and banks and, therefore, may result in direct effects such as physical alteration of channel morphology and habitat, and indirect effects such as alteration of water quality and sediment dynamics, on aquatic ecosystems (e.g., Alberta Environment 2001; Alberta Transportation and Utilities 2000)."[264]

- Even with dry-ditch, open-cut methods, "[m]ean TSS concentrations increased by between 4 and 100 mg l$^{-1}$ above background. Installation of dams and flumes for water diversion generated TSS concentrations on average less than 76 mg l$^{-1}$ greater than background over periods of 2 to 16.5 h (with one crossing experiencing an increase of 520 mg l$^{-1}$ for 3 h). Removal of dams and flumes resulted in TSS increases of between 1 and 703 mg l$^{-1}$ downstream of construction over periods of 20 min to 6.5 hrs. Other stages of construction were associated with average TSS increases of less than 8 mg l$^{-1}$, with the exception of accidental leaks from construction infrastructure (e.g., 820 mg l$^{-1}$

---

[261] Lévesque and Dubé at 395.

[262] *Id.*

[263] *Id.* at 396.

[264] *Id.*

over 5.5 h). Plumes of highly turbid water were observed downstream of construction[.]"[265]

- "Armitage and Gunn (1996) noted that pipeline crossing construction in a stream in England resulted in a shift in invertebrate species due to an increased proportion of silt in stream substrates. This effect persisted for 4 years until a high magnitude flow event scoured the stream channel bed, promoting re-establishment of pre-construction invertebrate species. Tsui and McCart (1981) found that crossing construction of Archibald Creek, British Columbia, caused short-term increases in silt and sand accumulations and decreases in invertebrate standing crop and diversity, which lasted 1 to 2 years."[266] and

- "The potential for cumulative effects associated with pipeline crossing construction should be taken into consideration in assessing the impacts of these activities on rivers and streams. Construction of a single crossing on a stream or river, or within a watershed, may not have significant effects on fish and fish habitat in that system. **Construction of multiple crossings on a stream or river, or within a watershed, however, has the potential for cumulative effects on that system. In such cases, the capacity of the system to recover from impact may be exceeded, and the detrimental effects of crossing construction permanent. The same may be said for the frequency of crossing construction within a given system; rivers and streams will have limited capacities to recover from multiple impacts. As well, recurrent stresses on fish, such as those that originate from elevated suspended sediment concentrations, may have cumulative effects on fish health, survival and reproduction. The long-term effects of such impacts are not well known at this time (Reid et al. 2003).**[267]

---

[265] *Id.* at 398.

[266] *Id.* at 399.

[267] *Id.* at 406–07.

Following their reviews of the literature, Hansen and Betcher (2021) and Silvis (2023) concur that the effects of dry-ditch, open-cut crossings are substantial and long-term. Hansen and Betcher (2021) recognize that data on those effects are "sparse" in the literature, but that the available data in the literature does substantiate long-term effects.[268] And Silvis (2023) describes those effects this way:

> Immediate environmental impacts associated with dry-ditch open-cut methods include death of all fish and benthic macroinvertebrates within the work area and increased turbidity and suspended sediment loads when the diversion is installed, for the duration of the disturbance, as well as when flow is returned to the disturbed channel bed. . . . There are long-term increases in sedimentation due to stream bank and upland disturbances until vegetation can be re-established. Increased turbidity and high suspended sediment loads can cause long-term impacts to invertebrate communities downstream of the disturbance including reducing invertebrate biomass, growth rates, and species diversity and increasing invertebrate mortality. Increased suspended and deposited sediment causes negative impacts in fish populations as well. These impacts can include smothering of fish eggs, changes in stream bed characteristics which can reduce reproductive success, reduction of juvenile survival rates, reduction of food sources, as well as reduction in in-stream dissolved oxygen which causes respiratory distress.[269]

Based on her "experience in stream restoration, hydrology, stream

---

[268] Evan Hansen & Meghan Betcher, *Sedimet Generation and Impacts from Dry-Ditch Open-Cut Stream Crossings Such as Those Proposed for the Mountain Valley Pipeline* 6 (May 26, 2021) (attached as Exhibit 22). That "paucity of current, data-driven documentation of the long-term impacts" requires that, for permitting purposes, an evaluation "at each individual stream [is required] due to stream-specific factors that influence the duration of stream channel and aquatic life impacts." *Id.* at 2.

[269] Silvis (2023) at 3.

geomorphology, and erosion and sediment control," Silvis concludes "that there are significant permanent impacts associated with trenched methods of stream and wetland crossings."[270]

The inherent adverse effects of dry-ditch, open-cut crossings are exacerbated by improper application of protective measures. Even industry consultants acknowledge that

> [t]he effectiveness of isolated crossing methods is dependent on proper design and application. Reported construction related difficulties include (1) pump failure or insufficient capacity, (2) dam or flume failure, (3) poor dam seal, (4) poor containment of pumped ditch water, and (5) inadequate maintenance of sediment control measures (Macks et al. 1997; CPWCC 1999; this study). During dam and pump crossings, construction related difficulties that resulted in large increases to downstream TSS concentrations were rare (1 of 23 crossings). Alternatively, such difficulties resulted in large increases in downstream TSS concentrations (60-1848 mg $L^{-1}$) during 5 of the 12 flumed crossings. Poor containment of pumped ditch water and poor dam seals were the causes. Flumed crossings are often applied to larger watercourses than dam and pump crossings. Larger water crossings require longer periods of instream activity and the control of larger volumes of both streamflow and trench water. Both characteristics increase the risk of sediment being released into the watercourse (Reid et al. 2002*b*, 2002*c*).[271]

Accordingly, there are a multitude of ways that dry-ditch, open-cut crossings can go wrong, and the Corps cannot rationally assume that Tennessee Gas will flawlessly construct hundreds of such crossings. Rather,

---

[270] *Id.* at 2.

[271] S. M. Reid et al., *Sediment Entrainment During Pipeline Water Crossing Construction: Predictive Models and Crossing Method Comparison*, 3 J. ENV'T ENG. & SCI. 81, 82 (2004) (attached as Exhibit 23).

the Corps should expect multiple incidents with impermissible adverse effects, individually and cumulatively, on water quality and aquatic life.

Tennessee Gas's mischaracterization of the effects of its proposed dry-ditch, open-cut crossings is important because of the 404(b)(1) Guidelines' prohibitions on issuing individual permits where they will cause or contribute to water quality standards violations or cause significant degradation of the waters of the United States.[272] As explained below, given that a complete review of the literature reveals that dry-ditch, open-cut crossings have substantial and long-term adverse impacts on waterbodies and aquatic life, the Corps cannot issue an individual Section 404 permit to Tennessee Gas.

### 2. THE CUMBERLAND PROJECT WILL CAUSE OR CONTRIBUTE TO VIOLATIONS OF WATER QUALITY STANDARDS.

The 404(b)(1) Guidelines prohibit the issuance of a discharge permit where the discharge will "cause[] or contribute[] . . . to violations of any applicable State water quality standard."[273] The relevant water quality

---

[272] 40 C.F.R. §230.10(b)–(c). Tennessee Gas's understatement of the significance of the potential environmental impacts is also relevant to the LEDPA analysis. The 404(b)(1) Guidelines provide that, "[a]lthough all requirements in §230.10 must be met, [including the LEDPA analysis,] the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities." *Id.* §230.10. As established above, the seriousness of the potential adverse effects of the hundreds of discharges proposed by Tennessee Gas warrants a robust LEDPA analysis.

[273] *Id.* §230.10(b).

standards here are the Tennessee's water quality criteria protecting designated uses from sedimentation and turbidity, as well as the state's antidegradation statement. The scientific literature discussed above establishes that Tennessee Gas will cause or contribute to violations of those standards.

### a. The Corps Must Evaluate Water Quality Standards Impacts.

As a threshold matter, the Corps must address these issues in this permitting decision. Although a Corps regulation purports to allow it to avoid an independent analysis of water quality issues in the context of its public interest review of permit applications where a state has certified an activity under Section 401 of the Clean Water Act, that regulation does not affect the Corps' obligations under the Section 404(b)(1) Guidelines.[274] That regulation, found at 33 C.F.R. §320.4(d), appears in the Corps' public interest review regulations, not the Section 404(b)(1) Guidelines.[275] The Section 404(b)(1) Guidelines independently require factual findings regarding water quality standards and significant degradation.[276] And, as a product of a joint effort by

---

[274] *See* 33 C.F.R. §320.4(d).

[275] *Id.*

[276] *See* 40 C.F.R. §230.11 (requiring the Corps to determine in writing the potential short-term or long-term effects of proposed discharges to be used in finding compliance or noncompliance with the prohibitions on water quality standards violations or significant degradation in §230.10).

EPA and the Corps, the 404(b)(1) Guidelines cannot be altered by unilateral Corps action.[277] The regulation purporting to allow the Corps to avoid water quality analyses was promulgated solely by the Corps.[278] Accordingly, it only applies to the Corps' public interest review of DA permits. Consequently, the Corps must analyze the water quality effects of the project.

### b. Tennessee Gas's Stream Crossings Will Cause or Contribute to Violations of Tennessee's Narrative Standards.

Tennessee's narrative water quality criteria prohibit "distinctly visible solids . . . or the formation of . . . bottom deposits of such size or character as may" impair designated uses.[279] They also prohibit turbidity in amounts that would impair designated uses.[280]

Violations of those narrative standards can be assessed in numerous ways. For example, violations of the narrative criteria protecting the

---

[277] *Id.* §230.1(c) ("No modifications to the basic application, meaning, or intent of these Guidelines will be made without rulemaking by the Administrator [of the Environmental Protection Agency] under the Administrative Procedure Act[.]").

[278] 33 C.F.R. §320.4(d).

[279] TN ADC §0400-40-03-.03(1)(e); *id.* §0400-40-03-.03(2)(e); *id.* §0400-40-03-.03(3)(c); *id.* §0400-40-03-.03(4)(c); *id.* §0400-40-03-.03(5)(d); *id.* §0400-40-03-.03(6)d. For example, the narrative standard protecting the recreational use of Tennessee's waters prohibits such visible solids or deposits "that may be detrimental to recreation." *Id.* §0400-40-03-.03(4)(c).

[280] *Id.* §0400-40-03-.03(1)(f); *id.* §0400-40-03-.03(2)(f); *id.* §0400-40-03-.03(3)(d); *id.* §0400-40-03-.03(4)(d). For example, the narrative standard protecting the fish and aquatic life use of Tennessee's waters prohibits "turbidity, total suspended solids, or color in such amounts or of such character that will material affect fish and aquatic life." *Id.* §0400-40-03-.03(3)(d). And the

recreational and aesthetic uses of a stream can be assessed visually, since those criteria prohibit "total suspended solids, turbidity, or color in such amounts or character that will result in *any objectionable appearance to the water.*"[281] And because it is a fundamental principal under the Clean Water Act that water quality standards "are legally required to be met [at] all times," [282] even short-term or temporary objectional appearances are prohibited.

Moreover, compliance with water quality standards can be assessed through biological assessments of particular waters, including benthic monitoring.[283] Once a violation of the biological component of the narrative

---

narrative standard protecting the recreational use of Tennessee's waters prohibits "total suspended solids, turbidity, or color in such amounts or character that will result in *any objectionable appearance to the water.*" *Id.* §0400-40-03-.03(4)(d) (emphasis added).

[281] *Id.* §0400-40-03-.03(4)(d).

[282] *Sierra Club v. W. Va. Dep't of Envtl. Prot.*, 64 F.4th 487, 503 (4th Cir. 2023) (quoting 49 Fed. Reg. 37,998, 38,038 (Sept. 26, 1984)).

[283] *See* TN ADC §0400-40-03-.03(3)(m); *see also Ohio Valley Envtl. Coalition, Inc. v. Pruitt*, 893 F.3d 225, 228 (4th Cir. 2018) (describing the West Virginia Stream Condition Index as a measure of compliance with narrative criteria); *Ohio Valley Envtl. Coalition v. Fola Coal Co.*, 845 F.3d 133, 138, 144 (4th Cir. 2027) (same); *Ohio Valley Envtl. Coalition, Inc. v. U.S. Army Corps of Eng'rs*, 716 F.3d 119, 124 (4th Cir. 2013) (explaining the use of benthic community metrics to determine that streams are biologically impaired); *S. Appalachian Mountain Stewards v. Red River Coal Co., Inc.*, 420 F. Supp. 3d 481, 489 (W.D. Va. 2019) (explaining that Virginia's "narrative standards include a biological component that is assessed by, among other things, monitoring benthic invertebrates").

standards is found, its cause must be identified; sedimentation is frequently the stressor causing the impairment.[284]

Importantly, for purposes of the prohibition on issuing a discharge permit in the face of water quality standards violations, causation is not required; contribution is sufficient.[285] A "contribution" provision "imposes something less stringent than traditional but-for causation."[286] "Contribution" suggests that "more than one factor can be a substantial cause, and no single factor need be the sole causative element."[287] As one federal district court has observed, "Liability cannot be skirted by the mere presence of multiple stressors, lest we enable the simple nature of ecological systems to invariably frustrate the Clean Water Act."[288] Accordingly, if "it is more probable than not that . . . pollution [from stream crossing construction] is among some collection of . . . contributors to" a water quality standard violation, then that pollution

---

[284] *See, e.g.*, 2010 Release of CADDIS (Causal Analysis/Diagnosis Decision Information System), 75 Fed. Reg. 58,374 (Sept. 24, 2010).

[285] 40 C.F.R. §230.10(b).

[286] *Ohio Valley Envtl. Coalition v. Fola Coal Co., LLC*, 120 F. Supp. 3d 509, 542 (S.D. W. Va. 2015) (examining meaning of "material contribution" in West Virginia's narrative criteria). Much of this discussion relies on cases interpreting what it means to "materially contribute." *See, e.g., id.* Because the 404(b)(1) Guidelines do not impose a materiality component, the standard for what it means to contribute is actually less than in the cases discussed here.

[287] *Frito-Lay, Inc. v. Local Union No. 137*, 623 F.2d 1354, 1363 (9th Cir. 1980).

[288] *Fola Coal*, 120 F. Supp. 3d at 542.

"contributes" to water quality standards violations.[289] "This standard does not require scientific certainty, but rather legal probability."[290]

Here, it is more probable than not that sedimentation from Tennessee Gas's dry-ditch, open-cut crossings will contribute to violations of Tennessee's narrative water quality criteria. Those criteria prohibit floating solids, sediment deposits, total suspended solids, and turbidity.[291] The literature establishes that dry-ditch, open-cut crossings cause sediment deposits and visible turbidity plumes downstream from the crossing location.[292] For example, Reid and Anderson (1999) find that "large depositions in slow velocity areas such as shallow side pools, behind boulders and instream debris have been observed to require longer periods or higher flows for removal," and note that 30 cm deep deposits have been observed within 100 m of crossings.[293] And Lévesque, L.M., Dubé (2007) found that "[p]lumes of highly turbid water [have been] observed downstream of construction."[294] Such deposits and turbidity

---

[289] *Id.* at 543.

[290] *Id.*

[291] TN ADC §0400-40-03-.03(1)(e)–(f); *id.* §0400-40-03-.03(2)(e)–(f); *id.* §0400-40-03-.03(3)(c)–(d); *id.* §0400-40-03-.03(4)(c)–(d); *id.* §0400-40-03-.03(5)(d); *id.* §0400-40-03-.03(6)d).

[292] Penkal & Phillips (1984) at 6; Reid & Anderson (1999) at 242.

[293] Reid & Anderson (1999) at 243.

[294] Lévesque & Dubé (2007) at 398.

readily violate the relatively low threshold set by the narrative criteria protecting the recreational and aesthetic uses of Tennessee waters, which prohibit sediment deposits that "*may be detrimental to recreation*" and "suspended solids, turbidity or color in such amounts or character that will result in *any objectionable appearance to the water*[.]"[295]

Moreover, Tennessee's narrative criteria prohibit visible solids and sediment deposits that "*may be detrimental* to fish and aquatic life" and "turbidity, total suspended solids, or color in such amounts or of such character that will materially affect fish and aquatic life."[296] And the narrative criteria further provide that

> [t]he waters shall not be modified through the addition of pollutants or through physical alteration to the extent that the diversity and/or productivity of aquatic biota within the receiving waters are substantially decreased or, in the case of wadeable streams, substantially different from conditions in reference streams in the same ecoregion.[297]

The literature establishes that dry-ditch, open-cut crossings cause such harm to fish and benthos.[298] As Hansen and Betcher (2021) conclude, sedimentation from pipeline construction

> affects benthic macroinvertebrates in several ways: Sediment accumulation fills interstitial spaces used for refuge, decreases

---

[295] TN ADC §0400-40-03-.03(4)(c)–(d) (emphasis added).

[296] *Id.* §0400-40-03-.03(3)(c)–(d) (emphasis added).

[297] *Id.* §0400-40-03-.03(3)(m).

[298] Lévesque & Dubé (2007) at 395–96; X. Yu et al., *Effects of Pipeline Construction on Wetland Ecosystems: Russia-China Oil Pipeline Project (Mohe-*

oxygen availability, and inhibits food sources (Harrison et al. 2007, Leitner et al. 2015). Some species are more susceptible to sediment impacts, which leads to a decrease in benthic biodiversity. Macroinvertebrates of the *Ephemeroptera*, *Plecoptera*, and *Trichoptera* orders are most impacted by sedimentation and are also important food sources for stream fish (Harrison et al. 2007).[299]

That is particularly true where, as here, there would be "multiple crossings on a stream or river, or within a watershed."[300] In those cases, "the detrimental effects of crossing construction [may be] permanent."[301]

The effects described above are more than theoretical. Such violations of state water quality standards caused by open-cut, dry-ditch pipeline crossings have been observed in recent years in West Virginia and Virginia. For example, in 2019, the West Virginia Department of Environmental

---

*Daqing Section*), 39 AMBIO 449 (2010) (attached as Exhibit 24) ("[P]ipeline crossing construction is shown to not only compromise with the integrity of the physical and chemical nature of fish habitat, but also to affect biological habitat and fish behavior and physiology (Lévesque, L.M., Dubé 2007), which will result in the avoidance movement of fish, altered distribution of populations (Newcombe and Jensen 1996) and reduce population size."); Penkal & Phillips (1984) at 7 (noting that blasting attendant to crossing construction kills fish); *id.* at 8 ("Construction and operation of pipelines can cause significant damage to aquatic habitats and fishery resources."); Reid & Anderson (1999) at 244 (finding extirpation of benthic insects and reduced benthic diversity downstream of pipeline crossings).

[299] Hansen & Betcher (2021) at 4.

[300] Lévesque & Dubé (2007) at 406–07. As discussed in Section II.C., *infra*, Tennessee Gas proposes to cut several streams multiple times, and there are multiple of crossings in the same watershed in multiple important systems.

[301] Lévesque & Dubé (2007) at 406–07.

Protection ("WVDEP") entered a consent order to Columbia Gas Transmission, LLC, regarding water quality standards violations that occurred when that pipeline company allowed an upstream dam to fail on a dry-ditch, open-cut crossing of a trout stream in Pendleton County, West Virginia.[302] That particular crossing was using the dam-and-pump crossing method,[303] which is supposed to be less likely to fail than the flume crossing method.[304] WVDEP expressly found that the pipeline company had "cause[d] conditions not allowable [*i.e.*, a violation of West Virginia's narrative water quality criteria] by creating distinctly visible settleable solids in the North Fork of the South Branch of the Potomac River . . . , which is a trout stream."[305] The violation persisted through a ***19-mile-long*** reach of the trout stream.[306]

Two completed Mountain Valley Pipeline crossings also contributed to water quality standards violations, one in Virginia and one in West Virginia. In Virginia, Mountain Valley constructed its dry-ditch, open-cut crossing of S-

---

[302] Consent Order Issued Under the West Virginia Water Pollution Control Act to Columbia Gas Transmission, LLC (Jan. 28, 2019) [hereinafter, "Columbia Gas Consent Order"] (attached as Exhibit 25).

[303] *Id.*

[304] Reid et al. (2004) at 87.

[305] Columbia Gas Consent Order at 2.

[306] *Id.*; *see also* Hansen & Betcher (2021) at 5 (concluding that "The 19-mile sediment impact from a failed dry ditch open-cut crossing during construction of the WB Express Pipeline . . . provides a vivid illustration of the scale of problems that can be caused.").

G36—the North Fork of the Roanoke River—on July 19, 2018.[307] Mountain Valley's inspectors reported problems with sedimentation and turbidity from the pump around outlet.[308] Citizen inspectors, trained by Trout Unlimited in turbidity monitoring, documented sediment deposits and consistent turbidity increases downstream from the crossing location throughout their sampling period from July 19, 2018 through September 9, 2018.[309] Indeed, citizen inspections revealed sediment deposits persisting downstream of that crossing 40 months later.[310] Because sediment deposits and turbidity are harmful to aquatic life and interfere with the aquatic life use by smothering benthic macroinvertebrates, what the citizen inspectors observed constituted violations of Virginia narrative water quality criteria.

In West Virginia, Mountain Valley constructed a pipeline right-of-way crossing through stream S-IJ64 (an unnamed tributary of Little Stony Creek

---

[307] Mountain Valley Pipeline, Visual Site Inspection Report #4841 (July 19, 2018) (attached as Exhibit 26).

[308] *Id.*

[309] Elizabeth Struthers Malbon, Changes in Turbidity of the North Fork of the Roanoke River in Catawba Valley After the Start of Construction of the Mountain Valley Pipeline (2018) (attached as Exhibit 27).

[310] Email from Elizabeth Struthers Malbon to Army Corps of Engineers, Re: Section 10 and Section 404 Permits for Mountain Valley Pipeline (Nov. 18, 2021) (attached as Exhibit 28).

in Monroe County), and its attendant right-of-way bridge, in May 2018.[311] In an inspection on May 9, 2018, a WVDEP inspector documented "conditions not allowable" (that is, a narrative water quality standards violation) that resulted from Mountain Valley's neglect of "[b]ridge matting [that] failed contributing sediment laden water at the right-of-way crossing at S-IJ64[312] The inspector concluded that the resulting sediment deposits caused the "conditions not allowable."[313]

In sum, there is overwhelming evidence that Tennessee Gas's proposed dry-ditch, open-cut crossings will contribute to violations of Tennessee's narrative water criteria, and that those violations will be both substantial and long-term, if not permanent. Accordingly, 40 C.F.R. §230.10(b) prohibits the Corps from issuing the permit sought by Tennessee Gas.

### c. Tennessee Gas's Stream Crossings Will Cause or Contribute to Violations of Tennessee's Antidegradation Policies.

Section 303 of the Clean Water Act establishes an antidegradation policy, "requiring that state standards be sufficient to maintain existing

---

[311] West Va. Dep't of Envtl. Prot., Inspection Report (May 9, 2018) (attached as Exhibit 29).

[312] *Id.*

[313] *Id.*

beneficial uses of navigable waters, preventing their further degradation."[314] Such policies are fundamental elements of a state's water quality standards.[315]

State antidegradation policies must be consistent with 40 C.F.R. §131.12(a), and states must develop implementation methods consistent with that provision.[316] The federal regulations require that antidegradation policies protect existing uses, maintain the existing quality of high-quality waters unless degradation is justified by socio-economic development, and prohibit degradation of outstanding national resource waters.[317]

Tennessee's antidegradation policy has been approved by EPA and is set out in TN ADC §0400-40-03-.06. It categorizes Tennessee's waters into four categories, depending on their existing quality and their state and national significance: "waters with unavailable parameters,"[318] "waters with available

---

[314] 33 U.S.C. §1313(d).

[315] *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 706 (1994) ("EPA's regulations implementing the Act require that state water quality standards include a 'statewide antidegradation policy'[.]" (quoting 40 C.F.R. §131.12)); *see also Nat. Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency*, 16 F.3d 1395, 1400 (4th Cir. 1993) (noting that the antidegradation policy is one of three elements of a state's water quality standards).

[316] 40 C.F.R. §131.12(b).

[317] *Id.* §131.12(a).

[318] TN ADC §0400-40-03-.06(2).

parameters," [319] "Exceptional Tennessee Waters," [320] and "Outstanding National Resource Waters." [321] For waters with unavailable parameters, further degradation of the available parameter is prohibited.[322] Degradation of waters with available parameters or Exceptional Tennessee Waters is only allowed if there are no feasible alternatives and there is a socio-economic justification.[323] And the degradation of Outstanding National Resource Waters is strictly prohibited.[324]

Tennessee's antidegradation implementation procedures are codified in TN ADC §0400-40-03-.06. To conduct an antidegradation review to determine an activity's compliance with Tennessee's antidegradation policy, the reviewer must ensure the application is complete and includes an alternatives analysis to "prevent or lessen the degradation associated with the proposed activity[.]" [325]

---

[319] *Id.* §0400-40-03-.06(3).

[320] *Id.* §0400-40-03-.06(4).

[321] *Id.* §0400-40-03-.06(5).

[322] *Id.* §0400-40-03-.06(2)(a), (c).

[323] *Id.* §0400-40-03-.06(3)–(4).

[324] *Id.* §0400-40-03-.06(5).

[325] *Id.* §0400-40-03-.06(1)(b).

For Tennessee waters with unavailable parameters, new discharges cannot "cause measurable degradation of the parameter that is unavailable."[326] And "habitat alterations that cause significant degradation shall not be authorized" where the unavailable parameter is habitat related.[327]

For Tennessee waters with available parameters, new discharges that would cause more than *de minimis* degradation are only authorized in the absence of "practicable alternatives to prevent or lessen degradation" and where "necessary to accommodate important economic or social development in the area."[328] The same is true for habitat alteration of such waters that would cause more than *de minimis* degradation.[329] Thus, an antidegradation review of waters with available parameters cannot be performed without knowing the baseline water quality of a receiving stream and an analysis of effects of the discharge or habitat alteration at issue.

Because antidegradation policies are a part of Tennessee's water quality standards, the Corps must consider whether Tennessee Gas's proposed

---

[326] *Id.* §0400-40-03-.96(2)(a).

[327] *Id.* §0400-40-03-.06(2)(c).

[328] *Id.* §0400-40-03-.06(3)(a).

[329] *Id.* §0400-40-03-.06(3)(c).

activities comply with those policies as part of its review of the pending application under the Section 404(b)(1) Guidelines.[330]

In short, the Corps must conduct a full antidegradation review of each proposed stream crossing under the Section 404(b)(1) Guidelines.[331] That review must determine the status of the scores of waterbodies that would receive discharges from and be altered by the proposed activities. That review must include a determination of the baseline water quality of those waterbodies for parameters of concern: sedimentation and turbidity. As explained below, that review must conclude that Tennessee Gas's proposed activities are impermissible under Tennessee's antidegradation policy.

Tennessee Gas acts as if an antidegradation review begins and ends with determining whether its project will affect Exceptional Tennessee Waters or Outstanding National Resource Waters.[332] But Tennessee waters with and without available parameters must also be protected from degradation caused

---

[330] 40 C.F.R. §230.10(b) (prohibiting the issuance of a Section 404 permit that would "cause[] or contribute[] . . . to violations of any applicable State water quality standard"); 40 C.F.R §230.11 (requiring the permitting authority to make written factual determinations of compliance or noncompliance with the restrictions in §230.10); *see also Arkansas v. Oklahoma*, 503 U.S. 91, 109 (1992) (holding that "state water quality standards . . . are part of the federal law of water pollution control").

[331] *Cf. Sierra Club*, 64 F.3d at ___ (agreeing that refusal to engage in location-specific antidegradation review of pipeline crossing impacts was arbitrary and capricious).

[332] Application at 65–66.

by dry-ditch, open-cut pipeline crossings. As noted elsewhere in these comments, the degradation caused by Tennessee Gas's construction of dry-ditch, open-cut crossings could be permanent, or at least persist for four years,[333] which cannot be construed as a "short duration."[334]  Indeed, even FERC's deficient DEIS for the Cumberland Project acknowledges that impacts that "require more than 3 years" for recovery are "long term" in duration.[335] For the following reasons, the Corps should deny Tennessee Gas's application on the basis of the projects impacts to such waters.

### i. Antidegradation Rules Protect Already Impaired Streams.

The Corps must consider the effects of Tennessee Gas's proposed activities on Tennessee streams that are not currently meeting their designated uses or are failing to meet specified water quality criteria. Under Tennessee's antidegradation procedures, "[u]navailable parameters exist where water quality is at, or fails to meet, the levels specified in" Tennessee's

---

[333] Lévesque & Dubé (2007) at 406–07; Silvis at 2–5; BiOp at 210; Armitage & Gunn (1996) at 170 (emphasis added).

[334] TN ADC §0400-40-03-.04(3).

[335] DEIS at 4-5.

water quality criteria.[336] Tennessee's antidegradation policy prohibits any further degradation when a stream is already impaired.[337]

In accordance with Section 303(d) of the Clean Water Act, Tennessee maintains a list of impaired streams.[338] In its Section 404 permit application, Tennessee Gas did not bother to address the Section 303(d)-listing status of the streams that it intends to trench or blast through. Section 4.3.2.2 of FERC's deficient DEIS for the Cumberland Project, however, claims that there are five waterbodies that do not meet state water quality criteria.[339] Specifically, Jones Creek is identified as impaired due to, *inter alia*, excessive sedimentation and siltation.[340] Two unnamed tributaries of Jones Creek are impaired because of flow alterations, and a third unnamed tributary of Jones Creek is impaired because of excessive sedimentation and siltation.[341] And Wells Creek is impaired because of *E. coli* contamination from sewer overflows.[342]

---

[336] TN ADC §0400-40-03-.06(2).

[337] *Id.*

[338] Tennessee 303(d) List.

[339] DEIS at 4-31.

[340] *Id.*

[341] *Id.* at 4-31 to 4-32.

[342] *Id.* at 4-32.

Tennessee Gas does not intend to use dry-ditch, open-cut crossings on Wells Creek and Jones Creek, so the right-of-way crossings of those streams may not require antidegradation review.[343] But Tennessee Gas does plan to use dry-ditch, open-cut crossings on as many as seven streams that it identifies as unnamed tributaries of Jones Creek.[344] Tennessee Gas's Section 404 permit application does not specify which of those crossings are the impaired unnamed tributaries of Jones Creek discussed in the DEIS, let alone address how the impaired status of those streams affects the antidegradation analysis described in these comments.

Moreover, neither Tennessee Gas's Section 404 application nor the DEIS acknowledge or discuss the impaired status of a sixth stream. Tennessee's 2022 Section 303(d) list identifies Leatherwood Creek in the Harpeth River

---

[343] Table 1 (rev. Mar. 2023) at 2, 17. Tennessee Gas has proposed two access road crossings for Jones Creek, however, which will require antidegradation review.

[344] *Id.* at 2–3. The plan to blast or trench through all unnamed tributaries to Jones Creek contradicts Tennessee Gas's plans that it communicated to FERC contemporaneously with its Section 404 application. Tennessee Gas's Resource Reports to FERC state that the company planned to use HDD to cross three unnamed tributaries to Jones Creek because of their impaired status. Tennessee Gas Pipeline Co., LLC, Final Resource Report 2: Water Use and Quality, Cumberland Project, Docket No, CP22-)))-000 at 2-14 (July 2022) (attached as Exhibit 6). Inexplicably, Tennessee Gas's Section 404 permit application proposes dry-ditch, open-cut crossings for all of the unnamed tributaries of Jones Creek. Table 1 (rev. Mar. 2023) at 2–3. Tennessee Gas must explain that discrepancy before the Corps can act on its Section 404 application.

Watershed as impaired for unknown causes.[345] Tennessee Gas proposes dry-ditch, open-cut crossings of Leatherwood and eight of its unnamed tributaries in its Section 404 application.[346] Tennessee Gas proposes two dry-ditch, open-cut crossings of one of those unnamed tributaries.[347] And Tennessee Gas proposes an access road crossing and a workspace crossing for two of those unnamed tributaries, in addition to the proposed right-of-way crossings.[348] Tennessee Gas's failure to acknowledge or discuss the impaired status of Leatherwood Creek and its unnamed tributaries, as well as its omission of the status of the unnamed tributaries of Jones Creek, is yet another reason its application is incomplete and for Corps denial of the permit.

But in all events, the Corps must consider the effects of sedimentation from Tennessee Gas's proposed crossings on Leatherwood Creek and its unnamed tributaries, as well as on the unnamed tributaries of Jones Creek, because those streams are waters without available parameters under Tennessee's antidegradation standard. And, as discussed elsewhere in these

---

[345] Tennessee 303(d) List.

[346] Table 1 (rev. Mar. 2023) at 10–11.

[347] *Id.* at 12 (proposing two crossings of Stream ID No. SDKB025).

[348] *Id.* at 10 (access road crossing of Stream ID No. SDKA047); *id.* at 11 (workspace crossing of Stream ID No. SDKB028).

comments, Tennessee Gas's stream crossings will result in increased sedimentation in streams.[349]

For the streams discussed above that have been identified as impaired because of sedimentation or biologically impaired for an unknown cause, the antidegradation policy prohibits additional lowering of the water quality for the sedimentation.[350] Because of that strict prohibition, and because of the persistent nature of sedimentation, additional sedimentation in those streams from Tennessee Gas's proposed activities is prohibited by Tennessee's water quality standards. Accordingly, the Corps should deny Tennessee Gas's application under the Section 404(b)(1) guidelines.[351]

### ii. Antidegradation Rules Protect High-Quality Streams that Have Available Parameters.

The Corps should treat any stream that is not impaired because of noncompliance with Tennessee water quality standards that would be affected by Tennessee Gas's proposed crossings as a water with available parameters under TN ADC §0400-40-30-.06(3). Tennessee's antidegradation policy prohibits more than *de minimis* degradation of such streams without conducting an alternatives analysis and a socio-economic evaluation. [352]

---

[349] *See, e.g.*, Section II.B.1, *supra*.

[350] TN ADC §0400-40-03-.06(2).

[351] 40 C.F.R. §230.10(b).

[352] TN ADC §0400-40-30-.06(3).

Whether impermissible degradation will occur cannot be determined without two important quantifications that are absent from Tennessee Gas's application: (1) baseline water quality for the affected streams—such as measures of embeddedness and benthic macroinvertebrate assessment scores, and (2) the quantification through modeling of the amount of additional sediment loading that will result from the proposed activities.

Tennessee Gas has not provided baseline water quality data for sedimentation, turbidity, embeddedness, or other parameters of concern for the streams that will be affected by its proposed activities. Nor has Tennessee Gas made any effort to quantify the increased sediments that would be discharged as a result of its proposed activities.[353] Such a quantification is possible through the use of modeling techniques to predict the turbidity and suspended solids concentrations that would result from pipeline construction.[354]

Without baseline water quality data for sedimentation and turbidity, and without quantification of increased sedimentation and turbidity from

---

[353] Hansen & Betcher (2021) at 5 ("Detailed, site-specific and stream-specific information and modeling would be needed to predict the scale of impacts and the amount of time required to return to pre-construction conditions. This type of information and modeling is absent from MVP's application.").

[354] *See, e.g.*, Fed. Energy Regul. Comm'n, *Final Environmental Impact Statement for the Jordan Cove Energy Project* 4-108 (Nov. 2019) (attached as Exhibit 30), https://www.ferc.gov/sites/default/files/2020-05/11-15-19-FEIS_Part_1.pdf.

Tennessee Gas's proposed activities, the Corps cannot perform an antidegradation review for the waters with available parameters impacted by the proposed activities. Accordingly, the Corps should deny Tennessee Gas's application as incomplete. At minimum, the Corps should require Tennessee Gas to gather the required data and solicit additional public comment—to ensure data quality—prior to acting on Tennessee Gas's application.

### 3. TENNESSEE GAS'S PROPOSED ACTIVITIES WILL CAUSE OR CONTRIBUTE TO SIGNIFICANT DEGRADATION OF THE WATERS OF THE UNITED STATES.

The 404(b)(1) Guidelines prohibit the issuance of a permit where the proposed discharges "will cause or contribute to significant degradation of the waters of the United States."[355] "Significant degradation" includes significant adverse effects on municipal water supplies; fish; shellfish; special aquatic sites; life stages of aquatic life and other wildlife; and aquatic ecosystem diversity, productivity, and stability.[356] As explained below, the discharges proposed by Tennessee Gas will cause or contribute to such degradation. As with the prohibition against water quality standards violations, a contribution

---

[355] 40 C.F.R. §230.10(c).

[356] *Id*. §230.10(c)(1)–(4).

to significant degradation is sufficient to trigger the prohibition.[357] Consequently, the Corps must deny the application.

### a. Tennessee Gas's Stream Crossings Threaten Significant Adverse Effects to Fish and Shellfish.

The 404(b)(1) Guidelines prohibit significant degradation in the form of significant adverse effects on fish and shellfish.[358] The pipeline crossing literature discussed in Section II.B.1, *supra*, establishes that dry-ditch, open-cut crossings like those proposed by Tennessee Gas, contribute to significant adverse effects on fish. Those impacts include, *inter alia*, adverse effects on fishery habitat from sedimentation;[359] lethal effects from blasting;[360] and effects on "fish behavior and physiology (hierarchy, feeding, respiration rate, loss of equilibrium, blood hematocrit and leukocrit levels, heart rate and stroke volume)."[361] Accordingly, Tennessee Gas's proposed discharges threaten to cause or contribute to significant adverse effects on fish, and the permit application should be denied.

---

[357] *Id.* §230.10(c); *see also* Section II.B.2, *supra*.

[358] *Id.* §230.10(c)(1).

[359] Penkal & Phillips (1984) at 6; Reid & Anderson (1999) at 242.

[360] Penkal & Phillips (1984) at 7.

[361] Lévesque & Dubé (2007) at 395.

### b. *Tennessee Gas's Crossings Threaten Significant Adverse Effects to Special Aquatic Sites.*

Not only do special aquatic sites receive special treatment in the LEDPA analysis, they must be evaluated to determine whether the proposed discharges will cause or contribute to significant adverse effects on them.[362] As discussed above, Tennessee Gas's proposed activities will affect two types of special aquatic sites: wetlands and streams with riffle and pool complexes.

### i. *Tennessee Gas's Crossings Will Cause or Contribute Significant Degradation to Wetlands and Their Functions.*

Tennessee Gas's proposed discharges will cause or contribute to significant adverse impacts to 0.69 acres of wetlands.[363] As a threshold matter, the lack of information in the application about how Tennessee Gas intends to construct dry-ditch, open-cut crossings in standing water in wetlands is concerning. Silvis concludes that that the "application's lack of information on wetland crossing methods to reduce environmental impacts does not meet minimum industry standards and will lead to substantial negative impacts to wetland resources."[364] In other words, Silvis predicts significant degradation to wetlands.

---

[362] 40 C.F.R. §230.10(c)(1).

[363] Table 2.

[364] Silvis (2023) at 18.

The scientific literature concludes that pipeline crossings have the potential to destroy the integrity and background of wetland ecosystems.[365] As a result of the deep trenching required in an open-cut crossing of wetlands, Silvis (2023) states that

> Excavation of material in wetlands alters the hydraulic properties and the soil structure **permanently**. Olson and Doherty (2012) noted that '[i]nstallation of large-scale infrastructure, including pipelines, has the potential to damage soil and vegetation in wetlands within the path of construction by compacting soil, altering hydrology, decreasing plant diversity, and facilitating invasions of unwanted species." In one study, soils consistently showed evidence of compaction and hydrologic alteration eight years after the wetlands were crossed by natural gas pipelines (Olson and Doherty, 2012). Wetland soils take years to form and to function (Jackson et al., 2014). By excavating, stockpiling, and then replacing soils in wetlands, the hydraulic conductivity of the soil changes, the porosity is decreased, connectivity of pores decreases, compaction increases, and soil horizons are altered. All of these characteristics work in conjunction to form a functioning wetland soil (Jackson et al., 2014). Fill associated with trenching changes all of these characteristics. Even with the provision to replace the top layer

---

[365] Yu et al. (2010) at 449.

of wetland soils, the functionality of the wetland is permanently negatively impacted.[366]

Accordingly, Tennessee Gas's proposed wetland trenching will have impermissible significant adverse effects on wetland, particularly given the absence of any proposal from Tennessee Gas for mitigation.[367]

### ii. Tennessee Gas's Crossings Will Significantly Degrade Riffle-and-Pool Complexes.

As discussed above, Tennessee Gas will surely cross streams with riffle-and-pool complexes, but the applicant does not specify where or how many.[368] The 404(b)(1) Guidelines identify a number of adverse effects on riffle-and-pool complexes from sedimentation, including the total elimination of such complexes, the creation of unsuitable habitat, clogging, habitat destruction, and anaerobic conditions.[369]

Effects of Tennessee Gas's proposed project on riffle-and-pool complexes will not be limited to the crossing locations themselves. Sedimentation released from dry-ditch, open-cut crossings fills downstream interstitial spaces.[370] As Sulkin observes, the streams that Tennessee Gas proposes to

---

[366] Silvis (2023) at 3–4 (emphasis added).

[367] Application at 56.

[368] *See* Section II.A.1, *supra*.

[369] 40 C.F.R. §230.45.

[370] Penkal & Phillips (1984) at 6.

cross are likely rife with riffle-and-pool complexes.[371] Accordingly, Tennessee Gas's stream crossings will lead to adverse significant impacts on riffle-and-pool complexes downstream from the proposed crossing locations.

In any event, the Corps cannot conclude that Tennessee Gas's proposals comply with the prohibition against significant adverse impacts to special aquatic sites because Tennessee Gas has failed to sufficiently quantify or identify the riffle-and-pool complexes it intends to cross. Without that information, the Corps cannot make the requisite factual determinations under 40 C.F.R. §230.11.

### c. Tennessee Gas's Crossings Threaten Significant Adverse Effects to Life Stages of Aquatic Life and Other Wildlife.

The 404(b)(1) Guidelines prohibit significant degradation in the form of serious adverse effects on the life stages of aquatic life and other wildlife.[372] The literature establishes that "silt or sand deposition can fill interstices in gravel," and that "[e]quipment operating in the stream . . . can eliminate spawning habitat."[373] As a result, stream crossings have been shown to affect fish reproductive success.[374] Specifically,

> [i]ncreased sediment deposition and substrate compaction from pipeline crossings can degrade spawning habitat, result in the

---

[371] Sulkin (2023) at 2.

[372] 40 C.F.R. §230.10(c)(2).

[373] Penkal & Phillips (1984) at 6.

[374] Lévesque & Dubé (2007) at 399.

production of fewer and smaller fish eggs, impair egg and larvae development, [and] limit food availability for young-of-year fish[.][375]

Notwithstanding all its other flaws, FWS's Revised Biological Opinion for the Mountain Valley Pipeline reaches the same conclusion, stating that sedimentation from pipeline construction, including dry-ditch, open-cut crossings, can be expected to

cause multiple adverse effects on all life stages of benthic fish, including loss of stream habitat essential for sheltering, foraging, and spawning; increased mortality of eggs, YOY, juveniles, and adults; increased predation on eggs by sediment-dwelling invertebrates; avoidance of previously occupied habitat; increased vulnerability of adults to predation; [and] reduced reproductive success.[376]

Consequently, Tennessee Gas's proposed crossings will cause significant adverse effects on the life stages of aquatic life and cannot be permitted.

### d. Tennessee Gas's Crossings Threaten Significant Adverse Effects to Aquatic Ecosystem Diversity, Productivity, and Stability.

The Corps cannot issue a Section 404 permit where the proposed discharges would cause or contribute to significant adverse effects on "aquatic ecosystem diversity, productivity, and stability."[377] The available stream-crossing literature establishes that such effects should be expected from

---

[375] Ex. 19 at 3.

[376] BiOp at 190.

[377] 40 C.F.R. §203.10(c)(3).

Tennessee Gas's proposed dry-ditch, open-cut crossings. For example, Reid and

Anderson (1999) found:

> Downstream changes to the diversity and structure of benthic invertebrate communities have also occurred after pipeline construction (Anderson *et al.* 1998). One week after construction, the downstream benthic invertebrate community in Findlay Creek, Ontario was generally limited to sediment tolerant species of oligochaetes (aquatic earthworms) (Anderson *et al.*, 1998). At upstream control sites, the benthic invertebrate fauna was characterized as very diverse with over 26 species comprised of chironomids, caddisflies, stoneflies, mayflies, and dragonflies. Observed changes in community structure likely resulted from reductions in habitat availability for species dependent on interstitial spaces between coarse substrates.[378]

And Lévesque and Dubé (2007) observed that

> Armitage and Gunn (1996) noted that pipeline crossing construction in a stream in England **resulted in a shift in invertebrate species** due to an increased proportion of silt in stream substrates. **This effected persisted for 4 years** until a high magnitude flow event scoured the stream channel bed, promoting re-establishment of pre-construction invertebrate species. Tsui and McCart (1981) found that crossing construction of Archibald Creek, British Columbia, caused short-term increases in silt and sand accumulation **and decreases in invertebrate standing crop and diversity, which lasted 1 to 2 years.**[379]

Moreover, "[p]ipeline crossing construction is shown to not only compromise

with the integrity of the physical and chemical nature of fish habitat, but also

to affect biological habitat and fish behavior and physiology (Lévesque and

Dube 2007), which will result in avoidance movement of fish, altered

---

[378] Reid & Anderson (1999) at 244.

[379] Lévesque & Dubé (2007) at 399 (emphasis added).

distribution of populations (Newcombe and Jensen 1996) and reduce population size and species."[380] And "[t]he integrity and background of wetland ecosystems may be destroyed."[381] Those significant adverse effects on the aquatic ecosystems, diversity, productivity, and stability require the Corps to deny Tennessee Gas's pending application under 40 C.F.R. §230.10(c)(3).

## C. TENNESSEE GAS HAS NOT PROVIDED SUFFICIENT INFORMATION TO ALLOW THE CORPS TO MAKE THE FACTUAL DETERMINATIONS REQUIRED BY THE 404(B)(1) GUIDELINES.

As both EPA and the federal courts recognize, under the 404(b)(1) Guidelines, "[t]he burden of proof to establish compliance with the Guidelines rests with the applicant; where insufficient information is provided to determine compliance, the Guidelines require no permit be issued."[382] That requirement comes from 40 C.F.R. §230.12(a)(3)(4), which requires the Corps to reject proposed disposal sites when "[t]here does not exist sufficient

---

[380] Yu et al. (2010) at 449.

[381] *Id.*; *see also* Section II.B.3.b, *supra.*

[382] Memorandum to the Field, Subject: Appropriate Level of Analysis Required for Evaluating Compliance with the Section 404(b)(1) Guidelines Alternatives Requirements (Aug. 23, 1993), *available at* 62 Fed. Reg. 31,492, 31,497–99 (June 9, 1997); *e.g.*, *Utahns for Better Transp.*, 305 F.3d at 1187 ("The burden of proof to demonstrate compliance with the § 404(b) permit Guidelines rests with the applicant; where insufficient information is provided to determine compliance, the Guidelines require that non permit be issued.").

information to make a reasonable judgment as to whether the proposed discharge will comply with these guidelines."[383]

Tennessee Gas's permit application is far too summary about its proposed discharges and disposal sites. It is almost as if the applicant is relying on the sheer scope of its proposed individual permit to overwhelm the process and allow it to skirt the information requirements. Tennessee Gas attempts to push through an application for 155 stream crossings and seven wetlands crossings that would readily be found insufficient if it were submitted for any single one of its proposed crossings. But Section 404 does not allow Tennessee Gas to generalize about its crossing locations simply because it decided to build a project with scores of proposed discharges at scores of proposed locations. If it were otherwise, the biggest, most destructive projects would face fewer requirements than a project affecting just one stream or wetland.

The Section 404(b)(1) Guidelines require detailed information about **each disposal site**, and Tennessee Gas simply has not met that requirement. That is equally true of the recently added unsurveyed, discharge sites— considered only through a desktop review—and the surveyed sites identified in the July 2022 application. The 404(b)(1) Guidelines provide that "[d]ocumentation to demonstrate knowledge about . . . the candidate disposal

---

[383] 40 C.F.R. §230.12(a)(4)(iv).

site is an essential component of guideline application."[384] The Corps must make factual findings about the suspended particulates and turbidity that are certain to result from Tennessee Gas's proposed discharges, including "in terms of potential changes in the kinds and concentrations of suspended particulate/turbidity in the vicinity **of the disposal site**."[385] It also must make factual findings regarding the physical substrate, including "the characteristics of the substrate **at the proposed disposal site**."[386] And the Corps must make factual findings about the nature and degree of the effects of the discharge "on the structure and function of the aquatic ecosystem and organisms."[387] To make all of those findings, the Corps needs far more site-specific information than Tennessee Gas has provided.

For example, to make determinations about sedimentation and turbidity, the Corps needs site-specific information about the current water quality at each and every stream, as well as modeling data to determine how much sediment and turbidity each specific crossing will add to the affected streams.[388] To make determinations about the effects on the substrate, the

---

[384] 40 C.F.R. §230.6(a).

[385] *Id.* §230.11(c) (emphasis added).

[386] *Id.* §230.11(a) (emphasis added).

[387] *Id.* §230.11(e).

[388] Hansen & Betcher (2021) at 5 ("Detailed, site-specific and stream-specific information and modeling would be needed to predict the scale of impacts and the amount of time required to return to pre-construction conditions. This type

Corps needs to know where the riffle-and-pool complexes are. And to make determinations about the structure and function of the aquatic ecosystem and organisms, the Corps needs benthic assessments and other water quality data from each and every affected stream and confirmation of the fish species present in each and every affected stream.

The Fourth Circuit's opinion in *Ohio Valley Environmental Coalition, Inc. v. U.S. Army Corps of Engineers*, 716 F.3d 119 (4th Cir. 2013), provides examples of the kinds of information that the Corps would need in order to survive a judicial challenge to Tennessee Gas's proposed permit on the basis of insufficient baseline data. In that case, the environmental plaintiffs challenged whether the Corps had misapprehended the baseline conditions at the disposal sites at issue.[389] To determine whether the plaintiffs' claims had merit, the Court examined how the Corps examined the baseline conditions of the watershed at issue.[390] Among the factors the Corps considered were: (1) "the

---

[389] of information and modeling is absent from MVP's application."); *see also* Section II.B.2.c.ii, *supra*.

[389] *Ohio Valley Envtl. Coalition, Inc. v. U.S. Army Corps of Eng'rs*, 716 F.3d 119, 124 (4th Cir. 2013). Accurate information about baseline conditions is essential because "[a] material misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork for an arbitrary and capricious decision." *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012).

[390]*Id.*

conditions at the [proposed] fill site itself,"[391] and (2) an analysis of the impaired conditions of the streams in the relevant watershed."[392]

The Corps' review of the conditions at the disposal site included a review of the flow regime, rapid bioassessment protocols, stream condition index scores, benthic macroinvertebrate analyses, the condition and functions of the receiving streams, and the existing stream quality.[393] From there, the Court noted that the Corps "followed up this summary by detailing the supporting data collected with respect to 'physical habitat,' 'water quality,' 'benthics,' and 'stream functioning.'"[394]

When it turned to the impaired status of the watershed at issue, the Corps examined baseline water-quality testing data from eight sites in the watershed, including the stream to be filled and nearby streams, as well as the forest coverage in the watershed at issue and its ability to absorb the impacts.[395]

Based on what it described as the Corps' "contextual judgment made after considering all relevant data," the Fourth Circuit rejected the

---

[391] *Id.* at 125.

[392] *Id.*

[393] *Id.*

[394] *Id.* at 125–26.

[395] *Id.* at 126–27.

environmental plaintiffs' contention that the Corps misapprehended the baseline conditions.[396]

In contrast, Tennessee Gas has not provided the amount of data held to be sufficient in *Ohio Valley Environmental Coalition* for ***any single disposal site***, let alone the 150+ sites it seeks to permit.[397] For example, Tennessee Gas has not provided *any* water quality data or benthic assessment scores for *any* stream in its path. A robust dataset like that upheld in *Ohio Valley Environmental Coalition* is necessary for every waterbody at issue in order for the Corps to consider all of the relevant factors, determine compliance with the 404(b)(1) Guidelines, and survive judicial review.

The need for baseline data is not just required by the 404(b)(1) Guidelines and federal court caselaw, it is also required by the scientific literature examining pipeline crossings. The authors of the article documenting benthic effects for four years after a pipeline crossing was completed concluded that, "the study has shown . . . that before authoritative statements concerning environmental impact can be made *it is essential to have knowledge of the natural variation to be expected in streams of differing*

---

[396] *Id.* at 127.

[397] *See* Silvis (2023) at 14 (noting lack of site-specific information).

*characteristics.*[398] In order to predict the potential effects of dry-ditch, open-cut trenches on *specific* streams,

> **[m]onitoring prior to construction should include both habitat and biological surveys upstream and downstream of the proposed crossing location. . . . Other important habitat measures pertain to . . . water quality (e.g., TSS, turbidity, DO, water temperature, pH, conductivity). Biotic measures provide information on fish and invertebrate communities specific to the river or stream, and/or habitat types, of interest.**[399]

And because of the existence of multi-year impacts from stream crossings, robust baseline data is needed "to identify site-specific sensitivities and responses to disturbance."[400] That sort of information is absent from Tennessee Gas's application,[401] yet it is required for each and every waterbody.

Silvis (2023) predicts dire consequences from that scarcity.[402] She notes that Tennessee Gas has identified two types of dry-ditch, open-cut crossings that it might employ—dam-and-pump and flume—but does not specify which method would be used at which site.[403]

> [Each of these methods] require[s] prior crossing-specific knowledge of velocity, flow rate, soil conditions, contributing

---

[398] Armitage & Gunn (1996) at 161 (emphasis added).

[399] Lévesque & Dubé (2007) at 405–06 (emphasis added).

[400] *Id.* at 406.

[401] Silvis (2023) at 15.

[402] *Id.*

[403] *Id.*

> watershed area, seasonal rainfall data, stream plan, profile, and longitudinal surveys, channel cross-section, depth of flow, bank stability, and more because these methods are not fungible and their suitability and the extent of their impacts will vary site by site. … Tennessee Gas's application does not provide the necessary information described above for making or justifying appropriate site-specific selections of dewatering method for each proposed open-cut crossing.[404]

The dearth of information and lack of planning will allow Tennessee Gas's field personnel "to make decisions on the fly with no ability for regulatory agencies to evaluate the efficacy of the proposed crossing for environmental protection."[405] Silvis (2023) concludes,

> **As someone who has evaluated many stream crossing proposals, I conclude that Tennessee Gas's application does not meet minimum industry standards for evaluating site-specific conditions. Furthermore, given the omission of critical site-specific information in the application, it is my professional opinion that there is significant likelihood of water quality violations, including increases in turbidity as well as in-stream sediment deposition, from the proposed crossings.[406]**

Information deficits infect every aspect of Tennessee Gas's application. For example, as flagged elsewhere in these comments, such data gaps affect

---

[404] *Id.*

[405] *Id.*

[406] *Id.* at 17 (emphasis added). Silvis identified similar information gaps regarding Tennessee Gas's proposed waterbody crossings for its roads that would lead to ill-informed "on the fly" decision making. *Id.* at 13. Silvis concluded, "if left to field personnel to install without design documents, there will be excessive impacts and failures which will cause long-term damage to aquatic ecosystems . . . ." *Id.*

the LEDPA analysis, identification of riffle-and-pool complexes, the determination of whether the project will cause water quality standards violations, and the determination of whether the project will cause significant degradation.

Additionally, more information is needed to determine the cumulative effects of the crossings proposed by Tennessee Gas. Among the factual findings that the Corps must make under the 404(b)(1) Guidelines is a "[d]etermination of cumulative effects on the aquatic ecosystem."[407] Cumulative effects must also be evaluated as part of the factual determinations of the effects of the proposed discharge on the physical substrate, the effects of suspended particulates and turbidity, and the effects on the structure and function of the aquatic ecosystem and organisms.[408]

The 404(b)(1) Guidelines recognize that, "[a]lthough the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems." [409] That description of cumulative effects

---

[407] 40 C.F.R. §230.11(g).

[408] *Id.* §230.11(a), (c), & (e).

[409] *Id.* §230.11(g).

remarkably tracks the conclusions of the scientific literature on the significant

cumulative effects of dry-ditch, open-cut crossings:

> The potential for cumulative effects associated with pipeline crossing construction should be taken into consideration in assessing the impacts of these activities on rivers and streams. Construction of a single crossing on a stream or river, or within a watershed, may not have significant effects on fish and fish habitat in that system. **Construction of multiple crossings on a stream or river, or within a watershed, however, has the potential for cumulative effects on that system. In such cases, the capacity of the system to recover from impact may be exceeded, and the detrimental effects of crossing construction permanent. The same may be said for the frequency of crossing construction within a given system; rivers and streams will have limited capacities to recover from multiple impacts.**[410]

Despite the 404(b)(1) Guidelines' requirements for factual findings

regarding cumulative effects, and despite the scientific literature's clear

predictions of significant effects, Tennessee Gas's application is devoid of any

analysis of the cumulative effects of its proposed crossings. Indeed, it does not

even call the Corps' attention to, or otherwise quantify, the streams and

watersheds that it would cut multiple times with its proposed open-cut

trenches. There are many.

Lickskillet Branch presents an example of a stream poised to suffer

permanent adverse effects if the Corps grants Tennessee Gas's permit.

Tennessee Gas proposes to cross Lickskillet Branch in Houston County with

---

[410] Lévesque & Dubé (2007) at 406–07.

*three* open-cuts for the Cumberland Pipeline's right-of-way.[411] Tennessee Gas presents no analysis of Lickskillet Branch's capacity to recover from multiple impacts of the scale threatened by the multiple proposed crossings. Although Lickskillet Branch holds the unfortunate distinction of being the stream the Cumberland Pipeline will cross the most, there is a six-way tie for second place between Upper Sugarcamp Branch, Porters Branch, an unnamed tributary of Harris Branch (Stream ID No. SDKA038), an unnamed tributary of Dry Hollow Branch (Stream ID No. SDKR008), an unnamed tributary of Leatherwood Creek (Stream ID No. SDKB025), and an unnamed tributary of Guices Branch (Stream ID No. SHNE004) with two proposed dry-ditch, open-cut crossings each.[412] As with Lickskillet Branch, Tennessee Gas does not provide any information about the capacity of those six streams to recover from multiple open-cuts. Tennessee Gas's silence is particularly problematic for the unnamed tributary of Leatherwood Creek, given that Leatherwood Creek is listed on Tennessee's 303(d) List as impaired for an unknown reason.[413]

Substantial and permanent adverse effects are not limited to multiple open-cuts on the same stream, however; they are also implicated by multiple

---

[411] Table 1 (rev. Mar. 2023) at 16.

[412] Table 1 (rev. Mar. 2023) at 1, 2, 5, 8, 10, 14.

[413] Tennessee 303(d) List.

crossings in the same watershed.[414] At this level of analysis, numerous river and stream systems face a high-risk of substantial and permanent cumulative effects from open-cut trenches, yet Tennessee Gas does not discuss those risks. Tennessee Gas proposes multiple cuts in small watersheds as follows:

- Two dry-ditch, open-cuts of the mainstem of Upper Sugarcamp Branch and one dry-ditch, open-cut crossing for one of its unnamed tributaries;[415]

- Dry-ditch, open-cut crossings of the mainstem of Jordan Branch and three of its unnamed tributaries;[416]

- Two dry-ditch, open-cut crossings of the mainstem of Porters Branch and four of its unnamed tributaries;[417]

- Dry-ditch, open-cut crossings of six unnamed tributaries of Jones Creek;[418]

- Dry-ditch, open-cut crossings of the mainstem of Gafford Branch and five of its unnamed tributaries;[419]

---

[414] Lévesque & Dubé (2007) at 406–07.

[415] Table 1 (rev. Mar. 2023) at 1.

[416] *Id.* at 1.

[417] *Id.* at 1–2.

[418] *Id.* at 2–3.

[419] *Id.* at 3–4.

- Dry-ditch, open-cut crossings of the mainstem of Johnson Creek and five of its unnamed tributaries;[420]

- A dry-ditch, open-cut crossing of the mainstem of Harris Branch, two dry-ditch, open-cut crossings of one of its unnamed tributaries (SDKA038), and a single dry-ditch, open-cut crossing of two other unnamed tributaries of that stream;[421]

- Dry-ditch, open-cut crossings of the mainstem of Bartons Creek and one of its unnamed tributaries;[422]

- Dry-ditch, open-cut crossings of the mainstem of Nesbitt Branch and four of its unnamed tributaries;[423]

- Dry-ditch, open-cut crossings of Furnace Creek and one of its unnamed tributaries;[424]

- A dry-ditch, open-cut crossing of the mainstem of Dry Hollow Branch, two dry-ditch, open-cut crossings of one of its unnamed tributaries

---

[420] *Id.* at 4–5.

[421] *Id.* at 5.

[422] *Id.* at 5–6.

[423] *Id.* at 6.

[424] *Id.* at 6–7.

(SDKR008), and a single dry-ditch, open-cut crossing of eight other unnamed tributaries of that stream;[425]

- Dry-ditch, open-cut crossings of Little Bartons Creek and five of its unnamed tributaries;[426]

- A dry-ditch, open-cut crossing of the mainstem of Leatherwood Creek, two dry-ditch, open-cut crossings of one of its unnamed tributaries (SDKA025), and a single dry-ditch, open-cut crossing of eight other unnamed tributaries of that stream;[427]

- Dry-ditch, open-cut crossings of seven unnamed tributaries of Williamson Branch;[428]

- Dry-ditch, open-cut crossings of seven unnamed tributaries of Yellow Creek;[429]

- Dry-ditch, open-cut crossings of the mainstem of Indian Branch and three of its unnamed tributaries;[430]

---

[425] *Id.* at 7–8.

[426] *Id.* at 9.

[427] *Id.* at 10–11.

[428] *Id.* at 11–12.

[429] *Id.* at 12–13.

[430] *Id.* at 13–14.

- A dry-ditch, open-cut crossing of the mainstem of Guices Branch, two dry-ditch, open-cut crossings of one of its unnamed tributaries (SHNE004), and a single dry-ditch, open-cut crossing of 11 other unnamed tributaries of that stream;[431]

- Dry-ditch, open-cut crossings of the mainstem of Guices Creek and two of its unnamed tributaries;[432] and

- Three dry-ditch, open-cut crossings of Lickskillet Branch and one dry-ditch, open-cut crossing each for of its unnamed tributaries.[433]

Tennessee Gas's application does not present any information about the capacity of those watersheds (or any others) to recover from the multiple open-cuts that Tennessee Gas's proposed route would trench through those watersheds.

In sum, because of the requirements of the Section 404(b)(1) Guidelines, the scientific literature establishing potentially permanent impacts to watersheds from multiple trenched crosses in the same watershed, and the silence of Tennessee Gas's application on those issues, the Corps must deny the pending application.[434]

---

[431] *Id.* at 14–15.

[432] *Id.* at 15–16.

[433] *Id.* at 16.

[434] Also missing from Tennessee Gas's application is any evaluation of the cumulative and aggregated impacts that would result from the combination of Tennessee Gas's upland activities and proposed stream crossings. Tennessee

## D. THE CORPS CANNOT ISSUE THE REQUESTED PERMIT BECAUSE ALL APPROPRIATE AND PRACTICABLE STEPS HAVE NOT BEEN TAKEN TO MINIMIZE POTENTIAL ADVERSE IMPACTS TO THE AQUATIC ECOSYSTEM.

The 404(b)(1) Guidelines prohibit the issuance of a Section 404 permit "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts on the aquatic ecosystem." [435] The 404(b)(1)

---

Gas's upland activities threaten to contribute substantial sediment loads to streams along the proposed route of the Cumberland Pipeline. Expert Starr Silvis predicts these impacts from upland disturbances:

> The conversion of forested land to maintained right-of-way increases runoff volumes, which will change stream morphology. Lack of intact forest cover has been found to change stream morphology for two to four years post-disturbance (Reid & Anderson 1999). Methods to maintain the right-of-way include the use of pesticides and herbicides which can be mobilized in stormwater runoff and cause degradation of aquatic ecosystems. The construction of temporary and permanent access roads also increases runoff volumes and increases turbidity and sediment migration from upland areas to waterbodies. The increases in stormwater runoff volumes can alter stream morphology and stream bed composition. There are also long-term increases in temperature associated with the reduction of forested canopy for both streams and wetlands.

Silvis (2023) at 4. As a result, the Corps must evaluate whether the locations that would be affected by sedimentation from Tennessee Gas's proposed open-cut stream crossings will also be affected by sedimentation and runoff from Tennessee Gas's upland activities and determine the cumulative effects of those discharges on the aquatic ecosystems. *See* 40 C.F.R. §230.11(g).

[435] 40 C.F.R. §230.10(d).

Guideline's "Subpart H identifies such possible steps."[436] Tennessee Gas essentially ignores Subpart H in its application.

This is yet another instance where Tennessee Gas has failed to carry its burden to provide sufficient information to determine compliance with the 404(b)(1) Guidelines. Moreover, given the deficiencies in Tennessee Gas's LEDPA analysis discussed *supra*, Tennessee Gas has not implemented all the actions related to technology that would minimize the impacts on its discharges.

In short, Tennessee Gas's compliance with Subpart H's requirements suffers from multiple flaws. This next section of the comments focuses on two of them with more detail: (1) Tennessee Gas's dubious claims that its restoration techniques will minimize adverse effects on aquatic ecosystems,[437] and (2) the company's misplaced reliance on FERC's waterbody and wetland construction manual to minimize the adverse effects of its open-cut crossings.[438] Following that discussion, the comments turn to proposing a risk-based assessment as an appropriate and practicable step that could be taken to minimize the effects of Tennessee Gas's discharges if those discharges were otherwise permissible.

---

[436] *Id.*; *see also id.* §§230.70–230.77 (Subpart H).

[437] Application at 55–56.

[438] *See, e.g.*, *id.* at 11.

1.  **TENNESSEE GAS'S RESTORATION PLANS ARE INADEQUATE BECAUSE THEY DO NOT INCLUDE APPROPRIATE AND PRACTICABLE STEPS TO MINIMIZE ADVERSE IMPACTS TO WETLANDS AND STREAMS.**

The Corps must deny Tennessee Gas's application because it does not ensure that Tennessee Gas will take "appropriate and practicable steps . . . which will minimize potential adverse effects of the discharge on the aquatic ecosystem[,]" as required by the 404(b)(1) Guidelines.[439] Subpart H of the 404(b)(1) Guidelines "identifies . . . possible steps" to minimize impacts.[440] Tennessee Gas's restoration plans for wetlands and streams[441] do not take the relevant steps listed in Subpart H, nor does the company take other appropriate and practicable steps that would minimize adverse impacts.

   a.  *Tennessee Gas's Restoration Plans Would Not Minimize Adverse Impacts to Streams and Wetlands.*

      i.  *Tennessee Gas's plans are bare-bones and one-size-fits-all.*

Whereas under Subpart H "[d]ischarge technology should be adapted to the needs of each site[,]"[442] Tennessee Gas's restoration plans employ a one-size-fits-all approach, with no site-specific distinctions beyond the broad

---

[439] 40 C.F.R. §230.10(d).

[440] *Id.*

[441] IP Application at 11, 15, 55–56.

[442] 40 C.F.R. §230.74; *see also id.* §230.75(d) ("Use [habitat development and restoration techniques that have been demonstrated to be effective in circumstances similar to those under consideration wherever possible.").

categories of "wetland"[443] or "stream."[444] Scientific literature on restoration emphasizes that "[e]very [restoration] project has unique features" and that, as a result, "[s]urprise is a common element in restoration[.]"[445] However, Tennessee Gas does not address how any site-specific features might affect its restoration efforts or provide any plans for addressing common challenges, such as the invasion and domination of non-native species in the disturbed area, beyond a vague statement that it will conduct post-construction monitoring for such species.[446]

Tennessee Gas's restoration plans pay no attention to site-specific features or ecological functions, even for Special Aquatic Sites, including riffle-and-pool complexes and wetlands.[447] It is clear Tennessee Gas has not considered the needs of each site in its simplistic, one-size-fits-all approach and

---

[443] IP Application at 15.

[444] *Id.* at 11.

[445] Joy B. Zedler & Suzanne Kercher, *Wetland Resources: Status, Trends, Ecosystem Services, and Restorability*, 30 ANN. REV. ENV'T & RES. 39, 65 (2005), *available                                                                          at* https://www.annualreviews.org/doi/pdf/10.1146/annurev.energy.30.050504.14 4248 (attached as Exhibit 31).

[446] IP Application at 11, 20. Disturbed wetlands are particularly prone to invasive species. Zedler & Kercher (2005) at 41.

[447] *See* 40 C.F.R. §203.45 (riffles and pools); *id.* §230.41 (wetlands). *See also* Section II.A.1 and II.B.3.b.ii, *supra*, for a discussion of other problems with Tennessee Gas's treatment of riffle-and-pool complexes.

thereby will fail to minimize losses in ecosystem function. Of course, the Corps is required to consider the lack of minimization of those losses.[448]

That inadequacy is no less glaring in Tennessee Gas's wetland restoration plans. Tennessee Gas's general statements do not suffice to establish that it has minimized adverse impacts through restoration.

### ii. Tennessee Gas Plans to Gauge Its Restoration Success Based Only On Appearance (Structure), Ignoring Water Quality and Function.

Tennessee Gas's restoration plans focus on (1) achieving "pre-construction elevations and grades" for streams[449] and returning segregated topsoil "to its original location" for wetlands.[450] Post-construction, Tennessee Gas intends to reseed, monitor for revegetation, and keep an eye on stream geomorphology.[451] The company does not appear to have any plans to perform baseline water quality surveys or post-construction water-quality monitoring of the areas to be restored. Baseline surveys or monitoring are not only recommended by experts,[452] but also intuitively necessary, as it is unclear how

---

[448] *Id.* §230.77(d) ("When a significant ecological change in the aquatic environment is proposed by the discharge of dredged or fill material, the permitting authority should consider the ecosystem that will be lost[.]").

[449] IP Application at 11.

[450] *Id.* at 15.

[451] *Id.* at 56.

[452] Leslie Sauer*, Achieving Higher Quality Restoration Along Pipeline Rights-of-Way: An Overview of Pipeline Construction Impacts with Recommendations for Reducing Environmental Damage* 9 (2014), *available at*

Tennessee Gas would even attempt to return a disturbed area as close as practicable to its previous condition if it has no record of that condition. A true baseline includes not only the area's appearance, but also information about the habitat it provides and its other ecological functions. Tennessee Gas's plans impermissibly conflate structure and function.

### iii. Tennessee Gas Has Not Established that Simply Rebuilding Streambeds Restores Ecological Function.

Tennessee Gas relies exclusively on a "Field of Dreams" restoration plan to minimize effects on aquatic life—"[Re]build it, and they will come." That simplistic approach, even if it were to get the *structure* right, does not ensure a restoration of *function*, and Tennessee Gas's application is impermissibly silent on the latter.

Given that manipulating physical attributes of streams has a very low success rate in promoting stream recovery biologically (as measured by biodiversity),[453] Tennessee Gas cannot assume that function will simply follow form. Indeed, as Palmer (2014) observes, "habitat may be important

---

https://delawareriverkeeper.org/sites/default/files/Documents/SauerL_Achieving_Higher_Quality_Restoration_Along_Pipeline_Rights_of_Way.pdf (attached as Exhibit 32) ("The purpose of baseline monitoring is to inform route selection and the determination of appropriate methods for construction, restoration and management for various segments of the route. Baseline monitoring can help to customize a process that is otherwise a one-size-fits-all approach.").

[453] Palmer et al., *Ecological Restoration of Streams and Rivers: Shifting Strategies and Shifting Goals*, ANN. REV. ECOLOGY, EVOLUTION, & SYSTEMATICS 45, 259 (2014) (attached as Exhibit 33).

ecologically, but it is not sufficient for assessing ecological outcomes (Doyle &
Shields 2012), and in the vast majority of cases restoration of habitat does not
lead to restoration biologically (Jahning et al. 2010)."[454] Accordingly, the Corps
cannot rely on Tennessee Gas's commitment to restore the form of the stream
as a technique to minimize its adverse effects on the aquatic ecosystems
through which it will trench.

### b. Even Compliant Restoration Efforts Would Not Reverse Expected and Significant Adverse Impacts, Including Cumulative Impacts.

Because restoration efforts are generally successful only in a limited
sense, many of the impacts to wetlands, streams, and streambanks that
Tennessee Gas deems "temporary" due to restoration efforts are more likely to
be long-term or permanent even if Tennessee Gas follows through with the
restoration plans included in its application.[455] According to Zedler and
Kercher (2005), "Restoration can reverse some degradation but many damages
are not reversible[.]"[456] Zedler and Kercher add that "[m]any local damages to
ecosystems are . . . irreversible, at least in the time frame of most restoration
projects (often 3 to 5 years, sometimes 10 to 20 years, rarely 50 years)."[457] Even

---

[454] *Id.*

[455] *See* Silvis (2023) at 2–5.

[456] *See, e.g.*, Zedler & Kercher (2005) at 57.

[457] *Id.* at 58.

"[i]f a wetland has survived filling, draining, or diversion, its integrity has not necessarily been preserved, nor is it safe from future degradation." [458] Employing any criteria related to ecological functions—rather than merely the superficial appearance of herbaceous ground cover—undermines Tennessee Gas's optimism. Instead, it is most likely that genuine restoration will still not have occurred long after Tennessee Gas abandons post-construction monitoring.

Wetlands perform valuable ecosystem services of global significance, including biodiversity support, water purification, flood abatement, and carbon storage,[459] yet restorations can be deemed completed and successful even if a wetland's ability to perform those functions has been degraded. One expert report (Sauer 2014) explains:

> Current pipeline construction restoration requirements are very low; they rely primarily on cool grass seeding and erosion blankets and often have poor long term results after the two required maintenance and monitoring seasons for the agencies. Even with such low stabilization standards, the rate of compliance is abysmal. For example, between June 2011 and October 2011, in just two counties in Pennsylvania there were 32 documented sediment discharge violations along the route of the Tennessee Gas Pipe line Company's 300 Line project. Imagine how many such violations go unobserved. Pipelines can also dewater the headwater areas through which they pass and change the hydrology of wetlands areas along the route. Taken with the loss of vegetation and soil compaction, these impacts

---

[458] *Id.* at 49.

[459] *Id.* at 39, 50; *see also* Section II.B.3.b.i, *supra*.

cause landscape-scale changes to the watershed yet they are neither acknowledged nor mitigated.[460]

Solely focusing on the presence or absence of herbaceous ground cover is part of the problem. Sauer explains that, along the pipeline right-of-way, including at stream and wetland crossings,

> [t]he loss of vegetation may be the most apparent impact, but soil changes are the most pernicious. The single biggest problem is soil compaction, which may be as high as 98%, the same as concrete. Rainwater often runs off the ROW like a stream, creating gullies in the adjacent landscape, which leads to erosion and sedimentation locally. Once soil has been disturbed and compacted, it is very difficult to restore its capacity for water infiltration. Re-ripping the soil with a chisel plow is a partial solution to surface compaction, but it leaves behind an exceedingly erodible surface and does not address the issue of recharge. Ripping deep enough to effect recharge would destabilize large areas of the landscape and be almost impossible to re-stabilize. The damage from soil compaction, loss of vegetation, increased runoff, erosion, and resulting pollution has effects well beyond the boundaries of the ROW where it originates[.][461]

Even if restoration efforts are successful enough that soils look the same, soil properties have nonetheless changed due to the disturbance. [462] Additionally, as is common practice for wetland restorations, Tennessee Gas plans to segregate the topsoil up to one foot in depth in wetlands.[463] That helps

---

[460] Sauer (2014) at 6.

[461] *Id.* at 5–6.

[462] *See* Section I.B.3.c.i, *supra*.

[463] IP Application at 15.

to ensure successful revegetation; however, that soil disturbance alone would result in a large release of carbon, as the greatest density of soil organic carbon is found in the top 30 centimeters of the soil profile.[464]

Another reason that restoration efforts fall short of restoring ecological functions is that the precise previous topography of a disturbed area cannot be re-established. In wetlands, "[a]n elevation difference as small as 10 cm can eliminate some species and allow others to dominate."[465] Hydrology can also be altered by very slight changes in grade, impacting a wetland's water supply and purification services.

Because it is extremely unlikely that restoration efforts will be successful at restoring the stream and wetlands' ecological functions, Tennessee Gas's plans will likely result in very significant cumulative impacts. Just as with Tennessee Gas's lack of concern for cumulative impacts generally, the application downplays the expected damage to streams and wetlands by mislabeling many impacts as "temporary" and claiming that even the admittedly permanent losses are *de minimis*.[466] As discussed above, Tennessee Gas underestimates the permanent loss or degradation of wetlands by treating "restored" wetlands as suffering only temporary impacts.  Furthermore, it does

---

[464] *See* A.M. Nahlik & M.S. Fennessy, *Carbon Storage in U.S. Wetlands*, NATURE COMMC'NS (Dec. 13, 2016) (attached as Exhibit 34).

[465] Zedler & Kercher (2005) at 61.

[466] IP Application at 55–56.

not matter that many affected wetlands are small, as a wetland's size does not determine its importance; indeed, if there are many small wetlands in an area dominated by drier areas, each wetland may be extremely important to birds and other wildlife.

This problem particularly impacts fauna that move among streams and wetlands. As Zedler and Kercher (2005) have noted, "The entire wetland landscape needs to be restored in order to attract some animal species. Amphibians are a good example because these animals move among ponds and cannot survive where pond-to-pond distances are too great." [467] Stream-associated salamanders also have low dispersal ability and may not be able to travel between forest gaps.[468] The primary factor in amphibian decline in the Southern Appalachians is habitat loss and degradation, and, because these salamanders are "highly influential in community and ecosystem processes," their fate has ripple effects on the whole ecosystem.[469]

In sum, the Corps should deny the permit because Tennessee Gas's restoration plans—even if the company were to comply with all applicable

---

[467] Zedler & Kercher (2005) at 63.

[468] Kristen K. Cecala et al., *Multiple drivers, scales, and interactions influence southern Appalachian stream salamander* occupancy, ECOSPHERE (Mar 14, 2018), https://doi.org/10.1002/ecs2.2150.

[469] *Id.*

requirements—do not come close to minimizing the project's adverse impacts on streams and wetlands, as required by the 404(b)(1) Guidelines.

### 2. TENNESSEE GAS'S RELIANCE ON FERC'S WATERBODY AND WETLAND PROCEDURES IS INSUFFICIENT TO MINIMIZE THE IMPACTS OF ITS CROSSINGS.

Tennessee Gas relies on FERC's Wetland and Waterbody Construction and Mitigation Procedures (2013) ("FERC Procedures") to support is application.[470] But the scientific literature on stream crossings is highly critical of FERC's procedures. Indeed, a 2015 journal article authored by a FWS biologist stated,

> [C]urrent FERC guidance for Wetland and Waterbody Construction and Mitigation procedures (Procedures; FERC 2013) is national in scope and general in nature and **therefore does not provide sufficient detailed and specific information at a regional level to adequately protect aquatic ecosystems with numerous species in complex geographic and ecologic settings.**
>
> *****
>
> While the FERC Procedures do address some predictable pipeline impacts, especially during construction, the guidance does not address the longer term stream response potential, which is highly dependent on characteristics of the stream system rather than the pipeline. Therefore, depending upon the crossing locations, stream and catchment characteristics, timing, extent of activities, and application of Best Management Practices (BMPs—construction conservation measures intended to reduce impacts to the environment), impacts to aquatic species will vary but may include simplification of habitat, loss of aquatic species passage, removal of spawning gravel, increased sediment and turbidity, loss of side channels, disconnection from the floodplain, or change in hyporheic flow patterns (Reid *et al.*, 2002b). These

---

[470] IP Application at 11, 16, 17–20, 30, 32, 56, 60, 62–64.

> impacts may occur at the project site or may propagate upstream, downstream, or laterally into the floodplain.[471]

In other words, adherence to the FERC Procedures is insufficient to ensure the avoidance of significant degradation of the waters of the United States or to otherwise minimize impacts from the discharges attendant pipeline stream crossings. The FERC Procedures are far too generalized. Accordingly, site-specific review and design is required to protect the aquatic ecosystems. As discussed elsewhere in these comments, such information is sorely lacking from Tennessee Gas's application. As a result, neither Tennessee Gas nor the Corps can rely on the FERC Procedures to comply with the Section 404(b)(1) Guidelines' minimization requirements in 40 C.F.R. §230.10(d).

### 3. USE OF A RISK-BASED ASSESSMENT WOULD CONSTITUTE AN APPROPRIATE AND PRACTICABLE STEP TO MINIMIZE THE EFFECTS OF TENNESSEE GAS'S PROPOSED DISCHARGES, IF PERMITTING THOSE DISCHARGES WERE LAWFUL.

The Section 404(b)(1) Guidelines prohibit the issuance of a permit "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."[472] Even assuming that the permit sought by Tennessee Gas could be issued in compliance with the Section 404(b)(1) Guidelines, the Corps should require

---

[471] Castro et al. (2015) at 769.

[472] 40 C.F.R. §230.10(d).

Tennessee Gas to minimize the effects of its proposed discharges through implementation of a risk-based approach.

Such an approach is endorsed by Castro et al. (2015). In that article, the FWS "developed a pipeline crossing framework and risk analysis approach to stratify potential aquatic impacts, based on both stream characteristics and project types."[473] The approach ranks pipeline crossings "in terms of relative short and long-term risk to aquatic habitat" and then analyzes, designs, and monitors the crossings in ways appropriate to their risk.[474]

To apply this risk based approach, the applicant first gathers a robust dataset to establish baseline data and enable the crossings to be ranked based on their relative risk.[475] That ranking occurs through the application of the Pipeline Screening Risk Matrix to allow a qualitative analysis of risk.[476] The matrix cannot be successful, however, without "site-specific, field observations and measurements."[477] The objective of the matrix is "that pipeline crossings should do no long-term harm to aquatic habitat on-site, upstream, or downstream and that short and long-term negative impacts will be avoided

---

[473] Castro et al. (2015) at 767.

[474] *Id.*

[475] *Id.* at 771.

[476] *Id.*

[477] *Id.*

where possible, minimized to the greatest extent possible, and mitigated where necessary."[478] In other words, the matrix is consistent with the requirements of the Section 404(b)(1) Guidelines.

Although these comments establish elsewhere that the Corps must deny Tennessee Gas's application because the permit sought is prohibited by the Section 404(b)(1) Guidelines, even if that were not true Tennessee Gas's adverse impacts would still have to be minimized and the Corps would need to ensure that they are by requiring Tennessee Gas to implement the risk-based approach discussed in Castro et al. (2015).

## III.   THE PUBLIC INTEREST LIES IN DENYING TENNESSEE GAS'S APPLICATION.

The Corps is required to base its decision on an application for any DA permit—including, but not limited to, those like Tennessee Gas's that are required under Section 404—upon an evaluation of the probable impacts, including cumulative impacts, that the proposed activity and its intended use will have on the public interest.[479] If a permit would be contrary to the public interest, the Corps must deny the application.[480]

Evaluating whether permit issuance would be in the public interest requires the Corps to weigh multiple factors and balance a proposed project's

---

[478] *Id.*

[479] 33 C.F.R. §320.4(a)(1).

[480] 33 C.F.R. §320.4(a)(1); *see also* 33 C.F.R. § 320.4(b)(4).

reasonably expected benefits against its reasonably foreseeable detriments.[481] Corps regulations instruct that "[a]ll factors which may be relevant to the proposal must be considered" along with "the cumulative effects thereof," including "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, . . . recreation, water supply and conservation, water quality, energy needs, safety, . . . considerations of property ownership and, in general, the needs and welfare of the people."[482] This multi-factor inquiry demands that the Corps undertake a comprehensive evaluation, but "[t]he specific weight of each factor is determined by its importance and relevance to the particular proposal," and "a specific factor may be given great weight" for some proposals while not being implicated in others.[483]

In the case of Tennessee Gas's application, many of the issues discussed elsewhere in these comments overlap substantially with the public interest factors the Corps is required to consider. For example, the proposed discharges' significant and long-term effects on: (1)  the structure and function of the

---

[481] 33 C.F.R. §320.4(a)(1). Further, as discussed in Section II.A.5, *supra*, the Corps must ensure that it has a NEPA record to support its regulatory determinations, *see generally* 33 C.F.R. Part 325, App. B, which is particularly critical here because the DEIS that FERC has issued for Tennessee Gas's proposed pipeline is not up to the task.

[482] 33 C.F.R. §320.4(a)(1).

[483] 33 C.F.R. §320.4(a)(3).

impacted streams and wetlands; (2) violations of water quality standards; (3) aquatic ecosystems; (4) individual fish and aquatic creatures; (5) fish, shellfish, and benthic macroinvertebrate populations, and other aquatic  populations; and (6) aquatic life relate to the following public interest review factors, including conservation, general environmental concerns, wetlands, fish and wildlife values, and water quality.[484] Accordingly, the Corps must consider the previous discussions in these comments as part of their public interest review, and must conclude that those factors favor permit denial.

In addition, at least four additional factors at issue here weigh in favor of permit denial: (1) the lack of need for Tennessee Gas's proposed pipeline from an economic and energy perspective, (2) the proposed pipeline's effects on climate change, (3) considerations of property ownership along and near the proposed pipeline route, and (4) environmental justice.

### A. THE LACK OF PUBLIC NEED FOR THE CUMBERLAND PIPELINE WEIGHS HEAVILY IN FAVOR OF PERMIT DENIAL AND AGAINST FINDING THAT THE PROJECT IS IN THE PUBLIC INTEREST.

The Corps is required to evaluate whether the proposed pipeline is needed and the agency must conclude that it is not. Corps regulations instruct that the agency must consider "the relative extent of the public and private need" for the pipeline and the practicability of "alternative locations and

---

[484] *Id.*

methods to accomplish the objective" of the project.[485] To be clear, the Corps has an independent obligation to determine whether the project is in the public interest, and the relative extent of the public and private need for the pipeline is just one factor.[486] But here, since neither the Cumberland Pipeline nor the TVA power plant it would serve are needed, the relative lack of need for the project weighed against its environmental and other harms demonstrates that the project is not in the public interest.

The Corps is in a similar position to FERC in that it must evaluate whether the project is needed. However, the Corps has nothing in the administrative record establishing a need for the project beyond the applicant's own say-so. Furthermore, even the evidence that has been put before FERC is insufficient. Commenters incorporate by reference their comments on the FERC DEIS and also highlight several key issues here.[487]

The central problem is that the Cumberland Pipeline exists solely to serve one gas plant, and since that one gas plant is not needed, the pipeline is not needed either. The Corps cannot simply defer to TVA's claim that the plant is needed, nor Tennessee Gas's invocation of TVA's claim. And the Corps

---

[485] 33 C.F.R. §320.4(a)(2).

[486] 33 C.F.R. §320.4(a)(1)–(3).

[487] Comments of Sierra Club et al. on the Federal Energy Regulatory Commission's Draft Environmental Impact Statement for the Cumberland Project; FERC Docket No. CP22-493 (March 27, 2023) (attached as Exhibit 35).

cannot simply defer to a potential FERC approval for the Cumberland Pipeline because the Corps and FERC are independent agencies carrying out different regulatory schemes, and the Corps has an independent duty to assess the public interest in the need for the pipeline.

Before FERC, the sole evidence for the claim that the pipeline is needed is a precedent agreement between Tennessee Gas and TVA. However, under the circumstances, that precedent agreement is not reliable evidence of need. Indeed, FERC has already been warned that precedent agreements do not conclusively establish market need,[488] and the Corps finds itself in a similar position with reason to be skeptical here. TVA appears to have committed to this deal long before completing the environmental reviews of its decision that TVA is required to undertake. The precedent agreement was executed one day after TVA published its scoping report describing options for replacing the Cumberland Fossil Plant on August 10, 2021.[489] The agreement, called a "binding precedent agreement" by Tennessee Gas in earlier filings before

---

[488] *Env't Def. Fund v. FERC*, 2 F.4th 953, 973 (D.C. Cir. 2021) (admonishing FERC for failing to engage with "strong arguments as to why the precedent agreement [at issue in this case] was insufficiently probative of market need and benefits of the proposed pipeline.").

[489] *See* TVA, Cumberland Fossil Plant Retirement EIS Scoping Report at 1 (Aug. 10, 2021), https://www.tva.com/docs/default-source/1-float/final_tva_cumberland_eis_scoping_report2b91b738-1fc7-4db7-8cf6-015c504730bd.pdf?sfvrsn=bd3c1ed6_5, [hereinafter "Cumberland Scoping Report"].

FERC,[490] was in place before any public comment had been heard on any stage of TVA's decision, almost a year and a half before TVA finally announced its definite decision to select the gas plant.[491] Further, the precedent agreement uses "shall" language to obligate TVA to execute the service agreements "similar in all material respects" to the agreements already included with the precedent agreement[492]; already contains TGP's rates for the Project[493]; and obligates TVA to certain undisclosed reimbursement obligations.[494]

In addition, as FERC recognized in the DEIS, TVA is authorized to make unilateral decisions about generation assets without the oversight of a state public utility commission.[495] That allows the agency to make decisions that

---

[490] Tennessee Gas Pipeline Company, L.L.C., Draft Resource Report 10: Alternatives at 10-2 (Apr. 2022) (attached Exhibit 36).

[491] [Record of Decision re:] Cumberland Fossil Plant Retirement Environmental Impact Statement, 88 Fed. Reg. 3767, 3770 (Jan. 20, 2023), [hereinafter "Cumberland Record of Decision"].

[492] Pipeline Precedent Agreement between Tennessee Gas Pipeline Company, L.L.C. and Tennessee Valley Authority dated August 11, 2021 at § 8.A [hereinafter "Redacted Precedent Agreement"] (attached as Exhibit 37).

[493] Memorandum Opinion and Order at 5, Southern Environmental Law Center v. TVA, No. 22-cv-00108 (E.D. Tenn. Mar. 7, 2023) ("[T]he [precedent] Agreement sets out the rates and terms regarding TGP providing service to TVA's power plant.").

[494] Redacted Precedent Agreement at § 7.C.

[495] DEIS at 1-4 ("Although the evaluation of need for additional electrical generation is generally up to the States, under the TVA Act, the TVA Board has the exclusive authority to evaluate a need for generation facilities within TVA's service territory.").

could be detrimental to ratepayers without regulatory oversight.[496] In the case of this decision in particular, TVA's board delegated its authority to TVA's CEO to "evaluate, decide upon, and complete, if necessary, the retirements of the Cumberland and Kingston plants and replacement generation projects"[497]— abdicating even the internal accountability that would otherwise be a check on TVA's generation decisions. Further, TVA's relationship with its distributors is such that neither FERC nor the Corps can assume the agency is voluntarily behaving as another utility—one subject to market discipline—might: the agency's onerous 20-year distribution contracts have the practical effect of locking in local distributors forever.[498] As a result, there has been little market

---

[496] *Athens Utilities Bd. Gibson Elec. Membership Corp. Joe Wheeler Elec. Membership Corp. Volunteer Energy Coop.*, 177 FERC ¶ 61,021, 61,074 (2021) ("As an instrumentality of the United States, TVA is not . . . subject to Commission regulation under sections 205 or 206 of the [Federal Power Act].");
*see also id.* at 61,090 (2021) (Clements, Commissioner, concurring) ("[Requiring TVA to wheel outside power to its customers] would provide the customers of the relevant not-for-profit cooperative and municipal utilities access to lower cost power than TVA currently provides them with, supplying a modicum of competition and its associated benefits to the region."); *id.* at 61,091 (Christie, Commissioner, concurring) ("Competitive procurements hold the promise of reducing power supply costs to all customers, large and small, while avoiding the threat of potential cost-shifting to small customers."); 16 U.S.C. § 831a(g)(1)(L) (authorizing the TVA Board itself—not a separate regulator—to "establish the electricity rates charged by the Corporation").

[497] TVA, ANNUAL REPORT PURSUANT TO SECTION 13, 15(D), OR 37 OF THE SECURITIES EXCHANGE ACT OF 1934 (Form 10-K) (Nov. 15, 2021) at 79, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001376986/0001376986210 00028/tve-20210930.htm (attached as Exhibit 38).

[498] The contracts are designed in a way that penalizes non-signing distributors and removes local distributors' discretion to invest in renewable power. *See* Motion to Intervene of Sierra Club and Appalachian Voices, Dkt. No CP22-493-

discipline or democratic accountability for TVA's decision to invest in this new gas plant, and the Corps cannot rely on TVA's self-serving claims of need for the gas plant to evaluate whether the plant or connected pipeline are, in fact, needed.

Indeed, even EPA is skeptical. In the DEIS, FERC uncritically reported that:

> TVA's financial and system analysis indicated that their Proposed Action (i.e., the new Cumberland Gas Plant) would be the best overall solution to provide low-cost, reliable, and cleaner energy to the TVA power system. TVA states that the proposed combined-cycle plant at the CUF would also provide the flexibility to reliably integrate 10 GW of solar power onto their system by 2035 and enable the remaining coal-fired units to be retired on an accelerated schedule. Therefore, this EIS examines the environmental impacts associated with construction and operation of TVA's Proposed Action (Tennessee[ Gas]'s proposed Cumberland Pipeline Project) to serve TVA's need.[499]

But in comments on TVA's DEIS, EPA found that TVA had failed to completely disclose TVA's underlying assumptions about both the alternatives it did consider (including Alternative C: a portfolio of solar generation and rapidly dispatchable storage assets), and the alternatives TVA rejected wholesale.[500]

---

000                         at                    2-3                    (Oct. 28, 2022), https://elibrary.ferc.gov/eLibrary/docinfo?accession_number=20220819-5146.

[499] DEIS at 3-2.

[500] Environmental Protection Agency, EPA Comments on the Draft Environmental Impact Statement for the Cumberland Fossil Plant Retirement, Stewart County, Tennessee; CEQ No: 20220059 at 2, https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=364841 [hereinafter "EPA DEIS Comments"] (attached as Exhibit 39).

EPA further recommended that TVA consider how future regulatory, policy, and energy transition trends will impact the assets it proposes to build. Noting "forecasts of declining costs and increasing adoption of renewable generation," EPA urged TVA to consider the long-term financial risk associated with fossil fuel assets that typically have long lifespans and may become uneconomic well before their projected retirement.[501]

TVA failed to rectify these errors in its final EIS, glibly concluding instead that "comments raised by the USEPA [on TVA's Final EIS] reiterated the agency's earlier comments on the Draft EIS and did not raise new issues of relevance that were not already addressed by TVA in the Final EIS or Appendix O of the Final EIS."[502] That's not true. EPA in fact wrote, among other criticisms, that the final EIS's "alternatives analysis continues to rely on inaccurate underlying economic information"[503]; that "TVA's preferred alternative does not take into account . . . the implications of continued fossil fuel investment for its ratepayers and the cost and public health toll of increasingly disruptive climate-driven weather extremes"[504]; and that "[t]he

---

[501] *Id.* at 4–5.

[502] Cumberland Record of Decision, 86 Fed. Reg. at 3770.

[503] Envtl' Prot. Agency, EPA Comments on the Final Environmental Impact Statement for the Cumberland Fossil Plant Retirement, Stewart County, Tennessee; CEQ No: 20220181 at 1 (Jan. 6, 2023), [hereinafter "EPA FEIS Comments"] (attached as Exhibit 40).

[504] *Id.*

Final EIS did not disclose to what extent each alternative is resilient or vulnerable to outages (e.g., extreme cold weather events) in a manner that allows for comparison across alternatives, with the expectation that climate change will increase impacts that could affect risks to reliability."[505]

In sum, the precedent agreement here contravenes NEPA by precommitting TVA to building its gas plant before completing environmental reviews, and TVA's unique position in the market creates opportunities for it to make decisions that would harm end-use ratepayers with impunity. The record cries out for skepticism that the gas plant and pipeline are needed. The Corps' obligation to consider the public and private need for the pipeline infrastructure is separate from what TVA unilaterally decides or what FERC accepts, and the Corps must use its authority here to protect the public and the environment from the impacts of an unnecessary project.

It goes without saying that the Corps has an independent regulatory obligation and cannot simply defer to whatever FERC may decide about the project. However, to the extent the Corps relies on FERC, the lawfulness of the Corps' determinations would depend in part on the lawfulness of FERC's. In such a scenario, flaws in FERC's determinations—such as a failure by FERC to look beyond the precedent agreement for genuine evidence of market need

---

[505] *Id.*

for the pipeline and downstream gas plant—would also infect the Corps'
determinations.

## B. THE PUBLIC'S INTEREST IN COMBATTING CLIMATE CHANGE PRECLUDES BUILDING THE CUMBERLAND PIPELINE.

This project is not in the public interest because it conflicts with the
federal policy priority of combatting climate change. To address the climate
crisis, President Biden ordered the entire federal government to take decisive,
bold action—including swiftly decarbonizing the electricity sector. In
Executive Order 14,008, *Tackling the Climate Crisis at Home and Abroad*,
President Biden emphasized the urgency of the moment: "The United States
and the world face a profound climate crisis. We have a narrow moment to
pursue action at home and abroad in order to avoid the most catastrophic
impacts of that crisis and to seize the opportunity that tackling climate change
presents."[506] Consequently, Executive Order 14,008 calls for a "government-
wide approach," as the "Federal Government must drive assessment,
disclosure, and mitigation of climate pollution and climate-related risks in
every sector of our economy, marshaling the creativity, courage, and capital
necessary to make our Nation resilient in the face of this threat."[507] Executive
Order 14,008 establishes the goals of "net-zero emissions, economy-wide, by no

---

[506] Executive Order 14,008, 86 Fed. Reg. 7619, 7622 (Jan. 27, 2021).

[507] *Id.*

later than 2050"[508] and "a carbon pollution-free electricity sector no later than 2035." [509] In Executive Order 13,990, President Biden reestablished the Interagency Working Group on the Social Cost of Greenhouse Gases and instructed agencies "to capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account."[510]

Even more recently, Congress passed the Inflation Reduction Act, the most ambitious and comprehensive climate legislation to date.[511] The Act will invest billions in climate solutions, with the aim of lowering our nation's carbon emissions by 40% by 2030.[512] Among other things, it will provide clean energy tax credits that make it cheaper to deploy renewable generation and expand funding for clean energy in lower wealth communities.[513]

---

[508] *Id.*

[509] *Id.* at 7624.

[510] Executive Order 13,990, 86 Fed. Reg. 7036, 7037 (Jan 20, 2021).

[511] Inflation Reduction Act of 2022, Pub. L. No. 117-169 (2022).

[512] Nadja Popovich and Brad Plumer, *How the New Climate Bill Would Reduce Emissions*, N.Y. Times (Aug. 12, 2022), https://www.nytimes.com/interactive/2022/08/02/climate/manchin-deal-emissions-cuts.html.

[513] *Id.*; *see also* Press Release, The White House, Fact Sheet: Inflation Reduction Act Advances Environmental Justice (Aug. 17, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/17/fact-sheet-inflation-reduction-act-advances-environmental-justice/.

This project conflicts with the nation's climate goals by locking in decades of new fossil fuel assets: the pipeline and the gas plant it would serve.

Critically, the Corps will not be equipped take a hard look at the climate impacts of the project under NEPA or accurately evaluate how the project affects the public interest in combatting the climate crisis unless the Corps demands that FERC cure the manifold deficiencies in the DEIS related to climate change or the Corps prepares its own supplemental EIS. Again, Commenters incorporate by reference their comments on the FERC DEIS and also highlight three flaws in the DEIS here.[514] *First*, the DEIS ignored the decades of harmful greenhouse gas ("GHG") emissions the project would cause. The Cumberland Pipeline would supply gas to a single customer: a new multi-billion-dollar TVA combined-cycle gas plant that would have a useful life of at least 30 years.[515] Yet FERC failed to publish lifecycle estimates of the GHG emissions for the new plant and pipeline. And FERC does not estimate the total GHG emissions for the Project's useful life.

The DEIS excused itself from assessing the Project's substantial climate effects by pointing to TVA's decision to retire the Cumberland coal plant.[516] Subtracting the coal plant's considerable GHG emissions, the DEIS

---

[514] *See* Comments of Sierra Club et al. on FERC DEIS.

[515] *See* TVA FEIS at 412 ("The Project could continue the current land's industrial use for at least 30 years.").

[516] DEIS at 4-100 to 4-105.

emphasizes the net annual emission rate of a brand-new gas plant compared to a 50-year-old coal plant. But neither the Corps nor FERC are "excused from making emissions estimates just because the emissions in question might be partially offset by reductions elsewhere," including where some alternatives may "make it possible for utilities to retire dirtier, coal-fired plants."[517] The DEIS cannot take carbon credits for TVA's prior and final decision to retire the Cumberland coal plant. Yet the DEIS did just that, obscuring the climate impacts of the pipeline and precluding any cooperating agencies, including the Corps, from taking a hard look at the issue on the current record.

**Second**, the DEIS also fails to provide essential context to analyze the project's climate effects. FERC's effort "to provide context of the Project's emissions" was to "compare the Project's GHG emissions to the total GHG emissions for the Tennessee GHG inventories."[518] As discussed above, those estimates are flawed by FERC's impermissible use of offsets from the retiring coal plant. But even when accounting for emissions accurately, the DEIS's reliance on facile percentages does not satisfy NEPA's "hard look" requirement. Most recently, the U.S. Court of Appeals for the Tenth Circuit rejected this same approach: "Simply stating what percentage the emissions will make up of regional, national, and global emissions does not meaningfully inform the

---

[517] *Sabal Trail*, 867 F.3d at 1374–75.

[518] DEIS at 4-103.

public or decisionmakers about the impact of the emissions. Indeed, all agency actions causing an increase in GHG emissions will appear de minimis when compared to the regional, national, and global numbers."[519] Similarly, in comments to TVA regarding the gas plant the proposed Project would serve, EPA has objected that this approach "diminishes the significance of substantial project-scale GHG emissions" and is "misleading given the nature of the climate policy challenge to reduce GHG emissions from a multitude of sources, each making a relatively small individual contributions to overall GHG emissions."[520] EPA advises that "NEPA documents [should] instead discuss the conflict between GHG emissions and national, state, and local GHG reduction policies and goals, and—equally important—ways to avoid or address the policy conflict, that increases over time created by projects that otherwise expand or lock-in fossil fuel consumption."[521]

In January 2023, the Council on Environmental Quality ("CEQ") published "National Environmental Policy Act Guidance on Consideration of

---

[519] *Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1043–44 (10th Cir. 2023) (internal citation omitted); *see also 350 Montana v. Haaland*, 50 F.4th 1254, 1269–70 (9th Cir. 2022) ("By relying on an opaque to total global emissions … the 2018 EA hid the ball and frustrated NEPA's purpose.").

[520] EPA DEIS Comments at 12.

[521] *Id.*

Greenhouse Gas Emissions and Climate Change."[522] The guidance "applies longstanding NEPA principles to the analysis of climate change effects,"[523] and CEQ has instructed agencies to use the guidance "to inform the NEPA review for all new proposed actions."[524] Echoing EPA's comments to TVA—as well as to FERC[525]—one of CEQ's primary recommendations is that agencies should place GHG emissions "in the context of relevant climate action goals and commitments, including Federal goals, international agreements, state or regional goals, Tribal goals, agency-specific goals, or others as appropriate."[526] CEQ advises that "analysis generally should be complemented with evaluation that compares the proposed action's and reasonable alternatives' energy use against scenarios or energy use trends that are consistent with achieving

---

[522] Council on Environmental Quality, National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1196 (Jan. 9, 2023) [hereinafter "CEQ Climate Guidance"].

[523] *Id.* at 1198.

[524] *Id.* at 1212. FERC published the Draft EIS on February 9, 2023, and this Corps comment period is open until May 10, 2023, well after CEQ published the revised climate guidance on January 4, 2023. Therefore, the Corps must apply CEQ's 2023 climate guidance.

[525] *See* EPA FEIS Comments; Letter from Vicki Arroyo, Associate Administrator, U.S. Envtl. Prot. Agency, to Kimberly Bose, Fed. Energy Regul. Comm'n, Re: Comments on Draft Greenhouse Gas Policy Statement (Apr. 25, 2022) (attached as Exhibit 41).

[526] CEQ Climate Guidance, 88 Fed. Reg. at 1201.

science-based GHG reduction goals, such as those pursued in the *Long-Term Strategy of the United States*."[527]

The DEIS entirely ignores science-driven federal and local policy goals. In addition to the federal climate policies discussed above, local governments within the TVA service territory have established their own climate goals. The City of Nashville aims to reduce GHG emissions community-wide by 80%.[528] Nashville Electric Service—one of TVA's largest customers—unanimously passed a resolution against the proposed methane gas plant at Cumberland largely because it's out of step with the city's target.[529] The DEIS failed to acknowledge these national and local decarbonization pathways, much less analyze the project's GHG emissions against them. FERC's failure puts the ball in the Corps' court. To analyze the project's emissions, the Corps must provide GHG emissions estimates against these decarbonization pathways,

---

[527] *Id.* at 1205.

[528] Metropolitan Nashville and Davidson County, TN, *A Resolution Adopting a Metropolitan Government Community-Wide Target of an 80% Reduction in Annual Greenhouse Gas Emissions from 2014 Levels by 2050*, RS2022-1358 (approved Feb. 2, 2022 (attached as Exhibit 42).

[529] *See* Nashville Electric Service, *Resolution Recommending TVA Pursue Solar and Storage Investments in Middle Tennessee* (May 25, 2022) (attached Exhibit 43); Caroline Eggers, *NES Board, for the First Time Ever, Comes Out Against TVA Fossil Fuel Plans*, WPLN (May 26, 2022), https://wpln.org/post/nes-board-for-the-first-time-ever-comes-out-against-tva-fossil-fuel-plans/ (attached Exhibit 44).

assessing the extent to which the Project would or would not align with these science-based targets.

***Third***, the DEIS ignores foreseeable upstream emissions. FERC appears to assume that the impact of switching from coal to methane gas would be a be a net benefit because of relatively smaller emissions generated by burning gas as opposed to coal.[530] But a growing body of literature is providing independent estimates of the fugitive emissions from unconventional natural gas production and it is now abundantly clear that these emissions can eclipse, or at a minimum greatly reduce, the stated climate benefits of switching from coal to natural gas.[531] Rather than simply assuming the project would offer a climate benefit as FERC did, the Corps must acknowledge and account for the ways that fugitive emissions could eclipse any benefit that switching fossil fuels offers.

Further, the Corps must present appropriate metrics to contextualize the longer-term warming potential this project presents. To compare the global warming impacts of various GHGs, the DEIS quantified GHG emissions as carbon dioxide equivalents ("$CO_{2e}$"). To account for varying potency, the DEIS applied the global warming potential ("GWP") of each GHG. The GWP is the

---

[530] DEIS at vii.

[531] Nathan Hultman et al., *The greenhouse gas impact of unconventional gas for electricity generation*, 6 ENVTL. RES. LETT. 044008 (2011) (attached as Exhibit 45).

measure of a particular GHG's ability to absorb solar radiation as well as its residence time within the atmosphere."[532] FERC based these GWPs "on a 100-year period."[533] Omitting the 20-year GWP unreasonably obscures the project's climate impacts. Methane is substantially more potent in its first several decades in the atmosphere. FERC gave methane a GWP of 25 based on a 100-year period—meaning FERC estimates methane to be 25 times as powerful a GHG as carbon dioxide.[534] Yet "[o]ver a 20-year timeframe, methane is about 84 times as potent as carbon dioxide."[535] Methane's short-term potency is a critical factor in assessing the project's climate effects. Using the 20-year GWPs—in addition to the 100-year GWPs—would comply with the agencies' NEPA obligation to use the "best available science and data"[536] and consider "[b]oth short- and long-term effects."[537]

　　Understanding the project's methane emissions is critical to analyzing its climate effects. Because methane is so potent over its first several decades, methane emissions "significantly erode the potential climate benefits of

---

[532] DEIS at 4-90.

[533] DEIS at 4-90.

[534] Even this 100-year GWP is low. CEQ estimates methane's 100-year GWP to be between 28 and 36. 88 Fed. Reg. at 1199.

[535] 88 Fed. Reg. at 1199.

[536] 88 Fed. Reg. at 1199.

[537] 40 C.F.R. §1502.3(b)(2)(i).

natural gas use" relative to coal.[538] Yet, because methane is shorter lived than carbon dioxide, "achieving significant reductions would have a rapid and significant effect on atmospheric warming potential."[539]

The DEIS touts the climate benefits of TVA's decision to retire the Cumberland coal plant,[540] but the DEIS does not disclose or analyze information essential to determining whether operating a new gas plant will be better or worse for the climate than the 50-year-old coal plant. Not only does FERC omit the 20-year GWP, but FERC unreasonably fails to *mention*—much less analyze—the Project's upstream emissions.[541] Like combustion-related emissions, methane emissions throughout the gas infrastructure are also reasonably foreseeable. Whether through accidental leaks or intentional venting, gas infrastructure leaks significant amounts of methane during both production and transmission. As CEQ has made clear, "NEPA requires agencies to consider the reasonably foreseeable direct and indirect effects of

---

[538] Ramon A. Alvarez et al., *Assessment of Methane Emissions from the U.S. Oil & Gas Supply Chain*, 361 Sci. 186 (2018) ("Alvarez Assessment") (attached As Exhibit 46).

[539] EPA, *Importance of Methane*, https://www.epa.gov/gmi/importance-methane.

[540] *See, e.g.*, DEIS at vii ("However, substantial downstream emissions reductions would be associated with the replacement of coal-fired generation with natural gas-powered generation at TVA's electrical generating facility that the Project is designed to serve.").

[541] *See* DEIS at Sections 4-90 to 4-105.

their proposed actions and reasonable alternatives (as well as the no-action alternative). . . . Indirect effects generally include reasonably foreseeable emissions related to a proposed action that are ***upstream*** or downstream of the activity resulting from the proposed action."[542] Yet the DEIS completely ignores this important and foreseeable part of the climate problem. If the final EIS does not cure these errors, it will be incumbent upon the Corps to prepare a supplemental EIS.

## C. CONSIDERATION OF PROPERTY OWNERSHIP FAVORS DENYING TENNESSEE GAS'S PERMIT APPLICATION.

Under 33 C.F.R. §320.4(g), the Corps must include in its public interest review "[c]onsideration of property ownership." Interstate natural gas pipelines are unusual among projects the Corps considers permitting in that the applicant is not the fee-owner of the property at a substantial number of its proposed disposal sites.[543] That is because interstate natural gas pipelines frequently use the extraordinary power of eminent domain to seize vast stretches of their right-of-way.[544]

Considerations of property ownership cut *against* issuing the requested permits in this case. Whereas considerations of private property rights

---

[542] CEQ Climate Guidance, 88 Fed. Reg. at 1204.

[543] *Cf.* 33 C.F.R. §320.4(g)(6).

[544] *See, e.g.*, *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197 (4th Cir. 2019) (appeal by hundreds of landowners of federal court order

frequently cut in favor of allowing an owner to engage in a regulated activity,[545] here private property rights cut in favor of permit denial. The "power to exclude [others from private property] has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." [546] Landowners in the path of the proposed Cumberland Pipeline may find themselves haled into court so that Tennessee Gas can seize an easement across their lands.

The Corps should also consider the interests of property owners in the surrounding area, as landowners within the pipeline right-of-way are not the only ones who will be affected. Construction and operation of a natural gas pipeline will burden nearby residents with noise pollution, additional traffic, and other disturbance.

Furthermore, even if the Cumberland Pipeline were constructed and placed into operation, the visual blight of the right-of-way would cause ongoing harm to the community, as residents who once had unspoiled, bucolic views will lose them as long as the right-of-way is maintained, and many years after.

---

allowing Mountain Valley to engage in pipeline construction on their property before paying just compensation).

[545] *See* 33 C.F.R. §320.4(g)(1)–(2).

[546] *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435–36 (1982); *see also Rakas v. Illinois*, 439 U.S. 128, 143, (1978) (observing that "one of the main rights attaching to property is the right to exclude others" (citing W. Blackstone, Commentaries, Book 2, ch. 1)).

Landowners outside the right-of-way have no recourse for this loss. As the loss of these views decrease the enjoyment of the families who live in the area, it is only common sense that new families (and, as a result, businesses) will either be less likely to move to the area or will pay less to do so.[547]  In other words, residents are also likely to feel these aesthetic losses as losses in property values and/or greater difficulty selling their property,[548] which will persist with the visibility of the right-of-way for decades after the pipeline ceases operating.[549]

Some community members may reasonably fear their families are in greater danger due to the presence of the pipeline.[550] These fears may extend

---

[547] Spencer Phillips et al., *Economic Costs of the Mountain Valley Pipeline: Effects on Property Value, Ecosystem Services, and Economic Development in Virginia and West Virginia* 29–33 (May 2016) (attached as Exhibit 47).

[548] *Id.*

[549] Nick Cropper, *With ACP Canceled, Nelson Residents Look to Environmental Recovery*, NELSON CNTY. TIMES (Sept. 30, 2020), https://newsadvance.com/community/nelson_county_times/news/with-acp-canceled-nelson-residents-look-to-environmental-recovery/article_dc071425-d557-5d94-98ee-3475754d0059.html (director of operations of Virginia Department of Conservation and Recreation remarking, after restoration efforts had begun on the abandoned Atlantic Coast Pipeline right-of-way, "[P]robably in 20 to 40 years there will be some fairly good-sized trees, and somebody new coming to the area won't notice much of an impact from a visual perspective.").

[550] *See*, e.g.*,* Erin Brock Carlson and Martina Angela Caretta, *Living with Natural Gas Pipelines: Appalachian Landowners Describe Fear, Anxiety, and Loss*, THE CONVERSATION (Feb. 3, 2021) (recounting the results of a 2020 survey of 45 respondents living close to natural gas pipelines, reporting that the top concern among respondents was explosions, and noting that between 2010 and

to any community members living near the pipeline, not just those whose land will be burdened by right-of-way easements. Again, in addition to psychological harm and very real safety risks that community members will be forced to bear, property values are expected to decrease in the entire area perceived as the zone of danger.[551]

In sum, the "considerations of property ownership" factor supports a finding that this project is contrary to the public interest, due to the potential exercise of eminent domain for this project and the detrimental effect the pipeline may have on property owners in the communities near the pipeline route. For these reasons, the public interest in private property rights favors permit denial.

**D.    THE CORPS MUST CONSIDER THE CUMBERLAND PIPELINE'S ENVIRONMENTAL JUSTICE IMPACTS WHEN CONDUCTING ITS PUBLIC INTEREST REVIEW AND FIND THAT THOSE IMPACTS WEIGH IN FAVOR OF DENYING TENNESSEE GAS'S APPLICATION.**

As part of its public interest review,[552] the Corps must consider principles of environmental justice and the Cumberland Pipeline's impacts on environmental justice communities, including minority and low-income

---

2018, a pipeline explosion occurred every 11 days, on average, in the United States).

[551] *See* Phillips et al. (2016) at 24–26.

[552] *See* 33 C.F.R. § 320.4(a)(1) (listing public interest factors, including "the needs and welfare of the people").

communities.[553] Such consideration must include all disproportionate and adverse human health, environmental, climate-related, and cumulative impacts of the Cumberland Pipeline on each environmental justice community that may be affected by the project. Based on a thorough review, the only defensible conclusion that the Corps could reach is that the Cumberland Pipeline's disproportionate and adverse environmental justice impacts outweigh any project benefits. Consequently, the Corps should deny Tennessee Gas's application.

## 1. THE CORPS MUST IDENTIFY AND ANALYZE ALL DISPROPORTIONATE AND ADVERSE EFFECTS OF THE CUMBERLAND PIPELINE ON ENVIRONMENTAL JUSTICE COMMUNITIES AS PART OF ITS PUBLIC INTEREST REVIEW.

In 1994, President Clinton signed Executive Order 12,898, which urged federal agencies to consider environmental justice by "identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities."[554] Building on that foundation, President Biden has made environmental justice a top

---

[553] Exec. Order No. 14,096, Revitalizing Our Nation's Commitment to Environmental Justice for All, 88 Fed. Reg. 25,251 (Apr. 21, 2023); Exec. Order No. 12,898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 7,629 (Feb. 11, 1994); *see also Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 92 (4th Cir. 2020) ("[E]nvironmental justice is not merely a box to be checked … .").

[554] 59 Fed. Reg. at 7,629.

priority. On his first day in office, President Biden signed an executive order that mandates the advancement of environmental justice across the federal government and directs all federal agencies to "prioritize … environmental justice."[555] One week later, President Biden signed another executive order directing all federal agencies to "make achieving environmental justice part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."[556]

Most recently, on April 21, 2023, President Biden signed Executive Order 14,096, *Revitalizing Our Nation's Commitment to Environmental Justice for All*, which reemphasizes the importance of environmental justice review and directs "[e]ach agency … [to] identify, analyze, and address disproportionate and adverse human health and environmental effects (including risks) and hazards of Federal activities, including those related to climate change and cumulative impacts of environmental and other burdens on communities with environmental justice concerns … ."[557] Executive Order

---

[555] Exec. Order No. 13,990, Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, 86 Fed. Reg. 7,037 (Jan. 20, 2021).

[556] Exec. Order No. 14,008, Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7,619 (Jan. 27, 2021).

[557] 88 Fed. Reg. at 25,253.

14,096 "uses the term 'disproportionate and adverse' as a simpler, modernized version of the phrase 'disproportionately high and adverse' used in Executive Order 12,898 … [to] eliminate[] potential misunderstanding that agencies should only be considering large disproportionate effects."[558]

Those Executive Orders make crystal clear that the Corps **must** conduct its own environmental justice review as part of its public interest review. The first step is for the Corps to understand the demographics of the populations affected and "determine whether minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action." [559] Although tools like EPA's EJScreen and census data can be important in this effort, there are limitations to what those tools can offer, which can lead to communities with environmental justice concerns being overlooked.[560] EPA guidance has noted this issue, cautioning that "[t]he fact

---

[558] *FACT SHEET: President Biden Signs Executive Order to Revitalize Our Nation's Commitment to Environmental Justice for All*, THE WHITE HOUSE (Apr. 21, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/04/21/fact-sheet-president-biden-signs-executive-order-to-revitalize-our-nations-commitment-to-environmental-justice-for-all/.

[559] *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F.Supp.3d 101, 136–37 (D.D.C. 2017) (quoting CEQ, *Environmental Justice Guidance Under the National Environmental Policy Act* 9 (Dec. 10, 1997), https://www.epa.gov/sites/default/files/2015-02/documents/ej_guidance_nepa_ceq 1297.pdf [hereinafter, "CEQ EJ Guidance"] (attached as Exhibit 48)).

[560] *See* EPA, *EJScreen Fact Sheet* (2021), https://www.epa.gov/system/files/documents/2022-02/ejscreen_fact_sheet_2022.pdf ?msclkid=91181c4eb09311ec8df33f0de535e3b4 (noting that the "EJSCREEN

---

—175—

that census data can only be disaggregated to certain prescribed levels (e.g., census tracts, census blocks) suggests that pockets of minority or low-income communities, including those that may be experiencing disproportionate[] and adverse effects, may be missed in a traditional census tract-based analysis."[561] Accordingly, an on-the-ground approach or direct outreach to communities along the pipeline route—or other potentially impacted areas—may be necessary to identify all environmental justice communities that could be affected by the Cumberland Pipeline.[562]

In its DEIS, FERC identified several environmental justice communities within the Cumberland Pipeline area.[563] Specifically, FERC identified seven communities that would be considered environmental justice communities based on minority percentage thresholds and low-income thresholds. [564] Although FERC has identified at least seven environmental justice

---

does not cover all environmental or EJ issues," "[c]ensus data has limitations and can obscure small communities," and "[r]esults should be verified on the ground when possible").

[561] EPA, Final Guidance for Incorporating Environmental Justice Concerns in EPA's NEPA Compliance Analyses §2.1.1 (Apr. 1998), https://www.epa.gov/sites/default/files/2015-02/documents/ej_guidance_nepa_epa 0498.pdf.

[562] *See* CEQ EJ Guidance at 4, 9–13.

[563] DEIS at 4-73.

[564] *Id.*

communities that would be impacted by the Cumberland Pipeline, the Corps must conduct its own evaluation. As discussed above, EPA's EJScreen and census data alone may not be sufficient to identify all impacted communities, and direct community outreach or on-the-ground data collection may be necessary. Moreover, FERC only used a 1-mile radius around the proposed route and proposed aboveground facilities to determine the geographic scope of the Cumberland Pipeline's impacts.[565] FERC did not adequately explain or justify why the 1-mile radius was sufficient, and as a result, any Corps reliance on FERC's determination would be unreasonable. Research on environmental justice mapping indicates that use of different geographic units of analysis can yield drastically different results.[566] For example, impacts on transportation, access to public services, or water impacts could easily extend beyond the arbitrary 1-mile radius that FERC used. Drawing different boundaries for the

---

[565] *Id.* at 4-79.

[566] *See, e.g.*, Juliana Maantay, *Mapping Environmental Injustices: Pitfalls and Potential of Geographic Information Systems in Assessing Environmental Health and Equity*, 110 Envtl. Health Perspectives 161, 165 (Apr. 1, 2002), https://ehp.niehs.nih.gov/doi/epdf/10.1289/ehp.02110s2161; Eric Sheppard et al., *GIS-based measures of environmental equity: Exploring their sensitivity and significance*, 9 J. Exposure Analysis & Envtl. Epidemiology 18, 19–20 (Jul. 1999), https://www.researchgate.net/publication/13107786_GIS-based_measures_of_environmental_equity_Exploring_their_sensitivity_and_significance ("In spatial analysis of environmental equity, it has now become clear that the choice of the geographic scale of the study area (e.g., states, metropolitan areas, counties, municipalities) and the spatial resolution of data within that study area (e.g., zip codes, census tracts, block groups) employed, influence the results of the analysis.").

study area may therefore have dramatic implications. And because FERC did not provide an adequate or reasonable explanation for its delineation of the area potentially affected by the Cumberland Pipeline, the Corps cannot rely on such data.[567]

Once the Corps has adequately identified all communities with environmental justice concerns that may be affected by the Cumberland Pipeline, it must then identify, analyze, and address all disproportionate and adverse impacts—including human health, environmental, climate-related, and cumulative impacts—caused by the project on each of those communities.[568] What constitutes a "disproportionate and adverse" impact necessarily depends on the context and characteristics of the impacted community, and may involve a consideration of whether the risk or rate of the impact to the environmental justice community exceeds or is likely to exceed that to the general population or an appropriate comparison group.[569] In other

---

[567] *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330 (D.C. Cir. 2021) ("When conducting an environmental justice analysis, an agency's delineation of the area potentially affected by the project must be 'reasonable and adequately explained,' … and include 'a rational connection between the facts found and the decision made.'" (internal citations omitted)).

[568] 88 Fed. Reg. at 25,253.

[569] *See* CEQ EJ Guidance at 26; Fed. Interagency Working Grp. On Envtl. Justice & NEPA Comm., *Promising Practices for EJ Methodologies in NEPA Reviews* 38–42 (Mar. 2016), https://www.epa.gov/sites/default/files/2016-08/documents/nepa_prom

words, impacts may pose "unique or unknown risks" to environmental justice communities that arise as a result of the particular characteristics of those communities.[570]

For example, environmental justice communities may be more vulnerable than the general population to events that are low-probability but catastrophic—like pipeline explosions—due to lack of public or private resources to address such emergencies, inability to evacuate or relocate, lack of access to affordable, high-quality health care, and reliance on affected place-based resources.[571] Even though risk of death or injury from pipeline accidents to the general population may be higher in urban areas—because there are more people living in proximity to pipelines in urban areas than in rural areas—rural communities often have fewer resources to address those risks, and natural gas infrastructure "often exacerbates existing social vulnerability."[572]

---

ising_practices_document_2016.pdf [hereinafter, "*Promising Practices for EJ Methodolgies*"] (attached as Exhibit 49).

[570] *Promising Practices for EJ Methodologies* at 34.

[571] *Id.* at 35.

[572] *See* Ryan E. Emanuel et al., *Natural Gas Gathering and Transmission Pipelines and Social Vulnerability in the United States*, 5 GEOHEALTH, Jun. 2021, at 8, https://agupubs.onlinelibrary.wiley.com/doi/epdf/10.1029/2021GH000442.

There is no doubt that the Pipeline would result in disproportionate and adverse impacts on environmental justice communities. In its DEIS for the Pipeline, FERC concluded that such impacts to environmental justice communities would occur because "the Project includes the construction and operation of new pipeline facilities in environmental justice communities[.]"[573] In other words, FERC categorically concluded that construction and operation of new interstate methane pipelines necessarily has disproportionate and adverse effects on environmental justice communities along their route. The Corps must consider those impacts in its public interest review of Tennessee Gas's application.

In its DEIS, FERC identifies factors that could affect environmental justice communities, including visual impacts, socioeconomic impacts, including traffic impacts, and air and noise impacts from construction and operation.[574] However, FERC's analysis was insufficient because, among other reasons, it failed to fully account for the impacts of a large influx of temporary workers in small, rural communities along the pipeline route,[575] failed to consider the impacts of climate change,[576] failed to evaluate the risks of

---

[573] DEIS at vi.

[574] DEIS at 4-78.

[575] *See id.* at 4-65–4-66.

[576] *See generally id.* at 4-77–4-82.

explosions and other pipeline safety failures,[577] and wrongly avoided analyzing impacts—including cumulative impacts—by cursorily characterizing impacts as minor, temporary, or likely to be avoided or mitigated.[578]

FERC's dismissal of the disproportionate and adverse impacts as minor or mitigatable commits a common error that Executive Order 14,906 seeks to rectify—the assumption that agencies only need to concern themselves with "large disproportionate effects."[579] A project might be in compliance with environmental laws or safety regulations and still be a source of disproportionate impacts, because the thresholds for the two questions are not the same.[580] Even small incremental additions to pollution or other environmental impacts in environmental justice communities could be a source of unfair burdens, particularly when cumulative impacts are considered.

Accordingly, the Corps must conduct its own evaluation to identify and analyze the Cumberland Pipeline's disproportionate and adverse impacts to

---

[577] *See id.* at 4-112–4-118 (discussing risks associated with pipeline safety, including potential for fires or explosions, but not accounting for these risks in the environmental justice context).

[578] *Id.* at 4-78.

[579] *FACT SHEET: President Biden Signs Executive Order to Revitalize Our Nation's Commitment to Environmental Justice for All*, THE WHITE HOUSE (Apr. 21, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/04/21/fact-sheet-president-biden-signs-executive-order-to-revitalize-our-nations-commitment-to-environmental-justice-for-all/.

[580] *See, e.g., Friends of Buckhingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 92 (4th Cir. 2020).

environmental justice communities. Those impacts may include visual impacts, socioeconomic impacts, and air and noise impacts, as identified by FERC.[581] But, they must also include other impacts ignored by FERC.

For example, low-income rural Americans are disproportionately reliant on wells and springs for domestic water supplies,[582] the loss or contamination of which due to pipeline construction or operation could be economically devastating due to the expense of relocation or water replacement. Moreover, Pipeline construction will require 300-400 workers, 90% of which would be non-local.[583] The impact that the influx of these temporary construction workers will have on the environmental justice communities—including the strain on public services, affordable housing, and transportation—must be considered. Additionally, the Cumberland Pipeline will exacerbate the effects of climate change by supporting the continued combustion of fossil fuels, and climate change is known to disproportionately harm environmental justice communities.[584] Furthermore, proximity to natural gas pipelines may reduce

---

[581] DEIS at 4-78.

[582] *See* Erin Arciposki et al., *Clean Water, Clean Life: Promoting Healthier, Accessible Water in Rural Appalachia*, 161 J. Contemporary Water Research & Educ. 1 (Sep. 5, 2017), https://onlinelibrary.wiley.com/doi/10.1111/j.1936-704X.2017.3248.x.

[583] DEIS at 4-65.

[584] *See* Kristie S. Gutierrez & Catherine E. LePrevost, *Climate Justice in Rural Southeastern United States*, 13 INT'L J. ENVTL. RESEARCH & PUB. HEALTH 189 (Feb. 3, 2016), https://www.mdpi.com/1660-4601/13/2/189.

local property values, which could lower the overall tax base of an impacted area and negatively affect even those who do not have pipeline easements on their property.[585]

> **2. THE DISPROPORTIONATE AND ADVERSE IMPACTS OF THE CUMBERLAND PIPELINE ON ENVIRONMENTAL JUSTICE COMMUNITITES OUTWEIGH THE PROJECT BENEFITS AND WARRANT DENIAL OF THE APPLICATION UNDER THE CORPS' PUBLIC INTEREST REVIEW OBLIGATIONS.**

As discussed above, there are at least seven communities along the pipeline route with environmental justice concerns and particular vulnerability to the Cumberland Pipeline's disproportionate and adverse impacts. And there is no question that those communities—with residents who are more likely than the general population to be minorities or low-income—will suffer the disproportionate and adverse impacts from the Cumberland Pipeline noted above.[586] Because those disproportionate and adverse impacts

---

[585] *See* Daniel Walmer, *Pipelines could affect property values*, LEBANON DAILY NEWS (Jan. 2, 2016), https://www.ldnews.com/story/news/local/2016/01/02/pipelines-could-affect-property-values/77984160/; *see also* Martina Angela Caretta & Ryan E. Emanuel, *Does shale gas development impact property values in Central Appalachia? A mixed methods critical exploration*, 14 EXTRACTIVE INDUSTRIES & SOC'Y, Apr. 2023, at 3, https://www.sciencedirect.com/science/article/pii/S2214790X23000424 (noting that "just the announcement of a proposed pipeline in NY showed to impact negatively property values by 9%" and that "a study looking at the impact of 864 gas distribution incidents between 2010 and 2020 shoed a reduction in housing prices between 4 and 6%").

[586] DEIS at vi.

outweigh the Cumberland Pipeline benefits, the Corps must deny Tennessee Gas's application.

As part of the Corps' public interest review, "[t]he benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments."[587] This requires a consideration of "[a]ll factors which may be relevant to the proposal," including "the needs and welfare of the people."[588] Environmental justice concerns fit squarely in the Corps' consideration of "the needs and welfare of the people." "The specific weight of each factor is determined by its importance and relevance to the particular proposal."[589] Here, the disproportionate and adverse impacts to environmental justice communities as a result of the construction and operation of the Cumberland Pipeline—including those to human health and the environment, as well as all cumulative and climate-related impacts—outweigh any supposed project benefits, which are primarily economic benefits that accrue to Tennessee Gas and are largely dependent upon the unfounded public need for the pipeline.[590]

---

[587] 33 C.F.R. §320.4(a)(1).

[588] 33 C.F.R. §320.4(a)(1).

[589] *Id.* §320.4(a)(3).

[590] *See id.* §320.4(a)(2)(i) (including "[t]he relative extent of the public and private need for the proposed structure or work" as general criteria to be considered in the Corps' public interest review).

Accordingly, after adequate identification and analysis of the Cumberland Pipeline's disproportionate and adverse impacts to environmental justice communities, the Corps must deny Tennessee Gas's application as contrary to the public interest.

## IV. THE CORPS SHOULD HOLD A PUBLIC HEARING IN CONNECTION WITH ITS CONSIDERATION OF THE PERMIT APPLICATION.

Section 404(a) of the Clean Water Act requires the Corps to allow an opportunity for a public hearing prior to issuing an individual discharge permit under that section.[591] The Corps' regulations implementing that provision provide that "[a] public hearing will be held in connection with the consideration of a DA permit application . . . whenever a public hearing is needed for making a decision on such permit application[.]"[592] "Requests for a public hearing . . . *shall be granted*, unless the district engineer determines that the issues raised are insubstantial or there is otherwise no valid interest

---

[591] 33 U.S.C. §1344(a).

[592] 33 C.F.R. §327.4(a).

to be served by a hearing."[593] "In case of doubt, a public hearing should be held."[594]

As established through these comments and their attachments, there are a host of substantive issues with Tennessee Gas's application that compel the conclusion that a public hearing is needed. The issues raised in these comments are not "insubstantial." The Corps should have a full public airing of the legal and technical defects in Tennessee Gas's application to ensure that it does not issue an unlawful permit to the company.

Moreover, the public controversy over the proposed Cumberland Pipeline and the Tennessee Valley Authority's proposed gas plant that it will serve also compel the conclusion that a public hearing is necessary. The Tennessee Valley Authority received 830 scoping comments on its proposal to build a combined cycle gas plant to replace the retiring coal-fired units at Cumberland.[595] And the Tennessee Valley Authority received an additional 770 comments on its draft NEPA documents—most of which opposed the

---

[593] *Id.* §327.4(b) (emphasis added).

[594] *Id.* §327.4(c).

[595] Tennessee Valley Authority, Cumberland Fossil Plant Retirement: Final Environmental Impact Statement 13 (Dec. 2022), <u>available at</u> <u>https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/environment/cumberland-fossil-plant-retirement-final-eis4eeac6f0-b6bf-4843-9881-75d19ccf8ede.pdf?sfvrsn=d61f6b6f_7</u>.

proposal to use methane gas for power generation.[596] Moreover, a review of the FERC docket for Tennessee Gas's FERC certificate proceeding reveals that there have been around 30 motions to intervene in the proceeding, and FERC received 82 sets of scoping comments in response to its NEPA notice.[597] Because of the importance of public participation under the Clean Water Act,[598] the Corps should allow the opponents and proponents of this project to present their respective positions in a public hearing.

---

[596] *Id.* at 14.

[597] DEIS, app. B.

[598] *See Sierra Club*, 909 F.3d at 654 (noting "the critical importance of notice-and-comment requirements throughout the Clean Water Act," and citing *United States v. Smithfield Foods, Inc.*, 191 F.3d 516 (4th Cir. 1999)).

## CONCLUSION

For the foregoing reasons, we respectfully request that the Corps hold a public hearing on Tennessee Gas's pending permit application and ultimately deny that application.

Respectfully submitted,

**/s/ Derek O. Teaney**
Derek O. Teaney
Elizabeth A. Bower
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
(304) 646-1182
dteaney@appalmad.org
*Counsel for Sierra Club and*
*Appalachian Voices*

**/s/ Howard Crystal**
Howard Crystal
Center for Biological Diversity
1411 K St., NW, Suite 1300
Washington, D.C. 20005
(202) 849-8401
HCrystal@biologicaldiversity.org
*Counsel for Center for Biological*
*Diversity*

**/s/ Spencer Gall**
Spencer Gall
Southern Environmental Law Center
120 Garrett Street, Suite 400
Charlottesville, VA 22902
(434) 977-4090
sgall@selcva.org

Amanda Garcia
Southern Environmental Law Center
1033 Demonbreun St., Suite 205
Nashville, TN 37203
(615) 921-9470
*Counsel for Sierra Club and*
*Appalachian Voices*