No. 24-3831

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

APPALACHIAN VOICES and SIERRA CLUB,
*Petitioners*

v.

UNITED STATES ARMY CORPS OF ENGINEERS, CHRISTINE E. WORMUTH, in her official capacity as Secretary of the U.S. Army; LIEUTENANT GENERAL WILLIAM H. GRAHAM, JR., in his official capacity as U.S. Army Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; LIEUTENANT COLONEL ROBERT W. GREEN, in his official capacity as District Commander of the U.S. Army Corps of Engineers, Nashville District, and JOSHUA FROST, in his official capacity as Chief, Regulatory Division, U.S. Army Corps of Engineers, Nashville District,
*Respondents*

On Petition for Review from the
United States Army Corps of Engineers
Department of Army Permit LRN-2021-00866 (July 25, 2024)

## APPENDIX

JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org

DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES
PO BOX 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email: dteaney@appalmad.org

O.W. "TREY" BUSSEY
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
Email: tbussey@selctn.org

*Counsel for Petitioners*

## TABLE OF CONTENTS

| Starting Page Number | Document Description | Administrative Record Document Numbers |
|---|---|---|
| App-0001 | Final §404 Water Quality Certification and Final §401 Water Quality Certification | AR000001-000196 |
| App-0197 | Petition for Review | ECF 1-1 |
| App-0210 | Corps Decision Document for DA Permit LRN-2021-00866 | AR000397-000499 |
| App-0313 | FERC notice to EPA of receipt from TDEC of 401 WQC waiver | AR000500 |
| App-0314 | Modified ARAP NRS22.192 | AR000503-000706 (excerpted) |
| App-0389 | Corps letter to TDEC advising that Corps considers 401 WQC issued on Jul. 21, 2023, valid for Cumberland project | AR000703-000704 |
| App-0391 | Corps memorandum for record regarding validity of TDEC's 401 WQC for the Cumberland project | AR000705-000706 |
| App-0393 | Draft modified ARAP for public notice | AR000707-000896 (excerpted) |
| App-0458 | SELC letter advising Corps that TDEC has not issued 401 WQC for additional crossings addressed in draft modified ARAP | AR000923-000926 |
| App-0462 | August 2023 RAI Response Enclosure 1. Additional information for alternatives analysis for avoidance, minimization, and mitigation, and responses to public comments received | AR001802-001860 (excerpted) |
| App-0478 | August 2023 RAI Response Enclosure 1 Attachment 2. Final Environmental Impact Statement | AR001869-002444 (excerpted) |
| App-0481 | FERC email notifying Corps of final EIS and addressing Corps included in comments to draft EIS, regarding additional crossings in unsurveyed parcels and mitigation (e.g., blasting) | AR003323-00325 |

| App-0484 | SELC comment for public notice 23-13 | AR004027-004214 |
| App-0672 | SELC comment exhibit 1 (Barry Sulkin, "Evaluation of Impacts to Riffle-and-Pool Complexes from the Proposed Cumberland Pipeline Project") and exhibit 5 (LRB-RD, LRH-RD, and LRB-RD, "Checklist for Preparing an Alternatives Analysis Under Section 404 of the Clean Water Act") | AR004215-004335 (excerpted) |
| App-0687 | SELC comment exhibit 7 (Starr Silvis, "Evaluation of Tennessee Gas Pipeline Company, LLC's Application for a Department of the Army Permit for the Cumberland Project") and exhibit 9 (FERC EA for Mountain Valley Pipeline Amendment Project) | AR004336-004623 (excerpted) |
| App-0753 | SELC comment exhibit 14 (Lévesque and Dubé, "Review of the Effects of In-stream Pipeline Crossing Construction on Aquatic Ecosystems and Examination of Canadian Methodologies for Impact Assessment") | AR004624-005685 (excerpted) |
| App-0768 | TGP Permit Application, dated Jul. 22, 2022 | AR010775-010847 |
| App-0841 | July 2022 Application Attachment 11. Trenchless Construction Methods Summary Table | AR012476-012477 |
| App-0843 | Corps memorandum for record summarizing pre-application meeting held on May 24, 2022. Attendees included: Amy Priest (LRN), Tim Wilder (LRN), David Jackson (BDY), Rhett Bagett (Stantec), Mike Staggs (TGP), Jeff Hagen (KM), Blake Amos (KM) | AR012549-012550 |
| App-0845 | Corps memorandum for record summarizing pre-application meeting held on Nov. 29, 2021, and with presentation screenshots. Attendees included Amy Priest (LRN), Tim Wilder (LRN), Mike Letson (TGP), Jeff Hagan (KM), David Jackson (BDY) | AR012710-012715 |



**DEPARTMENT OF THE ARMY**
NASHVILLE DISTRICT, CORPS OF ENGINEERS
110 9TH AVENUE SOUTH, ROOM A-405
NASHVILLE, TENNESSEE 37203-3852

July 25, 2024

SUBJECT: File No.  LRN-2021-00866, Proposed Tennessee Gas Pipeline, Natural Gas Line crossing multiple streams and wetlands from Dickson to Cumberland City, in Dickson, Houston, and Stewart Counties, Tennessee (Lat: 36.2667; Long: -87.4266)

Tennessee Gas Pipeline Company, LLC (TGP)
C/O Kinder Morgan Inc.
Gina Dorsey
1001 Louisiana Street
Houston, Texas 77502

Dear Gina Dorsey:

Enclosed is a Department of the Army permit for the subject activity.  If changes in the location or plans of the proposed work are necessary for any reason, revised plans should be submitted promptly to this office.  No deviations should be made in the approved plans without first obtaining approval from this office.

If you have any questions or comments contact Sammy Iskrzycki at Samantha.N.Iskrzycki@usace.army.mil, or (615) 829-3086.

Sincerely,

Robert W. Green
Lieutenant Colonel U.S. Army
District Commander

Encls
1.  Standard Permit Form
2.  Water Quality Certification

**App-0001**

## DEPARTMENT OF THE ARMY PERMIT

PERMITTEE:  Tennessee Gas Pipeline Company, LLC (TGP)

**PERMIT NUMBER**: LRN-2021-00866

**ISSUING OFFICE**:  Nashville District Corps of Engineers

**NOTE:**  The term you and its derivatives, as used in this permit, means the permittee or any future transferee.  The term "this office" refers to the appropriate district or division office of the Corps of Engineers having jurisdiction over the permitted activity or the appropriate official of that office acting under the authority of the commanding officer. You are authorized to perform work in accordance with the terms and conditions specified below.

**PROJECT DESCRIPTION:** The proposed work consists of the temporary discharge of fill into 2.39 acres of streambed and 0.69 acre of wetlands associated with the Cumberland Gas Pipeline as indicated on project plans submitted depicted on project plans submitted August 25, 2023.

**PROJECT LOCATION:**  The proposed pipeline route crosses multiple waterways within the state of Tennessee.  The designated route crosses portions of Dickson, Houston, and Stewart Counties.   Beginning Location: 36.162322, -87.208655, Ending Location: 36.372929, -87.675659

**PERMIT CONDITIONS:**

1.  The time limit for completing the work authorized ends on __June 18, 2029__. If you find that you need more time to complete the authorized activity, submit your request for a time extension to this office for consideration at least one month before the above date is reached.

2.  You must maintain the activity authorized by this permit in good condition and in conformance with the terms and conditions of this permit.  You are not relieved of this requirement if you abandon the permitted activity, although you must make a good faith transfer to a third party in compliance with General Condition 4 below.  Should you wish to cease to maintain the authorized activity, or should you desire to abandon it without a good faith transfer, you may obtain a modification of this permit from this office, which may require restoration of the area.

3.  If you discover any previously unknown historic or archaeological remains while accomplishing the activity authorized by this permit, you must immediately notify this

1

office of what you have found.  We will initiate the Federal and state coordination required to determine if the remains warrant a recovery effort or if the site is eligible for listing in the National Register of Historic Places.

4.  If you sell the property associated with this permit, you must obtain the signature of the new owner in the space provided and forward a copy to this office to validate the transfer of this authorization.

5.  If a conditioned water quality certification has been issued for your project, you must comply with the conditions specified in the certification as special conditions to this permit.  For your convenience, a copy of the certification is attached.

6.  You must allow representatives from this office to inspect the authorized activity at any time deemed necessary to ensure that it is being or has been accomplished in accordance with the terms and conditions of your permit.

7.  The permittee understands and agrees that, if future operations by the United States require the removal, relocation, or other alteration, of the structure or work herein authorized, or if, in the opinion of the Secretary of the Army or his authorized representative, said structure or work shall cause unreasonable obstruction to the free navigation of the navigable waters, the permittee will be required, upon due notice from the U.S. Army Corps of Engineers, to remove, relocate, or alter the structural work or obstructions caused thereby, without expense to the United States. No claim shall be made against the United States on account of any such removal or alteration.

Special Conditions:  See Page 4 "**Special Permit Conditions (File No. 2021-00866)**".

Further Information:

Congressional Authorities. You have been authorized to undertake activity described above pursuant to:

( **X** )  Section 10 of the Rivers and Harbors Act of 1899

( **X** )  Section 404 of the Clean Water Act

Limits of this authorization.
   a.  This permit does not obviate the need to obtain other Federal, state or local authorizations required by law.
   b.  This permit does not grant any property rights or exclusive privileges.
   c.  This permit does not authorize any injury to the property or rights of others.

    d.  This permit does not authorize interference with any existing or proposed Federal project.

Limits of Federal Liability.  In issuing this permit, the Federal Government does not assume any liability for the following:
    a.  Damages to the permitted project or uses thereof as a result of other permitted or unpermitted activities or from natural causes.
    b.  Damages to the permitted project or uses thereof as a result of current or future activities undertaken by or on behalf of the United States in the public interest.
    c.  Damages to persons, property, or to other permitted or unpermitted activities or structures caused by the activity authorized by this permit.
    d.  Design or construction deficiencies associated with the permitted work.
    e.  Damage claims associated with any future modification, suspension, or revocation of this permit.

Reliance on Applicant's Data:  The determination of this office that issuance of this permit is not contrary to the public interest was made in reliance on the information you provided.

Reevaluation of Permit Decision.  This office may reevaluate its decision on this permit at any time the circumstances warrant.  Circumstances that could require a reevaluation include, but are not limited to the following:
    a. You fail to comply with the terms and conditions of this permit.
    b. The information provided by you in support of your permit application proves to have been false, incomplete, or inaccurate (see 4 above).
    c. When significant new information surfaces which this office did not consider in reaching the original public interest decision. Such a reevaluation may result in a determination that it is appropriate to use the suspension, modification, and revocation procedures contained in 33 CFR 325.7 or enforcement procedures such as those contained in 33 CFR 326.4 and 326.5.  The referenced enforcement procedures provide for the issuance of an administrative order requiring you to comply with the terms and conditions of your permit and for the initiation of legal action where appropriate.  You will be required to pay for any corrective measures ordered by this office, and if you fail to comply with such directive, this office may in certain situations (such as this specified in 33 CFR 209.170) accomplish the corrective measures by contract or otherwise and bill you for the cost.

Extensions.  General condition 1 establishes a time limit for the completion of the activity authorized by this permit. Unless there are circumstances requiring either a prompt completion of the authorized activity or a reevaluation of the public interest decision, the Corps will normally give favorable consideration to a request for an extension of this time limit.

3

Your signature below, as permittee, indicates that you accept and agree to comply with the terms and conditions of this permit.

Gina B. Dorsey   Digitally signed by Gina B. Dorsey
Date: 2024.07.24 16:10:03 -05'00'

7/24/2024

_____
(Permittee)

_____
(Date)

This permit becomes effective when the Federal official, designated to act for the Secretary of the Army, has signed below.

Robert W. Green, LTC, Corps of Engineers
      (District Commander)

_____
Robert W. Green
Lieutenant Colonel U.S. Army
District Commander

_____
(Date)

When the structures or work authorized by this permit are still in existence at the time the property is transferred, the terms and conditions of this permit will continue to be binding on the new owner(s) of the property. To validate the transfer of this permit and the associated liabilities associated with compliance with its terms and conditions, have the transferee sign and date below.

_____
(Transferee)

_____
(Date)

4

**App-0005**

**Special Permit Conditions (File No. 2021-00866)**

Special Condition 1:  The work must be performed in accordance with the plans submitted August 25, 2023.  Any changes to the plans must be approved in advance by this office of U.S. Army Corps of Engineers, Nashville District Regulatory Division (USACE).

Special Condition 2:   The Permittee must have a copy of this permit available onsite and ensure all contractors are aware of its conditions and abide by them.

Special Condition 3:   Construction within streams must be performed during low flow and/or dry conditions of the stream resources.  The construction activity must be isolated from active stream flow.

Special Condition 4:  The Permittee shall avoid the remaining portions of the streams and wetlands within the project area.  These areas were avoided as part of the permit application review process and therefore will not be disturbed by any dredging, filling, mechanized land clearing, or other construction work whatsoever.

Special Condition 5:  Wetland Mitigation: Prior to initiating the authorized work in the wetlands, the Permittee shall provide verification to the U.S. Army Corps of Engineers, Nashville District Regulatory Division, of purchase of 1.44 wetland credits from the Tennessee Mitigation Fund, Lower Cumberland River Service Area, for the proposed project.  The verification submitted to the Corps must include the File Number LRN-2021-00866.

Special Condition 6:  Water Quality Certification:  You must abide by all conditions of the state of Tennessee, Department of Environment and Conservation (TDEC), Section 401 Water Quality Certification issued on July 21, 2023 [NRS 22.192].

Special Condition 7:  Cultural Resources/Archaeological/Historical:  In the event any previously unknown cultural resources, historic or archaeological sites or human remains are uncovered or encountered while accomplishing the activity authorized by this permit, the permittee must cease all work immediately and contact local, state and county law enforcement offices (only contact law enforcement on findings of human remains), our office at (615) 369-7500.

Special Condition 8:  Within 30 days of completion of the authorized work or at the expiration of the construction authorization of this permit, whichever occurs first, the Permittee shall complete and submit to the Corps the attached "Compliance Certification" form.

5

**App-0006**

Special Condition 9:  Blasting shall not occur in waters of the United States or immediately adjacent uplands identified by the applicant as having karst prone geology with an unacceptable risk of hydrologic loss as identified in table 2.7.3 in the application submitted August 22, 2022.  For each crossing, the permittee shall select the least impactful trenching technique practicable, as described in the application submitted August 22, 2022. For any crossings in which blasting is identified as necessary, written justification, site specific blasting operations and monitoring plans shall be sent to 3701 Bell Road Nashville, TN 37214 referencing file number LRN-2021-00866 prior to blasting. Blasting shall not commence until the applicant is in receipt of written concurrence from the Corps.


Special Condition 10: Tree clearing shall only occur between October 15 and March 31 to avoid impacting federally listed bat species.



**US Army Corps
of Engineers ®**
Nashville District

## <u>COMPLIANCE CERTIFICATION</u>

**YOU ARE REQUIRED TO SUBMIT THIS SIGNED CERTIFICATION REGARDING
THE COMPLETED ACTIVITY AND ANY REQUIRED MITIGATION**

I hereby certify that the work authorized by **Permit No. __LRN-2021-00866___,** and any required mitigation was done in accordance with the Corps authorization, including any general, regional, or special conditions.

_____
Permittee Signature

_____
Date

Please note that your permitted activity is subject to a compliance inspection by an U.S. Army Corps of Engineers representative.

Submit this signed certification to the address below:

U.S Army Corps of Engineers
Regulatory Division
3701 Bell Road
Nashville, TN 37214-2660

**App-0008**

Cumberland Gas Pipeline Project; NRS22.192
§401 Water Quality Certification



**STATE OF TENNESSEE**

**§401 WATER QUALITY CERTIFICATION**

### AQUATIC RESOURCE ALTERATION PERMIT NRS 22.192

Pursuant to the Tennessee Water Quality Control Act of 1977 (T.C.A. §§ 69-3-101 et seq.) and supporting regulations, a permit is required to alter the properties of waters of the state. Also, pursuant to section 401 of the Clean Water Act (33 U.S.C. § 1341), an applicant for a federal license or permit which may result in a discharge into the waters of the U.S., shall provide the federal licensing or permitting agency a certification from the State in which the discharge will originate. Accordingly, the Division of Water Resources requires reasonable assurance that the activity will not violate provisions of the Tennessee Water Quality Control Act of 1977 (T.C.A. §§ 69-3-101 et seq.) or provisions of sections 301, 302, 303, 306 or 307 of the Clean Water Act.

Subject to conformance with accepted plans, specifications, and other information submitted in support of the application, the state of Tennessee hereby certifies pursuant to 33 U.S.C. § 1341, and permits pursuant to T.C.A. § 69-3-108(b), the activity described below:

**PERMITTEE**              Tennessee Gas Pipeline Company, LLC

**AUTHORIZED WORK:**    Temporary impacts to 0.69 acres of wetland, permanent impacts to 0.03 acres of wetland, temporary impacts to approximately 5400 linear feet of stream, temporary water withdrawals from eight streams and one reservoir, and permanent impacts to 490 linear feet of stream associated with the construction of a 32-mile 30-inch diameter natural gas pipeline.

**LOCATION:**             From near Claylick Rd., Dickson, to near Old Scott Rd., Cumberland City
                          Dickson, Houston, and Stewart Counties, Tennessee
                          Unnamed Wetlands, Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells Creek, Barkley Reservoir
                          Harpeth River Watershed and Lake Barkley Watershed
                          From approximately 36.161840, -87.206428 to approximately 36.372977, -87.675641

**EFFECTIVE DATE:** July 21, 2023

**EXPIRATION DATE:** July 20, 2028

for Jennifer Dodd
Director, Division of Water Resources

**Table of Contents**

LIST OF ABBREVIATIONS AND ACRONYMS USED IN THIS PERMIT AND APPENDICES.... 3

**PART I**                                                                                            **4**

AUTHORIZED WORK: ..................................................................................................... 4

SPECIAL CONDITIONS:.............................................................................................. 11

GENERAL CONDITIONS: ........................................................................................... 16

**PART II**                                                                                           **17**

MONITORING REQUIREMENTS ................................................................................ 17

DUTY TO REAPPLY ..................................................................................................... 17

PROPERTY RIGHTS ..................................................................................................... 17

OTHER INFORMATION ............................................................................................... 18

CHANGES AFFECTING THE PERMIT ....................................................................... 18

    Transfer/Change of Ownership ................................................................................. 18

    Change of Mailing Address ...................................................................................... 18

NONCOMPLIANCE ....................................................................................................... 18

    Effect of Noncompliance .......................................................................................... 18

    Reporting of Noncompliance .................................................................................... 19

    Adverse Impact ......................................................................................................... 19

LIABILITIES .................................................................................................................. 19

    Civil and Criminal Liability ..................................................................................... 19

    Liability under State Law........................................................................................... 19

**APPENDIX**                                                                                          **21**

PERMIT RATIONALE .................................................................................................... 21

TABLES ........................................................................................................................... 48

SITE MAPS ...................................................................................................................... 54

PLANS AND DRAWINGS ........................................................................................... 179

**List of abbreviations and acronyms used in this permit and appendices**

ac = acres
BMP = best management practice
ETW = Exceptional Tennessee Water
FERC = Federal Energy Regulation Commission
ft = feet
gpm = gallons per minute
HD = hydrologic determination
HDD = horizontal directional drilling
Lat. = latitude
Long. = longitude
Misc. tribs. = miscellaneous tributaries
MP = milepost
N/A = not applicable
NPDES = National Pollutant Discharge Elimination System
PEM = palustrine emergent
PFO = palustrine forested
RAI = request for additional information
ROW = right-of-way
SWPPP = stormwater pollution prevention plan
TDEC = Tennessee Department of Environment and Conservation
TGP = Tennessee Gas Pipeline Company
TVA = Tennessee Valley Authority
USACE = United States Army Corps of Engineers
UT = unnamed tributary
WWC = wet weather conveyance

**PART I**
**Authorized Work:**

Table 1: Authorized habitat alteration impacts to streams and wetlands.

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SDKA023 | Upper Sugar Camp Branch | TN05130204001_1100 | UT Harpeth | 36.1630 | -87.2073 | 97 ft. | | | 10 ft. | 97 ft. |
| | | | | 36.1655 | -87.2057 | 77 ft. | | | 10 ft. | 77 ft. |
| SDKA026 | Jordan Branch | TN05130204002_0100 | Jordan Branch | 36.1705 | -87.2128 | 126.5 ft. | | | 10 ft. | 126.5 ft. |
| SDKA027 | UT to Jordan Branch | TN05130204002_0100 | Jordan Branch | 36.1709 | -87.2131 | 86 ft. | | | 10 ft. | 86 ft. |
| SDKA004 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1765 | -87.2235 | 79.6 ft. | | | 10 ft. | 79.6 ft. |
| SDKA006 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1809 | -87.2317 | 78 ft. | | | 10 ft. | 78 ft. |
| SDKA008 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1826 | -87.2348 | 78.6 ft. | | | 10 ft. | 78.6 ft. |
| SDKA058 | Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1853 | -87.2430 | 76.7 ft. | | | 10 ft. | 76.7 ft. |
| SDKA013 | Gafford Branch | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1979 | -87.2624 | 76 ft. | | | 10 ft. | 76 ft. |
| SDKA049 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1920 | -87.2442 | 53.1 ft. | | | 10 ft. | 53.1 ft. |
| SDKA051 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1899 | -87.2485 | 75.5 ft. | | | 10 ft. | 75.5 ft. |
| SDKA053 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1924 | -87.2536 | 89.4 ft. | | | 10 ft. | 89.4 ft. |
| SDKA054 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1927 | -87.2480 | | | 20.1 ft. | | 20.1 ft. |
| SDKA055 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1948 | -87.2566 | 80.4 ft. | | | 10 ft. | 80.4 ft. |
| SDKA048 | Jones Creek | TN05130204002_1000 | Jones Creek | 36.1875 | -87.2439 | | 0 ft. | | 0 ft. | 0 ft. |

Page 4 of 188

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
|  |  |  |  | 36.1923 | -87.2425 |  |  | 127 ft. |  | 127 ft. |
|  |  |  |  | 36.1876 | -87.2439 |  |  | 2 ft. |  | 2 ft. |
| SDKA014 | UT to Gafford Branch | TN05130204002_1500 | Peabody Branch | 36.1978 | -87.2622 |  |  | 19 3 ft. |  | 19 3 ft. |
| SDKB025 | UT to Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2833 | -87.4932 | 250 ft. |  |  | 10 ft. | 250 ft. |
|  |  |  |  | 36.2840 | -87.4940 | 127 ft. |  |  | 10 ft. | 127 ft. |
| SDKB026 | Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2845 | -87.4962 | 95 ft. |  |  | 10 ft. | 95 ft. |
| SDKB027 | UT to Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2845 | -87.4980 | 76.7 ft. |  |  | 10 ft. | 76.7 ft. |
| SDKB028 | UT to Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2855 | -87.4995 | 190 ft. |  |  | 10 ft. | 190 ft. |
|  |  |  |  | 36.2855 | -87.5007 |  |  | 4 ft. |  | 4 ft. |
| SHNC010-1 | UT Yellow Creek | TN05130205019_0999 | Misc tribs to Yellow Creek | 36.2978 | -87.5494 |  | 0 ft. |  | 0 ft. | 0 ft. |
| SHNC018 | UT to Yellow Creek | TN05130205019_0999 | Misc tribs to Yellow Creek | 36.3025 | -87.5572 | 99 ft. |  |  | 10 ft. | 99 ft. |
|  |  |  |  | 36.3021 | -87.5592 |  |  | 20 ft. |  | 20 ft. |
| SHNC020 | Indian Branch | TN05130205019_0999 | Misc tribs to Yellow Creek | 36.3100 | -87.5770 | 84 ft. |  |  | 10 ft. | 84 ft. |
| SHNC007-1 | Yellow Creek | TN05130205019_1000 | Yellow Creek | 36.2982 | -87.5500 |  | 0 ft. |  | 0 ft. | 0 ft. |
| SDKA046 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2639 | -87.4195 | 84.8 ft. |  |  | 10 ft. | 84.8 ft. |
| SDKB009 | Furnace Creek | TN05130205024_0400 | Furnace Creek | 36.2498 | -87.3804 | 102.9 ft. |  |  | 10 ft. | 102.9 ft. |

Page 5 of 188

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SDKB011 | Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2610 | -87.4113 | 206 ft. | | | 10 ft. | 206 ft. |
| | | | | 36.2614 | -87.4089 | | | 21 ft. | | 21 ft. |
| SDKB014 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2665 | -87.4261 | 104.3 ft. | | | 10 ft. | 104.3 ft. |
| SDKR005 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2609 | -87.4118 | | | 25.7 ft. | | 25.7 ft. |
| SDKR008 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2668 | -87.4288 | 97 ft. | | | 10 ft. | 97 ft. |
| | | | | 36.2669 | -87.4287 | 49 ft. | | | 10 ft. | 49 ft. |
| SDKB023 | Little Bartons Creek | TN05130205024_0600 | Little Bartons Creek | 36.2726 | -87.4552 | 81.9 ft. | | | 10 ft. | 81.9 ft. |
| SDKA038 | UT to Harris Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2283 | -87.3231 | | | 23 ft. | | 23 ft. |
| | | | | 36.2276 | -87.3211 | 82 ft. | | | 10 ft. | 82 ft. |
| | | | | 36.2283 | -87.3222 | 76 ft. | | | 10 ft. | 76 ft. |
| SDKA041 | Harris Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2303 | -87.3252 | 90.3 ft. | | | 10 ft. | 90.3 ft. |
| SDKA042 | UT to Bartons Creek | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2349 | -87.3365 | 77.5 ft. | | | 10 ft. | 77.5 ft. |
| SDKB001 | Miller Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2375 | -87.3453 | 107 ft. | | | 10 ft. | 107 ft. |
| | | | | 36.2365 | -87.3452 | | | 21 ft. | | 21 ft. |
| SDKB004 | UT to Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2430 | -87.3608 | 86.5 ft. | | | 10 ft. | 86.5 ft. |
| SDKB005 | UT to Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2436 | -87.3643 | 78.2 ft. | | | 10 ft. | 78.2 ft. |
| SDKB008 | Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2452 | -87.3689 | 55.2 ft. | | | 10 ft. | 55.2 ft. |

Page 6 of 188

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SDKB002 | Bartons Creek | TN05130205024_1000 | Bartons Creek | 36.2379 | -87.3469 | 112.6 ft. | | | 10 ft. | 112.6 ft. |
| SDKA033 | UT to Johnson Creek | TN05130205031_0999 | Misc tribs to Johnson Creek | 36.2180 | -87.3004 | 108.8 ft. | | | 10 ft. | 108.8 ft. |
| SDKA034 | UT to Johnson Creek | TN05130205031_0999 | Misc tribs to Johnson Creek | 36.2187 | -87.3038 | 77.2 ft. | | | 10 ft. | 77.2 ft. |
| SDKA036 | Johnson Creek | TN05130205031_1000 | Johnson Creek | 36.2237 | -87.3132 | 263 ft. | | | 10 ft. | 263 ft. |
| | | | | 36.2237 | -87.3130 | | | 21 ft. | | 21 ft. |
| SHNA001 | Guices Creek | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3376 | -87.6087 | 78.6 ft. | | | 10 ft. | 78.6 ft. |
| SHNA011 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3313 | -87.6007 | 75 ft. | | | 10 ft. | 75 ft. |
| | | | | 36.3310 | -87.6011 | | | 23 ft. | | 23 ft. |
| SHNB030 | UT to Guices Creek | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3472 | -87.6254 | 168 ft. | | | 10 ft. | 168 ft. |
| | | | | 36.3477 | -87.6257 | | | 31 ft. | | 31 ft. |
| SHNC023 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3118 | -87.5828 | 89 ft. | | | 10 ft. | 89 ft. |
| SHNC030 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3195 | -87.5886 | 79.5 ft. | | | 10 ft. | 79.5 ft. |
| SHNE003 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3243 | -87.5930 | 75.1 ft. | | | 10 ft. | 75.1 ft. |
| SHNA012 | Guices Branch | TN05130205121_1000 | Guices Creek | 36.3327 | -87.6041 | 93 ft. | | | 10 ft. | 93 ft. |
| | | | | 36.3309 | -87.6035 | | | 20 ft. | | 20 ft. |
| SHNA008 | UT to Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3548 | -87.6395 | | | 44 ft. | | 44 ft. |
| | | | | 36.3544 | -87.6395 | | | 62 ft. | | 62 ft. |

Page 7 of 188

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SHNB033-1 | Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3527 | -87.6339 | 104.9 ft. | | | 10 ft. | 104.9 |
| SHNB033-2 | Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3549 | -87.6388 | 139.4 ft. | | | 10 ft. | 139.4 |
| SHNB033-3 | Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3664 | -87.6559 | 76.4 ft. | | | 10 ft. | 76.4 |
| SHNA010 | Wells Creek | TN051302051735_1000 | Wells Creek | 36.3713 | -87.6622 | | 0 ft. | | | 0 ft. |
| WDKB001 | Wetland WDKB001 | N/A | Unnamed PFO wetland | 36.2494 | -87.3803 | 0.02 ac | | 0.01 ac | 0.02 ac | 0.03 ac |
| WHNA001 | Wetland WHNA001 | N/A | Unnamed PEM wetland | 36.3558 | -87.6394 | | | 0 10 ac | | 0.10 ac |
| WHNB002 | Wetland WHNB002-PEM | N/A | Unnamed PEM wetland | 36.3664 | -87.6554 | 0.33 ac | | 0.04 ac | | 0.37 ac |
| | Wetland WHNB002-PFO | N/A | Unnamed PFO wetland | 36.3664 | -87.6554 | | | 0.03 ac | 0.01 ac | 0.04 ac |
| WHNW001 | Wetland WHNW001 | N/A | Unnamed PEM wetland | 36.2903 | -87.5159 | | | 0.03 ac | | 0.03 ac |
| WHNW002 | Wetland WHNW002 | N/A | Unnamed PEM wetland | 36.2926 | -87.5251 | | | 0.01 ac | | 0.01 ac |
| WSTA001 | Wetland WSTA001 | N/A | Unnamed PEM wetland | 36.3722 | -87.6662 | 0.05 ac | | 0.06 ac | | 0.11 ac |

[1]Here and throughout this permit and rationale, where waterbodies are mentioned, the label and name as written in TGP's permit application materials and the TDEC Waterbody ID and Waterbody Name are given to facilitate review of authorized impacts. The project will also impact waterbodies identified by TDEC as WWCs (listed in this permit's Appendix). In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), impacts to waters identified by TDEC as WWCs do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108 (q).

[2]The linear feet of stream impacts and acreage of wetland impacts associated with pipeline installation via trench include the 10-foot-wide trench in which the pipeline will be installed. The impacts associated with the pipeline installation via trenching will be temporary.

[3]The linear feet of stream impacts associated with pipeline installation via HDD is reported as zero because this method does not require disturbance to the channel. No ongoing vegetation mowing or clearing will take place in riparian areas that are between HDD entry and exit points.

Page 8 of 188

[4]The linear feet of stream impacts and acreage of wetland impacts associated with road or workspace crossings include impacts from construction of access roads, additional workspace areas, and equipment or construction staging areas. The impacts associated with road or workspace crossings will be temporary.

[5]To facilitate periodic corrosion/leak surveys, a corridor centered on the pipeline and up to 10 feet wide may be cleared at a frequency necessary to maintain the 10-foot corridor in an herbaceous state, resulting in conversion of plant communities in forested riparian zones and forested wetlands to herbaceous/emergent or scrub-shrub plant communities. In addition, individual trees that are located within 15 feet of the pipeline that have roots that could compromise the integrity of the pipeline coating may be cut and removed from the permanent right-of-way. These impacts will not result in loss of wetland acreage.

Page 9 of 188

Table 2: Authorized temporary water withdrawals from streams and reservoirs.

| | Waterbody | | | Impact location | | Flow statistics | | Class 1 minor water withdrawal | Class 2 minor water withdrawal | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | 7Q10 flow rate (gpm)[1] | Summer mean flow rate (gpm)[2] | Maximum instantaneous stream withdrawal percentage of instantaneous flow[3] | Maximum instantaneous reservoir withdrawal rate (gpm) | Duration (days) |
| SDKA048 | Jones Creek | TN05130204002_1000 | Jones Creek | 36 1874 | -87 2440 | 4263 89 | 28680 24 | 10% | | ≤ 30 |
| SDKB002 | Bartons Creek | TN05130205024_1000 | Bartons Creek | 36 2380 | -87 3467 | 628 40 | 4712 72 | 10% | | ≤ 30 |
| SDKB009 | Furnace Creek | TN05130205024_0400 | Furnace Creek | 36 2496 | -87 3804 | 291 70 | 2217 22 | 10% | | ≤ 30 |
| SDKB011 | Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36 2611 | -87 4112 | 71 80 | 561 04 | 10% | | ≤ 30 |
| SDKB023 | Little Bartons Creek | TN05130205024_0600 | Little Bartons Creek | 36 2725 | -87 4554 | 59 70 | 411 13 | 10% | | ≤ 30 |
| SHNC007-1 | Yellow Creek | TN05130205019_1000 | Yellow Creek | 36 2983 | -87 5504 | 8707 30 | 38644 26 | 10% | | ≤ 30 |
| SHNA012 | Guices Creek | TN05130205121_1000 | Guices Creek | 36 3329 | -87 6040 | 475 80 | 2082 57 | 10% | | ≤ 30 |
| SHNA010 | Wells Creek | TN051302051735_1000 | Wells Creek | 36 3714 | -87 6616 | 4093 30 | 17818 55 | 10% | | ≤ 30 |
| None | Cumberland River | TN05130205015_1000 | Barkley Reservoir | 36 3969 | -87 6593 | 325401 80 | 5655258 00 | N/A | 1500 | ≤ 30 |

[1]7Q10 flow rate is the lowest seven-day average flow with a 10% probability of occurring in any given year (i.e., that occurs on average once every ten years).

[2]Summer mean flow rate is the average individual daily mean discharge measured from June 1 through August 31 over an entire stream gage period of record.

[3]Temporary stream and reservoir impacts from minor water withdrawals are associated with hydrostatic testing of the pipeline before it is put into service. Withdrawals from streams are Class 1 minor water withdrawals, and the withdrawals from Barkley Reservoir is a Class 2 minor water withdrawal as defined by the TDEC *General Aquatic Resource Alteration Permit for Minor Water Withdrawals*.

The project will also impact waterbodies identified by TDEC as WWCs (listed in this permit's Appendix). In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), impacts to waters identified by TDEC as WWCs do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108 (q).

**Special Conditions:**
a. **Impacts to streams or wetlands in the project area and along the pipeline ROW are not authorized until the permittee has:**
   1. **Obtained a notice to proceed with project construction from the Federal Energy Regulatory Commission and submitted a copy to the Division,**
   2. **Submitted amendments to the project aquatic resources inventory to the permit writer that address parcels not previously inventoried,**
   3. **Received an updated Aquatic Resources Inventory/HD concurrence letter from the Division,**
   4. **Submitted an application for a modified permit that addresses newly inventoried resources, and**
   5. **Received a modified ARAP covering all proposed impacts to aquatic resources for the entire pipeline project.**
b. Unless stated otherwise, all work shall be accomplished in conformance with the accepted plans, specifications, data, and other information submitted in support of application NRS22.192.
c. Written notification of the commencement of authorized work shall be provided to the TDEC Nashville Environmental Field Office prior to, or within 24 hours after initiation.
d. The permittee shall notify this office of project completion and supply as-constructed or record drawings of the final structure within 45 days after completion.
e. Wetlands and streams outside of the permitted impact area shall be clearly marked with signs, high visibility fencing, or similar structures so that all work performed by the contractor is solely within the permitted area of impact.
f. **The permittee shall submit a post-construction monitoring report annually to the Division for three years following the project's completion.** This annual report shall include documentation of the maintenance of jurisdictional status and resource value in **all** impacted wetlands and streams in each monitoring year. See Monitoring Requirements section of this permit for details.
g. For each stream crossing to be accomplished by a method other than HDD:
   1. The permittee shall select from the list of potentially practicable alternatives below. This list is arranged in ascending order of perceived impact to the resource:
      i. Conventional excavation with an excavator;
      ii. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;
      iii. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;
      iv. Removal by rock trencher; or
      v. Controlled blasting and excavation with a backhoe.
   2. The permittee shall select the least impactful practicable trenching technique for each stream crossing. Evaluation criteria include observed conditions at the stream crossing, the technical feasibility and limitations of each particular technique, best professional judgment of experienced personnel, logistics, and costs. The permittee shall select one or

more non-blasting alternatives unless it demonstrates that each of these is impracticable. Prior to blasting, the permittee shall attempt at least one non-blasting alternative.

h. For controlled blasting within 50 feet of a stream or wetland:

1. Unless stated otherwise, all blasting shall adhere to the conditions and other information submitted in the Draft Blasting Plan found in the document entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

2. The blasting contractor(s) will create a site-specific blasting plan for each blasting location as described in the Draft Blasting Plan. The blasting plans must be submitted by the blasting contractor(s) to the permittee for review and approval by one if its engineers.

3. Blasting operations must be conducted by, or under the direct and constant supervision of, personnel licensed and certified to perform such activity in Tennessee. Prior to any blasting activities, the blasting contractor(s) will provide documentation of the experience, licenses, and permits associated with blasting personnel to the permittee. The individual directly overseeing any controlled blasting activities will be required to hold a registration classification as defined in the T.C.A. Title 68, Chapter 105. The Geohazard Inspector will have prior experience in geohazard identification and characterization and experience in providing support/oversight during construction. The Geohazard Inspector will work under the direction of a licensed Professional Engineer. All blasting must be conducted with a Geohazard Inspector present.

4. Blasting will not be used in Tennessee jurisdictional streams characterized by karst-prone geology or with an unacceptable risk of hydrologic loss, as identified in the Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022. Only streams in which 1) karst is unlikely *and* 2) risk of hydrologic loss is "reduced" *and* 3) HDD has been determined to not be practicable may blasting be considered.

5. Blasting is not authorized within wetlands.

6. The Division (Natural Resources Unit permit writer and Nashville Environmental Field Office) must be contacted in writing at least 48 hours in advance when controlled blasting is proposed. The permittee must provide site-specific documentation to the Natural Resources Unit permit writer supporting that controlled blasting is the least environmentally damaging practicable alternative for that particular stream crossing per Special Condition g. Written authorization must be obtained from the Division prior to initiation of controlled blasting.

7. A qualified project biologist will survey the proposed blasting zone identified by the pipeline blasting contractor(s) immediately in advance of any blasting for the presence of any state-listed species and if found, will contact the TWRA and TDEC Division of Natural Areas before proceeding.

8. Blasting will be conducted in dry conditions within the workspace.

9. The permittee will minimize the length of time that aquatic resources are disturbed by expediting completion of each crossing and completing stream crossings separate from the mainline construction.

10. All streams and stream banks will be restored to original contours immediately following pipeline installation.

11. **The permittee shall submit a post-blasting monitoring report to the Division within 30 days of the restoration of the temporary stream impacts**. See Monitoring Requirements section of this permit for details.

Page 12 of 188

**i.** Loss of stream flow due to fracturing of bedrock is prohibited. Adequate provisions shall be made to prevent the loss of stream flow due to fracturing of bedrock during pipeline installation across streams and wetlands.

    **1.** Trench plugs are barriers placed within a pipeline excavation to slow flow and reduce erosion in the trench and also to prevent the trench from becoming a subsurface drainage path. Since gas line bedding and embedment are constructed using cohesionless, free-draining soils, a path is created for water to flow easily (French drain effect) alongside the pipe. In areas where there is high groundwater, where the pipeline crosses streams or aquifers, or where the natural groundwater flow would be affected or even diverted by the select material, trench plugs of compacted, cohesive, soils or impervious materials shall be constructed at intervals along the pipeline.

    **2.** Pipeline crossings of streams with bedrock streambeds must provide non-erodible fill and cover, such as concrete or controlled low strength materials (flowable fill), and trench plugs at each end of the crossing.

    **3.** Trench plugs shall be placed in the portions of any trench within 50 feet of a stream channel.

    **4.** The trench plug area will have a bedding of compacted, cohesive soils or impervious materials (such as concrete or controlled low strength materials  (i.e., flowable fill)), whereas the bedding on both sides of the trench plug will have a bedding of uncompacted, cohesionless soil. Trench plugs must have lower permeability than the surrounding native soil.

**j.** For pipeline installation areas that cross streams or wetlands using horizontal directional drilling:

    **1.** Entry and exit locations must be at least 50 feet from the stream bank or wetland margin.

    **2.** The depth of bore below the streambed must be sufficient to reasonably prevent release of drilling fluid, based on the parent material.

    **3.** In the event of an inadvertent release of drilling fluid, a site-specific contingency plan must be followed. This plan includes notification to the Division within 24 hours after release to surface waters. Site-specific proposed containment plans must be approved by the Division prior to initiation.

**k.** For the minor water withdrawals for the purposes of hydrostatic testing:

    **1.** All stream and river water withdrawals will adhere to the notification requirements, conditions, and limits of Class 1 water withdrawals in TDEC's *General Aquatic Resource Alteration Permit for Minor Water Withdrawals:*

        **i.** Withdrawal rates will not exceed 10% of instantaneous flow, and will not take place for more than 30 days in a calendar year from a particular waterbody. The permittee must demonstrate that instantaneous flow of the source water is accurately measured or determined for the purpose of compliance with the terms and limits of this permit.

    **2.** The reservoir water withdrawal from Barkley Reservoir will adhere to the notification requirements, conditions, and limits of Class 2 water withdrawals in TDEC's *General Aquatic Resource Alteration Permit for Minor Water Withdrawals:*

        i. Withdrawal rates will not exceed 1500 gpm and will not take place for more than 30 days in a calendar year.

    **3.** Where the total average withdrawal exceeds 10,000 gallons per day, the withdrawal shall be registered under the Water Resources Information Act of 2002 (T.C.A. § 69-7-301 et seq.) More information regarding water withdrawal information may be found at:

https://www.tn.gov/environment/program-areas/wr-water-resources/water-quality/water-withdrawal-registration-program.html

4. Except for withdrawals from Barkley Reservoir, withdrawal is not authorized from a stream or river in a county or region during severe (D2), extreme (D3), or exceptional (D4) drought as indicated by the National Drought Mitigation Center website: https://droughtmonitor.unl.edu/CurrentMap/StateDroughtMonitor.aspx?TN

5. The permittee must screen all water intake to minimize the potential for entrainment of fish.

6. The permittee must adhere to conditions intended to minimize water withdrawal and hydrostatic testing impacts in the documented entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

7. **The permittee shall submit a one-time water withdrawal monitoring report to the Division following the completion of all water withdrawals** to demonstrate adherence to permit conditions. See Monitoring Requirements section of this permit for details.

l. The permittee will adhere to the recommendations and other information submitted in the geologic and hydrotechnical hazard assessment, karst surveys, and geohazard mitigation guidance for the project provided in Attachment 6 of the documented entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022.

m. The permittee will use low pressure ground equipment in wetlands and riparian areas to minimize vegetation damage, soil compaction, and rutting.

n. Temporary wetland crossings shall utilize timber matting. Gravel, riprap, or other rock is not approved for construction of temporary crossings or haul roads across wetlands. Upon completion of construction activities, all temporary wetland impact areas are to be restored to pre-construction contours and elevations. Non-native soils, side-cast material, or other materials shall not be placed within the temporary impact locations during restoration. Permanent vegetative stabilization must use native species as described in Special Condition p.

o. Temporary impacts to wetlands associated with trench excavation shall be mitigated by the removal and stockpiling of the first 12 inches of topsoil prior to construction. Upon completion of construction activities, all temporary wetland impact areas are to be restored to pre-construction contours, and the stockpiled topsoil spread to restore these areas to pre-construction elevation. Non-native soils, side-cast material, or other materials shall not be placed within the temporary impact locations during restoration. Permanent vegetative stabilization must use native species as described in Special Condition p.

p. Permanent vegetative stabilization using native species of all disturbed areas in or near streams and wetland must be initiated within 14 days of project completion (see also *Landscaping With Natives* at https://www.tnipc.org/wp-content/uploads/2017/10/landscaping_2016_forweb.pdf). Non-native, non-invasive annuals may be used as cover crops until native species can be established.

q. Only earthen materials comprising native, uncontaminated soil or rock, or a combination thereof shall be "Acceptable Fill" to be placed as fill in wetlands and streams. Acceptable Fill shall consist of only soil or rock in which all substances naturally occurring therein are present in concentrations not exceeding the concentrations of such substances occurring naturally in the local area. Acceptable Fill shall not contain any sewage, industrial wastes, additives or materials such as refuse, rubble, muck, metal, glass, concrete pieces, bricks, or asphalt paving materials, wood or other wastes. For the purposes of this permit, "other wastes" means any and all other substances or forms of energy, including, but not limited to, decayed wood, sand, garbage, silt, municipal refuse, sawdust, shavings, bark, lime, ashes, offal, oil, hazardous materials, tar, sludge, or other petroleum byproducts, radioactive

material, chemicals, heated substances, dredged spoil, solid waste, incinerator residue, sewage sludge, munitions, biological materials, wrecked and discarded equipment, and cellar dirt.

**r.** The authorized alterations shall not cause measurable degradation to resource values and classified uses of hydrologically connected waters of the state, including disruption of sustaining surface or groundwater hydrology. Adjacent wetlands or streams determined likely to be measurably degraded by such hydrologic alteration, or by partial fill, must be included in the cumulative impact calculation, even if not filled or otherwise directly altered physically.

**s.** The use of monofilament-type erosion control netting or blanket is prohibited in the wetland, and in any stream channels, stream banks, or any disturbed riparian areas within 30 feet of top of bank.

**t.** Hard armoring of banks at any stream or wetland crossing is prohibited.

**u.** The pipeline, access roads, workspaces, and staging areas shall be located to avoid permanent alteration or damage to the integrity of the stream channel. Large trees, steep banks, rock outcroppings, etc., should be avoided.

**v.** The pipeline, access roads, workspaces, and staging areas shall not impound normal or base flows on the upstream side, and shall not result in a permanent disruption or barrier to the movement of fish or other aquatic life on the downstream side. Base flow is the usual or normal flow of the stream that is supplied primarily by groundwater from springs and seeps, but not affected by rapid runoff during and after rainfall.

**w.** The width of the stream channel and bank modifications, or other impacts associated with the installation of the pipeline, access roads, workspaces, and staging areas shall be limited to the minimum necessary.

**x.** Erosion control measures shall be utilized where stream bank vegetation is disturbed for the purpose of temporary stream crossings. Stream beds shall not be used as linear transportation routes for mechanized equipment. The stream channel may be crossed perpendicularly with equipment provided no additional fill or excavation is necessary. EPSC measures shall be utilized when streambanks are disturbed.

**y.** The stream channels shall not be over-widened as a result of the installation of the pipeline, access roads, workspaces, or staging areas.

**z.** Backfill activities must be accomplished in the least impactful manner possible that stabilizes the streambed and banks to prevent erosion. Permanent vegetative stabilization must use native species as described in Special Condition p.

**aa.** All dewatering activities shall be conducted in a manner that prevents the discharge of sediment-laden water into waters of the state.

**bb.** All spoil material from trench excavation, bore pits, and other earth-disturbing activities shall be deposited in an upland location and stabilized within seven days.

**cc.** Erosion prevention and sediment control measures must be in place and functional before any earth moving operations begin, and shall be designed according to the department's Erosion and Sediment Control Handbook (http://tnepsc.org/handbook.asp).

**dd.** Erosion prevention and sediment control measures such as silt fences shall be removed following completion of construction.

**ee.** Best Management Practices (BMPs) shall be stringently implemented throughout the construction period to prevent sediments, oils, or other project-related pollutants from being discharged into waters of the state. All spills must be reported to the appropriate emergency management agency, and measures shall be taken immediately to prevent the pollution of waters of the state, including groundwater, should a spill occur.

**ff.** Equipment staging and maintenance areas shall be developed a sufficient distance from any water to ensure that oil, gas, other petroleum products, and other hazardous materials do not enter the waters.

Page 15 of 188

**gg.** The permittee shall minimize the use of heavy equipment in streams or wetlands. Equipment shall be free of noticeable leaks of fluids and oils.

**hh.** Where practicable, all activities shall be accomplished during drier times of year or when recent conditions have been dry at the impact location. The excavation and fill activities associated with the pipeline crossing of streams and wetlands shall be kept to a minimum and shall be separated from flowing waters. Wet-cut trenching methods are not authorized. All surface water flowing towards or from the construction activity shall be diverted using flume or dam-and-pump methods as described in the permit application materials. Temporary diversion channels shall be protected by non-erodible material and lined to the expected high water level. Cofferdams and/or berms must be constructed of sandbags, steel sheeting, or other non-erodible, non-toxic material. All such diversion materials must be removed upon completion of the work.

**ii.** The permittee shall minimize clearing, grubbing, and other disturbance to riparian vegetation. Unnecessary native vegetation removal, including tree removal, and soil disturbance is prohibited. Native riparian vegetation must be reestablished in all areas of disturbance outside of any permanent authorized structures or vegetation management zones after work is completed, per Special Condition p. Coverage under this permit does not waive any local riparian buffer protection requirement, and the permittee is responsible for obtaining any necessary local approval.

**jj.** In addition to the erosion prevention and sediment control measures described herein associated with authorized aquatic impacts, the permittee must comply with the conditions of the National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges of Stormwater Associated with Construction Activities (CGP), TNR100000 for the entire area of disturbance associated with the construction project.

**General Conditions:**

**a.** It is the responsibility of the permittee to convey all terms and conditions of this permit to all contractors. A copy of this permit, approved plans, and any other documentation pertinent to the activities authorized by this permit shall be maintained on site at all times during periods of construction activity.

**b.** Work shall not commence until the permittee has obtained and maintained all necessary authorizations pursuant to applicable provisions of section 10 of The Rivers and Harbors Act of 1899, section 404 of the Clean Water Act, section 26a of The Tennessee Valley Authority Act, or any other applicable federal, state or local laws.

**c.** All activities must be carried out in such a manner as will prevent violations of water quality criteria as stated in TDEC Rule Chapter 0400-40-03, or impairment of the uses of waters of the state as designated by Rule Chapter 0400-40-04.

**d.** This activity may not result in a disruption or barrier to the movement of fish or other aquatic life and wetland dependent species upon project completion.

**e.** Adverse impact to formally listed state or federal threatened or endangered species or their critical habitat is prohibited.

**f.** This permit does not authorize adverse impacts to cultural, historical, or archeological features or sites.

**g.** This permit does not authorize access to public or private property. Arrangements concerning the use of public or private property shall be made with the landowner. The permittee is responsible for obtaining any additional permitting or maintenance agreements with other government or public agencies or lands.

**PART II**

**Monitoring Requirements**

All reports must be submitted in report form to the Division's Natural Resources Unit located on the 11th Floor of the William R. Snodgrass Tennessee Tower, 312 Rosa L. Parks Avenue, Nashville, Tennessee 37243,  or via email to water.permits@tn.gov and to the permit writer Claire Wainwright at Claire.wainwright@tn.gov. Please be sure to indicate the ARAP permit number on your submittal.

a. **An as-constructed report** must be submitted within 45 days after the project's completion (per Special Condition d above) and must contain as-constructed or record drawings of the final structure.

b. **An annual post-construction monitoring report** must be submitted by April 30 each year for three years after the project's completion (per Special Condition f above) to document evidence of the maintenance of jurisdictional status and successful restoration within **all impacted jurisdictional features**, and shall include:

  1. Representative photographs of each feature pre-impact and post-impact
  2. Wetland delineations and stream hydrologic determinations. All stream hydrologic determinations must be made during the February 1 – April 15 time period each year and in accordance with the procedures in TDEC Rule 0400-40-03-.05(9)
  3. Identification of any features that have not returned to pre-impact condition, and a corresponding proposed adaptive management plan

c. **A post-blasting monitoring report** must be completed for each applicable stream crossing within 30 days post-impact (per Special Condition h above). This report will include:

  1. Representative photographs of each feature pre-impact and post-impact
  2. A description of the attempts to implement the potentially practicable alternatives to blasting techniques,
  3. The results for each technique attempted prior to blasting,
  4. A narrative description of the site-specific factors necessitating blasting, and
  5. The date of the blasting.

d. **A water withdrawal monitoring report** must be submitted within 30 days following the completion of all hydrostatic testing associated with the pipeline installation (per Special Condition k above). The report shall include, for each withdrawal location:

  1. Specific location of each intake
  2. Daily maximum withdrawal rates
  3. Instantaneous flow rates and the source of instantaneous flow data, and
  4. Total daily withdrawal volume

**Duty to Reapply**

If any portion of the permitted activities, including the authorized impacts to water resources, compensatory mitigation requirements, or post-project monitoring is not completed before the expiration date of this permit **the applicant must apply for permit re-issuance**. The permittee shall submit such information and forms as are required to the director of the Division of Water Resources at least ninety (90) days prior to its expiration date. Such applications must be properly signed and certified.

**Property Rights**

The issuance of this permit does not convey any property rights in either real or personal property, or any exclusive privileges, nor does it authorize any injury to private property or any invasion of personal rights, nor any infringement of Federal, State, or local laws or regulations.

**Other Information**

If the permittee becomes aware that he/she failed to submit any relevant facts in a permit application or submitted incorrect information in a permit application or in any report to the Director, then he/she shall promptly submit such facts or information.

**Changes Affecting the Permit**

**Transfer/Change of Ownership**

**a.**   This permit may be transferred to another party, provided there are no activity or project modifications, no pending enforcement actions, or any other changes which might affect the permit conditions contained in the permit, by the permittee if:

**b.**   The permittee notifies the Director of the proposed transfer at least 30 days in advance of the proposed transfer date;

**c.**   The notice includes a written agreement between the existing and new permittees containing a specified date for transfer of permit responsibility, coverage, and contractual liability between them; and

**d.**   The Director does not notify the current permittee and the new permittee, within 30 days, of his intent to modify, revoke, reissue, or terminate the permit, or require that a new application be filed rather than agreeing to the transfer of the permit.

**e.**   The permittee must provide the following information to the division in their formal notice of intent to transfer ownership:

   1.   the permit number of the subject permit;
   2.   the effective date of the proposed transfer;
   3.   the name and address of the transferor;
   4.   the name and address of the transferee;
   5.   the names of the responsible parties for both the transferor and transferee;
   6.   a statement that the transferee assumes responsibility for the subject permit;
   7.   a statement that the transferor relinquishes responsibility for the subject permit;
   8.   the signatures of the responsible parties for both the transferor and transferee, and;
   9.   a statement regarding any proposed modifications to the permitted activities or project, its operations, or any other changes which might affect the permit conditions contained in the permit.

**Change of Mailing Address**

The permittee shall promptly provide to the Director written notice of any change of mailing address. In the absence of such notice the original address of the permittee will be assumed to be correct.

**Noncompliance**

**Effect of Noncompliance**

All impacts shall be consistent with the terms and conditions of this permit. Any permit noncompliance constitutes a violation of applicable State and Federal laws and is grounds for enforcement action, permit termination, permit modification, or denial of permit reissuance.

Page 18 of 188

**Reporting of Noncompliance**
**24-Hour Reporting**

**a.** In the case of any noncompliance which could cause a threat to public drinking supplies, or any other discharge which could constitute a threat to human health or the environment, the required notice of non-compliance shall be provided to the Division of Water Resources in the appropriate Environmental Field Office within 24-hours from the time the permittee becomes aware of the circumstances. (The Environmental Field Office should be contacted for names and phone numbers of environmental response personnel).

**b.** A written submission must be provided within five (5) days of the time the permittee becomes aware of the circumstances unless this requirement is waived by the Director on a case-by-case basis. The permittee shall provide the Director with the following information:

   **1.** A description of the discharge and cause of noncompliance;

   **2.** The period of noncompliance, including exact dates and times or, if not corrected, the anticipated time the noncompliance is expected to continue; and

   **3.** The steps being taken to reduce, eliminate, and prevent recurrence of the non-complying discharge.

**Scheduled Reporting**

For instances of noncompliance which are not reported under subparagraph a. above, the permittee shall report the noncompliance by contacting the permit coordinator, and provide all information concerning the steps taken or planned to reduce, eliminate, and prevent recurrence of the violation and the anticipated time the violation is expected to continue.

**Adverse Impact**

The permittee shall take all reasonable steps to minimize any adverse impact to the waters of Tennessee resulting from noncompliance with this permit, including but not limited to, accelerated or additional monitoring as necessary to determine the nature and impact of the noncompliance. It shall not be a defense for the permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit.

**Liabilities**

**Civil and Criminal Liability**

Nothing in this permit shall be construed to relieve the permittee from civil or criminal penalties for noncompliance. Notwithstanding this permit, the permittee shall remain liable for any damages sustained by the State of Tennessee, including but not limited to fish kills and losses of aquatic life and/or wildlife, as a result of the discharge of pollutants to any surface or subsurface waters. Additionally, notwithstanding this Permit, it shall be the responsibility of the permittee to conduct its discharge activities in a manner such that public or private nuisances or health hazards will not be created.

**Liability under State Law**

Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the permittee from any responsibilities, liabilities, or penalties established pursuant to any applicable State law or the Federal Water Pollution Control Act, as amended.

This permit does not preclude requirements of other federal, state or local laws. This permit also serves as a State of Tennessee Aquatic Resource Alteration Permit (ARAP) pursuant to the Tennessee Water Quality Control Act of 1977 (T.C.A. § 69-3-101 et seq.).

The State of Tennessee may modify, suspend or revoke this permit or seek modification or revocation should the state determine that the activity results in more than an insignificant violation of applicable water quality standards or violation of the act. Failure to comply with permit terms may result in penalty in accordance with T.C.A. § 69-3-115.

An appeal of this action may be made as provided in T.C.A. § 69-3-105(i) and Rule 0400-40-07-.04(9) by submitting a petition for appeal:

**a.**  The petition must be filed within 30 days after public notice of the issuance of the permit.

**b.**  The petition must specify the basis for the appeal and state a claim for relief based on an alleged violation of the Tennessee Water Quality Control Act or the rules promulgated thereunder. Third parties shall specify facts sufficient to establish that they have satisfied the statutory and regulatory preconditions and otherwise have standing to appeal.

**c.**  The petition should be addressed to the technical secretary of the Tennessee Board of Water Quality, Oil and Gas at the following address: Jennifer Dodd, Director, Division of Water Resources, William R. Snodgrass - Tennessee Tower, 312 Rosa L. Parks Avenue, Nashville, Tennessee 37243-1102, or you may submit such petition electronically to TDEC.Appeals@tn.gov. Any hearing would be in accordance with T.C.A. §§ 69-3-110 and 4-5-301 et seq.

APPENDIX
Permit Rationale

<div style="border:1px solid black; padding:4px; text-align:center;">

**PERMIT RATIONALE**
**Aquatic Resource Alteration Permit NRS22.192**

</div>

Tennessee Natural Gas Company, LLC
Unnamed Wetlands, Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells Creek, and Barkley Reservoir; Harpeth River and Lake Barkley Watersheds, Dickson, Houston, and Stewart Counties, Tennessee
July 21, 2023
*Permit Writer: Claire Wainwright*

## Summary

Names of Applicants:
Tennessee Natural Gas Company, LLC

Contact:
Gina Dorsey
1001 Louisiana St, Suite 1000
Houston, TX 77002-5089

Activity Location:  From near Claylick Road, Dickson to near Old Scott Road, Cumberland City

Nature of Business: Construction of a natural gas pipeline and associated infrastructure

Authorized Activity: Temporary impacts to 0.69 acres of wetland, permanent impacts to 0.03 acres of wetland, temporary impacts to approximately 5400 linear feet of stream, temporary water withdrawals from eight streams and one reservoir, and permanent impacts to 490 linear feet of stream associated with the construction of a 32-mile 30-inch diameter natural gas pipeline.

Waterbody Name: Unnamed Wetlands, Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells Creek, Barkley Reservoir; Harpeth River and Lake Barkley Watersheds, Dickson, Houston, and Stewart Counties, Tennessee

## Permit Status

ARAP NRS22.192 issued:  **July 21, 2023**

ARAP NRS22.192 expires:  **July 20, 2028**

Application for ARAP received:  **July 22, 2022**

Application Complete:  **April 20, 2023**

Page 21 of 188

**App-0029**

**Status of Affected Waters**

Streams

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SDKA023 | Upper Sugar Camp Branch | TN05130204001_1100 | UT Harpeth | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
|  |  |  |  | Irrigation | Not Assessed | N/A | N/A | N/A |  |  |
|  |  |  |  | Recreation | Not Assessed | N/A | N/A | N/A |  |  |
|  |  |  |  | Fish and aquatic life | Not Assessed | N/A | N/A | N/A |  |  |
| SDKA026, SDKA027 | Jordan Branch, UT to Jordan Branch | TN05130204002_0100 | Jordan Branch | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
|  |  |  |  | Irrigation | Not Assessed | N/A | N/A | N/A |  |  |
|  |  |  |  | Recreation | Not Assessed | N/A | N/A | N/A |  |  |
|  |  |  |  | Fish and aquatic life | Not Assessed | N/A | N/A | N/A |  |  |
| SDKA004, SDKA006, | UT to Porters Branch, | TN05130204002_0200 | UT Jones Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | June 3, 2019 | Unavailable | Not a known ETW |

Page 22 of 188

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SDKA008, SDKA058 | Porters Branch | | | Irrigation | Fully Supporting | N/A | N/A | June 3, 2019 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Supporting | Flow regime modification | Dam or impoundment | June 3, 2019 | | |
| SDKA013, SDKA049, SDKA051, SDKA053, SDKA054, SDKA055 | Gafford Branch, UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA048 | Jones Creek | TN05130204002_1000 | Jones Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | June 5, 2019 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | June 5, 2019 | | |
| | | | | Recreation | Fully Supporting | N/A | N/A | June 5, 2019 | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | June 5, 2019 | | |

Page 23 of 188

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Industrial Water Supply | Fully Supporting | N/A | N/A | June 5, 2019 | | |
| SDKA014 | UT to Gafford Branch | TN05130204002_1500 | Peabody Branch | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKB025, SDKB026, SDKB027, SDKB028 | UT to Leatherwood Creek, Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| SHNC010-1, SHNC018, SHNC020 | UT Yellow Creek, Indian Branch | TN05130205019_0999 | Misc tribs to Yellow Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | | | N/A | N/A | N/A | | |

Page 24 of 188

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | | | | | |
| SHNC007-1 | Yellow Creek | TN05130205019_1000 | Yellow Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| SDKA046, SDKB009, SDKB011, SDKB014, SDKR005, SDKR008 | UT to Dry Hollow Branch, Furnace Creek, Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| SDKB023 | Little Bartons Creek | TN05130205024_0600 | Little Bartons Creek | | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |

Page 25 of 188

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Fully Supporting | | | | | |
| | | | | Fish and aquatic life | | N/A | N/A | May 29, 2018 | | |
| SDKA038, SDKA041, SDKA042, SDKB001, SDKB004, SDKB005, SDKB008 | UT to Harris Branch, Harris Branch, UT to Bartons Creek, Miller Branch, UT to Nesbitt Branch, Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKB002 | Bartons Creek | TN05130205024_1000 | Bartons Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |

Page 26 of 188

App-0034

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SDKA033, SDKA034 | UT to Johnson Creek | TN05130205031_0999 | Misc tribs to Johnson Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA036 | Johnson Creek | TN05130205031_1000 | Johnson Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SHNA001, SHNA011, SHNB030, SHNC023, SHNC030, SHNE003 | Guices Creek, UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |

Page 27 of 188

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SHNA012 | Guices Branch | TN05130205121_1000 | Guices Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SHNA008, SHNB033-1, SHNB033-2, SHNB033-3 | UT to Lickskillet Branch, Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SHNA010 | Wells Creek | TN051302051735_1000 | Wells Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 30, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 30, 2018 | | |
| | | | | Recreation | Not Supporting | E coli | Sanitary sewer overflows (collection system failures) | May 30, 2018 | | |

Page 28 of 188

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| None | Cumberland River | TN05130205015_1000 | Barkley Reservoir (Cumberland River) | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 25, 2018 | Available | ETW due to documented non-experimental populations of state-listed threatened and endangered aquatic animal species |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Recreation | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Domestic Water Supply | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Industrial Water Supply | Fully Supporting | N/A | N/A | May 25, 2018 | | |

Page 29 of 188

Cumberland Gas Pipeline Project; NRS22.192
§401 Water Quality Certification

<u>Wetlands</u>

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody Name | TDEC Waterbody ID | Wetland Type | Parameters for Habitat Alteration | ETW Status |
|---|---|---|---|---|---|---|
| WDKB001 | Wetland WDKB001 | Unnamed PFO wetland | N/A | PFO | Available | Not a known ETW |
| WHNA001 | Wetland WHNA001 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| WHNB002 | Wetland WHNB002-PEM | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| | Wetland WHNB002-PFO | Unnamed PFO wetland | N/A | PFO | Available | Not a known ETW |
| WHNW001 | Wetland WHNW001 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| WHNW002 | Wetland WHNW002 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| WSTA001 | Wetland WSTA001 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |

**Authorized Alterations**

TGP is authorized to conduct stream and wetland alterations associated with the construction of approximately 32 miles of new 30-inch-diameter natural gas lateral pipeline and associated infrastructure. A detailed summary of these impacts can be found in Tables 1 and 2 in this permit. The project also will impact waterbodies identified by TDEC as WWCs (listed in this permit's Appendix in Table 3). In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), alterations to waters identified by TDEC as WWCs do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108 (q).

The broad categories of activities associated with the project that may alter Waters of the State include vegetation clearing, soil disturbance for grading purposes, water withdrawals for hydrostatic testing, trenching, HDD, and temporary fill from construction timber mats or temporary culvert crossings.

Prior to construction, temporary and permanent ROW workspaces will be cleared of woody vegetation. The pipeline construction corridor, adjacent work areas, and contractor yards will be cleared of vegetation and graded, as needed, to accommodate mobilization of equipment and materials and to facilitate access. During operation, the permanent easement or ROW will be maintained clear of trees and woody shrubs to allow for ongoing pipeline inspection and maintenance as required by United States Department of Transportation pipeline safety regulations. A corridor not exceeding ten feet in width, centered on the pipeline, may be

**App-0038**

maintained annually in an herbaceous state as required to facilitate periodic corrosion and leak detection surveys.

Trench excavation will be the primary construction method to install the pipeline. Installation of the proposed pipeline will primarily entail excavation of a trench 4.5 to 8 feet in depth (averaging approximately 5 feet deep) and 4 to 5 feet in width (averaging approximately 4.5 feet wide). After the pipe is installed, the pipeline trench will be backfilled to grade by a minimum of 18 to 36 inches of cover (depending on location-specific soil and rock conditions) and vegetatively stabilized. All buried pipelines will be installed with a minimum cover of 48 inches of soil or 24 inches of consolidated rock between the top of the pipe and the underwater natural bottom.

TGP will cross all waterbodies in accordance with the FERC Procedures (with requested deviations to be approved by the FERC), the project's SWPPP, and applicable USACE and TDEC permit conditions. The proposed construction procedures will ensure that authorized impacts at all stream crossings are minimized to the extent practicable. TGP anticipates that waterbodies will be crossed primarily by dry open-cut methods, which may include a flumed crossing or dam-and-pump techniques, depending on site-specific conditions at the time of construction. Approximately 0.8 miles of the pipeline will be installed via HDD to avoid open-cut construction methods in three larger and potentially higher-flow streams as well as one associated unnamed tributary.

Construction BMPs will include:
- Minimizing vegetation clearing, use of timber mats, and minimizing soil disturbance;
- Avoiding unnecessary vehicular traffic and equipment use;
- Installing and maintaining erosion and sedimentation control devices such as straw bales and silt fences;
- Restricting the duration of construction to the extent practicable;
- Using timber construction mats to create a temporary work surface in wet conditions;
- Using low pressure ground equipment in wet conditions to minimize vegetation damage, soil compaction, and rutting;
- Training employees and contractors regarding the handling of oils and hazardous materials commensurate with their position;
- Inspecting equipment used in construction and operations at regular intervals;
- Using only approved access roads for vehicles transporting oils or fuel to construction workspaces;
- At the discretion of the Environmental Inspector, fueling equipment at the construction workspaces at least 100 feet from any waterbody;
- Storing hazardous materials, including chemicals, fuels, and oils, more than 100 feet from any waterbody;
- Using secondary containment, as appropriate, for pumps that transfer hazardous substances or petroleum within 100 feet of a waterbody to prevent spills and overflow; and
- Keeping spill response materials on site and in designated vehicles in the construction workspaces.

Disturbances to all other Waters of the State identified in the project area outside of the construction ROW will be avoided.

Stabilization will be achieved according to the conditions of the National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges of Stormwater Associated with Construction Activities (CGP), TNR100000. The work will be completed in the dry at all crossings. Where practicable, all stream and wetland impacts shall be accomplished during drier times of year or when recent conditions have been

dry at the impact location. The excavation and fill activities associated with the pipeline crossing of streams and wetlands shall be kept to a minimum and shall be separated from flowing waters. When working in drier times of year or under dry recent conditions is not practicable, check dams, diversions, or a system of pumps and sediment bags may be used to create dry sections and reduce sedimentation. All surface water flowing towards or from the construction activity shall be diverted primarily using flume or dam-and-pump methods as described in the permit application materials.

Streams

The proposed construction ROW includes the permanent easement, temporary workspaces, access roads, and contractor yards. A total of 53 streams are located within the construction ROW, with some features crossed by the ROW more than once, for a total of 69 stream crossings (approximately 5400 linear feet). Of the total 69 stream crossings, 49 are open-cut pipeline crossings. An additional 16 stream crossings will incur minor, temporary impacts due to workspace disturbances (i.e., equipment/construction staging locations, access roads, and additional workspace areas). The remaining four stream crossings will have no direct impacts due to the use of the HDD crossing method described in more detail below.

Stream crossings will be perpendicular to stream flow to the extent practicable. Temporary erosion control measures will be installed as necessary to prevent downstream impacts. If necessary, the pipe used for waterbody crossings will be weighted to prevent flotation. Prior to waterbody crossing construction, TGP will clear vegetation on each side of the waterbody, install sediment barriers, and prepare prefabricated segments of pipeline for installation.

Except for waterbodies that are proposed to be crossed using the trenchless HDD crossing method, TGP is authorized to cross the remaining waterbodies using dry open cut crossing methods. Dry open cut crossing methods, which consist of the "dam-and-pump" and "dry-flumed" crossing methods, will be accomplished by temporarily diverting stream flow around or through the work area to minimize contact between stream water and excavation and to minimize sediment suspension during trench excavation, pipeline installation, and backfill activities.

*Flumed method for installation via trench*

A flumed stream crossing redirects the water flow through one or more flume pipes to allow for the trenching and pipe installation to occur in dry conditions. The number, length, and diameter of the pipes are dependent on estimated stream flow for the stream being crossed. This method allows for drier trenching, pipe installation, and restoration, while maintaining continuous downstream flow and passage for aquatic organisms. Soil types must have characteristics that allow stable stream bank conditions, and stream flow must be low enough for this method to be used successfully and safely. The flume pipe(s) must be long enough to account for the potential for the ditch width to increase during excavation (due to sloughing) and over-sized somewhat to accommodate the possibility of high flow conditions. An effective seal must be created around the flume(s) at both the inlet and outlet ends, so water will not penetrate and potentially compromise the channelized dam. TGP will implement the following measures where the flumed crossing method is used:

- The flume pipe will be installed before any trenching;
- An effective seal will be created around the flume pipe with sandbags or an equivalent seal mechanism;
- The flume pipe(s) will be aligned parallel with natural water flow to prevent scouring of the bank, preventing erosion and sedimentation;

- The flume pipe will not be removed during trenching, pipe-laying, backfilling activities, or initial streambed restoration efforts, except in rare conditions where a severe flow event causes conditions that make it unsafe for the pipe to remain; and
- Flume pipes and dams that are not associated with an equipment bridge will be removed as soon as final clean-up of the stream bed and bank is complete.

*Dam-and-pump dewatering method for installation via trench*

The dam-and-pump method may be used for stream crossings where pumps and hoses can adequately transfer stream flow volumes from upstream of the work area to downstream of the work area, and where there are no concerns with preventing the passage of aquatic organisms.

TGP will implement the following measures where the dam and pump method is utilized:

- Sufficient pump size, horsepower, and hose capacity, including on site backup pumps, will be used to maintain downstream flows;
- Coffer dams will be constructed with "clean" materials to prevent pollutants from entering the waterbody (e.g., sandbags or clean gravel with plastic liner);
- Water intakes will be suspended in the water column above the stream bed and will be screened to reduce entrainment of aquatic organisms or particles that may clog the pump;
- Pumps will be located within secondary containment structures to catch petroleum liquids and prevent them from entering the waterbody during refueling or if a pump failure occurs;
- For waterbodies with large volumes and strong velocity discharges, water dispersion structures will be placed at the downstream discharge location to prevent streambed scour; and
- The coffer dam, pumps, and hoses will be monitored and maintained to ensure proper operation for the duration of the waterbody crossing.

*Rock removal methods for installation via trench*

Bedrock refers to the solid rock that is found beneath the soil layer and other unconsolidated rock or sediment fragments. Shallow and hard bedrock can restrict trenching, requiring special mechanical means or blasting in certain areas to excavate to required design depths.

If bedrock is encountered during trenching, TGP plans to remove such bedrock using one of the techniques detailed below. The technique selected by TGP's construction contractor will be dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location. Techniques to be attempted are the following, in increasing order of perceived impact to aquatic resources:

    1. Conventional excavation with an excavator;
    2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;
    3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;
    4. Removal by rock trencher; or
    5. Controlled blasting and excavation with a backhoe.

Evaluation criteria for the above-listed techniques include observed conditions at the stream crossing, the technical feasibility and limitations of each particular technique, considerations based on the experience of TGP personnel and its construction contractor, logistics, and costs. Based on the evaluation, one or more of the four non-blasting techniques may be determined not to be a practicable alternative at a particular crossing. However, based on the results of the evaluation at each stream crossing, TGP will attempt the remaining potentially practicable non-blasting techniques to determine which is the least adverse yet

practicable alternative. Only if evaluation and attempted implementation of the non-blasting techniques indicate that these non-blasting alternatives are not practicable will controlled blasting be selected as the least impactful to resource values, yet practicable, alternative. If techniques 1-4 are unsuccessful for rock removal and excavation at stream crossings, controlled blasting will be considered in non-karst areas that are also not streams with an unacceptable risk of hydrologic loss. In accordance with the permit Special Condition, blasting in wetlands is prohibited.  The risk of karst-prone geology and risk of unacceptable hydrologic loss has been evaluated for each stream crossing location as identified in the Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022.

TGP anticipates encountering areas of shallow bedrock during construction that may require controlled blasting to remove, based on the following information: review of surficial geology, soil mapping, and desktop geotechnical survey results. TGP has developed a Draft Blasting Plan for the project, provided in Draft Blasting Plan found in the documented entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package. To avoid potential damage, TGP's blasting contractor will conduct pre-blasting of the rock, as needed, and develop site-specific blasting operations and monitoring plans to be approved by TGP. Control of blasting will limit stresses on existing pipelines, nearby structures, water supply wells, oil and gas wells, electrical transmission tower footings, and other utilities located near the project. Blasting activities will not begin until occupants of nearby buildings, stores, residences, businesses, and farms have been notified, and pre-blast inspections have been conducted on structures and water wells. Special care will be taken to monitor and assess blasting within 200 feet of residences and 200 feet of private or public water supply wells. Blasting mats will be used during blasting to keep the material within the approved workspaces. TGP and its blasting contractor will adhere to the provisions in the Draft Blasting Plan, which identifies blasting procedures, including use, storage, and transportation of explosives. Following blasting, where necessary, excess rock will be removed from the construction workspace, subject to affected landowner approval and applicable permit conditions. In areas where rock is predominant and little suitable backfill material is available, rock will be pulverized and placed in the trench as pad material around the pipe.

*Horizontal Directional Drilling (HDD) for trenchless installation*
HDD is a construction technique that is used to install pipelines in areas where traditional open cut excavations are not practicable due to technical feasibility, logistics, and costs. With the HDD method, a small diameter pilot hole is drilled from the entry point to the exit point. Drilling fluids are pumped to the drill bit, to cool the bit, remove rock cuttings, seal the drilled path, and lubricate the drill stem. From there, the hole is widened, and the pipeline is pulled into position. Compared to the other crossing methods, the HDD technique minimizes the impacts to an area by drilling down and under a sensitive resource, leaving the portion of land in between the entry and exit point relatively undisturbed.  HDDs are authorized at three locations that will avoid direct impacts to four streams: Jones Creek (MP 3.2), Yellow Creek and an unnamed tributary (MP 22.4), and Wells Creek (MP 30.7). The use of HDDs at these three locations will be implemented to overcome obstacles posed by use of other stream crossing construction methods that are impracticable because of channel dimensions, flow, or other constraints. The feasibility of HDDs at these three (3) locations has been confirmed by analysis of geotechnical testing. HDD feasibility studies were conducted in June 2022 and provided as "Attachment 7 – HDD Feasibility Studies" submitted to the Division on July 22, 2022, as part of the initial permit application package. In the case of inadvertent release of drilling fluid, TGP and its contractors will follow the HDD contingency plan submitted to the Division as part of "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

Page 34 of 188

Following construction, streambeds will be restored to their pre-construction elevations and grades and as specified in "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package. Spoil, debris, piping, construction materials, and any other obstructions resulting from or used during construction of the pipeline will be removed to prevent interference with normal stream flow. Any excavated material not used as backfill will be removed and disposed of in uplands. Following grading, all waterbody banks will be restored to pre-construction conditions and in accordance with permit requirements.

*Water withdrawals for hydrostatic testing*

In compliance with U.S. Department of Transportation specifications, TGP will conduct hydrostatic testing on all pipeline segments prior to placing them in service. Authorized sources of hydrostatic test water for the Project are identified in Table 2 of this permit. Hydrostatic test manifolds will be located outside of wetlands and riparian areas to the maximum extent practicable. The pipe segments will be capped with manifolds, filled with water, pressurized, and held for one or eight hours. Any significant loss of pressure will indicate that a leak may have occurred and warrant further inspection and, where necessary, repair. Water may be re-used for hydrostatic testing between the new pipeline segments. The test water is expected to contact only new pipe, and no additives or chemicals will be added to the test water. Upon completion of the hydrostatic tests, the hydrotest water will be discharged to an upland area through a dewatering structure consisting of an energy dissipation device and water filtration structure. Environmental impacts from withdrawal and discharge of test water will be minimized by utilizing the measures outlined in the documented entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

Wetlands

No permanent fill or loss of wetland acreage is authorized. However, the project will result in the permanent vegetation conversion of up to 0.03 acres of wetlands from forested to herbaceous within the new permanent easement due to construction clearing and periodic maintenance activities. Post-construction monitoring will be conducted to ensure that the areas are restored and that invasive non-native plant species do not dominate as detailed in "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

*Wetland construction methods*

"Conventional" wetland construction methods support construction equipment without significant soil disturbance. Prior to crossing and movement of construction equipment through these wetlands, the ROW will be stabilized using timber mats to allow for a stable, safe working condition. All trenches will be dewatered according to permit conditions to ensure that work is done in the dry. TGP will segregate up to the top 12 inches of wetland topsoil over the trench line. Trench soil will be temporarily stockpiled in a ridge along the pipeline trench. Gaps in the spoil pile will be left at appropriate intervals to provide for natural circulation or drainage of water. While the trench is dug, the pipeline will be assembled in a staging area located in an upland area. After the pipeline is lowered into the trench, wide-track bulldozers or backhoes supported on timber mats will be used for backfilling, final clean-up, and grading. This method will minimize the amount of equipment and travel in wetland areas. Where necessary, a drag-section may be used with the conventional wetland construction method. The drag-section involves the trenching, installation, and backfill of a prefabricated length of pipeline containing several pipe segments all in one day. The trench is backfilled at the end of each day after the pipe is lowered in as necessary to ensure safety.

**Alternatives Analysis and Selection of Least Impactful Practicable Alternative**

Page 35 of 188

**App-0043**

The applicant has submitted potentially practicable alternatives to the activity. The overall stated goal and purpose of the activity is to transport natural gas to TVA from TGP's existing interstate pipeline system, as follows:

> "The proposed Project, which consists of the construction of the approximately 32-mile Cumberland Pipeline and appurtenant facilities (Cumberland Meter Station, Pressure Regulation Station, mainline valves, and inline inspection facilities), will allow TGP to transport approximately 245,040 dekatherms per day ("Dth/d") of natural gas from TGP's existing interstate pipeline system for TVA."

The applicant has considered the following alternatives:

**Alternative 1: Major route variations**

> "TGP conducted an analysis to determine if alternatives to construct and install the Cumberland Pipeline are practicable based on environmental considerations, construction costs, technical feasibility, human safety, and logistics."

> "The proposed Cumberland Pipeline will be constructed and installed generally parallel and adjacent to an existing TVA electric utility easement (approximately 80 percent co-located) and other utility easements."

> "The route for the Project is spatially constrained by two existing and fixed locations: (1) TVA's Cumberland Fossil Plant and (2) TGP's existing natural gas pipeline system (Lines 100-3 and 100-4). A primary routing consideration was co-locating the Cumberland Pipeline with existing utility easements for approximately 80 percent of its length, thereby minimizing environmental and landowner impacts. Based on TGP's analysis, an alternate Project route that is not co-located with existing utility easements would not result in decreased impacts to water quality, and would have additional environmental and landowner impacts than the preferred route, where land-use and property disruptions have already occurred."

> "In order to meet the purpose and need for the Project, the Cumberland Pipeline was designed to extend from the Project receipt point on TGP's existing interstate natural gas pipeline system along the Project's eastern beginning point to the Project delivery point at the location of TVA's proposed combined-cycle combustion turbine gas plant to be located on the Cumberland Fossil Plant Reservation at the Project's western terminus. Because these points are fixed as existing facilities, alternate routes with other starting or terminating points are not practicable or feasible to achieve the Project purpose. TGP's preferred route for the Cumberland Pipeline extends between these two points generally along an existing TVA powerline easement and other utility easements. This route is preferred primarily because of its generally co-located alignment between the Project receipt and delivery points. Further, with regard to Project impacts, disruptions to existing land-use along the TVA powerline easement and other utility easements have already occurred and have been assimilated, minimizing impacts to the environment and to new landowners for alternative routes. Finally, ease of access along the existing TVA easement and other utility easements by use of existing access roads for Project construction and operations provides another advantage for the preferred route as compared to alternative routes. Because of the ubiquitous occurrence of streams and wetlands in the topographically dissected Western Highland Rim Physiographic Province in which the Project is located, it is unlikely that other routes between the Cumberland Pipeline's receipt and delivery points would encounter substantially fewer aquatic resources than those along the preferred route, which is co-located with an existing TVA powerline easement and other utility easements for approximately 80 percent of its length. Further, alternative routes likely would

Page 36 of 188

contain aquatic resources that have not been disturbed by previous utility clearing and maintenance activities. For these reasons, TGP has chosen the route generally extending along the TVA powerline easement and other utility easement as the preferred alternative for the Cumberland Pipeline."

"There are no additional major route alternatives to the Cumberland Project."

**Alternative 2: Minor Route Variations**

"During the process of siting the Project, TGP has and will continue to consider multiple minor route variations to refine the pipeline alignment and to address concerns raised by potentially affected landowners and regulatory agencies. Route variations have been made to accommodate construction limitations, to improve the alignment for features such as roads and waterbody crossings, and to avoid natural features that would be challenging during construction, restoration, and operation of the pipeline, as well as to address landowner concerns. Table 10.2-1 summarizes the route variations that TGP has considered and incorporated in the Project alignment. At this time, TGP continues to refine the pipeline route and address route variations requested by potentially affected landowners and regulatory agencies, which may necessitate further changes to proposed pipeline route."

**TABLE 10.2-1**
**Cumberland Project Minor Route Variations**

| Mile Post | Variation Description | At Landowner Request |
|---|---|---|
| 0 | Potential sites for Pressure Regulation Station | |
| 2.3 | Rock ledge avoidance | |
| 3 | Landowner request to shift onto TVA easement | X |
| 4.5 | Avoid building on east side of White Oak Flat Road and eliminate additional pipeline points of inflection | |
| 8.5 | Improve crossing angle at two streams on tract 1.055 | |
| 12.5 | Avoid water feature | X |
| 16.5 | Avoid spring well and align the route for improved stream crossing and create a more perpendicular crossing for Little Bartons Creek | |
| 22.7 | Adjust stream crossing away from middle of the stream | |
| 25 | Avoid side hill construction and align the route to parallel the TVA easement | |
| 26 | Improve crossing angle at Highway 13 and stream (encroaches on TVA) | |
| 30-32 | Address multiple HDD routing issues at Wells Creek | |

"Three minor route variations were evaluated between MP 30-32 where the pipeline needed to be routed away from the original pipeline route (paralleling the TVA powerline easement) to connect to the meter station location specified by the Project Shipper on TVA property."

"Table 10.2-2 summarizes the collective items addressed in the interconnected route variations that were considered between MP 30-32 The preferred route, which incorporates the minor route

Page 37 of 188

variations set forth in Table 10.2-2, results in an increase of approximately 0.12 miles over alternative routes considered between MP 30 and MP 32."

**TABLE 10.2-2**
**Minor Route Variations (Summary MP 30-32)**

| Mile Post | Construction Method | Variation Description (Selected Route) |
|---|---|---|
| 29.8–32 | Upland Construction; Stream-crossing Construction; HDD | Shifted route westward toward TVA's preferred location for the Cumberland Meter Station and to avoid the Stewart Houston Industrial Park. |
| 30.1 | Upland Construction; Stream-crossing Construction | Shifted 50 feet to the south to avoid old railroad bridge supports when crossing abandoned railroad. |
| 30.3–30.8 | Upland Construction; HDD | Moved route to attain a more perpendicular HDD crossing of Wells Creek and avoid crossings of Booster Branch and another tributary to Wells Creek, as well as avoid known cultural resource locations. Moved onto TVA property toward TVA's preferred location for the Cumberland Meter Station. |

For full descriptions of each variation in the tables above please refer to "Attachment 8 – Route Variations" submitted to the Division on July 22, 2022.

During course of application review by TDEC, additional jurisdictional wetlands were found within the ROW. TGP made additional minor route changes to avoid impacts to these features. These changes are summarized in TGP's response to a TDEC Request for Additional Information "TGP & USACE Cumberland Project – TDEC Field Review / Revisions (Supplement 1)", document dated September 29, 2022.

**Alternative 3: Pipeline installation via dry-cut trenching vs. wet-cut trenching**

"The dry open cut construction procedure involves isolating the streambed work area from the stream to allow the construction to be performed in a controlled "dry" state by temporarily diverting the stream around the work area. The most common dry open cut methods include the flumed crossing and the dam and pump crossing methods. The dry open cut method has been selected as the preferred crossing method for the majority of waterbody crossings for the Cumberland Pipeline. The two main types of dry open cut crossing methods are discussed below. While dry open cut methods result in increased time to cross a stream as compared to wet open cut methods, the potential for weather to affect the flow in the stream and thus the crossing, and the ability to handle flow volume, some stream flow may not be appropriately handled by the use of the dry open cut crossing methods. In that case, a trenchless crossing method (HDD or conventional bore method, as discussed below) may be more appropriate."

"In the flumed crossing method, a flumed stream crossing redirects the water flow through one or more pipes to allow for the trenching and pipe installation to occur in dry conditions. The number, length, and diameter of the pipes are dependent on estimated stream flow for the stream being crossed. The major advantage of this method is that it allows for dry trenching, pipe installation, and restoration, while maintaining continuous downstream flow and passage for aquatic organisms. Further, because this method isolates the stream flow from the construction activities, the only downstream turbidity that is created is during the dam/flume installation."

"The dam-and-pump crossing method is primarily used for stream crossing where pumps and hoses can adequately transfer stream flow volumes from upstream work to downstream of the work area,

Page 38 of 188

and where there are no concerns with preventing the passage of aquatic organisms. The major advantage of this method is that it allows for dry trenching, pipe installation, and restoration, while maintaining continuous downstream flow. Further, because this method isolates the stream flow from the construction activities, the only downstream turbidity that is created is transient conditions of short duration during the dam installation. Both methods require that the waterway is dewatered in the construction area by pumping the standing water into a dewatering structure on the banks. The streambed material is then segregated and stockpiled to prevent mixing with other materials and used during the stream restoration process. In terms of adverse environmental effects and practicability, these two methods are essentially equivalent."

**Alternative 4: Rock removal methods for trenched pipeline installation**

"If bedrock is encountered during trenching, TGP plans to remove such bedrock using one of the techniques detailed below. The technique selected by TGP's construction contractor will be dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location. Techniques to be used are the following:

    1. Conventional excavation with an excavator;

    2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;

    3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;

    4. Removal by rock trencher; or

    5. Controlled blasting and excavation with a backhoe."

"[The conventional excavation] method consists of using a backhoe to dig a trench. It is most effective in poorly or unconsolidated materials, such as a dry stream bed underlain by fluvial materials. In conditions supporting its use, including unconsolidated substrate materials that can be relatively easily removed, Conventional Excavation ("CE") presents little environmental risk to water quality and is the most practicable alternative considering technical feasibility, logistics, and costs. However, in instances where tougher substrate materials are present, this alternative may not be practicable because of technical infeasibility. Accordingly, CE will not be used to trench across channels with exposed bedrock substrate. For channels covered by unconsolidated materials overlying bedrock at greater depths, CE will be used to depths at which it is practicable, but removal of deeper materials will necessitate selection among the additional methods described below."

"[The ripping] method makes use of an excavator equipped with concave tooth that is inserted into and dragged through substrate materials. After ripping, a conventional excavator is used to remove the dislodged materials from the trench. For streams at which bedrock is encountered at or beneath the streambed surface, ripping will be the preferred alternative in terms of least environmentally adverse effects because it confers little or no risk of hydrologic loss."

"[The hammering method] entails use of a pneumatic tool attached to a backhoe boom to break apart substrate materials. After hammering, a conventional excavator is used to remove the dislodged materials from the trench. Hammering is time-consuming and increases construction costs considerably in comparison with CE or ripping. Further, hammering exposes equipment operators to prolonged hours on the work-site, potentially resulting in safety risks. Hammering also entails a risk of fracturing potentially resulting in hydrologic loss."

"[The rock trenching] method uses a large trenching machine to cut through bedrock. Although costly to mobilize, this method can reduce construction time at the work site. Primary disadvantages are cost and inaccessibility for many sites where tight space or steep slopes prevent the effective use of the equipment."

"At stream crossings, TGP's construction contractor will evaluate and attempt the use of [each of the] Techniques 1-4 described above based on the conditions observed at the time of construction to determine the best method for rock removal and excavation. If [Techniques 1-4 are] unsuccessful for rock removal and excavation at stream crossings, Technique 5 (controlled blasting) will be considered in non-karst areas or in wetlands or streams with an unacceptable risk of hydrologic loss. The risk of karst-prone geology and risk of unacceptable hydrologic loss has been evaluated for each stream crossing location at which a bedrock substrate has been identified (see [Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "Aquatic Resource Alteration Permit (ARAP) Application and State 401 Water Quality Permit" submitted to the Division on July 22, 2022, as part of the initial permit application package]). If controlled blasting is necessary at a waterbody or wetland crossings, TGP's construction contractor will utilize a dry-ditch crossing method (either dam-and-pump or flume crossing) and adhere to 1) all applicable federal, state, and local regulations, including the FERC Procedures, USACE and TDEC permit conditions, 2) Draft Blasting Plan (see ["Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package], and 3) karst mitigation measures. Immediately following blasting, TGP would remove rock that impedes stream flow."

"The use of the dry open cut method with controlled blasting will only be used if other rock removal methods have been evaluated but deem impracticable. TGP anticipates that controlled blasting will be used rarely to facilitate waterbody crossings. In no event will controlled blasting be used in karst-prone areas or wetlands. A desktop analysis of the study area has identified a few areas of shallow bedrock where controlled blasting may become necessary to cross certain waterbodies using the dry open cut construction method (see [Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "Aquatic Resource Alteration Permit (ARAP) Application and State 401 Water Quality Permit" submitted to the Division on July 22, 2022, as part of the initial permit application package]. TGP's Draft Blasting Plan is provided in ["Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package]. In the unlikely event that controlled blasting is needed, a qualified contractor will review and update this plan to address the specific circumstances of each dry open cut waterbody crossing that requires controlled blasting to remove rock. A qualified Project biologist will survey the area immediately in advance of the controlled blasting activities, including any drilling. for the presence of any sensitive species. Once cleared, holes will be drilled into the streambed and carefully loaded with explosives and packed with aggregates. A pre-blast safety check will then be performed followed by the controlled detonation of the explosives, which will result in a small release of dust and mounding of the surface. The use of controlled blasting would drastically minimize the duration of in-stream work and temporary disruptions to stream flow. The overall area of construction impacts when using controlled blasting is significantly smaller in comparison to other construction methods and results in less costs given reduced time in the workspace. However, the use of controlled blasting may confer a higher risk of loss of stream flow than other crossing construction methods; thus, it is not generally considered to be the [least environmentally damaging practicable alternative] at locations where other methods are feasible and practicable. Although TGP expects the use of blasting for the removal of rock at

Page 40 of 188

waterbody crossing for the Project to be limited and has eliminated the use of controlled blasting for rock removal for use in karst-prone areas, crossing conditions at non-karst prone locations where CE, ripping, hammering, or rock trenching are technically infeasible to dislodge bedrock materials may require controlled blasting as the only practicable alternative. In these instances, TGP will ensure that controlled basting is localized and isolated to within the trench line to minimize the movement of materials outside of the waterbody. Drill patterns will be set so that they achieve smaller rock fragments, which will allow for the use of as much of the fragmented rock as possible when restoring the trench to its pre-construction condition. Rock fragments also will be shifted, as needed, to maintain the contours and flow patterns of the waterbody after the blasting is complete."

"TGP will not utilize the dry open cut crossing method with controlled blasting for rock removal in wetland habitats."

### Alternative 5: Pipeline installation via trenchless methods vs. open-cut trenching

"The HDD method is a trenchless construction procedure in which a waterbody is crossed by pulling the prefabricated pipeline into place using drilled boreholes. In this procedure, a small diameter pilot hole is drilled down from an entry point to an exit point by pumping a slurry mixture of bentonite clay, drilling additives, and water into the ground at high pressure. The hole is then widened, and the pipeline is pulled into position. The HDD method has been a standard construction procedure for linear pipeline installations across large waterbodies since the 1970s. This construction procedure drastically reduces the impacts to waterbodies and their aquatic environments by drilling down and under the sensitive resource, resulting in the surface area between the entry and exit point remaining relatively undisturbed. While the HDD method is a proven technology for pipeline installations, there is still the potential that the HDD method can fail for reasons such as encountering soil conditions that are not conducive to boring, borehole collapse, and loss of the drill string or drilling fluid return. TGP has performed a feasibility analysis of the study area to determine if HDD is a viable waterbody crossing method. This analysis included geological surveys, reviews of nearby public drinking water sources, private wells, and mining activities (active and abandoned). Three (3) HDDs are being proposed for the Project at the following waterbodies: (1) Yellow Creek, (2) Jones Creek, and (3) Wells Creek. Prior to the final HDD determination, TGP conducted geotechnical investigations in June 2022 at each of these three crossings to assess the characteristics of the geologic formations. This information was reviewed, and it was confirm that a HDD is technically feasible for each crossing given the specific geology evaluated by project engineers to ensure the HDD has a high rate of success."

"Conventional boring consists of creating a shaft/tunnel for a pipe or conduit to be installed to minimize surface disturbance. This is accomplished by first excavating a bore pit and a receiving pit. The bore pit is excavated to a depth slightly deeper than the depth of the associated trench and is graded such that the bore will follow the proposed angle of the pipe. A boring machine is then lowered to the bottom of the bore pit to tunnel using a cutting head mounted on an auger. The auger rotates through a bore casing, both of which are pushed forward as the hole is cut. The pipeline is then installed through the bored hole and welded to the adjacent pipeline. The typical workspace configurations required for boring operations consist of staging areas (50 feet by 100 feet) for boring machine setup, cuttings/return settlement and storage pits, pipe storage, entrance and exit pit spoil storage, and construction equipment necessary to support the operation. Major factors limiting the success of a boring operation under waterbodies for the Project include the crossing

Page 41 of 188

distance, subsurface soil and geologic conditions, and existing topography. Boring operations typically occur over a crossing distance of 50 to 60 feet. The maximum length a bore could achieve in ideal soil conditions typically does not exceed 400 feet. Subsurface soil and geologic conditions must be conducive to establishing and maintaining a safe bore pit excavation, as well as provide the capabilities for the boring equipment to conduct a successful bore. Loosepacked sediment, free of rock material, is preferred when conducting boring operations. The topographic conditions for most waterbody crossing locations on this Project also limit the use of this method, as preferred locations are generally consistent with level or moderately convex terrain, such that the depth of the bore pit does not present concerns relative to constructability or safety constraints."

"TGP considered six (6) factors when evaluating the use of HDD or conventional bore crossing methods versus a dry open-cut method for Project waterbody crossings: (1) the length of the crossing, (2) the potential for risk of loss of drilling fluid (i.e., inadvertent/lost returns), (3) geological considerations, and (4) length of time of the crossing (5) worker safety and technical feasibility, and (6) cost of the crossing method. For a 30-inch diameter pipe, as will be installed for the Project, the minimum distance needed to achieve the necessary radius for the HDD pipe string is approximately 1,300 feet, which means that each HDD must be at least 1,300 feet long, regardless of the width of the feature it is avoiding in order to reduce stress pressure on the pipeline. Considering the undulating topography of the Project area, many HDD entry/exit pads or conventional bore entry/exit pits likely would be located on slopes, which create a construction safety and technical feasibility challenge. Further, given the need for HDD or conventional bore entry and exit pads or pits to be at or near the same elevation to promote drill cutting returns, use of these methods in hilly terrain may not be practicable. For example, if either the entry or exit points is at a higher location than the other, greater annular pressure is needed to facilitate the drill cutting returns. This increase in pressure could contribute to additional risks of inadvertent returns to the formation or to the surface. Inadvertent returns are characterized by drilling fluid flowing through the underlying formation and finding a pathway of least resistance to the surface or to voids in the formation. These returns may be expressed on land or in the feature that is being avoided. Although the drilling fluid is generally inert bentonite clay that is not toxic or harmful, it may be discharged to downstream waters. In that event, inadvertent returns would be contained and cleaned up once identified. Costs associated with an HDD and Conventional Bore, in general, may be five (5) times more per foot than costs for a conventional crossing using open cut methods, which can become prohibitive to the Project budget (see ["Attachment 9 – Summary of Trenchless Construction Methods for the Cumberland Project" submitted to the Division on July 22, 2022, as part of the initial permit application package]). Geology plays a major role in the success of an HDD or conventional bore. In an area without the appropriate geology to support an HDD or conventional bore, the drilling hole will not maintain its integrity and could collapse, causing delays. In other areas, if the geology contains large boulders or voids, the drilling head cannot negotiate these obstacles and the bore may fail. Further, for a HDD, in order for the radius of the drill and pipe to be maintained, the boring must be made to greater depths in the formation, potentially impacting groundwater resources or karst topography. HDD and conventional bores take more time to complete than open cut crossings due to the amount of drilling equipment necessary, the mobilization and demobilization of the drilling equipment, the drilling itself, pipe preparation, and for a HDD, the pullback of the pipeline. For the proper pullback of the pipeline, the same length of construction workspace is needed to accommodate a straight entry into the exit point of the HDD. In some cases, due to pipeline inflections, and the lack of available straight construction workspace, a false ROW may be needed, thus increasing potential impacts. A false ROW is a work area approximately 50 feet wide by the length of the HDD pullback section that is

Page 42 of 188

**App-0050**

prepared to stage the pipeline. Generally, HDDs can take a month or longer to complete. HDDs occur over a longer timeframe with continuous activities throughout the procedure in comparison to open cut methods. During this time, there is the possibility of impacts to noise sensitive areas, inadvertent returns, and equipment failures throughout the duration of the HDD. When comparing an HDD or conventional bores to conventional open cuts of streams/wetlands, the issues associated with the HDDs and conventional bores are reduced or mitigated by the use of open cut methods. For example, the trench line for open-cut methods is much shallower across a stream, thus minimizing the potential impact to deep geological features. Also, there is no need for long pull back sections for conventional open cut crossings because there is no minimum length of pipeline that is needed to cross a stream. The length of the pipeline is dictated by the stream width, not the necessity to maintain a certain radius to reduce pipe stressors, as is the case with an HDD. There are no risks of inadvertent returns for a conventional open cut crossing as no drilling fluid is used during the process. The conventional open cut crossing is a straightforward digging of the trench line, installing the pipeline, and backfilling with native material. At all times during a conventional dry open cut of a stream, the contactor is able to see the trenchline and the surrounding work zone, unlike that of a HDD or conventional bore, which increases the safety factor. Also, in general, it takes one to two days to complete a conventional open cut crossing (if not using controlled blasting for rock removal), as opposed to at least one month for an HDD or up to 10 days for a conventional bore. While the timing of an open cut crossing can be extended for certain reasons, such as weather, stability of the trench line, and water flow, the time for an open cut crossing is still much less than that for an HDD. Notwithstanding the concerns outlined above, HDDs are proposed for certain crossings to avoid environmental impacts at two Natural Rivers Inventory stream reaches (Jones Creek and Yellow Creek) and due to the physical characteristics of Wells Creek. The HDD at Yellow Creek will also avoid direct impacts to one of its unnamed tributaries."

Based on the available information the Division has made a final determination that applicant has demonstrated that the route selection method and process for determining the appropriate crossing method will result in the use of the least impactful practicable alternative to accomplish the project purpose.

**Existing Conditions/ Loss of Resource Values**

Streams

Jurisdictional streams identified within the project impact areas are characterized by predominantly silt/clay substrates. Several intermittent and perennial streams within the study area are characterized by bedrock, cobble, and gravel substrates. Fish, amphibians, and populations of benthic macroinvertebrates were observed in some of the streams during TGP's on-site aquatic resource inventory. A summary of stream channel dimensions and general characteristics can be found in Table D-1 within "TGP & USACE Cumberland Project – TDEC Field Review / Revisions (Supplement 1)", dated September 26, 2022.

Reservoir

Barkley Reservoir (Cumberland River) is located adjacent to the existing TVA Cumberland Fossil Plant in Cumberland City, Tennessee. This segment of the reservoir is an Exceptional Tennessee Water due to the observed presence of state-listed aquatic animal species.

Wetlands

The wetlands to be impacted by the project are characteristic of low to moderate resource value wetlands typically found in the region. Dominant tree species in the PFO wetlands along the proposed alignment includes red maple (*Acer rubrum*), sweetgum (*Liquidambar styraciflua*), tulip poplar (*Liriodendron*

Page 43 of 188

*tulipifera)*, and blackgum/black tupelo *(Nyssa sylvatica)*. Dominant herbaceous species in the PEM wetlands along the proposed alignment includes bluestem *(Andropogon* spp.), soft rush *(Juncus effusus)*, beaksedge *(Rhynchospora* spp.), blackberry *(Rubus argutus)*, goldenrod *(Solidago elliottii)*, and dog fennel *(Eupatorium capillifolium)*.

Permanent impacts to streams and wetlands include ongoing vegetation management in riparian zones. A corridor above the pipeline and up to 10 feet wide may be cleared at a frequency necessary to maintain the 10-foot corridor in an herbaceous state, resulting in conversion of plant communities in forested riparian zones and forested wetlands to herbaceous/emergent or scrub-shrub plant communities. In addition, individual trees that are located within 15 feet of the pipeline that have roots that could compromise the integrity of the pipeline coating may be cut and removed from the permanent right-of-way. These impacts will not result in loss of wetland acreage.

Temporary wetland and stream impacts will be mitigated by returning impacted areas to original elevation and condition following appropriate erosion prevention and sediment control measures. All features that are temporarily impacted will be monitoring annually for three years following completion of project construction to ensure no net loss of resource value by the Division.

In an email from TWRA to consultants of TGP dated August 31, 2022 (provided in Attachment 6 of the documented entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022), TWRA states:

> "It is TWRA's understanding that state listed species (outlined in TWRA's consultation from August, 2, 2022) will not be impacted by the current design of the project" and "With the above understandings, TWRA agrees that time-of-year restrictions for state protected species do not apply to the Cumberland Project, and that the project will have no effect on state listed species." On October 3, 2022, TWRA conveyed to a consultant of TGP via email that "The TWRA has no concerns for non-listed aquatic species as outlined by the project location that was presented to TWRA on 7/19/2022."

In a letter to a consultant of TGP dated June 29, 2021 (provided with initial permit application materials submitted to the Division on July 22, 2022 in "Attachment 4 – Agency Correspondences"), the TDEC Division of Natural Areas states:

> "The Division of Natural Areas - Natural Heritage Program has reviewed the location of the proposed project workspace with respect to rare plant species. While the extent of the project (33.2 miles) makes the project more likely to encounter rare species at previously unsurveyed locations, the current project route is mostly confined to a previously established ROW and comes within one mile of just two rare plant records – neither of which are in the project area - at the easternmost extent of the route. Thus, we do not anticipate any impacts to known occurrences of rare, threatened, or endangered plant species from this project and believe risk to unknown occurrences is minimal."

The Division has made a final determination that the overall activities, if conducted in accordance with the submitted plans and permit conditions, will not result in any appreciable permanent loss of resource values.

**Mitigation Required**

The Division has made a final determination that the authorized impacts to jurisdictional waters, if carried out in accordance with the permit's conditions, will result in *de minimis* degradation; therefore, compensatory mitigation is not required.

**Social or Economic Justification Information**

Formal social and economic justification for the impacts associated with this activity is not required based on the Division's final determination that the authorized impacts to jurisdictional waters will result in *de minimis* degradation. However, the applicant has provided the following information on social and economic justification:

"… construction of the Project will have a net positive impact on local and regional businesses within counties impacted by the Project. TGP estimates that approximately $17,300,000 in Dickson County, $8,100,000 in Houston County, and $1,300,000 in Stewart County ($26,700,000 total) will be distributed in construction payroll for personnel working at the various Project sites over the 12-month construction period. During construction, it is anticipated that 20 to 30 percent of worker payroll will be spent locally by both local and nonlocal workers for the purchase of housing, food, gasoline, entertainment, and luxury items. The dollar amount would be dependent on the number of construction workers employed at any given time and the duration of the non-local worker's residence in the Project area.

It is also anticipated that some portion of construction materials will be purchased locally. Material purchases, including construction equipment, pipe, and valves, are estimated to be $16,500,000 in Dickson County, $6,800,000 in Houston County, and $2,200,000 in Stewart County ($25,500,000 total), including freight and taxes. An additional estimated $71,000,000 in Dickson County, $34,500,000 in Houston County, $3,900,000 in Stewart County ($109,400,000 total) will be spent by TGP on other construction related expenditures, for a total estimated construction cost of $161,600,000. These payroll and materials expenditures will have a positive impact on the local economy.

Construction and operation will result in increased tax revenues for the state of Tennessee, Dickson County, Houston County, and Stewart County, and potentially other local taxing authorities. The prevailing state sales tax rate for most items in Tennessee is seven percent. An additional 2.75 percent county sales tax is levied in Dickson and Houston counties. In Stewart County, an additional 2.25 percent sales tax is levied. Assuming all material purchases are taxed at an effective sales tax rate of 9.25 percent, TGP will pay approximately $2,300,000 in sales tax during construction. Once in operation, TGP will also pay ad valorem taxes based on the assessed value of the Project facilities. TGP estimates paying approximately $2,400,000 annually in ad valorem taxes on average over the first 10 years of Project operations. Ad valorem taxes are anticipated to be paid annually at similar or higher levels for the remaining life of the Project.

Although the preferred Cumberland Pipeline route that is co-located generally with an existing TVA powerline easement and other utility easements (for approximately 80 percent of its length) is the [Least Environmentally Damaging Practicable Alternative], other routes extending from TGP's existing interstate natural gas pipeline system to TVA's Cumberland Fossil Plant would not vary in terms of socioeconomic benefits. Use of an alternate route would unnecessarily result in land-use disruptions that have primarily already occurred in constructing and maintaining the TVA powerline and easement and other utility easements. Social and economic consequences to property owners or local communities of the considered crossing methodologies summarized in [Table 1 of this permit and Table 10.5-1 of TGP's initial permit application materials] would be minor, and

Page 45 of 188

would not materially vary, as the method to be implemented at each crossing is limited in area and length with no more than localized, temporary effects.

The Project is not anticipated to have significant adverse impacts during construction or operation on population, employment, regional or local services, traffic or transportation, residences or businesses, or minority communities. In addition, TGP has identified environmental justice communities near the location of the Project, and will continue to identify and address any concerns of these environmental justice communities (designated below poverty level but not with disproportionately high minority populations). TGP's communication and involvement with the environment justice communities is ongoing and will continue through the certificate, permitting, construction, and restoration phases of the Project. TGP will continue its engagement of minority and low-income populations in proximity to the proposed Project through meaningful participation and coordination with community leaders and groups within environmental justice communities. TGP plans to take the following steps during the certificate, permitting, construction, and restoration phases of the Project to continue to inform and engage environmental justice communities: (1) beginning in the third quarter 2022, conduct small group discussions (e.g., 5-10 people) with community leaders and organizations in environmental justice communities to discuss the Project and any concerns or issues; (2) beginning in the third quarter 2022, provide formal presentations to groups in the impacted environmental justice communities; (3) distribute Project information to community partners for further distribution within their communities; and (4) translate certain Project materials for distribution within environmental justice communities, as well as portions of the Project website, Overall, Project construction activities are anticipated to have temporary, short-term impacts on population, housing, public services, and traffic and transportation, and will provide an overall net positive impact on employment and the local economy when the Project is operational."

**Antidegradation**

In accordance with the Tennessee Antidegradation Statement (Rule 0400-40-03-.06):

For impacts to streams in the TDEC Waterbodies known as Unnamed tributaries to Harpeth River, Jordan Branch, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, and Wells Creek, the Division has made a final determination that the authorized activities will result in *de minimis* degradation of waters with available parameters for habitat alteration and/or water withdrawals without mitigation, and will not result in an appreciable permanent loss of resource values.

For impacts to Barkley Reservoir, the Division has made a final determination that the authorized activities will result in *de minimis* degradation of Exceptional Tennessee Waters without mitigation, and will not result in an appreciable permanent loss of resource values.

For impacts to streams in the TDEC Waterbody known as Unnamed tributaries to Jones Creek, the Division has made a final determination that the authorized activities will result in no significant degradation in a waterbody with unavailable parameters for habitat alteration because the activities will not result in an appreciable permanent loss of resource values.

For impacts to jurisdictional wetlands, the Division has made a final determination that the authorized activities will result in *de minimis* degradation of waters with available parameters for alteration without mitigation, and will not result in an appreciable permanent loss of resource values.

For more information please reference Tennessee's Antidegradation Statement which is found in Chapter *0400-40-03* of the Rules of the Tennessee Department of Environment and Conservation.

Page 47 of 188

**App-0055**

Cumberland Gas Pipeline Project; NRS22 192
§401 Water Quality Certification

**Tables**

Table 3: list of features to be impacted that have been identified by TDEC to be WWCs.

| Waterbody[1] | | | | Impact location | | |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Total impacts (linear feet) |
| SDKA001 | UT to Jordan Branch | N/A (WWC) | N/A (WWC) | 36.1730 | -87.2174 | 112.2 |
| SDKA002 | UT to Jordan Branch | N/A (WWC) | N/A (WWC) | 36.1733 | -87.2176 | 10.8 |
| SDKA012 | UT to Jones Creek | N/A (WWC) | N/A (WWC) | 36.1979 | -87.2590 | 99.1 |
| SDKA015 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.1984 | -87.2649 | 55.5 |
| SDKA016 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.1989 | -87.2655 | 20.9 |
| SDKA017 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.2025 | -87.2730 | 97 |
| SDKA019 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.2032 | -87.2735 | 76.9 |
| SDKA020 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.2078 | -87.2827 | 127 |
| SDKA024 | UT to Upper Sugar Camp Branch | N/A (WWC) | N/A (WWC) | 36.1663 | -87.2063 | 93.2 |
| SDKA028 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2114 | -87.2891 | 14.7 |
| SDKA029 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2121 | -87.2909 | 75.3 |
| SDKA030 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2141 | -87.2944 | 33.2 |
| SDKA031 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2101 | -87.2907 | 40.4 |
| SDKA035 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2186 | -87.3039 | 43.1 |

**App-0056**

| Waterbody[1] | | | | Impact location | | |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Total impacts (linear feet) |
| SDKA037 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2237 | -87.3132 | 76.2 |
| SDKA040 | UT to Harris Branch | N/A (WWC) | N/A (WWC) | 36.2291 | -87.3231 | 111.4 |
| SDKA047 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2749 | -87.4715 | 109 |
| SDKA050 | UT to Jones Creek | N/A (WWC) | N/A (WWC) | 36.1896 | -87.2484 | 79.3 |
| SDKA056 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2747 | -87.4652 | 60 |
| SDKA057 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2747 | -87.4652 | 91.2 |
| SDKB006 | UT to Nesbitt Branch | N/A (WWC) | N/A (WWC) | 36.2441 | -87.3658 | 80 |
| SDKB007 | UT to Nesbitt Branch | N/A (WWC) | N/A (WWC) | 36.2455 | -87.3687 | 72 |
| SDKB010 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2585 | -87.4036 | 80.3 |
| SDKB013 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2649 | -87.4211 | 174.3 |
| SDKB015 | UT to Woods Valley Branch | N/A (WWC) | N/A (WWC) | 36.2670 | -87.4302 | 95.4 |
| SDKB016 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2683 | -87.4353 | 78.7 |
| SDKB017 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2691 | -87.4373 | 77.6 |
| SDKB018 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2696 | -87.4396 | 297.9 |

Page 49 of 188

| Waterbody[1] | | | | Impact location | | |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Total impacts (linear feet) |
| SDKB019 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2706 | -87.4435 | 97.3 |
| SDKB020 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2710 | -87.4460 | 70 |
| SDKB024 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2740 | -87.4609 | 74 |
| SDKR002 | UT to Furnace Creek | N/A (WWC) | N/A (WWC) | 36.2474 | -87.3755 | 125.3 |
| SDKR003 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2609 | -87.4118 | 75.4 |
| SDKR004 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2609 | -87.4118 | 26.4 |
| SDKR006 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2609 | -87.4118 | 94.2 |
| SDKR007 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2656 | -87.4237 | 106.8 |
| SDKR009 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2671 | -87.4301 | 11.3 |
| SDKR010 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2881 | -87.5081 | 115.1 |
| SDKR011 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2893 | -87.5121 | 96.2 |
| SHNA002 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3401 | -87.6140 | 5.4 |
| SHNA003 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3404 | -87.6145 | 50 |
| SHNA005 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3406 | -87.6148 | 38.7 |

Page 50 of 188

| Waterbody[1] | | | | Impact location | | |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Total impacts (linear feet) |
| SHNA007 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3429 | -87.6182 | 20 |
| SHNA013 | UT to Lickskillet Branch | N/A (WWC) | N/A (WWC) | 36.3557 | -87.6390 | 124.4 |
| SHNB031 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3429 | -87.6182 | 83 |
| SHNB032 | UT to Lickskillet Branch | N/A (WWC) | N/A (WWC) | 36.3558 | -87.6400 | 84.2 |
| SHNB034 | UT to Lickskillet Branch | N/A (WWC) | N/A (WWC) | 36.3663 | -87.6556 | 77.9 |
| SHNC001 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.3376 | -87.6087 | 56.6 |
| SHNC002 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.3401 | -87.6140 | 17.6 |
| SHNC003 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.3404 | -87.6145 | 93.3 |
| SHNC004 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2978 | -87.5409 | 71.9 |
| SHNC005 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.297882 | -87.5421 | 110 |
| SHNC006 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.2986 | -87.5439 | 74 |
| SHNC006 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.2985 | -87.5451 | 80 |
| SHNC015 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3038 | -87.5628 | 124.7 |
| SHNC016 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3041 | -87.5630 | 98.5 |

Page 51 of 188

App-0059

| Waterbody[1] | | | | | Impact location | | |
|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Total impacts (linear feet) |
| SHNC017 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3038 | -87.5626 | 81.6 |
| SHNC019 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3099 | -87.5766 | 77.2 |
| SHNC021 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3106 | -87.5796 | 87.1 |
| SHNC022 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3114 | -87.5814 | 116.4 |
| SHNC023-2 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3187 | -87.5878 | 20.6 |
| SHNC024 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3130 | -87.5847 | 80.7 |
| SHNC025 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3141 | -87.5860 | 89.7 |
| SHNC041 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2951 | -87.5318 | 75.2 |
| SHNC042 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2945 | -87.5296 | 83 |
| SHNE001 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3070 | -87.5710 | 134.1 |
| SHNE002 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3099 | -87.5770 | 12 |
| SHNE002 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3098 | -87.5770 | 90 |
| SHNE004 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3252 | -87.5947 | 64 |
| SHNE004 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3253 | -87.5948 | 76 |

Page 52 of 188

| Waterbody[1] | | | | Impact location | | |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Total impacts (linear feet) |
| SHNE005 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3267 | -87.5955 | 102 |
| SHNE006 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3268 | -87.5957 | 76.1 |
| SHNE007 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3225 | -87.5920 | 77.2 |
| SHNW002 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2909 | -87.5186 | 22.5 |
| SHNW003a | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2945 | -87.5231 | 162 |
| SHNW004a | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2931 | -87.5251 | 79.6 |

[1] All features listed above are considered WWCs by the State of Tennessee, and do not require an Aquatic Resource Alteration Permit for the alterations proposed. In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), the impacts to WWCs shall require no notice or approval, and do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions in the Tennessee Water Quality Control Act 69-3-108(q).

Page 53 of 188

Cumberland Gas Pipeline Project; NRS22.192
§401 Water Quality Certification

**Site maps**

Note: PDF versions of these maps, which may enhance visibility of map features, can be found in "Attachment 1 – Updated Aerial and USGS Figures" in the RAI response document submitted by TGP to the Division on December 1, 2022. Photos of each waterbody crossing are available in the document entitled "Attachment 3 – Project Design Plans and Permit Drawings" submitted with the initial permit application packaged to the Division on July 22, 2022.





Page 55 of 188



Page 56 of 188

**App-0064**





Page 58 of 188



Page 59 of 188



Page 60 of 188



Page 61 of 188



Page 62 of 188

**App-0070**



Page 63 of 188



Page 64 of 188



Page 65 of 188



Page 66 of 188



Page 67 of 188



Page 68 of 188

**App-0076**



Page 69 of 188

**App-0077**



Page 70 of 188

**App-0078**



Page 71 of 188



Page 72 of 188



AR000081





Page 75 of 188

App-0083



Page 76 of 188



Page 77 of 188

**App-0085**



App-0086



Page 79 of 188



Page 80 of 188



Page 81 of 188



Page 82 of 188



Page 83 of 188





Page 85 of 188





Page 87 of 188



Page 88 of 188





Page 90 of 188



Page 91 of 188



Page 92 of 188

**App-0100**



Page 93 of 188



Page 94 of 188



Page 95 of 188

**App-0103**







Page 98 of 188



Page 99 of 188

**App-0107**



Page 100 of 188



Page 101 of 188





Page 103 of 188



Page 104 of 188

**App-0112**



Page 105 of 188





Page 107 of 188





Page 109 of 188



Page 110 of 188



Page 111 of 188

**App-0119**



Page 112 of 188

**App-0120**



Page 113 of 188



Page 114 of 188



Page 115 of 188



Page 116 of 188



Page 117 of 188



Page 118 of 188



Page 119 of 188

**App-0127**



Page 120 of 188

**App-0128**





Page 122 of 188

**App-0130**





Page 124 of 188

**App-0132**



Page 125 of 188



Page 126 of 188



Page 127 of 188





Page 129 of 188

**App-0137**



**App-0138**



App-0139



Page 132 of 188

**App-0140**



Page 133 of 188

**App-0141**



Page 134 of 188



Page 135 of 188





Page 137 of 188

**App-0145**



Page 138 of 188

**App-0146**







Page 141 of 188



Page 142 of 188



Page 143 of 188



Page 144 of 188



Page 145 of 188



Page 146 of 188



Page 147 of 188

**App-0155**



Page 148 of 188

**App-0156**



Page 149 of 188



Page 150 of 188



Page 151 of 188



Page 152 of 188



Page 153 of 188



Page 154 of 188



Page 155 of 188



Page 156 of 188



Page 157 of 188

**App-0165**



Page 158 of 188









Page 162 of 188





Page 164 of 188



Page 165 of 188

**App-0173**



Page 166 of 188



Page 167 of 188



Page 168 of 188





Page 170 of 188



Page 171 of 188

**App-0179**



Page 172 of 188

**App-0180**



Page 173 of 188

**App-0181**



Page 174 of 188

**App-0182**



Page 175 of 188

**App-0183**



Page 176 of 188



Page 177 of 188

Cumberland Gas Pipeline Project; NRS22 192
§401 Water Quality Certification



Above: water withdrawal locations.

**Plans and drawings**

Note: full sized PDFs of the drawings and photos of each waterbody crossing are available in the document entitled "Attachment 3 – Project Design Plans and Permit Drawings" submitted with the initial permit application packaged to the Division on July 22, 2022. Note that minor revisions to pipeline alignment are shown in updated maps and plans found in "Attachment 1 – Revised USGS Figure" in the RAI response document submitted by TGP to the Division on March 17, 2023.



NOTES:

1. THE PURPOSE OF THIS TYPICAL CONSTRUCTION RIGHT-OF-WAY CROSS-SECTION DIAGRAM IS TO SHOW WIDTHS AND RELATIVE LOCATIONS OF EXISTING RIGHTS-OF-WAY, NEW PERMANENT RIGHT-OF-WAY, AND TEMPORARY CONSTRUCTION RIGHT-OF-WAY.
2. THIS DRAWING IS REPRESENTATIVE OF THE TYPICAL CONSTRUCTION WORK SPACE.  SEE CONSTRUCTION ALIGNMENT SHEETS FOR SITE SPECIFIC DETAILS.
3. ADDITIONAL TEMPORARY WORK SPACE (ATWS) IS REQUIRED NEAR ROAD AND STREAM CROSSINGS, SIDE SLOPES, AND OTHER AREAS WITH UNIQUE CONSTRUCTION REQUIREMENTS.  (SEE ALIGNMENT SHEETS FOR ATWS)
4. AT LOCATIONS WITH CULTIVATED LAND, TOPSOIL SEPARATION WILL BE COMPLETED FOR THE, TRENCH, SPOIL PILE, AND WORKING SIDE.  AT FORESTED AND NON-CULTIVATED AREAS TOPSOIL SEPARATION WILL BE COMPLETED FOR THE TRENCH AND SPOIL PILE.
5. DRAWING IS NOT TO SCALE.

| | REVISIONS | | | | |
|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPD |
| | | | | | |
| | | | | | |
| | | | | | |

Tennessee Gas Pipeline Company, L.L.C.
a Kinder Morgan Company

TABLEROCK
S U R V E Y, LLC
2204 TIMBERLOCH PL., STE. 180
THE WOODLANDS, TX 77380
OFFICE: 832-415-3869
TBPELS FIRM NO. 10194261

PROPOSED 30" PIPELINE
ADJACENT TO TGP PIPELINE
TYPICAL CONSTRUCTION RIGHT-OF-WAY

| DATE 04/05/2022 | DRAWN BY: EPG | APPROVED BY: CDW |
|---|---|---|
| SCALE: N.T.S. | P2021-1119-STD-0001 | SH.1 OF 3 |

Page 180 of 188



1. THE PURPOSE OF THIS TYPICAL CONSTRUCTION RIGHT-OF-WAY CROSS-SECTION DIAGRAM IS TO SHOW WIDTHS AND RELATIVE LOCATIONS OF EXISTING RIGHTS-OF-WAY, NEW PERMANENT RIGHT-OF-WAY, AND TEMPORARY CONSTRUCTION RIGHT-OF-WAY.
2. THIS DRAWING IS REPRESENTATIVE OF THE TYPICAL CONSTRUCTION WORK SPACE. SEE CONSTRUCTION ALIGNMENT SHEETS FOR SITE SPECIFIC DETAILS.
3. ADDITIONAL TEMPORARY WORK SPACE (ATWS) IS REQUIRED NEAR ROAD AND STREAM CROSSINGS, SIDE SLOPES, AND OTHER AREAS WITH UNIQUE CONSTRUCTION REQUIREMENTS. (SEE ALIGNMENT SHEETS FOR ATWS)
4. AT LOCATIONS WITH CULTIVATED LAND, TOPSOIL SEPARATION WILL BE COMPLETED FOR THE, TRENCH, SPOIL PILE, AND WORKING SIDE. AT FORESTED AND NON-CULTIVATED AREAS TOPSOIL SEPARATION WILL BE COMPLETED FOR THE TRENCH AND SPOIL PILE.
5. DRAWING IS NOT TO SCALE.

| REVISIONS | | | | | |
|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Tennessee Gas Pipeline Company, L.L.C.**
a Kinder Morgan Company

TABLEROCK
SURVEY LLC
2204 TIMBERLOCH PL, STE. 180
THE WOODLANDS, TX 77380
OFFICE: 832-415-3869
TBPELS FIRM NO. 10194261

PROPOSED 30" PIPELINE
NOT ABUTTING TVA EASEMENT
TYPICAL CONSTRUCTION RIGHT-OF-WAY

| DATE: | 04/05/2022 | DRAWN BY: EPG | APPROVED BY: CDW |
|---|---|---|---|
| SCALE: N.T.S. | | P2021-1119-STD-0001 | SH. 2 OF 3 |



1. THE PURPOSE OF THIS TYPICAL CONSTRUCTION RIGHT–OF–WAY CROSS–SECTION DIAGRAM IS TO SHOW WIDTHS AND RELATIVE LOCATIONS OF EXISTING RIGHTS–OF–WAY, NEW PERMANENT RIGHT–OF–WAY, AND TEMPORARY CONSTRUCTION RIGHT–OF–WAY.
2. THIS DRAWING IS REPRESENTATIVE OF THE TYPICAL CONSTRUCTION WORK SPACE. SEE CONSTRUCTION ALIGNMENT SHEETS FOR SITE SPECIFIC DETAILS.
3. ADDITIONAL TEMPORARY WORK SPACE (ATWS) IS REQUIRED NEAR ROAD AND STREAM CROSSINGS, SIDE SLOPES, AND OTHER AREAS WITH UNIQUE CONSTRUCTION REQUIREMENTS. (SEE ALIGNMENT SHEETS FOR ATWS)
4. AT LOCATIONS WITH CULTIVATED LAND, TOPSOIL SEPARATION WILL BE COMPLETED FOR THE, TRENCH, SPOIL PILE, AND WORKING SIDE. AT FORESTED AND NON–CULTIVATED AREAS TOPSOIL SEPARATION WILL BE COMPLETED FOR THE TRENCH AND SPOIL PILE.
5. DRAWING IS NOT TO SCALE.

| REVISIONS | | | | | | | PROPOSED 30" PIPELINE ABUTTING TVA EASEMENT TYPICAL CONSTRUCTION RIGHT–OF–WAY | | |
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR | | | | |

Tennessee Gas Pipeline Company, L.L.C.
a Kinder Morgan Company

TABLEROCK SURVEY LLC
2204 TIMBERLOCH PL, STE. 180
THE WOODLANDS, TX 77380
OFFICE: 832–415–3869
TBPELS FIRM NO. 10194261

| DATE: | 04/05/2022 | DRAWN BY: EPG | APPROVED BY: CDW |
| SCALE: N.T.S. | | P2021–1119–STD–0001 | SH.3 OF 3 |

AR000190   **App-0190**



TYPICAL ADDITIONAL TEMPORARY WORK SPACE AT CREEK CROSSINGS

NOTES:

1. THIS TYPICAL WORK SPACE LAYOUT WILL BE ADJUSTED TO ACCOMMODATE SITE-SPECIFIC CONDITIONS.

2. THE SIZE OF THE ADDITIONAL TEMPORARY WORKS SPACE (ATWS) WILL VARY WITH THE DEPTH OF THE CREEK, STEEPNESS OF THE SURROUNDING SLOPES, AND OTHER CONDITIONS.

Page 183 of 188



EXTRA TEMP. WORKSPACE
(AS REQUIRED)

CONSTRUCTION R.O.W. WIDTH

PLAN VIEW

NOTES:

1. METHOD APPLIES TO WATERBODIES WHERE DOWNSTREAM SILTATION MUST BE AVOIDED. FLUMES ARE GENERALLY NOT RECOMMENDED FOR USE ON WATERBODIES WITH A BROAD UNCONFINED CHANNEL, PERMEABLE SUBSTRATE, EXCESSIVE DISCHARGE, OR WHERE A SIGNIFICANT AMOUNT OF BED OR BANK ALTERATION IS REQUIRED TO INSTALL FLUMES OR DAMS.

2. SCHEDULE CROSSING DURING LOW FLOW PERIOD IF POSSIBLE.

3. COMPLETE ALL WATERCOURSE ACTIVITIES AS EXPEDIENTLY AS POSSIBLE.

4. NO REFUELING OF MOBILE EQUIPMENT WITHIN 100 FEET OF WATERBODY. REFUEL STATIONARY EQUIPMENT AS PER THE SPCC PLAN.

5. INSTALL TEMPORARY EQUIPMENT CROSSING.

6. IN AGRICULTURAL LAND, STRIP TOPSOIL FROM SPOIL STORAGE AREA.

7. IN-STREAM SPOIL TO BE STORED ON BANKS A MINIMUM OF 10 FEET FROM THE TOP OF THE BANK.

8. LEAVE HARD PLUGS AT THE STREAM BANK EDGE UNTIL JUST PRIOR TO PIPE INSTALLATION.

9. SIZE FLUME TO HANDLE 150 % ANTICIPATED FLOWS. INSTALL FLUME IN WATERCOURSE AND MAINTAIN CORRECT ALIGNMENT UNTIL REMOVED.

10. CONSTRUCT UPSTREAM DAM FOLLOWED BY DOWNSTREAM DAM. INSTALL A FLANGE ON UPSTREAM END OF FLUME AND SEAL TO SUBSTRATE WITH SANDBAGS AND POLYETHYLENE LINER WHERE NECESSARY TO ENSURE A WATERTIGHT BARRIER. "KEY" DAMS INTO BANKS OR CONSTRUCT SECONDARY DAM, IF NECESSARY.

11. PUMP STREAM CHANNEL BETWEEN DAMS, IF NECESSARY. DISCHARGE WATER THROUGH A DEWATERING STRUCTURE AND ONTO A STABLE WELL VEGETATED AREA TO PREVENT EROSION AND SEDIMENTATION. NO HEAVILY SILT-LADEN WATER MAY BE DISCHARGED IN THE STREAM.

12. CONSTRUCT SEDIMENT BARRIERS (STRAW BALES AND/OR SILT FENCE) TO PREVENT SILT LADEN WATER AND SPOIL FROM FLOWING BACK INTO WATERCOURSE. CONSTRUCTED SEDIMENT BARRIERS SHALL EXTEND ALONG THE SIDES OF THE STOCKPILES AND THE ENDS OF DAMS. BARRIERS MAY BE TEMPORARILY REMOVED TO ALLOW CONSTRUCTION ACTIVITIES BUT MUST BE REPLACED BY THE END OF EACH WORK DAY.

13. COMPLETE PREFABRICATION OF IN-STREAM PIPE SECTION AND WEIGHT PIPE AS NECESSARY PRIOR TO COMMENCEMENT OF IN-STREAM ACTIVITY.

14. TRENCH THROUGH WATERCOURSE. INSTALL TEMPORARY (SOFT) PLUGS, IF NECESSARY, TO CONTROL WATER FLOW AND TRENCH SLOUGHING.

15. MAINTAIN STREAM FLOW, IF PRESENT, THROUGH FLUME THROUGHOUT CROSSING CONSTRUCTION.

16. LOWER-IN PIPE, INSTALL TRENCH PLUG AND BACKFILL IMMEDIATELY.

17. BACKFILL WITH NATIVE MATERIAL.

18. RESTORE WATERCOURSE CHANNEL TO APPROXIMATE PRE-CONSTRUCTION PROFILE AND SUBSTRATE.

19. RESTORE STREAM BANKS TO APPROXIMATE ORIGINAL CONDITION AND STABILIZE, AS REQUIRED.

DRAWING DEPICTED IS SUPERSEDED BY WRITTEN STANDARD, SCOPE OF WORK OR LINE LIST.

| REVISIONS | | | | | |
|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR |
| 1 | 07/08/04 | ISSUED FOR REVIEW | RB | CM | |
| 2 | 07/13/04 | REVISED PER CLIENT COMMENT | RB | CM | |
| 3 | 07/01/05 | DWG REWRITE RELEASE | WS | | |

**KINDER MORGAN**

WATERBODY CROSSING
OPEN CUT DRY FLUME

| DATE: | 07/01/05 | | APPROVED BY: | |
|---|---|---|---|---|
| SCALE: N.T.S. | | CST-P-1150-A375 | SH. 1 OF 1 |

AR000192



PLAN VIEW

NOTES:

1. THIS METHOD APPLIES TO WATERBODIES WITH LIMITED FLOW AT TIME OF CONSTRUCTION WHERE DOWNSTREAM SILTATION MUST BE AVOIDED AND THE CROSSING WIDTH IS NOT PROHIBITIVE.

2. SCHEDULE CROSSING DURING LOW FLOW PERIOD IF POSSIBLE.

3. COMPLETE ALL IN-STREAM ACTIVITIES AS EXPEDIENTLY AS POSSIBLE.

4. NO REFUELING OF MOBILE EQUIPMENT WITHIN 100 FEET OF WATERBODY. REFUEL STATIONARY EQUIPMENT AS PER THE SPCC PLAN.

5. INSTALL TEMPORARY EQUIPMENT CROSSING, IF REQUIRED.

6. IN AGRICULTURAL LAND, STRIP TOPSOIL FROM SPOIL STORAGE AREA.

7. CONSTRUCT SEDIMENT BARRIERS TO PREVENT SILT LADEN WATER AND SPOIL FROM FLOWING INTO WATERBODY. CONSTRUCTED SEDIMENT BARRIERS SHALL EXTEND ALONG THE SIDES OF THE SPOIL AND TOPSOIL STOCKPILES AND ACROSS THE ENTIRE CONSTRUCTION R.O.W. BARRIERS MAY BE TEMPORARILY REMOVED TO ALLOW CONSTRUCTION ACTIVITIES BUT MUST BE REPLACED BY THE END OF EACH WORK DAY.

8. CONSTRUCT UPSTREAM STRUCTURE (DAM) FOLLOWED BY DOWNSTREAM STRUCTURE (DAM). WATER STRUCTURES' (AQUA DAM, JERSEY BARRIERS, SAND BAGS, STEEL PLATE, POLYETHYLENE LINER, ETC.) FINAL LOCATION WILL BE APPROVED BY THE ENVIRONMENTAL INSPECTOR.

9. SIZE PUMPS FOR DIVERSION OF ENTIRE STREAM FLOW. CONTRACTOR SHALL MAINTAIN 100% SPARE PUMPING CAPACITY ON SITE. PUMPS SHALL BE INSTALLED ON POLYETHYLENE BARRIERS FOR FUEL/OIL SPILL CONTAINMENT. PUMP INTAKES WILL BE SCREENED TO PREVENT ENTRAPMENT OF FISH. CONTRACTOR SHALL MONITOR PUMPS AND WATER STRUCTURES ON A 24 HOUR BASIS UNTIL THE CROSSING INSTALLATION IS COMPLETE. SHOULD LEAKAGE AT THE DAM STRUCTURES OCCUR, CONTRACTOR SHALL DEWATER BETWEEN THE STRUCTURES THROUGH AN APPROPRIATE FILTER AND ONTO A WELL VEGETATED UPLAND AREA. NO HEAVILY SILT-LADEN WATER SHALL BE DISCHARGED INTO THE STREAM.

10. LEAVE HARD PLUGS AT STREAM BANK EDGE UNTIL JUST PRIOR TO PIPE INSTALLATION.

11. COMPLETE CONSTRUCTION OF IN-STREAM PIPE SECTION. WEIGHT PIPE AS NECESSARY PRIOR TO COMMENCEMENT OF IN-STREAM ACTIVITY.

12. TRENCH THROUGH WATERBODY AS EXPEDIENTLY AS PRACTICAL. INSTALL TEMPORARY (SOFT) PLUGS, IF NECESSARY, TO CONTROL WATER FLOW AND TRENCH SLOUGHING.

13. MAINTAIN STREAM FLOW THROUGHOUT CROSSING CONSTRUCTION.

14. LOWER-IN PIPE, INSTALL TRENCH PLUG AND BACKFILL IMMEDIATELY.

15. BACKFILL WITH NATIVE MATERIAL.

16. RESTORE WATERBODY CHANNEL TO APPROXIMATE PRE-CONSTRUCTION PROFILE AND SUBSTRATE.

17. DISMANTLE DOWNSTREAM WATER STRUCTURE (DAM) AND UPSTREAM WATER STRUCTURE (DAM) AFTER TRENCH BACKFILL.

18. RESTORE STREAM BANKS TO APPROXIMATE ORIGINAL CONDITION AND STABILIZE, AS REQUIRED.

DRAWING DEPICTED IS SUPERSEDED BY WRITTEN STANDARD, SCOPE OF WORK OR LINE LIST.

| REVISIONS | | | | | |
|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR. |
| 1 | 07/08/04 | ISSUED FOR REVIEW | RB | CW | |
| 2 | 07/13/04 | REVISED PER CLIENT COMMENT | RB | CW | |
| 3 | 07/01/05 | DWG REWRITE RELEASE | WS | | |

KINDER MORGAN

WATERBODY CROSSING
OPEN CUT DAM & PUMP

| DATE: | 07/01/05 | | APPROVED BY: | |
|---|---|---|---|---|
| SCALE: | N.T.S. | CST-P-1150-A370 | SH. 1 OF 1 | |

Page 185 of 188

App-0193



AR000194

**App-0194**



TYPICAL PROFILE

PLAN VIEW

Page 187 of 188



Page 188 of 188

No. _____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

APPALACHIAN VOICES and SIERRA CLUB,
*Petitioners*

v.

UNITED STATES ARMY CORPS OF ENGINEERS, CHRISTINE E.
WORMUTH, in her official capacity as Secretary of the U.S. Army;
LIEUTENANT GENERAL WILLIAM H. GRAHAM, JR., in his official capacity
as U.S. Army Chief of Engineers and Commanding General of the U.S. Army
Corps of Engineers; LIEUTENANT COLONEL ROBERT W. GREEN, in his
official capacity as District Commander of the U.S. Army Corps of Engineers,
Nashville District, and JOSHUA FROST, in his official capacity as Chief,
Regulatory Division, U.S. Army Corps of Engineers, Nashville District
*Respondents*

**PETITION FOR REVIEW**

JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org

DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email:  dteaney@appalmad.org

*Counsel for Petitioners*

Pursuant to Section 19(d)(1) of the Natural Gas Act, 15 U.S.C. § 717r(d)(1), and Rule 15(a) of the Federal Rules of Appellate Procedure, APPALACHIAN VOICES and SIERRA CLUB hereby petition the United States Court of Appeals for the Sixth Circuit for review of a July 25, 2024 order of the United States Army Corps of Engineers issuing a Department of the Army Permit under Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act to Tennessee Gas Pipeline Company, LLC, for its proposed Cumberland Pipeline. In accordance with Local Rule 15(b), a copy of the Department of the Army Permit (LRN-2021-00866) is attached hereto as Exhibit A.

In accordance with Rule 15(c) of the Federal Rules of Civil Procedures, parties that may have been admitted to participate in the underlying procedure have been served with a copy of this Petition. Also attached hereto is a list of Respondents specifically identifying the Respondents' names and addresses.

DATED: September 24, 2024

Respectfully submitted,

**/s/ James S. Whitlock**
JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org

**/s/ Derek O. Teaney**
DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email: dteaney@appalmad.org

*Counsel for Petitioners*

1

**App-0198**

# LIST OF RESPONDENTS

Petitioners hereby provide a list of Respondents specifically identifying the Respondents' names and the addresses where Respondents may be served with copies of the Petition:

United States Army Corps of Engineers
441 G Street NW
Washington, DC 20314-1000

Christine E. Wormuth
Secretary of the United States Army
101 Army Pentagon
Washington, DC 20310-0101

Lt. Gen. William H. Graham, Jr.
Chief of Engineers
U.S. Army Corps of Engineers
441 G Street NW
Washington, DC 20314-1000

Lt. Col. Robert W. Green
District Engineer
U.S. Army Corps of Engineers, Nashville District
110 9th Ave. S., Room A-405
Nashville, TN 37203-3852

Joshua Frost
Chief, Regulatory Division
U.S. Army Corps of Engineers, Nashville District
110 9th Ave. S., Room A-405
Nashville, TN 37203-3852

App-0199

## CERTIFICATE OF SERVICE

In accordance with Federal Rule of Appellate Procedure 15(c)(1) & (2), the undersigned hereby certifies that, on September 24, 2024, a true copy of this Petition for Review was served via first-class certified mail on each of the following entities that may have been admitted to participate in the agency proceedings:

Capitol Corporate Services, Inc.
Registered Agent for Tennessee Gas Pipeline Company, LLC
992 Davidson Dr., Suite B
Nashville, TN 37205-1051

DATED: Sept. 24, 2024     **/s/ James S. Whitlock** _____

JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org

*Counsel for Petitioners*

**App-0200**

# Exhibit A



**DEPARTMENT OF THE ARMY**
NASHVILLE DISTRICT, CORPS OF ENGINEERS
110 9TH AVENUE SOUTH, ROOM A-405
NASHVILLE, TENNESSEE 37203-3852

July 25, 2024

SUBJECT: File No.  LRN-2021-00866, Proposed Tennessee Gas Pipeline, Natural Gas Line crossing multiple streams and wetlands from Dickson to Cumberland City, in Dickson, Houston, and Stewart Counties, Tennessee (Lat: 36.2667; Long: -87.4266)

Tennessee Gas Pipeline Company, LLC (TGP)
C/O Kinder Morgan Inc.
Gina Dorsey
1001 Louisiana Street
Houston, Texas 77502

Dear Gina Dorsey:

Enclosed is a Department of the Army permit for the subject activity.  If changes in the location or plans of the proposed work are necessary for any reason, revised plans should be submitted promptly to this office.  No deviations should be made in the approved plans without first obtaining approval from this office.

If you have any questions or comments contact Sammy Iskrzycki at Samantha.N.Iskrzycki@usace.army.mil, or (615) 829-3086.

Sincerely,

Robert W. Green
Lieutenant Colonel U.S. Army
District Commander

Encls
1.  Standard Permit Form
2.  Water Quality Certification

**App-0202**

# DEPARTMENT OF THE ARMY PERMIT

PERMITTEE:  Tennessee Gas Pipeline Company, LLC (TGP)

**PERMIT NUMBER**: LRN-2021-00866

**ISSUING OFFICE**:  Nashville District Corps of Engineers

**NOTE:**  The term you and its derivatives, as used in this permit, means the permittee or any future transferee.  The term "this office" refers to the appropriate district or division office of the Corps of Engineers having jurisdiction over the permitted activity or the appropriate official of that office acting under the authority of the commanding officer. You are authorized to perform work in accordance with the terms and conditions specified below.

**PROJECT DESCRIPTION:** The proposed work consists of the temporary discharge of fill into 2.39 acres of streambed and 0.69 acre of wetlands associated with the Cumberland Gas Pipeline as indicated on project plans submitted depicted on project plans submitted August 25, 2023.

**PROJECT LOCATION:**  The proposed pipeline route crosses multiple waterways within the state of Tennessee.  The designated route crosses portions of Dickson, Houston, and Stewart Counties.   Beginning Location: 36.162322, -87.208655, Ending Location: 36.372929, -87.675659

**PERMIT CONDITIONS:**

1.  The time limit for completing the work authorized ends on __June 18, 2029__. If you find that you need more time to complete the authorized activity, submit your request for a time extension to this office for consideration at least one month before the above date is reached.

2.  You must maintain the activity authorized by this permit in good condition and in conformance with the terms and conditions of this permit.  You are not relieved of this requirement if you abandon the permitted activity, although you must make a good faith transfer to a third party in compliance with General Condition 4 below.  Should you wish to cease to maintain the authorized activity, or should you desire to abandon it without a good faith transfer, you may obtain a modification of this permit from this office, which may require restoration of the area.

3.  If you discover any previously unknown historic or archaeological remains while accomplishing the activity authorized by this permit, you must immediately notify this

1

App-0203

office of what you have found. We will initiate the Federal and state coordination required to determine if the remains warrant a recovery effort or if the site is eligible for listing in the National Register of Historic Places.

4. If you sell the property associated with this permit, you must obtain the signature of the new owner in the space provided and forward a copy to this office to validate the transfer of this authorization.

5. If a conditioned water quality certification has been issued for your project, you must comply with the conditions specified in the certification as special conditions to this permit. For your convenience, a copy of the certification is attached.

6. You must allow representatives from this office to inspect the authorized activity at any time deemed necessary to ensure that it is being or has been accomplished in accordance with the terms and conditions of your permit.

7. The permittee understands and agrees that, if future operations by the United States require the removal, relocation, or other alteration, of the structure or work herein authorized, or if, in the opinion of the Secretary of the Army or his authorized representative, said structure or work shall cause unreasonable obstruction to the free navigation of the navigable waters, the permittee will be required, upon due notice from the U.S. Army Corps of Engineers, to remove, relocate, or alter the structural work or obstructions caused thereby, without expense to the United States. No claim shall be made against the United States on account of any such removal or alteration.


Special Conditions: See Page 4 "**Special Permit Conditions (File No. 2021-00866)**".

Further Information:

Congressional Authorities. You have been authorized to undertake activity described above pursuant to:

( **X** ) Section 10 of the Rivers and Harbors Act of 1899

( **X** ) Section 404 of the Clean Water Act

Limits of this authorization.
a. This permit does not obviate the need to obtain other Federal, state or local authorizations required by law.
b. This permit does not grant any property rights or exclusive privileges.
c. This permit does not authorize any injury to the property or rights of others.

**App-0204**

d. This permit does not authorize interference with any existing or proposed Federal project.

Limits of Federal Liability. In issuing this permit, the Federal Government does not assume any liability for the following:
a. Damages to the permitted project or uses thereof as a result of other permitted or unpermitted activities or from natural causes.
b. Damages to the permitted project or uses thereof as a result of current or future activities undertaken by or on behalf of the United States in the public interest.
c. Damages to persons, property, or to other permitted or unpermitted activities or structures caused by the activity authorized by this permit.
d. Design or construction deficiencies associated with the permitted work.
e. Damage claims associated with any future modification, suspension, or revocation of this permit.

Reliance on Applicant's Data: The determination of this office that issuance of this permit is not contrary to the public interest was made in reliance on the information you provided.

Reevaluation of Permit Decision. This office may reevaluate its decision on this permit at any time the circumstances warrant. Circumstances that could require a reevaluation include, but are not limited to the following:
a. You fail to comply with the terms and conditions of this permit.
b. The information provided by you in support of your permit application proves to have been false, incomplete, or inaccurate (see 4 above).
c. When significant new information surfaces which this office did not consider in reaching the original public interest decision. Such a reevaluation may result in a determination that it is appropriate to use the suspension, modification, and revocation procedures contained in 33 CFR 325.7 or enforcement procedures such as those contained in 33 CFR 326.4 and 326.5. The referenced enforcement procedures provide for the issuance of an administrative order requiring you to comply with the terms and conditions of your permit and for the initiation of legal action where appropriate. You will be required to pay for any corrective measures ordered by this office, and if you fail to comply with such directive, this office may in certain situations (such as this specified in 33 CFR 209.170) accomplish the corrective measures by contract or otherwise and bill you for the cost.

Extensions. General condition 1 establishes a time limit for the completion of the activity authorized by this permit. Unless there are circumstances requiring either a prompt completion of the authorized activity or a reevaluation of the public interest decision, the Corps will normally give favorable consideration to a request for an extension of this time limit.

**App-0205**

Your signature below, as permittee, indicates that you accept and agree to comply with the terms and conditions of this permit.

Gina B. Dorsey  Digitally signed by Gina B. Dorsey
                Date: 2024.07.24 16:10:03 -05'00'

**7/24/2024**
_____
(Date)

_____
(Permittee)

This permit becomes effective when the Federal official, designated to act for the Secretary of the Army, has signed below.

Robert W. Green, LTC, Corps of Engineers
        (District Commander)

_____          _____
                                             (Date)
    Robert W. Green
    Lieutenant Colonel U.S. Army
    District Commander

When the structures or work authorized by this permit are still in existence at the time the property is transferred, the terms and conditions of this permit will continue to be binding on the new owner(s) of the property.  To validate the transfer of this permit and the associated liabilities associated with compliance with its terms and conditions, have the transferee sign and date below.

_____          _____
        (Transferee)                           (Date)

4

**Special Permit Conditions (File No. 2021-00866)**

Special Condition 1:  The work must be performed in accordance with the plans submitted August 25, 2023.  Any changes to the plans must be approved in advance by this office of U.S. Army Corps of Engineers, Nashville District Regulatory Division (USACE).

Special Condition 2:   The Permittee must have a copy of this permit available onsite and ensure all contractors are aware of its conditions and abide by them.

Special Condition 3:   Construction within streams must be performed during low flow and/or dry conditions of the stream resources.  The construction activity must be isolated from active stream flow.

Special Condition 4:  The Permittee shall avoid the remaining portions of the streams and wetlands within the project area.  These areas were avoided as part of the permit application review process and therefore will not be disturbed by any dredging, filling, mechanized land clearing, or other construction work whatsoever.

Special Condition 5:  Wetland Mitigation: Prior to initiating the authorized work in the wetlands, the Permittee shall provide verification to the U.S. Army Corps of Engineers, Nashville District Regulatory Division, of purchase of 1.44 wetland credits from the Tennessee Mitigation Fund, Lower Cumberland River Service Area, for the proposed project.  The verification submitted to the Corps must include the File Number LRN-2021-00866.

Special Condition 6:  Water Quality Certification:  You must abide by all conditions of the state of Tennessee, Department of Environment and Conservation (TDEC), Section 401 Water Quality Certification issued on July 21, 2023 [NRS 22.192].

Special Condition 7:  Cultural Resources/Archaeological/Historical:  In the event any previously unknown cultural resources, historic or archaeological sites or human remains are uncovered or encountered while accomplishing the activity authorized by this permit, the permittee must cease all work immediately and contact local, state and county law enforcement offices (only contact law enforcement on findings of human remains), our office at (615) 369-7500.

Special Condition 8:  Within 30 days of completion of the authorized work or at the expiration of the construction authorization of this permit, whichever occurs first, the Permittee shall complete and submit to the Corps the attached "Compliance Certification" form.

App-0207

Special Condition 9:  Blasting shall not occur in waters of the United States or immediately adjacent uplands identified by the applicant as having karst prone geology with an unacceptable risk of hydrologic loss as identified in table 2.7.3 in the application submitted August 22, 2022.  For each crossing, the permittee shall select the least impactful trenching technique practicable, as described in the application submitted August 22, 2022. For any crossings in which blasting is identified as necessary, written justification, site specific blasting operations and monitoring plans shall be sent to 3701 Bell Road Nashville, TN 37214 referencing file number LRN-2021-00866 prior to blasting. Blasting shall not commence until the applicant is in receipt of written concurrence from the Corps.


Special Condition 10: Tree clearing shall only occur between October 15 and March 31 to avoid impacting federally listed bat species.

App-0208



**US Army Corps
of Engineers ®**
Nashville District

### <u>COMPLIANCE CERTIFICATION</u>

**YOU ARE REQUIRED TO SUBMIT THIS SIGNED CERTIFICATION REGARDING
THE COMPLETED ACTIVITY AND ANY REQUIRED MITIGATION**

I hereby certify that the work authorized by **Permit No.** __LRN-2021-00866___**,** and any
required mitigation was done in accordance with the Corps authorization, including any
general, regional, or special conditions.


_____
Permittee Signature


_____
Date

Please note that your permitted activity is subject to a compliance inspection by an U.S.
Army Corps of Engineers representative.

Submit this signed certification to the address below:


U.S Army Corps of Engineers
Regulatory Division
3701 Bell Road
Nashville, TN 37214-2660

**App-0209**

CE LRN-RD (File Number, LRN- 2021-00866)

**MEMORANDUM FOR RECORD**

**SUBJECT:  Department of the Army Environmental Assessment and Statement of Findings for the Above-Referenced Standard Individual Permit Application**

This document constitutes the Environmental Assessment, Section 404(b)(1) Guidelines Evaluation, Public Interest Review, and Statement of Findings for the subject application.

**1.0 Introduction and Overview**

Information about the proposal subject to one or more of the United States Army Corps of Engineers' (Corps') regulatory authorities is provided in Section 1, detailed evaluation of the activity is found in Sections 2 through 11 and findings are documented in Section 12 of this memorandum. Further, summary information about the activity including administrative history of actions taken during project evaluation is attached (ORM2 Summary) and incorporated in this memorandum.

Pursuant to National Environmental Policy Act (NEPA), the Federal Energy Regulatory Commission (FERC) prepared an Environmental Impact Statement (EIS) for Tennessee Gas Pipeline Company, LLC's (the applicant) proposed project. The Corps and U.S. Environmental Protection Agency (EPA) participated as cooperating agencies in the preparation of the EIS. The final EIS FERC/EIS -0329F was issued in June 2023 and may be viewed and downloaded from the FERC website (https://ferc.gov/), on the natural gas environmental documents page (https://www.ferc.gov/industries-data/naturalgas/environmental-overview/environmental-documents-2023).

Due to multiple agency approvals needed for the proposed project, the Corps and other regulatory agencies worked collaboratively to leverage expertise and information, and to maximize consistency in regulatory requirements where allowed by respective agency policies to assist in minimizing impacts to aquatic resources as well as reduce duplication in regulatory requirements.

Placement of fill in waters of the United States occurring during construction of a natural gas pipeline is a category of activity authorized by Nationwide Permit (NWP) (86 FR 2744). The proposal for the temporary placement of fill at 139 stream and 7 wetland crossings by the applicant during construction of a new 32-mile 30-inch diameter pipeline likely qualified for coverage by *Nationwide Permit 12 Oil or Natural Gas Pipeline Activities.* During pre-application meetings between November 2021 and May 2022 the applicant and the Corps discussed the applicability of NWP #12 to the proposed pipeline. Subsequent to these discussions, the applicant requested the Corps accept an application for a Standard Individual Permit, rather than verify coverage under NWP#12. The Corps considered the views of the applicant and also opportunity for public participation and comment that would be part of the processing of a Standard Individual Permit and elected to accept an application for a Standard Individual Permit.

CE LRN-RD (File Number, LRN- 2021-00866)

## 1.1    Applicant name

Tennessee Gas Pipeline Company, LLC (TGP)
1001 Louisiana Street
Houston, Texas 77502

## 1.2    Activity location

The proposed pipeline route crosses multiple waterways within the state of Tennessee. The designated route crosses portions of Dickson, Houston, and Stewart Counties.  Beginning Location: 36.162322, -87.208655, Ending Location: 36.372929, -87.675659.



Figure 1: Location Map of Proposed Activity

## 1.3    Description of activity requiring permit

The applicant, TGP, seeks a department of the Army (DA) permit for the temporary discharge of fill in waters of the United States (WOUTS) during construction of a pipeline and associated infrastructure.  The applicant proposes no permanent discharge of fill in waters of the United States during construction, as pre-construction contours will be re-established post construction.  The proposed project involves the construction of 32 miles of new 30-inch diameter natural gas lateral pipeline to connect existing lines (100-3 and 100-4) in Dickson, TN to the site of the Tennessee Valley Authority Cumberland Fossil Plant in Cumberland City, TN.  Infrastructure that would be constructed with the pipeline includes bi-directional back pressure regulation facilities, a new meter station, in-line inspection traps, and three new mainline valves.

CE LRN-RD (File Number, LRN- 2021-00866)

A total of 146 crossings of waters of the U.S. (WOTUS), 139 stream crossings and 7 wetland crossings, were proposed. Construction activities would result in temporary discharges of fill material into 0.69 acre of wetlands, temporary discharges of fill material into 2.39 acres of streambed, and permanent maintenance of emergent vegetation in 0.41 acre of wetland within the right-of-way (ROW).  Maintenance of the ROW during the operational life of the pipeline would keep 0.38 acre of wetlands in an emergent state and would convert 0.03 acre of forested wetland to emergent or shrub/scrub (PSS) wetlands within the operational maintenance corridor.

A permanent easement of 50 linear feet would be established for the pipeline with a temporary work access easement of up to an additional 50 linear feet.  Operational maintenance would not occur across the full permanent right-of-way (ROW). A 10-foot-wide corridor would be maintained directly over the pipeline centerline, with removal of trees within 15 feet of the centerline in wetlands.

Construction of the pipeline crossings would be accomplished by either dry open-cut trench or horizontal directional drill (HDD) construction methods. Details of construction methods are summarized in the final FERC EIS in Section 2.5.3.1 "Waterbody Crossings" beginning on page 2-13, Appendix D "Construction Typicals", and Appendix G "FERC's Wetland and Waterbody Construction and Mitigation Procedures". All proposed impacts to waterbodies associated with the pipeline construction would be temporary aside from the 0.03 acre of permanent wetland type conversion in the ROW.  Approximately 80% of the proposed pipeline route is co-located with an existing Tennessee Valley Authority (TVA) easement or other utility easements.

HDD crossings are proposed for the crossings of Jones Creek at pipeline milepost (MP) 3.2, Wells Creek (MP 30.7), Yellow Creek (MP 22.4) and an unnamed tributary to Yellow Creek.  HDD crossings do not require discharge of fill material below the ordinary high-water mark (OHWM) of the streams, thus these crossings do not require a DA permit under Section 404 of the Clean Water Act.  The HDD crossing of Jones Creek does not involve a discharge of fill below the OHWM, but Jones Creek is a navigable water of the U.S. at this location and therefore requires a DA permit under Section 10 of the Rivers and Harbors Act (RHA).

| Table 1: Number of Crossings by Resource Type | | | | | | |
|---|---|---|---|---|---|---|
| Resource Type | | Total # Crossings | Pipeline Crossing | | Construction Crossing | |
| | | | HDD | Dry Open Cut | Workspace Crossing | Access Road Crossings |
| Stream | Perennial | 38 | 3 | 26 | 3 | 6 |
| | Intermittent | 34 | 1 | 25 | 2 | 6 |
| | Ephemeral | 67 | 0 | 52 | 11 | 4 |
| Wetland | Forested | 2 | 0 | 1 | 1 | 0 |
| | Emergent | 5 | 0 | 2 | 2 | 1 |
| | Total | 146 | 4 | 106 | 19 | 17 |

CE LRN-RD (File Number, LRN- 2021-00866)

| Table 2: Proposed placement of temporary fill in WOTUS by Acreage | | | | | | |
|---|---|---|---|---|---|---|
| Resource Type | | Total fill impact | Construction Activity | | | |
| | | | HDD | Dry Open Cut | Workspace | Access Road |
| Stream | Perennial | 1.37 | 0 | 1.1 | 0.03 | 0.242 |
| | Intermittent | 0.56 | 0 | 0.48 | 0.04 | 0.033 |
| | Ephemeral | 0.46 | 0 | 0.4 | 0.05 | 0.006 |
| Wetland | Forested | 0.07 | 0 | 0.03 | 0.04 | 0 |
| | Emergent | 0.62 | 0 | 0.48 | 0.13 | 0.01 |
| Total | | 3.08 | 0 | 2.49 | 0.29 | 0.291 |

See table in attached Appendix A for additional information regarding proposed impacts.

### 1.3.1  Proposed avoidance and minimization measures

On July 22, 2022, TGP filed a formal application with FERC pursuant to Section 7(c) of the Natural Gas Act and Parts 157 and 284 of the Commission's regulations to construct, own, and operate the proposed intrastate natural gas pipeline and ancillary facilities.  During the scoping process for the EIS, the applicant provided an alternatives analysis. Included were no action alternatives, major route alternatives, minor route alternatives, system alternatives, and company alternatives for the proposed project. In selecting their preferred route, TGP considered factors such as practicability, potential impacts to the environment, private property, land disturbance, cultural resources, federal and state land, and recreational areas.

TGP's proposed alignment minimizes adverse environmental effects by locating more than 80% of its length along an existing TVA transmission line ROW. Facilities such as the pressure regulation station, meter station, launcher and receiver, and mainline valves would be constructed in uplands. Additional information regarding avoidance and minimization of adverse effects to aquatic resources are in Section 5.0, Alternative Analysis.  FERC evaluated alternatives in Section 3 of their final EIS.

FERC's EIS states that factors that could affect adjacent environmental justice communities including visual impacts (see EIS section 4.7.4), socioeconomics (see EIS section 4.8.1), traffic impacts (see EIS section 4.8.2), and air and noise impacts from construction and operation (see EIS sections 4.10 and 4.11). TGP committed to several minimization and mitigation measures to reduce impacts related to traffic delays, construction-period dust and noise, and visual impacts, as well as long-term noise and air quality. These include the following:

- Working with local school districts to identify school routes and commute times to minimize construction traffic impacts along these routes during peak use periods;
- Using equipment haul roads where possible that avoid residential areas and schools;

CE LRN-RD (File Number, LRN- 2021-00866)

- Complying with all fugitive dust requirements specified in section 4.10.2 of this EIS, including implementation of its Dust Control Plan, and generally limiting most construction activities to 7:00 a.m. to 7:00 p.m., as well as the areas of ground disturbance, to minimize fugitive dust and noise during construction;
- Avoiding nighttime and Sunday construction activities in areas where NSAs are located within 0.5 mile;
- Implementing noise control measures during HDD construction at Yellow Creek; and
- Reducing vehicle and equipment speed in construction work areas and on access roads to account for environmental conditions and by limiting vehicle and equipment idling. In addition, based on our recommendation in section 4.11.3, TGP would be required to file a final noise monitoring and mitigation plan for HDD #2 (Yellow Creek) to ensure they restrict the noise attributable to the drilling operations to no more than 55 dBA at nearby NSAs.

TGP proposes to restore areas to pre-construction contours and monitor construction areas. Reporting and monitoring requirements are summarized in FERCs EIS in appendix F and G. Each crossing was designed regarding the site's geological, hydrological, and physical characteristics. TGP completed a Waterbodies Crossings Hydrologic Risk Analysis which can be found in the original application at Table 2.7-3.

TGP would minimize potential for adverse effects at crossings by implementing management practices and sediment and erosion controls.

Among these are:
- Using flumes or cofferdams and pumps to route water around trench excavation in order to work in dry conditions whenever possible.
- Minimizing vegetation clearing and minimizing soil disturbance.
- Avoiding unnecessary vehicular traffic and equipment use.
- Installing and maintaining erosion and sedimentation control devices such as straw bales and silt fences.
- Restricting the duration of construction to the extent practicable.
- Using timber construction mats to create a temporary work surface in wet conditions.
- Using low pressure ground equipment in wet conditions to minimize vegetation damage, soil compaction, and rutting.
- Restoring the crossings to original elevations and stabilizing and re-vegetating disturbed areas.
- Inspecting equipment used in construction and operations at regular intervals.
- Blasting will be avoided in karst areas with risk of unacceptable hydraulic loss. According to the FERC EIS no blasting is to occur within WOTUS.

Additionally, the applicant has stated that they will implement FERC procedures and TDEC permit conditions during construction.

CE LRN-RD (File Number, LRN- 2021-00866)

### 1.3.2  Proposed compensatory mitigation

The proposed construction of the pipeline would not result in permanent, adverse effects to streams, nor permanent fill in wetlands. However, compensatory mitigation for the unavoidable loss of wetland function from the proposed conversion of 0.03 acre of forested wetland to emergent wetlands was requested by the Corps to offset the functional loss of forested wetland habitat.  On August 15, 2023, the applicant provided a letter from the Tennessee Mitigation Fund documenting reservation of 1.44 wetland mitigation credits in the Lower Cumberland River Service Area for the proposed conversion of forested wetlands to emergent wetlands.

### 1.4     Existing conditions and any applicable project history

**Existing Conditions:** The proposed project is in a predominantly rural area of north-central Tennessee in the Western Highland Rim ecoregion. The eastern-most part of the proposed project, at MP 0.0 in Dickson County, is 17 miles west of the Nashville metro area in the town of White Bluff. White Bluff has a population of approximately 3,860 (according to the 2020 U.S. Census). About 5 miles west of White Bluff is the small town of Charlotte, which is the Dickson County seat. Charlotte has a population of approximately 1,660 people. Continuing west-northwest for approximately 20 miles, the pipeline route approaches the town of Erin. Erin is the county seat for Houston County; it has a 2020 estimated population of 1,225 people. Approximately 3 miles west-northwest form Erin is the town of Cumberland City, where the pipeline would end at the Cumberland Meter Station. Cumberland City has an estimated 2020 population of about 300 people.  Slightly more than 80 percent of the pipeline route would be co-located either adjacent to an existing Tennessee pipeline (Line 100-3) right-of-way or adjacent to (within 200 feet of) an existing TVA electric transmission line right-of-way, minimizing the creation of new utility rights-of-way (FERC EIS).

**Applicable Project History:**

The Corps' Section 404/10 review includes segments of the overall proposed project comprised of waters where regulated activities would occur as well as nearby uplands where the Corps has sufficient control and responsibility to consider effects due to the relationship of the work in those upland areas to work in waters (see Section 2.1).

The applicant filed for a certificate of public convenience and necessity with FERC on June 22, 2022. FERC issued a notice of intent to prepare an EIS for the proposed project on September 7, 2022.   The Corps was invited to be a Cooperating Agency in the preparation of the EIS with FERC as the lead federal agency. The Corps provided comments on the FERC draft EIS. The FERC final EIS was provided to the Corps on May 26, 2023 for comment. The Corps provided comments on the final EIS on June 15, 2023. These comments included NEPA review of an unsurveyed 1.15-mile section of pipeline alignment, the use of blasting in WOTUS, alternative crossing methods (i.e., HDD usage), karst impacts, and mitigation for temporal loss. The FERC final EIS was issued on June 30, 2023.

CE LRN-RD (File Number, LRN- 2021-00866)

1.4.1  Jurisdictional Determination

Is this project supported by a jurisdictional determination? Yes, a preliminary jurisdictional determination (PJD) was prepared on January 4, 2023, for the features to be potentially impacted by the pipeline. An Approved Jurisdictional Determination was prepared on February 5, 2024 for 19 features.

1.5     Permit authority

| Table 3 – Permit Authority | |
|---|---|
| Section 10 of the Rivers and Harbors Act (33 USC 403) | X |
| Section 404 of the Clean Water Act (33 USC 1344) | X |
| Section 103 of the Marine Protection, Research and Sanctuaries Act of 1972 (33 USC 1413) | |

A crossing of Jones Creek (MP 3.2) is proposed for HDD installation, and while it does not involve a discharge of fill below the OHWM, it is a navigable water of the U.S. and is subject to Section 10 of RHA authorization.

**2.0  Scope of review for National Environmental Policy Act (i.e., scope of analysis), Section 7 of the Endangered Species Act (i.e., action area), and Section 106 of the National Historic Preservation Act (i.e., permit area)**

2.1     Determination of scope of analysis for National Environmental Policy Act (NEPA)

FERC has control and responsibility over the majority of the project and served as the lead Federal Agency for the conduct of environmental reviews and coordination with other Federal agencies required for compliance under NEPA. The Corps' limited areas of responsibility were encompassed within the areas of FERC's EIS. In accordance with 33 C.F.R. 325, App. B, § 7(b)(3), the Corps relied upon documentation in FERCs EIS and documentation of compliance under NEPA.

In conclusion, the Corps' limited scope is contained entirely within FERCs larger, broader scope.  The Corps' scope is described below.

The scope of analysis always includes the specific activity requiring a Department of the Army permit that is located within the Corps' geographic jurisdiction.  In addition, we have applied the four factors test found in 33 CFR Part 325, Appendix B to determine if there are portions of the larger project beyond the limits of the Corps' geographic jurisdiction where the federal involvement is sufficient to turn these portions of an essentially private action into a federal action.

When determining whether there is sufficient control and responsibility to include portions of the project beyond the regulated activities in jurisdictional waters, the Corps considered as appropriate the following factors from Appendix B of 33 CFR part 325.

1.  Whether or not the regulated activity comprises "merely a link" in a corridor type

CE LRN-RD (File Number, LRN- 2021-00866)

      project (e.g., a transportation or utility transmission project).
2. Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity.
3. The extent to which the entire project will be within Corps jurisdiction.
4. The extent of cumulative Federal control and responsibility.

Based on our application of the guidance in Appendix B, we have determined that the scope of analysis for this review includes only the Corps geographic jurisdiction.

The proposed fill in WOTUS associated with the project is associated with separate crossings that are "merely links" in a corridor type project (e.g., utility transmission project). In other words, much of the corridor project is located in uplands (>99%) and does not involve regulated work in waters of the U.S. (0.6% of the total of construction). A total of 146 crossings (minus 3 HDD crossings under non-navigable waters without Section 10 jurisdiction) along approximately 32 miles of the entire corridor are proposed which would result in temporary discharge of fill material during trenching and construction activities. All temporary fill in WOTUS at pipeline crossings and workspaces would be removed at the conclusion of construction activities. Crossings of WOTUS would be restored to pre-existing elevations, and disturbed and exposed areas would be stabilized.

At each crossing, workspace, and access road, the Corps control and responsibility was determined to be the area within the OHWM of WOTUS where fill and work would occur and the area of uplands immediately adjacent to that fill in WOTUS.

Immediately adjacent uplands were determined to extend to the construction right of way (ROW) laterally from either side of the proposed crossing, which includes the work area necessary to facilitate the crossing construction. The immediately adjacent uplands also extend linearly up the pipeline alignment from the crossing to the point in uplands where the pipeline or access road could deviate to a different alignment through uplands.

The extent to which the entire project would be within Corps jurisdiction is approximately 0.6% of the total pipeline and pipeline infrastructure construction project area. According to the FERC EIS, 507.5 acres are within the construction footprint of the pipeline and associated infrastructure. Of these, 313.8 acres would be restored to pre-construction uses. Approximately 0.6% percent (3.08 acres) of the overall project comprise activities in WOTUS or the immediately adjacent uplands.

Final description of scope of analysis:
The Corps determined that our scope of analysis includes the regulated activities in WOTUS associated with crossings of WOTUS as well as the immediately adjacent uplands. The immediately adjacent uplands are defined as the upland areas to the construction right of way (ROW) laterally from either side of the proposed crossing, which includes the work area necessary to facilitate the crossing construction. The immediately adjacent uplands also extend linearly up the pipeline alignment from the

CE LRN-RD (File Number, LRN- 2021-00866)

crossing to the point in uplands where the pipeline or access road could deviate to a different alignment through uplands.

This scope for NEPA analysis aligns with the Corps' action area for Section 7 of the Endangered Species Act (ESA) and permit area for Section 106 of the National Historic Preservation Act (NHPA) as described below. The scope does not extend to the entire area of pipeline construction activities, nor its subsequent operation. The Corps authorities under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act does not grant to the Corps control and responsibility over 99.4% of the pipeline construction area, nor does the Corps' authority extend to the use and operation of the pipeline after it is constructed. Accordingly, the Corps' analysis of the potential environmental effects of the project was limited to effects of fill temporarily placed in WOTUS during and immediately after construction. Other portions of the entire project are not included because the Corps does not have sufficient control and responsibility to warrant review by the Corps.

2.2    Determination of the Corps' action area for Section 7 of the Endangered Species Act (ESA)

FERC has control and responsibility over the majority of the project and served as the lead Federal Agency for the consultation under Section 7 of the Endangered Species Act (ESA). The Corps' limited areas of responsibility were encompassed within the areas of FERC's EIS scope and subsequent required consultations with the US Fish and Wildlife Service pursuant to Section 7 of ESA. In accordance with 33 C.F.R. 325, App. B, § 7(b)(3), the Corps relied upon documentation in FERCs EIS and documentation of consultation under ESA in conducting our assessment of the effects of the temporary fill within WOTUS.

The Corps' action area is encompassed entirely within FERC's defined area of potential effect (APE).

The Corps action area includes all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action. The Corps Federal action being considered is issuance of a permit for activities regulated under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act. Direct effects are those effects that are caused by the proposed action (i.e., the regulated activity in waters of the U.S.) and occur at the same time and place. Indirect effects are those that are caused by the proposed action (i.e., the regulated activity in waters of the United States) and are later in time but are still reasonably certain to occur. The action area for this project is coincident with the areas described above for the NEPA scope of analysis.

2.3    Determination of Corps' permit area for Section 106 of the National Historic Preservation Act (NHPA)

FERC has control and responsibility over the majority of the project and served as the lead Federal Agency for the consultation under Section 106 of the National Historic

Page 9 of 76

**App-0218**

CE LRN-RD (File Number, LRN- 2021-00866)

Preservation Act (NHPA). The Corps' limited areas of responsibility were encompassed within the areas of FERC's EIS scope and subsequent required consultations with the State Historic Preservation Officer (SHPO) and Tribal Historic Preservation Officers (THPOs) pursuant to Section 106 of the NHPA. In accordance with 33 C.F.R. 325, App. B, § 7(b)(3), the Corps relied upon documentation in FERCs EIS and documentation of consultation under NHPA in conducting our assessment of the effects of the temporary fill within WOTUS.

The Corps' permit area is encompassed entirely within FERC's defined area of potential effect (APE).

The permit area includes only those areas comprising waters of the United States that would be directly affected by the proposed work/structures and the immediately adjacent uplands as described in section 2.1.  Activities outside of waters of the U.S. are not included; all three tests in 33 CFR 325, Appendix C(g)(1) have not been met.

    1.  "Such activity would not occur but for the authorization of the work or structures within the waters of the United States"

    This test is not met because, but for authorizing the discharge of fill material into the aquatic resources for the installation of the pipe and access roads, the upland activities could occur.

    2.  "Such activity must be integrally related to the work or structures to be authorized within waters of the United States. Or, conversely, the work or structures to be authorized must be essential to the completeness of the overall Project or program"

    This test is not met because the regulated work in waters associated with the installation of the pipe and temporary access roads and work areas are not essential to activities in uplands.

    3.  "Such activity must be directly associated (first order impact) with the work or structures to be authorized"

    This test is not met because the activities in uplands could occur separately from the authorized work in waters of the U.S. and at a different time.

Final description of the permit area:

The permit area the regulated activities in WOTUS associated with crossings of WOTUS as well as the immediately adjacent uplands.  The immediately adjacent uplands are defined as the upland areas to the construction right of way (ROW) laterally from either side of the proposed crossing, which includes the work area necessary to facilitate the crossing construction.  The immediately adjacent uplands also extend linearly up the pipeline alignment from the crossing to the point in uplands where the pipeline or access road could deviate to a different alignment through uplands.

CE LRN-RD (File Number, LRN- 2021-00866)

In order to determine the Corps "permit area", the Corps considered the nature of the activities in the permit area, which are proposed to include temporary construction work in waters of the U.S. and adjacent uplands, such as vegetation clearing, excavation, and back-filling. Sound and air resource effects resulting from activities in the permit area would be temporary and limited in their extent. Potential for changes in the use or character of a property would also be limited, particularly where pipeline construction is within or adjacent to an existing utility corridor. About 80 percent of the project would be co-located with existing TVA easements for electrical transmission lines.  Along these co-located areas, the installation of pipeline would result in minimal, if any, visual impacts. The archaeological and architectural surveys included a corridor along the proposed pipeline route that varied between 200 and 300 feet wide, depending on whether the pipeline route paralleled the existing TVA powerline right-of-way. The cultural surveys included a 50-foot-wide corridor around proposed access roads and the defined boundaries of additional proposed facilities or workspaces. The architectural survey also considered potential visual effects to parcels immediately adjacent to the project footprint as well as any additional areas within 500 feet of the proposed pipeline centerline.

## 3.0 Purpose and Need

3.1     Project purpose and need

Project purpose and need for the project as provided by the applicant and reviewed by the Corps:

The applicant states the purpose of the proposed project is to construct approximately 32 miles of pipeline and associated facilities that would allow TGP to transport approximately 245,040 dekatherms per day ("Dth/d") of natural gas from the TGP's existing interstate pipeline system to the site of TVA's Cumberland Fossil Plant. Section 1.1 of FERC's EIS provides the details of the purpose of the proposed action.
The need of the project is to provide fuel to a combined-cycle gas turbine generator on the site of TVA's existing Cumberland Fossil Plant. The combined-cycle gas turbine generator is intended to replace capacity of coal-fired generators currently in operation at the plant and scheduled for decommissioning.

TVA is legislatively mandated to develop and provide a least cost energy strategy that also delivers rate stability to its customers over a variety of future scenarios. TVA issued an Integrated Resource Plan (IRP) in 2019 that examines how TVA can meet future power demands. TVA proposes to retire and decommission two coal-fired units at the Cumberland Fossil Plant by 2028, and provide replacement generation of 1,450 MW of firm, dispatchable power by the time the first unit is retired in 2026. TGP's Cumberland Pipeline Project would provide natural gas to serve TVA's Proposed Action (one of three action alternatives evaluated in the TVA EIS).

3.2     Basic project purpose

Basic project purpose, as determined by the Corps: Transportation of natural gas.

CE LRN-RD (File Number, LRN- 2021-00866)

### 3.3   Water dependency determination

The activity does not require access, proximity to, nor siting within a special aquatic site to fulfill its basic purpose. Therefore, the activity is not water dependent. The Section 404(b)(1) guidelines are applicable to the Corps' review of this Project.

### 3.4   Overall project purpose

Overall project purpose, as determined by the Corps:

The overall project purpose is to provide 245,040 dekatherms per day (Dth/d) of firm transportation capacity of natural gas to the site of TVA's Cumberland Fossil Plant to meet the people's need for electricity in TVA's service area.

## 4.0 Coordination

### 4.1   Public Notice Results

The results of coordinating the proposal on public notice are identified below, including a summary of issues raised, any applicant response and the Corps' evaluation of concerns.

Public Notice (PN) 23-02 was issued on February 14, 2023, for a period of 30 days, advertising the temporary fill at 156 crossings of waters by the proposed pipeline project (149 streams and 7 wetlands).  A second 30-day public notice, PN 23-13, was issued on April 11, 2023, to advertise temporary fill at 6 additional crossings of streams within a 1.15-mile section of pipeline that was not included within PN 23-02.

The Tennessee Department of Environment and Conservation (TDEC) issued public notices for the proposed crossings on July 6, 2023, and January 30, 2024, under TDEC Permit Number NRS22.192. Other agency and public outreach opportunities have been performed by FERC during separate phases of evaluation. The Commission mailed a copy of the *Notice of Availability* for the final EIS to federal, state, and local government representatives and agencies; elected officials; environmental and public interest groups; Native American Tribes; adjacent landowners and other interested individuals and groups; and newspapers and libraries in the Project area.

Were comments received in response to the public notice? Yes

Were comments forwarded to the applicant for response?  Yes

Was a public meeting and/or hearing requested, and if so, was one conducted?

Yes, a public meeting/hearing was requested but was not held.

A Memorandum for Record (MFR) was prepared describing the Corps' determination of the need for a public hearing.  We determined that the public has had ample opportunity to express its views and opinions regarding this application through ten FERC public

CE LRN-RD (File Number, LRN- 2021-00866)

opportunities, two of the Corps' public notices, and a TDEC public notice and a public hearing. In accordance with 33 C.F.R. § 325.3(d), PN 23-02 and PN 23-13 were sent to the applicant, federal, state, and local agencies and officials, and all owners of property adjoining the property on which the regulated activity would occur. All responses to the PN have served to fully develop the pertinent issues and there is sufficient information in the record addressing these issues. We determined that a public hearing would not provide additional information that would assist in reaching a final decision on the DA permit request.

The following provides a summary of public notice and participation opportunities:

a. FERC public involvement opportunities:

  I. On November 5, 2021, FERC granted TGP's request to use FERC's Pre-Filing Process for the planned Project in Docket No. PF22-2-000. The Pre-Filing Process is designed to encourage early involvement by citizens, governmental entities, non-governmental organizations, and other interested parties in the development of proposed natural gas transmission projects, prior to the filing of a formal application. FERC stated that during the Pre-Filing Process, they worked with TGP and interested stakeholders, including federal and state agencies, to identify and resolve Project-related issues. FERC encouraged TGP to communicate frequently with the public and resource agencies during this time. On November 29, 2021, May 5, 2022, and May 24, 2022, the applicant attended pre-application meetings with the Corps to discuss the proposed project. During these meetings we emphasized the importance of the alternative analysis information, minimization/avoidance of impacts to WOTUS, proposed construction methods, and lead federal agency responsibilities

  II. TGP conducted two in-person open house / information meetings on January 18 and 19, 2022, in the towns of Vanleer and Erin, Tennessee. FERC representatives attended both meetings. The open houses provided an opportunity for the public to ask questions and express concerns. TGP mailed letters to landowners and stakeholders inviting them to the meetings. Approximately 50 individuals attended the two open house sessions. TGP discussed plans for the project including routing, surveys, timeline, road crossings, stream crossings, and restoration.

  III. TGP conducted a virtual open house meeting on January 27, 2022, for the proposal with FERC representatives attending.

  IV. On March 3, 2022, FERC issued in Docket PF22-2-000 a *Notice of Scoping Period Requesting Comments on Environmental Issues for the Planned Cumberland Project*. The notice was mailed to approximately 250 entities, including affected landowners; federal, state, and local officials; Native American tribes; agency representatives; environmental and public interest groups; and local libraries and newspapers. The 30-day scoping

CE LRN-RD (File Number, LRN- 2021-00866)

period was open from March 3 to April 4, 2022, and as a result, FERC received 16 comment letters during the Pre-Filing Process.

V.  On July 29, 2022, the Commission issued in Docket CP22-493-000 a Notice of Application announcing that TGP filed its application. This notice opened a comment period and indicated that the deadline for filing a motion to intervene would end on August 29, 2022.

VI.  On September 7, 2022, FERC issued a *Notice of Intent to Prepare an Environmental Impact Statement for the Proposed Cumberland Project, Request for Comments on Environmental Issues, and Schedule for Environmental* Review (NOI). The NOI opened another 30-day scoping period, which ended on October 7, 2022. Between July 29 and October 7, 2022, they received ~65 comment letters, of which about 25 were Motions to Intervene. The NOI was published in the Federal Register on September 7, 2022

VII.  On February 3, 2023, FERC issued a *Notice of Availability of the Draft Environmental Impact Statement for the Proposed Cumberland Project*. The draft EIS was filed with the U.S. Environmental Protection Agency (EPA), and EPA's formal notice of availability was issued in the Federal Register on Thursday, February 9, 2023.  FERC mailed a copy of the *Notice of Availability* to federal, state, and local government representatives and agencies, elected officials, environmental and public interest groups, Native American Tribes, potentially affected landowners, other interested individuals and groups, and newspapers and libraries within the project area. The notice of availability invited the public to comment on the draft EIS by filing comments electronically (via FERC eComment or eFiling), mailing written comments to the Secretary, or by attending one of the two upcoming in-person public comment sessions hosted by FERC staff.

VIII.  An in-person public comment session/open house was held by FERC on February 21, 2022, in Dickson, TN.  Five individuals attending this session made oral comments.  A second in-person public comment session/ open-house was held by FERC on February 22, 2023, in Cumberland City, TN and only one individual provided an oral comment.  The official comment period closed on March 27, 2023; however, FERC stated any comments received after this date were still included in their analysis.

FERC's evaluation of the TGP pipeline has offered the public ten (10) formal opportunities to provide comments on the proposal since November 5, 2021.

b. Corps opportunities:

I.  PN 23-02 was issued on February 14, 2023, by the Corps to advertise the proposed pipeline (with information available at that time).

CE LRN-RD (File Number, LRN- 2021-00866)

II.   PN 23-13 was issued on April 11, 2023, by the Corps to advertise the proposed pipeline with updated stream crossings (six additional crossings were added).

Both of the Corps' public notices were mailed to owners of property adjacent to the proposed project (~160). Both public notices were also available for review on the Nashville District web site at: http://www.lrn.usace.army.mil/Media/PublicNotices.aspx. The public notices provided contact information for the Corps project manager. Comments received from both public notices were preserved in the Corps administrative record and were considered during evaluation of the proposed temporary fill in WOTUS proposed for the pipeline construction.

c. Tennessee Department of Environment and Conservation (TDEC) opportunities:

I.   TDEC issued a public notice NRS22.192 on May 30, 2023, stating its intent is to inform interested parties of the applicant's request for Section 401 Water Quality Certification (WQC) and application for a state of Tennessee Aquatic Resource Alteration Permit (ARAP). The TDEC published a draft permit and rationale and solicited comments and information regarding possible impacts to water quality.

II.   TDEC hosted a public hearing on July 6, 2023, in Dickson, TN to allow the public an opportunity to voice their concerns of the proposal regarding Water Quality Certification for the proposed stream and wetland alterations associated with the proposed pipeline.  A virtual attendance option was available simultaneously during the in-person hearing.  Corps personnel attended in person.

Comments received in response to public notice:

| Table 4: Public Comments Summary | |
|---|---|
| Corps PN # | Commenter |
| **Federal Agencies** | |
| PN 23-02 | U.S. Department of Agriculture |
| PN 23-02 | U.S. Environmental Protection Agency |
| PN 23-02/PN 23-13 | U.S. Fish and Wildlife Service |
| PN-23-13 | U.S. Coast Guard |
| **State Agencies** | |
| PN 23-02 | Tennessee Department of Environment and Conservation |
| PN-23-13 | Tennessee Wildlife Resources Agency |
| **Tribal** | |
| PN 23-02/PN 23-13 | The Quapaw Nation |
| PN 23-02 | The Cherokee Nation |
| PN 23-02/PN 23-13 | The Catawba Indian Nation |
| PN-23-13 | The Eastern Shawnee Tribe |
| PN-23-13 | The Choctaw Nation of Oklahoma/The Choctaw Nation |
| **Non-Governmental Organizations (NGO)** | |

CE LRN-RD (File Number, LRN- 2021-00866)

| PN 23-02 (2) */PN-23-13 | Conservation Groups - Appalachian Mountain Advocates, Southern Environmental Law Center, Sierra Club, and Appalachian Voices |
|---|---|
| PN 23-13 | Conservation Groups - Appalachian Mountain Advocates and Southern Environmental Law Center, on behalf of Sierra Club and Appalachian Voices, and Center for Biological Diversity |
| PN-23-13 (2)* | Appalachian Voices |
| PN-23-13 | The Sierra Club |
| **Individuals** | |
| PN 23-02 | Heather Waldrup |
| PN 23-02 | Edward M. Polk/Nancy G. Polk |
| PN 23-02 | Michael Schenk |
| PN 23-02 | Erica Caldwell Colmenares |
| PN 23-02 | Joseph VanDeusen |
| PN 23-02 | Sharon King |
| PN 23-02 | Austin Wall |

*Denotes multiple comments received in response to same public notice

All comments described above have been reviewed by the Corps. A summary of comments received by the Corps is included in Appendix B of this combined decision document. The purpose of Appendix B is to summarize comments received by the Corps. FERC included all comments received by FERC in Appendix I of its Final EIS. Additionally, FERC discussed their public review and comments in Section 1.3 of the EIS.

The Corps received four letters to its public notices stating no additional comments regarding the proposed project (Tennessee Wildlife Resources Agency, U.S. Coast Guard, U.S. Fish and Wildlife Service with inclusion of tree clearing to be performed during bat's hibernation season, and U.S. Department of Agriculture). Four letters were provided from Native American Tribes with no adverse comments regarding the proposed project (Eastern Shawnee Tribe, Quapaw Nation, Catawba Indian Nation and Choctaw Nation). Two Tribes asked to be notified if an archaeological site or object(s) discovered during construction (Eastern Shawnee Tribe and Catawba Indian Nation). The Cherokee Nation expressed interest in acting as a consulting party to the proposed project related to cultural, historic, and pre-historic resources with the proposed project area.

Corps policy provides the applicant an opportunity to furnish a proposed resolution or rebuttal to all objections and other substantive comments before a final decision is made on a proposed project. A copy of all the comments received and the Corps summary of issues were provided to the applicant on July 18, 2023, for the applicant's response. Issues raised in comments received by the Corps in response to its public notices and forwarded to the applicant for response were:

1. <u>404(b)(1) Guidelines and Least Environmentally Damaging Practicable Alternative (LEDPA)/Alternatives Analysis</u>: The proposed impacts to waters of the U.S. must meet the 404(b)(1) guidelines of the Clean Water Act. The following detailed information will be needed to assist us in fully evaluating the project:

   a. <u>Avoidance</u>: Provide discussion of alternative routes considered and justification of why they were not selected or would have resulted in more impacts than the

CE LRN-RD (File Number, LRN- 2021-00866)

proposal, including utilizing existing pipelines and/or natural gas pipeline rights-of-way (ROW).

b. <u>Minimization</u>:  The proposal must be shown to be the least environmentally damaging practicable alternative (LEDPA) that meets the basic project purpose.  Please identify all criteria and weighting factors used to evaluate and rate alternatives, discuss why each alternative was not found to be a practicable alternative, and/or the least environmentally damaging alternative. Minimization includes alternate site plans, construction methods, and other steps which would reduce impacts to waters of the U.S.  Methods of crossing other waterways that do not involve a discharge of fill material such as by horizontal directional drill (HDD), micro tunneling, conventional boring or directional micro tunneling need to be evaluated.  Alternative construction methods are especially important within special aquatic sites like riffle and pool complexes, wetlands, and sites of karst terrain.

c. <u>Compensatory Mitigation</u>:  Once the project is determined to be the least environmentally-damaging, practicable alternative, please provide an appropriate compensatory mitigation plan that would offset the proposed impacts in accordance with 33 CFR 332.  Any proposed compensatory mitigation plan should follow the mitigation hierarchy presented in §332.3(b)(2)-(6). Mitigation should be considered to offset any temporal losses especially throughout the wetland areas. As requested by EPA, compensatory mitigation should be planned for if post-construction monitoring indicates a loss of aquatic functions.

2. <u>Monitoring</u>: Details for monitoring of the open-cut trench crossings need to include habitat and biological surveys, gain or loss of aquatic functions (i.e., physical, chemical, and biological), upstream and downstream limits, and any additional monitoring in karst terrain.

3. <u>Cumulative Effects Analyses</u>:  Information is needed to evaluate the cumulative effects of the proposed impacts on the streams and watershed.

4. <u>Public Interest</u>:  Additional public interest criteria to be addressed includes impacts to drinking water, conservation, natural springs and wells, public safety, environmental justice, farmland, forested land, social justice/property ownership, invasive species, recreation, agriculture, invasive species management, etc.

5. <u>Economics</u>:  Concerns include that the project is too costly for taxpayers and would increase cost of energy/electricity, does not benefit the local workforce, decreases long-term employment opportunities, and decreases property values.

6. <u>Disposal site(s)</u>: Identify any proposed disposal site(s) and impacts to waters of U.S. that maybe required at these site(s).

7. <u>Shapefiles</u>:  The Cherokee Nation requested shapefiles for the proposed project in addition to comments from the State Historic Preservation Office prior to providing comments.

8. <u>Blasting</u>:  Concerns of blasting the streambeds and irreversible damage to the stream quality and aquatic habitat should be addressed, particularly from increased sedimentation.

V 30 AUG 2022

CE LRN-RD (File Number, LRN- 2021-00866)

9.  <u>Restoration:</u>  Comments were received regarding the post-construction restoration plans of streams and wetland and restoration plans of the cleared areas temporarily for construction purposes.

10. <u>Property Values and Ownership</u>: Concerns include short and long-term adverse impacts, property damage, clearing of timber, loss of income from agricultural or timber harvesting, aesthetics/viewshed, property values, quality of life, and cumulative impacts the pipeline would have on their property.

11. <u>Safety</u>:  Concerns include pipeline integrity, threat of leaks, uncontrollable burns, fire protection, lack of cutoff valves, safety measures on private property, and voltage interference where buried pipelines are collocated with high voltage current transmission lines especially since there has been an explosion in the past damaging hundreds of acres and homes.  Concerns of the multiple safety hazards associated with pipeline construction near a high voltage power line are discussed in reports published by the Interstate Natural Gas Association of America Foundation and Canadian Energy Pipeline Association.

12. <u>Wildlife</u>:  Concerns include impacts on wildlife in the cleared corridor and their habitat, including the bald eagle and their protection under the Bald and Golden Eagle Protection Act.

13. <u>Alternatives/Renewable Energy</u>: Concern that an inadequate review and evaluation have been conducted of other energy sources and alternatives that are cleaner and less dangerous compared to the natural gas pipeline's impacts to the overall area, public, watershed, environment, and climate effects.


4.2    Additional issues raised by the Corps

During pre-application meetings the Corps raised several issues for discussion of the initial proposed project such as delineation verification of resources through jurisdictional determinations, lead federal agency responsibilities such as Section 106 cultural resource, Section 7 ESA, and NEPA determinations, mitigation for wetland-type conversion, minimization of impacts via proposed crossing methods, proposed blasting in geologic formations at risk of hydrologic loss of streams, and potential for water quality impacts after exposure of Chattanooga Shale during construction.

In a pre-application request submitted to the Corps by the applicant on April 21, 2022, the applicant proposed construction techniques including controlled blasting. During the pre-application meeting on May 4, 2022 the Corps expressed that the proposed construction methods may cause more than minimum adverse effects (open cut wet methods and blasting).  During a pre application meeting on May 24, 2022 the applicant presented a chart with crossings that indicated each geologic condition, karst, and potential method of construction.  The potential for hydraulic loss on certain types of geology at crossing sites was discussed.  The applicant clarified that they would propose to only use controlled blasting in areas with non-karst geology.  The applicant also updated many proposed crossing methods to open cut dry installation practices. During the permitting process, it was further clarified that at each waterbody crossing, one or more non-blasting rock removal methods would be selected and implemented,

CE LRN-RD (File Number, LRN- 2021-00866)

prior to moving to controlled blasting to remove rock if other methods are demonstrated to be impracticable. The applicant states that no controlled blasting would be implemented in karst-prone geologic terrane or in wetlands.


4.3     Comments regarding activities and/or effects outside of the Corps' scope of review

Many comments focused on general energy policy concerns such as opposition to fossil fuels in general and that TVA should consider non-fossil fuel methods of power generation or that FERC should consider cumulative impacts of alternative energy sources. Such comments were preserved in the Corps administrative record but are outside the scope of the Corps authority under the Clean Water Act and the Rivers and Harbors Act and were not considered in evaluation of the effects of fill and work in waters of the United States during construction of the pipeline.

## 5.0 Alternatives Analysis

(33 CFR Part 325 Appendix B, 40 CFR 230.5(c), 40 CFR 1501, and RGL 88-13).  An evaluation of alternatives is required under NEPA for all jurisdictional activities.  NEPA requires discussion of a reasonable range of alternatives, including the no action alternative, and the effects of those alternatives.  An evaluation of alternatives is required under the Section 404(b)(1) Guidelines for projects that include the discharge of dredged or fill material to waters of the United States. Under the Section 404(b)(1) Guidelines, practicability of alternatives is taken into consideration and no alternative may be permitted if there is a less environmentally damaging practicable alternative.

5.1     Site selection/screening criteria

In order to be practicable, an alternative must be available, achieve the overall project purpose (as defined by the Corps) and be feasible when considering cost, logistics and existing technology.

Criteria for evaluating alternatives as evaluated and determined by the Corps:

Criteria used to determine if an alternative is practicable:

- Available – Available considering public/private land ownership, local and regional planning, easements/property restrictions, ability to be acquired, ability to be used to meet the project purpose.
- Logistics – Capacity to provide approximately 245,040 Dth/d of firm transportation.
- Technology – Appropriate equipment, engineering machinery currently exist.

Criteria used to determine the least environmentally damaging practicable alternative (LEDPA):

- Aquatic resource impact (streams and wetlands)

CE LRN-RD (File Number, LRN- 2021-00866)

- Construction ROW
- Permanent ROW
- Length Co-Located within existing ROW
- Known archeological sites (within 0.5 mile of route)
- Known historic structures (within 0.5 mile of route)
- Federal land crossed
- State land crossed
- Recreation/designated lands crossed
- Existing residences within 50 ft of construction work area

## 5.2    Description of alternatives

The Corps independently considered whether transportation of 245,040 dekatherms/day of natural gas to the Cumberland Fossil Plant by tanker on rail, by water (on the Cumberland River), or by highway was practicable. Transportation in these modes would require reduction of the volume of natural gas by liquefying it at extremely low temperatures. Specialized cryogenic tankers are required to transport liquefied natural gas (LNG).

Transportation of LNG by rail is currently prohibited in the United States (49 CFR Part 172, in 88 FR 60356).

We determined that transportation of LNG by barge is not available, as a fleet of barges capable of transporting LNG on the Cumberland River does not exist.

We determined from review of industry information that capacities of tanker trucks equipped to transport LNG ranges from about 5,000 gallons to about 12,000 gallons. Transportation of LNG by truck to the Cumberland Fossil Plant site would require daily deliveries from a minimum of 247 tanker trucks having maximum capacity of 12,000 gallons of LNG to provide 245,040 Dkth of natural gas (1 Dkth of natural gas = 12.1 gallons of LNG. Approximately 2,964,984 gallons of LNG is the equivalent of 245,000 Dkth). To receive LNG at the site, loading facilities equipped to convert natural gas delivered by pipeline to LNG would be required. The delivery point must have storage for LNG and facilities equipped to return LNG to a gaseous state before it can be burned. Based on the above, supplying the required natural gas to the Cumberland Fossil Plant by highway is not practicable.

We concluded that a pipeline for transportation of natural gas in the quantity required was the only available, practicable alternative.

### 5.2.1   No action alternative

The No Action alternative is one in which the construction of pipeline for the transportation of natural gas from existing sources to the site of the Cumberland Fossil Plant would not require fill in waters of the United Staes, nor work in, under, or above a navigable water of the United States. The Corps reviewed the FERC EIS and available maps and determined that construction of a buried natural gas pipeline between existing

CE LRN-RD (File Number, LRN- 2021-00866)

interstate pipelines with available capacity and the Cumberland Fossil Plant could not be constructed to avoid all waters of the United States and still meet the project purpose. This determination is based on the density and general south to north orientation of the drainage network within this part of the Western Highland Rim ecoregion. The No Action Alternative was determined to not be practicable because it would not fulfill the project purpose.

### 5.2.2   Off-site alternatives

Offsite Alternative 1 - ANR Pipeline Company's 30-inch-diameter interstate pipeline:

This alternative includes some available capacity, but not the required 245,040 Dth/d of firm transportation capacity within the segment of the pipeline nearest TVA's Cumberland Fossil Plant. This alternative would require a new 44-mile-long pipeline and cross federal and state property (Creeks National Wildlife Refuge, Stewart State Forest, and Lake Barkley Recreational Area). This alternative is not practicable based on logistics (inability to provide required capacity).

Offsite Alternative 2 - East Tennessee Natural Gas Pipeline, LLC's 16-inch and 36-inch diameter interstate pipeline system:

This alternative includes at minimum a new 40.35-mile-long pipeline that would require a crossing of the Duck River, which is the most biodiverse river in North America with many species listed as federally threatened or endangered. Regardless, the TGP 16-inch and 36-inch pipelines have no available capacity.  This alternative is not practicable based on logistics (inability to provide required capacity).

CE LRN-RD (File Number, LRN- 2021-00866)



Figure 2: Other Pipeline Company Alternatives
(Alternatives 1 and 2 in pink, preferred alternative in red)

Offsite Alternative 3 – Utilizing Abandoned Systems:

FERC determined there are no abandoned pipelines that could be used to deliver natural gas to the required delivery point. This alternative is not practicable based on availability.

Offsite Alternative 4 (System Alternative 2):

This alternative would involve constructing a 65-mile 30-inch diameter pipeline from Portland Compressor Station 87. A new booster system would be required for this alternative as the increased distance would require additional pressure. This new booster system would consist of one Electronic Motor Driven Compressor (EMDC) as a primary unit with a back-up Solar Taurus 60 turbine driven centrifugal compressor to provide gas for the TVA Cumberland Plant when the electric power grid supplying the EMDC is not available.  Additional gas combustion and electric power consumption would result from this alternative. The total cost of this alternative is approximately $418 million. The alignment of this alternative would cross the federally owned Barkley Recreation Area. See alignment location in Figure 3. This alternative is practicable based on the selection criteria. See section 5.4.

CE LRN-RD (File Number, LRN- 2021-00866)

Offsite Alternative 5 (System Alternative 3):

This alternative would involve constructing a new 41.6-mile 24-inch diameter pipeline from a point on the TGP main line system 16.5 miles north of the mainline valve 83. This alternative would include the installation of a new compressor station due to the longer and smaller diameter of the pipeline. A primary EDMC and a backup Solar Centaur 40 turbine driven centrifugal compressor would be required. The backup solar system would be required to provide fuel gas for the new plant when the electric power grid is not available for the primary EMDC. The total estimated cost is approximately $240 million. The alignment of this alternative would cross Barkley Recreation Area and Shady Park Public Hunting Area. See alignment location in Figure 3. This alternative is practicable based on the selection criteria. See section 5.4.



Figure 3: System Alternative Locations

CE LRN-RD (File Number, LRN- 2021-00866)

| **Table 5:** Offsite Alternative Analysis Summary of Practicability Determination* | | | |
|---|---|---|---|
| **Offsite Alternatives** | **Availability** | **Logistics** | **Existing Technology** |
| Offsite Alternative 1 (ANR Pipeline) | Available for project purpose | **Required Capacity Not Available** | Able to be constructed with current technology |
| Offsite Alternative 2 (East TN NG Pipeline) | Available for project purpose | **Required Capacity Not Available** | Able to be constructed with current technology |
| Offsite Alternative 3 Abandoned Systems | **No Abandoned Systems Available** | _ | _ |
| Offsite Alternative 4 (System Alternative 2) | Available for project purpose | Would fulfill project purpose | Able to be constructed with current technology |
| Offsite Alternative 5 (System Alternative 3) | Available for project purpose | Would fulfill project purpose | Able to be constructed with current technology |

*Evaluation is based off of available information provided by the applicant and documented within the FERC EIS.  Red text indicates that an alternative did not meet practicability criteria. Green text indicates that an alternative did meet practicability criteria.

### 5.2.3  On-site alternatives

On-site alternative 1 (applicant's preferred alternative):

This alternative is a 30-inch diameter pipeline, over a 32-mile route, from TGP's existing Lines 100-3 and 100-4 to the Cumberland Fossil Plant site. The alignment is 80% co-located with existing TVA electric transmission lines/utility easement. The cost of this alternative is estimated at $162 million. The estimated land disturbance associated with this alternative is 507.5 acres (including both temporary and permanent). This alternative is practicable based on the selection criteria.  See Section 5.4.

Onsite Alternative 2 (System Alternative 1):

This alternative would include using the same alignment and length as On-site Alternative 1, but a smaller diameter pipeline (24-inch). Due to the decreased size of the pipeline in this alternative, a booster compressor station would be required to transfer the same amount of natural gas. This alternative was described as involving more land disturbance due to the need to construct a power system for the additional compression required to operate the smaller pipe at adequate pressures (10 more acres of

CE LRN-RD (File Number, LRN- 2021-00866)

permanent ROW and 50 more acres of construction ROW compared to onsite Alternative 1). The cost of this alternative was estimated at $203 million. This alternative is practicable based on the selection criteria.  See Section 5.4.

Onsite Alternative 3 (Trenchless Method – HDD/Conventional Bore Crossings):

This alternative would include using the Horizontal Directional Drill (HDD) method to install the pipeline underneath aquatic resources, negating the need for temporary fill within the majority of crossings of WOTUS associated with the project. Corps jurisdiction would be limited to the HDD under Jones Creek (Section 10 water). Inadvertent loss of drilling fluid ("frack-outs") may occur with HDD methods which would be addressed under a containment and clean-up contingency plan. We considered the potential for reduced harm to the environment if HDD was used instead of an open trench to effect a crossing. We determined that HDD construction would be disruptive to nearby residents for weeks or months, rather than days. The noise of HDD equipment would be a major factor of disruption. We considered the potential for unintended release of drilling fluids in the geology of the Western Highland Rim and regard it as high based on our knowledge of the region and previous experience with HDD crossings. Inadvertent loss of drilling fluid is not a rare occurrence in the geologic formations of Middle Tennessee. Our experience has been that the emergence of drilling fluid during a "frac-out" is unpredictable in volume and exact location. The physical properties of bentonite slurry make it highly mobile and difficult to contain when it is released within a waterbody, and therefore has a high potential to degrade stream habitat downstream. Aquatic organisms, especially benthics, are sensitive to the suspended and fine sediments of such a slurry. In addition, upland worksites at each end of the HDD tend to be compacted by the activity of crews and equipment at drilling sites because of the volume of water involved and the duration required to effect a crossing. The residual bentonite tends to accumulate at these sites, which likely adds to long-term compaction and other detrimental effects on the affected soils. The applicant assessed feasibility of employing HDD at all crossings proposed. This analysis included geological surveys, reviews of nearby drinking water sources, private wells, and mining activities. When evaluating whether the exclusive use of HDD would be practicable, the applicant considered crossing length, potential risk of loss of drilling fluid, geology, estimated time required to complete crossings, safety/technical feasibility, and the cost of HDD.

The applicant states that each HDD crossing would require borings of a minimum of 1300 linear feet to achieve sufficiently shallow angles for acceptable stress on the finished pipeline. Much of the terrain of the Western Highland Rim is not conducive for HDD methods due to slopes at crossing points. Additionally, HDDs in such terrain create the need for greater drilling pressure, which in turn increases the risk of inadvertent drilling fluid loss. The applicant states that costs of an HDD crossing compared to open-cut method is generally 5 times more per foot. The applicant states that the timeline associated with an HDD/conventional bore crossings are approximately 10 days to 1 month, compared to open-cut methods which take approximately 1-2 days.

V 30 AUG 2022

CE LRN-RD (File Number, LRN- 2021-00866)

Our assessment of the logistics of using HDD at every crossing was that the additional cost and time of construction is not reasonable and is therefore not a practicable alternative. However, the selective use of HDD may be practicable to address the peculiarities of certain crossings; working around existing utilities or other infrastructure are examples.

## 5.3    Alternatives evaluation under the Section 404(b)(1) Guidelines and NEPA

Four alternatives were considered practicable: Offsite Alternative 4 (System Alternative 2), Offsite Alternative 5 (System Alternative 3), On-site alternative 1 (applicant's preferred alternative), and Onsite Alternative 2 (System Alternative 1).  These alternatives were carried forward for comparison of potential for environmental damage. Factors such as impacts to waters, total area of disturbance, known archaeological sites/structures, federal and state land affected, and private property considerations were evaluated and are summarized in the table below for each of the four practicable alternatives.

| Table 6: Alternatives Evaluation under the Section 404(b)(1) Guidelines and NEPA | | | | |
|---|---|---|---|---|
| | Offsite Alternative 4 (System Alternative 2) | Offsite Alternative 5 (System Alternative 3) | On-site Alternative 1 (applicant's preferred alternative) | On-site Alternative 2 (System Alternative 1) |
| Construction ROW | 847.12 acres | 555.01 acres | **381.83 acres** | 431.83 acres |
| Permanent ROW | 423.55 acres | 257.47 acres | **190.88 acres** | 200.88 acres |
| Length co-located with existing ROW | 22.65% | 6.42% | **83.23%** | **83.23%** |
| Total wetlands affected | 16.27 acres | 15.58 acres | **2.83 acres** | **2.83 acres** |
| Total perennial streams crossed | 53 | 31 | **28** | **28** |
| Known archaeological sites (within 0.5 mile of route) | 59 | 47 | **44** | **44** |
| Known historic structures (within 0.5 mile of route) | 98 | 79 | **36** | **36** |
| Federal Land Crossed | 0.17 miles | 0.26 miles | **0** | **0** |
| State Land Crossed | **0** | 0.48 miles | **0** | **0** |
| Recreation/ designated lands crossed | 3 | **2** | **2** | **2** |
| Existing residences within 50 ft of construction work area | 12 | **3** | 7 | 5 |

*Green bold text represents the least impact for each of the screening criteria

## 5.4    Least environmentally damaging practicable alternative under the Section 404(b)(1) Guidelines

CE LRN-RD (File Number, LRN- 2021-00866)

Based on the Corps independent review including the Corps knowledge and experience in evaluating the environmental effects of construction methods, the factors summarized in the table in Section 5.3 above, and review of FERC's evaluations of alternative routes, we concluded that the proposed 32-mile pipeline identified above as On-site Alternative 1 is the least environmentally damaging practicable alternative to meet the project purpose.  Evaluation of the screening criteria summarized in the table in Section 5.3 demonstrate that On-Site Alternative 1 is the LEDPA. All other practicable alternatives had greater impacts.

## 6.0 Evaluation for Compliance with the Section 404(b)(1) Guidelines

The following sequence of evaluation is consistent with 40 CFR 230.5

6.1     Practicable alternatives

Practicable alternatives to the proposed discharge consistent with 40 CFR 230.5(c) are evaluated in Section 5.

The statements below summarize the analysis of alternatives:

In summary, based on the analysis in Section 5 above, the no-action alternative, which would not involve discharge into waters of the United States, is not practicable.

For those projects that would discharge into a special aquatic site and are not water dependent, the applicant has demonstrated there are no practicable alternatives that do not involve special aquatic sites.

It has been determined that there are no alternatives to the proposed discharge that would be less environmentally damaging (Subpart B, 40 CFR 230.10(a)).

The proposed discharge in this evaluation is the practicable alternative with the least adverse impact on the aquatic ecosystem, and it does not have other significant environmental consequences.

See discussion in Section 5.0 above regarding alternatives, potential aquatic resource impacts, other environmental consequences, and LEDPA.

6.2     Candidate disposal site delineation (Subpart B, 40 CFR 230.11(f))

Each disposal site shall be specified through the application of these Section 404(b)(1) Guidelines:

The "disposal site" is each crossing of WOTUS where a discharge of temporary fill has been proposed.

The Project would result in a total of 0.69 acre of temporary fill in wetlands (0.66 acre of temporary disturbance and 0.03 acre of permanent wetland vegetation type change) at 7 crossings of wetlands. ROW maintenance during the operation of the pipeline after

App-0236

CE LRN-RD (File Number, LRN- 2021-00866)

construction would result in the permanent conversion of 0.03 acre of forested wetland (PFO) to emergent (PEM) or shrub/scrub (PSS) wetlands within the operational maintenance corridor.

The temporary discharge of dredged and fill material would occur at a maximum of 139 reaches of stream (38 perennial, 34 intermittent, and 67 ephemeral) for a total temporary impact of ~2.39 acres (1.37 acres perennial, 0.56 acre intermittent, and 0.46 acres ephemeral). Construction of the pipeline crossings would be performed by either an open-cut trench method or horizontal direction drill (HDD).  See Table 1 in Section 1 of this document for waterbody crossing methods by resource type.

A total of 146 waterbodies would be crossed by the Project (minus 3 HDD crossings under non-navigable waters without Section 10 jurisdiction).

6.3    Potential impacts on physical and chemical characteristics of the aquatic ecosystem (Subpart C 40 CFR 230.20-40 CFR 230.25)

The following has been considered in evaluating the potential impacts on physical and chemical characteristics (see Table 7):

| Table 7 – Potential Impacts on Physical and Chemical Characteristics | | | | | | |
|---|---|---|---|---|---|---|
| Physical and Chemical Characteristics | N/A | No Effect | Negligible Effect | Minor Effect (Short Term) | Minor Effect (Long Term) | Major Effect |
| Substrate | | | | X | | |
| Suspended particulates/ turbidity | | | X | | | |
| Water | | | | X | | |
| Current patterns and water circulation | | | X | | | |
| Normal water fluctuations | | | | X | | |
| Salinity gradients | X | | | | | |

Discussion:

**Substrate:** FERC EIS Section 4.2, Section 4.3, Appendix G

The proposed discharge would temporarily impact the physical substrate to 0.69 acre of wetland and 2.39 acres of streambed. Dredged and fill material would be discharged into wetlands and streams as a result of temporary construction.

CE LRN-RD (File Number, LRN- 2021-00866)

Soils excavated in wetlands would be segregated prior to installation of the pipe in accordance with the method described in Appendix G of the FERC EIS.  For wetland crossings, the top 1 foot of soil from the area disturbed by trenching would be segregated and then returned to the original location, except in areas were standing water is present or soils are saturated.  In the case of stream crossings, streambed materials would not be segregated during excavation of the trench. Fluvial processes would sort and redistribute stream substrate after the trench is backfilled to the original elevations. During high water events, the top few inches of streambed substate are entrained in the flow (stream bedload) and are re-deposited as the flows recede. Natural streambed substrate in the Western Highland Rim are typically gravels, sands, sediments, and organic matter. Natural stream substrate would be reestablished by these processes over the backfilled trenches after one or a few high-flow events. The frequency of such channel forming flows is typically on a 1.5-year recurrence interval, or on average, about once every 18 months.

The applicant anticipates encountering areas of shallow bedrock during the proposed Project construction based on review of surficial geology, soil mapping, and desktop geotechnical surveys. Such areas may require controlled blasting to achieve the required trench depth. If bedrock is encountered during trenching, the applicant plans to remove such bedrock by a technique dependent on the relative hardness, fracture susceptibility, and expected volume of bedrock, as well as its location. One or more non-blasting rock removal methods would be attempted prior to utilizing controlled blasting to remove rock. These rock removal methods include conventional excavation with an excavator, ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator, hammering with a pointed backhoe attachment or pneumatic rock hammer, followed by removal by excavator, removal of material by rock trencher, and as a last resort - controlled blasting and excavation with a backhoe. The applicant states that no controlled blasting would be implemented in karst-prone geologic terrane or in wetlands. Controlled blasting would only be conducted in dry workplace conditions and in areas in which the risk of hydrologic loss has been determined to be low. Blasting is discussed in Section 4.1.6 in the FERC EIS.

Negative effects to the substrate are expected to be limited to the duration of construction and a short time after during restoration activities.

**Suspended particulates/turbidity**: National Pollutant Discharge Elimination System (NPDES) Permit, TDEC 401 WQC/ARAP

Pipeline installation across surface waters may have some localized and temporary increases in turbidity and Total Suspended Solids associated with the land disturbance, stream channel disturbance, and when required, preparation of rocks for blasting. The placement of construction mats, erosion and sediment controls, equipment crossings, or other structures over surface waters may also contribute to the resuspension of sediments during construction. The potential for adverse effects at stream crossings would be minimized by limiting construction time and by isolating steam flows from the open trench excavation in stream beds. Coffer dams would be installed across streams up and downstream of the workspace and the flow would be routed around trenches by

CE LRN-RD (File Number, LRN- 2021-00866)

use of flumes or pumps. Dry-trench crossings of streams are projected by the applicant to be completed within 1-2 days. Discharges from installation of the pipe and other attendant structures are subject to the TDEC NPDES permitting. The NPDES permit contains limits on the amount of total suspended solids.  Any increase in turbidity or total suspended solids (TSS) is expected to occur shortly after initiation of the crossing and may continue until the site is backfilled and stabilized. Potential for increases in turbidity and TSS would be further minimized by use of best management practices (BMPs) such as erosion and sedimentation controls.

The TDEC has authority for assessing potential effects to water quality. TDEC has determined that the temporary increase in turbidity and TSS would not violate water quality standards nor have long-term water quality effects and has issued an individual Section 401 water quality certification. The Project is expected to result in negligible effects from suspended particulates and turbidity.

**Water:** FERC EIS Section 4.3, Appendix G, TDEC 401/ARAP

FERC determined in section 4.3 of the EIS that impacts would be temporary and minor concerning increased water temperatures and depletion of dissolved oxygen levels.  They reported that the applicant does not anticipate that contaminated sediments would be encountered during construction of the proposed project. However, if contaminated sediments are discovered during construction, the applicant would implement protocols outlined in its Spill Prevention Control Plan (SPCP) and work with federal and state agencies to develop appropriate avoidance and mitigation procedures.

**Current patterns and water circulation**:

Most of the proposed crossings include excavation of the trench, installation of the pipe, and backfill and restoration of the trench and construction area to original elevations. The temporary impacts to wetlands and streams on water circulation is expected to be negligible due to the routing of flows past the construction site and the short time required to complete a crossing. Disturbed areas would be restored to original elevations and stabilized to prevent long-term impacts to circulation of water.

Any adverse effects are anticipated to be temporary and minor in the short-term.

**Normal water fluctuations:** FERC EIS Section 4.1

All impacts associated with temporary placement of fill at crossings of waters are expected to be temporary. These impacts have potential to affect normal water fluctuation in wetlands and waterbodies during construction. The applicant conducted geologic and hydrotechnical hazard assessments which included karst terrain. Best practices and guidance are described in Section 4.1 of the FERC EIS.  The applicant would restore crossings to pre-construction contours following construction.

**Salinity Gradients:**

CE LRN-RD (File Number, LRN- 2021-00866)

No marine waters are in the project area.

## 6.4    Potential impacts on the living communities or human uses (Subparts D, E and F)

### 6.4.1   Potential impacts on the biological characteristics of the aquatic ecosystem (Subpart D 40 CFR 230.30)

The following has been considered in evaluating the potential impacts on biological characteristics (see Table 8):

| Table 8 – Potential Impacts on Biological Characteristics | | | | | | |
|---|---|---|---|---|---|---|
| Biological Characteristics | N/A | No Effect | Negligible Effect | Minor Effect (Short Term) | Minor Effect (Long Term) | Major Effect |
| Threatened and endangered species | | | | X | | |
| Fish, crustaceans, mollusks, and other aquatic organisms | | | | X | | |
| Other wildlife | | | | | X | |

Discussion:

**Threatened and endangered species:** FERC EIS Section 4.6

FERC's EIS evaluated any potential impacts that may occur to threatened and endangered species (T&E).  FERC is responsible as the lead federal agency for the Cumberland Project for consultation with USFWS under Section 7 of the ESA.  The USFWS and the Tennessee Wildlife Resources Agency (TWRA) concurred with the applicants' preliminary list of species proposed for surveys on June 14, 2021 and July 21, 2021, respectively. General habitat surveys were conducted by the applicant between June 2021 and January 2022, during which potential for suitable habitat for listed species was assessed. Additional consultations and site-specific surveys were conducted for two species of freshwater mussels and three species of bats.

CE LRN-RD (File Number, LRN- 2021-00866)

| Common Name | Scientific Name | Status (Fed/State) | Preferred Habitat | Habitat Present? | Determination of Effect/Impact Analysis |
|---|---|---|---|---|---|
| **Birds** | | | | | |
| Bald Eagle | *Haliaeetus leucocephalus* | BGEPA/D | Larger mature trees - usually found near larger waterways | No | No impact |
| **Flowering Plants** | | | | | |
| Ridge-stem false foxglove | *Agalinis oligophylla* | None/SE | Pine savannas and chalky outcrops | No | No impact |
| Price's potato-bean | *Apios priceana* | FT/SE | Sightly disturbed areas such as forest openings, woodland edges, and where bluffs descend to streams | Yes | NLAA/no significant impact |
| Butternut | *Juglans cinerea* | None/ST | Stream benches and areas with good drainage | Yes | No significant impact |
| Short's bladderpod | *Physaria globosa* | FE/SE | Slopes and stream and rivers | Yes | NLAA/no significant impact |
| Grassleaf arrowhead | *Sagittaria graminea* | None/ST | Streams and areas with standing water | Yes | No significant impact |
| Sand grape | *Vitis rupestris* | None/SE | Streams and stream banks | Yes | No significant impact |
| Broadleaf bunchflower | *Melanthium latifolium* | None/SE | Rocky forest slopes | Yes | No significant impact |
| **Freshwater Mussels** | | | | | |
| Rabbitsfoot | *Quadrula cylindrica cylindrica* | FT/None | Small to medium sized streams and large rivers with clear shallow water | Yes | NLAA |
| Tan riffleshell | *Epioblasma florentina walkeri* | FE/None | Small to medium sized streams and large rivers with cobble or gravel shoals | Yes | NLAA |
| **Mammals** | | | | | |
| Gray bat | *Myotis grisescens* | FE/SE | Caves in limestone karst areas, forages in streams, ponds, and wetlands | Yes | NLAA |
| Indiana bat | *Myotis sodalis* | FE/SE | Woodland edges and forest openings where trees are warmed by the sun, forages in in forested stream corridors, upland and bottomland forests, forested wetlands, and along wooded edges of agricultural fields, pastures, and impounded bodies of water | Yes | NLAA |
| Northern long-eared bat | *Myotis septentrionalis* | FE/SE | Winter in caves, abandoned mines, and cave-like structures, summer beneath exfoliating bark or in crevices of both live and dead trees, forages below the canopy of mature forests on hillsides and roads, and occasionally over forest clearings and along riparian areas | Yes | NLAA |
| Tricolored bat | *Perimyotis subflavus* | Proposed FE | Winter in caves and mines, although in the southern U.S. Where caves are sparse tricolored bats are often found roosting in road-associated culverts. During the spring, summer and fall, tricolored bats are found in forested habitats where they roost in trees, primarily among leaves. | Yes | NLAA |
| **Reptiles** | | | | | |
| Northern pinesnake | *Pituophis melanoleucus* | None/ST | Well-drained, sandy soils, especially in pine or mixed pine-hardwood forests | No | No impact |

FE - Federally Endangered, FT = Federally Threatened, SE = State Endangered, ST = State Threatened
NLAA = Not Likely to Adversely Affect, BGEPA = Bald and Golden Eagle Protection Act, D = Deemed in Need of Management

Figure 4: FERC ESA Determinations

BMPs would be installed prior to construction and maintained in accordance with the Stormwater Pollution Prevention Plan (SWPPP). U.S. Fish and Wildlife Service (USFWS) would require a restriction on timing for clearing trees to minimize impacts to bat habitat. According to the FERC EIS the applicant has agreed to USFWS' recommendation to clear trees only between October 15 and March 31 to avoid impacting bat species and minimizing maintenance mowing between April 1 and October 15 to benefit bats that may potentially be roosting or nesting within the project area. Additional mitigation measures for impacts to aquatic and wildlife resources are

CE LRN-RD (File Number, LRN- 2021-00866)

discussed in detail in section 4.6 of the FERC EIS. USFWS has concurred with FERC's determinations of the project's effects on federally listed species and habitat. Fish, crustaceans, mollusks, and other aquatic organisms:  FERC EIS Section 4.4

Potential effects on fish and aquatic macroinvertebrate communities includes temporary changes in physical habitat (including flow) during construction, alteration of riparian vegetation within the ROW at stream and wetland crossings, and temporary effects on water quality from the potential for increased turbidity and TSS in the water column during construction. There is no permanent loss of aquatic resources proposed as part of the proposed project.

Of the 146 waterbodies that would be crossed by the proposed project, 67 of the waterbodies are ephemeral, 34 are intermittent and 38 are perennial.  No impact is anticipated to organisms where the pipe would cross a waterbody via an HDD or bore method except in the event of a "frac-out" (inadvertent loss of drilling fluid). The applicant has developed contingency procedures in the case of a frac-out. Trenching across waterbodies may impact aquatic organisms during the duration of trenching, pipe installation, backfilling, and initial restoration. According to the applicant, durations of construction activity using an open-trench crossing installation would range from 1-2 days. The resources would be restored to pre-construction contours after construction.  There are no federally listed fish species or designated critical habitat for fish or Essential Fish Habitat (EFH) in the Project area. Where the dam-and-pump method is proposed, the applicant would screen the pump intakes to minimize the potential for entrainment of fish and other aquatic organisms. The applicant also would implement FERC's Procedures, which include BMPs to avoid, minimize, and mitigate potential impacts during waterbody crossings, such as limiting equipment in streams to only that which is necessary and minimizing clearing of stream bank vegetation.

The applicant would undertake additional minimization efforts through excluding construction during times when aquatic organisms, mainly fish, could be most susceptible to impacts. Effects to aquatic organisms are anticipated but they would be minor in the short term. Erosion and sediment control measures and other BMPs are described in the FERC EIS and required in the TDEC WQC/ARAP.

Other wildlife: Section 4.6 FERC EIS

Short-term impacts on wildlife would potentially include displacement of individuals from construction areas and adjacent habitats, including pollinator species such as birds, bees, and butterflies; and the direct mortality of smaller, less mobile animals such as snails, that are not able to leave the active construction area. Long-term and permanent impacts would include permanent conversion of forested or scrub-shrub habitat along the maintained right-of way. The applicant is minimizing alteration of undisturbed areas by generally locating the Project adjacent or generally parallel to an existing TVA powerline easement and other utility easements, therefore avoiding additional fragmentation of contiguous habitats. Restricted time periods for right-of-way maintenance would also minimize effects to breeding birds. Tennessee Gas Pipeline Company, LLC would avoid maintenance mowing activities between April 1 through

CE LRN-RD (File Number, LRN- 2021-00866)

October 15.  FERC determined that the project would have "no impacts" or "no significant impacts" on state-listed species.  Wildlife concerns are covered in Section 4.6 of the EIS.

6.4.2  Potential impacts on special aquatic sites (Subpart E 40 CFR 230.40)

The following has been considered in evaluating the potential impacts on special aquatic sites (see Table 10):

| Table 10 – Potential Impacts on Special Aquatic Sites | | | | | | |
|---|---|---|---|---|---|---|
| Special Aquatic Sites | N/A | No Effect | Negligible Effect | Minor Effect (Short Term) | Minor Effect (Long Term) | Major Effect |
| Sanctuaries and refuges | X | | | | | |
| Wetlands | | | | | X | |
| Mud flats | X | | | | | |
| Vegetated shallows | X | | | | | |
| Coral reefs | X | | | | | |
| Riffle pool complexes | | | X | | | |

Discussion:  There are no sanctuaries, refuges, mud flats, vegetated shallows, or coral reefs located within the project area. There are seven wetlands located within the project's pipeline alignment. Compensatory mitigation would be provided by purchasing 1.44 wetland credits from Tennessee Mitigation Fund in the Lower Cumberland River Service Area for the proposed project. Only 0.03 acres of wetlands are expected to have long-term effects due to easement maintenance (removal of woody vegetation would change PFO wetlands to PEM wetlands). The majority of wetland impacts are temporary where preconstruction contours would be restored at the completion of construction. All impacts to wetlands would be minor.

General construction measures to mitigate adverse impacts include:

• limiting the construction right-of-way width in wetlands to 75 feet.
 • limiting construction equipment in wetlands to that needed to clear the right-of-way, excavate the trench, fabricate the pipe, install the pipe, backfill the trench, and restore the right-of-way.
• installing sediment barriers prior to ground-disturbing activities near wetlands and maintaining these barriers throughout construction.
• Use of timber mats, prefabricated equipment mats, or terra mats on wet soils;
 • using low ground weight equipment or operating equipment on timber matting on saturated soils or where standing water is present; and
• installing trench plugs as necessary to prevent a french-drain effect and maintain the original wetland hydrology.

CE LRN-RD (File Number, LRN- 2021-00866)

Further, no indirect impacts on any downgradient wetlands from construction activities are expected due to placement of erosion controls and other measures outlined in the Project's Environmental Construction Management Plan (ECMP). Stream/riffle pool complexes would be temporarily disturbed during trenching and backfilling during construction of the pipeline. The fluvial processes responsible for formation and maintenance of riffles and pools are controlled at the watershed scale and would remain intact. Stream substrates at crossings are expected to return to natural conditions post-construction as subsequent high-water events redistribute stream bedload over the backfilled trenches.

6.4.3   Potential impacts on human use characteristics (Subpart F 40 CFR 230.50)

The following has been considered in evaluating the potential impacts on human use characteristics (see Table 11):

| Table 11 – Potential Effects on Human Use Characteristics | | | | | | |
|---|---|---|---|---|---|---|
| Human Use Characteristics | N/A | No Effect | Negligible Effect | Minor Effect (Short Term) | Minor Effect (Long Term) | Major Effect |
| Municipal and private water supplies | | | X | | | |
| Recreational and commercial fisheries | | X | | | | |
| Water-related recreation | | | X | | | |
| Aesthetics | | | X | | | |
| Parks, national and historical monuments, national seashores, wilderness areas, research sites, and similar preserves | X | | | | | |

Discussion:

**Municipal and private water supplies:** FERC EIS Section 4.3

There are no EPA designated sole source aquifers in the vicinity of the project.  Wellhead protection areas were reviewed by the applicant.  Yellow Creek is the only source of water in the wellhead and water protection areas that could be impacted by the project.  Yellow Creek is proposed to be crossed via HDD, and the applicant anticipates that no impacts on wellhead and water protections would occur from the proposed project.  The applicant identified 62 wells and springs near project construction workspaces. The majority of the wells identified were open hole wells with steel or galvanized casing.  The applicant proposed to monitor public and private groundwater supply wells and potable springs within 150 feet of the pipeline construction areas where no karst terrain is present, or within 1,000 feet of the

CE LRN-RD (File Number, LRN- 2021-00866)

construction areas where karst terrain is present. With well-owner permission, Tennessee Gas Pipeline Company, LLC would conduct pre- and post-construction monitoring of water quality and yield using a qualified, independent contractor to conduct well sampling. Landowners with water supplies located outside of the monitoring area also may request pre- and/or post-construction water sampling. With adherence to the measures included in the FERC EIS, construction impacts on water supply would be negligible.

**Recreational and commercial fisheries**: FERC EIS Section 4.4

There are no federally listed fish species or designated critical habitat for fish or EFH in the Project area. The majority of the streams to be crossed do not support water-related recreation and/or commercial fisheries.  Jones Creek and Yellow Creek would support recreation and public fishing opportunities; however, these streams are to be crossed by HDD, which would not impact these opportunities. The proposed project would have no effects on recreational and commercial fisheries.

**Water-related recreation:**

The majority of the streams to be crossed do not support water-related recreation and/or commercial fisheries.  Jones Creek and Yellow Creek would support recreation and public fishing opportunities; however, these streams are to be crossed by HDD, which would not impact these opportunities. The proposed project would have no effect to water related recreation.

**Aesthetics:**

The majority of this pipeline is co-located (80%+) with other utility easement. The duration of potential Project impacts on visual resources along the pipeline rights-of way is likely to be limited to a couple days during active construction.  During construction, the greatest impacts would be caused by clearing of vegetation, as well as the presence of workers and construction equipment.  The effects to aesthetics are expected to be negligible.

**Parks, national and historical monuments, national seashores, wilderness areas, research sites, and similar preserves:**

No parks, national and historic monuments, seashores, wilderness areas, research sites, and/or similar preserves are located within the project site.

6.5    Pre-testing evaluation (Subpart G, 40 CFR 230.60)

The following has been considered in evaluating the biological availability of possible contaminants in dredged or fill material (see Table 12):

**App-0245**

CE LRN-RD (File Number, LRN- 2021-00866)

| Table 12 – Possible Contaminants in Dredged/Fill Material | |
|---|---|
| Physical substrate characteristics | X |
| Hydrography in relation to known or anticipated sources of contaminants | |
| Results from previous testing of the material or similar material in the vicinity of the project | X |
| Known, significant sources of persistent pesticides from land runoff or percolation | |
| Spill records for petroleum products or designated hazardous substances (Section 311 of the Clean Water Act) | |
| Other public records or significant introduction of contaminants from industries, municipalities, or other sources | X |
| Known existence of substantial material deposits of substances which could be released in harmful quantities to the aquatic environment by man-induced discharge activities | |

Discussion: Discussion: Section 4.2.2 of FERC's EIS addresses hazardous materials, solid waste, and pollution prevention. Testing performed (including compressor station facilities) indicated that the pipeline system in the area of the Project was confirmed to have concentrations of less than 50 parts per million (ppm) polychlorinated biphenyl (PCB) and was not regulated under Toxic Substance Control Act. The EPA NEPA assist program was utilized to identify Brownfields, Superfund, Toxic Release (TRI), Toxic Substance Control Act (TSCA), or Resource Conservation and Recovery Act (RCRA) sites in or adjacent to Project areas. No such sites were identified within the immediate Project area (EPA 2022a); however, six sites identified as TRI, TSCA, and/or RCRA sites were identified within a 3-mile radius of the northern end of the proposed project. Section 4.2.3 of the EIS provides mitigative measures to minimize any contamination issues. The applicant does not anticipate encountering contaminated sediments. If contaminated sediments are identified during construction, TGP would implement protocols outlined in its SPCP. Notification to appropriate federal and state agencies would be made if any hazardous materials are encountered on the site during excavations to ensure proper disposal.

Due to the availability of constraints to reduce contamination to acceptable levels within the disposal site, which would prevent contaminants from being transported beyond the boundaries of the disposal site, it has been determined that testing is not required.

6.6     Evaluation and testing (Subpart G, 40 CFR 230.61)

Discussion: See discussion above in Section 6.5.

6.7     Actions to minimize adverse impacts (Subpart H)

The following actions, as appropriate, have been taken through application of 40 CFR 230.70-230.77 to ensure no more than minimal adverse effects of the proposed discharge (see Table 13):

CE LRN-RD (File Number, LRN- 2021-00866)

| Table 13 – Actions to Minimize Adverse Effects | |
|---|:---:|
| Actions concerning the location of the discharge | X |
| Actions concerning the material to be discharged | X |
| Actions controlling the material after discharge | X |
| Actions affecting the method of dispersion | X |
| Actions related to technology | X |
| Actions affecting plant and animal populations | X |
| Actions affecting human use | X |
| Other actions | |

Discussion: Discussion: All actions and minimization measures as described above are addressed throughout FERC's EIS, TDEC's Water Quality Certification/ARAP, and throughout this combined decision document for the proposed project. These effects would also be addressed in SWPPP plan for the project. Mitigation is being provided by the applicant to offset wetland type conversion impacts.

6.8    Factual Determinations (Subpart B, 40 CFR 230.11)

The following determinations are made based on the applicable information above, including actions to minimize effects and consideration for contaminants (see Table 14):

| Table 14 – Factual Determinations of Potential Effects | | | | | | |
|---|---|---|---|---|---|---|
| Site | N/A | No Effect | Negligible Effect | Minor Effect (Short Term) | Minor Effect (Long Term) | Major Effect |
| Physical substrate | | | | X | | |
| Water circulation, fluctuation and salinity | | | | X | | |
| Suspended particulates/turbidity | | | | X | | |
| Contaminants | | | X | | | |
| Aquatic ecosystem and organisms | | | | X | | |
| Proposed disposal site | | | | X | | |
| Cumulative effects on the aquatic ecosystem | | | | X | | |
| Secondary effects on the aquatic ecosystem | | | | X | | |

Discussion: The proposed work would have minor but short-term impacts to physical substrate, turbidity, cumulative effects and secondary effects to aquatic ecosystem.  These impacts are expected to be minor and temporary since the pipeline

CE LRN-RD (File Number, LRN- 2021-00866)

would be buried below the grade of stream channels in accordance with USDOT Pipeline and Hazardous Materials Safety Administration requirements, landowner requests, and permit conditions. According to the FERC EIS, except as depicted on site specific plans, the depth of cover for the pipeline would be in accordance with Tennessee's minimum specifications as shown in the below table.   The applicant states that all buried pipelines would be installed with a minimum cover of 48 inches of soil or 24 inches of consolidated rock between the top of the pipe and the underwater natural bottom.

| Table 15 – Tennessee Minimum Specification for Depth of Cover (inches) | | |
|---|---|---|
| Location[a/] | Normal Soil | Consolidated Rock |
| USDOT PHMSA Class 1 | 30 | 18 |
| USDOT PHMSA Class 2, 3, and 4 | 36 | 24 |
| Land in agriculture | 48 | 24 |
| Drainage ditches of public roads or railroad crossings | 60 | 24 |

a/ As defined by USDOT PHMSA at 49 CFR 192.5.
Class 1: offshore areas and areas within 220 yards of a pipeline with ≤10 buildings intended for human occupancy.
Class 2: areas within 220 yards of a pipeline with >10 but <46 buildings intended for human occupancy.
Class 3: areas within 220 yards of a pipeline with >46 buildings intended for human occupancy and areas within 100 yards of either a building or a small, well defined outside area (such as a playground, recreation area, outdoor theater, or other place of public assembly) that is occupied by 20 or more persons on at least five days a week for 10 weeks in any 12-month period.
Class 4: areas within 220 yards of a pipeline where buildings with four or more stories are prevalent.

Fluvial processes operating at the watershed scale would not be affected by the short-term construction disturbance across channels. Stream morphology (riffles and pools, etc.) is dynamic and is controlled by the fluvial processes. Local stream morphology would revert to natural dimensions as it responds to these fluvial processes.  Natural stream substrates (via bedload) would return to natural conditions within short time frames. Minor effects to flow patterns across the affected stream reach are expected to occur during and immediately after the construction of the crossing but are expected to return to normal post construction as the stream morphology and substrates adjust naturally.

6.9    Findings of compliance or non-compliance with the restrictions on discharges (40 CFR 230.10(a-d) and 230.12)

Based on the information above, including the factual determinations, the proposed discharge has been evaluated to determine whether any of the restrictions on discharge would occur (see Table 16):

| Table 16 – Compliance with Restrictions on Discharge | | |
|---|---|---|
| Subject | Yes | No |
| 1. Is there a practicable alternative to the proposed discharge that would be less damaging to the environment (any alternative with less aquatic resource effects, or an alternative with more aquatic resource effects that avoids other significant adverse | | X |

CE LRN-RD (File Number, LRN- 2021-00866)

| Table 16 – Compliance with Restrictions on Discharge | | |
|---|---|---|
| Subject | Yes | No |
| environmental consequences?) | | |
| 2. Will the discharge cause or contribute to violations of any applicable water quality standards? | | X |
| 3. Will the discharge violate any toxic effluent standards (under Section 307 of the Clean Water Act)? | | X |
| 4. Will the discharge jeopardize the continued existence of endangered or threatened species or their critical habitat? | | X |
| 5. Will the discharge violate standards set by the Department of Commerce to protect marine sanctuaries? | | X |
| 6. Will the discharge cause or contribute to significant degradation of waters of the United States? | | X |
| 7. Have all appropriate and practicable steps (Subpart H, 40 CFR 230.70) been taken to minimize the potential adverse impacts of the discharge on the aquatic ecosystem? | | X |

Discussion:

Based on consideration of the sections above, it has been determined that the proposed discharge of dredged and fill material would not:

1.  Violate any applicable State water quality standard. The water quality certifying authority with jurisdiction, TDEC, issued a conditioned Section 401 Water Quality Certification for the discharge of fill material into waters in association with the Applicant's proposed Project as described in Section 1.3.

2.  Cause or contribute to violations of any applicable water quality standards and would not violate any toxic effluent standards under section 307 of the CWA.

3.  Jeopardize the continued existence of any species listed as endangered or threatened species under the Endangered Species Act of 1973 (ESA) or their critical habitat. See Section 6.4.1 for species effects determinations. The USFWS concurred with the FERC determinations and the Project would not likely adversely affect any federally listed T&E species.

4.  Violate any requirement imposed by the Department of Commerce to protect marine sanctuaries under Title III of the Marine Protection, Research, and Sanctuaries Act of 1972. This is not applicable as there are no marine sanctuaries in the Project area.

Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted which would cause or contribute to significant degradation of waters of the U.S. [40 CFR 230.10(c)]

CE LRN-RD (File Number, LRN- 2021-00866)

Findings of significant degradation related to the proposed discharge shall be based upon appropriate factual determinations, evaluations, and tests, which are required by the Section 404(b)(1) Guidelines under subparts B and C, after consideration of subparts C through F. The discharge shall not be permitted if it:

> (1) Causes significant adverse effects through pollutants on human health or welfare, municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites. These factors for the proposed Project have been thoroughly evaluated above.

> (2) Causes significant adverse effects through pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems. These factors for the proposed Project have been thoroughly evaluated above.

> (3) Causes significant adverse effects through pollutants on aquatic ecosystem diversity, productivity, and stability to the loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy. These factors for the proposed Project have been thoroughly evaluated above.

> (4) Causes significant adverse effects through pollutants on recreational, aesthetic, and economic values. These factors for the proposed Project have been thoroughly evaluated above.

No significant adverse effects from pollutants would occur on the resources described in (1)-(4) above provided the Applicant complies with all approved permits including general and special conditions of those permits. The Project is compliant with the Section 404(b)(1) Guidelines.

## 7.0  General Public Interest Review (33 CFR 320.4 and Regulatory Guidance Letter 84-09)

The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest as stated at 33 CFR 320.4(a).  To the extent appropriate, the public interest review below also includes consideration of additional policies as described in 33 CFR 320.4(b) through (r). The benefits which reasonably may be expected to accrue from the proposal are balanced against its reasonably foreseeable detriments.

7.1    Public interest factors review

All public interest factors have been reviewed and those that are relevant to the proposal are considered and discussed in additional detail (see below Table 17):

CE LRN-RD (File Number, LRN- 2021-00866)

| Table 17 – Public Interest Factors | None | Detrimental | Neutral (mitigated) | Negligible | Beneficial | Not Applicable |
|---|---|---|---|---|---|---|
| **Factor** | | | | | | |
| 1. Conservation | | | | X | | |
| 2. Economics | | | | | X | |
| 3. Aesthetics | | | | X | | |
| 4. General Environmental Concerns | | | | X | | |
| 5. Wetlands | | | X | | | |
| 6. Historic Properties | X | | | | | |
| 7. Fish and Wildlife Values | | | | X | | |
| 8. Flood Hazards | X | | | | | |
| 9. Floodplain Values | | | | X | | |
| 10. Land Use | | | | X | | |
| 11. Navigation | | | X | | | |
| 12. Shoreline Erosion and Accretion | | | X | | | |
| 13. Recreation | | | | X | | |
| 14. Water Supply and Conservation: | | | | X | | |
| 15. Water Quality | | | X | | | |
| 16. Energy Needs | | | | X | | |
| 17. Safety | | | X | | | |
| 18. Food and Fiber Production | | | | X | | |
| 19. Mineral Needs | X | | | | | |
| 20. Consideration of Property Ownership | | | X | | | |
| 21. Needs and Welfare of the People | | | | | X | |

Additional discussion of effects on factors above:

CE LRN-RD (File Number, LRN- 2021-00866)

Conservation:
FERC's EIS addresses conservation measures of various factors such as aesthetics, water, energy, water resources, soil, water quality, land use, vegetation, wildlife, etc.  The Natural Resources Conservation Service (NRCS) confirmed in consultation with FERC that no Conservation Reserve Program property or NRCS controlled easements would be impacted by the Project. No known public or conservation lands have been identified that would be impacted by the proposed Project facilities.  The applicant has proposed to minimize impacts to conservation by restricting construction and additional workspace to the minimum necessary and following existing infrastructure for the majority of the ROW which would reduce habitat fragmentation.  The Corps has determined that the project would have a negligible impact on conservation.  See the appropriate sections within the EIS for discussion.

Economics:
Corps regulations specify that when the applicant is a private enterprise, it is generally assumed that appropriate economic evaluations have been completed, and that the proposal is economically viable, and needed in the marketplace (33 CFR 320.4(q)).

Project construction would occur over a 12-month period and the average construction workforce would range between 300-400 workers, of which 90 percent would be non-local (between 270 and 360 people). In addition to construction payroll and some purchases of locally sourced construction materials and services, TGP would pay property taxes based on the value of the Project facilities to the local government, increasing the tax revenue for these local communities. TGP estimates that $2,400,000 in ad valorem taxes would be generated by the proposed project on an annual basis on average over the first 10 years of operations. Ad valorem taxes are anticipated to be paid annually at similar or higher levels for the remaining life of the Project.  Due to the short-term nature of the construction period, it is expected construction workers would rely on short-term housing options such as hotels and campgrounds, rather than long-term rental or permanent housing thus, expecting to economically benefit the local hotels and campgrounds. TGP estimates approximately 339 hotel and motel rooms and up to 56 areas for campsites and cabin rental in the immediate vicinity (and not including availabilities in Clarksville and Nashville areas). TGP states this would be sufficient to accommodate the 270 to 360 non-local construction workers during construction.  Economic benefits would also be realized by the equipment, pipe suppliers, and associated material suppliers from the purchase of the items.  Additionally, local restaurants, convenience stores, grocery stores, etc., are expected to economically benefit from the influx of the additional workers in the area.  The Corps has determined that the proposed project would have a beneficial impact on economics.  Economic benefits from the project are discussed throughout the EIS.

Aesthetics:
The proposed project would not cross or be within 0.25 mile of any NPS lands, Wildlife Management Areas, state forests, Indian reservations, or lands held in the Wetland Reserve Program, Emergency Conservation Program, or Grassland Reserve Program.  There are no hospitals, schools, landfills, orchards, nurseries, specialty

App-0252

CE LRN-RD (File Number, LRN- 2021-00866)

crops, remnant prairies, old growth forests, registered natural landmarks, areas of critical environmental concern, wilderness areas designated under the Wilderness Act, wilderness study areas, National Primitive Areas, National Scenic Areas, National Scenic Research Areas, National Wild and Scenic Rivers, National Recreation Areas, National Game Refuges and Wildlife Preserves, National Monument Areas, National Volcanic Monument Areas, National Historic Areas, National Forests, National Protection Areas, Special Management Areas, Natural Botanical Areas, Recreation Management Areas, Scenic Recreation Areas, Scenic Wildlife Areas, or other designated natural areas within 0.25 mile of the proposed Project disturbance area. Impacts to aesthetics would occur mainly to the transition of forested areas to open maintained ROW.  Impacts to the residents' aesthetics in the area would mainly be temporary during construction from the presence of equipment, undisturbed dirt, construction workers and additional trucks.  Post construction, these impacts would not be present.  The Corps has determined that the proposed project would have a negligible impact to aesthetics.

General Environmental Concerns:
General environmental concerns that were identified and are not standard public interest topics include noise, air quality, impacts to karst features, and greenhouse gas emissions including contribution to climate change.

The majority of environmental impacts associated with the project within the Corps authority are temporary stream impacts, some temporary wetland impacts, and minor permanent wetland type conversion due to ROW maintenance.

FERC evaluated potential noise impacts in Section 4.11 of the EIS.  FERC has adopted a criterion from the EPA that indicates that a day light noise level of 55 A decibels protects the public from indoor and outdoor activity interference.  Sound-level impacts during construction would be highly localized and attenuate quickly as the distance from the sound source increases. Based on the short-term and temporary nature of construction-related activities, FERCs noise recommendation for HDD drilling, and the applicant's commitment to construct non-HDD Project components primarily during the daytime hours, FERC determined that impacts from the proposed project are not expected to significantly contribute to cumulative impacts on noise levels during construction.

FERC evaluates potential impacts to air quality in Section 4.10 of the EIS.  FERC determined that construction-related exhaust emissions and fugitive dust would result in short-term, localized impacts in the immediate vicinity of construction work areas. In order to minimize construction emissions, the applicant would comply with all fugitive dust requirements specified in Section 4.10.3 of the EIS and would generally limit ground disturbance to the areas needed to install the Project.

A Phase 1 Assessment was performed and indicated the possible presence of 31 karst features along the proposed pipeline route. An additional karst feature was identified in the field during surveys. After a detailed field assessment, 12 of the 32 features were confirmed karst features; however, 8 of the karst features were identified as occurring

CE LRN-RD (File Number, LRN- 2021-00866)

within or close enough to the Project to pose a hazard to construction and/or operation. Geophysical investigations were completed at 7 of the 8 features (landowner permission was not granted for one of the eight features). Based on the results of geophysical surveys, significant subsurface karst features are not anticipated, and site-specific mitigation plans would not be required.  However, a Project-specific Karst Hazards Mitigation Guidance Plan would be followed during construction through all karst areas identified along the Project route to address any unexpected conditions and to minimize the risk of any construction-related issues associated with constructing in karst-prone regions. Additional details regarding the locations of potential and confirmed karst features are included in section 4.1 of the FERC EIS.

The proposed activities within the Corps' federal control and responsibility likely would result in a negligible release of greenhouse gases into the atmosphere when compared to global greenhouse gas emissions. Greenhouse gas emissions have been shown to contribute to climate change. Aquatic resources can be sources and/or sinks of greenhouse gases. For instance, some aquatic resources sequester carbon dioxide whereas others release methane; therefore, authorized impacts to aquatic resources can result in either an increase or decrease in atmospheric greenhouse gas. Greenhouse gas emissions associated with the Corps' federal action may also occur from the combustion of fossil fuels associated with the operation of construction equipment. The Corps has no authority to regulate emissions that result from the combustion of fossil fuels. These are subject to federal regulations under the Clean Air Act and/or the Corporate Average Fuel Economy (CAFE) Program. Greenhouse gas emissions from the Corps' action have been weighed against national goals of energy independence, national security, and economic development and determined not contrary to the public interest. An analysis of greenhouse gas emissions was conducted by FERC in the EIS, with climate change addressed in Section 4.13.10.

The Corps has determined that the proposed project would have negligible impacts on general environmental concerns.

Wetlands:

TGP performed wetland delineation surveys between June 2021 and April 2022. On August 23 and September 14, 2022, TDEC conducted field investigations and requested modifications to the pipeline route and workspaces to avoid impacts to two emergent wetlands (located at MP 10.6 and MP 17.05) that had been previously delineated as ponds but were reclassified as wetlands by TDEC. Additionally, wetland acreage revisions resulted from TDEC's expansion of the boundaries of two delineated wetlands at MP 30.1 and MP 29.0. These changes were incorporated into supplements submitted by the applicant to the Corps and to TDEC on September 30, 2022, and are reflected in the Project impacts described in the EIS. The Corps issued a preliminary jurisdictional determination of the Project's potential waters of the U.S. on January 4, 2023.  Wetlands are addressed in Section 4.3.3 of FERC's EIS.  Seven wetland areas, totaling 0.69 acres (0.07 acre of PFO wetland and 0.62 acre of PEM wetlands), would be disturbed during pipeline construction.  By letter dated August 15, 2023, the applicant provided a letter from the Tennessee Mitigation Fund stating they have reserved 1.44 wetland credits in the Lower Cumberland River Service Area for the

CE LRN-RD (File Number, LRN- 2021-00866)

proposed project.  Monitoring of impacts and restoration sites would be required as outlined in the post construction monitoring plan.  The Corps has determined that the proposed project would have a neutral impact to wetlands (mitigated).  Additional wetland onsite mitigation measures are discussed in FERC's EIS, Section 4.3.3.1.

Historic Properties:
As a result of surveys of the pipeline alignment, sites were identified.  SHPO concurred that the proposed project has no potential to cause effects to historic properties listed or eligible to be listed in National Register for Historic Places (NRHP).  See Section 4.9 of FERC's EIS for detailed information regarding evaluation of historic, architectural, and archeological properties.

Fish and Wildlife Values:
Based on the potential presence of two freshwater mussels (Rabbitsfoot and Tan Riffle Shell) within the streams, eight stream crossings that exhibited potential mussel habitat was surveyed by qualified biologists.  The sites were surveyed on September 8 and 9, 2021. All suitable substrates at each crossing site, upstream and downstream, were assessed.  Neither the rabbitsfoot nor tan riffleshell was found during the survey; only the painted creekshell (Villosa taeniata), a common species, was documented. As no protected mussel species were identified at Project stream crossings, and TGP would use BMPs outlined in its Procedures to minimize impacts on aquatic habitats, the USFWS agreed with the applicant's determination that the proposed project is not likely to affect the rabbitsfoot and tan riffle shell mussels.  Other aquatic/fish habitat would be impacted during construction of the pipeline crossing.  The crossing sites are to be restored to normal conditions post-construction; thus, any impacts to fish/aquatic habitat would be temporary and minor.    Temporary to short term impacts on wildlife would potentially include displacement of individuals from construction areas and adjacent habitats, including pollinator species such as birds, bees, and butterflies; and the direct mortality of smaller, less mobile animals such as small mammals, reptiles, and amphibians that are not able to leave the active construction area. Long-term and permanent impacts would include permanent conversion of forested or scrub-shrub habitat for ROW and periodic disturbance of wildlife during operation and maintenance. Altered habitat, human presence, vehicular transit, and periodic disturbance could also increase wildlife mortality, injury, and stress.  Wildlife impacts are expected to be minimized by locating the Project adjacent or generally parallel to an existing TVA powerline easement and other utility easements, therefore avoiding additional fragmentation of contiguous habitats. TGP stated they would restrict time periods for ROW maintenance to minimize effects to breeding birds. Additionally, TGP would avoid maintenance mowing activities between April 1 and October 15 to benefit bats that may potentially be roosting or nesting within the project area. Increased noise and lighting during construction of the pipeline could cause some wildlife to disperse to similar adjacent habitats; however, these impacts would be temporary during construction.

Potential impacts on threatened and/or endangered (T&E) species have been evaluated (see Section 9.1.1 of this document and Section 4.6.4 of the EIS for additional information and USFWS coordination).  Additionally, TGP agreed to implement

V 30 AUG 2022

CE LRN-RD (File Number, LRN- 2021-00866)

recommendations provided by the USFWS to conduct clearing of trees between October 15 and March 31, to the greatest extent practicable.

The Corps has determined that the proposed project would have a negligible impact on fish and wildlife values.

Flood Hazards:
The pipeline would be completely buried underground; thus, post-construction, the project would not create any flood hazards. The Corps has determined that the proposed project would have no impact on flood hazards.

Floodplain Values:
The proposed project would cross FEMA Zones A and E (100-year) floodplains and regulatory floodways. The proposed project would not cross 500-year floodplains. TGP indicated they would coordinate with the appropriate floodplain administrators as necessary. The construction methods proposed for the pipeline crossings would not result in any permanent fill within floodplains, and temporary construction workspaces would be restored to pre-construction contours. Any impacts to floodplain values would be very minimal. The Corps has determined that the proposed project would have a negligible impact on floodplain hazards. Floodplain values are addressed within FERC's FERC EIS, Section 4.3.2.

Land Use:
The Project would temporarily disturb a total of about 507.5 acres of land during construction. Following construction, about 313.8 acres of temporary workspace would be restored to pre-construction conditions and uses, to the extent practicable. The remaining 193.7 acres would be retained for operation of the Project. General land requirements for the Project are provided in table 2.4-1 of the FERC EIS and are further discussed in detail in section 4.7. Lands affected by operation of the Project are primarily classified as agricultural and open land but also include forested uplands, wetlands, and open water. The typical construction right-of-way for the Cumberland Pipeline would be 100 feet wide in upland areas, including agricultural land, and 75 feet wide at wetland and waterbody crossings. After construction, TGP's permanent right-of-way would be 50 feet wide. The proposed pipeline is co-located along 25.77 miles of the 32-mile pipeline in order to minimize disturbance of new right-of-way alignments. The Corps has determined that the proposed project would have a negligible impact on land use.

Navigation:
Only one navigable waterway would be crossed by the pipeline project. The construction of this crossing would be by HDD which would not permanently nor temporarily impact navigable capacity of the waterway. The Corps has determined that the proposed project would have a neutral impact on navigation.

Shoreline Erosion and Accretion:
TGP and its contractor conducted a scour analysis along the entire pipeline route during the Project feasibility phase. Each stream crossing location was reviewed for evidence

CE LRN-RD (File Number, LRN- 2021-00866)

of geomorphic instabilities that could require modifications to standard pipeline burial depths, as established by Pipeline and Hazardous Materials Safety Administration (PHMSA) in 49 CFR 192.327(e). TGP determined that it could install the pipeline across waterbodies (other than field drains or roadside ditches) below the thalwegs of the streambeds to reduce the potential for scour-related damage. Generally, TGP would install the pipeline with a minimum cover of 30 inches between the streambed and the top of the pipeline, except at two streams (HT0079 and HT0100, located at MPs 22.8 and 26.43, respectively) where TGP determined that the streams could be subject to significant scouring during storm events. These two stream crossings would have a minimum of 5 feet of cover over the pipeline. In addition, the pipeline would be maintained and monitored in accordance with 49 CFR 192.   BMPs in place require that the stream and uplands must be properly stabilized to minimize erosion and turbidity from entering any waterways.  General construction BMPs (including silt fences, check dams, and other controls as appropriate) would be incorporated into construction plans to help prevent erosion, protect water quality, and ultimately to minimize potential impacts to surface water resulting from storm water runoff.  Some erosion may be experienced immediately during trenching of the crossing.  This is expected to be minimal and temporary.  As required by the CWA Section 402 NPDES permitting process, a SWPPP for the Proposed Action would be developed and implemented. The Corps has determined that the proposed project would have a neutral impact on shoreline erosion and accretion considering the above BMPs and minimization actions.

Recreation:
No parks, national and historic monuments, seashores, wilderness areas, research sites, and/or similar preserves are located within the project site.  See additional discussion of this and aesthetic impacts of the proposed project are discussed throughout the EIS.  The majority of the streams to be crossed do not support water-related recreation and/or commercial fisheries.  Jones Creek and Yellow Creek would support recreation and public fishing opportunities; however, these streams are to be crossed by HDD which would not impact these opportunities.   The Corps has determined that the proposed project would have negligible impact on recreation.

Water Supply and Conservation:
The Project does not directly impact any surface waters that are utilized for public water withdrawals (TDEC 2017).  However, in order to protect water supply sources downstream, BMPs would require the stream and uplands must be properly stabilized to minimize erosion and turbidity from entering any waterways.  General construction BMPs (including silt fences, check dams, and other controls as appropriate) are incorporated into construction plans to help prevent erosion, protect water quality, and ultimately to minimize potential impacts to surface water resulting from storm water runoff. In addition, BMPs would require measures to prevent or minimize the potential release of contaminants into surface waters, provide swift response to accidental spills, and define acceptable on-site storage of fuel and lubricants. In addition, BMPs would require measures to prevent or minimize the potential release of contaminants into surface waters, provide swift response to accidental spills, and define acceptable on-site storage of fuel and lubricants.  FERC identified 62 wells and springs located near the project area.  The applicant proposes to monitor public and private groundwater

CE LRN-RD (File Number, LRN- 2021-00866)

supply wells and potable springs within 150 feet of the pipeline construction areas where no karst terrain is present, and within 1,000 feet where karst terrain is present. With landowner permission the applicant has proposed to conduct pre and post construction monitoring of water quality. Landowners outside the set monitoring area also may request water sampling.  The applicant would also offer water sampling to all municipal and public groundwater wells within 400 feet of the project area.  The FERC EIS states that if impacts on private wells result from construction, the applicant would provide an alternative water source, repair any permanent damage, or otherwise restore the landowners' water source. See section 4.3.1 of the FERC EIS for additional information.  The Corps has determined that the proposed project would have negligible impact on water supply and conservation.

Water Quality:
Potential impacts on surface water resources include increases in turbidity and sedimentation, increased water temperatures, depletion of dissolved oxygen levels, and decreased water quality during and immediately following Project construction. However, these impacts would be temporary and minor.  TGP has committed to cross all waterbodies in accordance with its Procedures and SPCP, and applicable state and federal regulations and permit conditions. The proposed construction procedures would ensure that TGP would install erosion controls in accordance with its Procedures and SWPPP to minimize impacts during construction. Trench spoil would be placed at least 10 feet from the waterbody edge for use as backfill, and temporary erosion controls would be installed to prevent migration of trench spoil into the waterbody. TGP also would construct stream crossings during low-flow periods, when feasible, to minimize impacts on turbidity, and equipment working within the waterbody would be limited to the minimum necessary to construct the crossing. To limit the amount of time a stream is impacted during construction activities, TGP would clear vegetation on each side of the waterbody, install all sediment barriers, and prepare prefabricated segments of pipeline for installation prior to beginning the stream crossing. Stream crossings would be perpendicular to the flow to the extent practicable, to minimize the length of crossing. If necessary, the pipe used for stream crossings would be weighted to prevent flotation. Implementation of the Procedures during construction and post-construction monitoring would ensure that impacts on surface water resources are avoided and/or minimized and mitigated. Once the pipeline is installed, the waterbody banks would be restored to pre-construction conditions to the extent practicable.   General construction BMPs (including silt fences, check dams, and other controls as appropriate) would be incorporated into construction plans to help prevent erosion, protect water quality, and ultimately to minimize potential impacts to surface water resulting from storm water runoff. In addition, BMPs would require measures to prevent or minimize the potential release of contaminants into surface waters, provide swift response to accidental spills, and define acceptable on-site storage of fuel and lubricants.  Impacts to water quality are expected to be temporary and subside post-construction with implementation. TDEC has issued the required Water Quality Certification for the proposed project with conditions to further minimize impacts to water quality.  Based on the TDEC permit, the Corps has determined that the proposed project would have a neutral (mitigated) impact on water quality.

V 30 AUG 2022

**App-0258**

CE LRN-RD (File Number, LRN- 2021-00866)

Energy Needs:

The purpose of the project is to provide a new energy source to the TVA Cumberland Plant to retire the coal-fired power plant.  According to FERC's EIS, natural gas delivered by the Project to TVA's proposed Cumberland Gas Plant would provide fuel for two new natural gas-fired turbines (total output of 1,450 MW) that are intended to replace one coalfired power plant unit in 2026. The second unit would be retired by the end of 2028. TVA proposes to construct and operate a simple cycle Combustion Turbine plant.  The project is expected to benefit energy needs of the customers serviced by TVA Cumberland Plant while complying with policy to reduce fossil fuels.  The Corps has determined that the proposed project would have a beneficial impact on energy needs.

Safety:

The EIS states the new Project facilities would be designed, constructed, tested, operated, and maintained to conform with or exceed federal, state, and local requirements, including the U.S. Department of Transportation's (USDOT) regulations in 49 CFR 192, Transportation of Natural and Other Gas by Pipeline: Minimum Federal Safety Standards; FERC's Siting and Maintenance Requirements in 18 CFR380.15; and other applicable federal and state safety regulations. During construction and restoration of the Project, TGP would implement the measures contained in the following plans, in addition to other federal, state, and local permit requirements:

- FERC's Upland Erosion Control, Revegetation, and Maintenance Plan (FERC Plan) and Wetland and Waterbody Construction and Mitigation Procedures (FERC Procedures),
- Horizontal Directional Drill Monitoring, Inadvertent Return Response, and Contingency Plan(HDD Plan);
- Environmental Construction Management Plan (ECMP);
- Spill Prevention and Control Plan (SPCP);
- Plan for Unanticipated Discovery of Contaminated Environmental Media;
- Fugitive Dust Control Plan;
- Stormwater Pollution Prevention Plan (SWPPP);
- Exotic and Invasive Species Control Plan
- Revegetation Plan;
- Environmental Complaint Resolution Plan;
- Site-specific Plans for Major Waterbody Crossings; and
- Plan for the Unanticipated Discovery of Historic Properties or Human Remains During Construction (Unanticipated Discovery Plan).

Prior to initiating construction-related activities, TGP would contact the "One-Call" system of Tennessee, and underground utilities would be flagged by their respective operators. TGP would also perform utility locating at other areas suspected of containing other underground features. The Corps has determined that the proposed project would have a neutral (mitigated) impact on safety.

CE LRN-RD (File Number, LRN- 2021-00866)

Food and Fiber Production:
The pipeline would mainly be located in uplands that were utilized for agricultural uses (food and livestock production).  During construction of the pipeline, impacts to food and livestock production could be realized; however, impacts are expected to be minimal post-construction. To preserve soil productivity in agricultural lands, TGP proposes that up to 12 inches of topsoil would be segregated during grading and stored separately from subsoil. They would utilize full right-of-way topsoil segregation as required by landowner agreements, the NRCS District, or as appropriate based upon site specific conditions. During the backfilling and restoration phases, topsoil would be replaced, and any stones uncovered during construction that are larger than 4 inches would be removed or handled in accordance with individual landowner agreements. Any drain tiles damaged during construction would be repaired or replaced. Cleanup and restoration would leave the construction ROW in a condition similar to surrounding areas. The FERC EIS states that operation of the Project would affect 38.35 acres of agricultural land, most of which (38.06 acres) would be within the permanent right-of-way of the pipeline, where farming and grazing could resume immediately following restoration.  TGP stated they would compensate for the permanent loss of agricultural land according to the terms of individual landowner agreements. The Corps has determined that the proposed project would have negligible impacts to food and fiber production.

Mineral Needs:
There are four mineral resource locations identified along the proposed pipeline facilities, one in Stewart County adjacent to the Cumberland City Quarry, and three in Dickson County (USGS 2022a).  There is one historic quarry within 0.25 mile of the Project in the Cumberland City area, which is associated with the Cumberland City Quarry, a crushed stone surface mine that is no longer active, and two historic surface mines in Dickson County (USGS 2022a). The first Dickson County mineral resource identified is an iron prospect named Gillam Prospect, approximately 0.1 mile from the Project area in forested, undeveloped land. The second is an iron prospect named Stokes Ore Bank, approximately 0.1 mile from the Project area. Stokes Ore Bank was previously a surface mine, yet appears to be in forested, undeveloped land. The third identified is another iron prospect named Dry Creek Hollow Mines approximately 0.25 mile from the Project area, which was previously a surface mine, yet appears to be in forested, undeveloped land (USGS 2011). There are no identified mineral resources, or active or historical mines in Houston County (USGS 2011). The Project would have no anticipated effects on the identified mineral resources, and the Project would not be affected by the presence of these historical mines and quarry.  TGP stated that any mineral resources discovered in the Project area during construction would be avoided on a case-by-case basis, including but not limited to rerouting or narrowing the right-of-way width to avoid the resource. The Corps has determined that the proposed project would have no impact to mineral needs.

Consideration of Property Ownership:
Temporary construction impacts on residential areas may include inconvenience caused by noise and dust generated by construction equipment, personnel, and trenching of roads or driveways; ground disturbance of lawns; removal of trees,

CE LRN-RD (File Number, LRN- 2021-00866)

landscaped shrubs, or other vegetation screening between residences; potential damage to existing septic systems or wells; and removal of aboveground structures such as fences, sheds, or trailers from the right-of-way. TGP would maintain access for landowners to their homes and private property at all times except for the brief periods required for laying the new pipeline into the trench. TGP would advise landowners in advance of any planned temporary access limitations. Construction through or near residential areas would be done in a manner to ensure that all construction activities minimize adverse impacts on residences and that clean-up is prompt and thorough. Topsoil in landscaped lawns would be segregated and replaced or topsoil would be imported. Following pipe installation, TGP would require its contractor to backfill trenches in residential areas as soon as practicable after installation of the pipeline. Further, cleanup and restoration in residential areas would take place within 10 days of backfilling in accordance with the Plan. Immediately after backfilling, and with appropriate weather and soil conditions, residential areas would be restored and all construction debris removed. Private property, such as mailboxes, fences, gates, and other structures that have been removed would be restored, unless alternate plans have been made with the landowner. Sidewalks, driveways, and roads disturbed by pipeline construction would be restored to their original condition upon completion of construction activities. See section 4.7 of the FERC EIS for more details.
The Corps has determined that the proposed project would have a neutral (mitigated) impact on property ownership.

Needs and Welfare of the People:
The Project would provide up to 245,040 dekatherms per day (Dth/d) of firm natural gas transportation capacity to the Tennessee Valley Authority's (TVA) Cumberland Gas Combined Cycle Power Plant, an electrical generating facility in Stewart County, Tennessee. This would maintain and provide reliable electricity generation for TVAs service territory where there is an identified need. The proposed project would create both temporary and permanent jobs. The anticipated peak construction workforce would consist of approximately 300-400 personnel for the pipeline and approximately 10 personnel at each of the Pressure Regulation Station and Cumberland Meter Station sites. Construction is anticipated to be completed in nine months for the pipeline and approximately six months for the Pressure Regulation Station and Cumberland Meter Station, depending upon weather and site-specific conditions. Additional impacts may also include temporary increased noise, traffic, and visual disruption associated with the active construction. The Corps has determined that the proposed project would have an overall beneficial impact to the needs and welfare of the people.

Additional discussion of effects on each factor (plus other factors) can be found within FERC's EIS.

7.2    Public and private need

The relative extent of the public and private need for the proposed structure or work:

There is great public and private need for the proposed natural gas pipeline in order to provide an alternative energy source to meet electricity demands in the Tennessee

CE LRN-RD (File Number, LRN- 2021-00866)

Valley. Socioeconomical studies have been performed and results provided and documented within Section 4.8 of the FERC EIS. The evaluation provides detailed analysis of the present and expected adverse and beneficial impacts of the proposed project.  Bottom line of the studies concluded that the construction of the pipeline would increase employment in the workforce, tax benefits, material sales, and local economy sales and revenues.


7.3    Resource use unresolved conflicts

If there are unresolved conflicts as to resource use, explain how the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work was considered.

There were no unresolved conflicts identified as to resource use.

7.4    Beneficial and/or detrimental effects on the public and private use

The extent and permanence of the beneficial and/or detrimental effects that the proposed work is likely to have on the public and private use to which the area is suited is described below:

Detrimental effects are expected to be minimal and temporary.

Beneficial effects are expected to be more than minimal and permanent.


7.5    Climate Change

The proposed activities within the Corps' federal control and responsibility likely will result in a negligible release of greenhouse gases into the atmosphere when compared to global greenhouse gas emissions.  Greenhouse gas emissions have been shown to contribute to climate change.  Aquatic resources can be sources and/or sinks of greenhouse gases.  For instance, some aquatic resources sequester carbon dioxide whereas others release methane; therefore, authorized impacts to aquatic resources can result in either an increase or decrease in atmospheric greenhouse gas.  These impacts are considered de minimis. Greenhouse gas emissions associated with the Corps' federal action may also occur from the combustion of fossil fuels associated with the operation of construction equipment, increases in traffic, etc.  The Corps has no authority to regulate emissions that result from the combustion of fossil fuels.  These are subject to federal regulations under the Clean Air Act and/or the Corporate Average Fuel Economy (CAFE) Program. Greenhouse gas emissions from the Corps' action have been weighed against national goals of energy independence, national security, and economic development and determined not contrary to the public interest.

FERC's EIS discussed Climate Change regarding the potential effects from the proposed project.  The EIS stated "Climate change is a global phenomenon; however, for this analysis, we will focus on the existing and potential cumulative climate change

CE LRN-RD (File Number, LRN- 2021-00866)

impacts in the Project area. The EPA recommended that the EIS include an assessment of climate change impacts on the Project area." To date, FERC has not identified a methodology to attribute discrete, quantifiable, physical effects on the environment resulting from the Project's incremental contribution to Greenhouse Gases (GHGs). Without the ability to determine discrete resource impacts, FERC is unable to assess the Project's contribution to climate change through any objective analysis of physical impact attributable to the Project. Additionally, FERC has not been able to find an established threshold for determining the Project's significance when compared to established GHG reduction targets at the state or federal level. Ultimately, FERC's EIS does not characterize the Project's GHG emissions as significant or insignificant. The EIS states that "The net overall reduction in GHG emissions from the combined operation of the modified TVA Cumberland Plant and the Project's facilities would be approximately -4,996,759 tons per year (-4,532,985 metric tons per year) and would decrease emissions within the national inventory based on the 2020 levels by approximately 0.09 percent." Additional details on climate change evaluation are discussed in Section 4.13.10 of the FERC EIS.

## 8.0 Mitigation

(33 CFR 320.4(r), 33 CFR Part 332, 40 CFR 230.70-77, and 40 CFR 1508)

8.1     Avoidance and minimization

Avoidance and Minimization: When evaluating a proposal including regulated activities in waters of the United States, consideration must be given to avoiding and minimizing effects to those waters. Avoidance and minimization are described in Section 1.3.1 above.

Describe other mitigative actions including project modifications implemented to minimize adverse project impacts? (See 33 CFR 320.4(r)(1)(i))

The applicant states onsite best management practices would be utilized to minimize water quality impacts. Minimization measures to be incorporated for the stream crossings include the following:

Avoidance and Minimization: When evaluating a proposal including regulated activities in waters of the United States, consideration must be given to avoiding and minimizing effects to those waters. Avoidance and minimization are described in Section 1.3.1 above.

Describe other mitigative actions including project modifications implemented to minimize adverse project impacts? (See 33 CFR 320.4(r)(1)(i))

The applicant states onsite best management practices would be utilized to minimize water quality impacts. Minimization measures to be incorporated for the stream crossings include the following:

CE LRN-RD (File Number, LRN- 2021-00866)

- Trench spoil would be placed at least 10 feet from the stream for use as backfill, and temporary erosion controls would be installed to prevent migration of trench spoil;
- Construct stream crossings during dry and/or low-flow periods, when available, to minimize turbidity impacts;
- To limit the amount of time a stream is impacted during construction activities, upland preparation and prefabricated segments of pipeline would be prepared for installation prior to beginning the stream crossing;
- Where the dam-and-pump method is proposed, pump intakes would be screened to minimize the potential for fish entrainment;
- Stream crossings would be perpendicular to the flow to the extent practicable;
- Monitoring would be performed during construction and post-construction;
- Immediately after the pipeline is installed, stream banks would be restored to pre-construction conditions to the extent practicable;
- All temporary work areas would be restored to pre-construction conditions.


Construction requirements in wetland areas would include the following:

- Limit the construction right-of-way width in wetlands to 75 feet;

- Limit construction equipment in wetlands to extent possible;
- Install sediment barriers prior to ground-disturbing activities near wetlands and maintaining these barriers throughout construction;
- Utilize timber mats, pre-fabricated equipment mats, or terra mats when necessary;
- Use low ground weight equipment or operating equipment on timber matting on saturated soils or where standing water is present;
- Install trench plugs as necessary to maintain the original wetland hydrology.

Section 5.2 of FERC's EIS provides a concise list of BMPs, mitigative, and minimization measures to be performed to avoid, minimize, and/or mitigate for any potential impact from the Project.


8.2     Compensatory mitigation requirement

Is compensatory mitigation required to offset environmental losses resulting from proposed unavoidable impacts to waters of the United States?  Yes

Provide rationale: Impacts to the wetlands could create more than adverse environmental impacts from the permanent conversion of forested (PFO) to emergent wetlands

8.3     Type and location of compensatory mitigation

CE LRN-RD (File Number, LRN- 2021-00866)

### 8.3.1   Mitigation bank service area

Is the impact in the service area of an approved mitigation bank? No

### 8.3.2   In-lieu fee program service area

Is the impact in the service area of an approved in-lieu fee program? Yes

Does the in-lieu fee program have the appropriate number and resource type of credits available?  Yes

### 8.3.3   Compensatory mitigation

Selected compensatory mitigation type/location(s) (see Table 18):

| Table 18 – Mitigation Type and Location | |
|---|---|
| Mitigation bank credits | |
| In-lieu fee program credits | X |
| Permittee-responsible mitigation under a watershed approach | |
| Permittee-responsible mitigation, on-site and in-kind | |
| Permittee-responsible mitigation, off-site and/or out-of-kind | |

### 8.3.4   Mitigation hierarchy

Does the selected compensatory mitigation option deviate from the order of the options presented in 33 CFR 332.3(b)(2)-(6)? No

### 8.3.5   Watershed approach

Does the selected compensatory mitigation option follow a watershed approach? Yes

Is the impact in a watershed with a watershed plan? Yes

Is the compensatory mitigation consistent with the watershed plan? Yes

### 8.4     Amount of compensatory mitigation

On August 15, 2023, the applicant provided a letter from the Tennessee Mitigation Fund stating they have reserved 1.44 wetland credits in the Lower Cumberland River Service Area for the proposed project to offset the wetland conversion of 0.03 acre of PFO to PEM.

Rationale for required compensatory mitigation amount:

A 2:1 ratio was used to determine mitigation requirement plus temporal loss associated

CE LRN-RD (File Number, LRN- 2021-00866)

with ILF banking.

## 9.0 Consideration of Cumulative Effects

(40 CFR 1508 & RGL 84-9) Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor direct and indirect but collectively significant actions taking place over a period of time. A cumulative effects assessment should consider how the direct and indirect environmental effects caused by the proposed activity requiring DA authorization (i.e., the incremental impact of the action) contribute to the aggregate effects of past, present, and reasonably foreseeable future actions, and whether that incremental contribution is significant or not.

9.1     Identify/describe the direct and indirect effects which are caused by the proposed activity:

The direct effects to aquatic waters of the U.S. as a result of the Project include temporary impacts to a total of 0.69 acre of wetland and 2.39 acres of streams. The project would cross 146 water bodies total which would result in temporary impacts to a total of 3.08 acres of impact for the installation of the pipe, construction workspaces, and access roads.

Temporary impacts, as a result of trench excavation and backfill, and temporary access roads would result in temporal loss of wetland functions during construction and initial restoration. Construction ROW clearing would result in a temporary conversion of forested and scrub-shrub wetlands to emergent. These areas would be allowed to revert back to their preconstruction wetland type after construction. However, some areas within the ROW would not be allowed to revert back to their preconstruction wetland type due to required maintenance of the ROW to facilitate inspection and access. This includes 0.03 acres of PFO wetland that would be permanently converted to emergent type wetland as a result of the ROW maintenance.

Streams banks and beds that would be disturbed by construction would be restored as near as possible to pre-construction conditions utilizing survey data collected pre-Project. Restoration of areas impacted by stream crossings should return any functions lost during the relatively short construction period. Site specific restoration plans, completed in consultation with the appropriate agencies, as well as post construction monitoring would reduce the potential for any long-term effects at waterbody crossing sites and to aquatic organisms at the crossing sites.

Indirect effects are those that are caused by the proposed action (i.e., the regulated activity in waters of the United States) and are later in time but are still reasonably certain to occur. Indirect effects may include temporary increases in erosion and sedimentation during and directly following construction. These impacts would be minimized through the project's erosion control plan and the use of BMPs. See the FERC EIS for additional evaluation of indirect effects.

Page 57 of 76

CE LRN-RD (File Number, LRN- 2021-00866)

9.2    The geographic scope for the cumulative effects assessment is:

The geographic scope is the proposed project area and surrounding area as defined by FERC in their EIS.  This includes HUC-12 Watersheds:

Lower Jones Creek (51302040503), Outlet Harpeth River (51302040606), Trace Creek-Harpeth River (51302040605), Furnace Creek (51302050101), Upper Bartons Creek (51302050102), Lower Bartons Creek (51302050104), Lower Yellow Creek (51302050203), Outlet Yellow Creek (51302050205), Johnson Creek- Cumberland River (51302050302), Guices Creek (51302050401), and Wells Creek (51302050402).

These watersheds are encompassed in the Harpeth (05130204) and Lower Cumberland River/Lake Barkley (05130205) HUC 8s.

9.3    The temporal scope of this assessment covers:

Impacts authorized by Section 404 and Section 10 permits from 2013 to 2023 are summarized below in section 9.4.

9.4    Describe the affected environment:

The following described the watershed conditions and impacts to wetlands resources as a result of the proposed Project in each 8-digit HUC watershed. Due to the nature of the construction, most direct impacts to wetlands would be temporary. However, wetland type conversion, mainly forested and scrub-shrub wetland/emergent type wetland would occur. The table below includes the compensatory mitigation being provided within each 8-digit HUC. Details on overall wetland impacts and conversion impacts are included in Section 6 of this document.

**<u>Harpeth (05130204)</u>**

Approximately ¼ of the alignment is within the Harpeth HUC 8 watershed.  The watershed is approximately 860 square miles in size. The watershed is located within the Cumberland Basin Watershed (HUC 0513).  Three different ecoregions are associated with this HUC; Western Highland Rim, Inner Nashville basin, and the Outer Nashville Basin.  The impacts within this HUC are within the Western Highland Rim ecoregion.  Predominant land use is agricultural and forest.

Corps permits from 2011 through March 2024 across 375 permit actions, authorized 10 acres of permanent wetland fill, 2 acres of pond fill, and 11.75 acre of stream fill.  The projection is that waters of the U.S. will continue to be lost at the current rate.

CE LRN-RD (File Number, LRN- 2021-00866)



Figure 5: Harpeth HUC 8 Watershed National Land Cover Database

### Lower Cumberland/Lake Barkley (05130205)

Approximately ¾ of the alignment is within the Lower Cumberland HUC 8 watershed.  The watershed is approximately 2,351 square miles in size. There are two main ecoregions associated with this HUC in Tennessee, Western Highland Rim and Western Pennyroyal Karst.  The proposed project is located within the Western Highland Rim ecoregion.  Predominant land use is agricultural and forested.

Corps permits from 2011 through March 2024 across 490 permit actions, authorized 9.09 acres of permanent wetland fill, 1.6 acres of lake fill, and 7.7 acre of stream fill.  The projection is that waters of the U.S. will continue to be lost at the current rate.



Figure 6: Lower Cumberland/Lake Barkley HUC 8 Watershed National Land Cover Database

9.5    Determine the environmental consequences:

The direct impact to the streams and wetlands within the project site and watershed is insignificant in size compared to the overall waters of the U.S. located within the watershed.  The affected environment in this immediate vicinity has experienced losses

CE LRN-RD (File Number, LRN- 2021-00866)

of wetlands and streams mainly due to industrial and agricultural development which is fairly low considering the size of the review area. The loss of these aquatic resources is a concern for overall freshwater availability for subsurface aquifers, for climate and human consumption, stream and wetland dynamics for aquatic productivity, wildlife, and food chain contributions. These are mainly out of the Corps responsibility and jurisdiction unless impacts to these resources would require a DA permit due to discharges of dredged or fill material into waters of the U.S.  DA permit evaluation would provide opportunity to avoid, minimize and/or require compensatory mitigation and would be considered on a case by case basis.  Future development is also constrained due to existing infrastructure, roadways, utilities, floodplain, waters and wetland resources that are less desirable areas for development.

Future development for the project (which is not expected) and/or conducted by others (TVA) would be evaluated separately and would be required to follow applicable local, state and federal guidelines including avoidance, minimization and mitigation measures to address any potential impacts from such projects.

9.6    Conclusions regarding cumulative impacts:

When considering the direct and indirect impacts that will result from the proposed activity, in relation to the overall direct and indirect impacts from past, present, and reasonably foreseeable future activities, the incremental contribution of the proposed activity to cumulative impacts in the area described in section 9.2, are not significant . Compensatory mitigation will not be required to offset the impacts of the proposed activity to eliminate or minimize its incremental contribution to cumulative effects within the geographic area described in Section 9.2.  Mitigation required for the proposed activity is discussed in Section 8.0.

## 10.0    Compliance with Other Laws, Policies and Requirements

10.1    Section 7(a)(2) of the Endangered Species Act (ESA)

Refer to Section 2.2 for description of the Corps' action area for Section 7 of the ESA.

10.1.1 Lead federal agency for Section 7 of the ESA

Has another federal agency been identified as the lead agency for complying with Section 7 of the ESA with the Corps designated as a cooperating agency and has that consultation been completed? Yes

Identify the lead agency, the actions taken to document compliance with Section 7 of the ESA and whether those actions are sufficient to ensure the activity(s) requiring Department of the Army authorization is in compliance with Section 7 of the ESA:

FERC

The Corps has reviewed the documentation provided by the agency and determined it is sufficient to confirm Section 7 ESA compliance for this permit authorization, and

CE LRN-RD (File Number, LRN- 2021-00866)

additional consultation is not necessary.

10.1.2 Listed/proposed species and/or designated/proposed critical habitat

Are there listed or proposed species and/or designated critical habitat or proposed critical habitat that may be present or in the vicinity of the Corps' action area? Yes

Effect determination(s), including no effect, for all known species/habitat, and basis for determination(s):  FERC's EIS documented that the applicant reviewed the U.S. Fish and Wildlife Service (USFWS) IPaC System and the TDEC Division of Natural Areas Natural Heritage Portal and coordinated with the USFWS and Tennessee Wildlife Resources Agency (TWRA) to identify a preliminary list of federal and state-listed species. TWRA and USFWS concurred with the preliminary list of species proposed for surveys on June 14, 2021, and July 21, 2021, respectively. General habitat surveys were conducted between June 2021 and January 2022, during which it assessed the potential for suitable habitat for listed species. Additional consultations and site-specific surveys were conducted for two species of freshwater mussels and three species of bats.  From FERC's EIS, the below table summarizes the federal endangered (E) or threatened (T) listed species that may occur in the project area and determination of effect:

| Table 19: FERC ESA Determinations | | | | |
|---|---|---|---|---|
| Group | Common Name | Scientific Name | Status | Determination |
| Mammal | Indiana bat | *Myotis sodalis* | E | Not likely to adversely affect |
| Mammal | Gray bat | *Myotis grisescens* | E | Not likely to adversely affect |
| Mammal | Northern Long-Eared Bat | *Myotis septentrionalis* | T | Not likely to adversely affect |
| Plant | Price's Potato Bean | *Apios priceana* | T | Not likely to adversely affect |
| Plant | Shorts Bladder Pod | *Physaria* | E | Not likely to adversely affect |
| Mussel | Rabbitsfoot | *Quadrula cylindrica cylindrica* | T | Not likely to adversely affect |
| Mussel | Tan Riffleshell | *Epioblasma florentina walkeri* | E | Not likely to adversely affect |

No designated critical habitat was identified in the Project area for any species (USFWS 2021b). For compliance with Section 7 of the ESA, FERC's non-federal representative for the proposed project (18 CFR 380.13) initiated informal consultation with the USFWS Tennessee Ecological Services Field Office on September 29, 2021. On March 10, 2022, the USFWS provided concurrence with the effects determinations as shown in the above table for each of the seven species potentially occurring in the project area.

On September 14, 2022, the USFWS announced a proposal to list the tricolored bat as endangered under the ESA (87 FR 56381).  If the species becomes federally protected prior to the completion of the project, then additional section 7 ESA consultation would then be required.  The applicant stated that prior to the end of the DEIS comment period, they will provide an update regarding any further discussions and/or progress made in coordination with the USFWS for the tricolored bat.

CE LRN-RD (File Number, LRN- 2021-00866)

On March 17, 2023, USFWS responded to the Corps' public notice stating the lead regulatory agency FERC made a "not likely to adversely affect" (NLAA) determination for each of the species generated during a search of the Information for Planning and Consultation system (IPAC). USFWS stated that they had concurred with FERC's determinations. USFWS added that the project proponent also coordinated with them to address potential impacts to the tricolored bat (Perimyotis subflavus), which is proposed for listing as endangered. Tree clearing would be conducted during the species' hibernation season in order to address potential injury to individual bats, and the potential for effects to the species' reproductive behavior has been demonstrated as being very low. Therefore, USFWS concurred with the project proponent's determination that, should the species be listed, the project is not likely to adversely affect it.

10.1.3 Section 7 ESA consultation

Consultation with either the National Marine Fisheries Service and/or the United States Fish and Wildlife Service was initiated and completed as required, for any determinations other than "no effect" (see the attached ORM2 Summary sheet for begin date, end date and closure method of the consultation)

See above section.


10.2    Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act), Essential Fish Habitat (EFH)

N/A, there is no essential fish habitat in LRN's area of responsibility.

10.3    Section 106 of the NHPA

Refer to Section 2.3 for permit area determination.

10.3.1 Lead federal agency for Section 106 of the NHPA

Has another federal agency been identified as the lead federal agency for complying with Section 106 of the NHPA with the Corps designated as a cooperating agency and has that consultation been completed? Yes

Identify the lead agency, and whether the undertaking they consulted on included the Corps' undertaking(s). Briefly summarize actions taken by the lead federal agency.

FERC

The Corps has reviewed the documentation provided by the agency and determined it is sufficient to confirm Section 106 compliance for this permit authorization, and additional consultation is not necessary.

10.3.2 Historic properties

CE LRN-RD (File Number, LRN- 2021-00866)

Known historic properties present? Yes

TGP completed cultural resources surveys for all the accessible project areas. The surveys encompassed approximately 1260.5 acres, and a total of 4,125 shovel test units were excavated. The surveys resulted in recording of 39 newly identified archaeological sites, a revisit of one previously recorded site, which was expanded in size, two additional previously recorded sites, 22 isolated finds, and one site which was previously recorded within the Project footprint but could not be relocated during the current survey. Of these sites, 34 were recommended ineligible for the NRHP, eight were recommended as potentially eligible for the NRHP, and one was unevaluated (40HO6 was a previously recorded site that could not be located within the project area).  Two previously recorded sites and six newly recorded sites were recommended as potentially eligible for the NRHP during the Phase I survey and were recommended for Phase II testing. One of these was later avoided through Project design efforts, and the remaining seven potentially eligible sites have undergone Phase II testing. Following Phase II investigations, three of the sites were recommended ineligible for the National Register of Historic Places (NRHP) under Criterion D with no further investigations recommended. Two sites, both located on TVA's property, were recommended as eligible for the NRHP under Criterion D with no adverse effects based on the applicant's avoidance plans. The State Historic Preservation Office (SHPO) has concurred with these recommendations and with TGP's avoidance plans on August 29, 2022.  FERC agreed with the plan.  Phase II investigations of the remaining two sites were completed in 2022, resulting in recommendations that sites were eligible for the NRHP under Criterion D. The report and an avoidance plan for the two sites were submitted to the SHPO on February 13, 2023. On February 23, 2023, the SHPO concurred with the recommendations and found that with adherence to the avoidance plan, the Project would not adversely affect the two sites.  FERC also found the plan acceptable.

At the time of finalization of the FREC EIS, approximately 1.3 miles of the proposed pipeline route and two access roads remained to be surveyed due to denied access. The Corps received verification that FERCs determination covered this section from FERC on October 19, 2023 via email.

A historic architectural survey was performed and as a result, 7 historic resources were recorded, including 27 in Dickson County and 20 in Houston County. No historic resources were recorded within Stewart County in association with the Project. The 47 resources include four cemeteries, two bridges, and 41 structures or structure groups. Of the 41 structures and structure groups, 27 are or include residential structures, 10 comprise only barns or other outbuildings, two are commercial structures, one is an industrial structure, and one is a water tower. Two of the historic resources, including one structure and one bridge, are recommended eligible for the NRHP, while the other 45 are recommended ineligible. TGP consulted with the SHPO regarding avoidance and/or minimization measures and recommended that the Project would have no adverse effects on historic properties. SHPO concurred.

On September 14, 2023, TGP submitted Addendum 2 to Phase I Cultural Resources Investigations, Cumberland Project, Dickson, Houston and Stewart Counties, TN to the

V 30 AUG 2022

**App-0272**

CE LRN-RD (File Number, LRN- 2021-00866)

THC/SHPO. This was the final report detailing cultural resource investigations on all remaining outstanding tracts where surveys were previously not conducted. SHPO responded on September 18, 2023 and concurred that "no historic properties eligible for listing in the National Register of Historic Places would be affected by this undertaking."

The following is a timeline of 106 events

| Report Title | Submittal Date | SHPO Review / Concurrence Date |
|---|---|---|
| Cumberland Project Phase I Cultural Resource Identification Survey - Work Plan | 6/14/2021 | 6/15/2021 |
| Cumberland Project Proposed Phase II Work Plans for the Evaluation of Sites 40HO83, 40HO84, 40HO85, 40HO86, and 40DS113, Houston and Dickson Counties, Tennessee | 9/13/2021 (initial submittal) | 9/14/2021 (initial review) |
| | 10/28/2021 (resubmittal) | 11/3/2021 (review) |
| | | 12/3/2021 (concurrence) |
| Phase I Cultural Resources Investigations for the Cumberland Project, Dickson, Houston, and Stewart Counties, TN | 10/28/2021 | 11/3/2021 |
| Cumberland Project Proposed Phase II Work Plan, Evaluation of Sites 40SW63 and 40SW710, Stewart County, Tennessee | 2/16/2022 | 2/17/2022 |
| Unanticipated Discovery Plan, Cumberland Project | 6/8/2022 | 6/9/2022 |
| Addendum to Phase I Cultural Resources Investigations, Cumberland Project, Dickson, Houston, and Stewart Counties, Tennessee | 7/7/2022 | 7/12/2022 |
| Phase II Archaeological Investigation of Site 40DS113 for the Cumberland Project, Dickson County, TN | 7/19/2022 | 7/19/2022 |
| Phase II Archaeological Investigation of Site 40HO83 for the Cumberland Project, Houston and Stewart Counties, TN | 7/19/2022 | 7/19/2022 |
| Phase II Archaeological Investigation of Sites 40HO84, 40HO85, and 40HO86 for the Cumberland Project, Houston County, TN in the Yellow Creek Valley | 7/19/2022 | 7/19/2022 |
| Avoidance Plan for Site 40HO85 and Site 40HO86 for the Cumberland Project, Houston County, TN | 8/18/2022 | 8/29/2022 |
| Phase II Archaeological Investigation of Sites 40SW63 and 40SW710 for the Cumberland Project, Stewart County, TN | 2/13/2023 | 2/23/2023 |
| Avoidance Plan for Sites 40SW63 and 40SW710 for the Cumberland Project, Stewart County, TN | 2/13/2023 | 2/23/2023 |
| Addendum 2 to Phase I Cultural Resources Investigations, Cumberland Project, Dickson, Houston, and Stewart Counties, Tennessee | 9/14/2023 | 9/18/2023 |

Figure 7: Timeline of Section 106 Events

Effect determination and basis for that determination: Based on the information available and surveys, TGP (with FERC's concurrence) determined the proposed project has no potential to cause effects to historic properties listed or eligible to be listed in NRHP. The Corps has reviewed the documentation provided by the agency and determined it is sufficient to confirm Section 106 compliance for this permit authorization, and additional consultation is not necessary.

CE LRN-RD (File Number, LRN- 2021-00866)

10.3.3 Consultation with the appropriate agencies, tribes and/or other parties for effect determinations

Consultation was initiated and completed with the appropriate agencies, tribes and/or other parties for any determinations other than "no potential to cause effects." (See the attached ORM2 Summary sheet for begin date, end date and closure method of the consultation)

FERC reached out to numerous tribes requesting their comments on the proposed project and the draft EIS.  Additionally, the Corps' public notices were provided to the tribes for their comments.  The Cherokee Tribe requested shapefiles of the proposed project on March 16, 2023.  The shapefiles were provided on September 25, 2023.  No negative comments were received.

10.4    Tribal Trust Responsibilities

10.4.1 Tribal government-to-government consultation

Was government-to-government consultation conducted with federally-recognized tribe(s)? No

10.4.2 Other Tribal consultation

Other Tribal consultation including any discussion of Tribal Treaty rights.

N/A

10.5    Section 401 of the Clean Water Act – Water Quality Certification (WQC)

10.5.1 Section 401 WQC requirement

Is an individual Section 401 WQC required, and if so, has the certification been issued or waived?

An individual WQC is required and has been granted.

TDEC issued the required WQC with conditions [NRS22.192] effective date July 21, 2023, for the proposed project.  The WQC states TDEC has reasonable assurance that the activity as proposed in accordance with all permit conditions will not violate applicable water quality standards.

As a result of TGP's field verification of a 1.15-mile section of pipeline alignment, additional streams were found to be crossed by the pipeline.  These additional crossings were included through a special condition within the WQC, dated July 21, 2023.  This office reached out to TDEC regarding validity of the WQC based on the lack of these crossings, stating that it was the Corps understanding that the applicant's submission of additional information did not constitute a new certification request

CE LRN-RD (File Number, LRN- 2021-00866)

requiring further state action. Therefore, the Corps regarded the state's conditional grant of water quality certification of July 21, 2023 to be valid for the entire 32-mile pipeline.

10.5.2 401(a)(2) Process

If the certifying authority granted an individual WQC, did the United States Environmental Protection Agency make a determination that the discharge 'may affect' water quality in a neighboring jurisdiction? No

Provide an explanation of the determination of the effect on neighboring jurisdiction.

As required to fulfill 401(a)(2) process, the Corps notified EPA regarding the standard permit evaluation for the proposed project by email on July 25, 2023.  By email dated August 1, 2023, EPA responded "EPA considered the potential for water quality impacts to a neighboring jurisdiction from the project as certified. EPA will not issue a "may affect" determination for this project pursuant to CWA Section 401(a)(2)."

10.6    Coastal Zone Management Act (CZMA): Not Applicable; no areas subject to the CZMA are in LRN's Regulatory area of responsibility.

10.7    Wild and Scenic Rivers Act

10.7.1 National Wild and Scenic River System

Is the project located in a component of the National Wild and Scenic River System, or in a river officially designated by Congress as a "study river" for possible inclusion in the system?  No

10.8    Effects on Corps Civil Works Projects (33 USC 408)

10.8.1 Permission requirements under Section 14 of the Rivers and Harbors Act (33 USC 408)

Does the applicant also require permission under Section 14 of the Rivers and Harbors Act (33 USC 408) because the activity, in whole or in part, would alter, occupy, or use a Corps Civil Works project?

No, the appropriate non-Regulatory office has determined that there will be no effects to federal projects that require permission from the Corps.

10.9    Corps Wetland Policy (33 CFR 320.4(b))

10.9.1 Wetland Impacts

Does the project propose to impact wetlands? Yes

10.9.2 Wetland impact public interest review

CE LRN-RD (File Number, LRN- 2021-00866)

Based on the public interest review herein, the beneficial effects of the project outweigh the detrimental impacts of the project.

10.10  Other (as needed)

10.11  Compliance Statement

The Corps has determined that it has fulfilled its responsibilities under the following laws, regulations, policies, and guidance:

| Table 20 – Compliance with Federal Laws and Responsibilities | | |
|---|---|---|
| Laws, Regulations, Policies, and Guidance | Yes | N/A |
| Section 7(a)(2) of the ESA | X | |
| EFH provisions of the Magnuson-Stevens Act | | X |
| Section 106 of the NHPA | X | |
| Tribal Trust | | X |
| Section 401 of the Clean Water Act | X | |
| CZMA | | X |
| Wild and Scenic Rivers Act | | X |
| Section 408 - 33 USC 408 | | X |
| Corps Wetland Policy (33 CFR 320.4(b)) | X | |
| Other: N/A | | |

## 11.0  Special Conditions

11.1  Special condition(s) requirement(s)

Are special conditions required to ensure minimal effects, ensure the authorized activity is not contrary to the public interest and/or ensure compliance of the activity with any of the laws above? Yes

11.2  Required special condition(s)

Special Condition 1:  The work must be performed in accordance with the plans submitted August 25, 2023.  Any changes to the plans must be approved in advance by this office of U.S. Army Corps of Engineers, Nashville District Regulatory Division (USACE).

Rationale:  *Permit compliance [33CFR 326.4(d)].*

Special Condition 2:   The Permittee must have a copy of this permit available onsite and ensure all contractors are aware of its conditions and abide by them.

*Rationale: Recommended at 33 CFR 325, Appendix A.*

Special Condition 3:   Construction within streams must be performed during low flow and/or dry conditions of the stream resources.  The construction activity must be isolated from active stream flow.

CE LRN-RD (File Number, LRN- 2021-00866)

*Rationale:  Minimize water quality impacts.*

Special Condition 4:  The Permittee shall avoid the remaining portions of the streams and wetlands within the project area.  These areas were avoided as part of the permit application review process and therefore will not be disturbed by any dredging, filling, mechanized land clearing, or other construction work whatsoever.

*Rationale:  Protection of other on-site aquatic resources.*

Special Condition 5:  Wetland Mitigation: Prior to initiating the authorized work in the wetlands, the Permittee shall provide verification to the U.S. Army Corps of Engineers, Nashville District Regulatory Division, of purchase of 1.44 wetland credits from the Tennessee Mitigation Fund, Lower Cumberland River Service Area, for the proposed project.  The verification submitted to the Corps must include the File Number LRN-2021-00866.

*Rationale: Mitigation of temporal wetland impacts.*

Special Condition 6:  Water Quality Certification:  You must abide by all conditions of the state of Tennessee, Department of Environment and Conservation (TDEC), Section 401 Water Quality Certification issued on July 21, 2023 [NRS 22.192].

*Rationale:  Section 401 compliance*

Special Condition 7:  Cultural Resources/Archaeological/Historical:  In the event any previously unknown cultural resources, historic or archaeological sites or human remains are uncovered or encountered while accomplishing the activity authorized by this permit, the permittee must cease all work immediately and contact local, state and county law enforcement offices (only contact law enforcement on findings of human remains), our office at (615) 369-7500.

*Rationale:  Minimize potential impacts to cultural resources/archaeological/historical sites.*

Special Condition 8*:*  Within 30 days of completion of the authorized work or at the expiration of the construction authorization of this permit, whichever occurs first, the Permittee shall complete and submit to the Corps the attached "Compliance Certification" form.

*Rationale: Assurance of compliance.*

Special Condition 9:  Blasting shall not occur in waters of the United States or immediately adjacent uplands identified by the applicant as having karst prone geology with an unacceptable risk of hydrologic loss as identified in table 2.7.3 in the application submitted August 22, 2022.  For each crossing, the permittee shall select the least impactful trenching technique practicable, as described in the application submitted August 22, 2022. For any crossings in which blasting is identified as necessary, written

CE LRN-RD (File Number, LRN- 2021-00866)

justification, site specific blasting operations and monitoring plans shall be sent to 3701 Bell Road Nashville, TN 37214 referencing file number LRN-2021-00866 prior to blasting. Blasting shall not commence until the applicant is in receipt of written concurrence from the Corps.

Rationale: Minimization of impacts to waters

Special Condition 10: Tree clearing shall only occur between October 15 and March 31 to avoid impacting federally listed bat species.

Rationale: ESA Compliance

## 12.0    Findings and Determinations

12.1    Section 176(c) of the Clean Air Act General Conformity Rule Review:

The proposed permit action has been analyzed for conformity applicability pursuant to regulations implementing Section 176(c) of the Clean Air Act.  It has been determined that the activities proposed under this permit will not exceed *de minimis* levels of direct or indirect emissions of a criteria pollutant or its precursors and are exempted by 40 CFR Part 93.153.  Any later indirect emissions are generally not within the Corps' continuing program responsibility and generally cannot be practicably controlled by the Corps.  For these reasons a conformity determination is not required for this permit action.

TGP does not propose to install combustion-powered equipment as part of the Project, and emissions from the applicant's facilities would be limited to negligible fugitive emissions and/or minor leaks from piping components, the Cumberland Meter Station, and during pigging activities. Operation of the Cumberland Gas Plant and other area projects with air emissions sources would be subject to the requirements of the CAA and would not be expected to result in an exceedance of the National Ambient Air Quality Standards (NAAQS). Section 4.10 of the FERC EIS provides additional information on the air quality analysis that was completed specifically for the proposed Project.

12.2    Presidential Executive Orders (EO)

12.2.1 EO 11988, *Floodplain Management*

The proposed project would cross FEMA Zones A and E (100-year) floodplains and regulatory floodways (FERC appendix C; figure C-5); the proposed project would not cross 500-year floodplains.  TGP indicated they would coordinate with the appropriate floodplain administrators as necessary. The construction methods proposed for the pipeline crossings would not result in any permanent fill within floodplains, and temporary construction workspaces would be restored to pre-construction contours.  Any impacts to floodplain values would be very minimal.  Floodplain values are addressed within FERC's EIS, Section 4.3.2.

CE LRN-RD (File Number, LRN- 2021-00866)

12.2.2 EO 12898 and EO 14008, Environmental Justice

12.2.2.1      Provide details regarding screening and mapping tools and available information utilized during the review.

Environmental justice has been addressed for the entire project within the FERC EIS, Section 4.8.  The EIS states FERC's staff used the Federal Interagency Working Group on Environmental Justice & NEPA Committee's publication, *Promising Practices for EJ Methodologies in NEPA Reviews* (*Promising Practices*) (EPA 2016), which provides methodologies for conducting environmental justice analyses throughout the NEPA process for this Project. FERC's staff used EJScreen 2.1 as an initial step to gather information regarding minority and/or low-income populations; potential environmental quality issues; environmental and demographic indicators; and other important factors. The EPA recommends that screening tools, such as EJScreen 2.1 be used for a "screening-level" look and a useful first step in understanding or highlighting locations that may require further review.

12.2.2.2      Have disadvantaged communities been identified within the vicinity of the proposed project?  Yes

Identification of Environmental Justice Communities: FERC used the "50 percent", the "meaningfully greater analysis" and "low-income threshold criteria" methods to identify minority populations. Using these methods FERC determined minority populations as either

   (a) the aggregate minority population of the block group in the affected area exceeds 50 percent; or
   (b) the aggregate minority population in the block group affected is 10 percent higher than the aggregate minority population percentage in the county.
   (c) low-income populations to be identified based on the annual statistical poverty thresholds (Dickson, Houston, and Stewart counties in Tennessee were used as the reference community).

FERC used a 1-mile radius from the project boundaries to estimate the furthest extent of impacts on environmental justice communities. FERC identified 11 block groups within the geographic scope of the project area.  Three block groups were identified based on minority percentage thresholds and four block groups were identified based on low-income thresholds.

CE LRN-RD (File Number, LRN- 2021-00866)

| State / County Census Tract & Block Group | Population Data (2020) | Race and Ethnicity Columns[a] | | | | | | | | | Low-Income Column |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | White – Not Hispanic | Black or African American | Asian | American Indian & Alaskan Native | Native Hawaiian & Other Pacific Isl. | Some other Race Alone | Two or More Races | Hispanic or Latino | Total Minority [a] | Households below Poverty Level [a] |
| TENNESSEE | 6,910,840 | 73.4 | 16.5 | 1.8 | 0.2 | 0.1 | 0.2 | 2.3 | 5.6 | 26.6 | 14.4 |
| Dickson County | 54,315 | 92.6 | 4.1 | 0.4 | 0.3 | 0.0 | 0.1 | 2.0 | 3.7 | 10.6 | 11.7 |
| CT 0601 BG 1 [*] | 2,336 | 92.5 | 3.9 | 3.3 | 0.0 | 0.0 | 0.0 | 0.3 | 0.0 | 7.5 | 10.6 |
| CT 0602.02 BG 1 | | 95.4 | 0.0 | 0.0 | 0.0 | 0.0 | 2.1 | 0.6 | 1.9 | 4.6 | 7.5 |
| CT 0601 BG 2 | 1,782 | 89.1 | 0.1 | 0.0 | 1.1 | 0.0 | 0.0 | 4.3 | 5.4 | 10.9 | 17.9 |
| CT 0602.01 BG 1 | | 99.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.9 | 0.9 | 27.3 |
| CT 0602.01 BG 2 | | 97.6 | 0.0 | 0.0 | 1.2 | 0.0 | 0.0 | 1.2 | 0.0 | 2.4 | 24.6 |
| CT 0602 BG 2 | 2,152 | 95.7 | 3.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.9 | 1.3 | 4.3 | 3.8 |
| CT 0603 BG 1 | 2,386 | 98.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.3 | 16.0 |
| CT 0603 BG 2 | | 97.1 | 0.5 | 0.0 | 0.0 | 0.0 | 0.9 | 1.6 | 0.0 | 2.9 | 4.5 |
| Houston County | 8,283 | 91.7 | 4.8 | 0.2 | 0.3 | 0.2 | 0.0 | 1.3 | 1.5 | 8.3 | 17.2 |
| CT 1202 BG 2 [*] | 980 | 90.7 | 9.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 9.3 | 13.9 |
| CT 1201 BG 2 | 1,887 | 86.1 | 8.5 | 0.0 | 0.0 | 0.0 | 0.0 | 4.3 | 0.0 | 12.8 | 16.6 |
| Stewart County | 13,657 | 91.5 | 0.3 | 0.5 | 0.5 | 0.8 | <0.1 | 3.2 | 3.2 | 8.5 | 12.8 |
| CT 1106 BG 2 [*] | 894 | 90.2 | 2.6 | 0.0 | 0.0 | 0.0 | 0.0 | 3.9 | 3.3 | 9.8 | 12.0 |

Source: American Community Survey, 2019 (5-Year Estimates), File # B17017 and File # B03002.
a/ Minority classifications account for the percentage of people who self-report their race according to the column header, their ethnicity, and who are non-Hispanic/non-Latino. Individuals who do self-report as a minority race and as Hispanic/Latino are captured in the Hispanic/Latino column.
b/ Percentages displayed in red font represent statistics that designate that census tract/block group as an Environmental Justice community.
c/ These census tract/block groups includes a 1-mile radius around the aboveground Pressure Regulator Station and Cumberland Meter Station.
d/ This census tract/block group includes a 1-mile radius around the two proposed contractor yards.
Note: Due to rounding differences in the dataset, the totals may not reflect the sum of the addends.

**Figure 8: Minority Populations by Race and Ethnicity and Low Income Populations in the Project Area**



**Figure 9: Environmental Justice Communities (Low Income Thresholds)**

CE LRN-RD (File Number, LRN- 2021-00866)



Figure 10: Environmental Justice Communities (Minority Thresholds)

12.2.2.3        What meaningful involvement efforts did the Corps take for potentially affected disadvantaged communities and other interested individuals, communities, and organizations?

The Corps issued two public notices (PN 23-02 and PN 23-13) to facilitate involvement of potentially disadvantaged communities and other interested individuals, communities and organizations. See section 4 of this document for more details. Additionally, in section 4.8.3 of the FERC EIS it is documented that the applicant conducted meetings with federal, state, county, and local elected officials in the project area and the chamber of commerce for each county as part of their outreach. The application hosted three open house meetings on the proposed project. Representatives from FERC were present at these meetings in order to answer questions.  Notices for the open houses were placed in local newspapers. FERC distributed copies of the application to local libraries to facilitate access and review for all members of the communities in the project area.  Outreach completed by the applicant is summarized in the figure below.

CE LRN-RD (File Number, LRN- 2021-00866)

| Date | Organization/Meeting and Type |
|---|---|
| March 10, 2022 | Houston County School District (school district) |
| March 16, 2022 | Dickson County Help Center (non-profit) |
| March 16, 2022 | Dickson County School District (school district) |
| April 13, 2022 | Stewart County School System (school district) |
| May 4, 2022 | Erin Housing Authority (community housing organization) |
| May 4, 2022 | J.D. Lewis Senior Center (non-profit) |
| June 1, 2022 | Highland Rim Head Start (non-profit) |
| June 1, 2022 | Bible Baptist Church (religious organization) |
| June 1, 2022 | Cross Point Church (religious organization) |
| June 1, 2022 | Patterson Chapel Revival Center (religious organization) |
| June 1, 2022 | Spring Hill Methodist Church (religious organization) |
| June 10, 2022 | The Quest Center (non-profit) |
| June 14, 2022 | Highland RIM Economic Corporation (non-profit) |
| August 24, 2022 | Bethesda Community Mission (non-profit) |
| September 8, 2022 | Highland RIM Economic Corporation (non-profit) |
| September 8, 2022 | J.D. Lewis Senior Center (non-profit) |
| December 8, 2022 | Erin Housing Authority (community housing organization) |
| December 8, 2022 | Promise Land Heritage Association (non-profit) |

Figure 11: Applicant Outreach Events

FERC issued a notice of scope and a NOI published in the federal register. The notices were mailed to FERC's environmental mailing list, which included federal and state resource agencies, elected officials; environmental groups and non-governmental organizations; Native American Tribes; potentially affected landowners; local libraries and newspapers; and other stakeholders who had indicated an interest in the proposed project. In person comment sessions were held by FERC to solicit comments on the draft EIS in Dickson and Cumberland City Tennessee.

See section 4.8.3 of the FERC EIS for additional information on meaningful involvement measures taken by federal/state agencies and the applicant.

12.2.2.4        Describe if resource impacts are high and adverse.

Do the impacts fall disproportionately on disadvantaged communities?  Yes

FERC has control and responsibility over the majority of the proposed project and served as the lead Federal Agency for the conduct of environmental reviews and coordination with other Federal agencies required for compliance under NEPA. The Corps' limited areas of responsibility were encompassed within the areas of FERC's EIS. In accordance with 33 C.F.R. 325, App. B, § 7(b)(3), the Corps relied upon documentation in FERCs EIS and documentation of compliance under NEPA. The Corps' limited scope is contained entirely within FERCs larger, broader scope.

The temporary placement of fill associated with the Corps permit action would have limited impact to environmental justice communities identified by FERC. Impacts on Environmental Justice Communities within the Corps scope include the HDD crossing under Jones Creek and construction of the Cumberland Pipeline at jurisdictional

CE LRN-RD (File Number, LRN- 2021-00866)

wetland and stream crossing locations. The majority of the Cumberland Pipeline (about 26 miles out of 32 miles) would be within an environmental justice community.

Impacts could include routine vegetation maintenance along the right-of-way, restrictions on use within the pipeline easement, and visual impacts associated with vegetation maintenance and aboveground pipeline structures.  Land use is also impacted as within the easement landowners are unable to conduct certain activities such as the construction of permanent structures. These factors are described within the FERC EIS – Visual impacts (EIS section 4.7.4), socioeconomic impacts, including traffic impacts (EIS section 4.8.2), and air and noise impacts from construction and operation (EIS sections 4.10 and 4.11).

FERC states that potentially adverse environmental effects on surrounding communities associated with the proposed project, including environmental justice communities, would be minimized and/or mitigated. FERC states that environmental justice concerns are not present concerning geology, soils, groundwater, surface water, wetlands, vegetation, wildlife, or cultural resources due to the minimal overall impact the proposed project would have on these resources.

FERC defined a disproportionately high and adverse effect as the adverse effect being predominantly borne by such populations. FERC states that impacts associated with the HDD crossings, and construction of the Cumberland Pipeline may be disproportionately high and adverse as they would be predominantly borne by an environmental justice community based on 26 miles out of 32 miles of the alignment being within an identified environmental justice community.

We reviewed the information provided in the FERC EIS, which is summarized above, and agree with FERCs determination that the proposed project may have disproportionately high and adverse impacts to environmental justice communities. Long-term impacts associated with operation would generally be limited to maintenance of a permanent pipeline right-of way such as mowing and occasional repair activities.  However, the adverse impacts within the Corps' area of responsibility (approximately 0.6% of the total project area) would occur during construction and immediately after and are minimal and temporary in nature. The overall impact to environmental justice communities within the Corps' area of responsibility would bless than significant.

12.2.2.5    Based upon the discussion and analysis in the preceding sections, the Corps has determined that portions of the proposed project within our federal control and responsibility would not have a disproportionately high and adverse human health or environmental effect on disadvantaged communities.


12.2.3 EO 13112, Invasive Species, as amended by EO 13751

Through special conditions, the permittee will be required to control the introduction and spread of exotic species.  FERC's EIS addressed control of invasive species especially in the borrow/disposal site.

CE LRN-RD (File Number, LRN- 2021-00866)

12.2.4 EO 13212 and EO 13302, Energy Supply and Availability

The review was expedited and/or other actions were taken to the extent permitted by law and regulation to accelerate completion of this energy related project while maintaining safety, public health and environmental protections.

12.3    Findings of No Significant Impact

Having reviewed the information provided by the applicant and all interested parties and an assessment of the environmental impacts, I find that this permit action will not have a significant impact on the quality of the human environment.  Therefore, an environmental impact statement will not be required.

12.4    Compliance with the Section 404(b)(1) Guidelines

The proposed discharge complies with the Guidelines, with the inclusion of the appropriate and practicable special conditions to minimize pollution or adverse effects to the affected ecosystem.

12.5    Public interest determination

Having reviewed and considered the information above, I find that the proposed project is not contrary to the public interest.  The permit will be issued with appropriate conditions included to ensure minimal effects, ensure the authorized activity is not contrary to the public interest and/or ensure compliance of the activity with any of the authorities identified in Section 10.

**PREPARED BY:**

Date: 06/18/2024

Samantha Iskrzycki
Biologist, West Regulatory Branch
Nashville District

**REVIEWED BY:**

Date: 18 June 2024

Timothy Wilder
Chief, West Regulatory Branch
Nashville District

CE LRN-RD (File Number, LRN- 2021-00866)

**REVIEWED BY:**

Date: 18 June 2024

Joshua Frost
Chief, Regulatory Division
Nashville District

**APPROVED BY:**

Date: 25JUN2024

Robert W. Green
Lieutenant Colonel
U.S. Army District Commander

V 30 AUG 2022

# Appendix A - Impact Table

| MP | Waterbody ID | Waterbody Name | Flow Regime | Start Lat | Start Long | End Lat | End Long | Avg Stream Bkf Width (Feet) | Avg OHWM / Bkf Height (Feet) | Temp In Trench Impact Type | Temp In Trench Impact Acres | Temp In Trench Impact Linear Feet | Temp Outside Trench Impact Type | Temp Outside Trench Impact Acres | Temp Outside Trench Impact Linear Feet | Total Temp Impact Acres | Total Temp Impact Linear Feet |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0.1 | SDKA023 | Upper Sugarcamp Branch | Perennial | 36.1630 | -87.2073 | 36.1632 | -87.2073 | 4 | 2.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.008 | 87.2 | 0.009 | 97.2 |
| 0.3 | SDKA023 | Upper Sugarcamp Branch | Perennial | 36.1655 | -87.2057 | 36.1655 | -87.2055 | 4 | 2.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 67.1 | 0.007 | 77.1 |
| 0.4 | SDKA024 | UT to Upper Sugarcamp Branch | Ephemeral | 36.1663 | -87.2063 | 36.1664 | -87.2060 | 2 | 1 | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.004 | 83.2 | 0.004 | 93.2 |
| 0.9 | SDKA026 | Jordan Branch | Perennial | 36.1705 | -87.2128 | 36.1709 | -87.2130 | 21 | 8 | Dry Open Cut | 0.005 | 10.0 | Pipeline Crossing | 0.056 | 116.5 | 0.061 | 126.5 |
| 0.9 | SDKA027 | UT to Jordan Branch | Perennial | 36.1709 | -87.2131 | 36.1708 | -87.2133 | 10 | 6 | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.017 | 76.0 | 0.020 | 86.0 |
| 1.2 | SDKA001 | UT to Jordan Branch | Ephemeral | 36.1730 | -87.2174 | 36.1733 | -87.2175 | 2 | 1 | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.005 | 102.2 | 0.005 | 112.2 |
| 1.6 | SDKA004 | UT to Porters Branch | Ephemeral | 36.1765 | -87.2235 | 36.1764 | -87.2237 | 2 | 1 | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.006 | 69.6 | 0.007 | 79.6 |
| 2.1 | SDKA006 | UT to Porters Branch | Intermittent | 36.1809 | -87.2317 | 36.1807 | -87.2319 | 6 | 3 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.009 | 68.0 | 0.011 | 78.0 |
| 2.3 | SDKA008 | UT to Porters Branch | Ephemeral | 36.1826 | -87.2348 | 36.1824 | -87.2349 | 2.5 | 2 | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.004 | 68.6 | 0.005 | 78.6 |
| 2.8 | SDKX03 | UT to Porters Branch | Perennial | 36.1822 | -87.8402 | 36.1842 | -87.2426 | 4.5 | 3 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.020 | 194.0 | 0.021 | 204.0 |
| 2.8 | SDN1C008 | UT to Porters Branch | Ephemeral | 36.1832 | -87.2398 | 36.1827 | -87.2407 | 10 | 3 | N/A | 0.000 | 0.0 | Workspace Crossing | 0.011 | 48.0 | 0.011 | 48.0 |
| 2.9 | SDKA058 | Porters Branch | Perennial | 36.1853 | -87.2430 | 36.1852 | -87.2429 | 3.5 | 1 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.015 | 184.0 | 0.016 | 194.0 |
| 3.0 | SDKA058 | Porters Branch | Perennial | 36.1853 | -87.2430 | 36.1852 | -87.2429 | 3.5 | 1 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.005 | 66.7 | 0.006 | 76.7 |
| 3.2 | SDKA048 | Jones Creek | Perennial | 36.1875 | -87.2439 | 36.1873 | -87.2440 | 70 | 2 | HDD | 0.000 | 0.0 | Pipeline Crossing | 0.000 | 0.0 | 0.000 | 0.0 |
| 3.2 | SDKA048 | Jones Creek | Perennial | 36.1923 | -87.2425 | 36.1920 | -87.2425 | 70 | 2 | Dry Open Cut | 0.000 | 0.0 | Access Road | 0.205 | 127.7 | 0.205 | 127.7 |
| 3.2 | SDKA048 | Jones Creek | Perennial | 36.1876 | -87.2439 | 36.1876 | -87.2439 | 70 | 2 | N/A | 0.000 | 0.0 | Access Road | 0.003 | 2.0 | 0.003 | 2.0 |
| 3.4 | SDKA049 | UT to Jones Creek | Perennial | 36.1920 | -87.2442 | 36.1921 | -87.2444 | 12.5 | 1 | N/A | 0.000 | 0.0 | Workspace Crossing | 0.027 | 94.0 | 0.027 | 94.0 |
| 3.4 | SDKA049 | UT to Jones Creek | Perennial | 36.1920 | -87.2442 | 36.1921 | -87.2444 | 12.5 | 1 | Dry Open Cut | 0.003 | 10.0 | Pipeline Crossing | 0.046 | 161.0 | 0.049 | 171.0 |
| 3.5 | SDKA050 | UT to Jones Creek | Ephemeral | 36.1896 | -87.2486 | 36.1898 | -87.2483 | 3.5 | 0.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 69.3 | 0.006 | 79.3 |
| 3.5 | SDKA051 | UT to Jones Creek | Intermittent | 36.1899 | -87.2485 | 36.1898 | -87.2487 | 4.5 | 0.5 | Dry Open Cut | 0.001 | 10.0 | Access Road | 0.001 | 65.5 | 0.008 | 75.5 |
| 3.6 | SDKA054 | UT to Jones Creek | Intermittent | 36.1927 | -87.2480 | 36.1927 | -87.2480 | 3 | 0.2 | N/A | 0.000 | 0.0 | Access Road | 0.001 | 20.1 | 0.001 | 20.1 |
| 3.7 | SDKX02 | UT to Jones Creek | Perennial | 36.1905 | -87.2522 | 36.1914 | -87.2520 | 3 | 2 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.009 | 128.0 | 0.010 | 138.0 |
| 3.7 | SDKX01 | UT to Jones Creek | Intermittent | 36.1913 | -87.2529 | 36.1916 | -87.2528 | 3 | 2 | N/A | 0.000 | 0.0 | Workspace Crossing | 0.002 | 24.0 | 0.002 | 24.0 |
| 4.1 | SDKA053 | UT to Jones Creek | Intermittent | 36.1924 | -87.2536 | 36.1926 | -87.2536 | 3 | 0.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.005 | 79.4 | 0.006 | 89.4 |
| 4.1 | SDKA055 | UT to Jones Creek | Intermittent | 36.1948 | -87.2566 | 36.1950 | -87.2565 | 5 | 0.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.008 | 70.4 | 0.009 | 80.4 |
| 4.3 | SDKA012 | UT to Jones Creek | Ephemeral | 36.1979 | -87.2590 | 36.1982 | -87.2589 | 2 | 0.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.004 | 89.1 | 0.005 | 99.1 |
| 4.5 | SDKA014 | UT to Gafford Branch | Perennial | 36.1978 | -87.2622 | 36.1978 | -87.2621 | 3 | 0.2 | N/A | 0.000 | 0.0 | Workspace Crossing | 0.001 | 19.3 | 0.001 | 19.3 |
| 4.5 | SDKA013 | Gafford Branch | Perennial | 36.1979 | -87.2624 | 36.1977 | -87.2623 | 37.5 | 35 | Dry Open Cut | 0.009 | 10.0 | Pipeline Crossing | 0.057 | 66.0 | 0.065 | 76.0 |
| 5.2 | SDKA017 | UT to Gafford Branch | Ephemeral | 36.2025 | -87.2730 | 36.2027 | -87.2732 | 2 | 0.5 | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.004 | 87.0 | 0.004 | 97.0 |
| 5.3 | SDKA019 | UT to Gafford Branch | Ephemeral | 36.2032 | -87.2735 | 36.2034 | -87.2743 | 3 | 1 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.005 | 66.9 | 0.005 | 76.9 |
| 5.9 | SDKA020 | UT to Gafford Branch | Ephemeral | 36.2078 | -87.2827 | 36.2076 | -87.2830 | 8.5 | 4.5 | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.023 | 117.0 | 0.025 | 127.0 |
| 6.0 | SDKX05 | UT to Gafford Branch | Ephemeral | 36.2089 | -87.2846 | 36.2091 | -87.2845 | 3 | 2 | N/A | 0.000 | 0.0 | Workspace Crossing | 0.001 | 20.3 | 0.001 | 20.3 |
| 6.3 | SDKA028 | UT to Johnson Creek | Ephemeral | 36.2114 | -87.2891 | 36.2115 | -87.2889 | 2 | 1 | N/A | 0.000 | 0.0 | Workspace Crossing | 0.001 | 14.7 | 0.001 | 14.7 |
| 6.6 | SDKX04 | UT to Johnson Creek | Ephemeral | 36.2138 | -87.2939 | 36.2143 | -87.2936 | 2 | 0.5 | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.002 | 54.0 | 0.003 | 64.0 |
| 6.7 | SDKA030 | UT to Johnson Creek | Ephemeral | 36.2141 | -87.2944 | 36.2143 | -87.2939 | 2 | 0.5 | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 67.0 | 0.004 | 77.0 |
| 7.1 | SDKA033 | UT to Johnson Creek | Intermittent | 36.2180 | -87.3004 | 36.2179 | -87.3004 | 12.5 | 8 | Dry Open Cut | 0.003 | 10.0 | Pipeline Crossing | 0.028 | 98.8 | 0.031 | 108.8 |
| 7.3 | SDKA034 | UT to Johnson Creek | Ephemeral | 36.2187 | -87.3038 | 36.2186 | -87.3038 | 9.5 | 7 | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.015 | 67.2 | 0.017 | 77.2 |
| 7.3 | SDKA035 | UT to Johnson Creek | Ephemeral | 36.2186 | -87.3039 | 36.2186 | -87.3038 | 2.5 | 1 | N/A | 0.000 | 0.0 | Workspace Crossing | 0.002 | 43.1 | 0.002 | 43.1 |
| 8.0 | SDKA036 | Johnson Creek | Perennial | 36.2237 | -87.3130 | 36.2239 | -87.3141 | 10 | 6 | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.058 | 252.7 | 0.060 | 262.7 |
| 8.0 | SDKA036 | Johnson Creek | Perennial | 36.2237 | -87.3130 | 36.2237 | -87.3131 | 10 | 6 | N/A | 0.000 | 0.0 | Access Road | 0.005 | 21.0 | 0.005 | 21.0 |
| 8.1 | SDKA037 | UT to Johnson Creek | Ephemeral | 36.2243 | -87.3153 | 36.2248 | -87.3152 | 5.5 | 1 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.008 | 66.2 | 0.010 | 76.2 |
| 8.3 | SDKA038 | UT to Harris Branch | Intermittent | 36.2276 | -87.3231 | 36.2278 | -87.3211 | 6 | 2 | N/A | 0.000 | 0.0 | Access Road | 0.003 | 23.1 | 0.003 | 23.1 |
| 8.5 | SDKA038 | UT to Harris Branch | Intermittent | 36.2276 | -87.3211 | 36.2278 | -87.3211 | 6 | 2 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.010 | 71.9 | 0.011 | 81.9 |
| 8.5 | SDKA038 | UT to Harris Branch | Intermittent | 36.2281 | -87.3222 | 36.2282 | -87.3224 | 6 | 2 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.009 | 66.1 | 0.010 | 76.1 |
| 8.6 | SDKA040 | UT to Harris Branch | Perennial | 36.2291 | -87.3231 | 36.2291 | -87.3237 | 6.5 | 0.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.015 | 101.4 | 0.017 | 111.4 |
| 8.8 | SDKA041 | Harris Branch | Perennial | 36.2303 | -87.3252 | 36.2297 | -87.3253 | 6.5 | 4 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.012 | 80.3 | 0.013 | 90.3 |
| 9.5 | SDKA042 | UT to Bartons Creek | Perennial | 36.2349 | -87.3365 | 36.2345 | -87.3369 | 8 | 4 | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.012 | 67.5 | 0.014 | 77.5 |

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10.0 | SDKB001 | Miller Branch | Perennial | 36.2375 | -87.3453 | 36.2377 | -87.3453 | 20 | 3 | Dry Open Cut | 0.005 | 10.0 | Pipeline Crossing | 0.045 | 97.6 | 0.049 | 107.6 |
| 10.0 | SDKB001 | Miller Branch | Perennial | 36.2365 | -87.3452 | 36.2365 | -87.3452 | 20 | 3 | N/A | 0.000 | 0.0 | Access Road | 0.010 | 20.7 | 0.010 | 20.7 |
| 10.1 | SDKB002 | Bartons Creek | Perennial | 36.2379 | -87.3469 | 36.2382 | -87.3465 | 62.5 | 3 | Dry Open Cut | 0.014 | 10.0 | Pipeline Crossing | 0.147 | 102.6 | 0.162 | 112.6 |
| 11.0 | SDKB004 | UT to Nesbitt Branch | Intermittent | 36.2430 | -87.3608 | 36.2428 | -87.3614 | 12.5 | 2 | Dry Open Cut | 0.003 | 10.0 | Pipeline Crossing | 0.022 | 76.5 | 0.025 | 86.5 |
| 11.1 | SDKB005 | UT to Nesbitt Branch | Intermittent | 36.2436 | -87.3643 | 36.2440 | -87.3639 | 3.5 | 1.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.005 | 68.2 | 0.006 | 78.2 |
| 11.2 | SDKB006 | UT to Nesbitt Branch | Ephemeral | 36.2441 | -87.3658 | 36.2445 | -87.3658 | 3.5 | 0.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 70.0 | 0.006 | 80.0 |
| 11.4 | SDKB007 | UT to Nesbitt Branch | Ephemeral | 36.2455 | -87.3687 | 36.2454 | -87.3688 | 5 | 0.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.007 | 62.0 | 0.008 | 72.0 |
| 11.4 | SDKB008 | Nesbitt Branch | Ephemeral | 36.2452 | -87.3689 | 36.2455 | -87.3689 | 5 | 0.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.005 | 45.2 | 0.006 | 55.2 |
| 11.9 | SDKB002 | UT to Furnace Creek | Ephemeral | 36.2474 | -87.3755 | 36.2481 | -87.3759 | 3.5 | 2 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.009 | 115.3 | 0.010 | 125.3 |
| 12.1 | SDKB009 | Furnace Creek | Perennial | 36.2498 | -87.3804 | 36.2493 | -87.3808 | 55 | 25 | Dry Open Cut | 0.013 | 10.0 | Pipeline Crossing | 0.117 | 92.9 | 0.130 | 102.9 |
| 13.2 | SDKK06 | Tributary to Dry Hollow Branch | Ephemeral | 36.2557 | -87.3979 | 36.2560 | -87.3970 | 3 | 2 | Dry Open Cut | 0.010 | 10.0 | Pipeline Crossing | 0.010 | 138.0 | 0.010 | 148.0 |
| 13.2 | SDKK07 | Tributary to Dry Hollow Branch | Ephemeral | 36.2555 | -87.3975 | 36.2559 | -87.3974 | 3 | 2 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.004 | 54.0 | 0.004 | 64.0 |
| 13.6 | SDKB010 | UT to Dry Hollow Branch | Ephemeral | 36.2585 | -87.4036 | 36.2580 | -87.4040 | 2 | 1 | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 70.3 | 0.004 | 80.3 |
| 13.9 | SDKB003 | UT to Dry Hollow Branch | Ephemeral | 36.2609 | -87.4118 | 36.2614 | -87.4088 | 4 | 3 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 65.4 | 0.007 | 75.4 |
| 14.0 | SDKB011 | Dry Hollow Branch | Perennial | 36.2610 | -87.4113 | 36.2610 | -87.4106 | 30 | 9.5 | Dry Open Cut | 0.007 | 10.0 | Pipeline Crossing | 0.135 | 196.3 | 0.142 | 206.3 |
| 14.0 | SDKB011 | Dry Hollow Branch | Perennial | 36.2614 | -87.4089 | 36.2614 | -87.4088 | 30 | 9.5 | N/A | 0.000 | 0.0 | Access Road | 0.014 | 21.0 | 0.014 | 21.0 |
| 14.3 | SDKB004 | UT to Dry Hollow Branch | Ephemeral | 36.2609 | -87.4118 | 36.2614 | -87.4088 | 6 | 2 | N/A | 0.000 | 0.0 | Workspace Crossing | 0.004 | 26.4 | 0.004 | 26.4 |
| 14.3 | SDKB005 | UT to Dry Hollow Branch | Intermittent | 36.2609 | -87.4118 | 36.2614 | -87.4088 | 3.5 | 2 | N/A | 0.000 | 0.0 | Workspace Crossing | 0.002 | 25.7 | 0.002 | 25.7 |
| 14.6 | SDKA046 | UT to Dry Hollow Branch | Intermittent | 36.2639 | -87.4195 | 36.2650 | -87.4198 | 8 | 1 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.014 | 74.8 | 0.016 | 84.8 |
| 14.6 | SDKB013 | UT to Dry Hollow Branch | Ephemeral | 36.2649 | -87.4211 | 36.2649 | -87.4203 | 3.5 | 1 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.013 | 164.3 | 0.014 | 174.3 |
| 14.6 | SDKB006 | UT to Dry Hollow Branch | Ephemeral | 36.2609 | -87.4118 | 36.2614 | -87.4088 | 6 | 2.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.012 | 84.2 | 0.013 | 94.2 |
| 14.8 | SDKB007 | UT to Dry Hollow Branch | Ephemeral | 36.2656 | -87.4237 | 36.2653 | -87.4233 | 2 | 0.5 | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.004 | 96.8 | 0.005 | 106.8 |
| 15.0 | SDKB014 | UT to Dry Hollow Branch | Intermittent | 36.2665 | -87.4261 | 36.2661 | -87.4265 | 5 | 0.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.011 | 94.3 | 0.012 | 104.3 |
| 15.1 | SDKB008 | UT to Dry Hollow Branch | Ephemeral | 36.2669 | -87.4288 | 36.2670 | -87.4286 | 3 | 1.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 88.6 | 0.007 | 98.6 |
| 15.1 | SDKB008 | UT to Dry Hollow Branch | Intermittent | 36.2669 | -87.4287 | 36.2668 | -87.4287 | 3 | 1.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.003 | 39.2 | 0.003 | 49.2 |
| 15.2 | SDKB015 | UT to Woods Valley Branch | Ephemeral | 36.2670 | -87.4302 | 36.2675 | -87.4304 | 4.5 | 0.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.009 | 85.4 | 0.010 | 95.4 |
| 15.2 | SDKB009 | UT to Dry Hollow Branch | Ephemeral | 36.2671 | -87.4301 | 36.2669 | -87.4306 | 2 | 1 | N/A | 0.000 | 0.0 | Workspace Crossing | 0.001 | 11.3 | 0.001 | 11.3 |
| 15.6 | SDKB017 | UT to Little Bartons Creek | Ephemeral | 36.2691 | -87.4373 | 36.2687 | -87.4373 | 2 | 0.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.003 | 67.6 | 0.004 | 77.6 |
| 15.8 | SDKB018 | UT to Little Bartons Creek | Ephemeral | 36.2696 | -87.4396 | 36.2698 | -87.4404 | 4 | 1 | N/A | 0.000 | 0.0 | Workspace Crossing | 0.026 | 277.8 | 0.026 | 277.8 |
| 15.8 | SDKB018 | UT to Little Bartons Creek | Ephemeral | 36.2718 | -87.4425 | 36.2718 | -87.4426 | 4 | 1 | N/A | 0.000 | 0.0 | Access Road | 0.002 | 20.1 | 0.002 | 20.1 |
| 16.0 | SDKB019 | UT to Little Bartons Creek | Ephemeral | 36.2706 | -87.4435 | 36.2704 | -87.4436 | 2.5 | 1 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.003 | 54.6 | 0.004 | 64.6 |
| 16.0 | SDKB019 | UT to Little Bartons Creek | Ephemeral | 36.2718 | -87.4427 | 36.2717 | -87.4427 | 2.5 | 1 | N/A | 0.000 | 0.0 | Access Road | 0.002 | 32.7 | 0.002 | 32.7 |
| 16.1 | SDKB020 | UT to Little Bartons Creek | Ephemeral | 36.2710 | -87.4460 | 36.2713 | -87.4460 | 2 | 1 | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 60.0 | 0.003 | 70.0 |
| 16.7 | SDKB023 | Little Bartons Creek | Perennial | 36.2725 | -87.4518 | 36.2727 | -87.4524 | 20 | 1.5 | Dry Open Cut | 0.005 | 10.0 | Pipeline Crossing | 0.033 | 71.9 | 0.038 | 81.9 |
| 17.2 | SDKA056 | UT to Leatherwood Creek | Ephemeral | 36.2747 | -87.4652 | 36.2750 | -87.4647 | 3.5 | 0.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.004 | 50.0 | 0.005 | 60.0 |
| 17.5 | SDKA047 | UT to Leatherwood Creek | Ephemeral | 36.2749 | -87.4715 | 36.2748 | -87.4716 | 2 | 0.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.004 | 78.7 | 0.004 | 88.7 |
| 17.5 | SDKA047 | UT to Leatherwood Creek | Ephemeral | 36.2749 | -87.4715 | 36.2748 | -87.4716 | 2 | 0.5 | N/A | 0.000 | 0.0 | Access Road | 0.001 | 20.1 | 0.001 | 20.1 |
| 19.0 | SDKB025 | UT to Leatherwood Creek | Intermittent | 36.2833 | -87.4932 | 36.2837 | -87.4939 | 10 | 7 | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.055 | 240.3 | 0.057 | 250.3 |
| 19.0 | SDKB025 | UT to Leatherwood Creek | Intermittent | 36.2840 | -87.4947 | 36.2838 | -87.4951 | 10 | 7 | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.027 | 117.0 | 0.029 | 127.0 |
| 19.1 | SDKB026 | Leatherwood Creek | Perennial | 36.2845 | -87.4962 | 36.2839 | -87.4960 | 22.5 | 3 | Dry Open Cut | 0.005 | 10.0 | Pipeline Crossing | 0.044 | 85.0 | 0.049 | 95.0 |

App-0287

| 19.2 | SDKB027 | UT to Leatherwood Creek | Intermittent | 36.2845 | -87.4980 | 36.2850 | -87.4978 | 10 | 7 | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.015 | 66.7 | 0.018 | 76.7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19.3 | SDKB028 | UT to Leatherwood Creek | Intermittent | 36.2855 | -87.4995 | 36.2856 | -87.5019 | 10 | 7 | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.041 | 179.8 | 0.044 | 189.8 |
| 19.3 | SDKB028 | UT to Leatherwood Creek | Intermittent | 36.2855 | -87.5007 | 36.2855 | -87.5007 | 10 | 7 | N/A | 0.000 | 0.0 | Workspace Crossing | 0.041 | 179.8 | 0.044 | 4.4 |
| 19.8 | SDKR010 | UT to Leatherwood Creek | Ephemeral | 36.2881 | -87.5081 | 36.2877 | -87.5088 | 5 | 1 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.012 | 105.1 | 0.013 | 115.1 |
| 20.4 | SHNW002 | UT to Williamson Branch | Ephemeral | 36.2909 | -87.5186 | 36.2907 | -87.5188 | 3.5 | 1 | N/A | 0.000 | 0.0 | Workspace Crossing | 0.002 | 22.5 | 0.002 | 22.5 |
| 20.7 | SHNW003a | UT to Williamson Branch | Ephemeral | 36.2924 | -87.5231 | 36.2923 | -87.5243 | 3.5 | 3 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.012 | 152.0 | 0.013 | 162.0 |
| 20.8 | SHNW004a | UT to Williamson Branch | Ephemeral | 36.2931 | -87.5251 | 36.2927 | -87.5253 | 2 | 2 | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 69.6 | 0.004 | 79.6 |
| 21.1 | SHNC042 | UT to Williamson Branch | Ephemeral | 36.2945 | -87.5296 | 36.2940 | -87.5297 | 5 | 0.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.008 | 73.0 | 0.010 | 83.0 |
| 21.6 | SHNC001 | UT to Williamson Branch | Ephemeral | 36.3376 | -87.6087 | 36.3372 | -87.6090 | 3.5 | 2.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.004 | 46.6 | 0.005 | 56.6 |
| 21.6 | SHNC002 | UT to Williamson Branch | Ephemeral | 36.3401 | -87.6140 | 36.3403 | -87.6139 | 2 | 1.5 | N/A | 0.000 | 0.0 | Workspace Crossing | 0.001 | 17.6 | 0.001 | 17.6 |
| 21.6 | SHNC003 | UT to Williamson Branch | Ephemeral | 36.3404 | -87.6145 | 36.3407 | -87.6144 | 6 | 5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.011 | 83.3 | 0.013 | 93.3 |
| 21.7 | SHNC004 | UT to Williamson Branch | Ephemeral | 36.2978 | -87.5409 | 36.2973 | -87.5410 | 3.5 | 2.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.005 | 61.9 | 0.006 | 71.9 |
| 21.9 | SHNC006 | UT to Yellow Creek | Ephemeral | 36.2986 | -87.5439 | 36.2985 | -87.5441 | 2 | 1 | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 63.8 | 0.003 | 73.8 |
| 22.0 | SHNC006 | UT to Yellow Creek | Ephemeral | 36.2985 | -87.5451 | 36.2986 | -87.5453 | 2 | 1 | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 69.7 | 0.004 | 79.7 |
| 22.3 | SHNC010-1 | UT to Yellow Creek | Intermittent | 36.2978 | -87.5494 | 36.2978 | -87.5494 | 10 | 0.2 | HDD | 0.000 | 0.0 | Pipeline Crossing | 0.000 | 0.0 | 0.000 | 0.0 |
| 22.4 | SHNC007-1 | Yellow Creek | Perennial | 36.2982 | -87.5500 | 36.2982 | -87.5500 | 115 | 111 | HDD | 0.000 | 0.0 | Pipeline Crossing | 0.000 | 0.0 | 0.000 | 0.0 |
| 22.9 | SHNC018 | UT to Yellow Creek | Intermittent | 36.3025 | -87.5572 | 36.3024 | -87.5575 | 25 | 4 | Dry Open Cut | 0.006 | 10.0 | Pipeline Crossing | 0.051 | 88.9 | 0.057 | 98.9 |
| 22.9 | SHNC018 | UT to Yellow Creek | Intermittent | 36.3021 | -87.5592 | 36.3021 | -87.5592 | 25 | 4 | N/A | 0.000 | 0.0 | Access Road | 0.012 | 20.1 | 0.012 | 20.1 |
| 23.2 | SHNC015 | UT to Yellow Creek | Ephemeral | 36.3038 | -87.5628 | 36.3046 | -87.5635 | 10 | 7 | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.026 | 114.7 | 0.029 | 124.7 |
| 24.1 | SHNE002 | UT to Indian Branch | Ephemeral | 36.3098 | -87.5770 | 36.3096 | -87.5770 | 2 | 0.5 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.004 | 80.5 | 0.004 | 90.5 |
| 24.1 | SHNC020* | Indian Branch | Intermittent | 36.3100 | -87.5770 | 36.3094 | -87.5772 | 8.5 | 4 | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.014 | 74.0 | 0.016 | 84.0 |
| 24.3 | SHNC021 | UT to Indian Branch | Ephemeral | 36.3106 | -87.5796 | 36.3103 | -87.5796 | 3.5 | 0.1 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 77.1 | 0.007 | 87.1 |
| 24.4 | SHNC022 | UT from Guices Branch | Ephemeral | 36.3114 | -87.5814 | 36.3123 | -87.5818 | 3.5 | 0.2 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.009 | 106.4 | 0.009 | 116.4 |
| 24.5 | SHNC023 | UT from Guices Branch | Intermittent | 36.3118 | -87.5828 | 36.3124 | -87.5822 | 3.5 | 0.1 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 79.0 | 0.007 | 89.0 |
| 24.6 | SHNC024 | UT from Guices Branch | Ephemeral | 36.3130 | -87.5847 | 36.3138 | -87.5843 | 3.5 | 0.1 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 70.7 | 0.006 | 80.7 |
| 24.7 | SHNC025 | UT from Guices Branch | Ephemeral | 36.3141 | -87.5860 | 36.3146 | -87.5858 | 3.5 | 0.2 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 79.7 | 0.007 | 89.7 |
| 25.1 | SHNC023-2 | UT from Guices Branch | Ephemeral | 36.3187 | -87.5878 | 36.3188 | -87.5877 | 3.5 | 0.1 | N/A | 0.000 | 0.0 | Access Road | 0.002 | 20.6 | 0.002 | 20.6 |
| 25.4 | SHNC030 | UT from Guices Branch | Intermittent | 36.3195 | -87.5886 | 36.3219 | -87.5923 | 10 | 4 | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.016 | 69.5 | 0.018 | 79.5 |
| 25.6 | SHNE003 | UT from Guices Branch | Ephemeral | 36.3243 | -87.5930 | 36.3241 | -87.5939 | 3.5 | 2 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.005 | 65.1 | 0.006 | 75.1 |
| 25.7 | SHNE004 | UT from Guices Branch | Ephemeral | 36.3252 | -87.5947 | 36.3253 | -87.5949 | 2 | 1 | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.002 | 53.6 | 0.003 | 63.6 |
| 25.7 | SHNE004 | UT from Guices Branch | Ephemeral | 36.3253 | -87.5948 | 36.3252 | -87.5950 | 2 | 1 | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.003 | 66.5 | 0.004 | 76.5 |
| 25.8 | SHNE005 | UT from Guices Branch | Ephemeral | 36.3267 | -87.5955 | 36.3264 | -87.5962 | 3.5 | 1 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.007 | 92.0 | 0.008 | 102.0 |
| 25.8 | SHNE006 | UT from Guices Branch | Ephemeral | 36.3268 | -87.5955 | 36.3265 | -87.5962 | 4 | 3 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.006 | 66.1 | 0.007 | 76.1 |
| 26.2 | SHNA011 | UT from Guices Branch | Intermittent | 36.3313 | -87.6007 | 36.3312 | -87.6009 | 12.5 | 2 | Dry Open Cut | 0.003 | 10.0 | Pipeline Crossing | 0.019 | 65.3 | 0.022 | 75.3 |
| 26.2 | SHNA011 | UT from Guices Branch | Intermittent | 36.3310 | -87.6011 | 36.3309 | -87.6012 | 12.5 | 2 | N/A | 0.000 | 0.0 | Access Road | 0.007 | 22.9 | 0.007 | 22.9 |
| 26.4 | SHNA012 | Guices Branch | Intermittent | 36.3327 | -87.6041 | 36.3329 | -87.6040 | 17.5 | 1 | Dry Open Cut | 0.004 | 10.0 | Pipeline Crossing | 0.033 | 82.7 | 0.037 | 92.7 |
| 26.4 | SHNA012 | Guices Branch | Intermittent | 36.3309 | -87.6035 | 36.3309 | -87.6036 | 17.5 | 1 | N/A | 0.000 | 0.0 | Access Road | 0.008 | 20.6 | 0.008 | 20.6 |
| 26.9 | SHNA001 | Guices Creek | Perennial | 36.3376 | -87.6087 | 36.3372 | -87.6090 | 20 | 15 | Dry Open Cut | 0.005 | 10.0 | Pipeline Crossing | 0.031 | 68.6 | 0.036 | 78.6 |
| 27.3 | SHNA003 | UT to Guices Creek | Ephemeral | 36.3404 | -87.6145 | 36.3407 | -87.6144 | 2 | 0.5 | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.002 | 40.0 | 0.002 | 50.0 |
| 27.5 | SHNA007 | UT to Guices Creek | Ephemeral | 36.3429 | -87.6182 | 36.3428 | -87.6186 | 6 | 2 | N/A | 0.000 | 0.0 | Workspace Crossing | 0.003 | 20.0 | 0.003 | 20.0 |

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27.5 | SHNB031 | UT to Guices Creek | Ephemeral | 36.3429 | -87.6182 | 36.3430 | -87.6178 | 6 | 2 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.010 | 73.0 | 0.011 | 83.0 |
| 28.0 | SHNB030 | UT to Guices Creek | Interm ttent | 36.3472 | -87.6254 | 36.3476 | -87.6256 | 3.5 | 2 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.013 | 158.1 | 0.014 | 168.1 |
| 28.0 | SHNB030 | UT to Guices Creek | Interm ttent | 36.3477 | -87.6257 | 36.3478 | -87.6258 | 3.5 | 2 | N/A | 0.000 | 0.0 | Access Road | 0.002 | 30.8 | 0.002 | 30.8 |
| 28.6 | SHNB033-1 | Licksk llet Branch | Perennial | 36.3527 | -87.6339 | 36.3520 | -87.6339 | 22.5 | 3 | Dry Open Cut | 0.005 | 10.0 | Pipeline Crossing | 0.049 | 94.9 | 0.054 | 104.9 |
| 28.9 | SHNB033-2 | Licksk llet Branch | Perennial | 36.3549 | -87.6388 | 36.3551 | -87.6379 | 10 | 3 | Dry Open Cut | 0.002 | 10.0 | Pipeline Crossing | 0.030 | 129.4 | 0.032 | 139.4 |
| 29.0 | SHNA008 | UT to Lickskillet Branch | Perennial | 36.3548 | -87.6395 | 36.3547 | -87.6395 | 3.5 | 0.5 | N/A | 0.000 | 0.0 | Workspace Crossing | 0.004 | 43.6 | 0.004 | 43.6 |
| 29.0 | SHNA008 | UT to Lickskillet Branch | Perennial | 36.3544 | -87.6395 | 36.3546 | -87.6395 | 3.5 | 0.5 | N/A | 0.000 | 0.0 | Access Road | 0.005 | 61.6 | 0.005 | 61.6 |
| 29.0 | SHNA013 | UT to Lickskillet Branch | Ephemeral | 36.3557 | -87.6390 | 36.3558 | -87.6398 | 2 | 1 | Dry Open Cut | 0.000 | 10.0 | Pipeline Crossing | 0.005 | 114.4 | 0.006 | 124.4 |
| 29.0 | SHNB032 | UT to Lickskillet Branch | Ephemeral | 36.3558 | -87.6400 | 36.3562 | -87.6397 | 6.5 | 2 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.011 | 74.2 | 0.013 | 84.2 |
| 30.2 | SHNB034 | UT to Lickskillet Branch | Ephemeral | 36.3663 | -87.6556 | 36.3668 | -87.6556 | 3.5 | 2 | Dry Open Cut | 0.001 | 10.0 | Pipeline Crossing | 0.005 | 67.9 | 0.006 | 77.9 |
| 30.2 | SHNB033-3 | Licksk llet Branch | Perennial | 36.3664 | -87.6559 | 36.3676 | -87.6563 | 17.5 | 3 | Dry Open Cut | 0.004 | 10.0 | Pipeline Crossing | 0.027 | 66.4 | 0.031 | 76.4 |
| 30.7 | SHNA010 | Wells Creek | Perennial | 36.3713 | -87.6622 | 36.3716 | -87.6612 | 60 | 3 | HDD | 0.000 | 0.0 | Pipeline Crossing | 0.000 | 0.0 | 0.000 | 0.0 |

**App-0289**

**Appendix B**

**Public Notice Comments and Responses**

**LRN-2021-00866**

**PUBLIC NOTICE COMMENTS AND RESPONSES**

***Many commentors requested a public hearing***

Response:

The primary reason for holding a public hearing is to obtain information that is not otherwise available, and which is necessary to properly evaluate the permit application. We considered the stated reason(s) for each request for a public hearing and determined that none of the requests identified issues within the Corps scope of authority that did not already have sufficient information in the administrative record. The Corps sent a letter explaining the basis for the Corps decision to each individual that requested a public hearing.

***A few commentors requested an extension to the comment period due to the size of the project, amount of associated data, and controversial nature of the project, stating that the Corps must allow sufficient time for meaningful public review and comment on all relevant information.***

Response:

Two separate public notices were issued by USACE in association with the project (PN 23-02 on February 14, 2023, and PN 23-13 on April 11, 2023). The public participation opportunities in the Corps evaluation of the permit application are described in Section 4.0 of the Corps Decision Document.

***A commentor requested that the PN be cancelled due to an incomplete application.***

Response:

A DA application will be determined to be complete for public notice when the information identified at 33 CFR 325.1(d) and 325.3(a) has been received. This office determined the application contained the information required to issue a public notice. The original DA application did not include crossing information along approximately 1.15 miles of the pipeline route (six crossings of streams), which were subsequently identified by the applicant. The entire project with the addition of these crossings was re-advertised by a second public notice (PN 23-13) on April 11, 2023. The applicant then submitted updates to the crossings along the 1.15 mile of pipeline based on field surveys that were completed.   We determined that the applicant's modification to the number of stream crossings did not result in a significant change to the proposed activity. Consistent with 33 CFR § 325.3, the Corps had already advised the public

through two notices of the proposed activity and provided sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful public comment. A third public notice and comment period was unlikely to yield information not already in the administrative record and therefore was unnecessary to assist this office in reaching a permit decision.

**_Multiple commentors expressed that additional data that was not included in the USACE public notice should be made available to the public for review and comment_**

Response:

The regulations at 33 CFR 325.3(a) require sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment from the public. The required items are listed at 33 CFR 325.3(a). Public Notice 23-13 included the items listed at 33 CFR 325.3(a).

**_Many commenters requested denial of the permit without citing any regulatory rationale._**

Response:

Denial of a permit application without a basis would be arbitrary and capricious.

**_A commentor stated that the Corps must prepare a supplemental environmental impact statement (EIS) or insist on significant changes to and additional comment on FERCs draft EIS because that NEPA document does not contain adequate information to allow USACE to determine the LEDPA or satisfy NEPA's requirements with regard to the environmental effects of the proposed stream and wetland crossings._**

**_A commentor stated that USACE has an independent obligation to make determinations on public interest, applicant information, LEDPA analysis, riffle pool complex presence, crossing methods, rock removal methods, NEPA, and water quality._**

Response:

The USACE was a cooperating agency during FERC's (lead federal agency) development of the EIS.  40 CFR 1501.11 states that Agencies should tier their environmental assessments when it would eliminate repetitive discussions of the same issues, focus on the actual issues ripe for decision, and exclude from consideration issues already decided or not yet ripe at each level of environmental review.  When an agency has prepared an environmental impact statement or environmental assessment for a program or policy and then prepares a subsequent statement or assessment on an action included within the entire program or policy (such as a project- or site-specific action), the tiered document needs only to summarize and incorporate by reference the issues discussed in the broader document. The tiered document shall concentrate on

the issues specific to the subsequent action. Tiering is appropriate when the sequence from an environmental impact statement or environmental assessment is from a policy environmental impact statement or environmental assessment to an assessment of lesser or narrower scope or to a site-specific statement or assessment.

The USACE evaluated the application for effects arising from the temporary placement of fill in waters of the U.S. during construction of the pipeline, within the limits of USACE authority and responsibility. Construction-related impacts of utility line projects to waters of the US and construction methods proposed to minimize adverse effects to aquatic resources were addressed in the FERC EIS and supplemented when necessary in the Corps decision document. The Corps analysis of alternatives and LEDPA are detailed in Sections 5.0 and 6.0 of the Corps Decision Document.

***Several Commenters questioned the applicant's purpose and need.***

Response:

The applicant's purpose and need statement provides the basis for developing a range of alternatives, the criteria for comparative evaluation of alternatives, and the basis of criteria for comparing alternatives. It dictates the range of alternatives which may be considered reasonable, prudent, and practicable, consistent with the environmental process requirements of NEPA and the 404 (b)(1) guidelines.

The Corps reviewed the applicant's purpose and need statement and found that it was not so narrow in definition nor so specific that it predetermined the outcome or eliminated otherwise reasonable alternatives, nor was it so vague that evaluation criteria or measurable objectives could not be determined. The purpose and need are discussed in Section 3.0 of the Corps Decision Document and in Section 1.1 of the FERC EIS.

***Many commentors expressed concern that an alternative analysis/ least environmentally damaging practicable alternative (LEDPA) determination was not completed.***

*Response:*

Alternatives were reviewed and the LEDPA determined as summarized in Section 5.0 and Section 6.0 of the Corps Decision Document. Alternatives under NEPA are discussed in Section 3 of FERCs FEIS.

***Many commentors stated that they do not believe all alternative routes were evaluated by the applicant/FERC.***

Response:

Alternative routes for the pipeline were considered in section 3.3 of the EIS. FERC stated that it is unaware of any more suitable routes associated with Tennessee Gas Pipeline LLC's current system, nor has any other natural gas companies proposed a

project that has the additional capacity available to serve the purpose of the Project and is a shorter distance than the current route. Potential route alternatives are discussed in Section 5.0 of the Corps Decision Document.

**A commentor states that the applicant must consider additional minor deviations to the route alignment to avoid stream and habitat impacts, especially special aquatic sites such as wetlands or riffle pool complexes.**

Response:

The applicant responded to this comment describing minor variations to the route proposed at mile posts 8.5, 12.5, 16.5, 22.7, 26, and 30-32 in order to avoid and minimize impacts to wetlands or waterbodies along the proposed route.

***Many commentors expressed concern that alternative energy sources such as hydropower, wind, thermal, wave, or solar were not considered and/or that prior TVA environmental documents/decisions associated with the decision to construct a natural gas plant were flawed.***

*Response:*

Requiring development of alternative energy sources is not within the Corps' regulatory authority**.** USACE's authority under §404 of the CWA is limited to fill placed within waters of the United States during construction of the pipeline and work or structures in, under, or over navigable waters under §10 of the Rivers and Harbors Act**.**

***A commentor stated that alternative crossing methods were not adequately described, and that the applicant did not consider all methods of trenchless installation methods such as guided conventional boring, micro-tunnelling, direct pipe, or directional micro-tunneling.***

Response:

Trenchless methods (HDD, micro-tunneling, etc.) to install the pipeline beneath a stream does not require fill in waters, and therefore does not require a §404 permit under the Clean Water Act and would not require review by the Corps. The choice of trenchless method by the applicant is outside the scope of the Corps assessment of effects of fill in waters of the United States.

Trenchless installation beneath a navigable water likewise does not require fill in waters but does require a §10 permit under the Rivers and Harbors Act. Jones Creek is the only navigable water crossed by the Cumberland Pipeline Project. A navigation channel is not maintained in Jones Creek. The scope of the Corps review for the pipeline crossing beneath a navigable water concerns whether it would create an obstruction to navigation or interfere with maintenance dredging of a navigation channel. The choice of trenchless method is not relevant to whether an installed pipeline would create an obstruction to navigation or interfere with channel maintenance so long as it is installed at a sufficient depth below the channel grade.

The applicant compared open-trench methods to trenchless methods. The applicant assessed feasibility of employing HDD at all crossings proposed. This analysis included geological surveys, reviews of nearby drinking water sources, private wells, residences, and mining activities. When evaluating whether the exclusive use of HDD would be practicable, the applicant considered crossing length, potential risk of loss of drilling fluid, geology, estimated time required to complete crossings, safety/technical feasibility, and the cost of HDD. The applicant states that each HDD crossing would require borings of a minimum of 1300 linear feet to achieve sufficiently shallow angles for acceptable stress on the finished pipeline.  Much of the terrain of the Western Highland Rim is not conducive for HDD methods due to slopes at crossing points. Additionally, HDDs in such terrain create the need for greater drilling pressure, which in turn increases the risk of inadvertent drilling fluid loss. The applicant states that costs of an HDD crossing compared to open-cut method is generally 5 times more per foot. The applicant states that the timeline associated with an HDD/conventional bore crossings are approximately 10 days to 1 month, compared to open-cut methods which take approximately 1-2 days. Our assessment of the logistics of using HDD at every crossing was that the additional cost and time of construction is not reasonable and is therefore not a practicable alternative. However, we did consider the potential for reduced harm to the environment if HDD was used instead of an open trench to effect a crossing. We determined that construction would be disruptive to nearby residents for weeks or months, rather than days. The noise of HDD equipment would be a major factor of disruption. We considered the potential for unintended release of drilling fluids in the geology of the Western Highland Rim and regard it as high based on our knowledge of the region and previous experience with HDD crossings. Inadvertent loss of drilling fluid is not a rare occurrence in the geologic formations of Middle Tennessee. Our experience has been that the emergence of drilling fluid during a "frac-out" is unpredictable in volume and exact location. The physical properties of bentonite slurry make it highly mobile and difficult to contain when it is released within a waterbody, and therefore has a high potential to degrade stream habitat downstream. Aquatic organisms, especially benthics, are sensitive to the suspended and fine sediments of such a slurry. In addition, upland worksites at each end of the HDD tend to be compacted by the activity of crews and equipment at drilling sites, because of the volume of water involved and the duration required to effect a crossing. The residual bentonite tends to accumulate at these sites, which likely adds to long-term compaction and other detrimental effects on the affected soils. However, the selective use of HDD may be practicable to address the peculiarities of certain crossings; working around existing utilities or other infrastructure, are examples.

Appendix G of FERCs EIS provides a comprehensive list of conditions and mitigation measures to avoid, minimize, and/or mitigate any adverse impacts from the proposed project.

***A commentor stated that analysis was not completed at an acceptable level of scope (crossing by crossing) and requested that the applicant provide information concerning the justification of crossing type at each crossing***

Response:

Geologic, hydrologic, and watershed conditions at each waterbody crossing location was included in the permit application (Table 2.7-3: Waterbodies Crossings Hydrologic Risk Analysis).

***A commentor stated that the applicant has not made enough of an effort to identify and quantify impacts to riffle pool complexes. Commentors were concerned that open cut methods may impact riffle pool complexes.***

Response:

Streams of the Western Highland Rim typically exhibit riffle and pool sequences. We assumed each stream crossed by the proposed pipeline would have such channel features.

The morphology of a stream channel at a particular point along its course, such as sinuosity, channel dimensions, channel profile, and spacing of riffles, runs, and pools is largely determined by watershed-scale factors. These include the region's climate, geology of the watershed, the size of the watershed, slope of the stream valley, particle size of the bedload, and land use. The temporary excavation and backfill to original elevations of a trenched crossing within a short reach of stream (applicant states average trench width of 4.5 ft) would not affect watershed-scale factors, and therefore the major channel processes that form and maintain riffle and pool complexes and other stream-channel features will remain intact.

The local disturbance to the stream bed is soon restored by the stream itself. Fluvial processes will sort and redistribute stream substrate after the trench is backfilled to the original elevations. Natural stream-bed substrates in the Western Highland Rim are typically gravels, sands, sediments, and organic matter. During high water events, the top few inches of streambed substrate are entrained in the flow (stream bedload) and are re-deposited as the flows recede.  Natural stream substrate will be established over the backfilled trenches by these processes after one or a few high-flow events. The frequency of flows capable of channel forming is typically on a 1.5-year recurrence interval in the Western Highland Rim, or on average, about once every 18 months.

***A commentor stated that using blasting as the rock removal method is unacceptable and cannot be used unless it has been independently verified that no other rock removal options are practicable.***

*Response:*

The applicant states that at each waterbody crossing, one or more non-blasting rock removal methods would be selected and implemented, prior to moving to controlled blasting to remove rock if other methods are demonstrated to be impracticable. These rock removal methods include conventional excavation with an excavator, ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator, hammering with a pointed backhoe attachment or pneumatic rock hammer, followed by removal by excavator, removal of material by rock trencher, and as a last resort - controlled blasting and excavation with a backhoe. The applicant states that no controlled blasting would be implemented in karst-prone geologic terrane or in wetlands. Controlled blasting would only be conducted in dry workplace conditions and in areas in which the risk of hydrologic loss has been determined to be reduced. Blasting is discussed in Section 4.1.6 in the FERC EIS. The Corps permit would include a special condition that the applicant shall select the least impactful trenching technique practicable. For any crossings in which blasting is identified as necessary, written justification, site specific blasting operations and monitoring plans would be sent to the Corps for concurrence.  Blasting would not commence until the applicant is in receipt of written concurrence from the Corps.

***A commentor expressed concern that field construction contractors would make decisions about blasting during construction***

Response:

If blasting is considered at a particular crossing site, contractors would be required to submit site-specific blasting plans at minimum to the applicant, TDEC, and the Corps for approval prior to blasting activities for each location requiring blasting. Pre- and post-blasting monitoring reports would be required at each applicable stream crossing.  Part of this report includes documenting attempts to implement practicable alternatives to blasting and the site-specific factors necessitating blasting. Blasting is discussed in Section 4.1.6 in the FERC EIS.

***A commentor asked for clarification of which streams would be subject to blasting, expressing concern that some stream identified as medium to high risk of hydrologic loss have been also documented as being candidates for blasting.***

Response:

Blasting would not occur in waters of the United States or immediately adjacent uplands identified by the applicant as having karst prone geology with an unacceptable risk of hydrologic loss as identified in table 2.7.3 in the application submitted August 22, 2022. Blasting is discussed in Section 4.1.6 in the FERC EIS.

***A commentor requests that the Corps evaluate the temporary road crossing methods used by the applicant***

Response:

Temporary fills due to side casting of materials in wetlands and streams would be removed and waters restored to pre-existing elevations in accordance with the FERC Procedures. All temporary matting and/or equipment bridges would be removed after construction is complete.

***A commentor noted that FERC failed to identify all impaired streams to be impacted by the proposed project within the draft EIS. Commentor stated that Leatherwood Creek should also be acknowledged as impaired.***

Response:

*In section 4.3.2.2 of the EIS FERC acknowledged the additional impaired water stating that "*Leatherwood Creek was added to the 2022 303(d) list for "cause unknown" and "source unknown."

***A commentor stated that the applicant is incorrect in stating that the open cut crossings would result in only minor, short term impacts including temporary localized increases in turbidity levels and downstream sediment deposition. The commentor stated that the open cut crossing impacts could be permanent and effects could last many months to years.***

Response:

The commentor did not specify what impacts could be permanent and which effects could last many months or years. Our assessment of environmental effects arising from the regulated activity under the Corps' authority is that that the majority of impacts proposed by the applicant (aside from the wetland conversion of PFO to PEM) are temporary in nature. Following construction, pre-construction contours would be restored in the impacted waters. The applicant detailed minimization efforts throughout their application, which are documented in the FERC EIS that would minimize adverse effects to aquatic resources. The applicant states that prior to construction at each aquatic crossing, they would implement flume or dam-and-pump measures to allow the work to be accomplished "in the dry" while also ensuring continuous flow of water to downstream habitat. The applicant has proposed vegetative stabilization using native species at all disturbed areas in or near aquatic resources within 14 days of the completion of Project activities at each aquatic resource, which would further mitigate runoff and sedimentation into streams while helping prevent erosion. See the applicant's response to public comment and FERCs EIS Appendix F and Appendix G for details on crossing methodology and mitigation procedures.

The morphology of a stream channel at a particular point along its course, such as sinuosity, channel dimensions, channel profile, and spacing of riffles, runs, and pools is largely determined by watershed-scale factors. These include the region's climate, the size of the watershed, slope of the stream valley, particle size of the bedload, and land use. The temporary excavation and backfill to original elevations of a trenched crossing within a short reach of stream would not affect watershed-scale factors, and therefore

the major channel processes that form and maintain riffle and pool complexes and other stream-channel features will remain intact.

The local disturbance to the stream bed is soon restored by the stream itself. Fluvial processes will sort and redistribute stream substrate after the trench is backfilled to the original elevations. Natural stream-bed substrates in the Western Highland Rim are typically gravels, sands, sediments, and organic matter. During high water events, the top few inches of streambed substate are entrained in the flow (stream bedload) and are re-deposited as the flows recede.  Natural stream substrate will be re-stablished over the backfilled trenches by these processes after one or a few high-flow events. The frequency of flows capable of channel forming is typically on a 1.5-year recurrence interval in the Western Highland Rim, or on average, about once every 18 months.

***A commentor stated that the applicant's crossings threaten significant adverse effects to special aquatic sites (wetlands and riffle pool complexes).***

Response:

Section 4 of the EIS addresses potential impacts on surface waters. Effects would include increases in turbidity and sedimentation, increased water temperatures, depletion of dissolved oxygen levels, and decreased water quality during and immediately following pipeline construction. However, these impacts would be temporary and minor. The measures the applicant would implement to minimize impacts on surface water resources are in Section 4.3.2.6, which included erosion controls, a SWPPP, construction during low-flow conditions, sediment barriers, minimizing crossing lengths, and restoration of contours. In Section 4.3.2.6 of the EIS FERC concluded that impacts to surface waters would be adequately minimized and not significant based on the construction plans and minimization efforts.

In section 4 of the EIS FERC states that the primary impact of the proposed Project construction on wetlands would be the potential alteration of wetland vegetation due to the clearing, excavation, rutting, compaction, and mixing of topsoil and subsoil. Temporary construction impacts on wetlands could include the loss of vegetation; soil disturbance associated with grading, trenching, and stump removal; and changes in the hydrological profile due to excavation or compaction. Impacts on wetlands would be the greatest during and immediately following construction. Most of these effects would be short-term in nature and would cease when or shortly after the wetlands are restored or revegetated. The applicant has indicated that wetland areas would be allowed to revegetate naturally in accordance with its Procedures. Following restoration, wetlands would eventually transition back into a community similar to that of the pre-construction state. The applicant would further minimize impacts on wetlands by implementing the construction and mitigation measures outlined in its ECMP, which incorporates the Procedures, and by adhering to applicable permit requirements. General construction and mitigation measures include limiting the ROW width in wetland areas, sediment barriers, stabilizing mats, and installing trench plugs as necessary to maintain wetland hydrology. Permanent impacts on wetlands would include the conversion of less than an acre of PFO wetland to PEM/PSS wetland within the maintained permanent pipeline

**App-0299**

easement. The applicant has proposed mitigation for this wetland impact.  FERC states that while long-term and permanent effects on wetlands would occur, the applicant's adherence to the measures in its Plan and Procedures would ensure that impacts are not significant.

The morphology of a stream channel at a particular point along its course, such as sinuosity, channel dimensions, channel profile, and spacing of riffles, runs, and pools is largely determined by watershed-scale factors. These include the region's climate, the size of the watershed, slope of the stream valley, particle size of the bedload, and land use. The temporary excavation and backfill to original elevations of a trenched crossing within a short reach of stream would not affect watershed-scale factors, and therefore the major channel processes that form and maintain riffle and pool complexes and other stream-channel features will remain intact.

The local disturbance to the stream bed is soon restored by the stream itself. Fluvial processes will sort and redistribute stream substrate after the trench is backfilled to the original elevations. Natural stream-bed substrates in the Western Highland Rim are typically gravels, sands, sediments, and organic matter. During high water events, the top few inches of streambed substate are entrained in the flow (stream bedload) and are re-deposited as the flows recede.  Natural stream substrate will be re-stablished over the backfilled trenches by these processes after one or a few high-flow events. The frequency of flows capable of channel forming is typically on a 1.5-year recurrence interval in the Western Highland Rim, or on average, about once every 18 months.

***A commentor stated that the proposed project would cause or contribute to significant degradation of WOTUS and the environment.***

Authorization of temporary fill in waters of the United States during construction of this pipeline project is minor in effect and of short duration. Portions of the project requiring crossing of WOTUS is a small fraction of the overall construction of the pipeline (0.6% of the total) and is likely eligible for coverage under Nationwide permit. The Corps authorization of temporary fill in waters is therefore not a "major federal action" with significant effects to the environment.  The Corps evaluation of cumulative effects and determination of the significance of anticipated impacts are summarized in Section 9 and Section 12 of the Corps Decision Document.

***A commentor stated that the applicant has not provided sufficient information to allow the Corps to make factual determinations required by the 404 (b)(1) guidelines.***

Response:

The applicant provided sufficient information for the Corps evaluation for compliance with the Section 404(b)(1) guidelines. The Corps evaluation is in Section 6 of the decision document.

***A commentor stated that more information about each disposal site is required for the Corps to make determinations of impacts to the disposal site***

Response:

40 CFR 230.11(f) states that the permitting authority shall consider factors listed in determining the acceptability of a proposed mixing zone. The "disposal site" is where a discharge of dredged or fill material is proposed in WOTUS. These were described in the delineation of waters report submitted by the applicant, which included flow regimes, photographs of resources, and stream delineation forms. Due to the temporary nature of the majority of the impacts being proposed, and that work is being completed during dry conditions whenever possible, impacts to the proposed disposal sites has been minimized to the maximum extent practicable. Evaluation of the disposal sites is summarized in Section 6 of the decision document.

The applicant stated in their public comment response that all excess construction materials and debris (e.g., timber, slash, mats, garbage, drill cuttings and fluids, excess rock) would be collected, contained, and disposed of in compliance with all applicable survey, landowner or land management agency approval, and permit requirements. Any excavated material not used as backfill would be removed and disposed of in accordance with local, state, and federal conditions and disposed of outside the 100-year floodplain. Containment and disposal of the drilling mud used for HDD would be performed in accordance with applicable permit requirements. Waste drilling fluid and cuttings would be collected, temporarily stored in the construction workspace, and then disposed of off-site at an approved facility. Trash and food debris would be placed in secured containers and disposed of at an approved disposal facility. Timber and other vegetative debris may be stacked at the edge of the ROW, chipped for use as erosion-control mulch, or otherwise disposed of in accordance with applicable regulations and landowner requirements/requests.

***A commentor expressed concern that contractors were described as making decision "on the fly" for what type of method of flow diversion would be used at each site (dam and pump vs flume).***

Response:

The method of flow diversion is dependent on-site conditions and the amount of flow potentially present at a crossing location at the time of construction.

A flumed stream crossing redirects the water flow through one or more flume pipes to allow for the trenching and pipe installation to occur in relatively dry conditions. This method allows for separation of flowing waters from trenching, pipe installation, and restoration activity, while maintaining continuous downstream flow and passage for aquatic organisms. Soil types must have characteristics that allow stable stream bank conditions, and stream flow must be low enough for this method to be used successfully and safely. The dam-and-pump method is used for stream crossings where pumps and hoses can adequately transfer stream flow volumes from upstream of the work area to

downstream of the work area, and where there are no concerns with preventing the passage of aquatic organisms.

### A commentor stated that the project should be denied due to being against the public interest

*Response:*

The commentor did not state a particular aspect of the project that is against the public interest. A denial based solely on an assertion without justification that the project is against the public interest would be arbitrary and capricious. The Corps' evaluation of the impacts on public interest are in Section 7 of the decision document.

### A commentor expressed concerns associated with social impacts of the proposed project including lack of long-term jobs

Response:

FERC evaluated the proposed projects' impact on the workforce in Section 2.6 and Section 4.8 of the EIS. FERC states that there are approximately 300-400 temporary jobs associated with the project with one permanent position anticipated. FERC determined that the increase in employment for local workers would result in a temporary and negligible impact to unemployment rates in the Project area.

The Corps' evaluation of the impacts on public interest are in Section 7 of the decision document.

### A commentor stated that the Corps must identify and analyze all disproportionate and adverse effects of the Cumberland pipeline on environmental justice communities as part of its public interest review.

Response:

FERC documented potential impacts to environmental justice communities in Section 4.8.3 in the EIS. In conducting NEPA reviews of proposed natural gas projects, FERC follows the instruction of Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, which directs federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on minority and low-income populations (i.e., environmental justice communities). 39 Executive Order 14008, Tackling the Climate Crisis at Home and Abroad, also directs agencies to develop programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts. The Corps evaluation of potential impacts to environmental justice communities per EO 12898 and EO 14008 is summarized in Section 12 of the Corps decision document.

***A commentor expressed that the Corps may need to do on the ground outreach to communities along the pipeline route to identify all environmental justice communities.***

Response:

FERC used the Federal Interagency Working Group on Environmental Justice & NEPA Committee's publication, *Promising Practices for EJ Methodologies in NEPA Reviews* (*Promising Practices*) (EPA 2016), which provides methodologies for conducting environmental justice analyses throughout the NEPA process for this Project. FERC's use of these methodologies is described throughout section 4.8.3 of the EIS. The Corps concurs with FERC's methods and conclusions.

***A commentor requested that USACE use a larger radius than FERC to identify environmental justice communities.***

Response:

While responding to a similar comment to the draft EIS, FERC stated that a 1-mile radius around the proposed project sites were sufficient given construction and operational impacts on environmental justice communities. A 1- mile radius for the contractor yards represented a conservative estimate of the furthest extent of impacts on environmental justice communities, the furthest of which would be associated with traffic impacts. For the pipeline system itself, FERC identified the census block groups crossed by the pipelines as the appropriate units of geographic analysis for assessing the facilities' impacts on environmental justice communities because impacts related to noise, visual, traffic, and air emissions from construction and operation of the pipelines would be localized such that an expanded radius is not warranted. The Corps concurs with this assessment.

***Many commentors expressed concerns related to the proposed easement that is associated with the applicant's project. Concerns included private property devaluation, timber and agricultural production impacts, eminent domain, and the applicant's authority to operate on the existing TVA easement.***

Response:

Concerns regarding the terms and conditions of any easement agreement, the use of eminent domain, or the authority of the applicant to operate within the existing TVA easement are outside the scope of the Corps' regulatory authority. The potential impacts to land use associated with the proposed project are evaluated in FERC EIS in section 4.7 and considered in the public interest factors in Section 7 of the Corps' decision document.

***Commentors expressed concern that the proposed project would burden nearby residents with noise pollution.***

Response:

Noise pollution is discussed in section 4.11 of the FERC EIS.  FERC has adopted a criterion from the EPA that indicates that a day-time noise level of 55 A decibels protects the public from indoor and outdoor activity interference.  Sound-level impacts during construction would be highly localized and attenuate quickly as the distance from the sound source increases. Based on the short-term and temporary nature of construction-related activities, noise recommendation for HDD drilling, and the applicant's commitment to construct non-HDD Project components primarily during the daytime hours, FERC determined that impacts from the proposed project are not expected to significantly contribute to cumulative impacts on noise levels during construction.

*A commentor stated that the proposed project would burden nearby residents with additional traffic*

Response:

 FERC evaluates impacts to transportation and traffic in Section 4.8 of the EIS.  Based on the traffic data for these roadways, and a conservative assumption that all construction traffic occurs on each roadway, the proposed project would result in decreased capacities on the roadways. However, based on traffic volume data from the Federal Highway Administration (FHWA), most roads proposed to be utilized for construction access are currently operating below design capacity.  FERC determined that it is likely that these roadways have sufficient capacity to support the proposed project during construction.

*A commentor expressed concern that the visual aesthetics of the proposed project would impact property values, and the ability to sell property.*

Response:

Visual impacts of the proposed project were evaluated by FERC in Section 4.7 of the EIS. Visual impacts would be the greatest during construction due to views of the cleared right-of-way needed for construction, the displaced soil, and the presence of personnel, equipment, and vehicles. After construction, temporary workspaces associated with construction would be restored to preconstruction uses. FERC determined that given that land would be restored and returned to pre-construction uses, which are expected to be re-established within 1 – 3 years following construction, visual impacts on these areas would be temporary and not significant.

*Commentors expressed concern associated with the project's potential impacts to threatened and endangered species such as bats and bald eagles.*

Response:

Section 4.6 of the FERC EIS evaluates the projects potential impacts to wildlife. The applicant identified one bird, seven plants, two freshwater mussels, four bats (including the tricolored bat), and one reptile as federal and/or state protected species with potential to occur within the proposed project area. Habitat assessment surveys and consultation with U.S. Fish and Wildlife Service (USFWS) under section 7 of the Endangered Species Act was completed for the entire Project. The USFWS concurred that the Project activities are *not likely to adversely affect* federally protected species. The Corps areas of responsibility are encompassed entirely within the areas for which effects determinations were made and consultation under Section 7 was completed. The Corps concurs with the effects determinations within its areas of responsibility.

FERC states that the Bald and Golden Eagle Protection Act requires consultation with the USFWS if an eagle is identified within 660 feet of an active construction workspace. If a bald eagle was identified along the construction corridor, the applicant is obligated to consult with the USFWS and notify FERC before proceeding with construction activities in proximity of an eagle or eagle nest.

***Several commentors expressed concern that the project would have a negative impact on species associated with aquatic ecosystems such as benthic species, freshwater bivalves, and trout/fish.***

Response:

Impacts to freshwater species such as benthics or bivalves are tied to potential increases in sedimentation or increase in turbidity. The measures outlined in the applicants Stormwater Pollution Protection Plan (SWPPP) would minimize impacts on water quality due to increased sedimentation from construction stormwater.

Section 4 of the FERC EIS addresses potential impacts to wildlife. In Section 4.4 FERC discusses potential impacts to fisheries. The applicant consulted with the USFWS, TWRA, and the federal essential fish habitat (EFH) mapper to identify waterbodies that may contain federally listed or state-listed rare, threatened, and endangered species and associated habitat, EFH, cold water fisheries, and other fisheries resources that could be considered fisheries of special concern. They determined that there are no federally listed fish species or designated critical habitat for fish or EFH in the proposed project area. The proposed dry-trench crossing methods, such as dam-and-pump, typically decrease downstream turbidity and sedimentation because the trench is excavated under nonflowing conditions while the streamflow is routed around the construction area. Where the dam-and-pump method is proposed, the applicant would screen the pump intakes to minimize the potential for fish entrainment, injury, and mortality.

***Many commentors expressed concern about wildlife impacts associated with the proposed ROW causing wildlife barriers and the construction causing an increase in invasive species.***

Response:

Wildlife impacts were evaluated by FERC in Section 4.6 of the EIS. Habitat fragmentation resulting from new pipeline through forested areas would be minimized along the proposed route by virtue of approximately 80% of it being co-located with an existing maintained easement for the TVA powerline.  Surveys to identify noxious and invasive plants were conducted by the applicant, and the applicant submitted an exotic and invasive species control plan as part of their construction plans.

***A commentor expressed concern with water quality issues, including potential impacts to groundwater associated with karst topography, existing water tables, and springs.***

Response:

The applicant proposes to monitor public and private groundwater supply wells and potable springs within 150 feet of the pipeline construction areas where no karst terrain is present, or within 1,000 feet of the construction areas where karst terrain is present. With well owner permission, the applicant would conduct pre- and post-construction monitoring of water quality and yield using a qualified, independent contractor to conduct well sampling. To mitigate against possible drilling fluid or other materials loss during drilling, the applicant developed a Spill Prevention, Containment, and Countermeasures plan to limit groundwater impacts. Control of erosion and sediment transport by surface runoff are addressed by planned employment of standard erosion and sediment control measures FERC determined that surface activities are unlikely to impact wells accessing water at these depths. Additional information can be found in Section 4 of the EIS.

***A few commentors were concerned that landowners were not being contacted or being offered water testing.***

Response:

FERC states in Section 4.3.1.4 of the EIS that the applicant would offer to conduct pre- and postconstruction evaluations of water quality and well yield for private wells within 150 feet of construction workspaces where no karst terrain is present, or within 1,000 feet of the construction areas where karst terrain is present. Testing would be conducted with landowner permission and using methods developed in coordination with each landowner. Additionally, the applicant would conduct pre- and post-construction well testing per landowner request outside of these areas. *If the applicant does not address testing concerns, landowners may contact the FERC Landowner Helpline at: 1-877-337-2237 or landownerHelp@ferc.gov.*

**A commentor stated that the proposed project would cause or contribute to violations of water quality standards.  They stated that the Corps must evaluate**

**the project for water quality standard impacts and Tennessee's Antidegradation policies under the 404(b)(1) guidelines**.

Response:

Under Section 401 of the Clean Water Act (CWA), a federal agency may not issue a permit or license to conduct any activity that may result in any discharge into waters of the United States unless a Section 401 water quality certification is issued by the Water Quality Certifying authority, or certification is waived. In this instance, the State of Tennessee Department of Environment and Conservation (TDEC) is the Water Quality Certifying authority responsible for determining whether the project would violate applicable water quality standards. TDEC issued a water quality certification on July 21, 2023 for the proposed pipeline construction.

TDEC has the sole authority for determining the projects compliance with the Tennessee Antidegradation Statement (Rule 0400-40-03-.06). See TDEC permit NRS 22.192 on July 21, 2023.

The Corps utilized information provided in the State permit in our evaluation of the project under the 404 (b)(1) guidelines.

***Commentors expressed concern that sedimentation impacts would not be temporary in nature and would contribute to water quality degradation.***

Response:

The applicant would minimize erosion and sedimentation to surface waters by implementing BMPs as outlined in its Plan and its Procedures and the Project-specific SWPPP to be developed prior to construction. These BMPs may include, but are not limited to, maintaining a 60-foot buffer on each side of impaired waterbodies; locating all workspaces at least 60 feet back from waterbody crossings where practicable; and utilizing additional rows of silt fencing and filter socks near impaired waterbodies.

***Many commentors expressed concern regarding climate change, including topics such as emission of carbon dioxide, the use of non-renewable energy, greenhouse gas, global warming, impacts to carbon sinks, and extreme weather***.

Response:

The Corps authorities under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act does not grant to the Corps control and responsibility over 99.4% of the pipeline construction area, nor does the Corps' authority extend to the use and operation of the pipeline and after it is constructed. Accordingly, the Corps' analysis of the potential climate effects of the project was limited to effects of fill temporarily placed in WOTUS during and immediately after construction. The Corps considered the potential effect on global climate from proposed construction activities within and immediately adjacent to waters of the US.  Emissions from construction activity would be temporary in nature. We reviewed Section 4.10.6 of the FERC EIS and determined

that greenhouse gas emissions from construction activity within the 0.6% of the project under our authority would have negligible effect on global climate.

***Many commentors expressed concern pertaining to the safety of the proposed project associated with the nearby power lines, pipeline leaks, valve operation, and potential for explosions/fire.***

Response:

In Section 2.5 of the EIS, FERC states that the new Project facilities would be designed, constructed, tested, operated, and maintained to conform with or exceed federal, state, and local requirements, including the USDOT-PHMSA regulations in 49 CFR 192, *Transportation of Natural and Other Gas by Pipeline: Minimum Federal Safety Standards*; FERC's Siting and Maintenance Requirements in 18 CFR 380.15; and other applicable federal and state safety regulations. As further described in the EIS section 4.12.4, each pipeline operator is required under 49 CFR 192.615 to establish an emergency plan that includes procedures to minimize the hazards of a natural gas pipeline emergency, including establishing and maintaining communications with local fire, police, and public officials, and coordinating emergency response.

Congress has not authorized the Corps to regulate the operation of pipelines. Our regulatory authority and jurisdiction is limited to the temporary fill in waters during construction of crossings of waters of the United States. The Corps may not regulate the substance being transported within a pipeline. The potential for leaks is beyond the scope of our regulatory authority.

***A few commentors stated concern for potential impacts to air quality/air pollution.***

Response:

FERC evaluates potential impacts to air quality in Section 4.10 of the EIS. FERC determined that construction-related exhaust emissions and fugitive dust would result in short-term, localized impacts in the immediate vicinity of construction work areas. In order to minimize construction emissions, the applicant would comply with all fugitive dust requirements specified in Section 4.10.3 of the EIS and would generally limit ground disturbance to the areas needed to install the Project.

***A commentor expressed concern that the project may cause soil contamination.***

Response:

FERC evaluates potential impacts to soil through contamination in Section 4.2.2 in the EIS. FERC determined that temporary impacts on soils would occur during construction; however, these impacts would be short-term and primarily limited to the construction workspaces. Tennessee's adherence to the measures in its Plan and Procedures would reduce these impacts to a less than significant level. The applicant does not anticipate encountering contaminated sediments as a result of Project construction. Mitigation for inadvertent spills or discovery of contaminants is discussed in Section 4.2.3.

*A commentor stated that the project would require an individual aquatic resource alteration permit (ARAP) and a hydrologic determination to identify all aquatic resources.*

Response:

TDEC is the sole authority for determining the extent of its jurisdiction over aquatic resources. TDEC issued permit NRS 22.192 on July 21, 2023.

*A commentor asked whether compensatory mitigation would be required to offset permanent impacts in the event post-construction monitoring indicated loss of aquatic function (i.e., physical, chemical, and biological) at these crossings..*

Response:

Mitigation is required for impacts that are considered more than minimally environmentally adverse. The applicant states that annual monitoring in accordance with the FERC Procedures and applicable USACE and TDEC permit conditions will be conducted to ensure all aquatic resources are properly restored to pre-construction conditions. Aquatic crossings will be monitored after the completion of construction and restoration activities to ensure successful revegetation of channel stream buffers and wetlands, stabilization of previously disturbed stream geomorphology (i.e., channel bed and bank, dimension, and profile), and to ensure no loss to streams' hydrologic regimes. FERC Wetland and Waterbody Construction and Mitigation Procedures (with Tennessee's Requested Deviations) are detailed in Appendix G of the EIS.

*A commentor requested that USACE conduct appropriate inquiries with the SHPO and any other pertinent historic preservation offices.*

Response:

The FERC was the lead federal agency responsible for determining the project's potential effects to historic properties. In section 4.9 of the FERC EIS, FERC summarizes potential impacts to historic properties. Consultation obligations with SHPO under §106 of the National Historic Preservation Act were completed by FERC as lead federal agency for the entirety of the pipeline project. The portion of the pipeline construction within the Corps responsibility (0.6% of the project) was encompassed entirely within the scope of FERC's area of potential effect. USACE reviewed FERC documentation of its effects determination and consultation with SHPO and determined that it is sufficient to confirm Section 106 compliance for the Corps permit authorization, and additional consultation is not necessary. Section 10.3 of the Corps decision document summarizes USACE compliance with §106 of the National Historic Preservation Act.

***Many commentors stated concern over potential recreation impacts, including but not limited to sport fishing, fly fishing, gigging/frogging, kayaking, backpacking, camping, hiking, swimming, paddling, and recreational boating.***

Response:

FERC discusses potential impacts to recreation in Section 4.7 of the EIS. There are no hospitals, schools, landfills, sugar maple stands, orchards, nurseries, specialty crops, remnant prairies, old growth forests, registered natural landmarks, areas of critical environmental concern, wilderness areas designated under the Wilderness Act, wilderness study areas, National Primitive Areas, National Scenic Areas, National Scenic Research Areas, National Wild and Scenic Rivers, National Recreation Areas, National Game Refuges and Wildlife Preserves, National Monument Areas, National Volcanic Monument Areas, National Historic Areas, National Forests, National Protection Areas, Special Management Areas, Natural Botanical Areas, Recreation Management Areas, Scenic Recreation Areas, Scenic Wildlife Areas, or other designated natural areas within 0.25 mile of the proposed Project disturbance area.

FERC concluded that impacts on recreation from construction and operation of the Project would be less than significant.

The majority of the streams to be crossed do not support water-related recreation and/or commercial fisheries.  Jones Creek and Yellow Creek would support recreation and public fishing opportunities; however, these streams are to be crossed by HDD, which would not impact these opportunities. The proposed project would have negligible effect to water related recreation.

***A commentor expressed concern that no mitigation plan was associated with the project.***

Response:

The applicant submitted an updated mitigation plan, addressing the temporal loss associated with the permanent conversion of some wetlands from forested to emergent vegetation.  This included the purchase of 1.44 credits from the TWF TN Mitigation Fund. The Corps evaluation of the need for compensatory mitigation is summarized in Section 8.0 of the Corps decision document.

***A commentor expressed concern for potential land use changes associated with the project.***

Response:

The Project would temporarily disturb a total of about 507.5 acres of land during construction.  Following construction, about 313.8 acres of temporary workspace would be restored to pre-construction conditions and uses, to the extent practicable. The remaining 193.7 acres would be retained for operation of the Project. General land

requirements for the Project are provided in table 2.4-1 of the FERC EIS and are further discussed in detail in section 4.7. The typical construction right-of-way for the Cumberland Pipeline would be 100 feet wide in upland areas, including agricultural land, and 75 feet wide at wetland and waterbody crossings. After construction, TGP's permanent right-of-way would be 50 feet wide. The proposed pipeline is co-located along 25.77 miles of the 32-mile pipeline which reduces disturbance of new right-of-way alignments.

***A commentor expressed concern that the project may impacts national parks.***

Response:

The National Park service notified the applicant on 04/25/2022 that they have no comments or objections associated with the proposed project. The project is not proposed to impact any national parks.

***A commentor stated that the applicant has not minimized impacts to resources through technology and states that USACE cannot rely on FERC's waterbody and wetland construction manual to minimize adverse effects of the crossings.***

Response:

The applicant would cross all waterbodies in accordance with the FERC Procedures (with requested TDEC deviations), the project's SWPPP, and Corps and TDEC permit conditions. The proposed construction procedures will ensure that authorized fill and disturbance at all stream crossings are minimized to the extent practicable. Construction BMPs and other minimization measures are described through the 401 WQC and the FERC EIS.

***A commentor stated that the restoration plans are only based on appearance/structure instead of water quality and function. The commentor wants the applicant to perform baseline water quality surveys or post construction water quality monitoring***

Response:

The Corps has determined that the applicant's restoration/monitoring plans, including requirements set by FERC and TDEC, are sufficient to ensure that impacts are minimized to the maximum extent practicable. TDEC is the authority in determining whether the proposed project would violate water quality standards.

***A commentor stated that the applicant should use a risk-based approach/Pipeline Screening Matrix with site specific field observations and measurements to proposed discharges***

Response:

The Corps determined that the applicant's quantification of impacts is sufficient.

***A commentor stated that the Corps must examine the aggregate effects of the crossings proposed, including sedimentation, upland activities, and effects to resources that are crossed multiple times.***

Response:

Cumulative impacts were evaluated by the Corps and are summarized in Section 9.0 of the Corps decision document.

| | |
|---|---|
| **From:** | Nicole Huang |
| **To:** | Wilder, Timothy C CIV USARMY CELRN (USA); Morris, Kathryn G CIV USARMY CELRN (USA); Monroe, Ashley; 401-R4notices@epa.gov |
| **Cc:** | Olubukola Pope; Julia Yuan; Noor Ahmad |
| **Subject:** | [Non-DoD Source] RE: Implementation of 40 CFR 121.12 - Cumberland Project - CP22-493-000 |
| **Date:** | Thursday, June 13, 2024 2:29:13 PM |

As required by 40 C.F.R. § 121.12, we are notifying EPA that an express waiver of water quality certification by the Tennessee Department of Environment and Conservation, Division of Water Resources (TDEC) has been received by the Federal Energy Regulatory Commission for the Natural Gas Act section 7(c) application for the Cumberland Project/FERC Docket No. CP22-493. TDEC's statement of waiver can be accessed at: eLibrary | File List (ferc.gov) (see page 22 of 65 of the modified Aquatic Resources Alteration Permit [ARAP]). The FERC certificate application can be accessed at: eLibrary | File List (ferc.gov), which includes a general description of the project. Information regarding additional water resource impacts can be accessed at: eLibrary | File List (ferc.gov) (see attachment A).

As background, the Tennessee Department of Environment and Conservation, Division of Water Resources (TDEC) issued a 401 water quality certification for the Cumberland Project on July 21, 2023, which can be accessed at: eLibrary | File List (ferc.gov). On November 9, 2023, FERC staff notified EPA that a water quality certification had been received by the Commission, which can be accessed at: eLibrary | File List (ferc.gov). EPA responded on November 16, 2023 that the agency considered the potential for water quality impacts to a neighboring jurisdiction from the project as certified and EPA will not issue a "may affect" determination for this project pursuant to CWA Section 401(a)(2), see eLibrary | File List (ferc.gov). The FERC approved the Cumberland Project and issued an *Order Issuing Certificate* on January 18, 2024, which can be accessed at: eLibrary | File List (ferc.gov).

On April 24, 2024, TDEC issued a modified ARAP for the Cumberland Project, to include new and modified stream impacts, but waived its authority under CWA Section 401 with respect to the new impacts authorized by its state ARAP permit that were not included in the July 21, 2023 section 401 certification (see page 22 of 65 of the modified ARAP).

Please respond to this email or call at 202-502-8410 if you have any questions about this project.

**Nicole Huang**
**Civil Engineer**
**Division of Pipeline Certificates - Branch 1**
**Office of Energy Projects**
**Federal Energy Regulatory Commission (FERC)**
**202-502-8410**
**Nicole.Huang@ferc.gov**

Cumberland Gas Pipeline Project; NRS22.192 Modification
Aquatic Resource Alteration Permit

**AQUATIC RESOURCE ALTERATION PERMIT NRS 22.192 Modification**

**Summary of newly authorized stream impacts**

| TDEC Waterbody ID | TGP Waterbody ID | Impact Location | Description | Temporary | | Permanent | Total |
|---|---|---|---|---|---|---|---|
| | | | | Pipeline install via trench | Access road or workspace | Vegetation conversion | |
| TN05130204002_0200, UT Jones Creek | SDKA058 | 36.1839, -87 2427 | Newly proposed impact in an additional location to previously permitted impact | 117 ft. | | 10 ft. | 117 ft. |
| | SDKK03 | 36.1826, -87 2405 | Impact to a new stream | 204 ft. | | 10 ft. | 204 ft. |
| | SDN1C008 | 36.1828, -87 2405 | Impact to a new stream | | 48 ft. | | 48 ft. |
| TN05130204002_0999, Misc tribs to Jones Creek | SDKA049 | 36.1920, -87 2442 | Newly proposed temporary impact in previously permitted permanent impact location | | 94 ft. | | 94 ft. |
| | | 36.1915, -87 2528 | Permanent impact relocated to a different location than previously permitted | 171 ft. | | 10 ft. | 171 ft. |
| | SDKK01 | 36.1913, -87 2528 | Impact to a new stream | | 24 ft. | | 24 ft. |

**App-0314**

**AQUATIC RESOURCE ALTERATION PERMIT NRS 22.192 Modification**

Pursuant to the Tennessee Water Quality Control Act of 1977 (T.C.A. §§ 69-3-101 et seq.) and supporting regulations, a permit is required to alter the properties of waters of the state. Also, pursuant to section 401 of the Clean Water Act (33 U.S.C. § 1341), an applicant for a federal license or permit which may result in a discharge into the waters of the U.S., shall provide the federal licensing or permitting agency a certification from the State in which the discharge will originate. Accordingly, the Division of Water Resources requires reasonable assurance that the activity will not violate provisions of the Tennessee Water Quality Control Act of 1977 (T.C.A. §§ 69-3-101 et seq.) or provisions of sections 301, 302, 303, 306 or 307 of the Clean Water Act.

Subject to conformance with accepted plans, specifications, and other information submitted in support of the application, the state of Tennessee previously certified specified activities on July 21, 2023 pursuant to 33 U.S.C. § 1341, and permits pursuant to T.C.A. § 69-3-108(b), the activity described below:

**PERMITTEE**        Tennessee Gas Pipeline Company, LLC

**AUTHORIZED WORK:**        This ARAP modification authorizes temporary impacts to an additional 604 linear feet of stream and permanent impacts to an additional 20 linear feet of stream associated with the construction of a 32-mile 30-inch diameter natural gas pipeline. Previously authorized and certified impacts are temporary impacts to 0.69 acres of wetland, permanent impacts to 0.03 acres of wetland, temporary impacts to approximately 5400 linear feet of stream, temporary water withdrawals from eight streams and one reservoir, and permanent impacts to 490 linear feet of stream.

**LOCATION:**        From near Claylick Rd., Dickson, to near Old Scott Rd., Cumberland City Dickson, Houston, and Stewart Counties, Tennessee
Unnamed Wetlands, Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells Creek, Barkley Reservoir; Harpeth River Watershed and Lake Barkley Watershed
From approximately 36.161840, -87.206428 to approximately 36.372977, -87.675641

**EFFECTIVE DATE:** April 24, 2024

**EXPIRATION DATE:** July 20, 2028

*M Lee Barber*
_____
for Jennifer Dodd
Director, Division of Water Resources

Page 2 of 65

**Table of Contents**

SUMMARY OF NEWLY PROPOSED STREAM IMPACTS ................................................................ 1

LIST OF ABBREVIATIONS AND ACRONYMS USED IN THIS PERMIT AND APPENDICES.... 4

| PART I | 5 |

AUTHORIZED WORK: ..................................................................................................................... 5

SPECIAL CONDITIONS: ................................................................................................................... 12

GENERAL CONDITIONS: ................................................................................................................ 17

| PART II | 17 |

MONITORING REQUIREMENTS ................................................................................................... 17

DUTY TO REAPPLY ........................................................................................................................ 18

PROPERTY RIGHTS ........................................................................................................................ 18

OTHER INFORMATION .................................................................................................................. 18

CHANGES AFFECTING THE PERMIT .......................................................................................... 19

    Transfer/Change of Ownership .................................................................................................. 19

    Change of Mailing Address ....................................................................................................... 19

NONCOMPLIANCE .......................................................................................................................... 19

    Effect of Noncompliance ........................................................................................................... 19

    Reporting of Noncompliance ..................................................................................................... 19

    Adverse Impact .......................................................................................................................... 20

LIABILITIES ...................................................................................................................................... 20

    Civil and Criminal Liability ...................................................................................................... 20

    Liability under State Law ........................................................................................................... 20

| APPENDIX | 22 |

PERMIT RATIONALE ....................................................................................................................... 22

TABLES .............................................................................................................................................. 50

PLANS AND DRAWINGS ................................................................................................................ 56

SITE MAPS ........................................................................................................................................ 65

**List of abbreviations and acronyms used in this permit and appendices**

ac = acres
ARAP = Aquatic Resource Alteration Permit
BMP = best management practice
ETW = Exceptional Tennessee Water
FERC = Federal Energy Regulation Commission
ft = feet
gpm = gallons per minute
HD = hydrologic determination
HDD = horizontal directional drilling
Lat. = latitude
Long. = longitude
Misc. tribs. = miscellaneous tributaries
MP = milepost
N/A = not applicable
NPDES = National Pollutant Discharge Elimination System
PEM = palustrine emergent
PFO = palustrine forested
RAI = request for additional information
ROW = right-of-way
SWPPP = stormwater pollution prevention plan
TDEC = Tennessee Department of Environment and Conservation
TGP = Tennessee Gas Pipeline Company
TVA = Tennessee Valley Authority
USACE = United States Army Corps of Engineers
UT = unnamed tributary
WWC = wet weather conveyance

Page 4 of 65

**App-0317**

**PART I**
**Authorized Work:**

Table 1: Authorized habitat alteration impacts to streams and wetlands. Impacts newly authorized by this permit modification are highlighted in yellow. All other impacts are as previously authorized and certified.

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Waterbody[1]** → Impact location → Temporary impacts → Permanent impacts | | | | |
| SDKA023 | Upper Sugar Camp Branch | TN05130204001_1100 | UT Harpeth | 36.1630 | -87.2073 | 97 ft. | | | 10 ft. | 97 ft. |
| | | | | 36.1655 | -87.2057 | 77 ft. | | | 10 ft. | 77 ft. |
| SDKA026 | Jordan Branch | TN05130204002_0100 | Jordan Branch | 36.1705 | -87.2128 | 126.5 ft. | | | 10 ft. | 126.5 ft. |
| SDKA027 | UT to Jordan Branch | TN05130204002_0100 | Jordan Branch | 36.1709 | -87.2131 | 86 ft. | | | 10 ft. | 86 ft. |
| SDKA004 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1765 | -87.2235 | 79.6 ft. | | | 10 ft. | 79.6 ft. |
| SDKA006 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1809 | -87.2317 | 78 ft. | | | 10 ft. | 78 ft. |
| SDKA008 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1826 | -87.2348 | 78.6 ft. | | | 10 ft. | 78.6 ft. |
| SDKA058 | Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1853 | -87.2430 | 76.7 ft. | | | 10 ft. | 76.7 ft. |
| | | | | 36.1839 | -87.2427 | 117 ft. | | | 10 ft. | 117 ft. |
| SDKK03 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1826 | -87.2405 | 204 ft. | | | 10 ft. | 204 ft. |
| SDN1C008 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1828 | -87.2405 | | | 48 ft. | | 48 ft. |
| SDKA013 | Gafford Branch | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1979 | -87.2624 | 76 ft. | | | 10 ft. | 76 ft. |
| SDKA049 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1920 | -87.2442 | | | 94 ft. | | 94 ft. |
| | | | | 36.1915 | -87.2528 | 171 ft. | | | 10 ft. | 171 ft. |

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SDKK01 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1913 | -87.2528 | | | 24 ft. | | 24 ft. |
| SDKA051 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1899 | -87.2485 | 75.5 ft. | | | 10 ft. | 75.5 ft. |
| SDKA053 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1924 | -87.2536 | 89.4 ft. | | | 10 ft. | 89.4 ft. |
| SDKA054 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1927 | -87.2480 | | | 20.1 ft. | | 20.1 ft. |
| SDKA055 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1948 | -87.2566 | 80.4 ft. | | | 10 ft. | 80.4 ft. |
| SDKA048 | Jones Creek | TN05130204002_1000 | Jones Creek | 36.1875 | -87.2439 | | 0 ft. | | 0 ft. | 0 ft. |
| | | | | 36.1923 | -87.2425 | | | 127 ft. | | 127 ft. |
| | | | | 36.1876 | -87.2439 | | | 2 ft. | | 2 ft. |
| SDKA014 | UT to Gafford Branch | TN05130204002_1500 | Peabody Branch | 36.1978 | -87.2622 | | | 19.3 ft. | | 19.3 ft. |
| SDKB025 | UT to Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2833 | -87.4932 | 250 ft. | | | 10 ft. | 250 ft. |
| | | | | 36.2840 | -87.4940 | 127 ft. | | | 10 ft. | 127 ft. |
| SDKB026 | Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2845 | -87.4962 | 95 ft. | | | 10 ft. | 95 ft. |
| SDKB027 | UT to Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2845 | -87.4980 | 76.7 ft. | | | 10 ft. | 76.7 ft. |
| SDKB028 | UT to Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2855 | -87.4995 | 190 ft. | | | 10 ft. | 190 ft. |
| | | | | 36.2855 | -87.5007 | | | 4 ft. | | 4 ft. |
| SHNC010-1 | UT Yellow Creek | TN05130205019_0999 | Misc tribs to Yellow Creek | 36.2978 | -87.5494 | | 0 ft. | | 0 ft. | 0 ft. |

AR000508

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SHNC018 | UT to Yellow Creek | TN05130205019_0999 | Misc tribs to Yellow Creek | 36.3025 | -87.5572 | 99 ft. | | | 10 ft. | 99 ft. |
| | | | | 36.3021 | -87.5592 | | | 20 ft. | | 20 ft. |
| SHNC020 | Indian Branch | TN05130205019_0999 | Misc tribs to Yellow Creek | 36.3100 | -87.5770 | 84 ft. | | | 10 ft. | 84 ft. |
| SHNC007-1 | Yellow Creek | TN05130205019_1000 | Yellow Creek | 36.2982 | -87.5500 | | 0 ft. | | 0 ft. | 0 ft. |
| SDKA046 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2639 | -87.4195 | 84.8 ft. | | | 10 ft. | 84.8 ft. |
| SDKB009 | Furnace Creek | TN05130205024_0400 | Furnace Creek | 36.2498 | -87.3804 | 102.9 ft. | | | 10 ft. | 102.9 ft. |
| SDKB011 | Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2610 | -87.4113 | 206 ft. | | | 10 ft. | 206 ft. |
| | | | | 36.2614 | -87.4089 | | | 21 ft. | | 21 ft. |
| SDKB014 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2665 | -87.4261 | 104.3 ft. | | | 10 ft. | 104.3 ft. |
| SDKR005 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2609 | -87.4118 | | | 25.7 ft. | | 25.7 ft. |
| SDKR008 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2668 | -87.4288 | 97 ft. | | | 10 ft. | 97 ft. |
| | | | | 36.2669 | -87.4287 | 49 ft. | | | 10 ft. | 49 ft. |
| SDKB023 | Little Bartons Creek | TN05130205024_0600 | Little Bartons Creek | 36.2726 | -87.4552 | 81.9 ft. | | | 10 ft. | 81.9 ft. |
| SDKA038 | UT to Harris Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2283 | -87.3231 | | | 23 ft. | | 23 ft. |
| | | | | 36.2276 | -87.3211 | 82 ft. | | | 10 ft. | 82 ft. |
| | | | | 36.2283 | -87.3222 | 76 ft. | | | 10 ft. | 76 ft. |
| SDKA041 | Harris Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2303 | -87.3252 | 90.3 ft. | | | 10 ft. | 90.3 ft. |

AR000509

**App-0320**

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SDKA042 | UT to Bartons Creek | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2349 | -87.3365 | 77.5 ft. | | | 10 ft. | 77.5 ft. |
| SDKB001 | Miller Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2375 | -87.3453 | 107 ft. | | | 10 ft. | 107 ft. |
| | | | | 36.2365 | -87.3452 | | | 21 ft. | | 21 ft. |
| SDKB004 | UT to Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2430 | -87.3608 | 86.5 ft. | | | 10 ft. | 86.5 ft. |
| SDKB005 | UT to Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2436 | -87.3643 | 78.2 ft. | | | 10 ft. | 78.2 ft. |
| SDKB008 | Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2452 | -87.3689 | 55.2 ft. | | | 10 ft. | 55.2 ft. |
| SDKB002 | Bartons Creek | TN05130205024_1000 | Bartons Creek | 36.2379 | -87.3469 | 112.6 ft. | | | 10 ft. | 112.6 ft. |
| SDKA033 | UT to Johnson Creek | TN05130205031_0999 | Misc tribs to Johnson Creek | 36.2180 | -87.3004 | 108.8 ft. | | | 10 ft. | 108.8 ft. |
| SDKA034 | UT to Johnson Creek | TN05130205031_0999 | Misc tribs to Johnson Creek | 36.2187 | -87.3038 | 77.2 ft. | | | 10 ft. | 77.2 ft. |
| SDKA036 | Johnson Creek | TN05130205031_1000 | Johnson Creek | 36.2237 | -87.3132 | 263 ft. | | | 10 ft. | 263 ft. |
| | | | | 36.2237 | -87.3130 | | | 21 ft. | | 21 ft. |
| SHNA001 | Guices Creek | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3376 | -87.6087 | 78.6 ft. | | | 10 ft. | 78.6 ft. |
| SHNA011 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3313 | -87.6007 | 75 ft. | | | 10 ft. | 75 ft. |
| | | | | 36.3310 | -87.6011 | | | 23 ft. | | 23 ft. |
| SHNB030 | UT to Guices Creek | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3472 | -87.6254 | 168 ft. | | | 10 ft. | 168 ft. |
| | | | | 36.3477 | -87.6257 | | | 31 ft. | | 31 ft. |
| SHNC023 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3118 | -87.5828 | 89 ft. | | | 10 ft. | 89 ft. |

Page 8 of 65

**App-0321**

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SHNC030 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3195 | -87.5886 | 79.5 ft. | | | 10 ft. | 79.5 ft. |
| SHNE003 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3243 | -87.5930 | 75.1 ft. | | | 10 ft. | 75.1 ft. |
| SHNA012 | Guices Branch | TN05130205121_1000 | Guices Creek | 36.3327 | -87.6041 | 93 ft. | | | 10 ft. | 93 ft. |
| | | | | 36.3309 | -87.6035 | | | 20 ft. | | 20 ft. |
| SHNA008 | UT to Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3548 | -87.6395 | | | 44 ft. | | 44 ft. |
| | | | | 36.3544 | -87.6395 | | | 62 ft. | | 62 ft. |
| SHNB033-1 | Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3527 | -87.6339 | 104.9 ft. | | | 10 ft. | 104.9 |
| SHNB033-2 | Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3549 | -87.6388 | 139.4 ft. | | | 10 ft. | 139.4 |
| SHNB033-3 | Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3664 | -87.6559 | 76.4 ft. | | | 10 ft. | 76.4 |
| SHNA010 | Wells Creek | TN051302051735_1000 | Wells Creek | 36.3713 | -87.6622 | | 0 ft. | | | 0 ft. |
| WDKB001 | Wetland WDKB001 | N/A | Unnamed PFO wetland | 36.2494 | -87.3803 | 0.02 ac | | 0.01 ac | 0.02 ac | 0.03 ac |
| WHNA001 | Wetland WHNA001 | N/A | Unnamed PEM wetland | 36.3558 | -87.6394 | | | 0.10 ac | | 0.10 ac |
| WHNB002 | Wetland WHNB002-PEM | N/A | Unnamed PEM wetland | 36.3664 | -87.6554 | 0.33 ac | | 0.04 ac | | 0.37 ac |
| | Wetland WHNB002-PFO | N/A | Unnamed PFO wetland | 36.3664 | -87.6554 | | | 0.03 ac | 0.01 ac | 0.04 ac |
| WHNW001 | Wetland WHNW001 | N/A | Unnamed PEM wetland | 36.2903 | -87.5159 | | | 0.03 ac | | 0.03 ac |
| WHNW002 | Wetland WHNW002 | N/A | Unnamed PEM wetland | 36.2926 | -87.5251 | | | 0.01 ac | | 0.01 ac |

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| WSTA001 | Wetland WSTA001 | N/A | Unnamed PEM wetland | 36.3722 | -87.6662 | 0.05 ac | | 0.06 ac | | 0.11 ac |

[1]Here and throughout this permit and rationale, where waterbodies are mentioned, the label and name as written in TGP's permit application materials and the TDEC Waterbody ID and Waterbody Name are given to facilitate review of authorized impacts. The project will also impact waterbodies identified by TDEC as WWCs (listed in this permit's Appendix). In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), impacts to waters identified by TDEC as WWCs do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108 (q).

[2]The linear feet of stream impacts and acreage of wetland impacts associated with pipeline installation via trench include the 10-foot-wide trench in which the pipeline will be installed. The impacts associated with the pipeline installation via trenching will be temporary.

[3]The linear feet of stream impacts associated with pipeline installation via HDD is reported as zero because this method does not require disturbance to the channel. No ongoing vegetation mowing or clearing will take place in riparian areas that are between HDD entry and exit points.

[4]The linear feet of stream impacts and acreage of wetland impacts associated with road or workspace crossings include impacts from construction of access roads, additional workspace areas, and equipment or construction staging areas. The impacts associated with road or workspace crossings will be temporary.

[5]To facilitate periodic corrosion/leak surveys, a corridor centered on the pipeline and up to 10 feet wide may be cleared at a frequency necessary to maintain the 10-foot corridor in an herbaceous state, resulting in conversion of plant communities in forested riparian zones and forested wetlands to herbaceous/emergent or scrub-shrub plant communities. In addition, individual trees that are located within 15 feet of the pipeline that have roots that could compromise the integrity of the pipeline coating may be cut and removed from the permanent right-of-way. These impacts will not result in loss of wetland acreage.

Table 2: Authorized temporary water withdrawals from streams and reservoirs.

| Waterbody | | | | Impact location | | Flow statistics | | Class 1 minor water withdrawal | Class 2 minor water withdrawal | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | 7Q10 flow rate (gpm)[1] | Summer mean flow rate (gpm)[2] | Maximum instantaneous stream withdrawal percentage of instantaneous flow[3] | Maximum instantaneous reservoir withdrawal rate (gpm) | Duration (days) |
| SDKA048 | Jones Creek | TN05130204002_1000 | Jones Creek | 36.1874 | -87.2440 | 4263.89 | 28680.24 | 10% | | ≤ 30 |
| SDKB002 | Bartons Creek | TN05130205024_1000 | Bartons Creek | 36.2380 | -87.3467 | 628.40 | 4712.72 | 10% | | ≤ 30 |
| SDKB009 | Furnace Creek | TN05130205024_0400 | Furnace Creek | 36.2496 | -87.3804 | 291.70 | 2217.22 | 10% | | ≤ 30 |
| SDKB011 | Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2611 | -87.4112 | 71.80 | 561.04 | 10% | | ≤ 30 |
| SDKB023 | Little Bartons Creek | TN05130205024_0600 | Little Bartons Creek | 36.2725 | -87.4554 | 59.70 | 411.13 | 10% | | ≤ 30 |
| SHNC007-1 | Yellow Creek | TN05130205019_1000 | Yellow Creek | 36.2983 | -87.5504 | 8707 30 | 38644.26 | 10% | | ≤ 30 |
| SHNA012 | Guices Creek | TN05130205121_1000 | Guices Creek | 36.3329 | -87.6040 | 475.80 | 2082.57 | 10% | | ≤ 30 |
| SHNA010 | Wells Creek | TN051302051735_1000 | Wells Creek | 36.3714 | -87.6616 | 4093 30 | 17818.55 | 10% | | ≤ 30 |
| None | Cumberland River | TN05130205015_1000 | Barkley Reservoir | 36.3969 | -87.6593 | 325401.80 | 5655258.00 | N/A | 1500 | ≤ 30 |

[1]7Q10 flow rate is the lowest seven-day average flow with a 10% probability of occurring in any given year (i.e., that occurs on average once every ten years).

[2]Summer mean flow rate is the average individual daily mean discharge measured from June 1 through August 31 over an entire stream gage period of record.

[3]Temporary stream and reservoir impacts from minor water withdrawals are associated with hydrostatic testing of the pipeline before it is put into service. Withdrawals from streams are Class 1 minor water withdrawals, and the withdrawals from Barkley Reservoir is a Class 2 minor water withdrawal as defined by the TDEC *General Aquatic Resource Alteration Permit for Minor Water Withdrawals*.

Page 11 of 65

App-0324

The project will also impact waterbodies identified by TDEC as WWCs (listed in this permit's Appendix). In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), impacts to waters identified by TDEC as WWCs do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108 (q).

**Special Conditions:**
a. **Impacts to streams or wetlands in the project area and along the pipeline ROW are not authorized until the permittee has obtained a notice to proceed with project construction from the Federal Energy Regulatory Commission and submitted a copy to the Division.**
b. Unless stated otherwise, all work shall be accomplished in conformance with the accepted plans, specifications, data, and other information submitted in support of application NRS22.192 and this modification.
c. Written notification of the commencement of authorized work shall be provided to the TDEC Nashville Environmental Field Office prior to, or within 24 hours after initiation.
d. The permittee shall notify this office of project completion and supply as-constructed or record drawings of the final structure within 45 days after completion.
e. Wetlands and streams outside of the permitted impact area shall be clearly marked with signs, high visibility fencing, or similar structures so that all work performed by the contractor is solely within the permitted area of impact.
f. **The permittee shall submit a post-construction monitoring report annually to the Division for three years following the project's completion.** This annual report shall include documentation of the maintenance of jurisdictional status and resource value in **all** impacted wetlands and streams in each monitoring year. See Monitoring Requirements section of this permit for details.
g. For each stream crossing to be accomplished by a method other than HDD:
    1. The permittee shall select from the list of potentially practicable alternatives below. This list is arranged in ascending order of perceived impact to the resource:
        i. Conventional excavation with an excavator;
        ii. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;
        iii. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;
        iv. Removal by rock trencher; or
        v. Controlled blasting and excavation with a backhoe.
    2. The permittee shall select the least impactful practicable trenching technique for each stream crossing. Evaluation criteria include observed conditions at the stream crossing, the technical feasibility and limitations of each particular technique, best professional judgment of experienced personnel, logistics, and costs. The permittee shall select one or more non-blasting alternatives unless it demonstrates that each of these is impracticable. Prior to blasting, the permittee shall attempt at least one non-blasting alternative.
h. For controlled blasting within 50 feet of a stream or wetland:
    1. Unless stated otherwise, all blasting shall adhere to the conditions and other information submitted in the Draft Blasting Plan found in the document entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

Page 12 of 65

2. The blasting contractor(s) will create a site-specific blasting plan for each blasting location as described in the Draft Blasting Plan. The blasting plans must be submitted by the blasting contractor(s) to the permittee for review and approval by one if its engineers.

3. Blasting operations must be conducted by, or under the direct and constant supervision of, personnel licensed and certified to perform such activity in Tennessee. Prior to any blasting activities, the blasting contractor(s) will provide documentation of the experience, licenses, and permits associated with blasting personnel to the permittee. The individual directly overseeing any controlled blasting activities will be required to hold a registration classification as defined in the T.C.A. Title 68, Chapter 105. The Geohazard Inspector will have prior experience in geohazard identification and characterization and experience in providing support/oversight during construction. The Geohazard Inspector will work under the direction of a licensed Professional Engineer. All blasting must be conducted with a Geohazard Inspector present.

4. Blasting will not be used in Tennessee jurisdictional streams characterized by karst-prone geology or with an unacceptable risk of hydrologic loss, as identified in the Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022 and in the document entitled "October 30, 2023 Email Request for Additional Information Response" dated November 15, 2023 for the additional aquatic features authorized by this permit modification. Only streams in which 1) karst is unlikely *and* 2) risk of hydrologic loss is "reduced" *and* 3) HDD has been determined to not be practicable may blasting be considered.

5. Blasting is not authorized within wetlands.

6. The Division (Natural Resources Unit permit writer and Nashville Environmental Field Office) must be contacted in writing at least 48 hours in advance when controlled blasting is proposed. The permittee must provide site-specific documentation to the Natural Resources Unit permit writer supporting that controlled blasting is the least environmentally damaging practicable alternative for that particular stream crossing per Special Condition g. Written authorization must be obtained from the Division prior to initiation of controlled blasting.

7. A qualified project biologist will survey the proposed blasting zone identified by the pipeline blasting contractor(s) immediately in advance of any blasting for the presence of any state-listed species and if found, will contact the TWRA and TDEC Division of Natural Areas before proceeding.

8. Blasting will be conducted in dry conditions within the workspace.

9. The permittee will minimize the length of time that aquatic resources are disturbed by expediting completion of each crossing and completing stream crossings separate from the mainline construction.

10. All streams and stream banks will be restored to original contours immediately following pipeline installation.

11. **The permittee shall submit a post-blasting monitoring report to the Division within 30 days of the restoration of the temporary stream impacts**. See Monitoring Requirements section of this permit for details.

i.  Loss of stream flow due to fracturing of bedrock is prohibited. Adequate provisions shall be made to prevent the loss of stream flow due to fracturing of bedrock during pipeline installation across streams and wetlands.

Page 13 of 65

1. Trench plugs are barriers placed within a pipeline excavation to slow flow and reduce erosion in the trench and also to prevent the trench from becoming a subsurface drainage path. Since gas line bedding and embedment are constructed using cohesionless, free-draining soils, a path is created for water to flow easily (French drain effect) alongside the pipe. In areas where there is high groundwater, where the pipeline crosses streams or aquifers, or where the natural groundwater flow would be affected or even diverted by the select material, trench plugs of compacted, cohesive, soils or impervious materials shall be constructed at intervals along the pipeline.

2. Pipeline crossings of streams with bedrock streambeds must provide non-erodible fill and cover, such as concrete or controlled low strength materials (flowable fill), and trench plugs at each end of the crossing.

3. Trench plugs shall be placed in the portions of any trench within 50 feet of a stream channel.

4. The trench plug area will have a bedding of compacted, cohesive soils or impervious materials (such as concrete or controlled low strength materials (i.e., flowable fill)), whereas the bedding on both sides of the trench plug will have a bedding of uncompacted, cohesionless soil. Trench plugs must have lower permeability than the surrounding native soil.

**j.** For pipeline installation areas that cross streams or wetlands using horizontal directional drilling:

1. Entry and exit locations must be at least 50 feet from the stream bank or wetland margin.

2. The depth of bore below the streambed must be sufficient to reasonably prevent release of drilling fluid, based on the parent material.

3. In the event of an inadvertent release of drilling fluid, a site-specific contingency plan must be followed. This plan includes notification to the Division within 24 hours after release to surface waters. Site-specific proposed containment plans must be approved by the Division prior to initiation.

**k.** For the minor water withdrawals for the purposes of hydrostatic testing:

1. All stream and river water withdrawals will adhere to the notification requirements, conditions, and limits of Class 1 water withdrawals in TDEC's *General Aquatic Resource Alteration Permit for Minor Water Withdrawals:*

   i. Withdrawal rates will not exceed 10% of instantaneous flow, and will not take place for more than 30 days in a calendar year from a particular waterbody. The permittee must demonstrate that instantaneous flow of the source water is accurately measured or determined for the purpose of compliance with the terms and limits of this permit.

2. The reservoir water withdrawal from Barkley Reservoir will adhere to the notification requirements, conditions, and limits of Class 2 water withdrawals in TDEC's *General Aquatic Resource Alteration Permit for Minor Water Withdrawals:*

   i. Withdrawal rates will not exceed 1500 gpm and will not take place for more than 30 days in a calendar year.

3. Where the total average withdrawal exceeds 10,000 gallons per day, the withdrawal shall be registered under the Water Resources Information Act of 2002 (T.C.A. § 69-7-301 et seq.) More information regarding water withdrawal information may be found at: https://www.tn.gov/environment/program-areas/wr-water-resources/water-quality/water-withdrawal-registration-program.html

4. Except for withdrawals from Barkley Reservoir, withdrawal is not authorized from a stream or river in a county or region during severe (D2), extreme (D3), or exceptional (D4)

drought as indicated by the National Drought Mitigation Center website: https://droughtmonitor.unl.edu/CurrentMap/StateDroughtMonitor.aspx?TN

5. The permittee must screen all water intake to minimize the potential for entrainment of fish.

6. The permittee must adhere to conditions intended to minimize water withdrawal and hydrostatic testing impacts in the documented entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

7. **The permittee shall submit a one-time water withdrawal monitoring report to the Division following the completion of all water withdrawals** to demonstrate adherence to permit conditions. See Monitoring Requirements section of this permit for details.

l. The permittee will adhere to the recommendations and other information submitted in the geologic and hydrotechnical hazard assessment, karst surveys, and geohazard mitigation guidance for the project provided in Attachment 6 of the documented entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022.

m. The permittee will use low pressure ground equipment in wetlands and riparian areas to minimize vegetation damage, soil compaction, and rutting.

n. Temporary wetland crossings shall utilize timber matting. Gravel, riprap, or other rock is not approved for construction of temporary crossings or haul roads across wetlands. Upon completion of construction activities, all temporary wetland impact areas are to be restored to pre-construction contours and elevations. Non-native soils, side-cast material, or other materials shall not be placed within the temporary impact locations during restoration. Permanent vegetative stabilization must use native species as described in Special Condition p.

o. Temporary impacts to wetlands associated with trench excavation shall be mitigated by the removal and stockpiling of the first 12 inches of topsoil prior to construction. Upon completion of construction activities, all temporary wetland impact areas are to be restored to pre-construction contours, and the stockpiled topsoil spread to restore these areas to pre-construction elevation. Non-native soils, side-cast material, or other materials shall not be placed within the temporary impact locations during restoration. Permanent vegetative stabilization must use native species as described in Special Condition p.

p. Permanent vegetative stabilization using native species of all disturbed areas in or near streams and wetland must be initiated within 14 days of project completion (see also *Landscaping With Natives* at https://www.tnipc.org/wp-content/uploads/2017/10/landscaping_2016_forweb.pdf). Non-native, non-invasive annuals may be used as cover crops until native species can be established.

q. Only earthen materials comprising native, uncontaminated soil or rock, or a combination thereof shall be "Acceptable Fill" to be placed as fill in wetlands and streams. Acceptable Fill shall consist of only soil or rock in which all substances naturally occurring therein are present in concentrations not exceeding the concentrations of such substances occurring naturally in the local area. Acceptable Fill shall not contain any sewage, industrial wastes, additives or materials such as refuse, rubble, muck, metal, glass, concrete pieces, bricks, or asphalt paving materials, wood or other wastes. For the purposes of this permit, "other wastes" means any and all other substances or forms of energy, including, but not limited to, decayed wood, sand, garbage, silt, municipal refuse, sawdust, shavings, bark, lime, ashes, offal, oil, hazardous materials, tar, sludge, or other petroleum byproducts, radioactive material, chemicals, heated substances, dredged spoil, solid waste, incinerator residue, sewage sludge, munitions, biological materials, wrecked and discarded equipment, and cellar dirt.

r. The authorized alterations shall not cause measurable degradation to resource values and classified uses of hydrologically connected waters of the state, including disruption of sustaining surface or groundwater hydrology. Adjacent wetlands or streams determined likely to be measurably degraded

by such hydrologic alteration, or by partial fill, must be included in the cumulative impact calculation, even if not filled or otherwise directly altered physically.

**s.** The use of monofilament-type erosion control netting or blanket is prohibited in the wetland, and in any stream channels, stream banks, or any disturbed riparian areas within 30 feet of top of bank.

**t.** Hard armoring of banks at any stream or wetland crossing is prohibited.

**u.** The pipeline, access roads, workspaces, and staging areas shall be located to avoid permanent alteration or damage to the integrity of the stream channel. Large trees, steep banks, rock outcroppings, etc., should be avoided.

**v.** The pipeline, access roads, workspaces, and staging areas shall not impound normal or base flows on the upstream side, and shall not result in a permanent disruption or barrier to the movement of fish or other aquatic life on the downstream side. Base flow is the usual or normal flow of the stream that is supplied primarily by groundwater from springs and seeps, but not affected by rapid runoff during and after rainfall.

**w.** The width of the stream channel and bank modifications, or other impacts associated with the installation of the pipeline, access roads, workspaces, and staging areas shall be limited to the minimum necessary.

**x.** Erosion control measures shall be utilized where stream bank vegetation is disturbed for the purpose of temporary stream crossings. Stream beds shall not be used as linear transportation routes for mechanized equipment. The stream channel may be crossed perpendicularly with equipment provided no additional fill or excavation is necessary. EPSC measures shall be utilized when streambanks are disturbed.

**y.** The stream channels shall not be over-widened as a result of the installation of the pipeline, access roads, workspaces, or staging areas.

**z.** Backfill activities must be accomplished in the least impactful manner possible that stabilizes the streambed and banks to prevent erosion. Permanent vegetative stabilization must use native species as described in Special Condition p.

**aa.** All dewatering activities shall be conducted in a manner that prevents the discharge of sediment-laden water into waters of the state.

**bb.** All spoil material from trench excavation, bore pits, and other earth-disturbing activities shall be deposited in an upland location and stabilized within seven days.

**cc.** Erosion prevention and sediment control measures must be in place and functional before any earth moving operations begin, and shall be designed according to the department's Erosion and Sediment Control Handbook (http://tnepsc.org/handbook.asp).

**dd.** Erosion prevention and sediment control measures such as silt fences shall be removed following completion of construction.

**ee.** Best Management Practices (BMPs) shall be stringently implemented throughout the construction period to prevent sediments, oils, or other project-related pollutants from being discharged into waters of the state. All spills must be reported to the appropriate emergency management agency, and measures shall be taken immediately to prevent the pollution of waters of the state, including groundwater, should a spill occur.

**ff.** Equipment staging and maintenance areas shall be developed a sufficient distance from any water to ensure that oil, gas, other petroleum products, and other hazardous materials do not enter the waters.

**gg.** The permittee shall minimize the use of heavy equipment in streams or wetlands. Equipment shall be free of noticeable leaks of fluids and oils.

**hh.** Where practicable, all activities shall be accomplished during drier times of year or when recent conditions have been dry at the impact location. The excavation and fill activities associated with the pipeline crossing of streams and wetlands shall be kept to a minimum and shall be separated from

Page 16 of 65

flowing waters. Wet-cut trenching methods are not authorized. All surface water flowing towards or from the construction activity shall be diverted using flume or dam-and-pump methods as described in the permit application materials. Temporary diversion channels shall be protected by non-erodible material and lined to the expected high water level. Cofferdams and/or berms must be constructed of sandbags, steel sheeting, or other non-erodible, non-toxic material. All such diversion materials must be removed upon completion of the work.

**ii.** The permittee shall minimize clearing, grubbing, and other disturbance to riparian vegetation. Unnecessary native vegetation removal, including tree removal, and soil disturbance is prohibited. Native riparian vegetation must be reestablished in all areas of disturbance outside of any permanent authorized structures or vegetation management zones after work is completed, per Special Condition p. Coverage under this permit does not waive any local riparian buffer protection requirement, and the permittee is responsible for obtaining any necessary local approval.

**jj.** In addition to the erosion prevention and sediment control measures described herein associated with authorized aquatic impacts, the permittee must comply with the conditions of the National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges of Stormwater Associated with Construction Activities (CGP), TNR100000 for the entire area of disturbance associated with the construction project.

**General Conditions:**

**a.** It is the responsibility of the permittee to convey all terms and conditions of this permit to all contractors. A copy of this permit, approved plans, and any other documentation pertinent to the activities authorized by this permit shall be maintained on site at all times during periods of construction activity.

**b.** Work shall not commence until the permittee has obtained and maintained all necessary authorizations pursuant to applicable provisions of section 10 of The Rivers and Harbors Act of 1899, section 404 of the Clean Water Act, section 26a of The Tennessee Valley Authority Act, or any other applicable federal, state or local laws.

**c.** All activities must be carried out in such a manner as will prevent violations of water quality criteria as stated in TDEC Rule Chapter 0400-40-03, or impairment of the uses of waters of the state as designated by Rule Chapter 0400-40-04.

**d.** This activity may not result in a disruption or barrier to the movement of fish or other aquatic life and wetland dependent species upon project completion.

**e.** Adverse impact to formally listed state or federal threatened or endangered species or their critical habitat is prohibited.

**f.** This permit does not authorize adverse impacts to cultural, historical, or archeological features or sites.

**g.** This permit does not authorize access to public or private property. Arrangements concerning the use of public or private property shall be made with the landowner. The permittee is responsible for obtaining any additional permitting or maintenance agreements with other government or public agencies or lands.

**PART II**

**Monitoring Requirements**

All reports must be submitted in report form to the Division's Natural Resources Unit located on the 9th Floor of the Davy Crockett Tower, 500 James Robertson Parkway, Nashville, Tennessee 37243, or via email to water.permits@tn.gov and to the permit writer Claire Wainwright at Claire.wainwright@tn.gov. Please be sure to indicate the ARAP permit number on your submittal.

a.  **An as-constructed report** must be submitted within 45 days after the project's completion (per Special Condition d above) and must contain as-constructed or record drawings of the final structure.

b.  **An annual post-construction monitoring report** must be submitted by April 30 each year for three years after the project's completion (per Special Condition f above) to document evidence of the maintenance of jurisdictional status and successful restoration within **all impacted jurisdictional features**, and shall include:

    1.  Representative photographs of each feature pre-impact and post-impact

    2.  Wetland delineations and stream hydrologic determinations. All stream hydrologic determinations must be made during the February 1 – April 15 time period each year and in accordance with the procedures in TDEC Rule 0400-40-03-.05(9)

    3.  Identification of any features that have not returned to pre-impact condition, and a corresponding proposed adaptive management plan

c.  **A post-blasting monitoring report** must be completed for each applicable stream crossing within 30 days post-impact (per Special Condition h above). This report will include:

    1.  Representative photographs of each feature pre-impact and post-impact

    2.  A description of the attempts to implement the potentially practicable alternatives to blasting techniques,

    3.  The results for each technique attempted prior to blasting,

    4.  A narrative description of the site-specific factors necessitating blasting, and

    5.  The date of the blasting.

d.  **A water withdrawal monitoring report** must be submitted within 30 days following the completion of all hydrostatic testing associated with the pipeline installation (per Special Condition k above). The report shall include, for each withdrawal location:

    1.  Specific location of each intake

    2.  Daily maximum withdrawal rates

    3.  Instantaneous flow rates and the source of instantaneous flow data, and

    4.  Total daily withdrawal volume

**Duty to Reapply**

If any portion of the permitted activities, including the authorized impacts to water resources, compensatory mitigation requirements, or post-project monitoring is not completed before the expiration date of this permit **the applicant must apply for permit re-issuance**. The permittee shall submit such information and forms as are required to the director of the Division of Water Resources at least ninety (90) days prior to its expiration date. Such applications must be properly signed and certified.

**Property Rights**

The issuance of this permit does not convey any property rights in either real or personal property, or any exclusive privileges, nor does it authorize any injury to private property or any invasion of personal rights, nor any infringement of Federal, State, or local laws or regulations.

**Other Information**

If the permittee becomes aware that he/she failed to submit any relevant facts in a permit application or submitted incorrect information in a permit application or in any report to the Director, then he/she shall promptly submit such facts or information.

Page 18 of 65

**Changes Affecting the Permit**

**Transfer/Change of Ownership**

**a.** This permit may be transferred to another party, provided there are no activity or project modifications, no pending enforcement actions, or any other changes which might affect the permit conditions contained in the permit, by the permittee if:

**b.** The permittee notifies the Director of the proposed transfer at least 30 days in advance of the proposed transfer date;

**c.** The notice includes a written agreement between the existing and new permittees containing a specified date for transfer of permit responsibility, coverage, and contractual liability between them; and

**d.** The Director does not notify the current permittee and the new permittee, within 30 days, of his intent to modify, revoke, reissue, or terminate the permit, or require that a new application be filed rather than agreeing to the transfer of the permit.

**e.** The permittee must provide the following information to the division in their formal notice of intent to transfer ownership:

    **1.** the permit number of the subject permit;

    **2.** the effective date of the proposed transfer;

    **3.** the name and address of the transferor;

    **4.** the name and address of the transferee;

    **5.** the names of the responsible parties for both the transferor and transferee;

    **6.** a statement that the transferee assumes responsibility for the subject permit;

    **7.** a statement that the transferor relinquishes responsibility for the subject permit;

    **8.** the signatures of the responsible parties for both the transferor and transferee, and;

    **9.** a statement regarding any proposed modifications to the permitted activities or project, its operations, or any other changes which might affect the permit conditions contained in the permit.

**Change of Mailing Address**

The permittee shall promptly provide to the Director written notice of any change of mailing address. In the absence of such notice the original address of the permittee will be assumed to be correct.

**Noncompliance**

**Effect of Noncompliance**

All impacts shall be consistent with the terms and conditions of this permit. Any permit noncompliance constitutes a violation of applicable State and Federal laws and is grounds for enforcement action, permit termination, permit modification, or denial of permit reissuance.

**Reporting of Noncompliance**
**24-Hour Reporting**

**a.** In the case of any noncompliance which could cause a threat to public drinking supplies, or any other discharge which could constitute a threat to human health or the environment, the required notice of non-compliance shall be provided to the Division of Water Resources in the appropriate Environmental Field Office within 24-hours from the time the permittee becomes aware of the circumstances. (The

Environmental Field Office should be contacted for names and phone numbers of environmental response personnel).

**b.** A written submission must be provided within five (5) days of the time the permittee becomes aware of the circumstances unless this requirement is waived by the Director on a case-by-case basis. The permittee shall provide the Director with the following information:

> **1.** A description of the discharge and cause of noncompliance;
>
> **2.** The period of noncompliance, including exact dates and times or, if not corrected, the anticipated time the noncompliance is expected to continue; and
>
> **3.** The steps being taken to reduce, eliminate, and prevent recurrence of the non-complying discharge.

**Scheduled Reporting**

For instances of noncompliance which are not reported under subparagraph a. above, the permittee shall report the noncompliance by contacting the permit coordinator, and provide all information concerning the steps taken or planned to reduce, eliminate, and prevent recurrence of the violation and the anticipated time the violation is expected to continue.

**Adverse Impact**

The permittee shall take all reasonable steps to minimize any adverse impact to the waters of Tennessee resulting from noncompliance with this permit, including but not limited to, accelerated or additional monitoring as necessary to determine the nature and impact of the noncompliance. It shall not be a defense for the permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit.

**Liabilities**

**Civil and Criminal Liability**

Nothing in this permit shall be construed to relieve the permittee from civil or criminal penalties for noncompliance. Notwithstanding this permit, the permittee shall remain liable for any damages sustained by the State of Tennessee, including but not limited to fish kills and losses of aquatic life and/or wildlife, as a result of the discharge of pollutants to any surface or subsurface waters. Additionally, notwithstanding this Permit, it shall be the responsibility of the permittee to conduct its discharge activities in a manner such that public or private nuisances or health hazards will not be created.

**Liability under State Law**

Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the permittee from any responsibilities, liabilities, or penalties established pursuant to any applicable State law or the Federal Water Pollution Control Act, as amended.

This permit does not preclude requirements of other federal, state or local laws. This permit serves as a State of Tennessee Aquatic Resource Alteration Permit (ARAP) pursuant to the Tennessee Water Quality Control Act of 1977 (T.C.A. § 69-3-101 et seq.).

The State of Tennessee may modify, suspend or revoke this permit or seek modification or revocation should the state determine that the activity results in more than an insignificant violation of applicable water quality standards or violation of the act. Failure to comply with permit terms may result in penalty in accordance with T.C.A. § 69-3-115.

An appeal of this modification may be made as provided in T.C.A. § 69-3-105(i) and Rule 0400-40-07-.04(9) by submitting a petition for appeal:

**a.** Only those terms that are the subject of this modification may be appealed. Rule 0400-40-07-.04(9)(b).

**b.** The petition must be filed within 30 days after public notice of the issuance of the permit.

**c.** The petition must specify the basis for the appeal and state a claim for relief based on an alleged violation of the Tennessee Water Quality Control Act or the rules promulgated thereunder. Third parties shall specify facts sufficient to establish that they have satisfied the statutory and regulatory preconditions and otherwise have standing to appeal.

**d.** The petition should be addressed to the technical secretary of the Tennessee Board of Water Quality, Oil and Gas at the following address: Director, Division of Water Resources, Davy Crockett Tower, 500 James Robertson Parkway, Nashville, Tennessee 37243, or you may submit such petition electronically to TDEC.Appeals@tn.gov. Any hearing would be in accordance with T.C.A. §§ 69-3-110 and 4-5-301 et seq.

APPENDIX
Permit Rationale

---

**PERMIT RATIONALE**
**Aquatic Resource Alteration Permit NRS22.192 Modification**

---

Tennessee Natural Gas Company, LLC

Unnamed Wetlands, Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells Creek, and Barkley Reservoir; Harpeth River and Lake Barkley Watersheds, Dickson, Houston, and Stewart Counties, Tennessee

April 24, 2024

*Permit Writer: Claire Wainwright*

**Summary**

Names of Applicants: Tennessee Natural Gas Company, LLC

Contact: Gina Dorsey
      1001 Louisiana St, Suite 1000
      Houston, TX 77002-5089

Activity Location:  From near Claylick Road, Dickson to near Old Scott Road, Cumberland City

Nature of Business: Construction of a natural gas pipeline and associated infrastructure

Authorized Activity: This modification authorizes temporary impacts to an additional 604 linear feet of stream and permanent impacts to an additional 20 linear feet of stream associated with the construction of a 32-mile 30-inch diameter natural gas pipeline. Previously authorized and certified impacts include temporary impacts to 0.69 acres of wetland, permanent impacts to 0.03 acres of wetland, temporary impacts to approximately 5400 linear feet of stream, temporary water withdrawals from eight streams and one reservoir, and permanent impacts to 490 linear feet of stream.

Waterbody Name: Unnamed Wetlands, Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells Creek, Barkley Reservoir; Harpeth River and Lake Barkley Watersheds, Dickson, Houston, and Stewart Counties, Tennessee.

This modification affects only the state aquatic resource alteration permit, and does not constitute a modification of the Section 401 certification issued on July 21, 2023. The Department has waived its authority under Section 401 with respect to the new impacts to be authorized by this state permit modification that were not included in the July 21, 2023 section 401 certification.

**Permit Status**

ARAP NRS22.192 issued: **July 21, 2023**

Application for modified ARAP received: **August 24, 2023**

Application for modified ARAP complete: **December 21, 2023**

Modified ARAP NRS22.192 issued: **April 24, 2024**

Modified ARAP NRS22.192 expires: **July 20, 2028**

**Status of Affected Waters**

Streams

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SDKA023 | Upper Sugar Camp Branch | TN05130204001_1100 | UT Harpeth | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA026, SDKA027 | Jordan Branch, UT to Jordan Branch | TN05130204002_0100 | Jordan Branch | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA004, SDKA006, SDKA008, | UT to Porters Branch, | TN05130204002_0200 | UT Jones Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | June 3, 2019 | Unavailable | Not a known ETW |

Page 24 of 65

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SDKA058, SDKK03, SDN1C008 | Porters Branch | | | Irrigation | Fully Supporting | N/A | N/A | June 3, 2019 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Supporting | Flow regime modification | Dam or impoundment | June 3, 2019 | | |
| SDKA013, SDKA049, SDKA051, SDKA053, SDKA054, SDKA055, SDKK01 | Gafford Branch, UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA048 | Jones Creek | TN05130204002_1000 | Jones Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | June 5, 2019 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | June 5, 2019 | | |
| | | | | Recreation | Fully Supporting | N/A | N/A | June 5, 2019 | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | June 5, 2019 | | |

Page 25 of 65

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Industrial Water Supply | Fully Supporting | N/A | N/A | June 5, 2019 | | |
| SDKA014 | UT to Gafford Branch | TN05130204002_1500 | Peabody Branch | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKB025, SDKB026, SDKB027, SDKB028 | UT to Leatherwood Creek, Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| SHNC010-1, SHNC018, SHNC020 | UT Yellow Creek, Indian Branch | TN05130205019_0999 | Misc tribs to Yellow Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |

Page 26 of 65

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | | | | | |
| SHNC007-1 | Yellow Creek | TN05130205019_1000 | Yellow Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| SDKA046, SDKB009, SDKB011, SDKB014, SDKR005, SDKR008 | UT to Dry Hollow Branch, Furnace Creek, Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| SDKB023 | Little Bartons Creek | TN05130205024_0600 | Little Bartons Creek | | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |

Page 27 of 65

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Fully Supporting | | | | | |
| | | | | Fish and aquatic life | | N/A | N/A | May 29, 2018 | | |
| SDKA038, SDKA041, SDKA042, SDKB001, SDKB004, SDKB005, SDKB008 | UT to Harris Branch, Harris Branch, UT to Bartons Creek, Miller Branch, UT to Nesbitt Branch, Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKB002 | Bartons Creek | TN05130205024_1000 | Bartons Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |

Page 28 of 65

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SDKA033, SDKA034 | UT to Johnson Creek | TN05130205031_0999 | Misc tribs to Johnson Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA036 | Johnson Creek | TN05130205031_1000 | Johnson Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SHNA001, SHNA011, SHNB030, SHNC023, SHNC030, SHNE003 | Guices Creek, UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SHNA012 | Guices Branch | TN05130205121_1000 | Guices Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SHNA008, SHNB033-1, SHNB033-2, SHNB033-3 | UT to Lickskillet Branch, Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SHNA010 | Wells Creek | TN051302051735_1000 | Wells Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 30, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 30, 2018 | | |
| | | | | Recreation | Not Supporting | E. coli | Sanitary sewer overflows (collection system failures) | May 30, 2018 | | |

Page 30 of 65

AR000532

App-0343

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| None | Cumberland River | TN05130205015_1000 | Barkley Reservoir (Cumberland River) | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 25, 2018 | Available | ETW due to documented non-experimental populations of state-listed threatened and endangered aquatic animal species |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Recreation | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Domestic Water Supply | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Industrial Water Supply | Fully Supporting | N/A | N/A | May 25, 2018 | | |

Page 31 of 65

Cumberland Gas Pipeline Project; NRS22.192 Modification
Aquatic Resource Alteration Permit

<u>Wetlands</u>

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody Name | TDEC Waterbody ID | Wetland Type | Parameters for Habitat Alteration | ETW Status |
|---|---|---|---|---|---|---|
| WDKB001 | Wetland WDKB001 | Unnamed PFO wetland | N/A | PFO | Available | Not a known ETW |
| WHNA001 | Wetland WHNA001 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| WHNB002 | Wetland WHNB002-PEM | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| | Wetland WHNB002-PFO | Unnamed PFO wetland | N/A | PFO | Available | Not a known ETW |
| WHNW001 | Wetland WHNW001 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| WHNW002 | Wetland WHNW002 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| WSTA001 | Wetland WSTA001 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |

**Authorized Alterations**

TGP is authorized to conduct additional stream alterations in addition to the previously authorized stream and wetland alterations associated with the construction of approximately 32 miles of new 30-inch-diameter natural gas lateral pipeline and associated infrastructure. A detailed summary of these impacts can be found in Tables 1 and 2 in this permit. To the extent that Tennessee's 401 Water Quality Certification for the additional impacts has not already been waived, Tennessee hereby waives such authority.

The project also will impact waterbodies identified by TDEC as WWCs (listed in this permit's Appendix in Table 3). In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), alterations to waters identified by TDEC as WWCs do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108 (q).

The broad categories of activities associated with the project that may alter Waters of the State include vegetation clearing, soil disturbance for grading purposes, water withdrawals for hydrostatic testing, trenching, HDD, and temporary fill from construction timber mats or temporary culvert crossings.

Prior to construction, temporary and permanent ROW workspaces will be cleared of woody vegetation. The pipeline construction corridor, adjacent work areas, and contractor yards will be cleared of vegetation and

graded, as needed, to accommodate mobilization of equipment and materials and to facilitate access. During operation, the permanent easement or ROW will be maintained clear of trees and woody shrubs to allow for ongoing pipeline inspection and maintenance as required by United States Department of Transportation pipeline safety regulations. A corridor not exceeding ten feet in width, centered on the pipeline, may be maintained annually in an herbaceous state as required to facilitate periodic corrosion and leak detection surveys.

Trench excavation will be the primary construction method to install the pipeline. Installation of the proposed pipeline will primarily entail excavation of a trench 4.5 to 8 feet in depth (averaging approximately 5 feet deep) and 4 to 5 feet in width (averaging approximately 4.5 feet wide). After the pipe is installed, the pipeline trench will be backfilled to grade by a minimum of 18 to 36 inches of cover (depending on location-specific soil and rock conditions) and vegetatively stabilized. All buried pipelines will be installed with a minimum cover of 48 inches of soil or 24 inches of consolidated rock between the top of the pipe and the underwater natural bottom.

TGP will cross all waterbodies in accordance with the FERC Procedures (with requested deviations to be approved by the FERC), the project's SWPPP, and applicable USACE and TDEC permit conditions. The proposed construction procedures will ensure that authorized impacts at all stream crossings are minimized to the extent practicable. TGP anticipates that waterbodies will be crossed primarily by dry open-cut methods, which may include a flumed crossing or dam-and-pump techniques, depending on site-specific conditions at the time of construction. Approximately 0.8 miles of the pipeline will be installed via HDD to avoid open-cut construction methods in three larger and potentially higher-flow streams as well as one associated unnamed tributary.

Construction BMPs will include:
- Minimizing vegetation clearing, use of timber mats, and minimizing soil disturbance;
- Avoiding unnecessary vehicular traffic and equipment use;
- Installing and maintaining erosion and sedimentation control devices such as straw bales and silt fences;
- Restricting the duration of construction to the extent practicable;
- Using timber construction mats to create a temporary work surface in wet conditions;
- Using low pressure ground equipment in wet conditions to minimize vegetation damage, soil compaction, and rutting;
- Training employees and contractors regarding the handling of oils and hazardous materials commensurate with their position;
- Inspecting equipment used in construction and operations at regular intervals;
- Using only approved access roads for vehicles transporting oils or fuel to construction workspaces;
- At the discretion of the Environmental Inspector, fueling equipment at the construction workspaces at least 100 feet from any waterbody;
- Storing hazardous materials, including chemicals, fuels, and oils, more than 100 feet from any waterbody;
- Using secondary containment, as appropriate, for pumps that transfer hazardous substances or petroleum within 100 feet of a waterbody to prevent spills and overflow; and
- Keeping spill response materials on site and in designated vehicles in the construction workspaces.

Disturbances to all other Waters of the State identified in the project area outside of the construction ROW will be avoided.

Page 33 of 65

Stabilization will be achieved according to the conditions of the National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges of Stormwater Associated with Construction Activities (CGP), TNR100000. The work will be completed in the dry at all crossings. Where practicable, all stream and wetland impacts shall be accomplished during drier times of year or when recent conditions have been dry at the impact location. The excavation and fill activities associated with the pipeline crossing of streams and wetlands shall be kept to a minimum and shall be separated from flowing waters. When working in drier times of year or under dry recent conditions is not practicable, check dams, diversions, or a system of pumps and sediment bags may be used to create dry sections and reduce sedimentation. All surface water flowing towards or from the construction activity shall be diverted primarily using flume or dam-and-pump methods as described in the permit application materials.

<u>Streams</u>
The proposed construction ROW includes the permanent easement, temporary workspaces, access roads, and contractor yards. A total of 56 streams are located within the construction ROW, with some features crossed by the ROW more than once, for a total of 74 stream crossings (approximately 6004 linear feet). Of the total 74 stream crossings, 51 are open-cut pipeline crossings. An additional 19 stream crossings will incur minor, temporary impacts due to workspace disturbances (i.e., equipment/construction staging locations, access roads, and additional workspace areas). The remaining four stream crossings will have no direct impacts due to the use of the HDD crossing method described in more detail below.

Stream crossings will be perpendicular to stream flow to the extent practicable. Temporary erosion control measures will be installed as necessary to prevent downstream impacts. If necessary, the pipe used for waterbody crossings will be weighted to prevent flotation. Prior to waterbody crossing construction, TGP will clear vegetation on each side of the waterbody, install sediment barriers, and prepare prefabricated segments of pipeline for installation.

Except for waterbodies that are proposed to be crossed using the trenchless HDD crossing method, TGP is authorized to cross the remaining waterbodies using dry open cut crossing methods. Dry open cut crossing methods, which consist of the "dam-and-pump" and "dry-flumed" crossing methods, will be accomplished by temporarily diverting stream flow around or through the work area to minimize contact between stream water and excavation and to minimize sediment suspension during trench excavation, pipeline installation, and backfill activities.

*Flumed method for installation via trench*
A flumed stream crossing redirects the water flow through one or more flume pipes to allow for the trenching and pipe installation to occur in dry conditions. The number, length, and diameter of the pipes are dependent on estimated stream flow for the stream being crossed. This method allows for drier trenching, pipe installation, and restoration, while maintaining continuous downstream flow and passage for aquatic organisms. Soil types must have characteristics that allow stable stream bank conditions, and stream flow must be low enough for this method to be used successfully and safely. The flume pipe(s) must be long enough to account for the potential for the ditch width to increase during excavation (due to sloughing) and over-sized somewhat to accommodate the possibility of high flow conditions. An effective seal must be created around the flume(s) at both the inlet and outlet ends, so water will not penetrate and potentially compromise the channelized dam. TGP will implement the following measures where the flumed crossing method is used:
- The flume pipe will be installed before any trenching;
- An effective seal will be created around the flume pipe with sandbags or an equivalent seal mechanism;

- The flume pipe(s) will be aligned parallel with natural water flow to prevent scouring of the bank, preventing erosion and sedimentation;
- The flume pipe will not be removed during trenching, pipe-laying, backfilling activities, or initial streambed restoration efforts, except in rare conditions where a severe flow event causes conditions that make it unsafe for the pipe to remain; and
- Flume pipes and dams that are not associated with an equipment bridge will be removed as soon as final clean-up of the stream bed and bank is complete.

*Dam-and-pump dewatering method for installation via trench*
The dam-and-pump method may be used for stream crossings where pumps and hoses can adequately transfer stream flow volumes from upstream of the work area to downstream of the work area, and where there are no concerns with preventing the passage of aquatic organisms.

TGP will implement the following measures where the dam and pump method is utilized:
- Sufficient pump size, horsepower, and hose capacity, including on site backup pumps, will be used to maintain downstream flows;
- Coffer dams will be constructed with "clean" materials to prevent pollutants from entering the waterbody (e.g., sandbags or clean gravel with plastic liner);
- Water intakes will be suspended in the water column above the stream bed and will be screened to reduce entrainment of aquatic organisms or particles that may clog the pump;
- Pumps will be located within secondary containment structures to catch petroleum liquids and prevent them from entering the waterbody during refueling or if a pump failure occurs;
- For waterbodies with large volumes and strong velocity discharges, water dispersion structures will be placed at the downstream discharge location to prevent streambed scour; and
- The coffer dam, pumps, and hoses will be monitored and maintained to ensure proper operation for the duration of the waterbody crossing.

*Rock removal methods for installation via trench*
Bedrock refers to the solid rock that is found beneath the soil layer and other unconsolidated rock or sediment fragments. Shallow and hard bedrock can restrict trenching, requiring special mechanical means or blasting in certain areas to excavate to required design depths.

If bedrock is encountered during trenching, TGP plans to remove such bedrock using one of the techniques detailed below. The technique selected by TGP's construction contractor will be dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location. Techniques to be attempted are the following, in increasing order of perceived impact to aquatic resources:
    1. Conventional excavation with an excavator;
    2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;
    3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;
    4. Removal by rock trencher; or
    5. Controlled blasting and excavation with a backhoe.

Evaluation criteria for the above-listed techniques include observed conditions at the stream crossing, the technical feasibility and limitations of each particular technique, considerations based on the experience of TGP personnel and its construction contractor, logistics, and costs. Based on the evaluation, one or more of the four non-blasting techniques may be determined not to be a practicable alternative at a particular

**App-0348**

crossing. However, based on the results of the evaluation at each stream crossing, TGP will attempt the remaining potentially practicable non-blasting techniques to determine which is the least adverse yet practicable alternative. Only if evaluation and attempted implementation of the non-blasting techniques indicate that these non-blasting alternatives are not practicable will controlled blasting be selected as the least impactful to resource values, yet practicable, alternative. If techniques 1-4 are unsuccessful for rock removal and excavation at stream crossings, controlled blasting will be considered in non-karst areas that are also not streams with an unacceptable risk of hydrologic loss. In accordance with the permit Special Condition, blasting in wetlands is prohibited. The risk of karst-prone geology and risk of unacceptable hydrologic loss has been evaluated for each stream crossing location as identified in the Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022 and in the document entitled "October 30, 2023 Email Request for Additional Information Response" dated November 15, 2023 for the additional aquatic features addressed by this permit modification.

TGP anticipates encountering areas of shallow bedrock during construction that may require controlled blasting to remove, based on the following information: review of surficial geology, soil mapping, and desktop geotechnical survey results. TGP has developed a Draft Blasting Plan for the project, provided in Draft Blasting Plan found in the documented entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package. To avoid potential damage, TGP's blasting contractor will conduct pre-blasting of the rock, as needed, and develop site-specific blasting operations and monitoring plans to be approved by TGP. Control of blasting will limit stresses on existing pipelines, nearby structures, water supply wells, oil and gas wells, electrical transmission tower footings, and other utilities located near the project. Blasting activities will not begin until occupants of nearby buildings, stores, residences, businesses, and farms have been notified, and pre-blast inspections have been conducted on structures and water wells. Special care will be taken to monitor and assess blasting within 200 feet of residences and 200 feet of private or public water supply wells. Blasting mats will be used during blasting to keep the material within the approved workspaces. TGP and its blasting contractor will adhere to the provisions in the Draft Blasting Plan, which identifies blasting procedures, including use, storage, and transportation of explosives. Following blasting, where necessary, excess rock will be removed from the construction workspace, subject to affected landowner approval and applicable permit conditions. In areas where rock is predominant and little suitable backfill material is available, rock will be pulverized and placed in the trench as pad material around the pipe.

*Horizontal Directional Drilling (HDD) for trenchless installation*
HDD is a construction technique that is used to install pipelines in areas where traditional open cut excavations are not practicable due to technical feasibility, logistics, and costs. With the HDD method, a small diameter pilot hole is drilled from the entry point to the exit point. Drilling fluids are pumped to the drill bit, to cool the bit, remove rock cuttings, seal the drilled path, and lubricate the drill stem. From there, the hole is widened, and the pipeline is pulled into position. Compared to the other crossing methods, the HDD technique minimizes the impacts to an area by drilling down and under a sensitive resource, leaving the portion of land in between the entry and exit point relatively undisturbed. HDDs are authorized at three locations that will avoid direct impacts to four streams: Jones Creek (MP 3.2), Yellow Creek and an unnamed tributary (MP 22.4), and Wells Creek (MP 30.7). The use of HDDs at these three locations will be implemented to overcome obstacles posed by use of other stream crossing construction methods that are impracticable because of channel dimensions, flow, or other constraints. The feasibility of HDDs at these three (3) locations has been confirmed by analysis of geotechnical testing. HDD feasibility studies were conducted in June 2022 and provided as "Attachment 7 – HDD Feasibility Studies" submitted to the

Division on July 22, 2022, as part of the initial permit application package. In the case of inadvertent release of drilling fluid, TGP and its contractors will follow the HDD contingency plan submitted to the Division as part of "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

Following construction, streambeds will be restored to their pre-construction elevations and grades and as specified in "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package. Spoil, debris, piping, construction materials, and any other obstructions resulting from or used during construction of the pipeline will be removed to prevent interference with normal stream flow. Any excavated material not used as backfill will be removed and disposed of in uplands. Following grading, all waterbody banks will be restored to pre-construction conditions and in accordance with permit requirements.

*Water withdrawals for hydrostatic testing*
In compliance with U.S. Department of Transportation specifications, TGP will conduct hydrostatic testing on all pipeline segments prior to placing them in service. Authorized sources of hydrostatic test water for the Project are identified in Table 2 of this permit. Hydrostatic test manifolds will be located outside of wetlands and riparian areas to the maximum extent practicable. The pipe segments will be capped with manifolds, filled with water, pressurized, and held for one or eight hours. Any significant loss of pressure will indicate that a leak may have occurred and warrant further inspection and, where necessary, repair. Water may be re-used for hydrostatic testing between the new pipeline segments. The test water is expected to contact only new pipe, and no additives or chemicals will be added to the test water. Upon completion of the hydrostatic tests, the hydrotest water will be discharged to an upland area through a dewatering structure consisting of an energy dissipation device and water filtration structure. Environmental impacts from withdrawal and discharge of test water will be minimized by utilizing the measures outlined in the documented entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

Wetlands
No permanent fill or loss of wetland acreage is authorized. However, the project will result in the permanent vegetation conversion of up to 0.03 acres of wetlands from forested to herbaceous within the new permanent easement due to construction clearing and periodic maintenance activities.  Post-construction monitoring will be conducted to ensure that the areas are restored and that invasive non-native plant species do not dominate as detailed in "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

*Wetland construction methods*
"Conventional" wetland construction methods support construction equipment without significant soil disturbance. Prior to crossing and movement of construction equipment through these wetlands, the ROW will be stabilized using timber mats to allow for a stable, safe working condition. All trenches will be dewatered according to permit conditions to ensure that work is done in the dry. TGP will segregate up to the top 12 inches of wetland topsoil over the trench line. Trench soil will be temporarily stockpiled in a ridge along the pipeline trench. Gaps in the spoil pile will be left at appropriate intervals to provide for natural circulation or drainage of water. While the trench is dug, the pipeline will be assembled in a staging area located in an upland area. After the pipeline is lowered into the trench, wide-track bulldozers or backhoes supported on timber mats will be used for backfilling, final clean-up, and grading. This method will minimize the amount of equipment and travel in wetland areas. Where necessary, a drag-section may be used with the conventional wetland construction method. The drag-section involves the trenching,

installation, and backfill of a prefabricated length of pipeline containing several pipe segments all in one day. The trench is backfilled at the end of each day after the pipe is lowered in as necessary to ensure safety.

**Alternatives Analysis and Selection of Least Impactful Practicable Alternative**

The applicant has submitted potentially practicable alternatives to the activity. The overall stated goal and purpose of the activity is to transport natural gas to TVA from TGP's existing interstate pipeline system, as follows:

> "The proposed Project, which consists of the construction of the approximately 32-mile Cumberland Pipeline and appurtenant facilities (Cumberland Meter Station, Pressure Regulation Station, mainline valves, and inline inspection facilities), will allow TGP to transport approximately 245,040 dekatherms per day ("Dth/d) of natural gas from TGP's existing interstate pipeline system for TVA."

The applicant has considered the following alternatives:

**Alternative 1: Major route variations**

> "TGP conducted an analysis to determine if alternatives to construct and install the Cumberland Pipeline are practicable based on environmental considerations, construction costs, technical feasibility, human safety, and logistics."

> "The proposed Cumberland Pipeline will be constructed and installed generally parallel and adjacent to an existing TVA electric utility easement (approximately 80 percent co-located) and other utility easements."

> "The route for the Project is spatially constrained by two existing and fixed locations: (1) TVA's Cumberland Fossil Plant and (2) TGP's existing natural gas pipeline system (Lines 100-3 and 100-4). A primary routing consideration was co-locating the Cumberland Pipeline with existing utility easements for approximately 80 percent of its length, thereby minimizing environmental and landowner impacts. Based on TGP's analysis, an alternate Project route that is not co-located with existing utility easements would not result in decreased impacts to water quality, and would have additional environmental and landowner impacts than the preferred route, where land-use and property disruptions have already occurred."

> "In order to meet the purpose and need for the Project, the Cumberland Pipeline was designed to extend from the Project receipt point on TGP's existing interstate natural gas pipeline system along the Project's eastern beginning point to the Project delivery point at the location of TVA's proposed combined-cycle combustion turbine gas plant to be located on the Cumberland Fossil Plant Reservation at the Project's western terminus. Because these points are fixed as existing facilities, alternate routes with other starting or terminating points are not practicable or feasible to achieve the Project purpose. TGP's preferred route for the Cumberland Pipeline extends between these two points generally along an existing TVA powerline easement and other utility easements. This route is preferred primarily because of its generally co-located alignment between the Project receipt and delivery points. Further, with regard to Project impacts, disruptions to existing land-use along the TVA powerline easement and other utility easements have already occurred and have been assimilated, minimizing impacts to the environment and to new landowners for alternative routes. Finally, ease of access along the existing TVA easement and other utility easements by use of existing access roads for Project construction and operations provides another advantage for the preferred route as compared to alternative routes. Because of the ubiquitous occurrence of streams

Page 38 of 65

and wetlands in the topographically dissected Western Highland Rim Physiographic Province in which the Project is located, it is unlikely that other routes between the Cumberland Pipeline's receipt and delivery points would encounter substantially fewer aquatic resources than those along the preferred route, which is co-located with an existing TVA powerline easement and other utility easements for approximately 80 percent of its length. Further, alternative routes likely would contain aquatic resources that have not been disturbed by previous utility clearing and maintenance activities. For these reasons, TGP has chosen the route generally extending along the TVA powerline easement and other utility easement as the preferred alternative for the Cumberland Pipeline."

"There are no additional major route alternatives to the Cumberland Project."

**Alternative 2: Minor Route Variations**

"During the process of siting the Project, TGP has and will continue to consider multiple minor route variations to refine the pipeline alignment and to address concerns raised by potentially affected landowners and regulatory agencies. Route variations have been made to accommodate construction limitations, to improve the alignment for features such as roads and waterbody crossings, and to avoid natural features that would be challenging during construction, restoration, and operation of the pipeline, as well as to address landowner concerns. Table 10.2-1 summarizes the route variations that TGP has considered and incorporated in the Project alignment. At this time, TGP continues to refine the pipeline route and address route variations requested by potentially affected landowners and regulatory agencies, which may necessitate further changes to proposed pipeline route."

**TABLE 10.2-1**
**Cumberland Project Minor Route Variations**

| Mile Post | Variation Description | At Landowner Request |
|-----------|----------------------|----------------------|
| 0 | Potential sites for Pressure Regulation Station | |
| 2.3 | Rock ledge avoidance | |
| 3 | Landowner request to shift onto TVA easement | X |
| 4.5 | Avoid building on east side of White Oak Flat Road and eliminate additional pipeline points of inflection | |
| 8.5 | Improve crossing angle at two streams on tract 1.055 | |
| 12.5 | Avoid water feature | X |
| 16.5 | Avoid spring well and align the route for improved stream crossing and create a more perpendicular crossing for Little Bartons Creek | |
| 22.7 | Adjust stream crossing away from middle of the stream | |
| 25 | Avoid side hill construction and align the route to parallel the TVA easement | |
| 26 | Improve crossing angle at Highway 13 and stream (encroaches on TVA) | |
| 30-32 | Address multiple HDD routing issues at Wells Creek | |

Page 39 of 65

**App-0352**

"Three minor route variations were evaluated between MP 30-32 where the pipeline needed to be routed away from the original pipeline route (paralleling the TVA powerline easement) to connect to the meter station location specified by the Project Shipper on TVA property."

"Table 10.2-2 summarizes the collective items addressed in the interconnected route variations that were considered between MP 30-32 The preferred route, which incorporates the minor route variations set forth in Table 10.2-2, results in an increase of approximately 0.12 miles over alternative routes considered between MP 30 and MP 32."

**TABLE 10.2-2**
**Minor Route Variations (Summary MP 30-32)**

| Mile Post | Construction Method | Variation Description (Selected Route) |
|---|---|---|
| 29.8–32 | Upland Construction; Stream-crossing Construction; HDD | Shifted route westward toward TVA's preferred location for the Cumberland Meter Station and to avoid the Stewart Houston Industrial Park. |
| 30.1 | Upland Construction; Stream-crossing Construction | Shifted 50 feet to the south to avoid old railroad bridge supports when crossing abandoned railroad. |
| 30.3–30.8 | Upland Construction; HDD | Moved route to attain a more perpendicular HDD crossing of Wells Creek and avoid crossings of Booster Branch and another tributary to Wells Creek, as well as avoid known cultural resource locations. Moved onto TVA property toward TVA's preferred location for the Cumberland Meter Station. |

For full descriptions of each variation in the tables above please refer to "Attachment 8 – Route Variations" submitted to the Division on July 22, 2022.

During course of initial application review by TDEC, additional jurisdictional wetlands were found within the ROW. TGP made additional minor route changes to avoid impacts to these features. These changes are summarized in TGP's response to a TDEC Request for Additional Information "TGP & USACE Cumberland Project – TDEC Field Review / Revisions (Supplement 1)", document dated September 29, 2022.

**Alternative 3: Pipeline installation via dry-cut trenching vs. wet-cut trenching**

"The dry open cut construction procedure involves isolating the streambed work area from the stream to allow the construction to be performed in a controlled "dry" state by temporarily diverting the stream around the work area. The most common dry open cut methods include the flumed crossing and the dam and pump crossing methods. The dry open cut method has been selected as the preferred crossing method for the majority of waterbody crossings for the Cumberland Pipeline. The two main types of dry open cut crossing methods are discussed below. While dry open cut methods result in increased time to cross a stream as compared to wet open cut methods, the potential for weather to affect the flow in the stream and thus the crossing, and the ability to handle flow volume, some stream flow may not be appropriately handled by the use of the dry open cut crossing methods. In that case, a trenchless crossing method (HDD or conventional bore method, as discussed below) may be more appropriate."

"In the flumed crossing method, a flumed stream crossing redirects the water flow through one or more pipes to allow for the trenching and pipe installation to occur in dry conditions. The number, length, and diameter of the pipes are dependent on estimated stream flow for the stream being crossed. The major advantage of this method is that it allows for dry trenching, pipe installation,

and restoration, while maintaining continuous downstream flow and passage for aquatic organisms. Further, because this method isolates the stream flow from the construction activities, the only downstream turbidity that is created is during the dam/flume installation."

"The dam-and-pump crossing method is primarily used for stream crossing where pumps and hoses can adequately transfer stream flow volumes from upstream work to downstream of the work area, and where there are no concerns with preventing the passage of aquatic organisms. The major advantage of this method is that it allows for dry trenching, pipe installation, and restoration, while maintaining continuous downstream flow. Further, because this method isolates the stream flow from the construction activities, the only downstream turbidity that is created is transient conditions of short duration during the dam installation. Both methods require that the waterway is dewatered in the construction area by pumping the standing water into a dewatering structure on the banks. The streambed material is then segregated and stockpiled to prevent mixing with other materials and used during the stream restoration process. In terms of adverse environmental effects and practicability, these two methods are essentially equivalent."

**Alternative 4: Rock removal methods for trenched pipeline installation**

"If bedrock is encountered during trenching, TGP plans to remove such bedrock using one of the techniques detailed below. The technique selected by TGP's construction contractor will be dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location. Techniques to be used are the following:
  1. Conventional excavation with an excavator;
  2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;
  3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;
  4. Removal by rock trencher; or
  5. Controlled blasting and excavation with a backhoe."

"[The conventional excavation] method consists of using a backhoe to dig a trench. It is most effective in poorly or unconsolidated materials, such as a dry stream bed underlain by fluvial materials. In conditions supporting its use, including unconsolidated substrate materials that can be relatively easily removed, Conventional Excavation ("CE") presents little environmental risk to water quality and is the most practicable alternative considering technical feasibility, logistics, and costs. However, in instances where tougher substrate materials are present, this alternative may not be practicable because of technical infeasibility. Accordingly, CE will not be used to trench across channels with exposed bedrock substrate. For channels covered by unconsolidated materials overlying bedrock at greater depths, CE will be used to depths at which it is practicable, but removal of deeper materials will necessitate selection among the additional methods described below."

"[The ripping] method makes use of an excavator equipped with concave tooth that is inserted into and dragged through substrate materials. After ripping, a conventional excavator is used to remove the dislodged materials from the trench. For streams at which bedrock is encountered at or beneath the streambed surface, ripping will be the preferred alternative in terms of least environmentally adverse effects because it confers little or no risk of hydrologic loss."

"[The hammering method] entails use of a pneumatic tool attached to a backhoe boom to break apart substrate materials. After hammering, a conventional excavator is used to remove the

Page 41 of 65

dislodged materials from the trench. Hammering is time-consuming and increases construction costs considerably in comparison with CE or ripping. Further, hammering exposes equipment operators to prolonged hours on the work-site, potentially resulting in safety risks. Hammering also entails a risk of fracturing potentially resulting in hydrologic loss."

"[The rock trenching] method uses a large trenching machine to cut through bedrock. Although costly to mobilize, this method can reduce construction time at the work site. Primary disadvantages are cost and inaccessibility for many sites where tight space or steep slopes prevent the effective use of the equipment."

"At stream crossings, TGP's construction contractor will evaluate and attempt the use of [each of the] Techniques 1-4 described above based on the conditions observed at the time of construction to determine the best method for rock removal and excavation. If [Techniques 1-4 are] unsuccessful for rock removal and excavation at stream crossings, Technique 5 (controlled blasting) will be considered in non-karst areas or in wetlands or streams with an unacceptable risk of hydrologic loss. The risk of karst-prone geology and risk of unacceptable hydrologic loss has been evaluated for each stream crossing location at which a bedrock substrate has been identified (see [Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "Aquatic Resource Alteration Permit (ARAP) Application and State 401 Water Quality Permit" submitted to the Division on July 22, 2022, as part of the initial permit application package and the version of this table including the newly proposed impacted features in Enclosure 4 of the document entitled "October 30, 2023 Email Request for Additional Information Response" submitted to the Division dated November 15, 2023]). If controlled blasting is necessary at a waterbody or wetland crossings, TGP's construction contractor will utilize a dry-ditch crossing method (either dam-and-pump or flume crossing) and adhere to 1) all applicable federal, state, and local regulations, including the FERC Procedures, USACE and TDEC permit conditions, 2) Draft Blasting Plan (see ["Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package], and 3) karst mitigation measures. Immediately following blasting, TGP would remove rock that impedes stream flow."

"The use of the dry open cut method with controlled blasting will only be used if other rock removal methods have been evaluated but deem impracticable. TGP anticipates that controlled blasting will be used rarely to facilitate waterbody crossings. In no event will controlled blasting be used in karst-prone areas or wetlands. A desktop analysis of the study area has identified a few areas of shallow bedrock where controlled blasting may become necessary to cross certain waterbodies using the dry open cut construction method (see [Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "Aquatic Resource Alteration Permit (ARAP) Application and State 401 Water Quality Permit" submitted to the Division on July 22, 2022, as part of the initial permit application package and the version of this table including the newly proposed impacted features in Enclosure 4 of the document entitled "October 30, 2023 Email Request for Additional Information Response" submitted to the Division dated November 15, 2023]). TGP's Draft Blasting Plan is provided in ["Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package]. In the unlikely event that controlled blasting is needed, a qualified contractor will review and update this plan to address the specific circumstances of each dry open cut waterbody crossing that requires controlled blasting to remove rock. A qualified Project biologist will survey the area immediately in advance of the controlled blasting activities, including any drilling. for the presence of any sensitive species. Once cleared, holes will be drilled into the

streambed and carefully loaded with explosives and packed with aggregates. A pre-blast safety check will then be performed followed by the controlled detonation of the explosives, which will result in a small release of dust and mounding of the surface. The use of controlled blasting would drastically minimize the duration of in-stream work and temporary disruptions to stream flow. The overall area of construction impacts when using controlled blasting is significantly smaller in comparison to other construction methods and results in less costs given reduced time in the workspace. However, the use of controlled blasting may confer a higher risk of loss of stream flow than other crossing construction methods; thus, it is not generally considered to be the [least environmentally damaging practicable alternative] at locations where other methods are feasible and practicable. Although TGP expects the use of blasting for the removal of rock at waterbody crossing for the Project to be limited and has eliminated the use of controlled blasting for rock removal for use in karst-prone areas, crossing conditions at non-karst prone locations where CE, ripping, hammering, or rock trenching are technically infeasible to dislodge bedrock materials may require controlled blasting as the only practicable alternative. In these instances, TGP will ensure that controlled basting is localized and isolated to within the trench line to minimize the movement of materials outside of the waterbody. Drill patterns will be set so that they achieve smaller rock fragments, which will allow for the use of as much of the fragmented rock as possible when restoring the trench to its pre-construction condition. Rock fragments also will be shifted, as needed, to maintain the contours and flow patterns of the waterbody after the blasting is complete."

"TGP will not utilize the dry open cut crossing method with controlled blasting for rock removal in wetland habitats."

**Alternative 5: Pipeline installation via trenchless methods vs. open-cut trenching**

"The HDD method is a trenchless construction procedure in which a waterbody is crossed by pulling the prefabricated pipeline into place using drilled boreholes. In this procedure, a small diameter pilot hole is drilled down from an entry point to an exit point by pumping a slurry mixture of bentonite clay, drilling additives, and water into the ground at high pressure. The hole is then widened, and the pipeline is pulled into position. The HDD method has been a standard construction procedure for linear pipeline installations across large waterbodies since the 1970s. This construction procedure drastically reduces the impacts to waterbodies and their aquatic environments by drilling down and under the sensitive resource, resulting in the surface area between the entry and exit point remaining relatively undisturbed. While the HDD method is a proven technology for pipeline installations, there is still the potential that the HDD method can fail for reasons such as encountering soil conditions that are not conducive to boring, borehole collapse, and loss of the drill string or drilling fluid return. TGP has performed a feasibility analysis of the study area to determine if HDD is a viable waterbody crossing method. This analysis included geological surveys, reviews of nearby public drinking water sources, private wells, and mining activities (active and abandoned). Three (3) HDDs are being proposed for the Project at the following waterbodies: (1) Yellow Creek, (2) Jones Creek, and (3) Wells Creek. Prior to the final HDD determination, TGP conducted geotechnical investigations in June 2022 at each of these three crossings to assess the characteristics of the geologic formations. This information was reviewed, and it was confirm that a HDD is technically feasible for each crossing given the specific geology evaluated by project engineers to ensure the HDD has a high rate of success."

"Conventional boring consists of creating a shaft/tunnel for a pipe or conduit to be installed to minimize surface disturbance. This is accomplished by first excavating a bore pit and a receiving

pit. The bore pit is excavated to a depth slightly deeper than the depth of the associated trench and is graded such that the bore will follow the proposed angle of the pipe. A boring machine is then lowered to the bottom of the bore pit to tunnel using a cutting head mounted on an auger. The auger rotates through a bore casing, both of which are pushed forward as the hole is cut. The pipeline is then installed through the bored hole and welded to the adjacent pipeline. The typical workspace configurations required for boring operations consist of staging areas (50 feet by 100 feet) for boring machine setup, cuttings/return settlement and storage pits, pipe storage, entrance and exit pit spoil storage, and construction equipment necessary to support the operation. Major factors limiting the success of a boring operation under waterbodies for the Project include the crossing distance, subsurface soil and geologic conditions, and existing topography. Boring operations typically occur over a crossing distance of 50 to 60 feet. The maximum length a bore could achieve in ideal soil conditions typically does not exceed 400 feet. Subsurface soil and geologic conditions must be conducive to establishing and maintaining a safe bore pit excavation, as well as provide the capabilities for the boring equipment to conduct a successful bore. Loosepacked sediment, free of rock material, is preferred when conducting boring operations. The topographic conditions for most waterbody crossing locations on this Project also limit the use of this method, as preferred locations are generally consistent with level or moderately convex terrain, such that the depth of the bore pit does not present concerns relative to constructability or safety constraints."

"TGP considered six (6) factors when evaluating the use of HDD or conventional bore crossing methods versus a dry open-cut method for Project waterbody crossings: (1) the length of the crossing, (2) the potential for risk of loss of drilling fluid (i.e., inadvertent/lost returns), (3) geological considerations, and (4) length of time of the crossing (5) worker safety and technical feasibility, and (6) cost of the crossing method. For a 30-inch diameter pipe, as will be installed for the Project, the minimum distance needed to achieve the necessary radius for the HDD pipe string is approximately 1,300 feet, which means that each HDD must be at least 1,300 feet long, regardless of the width of the feature it is avoiding in order to reduce stress pressure on the pipeline. Considering the undulating topography of the Project area, many HDD entry/exit pads or conventional bore entry/exit pits likely would be located on slopes, which create a construction safety and technical feasibility challenge. Further, given the need for HDD or conventional bore entry and exit pads or pits to be at or near the same elevation to promote drill cutting returns, use of these methods in hilly terrain may not be practicable. For example, if either the entry or exit points is at a higher location than the other, greater annular pressure is needed to facilitate the drill cutting returns. This increase in pressure could contribute to additional risks of inadvertent returns to the formation or to the surface. Inadvertent returns are characterized by drilling fluid flowing through the underlying formation and finding a pathway of least resistance to the surface or to voids in the formation. These returns may be expressed on land or in the feature that is being avoided. Although the drilling fluid is generally inert bentonite clay that is not toxic or harmful, it may be discharged to downstream waters. In that event, inadvertent returns would be contained and cleaned up once identified. Costs associated with an HDD and Conventional Bore, in general, may be five (5) times more per foot than costs for a conventional crossing using open cut methods, which can become prohibitive to the Project budget (see ["Attachment 9 – Summary of Trenchless Construction Methods for the Cumberland Project" submitted to the Division on July 22, 2022, as part of the initial permit application package]). Geology plays a major role in the success of an HDD or conventional bore. In an area without the appropriate geology to support an HDD or conventional bore, the drilling hole will not maintain its integrity and could collapse, causing delays. In other areas, if the geology contains large boulders or voids, the drilling head cannot negotiate these obstacles and the bore may fail. Further, for a HDD, in order for the radius of the

drill and pipe to be maintained, the boring must be made to greater depths in the formation, potentially impacting groundwater resources or karst topography. HDD and conventional bores take more time to complete than open cut crossings due to the amount of drilling equipment necessary, the mobilization and demobilization of the drilling equipment, the drilling itself, pipe preparation, and for a HDD, the pullback of the pipeline. For the proper pullback of the pipeline, the same length of construction workspace is needed to accommodate a straight entry into the exit point of the HDD. In some cases, due to pipeline inflections, and the lack of available straight construction workspace, a false ROW may be needed, thus increasing potential impacts. A false ROW is a work area approximately 50 feet wide by the length of the HDD pullback section that is prepared to stage the pipeline. Generally, HDDs can take a month or longer to complete. HDDs occur over a longer timeframe with continuous activities throughout the procedure in comparison to open cut methods. During this time, there is the possibility of impacts to noise sensitive areas, inadvertent returns, and equipment failures throughout the duration of the HDD. When comparing an HDD or conventional bores to conventional open cuts of streams/wetlands, the issues associated with the HDDs and conventional bores are reduced or mitigated by the use of open cut methods. For example, the trench line for open-cut methods is much shallower across a stream, thus minimizing the potential impact to deep geological features. Also, there is no need for long pull back sections for conventional open cut crossings because there is no minimum length of pipeline that is needed to cross a stream. The length of the pipeline is dictated by the stream width, not the necessity to maintain a certain radius to reduce pipe stressors, as is the case with an HDD. There are no risks of inadvertent returns for a conventional open cut crossing as no drilling fluid is used during the process. The conventional open cut crossing is a straightforward digging of the trench line, installing the pipeline, and backfilling with native material. At all times during a conventional dry open cut of a stream, the contactor is able to see the trenchline and the surrounding work zone, unlike that of a HDD or conventional bore, which increases the safety factor. Also, in general, it takes one to two days to complete a conventional open cut crossing (if not using controlled blasting for rock removal), as opposed to at least one month for an HDD or up to 10 days for a conventional bore. While the timing of an open cut crossing can be extended for certain reasons, such as weather, stability of the trench line, and water flow, the time for an open cut crossing is still much less than that for an HDD. Notwithstanding the concerns outlined above, HDDs are proposed for certain crossings to avoid environmental impacts at two Natural Rivers Inventory stream reaches (Jones Creek and Yellow Creek) and due to the physical characteristics of Wells Creek. The HDD at Yellow Creek will also avoid direct impacts to one of its unnamed tributaries."

Based on the available information the Division has made a determination that the applicant has demonstrated that the route selection method and process for determining the appropriate crossing method will result in the use of the least impactful practicable alternative to accomplish the project purpose.

**Existing Conditions/ Loss of Resource Values**

Streams

Jurisdictional streams identified within the project impact areas are characterized by predominantly silt/clay substrates. Several intermittent and perennial streams within the study area are characterized by bedrock, cobble, and gravel substrates. Fish, amphibians, and populations of benthic macroinvertebrates were observed in some of the streams during TGP's on-site aquatic resource inventory. A summary of stream channel dimensions and general characteristics can be found in Table D-1 within "TGP & USACE Cumberland Project – TDEC Field Review / Revisions (Supplement 1)", dated September 26, 2022 and "October 30, 2023 Email Request for Additional Information Response" dated November 15, 2023.

Page 45 of 65

Reservoir

Barkley Reservoir (Cumberland River) is located adjacent to the existing TVA Cumberland Fossil Plant in Cumberland City, Tennessee. This segment of the reservoir is an Exceptional Tennessee Water due to the observed presence of state-listed aquatic animal species.

Wetlands

The wetlands to be impacted by the project are characteristic of low to moderate resource value wetlands typically found in the region. Dominant tree species in the PFO wetlands along the proposed alignment includes red maple (*Acer rubrum*), sweetgum (*Liquidambar styraciflua*), tulip poplar (*Liriodendron tulipifera)*, and blackgum/black tupelo (*Nyssa sylvatica*). Dominant herbaceous species in the PEM wetlands along the proposed alignment includes bluestem (*Andropogon* spp.), soft rush (*Juncus effusus*), beaksedge (*Rhynchospora* spp.), blackberry (*Rubus argutus*), goldenrod *(Solidago elliottii*), and dog fennel (*Eupatorium capillifolium)*.

Permanent impacts to streams and wetlands include ongoing vegetation management in riparian zones. A corridor above the pipeline and up to 10 feet wide may be cleared at a frequency necessary to maintain the 10-foot corridor in an herbaceous state, resulting in conversion of plant communities in forested riparian zones and forested wetlands to herbaceous/emergent or scrub-shrub plant communities. In addition, individual trees that are located within 15 feet of the pipeline that have roots that could compromise the integrity of the pipeline coating may be cut and removed from the permanent right-of-way. These impacts will not result in loss of wetland acreage.

Temporary wetland and stream impacts will be mitigated by returning impacted areas to original elevation and condition following appropriate erosion prevention and sediment control measures. All features that are temporarily impacted will be monitoring annually for three years following completion of project construction to ensure no net loss of resource value by the Division.

In an email from TWRA to consultants of TGP dated August 31, 2022 (provided in Attachment 6 of the documented entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022), TWRA states:

"It is TWRA's understanding that state listed species (outlined in TWRA's consultation from August, 2, 2022) will not be impacted by the current design of the project" and "With the above understandings, TWRA agrees that time-of-year restrictions for state protected species do not apply to the Cumberland Project, and that the project will have no effect on state listed species." On October 3, 2022, TWRA conveyed to a consultant of TGP via email that "The TWRA has no concerns for non-listed aquatic species as outlined by the project location that was presented to TWRA on 7/19/2022."

In a letter to a consultant of TGP dated June 29, 2021 (provided with initial permit application materials submitted to the Division on July 22, 2022 in "Attachment 4 – Agency Correspondences"), the TDEC Division of Natural Areas states:

"The Division of Natural Areas - Natural Heritage Program has reviewed the location of the proposed project workspace with respect to rare plant species. While the extent of the project (33.2 miles) makes the project more likely to encounter rare species at previously unsurveyed locations, the current project route is mostly confined to a previously established ROW and comes within one mile of just two rare plant records – neither of which are in the project area - at the easternmost

extent of the route. Thus, we do not anticipate any impacts to known occurrences of rare, threatened, or endangered plant species from this project and believe risk to unknown occurrences is minimal."

The Division has made a determination that the overall activities, if conducted in accordance with the submitted plans and permit conditions, will not result in any appreciable permanent loss of resource values.

## Mitigation Required

The Division has made a determination that the authorized impacts to jurisdictional waters, if carried out in accordance with the permit's conditions, will result in *de minimis* degradation; therefore, compensatory mitigation is not required.

## Social or Economic Justification Information

Formal social and economic justification for the impacts associated with this activity is not required based on the Division's determination that the authorized impacts to jurisdictional waters will result in *de minimis* degradation. However, the applicant has provided the following information on social and economic justification:

"… construction of the Project will have a net positive impact on local and regional businesses within counties impacted by the Project. TGP estimates that approximately $17,300,000 in Dickson County, $8,100,000 in Houston County, and $1,300,000 in Stewart County ($26,700,000 total) will be distributed in construction payroll for personnel working at the various Project sites over the 12-month construction period. During construction, it is anticipated that 20 to 30 percent of worker payroll will be spent locally by both local and nonlocal workers for the purchase of housing, food, gasoline, entertainment, and luxury items. The dollar amount would be dependent on the number of construction workers employed at any given time and the duration of the non-local worker's residence in the Project area.

It is also anticipated that some portion of construction materials will be purchased locally. Material purchases, including construction equipment, pipe, and valves, are estimated to be $16,500,000 in Dickson County, $6,800,000 in Houston County, and $2,200,000 in Stewart County ($25,500,000 total), including freight and taxes. An additional estimated $71,000,000 in Dickson County, $34,500,000 in Houston County, $3,900,000 in Stewart County ($109,400,000 total) will be spent by TGP on other construction related expenditures, for a total estimated construction cost of $161,600,000. These payroll and materials expenditures will have a positive impact on the local economy.

Construction and operation will result in increased tax revenues for the state of Tennessee, Dickson County, Houston County, and Stewart County, and potentially other local taxing authorities. The prevailing state sales tax rate for most items in Tennessee is seven percent. An additional 2.75 percent county sales tax is levied in Dickson and Houston counties. In Stewart County, an additional 2.25 percent sales tax is levied. Assuming all material purchases are taxed at an effective sales tax rate of 9.25 percent, TGP will pay approximately $2,300,000 in sales tax during construction. Once in operation, TGP will also pay ad valorem taxes based on the assessed value of the Project facilities. TGP estimates paying approximately $2,400,000 annually in ad valorem taxes on average over the first 10 years of Project operations. Ad valorem taxes are anticipated to be paid annually at similar or higher levels for the remaining life of the Project.

Page 47 of 65

**App-0360**

Although the preferred Cumberland Pipeline route that is co-located generally with an existing TVA powerline easement and other utility easements (for approximately 80 percent of its length) is the [Least Environmentally Damaging Practicable Alternative], other routes extending from TGP's existing interstate natural gas pipeline system to TVA's Cumberland Fossil Plant would not vary in terms of socioeconomic benefits. Use of an alternate route would unnecessarily result in land-use disruptions that have primarily already occurred in constructing and maintaining the TVA powerline and easement and other utility easements. Social and economic consequences to property owners or local communities of the considered crossing methodologies summarized in [Table 1 of this permit and Table 10.5-1 of TGP's initial permit application materials] would be minor, and would not materially vary, as the method to be implemented at each crossing is limited in area and length with no more than localized, temporary effects.

The Project is not anticipated to have significant adverse impacts during construction or operation on population, employment, regional or local services, traffic or transportation, residences or businesses, or minority communities. In addition, TGP has identified environmental justice communities near the location of the Project, and will continue to identify and address any concerns of these environmental justice communities (designated below poverty level but not with disproportionately high minority populations). TGP's communication and involvement with the environment justice communities is ongoing and will continue through the certificate, permitting, construction, and restoration phases of the Project. TGP will continue its engagement of minority and low-income populations in proximity to the proposed Project through meaningful participation and coordination with community leaders and groups within environmental justice communities. TGP plans to take the following steps during the certificate, permitting, construction, and restoration phases of the Project to continue to inform and engage environmental justice communities: (1) beginning in the third quarter 2022, conduct small group discussions (e.g., 5-10 people) with community leaders and organizations in environmental justice communities to discuss the Project and any concerns or issues; (2) beginning in the third quarter 2022, provide formal presentations to groups in the impacted environmental justice communities; (3) distribute Project information to community partners for further distribution within their communities; and (4) translate certain Project materials for distribution within environmental justice communities, as well as portions of the Project website, Overall, Project construction activities are anticipated to have temporary, short-term impacts on population, housing, public services, and traffic and transportation, and will provide an overall net positive impact on employment and the local economy when the Project is operational."

**Antidegradation**

Antidegradation review has been completed for the activities authorized in the original permit and section 401 certification.

In accordance with the Tennessee Antidegradation Statement (Rule 0400-40-03-.06):

For the impacts to streams in the TDEC Waterbody known as Miscellaneous Tributaries to Jones Creek addressed by the permit modification, the Division has made a determination that the authorized activities will result in de minimis degradation of waters with available parameters for habitat alteration without mitigation, and will not result in an appreciable permanent loss of resource values.

For the impacts to streams in the TDEC Waterbody known as Unnamed tributaries to Jones Creek addressed by the permit modification, the Division has made a determination that the authorized activities will result

in no significant degradation in a waterbody with unavailable parameters for habitat alteration because the activities will not result in an appreciable permanent loss of resource values.

For more information please reference Tennessee's Antidegradation Statement which is found in Chapter *0400-40-03* of the Rules of the Tennessee Department of Environment and Conservation.

Page 49 of 65

Cumberland Gas Pipeline Project; NRS22.192 Modification
Aquatic Resource Alteration Permit

**Tables**

Table 3: list of features to be impacted that have been identified by TDEC to be WWCs. Modifications to these impacts are highlighted in yellow.

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SDKA001 | UT to Jordan Branch | N/A (WWC) | N/A (WWC) | 36.1730 | -87.2174 | 112.2 |
| SDKA002 | UT to Jordan Branch | N/A (WWC) | N/A (WWC) | 36.1733 | -87.2176 | 10.8 |
| SDKA012 | UT to Jones Creek | N/A (WWC) | N/A (WWC) | 36.1979 | -87.2590 | 99.1 |
| SDKA015 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.1984 | -87.2649 | 55.5 |
| SDKA016 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.1989 | -87.2655 | 20.9 |
| SDKA017 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.2025 | -87.2730 | 97 |
| SDKA019 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.2032 | -87.2735 | 76.9 |
| SDKA020 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.2078 | -87.2827 | 127 |
| SDKK05 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.2098 | -87.2862 | 107 |
| SDKA024 | UT to Upper Sugar Camp Branch | N/A (WWC) | N/A (WWC) | 36.1663 | -87.2063 | 93.2 |
| SDKA028 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2114 | -87.2891 | 14.7 |
| SDKA029 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2121 | -87.2909 | 75.3 |
| SDKA030 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2141 | -87.2944 | 301 |

**App-0363**

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SDKA031 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2101 | -87.2907 | 40.4 |
| SDKA035 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2186 | -87.3039 | 43.1 |
| SDKA037 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2237 | -87.3132 | 76.2 |
| SDKK04 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2138 | -87.2939 | 178 |
| SDKA040 | UT to Harris Branch | N/A (WWC) | N/A (WWC) | 36.2291 | -87.3231 | 111.4 |
| SDKA047 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2749 | -87.4715 | 109 |
| SDKA050 | UT to Jones Creek | N/A (WWC) | N/A (WWC) | 36.1896 | -87.2484 | 79.3 |
| SDKK02 | UT to Jones Creek | N/A (WWC) | N/A (WWC) | 36.1905 | -87.5224 | 332 |
| SDKA056 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2747 | -87.4652 | 60 |
| SDKA057 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2747 | -87.4652 | 91.2 |
| SDKB006 | UT to Nesbitt Branch | N/A (WWC) | N/A (WWC) | 36.2441 | -87.3658 | 80 |
| SDKB007 | UT to Nesbitt Branch | N/A (WWC) | N/A (WWC) | 36.2455 | -87.3687 | 72 |
| SDKB010 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2585 | -87.4036 | 80.3 |
| SDKB013 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2649 | -87.4211 | 174.3 |

**App-0364**

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SDKB015 | UT to Woods Valley Branch | N/A (WWC) | N/A (WWC) | 36.2670 | -87.4302 | 95.4 |
| SDKB016 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2683 | -87.4353 | 78.7 |
| SDKB017 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2691 | -87.4373 | 77.6 |
| SDKB018 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2696 | -87.4396 | 297.9 |
| SDKB019 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2706 | -87.4435 | 97.3 |
| SDKB020 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2710 | -87.4460 | 70 |
| SDKB024 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2740 | -87.4609 | 74 |
| SDKR002 | UT to Furnace Creek | N/A (WWC) | N/A (WWC) | 36.2474 | -87.3755 | 125.3 |
| SDKR003 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2609 | -87.4118 | 75.4 |
| SDKR004 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2609 | -87.4118 | 26.4 |
| SDKR006 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2609 | -87.4118 | 94.2 |
| SDKR007 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2656 | -87.4237 | 106.8 |
| SDKR009 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2671 | -87.4301 | 11.3 |
| SDKK06 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2558 | -87.3982 | 366 |

Page 52 of 65

**App-0365**

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SDKK07 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2555 | -87.3975 | 176 |
| SDKR010 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2881 | -87.5081 | 115.1 |
| SDKR011 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2893 | -87.5121 | 96.2 |
| SHNA002 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3401 | -87.6140 | 5.4 |
| SHNA003 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3404 | -87.6145 | 50 |
| SHNA005 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3406 | -87.6148 | 38.7 |
| SHNA007 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3429 | -87.6182 | 20 |
| SHNA013 | UT to Lickskillet Branch | N/A (WWC) | N/A (WWC) | 36.3557 | -87.6390 | 124.4 |
| SHNB031 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3429 | -87.6182 | 83 |
| SHNB032 | UT to Lickskillet Branch | N/A (WWC) | N/A (WWC) | 36.3558 | -87.6400 | 84.2 |
| SHNB034 | UT to Lickskillet Branch | N/A (WWC) | N/A (WWC) | 36.3663 | -87.6556 | 77.9 |
| SHNC001 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.3376 | -87.6087 | 56.6 |
| SHNC002 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.3401 | -87.6140 | 17.6 |
| SHNC003 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.3404 | -87.6145 | 93.3 |

Page 53 of 65

**App-0366**

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SHNC004 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2978 | -87.5409 | 71.9 |
| SHNC005 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.297882 | -87.5421 | 110 |
| SHNC006 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.2986 | -87.5439 | 74 |
| SHNC006 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.2985 | -87.5451 | 80 |
| SHNC015 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3038 | -87.5628 | 124.7 |
| SHNC016 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3041 | -87.5630 | 98.5 |
| SHNC017 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3038 | -87.5626 | 81.6 |
| SHNC019 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3099 | -87.5766 | 77.2 |
| SHNC021 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3106 | -87.5796 | 87.1 |
| SHNC022 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3114 | -87.5814 | 116.4 |
| SHNC023-2 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3187 | -87.5878 | 20.6 |
| SHNC024 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3130 | -87.5847 | 80.7 |
| SHNC025 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3141 | -87.5860 | 89.7 |
| SHNC041 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2951 | -87.5318 | 75.2 |

Page 54 of 65

**App-0367**

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SHNC042 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2945 | -87.5296 | 83 |
| SHNE001 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3070 | -87.5710 | 134.1 |
| SHNE002 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3099 | -87.5770 | 12 |
| SHNE002 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3098 | -87.5770 | 90 |
| SHNE004 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3252 | -87.5947 | 64 |
| SHNE004 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3253 | -87.5948 | 76 |
| SHNE005 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3267 | -87.5955 | 102 |
| SHNE006 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3268 | -87.5957 | 76.1 |
| SHNE007 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3225 | -87.5920 | 77.2 |
| SHNW002 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2909 | -87.5186 | 22.5 |
| SHNW003a | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2945 | -87.5231 | 162 |
| SHNW004a | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2931 | -87.5251 | 79.6 |

[1] All features listed above are considered WWCs by the State of Tennessee, and do not require an Aquatic Resource Alteration Permit for the alterations proposed. In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), the impacts to WWCs shall require no notice or approval, and do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions in the Tennessee Water Quality Control Act 69-3-108(q).

AR000557

**Plans and drawings**



NOTES:
1. THE PURPOSE OF THIS TYPICAL CONSTRUCTION RIGHT-OF-WAY CROSS-SECTION DIAGRAM IS TO SHOW WIDTHS AND RELATIVE LOCATIONS OF EXISTING RIGHTS-OF-WAY, NEW PERMANENT RIGHT-OF-WAY, AND TEMPORARY CONSTRUCTION RIGHT-OF-WAY.
2. THIS DRAWING IS REPRESENTATIVE OF THE TYPICAL CONSTRUCTION WORK SPACE.  SEE CONSTRUCTION ALIGNMENT SHEETS FOR SITE SPECIFIC DETAILS.
3. ADDITIONAL TEMPORARY WORK SPACE (ATWS) IS REQUIRED NEAR ROAD AND STREAM CROSSINGS, SIDE SLOPES, AND OTHER AREAS WITH UNIQUE CONSTRUCTION REQUIREMENTS.  (SEE ALIGNMENT SHEETS FOR ATWS)
4. AT LOCATIONS WITH CULTIVATED LAND, TOPSOIL SEPARATION WILL BE COMPLETED FOR THE, TRENCH, SPOIL PILE, AND WORKING SIDE.  AT FORESTED AND NON-CULTIVATED AREAS TOPSOIL SEPARATION WILL BE COMPLETED FOR THE TRENCH AND SPOIL PILE.
5. DRAWING IS NOT TO SCALE.

| REVISIONS | | | | | | PROPOSED 30" PIPELINE ADJACENT TO TGP PIPELINE TYPICAL CONSTRUCTION RIGHT-OF-WAY | | |
|---|---|---|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR | | | |
| | | | | | | **Tennessee Gas Pipeline Company, L.L.C.** a Kinder Morgan Company | | |
| | | | | | | DATE: 04/05/2022 | DRAWN BY: EPG | APPROVED BY: CDM |
| | | | | | | SCALE: N.T.S. | P2021-1119-STD-0091 | SH. 1 OF 3 |

TABLEROCK
SURVEY LLC
2204 TIMBERLOCH PL., STE. 180
THE WOODLANDS, TX 77380
OFFICE: 832-415-3869
TBPELS FIRM NO. 10194261

Page 56 of 65

**App-0369**



1. THE PURPOSE OF THIS TYPICAL CONSTRUCTION RIGHT—OF—WAY CROSS—SECTION DIAGRAM IS TO SHOW WIDTHS AND RELATIVE LOCATIONS OF EXISTING RIGHTS—OF—WAY, NEW PERMANENT RIGHT—OF—WAY, AND TEMPORARY CONSTRUCTION RIGHT—OF—WAY.
2. THIS DRAWING IS REPRESENTATIVE OF THE TYPICAL CONSTRUCTION WORK SPACE. SEE CONSTRUCTION ALIGNMENT SHEETS FOR SITE SPECIFIC DETAILS.
3. ADDITIONAL TEMPORARY WORK SPACE (ATWS) IS REQUIRED NEAR ROAD AND STREAM CROSSINGS, SIDE SLOPES, AND OTHER AREAS WITH UNIQUE CONSTRUCTION REQUIREMENTS. (SEE ALIGNMENT SHEETS FOR ATWS)
4. AT LOCATIONS WITH CULTIVATED LAND, TOPSOIL SEPARATION WILL BE COMPLETED FOR THE, TRENCH, SPOIL PILE, AND WORKING SIDE. AT FORESTED AND NON—CULTIVATED AREAS TOPSOIL SEPARATION WILL BE COMPLETED FOR THE TRENCH AND SPOIL PILE.
5. DRAWING IS NOT TO SCALE.

| REVISIONS | | | | | |
|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Tennessee Gas Pipeline Company, L.L.C.
a Kinder Morgan Company

PROPOSED 30" PIPELINE
NOT ABUTTING TVA EASEMENT
TYPICAL CONSTRUCTION RIGHT—OF—WAY

| DATE: 04/05/2022 | DRAWN BY: EPG | APPROVED BY: CDW |
|---|---|---|
| SCALE: N.T.S. | P2021—1119—STD—0001 | SH. 2 OF 3 |

TABLEROCK SURVEY, LLC
2204 TIMBERLOCH PL, STE. 180
THE WOODLANDS, TX 77380
OFFICE: 832—415—3869
TBPELS FIRM NO. 10194261

Page 57 of 65

AR000559    **App-0370**



1. THE PURPOSE OF THIS TYPICAL CONSTRUCTION RIGHT-OF-WAY CROSS-SECTION DIAGRAM IS TO SHOW WIDTHS AND RELATIVE LOCATIONS OF EXISTING RIGHTS-OF-WAY, NEW PERMANENT RIGHT-OF-WAY, AND TEMPORARY CONSTRUCTION RIGHT-OF-WAY.
2. THIS DRAWING IS REPRESENTATIVE OF THE TYPICAL CONSTRUCTION WORK SPACE. SEE CONSTRUCTION ALIGNMENT SHEETS FOR SITE SPECIFIC DETAILS.
3. ADDITIONAL TEMPORARY WORK SPACE (ATWS) IS REQUIRED NEAR ROAD AND STREAM CROSSINGS, SIDE SLOPES, AND OTHER AREAS WITH UNIQUE CONSTRUCTION REQUIREMENTS. (SEE ALIGNMENT SHEETS FOR ATWS)
4. AT LOCATIONS WITH CULTIVATED LAND, TOPSOIL SEPARATION WILL BE COMPLETED FOR THE, TRENCH, SPOIL PILE, AND WORKING SIDE. AT FORESTED AND NON-CULTIVATED AREAS TOPSOIL SEPARATION WILL BE COMPLETED FOR THE TRENCH AND SPOIL PILE.
5. DRAWING IS NOT TO SCALE.

| REVISIONS | | | | | | PROPOSED 30" PIPELINE ABUTTING TVA EASEMENT TYPICAL CONSTRUCTION RIGHT-OF-WAY | | |
|---|---|---|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR | | | |

Tennessee Gas Pipeline Company, L.L.C.
a Kinder Morgan Company

TABLEROCK SURVEY LLC
2204 TIMBERLOCH PL, STE. 180
THE WOODLANDS, TX 77380
OFFICE: 832-415-3869
TBPELS FIRM NO. 10194261

DATE: 04/05/2022   DRAWN BY: EPG   APPROVED BY: CDW
SCALE: N.T.S.   P2021-1119-STD-0001   SH. 3 OF 3

Page 58 of 65



TYPICAL ADDITIONAL TEMPORARY WORK SPACE AT CREEK CROSSINGS

NOTES:

1. THIS TYPICAL WORK SPACE LAYOUT WILL BE ADJUSTED TO ACCOMMODATE SITE-SPECIFIC CONDITIONS.

2. THE SIZE OF THE ADDITIONAL TEMPORARY WORKS SPACE (ATWS) WILL VARY WITH THE DEPTH OF THE CREEK, STEEPNESS OF THE SURROUNDING SLOPES, AND OTHER CONDITIONS.

Page 59 of 65

**App-0372**



NOTES:

1. METHOD APPLIES TO WATERBODIES WHERE DOWNSTREAM SILTATION MUST BE AVOIDED. FLUMES ARE GENERALLY NOT RECOMMENDED FOR USE ON WATERBODIES WITH A BROAD UNCONFINED CHANNEL, PERMEABLE SUBSTRATE, EXCESSIVE DISCHARGE, OR WHERE A SIGNIFICANT AMOUNT OF BED OR BANK ALTERATION IS REQUIRED TO INSTALL FLUMES OR DAMS.

2. SCHEDULE CROSSING DURING LOW FLOW PERIOD IF POSSIBLE.

3. COMPLETE ALL WATERCOURSE ACTIVITIES AS EXPEDIENTLY AS POSSIBLE.

4. NO REFUELING OF MOBILE EQUIPMENT WITHIN 100 FEET OF WATERBODY. REFUEL STATIONARY EQUIPMENT AS PER THE SPCC PLAN.

5. INSTALL TEMPORARY EQUIPMENT CROSSING.

6. IN AGRICULTURAL LAND, STRIP TOPSOIL FROM SPOIL STORAGE AREA.

7. IN-STREAM SPOIL TO BE STORED ON BANKS A MINIMUM OF 10 FEET FROM THE TOP OF THE BANK.

8. LEAVE HARD PLUGS AT THE STREAM BANK EDGE UNTIL JUST PRIOR TO PIPE INSTALLATION.

9. SIZE FLUME TO HANDLE 150 % ANTICIPATED FLOWS. INSTALL FLUME IN WATERCOURSE AND MAINTAIN CORRECT ALIGNMENT UNTIL REMOVED.

10. CONSTRUCT UPSTREAM DAM FOLLOWED BY DOWNSTREAM DAM. INSTALL A FLANGE ON UPSTREAM END OF FLUME AND SEAL TO SUBSTRATE WITH SANDBAGS AND POLYETHYLENE LINER WHERE NECESSARY TO ENSURE A WATERTIGHT BARRIER. "KEY" DAMS INTO BANKS OR CONSTRUCT SECONDARY DAM, IF NECESSARY.

11. PUMP STREAM CHANNEL BETWEEN DAMS, IF NECESSARY. DISCHARGE WATER THROUGH A DEWATERING STRUCTURE AND ONTO A STABLE WELL VEGETATED AREA TO PREVENT EROSION AND SEDIMENTATION. NO HEAVILY SILT-LADEN WATER MAY BE DISCHARGED IN THE STREAM.

12. CONSTRUCT SEDIMENT BARRIERS (STRAW BALES AND/OR SILT FENCE) TO PREVENT SILT LADEN WATER AND SPOIL FROM FLOWING BACK INTO WATERCOURSE. CONSTRUCTED SEDIMENT BARRIERS SHALL EXTEND ALONG THE SIDES OF THE STOCKPILES AND THE ENDS OF DAMS. BARRIERS MAY BE TEMPORARILY REMOVED TO ALLOW CONSTRUCTION ACTIVITIES BUT MUST BE REPLACED BY THE END OF EACH WORK DAY.

13. COMPLETE PREFABRICATION OF IN-STREAM PIPE SECTION AND WEIGHT PIPE AS NECESSARY PRIOR TO COMMENCEMENT OF IN-STREAM ACTIVITY.

14. TRENCH THROUGH WATERCOURSE. INSTALL TEMPORARY (SOFT) PLUGS, IF NECESSARY, TO CONTROL WATER FLOW AND TRENCH SLOUGHING.

15. MAINTAIN STREAM FLOW, IF PRESENT, THROUGH FLUME THROUGHOUT CROSSING CONSTRUCTION.

16. LOWER-IN PIPE, INSTALL TRENCH PLUG AND BACKFILL IMMEDIATELY.

17. BACKFILL WITH NATIVE MATERIAL.

18. RESTORE WATERCOURSE CHANNEL TO APPROXIMATE PRE-CONSTRUCTION PROFILE AND SUBSTRATE.

19. RESTORE STREAM BANKS TO APPROXIMATE ORIGINAL CONDITION AND STABILIZE, AS REQUIRED.

DRAWING DEPICTED IS SUPERSEDED BY WRITTEN STANDARD, SCOPE OF WORK OR LINE LIST.

| REVISIONS | | | | | |
|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR |
| 1 | 07/08/04 | ISSUED FOR REVIEW | RB | CM | |
| 2 | 07/13/04 | REVISED PER CLIENT COMMENT | RB | CM | |
| 3 | 07/01/05 | DWG REWRITE RELEASE | WS | | |

**KINDER MORGAN**

WATERBODY CROSSING
OPEN CUT DRY FLUME

| | | | |
|---|---|---|---|
| DATE: | 07/01/05 | | APPROVED BY: |
| SCALE: N.T.S. | | CST-P-1150-A375 | SH. 1 OF 1 |



PLAN VIEW

NOTES:

1. THIS METHOD APPLIES TO WATERBODIES WITH LIMITED FLOW AT TIME OF CONSTRUCTION WHERE DOWNSTREAM SILTATION MUST BE AVOIDED AND THE CROSSING WIDTH IS NOT PROHIBITIVE.

2. SCHEDULE CROSSING DURING LOW FLOW PERIOD IF POSSIBLE.

3. COMPLETE ALL IN-STREAM ACTIVITIES AS EXPEDIENTLY AS POSSIBLE.

4. NO REFUELING OF MOBILE EQUIPMENT WITHIN 100 FEET OF WATERBODY. REFUEL STATIONARY EQUIPMENT AS PER THE SPCC PLAN.

5. INSTALL TEMPORARY EQUIPMENT CROSSING, IF REQUIRED.

6. IN AGRICULTURAL LAND, STRIP TOPSOIL FROM SPOIL STORAGE AREA.

7. CONSTRUCT SEDIMENT BARRIERS TO PREVENT SILT LADEN WATER AND SPOIL FROM FLOWING INTO WATERBODY. CONSTRUCTED SEDIMENT BARRIERS SHALL EXTEND ALONG THE SIDES OF THE SPOIL AND TOPSOIL STOCKPILES AND ACROSS THE ENTIRE CONSTRUCTION R.O.W. BARRIERS MAY BE TEMPORARILY REMOVED TO ALLOW CONSTRUCTION ACTIVITIES BUT MUST BE REPLACED BY THE END OF EACH WORK DAY.

8. CONSTRUCT UPSTREAM STRUCTURE (DAM) FOLLOWED BY DOWNSTREAM STRUCTURE (DAM). WATER STRUCTURES (AQUA DAM, JERSEY BARRIERS, SAND BAGS, STEEL PLATE, POLYETHYLENE LINER, ETC.) FINAL LOCATION WILL BE APPROVED BY THE ENVIRONMENTAL INSPECTOR.

9. SIZE PUMPS FOR DIVERSION OF ENTIRE STREAM FLOW. CONTRACTOR SHALL MAINTAIN 100% SPARE PUMPING CAPACITY ON SITE. PUMPS SHALL BE INSTALLED ON POLYETHYLENE BARRIERS FOR FUEL/OIL SPILL CONTAINMENT. PUMP INTAKES WILL BE SCREENED TO PREVENT ENTRAPMENT OF FISH. CONTRACTOR SHALL MONITOR PUMPS AND WATER STRUCTURES ON A 24 HOUR BASIS UNTIL THE CROSSING INSTALLATION IS COMPLETE. SHOULD LEAKAGE AT THE DAM STRUCTURES OCCUR, CONTRACTOR SHALL DEWATER BETWEEN THE STRUCTURES THROUGH AN APPROPRIATE FILTER AND ONTO A WELL VEGETATED UPLAND AREA. NO HEAVILY SILT-LADEN WATER SHALL BE DISCHARGED INTO THE STREAM.

10. LEAVE HARD PLUGS AT STREAM BANK EDGE UNTIL JUST PRIOR TO PIPE INSTALLATION.

11. COMPLETE CONSTRUCTION OF IN-STREAM PIPE SECTION. WEIGHT PIPE AS NECESSARY PRIOR TO COMMENCEMENT OF IN-STREAM ACTIVITY.

12. TRENCH THROUGH WATERBODY AS EXPEDIENTLY AS PRACTICAL. INSTALL TEMPORARY (SOFT) PLUGS, IF NECESSARY, TO CONTROL WATER FLOW AND TRENCH SLOUGHING.

13. MAINTAIN STREAM FLOW THROUGHOUT CROSSING CONSTRUCTION.

14. LOWER-IN PIPE, INSTALL TRENCH PLUG AND BACKFILL IMMEDIATELY.

15. BACKFILL WITH NATIVE MATERIAL.

16. RESTORE WATERBODY CHANNEL TO APPROXIMATE PRE-CONSTRUCTION PROFILE AND SUBSTRATE.

17. DISMANTLE DOWNSTREAM WATER STRUCTURE (DAM) AND UPSTREAM WATER STRUCTURE (DAM) AFTER TRENCH BACKFILL.

18. RESTORE STREAM BANKS TO APPROXIMATE ORIGINAL CONDITION AND STABILIZE, AS REQUIRED.

DRAWING DEPICTED IS SUPERSEDED BY WRITTEN STANDARD, SCOPE OF WORK OR LINE LIST.

| REVISIONS | | | | | |
|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR. |
| 1 | 07/08/04 | ISSUED FOR REVIEW | RB | CM | |
| 2 | 07/13/04 | REVISED PER CLIENT COMMENT | RB | CM | |
| 3 | 07/01/05 | DWG REWRITE RELEASE | WS | | |

**KINDER MORGAN**

WATERBODY CROSSING
OPEN CUT DAM & PUMP

| DATE: | 07/01/05 | | APPROVED BY: | |
|---|---|---|---|---|
| SCALE: N.T.S. | | CST-P-1150-A370 | SH. 1 OF 1 | |

Page 61 of 65

**App-0374**



## NOTES:

1. SET UP DRILLING EQUIPMENT A MINIMUM OF 100 FEET FROM THE EDGE OF THE WATERCOURSE. DO NOT CLEAR OR GRADE WITHIN THE 100 FOOT ZONE.

2. ENSURE THAT ONLY BENTONITE BASED DRILLING MUD IS USED. DO NOT ALLOW THE USE OF ANY ADDITIVES TO THE DRILLING MUD WITHOUT THE APPROVAL OF COMPANY'S INSPECTOR.

3. INSTALL SUITABLE DRILLING MUD TANKS OR SUMPS TO PREVENT CONTAMINATION OF WATERCOURSE.

4. INSTALL BERMS DOWNSLOPE FROM THE DRILL ENTRY AND ANTICIPATED EXIT POINTS TO CONTAIN ANY RELEASE OF DRILLING MUD.

5. DISPOSE OF DRILLING MUD IN ACCORDANCE WITH THE APPROPRIATE REGULATORY AUTHORITY REQUIREMENTS.

WATERBODY CROSSING
HORIZONTAL DIRECTIONAL DRILL

KINDER MORGAN

Page 62 of 65



Verification:                                          Apr 07, 2022  –  8:29AM

**TYPICAL PROFILE**

**PLAN VIEW**

DRAWING DEPICTED IS SUPERSEDED BY WRITTEN
STANDARD, SCOPE OF WORK OR LINE LIST.

302800

| A | ISSUED FOR APPROVAL | | 302880 | 04–06–2022 |
| ⚠ | Revision Description | | Project ID | Date |

Reference Drawings
CUMBERLAND PIPELINE Facility Name

**KINDER MORGAN**

TENNESSEE NATURAL GAS PIPELINE

TYPICAL WETLAND CROSSING

Status: **ISSUED FOR APPROVAL**

| State: | TENNESSEE | PIN No: | |
| County: | DICKSON | Scale: | N.T.S. |
| Category: | PIPELINE | | |
| File Name: 302800–EXHIBIT–05A.DWG | | | |
| Drawing No: | | | Rev |
| 302800–EXHIBIT–05A | | | A |

Page 63 of 65



1) Survey and Staking
2) Clearing
3) Front-End Grading
4) ROW Topsoil Stripping
5) Restaking Centerline of Trench
6) Trenching (wheel ditcher)
7) Trenching (rock)
8) Padding Trench Bottom
9) Stringing Pipe
10) Field Bending Pipe
11) Line-Up, Initial Weld
12) Fill & Cap, Final Weld
13) As-Built Footage
14) X-Ray Inspection, Weld Repair
15) Coating Field Welds
16) Inspection & Repair of Coating
17) Lowering Pipe into Trench
18) As-Built Survey
19) Pad, Backfill, Rough Grade
20) Hydrostatic Testing, Final Tie-In
21) Replace Topsoil, Final Clean-Up,
Full Restoration

TYPICAL PIPELINE
CONSTRUCTION SEQUENCE

Page 64 of 65

**Site maps**

Note: Photos of each waterbody crossing are available in the document entitled "Attachment 3 – Project Design Plans and Permit Drawings" submitted with the initial permit application package to the Division on July 22, 2022 and in the document entitled "March and April 2023 Field Photolog Request" dated October 18, 2023 for the additional aquatic features authorized by this permit modification.



Above: water withdrawal locations.

Page 65 of 65

**App-0378**

**Plans and drawings**



**App-0379**



AR000569  **App-0380**



1. THE PURPOSE OF THIS TYPICAL CONSTRUCTION RIGHT-OF-WAY CROSS-SECTION DIAGRAM IS TO SHOW WIDTHS AND RELATIVE LOCATIONS OF EXISTING RIGHTS-OF-WAY, NEW PERMANENT RIGHT-OF-WAY, AND TEMPORARY CONSTRUCTION RIGHT-OF-WAY.
2. THIS DRAWING IS REPRESENTATIVE OF THE TYPICAL CONSTRUCTION WORK SPACE. SEE CONSTRUCTION ALIGNMENT SHEETS FOR SITE SPECIFIC DETAILS.
3. ADDITIONAL TEMPORARY WORK SPACE (ATWS) IS REQUIRED NEAR ROAD AND STREAM CROSSINGS, SIDE SLOPES, AND OTHER AREAS WITH UNIQUE CONSTRUCTION REQUIREMENTS. (SEE ALIGNMENT SHEETS FOR ATWS)
4. AT LOCATIONS WITH CULTIVATED LAND, TOPSOIL SEPARATION WILL BE COMPLETED FOR THE, TRENCH, SPOIL PILE, AND WORKING SIDE. AT FORESTED AND NON-CULTIVATED AREAS TOPSOIL SEPARATION WILL BE COMPLETED FOR THE TRENCH AND SPOIL PILE.
5. DRAWING IS NOT TO SCALE.

| REVISIONS | | | | | | | PROPOSED 30" PIPELINE | | |
|---|---|---|---|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR | | ABUTTING TVA EASEMENT | | |
| | | | | | | Tennessee Gas Pipeline Company, L.L.C. a Kinder Morgan Company | TYPICAL CONSTRUCTION RIGHT-OF-WAY | | |
| | | | | | | | DATE: 04/05/2022 | DRAWN BY: EPG | APPROVED BY: CDW |
| | | | | | | | SCALE: N.T.S. | P2021-1119-STD-0001 | SH.3 OF 3 |

TABLEROCK
S U R V E Y, LLC
2204 TIMBERLOCH PL., STE. 180
THE WOODLANDS, TX 77380
OFFICE: 832-415-3869
TBPELS FIRM NO. 10194261

Page 58 of 65

**App-0381**



TYPICAL ADDITIONAL TEMPORARY WORK SPACE AT CREEK CROSSINGS

NOTES:

1. THIS TYPICAL WORK SPACE LAYOUT WILL BE ADJUSTED TO ACCOMMODATE SITE-SPECIFIC CONDITIONS.

2. THE SIZE OF THE ADDITIONAL TEMPORARY WORKS SPACE (ATWS) WILL VARY WITH THE DEPTH OF THE CREEK, STEEPNESS OF THE SURROUNDING SLOPES, AND OTHER CONDITIONS.

Page 59 of 65



PLAN VIEW

NOTES:

1. METHOD APPLIES TO WATERBODIES WHERE DOWNSTREAM SILTATION MUST BE AVOIDED. FLUMES ARE GENERALLY NOT RECOMMENDED FOR USE ON WATERBODIES WITH A BROAD UNCONFINED CHANNEL, PERMEABLE SUBSTRATE, EXCESSIVE DISCHARGE, OR WHERE A SIGNIFICANT AMOUNT OF BED OR BANK ALTERATION IS REQUIRED TO INSTALL FLUMES OR DAMS.

2. SCHEDULE CROSSING DURING LOW FLOW PERIOD IF POSSIBLE.

3. COMPLETE ALL WATERCOURSE ACTIVITIES AS EXPEDIENTLY AS POSSIBLE.

4. NO REFUELING OF MOBILE EQUIPMENT WITHIN 100 FEET OF WATERBODY. REFUEL STATIONARY EQUIPMENT AS PER THE SPCC PLAN.

5. INSTALL TEMPORARY EQUIPMENT CROSSING.

6. IN AGRICULTURAL LAND, STRIP TOPSOIL FROM SPOIL STORAGE AREA.

7. IN-STREAM SPOIL TO BE STORED ON BANKS A MINIMUM OF 10 FEET FROM THE TOP OF THE BANK.

8. LEAVE HARD PLUGS AT THE STREAM BANK EDGE UNTIL JUST PRIOR TO PIPE INSTALLATION.

9. SIZE FLUME TO HANDLE 150 % ANTICIPATED FLOWS. INSTALL FLUME IN WATERCOURSE AND MAINTAIN CORRECT ALIGNMENT UNTIL REMOVED.

10. CONSTRUCT UPSTREAM DAM FOLLOWED BY DOWNSTREAM DAM. INSTALL A FLANGE ON UPSTREAM END OF FLUME AND SEAL TO SUBSTRATE WITH SANDBAGS AND POLYETHYLENE LINER WHERE NECESSARY TO ENSURE A WATERTIGHT BARRIER. "KEY" DAMS INTO BANKS OR CONSTRUCT SECONDARY DAM, IF NECESSARY.

11. PUMP STREAM CHANNEL BETWEEN DAMS, IF NECESSARY. DISCHARGE WATER THROUGH A DEWATERING STRUCTURE AND ONTO A STABLE WELL VEGETATED AREA TO PREVENT EROSION AND SEDIMENTATION. NO HEAVILY SILT-LADEN WATER MAY BE DISCHARGED IN THE STREAM.

12. CONSTRUCT SEDIMENT BARRIERS (STRAW BALES AND/OR SILT FENCE) TO PREVENT SILT LADEN WATER AND SPOIL FROM FLOWING BACK INTO WATERCOURSE. CONSTRUCTED SEDIMENT BARRIERS SHALL EXTEND ALONG THE SIDES OF THE STOCKPILES AND THE ENDS OF DAMS. BARRIERS MAY BE TEMPORARILY REMOVED TO ALLOW CONSTRUCTION ACTIVITIES BUT MUST BE REPLACED BY THE END OF EACH WORK DAY.

13. COMPLETE PREFABRICATION OF IN-STREAM PIPE SECTION AND WEIGHT PIPE AS NECESSARY PRIOR TO COMMENCEMENT OF IN-STREAM ACTIVITY.

14. TRENCH THROUGH WATERCOURSE. INSTALL TEMPORARY (SOFT) PLUGS, IF NECESSARY, TO CONTROL WATER FLOW AND TRENCH SLOUGHING.

15. MAINTAIN STREAM FLOW, IF PRESENT, THROUGH FLUME THROUGHOUT CROSSING CONSTRUCTION.

16. LOWER-IN PIPE, INSTALL TRENCH PLUG AND BACKFILL IMMEDIATELY.

17. BACKFILL WITH NATIVE MATERIAL.

18. RESTORE WATERCOURSE CHANNEL TO APPROXIMATE PRE-CONSTRUCTION PROFILE AND SUBSTRATE.

19. RESTORE STREAM BANKS TO APPROXIMATE ORIGINAL CONDITION AND STABILIZE, AS REQUIRED.

DRAWING DEPICTED IS SUPERSEDED BY WRITTEN STANDARD, SCOPE OF WORK OR LINE LIST.

| REVISIONS | | | | | |
|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR |
| 1 | 07/08/04 | ISSUED FOR REVIEW | RB | CM | |
| 2 | 07/13/04 | REVISED PER CLIENT COMMENT | RB | CM | |
| 3 | 07/01/05 | DWG REWRITE RELEASE | WS | | |

**KINDER⚡MORGAN**

WATERBODY CROSSING
OPEN CUT DRY FLUME

DATE: 07/01/05

APPROVED BY:

SCALE: N.T.S.    CST-P-1150-A375    SH. 1 OF 1

AR000572



PLAN VIEW

NOTES:

1. THIS METHOD APPLIES TO WATERBODIES WITH LIMITED FLOW AT TIME OF CONSTRUCTION WHERE DOWNSTREAM SILTATION MUST BE AVOIDED AND THE CROSSING WIDTH IS NOT PROHIBITIVE.

2. SCHEDULE CROSSING DURING LOW FLOW PERIOD IF POSSIBLE.

3. COMPLETE ALL IN-STREAM ACTIVITIES AS EXPEDIENTLY AS POSSIBLE.

4. NO REFUELING OF MOBILE EQUIPMENT WITHIN 100 FEET OF WATERBODY.  REFUEL STATIONARY EQUIPMENT AS PER THE SPCC PLAN.

5. INSTALL TEMPORARY EQUIPMENT CROSSING, IF REQUIRED.

6. IN AGRICULTURAL LAND, STRIP TOPSOIL FROM SPOIL STORAGE AREA.

7. CONSTRUCT SEDIMENT BARRIERS TO PREVENT SILT LADEN WATER AND SPOIL FROM FLOWING INTO WATERBODY.  CONSTRUCTED SEDIMENT BARRIERS SHALL EXTEND ALONG THE SIDES OF THE SPOIL AND TOPSOIL STOCKPILES AND ACROSS THE ENTIRE CONSTRUCTION R.O.W.  BARRIERS MAY BE TEMPORARILY REMOVED TO ALLOW CONSTRUCTION ACTIVITIES BUT MUST BE REPLACED BY THE END OF EACH WORK DAY.

8. CONSTRUCT UPSTREAM STRUCTURE (DAM) FOLLOWED BY DOWNSTREAM STRUCTURE (DAM).  WATER STRUCTURES' (AQUA DAM, JERSEY BARRIERS, SAND BAGS, STEEL PLATE, POLYETHYLENE LINER, ETC.) FINAL LOCATION WILL BE APPROVED BY THE ENVIRONMENTAL INSPECTOR.

9. SIZE PUMPS FOR DIVERSION OF ENTIRE STREAM FLOW.  CONTRACTOR SHALL MAINTAIN 100% SPARE PUMPING CAPACITY ON SITE. PUMPS SHALL BE INSTALLED ON POLYETHYLENE BARRIERS FOR FUEL/OIL SPILL CONTAINMENT.  PUMP INTAKES WILL BE SCREENED TO PREVENT ENTRAPMENT OF FISH.  CONTRACTOR SHALL MONITOR PUMPS AND WATER STRUCTURES ON A 24 HOUR BASIS UNTIL THE CROSSING INSTALLATION IS COMPLETE.  SHOULD LEAKAGE AT THE DAM STRUCTURES OCCUR, CONTRACTOR SHALL DEWATER BETWEEN THE STRUCTURES THROUGH AN APPROPRIATE FILTER AND ONTO A WELL VEGETATED UPLAND AREA.  NO HEAVILY SILT-LADEN WATER SHALL BE DISCHARGED INTO THE STREAM.

10. LEAVE HARD PLUGS AT STREAM BANK EDGE UNTIL JUST PRIOR TO PIPE INSTALLATION.

11. COMPLETE CONSTRUCTION OF IN-STREAM PIPE SECTION.  WEIGHT PIPE AS NECESSARY PRIOR TO COMMENCEMENT OF IN-STREAM ACTIVITY.

12. TRENCH THROUGH WATERBODY AS EXPEDIENTLY AS PRACTICAL.  INSTALL TEMPORARY (SOFT) PLUGS, IF NECESSARY, TO CONTROL WATER FLOW AND TRENCH SLOUGHING.

13. MAINTAIN STREAM FLOW THROUGHOUT CROSSING CONSTRUCTION.

14. LOWER-IN PIPE, INSTALL TRENCH PLUG AND BACKFILL IMMEDIATELY.

15. BACKFILL WITH NATIVE MATERIAL.

16. RESTORE WATERBODY CHANNEL TO APPROXIMATE PRE-CONSTRUCTION PROFILE AND SUBSTRATE.

17. DISMANTLE DOWNSTREAM WATER STRUCTURE (DAM) AND UPSTREAM WATER STRUCTURE (DAM) AFTER TRENCH BACKFILL.

18. RESTORE STREAM BANKS TO APPROXIMATE ORIGINAL CONDITION AND STABILIZE, AS REQUIRED.

DRAWING DEPICTED IS SUPERSEDED  BY WRITTEN STANDARD, SCOPE OF WORK OR LINE LIST.

| REVISIONS | | | | | | |
|---|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR. |
| 1 | 07/08/04 | ISSUED FOR REVIEW | RB | CM | |
| 2 | 07/13/04 | REVISED PER CLIENT COMMENT | RB | CM | |
| 3 | 07/01/05 | ENG REWRITE RELEASE | WS | | |

KINDER MORGAN

WATERBODY CROSSING
OPEN CUT DAM & PUMP

| DATE: | 07/01/05 | | APPROVED BY: |
|---|---|---|---|
| SCALE: N.T.S. | | CST-P-1150-A370 | SH.  1 OF 1 |

Page 61 of 65

**App-0384**



NOTES:

1. SET UP DRILLING EQUIPMENT A MINIMUM OF 100 FEET FROM THE EDGE OF THE WATERCOURSE.  DO NOT CLEAR OR GRADE WITHIN THE 100 FOOT ZONE.

2. ENSURE THAT ONLY BENTONITE BASED DRILLING MUD IS USED.  DO NOT ALLOW THE USE OF ANY ADDITIVES TO THE DRILLING MUD WITHOUT THE APPROVAL OF COMPANY'S INSPECTOR.

3. INSTALL SUITABLE DRILLING MUD TANKS OR SUMPS TO PREVENT CONTAMINATION OF WATERCOURSE.

4. INSTALL BERMS DOWNSLOPE FROM THE DRILL ENTRY AND ANTICIPATED EXIT POINTS TO CONTAIN ANY RELEASE OF DRILLING MUD.

5. DISPOSE OF DRILLING MUD IN ACCORDANCE WITH THE APPROPRIATE REGULATORY AUTHORITY REQUIREMENTS.

Page 62 of 65

**App-0385**



App-0386



TYPICAL PIPELINE
CONSTRUCTION SEQUENCE

1) Survey and Staking
2) Clearing
3) Front-End Grading
4) ROW Topsoil Stripping
5) Restaking Centerline of Trench
6) Trenching (wheel ditcher)
7) Trenching (rock)
8) Padding Trench Bottom

9) Stringing Pipe
10) Field Bending Pipe
11) Line-Up, Initial Weld
12) Fill & Cap, Final Weld
13) As-Built Footage
14) X-Ray Inspection, Weld Repair
15) Coating Field Welds
16) Inspection & Repair of Coating
17) Lowering Pipe into Trench
18) As-Built Survey
19) Pad, Backfill, Rough Grade
20) Hydrostatic Testing, Final Tie-In
21) Replace Topsoil, Final Clean-Up,
    Full Restoration

Page 64 of 65

**Site maps**

Note: Photos of each waterbody crossing are available in the document entitled "Attachment 3 – Project Design Plans and Permit Drawings" submitted with the initial permit application package to the Division on July 22, 2022 and in the document entitled "March and April 2023 Field Photolog Request" dated October 18, 2023 for the additional aquatic features authorized by this permit modification.



Above: water withdrawal locations.

Page 65 of 65



**DEPARTMENT OF THE ARMY**
NASHVILLE DISTRICT, CORPS OF ENGINEERS
REGULATORY DIVISION
3701 BELL ROAD
NASHVILLE, TENNESSEE  37214

April 23, 2024

SUBJECT:  File No. LRN-2021-00866, Proposed Natural Gas Pipeline from Dickson, TN to Cumberland City, TN in Dickson, Houston, and Stewart Counties, Tennessee. (Lat: 36.2667; Long: -87.4266)

Tennessee Department of Environmental Conservation
Division of Water Resources
C/O Lee Barber
312 Rosa L. Parks Avenue, 11th Floor
Nashville, Tennessee 37243-1102

Dear Mr. Barber:

This correspondence concerns the state of Tennessee Department of Environment and Conservation (TDEC) conditional grant of §401 Water Quality Certification (WQC) of July 21, 2023 to Tennessee Gas Pipeline Company, LLC. The conditional grant of WQC is for a proposed natural gas pipeline extending 32 miles from Dickson, Tennessee to Cumberland City, TN. Our file number for this project is LRN-2021-00866.

Special condition a. of the TDEC WQC states in part: "Impacts to streams or wetlands in the project area and along the pipeline ROW are not authorized until [Tennessee Gas Pipeline Company LLC] has: …4. Submitted an application for a modified permit that addresses newly inventoried resources, and 5. Received a modified [Aquatic Resource Alternation Permit (ARAP)] covering all proposed impacts to aquatic resources for the entire pipeline project."

The applicant provided the information required by special condition a. to TDEC on August 25, 2023. Based on discussions with TDEC and the applicant, it is the Corps' understanding that the applicant's submission of additional information did not constitute a new certification request requiring further state action or waiver of §401 authority. TDEC advertised a modification of the state ARAP (NRS 22.192) by Public Notice on January 30, 2024. TDEC included two statements in that public notice with respect to the WQC previously granted:

"This modification would affect only the state aquatic resource alteration permit and would not constitute a modification of the Section 401 certification issued on July 21, 2023."

- 2 -

"The Department has waived its authority under Section 401 with respect to the new impacts to be authorized by this state permit modification that were not included in the July 21, 2023 section 401 certification."

On April 11, 2024, our counsel met with your counsel to discuss our understanding of the facts and position on the matter as outlined above. Based on that discussion, our position remains unchanged, and we regard the state's conditional grant of water quality certification of July 21, 2023 to be valid for the entire 32-mile pipeline. If you have any questions, please contact Sammy Iskrzycki at the letterhead address above, telephone 615-829-3086 or email Samantha.N.Iskrzycki@usace.army.mil.

Sincerely,

Joshua Frost
Chief, Regulatory Division
U.S. Army Corps of Engineers

Copy Furnished:

Claire Wainwright, TDEC, Claire.Wainwright@tn.gov

CELRN-RDW                                    DATE: April 23, 2024

MEMORANDUM FOR RECORD

SUBJECT:    401 Discussion Documentation

 FILE NO.    LRN-2021-00866

LOCATION: TVA Cumberland Pipeline Project

On 11 April 2024, Corps counsel Kathryn Morris met with TDEC counsel Stephanie Durman and Patrick Parker to discuss the Corps' understanding of relevant facts and validity of the 401 water quality certification (WQC). This memo summarizes the discussion during that meeting.

The Corps has identified the following facts as relevant to the validity of TDEC's 401 WQC.

- On July 22, 2022, the applicant submitted an ARAP and 401 WQC request to TDEC.

- On August 18, 2022, FERC established July 22, 2023, as the one-year reasonable period of time for TDEC to act on the 401 WQC request.

- On July 21, 2023, TDEC issued a conditional grant in response to the ARAP and 401 WQC request.

- On July 22, 2023, the one-year reasonable period of time ended for TDEC to act on the 401 WQC request.

- On August 24, 2023, the applicant submitted information on additional stream crossings in compliance with permit special condition a.

- On January 30, 2024, TDEC issued a public notice with a draft ARAP modification that included a waiver of 401 WQC authority for the additional stream crossings.

    Based on the foregoing facts, it is the Corps' understanding that the conditional grant issued by TDEC on July 21, 2023, was a valid 401 action because it occurred within the one-year reasonable period of time. The additional information provided by the applicant on August 24, 2023, did not invalidate the conditional grant. TDEC possessed the applicant's desktop assessments associated with six parcels that the applicant did not have landowner permission to access at the time of the conditional grant and, as indicated by its special condition, was aware that new information may be discovered when site access was granted and field surveys were completed for the six parcels. Therefore, it is the Corps' opinion that the conditional grant remains a valid 401 action. Counsel for TDEC concurred that the conditional grant is a valid 401 action.

    It is the Corps' position that the 401 waiver for the additional stream crossings in the draft ARAP modification is not a valid 401 action. It is the Corps' interpretation of final rules 85 Fed. Reg. 42,210 (Jun. 13, 2020) and 88 Fed. Reg. 66,558 (Sep. 27, 2023) that the

1

state may take only one action in response to a 401 request: grant, conditional grant, denial, or waiver. TDEC acted on the 401 WQC request when it issued a conditional grant within the reasonable period of time. The applicant's submission of new information about additional stream crossings after the reasonable period of time was not a new 401 WQC request requiring state action. Therefore, there was no underlying WQC request for TDEC's waiver. Counsel for TDEC did not concur with the Corps' interpretation of the final rules or its conclusion that the waiver is an invalid 401 action. Counsel for TDEC stated that, by issuing its conditional grant, the state waived its 401 authority to certify subsequent information about the additional stream crossings.

Sammy Iskrzycki
Biologist, West Branch
Regulatory Division
U.S. Army Corps of Engineers

2

**App-0392**

Cumberland Gas Pipeline Project; NRS22.192 Modification
Aquatic Resource Alteration Permit

**AQUATIC RESOURCE ALTERATION PERMIT NRS 22.192 Modification**

## Summary of newly proposed stream impacts

| TDEC Waterbody ID | TGP Waterbody ID | Impact Location | Description | Temporary | | Permanent | Total |
|---|---|---|---|---|---|---|---|
| | | | | Pipeline install via trench | Access road or workspace | Vegetation conversion | |
| TN05130204002_0200, UT Jones Creek | SDKA058 | 36.1839, -87 2427 | Newly proposed impact in an additional location to previously permitted impact | 117 ft. | | 10 ft. | 117 ft. |
| | SDKK03 | 36.1826, -87 2405 | Impact to a new stream | 204 ft. | | 10 ft. | 204 ft. |
| | SDN1C008 | 36.1828, -87 2405 | Impact to a new stream | | 48 ft. | | 48 ft. |
| TN05130204002_0999, Misc tribs to Jones Creek | SDKA049 | 36.1920, -87 2442 | Newly proposed temporary impact in previously permitted permanent impact location | | 94 ft. | | 94 ft. |
| | | 36.1915, -87 2528 | Permanent impact relocated to a different location than previously permitted | 171 ft. | | 10 ft. | 171 ft. |
| | SDKK01 | 36.1913, -87 2528 | Impact to a new stream | | 24 ft. | | 24 ft. |

**AQUATIC RESOURCE ALTERATION PERMIT NRS 22.192 Modification**

Pursuant to the Tennessee Water Quality Control Act of 1977 (T.C.A. §§ 69-3-101 et seq.) and supporting regulations, a permit is required to alter the properties of waters of the state. Also, pursuant to section 401 of the Clean Water Act (33 U.S.C. § 1341), an applicant for a federal license or permit which may result in a discharge into the waters of the U.S., shall provide the federal licensing or permitting agency a certification from the State in which the discharge will originate. Accordingly, the Division of Water Resources requires reasonable assurance that the activity will not violate provisions of the Tennessee Water Quality Control Act of 1977 (T.C.A. §§ 69-3-101 et seq.) or provisions of sections 301, 302, 303, 306 or 307 of the Clean Water Act.

Subject to conformance with accepted plans, specifications, and other information submitted in support of the application, the state of Tennessee previously certified specified activities on July 21, 2023 pursuant to 33 U.S.C. § 1341, and permits pursuant to T.C.A. § 69-3-108(b), the activity described below:

**PERMITTEE**          Tennessee Gas Pipeline Company, LLC

**AUTHORIZED WORK:**     This ARAP modification authorizes temporary impacts to an additional 604 linear feet of stream and permanent impacts to an additional 20 linear feet of stream associated with the construction of a 32-mile 30-inch diameter natural gas pipeline. Previously authorized and certified impacts are temporary impacts to 0.69 acres of wetland, permanent impacts to 0.03 acres of wetland, temporary impacts to approximately 5400 linear feet of stream, temporary water withdrawals from eight streams and one reservoir, and permanent impacts to 490 linear feet of stream.

**LOCATION:**          From near Claylick Rd., Dickson, to near Old Scott Rd., Cumberland City
Dickson, Houston, and Stewart Counties, Tennessee
Unnamed Wetlands, Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells Creek, Barkley Reservoir; Harpeth River Watershed and Lake Barkley Watershed
From approximately 36.161840, -87.206428 to approximately 36.372977, -87.675641

**EFFECTIVE DATE:** XXXXX

**EXPIRATION DATE:** July 20, 2028

for Jennifer Dodd
Director, Division of Water Resources

Page 2 of 65

**Table of Contents**

SUMMARY OF NEWLY PROPOSED STREAM IMPACTS ............................................................... 1

LIST OF ABBREVIATIONS AND ACRONYMS USED IN THIS PERMIT AND APPENDICES.... 4

| PART I | 5 |

AUTHORIZED WORK: .......................................................................................................... 5

SPECIAL CONDITIONS:....................................................................................................... 12

GENERAL CONDITIONS: ..................................................................................................... 17

| PART II | 17 |

MONITORING REQUIREMENTS............................................................................................ 17

DUTY TO REAPPLY ............................................................................................................ 18

PROPERTY RIGHTS ............................................................................................................ 18

OTHER INFORMATION ........................................................................................................ 18

CHANGES AFFECTING THE PERMIT ...................................................................................... 19

    Transfer/Change of Ownership ....................................................................................... 19

    Change of Mailing Address ............................................................................................ 19

NONCOMPLIANCE .............................................................................................................. 19

    Effect of Noncompliance ............................................................................................... 19

    Reporting of Noncompliance .......................................................................................... 19

    Adverse Impact ............................................................................................................ 20

LIABILITIES ...................................................................................................................... 20

    Civil and Criminal Liability ............................................................................................ 20

    Liability under State Law................................................................................................ 20

| APPENDIX | 22 |

PERMIT RATIONALE............................................................................................................ 22

TABLES ............................................................................................................................ 50

PLANS AND DRAWINGS ...................................................................................................... 56

SITE MAPS ....................................................................................................................... 65

**App-0395**

**List of abbreviations and acronyms used in this permit and appendices**

ac = acres
ARAP = Aquatic Resource Alteration Permit
BMP = best management practice
ETW = Exceptional Tennessee Water
FERC = Federal Energy Regulation Commission
ft = feet
gpm = gallons per minute
HD = hydrologic determination
HDD = horizontal directional drilling
Lat. = latitude
Long. = longitude
Misc. tribs. = miscellaneous tributaries
MP = milepost
N/A = not applicable
NPDES = National Pollutant Discharge Elimination System
PEM = palustrine emergent
PFO = palustrine forested
RAI = request for additional information
ROW = right-of-way
SWPPP = stormwater pollution prevention plan
TDEC = Tennessee Department of Environment and Conservation
TGP = Tennessee Gas Pipeline Company
TVA = Tennessee Valley Authority
USACE = United States Army Corps of Engineers
UT = unnamed tributary
WWC = wet weather conveyance

**PART I**

**Authorized Work:**

Table 1: Authorized habitat alteration impacts to streams and wetlands. Impacts newly authorized by this permit modification are highlighted in yellow. All other impacts are as previously authorized and certified.

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SDKA023 | Upper Sugar Camp Branch | TN05130204001_1100 | UT Harpeth | 36.1630 | -87.2073 | 97 ft. | | | 10 ft. | 97 ft. |
| | | | | 36.1655 | -87.2057 | 77 ft. | | | 10 ft. | 77 ft. |
| SDKA026 | Jordan Branch | TN05130204002_0100 | Jordan Branch | 36.1705 | -87.2128 | 126.5 ft. | | | 10 ft. | 126.5 ft. |
| SDKA027 | UT to Jordan Branch | TN05130204002_0100 | Jordan Branch | 36.1709 | -87.2131 | 86 ft. | | | 10 ft. | 86 ft. |
| SDKA004 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1765 | -87.2235 | 79.6 ft. | | | 10 ft. | 79.6 ft. |
| SDKA006 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1809 | -87.2317 | 78 ft. | | | 10 ft. | 78 ft. |
| SDKA008 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1826 | -87.2348 | 78.6 ft. | | | 10 ft. | 78.6 ft. |
| SDKA058 | Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1853 | -87.2430 | 76.7 ft. | | | 10 ft. | 76.7 ft. |
| | | | | 36.1839 | -87.2427 | 117 ft. | | | 10 ft. | 117 ft. |
| SDKK03 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1826 | -87.2405 | 204 ft. | | | 10 ft. | 204 ft. |
| SDN1C008 | UT to Porters Branch | TN05130204002_0200 | UT Jones Creek | 36.1828 | -87.2405 | | | 48 ft. | | 48 ft. |
| SDKA013 | Gafford Branch | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1979 | -87.2624 | 76 ft. | | | 10 ft. | 76 ft. |
| SDKA049 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1920 | -87.2442 | | | 94 ft. | | 94 ft. |
| | | | | 36.1915 | -87.2528 | 171 ft. | | | 10 ft. | 171 ft. |

Page 5 of 65

**App-0397**

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SDKK01 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1913 | -87.2528 | | | 24 ft. | | 24 ft. |
| SDKA051 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1899 | -87.2485 | 75.5 ft. | | | 10 ft. | 75.5 ft. |
| SDKA053 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1924 | -87.2536 | 89.4 ft. | | | 10 ft. | 89.4 ft. |
| SDKA054 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1927 | -87.2480 | | | 20.1 ft. | | 20.1 ft. |
| SDKA055 | UT to Jones Creek | TN05130204002_0999 | Misc tribs to Jones Creek | 36.1948 | -87.2566 | 80.4 ft. | | | 10 ft. | 80.4 ft. |
| SDKA048 | Jones Creek | TN05130204002_1000 | Jones Creek | 36.1875 | -87.2439 | | 0 ft. | | 0 ft. | 0 ft. |
| | | | | 36.1923 | -87.2425 | | | 127 ft. | | 127 ft. |
| | | | | 36.1876 | -87.2439 | | | 2 ft. | | 2 ft. |
| SDKA014 | UT to Gafford Branch | TN05130204002_1500 | Peabody Branch | 36.1978 | -87.2622 | | | 19.3 ft. | | 19.3 ft. |
| SDKB025 | UT to Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2833 | -87.4932 | 250 ft. | | | 10 ft. | 250 ft. |
| | | | | 36.2840 | -87.4940 | 127 ft. | | | 10 ft. | 127 ft. |
| SDKB026 | Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2845 | -87.4962 | 95 ft. | | | 10 ft. | 95 ft. |
| SDKB027 | UT to Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2845 | -87.4980 | 76.7 ft. | | | 10 ft. | 76.7 ft. |
| SDKB028 | UT to Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | 36.2855 | -87.4995 | 190 ft. | | | 10 ft. | 190 ft. |
| | | | | 36.2855 | -87.5007 | | | 4 ft. | | 4 ft. |
| SHNC010-1 | UT Yellow Creek | TN05130205019_0999 | Misc tribs to Yellow Creek | 36.2978 | -87.5494 | | 0 ft. | | 0 ft. | 0 ft. |

Page 6 of 65

App-0398

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SHNC018 | UT to Yellow Creek | TN05130205019_0999 | Misc tribs to Yellow Creek | 36.3025 | -87.5572 | 99 ft. | | | 10 ft. | 99 ft. |
| | | | | 36.3021 | -87.5592 | | | 20 ft. | | 20 ft. |
| SHNC020 | Indian Branch | TN05130205019_0999 | Misc tribs to Yellow Creek | 36.3100 | -87.5770 | 84 ft. | | | 10 ft. | 84 ft. |
| SHNC007-1 | Yellow Creek | TN05130205019_1000 | Yellow Creek | 36.2982 | -87.5500 | | 0 ft. | | 0 ft. | 0 ft. |
| SDKA046 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2639 | -87.4195 | 84.8 ft. | | | 10 ft. | 84.8 ft. |
| SDKB009 | Furnace Creek | TN05130205024_0400 | Furnace Creek | 36.2498 | -87.3804 | 102.9 ft. | | | 10 ft. | 102.9 ft. |
| SDKB011 | Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2610 | -87.4113 | 206 ft. | | | 10 ft. | 206 ft. |
| | | | | 36.2614 | -87.4089 | | | 21 ft. | | 21 ft. |
| SDKB014 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2665 | -87.4261 | 104.3 ft. | | | 10 ft. | 104.3 ft. |
| SDKR005 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2609 | -87.4118 | | | 25.7 ft. | | 25.7 ft. |
| SDKR008 | UT to Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2668 | -87.4288 | 97 ft. | | | 10 ft. | 97 ft. |
| | | | | 36.2669 | -87.4287 | 49 ft. | | | 10 ft. | 49 ft. |
| SDKB023 | Little Bartons Creek | TN05130205024_0600 | Little Bartons Creek | 36.2726 | -87.4552 | 81.9 ft. | | | 10 ft. | 81.9 ft. |
| SDKA038 | UT to Harris Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2283 | -87.3231 | | | 23 ft. | | 23 ft. |
| | | | | 36.2276 | -87.3211 | 82 ft. | | | 10 ft. | 82 ft. |
| | | | | 36.2283 | -87.3222 | 76 ft. | | | 10 ft. | 76 ft. |
| SDKA041 | Harris Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2303 | -87.3252 | 90.3 ft. | | | 10 ft. | 90.3 ft. |

Page 7 of 65

**App-0399**

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SDKA042 | UT to Bartons Creek | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2349 | -87.3365 | 77.5 ft. | | | 10 ft. | 77.5 ft. |
| SDKB001 | Miller Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2375 | -87.3453 | 107 ft. | | | 10 ft. | 107 ft. |
| | | | | 36.2365 | -87.3452 | | | 21 ft. | | 21 ft. |
| SDKB004 | UT to Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2430 | -87.3608 | 86.5 ft. | | | 10 ft. | 86.5 ft. |
| SDKB005 | UT to Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2436 | -87.3643 | 78.2 ft. | | | 10 ft. | 78.2 ft. |
| SDKB008 | Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | 36.2452 | -87.3689 | 55.2 ft. | | | 10 ft. | 55.2 ft. |
| SDKB002 | Bartons Creek | TN05130205024_1000 | Bartons Creek | 36.2379 | -87.3469 | 112.6 ft. | | | 10 ft. | 112.6 ft. |
| SDKA033 | UT to Johnson Creek | TN05130205031_0999 | Misc tribs to Johnson Creek | 36.2180 | -87.3004 | 108.8 ft. | | | 10 ft. | 108.8 ft. |
| SDKA034 | UT to Johnson Creek | TN05130205031_0999 | Misc tribs to Johnson Creek | 36.2187 | -87.3038 | 77.2 ft. | | | 10 ft. | 77.2 ft. |
| SDKA036 | Johnson Creek | TN05130205031_1000 | Johnson Creek | 36.2237 | -87.3132 | 263 ft. | | | 10 ft. | 263 ft. |
| | | | | 36.2237 | -87.3130 | | | 21 ft. | | 21 ft. |
| SHNA001 | Guices Creek | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3376 | -87.6087 | 78.6 ft. | | | 10 ft. | 78.6 ft. |
| SHNA011 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3313 | -87.6007 | 75 ft. | | | 10 ft. | 75 ft. |
| | | | | 36.3310 | -87.6011 | | | 23 ft. | | 23 ft. |
| SHNB030 | UT to Guices Creek | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3472 | -87.6254 | 168 ft. | | | 10 ft. | 168 ft. |
| | | | | 36.3477 | -87.6257 | | | 31 ft. | | 31 ft. |
| SHNC023 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3118 | -87.5828 | 89 ft. | | | 10 ft. | 89 ft. |

Page 8 of 65

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | Total impacts |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| SHNC030 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3195 | -87.5886 | 79.5 ft. | | | 10 ft. | 79.5 ft. |
| SHNE003 | UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | 36.3243 | -87.5930 | 75.1 ft. | | | 10 ft. | 75.1 ft. |
| SHNA012 | Guices Branch | TN05130205121_1000 | Guices Creek | 36.3327 | -87.6041 | 93 ft. | | | 10 ft. | 93 ft. |
| | | | | 36.3309 | -87.6035 | | | 20 ft. | | 20 ft. |
| SHNA008 | UT to Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3548 | -87.6395 | | | 44 ft. | | 44 ft. |
| | | | | 36.3544 | -87.6395 | | | 62 ft. | | 62 ft. |
| SHNB033-1 | Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3527 | -87.6339 | 104.9 ft. | | | 10 ft. | 104.9 |
| SHNB033-2 | Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3549 | -87.6388 | 139.4 ft. | | | 10 ft. | 139.4 |
| SHNB033-3 | Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | 36.3664 | -87.6559 | 76.4 ft. | | | 10 ft. | 76.4 |
| SHNA010 | Wells Creek | TN051302051735_1000 | Wells Creek | 36.3713 | -87.6622 | | 0 ft. | | | 0 ft. |
| WDKB001 | Wetland WDKB001 | N/A | Unnamed PFO wetland | 36.2494 | -87.3803 | 0.02 ac | | 0.01 ac | 0.02 ac | 0.03 ac |
| WHNA001 | Wetland WHNA001 | N/A | Unnamed PEM wetland | 36.3558 | -87.6394 | | | 0.10 ac | | 0.10 ac |
| WHNB002 | Wetland WHNB002-PEM | N/A | Unnamed PEM wetland | 36.3664 | -87.6554 | 0.33 ac | | 0.04 ac | | 0.37 ac |
| | Wetland WHNB002-PFO | N/A | Unnamed PFO wetland | 36.3664 | -87.6554 | | | 0.03 ac | 0.01 ac | 0.04 ac |
| WHNW001 | Wetland WHNW001 | N/A | Unnamed PEM wetland | 36.2903 | -87.5159 | | | 0.03 ac | | 0.03 ac |
| WHNW002 | Wetland WHNW002 | N/A | Unnamed PEM wetland | 36.2926 | -87.5251 | | | 0.01 ac | | 0.01 ac |

| Waterbody[1] | | | | Impact location | | Temporary impacts | | | Permanent impacts | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | Pipeline install via trench[2] | Pipeline install via HDD[3] | Access road or workspace[4] | Vegetation conversion[5] | Total impacts |
| WSTA001 | Wetland WSTA001 | N/A | Unnamed PEM wetland | 36.3722 | -87.6662 | 0.05 ac | | 0.06 ac | | 0.11 ac |

[1]Here and throughout this permit and rationale, where waterbodies are mentioned, the label and name as written in TGP's permit application materials and the TDEC Waterbody ID and Waterbody Name are given to facilitate review of authorized impacts. The project will also impact waterbodies identified by TDEC as WWCs (listed in this permit's Appendix). In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), impacts to waters identified by TDEC as WWCs do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108 (q).

[2]The linear feet of stream impacts and acreage of wetland impacts associated with pipeline installation via trench include the 10-foot-wide trench in which the pipeline will be installed. The impacts associated with the pipeline installation via trenching will be temporary.

[3]The linear feet of stream impacts associated with pipeline installation via HDD is reported as zero because this method does not require disturbance to the channel. No ongoing vegetation mowing or clearing will take place in riparian areas that are between HDD entry and exit points.

[4]The linear feet of stream impacts and acreage of wetland impacts associated with road or workspace crossings include impacts from construction of access roads, additional workspace areas, and equipment or construction staging areas. The impacts associated with road or workspace crossings will be temporary.

[5]To facilitate periodic corrosion/leak surveys, a corridor centered on the pipeline and up to 10 feet wide may be cleared at a frequency necessary to maintain the 10-foot corridor in an herbaceous state, resulting in conversion of plant communities in forested riparian zones and forested wetlands to herbaceous/emergent or scrub-shrub plant communities. In addition, individual trees that are located within 15 feet of the pipeline that have roots that could compromise the integrity of the pipeline coating may be cut and removed from the permanent right-of-way. These impacts will not result in loss of wetland acreage.

AR000716

Table 2: Authorized temporary water withdrawals from streams and reservoirs.

| Waterbody | | | | Impact location | | Flow statistics | | Class 1 minor water withdrawal | Class 2 minor water withdrawal | |
|---|---|---|---|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | 7Q10 flow rate (gpm)[1] | Summer mean flow rate (gpm)[2] | Maximum instantaneous stream withdrawal percentage of instantaneous flow[3] | Maximum instantaneous reservoir withdrawal rate (gpm) | Duration (days) |
| SDKA048 | Jones Creek | TN05130204002_1000 | Jones Creek | 36.1874 | -87.2440 | 4263.89 | 28680.24 | 10% | | ≤ 30 |
| SDKB002 | Bartons Creek | TN05130205024_1000 | Bartons Creek | 36.2380 | -87.3467 | 628.40 | 4712.72 | 10% | | ≤ 30 |
| SDKB009 | Furnace Creek | TN05130205024_0400 | Furnace Creek | 36.2496 | -87.3804 | 291.70 | 2217.22 | 10% | | ≤ 30 |
| SDKB011 | Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | 36.2611 | -87.4112 | 71.80 | 561.04 | 10% | | ≤ 30 |
| SDKB023 | Little Bartons Creek | TN05130205024_0600 | Little Bartons Creek | 36.2725 | -87.4554 | 59.70 | 411.13 | 10% | | ≤ 30 |
| SHNC007-1 | Yellow Creek | TN05130205019_1000 | Yellow Creek | 36.2983 | -87.5504 | 8707 30 | 38644.26 | 10% | | ≤ 30 |
| SHNA012 | Guices Creek | TN05130205121_1000 | Guices Creek | 36.3329 | -87.6040 | 475.80 | 2082.57 | 10% | | ≤ 30 |
| SHNA010 | Wells Creek | TN051302051735_1000 | Wells Creek | 36.3714 | -87.6616 | 4093 30 | 17818.55 | 10% | | ≤ 30 |
| None | Cumberland River | TN05130205015_1000 | Barkley Reservoir | 36.3969 | -87.6593 | 325401.80 | 5655258.00 | N/A | 1500 | ≤ 30 |

[1]7Q10 flow rate is the lowest seven-day average flow with a 10% probability of occurring in any given year (i.e., that occurs on average once every ten years).

[2]Summer mean flow rate is the average individual daily mean discharge measured from June 1 through August 31 over an entire stream gage period of record.

[3]Temporary stream and reservoir impacts from minor water withdrawals are associated with hydrostatic testing of the pipeline before it is put into service. Withdrawals from streams are Class 1 minor water withdrawals, and the withdrawals from Barkley Reservoir is a Class 2 minor water withdrawal as defined by the TDEC *General Aquatic Resource Alteration Permit for Minor Water Withdrawals*.

The project will also impact waterbodies identified by TDEC as WWCs (listed in this permit's Appendix). In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), impacts to waters identified by TDEC as WWCs do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108 (q).

**Special Conditions:**
a. **Impacts to streams or wetlands in the project area and along the pipeline ROW are not authorized until the permittee has obtained a notice to proceed with project construction from the Federal Energy Regulatory Commission and submitted a copy to the Division.**
b. Unless stated otherwise, all work shall be accomplished in conformance with the accepted plans, specifications, data, and other information submitted in support of application NRS22.192 and this modification.
c. Written notification of the commencement of authorized work shall be provided to the TDEC Nashville Environmental Field Office prior to, or within 24 hours after initiation.
d. The permittee shall notify this office of project completion and supply as-constructed or record drawings of the final structure within 45 days after completion.
e. Wetlands and streams outside of the permitted impact area shall be clearly marked with signs, high visibility fencing, or similar structures so that all work performed by the contractor is solely within the permitted area of impact.
f. **The permittee shall submit a post-construction monitoring report annually to the Division for three years following the project's completion.** This annual report shall include documentation of the maintenance of jurisdictional status and resource value in **all** impacted wetlands and streams in each monitoring year. See Monitoring Requirements section of this permit for details.
g. For each stream crossing to be accomplished by a method other than HDD:
   1. The permittee shall select from the list of potentially practicable alternatives below. This list is arranged in ascending order of perceived impact to the resource:
      i. Conventional excavation with an excavator;
      ii. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;
      iii. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;
      iv. Removal by rock trencher; or
      v. Controlled blasting and excavation with a backhoe.
   2. The permittee shall select the least impactful practicable trenching technique for each stream crossing. Evaluation criteria include observed conditions at the stream crossing, the technical feasibility and limitations of each particular technique, best professional judgment of experienced personnel, logistics, and costs. The permittee shall select one or more non-blasting alternatives unless it demonstrates that each of these is impracticable. Prior to blasting, the permittee shall attempt at least one non-blasting alternative.
h. For controlled blasting within 50 feet of a stream or wetland:
   1. Unless stated otherwise, all blasting shall adhere to the conditions and other information submitted in the Draft Blasting Plan found in the document entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

Page 12 of 65

**App-0404**

2. The blasting contractor(s) will create a site-specific blasting plan for each blasting location as described in the Draft Blasting Plan. The blasting plans must be submitted by the blasting contractor(s) to the permittee for review and approval by one if its engineers.

3. Blasting operations must be conducted by, or under the direct and constant supervision of, personnel licensed and certified to perform such activity in Tennessee. Prior to any blasting activities, the blasting contractor(s) will provide documentation of the experience, licenses, and permits associated with blasting personnel to the permittee. The individual directly overseeing any controlled blasting activities will be required to hold a registration classification as defined in the T.C.A. Title 68, Chapter 105. The Geohazard Inspector will have prior experience in geohazard identification and characterization and experience in providing support/oversight during construction. The Geohazard Inspector will work under the direction of a licensed Professional Engineer. All blasting must be conducted with a Geohazard Inspector present.

4. Blasting will not be used in Tennessee jurisdictional streams characterized by karst-prone geology or with an unacceptable risk of hydrologic loss, as identified in the Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022 and in the document entitled "October 30, 2023 Email Request for Additional Information Response" dated November 15, 2023 for the additional aquatic features authorized by this permit modification. Only streams in which 1) karst is unlikely *and* 2) risk of hydrologic loss is "reduced" *and* 3) HDD has been determined to not be practicable may blasting be considered.

5. Blasting is not authorized within wetlands.

6. The Division (Natural Resources Unit permit writer and Nashville Environmental Field Office) must be contacted in writing at least 48 hours in advance when controlled blasting is proposed. The permittee must provide site-specific documentation to the Natural Resources Unit permit writer supporting that controlled blasting is the least environmentally damaging practicable alternative for that particular stream crossing per Special Condition g. Written authorization must be obtained from the Division prior to initiation of controlled blasting.

7. A qualified project biologist will survey the proposed blasting zone identified by the pipeline blasting contractor(s) immediately in advance of any blasting for the presence of any state-listed species and if found, will contact the TWRA and TDEC Division of Natural Areas before proceeding.

8. Blasting will be conducted in dry conditions within the workspace.

9. The permittee will minimize the length of time that aquatic resources are disturbed by expediting completion of each crossing and completing stream crossings separate from the mainline construction.

10. All streams and stream banks will be restored to original contours immediately following pipeline installation.

11. **The permittee shall submit a post-blasting monitoring report to the Division within 30 days of the restoration of the temporary stream impacts**. See Monitoring Requirements section of this permit for details.

i. Loss of stream flow due to fracturing of bedrock is prohibited. Adequate provisions shall be made to prevent the loss of stream flow due to fracturing of bedrock during pipeline installation across streams and wetlands.

Page 13 of 65

1. Trench plugs are barriers placed within a pipeline excavation to slow flow and reduce erosion in the trench and also to prevent the trench from becoming a subsurface drainage path. Since gas line bedding and embedment are constructed using cohesionless, free-draining soils, a path is created for water to flow easily (French drain effect) alongside the pipe. In areas where there is high groundwater, where the pipeline crosses streams or aquifers, or where the natural groundwater flow would be affected or even diverted by the select material, trench plugs of compacted, cohesive, soils or impervious materials shall be constructed at intervals along the pipeline.
2. Pipeline crossings of streams with bedrock streambeds must provide non-erodible fill and cover, such as concrete or controlled low strength materials (flowable fill), and trench plugs at each end of the crossing.
3. Trench plugs shall be placed in the portions of any trench within 50 feet of a stream channel.
4. The trench plug area will have a bedding of compacted, cohesive soils or impervious materials (such as concrete or controlled low strength materials (i.e., flowable fill)), whereas the bedding on both sides of the trench plug will have a bedding of uncompacted, cohesionless soil. Trench plugs must have lower permeability than the surrounding native soil.

j.  For pipeline installation areas that cross streams or wetlands using horizontal directional drilling:
1. Entry and exit locations must be at least 50 feet from the stream bank or wetland margin.
2. The depth of bore below the streambed must be sufficient to reasonably prevent release of drilling fluid, based on the parent material.
3. In the event of an inadvertent release of drilling fluid, a site-specific contingency plan must be followed. This plan includes notification to the Division within 24 hours after release to surface waters. Site-specific proposed containment plans must be approved by the Division prior to initiation.

k.  For the minor water withdrawals for the purposes of hydrostatic testing:
1. All stream and river water withdrawals will adhere to the notification requirements, conditions, and limits of Class 1 water withdrawals in TDEC's *General Aquatic Resource Alteration Permit for Minor Water Withdrawals:*
    i. Withdrawal rates will not exceed 10% of instantaneous flow, and will not take place for more than 30 days in a calendar year from a particular waterbody. The permittee must demonstrate that instantaneous flow of the source water is accurately measured or determined for the purpose of compliance with the terms and limits of this permit.
2. The reservoir water withdrawal from Barkley Reservoir will adhere to the notification requirements, conditions, and limits of Class 2 water withdrawals in TDEC's *General Aquatic Resource Alteration Permit for Minor Water Withdrawals:*
    i. Withdrawal rates will not exceed 1500 gpm and will not take place for more than 30 days in a calendar year.
3. Where the total average withdrawal exceeds 10,000 gallons per day, the withdrawal shall be registered under the Water Resources Information Act of 2002 (T.C.A. § 69-7-301 et seq.) More information regarding water withdrawal information may be found at: https://www.tn.gov/environment/program-areas/wr-water-resources/water-quality/water-withdrawal-registration-program.html
4. Except for withdrawals from Barkley Reservoir, withdrawal is not authorized from a stream or river in a county or region during severe (D2), extreme (D3), or exceptional (D4)

Page 14 of 65

drought as indicated by the National Drought Mitigation Center website: https://droughtmonitor.unl.edu/CurrentMap/StateDroughtMonitor.aspx?TN

5. The permittee must screen all water intake to minimize the potential for entrainment of fish.

6. The permittee must adhere to conditions intended to minimize water withdrawal and hydrostatic testing impacts in the documented entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

7. **The permittee shall submit a one-time water withdrawal monitoring report to the Division following the completion of all water withdrawals** to demonstrate adherence to permit conditions. See Monitoring Requirements section of this permit for details.

**l.** The permittee will adhere to the recommendations and other information submitted in the geologic and hydrotechnical hazard assessment, karst surveys, and geohazard mitigation guidance for the project provided in Attachment 6 of the documented entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022.

**m.** The permittee will use low pressure ground equipment in wetlands and riparian areas to minimize vegetation damage, soil compaction, and rutting.

**n.** Temporary wetland crossings shall utilize timber matting. Gravel, riprap, or other rock is not approved for construction of temporary crossings or haul roads across wetlands. Upon completion of construction activities, all temporary wetland impact areas are to be restored to pre-construction contours and elevations. Non-native soils, side-cast material, or other materials shall not be placed within the temporary impact locations during restoration. Permanent vegetative stabilization must use native species as described in Special Condition p.

**o.** Temporary impacts to wetlands associated with trench excavation shall be mitigated by the removal and stockpiling of the first 12 inches of topsoil prior to construction. Upon completion of construction activities, all temporary wetland impact areas are to be restored to pre-construction contours, and the stockpiled topsoil spread to restore these areas to pre-construction elevation. Non-native soils, side-cast material, or other materials shall not be placed within the temporary impact locations during restoration. Permanent vegetative stabilization must use native species as described in Special Condition p.

**p.** Permanent vegetative stabilization using native species of all disturbed areas in or near streams and wetland must be initiated within 14 days of project completion (see also *Landscaping With Natives* at https://www.tnipc.org/wp-content/uploads/2017/10/landscaping_2016_forweb.pdf). Non-native, non-invasive annuals may be used as cover crops until native species can be established.

**q.** Only earthen materials comprising native, uncontaminated soil or rock, or a combination thereof shall be "Acceptable Fill" to be placed as fill in wetlands and streams. Acceptable Fill shall consist of only soil or rock in which all substances naturally occurring therein are present in concentrations not exceeding the concentrations of such substances occurring naturally in the local area. Acceptable Fill shall not contain any sewage, industrial wastes, additives or materials such as refuse, rubble, muck, metal, glass, concrete pieces, bricks, or asphalt paving materials, wood or other wastes.  For the purposes of this permit, "other wastes" means any and all other substances or forms of energy, including, but not limited to, decayed wood, sand, garbage, silt, municipal refuse, sawdust, shavings, bark, lime, ashes, offal, oil, hazardous materials, tar, sludge, or other petroleum byproducts, radioactive material, chemicals, heated substances, dredged spoil, solid waste, incinerator residue, sewage sludge, munitions, biological materials, wrecked and discarded equipment, and cellar dirt.

**r.** The authorized alterations shall not cause measurable degradation to resource values and classified uses of hydrologically connected waters of the state, including disruption of sustaining surface or groundwater hydrology.  Adjacent wetlands or streams determined likely to be measurably degraded

AR000721

by such hydrologic alteration, or by partial fill, must be included in the cumulative impact calculation, even if not filled or otherwise directly altered physically.

**s.** The use of monofilament-type erosion control netting or blanket is prohibited in the wetland, and in any stream channels, stream banks, or any disturbed riparian areas within 30 feet of top of bank.

**t.** Hard armoring of banks at any stream or wetland crossing is prohibited.

**u.** The pipeline, access roads, workspaces, and staging areas shall be located to avoid permanent alteration or damage to the integrity of the stream channel. Large trees, steep banks, rock outcroppings, etc., should be avoided.

**v.** The pipeline, access roads, workspaces, and staging areas shall not impound normal or base flows on the upstream side, and shall not result in a permanent disruption or barrier to the movement of fish or other aquatic life on the downstream side. Base flow is the usual or normal flow of the stream that is supplied primarily by groundwater from springs and seeps, but not affected by rapid runoff during and after rainfall.

**w.** The width of the stream channel and bank modifications, or other impacts associated with the installation of the pipeline, access roads, workspaces, and staging areas shall be limited to the minimum necessary.

**x.** Erosion control measures shall be utilized where stream bank vegetation is disturbed for the purpose of temporary stream crossings. Stream beds shall not be used as linear transportation routes for mechanized equipment. The stream channel may be crossed perpendicularly with equipment provided no additional fill or excavation is necessary. EPSC measures shall be utilized when streambanks are disturbed.

**y.** The stream channels shall not be over-widened as a result of the installation of the pipeline, access roads, workspaces, or staging areas.

**z.** Backfill activities must be accomplished in the least impactful manner possible that stabilizes the streambed and banks to prevent erosion. Permanent vegetative stabilization must use native species as described in Special Condition p.

**aa.** All dewatering activities shall be conducted in a manner that prevents the discharge of sediment-laden water into waters of the state.

**bb.** All spoil material from trench excavation, bore pits, and other earth-disturbing activities shall be deposited in an upland location and stabilized within seven days.

**cc.** Erosion prevention and sediment control measures must be in place and functional before any earth moving operations begin, and shall be designed according to the department's Erosion and Sediment Control Handbook (http://tnepsc.org/handbook.asp).

**dd.** Erosion prevention and sediment control measures such as silt fences shall be removed following completion of construction.

**ee.** Best Management Practices (BMPs) shall be stringently implemented throughout the construction period to prevent sediments, oils, or other project-related pollutants from being discharged into waters of the state.  All spills must be reported to the appropriate emergency management agency, and measures shall be taken immediately to prevent the pollution of waters of the state, including groundwater, should a spill occur.

**ff.** Equipment staging and maintenance areas shall be developed a sufficient distance from any water to ensure that oil, gas, other petroleum products, and other hazardous materials do not enter the waters.

**gg.** The permittee shall minimize the use of heavy equipment in streams or wetlands. Equipment shall be free of noticeable leaks of fluids and oils.

**hh.** Where practicable, all activities shall be accomplished during drier times of year or when recent conditions have been dry at the impact location. The excavation and fill activities associated with the pipeline crossing of streams and wetlands shall be kept to a minimum and shall be separated from

flowing waters. Wet-cut trenching methods are not authorized. All surface water flowing towards or from the construction activity shall be diverted using flume or dam-and-pump methods as described in the permit application materials. Temporary diversion channels shall be protected by non-erodible material and lined to the expected high water level. Cofferdams and/or berms must be constructed of sandbags, steel sheeting, or other non-erodible, non-toxic material. All such diversion materials must be removed upon completion of the work.

**ii.** The permittee shall minimize clearing, grubbing, and other disturbance to riparian vegetation. Unnecessary native vegetation removal, including tree removal, and soil disturbance is prohibited. Native riparian vegetation must be reestablished in all areas of disturbance outside of any permanent authorized structures or vegetation management zones after work is completed, per Special Condition p. Coverage under this permit does not waive any local riparian buffer protection requirement, and the permittee is responsible for obtaining any necessary local approval.

**jj.** In addition to the erosion prevention and sediment control measures described herein associated with authorized aquatic impacts, the permittee must comply with the conditions of the National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges of Stormwater Associated with Construction Activities (CGP), TNR100000 for the entire area of disturbance associated with the construction project.

**General Conditions:**

**a.** It is the responsibility of the permittee to convey all terms and conditions of this permit to all contractors. A copy of this permit, approved plans, and any other documentation pertinent to the activities authorized by this permit shall be maintained on site at all times during periods of construction activity.

**b.** Work shall not commence until the permittee has obtained and maintained all necessary authorizations pursuant to applicable provisions of section 10 of The Rivers and Harbors Act of 1899, section 404 of the Clean Water Act, section 26a of The Tennessee Valley Authority Act, or any other applicable federal, state or local laws.

**c.** All activities must be carried out in such a manner as will prevent violations of water quality criteria as stated in TDEC Rule Chapter 0400-40-03, or impairment of the uses of waters of the state as designated by Rule Chapter 0400-40-04.

**d.** This activity may not result in a disruption or barrier to the movement of fish or other aquatic life and wetland dependent species upon project completion.

**e.** Adverse impact to formally listed state or federal threatened or endangered species or their critical habitat is prohibited.

**f.** This permit does not authorize adverse impacts to cultural, historical, or archeological features or sites.

**g.** This permit does not authorize access to public or private property. Arrangements concerning the use of public or private property shall be made with the landowner. The permittee is responsible for obtaining any additional permitting or maintenance agreements with other government or public agencies or lands.

**PART II**

**Monitoring Requirements**

All reports must be submitted in report form to the Division's Natural Resources Unit located on the 11th Floor of the William R. Snodgrass Tennessee Tower, 312 Rosa L. Parks Avenue, Nashville, Tennessee 37243, or via email to water.permits@tn.gov and to the permit writer Claire Wainwright at Claire.wainwright@tn.gov. Please be sure to indicate the ARAP permit number on your submittal.

Page 17 of 65

**a.  An as-constructed report** must be submitted within 45 days after the project's completion (per Special Condition d above) and must contain as-constructed or record drawings of the final structure.

**b.  An annual post-construction monitoring report** must be submitted by April 30 each year for three years after the project's completion (per Special Condition f above) to document evidence of the maintenance of jurisdictional status and successful restoration within **all impacted jurisdictional features**, and shall include:

    **1.** Representative photographs of each feature pre-impact and post-impact

    **2.** Wetland delineations and stream hydrologic determinations. All stream hydrologic determinations must be made during the February 1 – April 15 time period each year and in accordance with the procedures in TDEC Rule 0400-40-03-.05(9)

    **3.** Identification of any features that have not returned to pre-impact condition, and a corresponding proposed adaptive management plan

**c.  A post-blasting monitoring report** must be completed for each applicable stream crossing within 30 days post-impact (per Special Condition h above). This report will include:

    **1.** Representative photographs of each feature pre-impact and post-impact

    **2.** A description of the attempts to implement the potentially practicable alternatives to blasting techniques,

    **3.** The results for each technique attempted prior to blasting,

    **4.** A narrative description of the site-specific factors necessitating blasting, and

    **5.** The date of the blasting.

**d.  A water withdrawal monitoring report** must be submitted within 30 days following the completion of all hydrostatic testing associated with the pipeline installation (per Special Condition k above). The report shall include, for each withdrawal location:

    **1.** Specific location of each intake

    **2.** Daily maximum withdrawal rates

    **3.** Instantaneous flow rates and the source of instantaneous flow data, and

    **4.** Total daily withdrawal volume

**Duty to Reapply**

If any portion of the permitted activities, including the authorized impacts to water resources, compensatory mitigation requirements, or post-project monitoring is not completed before the expiration date of this permit **the applicant must apply for permit re-issuance**. The permittee shall submit such information and forms as are required to the director of the Division of Water Resources at least ninety (90) days prior to its expiration date. Such applications must be properly signed and certified.

**Property Rights**

The issuance of this permit does not convey any property rights in either real or personal property, or any exclusive privileges, nor does it authorize any injury to private property or any invasion of personal rights, nor any infringement of Federal, State, or local laws or regulations.

**Other Information**

If the permittee becomes aware that he/she failed to submit any relevant facts in a permit application or submitted incorrect information in a permit application or in any report to the Director, then he/she shall promptly submit such facts or information.

Page 18 of 65

**Changes Affecting the Permit**

**Transfer/Change of Ownership**

**a.** This permit may be transferred to another party, provided there are no activity or project modifications, no pending enforcement actions, or any other changes which might affect the permit conditions contained in the permit, by the permittee if:

**b.** The permittee notifies the Director of the proposed transfer at least 30 days in advance of the proposed transfer date;

**c.** The notice includes a written agreement between the existing and new permittees containing a specified date for transfer of permit responsibility, coverage, and contractual liability between them; and

**d.** The Director does not notify the current permittee and the new permittee, within 30 days, of his intent to modify, revoke, reissue, or terminate the permit, or require that a new application be filed rather than agreeing to the transfer of the permit.

**e.** The permittee must provide the following information to the division in their formal notice of intent to transfer ownership:

  1. the permit number of the subject permit;
  2. the effective date of the proposed transfer;
  3. the name and address of the transferor;
  4. the name and address of the transferee;
  5. the names of the responsible parties for both the transferor and transferee;
  6. a statement that the transferee assumes responsibility for the subject permit;
  7. a statement that the transferor relinquishes responsibility for the subject permit;
  8. the signatures of the responsible parties for both the transferor and transferee, and;
  9. a statement regarding any proposed modifications to the permitted activities or project, its operations, or any other changes which might affect the permit conditions contained in the permit.

**Change of Mailing Address**

The permittee shall promptly provide to the Director written notice of any change of mailing address. In the absence of such notice the original address of the permittee will be assumed to be correct.

**Noncompliance**

**Effect of Noncompliance**

All impacts shall be consistent with the terms and conditions of this permit. Any permit noncompliance constitutes a violation of applicable State and Federal laws and is grounds for enforcement action, permit termination, permit modification, or denial of permit reissuance.

**Reporting of Noncompliance**
**24-Hour Reporting**

**a.** In the case of any noncompliance which could cause a threat to public drinking supplies, or any other discharge which could constitute a threat to human health or the environment, the required notice of non-compliance shall be provided to the Division of Water Resources in the appropriate Environmental Field Office within 24-hours from the time the permittee becomes aware of the circumstances. (The

Page 19 of 65

Environmental Field Office should be contacted for names and phone numbers of environmental response personnel).

**b.** A written submission must be provided within five (5) days of the time the permittee becomes aware of the circumstances unless this requirement is waived by the Director on a case-by-case basis. The permittee shall provide the Director with the following information:

    **1.** A description of the discharge and cause of noncompliance;

    **2.** The period of noncompliance, including exact dates and times or, if not corrected, the anticipated time the noncompliance is expected to continue; and

    **3.** The steps being taken to reduce, eliminate, and prevent recurrence of the non-complying discharge.

**Scheduled Reporting**

For instances of noncompliance which are not reported under subparagraph a. above, the permittee shall report the noncompliance by contacting the permit coordinator, and provide all information concerning the steps taken or planned to reduce, eliminate, and prevent recurrence of the violation and the anticipated time the violation is expected to continue.

**Adverse Impact**

The permittee shall take all reasonable steps to minimize any adverse impact to the waters of Tennessee resulting from noncompliance with this permit, including but not limited to, accelerated or additional monitoring as necessary to determine the nature and impact of the noncompliance.  It shall not be a defense for the permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit.

**Liabilities**

**Civil and Criminal Liability**

Nothing in this permit shall be construed to relieve the permittee from civil or criminal penalties for noncompliance. Notwithstanding this permit, the permittee shall remain liable for any damages sustained by the State of Tennessee, including but not limited to fish kills and losses of aquatic life and/or wildlife, as a result of the discharge of pollutants to any surface or subsurface waters. Additionally, notwithstanding this Permit, it shall be the responsibility of the permittee to conduct its discharge activities in a manner such that public or private nuisances or health hazards will not be created.

**Liability under State Law**

Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the permittee from any responsibilities, liabilities, or penalties established pursuant to any applicable State law or the Federal Water Pollution Control Act, as amended.

This permit does not preclude requirements of other federal, state or local laws.  This permit serves as a State of Tennessee Aquatic Resource Alteration Permit (ARAP) pursuant to the Tennessee Water Quality Control Act of 1977 (T.C.A. § 69-3-101 et seq.).

The State of Tennessee may modify, suspend or revoke this permit or seek modification or revocation should the state determine that the activity results in more than an insignificant violation of applicable water quality standards or violation of the act. Failure to comply with permit terms may result in penalty in accordance with T.C.A. § 69-3-115.

An appeal of this modification may be made as provided in T.C.A. § 69-3-105(i) and Rule 0400-40-07-.04(9) by submitting a petition for appeal:

**a.**  Only those terms that are the subject of this modification may be appealed. Rule 0400-40-07-.04(9)(b).

**b.**  The petition must be filed within 30 days after public notice of the issuance of the permit.

**c.**  The petition must specify the basis for the appeal and state a claim for relief based on an alleged violation of the Tennessee Water Quality Control Act or the rules promulgated thereunder. Third parties shall specify facts sufficient to establish that they have satisfied the statutory and regulatory preconditions and otherwise have standing to appeal.

**d.**  The petition should be addressed to the technical secretary of the Tennessee Board of Water Quality, Oil and Gas at the following address: Jennifer Dodd, Director, Division of Water Resources, William R. Snodgrass - Tennessee Tower, 312 Rosa L. Parks Avenue, Nashville, Tennessee 37243-1102, or you may submit such petition electronically to TDEC.Appeals@tn.gov. Any hearing would be in accordance with T.C.A. §§ 69-3-110 and 4-5-301 et seq.

APPENDIX
Permit Rationale

<div style="border: 2px solid black; text-align: center;">

**DRAFT PERMIT RATIONALE**
**Aquatic Resource Alteration Permit NRS22.192 Modification**

</div>

Tennessee Natural Gas Company, LLC
Unnamed Wetlands, Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells Creek, and Barkley Reservoir; Harpeth River and Lake Barkley Watersheds, Dickson, Houston, and Stewart Counties, Tennessee
January 30, 2024
*Permit Writer: Claire Wainwright*

**Summary**

Names of Applicants: Tennessee Natural Gas Company, LLC

Contact: Gina Dorsey
        1001 Louisiana St, Suite 1000
        Houston, TX 77002-5089

Activity Location:  From near Claylick Road, Dickson to near Old Scott Road, Cumberland City

Nature of Business: Construction of a natural gas pipeline and associated infrastructure

Proposed Activity: This modification would authorize temporary impacts to an additional 604 linear feet of stream and permanent impacts to an additional 20 linear feet of stream associated with the construction of a 32-mile 30-inch diameter natural gas pipeline. Previously authorized and certified impacts include temporary impacts to 0.69 acres of wetland, permanent impacts to 0.03 acres of wetland, temporary impacts to approximately 5400 linear feet of stream, temporary water withdrawals from eight streams and one reservoir, and permanent impacts to 490 linear feet of stream.

Waterbody Name: Unnamed Wetlands, Unnamed tributaries to Harpeth River, Jordan Branch, Unnamed tributaries to Jones Creek, Miscellaneous Tributaries to Jones Creek, Jones Creek, Peabody Branch, Leatherwood Creek, Miscellaneous tributaries to Yellow Creek, Yellow Creek, Furnace Creek, Little Bartons Creek, Miscellaneous tributaries to Bartons Creek, Bartons Creek, Miscellaneous tributaries to Johnson Creek, Johnson Creek, Miscellaneous tributaries to Guices Creek, Guices Creek, Miscellaneous tributaries to Wells Creek, Wells Creek, Barkley Reservoir; Harpeth River and Lake Barkley Watersheds, Dickson, Houston, and Stewart Counties, Tennessee.


This modification affects only the state aquatic resource alteration permit, and does not constitute a modification of the Section 401 certification issued on July 21, 2023. The Department has waived its authority under Section 401 with respect to the new impacts to be authorized by this state permit modification that were not included in the July 21, 2023 section 401 certification.

Page 22 of 65

**Permit Status**

ARAP NRS22.192 issued: **July 21, 2023**

Application for modified ARAP received: **August 24, 2023**

Application for modified ARAP complete: **December 21, 2023**

Modified ARAP NRS22.192 issued: **XXXXX**

Modified ARAP NRS22.192 expires: **July 20, 2028**

**Status of Affected Waters**

<u>Streams</u>

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SDKA023 | Upper Sugar Camp Branch | TN05130204001_1100 | UT Harpeth | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA026, SDKA027 | Jordan Branch, UT to Jordan Branch | TN05130204002_0100 | Jordan Branch | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA004, SDKA006, SDKA008, | UT to Porters Branch, | TN05130204002_0200 | UT Jones Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | June 3, 2019 | Unavailable | Not a known ETW |

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SDKA058, SDKK03, SDN1C008 | Porters Branch | | | Irrigation | Fully Supporting | N/A | N/A | June 3, 2019 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Supporting | Flow regime modification | Dam or impoundment | June 3, 2019 | | |
| SDKA013, SDKA049, SDKA051, SDKA053, SDKA054, SDKA055, SDKK01 | Gafford Branch, UT to Jones Creek | TN05130204002 _0999 | Misc tribs to Jones Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA048 | Jones Creek | TN05130204002 _1000 | Jones Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | June 5, 2019 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | June 5, 2019 | | |
| | | | | Recreation | Fully Supporting | N/A | N/A | June 5, 2019 | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | June 5, 2019 | | |

Page 25 of 65

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Industrial Water Supply | Fully Supporting | N/A | N/A | June 5, 2019 | | |
| SDKA014 | UT to Gafford Branch | TN05130204002_1500 | Peabody Branch | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKB025, SDKB026, SDKB027, SDKB028 | UT to Leatherwood Creek, Leatherwood Creek | TN05130205019_0100 | Leatherwood Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| SHNC010-1, SHNC018, SHNC020 | UT Yellow Creek, Indian Branch | TN05130205019_0999 | Misc tribs to Yellow Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |

AR000732

**App-0418**

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SHNC007-1 | Yellow Creek | TN05130205019_1000 | Yellow Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| SDKA046, SDKB009, SDKB011, SDKB014, SDKR005, SDKR008 | UT to Dry Hollow Branch, Furnace Creek, Dry Hollow Branch | TN05130205024_0400 | Furnace Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| SDKB023 | Little Bartons Creek | TN05130205024_0600 | Little Bartons Creek | | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |

Page 27 of 65

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Fully Supporting | | | | | |
| | | | | Fish and aquatic life | | N/A | N/A | May 29, 2018 | | |
| SDKA038, SDKA041, SDKA042, SDKB001, SDKB004, SDKB005, SDKB008 | UT to Harris Branch, Harris Branch, UT to Bartons Creek, Miller Branch, UT to Nesbitt Branch, Nesbitt Branch | TN05130205024_0999 | Misc tribs to Bartons Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKB002 | Bartons Creek | TN05130205024_1000 | Bartons Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 29, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 29, 2018 | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 29, 2018 | | |

Page 28 of 65

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SDKA033, SDKA034 | UT to Johnson Creek | TN05130205031_0999 | Misc tribs to Johnson Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SDKA036 | Johnson Creek | TN05130205031_1000 | Johnson Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SHNA001, SHNA011, SHNB030, SHNC023, SHNC030, SHNE003 | Guices Creek, UT from Guices Branch | TN05130205121_0999 | Misc tribs to Guices Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |

Page 29 of 65

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| SHNA012 | Guices Branch | TN05130205121_1000 | Guices Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SHNA008, SHNB033-1, SHNB033-2, SHNB033-3 | UT to Lickskillet Branch, Lickskillet Branch | TN051302051735_0999 | Misc tribs to Wells Creek | Livestock watering & wildlife | Not Assessed | N/A | N/A | N/A | Available | Not a known ETW |
| | | | | Irrigation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Recreation | Not Assessed | N/A | N/A | N/A | | |
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| SHNA010 | Wells Creek | TN051302051735_1000 | Wells Creek | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 30, 2018 | Available | Not a known ETW |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 30, 2018 | | |
| | | | | Recreation | Not Supporting | E. coli | Sanitary sewer overflows (collection system failures) | May 30, 2018 | | |

Page 30 of 65

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Classified Uses | Use Support | Causes | Sources | Assessment Date | Parameters for Habitat Alteration and/or Water Withdrawal | ETW status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Fish and aquatic life | Not Assessed | N/A | N/A | N/A | | |
| None | Cumberland River | TN05130205015_1000 | Barkley Reservoir (Cumberland River) | Livestock watering & wildlife | Fully Supporting | N/A | N/A | May 25, 2018 | Available | ETW due to documented non-experimental populations of state-listed threatened and endangered aquatic animal species |
| | | | | Irrigation | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Recreation | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Fish and aquatic life | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Domestic Water Supply | Fully Supporting | N/A | N/A | May 25, 2018 | | |
| | | | | Industrial Water Supply | Fully Supporting | N/A | N/A | May 25, 2018 | | |

Page 31 of 65

Cumberland Gas Pipeline Project; NRS22.192 Modification
Aquatic Resource Alteration Permit

<u>Wetlands</u>

| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody Name | TDEC Waterbody ID | Wetland Type | Parameters for Habitat Alteration | ETW Status |
|---|---|---|---|---|---|---|
| WDKB001 | Wetland WDKB001 | Unnamed PFO wetland | N/A | PFO | Available | Not a known ETW |
| WHNA001 | Wetland WHNA001 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| WHNB002 | Wetland WHNB002-PEM | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
|  | Wetland WHNB002-PFO | Unnamed PFO wetland | N/A | PFO | Available | Not a known ETW |
| WHNW001 | Wetland WHNW001 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| WHNW002 | Wetland WHNW002 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |
| WSTA001 | Wetland WSTA001 | Unnamed PEM wetland | N/A | PEM | Available | Not a known ETW |

**Proposed Alterations**

TGP proposes to conduct additional stream alterations in addition to the previously authorized stream and wetland alterations associated with the construction of approximately 32 miles of new 30-inch-diameter natural gas lateral pipeline and associated infrastructure. A detailed summary of these impacts can be found in Tables 1 and 2 in this permit. To the extent that Tennessee's 401 Water Quality Certification for the additional impacts has not already been waived, Tennessee hereby waives such authority.

The project also will impact waterbodies identified by TDEC as WWCs (listed in this permit's Appendix in Table 3). In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), alterations to waters identified by TDEC as WWCs do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions of Tennessee Water Quality Control Act 69-3-108 (q).

The broad categories of activities associated with the project that may alter Waters of the State include vegetation clearing, soil disturbance for grading purposes, water withdrawals for hydrostatic testing, trenching, HDD, and temporary fill from construction timber mats or temporary culvert crossings.

Prior to construction, temporary and permanent ROW workspaces will be cleared of woody vegetation. The pipeline construction corridor, adjacent work areas, and contractor yards will be cleared of vegetation and

graded, as needed, to accommodate mobilization of equipment and materials and to facilitate access. During operation, the permanent easement or ROW will be maintained clear of trees and woody shrubs to allow for ongoing pipeline inspection and maintenance as required by United States Department of Transportation pipeline safety regulations. A corridor not exceeding ten feet in width, centered on the pipeline, may be maintained annually in an herbaceous state as required to facilitate periodic corrosion and leak detection surveys.

Trench excavation will be the primary construction method to install the pipeline. Installation of the proposed pipeline will primarily entail excavation of a trench 4.5 to 8 feet in depth (averaging approximately 5 feet deep) and 4 to 5 feet in width (averaging approximately 4.5 feet wide). After the pipe is installed, the pipeline trench will be backfilled to grade by a minimum of 18 to 36 inches of cover (depending on location-specific soil and rock conditions) and vegetatively stabilized. All buried pipelines will be installed with a minimum cover of 48 inches of soil or 24 inches of consolidated rock between the top of the pipe and the underwater natural bottom.

TGP will cross all waterbodies in accordance with the FERC Procedures (with requested deviations to be approved by the FERC), the project's SWPPP, and applicable USACE and TDEC permit conditions. The proposed construction procedures will ensure that authorized impacts at all stream crossings are minimized to the extent practicable. TGP anticipates that waterbodies will be crossed primarily by dry open-cut methods, which may include a flumed crossing or dam-and-pump techniques, depending on site-specific conditions at the time of construction. Approximately 0.8 miles of the pipeline will be installed via HDD to avoid open-cut construction methods in three larger and potentially higher-flow streams as well as one associated unnamed tributary.

Construction BMPs will include:
- Minimizing vegetation clearing, use of timber mats, and minimizing soil disturbance;
- Avoiding unnecessary vehicular traffic and equipment use;
- Installing and maintaining erosion and sedimentation control devices such as straw bales and silt fences;
- Restricting the duration of construction to the extent practicable;
- Using timber construction mats to create a temporary work surface in wet conditions;
- Using low pressure ground equipment in wet conditions to minimize vegetation damage, soil compaction, and rutting;
- Training employees and contractors regarding the handling of oils and hazardous materials commensurate with their position;
- Inspecting equipment used in construction and operations at regular intervals;
- Using only approved access roads for vehicles transporting oils or fuel to construction workspaces;
- At the discretion of the Environmental Inspector, fueling equipment at the construction workspaces at least 100 feet from any waterbody;
- Storing hazardous materials, including chemicals, fuels, and oils, more than 100 feet from any waterbody;
- Using secondary containment, as appropriate, for pumps that transfer hazardous substances or petroleum within 100 feet of a waterbody to prevent spills and overflow; and
- Keeping spill response materials on site and in designated vehicles in the construction workspaces.

Disturbances to all other Waters of the State identified in the project area outside of the construction ROW will be avoided.

Stabilization will be achieved according to the conditions of the National Pollutant Discharge Elimination System (NPDES) General Permit for Discharges of Stormwater Associated with Construction Activities (CGP), TNR100000. The work will be completed in the dry at all crossings. Where practicable, all stream and wetland impacts shall be accomplished during drier times of year or when recent conditions have been dry at the impact location. The excavation and fill activities associated with the pipeline crossing of streams and wetlands shall be kept to a minimum and shall be separated from flowing waters. When working in drier times of year or under dry recent conditions is not practicable, check dams, diversions, or a system of pumps and sediment bags may be used to create dry sections and reduce sedimentation. All surface water flowing towards or from the construction activity shall be diverted primarily using flume or dam-and-pump methods as described in the permit application materials.

Streams

The proposed construction ROW includes the permanent easement, temporary workspaces, access roads, and contractor yards. A total of 56 streams are located within the construction ROW, with some features crossed by the ROW more than once, for a total of 74 stream crossings (approximately 6004 linear feet). Of the total 74 stream crossings, 51 are open-cut pipeline crossings. An additional 19 stream crossings will incur minor, temporary impacts due to workspace disturbances (i.e., equipment/construction staging locations, access roads, and additional workspace areas). The remaining four stream crossings will have no direct impacts due to the use of the HDD crossing method described in more detail below.

Stream crossings will be perpendicular to stream flow to the extent practicable. Temporary erosion control measures will be installed as necessary to prevent downstream impacts. If necessary, the pipe used for waterbody crossings will be weighted to prevent flotation. Prior to waterbody crossing construction, TGP will clear vegetation on each side of the waterbody, install sediment barriers, and prepare prefabricated segments of pipeline for installation.

Except for waterbodies that are proposed to be crossed using the trenchless HDD crossing method, TGP is authorized to cross the remaining waterbodies using dry open cut crossing methods. Dry open cut crossing methods, which consist of the "dam-and-pump" and "dry-flumed" crossing methods, will be accomplished by temporarily diverting stream flow around or through the work area to minimize contact between stream water and excavation and to minimize sediment suspension during trench excavation, pipeline installation, and backfill activities.

*Flumed method for installation via trench*

A flumed stream crossing redirects the water flow through one or more flume pipes to allow for the trenching and pipe installation to occur in dry conditions. The number, length, and diameter of the pipes are dependent on estimated stream flow for the stream being crossed. This method allows for drier trenching, pipe installation, and restoration, while maintaining continuous downstream flow and passage for aquatic organisms. Soil types must have characteristics that allow stable stream bank conditions, and stream flow must be low enough for this method to be used successfully and safely. The flume pipe(s) must be long enough to account for the potential for the ditch width to increase during excavation (due to sloughing) and over-sized somewhat to accommodate the possibility of high flow conditions. An effective seal must be created around the flume(s) at both the inlet and outlet ends, so water will not penetrate and potentially compromise the channelized dam. TGP will implement the following measures where the flumed crossing method is used:

- The flume pipe will be installed before any trenching;
- An effective seal will be created around the flume pipe with sandbags or an equivalent seal mechanism;

- The flume pipe(s) will be aligned parallel with natural water flow to prevent scouring of the bank, preventing erosion and sedimentation;
- The flume pipe will not be removed during trenching, pipe-laying, backfilling activities, or initial streambed restoration efforts, except in rare conditions where a severe flow event causes conditions that make it unsafe for the pipe to remain; and
- Flume pipes and dams that are not associated with an equipment bridge will be removed as soon as final clean-up of the stream bed and bank is complete.

*Dam-and-pump dewatering method for installation via trench*

The dam-and-pump method may be used for stream crossings where pumps and hoses can adequately transfer stream flow volumes from upstream of the work area to downstream of the work area, and where there are no concerns with preventing the passage of aquatic organisms.

TGP will implement the following measures where the dam and pump method is utilized:

- Sufficient pump size, horsepower, and hose capacity, including on site backup pumps, will be used to maintain downstream flows;
- Coffer dams will be constructed with "clean" materials to prevent pollutants from entering the waterbody (e.g., sandbags or clean gravel with plastic liner);
- Water intakes will be suspended in the water column above the stream bed and will be screened to reduce entrainment of aquatic organisms or particles that may clog the pump;
- Pumps will be located within secondary containment structures to catch petroleum liquids and prevent them from entering the waterbody during refueling or if a pump failure occurs;
- For waterbodies with large volumes and strong velocity discharges, water dispersion structures will be placed at the downstream discharge location to prevent streambed scour; and
- The coffer dam, pumps, and hoses will be monitored and maintained to ensure proper operation for the duration of the waterbody crossing.

*Rock removal methods for installation via trench*

Bedrock refers to the solid rock that is found beneath the soil layer and other unconsolidated rock or sediment fragments. Shallow and hard bedrock can restrict trenching, requiring special mechanical means or blasting in certain areas to excavate to required design depths.

If bedrock is encountered during trenching, TGP plans to remove such bedrock using one of the techniques detailed below. The technique selected by TGP's construction contractor will be dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location. Techniques to be attempted are the following, in increasing order of perceived impact to aquatic resources:

1. Conventional excavation with an excavator;
2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;
3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;
4. Removal by rock trencher; or
5. Controlled blasting and excavation with a backhoe.

Evaluation criteria for the above-listed techniques include observed conditions at the stream crossing, the technical feasibility and limitations of each particular technique, considerations based on the experience of TGP personnel and its construction contractor, logistics, and costs. Based on the evaluation, one or more of the four non-blasting techniques may be determined not to be a practicable alternative at a particular

Page 35 of 65

**App-0427**

crossing. However, based on the results of the evaluation at each stream crossing, TGP will attempt the remaining potentially practicable non-blasting techniques to determine which is the least adverse yet practicable alternative. Only if evaluation and attempted implementation of the non-blasting techniques indicate that these non-blasting alternatives are not practicable will controlled blasting be selected as the least impactful to resource values, yet practicable, alternative. If techniques 1-4 are unsuccessful for rock removal and excavation at stream crossings, controlled blasting will be considered in non-karst areas that are also not streams with an unacceptable risk of hydrologic loss. In accordance with the permit Special Condition, blasting in wetlands is prohibited. The risk of karst-prone geology and risk of unacceptable hydrologic loss has been evaluated for each stream crossing location as identified in the Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022 and in the document entitled "October 30, 2023 Email Request for Additional Information Response" dated November 15, 2023 for the additional aquatic features addressed by this permit modification.

TGP anticipates encountering areas of shallow bedrock during construction that may require controlled blasting to remove, based on the following information: review of surficial geology, soil mapping, and desktop geotechnical survey results. TGP has developed a Draft Blasting Plan for the project, provided in Draft Blasting Plan found in the documented entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package. To avoid potential damage, TGP's blasting contractor will conduct pre-blasting of the rock, as needed, and develop site-specific blasting operations and monitoring plans to be approved by TGP. Control of blasting will limit stresses on existing pipelines, nearby structures, water supply wells, oil and gas wells, electrical transmission tower footings, and other utilities located near the project. Blasting activities will not begin until occupants of nearby buildings, stores, residences, businesses, and farms have been notified, and pre-blast inspections have been conducted on structures and water wells. Special care will be taken to monitor and assess blasting within 200 feet of residences and 200 feet of private or public water supply wells. Blasting mats will be used during blasting to keep the material within the approved workspaces. TGP and its blasting contractor will adhere to the provisions in the Draft Blasting Plan, which identifies blasting procedures, including use, storage, and transportation of explosives. Following blasting, where necessary, excess rock will be removed from the construction workspace, subject to affected landowner approval and applicable permit conditions. In areas where rock is predominant and little suitable backfill material is available, rock will be pulverized and placed in the trench as pad material around the pipe.

*Horizontal Directional Drilling (HDD) for trenchless installation*
HDD is a construction technique that is used to install pipelines in areas where traditional open cut excavations are not practicable due to technical feasibility, logistics, and costs. With the HDD method, a small diameter pilot hole is drilled from the entry point to the exit point. Drilling fluids are pumped to the drill bit, to cool the bit, remove rock cuttings, seal the drilled path, and lubricate the drill stem. From there, the hole is widened, and the pipeline is pulled into position. Compared to the other crossing methods, the HDD technique minimizes the impacts to an area by drilling down and under a sensitive resource, leaving the portion of land in between the entry and exit point relatively undisturbed. HDDs are authorized at three locations that will avoid direct impacts to four streams: Jones Creek (MP 3.2), Yellow Creek and an unnamed tributary (MP 22.4), and Wells Creek (MP 30.7). The use of HDDs at these three locations will be implemented to overcome obstacles posed by use of other stream crossing construction methods that are impracticable because of channel dimensions, flow, or other constraints. The feasibility of HDDs at these three (3) locations has been confirmed by analysis of geotechnical testing. HDD feasibility studies were conducted in June 2022 and provided as "Attachment 7 – HDD Feasibility Studies" submitted to the

Division on July 22, 2022, as part of the initial permit application package. In the case of inadvertent release of drilling fluid, TGP and its contractors will follow the HDD contingency plan submitted to the Division as part of "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

Following construction, streambeds will be restored to their pre-construction elevations and grades and as specified in "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package. Spoil, debris, piping, construction materials, and any other obstructions resulting from or used during construction of the pipeline will be removed to prevent interference with normal stream flow. Any excavated material not used as backfill will be removed and disposed of in uplands. Following grading, all waterbody banks will be restored to pre-construction conditions and in accordance with permit requirements.

*Water withdrawals for hydrostatic testing*

In compliance with U.S. Department of Transportation specifications, TGP will conduct hydrostatic testing on all pipeline segments prior to placing them in service. Authorized sources of hydrostatic test water for the Project are identified in Table 2 of this permit. Hydrostatic test manifolds will be located outside of wetlands and riparian areas to the maximum extent practicable. The pipe segments will be capped with manifolds, filled with water, pressurized, and held for one or eight hours. Any significant loss of pressure will indicate that a leak may have occurred and warrant further inspection and, where necessary, repair. Water may be re-used for hydrostatic testing between the new pipeline segments. The test water is expected to contact only new pipe, and no additives or chemicals will be added to the test water. Upon completion of the hydrostatic tests, the hydrotest water will be discharged to an upland area through a dewatering structure consisting of an energy dissipation device and water filtration structure. Environmental impacts from withdrawal and discharge of test water will be minimized by utilizing the measures outlined in the documented entitled "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

Wetlands

No permanent fill or loss of wetland acreage is authorized. However, the project will result in the permanent vegetation conversion of up to 0.03 acres of wetlands from forested to herbaceous within the new permanent easement due to construction clearing and periodic maintenance activities.  Post-construction monitoring will be conducted to ensure that the areas are restored and that invasive non-native plant species do not dominate as detailed in "Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package.

*Wetland construction methods*

"Conventional" wetland construction methods support construction equipment without significant soil disturbance. Prior to crossing and movement of construction equipment through these wetlands, the ROW will be stabilized using timber mats to allow for a stable, safe working condition. All trenches will be dewatered according to permit conditions to ensure that work is done in the dry. TGP will segregate up to the top 12 inches of wetland topsoil over the trench line. Trench soil will be temporarily stockpiled in a ridge along the pipeline trench. Gaps in the spoil pile will be left at appropriate intervals to provide for natural circulation or drainage of water. While the trench is dug, the pipeline will be assembled in a staging area located in an upland area. After the pipeline is lowered into the trench, wide-track bulldozers or backhoes supported on timber mats will be used for backfilling, final clean-up, and grading. This method will minimize the amount of equipment and travel in wetland areas. Where necessary, a drag-section may be used with the conventional wetland construction method. The drag-section involves the trenching,

installation, and backfill of a prefabricated length of pipeline containing several pipe segments all in one day. The trench is backfilled at the end of each day after the pipe is lowered in as necessary to ensure safety.

**Alternatives Analysis and Selection of Least Impactful Practicable Alternative**

The applicant has submitted potentially practicable alternatives to the activity. The overall stated goal and purpose of the activity is to transport natural gas to TVA from TGP's existing interstate pipeline system, as follows:

> "The proposed Project, which consists of the construction of the approximately 32-mile Cumberland Pipeline and appurtenant facilities (Cumberland Meter Station, Pressure Regulation Station, mainline valves, and inline inspection facilities), will allow TGP to transport approximately 245,040 dekatherms per day ("Dth/d") of natural gas from TGP's existing interstate pipeline system for TVA."

The applicant has considered the following alternatives:

**Alternative 1: Major route variations**

> "TGP conducted an analysis to determine if alternatives to construct and install the Cumberland Pipeline are practicable based on environmental considerations, construction costs, technical feasibility, human safety, and logistics."

> "The proposed Cumberland Pipeline will be constructed and installed generally parallel and adjacent to an existing TVA electric utility easement (approximately 80 percent co-located) and other utility easements."

> "The route for the Project is spatially constrained by two existing and fixed locations: (1) TVA's Cumberland Fossil Plant and (2) TGP's existing natural gas pipeline system (Lines 100-3 and 100-4). A primary routing consideration was co-locating the Cumberland Pipeline with existing utility easements for approximately 80 percent of its length, thereby minimizing environmental and landowner impacts. Based on TGP's analysis, an alternate Project route that is not co-located with existing utility easements would not result in decreased impacts to water quality, and would have additional environmental and landowner impacts than the preferred route, where land-use and property disruptions have already occurred."

> "In order to meet the purpose and need for the Project, the Cumberland Pipeline was designed to extend from the Project receipt point on TGP's existing interstate natural gas pipeline system along the Project's eastern beginning point to the Project delivery point at the location of TVA's proposed combined-cycle combustion turbine gas plant to be located on the Cumberland Fossil Plant Reservation at the Project's western terminus. Because these points are fixed as existing facilities, alternate routes with other starting or terminating points are not practicable or feasible to achieve the Project purpose. TGP's preferred route for the Cumberland Pipeline extends between these two points generally along an existing TVA powerline easement and other utility easements. This route is preferred primarily because of its generally co-located alignment between the Project receipt and delivery points. Further, with regard to Project impacts, disruptions to existing land-use along the TVA powerline easement and other utility easements have already occurred and have been assimilated, minimizing impacts to the environment and to new landowners for alternative routes. Finally, ease of access along the existing TVA easement and other utility easements by use of existing access roads for Project construction and operations provides another advantage for the preferred route as compared to alternative routes. Because of the ubiquitous occurrence of streams

Page 38 of 65

and wetlands in the topographically dissected Western Highland Rim Physiographic Province in which the Project is located, it is unlikely that other routes between the Cumberland Pipeline's receipt and delivery points would encounter substantially fewer aquatic resources than those along the preferred route, which is co-located with an existing TVA powerline easement and other utility easements for approximately 80 percent of its length. Further, alternative routes likely would contain aquatic resources that have not been disturbed by previous utility clearing and maintenance activities. For these reasons, TGP has chosen the route generally extending along the TVA powerline easement and other utility easement as the preferred alternative for the Cumberland Pipeline."

"There are no additional major route alternatives to the Cumberland Project."

**Alternative 2: Minor Route Variations**

"During the process of siting the Project, TGP has and will continue to consider multiple minor route variations to refine the pipeline alignment and to address concerns raised by potentially affected landowners and regulatory agencies. Route variations have been made to accommodate construction limitations, to improve the alignment for features such as roads and waterbody crossings, and to avoid natural features that would be challenging during construction, restoration, and operation of the pipeline, as well as to address landowner concerns. Table 10.2-1 summarizes the route variations that TGP has considered and incorporated in the Project alignment. At this time, TGP continues to refine the pipeline route and address route variations requested by potentially affected landowners and regulatory agencies, which may necessitate further changes to proposed pipeline route."

**TABLE 10.2-1**
**Cumberland Project Minor Route Variations**

| Mile Post | Variation Description | At Landowner Request |
|---|---|---|
| 0 | Potential sites for Pressure Regulation Station | |
| 2.3 | Rock ledge avoidance | |
| 3 | Landowner request to shift onto TVA easement | X |
| 4.5 | Avoid building on east side of White Oak Flat Road and eliminate additional pipeline points of inflection | |
| 8.5 | Improve crossing angle at two streams on tract 1.055 | |
| 12.5 | Avoid water feature | X |
| 16.5 | Avoid spring well and align the route for improved stream crossing and create a more perpendicular crossing for Little Bartons Creek | |
| 22.7 | Adjust stream crossing away from middle of the stream | |
| 25 | Avoid side hill construction and align the route to parallel the TVA easement | |
| 26 | Improve crossing angle at Highway 13 and stream (encroaches on TVA) | |
| 30-32 | Address multiple HDD routing issues at Wells Creek | |

Page 39 of 65

"Three minor route variations were evaluated between MP 30-32 where the pipeline needed to be routed away from the original pipeline route (paralleling the TVA powerline easement) to connect to the meter station location specified by the Project Shipper on TVA property."

"Table 10.2-2 summarizes the collective items addressed in the interconnected route variations that were considered between MP 30-32 The preferred route, which incorporates the minor route variations set forth in Table 10.2-2, results in an increase of approximately 0.12 miles over alternative routes considered between MP 30 and MP 32."

**TABLE 10.2-2**
**Minor Route Variations (Summary MP 30-32)**

| Mile Post | Construction Method | Variation Description (Selected Route) |
|---|---|---|
| 29.8–32 | Upland Construction; Stream-crossing Construction; HDD | Shifted route westward toward TVA's preferred location for the Cumberland Meter Station and to avoid the Stewart Houston Industrial Park. |
| 30.1 | Upland Construction; Stream-crossing Construction | Shifted 50 feet to the south to avoid old railroad bridge supports when crossing abandoned railroad. |
| 30.3–30.8 | Upland Construction; HDD | Moved route to attain a more perpendicular HDD crossing of Wells Creek and avoid crossings of Booster Branch and another tributary to Wells Creek, as well as avoid known cultural resource locations. Moved onto TVA property toward TVA's preferred location for the Cumberland Meter Station. |

For full descriptions of each variation in the tables above please refer to "Attachment 8 – Route Variations" submitted to the Division on July 22, 2022.

During course of initial application review by TDEC, additional jurisdictional wetlands were found within the ROW. TGP made additional minor route changes to avoid impacts to these features. These changes are summarized in TGP's response to a TDEC Request for Additional Information "TGP & USACE Cumberland Project – TDEC Field Review / Revisions (Supplement 1)", document dated September 29, 2022.

**Alternative 3: Pipeline installation via dry-cut trenching vs. wet-cut trenching**

"The dry open cut construction procedure involves isolating the streambed work area from the stream to allow the construction to be performed in a controlled "dry" state by temporarily diverting the stream around the work area. The most common dry open cut methods include the flumed crossing and the dam and pump crossing methods. The dry open cut method has been selected as the preferred crossing method for the majority of waterbody crossings for the Cumberland Pipeline. The two main types of dry open cut crossing methods are discussed below. While dry open cut methods result in increased time to cross a stream as compared to wet open cut methods, the potential for weather to affect the flow in the stream and thus the crossing, and the ability to handle flow volume, some stream flow may not be appropriately handled by the use of the dry open cut crossing methods. In that case, a trenchless crossing method (HDD or conventional bore method, as discussed below) may be more appropriate."

"In the flumed crossing method, a flumed stream crossing redirects the water flow through one or more pipes to allow for the trenching and pipe installation to occur in dry conditions. The number, length, and diameter of the pipes are dependent on estimated stream flow for the stream being crossed. The major advantage of this method is that it allows for dry trenching, pipe installation,

and restoration, while maintaining continuous downstream flow and passage for aquatic organisms. Further, because this method isolates the stream flow from the construction activities, the only downstream turbidity that is created is during the dam/flume installation."

"The dam-and-pump crossing method is primarily used for stream crossing where pumps and hoses can adequately transfer stream flow volumes from upstream work to downstream of the work area, and where there are no concerns with preventing the passage of aquatic organisms. The major advantage of this method is that it allows for dry trenching, pipe installation, and restoration, while maintaining continuous downstream flow. Further, because this method isolates the stream flow from the construction activities, the only downstream turbidity that is created is transient conditions of short duration during the dam installation. Both methods require that the waterway is dewatered in the construction area by pumping the standing water into a dewatering structure on the banks. The streambed material is then segregated and stockpiled to prevent mixing with other materials and used during the stream restoration process. In terms of adverse environmental effects and practicability, these two methods are essentially equivalent."

**Alternative 4: Rock removal methods for trenched pipeline installation**

"If bedrock is encountered during trenching, TGP plans to remove such bedrock using one of the techniques detailed below. The technique selected by TGP's construction contractor will be dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location. Techniques to be used are the following:
   1. Conventional excavation with an excavator;
   2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;
   3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;
   4. Removal by rock trencher; or
   5. Controlled blasting and excavation with a backhoe."

"[The conventional excavation] method consists of using a backhoe to dig a trench. It is most effective in poorly or unconsolidated materials, such as a dry stream bed underlain by fluvial materials. In conditions supporting its use, including unconsolidated substrate materials that can be relatively easily removed, Conventional Excavation ("CE") presents little environmental risk to water quality and is the most practicable alternative considering technical feasibility, logistics, and costs. However, in instances where tougher substrate materials are present, this alternative may not be practicable because of technical infeasibility. Accordingly, CE will not be used to trench across channels with exposed bedrock substrate. For channels covered by unconsolidated materials overlying bedrock at greater depths, CE will be used to depths at which it is practicable, but removal of deeper materials will necessitate selection among the additional methods described below."

"[The ripping] method makes use of an excavator equipped with concave tooth that is inserted into and dragged through substrate materials. After ripping, a conventional excavator is used to remove the dislodged materials from the trench. For streams at which bedrock is encountered at or beneath the streambed surface, ripping will be the preferred alternative in terms of least environmentally adverse effects because it confers little or no risk of hydrologic loss."

"[The hammering method] entails use of a pneumatic tool attached to a backhoe boom to break apart substrate materials. After hammering, a conventional excavator is used to remove the

dislodged materials from the trench. Hammering is time-consuming and increases construction costs considerably in comparison with CE or ripping. Further, hammering exposes equipment operators to prolonged hours on the work-site, potentially resulting in safety risks. Hammering also entails a risk of fracturing potentially resulting in hydrologic loss."

"[The rock trenching] method uses a large trenching machine to cut through bedrock. Although costly to mobilize, this method can reduce construction time at the work site. Primary disadvantages are cost and inaccessibility for many sites where tight space or steep slopes prevent the effective use of the equipment."

"At stream crossings, TGP's construction contractor will evaluate and attempt the use of [each of the] Techniques 1-4 described above based on the conditions observed at the time of construction to determine the best method for rock removal and excavation. If [Techniques 1-4 are] unsuccessful for rock removal and excavation at stream crossings, Technique 5 (controlled blasting) will be considered in non-karst areas or in wetlands or streams with an unacceptable risk of hydrologic loss. The risk of karst-prone geology and risk of unacceptable hydrologic loss has been evaluated for each stream crossing location at which a bedrock substrate has been identified (see [Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "Aquatic Resource Alteration Permit (ARAP) Application and State 401 Water Quality Permit" submitted to the Division on July 22, 2022, as part of the initial permit application package and the version of this table including the newly proposed impacted features in Enclosure 4 of the document entitled "October 30, 2023 Email Request for Additional Information Response" submitted to the Division dated November 15, 2023]). If controlled blasting is necessary at a waterbody or wetland crossings, TGP's construction contractor will utilize a dry-ditch crossing method (either dam-and-pump or flume crossing) and adhere to 1) all applicable federal, state, and local regulations, including the FERC Procedures, USACE and TDEC permit conditions, 2) Draft Blasting Plan (see ["Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package], and 3) karst mitigation measures. Immediately following blasting, TGP would remove rock that impedes stream flow."

"The use of the dry open cut method with controlled blasting will only be used if other rock removal methods have been evaluated but deem impracticable. TGP anticipates that controlled blasting will be used rarely to facilitate waterbody crossings. In no event will controlled blasting be used in karst-prone areas or wetlands. A desktop analysis of the study area has identified a few areas of shallow bedrock where controlled blasting may become necessary to cross certain waterbodies using the dry open cut construction method (see [Waterbodies Crossings Hydrologic Risk Analysis table in the document entitled "Aquatic Resource Alteration Permit (ARAP) Application and State 401 Water Quality Permit" submitted to the Division on July 22, 2022, as part of the initial permit application package and the version of this table including the newly proposed impacted features in Enclosure 4 of the document entitled "October 30, 2023 Email Request for Additional Information Response" submitted to the Division dated November 15, 2023]). TGP's Draft Blasting Plan is provided in ["Attachment 5 – Comprehensive Environmental Construction Management Plans" submitted to the Division on July 22, 2022, as part of the initial permit application package]. In the unlikely event that controlled blasting is needed, a qualified contractor will review and update this plan to address the specific circumstances of each dry open cut waterbody crossing that requires controlled blasting to remove rock. A qualified Project biologist will survey the area immediately in advance of the controlled blasting activities, including any drilling. for the presence of any sensitive species. Once cleared, holes will be drilled into the

Page 42 of 65

streambed and carefully loaded with explosives and packed with aggregates. A pre-blast safety check will then be performed followed by the controlled detonation of the explosives, which will result in a small release of dust and mounding of the surface. The use of controlled blasting would drastically minimize the duration of in-stream work and temporary disruptions to stream flow. The overall area of construction impacts when using controlled blasting is significantly smaller in comparison to other construction methods and results in less costs given reduced time in the workspace. However, the use of controlled blasting may confer a higher risk of loss of stream flow than other crossing construction methods; thus, it is not generally considered to be the [least environmentally damaging practicable alternative] at locations where other methods are feasible and practicable. Although TGP expects the use of blasting for the removal of rock at waterbody crossing for the Project to be limited and has eliminated the use of controlled blasting for rock removal for use in karst-prone areas, crossing conditions at non-karst prone locations where CE, ripping, hammering, or rock trenching are technically infeasible to dislodge bedrock materials may require controlled blasting as the only practicable alternative. In these instances, TGP will ensure that controlled basting is localized and isolated to within the trench line to minimize the movement of materials outside of the waterbody. Drill patterns will be set so that they achieve smaller rock fragments, which will allow for the use of as much of the fragmented rock as possible when restoring the trench to its pre-construction condition. Rock fragments also will be shifted, as needed, to maintain the contours and flow patterns of the waterbody after the blasting is complete."

"TGP will not utilize the dry open cut crossing method with controlled blasting for rock removal in wetland habitats."

**Alternative 5: Pipeline installation via trenchless methods vs. open-cut trenching**

"The HDD method is a trenchless construction procedure in which a waterbody is crossed by pulling the prefabricated pipeline into place using drilled boreholes. In this procedure, a small diameter pilot hole is drilled down from an entry point to an exit point by pumping a slurry mixture of bentonite clay, drilling additives, and water into the ground at high pressure. The hole is then widened, and the pipeline is pulled into position. The HDD method has been a standard construction procedure for linear pipeline installations across large waterbodies since the 1970s. This construction procedure drastically reduces the impacts to waterbodies and their aquatic environments by drilling down and under the sensitive resource, resulting in the surface area between the entry and exit point remaining relatively undisturbed. While the HDD method is a proven technology for pipeline installations, there is still the potential that the HDD method can fail for reasons such as encountering soil conditions that are not conducive to boring, borehole collapse, and loss of the drill string or drilling fluid return. TGP has performed a feasibility analysis of the study area to determine if HDD is a viable waterbody crossing method. This analysis included geological surveys, reviews of nearby public drinking water sources, private wells, and mining activities (active and abandoned). Three (3) HDDs are being proposed for the Project at the following waterbodies: (1) Yellow Creek, (2) Jones Creek, and (3) Wells Creek. Prior to the final HDD determination, TGP conducted geotechnical investigations in June 2022 at each of these three crossings to assess the characteristics of the geologic formations. This information was reviewed, and it was confirm that a HDD is technically feasible for each crossing given the specific geology evaluated by project engineers to ensure the HDD has a high rate of success."

"Conventional boring consists of creating a shaft/tunnel for a pipe or conduit to be installed to minimize surface disturbance. This is accomplished by first excavating a bore pit and a receiving

<div align="center">Page 43 of 65</div>

pit. The bore pit is excavated to a depth slightly deeper than the depth of the associated trench and is graded such that the bore will follow the proposed angle of the pipe. A boring machine is then lowered to the bottom of the bore pit to tunnel using a cutting head mounted on an auger. The auger rotates through a bore casing, both of which are pushed forward as the hole is cut. The pipeline is then installed through the bored hole and welded to the adjacent pipeline. The typical workspace configurations required for boring operations consist of staging areas (50 feet by 100 feet) for boring machine setup, cuttings/return settlement and storage pits, pipe storage, entrance and exit pit spoil storage, and construction equipment necessary to support the operation. Major factors limiting the success of a boring operation under waterbodies for the Project include the crossing distance, subsurface soil and geologic conditions, and existing topography. Boring operations typically occur over a crossing distance of 50 to 60 feet. The maximum length a bore could achieve in ideal soil conditions typically does not exceed 400 feet. Subsurface soil and geologic conditions must be conducive to establishing and maintaining a safe bore pit excavation, as well as provide the capabilities for the boring equipment to conduct a successful bore. Loosepacked sediment, free of rock material, is preferred when conducting boring operations. The topographic conditions for most waterbody crossing locations on this Project also limit the use of this method, as preferred locations are generally consistent with level or moderately convex terrain, such that the depth of the bore pit does not present concerns relative to constructability or safety constraints."

"TGP considered six (6) factors when evaluating the use of HDD or conventional bore crossing methods versus a dry open-cut method for Project waterbody crossings: (1) the length of the crossing, (2) the potential for risk of loss of drilling fluid (i.e., inadvertent/lost returns), (3) geological considerations, and (4) length of time of the crossing (5) worker safety and technical feasibility, and (6) cost of the crossing method. For a 30-inch diameter pipe, as will be installed for the Project, the minimum distance needed to achieve the necessary radius for the HDD pipe string is approximately 1,300 feet, which means that each HDD must be at least 1,300 feet long, regardless of the width of the feature it is avoiding in order to reduce stress pressure on the pipeline. Considering the undulating topography of the Project area, many HDD entry/exit pads or conventional bore entry/exit pits likely would be located on slopes, which create a construction safety and technical feasibility challenge. Further, given the need for HDD or conventional bore entry and exit pads or pits to be at or near the same elevation to promote drill cutting returns, use of these methods in hilly terrain may not be practicable. For example, if either the entry or exit points is at a higher location than the other, greater annular pressure is needed to facilitate the drill cutting returns. This increase in pressure could contribute to additional risks of inadvertent returns to the formation or to the surface. Inadvertent returns are characterized by drilling fluid flowing through the underlying formation and finding a pathway of least resistance to the surface or to voids in the formation. These returns may be expressed on land or in the feature that is being avoided. Although the drilling fluid is generally inert bentonite clay that is not toxic or harmful, it may be discharged to downstream waters. In that event, inadvertent returns would be contained and cleaned up once identified. Costs associated with an HDD and Conventional Bore, in general, may be five (5) times more per foot than costs for a conventional crossing using open cut methods, which can become prohibitive to the Project budget (see ["Attachment 9 – Summary of Trenchless Construction Methods for the Cumberland Project" submitted to the Division on July 22, 2022, as part of the initial permit application package]). Geology plays a major role in the success of an HDD or conventional bore. In an area without the appropriate geology to support an HDD or conventional bore, the drilling hole will not maintain its integrity and could collapse, causing delays. In other areas, if the geology contains large boulders or voids, the drilling head cannot negotiate these obstacles and the bore may fail. Further, for a HDD, in order for the radius of the

Page 44 of 65

drill and pipe to be maintained, the boring must be made to greater depths in the formation, potentially impacting groundwater resources or karst topography. HDD and conventional bores take more time to complete than open cut crossings due to the amount of drilling equipment necessary, the mobilization and demobilization of the drilling equipment, the drilling itself, pipe preparation, and for a HDD, the pullback of the pipeline. For the proper pullback of the pipeline, the same length of construction workspace is needed to accommodate a straight entry into the exit point of the HDD. In some cases, due to pipeline inflections, and the lack of available straight construction workspace, a false ROW may be needed, thus increasing potential impacts. A false ROW is a work area approximately 50 feet wide by the length of the HDD pullback section that is prepared to stage the pipeline. Generally, HDDs can take a month or longer to complete. HDDs occur over a longer timeframe with continuous activities throughout the procedure in comparison to open cut methods. During this time, there is the possibility of impacts to noise sensitive areas, inadvertent returns, and equipment failures throughout the duration of the HDD. When comparing an HDD or conventional bores to conventional open cuts of streams/wetlands, the issues associated with the HDDs and conventional bores are reduced or mitigated by the use of open cut methods. For example, the trench line for open-cut methods is much shallower across a stream, thus minimizing the potential impact to deep geological features. Also, there is no need for long pull back sections for conventional open cut crossings because there is no minimum length of pipeline that is needed to cross a stream. The length of the pipeline is dictated by the stream width, not the necessity to maintain a certain radius to reduce pipe stressors, as is the case with an HDD. There are no risks of inadvertent returns for a conventional open cut crossing as no drilling fluid is used during the process. The conventional open cut crossing is a straightforward digging of the trench line, installing the pipeline, and backfilling with native material. At all times during a conventional dry open cut of a stream, the contactor is able to see the trenchline and the surrounding work zone, unlike that of a HDD or conventional bore, which increases the safety factor. Also, in general, it takes one to two days to complete a conventional open cut crossing (if not using controlled blasting for rock removal), as opposed to at least one month for an HDD or up to 10 days for a conventional bore. While the timing of an open cut crossing can be extended for certain reasons, such as weather, stability of the trench line, and water flow, the time for an open cut crossing is still much less than that for an HDD. Notwithstanding the concerns outlined above, HDDs are proposed for certain crossings to avoid environmental impacts at two Natural Rivers Inventory stream reaches (Jones Creek and Yellow Creek) and due to the physical characteristics of Wells Creek. The HDD at Yellow Creek will also avoid direct impacts to one of its unnamed tributaries."

Based on the available information the Division has made a preliminary determination that the applicant has demonstrated that the route selection method and process for determining the appropriate crossing method will result in the use of the least impactful practicable alternative to accomplish the project purpose.

**Existing Conditions/ Proposed Loss of Resource Values**

<u>Streams</u>
Jurisdictional streams identified within the project impact areas are characterized by predominantly silt/clay substrates. Several intermittent and perennial streams within the study area are characterized by bedrock, cobble, and gravel substrates. Fish, amphibians, and populations of benthic macroinvertebrates were observed in some of the streams during TGP's on-site aquatic resource inventory. A summary of stream channel dimensions and general characteristics can be found in Table D-1 within "TGP & USACE Cumberland Project – TDEC Field Review / Revisions (Supplement 1)", dated September 26, 2022 and "October 30, 2023 Email Request for Additional Information Response" dated November 15, 2023.

<div align="center">Page 45 of 65</div>

<div align="right">**App-0437**</div>

Reservoir

Barkley Reservoir (Cumberland River) is located adjacent to the existing TVA Cumberland Fossil Plant in Cumberland City, Tennessee. This segment of the reservoir is an Exceptional Tennessee Water due to the observed presence of state-listed aquatic animal species.

Wetlands

The wetlands to be impacted by the project are characteristic of low to moderate resource value wetlands typically found in the region. Dominant tree species in the PFO wetlands along the proposed alignment includes red maple (*Acer rubrum*), sweetgum (*Liquidambar styraciflua*), tulip poplar (*Liriodendron tulipifera)*, and blackgum/black tupelo (*Nyssa sylvatica*). Dominant herbaceous species in the PEM wetlands along the proposed alignment includes bluestem (*Andropogon* spp.), soft rush (*Juncus effusus*), beaksedge (*Rhynchospora* spp.), blackberry (*Rubus argutus*), goldenrod *(Solidago elliottii*), and dog fennel (*Eupatorium capillifolium)*.

Permanent impacts to streams and wetlands include ongoing vegetation management in riparian zones. A corridor above the pipeline and up to 10 feet wide may be cleared at a frequency necessary to maintain the 10-foot corridor in an herbaceous state, resulting in conversion of plant communities in forested riparian zones and forested wetlands to herbaceous/emergent or scrub-shrub plant communities. In addition, individual trees that are located within 15 feet of the pipeline that have roots that could compromise the integrity of the pipeline coating may be cut and removed from the permanent right-of-way. These impacts will not result in loss of wetland acreage.

Temporary wetland and stream impacts will be mitigated by returning impacted areas to original elevation and condition following appropriate erosion prevention and sediment control measures. All features that are temporarily impacted will be monitoring annually for three years following completion of project construction to ensure no net loss of resource value by the Division.

In an email from TWRA to consultants of TGP dated August 31, 2022 (provided in Attachment 6 of the documented entitled "TGP Cumberland Project – RAI Response Document" submitted to the Division on December 1, 2022), TWRA states:

"It is TWRA's understanding that state listed species (outlined in TWRA's consultation from August, 2, 2022) will not be impacted by the current design of the project" and "With the above understandings, TWRA agrees that time-of-year restrictions for state protected species do not apply to the Cumberland Project, and that the project will have no effect on state listed species." On October 3, 2022, TWRA conveyed to a consultant of TGP via email that "The TWRA has no concerns for non-listed aquatic species as outlined by the project location that was presented to TWRA on 7/19/2022."

In a letter to a consultant of TGP dated June 29, 2021 (provided with initial permit application materials submitted to the Division on July 22, 2022 in "Attachment 4 – Agency Correspondences"), the TDEC Division of Natural Areas states:

"The Division of Natural Areas - Natural Heritage Program has reviewed the location of the proposed project workspace with respect to rare plant species. While the extent of the project (33.2 miles) makes the project more likely to encounter rare species at previously unsurveyed locations, the current project route is mostly confined to a previously established ROW and comes within one mile of just two rare plant records – neither of which are in the project area - at the easternmost

Page 46 of 65

extent of the route. Thus, we do not anticipate any impacts to known occurrences of rare, threatened, or endangered plant species from this project and believe risk to unknown occurrences is minimal."

The Division has made a preliminary determination that the overall activities, if conducted in accordance with the submitted plans and permit conditions, will not result in any appreciable permanent loss of resource values.

## Mitigation Required

The Division has made a preliminary determination that the proposed impacts to jurisdictional waters, if carried out in accordance with the permit's conditions, will result in *de minimis* degradation; therefore, compensatory mitigation is not required.

## Social or Economic Justification Information

Formal social and economic justification for the impacts associated with this activity is not required based on the Division's preliminary determination that the proposed impacts to jurisdictional waters will result in *de minimis* degradation. However, the applicant has provided the following information on social and economic justification:

"… construction of the Project will have a net positive impact on local and regional businesses within counties impacted by the Project. TGP estimates that approximately $17,300,000 in Dickson County, $8,100,000 in Houston County, and $1,300,000 in Stewart County ($26,700,000 total) will be distributed in construction payroll for personnel working at the various Project sites over the 12-month construction period. During construction, it is anticipated that 20 to 30 percent of worker payroll will be spent locally by both local and nonlocal workers for the purchase of housing, food, gasoline, entertainment, and luxury items. The dollar amount would be dependent on the number of construction workers employed at any given time and the duration of the non-local worker's residence in the Project area.

It is also anticipated that some portion of construction materials will be purchased locally. Material purchases, including construction equipment, pipe, and valves, are estimated to be $16,500,000 in Dickson County, $6,800,000 in Houston County, and $2,200,000 in Stewart County ($25,500,000 total), including freight and taxes. An additional estimated $71,000,000 in Dickson County, $34,500,000 in Houston County, $3,900,000 in Stewart County ($109,400,000 total) will be spent by TGP on other construction related expenditures, for a total estimated construction cost of $161,600,000. These payroll and materials expenditures will have a positive impact on the local economy.

Construction and operation will result in increased tax revenues for the state of Tennessee, Dickson County, Houston County, and Stewart County, and potentially other local taxing authorities. The prevailing state sales tax rate for most items in Tennessee is seven percent. An additional 2.75 percent county sales tax is levied in Dickson and Houston counties. In Stewart County, an additional 2.25 percent sales tax is levied. Assuming all material purchases are taxed at an effective sales tax rate of 9.25 percent, TGP will pay approximately $2,300,000 in sales tax during construction. Once in operation, TGP will also pay ad valorem taxes based on the assessed value of the Project facilities. TGP estimates paying approximately $2,400,000 annually in ad valorem

Page 47 of 65

taxes on average over the first 10 years of Project operations. Ad valorem taxes are anticipated to be paid annually at similar or higher levels for the remaining life of the Project.

Although the preferred Cumberland Pipeline route that is co-located generally with an existing TVA powerline easement and other utility easements (for approximately 80 percent of its length) is the [Least Environmentally Damaging Practicable Alternative], other routes extending from TGP's existing interstate natural gas pipeline system to TVA's Cumberland Fossil Plant would not vary in terms of socioeconomic benefits. Use of an alternate route would unnecessarily result in land-use disruptions that have primarily already occurred in constructing and maintaining the TVA powerline and easement and other utility easements. Social and economic consequences to property owners or local communities of the considered crossing methodologies summarized in [Table 1 of this permit and Table 10.5-1 of TGP's initial permit application materials] would be minor, and would not materially vary, as the method to be implemented at each crossing is limited in area and length with no more than localized, temporary effects.

The Project is not anticipated to have significant adverse impacts during construction or operation on population, employment, regional or local services, traffic or transportation, residences or businesses, or minority communities. In addition, TGP has identified environmental justice communities near the location of the Project, and will continue to identify and address any concerns of these environmental justice communities (designated below poverty level but not with disproportionately high minority populations). TGP's communication and involvement with the environment justice communities is ongoing and will continue through the certificate, permitting, construction, and restoration phases of the Project. TGP will continue its engagement of minority and low-income populations in proximity to the proposed Project through meaningful participation and coordination with community leaders and groups within environmental justice communities. TGP plans to take the following steps during the certificate, permitting, construction, and restoration phases of the Project to continue to inform and engage environmental justice communities: (1) beginning in the third quarter 2022, conduct small group discussions (e.g., 5-10 people) with community leaders and organizations in environmental justice communities to discuss the Project and any concerns or issues; (2) beginning in the third quarter 2022, provide formal presentations to groups in the impacted environmental justice communities; (3) distribute Project information to community partners for further distribution within their communities; and (4) translate certain Project materials for distribution within environmental justice communities, as well as portions of the Project website, Overall, Project construction activities are anticipated to have temporary, short-term impacts on population, housing, public services, and traffic and transportation, and will provide an overall net positive impact on employment and the local economy when the Project is operational."

## Antidegradation

Antidegradation review has been completed for the activities authorized in the original permit and section 401 certification.

In accordance with the Tennessee Antidegradation Statement (Rule 0400-40-03-.06):

For the newly proposed impacts to streams in the TDEC Waterbody known as Miscellaneous Tributaries to Jones Creek addressed by the permit modification, the Division has made a preliminary determination that the authorized activities will result in de minimis degradation of waters with available parameters for habitat alteration without mitigation, and will not result in an appreciable permanent loss of resource values.

Page 48 of 65

For the newly proposed impacts to streams in the TDEC Waterbody known as Unnamed tributaries to Jones Creek addressed by the permit modification, the Division has made a preliminary determination that the proposed activities will result in no significant degradation in a waterbody with unavailable parameters for habitat alteration because the activities will not result in an appreciable permanent loss of resource values.

For more information please reference Tennessee's Antidegradation Statement which is found in Chapter *0400-40-03* of the Rules of the Tennessee Department of Environment and Conservation.

Cumberland Gas Pipeline Project; NRS22.192 Modification
Aquatic Resource Alteration Permit

**Tables**

Table 3: list of features to be impacted that have been identified by TDEC to be WWCs. Modifications to these impacts are highlighted in yellow.

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SDKA001 | UT to Jordan Branch | N/A (WWC) | N/A (WWC) | 36.1730 | -87.2174 | 112.2 |
| SDKA002 | UT to Jordan Branch | N/A (WWC) | N/A (WWC) | 36.1733 | -87.2176 | 10.8 |
| SDKA012 | UT to Jones Creek | N/A (WWC) | N/A (WWC) | 36.1979 | -87.2590 | 99.1 |
| SDKA015 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.1984 | -87.2649 | 55.5 |
| SDKA016 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.1989 | -87.2655 | 20.9 |
| SDKA017 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.2025 | -87.2730 | 97 |
| SDKA019 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.2032 | -87.2735 | 76.9 |
| SDKA020 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.2078 | -87.2827 | 127 |
| SDKK05 | UT to Gafford Branch | N/A (WWC) | N/A (WWC) | 36.2098 | -87.2862 | 107 |
| SDKA024 | UT to Upper Sugar Camp Branch | N/A (WWC) | N/A (WWC) | 36.1663 | -87.2063 | 93.2 |
| SDKA028 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2114 | -87.2891 | 14.7 |
| SDKA029 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2121 | -87.2909 | 75.3 |
| SDKA030 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2141 | -87.2944 | 301 |

**App-0442**

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SDKA031 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2101 | -87.2907 | 40.4 |
| SDKA035 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2186 | -87.3039 | 43.1 |
| SDKA037 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2237 | -87.3132 | 76.2 |
| SDKK04 | UT to Johnson Creek | N/A (WWC) | N/A (WWC) | 36.2138 | -87.2939 | 178 |
| SDKA040 | UT to Harris Branch | N/A (WWC) | N/A (WWC) | 36.2291 | -87.3231 | 111.4 |
| SDKA047 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2749 | -87.4715 | 109 |
| SDKA050 | UT to Jones Creek | N/A (WWC) | N/A (WWC) | 36.1896 | -87.2484 | 79.3 |
| SDKK02 | UT to Jones Creek | N/A (WWC) | N/A (WWC) | 36.1905 | -87.5224 | 332 |
| SDKA056 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2747 | -87.4652 | 60 |
| SDKA057 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2747 | -87.4652 | 91.2 |
| SDKB006 | UT to Nesbitt Branch | N/A (WWC) | N/A (WWC) | 36.2441 | -87.3658 | 80 |
| SDKB007 | UT to Nesbitt Branch | N/A (WWC) | N/A (WWC) | 36.2455 | -87.3687 | 72 |
| SDKB010 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2585 | -87.4036 | 80.3 |
| SDKB013 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2649 | -87.4211 | 174.3 |

Page 51 of 65

**App-0443**

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SDKB015 | UT to Woods Valley Branch | N/A (WWC) | N/A (WWC) | 36.2670 | -87.4302 | 95.4 |
| SDKB016 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2683 | -87.4353 | 78.7 |
| SDKB017 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2691 | -87.4373 | 77.6 |
| SDKB018 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2696 | -87.4396 | 297.9 |
| SDKB019 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2706 | -87.4435 | 97.3 |
| SDKB020 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2710 | -87.4460 | 70 |
| SDKB024 | UT to Little Bartons Creek | N/A (WWC) | N/A (WWC) | 36.2740 | -87.4609 | 74 |
| SDKR002 | UT to Furnace Creek | N/A (WWC) | N/A (WWC) | 36.2474 | -87.3755 | 125.3 |
| SDKR003 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2609 | -87.4118 | 75.4 |
| SDKR004 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2609 | -87.4118 | 26.4 |
| SDKR006 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2609 | -87.4118 | 94.2 |
| SDKR007 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2656 | -87.4237 | 106.8 |
| SDKR009 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2671 | -87.4301 | 11.3 |
| SDKK06 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2558 | -87.3982 | 366 |

Page 52 of 65

**App-0444**

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SDKK07 | UT to Dry Hollow Branch | N/A (WWC) | N/A (WWC) | 36.2555 | -87.3975 | 176 |
| SDKR010 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2881 | -87.5081 | 115.1 |
| SDKR011 | UT to Leatherwood Creek | N/A (WWC) | N/A (WWC) | 36.2893 | -87.5121 | 96.2 |
| SHNA002 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3401 | -87.6140 | 5.4 |
| SHNA003 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3404 | -87.6145 | 50 |
| SHNA005 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3406 | -87.6148 | 38.7 |
| SHNA007 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3429 | -87.6182 | 20 |
| SHNA013 | UT to Lickskillet Branch | N/A (WWC) | N/A (WWC) | 36.3557 | -87.6390 | 124.4 |
| SHNB031 | UT to Guices Creek | N/A (WWC) | N/A (WWC) | 36.3429 | -87.6182 | 83 |
| SHNB032 | UT to Lickskillet Branch | N/A (WWC) | N/A (WWC) | 36.3558 | -87.6400 | 84.2 |
| SHNB034 | UT to Lickskillet Branch | N/A (WWC) | N/A (WWC) | 36.3663 | -87.6556 | 77.9 |
| SHNC001 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.3376 | -87.6087 | 56.6 |
| SHNC002 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.3401 | -87.6140 | 17.6 |
| SHNC003 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.3404 | -87.6145 | 93.3 |

Page 53 of 65

**App-0445**

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SHNC004 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2978 | -87.5409 | 71.9 |
| SHNC005 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.297882 | -87.5421 | 110 |
| SHNC006 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.2986 | -87.5439 | 74 |
| SHNC006 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.2985 | -87.5451 | 80 |
| SHNC015 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3038 | -87.5628 | 124.7 |
| SHNC016 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3041 | -87.5630 | 98.5 |
| SHNC017 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3038 | -87.5626 | 81.6 |
| SHNC019 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3099 | -87.5766 | 77.2 |
| SHNC021 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3106 | -87.5796 | 87.1 |
| SHNC022 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3114 | -87.5814 | 116.4 |
| SHNC023-2 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3187 | -87.5878 | 20.6 |
| SHNC024 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3130 | -87.5847 | 80.7 |
| SHNC025 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3141 | -87.5860 | 89.7 |
| SHNC041 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2951 | -87.5318 | 75.2 |

Page 54 of 65

| Waterbody[1] | | | | Impact location | | Total impacts (linear feet) |
|---|---|---|---|---|---|---|
| TGP Waterbody ID | TGP Waterbody Name | TDEC Waterbody ID | TDEC Waterbody Name | Lat. | Long. | |
| SHNC042 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2945 | -87.5296 | 83 |
| SHNE001 | UT to Yellow Creek | N/A (WWC) | N/A (WWC) | 36.3070 | -87.5710 | 134.1 |
| SHNE002 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3099 | -87.5770 | 12 |
| SHNE002 | UT to Indian Branch | N/A (WWC) | N/A (WWC) | 36.3098 | -87.5770 | 90 |
| SHNE004 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3252 | -87.5947 | 64 |
| SHNE004 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3253 | -87.5948 | 76 |
| SHNE005 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3267 | -87.5955 | 102 |
| SHNE006 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3268 | -87.5957 | 76.1 |
| SHNE007 | UT from Guices Branch | N/A (WWC) | N/A (WWC) | 36.3225 | -87.5920 | 77.2 |
| SHNW002 | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2909 | -87.5186 | 22.5 |
| SHNW003a | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2945 | -87.5231 | 162 |
| SHNW004a | UT to Williamson Branch | N/A (WWC) | N/A (WWC) | 36.2931 | -87.5251 | 79.6 |

[1] All features listed above are considered WWCs by the State of Tennessee, and do not require an Aquatic Resource Alteration Permit for the alterations proposed. In accordance with the Tennessee Water Quality Control Act 69-3-108 and TDEC Rule 0400-40-03-.05(9), the impacts to WWCs shall require no notice or approval, and do not violate Tennessee Water Quality Standards provided that the impacts adhere to the conditions in the Tennessee Water Quality Control Act 69-3-108(q).

Page 55 of 65

**App-0447**

**Plans and drawings**



NOTES:
1. THE PURPOSE OF THIS TYPICAL CONSTRUCTION RIGHT-OF-WAY CROSS-SECTION DIAGRAM IS TO SHOW WIDTHS AND RELATIVE LOCATIONS OF EXISTING RIGHTS-OF-WAY, NEW PERMANENT RIGHT-OF-WAY, AND TEMPORARY CONSTRUCTION RIGHT-OF-WAY.
2. THIS DRAWING IS REPRESENTATIVE OF THE TYPICAL CONSTRUCTION WORK SPACE. SEE CONSTRUCTION ALIGNMENT SHEETS FOR SITE SPECIFIC DETAILS.
3. ADDITIONAL TEMPORARY WORK SPACE (ATWS) IS REQUIRED NEAR ROAD AND STREAM CROSSINGS, SIDE SLOPES, AND OTHER AREAS WITH UNIQUE CONSTRUCTION REQUIREMENTS. (SEE ALIGNMENT SHEETS FOR ATWS)
4. AT LOCATIONS WITH CULTIVATED LAND, TOPSOIL SEPARATION WILL BE COMPLETED FOR THE, TRENCH, SPOIL PILE, AND WORKING SIDE. AT FORESTED AND NON-CULTIVATED AREAS TOPSOIL SEPARATION WILL BE COMPLETED FOR THE TRENCH AND SPOIL PILE.
5. DRAWING IS NOT TO SCALE.

| REVISIONS | | | | | | Tennessee Gas Pipeline Company, L.L.C.  a Kinder Morgan Company | PROPOSED 30" PIPELINE  ADJACENT TO TGP PIPELINE  TYPICAL CONSTRUCTION RIGHT-OF-WAY | | |
|---|---|---|---|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPD | | | | |
| | | | | | | | DATE: 04/05/2022 | DRAWN BY: EPG | APPROVED BY: CDW |
| | | | | | | | SCALE: N.T.S. | P2021-1119-STD-0001 | SH. 1 OF 3 |

TABLEROCK SURVEY, LLC
2204 TIMBERLOCH PL., STE. 180
THE WOODLANDS, TX 77380
OFFICE: 832-415-3869
TBPELS FIRM NO. 10194261

Page 56 of 65



**App-0449**



1.  THE PURPOSE OF THIS TYPICAL CONSTRUCTION RIGHT–OF–WAY CROSS–SECTION DIAGRAM IS TO SHOW WIDTHS AND
    RELATIVE LOCATIONS OF EXISTING RIGHTS–OF–WAY, NEW PERMANENT RIGHT–OF–WAY, AND TEMPORARY CONSTRUCTION
    RIGHT–OF–WAY.
2.  THIS DRAWING IS REPRESENTATIVE OF THE TYPICAL CONSTRUCTION WORK SPACE.  SEE CONSTRUCTION ALIGNMENT
    SHEETS FOR SITE SPECIFIC DETAILS.
3.  ADDITIONAL TEMPORARY WORK SPACE (ATWS) IS REQUIRED NEAR ROAD AND STREAM CROSSINGS, SIDE SLOPES, AND
    OTHER AREAS WITH UNIQUE CONSTRUCTION REQUIREMENTS.  (SEE ALIGNMENT SHEETS FOR ATWS)
4.  AT LOCATIONS WITH CULTIVATED LAND, TOPSOIL SEPARATION WILL BE COMPLETED FOR THE, TRENCH, SPOIL PILE, AND
    WORKING SIDE.  AT FORESTED AND NON–CULTIVATED AREAS TOPSOIL SEPARATION WILL BE COMPLETED FOR THE
    TRENCH AND SPOIL PILE.
5.  DRAWING IS NOT TO SCALE.

| REVISIONS | | | | | | PROPOSED 30" PIPELINE ABUTTING TVA EASEMENT TYPICAL CONSTRUCTION RIGHT–OF–WAY | | |
|---|---|---|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR | | | |
| | | | | | | **Tennessee Gas Pipeline Company, L.L.C.** a Kinder Morgan Company | | |
| | | | | | | DATE: 04/05/2022 | DRAWN BY: EPG | APPROVED BY: CDW |
| | | | | | | SCALE: N.T.S. | P2021–1119–STD–0001 | SH. 3 OF 3 |

TABLEROCK
SURVEY LLC
2204 TIMBERLOCH PL., STE. 180
THE WOODLANDS, TX 77380
OFFICE: 832–415–3869
TBPELS FIRM NO. 10194261

Page 58 of 65



TYPICAL ADDITIONAL TEMPORARY WORK SPACE AT CREEK CROSSINGS

NOTES:

1. THIS TYPICAL WORK SPACE LAYOUT WILL BE ADJUSTED TO ACCOMMODATE SITE-SPECIFIC CONDITIONS.

2. THE SIZE OF THE ADDITIONAL TEMPORARY WORKS SPACE (ATWS) WILL VARY WITH THE DEPTH OF THE CREEK, STEEPNESS OF THE SURROUNDING SLOPES, AND OTHER CONDITIONS.

Page 59 of 65

**App-0451**



PLAN VIEW

NOTES:

1. METHOD APPLIES TO WATERBODIES WHERE DOWNSTREAM SILTATION MUST BE AVOIDED. FLUMES ARE GENERALLY NOT RECOMMENDED FOR USE ON WATERBODIES WITH A BROAD UNCONFINED CHANNEL, PERMEABLE SUBSTRATE, EXCESSIVE DISCHARGE, OR WHERE A SIGNIFICANT AMOUNT OF BED OR BANK ALTERATION IS REQUIRED TO INSTALL FLUMES OR DAMS.

2. SCHEDULE CROSSING DURING LOW FLOW PERIOD IF POSSIBLE.

3. COMPLETE ALL WATERCOURSE ACTIVITIES AS EXPEDIENTLY AS POSSIBLE.

4. NO REFUELING OF MOBILE EQUIPMENT WITHIN 100 FEET OF WATERBODY. REFUEL STATIONARY EQUIPMENT AS PER THE SPCC PLAN.

5. INSTALL TEMPORARY EQUIPMENT CROSSING.

6. IN AGRICULTURAL LAND, STRIP TOPSOIL FROM SPOIL STORAGE AREA.

7. IN-STREAM SPOIL TO BE STORED ON BANKS A MINIMUM OF 10 FEET FROM THE TOP OF THE BANK.

8. LEAVE HARD PLUGS AT THE STREAM BANK EDGE UNTIL JUST PRIOR TO PIPE INSTALLATION.

9. SIZE FLUME TO HANDLE 150 % ANTICIPATED FLOWS. INSTALL FLUME IN WATERCOURSE AND MAINTAIN CORRECT ALIGNMENT UNTIL REMOVED.

10. CONSTRUCT UPSTREAM DAM FOLLOWED BY DOWNSTREAM DAM. INSTALL A FLANGE ON UPSTREAM END OF FLUME AND SEAL TO SUBSTRATE WITH SANDBAGS AND POLYETHYLENE LINER WHERE NECESSARY TO ENSURE A WATERTIGHT BARRIER. "KEY" DAMS INTO BANKS OR CONSTRUCT SECONDARY DAM, IF NECESSARY.

11. PUMP STREAM CHANNEL BETWEEN DAMS, IF NECESSARY. DISCHARGE WATER THROUGH A DEWATERING STRUCTURE AND ONTO A STABLE WELL VEGETATED AREA TO PREVENT EROSION AND SEDIMENTATION. NO HEAVILY SILT-LADEN WATER MAY BE DISCHARGED IN THE STREAM.

12. CONSTRUCT SEDIMENT BARRIERS (STRAW BALES AND/OR SILT FENCE) TO PREVENT SILT LADEN WATER AND SPOIL FROM FLOWING BACK INTO WATERCOURSE. CONSTRUCTED SEDIMENT BARRIERS SHALL EXTEND ALONG THE SIDES OF THE STOCKPILES AND THE ENDS OF DAMS. BARRIERS MAY BE TEMPORARILY REMOVED TO ALLOW CONSTRUCTION ACTIVITIES BUT MUST BE REPLACED BY THE END OF EACH WORK DAY.

13. COMPLETE PREFABRICATION OF IN-STREAM PIPE SECTION AND WEIGHT PIPE AS NECESSARY PRIOR TO COMMENCEMENT OF IN-STREAM ACTIVITY.

14. TRENCH THROUGH WATERCOURSE. INSTALL TEMPORARY (SOFT) PLUGS, IF NECESSARY, TO CONTROL WATER FLOW AND TRENCH SLOUGHING.

15. MAINTAIN STREAM FLOW, IF PRESENT, THROUGH FLUME THROUGHOUT CROSSING CONSTRUCTION.

16. LOWER-IN PIPE, INSTALL TRENCH PLUG AND BACKFILL IMMEDIATELY.

17. BACKFILL WITH NATIVE MATERIAL.

18. RESTORE WATERCOURSE CHANNEL TO APPROXIMATE PRE-CONSTRUCTION PROFILE AND SUBSTRATE.

19. RESTORE STREAM BANKS TO APPROXIMATE ORIGINAL CONDITION AND STABILIZE, AS REQUIRED.

DRAWING DEPICTED IS SUPERSEDED BY WRITTEN STANDARD, SCOPE OF WORK OR LINE LIST.

| REVISIONS | | | | | |
|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR |
| 1 | 07/08/04 | ISSUED FOR REVIEW | RB | CM | |
| 2 | 07/13/04 | REVISED PER CLIENT COMMENT | RB | CM | |
| 3 | 07/01/05 | DWG REWRITE RELEASE | WS | | |

**KINDER MORGAN**

WATERBODY CROSSING
OPEN CUT DRY FLUME

DATE: 07/01/05

APPROVED BY:

SCALE: N.T.S.    CST-P-1150-A375    SH. 1 OF 1

AR000766

**App-0452**



PLAN VIEW

NOTES:

1. THIS METHOD APPLIES TO WATERBODIES WITH LIMITED FLOW AT TIME OF CONSTRUCTION WHERE DOWNSTREAM SILTATION MUST BE AVOIDED AND THE CROSSING WIDTH IS NOT PROHIBITIVE.

2. SCHEDULE CROSSING DURING LOW FLOW PERIOD IF POSSIBLE.

3. COMPLETE ALL IN-STREAM ACTIVITIES AS EXPEDIENTLY AS POSSIBLE.

4. NO REFUELING OF MOBILE EQUIPMENT WITHIN 100 FEET OF WATERBODY. REFUEL STATIONARY EQUIPMENT AS PER THE SPCC PLAN.

5. INSTALL TEMPORARY EQUIPMENT CROSSING, IF REQUIRED.

6. IN AGRICULTURAL LAND, STRIP TOPSOIL FROM SPOIL STORAGE AREA.

7. CONSTRUCT SEDIMENT BARRIERS TO PREVENT SILT LADEN WATER AND SPOIL FROM FLOWING INTO WATERBODY. CONSTRUCTED SEDIMENT BARRIERS SHALL EXTEND ALONG THE SIDES OF THE SPOIL AND TOPSOIL STOCKPILES AND ACROSS THE ENTIRE CONSTRUCTION R.O.W. BARRIERS MAY BE TEMPORARILY REMOVED TO ALLOW CONSTRUCTION ACTIVITIES BUT MUST BE REPLACED BY THE END OF EACH WORK DAY.

8. CONSTRUCT UPSTREAM STRUCTURE (DAM) FOLLOWED BY DOWNSTREAM STRUCTURE (DAM). WATER STRUCTURES' (AQUA DAM, JERSEY BARRIERS, SAND BAGS, STEEL PLATE, POLYETHYLENE LINER, ETC.) FINAL LOCATION WILL BE APPROVED BY THE ENVIRONMENTAL INSPECTOR.

9. SIZE PUMPS FOR DIVERSION OF ENTIRE STREAM FLOW. CONTRACTOR SHALL MAINTAIN 100% SPARE PUMPING CAPACITY ON SITE. PUMPS SHALL BE INSTALLED ON POLYETHYLENE BARRIERS FOR FUEL/OIL SPILL CONTAINMENT. PUMP INTAKES WILL BE SCREENED TO PREVENT ENTRAPMENT OF FISH. CONTRACTOR SHALL MONITOR PUMPS AND WATER STRUCTURES ON A 24 HOUR BASIS UNTIL THE CROSSING INSTALLATION IS COMPLETE. SHOULD LEAKAGE AT THE DAM STRUCTURES OCCUR, CONTRACTOR SHALL DEWATER BETWEEN THE STRUCTURES THROUGH AN APPROPRIATE FILTER AND ONTO A WELL VEGETATED UPLAND AREA. NO HEAVILY SILT-LADEN WATER SHALL BE DISCHARGED INTO THE STREAM.

10. LEAVE HARD PLUGS AT STREAM BANK EDGE UNTIL JUST PRIOR TO PIPE INSTALLATION.

11. COMPLETE CONSTRUCTION OF IN-STREAM PIPE SECTION. WEIGHT PIPE AS NECESSARY PRIOR TO COMMENCEMENT OF IN-STREAM ACTIVITY.

12. TRENCH THROUGH WATERBODY AS EXPEDIENTLY AS PRACTICAL. INSTALL TEMPORARY (SOFT) PLUGS, IF NECESSARY, TO CONTROL WATER FLOW AND TRENCH SLOUGHING.

13. MAINTAIN STREAM FLOW THROUGHOUT CROSSING CONSTRUCTION.

14. LOWER-IN PIPE, INSTALL TRENCH PLUG AND BACKFILL IMMEDIATELY.

15. BACKFILL WITH NATIVE MATERIAL.

16. RESTORE WATERBODY CHANNEL TO APPROXIMATE PRE-CONSTRUCTION PROFILE AND SUBSTRATE.

17. DISMANTLE DOWNSTREAM WATER STRUCTURE (DAM) AND UPSTREAM WATER STRUCTURE (DAM) AFTER TRENCH BACKFILL.

18. RESTORE STREAM BANKS TO APPROXIMATE ORIGINAL CONDITION AND STABILIZE, AS REQUIRED.

DRAWING DEPICTED IS SUPERSEDED BY WRITTEN STANDARD, SCOPE OF WORK OR LINE LIST.

| REVISIONS | | | | | |
|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR. |
| 1 | 07/08/04 | ISSUED FOR REVIEW | RB | CM | |
| 2 | 07/13/04 | REVISED PER CLIENT COMMENT | RB | CM | |
| 3 | 07/01/05 | DWG REWRITE RELEASE | WS | | |

**KINDER MORGAN**

WATERBODY CROSSING
OPEN CUT DAM & PUMP

| DATE: | 07/01/05 | | APPROVED BY: |
|---|---|---|---|
| SCALE: N.T.S. | | CST-P-1150-A370 | SH. 1 OF 1 |

Page 61 of 65

**App-0453**



PLAN

PROFILE

NOTES:

1. SET UP DRILLING EQUIPMENT A MINIMUM OF 100 FEET FROM THE EDGE OF THE WATERCOURSE. DO NOT CLEAR OR GRADE WITHIN THE 100 FOOT ZONE.

2. ENSURE THAT ONLY BENTONITE BASED DRILLING MUD IS USED. DO NOT ALLOW THE USE OF ANY ADDITIVES TO THE DRILLING MUD WITHOUT THE APPROVAL OF COMPANY'S INSPECTOR.

3. INSTALL SUITABLE DRILLING MUD TANKS OR SUMPS TO PREVENT CONTAMINATION OF WATERCOURSE.

4. INSTALL BERMS DOWNSLOPE FROM THE DRILL ENTRY AND ANTICIPATED EXIT POINTS TO CONTAIN ANY RELEASE OF DRILLING MUD.

5. DISPOSE OF DRILLING MUD IN ACCORDANCE WITH THE APPROPRIATE REGULATORY AUTHORITY REQUIREMENTS.

DRAWING DEPICTED IS SUPERSEDED BY WRITTEN STANDARD, SCOPE OF WORK OR LINE LIST.

| REVISIONS | | | | | |
|---|---|---|---|---|---|
| NO. | DATE | DESCRIPTION | BY | CHKD | APPR |
| 1 | 07/06/04 | ISSUED FOR REVIEW | RB | CM | |
| 2 | 07/13/04 | REVISED PER CLIENT COMMENT | RB | CM | |
| 3 | 07/01/05 | DWG REWRITE RELEASE | WS | | |

**KINDER MORGAN**

WATERBODY CROSSING
HORIZONTAL DIRECTIONAL DRILL

| DATE: | 07/01/05 | | APPROVED BY: |
|---|---|---|---|
| SCALE: N.T.S. | | CST-P-1160-A365 | SH. 1 OF 1 |

Page 62 of 65

**App-0454**



### TYPICAL PROFILE

### PLAN VIEW

Page 63 of 65



Page 64 of 65

**App-0456**

**Site maps**

Note: Photos of each waterbody crossing are available in the document entitled "Attachment 3 – Project Design Plans and Permit Drawings" submitted with the initial permit application package to the Division on July 22, 2022 and in the document entitled "March and April 2023 Field Photolog Request" dated October 18, 2023 for the additional aquatic features authorized by this permit modification.



Above: water withdrawal locations.

**App-0457**

**SOUTHERN
ENVIRONMENTAL
LAW
CENTER**

48 Patton Avenue, Suite 304
Asheville, NC 28801

Telephone 828-258-2023
Facsimile 828-258-2024

February 22, 2024

Tim Wilder, West Branch Chief
Nashville District
U.S. Army Corps of Engineers
Regulatory Branch
3701 Bell Road
Nashville, TN 37214
Timothy.C.Wilder@usace.army.mil

Re: Incomplete Section 401 Certification for Proposed Cumberland Pipeline Project (File No. LRN-2021-00866)

Dear Mr. Wilder:

On behalf of Sierra Club, Appalachian Voices, Southern Environmental Law Center, and Appalachian Mountain Advocates, we write to you to remind you that Tennessee Gas Pipeline Company ("TGPC") lacks Section 401 Certification for all of the activities it proposes to conduct under the individual Section 404 permit it seeks from the United States Army Corps of Engineers ("Corps") (File No. LRN-2021-00866). As explained below, because TGPC lacks Section 401 Certification for all of the proposed discharges and activities (including stream crossings) for which it seeks Corps authorization, the Corps cannot issue a Section 404 permit in response to TGPC's application. 33 C.F.R. §325.2(b)(ii).

As you are aware, TGPC's application for the Section 404 permit it seeks (as well as its original Section 401 Certification application to the Tennessee Department of Environment and Conservation ("TDEC")) were incomplete because, *inter alia*, they did not include all of the stream crossings that construction of the pipeline would require.[1] In an effort to rectify some of the deficiencies in its applications, on March 17, 2023, TGPC submitted desktop assessments of additional stream crossings for which it was unable to obtain survey access.[2]

---

[1] *See* Letter from Timothy Wilder, U.S. Army Corps of Eng'rs, to Gina Dorsey, Kinder Morgan, Inc., Re: File No. LRN-2021-00866, Request for Additional Information for the Proposed Tennessee Gas Pipeline, Natural Gas Line (Mar. 20, 2023).

[2] *See* Letter from Mike Letson, Tenn. Gas Pipeline Co., LLC, to Amy Priest, U.S. Army Corps of Eng'rs, Re: USACE Request for Additional Information (Mar. 17, 2023); Letter from Blake Amos, Tenn. Gas Pipeline Co., L.L.C., to Claire Wainright, PhD, Tenn. Dep't of Env't & Conservation, Re: Request for Additional Information Response (Mar. 17, 2023).

On July 21, 2023, TDEC issued an Aquatic Resource Alteration Permit (NRS 22.192) and Section 401 Water Quality Certification to TGPC for its proposed Cumberland Pipeline Project.[3] That 401 Certification recognized the absence of field surveys for a portion of the proposed pipeline's route, and included Special Conditions requiring the applicant to submit an application for a modified permit, and prohibiting stream or wetlands impacts until a modified permit is issued.

On August 24, 2023, TGPC provided TDEC with notice that it had completed field surveys of the previously unsurveyed areas, and requested "a modified ARAP covering all proposed impacts to aquatic resources for the entire Project."[4] That letter identified multiple new crossings of perennial and ephemeral streams that had not been part of TGPC's previous applications to either the Corps or to TDEC. It is our understanding from TGPC's FERC filings that, on or about August 24, 2023, TGPC provided the same information to your office.[5]

The multiple new crossings identified in TGPC's August 24, 2023 filings were not reviewed as part of the Section 401 Certification evaluation that led to TDEC's July 21, 2023 ARAP/Section 401 Certification. Accordingly, TGPC does not possess a Section 401 Certification for those newly identified discharges.

On January 30, 2024, TDEC released a public notice seeking public comment on a proposed action on the newly identified discharges. In that *draft* document, TDEC—inexplicably and surprisingly—states, "[t]o the extent that Tennessee's 401 Water Quality Certification for the additional impacts has not already been waived, Tennessee hereby waives such authority."[6] TDEC provided no citation to authority for its peculiar assertion of waiver, and no argument or

---

[3] That permit and Section 401 certification are the subject of a petition for judicial review pending the United States Court of Appeals for the Sixth Circuit. *Sierra Club et al. v. Tenn. Dep't of Env't & Conservation et al.*, No. 23-3682 (6th Cir.).

[4] Letter from Mike Letson, Tenn. Gas Pipeline Co., LLC, to Claire Wainright, PhD, Tenn. Dep't of Env't and Conservation, RE: Field Completion Data Update Notification and Revised ARAP Request (Aug. 24, 2023), available at https://dataviewers.tdec.tn.gov/dataviewers/apex_util.count_click?p_url=BGWPC.GET_WPC_D OCUMENTS?p_file=75369368146940431&p_cat=DOCS&p_id=75369368146940431&p_user =GUEST&p_workspace=19833722515258996.

[5] TGPC, Updated and Revised TABLE 1.9-1: Permits, Approvals, Certifications, Consultations, and Notifications Anticipated for Construction and Operation of the Cumberland Project (January 2024 Update), FERC Accession No. 20240216-5076, available at https://elibrary.ferc.gov/eLibrary/filedownload?fileid=416C6F1E-C6FE-C29F-9EDF-8DB2A6900000.

[6] TDEC, DRAFT Aquatic Resource Alteration Permit NRS 22.192 Modification at 32 (Jan. 30, 2024), available at https://dataviewers.tdec.tn.gov/dataviewers/apex_util.count_click?p_url=BGWPC.GET_WPC_D OCUMENTS?p_file=478170713442846353&p_cat=DOCS&p_id=478170713442846353&p_us er=GUEST&p_workspace=19833722515258996.

other rationale explaining how its contemplated waiver is permissible under the applicable law and regulations.

At the threshold, the extent to which Tennessee's 401 authority over the additional impacts had been involuntarily waived is and was **nil**, because the application for certification of those impacts was not submitted until August 24, 2023, at the earliest.

Moreover, because it remains a draft of a proposed agency action, TDEC's January 30, 2024 draft document cannot constitute an express waiver of its Section 401 certification authority over the additional impacts.[7] The 2023 Section 401 Regulations expressly provide that an express waiver of Section 401 authority by a State "should include [*inter alia*] … [a]n indication that the certifying authority complied with its public notice procedures established pursuant to Clean Water Act section 401(a)(1)." 40 C.F.R. § 121.7(f). TDEC appears to be attempting to comply at least with the procedural element of the Section 401 regulations by subjecting its contemplated waiver to public notice and comment. The Corps must not short-circuit those procedures by treating TDEC's purported waiver as to the newly identified discharges as effective unless and until TDEC finalizes an action on TGCP's application related to those discharges that fully complies with Section 401 of the Clean Water Act, the federal implementing regulations, and Tennessee law governing Section 401 certification decisions.

As you aware, the Corps' regulations provide that no Section 404 permit can be granted until Section 401 certification has been obtained or waived. 33 C.F.R. §325.2(b)(ii). Accordingly, even if it were otherwise lawful and/or appropriate, the Corps cannot grant TGPC's requested Section 404 permit for the reasons explained above.

Moreover, you should also be aware that, if Tennessee ultimately were to lawfully waive its Section 401 certification authority as to the newly identified discharges, the Corps will lose any argument that it does not have to consider the water quality implications of the newly identified discharges. Even if the Corps were able to rely on the provision of its public interest regulations in 33 C.F.R. §320.4(d) to duck its Section 404(b)(1) Guideline obligations (it cannot), by its own terms Section 320.4(d) only applies where there is a Section 401 certification. Here, if Tennessee finalizes a lawful express waiver of its Section 401 Certification authority regarding the newly identified discharges, then the Corps will have no argument that the conclusive presumption in Section 320.4(d) would allow it to avoid consideration of water quality impacts of the newly identified discharges.

In other words, the consequence of an express waiver by Tennessee of its Section 401 certification authority over the newly identified discharges is that the Corps will indisputably bear responsibility for evaluating—on a disposal-site–by–disposal-site basis—the water quality impacts of those proposed discharges and for making the site-specific findings and determinations required by the Section 404(b)(1) Guidelines.

---

[7] This would apply with equal force to any correspondence that TDEC has submitted to the Corps indicating its intent to waive its Section 401 Certification authority as to these additional impacts.

**App-0460**

In short, because TGPC lacks Section 401 Certification for all of the proposed discharges and activities associated with its proposed Cumberland Pipeline Project, the Corps cannot lawfully issue the Section 404 permit that TGPC seeks. Accordingly, we respectfully request that the Corps respond to this letter and confirm its commitment not to issue a Section 404 permit to TGPC for the Cumberland Pipeline Project in the absence of a final action by Tennessee on the newly identified crossings and/or discharges.

If you have any questions about this matter, please do not hesitate to contact us.

Sincerely,

s/James S. Whitlock
James Whitlock
Senior Attorney
Southern Environmental Law Center
jwhitlock@selcnc.org

s/Derek Teaney
Derek Teaney
Deputy Director
Appalachian Mountain Advocates
dteaney@appalmad.org

cc:    Kathryn Morris (via email)
       Assistant District Counsel
       Kathryn.G.Morris@usace.army.mil

**App-0461**

Tennessee Gas Pipeline Company, L.L.C.
Cumberland Project
USACE Project No. LRN-2021-00866
Public Notices 23-02 and 23-13
Response to USACE's July 18, 2023 Request for Additional Information

USACE: ITEMS REQUESTED BY THIS OFFICE THAT NEED TO BE RESOLVED IN ORDER TO CONTINUE PERMIT EVALUATION OF THIS PROPOSAL INCLUDE THE FOLLOWING:

1.  404(b)(1) Guidelines and "Least Environmentally Damaging Practicable Alternative (LEDPA)/Alternatives Analysis: The proposed impacts to waters of the U.S. must meet the 404(b)(1) guidelines of the Clean Water Act. The following detailed information will be needed to assist us in fully evaluating the project:

    a. Avoidance: Provide discussion of alternative routes considered and justification of why they were not selected or would have resulted in more impacts than the proposal, including utilizing existing pipelines and/or natural gas pipeline right-of-ways (ROW).

    b. Minimization: The proposal must be shown to be the least environmentally damaging practicable alternative (LEDPA) that meets the basic project purpose. Please identify all criteria and weighting factors used to evaluate and rate alternatives, discuss why each alternative was not found to be a practicable alternative, and/or the least environmentally damaging alternative. Minimization includes alternate site plans, construction methods, and other steps which would reduce impacts to waters of the U.S. Methods of crossing other waterways that do not involve a discharge of fill material such as by horizontal directional drill (HDD), microtunneling, conventional boring or directional microtunneling need to be evaluated. Alternative construction methods are especially important within special aquatic sites like riffle and pool complexes, wetlands, and sites of karst terrain.

    c. Compensatory Mitigation: Once the project is determined to be the least environmentally-damaging, practicable alternative, please provide an appropriate compensatory mitigation plan that will offset the proposed impacts in accordance with 33 CFR 332. Any proposed compensatory mitigation plan should follow the mitigation hierarchy presented in §332.3(b)(2)-(6). Mitigation should be considered to offset any temporal losses especially throughout the wetland areas. As requested by EPA, compensatory mitigation should be planned for if post-construction monitoring indicates a loss of aquatic functions.

**Response:**

a. Avoidance

*No-Action Alternative*

Under the No-Action Alternative, the Project facilities would not be constructed. The No-Action Alternative would avoid the temporary/short-term and permanent/long-term environmental impacts associated with construction of the proposed Project.

Tennessee Gas Pipeline Company, L.L.C.
Cumberland Project
USACE Project No. LRN-2021-00866
Public Notices 23-02 and 23-13
Response to USACE's July 18, 2023 Request for Additional Information

Under the No-Action Alternative, Tennessee Gas Pipeline Company, L.L.C. ("TGP") would not be able to meet the Project shipper's (Tennessee Valley Authority ("TVA")) stated need to provide up to approximately 245,040 Dth/d of firm transportation capacity to serve what was identified as Alternative A in TVA's Notice of Intent ("NOI") issued in May 2021. Subsequent to TGP's submittal of the IP application to the U.S. Army Corps of Engineers ("USACE"), TVA, on January 10, 2023, decided to implement the Preferred Alternative identified in its "Cumberland Fossil Plant Retirement Final Environmental Impact Statement", issued December 2022.[1] TVA's preferred alternative, Alternative A, involves the retirement and demolition of TVA's two-unit, coal-fired Cumberland Fossil Plant ("CUF") and the construction and operation of a natural gas-fueled combined cycle plant on the CUF Reservation to replace the generation capacity of one of the two retired units and TGP's Project to serve the new natural gas-fueled combined cycle plant on the CUF Reservation. In a Notice published in the *Federal Register* on January 20, 2023, TVA determined that as the least-cost alternative, Alternative A would achieve the purpose and need of its project to retire and decommission the two CUF units, one unit by the end of 2026 and the other unit by the end of 2028, and to provide replacement generation that can supply 1,450 megawatts of firm, dispatchable power by the time the first unit is retired by the end of 2026.

TGP's Cumberland Project ("Project") would allow it to make the firm transportation capacity to be created by the Project available to TVA at the time the Project is placed in service, pursuant to the terms of the precedent agreement between TGP and TVA and TGP's Federal Energy Regulatory Commission ("FERC") Gas Tariff. Now that TVA has selected Alternative A for implementation, TGP needs to construct the Project facilities, which include approximately 32-miles of 30-inch diameter pipeline and related appurtenant facilities to meet TVA's stated need at the Cumberland Facility. Since the No-Action Alternative would not satisfy TVA's stated need for incremental gas transportation capacity, it is likely that another project would need to be built utilizing another pipeline or pipelines to serve TVA's need, which TGP anticipates would have equal or greater environmental impacts and likely would be more costly than TGP's proposed Project. TGP does not have existing pipeline facilities with a direct connection to TVA's requested delivery point to meet the Project purpose and need.

For these reasons, the No-Action Alternative was considered but was rejected from further consideration because it did not meet the purpose and need for the Project. If the no action alternative were selected, another project would be proposed and built by another supplier to serve TVA's need for additional firm transportation capacity to serve TVA's selected Alternative A. As discussed below, new pipelines and related appurtenant facilities would be required to meet the Project's purpose and need if a system alternative or other pipeline alternative was selected.

*System Alternatives*

In developing the Project, TGP evaluated alternative project site criteria described in the USACE's *Guidelines for Preparation of Analysis of Section 404 Permit Applications Pursuant to the Section 404(B)(1) Guidelines of the Clean Water Act* (40 CFR, Section 231) and system alternatives as

---

[1]     Notice, Tennessee Valley Authority, Record of Decision, 88 Fed. Reg. 3767 (Jan. 20, 2023).

Tennessee Gas Pipeline Company, L.L.C.
Cumberland Project
USACE Project No. LRN-2021-00866
Public Notices 23-02 and 23-13
Response to USACE's July 18, 2023 Request for Additional Information

defined FERC's *Guidance Manual for Environmental Report Preparation* (FERC 2017. System alternatives are alternatives to a proposed project that would use a different (and often existing) natural gas facility/pipeline system or a different configuration of facilities that would eliminate the need to construct all or part of the Project. System alternatives involve the transportation of the equivalent amount of additional natural gas volumes by the expansion of existing facility/pipeline systems or by the construction and operation of other new facility/pipeline systems. A viable system alternative would make it unnecessary to construct all or part of the proposed Project and would involve the transportation of all or a portion of the additional natural gas volumes by expansion of another existing or construction of a new facility/pipeline system. The FERC Guidance Manual requires that system alternatives be analysed for large pipeline projects and for projects where there are significant concerns about the disturbance of specific resources.

The objective for identifying and evaluating system alternatives is to determine whether the potential environmental impact associated with the construction and operation of the proposed Project could be avoided or minimized by using an existing pipeline system. Environmental considerations with system alternatives include, but are not limited to, new right-of-way ("ROW") requirements, land use effects, and stream and wetland disturbances. A system alternative could make it unnecessary to construct TGP's Project, although modifications or additions to its system or another system may be required. Although modifications or additions to existing systems could result in environmental impact, this impact may be less, the same, or more than the impact associated with the proposed Project.

Although system alternatives that will result in less environmental impacts might be preferable to the proposed Project, only those alternatives that are reasonable, consistent with existing law, and consistent with the purpose and need of the Project are required to be considered for National Environmental Policy Act ("NEPA") purposes and determination of the LEDPA. Consequently, a viable system alternative must be technically and economically feasible and practicable to satisfy the Project's purpose.

The primary consideration in developing the preferred alternative for the Project was the co-location of the pipeline along an existing TVA powerline easement. A significant portion of the preferred pipeline route lies directly adjacent to a previously disturbed power line corridor. Utilizing this corridor to the greatest extent possible allows for the minimization of potential impacts and footprint of the pipeline ROW, and therefore was a primary consideration in the evaluation of system alternatives, as discussed below.

TGP evaluated alternatives to the proposed Project facilities on its existing natural gas pipeline system to meet the Project's purpose and need, as identified above. These evaluations include alternatives to the proposed approximately 32-mile, 30-inch diameter pipeline as shown in **Attachment 1** to this response. The system alternatives considered are discussed below and a comparative analysis of the proposed Project and the identified system alternatives is provided in **Table 1** below.

3

Tennessee Gas Pipeline Company, L.L.C.
Cumberland Project
USACE Project No. LRN-2021-00866
Public Notices 23-02 and 23-13
Response to USACE's July 18, 2023 Request for Additional Information

*System Alternative 1: 24-Inch-Diameter Pipeline and Booster Compression Station*

As an alternative to the proposed Project, TGP considered installing an approximately 31.97 mile, 24-inch-diameter pipeline in the same ROW as the proposed pipeline route. In addition, this alternative would require installation of a new booster compressor station located approximately 7.58 miles west of TGP's mainline pipeline system (see **Attachment 1**) due to the additional pressure drop associated with the smaller diameter pipeline to deliver gas to TVA's new Cumberland Plant at the required delivery pressure (the pipeline and booster compressor station are collectively referred to as "System Alternative 1").

The booster compressor station would consist of one approximately 4,000 horsepower Electric Motor Driven Compressor ("EMDC") as the primary unit. A secondary, back-up Solar Centaur 40 turbine-driven centrifugal compressor unit rated at 4,700 ISO ("International Organization for Standardization") horsepower would also be installed to provide fuel gas for the proposed Cumberland Plant when the electric power grid supplying the EMDC is not available. The compressor station would require approximately 10 acres for operations, with an additional 40 acres for construction and would produce Scope 1 (gas combustion) and Scope 2 (electric power generation) associated air emissions. The total cost of this alternative is estimated to be approximately $203 million.

Construction impacts related to the pipeline construction for this alternative would be identical to the proposed Project. However, due to the need for additional compression, System Alternative 1 would result in temporary impacts to an additional 50 acres and permanent impacts to an additional 10 acres of land. In addition, the compressor station would generate emissions which would not occur with the proposed Project. In addition, due to the additional need for compression, this alternative would cost more than the proposed Project and would take longer to construct, potentially impacting the Project's proposed schedule. For these reasons, System Alternative 1 was eliminated from further consideration.

*System Alternative 2 – 30-Inch-Diameter Pipeline Lateral and Booster Compression Station Commencing at Portland Compressor Station 87*

As an alternative to the proposed Project, TGP also considered installing an approximately 65-mile, 30-inch-diameter pipeline commencing at its Portland Compressor Station 87 and a new booster compressor station to be located on TGP-owned property where existing Compressor Station 87 is located (see Attachment 1) due to the additional pressure drop associated with the longer pipeline in order to deliver gas to TVA's new Cumberland Plant at the required delivery pressure (the pipeline and the booster compressor station are collectively referred to as "System Alternative 2").

The new booster compressor station would consist of one approximately 6,800 horsepower EMDC as the primary unit. A secondary, back-up Solar Taurus 60 turbine-driven centrifugal compressor unit rated at 7,700 ISO horsepower would also be installed to provide fuel gas for the proposed Cumberland Plant when the electric power grid supplying the EMDC is not available. The booster compressor station would not require any additional land for operation or construction but would

produce Scope 1 (gas combustion) and Scope 2 (electric power generation) associated air emissions. The total cost of this alternative is estimated to be approximately $418 million.

Construction and permanent impacts related to the additional length of pipeline required for this alternative would be greater than the proposed Project. The route for the pipeline required by this alternative would also not take advantage of as many existing utility corridors for co-location as the proposed pipeline, resulting in a greater impact to more native habitats and species. Construction of this alternative would result in impacts to a greater area of forested and shrub-scrub wetlands and would cross more waterbodies than the proposed Project. The route for System Alternative 2 crosses the Barkley Recreation Area, a federally owned property. Due to the need for additional compression, System Alternative 2 would also result in emissions which would not occur with the proposed Project. In addition, due to the additional pipeline length, larger number of waterbody crossings, crossing of federal property, and the need for compression, this alternative would cost more than the proposed Project and would take longer to construct, potentially impacting the Project's proposed schedule. For these reasons, System Alternative 2 was eliminated from further consideration.

### *System Alternative 3 – 24-Inch-Diameter Pipeline and Booster Compressor Station Commencing at Mainline Valve 83*

TGP also considered installing an approximately 41.6- mile, 24-inch diameter pipeline commencing from a point on the TGP mainline pipeline system approximately 16.5 miles north of mainline valve 83 to the proposed Cumberland Meter Station location, as an alternative to the proposed Project. In addition, this alternative would require installation of a new booster compressor station located approximately 7.1 miles west of TGP's mainline pipeline system (see **Attachment 1**) due to the additional pressure drop associated with the longer and smaller diameter pipeline in order to deliver gas to the new TVA Cumberland Plant at the required delivery pressure (the pipeline lateral and the booster compressor station are collectively referred to as "System Alternative 3").

The booster compressor station would consist of one approximately 4,000 horsepower EMDC as the primary unit. A secondary, back-up Solar Centaur 40 turbine driven centrifugal compressor unit rated at 4,700 ISO horsepower would also be installed to provide fuel gas for the new TVA Cumberland Plant when the electric power grid supplying the EMDC is not available. The booster compressor station would require 10 acres for operations, with an additional 40 acres for construction and would have produced Scope 1 (gas combustion) and Scope 2 (electric power generation) associated air emissions. The total estimated cost of this alternative is estimated at approximately $240 million.

Construction and permanent impacts related to the additional length of pipeline required for this alternative would be greater than the proposed Project. The route for the pipeline required for this alternative would also not be able to take advantage of as many existing utility corridors for co-location as the proposed pipeline, resulting in a greater impact to more native habitats and species. Construction of this alternative would result in impacts to a greater area of forested and shrub-scrub wetlands and would cross more waterbodies than the proposed Project. The route for System

Tennessee Gas Pipeline Company, L.L.C.
Cumberland Project
USACE Project No. LRN-2021-00866
Public Notices 23-02 and 23-13
Response to USACE's July 18, 2023 Request for Additional Information

Alternative 3 crosses the Barkley Recreation Area, a federally owned property, and Shady Park Public Hunting Area, a state-owned property. Due to the need for additional compression, System Alternative 3 would result in temporary impacts to an additional 50 acres and permanent impacts to an additional 10 acres of land. In addition, the compressor station that would be required for this alternative would generate emissions which would not occur with the proposed Project. In addition, due to the additional pipeline length, larger number of waterbody crossings, crossing of federal and state property, and the need for compression, this alternative would cost more than the proposed Project and would take longer to construct, potentially impacting the Project's proposed schedule. For these reasons, System Alternative 3 was eliminated from further consideration.

**TABLE 1**
**Comparison of System Alternatives**

| Characteristics or Resource | Unit | Proposed Project[4] | Alternative 1 | Alternative 2 | Alternative 3 |
|---|---|---|---|---|---|
| **Pipeline and Compression Facilities** | | | | | |
| New 24-inch Lateral | miles | - | 31.97 | - | 41.6 |
| New 30-inch Lateral | miles | 31.97 | - | 65.0 | - |
| New Compression | hp | - | 4,000 | 6,800 | 4,000 |
| Estimated Cost | $(M) | $162 | $203 | $418 | $240 |
| New Compression Site Construction | (acres) | - | 50 | - | 50 |
| New Compression Site Permanent | (acres) | - | 10 | - | 10 |
| **Environmental Factors** | | | | | |
| Construction right-of-way [1] | (acres) | 381.83 | 431.83 | 847.12 | 555.01 |
| Permanent right-of-way [2] | (acres) | 190.88 | 200.88 | 423.55 | 257.47 |
| Length adjacent to existing right-of-way or corridor | (percent) | 83.23 | 83.23 | 22.65 | 6.42 |
| Total wetlands affected [3] | (acres) | 2.83 | 2.83 | 16.27 | 15.58 |
| Forested wetlands [3] | (acres) | 1.84 | 1.84 | 10.24 | 4.65 |
| Scrub-Shrub wetlands [3] | (acres) | 0.00 | 0.00 | 0.00 | 0.93 |
| Total perennial waterbodies crossed | (no.) | 28 | 28 | 53 | 31 |
| Major waterbody crossings (>100 feet) | (no.) | 1 | 1 | 2 | 4 |
| Natural and scenic rivers | (no.) | 0 | 0 | 0 | 0 |
| Endangered or threatened species habitat | (no.) | 0 | 0 | 0 | 0 |
| Known archaeological sites (within 0.5 mile of route) | (no.) | 44 | 44 | 59 | 47 |
| Known historic structures (within 0.5 mile of route) | (no.) | 36 | 36 | 98 | 79 |
| Federal land crossed | (mi) | 0 | 0 | 0.17 | 0.26 |

Tennessee Gas Pipeline Company, L.L.C.
Cumberland Project
USACE Project No. LRN-2021-00866
Public Notices 23-02 and 23-13
Response to USACE's July 18, 2023 Request for Additional Information

| | | | | | |
|---|---|---|---|---|---|
| State land crossed | (mi) | 0 | 0 | 0 | 0.48 |
| Other recreation/designated land use areas[5] | (no.) | 2 | 2 | 3 | 2 |
| Length of crossing | (mi) | 0 | 0 | 0 | 0 |
| Existing residences within 50 feet of construction work area | (no.) | 7 | 5 | 12 | 3 |
| Scope 1 Emissions (5%) (a) | Mtpy | - | 557 | 1,096 | 527 |
| Scope 2 Emissions (95%) (b) | Mtpy | - | 4,598 | 10,364 | 4,354 |

[1] 100-foot-wide corridor for pipeline, includes compressor stations
[2] 50-foot-wide corridor for pipeline, includes compressor stations
[3] Calculated within the construction right-of-way
[4] Proposed Project calculations in this table are based on assumed construction and permanent corridors for comparative purposes. Actual construction impacts are calculated for other resource reports.
[5] Includes National River Inventory data (National Park Service. 2016).
(a) Scope 1 Emissions: The direct emissions from owned or controlled sources. This includes emissions from facilities, office buildings and company vehicles. (b) Scope 2 Emissions: The indirect greenhouse gas ("GHG") Emissions associated with the purchase of electricity, steam, heat, or cooling. Although scope 2 emissions do not physically occur at the facility where they are generated, they are accounted for in an organization's GHG inventory because they are a result of the organization's energy use. Source: The Greenhouse Gas Protocol: A Corporate Accounting and Reporting Standard (https://ghgprotocol.org/sites/default/files/standards/ghg-protocol-revised.pdf)

*Other Pipeline Company Alternatives*

TGP evaluated potential impacts associated with using other interstate natural gas pipelines in the vicinity of the Project to transport an equivalent volume of gas to meet the requirements of TVA, the Project shipper. The purpose and need of the Project is to provide approximately 245,040 Dth/d of firm natural gas transportation capacity to TVA's new combined cycle combustion turbine gas plant, which has been selected for implementation by TVA as its Preferred Alternative, as discussed above. To be considered a viable system alternative to the proposed Project, expansions or modifications of other natural gas pipelines would need to transport an equivalent volume of natural gas to a delivery point at TVA's new combined cycle combustion turbine gas plant as would the proposed Project, while resulting in fewer environmental impacts than anticipated from the proposed Project.

Based on a review of the Rextag Energy DataLink™ information, the closest interstate natural gas pipeline systems to the delivery point at the TVA's Combined Cycle Combustion Turbine Gas Plant, other than TGP's system, are operated by ANR Pipeline Company ("ANR") and East Tennessee Natural Gas, LLC. ("East Tennessee"). TGP evaluated publicly available information from the two pipelines' respective interactive bulletin boards regarding unsubscribed firm transportation capacity in the Project area on those two pipeline systems. Based on that evaluation of publicly available information, it appears that there is no firm transportation capacity available on East Tennessee's pipeline system to meet the Project need. While there may be a certain amount of unsubscribed capacity available on ANR's pipeline system within one segment of its pipeline in the area of the Project, it is unclear if that available capacity includes access to available gas supply or otherwise would meet the Project need. Further, based on the locations of these two

Tennessee Gas Pipeline Company, L.L.C.
Cumberland Project
USACE Project No. LRN-2021-00866
Public Notices 23-02 and 23-13
Response to USACE's July 18, 2023 Request for Additional Information

pipeline systems to the Project delivery point, new infrastructure, including new pipeline facilities, would be required to reach the Project delivery point. Also, due to the location of these two pipeline systems relative to the Project delivery point, the opportunity for co-location with existing utility easements appears to be minimal. Further information on the evaluation of these two pipeline systems is provided below.

*ANR Pipeline Company*

ANR's interstate natural gas pipeline system is located in western Tennessee (see **Attachment 1**). The system is located approximately 45 miles northwest of the Project's delivery point at TVA's new combined cycle combustion turbine gas plant. While TGP does not have access to specific information related to ANR's system, TGP used publicly available data and aerial photography to determine distances from ANR's existing mainline to the Project delivery point. TGP determined, using straight line distances, that a pipeline with a minimum length of 44.62 miles would need to be constructed between ANR's existing pipeline system and the delivery point located at TVA's proposed combined cycle combustion turbine gas plant. Given that a pipeline from ANR's pipeline system to the Project delivery point would be longer than the proposed Project pipeline, and based on an assumed shortest straight-line route between TVA's proposed combined cycle combustion turbine gas plant and ANR's existing pipeline, a pipeline required to connect to ANR's system would:

- Affect more private landowners due to the greater length than the proposed Project pipeline;

- Result in a larger area for construction and permanent ROW than the proposed Project pipeline;

- Impact a larger area of wetlands than the proposed Project pipeline (particularly due to the pipeline route being located along the Cumberland River);

- Cross more major waterbodies than the proposed Project pipeline;

- Cross federal and state property, including Cross Creeks National Wildlife Refuge, Stewart State Forest, and Lake Barkley Recreational Area, which are not impacted by the proposed Project pipeline;

- Limited options for co-location with existing utility easements as compared to the proposed Project pipeline;

- Result in increased costs associated with securing additional ROW easements as compared to the proposed Project pipeline; and

- Result in increased costs associated with approximately 10 miles of additional pipeline as compared to the proposed Project pipeline.

Tennessee Gas Pipeline Company, L.L.C.
Cumberland Project
USACE Project No. LRN-2021-00866
Public Notices 23-02 and 23-13
Response to USACE's July 18, 2023 Request for Additional Information

Based on this information, impacts to the environment, landowners, and communities from the use of ANR's pipeline system are anticipated to be greater than the impacts from the proposed Project.

*East Tennessee Natural Gas, LLC*

A second interstate natural gas pipeline system, East Tennessee, is located in western Tennessee (see **Attachment 1**). This system is located approximately 40 miles southeast of the Project's delivery point at TVA's proposed combined cycle combustion turbine gas plant. While TGP does not have access to specific information related to the East Tennessee system, TGP used publicly available data and aerial photography to determine distances from the East Tennessee existing mainline to the Project delivery point. TGP determined, using straight line distances, that a pipeline with a minimum length of 40.35 miles would need to be constructed between East Tennessee's existing pipeline system and the delivery point located at TVA's proposed combined cycle combustion turbine gas plant. Given that a pipeline from East Tennessee's system to the Project delivery point would be longer than the proposed Project pipeline, and based on an assumed shortest straight-line route between TVA's new Combined Cycle Combustion Turbine Gas Plant and East Tennessee's existing pipeline, a pipeline required to connect to East Tennessee's system would:

- Affect more private landowners due to the greater length than the proposed Project pipeline;

- Result in a larger area for construction and permanent ROW than the proposed Project pipeline;

- Impact a larger area of wetlands than the proposed Project pipeline;

- Cross more major waterbodies than the proposed Project pipeline;

- Cross the Duck River, which is identified habitat for the slabside pearlymussel and fluted kidneyshell, both candidate species that are not impacted by the proposed Project pipeline;

- Limited options for co-location with existing utility easements as compared to the proposed Project pipeline;

- Result in increased costs associated with securing additional ROW easements as compared to the proposed Project pipeline; and

- Result in increased costs associated with approximately 8 miles of additional pipeline as compared to the proposed Project pipeline.

Tennessee Gas Pipeline Company, L.L.C.
Cumberland Project
USACE Project No. LRN-2021-00866
Public Notices 23-02 and 23-13
Response to USACE's July 18, 2023 Request for Additional Information

Based on this information, impacts to the environment, landowners, and communities from the use of East Tennessee's pipeline system are anticipated to be greater than the impacts from the proposed Project.

b. Minimization

As discussed above, total avoidance of impacts to waters of the U.S. ("WOTUS") is not possible if the Project's purpose and need is to be achieved.   Based on the comparison of System Alternatives and Other Pipeline Company Alternatives, discussed above, TGP recommends that the proposed Project is the LEDPA.

With regards to System Alternatives, the proposed Project would affect less wetlands and waterbodies than Alternatives 2 and 3.  Although effects to wetlands and waterbodies (i.e., streams and ponds) are similar between the proposed Project and Alternative 1, Alternative 1 would also impact more land overall and results in air emissions due to the need for compression requiring the construction of a new compressor station.   For these reasons, the proposed Project was selected over the three system alternatives evaluated above.

The proposed Project would affect less area of wetlands and have less major waterbody crossings than the two other pipeline company alternatives evaluated.  For these reasons and the additional analysis set forth above, the proposed Project was selected over the other pipeline company alternatives.

TGP has designed the proposed Project pipeline route in a manner that avoids significant areas of residential development and to minimize environmental impacts. The minimization of impacts has been primarily accomplished by the proposal to co-locate a majority of the Project pipeline route (approximately 80 percent) the pipeline route either adjacent to an existing TGP pipeline (Line 100-3) right-of-way ("ROW") or adjacent to (within 200 feet ["ft"] of) an existing TVA electric transmission line ROW). Further, approximately 0.8 mile of the Project pipeline will be installed via three horizontal directional drills ("HDD"), further minimizing potential environmental impacts to waterbodies and wetlands, as well as other environmental resources.

TGP has also incorporated minor route variations for the proposed Project pipeline and evaluated the crossing methods for waterbodies to further minimize impacts to those waterbodies.

*Minor Route Variations*

As part of its effort to avoid and/or minimize impacts from the Project, TGP  made a number of minor route variations to the proposed Project pipeline route that was selected as its preferred alternative to accommodate construction limitations, to improve the alignment for features such as roads and stream crossings, and to eliminate and avoid natural features (including waterbodies) that would prove to be challenges not only during construction, but also during restoration activities following Project construction and operation of the Project pipeline, as well as to address landowner concerns.  Several of these route variations avoided or minimized crossings of wetlands or waterbodies, as described in Table 2.

**App-0471**

Tennessee Gas Pipeline Company, L.L.C.
Cumberland Project
USACE Project No. LRN-2021-00866
Public Notices 23-02 and 23-13
Response to USACE's July 18, 2023 Request for Additional Information

**TABLE 2**
**Cumberland Project Minor Route Variations**

| Mile Post | Variation Description | At Landowner Request |
|---|---|---|
| 8.5 | Improve crossing angle at two streams on tract 1.055 | |
| 12.5 | Avoid water feature | X |
| 16.5 | Avoid spring well and align the route for improved stream crossing and create a more perpendicular crossing for Little Bartons Creek | |
| 22.7 | Adjust stream crossing away from middle of the stream | |
| 26 | Improve crossing angle at Highway 13 and stream (encroaches on TVA) | |
| 30-32 | Address multiple HDD routing issues at Wells Creek | |

*Route Variation at MP 8.5*

The route variation located at approximate MP 8.5 (see **Attachment 1**) was made to avoid paralleling an unnamed tributary of Harris Branch. The original route paralleled the tributary for approximately 375 feet. The movement of the pipeline to the south by approximately 20 feet eliminates the paralleling of the tributary in the construction ROW. This variation results in a reduction in pipeline length of 0.01 mile as compared to the original pipeline route in this area.

*Route Variation at MP 12.5*

The route variation located at approximate MP 12.5 (see **Attachment 1**) was made to avoid a pond. The original route paralleled the powerline for approximately 660 feet. This variation results in an additional pipeline length of 38 feet as compared to the original pipeline route.

*Route Variation at MP 16.5*

The route variation located at approximate MP 16.5 (see **Attachment 1**) involved the realignment of the pipeline route from the north side to the south side of the TVA powerline easement to avoid a spring and to provide an improved perpendicular crossing of Little Bartons Creek. The routing of the pipeline on the south side of the TVA powerline easement maintains co-location with the TVA powerline easement and allows for a more perpendicular crossing of Little Bartons Creek than the original routing, thereby minimizing the length of potential stream-reach disturbance. In addition, the route variation provides for additional temporary workspace ("ATWS") between the creek and Little Bartons Creek Road than the original route. This additional ATWS will allow TGP to safely and efficiently conduct the road bore planned for Little Bartons Creek Road. This variation does not result in a change in pipeline length.

*Route Variation at MP 22.7*

Tennessee Gas Pipeline Company, L.L.C.
Cumberland Project
USACE Project No. LRN-2021-00866
Public Notices 23-02 and 23-13
Response to USACE's July 18, 2023 Request for Additional Information

The route variation located at approximate MP 22.7 (see **Attachment 1)** was made to accommodate a more perpendicular crossing of Highway 939 and to accommodate more perpendicular crossings for two unnamed tributaries of Yellow Creek. The original alignment placed the pipeline parallel to the TVA powerline easement and would have the pipeline crossing a stream at an angle, thus increasing the length of the stream crossing, and generally not conforming to crossing roads at a 90-degree angle. At the furthest point in the variation, the pipeline was moved approximately 175 feet away from the TVA powerline easement. Both the original route, as well as the route variation, are located within active agricultural areas; thus, there are no additional impacts to any sensitive features with this route variation. This variation does not result in a change in pipeline length.

*Route Variation at MP 26*

The route variation located at approximate MP 26 (see **Attachment 1**) addresses two items. First, the variation allows for a more perpendicular crossing of Highway 13 and provides more area between the crossing and TVA's powerline easement. Second, the variation allows for a more perpendicular crossing of Guices Creek. At the original crossing location of Guices Creek and Highway 13, which was parallel the south side of the TVA easement, TGP determined that there was insufficient workspace to cross both features at the same time. This would have resulted in a congested construction work area, leading to safety and constructability issues. The variation moved the pipeline to more agricultural land, which allows for more workspace for both the road and waterbody crossings and reduces about 120 feet of forested impacts on the east side of Highway 13. This variation does not result in a change in pipeline length.

*Route Variations at MPs 30-32*

Three minor route variations were evaluated between MP 30-32 where the pipeline needed to be routed away from the original pipeline route (paralleling the TVA powerline easement) to connect to the meter station location specified by TVA on its property. To accommodate multiple routing issues, including the preferred location of the HDD of Wells Creek, avoidance of known archaeological sites, and an adjustment to avoid a railroad bridge, the preferred route to the Cumberland Meter Station within the TVA Cumberland Fossil Plant Reservation Site was selected (see **Attachment 1**). The preferred route results in an increase of approximately 0.12 miles over alternative routes considered between MP 30 and MP 32.

*Waterbody Crossing Methods Considerations*

TGP evaluated multiple alternatives for crossing waterbodies encountered along the proposed Project pipeline route, including HDD and related methods (e.g., conventional boring, microtunneling, directional microtunneling), open wet cut trenching, and dry open cut trenching (with either flumed or dam-and-pump flow diversion to create a dry workspace for excavation and rock removal).

Tennessee Gas Pipeline Company, L.L.C.
Cumberland Project
USACE Project No. LRN-2021-00866
Public Notices 23-02 and 23-13
Response to USACE's July 18, 2023 Request for Additional Information

The open wet cut trenching method was discarded as an alternative crossing method because of expected adverse effects to water quality caused by turbidity and sedimentation in a flowing stream.

For the dry open cut trenching method alternative, five excavation and rock removal methods were considered:

- conventional excavation (with an excavator),
- ripping (with an excavator equipped with a ripping tooth, followed by conventional removal of ripped debris via excavation),
- hammering (followed by excavation),
- rock trencher, and
- controlled blasting (followed by excavation with a backhoe).

With the elimination of the wet open cut trenching method alternative as excessively detrimental to water quality, TGP determined that the remaining evaluated crossing methods would result in no more than temporary and *de minimis* (i.e., of a short duration or small magnitude) effects to water quality. However, practicability of the alternatives was found to vary according to the physical conditions at crossing locations. In evaluating the crossing methods to be used for the Project's 158 waterbody crossings, TGP applied the following criteria to evaluate practicability of alternatives and to ensure that the least invasive rock removal method will be implemented at each crossing location:(a) availability and capability to achieve the Project's purpose, (b) cost, (c) existing technology, (d) logistics, and (e) consideration of the specific information for each waterbody, including its dimensions, substrate materials, discharge (flow), geology, watershed position, and relation to regional groundwater base level.

A summary of various geologic, hydrologic, and watershed conditions at each waterbody crossing location was presented as Table 2.7-3: Waterbodies Crossings Hydrologic Risk Analysis in TGP's application. The information provided in this table was used to support TGP's selection of the most appropriate construction method at each of the waterbody crossing locations. The waterbodies that will be crossed by the Project pipeline share fundamental similarities as is typical of resources found in the Western Highland Rim Physiographic Province, where the Project is located. The Project's location is generally characterized by steeply-dissected topography, steep forested slopes, and highly-mobile surface materials, with an economic history of recurrent logging that has filled lower-elevation channels and valleys with alluvial materials. These characteristics result in stream similarities along the Project pipeline's route, including a grouping of small stream-order, high-to-moderate gradient along upper slopes, narrow incised valleys, and poorly-sorted bedload overlying bedrock substrate, as well as a grouping of broader, alluvium-dominated valleys with gentler gradients. These groupings of similar characteristic conditions along the Project pipeline route facilitated TGP's consideration of crossing alternatives for waterbodies with similar attributes.

As a result of its analysis of common waterbody characteristics that will be crossed by the Project pipeline, TGP focused its evaluation of waterbody crossing alternatives on two basic approaches suited to the crossing characteristics and with fewer environmental impacts than open wet

**App-0474**

Tennessee Gas Pipeline Company, L.L.C.
Cumberland Project
USACE Project No. LRN-2021-00866
Public Notices 23-02 and 23-13
Response to USACE's July 18, 2023 Request for Additional Information

crossings. The first approach is a suite of methods that, if successfully implemented, typically would not result in a discharge of fill materials into waterbodies, including HDD and related boring methods. These methods, although costly, are recommended at locations where they are logistically feasible (e.g., broader valleys in which equipment mobilization can be facilitated), and where alternative methods may impose increased risk of environmental harm. The second approach entails dry open trenching in which pipeline installation is accomplished via trenching, excavation, and pipeline installation under dry stream conditions.

To minimize potential adverse effects to water quality, TGP selected the HDD crossing method for those locations where that method can be practicably implemented (i.e., generally at the group of locations that are characterized by broader stream valleys, gentler slopes, and higher stream discharge). These locations selected for the HDD crossing method are Jones Creek, Yellow Creek, an unnamed tributary to Yellow Creek, and Wells Creek. In addition to logistical considerations of accessibility and topography, use of the HDD crossing method was selected at these crossings because of these waterbodies' larger channel size and higher stream flows, which were determined to pose a higher risk of adverse environmental effects than those that potentially could result from the use of flume or dam-and-pump methods (as would be needed to support a dry open cut crossing). Although considerably less time-consuming and costly, the use of dry open cut methods at these larger-dimension, higher-flow locations were determined to be potentially more likely to result in the inadvertent collapse of dry open cut flume or dam structures caused by outsized storm or weather-front events.

However, implementation of HDD or related methods at the Project's remaining group of waterbody crossings was determined by TGP to not be practicable because of feasibility concerns (e.g., topography not suited to HDD, bore-pit construction constraints dictating the possible length of the bore), as well as the extensive time and cost necessary to conduct HDD or related techniques, and the cumulative delay and expense that would accrue from use of these technologies at every crossing. Cumulative delays include HDD rig mobilization, pipeline pullback section makeup and placement, clearing and stabilizing the entry and exit pits and work areas, installation of tracking systems, and management of HDD drilling fluids. TGP estimates that use of HDD or related methods for each waterbody crossing along the route of the proposed pipeline would increase costs an estimated 10 times the value for each crossing as compared to the cost of the alternative, traditional crossing methods. Moreover, because of the steep and wooded slopes flanking many of the Project's waterbody crossings, mobilizing HDD or related equipment to each crossing sites would be logistically impracticable because of steep slopes, longer boring distances, mobilization difficulty, and would result in additional environmental risks associated with construction stormwater sediment releases, tree clearing, grading, and drilling mud staging and preparation. Further, additional risks to the environment, including aquatic resources, would result from the possible inadvertent instream loss of drilling mud, hydrocarbon spills, and other mishaps occurring during the prolonged drilling operations necessary to complete HDDs or bores. Finally, use of the HDD method requires a longer presence on the properties where the HDD method would be implemented.

Tennessee Gas Pipeline Company, L.L.C.
Cumberland Project
USACE Project No. LRN-2021-00866
Public Notices 23-02 and 23-13
Response to USACE's July 18, 2023 Request for Additional Information

Although HDDs and bores are useful and appropriate crossing methods for certain waterbodies, these methods are not applicable for every waterbody crossing, as discussed below:

- General limitations that must be considered for either an HDD or a bore include waterbody width, depth to bedrock, groundwater table, steep side slopes, soil type and karst topography. An HDD must have stable soils to drill through, otherwise the loss of the drill hole is likely, thus resulting in the need to either redrill or abandon the HDD altogether. Bores also need stable soil conditions to maintain the drill path.

- For both HDD and bores, long lead times are needed to prepare the site for the drill rigs, receiving pits, drilling fluid staging, and pipeline layout for the pullback. For an HDD, it can take weeks to set up a drill rig and associated workspace, depending on the ground conditions, access, and amount of preparation needed to provide a stable working surface. It then takes additional time to actually drill under the waterbody to the other side, install the pipeline and demobilize the drill rig. HDDs can take up to a month but may take longer to complete in some instances, thus making it impracticable to conduct HDD on small streams that can be crossed using a dry open cut in 24 to 72 hours. Although bores generally do not take the same amount of time as would a HDD, there is still a significant amount of preparation time needed to excavate the pits and store the material. In areas with slopes, the preparation time is significantly increased due to the amount of excavation needed to create a safe and effective workspace.

- At small waterbodies that are best crossed by a dry open cut crossing method (due to reduced stream dimensions and the absence of high discharge), the use of HDD would actually have a larger impact to the surrounding area than potential impacts to the stream. Workspace areas for an HDD are generally 150-by-250 feet and are needed on both sides of a waterbody to set up the drill rig and the receiving pit. Further, long sections of the pipeline ROW, or false ROW (cleared land not associated with the actual location of the pipeline) would be needed to stage a long section of pipe, generally over 1,000 feet, that serves at the HDD pull back section. Further, for a pipeline of this diameter, there is a minimum radius that must be designed to complete the HDD so that the pipeline can naturally bend with the drill hole. That length is greater than 1,000 feet. Therefore, the use of an HDD for a small waterbody is not justified, from the standpoint of the length of the drill and increased areas of workspace for the HDD equipment and installation activities.

- As with HDDs, bores of smaller waterbodies will impact areas greater than dry open cut crossings. Because bores are generally straight, with no radius curve as with an HDD, pits are needed on both side of the waterbody to accommodate the boring machine and the receipt of the carrier pipe. These excavations can be up to 50 feet wide by 150 feet long. The size of the workspace needed for bores limits the feasibility of bores in in areas of steep slopes, deep water, shallow groundwater, and high waterbody banks.

Tennessee Gas Pipeline Company, L.L.C.
Cumberland Project
USACE Project No. LRN-2021-00866
Public Notices 23-02 and 23-13
Response to USACE's July 18, 2023 Request for Additional Information

At waterbody crossings where HDD and related methods were determined to be impracticable, minimization of impacts will be achieved by use of the dry open cut crossing method alternative. The least invasive excavation and rock removal method will be implemented among a hierarchy of five adaptive management methods for each dry open cut waterbody crossing.  At each waterbody crossing, TGP will evaluate field conditions and implement the excavation and rock removal method for each crossing that is both practicable and least invasive with respect to the conditions present at each crossing.  The selected excavation and rock removal method for each dry open cut  waterbody crossing will be chosen from the following, which have been evaluated by factors of risk of environmental damage and practicability:  (1) conventional excavation with an excavator, (2) ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator, (3) hammering with a pointed backhoe attachment or pneumatic rock hammer, followed by removal by excavator, (4) removal of material by rock trencher, and as a last resort (5) controlled blasting and excavation with a backhoe (if used, controlled blasting will be subject to stringent limitations as provided in applicable Project permits and clearances, including applicable conditions provided in the Aquatic Resource Alteration Permit and Clean Water Act Section 401 Water Quality Certification ("ARAP / 401 WQC") issued by the Tennessee Department of Environment and Conservation ("TDEC") on July 21, 2023, and TGP's approved Blasting Plan).  At each waterbody crossing, TGP will attempt implementation of the least invasive method among the hierarchy of excavation and rock removal methods for the dry open cut waterbody crossing, using the following evaluation criteria:  the observed conditions at each crossing location, technical feasibility and limitations of each method, best professional judgment by experienced personnel of the predicted effectiveness of each method, as well as logistics and cost.

At each waterbody crossing, one or more of the above-listed non-blasting rock removal methods will be selected and implemented, prior to moving to controlled blasting to remove rock if other methods are demonstrated to be impracticable.  If controlled blasting is determined to be required, such blasting will be conducted according to limitations as provided in applicable Project permits and clearances, including applicable conditions provided in the ARAP / 401 WQC issued by the TDEC on July 21, 2023, and TGP's approved Blasting Plan.  No controlled blasting will be implemented in karst-prone geologic terrane or in wetlands.  Controlled blasting will only be conducted in dry workplace conditions and in areas in which the risk of hydrologic loss has been determined to be reduced.  After trenching, minimization will be further achieved by the use of trench plugs and the use of non-erodible fill and cover at bedrock stream crossings.

Minimization of impacts to water quality will be further achieved by prevention and stabilization measures, including use of erosion prevention/sediment control ("EPSC") best management practices ("BMP") to control sediment from entering stream channels from work zones in and along riparian margins.  Further, following trenching and pipeline installation at streams with bedrock substrate, non-erodible fill and cover (such as concrete or flowable fill), along with trench plugs at either end of the crossing, will be installed to prevent potential erosion of the stream bed or significant changes in channel geomorphology.




**Office of Energy Projects**

**FERC/EIS - 0329F**                                                                 **June 2023**

# CUMBERLAND PROJECT

## FINAL ENVIRONMENTAL IMPACT STATEMENT

Tennessee Gas Pipeline Company, LLC                    Docket No.  CP22-493-000

**Abstract:**

The staff of the Federal Energy Regulatory Commission (FERC or Commission) prepared a final Environmental Impact Statement (EIS) for the Cumberland Project, proposed by Tennessee Gas Pipeline Company, LLC (Tennessee).  Tennessee proposes to construct and operate approximately 32 miles of 30-inch-diameter natural gas pipeline and ancillary facilities in Dickson, Houston, and Stewart Counties, Tennessee.  The U.S. Army Corps of Engineers and the U.S. Environmental Protection Agency participated as cooperating agencies in the preparation of the EIS.  Commission staff conclude that construction and operation of the project would not result in significant environmental impacts.  Climate change impacts are not characterized in the EIS as significant or insignificant.

Estimate of Staff's Time Spent in Preparation of this EIS: $61,832.00
Cooperating agencies cost: $10,207.00
There were no direct contract costs.





U.S. Army Corps of Engineers                    U.S. Environmental Protection Agency

Contact:  Office of External Affairs, (866) 208-FERC
Federal Energy Regulatory Commission
Office of Energy Projects
888 First Street NE, Washington, DC  20426

acceptable and that implementation of the plan would adequately minimize and mitigate potential adverse impacts associated with HDD construction.

### 2.5.3.2    Wetland Crossings

Tennessee would protect and minimize potential adverse impacts on wetlands using construction procedures specified in its Plan and Procedures.  Tennessee would utilize one of the following two methods for crossing wetlands during construction:

- Standard Wetland Construction
- Conventional Wetland Construction

Standard Wetland Construction - The standard wetland construction method is used in wetlands where soils are non-saturated at the time of crossing and able to support construction equipment.  This method requires segregation of topsoil from subsoil along the trench line.  Where present, a maximum of 12 inches of topsoil is segregated from the area disturbed by trenching, except where standing water is present or if soils are super-saturated.  Topsoil segregation is followed by trench excavation, pipe laying, backfilling, and grade restoration.  Immediately after backfilling is complete, the segregated topsoil is restored to its original location.

Conventional Wetland Construction - Conventional wetland construction methods support construction equipment without significant soil disturbance.  Prior to crossing and movement of construction equipment through these wetlands, the construction workspace is stabilized using timber mats to allow for a stable, safe working conditions.  Unless soils are saturated, the top 12 inches of wetland topsoil are segregated over the trench line.  Trench soil is temporarily stockpiled in a ridge along the pipeline trench.  Gaps in the spoil pile are left at appropriate intervals to provide for natural circulation or drainage of water.  While the trench is dug, the pipeline is assembled in a staging area located in an upland area.  After the pipeline is lowered into the trench, wide-track bulldozers or backhoes supported on timber mats are used for backfilling, final clean-up, and grading.  This method minimizes the amount of equipment and travel in wetland areas.

Where necessary, a drag-section may be used with the Conventional Wetland Construction method.  The drag-section involves the trenching, installation and backfill of a prefabricated length of pipeline containing several pipe segments, all in one day.  The trench is backfilled at the end of each day after the pipe is lowered in as necessary to ensure safety.

### 2.5.3.3    Road Crossings

Construction of the Project across paved roads (table 2.4-3) would require boring under the roadbed, thereby avoiding impacts on the road surface.  Unpaved roads would be crossed by either boring under the roadbed or by open-cut methods.  The pipeline would be installed at a minimum depth of 5 feet below the center of roadways or as required by applicable crossing permits and approvals and would be designed to withstand anticipated external loadings.  There are no active or abandoned railroads that would be crossed by the pipeline.

**Table 2.5-3: Roadways Crossed by the Cumberland Pipeline**

| Road Crossed | Milepost | Road Material | Proposed Crossing Method |
|---|---|---|---|
| Pack Road | 0.5 | Asphalt | Open Cut |
| Nosegay Road | 1.4 | Asphalt | Open Cut |
| White Oak Flatt Road | 4.5 | Asphalt | Open Cut |
| Highway 49 | 5.9 | Asphalt | Bore |
| Brummit Road | 7.2 | Asphalt | Open Cut |
| Harris Hollow Road | 8.8 | Asphalt | Open Cut |
| Highway 48 | 10.0 | Asphalt | Bore |
| Old State Highway 48 (County Highway 967) | 10.1 | Asphalt | Open Cut |
| Daniel Lane | 11.1 | Asphalt | Open Cut |
| Sweet Home Road | 12.1 | Asphalt | Open Cut |
| Bell Hollow Road | 12.3 | Asphalt | Open Cut |
| Highway 1420 (New Dry Hollow Road) | 14.1 | Asphalt | Bore |
| Butcher Ridge Road | 14.4 | Asphalt | Open Cut |
| Little Bartons Creek Road | 16.6 | Asphalt | Bore |
| Slayden Marion Road (Highway 235 and 387) | 17.2 | Asphalt | Bore |
| Leatherwood Road | 19.1 | Asphalt | Open Cut |
| Slaydenwood Road | 19.2 | Asphalt | Open Cut |
| Williamson Branch Road (Highway 1785) | 22.2 | Asphalt | Open Cut |
| Williamson Branch Road (Highway 1785) | 22.3 | Asphalt | HDD |
| Ellis Mills Road (Highway 939) | 22.7 | Asphalt | Open Cut |
| Herman Adams Road | 23.9 | Asphalt | Open Cut |
| Barber Highway | 24.4 | Asphalt | Open Cut |
| Highway 46 (Cumberland City Highway) | 26.5 | Asphalt | Bore |
| Highway 13 | 26.8 | Asphalt | Bore |
| Herman Clark Road | 27.6 | Asphalt | Open Cut |
| Kizer Ridge Road | 28.9 | Asphalt | Open Cut |
| Cumberland City Highway (Highway 149) | 29.9 | Asphalt | Bore |

Emergency vehicle access would be maintained by minimizing the duration of road and driveway outages and by keeping steel plates at the site of construction. Should emergency vehicles need to travel through the work area, the steel plates would be quickly installed over the open trench, allowing vehicles to pass. The Project would not require any active railroad crossings.

### 2.5.3.4    Construction in Residential Areas

Tennessee has designed the route of the pipeline to minimize construction activities on residential land; however, 7 houses and 11 other buildings are within 50 feet of the edge of the proposed construction workspaces. Construction near residential areas would be conducted in a manner to ensure that all construction activities minimize adverse impacts on adjacent residences and that clean-up is prompt and thorough. One of the seven houses identified in proximity to Tennessee's construction footprint is within 25 feet of the Project workspaces. Tennessee has designed a site-specific construction plan for this area and has submitted it for our review. This plan is included in appendix H, and we encouraged the affected

**From:**        Julia Yuan
**To:**          Priest, Amy M CIV USARMY CELRN (USA)
**Subject:**     [Non-DoD Source] RE: FERC Cumberland administrative draft Final EIS
**Date:**        Friday, June 30, 2023 9:33:40 AM

Amy,

The Final EIS for the Cumberland Project was issued this morning:

---------------------------------------------------------------------

On 6/30/2023, the Federal Energy Regulatory Commission (FERC), Washington D.C., issued this
document:


Docket(s):              CP22-493-000
Lead Applicant: Tennessee Gas Pipeline Company, L.L.C.
Filing Type:        Environmental Assessment (EA) and Environmental Impact Statement (EIS)
Description:        Final Environmental Impact Statement for Tennessee Gas Pipeline Company, LLC's
Cumberland Project under CP22-493.

To view the document for this Issuance, click here
https://elibrary.ferc.gov/eLibrary/filelist?accession_num=20230630-3003
---------------------------------------------------------------

Also, please see below responses to your concerns that we discussed during our call yesterday.

Please let me know if you have any questions. I hope you have a wonderful 4th of July.

-Julia


**Julia Yuan**
Federal Energy Regulatory Commission
Office: 202.502.8130


---

**From:** Priest, Amy M CIV USARMY CELRN (USA) <Amy.M.Robinson@usace.army.mil>
**Sent:** Thursday, June 15, 2023 12:16 PM
**To:** Julia Yuan <Julia.Yuan@ferc.gov>; Clark, Maria <Clark.Maria@epa.gov>
**Subject:** RE: FERC Cumberland administrative draft Final EIS

Hi Julia,
I have attached word document with USACE's comments on the FEIS.   Also, I have attached PN 23-
02 and PN 23-13 for reference and to attach to the FEIS.   A few comments regarding the project
that are of concern or question on how to proceed include:

1. How is FERC handling the NEPA review of the pipeline for the 1.15-mile section that was not

provided to FERC, but was to USACE after our request (thus, the second PN)?  We concluded on our call that this 1.15 section is the unsurveyed portion of project and to which Section 106 of NHPA still needs to be completed by FERC staff.  This unsurveyed portion of the route is noted in the Exec Summary and in the Cultural Resources section of the EIS.

2. How will EPA view the FEIS with the 1.15-mile section missing from the NEPA document?  Issue resolved. See response to #1

3. Applicant needs to address controlled blasting, whether it will or will not be performed within WoUS. Agreed.  At the moment, Tennessee has indicated that it does not plan to blast within WoUS; however, it may blast in other upland areas. In its response to our recommended mitigation measure No. 13, from the February 3, 2023, draft EIS, Tennessee reaffirmed its plan to implement the recommendations identified in the Geohazard Mitigation Guidance Plans.  Tennessee confirmed it will hire a geohazard subject matter expert (SME) to be present onsite during construction activities to help identify hazards, document field conditions, and work directly with the construction contractor to support the field implementation of mitigation measures.  The geohazard SME will be responsible for monitoring the performance of mitigation measures, documentation of installed mitigation measures, daily reporting, and reporting on site-specific as-installed mitigation, which would be provided to Tennessee's Project Manager and the Commission as part of Tennessee's biweekly status reports (recommended mitigation measure no. 8).

4. USACE believes the applicant needs to provide more information for alternatives including on-site minimization measures especially for additional HDD installation methods especially on perennial streams in order to minimize impacts to WoUS.  USACE has sent a letter to the applicant requesting additional information on the alternatives to include review of HDD and/or justification of why more HDD methods are not proposed.  This was requested after expiration of PN 23-13.  All of the comments received were provided to the applicant and we requested a response to the comments within the USACE scope.  Comment noted. Any change to methods (ie. open cut to HDD) would require FERC staff review and would be processed as a variance (if appropriate). While HDDs would minimize impacts on waterbodies, there are potential concerns with HDD noise and impacts on EJ communities.

5. Applicant and FEIS need to provide more information on crossings involving Karst terrain and Chattanooga shale.  If not constructed properly, these can create additional impacts to the waterways, even after the trench has been backfilled.  A mitigation and/or contingency plan for these areas should be provided and included in FEIS. Please see Tennessee's Karst Hazard Mitigation Guidance Plan is available on FERC's eLibrary under accession no. 20220722-5052. It is located within appendix 6.D in a report titled Geohazard Mitigation Guidance Plans.

6. USACE will require compensatory mitigation for the temporal impacts of converting jurisdictional forested wetlands to emergent wetlands.  A note:  Of the 7 wetlands to be impacted, it is unknown if they would remain jurisdictional or not following the Sackett court ruling.  To date, we have not received guidance on how to proceed on this but the applicant has not requested a jurisdictional determination on them either.  Comment noted.  The FEIS

has been updated to include a note regarding known wetland mitigation.

These comments were provided after review by our Kathryn Morris (Office of Council), Tim Wilder (West Branch Chief), and myself.
Please let me know if you have any questions about the comments and/or if you need additional information from me.  I will also provide you a copy of the applicant's response when we receive.  I apologize these are a couple of days past the requested submittal date but I have been out of the office on sick leave for several days the past week.

Thank you for letting us comment,

Amy M. Priest
Project Manager
Regulatory Division
Nashville, TN
Cell: 615-474-8437



## Appalachian Mountain Advocates

**West Virginia**
Post Office Box 507
Lewisburg, WV 24901
(304) 645-9006

**Virginia**
415 Seventh Street NE
Charlottesville, VA 22902
(434) 529-6787

www.appalmad.org

Great Horned Owl © Estate of Roger Tory Peterson. All rights reserved.

**SOUTHERN ENVIRONMENTAL LAW CENTER**

1033 Demonbreun Street, Suite 205
Nashville, TN 37203

Telephone 615-921-9470
Facsimile 615-921-8011



RECEIVED
2023-05-10
US Army Corps of Engineers
Nashville District
Regulatory Division

May 10, 2023

**Sent by Electronic Mail to amy.m.robinson@usace.army.mil**
United States Army Corps of Engineers, Nashville District
ATTN: Amy Priest
Public Notice No. 23-13, File No. LRN-2021-00866
3701 Bell Road
Nashville, TN 37214

      **Re:**    **Public Comments on Public Notice No. 23-13, File No. LRN-2021-00866: Tennessee Gas Pipeline Company's Application for a Department of the Army Permit Under Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act**

Dear Ms. Priest:

      The United States Army Corps of Engineers (the "Corps") has solicited public comments on an application by Tennessee Gas Pipeline Company ("Tennessee Gas") for a Department of the Army ("DA") permit under Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act (Public Notice Number 23-13; File Number LRN-2021-00866). Appalachian Mountain Advocates and Southern Environmental Law Center, on behalf of Sierra Club and Appalachian Voices, and together with Center for Biological Diversity (collectively, the "Conservation Groups"), respectfully

App-0484

submit the following comments on Tennessee Gas's application and request a public hearing pursuant to 33 U.S.C. §1344(a) and 33 C.F.R. §327.4(b).[1]

## INTRODUCTION

Tennessee Gas seeks an individual permit under Section 404 for discharges of dredged and/or fill material associated with its proposed Cumberland Pipeline in Dickson, Houston, and Stewart Counties in Tennessee (the "Cumberland Pipeline").[2] In addition to impacts on one Section 10 river, the permit sought would authorize crossings of 155 streams (115 of which would be constructed using a dry-ditch, open-cut method) and seven wetlands.[3]

For the reasons set forth below, the Corps cannot issue the applied-for individual Section 404 permit application. Because the proposed discharges cannot comply with the 404(b)(1) Guidelines, and because the project is not in the public interest, the Corps must deny the permit application. Moreover,

---

[1] We incorporate into our comments by reference, as if they were fully set forth herein, the exhibits cited herein.

There are a total of 49 exhibits to these comments, some of which are rather large electronic files. Because attempting to provide them via email is fraught with potential technical difficulties, including potential "bounce back" due to file-size issues, we have uploaded the exhibit files to the "DoD SAFE" ftp site you provided.

[2] Tennessee Gas Pipeline Co., LLC, Cumberland Project: Section 404 Clean Water Act/Section 10 Rivers and Harbors Act Dredge and Fill – Individual Permit Application (July 22, 2022) [hereinafter, "IP Application"].

[3] Table 3 (rev. Mar. 2023).

given the scale of the project and its controversial nature, the Corps should hold a public hearing in connection with its consideration of the application.

## I.   THE CORPS MUST ALLOW SUFFICIENT TIME FOR MEANINGFUL PUBLIC REVIEW AND COMMENT ON ALL RELEVANT INFORMATION.

"[U]nder Section 404 of the CWA, the opportunity to comment and the right to a hearing both necessarily require that the Army present for public scrutiny the rationale and pivotal data underlying its proposed action *before* the close of the comment and hearing period."[4] When such rationales and pivotal data are only included "in the administrative record *after* the close of the comment and hearing period," it has "the effect of shielding essential data and the agency's rationale from public hearing and comment."[5] Rationales and pivotal data that support the Corps' factual determinations under the Section 404(b)(1) Guidelines are among the types of information that must be subjected to public comment.[6]

Much of the pivotal data that will be crucial to the factual determinations made by the Corps under the Section 404(b)(1) Guidelines—

---

[4] *Ohio Valley Envtl. Coalition v. U.S. Army Corps of Eng'rs*, 674 F.Supp.2d 783, 805 (S.D. W. Va. 2009) (quoting *Nat'l Wildlife Fed. v. Marsh*, 568 F.Supp. 985, 994 (D.D.C. 1983) (emphasis in *Marsh*)).

[5] *Marsh*, 568 F.Supp. at 994 (emphasis original).

[6] *Ohio Valley Envtl. Coalition*, 674 F.Supp.2d at 805 (holding that data critical to Corps' finding of no significant degradation must be subjected to public notice and comment).

**App-0486**

and any findings of compliance or noncompliance therewith—has not yet been publicly noticed and subjected to public comment. Indeed, much of that information may not even exist at this time. Accordingly, to comply with its CWA obligations, the Corps must make additional data and information available to the public and allow meaningful public comment before making a decision on Tennessee Gas's application. Such data and information include, but are not limited to:

- ***Least Environmentally Damaging Practicable Alternative ("LEDPA") Rationales.*** Any additional information that Tennessee Gas submits to supplement its deficient LEDPA analyses must be subjected to public comment because it will be fundamental to the Corps' findings of compliance or noncompliance with the Section 404(b)(1) Guidelines.[7]

- ***Cumulative Effects Analyses.*** Any additional information that Tennessee Gas submits to remedy its deficient cumulative effects analysis must be subjected to public comment because it will be pivotal in the Corps' Section 404(b)(1) Guidelines analysis.[8]

- ***Baseline Water Quality Data for Each Discharge Location***.

- ***Evaluation of the Presence and/or Absence of Riffle-and-Pool Complexes at Each Discharge Site***.

- ***Discharge-site information gathered if Tennessee Gas gains access to survey portions of its route that are presently unsurveyed.***[9]

---

[7] *Id.* at 805.

[8] *Id.*

[9] The Corps rightfully determined that its February 14, 2023 public notice of Tennessee Gas's application was premature because the applicant had failed to identify all of the stream crossings that its proposed pipeline would require. Letter from Timothy C. Wilder, Chief, West Branch of the Regulatory Division of the Nashville District, U.S. Army Corps of Eng'rs, to Gina Dorsey, Kinder

**App-0487**

- ***Compensatory Mitigation.*** Any additional information that Tennessee Gas submits regarding compensatory mitigation must be subjected to public comment because "information on proposed mitigation . . . must be . . . released for public review and comment *before* the close of comment on a [section] 404 permit[.]"[10]

- ***Any and all documents submitted by the applicant after the expiration of the April 11, 2023 Public Notice that includes information or pivotal data that is foundational either to the Corps' review of the application or to any determinations or findings the Corps would make under the Section 404(b)(1) Guidelines.***

Again, such information and data are pivotal because they will serve as the foundation for the factual determinations and findings of compliance or noncompliance that the Corps must make.

---

Morgan, Inc. Re: File No. LRN-2021-00866, Request for Additional Information for the Proposed Tennessee Gas Pipeline, Natural Gas Line crossing multiple streams and wetlands from Dickson to Cumberland City, in Dickson, Houston, and Steward Counties, Tennessee (Latitude: 36.266637; Longitude: - 87.426619) (Mar. 10, 2023).

Although the Nashville District did not cite the applicable Corps regulation, its reasoning for deeming the application incomplete squarely tracks 33 C.F.R. §325.1(d), which requires that a Corps application include "a complete description of the proposed activity" and that the District Engineer "reject, as incomplete, any permit application which fails to" include "[a]ll activities which the applicant plans to undertake which are reasonably related to the same project for which a DA permit would be required[.]" 33 C.F.R. §325.1(d).

Even assuming that Tennessee Gas's efforts to supplement its incomplete application with information from a "desktop" style review were sufficient to justify the April 11, 2023 reissuance of a public notice (they were not), those efforts are clearly insufficient to support permit issuance—partial or otherwise.

[10] *Id.*

Respectfully, the Corps has an interest in ensuring a meaningful opportunity for robust public comments on all aspects of this controversial permit. Federal courts have repeatedly emphasized the importance of the opportunities for public participation under the Clean Water Act.[11] As a result, it is in the Corps' interest—as well as the public's—to ensure additional meaningful opportunities for public participation in this permitting process.

The Corps reissuance of a public notice of Tennessee Gas's application should have waited for the submission **and** public availability of information missing from Tennessee Gas's application beyond information about undisclosed stream crossings. It did not.

The Corps' Huntington District recently faced a similar situation—an applicant for Department of the Army ("DA") permits related to an interstate methane gas pipeline submitted voluminous additional pivotal information well after the Expiration Date of the public notice of the application. In an effort to comply with the Clean Water Act's public participation requirements and ensure a meaningful opportunity for public comment, the Huntington District issued a Supplemental Public Notice for the application, and referred the public to the applicant's website to obtain the supplemental information.[12]

---

[11] *See, e.g., Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 654 (4th Cir. 2018) (noting "the critical importance of notice-and-comment requirements throughout the Clean Water Act," and citing *United States v. Smithfield Foods, Inc.*, 191 F.3d 516 (4th Cir. 1999)).

[12] Public Notice Nos. LRH-2015-00592-GBR, LRP-20150798, and NAO-201500898 for Department of the Army Permit Under Section 10 of the Rivers

The Huntington District extended the Expiration Date of that supplemental public notice to allow the public 60 days to review and comment on the voluminous supplemental information.[13] Then, when it was revealed that the applicant had failed to post all of the relevant supplemental information to its website, the Corps extended the public comment period an additional 15 days to allow the public to access the omitted information and submit comments on it.[14]

Because no decision on the permits at issue has been made, it is yet to be seen whether the Huntington District successfully made available all of the pivotal information or allowed sufficient opportunity for meaningful comment. Nonetheless, that District's efforts show that the Corps' public participation processes can be accompanied by greater transparency.

---

and Harbors Act of 1899 and Section 404 of the Clean Water Act for the Mountain Valley Pipeline Project (Dec. 12, 2022), https://www.lrh.usace.army.mil/Missions/Regulatory/Public-Notices/Article/3243440/lrh-2015-00592-gbr-lrp-2015-798-nao-2015-0898/.

[13] Supplemental Public Notice Nos. LRH-2015-00592-GBR, LRP-20150798, and NAO-201500898 for Department of the Army Permit Under Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act for the Mountain Valley Pipeline Project (Dec. 20, 2022), https://www.lrh.usace.army.mil/Missions/Regulatory/Public-Notices/Article/3250140/lrh-2015-00592-gbr-lrp-2015-798-nao-2015-0898/.

[14] Supplemental Public Notice Nos. LRH-2015-00592-GBR, LRP-20150798, and NAO-201500898 for Department of the Army Permit Under Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act for the Mountain Valley Pipeline Project (Feb. 10, 2023), http://www.lrh.usace.army.mil/Missions/Regulatory/Public-Notices/Article/3295080/lrh-2015-00592-gbr-lrp-2015-798-nao-2015-0898/.

**App-0490**

In short, the Nashville District must ensure that all the relevant materials—including those that Tennessee Gas must submit to fill the data gaps discussed in these comments—are made publicly available and allow a reasonable period for meaningful public comment before it makes a decision on Tennessee Gas's application.

## II. TENNESSEE GAS'S PROPOSED DISCHARGES CANNOT COMPLY WITH THE SECTION 404(B)(1) GUIDELINES.

The 404(b)(1) Guidelines govern the Corps' analysis of an application for an individual permit. The guidelines prohibit permit issuance where, among other things, the proposed discharges are not the least environmentally damaging practicable alternative, would cause or contribute to water quality standards violations, would cause or contribute to significant degradation of the waters of the United States, or are not appropriately minimized.[15] As at least one federal appellate court has held, "[t]he burden of proof to demonstrate compliance with the §404(b) permit Guidelines rests with the Applicant; where insufficient information is provided to determine compliance, the Guidelines require that no permit be issued."[16] As discussed below, Tennessee Gas has not

---

[15] 40 C.F.R. §230.10(a)–(d).

[16] *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1187 (10th Cir. 2002), *modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003) (citing 61 Fed. Reg. 30,990, 30,998 (June 18, 1996); 40 C.F.R. §230.12(a)(3)(iv)); *see also* Memorandum to the Field, Subject: Appropriate Level of Analysis Required for Evaluating Compliance with the Section 404(b)(1) Guidelines Alternatives Requirements (Aug. 23, 1993), *available at* 62 Fed. Reg. 31,492, 31,497–99 (June 9, 1997).

provided sufficient information to demonstrate compliance and cannot show that its proposed discharges will comply with the Section 404(b)(1) Guidelines.

**A.    THE CORPS MUST DENY TENNESSEE GAS'S APPLICATION BECAUSE THE APPLICANT HAS NOT ESTABLISHED THAT DRY-DITCH, OPEN-CUT CROSSINGS ARE THE LEAST ENVIRONMENTALLY DAMAGING PRACTICABLE ALTERNATIVE.**

The 404(b)(1) Guidelines prohibit the issuance of a Section 404 permit where "there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem[.]" [17] "[P]racticable alternatives include, but are not limited to, (i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States . . . [and] (ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters[.]"[18] This is commonly referred to as the "least environmentally damaging practicable alternative"—or "LEDPA"—analysis. The burden to demonstrate that the proposed alternative is the least environmentally damaging practicable alternative lies on the applicant.[19] In

---

[17] 40 C.F.R. §230.10(a).

[18] *Id.* §230.10(a)(1).

[19] *Utahns for Better Transp.*, 305 F.3d at 1187; *see also Alliance for Legal Action v. U.S. Army Corps of Eng'rs*, 314 F.Supp.2d 534, 543 (M.D.N.C. 2004) (holding "the burden to clearly demonstrate a lack of practicable alternatives lies with the project applicant").

As EPA explains it, "[t]he burden of proof to establish compliance with the Guidelines rest with the applicant; where insufficient information is provided to determine compliance, the Guidelines require no permit be issued." Memorandum to the Field, Subject: Appropriate Level of Analysis Required for

performing the LEDPA analysis, the Corps has "an obligation to independently verify the information supplied to it" by the applicant.[20]

As explained below, Tennessee Gas's LEDPA analysis is wholly inadequate. EPA instructs that, in order to comply with the Section 404(b)(1) Guidelines,

> the record [for an individual Section 404 permit] must contain sufficient information to demonstrate that the proposed discharge complies with the requirements of Section 230.10(a) of the Guidelines. The amount of information needed to make such a determination and the level of scrutiny required by the Guidelines is commensurate with the severity of the environmental impact (as determined by the functions of the aquatic resource and the nature of the proposed activity) and the scope/cost of the project.[21]

---

Evaluating Compliance with the Section 404(b)(1) Guidelines Alternatives Requirements (Aug. 23, 1993), *available at* 62 Fed. Reg. 31,492, 31,497–99 (June 9, 1997).

Indeed, in a May 2022 Pre-Application Meeting, the Nashville District "stressed that alternative analysis should be provided that would demonstrate LEDPA with quantitively [sic] criteria and in accordance with 404(b)(1) guidelines." U.S. Army Corps of Eng'rs, Nashville District, Memo. for Record, Subject: Pre-Application Meeting, File No. LRN-2021-00866 at 2 (24 May 2022).

[20] *Friends of the Earth v. Hintz*, 800 F.2d 822, 835 (9th Cir. 1986).

[21] Memorandum to the Field, Subject: Appropriate Level of Analysis Required for Evaluating Compliance with the Section 404(b)(1) Guidelines Alternatives Requirements (Aug. 23, 1993), *available at* 62 Fed. Reg. 31,492, 31,497–99 (June 9, 1997).

Here, the literature establishes that the potential environmental impacts could be severe and permanent.[22] Moreover, as discussed below, the cost of the project is nearly $200,000,000 and the proposed route involves a significant number of crossings.[23] Accordingly, a tremendous amount of information and scrutiny are required for the LEDPA analysis for this project. The application falls short of those requirements.

Under the Section 404(b)(1) Guidelines, there are at least two classes of practicable alternatives that must be considered:

> (i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters; [and]
> (ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters.[24]

For purposes of considering Tennessee Gas's application, alternatives under Subsection 230.10(a)(1)(i) should be considered "construction method alternatives," and alternatives under Subsection 230.10(a)(1)(ii) should be considered "routing alternatives." Tennessee Gas's presentation of both types of alternatives is so severely flawed that it borders on nonexistent, and the Corps must deny Tennessee Gas's application.

---

[22] *See generally* Section II.B.1, *infra.*

[23] Tenn. Gas Pipeline Co., L.L.C.; Notice of Application and Establishing Intervention Deadline, 87 Fed. Reg. 47,736, 47,736 (Aug. 4, 2022).

[24] 40 C.F.R. §230.10(a)(1)(i)–(ii).

**App-0494**

## 1. TENNESSEE GAS HAS NOT REBUTTED THE PRESUMPTIONS APPLICABLE TO SPECIAL AQUATIC SITES.

As a threshold matter, it must be noted that Tennessee Gas has failed to rebut the presumptions of available alternatives applicable to special aquatic sites. For projects (like the Cumberland Pipeline) that are not water dependent, alternatives to discharges into special aquatic sites—which include, among other things, wetlands and streams with riffle-and-pool complexes—"are presumed to be available, unless clearly demonstrated otherwise."[25]

"The presumption of practicable alternatives 'is *very* strong[.]'"[26] "The presumption for a non-water dependent project that a practicable alternative exists is not an automatic bar of issuance of a permit, but it does require that an applicant make a persuasive showing concerning the lack of alternatives."[27] Where that presumption applies, "the Corps may not issue a § 404 permit unless the applicant, 'with independent verification by the [Corps], . . . provide[s] detailed, clear and convincing information *proving*' that an

---

[25] *Id.* §230.10(a)(2).

[26] *Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d 1341, 1344 (8th Cir. 1994) (quoting *Buttrey v. United States*, 690 F.2d 1170, 1180 (5th Cir. 1982) (emphasis original)).

[27] *Utahns for Better Transp.*, 305 F.3d at 1163 (emphasis added).

**App-0495**

alternative with less adverse impact is 'impracticable.'"[28] "[T]he burden is on the Applicant . . . , with independent verification by the [Corps] to provide detailed, clear and convincing information *proving* impracticability."[29] And the Corps must take a "hard look at the [applicant's] proposals" to determine whether the presumption of practicable alternatives has been overcome.[30]

Under the Section 404(b)(1) Guidelines, special aquatic sites include wetlands and streams with riffle and pool complexes.[31] Tennessee Gas's proposed activities would impact wetlands at seven locations.[32] The presumption of practicable alternatives applies to each wetland crossing.[33] Regarding riffle-and-pool complexes, the Section 404(b)(1) Guidelines state:

> (a)      Steep gradient sections of streams are sometimes characterized by riffle and pool complexes. Such stream sections are recognizable by their hydraulic characteristics. The rapid movement of water over a coarse substrate in riffles results in a rough flow, a turbulent surface, and high dissolved oxygen levels in the water. Pools are deeper areas associated with riffles. Pools are characterized by a slower stream velocity, a steaming flow, a

---

[28] *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004) (quoting *Utahns for Better Transp.*, 305 F.3d at 1186–87; modifications and emphasis in *Greater Yellowstone Coal.*).

[29] *Utahns for Better Transp.*, 305 F.3d at 1186 (emphasis original).

[30] *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156,1168 (10th Cir. 2012).

[31] 40 C.F.R. §§230.41, 230.45.

[32] Table 3 (rev. Mar. 2023).

[33] 40 C.F.R. §230.10(a)(2).

smooth surface, and a finer substrate. Riffle and pool complexes are particularly valuable habitat for fish and wildlife.

(b)     Possible loss of values: Discharge of dredged or fill material can eliminate riffle and pool areas by displacement, hydrologic modification, or sedimentation. Activities which affect riffle and pool areas and especially riffle/pool ratios, may reduce the aeration and filtration capabilities at the discharge site and downstream, may reduce stream habitat diversity, and may retard repopulation of the disposal site and downstream waters through sedimentation and the creation of unsuitable habitat. The discharge of dredged or fill material which alters stream hydrology may cause scouring or sedimentation of riffles and pools. Sedimentation induced through hydrological modification or as a direct result of the deposition of unconsolidated dredged or fill material may clog riffle and pool areas, destroy habitats, and create anaerobic conditions. Eliminating pools and meanders by the discharge of dredged or fill material can reduce water holding capacity of streams and cause rapid runoff from a watershed. Rapid runoff can deliver large quantities of flood water in a short time to downstream areas resulting in the destruction of natural habitat, high property loss, and the need for further hydraulic modification.[34]

The special protections afforded riffle-and-pool complexes by the Section 404(b)(1) Guidelines are well warranted. As Tennessee stream expert Barry Sulkin observes, riffle-and-pool complexes are

ecologically important to the quality of a stream. The riffle or drop section provides the greatest aeration and thus elevates dissolved oxygen (DO) in the stream—an essential component and measure of stream health for fish and other aquatic life—as well as habitat for some species with a preference for such sites. The aerated pools following the riffles provide habitat for species, such as fish, where they live, eat, seek shelter, and reproduce. Pools below riffles also provide preferential locations for fishing and other recreational activities such as wading and swimming.[35]

---

[34] *Id.* §230.45.

[35] Barry Sulkin, *Evaluation of Impacts to Riffle-and-Pool Complexes from the Proposed Cumberland Pipeline Project* 2 (Mar. 20, 2023) (attached as Exhibit

Tennessee Gas has made little to no effort to quantify the impacts its proposed activities will have on riffle-and-pool complexes or to distinguish in its various stream impact tables which streams have riffle-and-pool complexes at the crossing locations. Indeed, Tennessee Gas's application does not state whether riffle-and-pool complexes are present or absent at its proposed crossing locations.[36] Despite that omission, information in the applicant's hydrological determination supports the conclusion that such complexes are present at many of the proposed crossings.

Tennessee Gas used a "Hydrologic Determination Field Data Sheet" produced by the Tennessee Division of Water Pollution Control to identity water resources along the proposed route of the Cumberland Pipeline.[37] That field sheet includes a "Secondary Field Indicator Evaluation," which in turn

---

1); *see also* Rebecca Johansen, PhD, *Field Assessment of Big Bartons Creek, Located in Cumberland Furnace Tennessee* 2 (2023) (attached as Exhibit 2); Angela Mummaw, *Field assessment of seven crossing sites of the proposed methane gas pipeline by Tennessee Gas Pipeline Company, L.L.C. (TGP) for the Cumberland Project* (2023) (attached as Exhibit 3).

[36] The exception may be in Table 1's description of the crossing location of Bartons Creek, which is described as having a "ripple/run/pool complex." Table 1 (rev. Mar. 2023) at 6. As established in Dr. Rebecca Johansen's field report, there is a riffle-and-pool complex at the proposed crossing location of Bartons Creek, making it likely that the term "ripple" in its description of the Bartons Creek crossing location, was meant by Tennessee Gas to mean "riffle." Johansen at 1–2 (2023).

[37] *See, e.g.*, IP Application, att. 2, app. B at 3–4.

**App-0498**

asks the user to evaluate "In-channel structure: riffle-pool sequences" on the following scale:

> 0 = Absent
> 1 = Weak
> 2 = Moderate
> 3 = Strong.[38]

Tennessee Department of Environment and Conservation guidance on the use of that field sheet defines the levels on that scale this way:

> *Strong* – Demonstrated by an even and frequent number of riffles followed by pools (every 5 – 7 channel widths or more frequent) along the entire reach. There is an obvious transition between riffles and pools.
>
> *Moderate* – Represented by a less frequent number of riffles and pools (every 10-14 channel widths). Distinguishing the transition between riffles and pools may be more difficult.
>
> *Weak* – Channels show occasional hydraulic diversity, but mostly exhibit long reaches of uniform hydraulics.
>
> *Absent* – There is no sequence exhibited.[39]

At minimum, then, a ranking of "Moderate" or "2" on riffle-and-pool complexes in the Secondary Field Indicator Evaluation should indicate the presence of those complexes.

---

[38] *See, e.g.*, *id.* at 4.

[39] Tennessee Department of Environment and Conservation, Division of Water Resources, *Guidance for Making Hydrologic Determinations v. 1.5* at 32 (April 2020) [hereinafter, "TDEC HD Guidance"] (attached as Exhibit 4).

**App-0499**

Tennessee Gas's field agents did not even bother to fill out the Secondary Field Indicator Evaluation for at least 24 of the streams assessed.[40] And in at least 30 instances, the field agent was dissatisfied with the ranking system designed by the state agency, and created in-between categories by circling the line between the given rankings[41]—a method that does not appear to be sanctioned by the field sheet's guidance.[42] Accordingly, the limited data in Tennessee Gas's hydrologic determination cannot be used to define the universe of proposed stream locations where riffle-and-pool complexes are present.

What the available data do show, however, is that riffle-and-pool complexes are present at many of the proposed stream locations. Tennessee Gas's field agents ranked the riffle-and-pool complexes at 10 proposed discharge sites as "Moderate," ranked one proposed discharge site in between "Moderate" and "Strong," and ranked one proposed discharge site as "Strong."[43]

---

[40] *See generally* IP Application, att. 2, app. B.

[41] *Id.*

[42] *See generally* TDEC HD Guidance at 32.

[43] *See generally* IP Application, att. 2, app. B. The "Moderate" riffle-and-pool structures were observed at Porters Branch, Harris Branch, Miller Branch, Nesbitt Branch, two unnamed tributaries of Williamson Branch (SHNW003a and SHNW004a), Indian Branch, an unnamed tributary from Guices Branch (SHNE003), and an unnamed tributary to Guices Creek (SHNB030). *Id.* The "Moderate" to "Strong" riffle-and-pool complex was observed in Guices Creek, and the "Strong" riffle-and-pool complex was observed in an unnamed tributary to Bartons Creek (SDKA042). *Id.*

Those rankings establish that even Tennessee Gas should acknowledge that riffle-and-pool complexes are present at its proposed discharge sites. Nonetheless, the applicant makes no effort to rebut the presumption of available less damaging practicable alternatives applicable to such sites.

The short-shrift Tennessee Gas gives riffle-and-pool complexes is striking given Tennessee Gas's obligation to *avoid* impacting those special aquatic sites.[44] Because Tennessee Gas has treated riffle-and-pool complexes so dismissively in its application, the full extent to which Tennessee Gas is proposing to discharge into riffle and pool complexes cannot be determined. As a result, the Corps cannot yet know to which stream crossings the special aquatic site presumptions apply. **Accordingly, the Corps must require Tennessee Gas to evaluate every stream discharge location for the presence or absence of riffle-and-pool complexes before the Corps can process Tennessee Gas's application; otherwise the Corps will not be able to properly apply the special aquatic site presumptions.**

Tennessee stream expert Barry Sulkin reviewed Tennessee Gas's application and, based on his familiarity with the watersheds at issue and the topography and geology of the project area, concluded that "many or most of the streams proposed to be crossed by the Cumberland Pipeline Project are

---

[44] 40 C.F.R. §230.10(a)(2) (presuming availability of practicable alternatives); *see also Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 202 (4th Cir. 2009) (recognizing that an applicant must first *avoid* impacts, before turning to minimization and mitigation).

likely characterized by riffle-and-pool complexes." [45] Accordingly, the presumptions of less environmentally damaging practicable alternatives apply to "many or most" of Tennessee Gas's proposed stream crossings.

Sulkin examined Tennessee Gas's field sheets and photographs in its Hydrologic Determination. [46] Based on that review, Sulkin identified 16 discharge sites that appeared to have characteristics of riffle-and-pool complexes.[47] Those discharge sites include the following:

- Upper Sugarcamp Branch (SDKA023; proposed for two dry-ditch, open-cut crossings);

- Jordan Branch (SDKA026);[48]

- UT to Jordan Branch (SDKA027);

- Porters Branch (SDKA058);

- UT to Jones Creek (SDKA049);

- Gafford Branch (SDKA013);

- Miller Branch (SDKB001);

---

[45] Sulkin (2023) at 2.

[46] *Id.*

[47] *Id.* at 2–3.

[48] In its desktop review of unsurveyed portions of the pipeline route—conducted *after* Sulkin generated his report on an apparently incomplete application, Tennessee Gas identified a second crossing of Porters Branch. Table 1 (rev. Mar. 2023) at 2. The Corps should presume that there are also riffle-and-pool complexes at the additional Porters Branch discharge site because of its proximity to the previously proposed Porters Branch crossing.

- Bartons Creek (SDKB002);

- Furnace Creek (SDKB009);

- Dry Hollow Branch (SDKB011);

- Leatherwood Creek (SDKB026);

- Guices Creek (SHNA001);

- Lickskillet Branch (SHNB033; proposed for three dry-ditch, open-cut crossings).[49]

Moreover, Sulkin reviewed photographs and field reports from visits to a selection of streams in March 2023 coordinated by a biology professor from Austin Peay State University.[50] Based on his review of those photographs and field reports, Sulkin concluded that they confirmed the presence of riffle-and-pool complexes at each of the field studied locations. Those streams include:

- Bartons Creek;[51]

- Jordan Branch (SDKA026);[52]

- Gafford Branch (SDKA013);[53]

_____

[49] Sulkin (2023) at 3.

[50] *Id.* at 4 (citing Mummaw (2023); Johansen (2023)).

[51] *Id.*; *see also* Johansen (2023) at 1–2.

[52] Sulkin (2023) at 4; *see also* Mummaw (2023) at 1–2.

[53] Sulkin (2023) at 4; *see also* Mummaw (2023) at 2–3.

**App-0503**

- Furnace Creek (SDKB009);[54]

- Leatherwood Creek (SDKB026);[55] and

- Lickskillet Branch (SHNB033) (proposed for three dry-ditch, open-cut crossings).[56]

At minimum, the Corps must apply the presumption of an available LEDPA to the streams discussed in the Sulkin, Johansen, and Mummaw reports.[57] Sulkin's review also confirms that, before it can process Tennessee Gas's application, the Corps must require Tennessee Gas to evaluate each proposed stream crossing location for the presence or absence of riffle-and-pool complexes.[58] And the Corps must independently verify Tennessee Gas's claims about the presence or absence of riffle-and-pool complexes at every proposed stream crossing.[59]

The 404(b)(1) Guidelines' presumptions applicable to the wetlands and riffle-and-pool complexes in the Tennessee Gas's path are twofold. As the

---

[54] Sulkin (2023) at 4; *see also* Mummaw (2023) at 3–4.

[55] Sulkin (2023) at 4; *see also* Mummaw (2023) at 5–6.

[56] Sulkin (2023) at 4; *see also* Mummaw (2023) at 7–8.

[57] Sulkin (2023) at 4; Johansen (2023) at 1–2; Mummaw (2023) at 1–8.

[58] As Sulkin observes, that process may entail multiple site visits to each proposed crossing location. Sulkin (2023) at 2. Although the *presence* of riffle-and-pool complexes can be confirmed through a single site visit, "a negative finding requires follow-up during times when there is likely to be flow." *Id.*

[59] *See, e.g., Greater Yellowstone Coalition*, 359 F.3d at 1269.

**App-0504**

Huntington District explains to applicants in its "Checklist for Preparing an Alternatives Analysis Under Section 404 of the Clean Water Act":

> The Guidelines include two rebuttable presumptions for projects with discharges of dredged and/or fill material into waters of the U.S. which involve special aquatic sites⬚ that do not require access to or siting within the special aquatic site(s) to achieve their basic essence (basic project purpose). All practicable alternatives not involving a discharge into special aquatic sites are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise. The **first presumption** states that alternatives that do not affect special aquatic sites are presumed to be available. The **second presumption** states that practicable alternatives located in non-special aquatic sites (e.g., other waters, uplands, etc.) have less adverse impact on the aquatic ecosystem. **It is the applicant's responsibility to clearly demonstrate to the Corps that both of these presumptions have been rebutted in order to pass the alternatives portion of the Guidelines.**[60]

Here, Tennessee Gas has failed to carry its burden to rebut either presumption.

Where Tennessee Gas proposes to use dry-ditch, open-cut crossings through wetlands and streams with riffle-and-pool complexes, Tennessee Gas has failed to clearly demonstrate that it can rebut the presumption that there are practicable alternatives that do not affect wetlands or streams with riffle-and-pool complexes. Tennessee Gas must rebut that presumption on a crossing-by-crossing basis. It has not done so either by clearly demonstrating that there are (1) no practicable "construction method alternatives" under

---

[60] Checklist for Preparing an Alternatives Analysis Under Section 404 of the Clean Water Act, Buffalo District – Regulatory Branch, Pittsburgh District – Regulatory Division, Huntington District – Regulatory Division (May 13, 2020) [hereinafter, "404 Alternatives Analysis Checklist"] (Exhibit 5) (emphasis original; internal footnote omitted).

**App-0505**

Subsection 230.10(a)(1)(i) or (2) no practicable "routing alternatives" under Subsection 230.10(a)(1)(ii).

With regard to "construction method alternatives," as discussed elsewhere in these comments,[61] Tennessee Gas's application falls woefully short of establishing that a dry-ditch, open-cut crossing—as opposed to a trenchless crossing—is the LEDPA at any location, regardless of whether special aquatic sites are present. For those same reasons, Tennessee Gas has failed to clearly demonstrate that a practicable trenchless method is not available at any of the seven wetland impact sites or at any stream reach with riffle-and-pool complexes.

With regard to "routing alternatives," Tennessee Gas's conclusory and categorical statements in its application about alignment and right-of-way adjustments are insufficient to "clearly demonstrate"—at each and every wetland and stream with a riffle-and-pool complex—that there is no routing alternative available. Tennessee Gas must clearly demonstrate on a crossing-by-crossing basis that there are not routing changes that would allow it to avoid special aquatic sites.[62] On streams with riffle-and-pool complexes, such

---

[61] *See* Section II.A.2, *infra.*

[62] Section 404 of the Clean Water Act authorizes the Corps to issue permits for discharges at "specified disposal sites," and requires the Corps to specify—and therefore evaluate—"*each* such disposal site" through the application of the 404(b)(1) Guidelines. 33 U.S.C. §1344(a)–(b) (emphasis added); *see also Wild Bainbridge v. Mainlander Servs. Corp.*, 544 F. Supp. 2d 1159, 1163 (W.D. Wash. 2008) ("*Each* disposal site for which the Corps issues an individual permit must be specified in accordance with guidelines developed by the

a demonstration would entail showing that there are not upstream or downstream stream reaches without riffle-and-pool complexes across which the Cumberland Pipeline could be routed, and for wetlands such a demonstration would entail showing that wetland features cannot be avoided through minor alignment variations.

That particular failure has implications for the second presumption applicable to special aquatic sites. Not only do the Section 404(b)(1) Guidelines presume that there are practicable alternatives available to discharges in special aquatic sites, they also presume that discharges into waters of the United States at non-special aquatic site locations have fewer adverse environmental impacts.[63] Accordingly, as applied to the Cumberland Pipeline and streams with riffle-and-pool complexes, there are presumptions that (1) Tennessee Gas could avoid riffle-and-pool complexes through realignment to cross the feature outside of the riffle-and-pool complexes and (2) crossings in such locations would have fewer adverse environmental impacts. Because of the deficiencies in its application regarding riffle-and-pool complexes, Tennessee Gas has not clearly demonstrated that it can rebut those presumptions. Consequently, the Corps must deny its application.

---

Administrator of the Environmental Protection Agency in conjunction with the Corps." (emphasis added)).

[63] 404 Alternatives Analysis Checklist.

**2. TENNESSEE GAS CANNOT ESTABLISH THAT THERE ARE NOT LESS ENVIRONMENTALLY DAMAGING PRACTICABLE CONSTRUCTION METHOD ALTERNATIVES TO ITS PROPOSED DRY-DITCH, OPEN-CUT CROSSINGS.**

Tennessee Gas asks the Corps to allow it to use a dry-ditch, open-cut crossing to blast or trench through every stream that the Cumberland Pipeline would cross, except for four streams that would be crossed by three Horizontal Directional Drill ("HDD") crossings.[64] For the following reasons, Tennessee Gas has failed to carry its burden to establish that its proposed dry-ditch, open-cut crossings are the LEDPA at each proposed location.

> ### *a. Tennessee Gas Fails To Consider A "No-Permit" Alternative On a Crossing-by-Crossing Basis.*

Under the Section 404(b)(1) Guidelines, Tennessee Gas must show—**on a crossing-by-crossing basis**—that there is neither (1) a practicable "construction method alternative" for that crossing that would allow it to avoid discharges under Subsection 230.10(a)(1)(i), nor (2) a practicable "routing alternative" that would still involve discharges, but at "other locations" and

---

[64] IP Application at 35. The streams that Tennessee Gas would cross using HDD are Jones Creek, Yellow Creek and one of its unnamed tributaries, and Wells Creek. *Id.* Tennessee Gas's Resource Reports to FERC state that the company will use HDD to cross three additional streams—all unnamed tributaries to Jones Creek—because of their impaired status. Tennessee Gas Pipeline Co., LLC, Final Resource Report 2: Water Use and Quality, Cumberland Project, Docket No, CP22-)))-000 at 2-14 (July 2022) (attached as Exhibit 6). Inexplicably, Tennessee Gas's Section 404 permit application proposes dry-ditch, open-cut crossings for all of the unnamed tributaries of Jones Creek. Table 1 (rev. Mar. 2023) at 2–3. Tennessee Gas must explain that discrepancy before the Corps can act on its Section 404 application.

App-0508

with fewer adverse impacts on the aquatic ecosystem under Subsection 230.10(a)(1)(ii).[65] In other words, the alternatives analysis, correctly framed, should ask whether Tennessee Gas can construct each of its 155 stream crossings and seven wetlands crossings without a Section 404 permit, either by implementing a crossing method that would not involve the discharge of dredged and/or fill material, or by selecting a minor alignment variation that entirely avoids the stream or wetland at issue.[66]

---

[65] Step 3 in the Huntington and Pittsburgh District's Checklist for Preparing an Alternatives Analysis Under Section 404 of the Clean Water Act—which requires that "the criteria used to establish [practicability] screens and how an alternative passes or fails the screen needs to be clearly elucidated and supported," and recommends a detailed alternatives comparison matrix and accompanying narrative—supports the requirement of a robust crossing-by-crossing analysis. 404 Alternatives Analysis Checklist.

[66] As noted above, Section 404 authorizes the Corps to issue permits for discharge at "specified disposal sites," and requires the Corps to specify—and therefore evaluate—"*each* such disposal site" through the application of the 404(b)(1) Guidelines. 33 U.S.C. §1344(a)–(b) (emphasis added); *see also Wild Bainbridge*, 544 F. Supp. 2d at 1163 ("*Each* disposal site for which the Corps issues an individual permit must be specified in accordance with guidelines developed by the Administrator of the Environmental Protection Agency in conjunction with the Corps." (emphasis added)).

The Section 404(b)(1) Guidelines require detailed information **about each disposal site**, and Tennessee Gas simply has not met that requirement. The 404(b)(1) Guidelines provide that "[d]ocumentation to demonstrate knowledge about . . . the candidate disposal site is an essential component of guideline application." 40 C.F.R. §230.6(a).

**b. Trenchless Crossing Methods Are The Least Environmentally Damaging Pipeline Crossing Methods. Tennessee Gas Has Failed to Establish on a Crossing-by-Crossing Basis That They Are Not Practicable at Locations Where it Proposes Dry-Ditch, Open-Cut Crossings.**

The Corps' analysis of Tennessee Gas's preferred crossing methods must start with this fundamental premise: "In general, avoidance of stream and wetland disturbances using trenchless methods is the least damaging alternative for waterbody crossings absent special site-specific conditions."[67] Silvis (2023) explains that trenchless methods are the "preferred method for pipelines to cross streams and wetlands to reduce negative environmental impacts … absent special site-specific factors."[68]

Silvis reaches that conclusion because "[t]renchless methods are associated with fewer short-term and long-term negative effects on aquatic ecosystems."[69] Silvis continues:

> [T]renchless construction allows the pipeline to cross streams and wetlands without disrupting riparian vegetation, stream bed substrate, wetland soils, and flow in streams and rivers, thereby reducing short- and long-term fish and macroinvertebrate mortality, and allows streams and wetlands to remain intact,

---

[67] Starr Silvis, *Evaluation of Tennessee Gas Pipeline Company, LLC's Application for a Department of the Army Permit for the Cumberland Project* 2 (May 10, 2023) (attached as Exhibit 7).

[68] *Id.* at 5.

[69] *Id.* at 2.

thereby reducing turbidity, suspended and settled sediment impacts.[70]

Silvis's conclusions are consistent with those of the pipeline regulatory community. For example, the New York State Department of Environmental Conservation ("NYSDEC") denied a Section 401 certification for open-cut pipeline stream and wetland crossings because the applicant refused to provide sufficient information about alternative trenchless crossing methods.[71] In its denial letter, NYSDEC concluded:

> Open trenching is a highly impactful construction technique involving significant disturbance of the existing stream bed and potential long-term stream flow disruption, destruction of riparian vegetation and establishment of a permanent cleared corridor. Comparatively, trenchless methods present significantly fewer environmental impacts to the regulated resource.[72]

The Federal Energy Regulatory Commission ("FERC") has reached similar conclusions on the environmental protection offered by trenchless crossings when compared to dry-ditch, open-cut crossings. Regarding the same pipeline for which NYSDEC denied a Section 401 Certification on the ground

---

[70] *Id.* at 5.

[71] *Constitution Pipeline Co., LLC v. N.Y. State Dept. of Envtl. Conservation*, 868 F.3d 87 (2d Cir. 2017). The United State Court of Appeals held that the state's denial of the Section 401 certification on those grounds was supported and permissible. *Id.* at 103.

[72] Letter from John Ferguson, N.Y. State Dept. of Envtl. Conservation, to Lynda Schubring, Constitution Pipeline Company, LLC, Re: Joint Application: DEC Permit # 0-9999-00181/00024 Water Quality Certification/Notice of Denial (Apr. 22, 2016) (attached as Exhibit 8).

that the applicant had not sufficiently considered trenchless crossings, FERC

concluded that

> [t]he potential impacts on waterbodies associated with the use of
> conventional bore or Direct Pipe trenchless crossing methods are
> considered minimal when compared to other crossing methods,
> The waterbody and its banks, and typically the entire immediate
> riparian zone, would not be disturbed by clear or trench; rather,
> the pipe would be installed below the feature.[73]

And in a recent Environmental Assessment of the effects of 120 proposed

trenchless pipeline crossings, FERC stated:

> In contrast to open-cut dry trenching, the use of a trenchless
> crossing method to cross an environmental resource such as a
> waterbody or wetland avoids direct impacts associated with
> working directly within the sensitive resource. Trenchless
> crossing methods allow for uninterrupted existing streamflow
> and undisturbed wetland soils, scrub-shrub, and herbaceous
> vegetation, thereby minimizing impacts on aquatic resources and
> wetland and wildlife habitat. Additionally, the proposed
> trenchless crossings would result in reduced in-stream
> sedimentation as compared to [dry-ditch, open-cut crossings].
> This reduction results from less disturbance of the riparian areas
> adjacent to the waterbodies and avoidance of impacts on the
> streambed. Lastly, trenchless crossings would avoid the ground
> disturbance associated with trenching and backfilling in the

---

[73] *Constitution Pipeline Co.*, 868 F.3d at 94 (quoting FERC Final
Environmental Impact Statement for the Constitution Pipeline, emphasis in
*Constitution Pipeline Co.*).

**App-0512**

subject wetlands and reduce longer-term impacts by accelerating the post-construction revegetation period.[74]

FERC also determined in that same Environmental Assessment that, "[i]n general, typical pipeline effects on waterbodies are avoided with trenchless methods."[75]

### c. Tennessee Gas Has Failed to Establish on a Crossing-by-Crossing Basis That Trenchless Crossings Are Not Practicable at Locations Where it Proposes Dry-Ditch, Open-Cut Crossings.

Tennessee Gas has failed to carry its burden to establish that its proposed dry-ditch, open-cut crossings are exceptions to the general rule recognized by Silvis. Indeed, Tennessee Gas has utterly failed to justify its selections on a crossing-by-crossing basis, as it must, to satisfy the Section 404(b)(1) Guidelines. Silvis—an environmental engineering expert with extensive regulatory experience—reviewed Tennessee Gas's application and concluded that the absence of site-specific analysis of the feasibility of trenchless methods requires denial of the application.[76] As Silvis observes,

- "Tennessee Gas has not substantiated that any of the proposed crossings for which the company seeks a permit are the least environmentally

---

[74] Fed. Energy Regul. Comm'n, Mountain Valley Pipeline Amendment Project: Environmental Assessment 8 (Aug. 2021) [hereinafter, "FERC MVP EA"] (attached as Exhibit 9).

[75] *Id.* at 33.

[76] Silvis (2023) at 5–7.

App-0513

damaging practicable alternative … . One of the most striking defects in Tennessee Gas's application is the company's failure to address the technical, logistical, and cost practicability of trenchless construction on a crossing-by-crossing basis for any of the proposed crossings beyond three HDD sites."[77]

- Because Tennessee Gas does not substantiate its crossing determinations with adequate information, it is Silvis's "professional opinion that trenchless methods are likely practicable for many more of the streams and wetlands that would be crossed by the pipeline than Tennessee Gas identifies. At a minimum, the deficiencies [in] the permit application make it impossible to conclude that Tennessee Gas's proposal is, in fact, the LEDPA. Accordingly, it is my professional opinion that Tennssee Gas has not demonstrated that any of its proposed open-cut crossings represent the least environmentally damaging practicable alternative."[78]

- "Since trenchless crossing methods are the least damaging to aquatic resources it is my professional opinion that trenchless crossing methods must, at a minimum, be evaluated on a crossing-by-crossing basis for use at all crossings. The application's failure to undertake this

---

[77] *Id.* at 5.

[78] *Id.* at 7.

**App-0514**

individualized evaluation compels the conclusion that Tennessee Gas has not shown its proposed crossings are the LEDPA."[79]

- "Although the application at times suggests that Tennessee Gas may have developed an internal rationale for its proposed method at each crossing, those individual rationales are not provided in the application or other materials. These are glaring omissions because an individualized LEDPA analysis is required under the Section 404(b)(1) Guidelines, and because it is an industry standard in applications for individual DA permits to evaluate trenchless crossing alternatives prior to proposing trenched crossings such as dry open-cut crossings, in order to reduce potential water quality and stream impacts."[80]

- "[C]onventional boring is not evaluated for any waterbody crossings in the application."[81]

As Silvis notes,

> the application overlooks the apparent practicability of trenchless methods across the route as evidenced by statements in the application and associated materials. For example, conventional boring is proposed for multiple road crossings shown in Attachment 3 to Tennssee Gas's application, indicating that this trenchless method is appropriate for substrates found along the

---

[79] *Id.* at 5–6.

[80] *Id.* at 5.

[81] *Id.* at 6.

project length. However, conventional boring is not evaluated for
any waterbody crossing in the application.[82]

That high level discussion of the technology is insufficient for the Corps to
conclude that Tennessee Gas's application establishes that a dry-ditch, open-
cut crossing is the LEDPA for any of the crossings where the applicant intends
to employ it, however. Given the absence of site-by-site application of those
factors, the Corps cannot independently verify—as it must—that Tennessee
Gas's proposed activities are the LEDPA under the Section 404(b)(1)
Guidelines.[83]

As the Huntington and Pittsburgh Districts make clear in their
"Checklist for Preparing an Alternatives Analysis Under Section 404 of the
Clean Water Act" ("Checklist"), "[t]he criteria used to establish [practicability
screens] and how an alternative passes or fails the screen needs to be clearly
elucidated and supported."[84] To accomplish this, the Checklist encourages
applicants to use an alternatives-comparison matrix, with a detailed
narrative.[85]

Because, as established above, trenchless crossings have fewer adverse
environmental effects on streams and wetlands than open-cut crossings,

---

[82] *Id.* at 6.

[83] *Id.* at 5.

[84] 404 Alternatives Analysis Checklist.

[85] *Id.*

**App-0516**

Tennessee Gas must either (1) employ a trenchless method at each crossing, or (2) present sufficient information to the Corps to allow the agency to independently verify that trenchless crossings are impracticable on a crossing-by-crossing basis. Tennessee Gas has not done so. That alone justifies denying the pending application.

### d. Tennessee Gas Has Not Evaluated All Trenchless Crossing Techniques.

Tennessee Gas's assessment of trenchless crossing methods is also deficient because it limits its consideration to only two trenchless crossing methods: horizontal directional drilling and conventional bore.[86] But there are additional trenchless methods that Tennessee Gas must consider as less environmentally damaging alternatives at each crossing. Four such methods are (1) guided conventional boring, (2) microtunneling, (3) Direct Pipe®, and (4) directional microtunneling.

**Guided conventional boring** is a variation of the conventional boring technique that uses pilot tubes to guide the auger.[87] Like conventional boring,

---

[86] IP Application at 28. Attachment 11 to Tennessee Gas's application briefly addresses Direct Pipe®, but that method is not discussed elsewhere in the application beyond Attachment 11, which Tennessee Gas admits it borrows from a 10-year-old application for a pipeline that was cancelled for insufficient consideration of trenchless crossings.

[87] Raymond L. Sterling, *Developments & Research Directions in Pipe Jacking and Microtunneling*, UNDERGROUND SPACE (BEIJING) VOLUME 5 at 4 (2020) [hereinafter "Sterling (2020)"] (attached as Exhibit 10), https://www.sciencedirect.com/science/article/pii/S2467967418301065/pdfft?m

App-0517

this method is commonly used in waterbody crossings for natural gas pipelines.[88] Water can frequently be used in guided conventional boring to return drill cuttings and keep the cutting head cool, and where bentonite drilling fluids are used it is at a much lower pressure than with HDD.[89]

**Microtunneling** allows pipe jacking with accurate guidance, remote operation, and continuous support of the bore hole.[90] The technique has been used to construct natural gas pipeline crossings beneath valuable aquatic resources such as streams protected by the Wild and Scenic Rivers Act.[91] As FERC has observed, "microtunneling can be used in many soil types, including boulders and rock," and can "span 200 to 1500 feet."[92] Microtunneling "is often used in longer trenchless crossings because the advanced control and guidance

---

d5=6bbb7dc48a705e7bf1acc4b5a0f7a459&pid=1-s2.0-S2467967418301065-main.pdf.

[88] Williams Field Servs. Co., LLC et al., Application for a Certificate of Environmental Compatibility and Public Need to Construct an Approximately 9.5-Mile Natural Gas Gathering Line, New York Mainline Loop Natural Gas Pipeline Project, Case 13-T-___ at 17 (Dec. 2, 2013), https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={769A8A9D-418C-409C-9DD9-DC58FE8E6288}; FERC MVP EA at 12–13.

[89] FERC MVP EA at 12–13.

[90] Sterling (2020) at 2.

[91] See, e.g., Rockies Express Pipeline LLC, 123 FERC ¶61234, ¶ 131 (May 30, 2008).

[92] FERC MVP EA at 14.

**App-0518**

system allows for precise line and grade tolerances."[93] The technique uses little bentonite drilling fluid and at low pressure, minimizing inadvertent returns.[94]

**Direct Pipe®** "is a hybrid technique combining aspects of microtunneling and HDD."[95] But, unlike HDD, "the borehole is never only mud supported" in this technique.[96] The risk of inadvertent return from Direct Pipe® installation is much lower than with HDD because of low pressures on the small quantities of drilling fluid used.[97] Because the borehole is continuously supported, and because of the low risk of hydraulic fracture, "the Direct Pipe® alignment can be designed much shallower than is typical for an HDD."[98] This method has been used to construct natural gas pipelines under waterbodies inhabited by species listed as threated under the ESA.[99]

**Directional microtunneling**, or curved microtunneling, "incorporate[s] the advantages of microtunneling, cartridge style feed of the pipe at entry and balancing earth pressures in a continuously cased tunnel,

---

[93] *Id.*

[94] *Id.*

[95] Sterling (2020) at 5.

[96] *Id.*

[97] FERC MVP EA at 13.

[98] *Id.*

[99] Transcontinental Gas Pipe Line Company, LLC, 141 FERC ¶ 61091, ¶¶ 53, 57 (Nov. 2, 2012).

**App-0519**

with the curved alignment of a [Direct Pipe®] to reduce entry and exit pit excavation requirements."[100] Tennessee Gas used that method to complete a trenchless crossing for a methane pipeline in Pennsylvania.[101] The method has previously allowed Tennessee Gas to use a trenchless crossing method "in an area with geotechnical constraints that made traditional crossing methods high risk or prohibitively expensive."[102]

Despite the established use of guided conventional bore, microtunneling, Direct Pipe®, and directional microtunneling in natural gas pipeline resource crossings, and despite their environmental advantages over both dry-ditch, open-cut crossings and HDD, Tennessee Gas did not consider them as crossing method alternatives for the Cumberland Pipeline. Nor did the applicant provide an explanation for their omission. But it should have evaluated them for *every* crossing.[103] Because it did not, Tennessee Gas Company's LEDPA analysis is deficient, and the application should be rejected.

---

[100] Jonathan L. Robison & Jim Elmore, *Innovative Directional Microtunnel Garners Success for Crucial Trenchless Crossing*, PIPELINES 2014: FROM UNDERGROUND TO THE FOREFRONT OF INNOVATION AND SUSTAINABILITY 760 (2014), *available at* https://ascelibrary.org/doi/epdf/10.1061/9780784413692.069.

[101] *Id.* at 758.

[102] *Id.* at 768.

[103] The need for an analysis of alternative trenchless crossings extends also to Tennessee Gas's planned HDD crossings. As Silvis notes in her report, Tennessee Gas's feasibility study for the proposed HDD crossing of Yellow Creek notes the presernce of karst geology, increasing the risks of the loss of drilling fluid and "mak[ing] it crucial to evaluate the feasibility of other

### e. Tennessee Gas's Generalizations About Conventional Boring Are Unsupported And Cannot Justify Eliminating It As A Crossing Method On The Cumberland Pipeline.

Rather than engage in a thorough, site-specific analysis of trenchless crossing methods, Tennessee Gas chose to identify a only handful of general factors that *might* go into a site-specific analysis (had it conducted one) and to make various (and frequently unsupported) generalizations about HDD and conventional boring.[104] Those efforts fall short of what is required of a LEDPA analysis under the Section 404(b)(1) Guidelines.

Out the outset of the "Construction Methods Alternatives" section of its application, Tennessee Gas speaks of "preliminary geotechnical and geological studies" that it claims were undertaken.[105] But the application fails to include any site-specific discussion about how those "studies" might limit the availability of trenchless crossing methods at any particular location.

As FERC recently recognized, "[t]he conventional bore method is a technology that has been used for decades to install natural gas pipelines."[106] Nonetheless, Tennessee Gas dismisses its use for the Cumberland Pipeline based on a general and unsupported discussion of three factors Tennessee Gas

---

trenchless methods to minimize potential environmental impacts." Silvis (2023) at 20.

[104] IP Application, §2.7.5.

[105] *Id.* at 27.

[106] FERC MVP EA at 8.

App-0521

claims limits the use of the technology. In each case, Tennessee Gas does so in the abstract, without any site-specific context.

**First**, Tennessee Gas maintains that crossing distances on the Project may preclude the use of conventional bore because, in Tennessee Gas's view, "[b]oring operations typically occur over a crossing distance of 50 to 60 feet" and "[t]he maximum length a bore could achieve in ideal soil conditions typically does not exceed 400 feet."[107] Tennessee Gas provides no citation to support those claims. Even if they were assumed to be true, however, they would remain unpersuasive because ***the widest stream that Tennessee Gas proposes to cross with an dry-ditch, open-cut crossing is Bartons Creek, with a span of 62.5 feet***.[108] As Silvis (2023) concludes, the width of the streams that Tennessee Gas proposes to cross "does not preclude the use of conventional boring at any proposed open-cut crossing."[109]

**Second**, Tennessee Gas insinuates that "subsurface soil and geologic conditions" might "limit the success of a boring operation under waterbodies for the project."[110] Tennessee Gas does not refer to the subsurface soil or geologic conditions at any particular crossing location, but instead generalizes

---

[107] IP Application at 34.

[108] Table 1 (rev. Mar. 2023) at 6; *see also* Silvis (2023) at 6.

[109] Silvis (2023) at 6.

[110] IP Application at 33.

**App-0522**

about preferences for "[l]oose packed soil, free of rock material."[111] Tennessee Gas's *ipse dixet* assertion contradicts recent descriptions of the capabilities of conventional boring technology by FERC, where that agency concluded that "[b]oulders and cobbles up to one third of the diameter of the installed pipe can be accommodated" in conventional boring.[112]

In any event, there are certainly subsurface soil and rock conditions in the Project area that are conducive to conventional boring because Tennessee Gas has committed to using that method to install its proposed pipeline under paved roads in the Project area.[113] Tennessee Gas should be required to provide crossing-specific evidence of adverse geological conditions that contraindicate conventional bore before it is allowed to afford fewer protections to Tennessee's aquatic resources than it does to paved roads.

**Third**, Tennessee Gas asserts (again without support) that "[t]he topographic conditions for most waterbody crossing locations on this Project also limit the use of [conventional bore], as preferred locations are generally consistent with level or moderately convex terrain, such that the depth of the bore pit does not present concerns relative to constructability or safety

---

[111] *Id.*

[112] FERC MVP EA at 9.

[113] Fed. Energy Regul. Comm'n, Draft Environmental Impact Statement for the Cumberland Project at tbl. 2.4-3 (Feb. 2023) [hereinafter, "DEIS"].

App-0523

concerns."[114] As Silvis notes, however, Tennessee Gas has failed to meet industry standards of providing topographic information in its site plan mapping.[115] Without such topographical information, "[i]t is impossible to verify grades or stream crossing locations" to confirm Tennessee Gas's general assertion of impracticable topography any particular crossing location.[116] Moreover, Tennessee Gas's asserted topographical limitations on the use of conventional bore on the Cumberland Pipeline are undermined by FERC's approval of the use of that technique on a project in the steep slopes of Central Appalachia. That project will involve bore pits as deep as 57 feet on grades that could exceed 30% (so long as the slope was less than 400 feet long).[117]

Following its inadequate and unsupported description of the conventional bore technique, Tennessee Gas purports to offer a contrast of "*HDD/Conventional Bore Methods versus Conventional Dry Open Cut Crossing Methods.*"[118] That section of Tennessee Gas's application appears to have been written as a contrast between just HDD and dry-ditch, open-cut

---

[114] IP Application at 34.

[115] Silvis (2023) at 21 ("Industry standard is to provide topographic information and stream locations on site plan mapping.").

[116] *Id.*

[117] FERC MVP EA at 95, app. D

[118] IP Application at 34–35.

**App-0524**

crossings, with conventional boring added as an afterthought and without consideration of the differences between HDD and conventional boring.

For example, Tennessee Gas tries to emphasize the comparative risks of inadvertent returns between open-cut crossings and trenchless crossings, stating, "[t]here are no risks of inadvertent returns for a conventional open cut crossing," while suggesting that there is a high risk of such returns from conventional bore.[119] Not so. FERC recently concluded that "[t]here would be *no risk of inadvertent release of drilling fluids*" from conventional bores proposed for a different methane gas pipeline project.[120] That is because during a conventional bore, "the borehole is continuously supported by pipe throughout the process," rendering unnecessary "the circulation of drilling fluids to transport drill cuttings and to support the walls of the borehole."[121]

Moreover, although Tennessee Gas sets out six factors it claims to have considered "when evaluating the use of trenchless HDD or conventional bore crossing methods versus a dry open-cut method for Project waterbody crossings," its application is absolutely devoid of any evidence that Tennessee Gas applied those factors on a crossing-by-crossing basis, as opposed to just

---

[119] *Id.*

[120] FERC MVP EA at 92.

[121] *Id.* at 9. Risks of inadvertent return are similarly low with the trenchless crossing methods Tennessee Gas failed to consider, such as guided conventional bore, microtunneling, and Direct Pipe®. *Id.* at 12–14.

making generalizations about the technologies and choosing a method based on its own convenience. As Silvis notes, "[a]lthough the application at times suggests that Tennessee Gas may have developed an internal rationale for its proposed method at each crossing, those individual rationales are not provided in the application or other available materials."[122] As discussed above, and emphasized by Silvis, "[t]he preferred method for pipelines to cross streams and wetlands to reduce negative environmental impacts is through trenchless construction absent site-specific factors."[123] Because of the site-specific nature of the analysis, "[o]ne of the most striking defects in Tennessee Gas's application is the company's failure to address the technical, logistical, and cost practicability of trenchless construction on a crossing-by-crossing basis[.]"[124]

Moreover, the notion that Tennessee Gas might have done a crossing-by-crossing evaluation of trenchless methods and rejected those methods because of technical impracticability is fatally undermined by the company's statement that it may use trenchless methods if it encounters adverse flow conditions at proposed dry-ditch, open-cut crossings.[125] As Silvis observes,

> These statements indicate that Tennessee Gas prioritized trenched crossings except where they are impracticable instead of the other way around, starting with trenchless techniques for all

---

[122] Silvis (2023) at 5.

[123] *Id.*

[124] *Id.*

[125] IP Application at 34.

**App-0526**

sites unless they are shown to be impracticable. As stated above, trenchless crossings are less environmentally damaging than open-cut (*i.e.* trenched) crossings absent special site-specific circumstances. Therefore they should be the first option evaluated when determining the LEDPA.[126]

Finally, Tennessee Gas's generalizations about the cost of trenchless crossing methods are insufficient to justify their rejections. Tennessee Gas asserts that "[c]osts associated with a HDD and conventional bore, in general, may be five (5) times more per foot than costs for a conventional crossing using open cut methods, which can become prohibitive to the Project budget" and directs the Corps to Attachment 11 to support that claim.[127] As discussed further below, Attachment 11 is a decade-old, high-level summary of trenchless methods developed for a different project—a pipeline that was ultimately cancelled after it could not obtain permits because of its proponent's failure to evaluate and implement trenchless crossings more broadly. Because the summary in Attachment 11 is a decade old, and does not support Tennessee Gas's "five (5) times more per foot" assertion in any event, Tennessee Gas must provide additional information before it can reject trenchless crossings on the basis of cost.

---

[126] Silvis (2023) at 7.

[127] IP Application at 34.

As EPA has emphasized, "[g]enerally, as the scope/cost of the project increases, the level of analysis should also increase."[128] The Cumberland Project is expected to cost nearly $200,000,000 and will bring guaranteed and substantial revenue to Tennessee Gas. Accordingly, the level of analysis required to determine whether the costs of trenchless crossings are practicable is substantial.

In the context of the Project's overall budget, the costs of the trenchless crossings Tennessee Gas has rejected may be insignificant. Tennessee Gas asserts, without support, that the costs may "become prohibitive to the project budget."[129] But, on an industry-wide basis, it is acknowledged that the "direct costs of various [stream] crossing techniques are difficult to predict" because of, among other things, necessary contingency factors.[130]

As EPA explained in its August 23, 1992 Memorandum to the Field, Subject: Appropriate Level of Analysis Required for Evaluating Compliance with the Section 404(b)(1) Guidelines Alternatives Requirements, "[t]he

---

[128] Memorandum to the Field, Subject: Appropriate Level of Analysis Required for Evaluating Compliance with the Section 404(b)(1) Guidelines Alternatives Requirements (Aug. 23, 1993), *available at* 62 Fed. Reg. 31,492, 31,497–99 (June 9, 1997).

[129] IP Application at 34.

[130] Canadian Ass'n of Petroleum Producers et al., Pipeline Associated Watercourse Crossings 3rd Ed., §4.4.1 (2005), *available at* http://registry.mvlwb.ca/Documents/MV2010L1-0001/MV2010L1-0001%20-%20Pipeline%20Associated%20Watercourse%20Crossings%20-%20May12-10.pdf.

**App-0528**

determination of what constitutes an unreasonable expense should generally consider whether the projected cost is substantially greater than the costs normally associated with the particular type of project. Generally, as the scope/cost of the project increases, the level of analysis should also increase."[131] EPA further explained that "[i]t is important to emphasize . . . that it is not a particular applicant's financial standing that is the primary consideration for determining practicability, but rather characteristics of the project and what constitutes a reasonable expense for these projects that are most relevant to practicability determinations."[132]

Oil and gas pipelines are frequently multi-million-dollar affairs, and their capital costs have been increasing in recent years.[133] Stream crossings "strongly affect pipeline construction costs."[134] Because the cost practicability component must be evaluated in the context of natural gas pipelines generally, and because such pipelines frequently cost hundreds of millions of dollars to

---

[131] That memorandum is available from multiple sources, including in the Federal Register at 62 Fed. Reg. 31,492, 31,498–99 (June 9, 1997), and at https://www.epa.gov/cwa-404/memorandum-appropriate-level-analysis-required-evaluating-compliance-cwa-section-404b1.

[132] *Id.*

[133] *Oil and Gas Pipeline Construction Costs*, Global Energy Monitor Wiki, https://www.gem.wiki/Oil_and_Gas_Pipeline_Construction_Costs#cite_note-source1-1.

[134] *Id.* (citing *Natural Gas Pipeline Profits, Construction Both Up*, OIL & GAS JOURNAL (Sept. 5, 2016)).

**App-0529**

build—with significant construction costs turning on the frequency of stream crossings—the cost increase that would result from implementing trenchless crossings are highly unlikely to render such methods impracticable from a cost standpoint. Indeed, FERC recently approved a request by a natural gas pipeline to construct more than 100 stream crossings using conventional bore, establishing that natural gas pipelines maintain financial viability even with frequent use of trenchless crossings.[135]

In any event, the materials submitted by Tennessee Gas to date—without crossing-by-crossing comparisons of the projected costs of trenchless crossings to dry-ditch, open-cut crossings—are certainly insufficient to support a conclusion that additional trenchless crossings are impracticable because of cost. As with other aspects of the LEDPA analysis, the Corps has a duty to independently verify the applicant's assertions.[136] On this record, the Corps cannot conclude that trenchless crossings are impracticable on the basis of cost.

### f. Tennessee Gas Relies on A Stale and Unpersuasive Document to Support Its Contentions About Crossing Methods.

In an attempt to justify its unsupported rejection of trenchless crossing methods for the overwhelming majority of its proposed crossings, Tennessee Gas includes a one-page table that generally describes three trenchless

---

[135] *Mountain Valley Pipeline, LLC*, 179 FERC ¶61,013, 2022 WL 1058057 (Apr. 8, 2022).

[136] *See, e.g., Hintz*, 800 F.2d at 835.

methods as Attachment 11 to its Section 404 application.[137] The source for Attachment 11 is a November 2013 effort by the proponent of the since-cancelled Constitution Pipeline to avoid using trenchless methods to the degree requested by regulatory authorities.[138] Attachment 11 is unpersuasive for a number of reasons.

**First**, it is outdated and stale. Attachment 11 is a decade old, yet Tennessee Gas holds it out as an authority on the technical and cost limitations on conventional bore, HDD, and Direct Pipe®.[139] It cannot bear the weight Tennessee Gas would put on it by dint of its age alone.

**Second**, Attachment 11 is inherently unpersuasive because of its source. Indeed, Tennessee Gas's reliance on any aspect of the trenchless crossing analysis from the Constitution Pipeline is surprising. State regulators found the stubborn refusal of proponents of that pipeline to even evaluate trenchless crossings so unsubstantiated that they denied a Section 401 certification for the pipeline's proposed open-cut crossings, and a federal

---

[137] IP Application, attachment 11.

[138] *Id.*; *see generally Const. Pipeline Co.*, 868 F.3d at 102–03.

[139] IP Application, att. 11.

**App-0531**

appellate court upheld that reasoning.[140] Like Tennessee Gas does here,[141] the proponents of the Constitution Pipeline cited "industry recognized standard[s]" in refusing to further evaluate trenchless crossing methods.[142] New York regulators and the United States Court of Appeals for the Second Circuit alike rejected that reasoning. As the Second Circuit explained, "Industry preferences do not circumscribe environmental relevance."[143]

### g. Tennessee Gas Has Not Presented A Sufficient LEDPA Review of Rock Removal Alternatives.

Even if Tennessee Gas were to establish that a dry-ditch, open-cut crossing were the LEDPA for any particular crossings (which it has not), its application would still fail to establish that its proposed *trenching* or rock removal methods are the LEDPA at each site.[144]

---

[140] *See generally Const. Pipeline Co.*, 868 F.3d at 102–03; *see also* Letter from John Ferguson, N.Y. State Dept. of Envtl. Conservation, to Lynda Schubring, Constitution Pipeline Company, LLC, Re: Joint Application: DEC Permit # 0-9999-00181/00024 Water Quality Certification/Notice of Denial (Apr. 22, 2016) (attached as Exhibit 8).

[141] IP Application at 28 ("TGP evaluated various waterbody crossing alternatives that meet accepted pipeline construction using TGP standards and industry practices.").

[142] *Const. Pipeline Co.*, 868 F.3d at 102.

[143] *Id.* at 103.

[144] Silvis (2023) at 7.

Tennessee Gas has designated blasting as the rock removal method for 29 stream crossings, and identified 20 additional locations as being "Candidate[s] for Blasting."[145] But, as Silvis observes, in-stream blasting

> is the most destructive and potentially environmentally damaging of all waterbody crossing methods. Blasting causes permanent changes to stream channel roughness, composition, and function, and may cause deposition of rock debris in channel. Blasting also may cause fissures, crack, and other alteration of subsurface structure that can lead to hydrologic losses. Additionally, blasting creates dust that may deposit in-stream and contribute to increased turbidity and sedimentation.[146]

Because of the Section 404(b)(1) LEDPA requirements, and because of the devastating impacts of in-stream blasting, the Corps cannot authorize Tennessee Gas to blast trenches through the streams in its path without an independently verified demonstration that no other rock removal options are practicable.[147]

Tennessee Gas's application does not even try to make that demonstration. Instead, it seeks to allow field construction contractors to make decisions about blasting on the fly.[148] That delegation of LEDPA analysis to crews in the field is extremely alarming. In expert environmental engineer

---

[145] *See generally* IP Application, tbl. 2.7-3 & att. 3; *see also* Silvis (2023) at 9–11 (synthesizing tbl. 2.7-3 & att. 3).

[146] Silvis (2023) at 7.

[147] *Id.* at 7–12.

[148] *Id.* at 8.

App-0533

Silvis's "professional opinion, allowing contractors to make decision on the fly results in increased probability of negative impacts to aquatic resources."[149]

The Section 404 application identifies five options for rock removal: conventional excavation with an excavator, ripping with an excavator equipped with a ripping tooth, hammering, use of a rock trencher, or blasting.[150] Even Tennessee Gas concedes that, because of its environmental risks, blasting "is not generally considered to be the LEDPA at locations where other methods are feasible and practicable."[151] Nonetheless, Tennessee Gas does not present the Corps with a crossing-by-crossing analysis of whether the other identified methods are practicable. Instead, Tennessee Gas says it will leave that task to its construction contractor.[152]

As a result, the Corps cannot issue the permit sought by Tennessee Gas. The time to identify the LEDPA is in the permit application and review process—not on the bank of a stream with the key to an excavator in one hand and an explosive in the other. Tennessee Gas would have the Corps delegate its obligation to verify the LEDPA to its construction crews—who will be far more susceptible to time and cost pressures in their on-the-fly evaluation of

---

[149] *Id.*

[150] IP Application at 30.

[151] *Id.* at 32.

[152] *Id.* at 30.

App-0534

what is "practicable." Fortunately for the streams in the path of the Cumberland Pipeline, the Corps cannot so-delegate its responsibilities under the Section 404(b)(1) Guidelines.

Moreover, Tennessee Gas's scheme to allow its construction crew to evaluate and attempt a minimum of *one* alternative rock-removal method before resorting to blasting [153] is inconsistent with what the Tennessee Department of Environment and Conservation ("TDEC") expects and requires. In its November 3, 2022 request for additional information, TDEC told Tennessee Gas that review of its application could not resume until, among other things, Tennessee Gas accepted TDEC's requirement "that the contractor evaluate and attempt *all* non-blasting techniques at each stream crossing[.]"[154] In its response to TDEC, Tennessee Gas reserved the right to unilaterally deem a non-blasting technique as impracticable based on its contractors' evaluation of technical considerations *and cost*.[155] That response further emphasizes that Tennessee Gas is uninterested in evaluating the practicability of alternatives to blasting during the application and permitting process, and wants to

---

[153] *Id.*

[154] Letter from Claire Wainwright, PhD, Natural Resources Unit, Tenn. Dept. of Envt. & Conservation, to Gina Dorsey, Tennessee Gas Pipeline, LLC, Re: Request for Additional Information at 3 (Nov. 3, 2022) (attached as Exhibit 11).

[155] Letter from Blake Amos, Tennessee Gas Pipeline Company, LLC, to Claire Wainright, PhD, Tenn. Dept. of Envl. & Conservation, Re: Request for Additional Information Response, Enclosure at 14 (Dec. 1, 2022) (attached as Exhibit 12).

App-0535

maintain the flexibility to allow construction contractors to make on-the-fly judgment calls based on their perceptions of "cost," notwithstanding the technical practicability of the alternatives. The Section 404(b)(1) Guidelines, however, require the LEDPA to be determined *before* a permit is issued, and do not permit that evaluation to be deferred to a later date, or deferred to the discretion of an unaccountable construction contractor.

### 3. TENNESSEE GAS CANNOT ESTABLISH THAT THERE ARE NOT LESS ENVIRONMENTALLY DAMAGING PRACTICABLE ROUTE VARIATIONS.

As discussed elsewhere in these comments, Tennessee Gas's limited discussion of routing alternatives does not provide the requisite level of detail for the Corps' alternatives analysis. Tennessee Gas must examine whether there are routing alternatives that will allow it to avoid certain resources, including by crossing waterbodies at locations that would have fewer impacts.

Subpart H of the Section 404(b)(1) Guidelines imposes an obligation on the applicant to consider actions to minimize adverse effects.[156] For example, the applicant must reduce the effects of the discharge through its choice of disposal site.[157] Applicants must also select discharge sites to minimize adverse effects on plant and animal populations.[158] Accordingly, Tennessee

---

[156] *See* Section II.D, *infra*, for discussion of other minimization issues with Tennessee Gas's application.

[157] 30 C.F.R. §230.70.

[158] *Id.* §230.75.

**App-0536**

Gas is obligated to evaluate routing alternatives that would avoid stream reaches with sensitive plant and animal species, special aquatic sites, and other sensitive resources. And it must do so on a crossing-by-crossing basis. That is, it must look at each crossing and determine whether modest alignment changes would allow it to select a crossing location with fewer environmental impacts or avoid the aquatic resource entirely. For most stream and wetland resources, there is no evidence in the application that Tennessee Gas has done so.

Tennessee Gas's Section 404 application presents only 13 "minor route variations."[159] Of those 13, only three discuss *avoidance* of aquatic resources, but the descriptions of those resources make it unclear whether they are waters of the United States.[160] Two other minor route variations appear to address minimization of impacts to aquatic resources because their stated purpose was to allow "more perpendicular" dry-ditch, open-cut stream crossings.[161] Although insufficient to constitute a complete alternatives analysis because they only address a handful of streams, those minor route

---

[159] IP Application at 23–27. Only ten minor route variations are addressed in FERC's DEIS. *See* Section II.A.5.c, *infra*.

[160] A route variation at milepost 12.5 avoids a "pond," a route variation at milepost 16.5 avoids a "spring," and a route variation at milepost 25 "avoids difficult side slope and stream construction." IP Application at 25–26.

[161] A route variation at milepost 22.7 allows for more perpendicular crossings of two unnamed tributaries of Yellow Creek and a route variation at milepost 26 allows for a more perpendicular crossing of Guices Creek. *Id.* at 26.

App-0537

variations nonetheless establish that Tennessee Gas can avoid or minimize impacts to aquatic resources through minor route variations. For example, the route variation at milepost 12.5 to avoid a pond adds only *38 feet* to the length of the Cumberland Pipeline.[162]

Moreover, Tennessee Gas says in its application that it "will continue to consider multiple minor route variations" and that it "continues to refine the pipeline route and address route variations."[163] Thus, Tennessee Gas in essence concedes that additional minor route variations to avoid or minimize effects on waters of the United States that are practicable and less environmentally damaging may exist. Tennessee Gas should have evaluated minor route variations at each crossing *before* it submitted its Section 404 application. Because Tennessee Gas did not do so, its application fails to provide sufficient detail to determine whether there are practicable routing alternatives under 30 C.F.R. §230.10(a)(1)(ii). Accordingly, the Corps should deny the application.

### 4. TENNESSEE GAS'S APPLICATION IS INCOMPLETE BECAUSE IT FAILS TO ENGAGE IN A LEDPA ANALYSIS FOR ROAD CROSSINGS.

Another fatal deficiency in Tennessee Gas's application is that it presents no crossing-by-crossing determination of whether the proposed road

---

[162] *Id.* at 25.

[163] *Id.* at 23–24.

crossings use the least environmentally damaging practicable alternative or are at the least environmentally damaging location.

Tennessee Gas has proposed 18 access road crossings of streams, and one of a wetland.[164] Although Tennessee Gas asserts that it "is not proposing to install any permanent culverts or permanent installation of gravel or rock into waterbodies or wetlands crossed by the Project's access road," it reserves the right to "temporarily" (a term without definition) install gravel or rock in waterbodies or wetlands.[165] Moreover, although Tennessee Gas appears to contemplate "temporary equipment bridges" for road crossings, it does not clarify whether those bridges will span aquatic resources from bank to bank, or whether they will be placed on streambeds or in wetlands.[166] And Tennessee Gas's application provides no site-specific information about road crossing methods.

Silvis (2023) concludes that "[t]he preferred access road method for avoidance of environmental impacts is spanning from dry ground beyond the existing top-of-bank on both sides of stream."[167] Tennessee Gas provides no alternatives analysis of the practicability of spanning each of its proposed road

---

[164] Table 3 (rev. Mar. 2023); IP Application, tbl. 2.1-1.

[165] IP Application at 64.

[166] *Id.*

[167] Silvis (2021) at 13.

App-0539

crossings. As Silvis observes, "Tennessee Gas provides no detail on how its road crossings would be accomplished nor how the non-bridging options would be designed to reduce the likelihood of permanent impacts."[168] Silvis further identifies the advantages and disadvantages of a series of road crossing alternatives.[169]

Without explaining what technique it will use at each road crossing, and justifying that selection as the least environmentally damaging practicable alternative at each crossing, Tennessee Gas cannot carry its burden to provide sufficient information to establish that the proposed discharges associated with its road crossings comply with the 404(b)(1) Guidelines. This is particularly true with respect to its road crossings in special aquatic sites like wetlands and streams with riffle and pool complexes, where there are presumptions that practicable alternatives exist and the applicant must clearly demonstrate that it can rebut those presumptions before being allowed to proceed.[170]

---

[168] *Id.*

[169] *Id.*, tbl. 3.

[170] *See* Section II.A.1, *supra.*

**5. THE CORPS MUST PREPARE A SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT ("EIS") OR INSIST ON SIGNIFICANT CHANGES TO AND ADDITIONAL COMMENT ON FERC'S DRAFT EIS ("DEIS") BECAUSE THAT NEPA DOCUMENT DOES NOT CONTAIN ADEQUATE INFORMATION TO ALLOW THE CORPS TO DETERMINE THE LEAST ENVIRONMENTALLY DAMAGING PRACTICABLE ALTERNATIVE OR SATISFY NEPA'S REQUIREMENTS WITH REGARD TO THE ENVIRONMENTAL EFFECTS OF THE PROPOSED STREAM AND WETLAND CROSSINGS.**

As discussed above, the Corps cannot determine the least environmentally damaging practicable alternative without analyzing significant outstanding information regarding the potential for Tennessee Gas to avoid and minimize aquatic impacts through the use of alternative construction methods—including the practicability of using trenchless crossing methods at all waterbody crossings—and minor route variations. [171] In assessing the practicability and impacts of employing such construction methods and route variations, the Corps may not rely on FERC's EIS because, like Tennessee Gas's Section 404 application, the DEIS indicates it will lack the essential information. Unless the Corps insists on major changes in the final FERC EIS and FERC obliges, the Corps must prepare, either on its own or in conjunction with FERC, a Supplemental EIS ("SEIS").[172]

---

[171] *See* Sections II.A.1, II.A.2, and II.A.3, *supra.*

[172] The flaws in FERC's DEIS that preclude the Corps' reliance on it are in addition to the fatal defects in the DEIS's climate change evaluations discussed in section III.B.

**App-0541**

Corps regulations explain that "the analysis of alternatives required for NEPA environmental documents, including supplemental Corps NEPA documents, will in most cases provide the information for the evaluation of alternatives under these Guidelines."[173] However, "[o]n occasion, these NEPA documents . . . may not have considered the alternatives in sufficient detail to respond to the requirements of these Guidelines," such that it is "necessary to supplement these NEPA documents with this additional information."[174]

Tennessee Gas's pending application presents just such a situation, such that supplemental NEPA analysis is required. Consideration of alternatives "is the heart of the environmental impact statement."[175] The "discussion of alternatives must rigorously explore and objectively evaluate all reasonable alternatives."[176] The obligation to consider alternatives flows from the NEPA statute itself and exists for any proposal, such as the Cumberland Pipeline, "which involves unresolved conflicts concerning alternative uses of available resources."[177]

---

[173] 40 C.F.R. §230.10(a)(4).

[174] *Id.*

[175] *Id.* §1502.14.

[176] *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 568 (D.C. Cir. 2016).

[177] 42 U.S.C. §4332(2)(E).

App-0542

The Corps is a cooperating agency on FERC's EIS.[178]  The DEIS acknowledges that the Corps must complete an independent review of the DEIS before adopting it, and that the Corps "must consider whether the proposed projects represent the least environmentally damaging practicable alternative."[179]

Because the alternatives analysis in FERC's DEIS does not analyze the feasibility or impacts of crossing waterbodies using trenchless crossing techniques such as conventional boring, microtunneling, DirectPipe®, or directional microtunnelling, and does not evaluate the potential for minor, crossing-specific route variations to avoid aquatic impacts—including impacts to special aquatic sites— the DEIS did not satisfy the Corps' NEPA obligations and it appears the EIS will be similarly deficient, requiring the Corps to conduct additional NEPA review. Again, the Section 404(b)(1) Guidelines make clear that the Corps cannot simply treat FERC's alternatives analysis in the DEIS as conclusive. Section 230.10(a)(4) requires the Corps to ensure that NEPA documents are supplemented to include sufficient detail to respond to the requirements of the Guidelines.[180] And Section 230.10(a)(5) requires alternatives analysis considered by another permitting authority to be

---

[178] DEIS at 1-5.

[179] *Id.*

[180] 40 C.F.R. §230.10(a)(4).

App-0543

supplemented when less complete than the analysis contemplated under Section 230.10(a).[181] Those regulations combine here to require the Corps to give closer scrutiny to alternative stream-crossing methods and route variations affecting streams and wetlands than FERC provided in the DEIS. Under these circumstances, it would be arbitrary and capricious for the Corps to rely on FERC's DEIS to satisfy its NEPA and Clean Water Act obligations.[182] As at least one federal appellate court has held, "an agency may only adopt [another agency's NEPA document] if it 'meets the standards for an adequate statement' under the applicable regulations."[183] If a NEPA document precludes meaningful analysis of an issue, then the potential adopting agency must conduct an independent review of that issue.[184] And if an agency acquiesces to

---

[181] *Id.* §230.10(a)(5).

[182] *See Cowpasture River Pres. Ass'n v. U.S. Forest Serv.*, 911 F.3d 150, 168 (4th Cir. 2018) (holding that the U.S. Forest Service wrongfully relied on the alternatives analysis in FERC's EIS for the Atlantic Coast Pipeline, which evaluated only whether a listed alternative "confers a significant environmental advantage over the proposed route," where the U.S. Forest Service had an independent legal obligation to analyze alternatives to determine whether "the proposed use *cannot reasonably be accommodated* off of National Forest System lands" (emphasis in original)), *reversed on other grounds*, 140 S.Ct 1837 (2020).

[183] *Id.* at 170.

[184] *Id.*

an inadequate alternatives analysis, such an action is arbitrary and capricious.[185]

### a. *FERC's Alternatives Analysis Methodology in the DEIS Is Not Consistent with the Analysis of Alternatives Necessary for the Corps to Determine the Least Environmentally Damaging Practicable Alternative.*

The criteria that FERC used to evaluate alternatives are not co-extensive with the criteria the Corps must consider when determining whether a proposed project is the least environmentally damaging practicable alternative. FERC considered only (1) the ability of alternatives "to meet Project objectives," (2) the "reasonableness, practicality, and technical and economic feasibility of the alternative," and (3) "whether [an] alternative would have a significant environmental advantage over the Proposed Action."[186] The Corps' LEDPA analysis, in contrast, focuses on whether an alternative would have "less adverse impact on the aquatic ecosystem."[187]

### b. *FERC's DEIS Did Not Analyze the Feasibility or Impacts of Crossing Waterbodies Using Trenchless Methods Such as the Conventional Bore.*

As explained above, the Corps cannot determine the least environmentally damaging practicable alternative based on Tennessee Gas's application because the application does not allow the Corps to meaningfully

---

[185] *Id.* at 173.

[186] DEIS at 3-1.

[187] 40 C.F.R. §230.10(a).

**App-0545**

assess the practicability of employing trenchless waterbody crossing methods, such as the conventional bore, at each crossing. FERC's DEIS likewise lacks sufficient information to make such a determination.

In the DEIS, FERC determined that Tennessee Gas would employ only two waterbody crossing methods: the dry-ditch, open-cut method for the overwhelming majority of its stream and wetland crossings and the HDD method for three crossings.[188] These were the only methods evaluated in FERC's discussion of the Cumberland Pipeline's potential impacts on water quality.[189] FERC briefly mentions boring, but only in the context of road crossings and without evaluating impacts to hydrology or aquatic resources.[190] FERC's alternatives analysis in the DEIS focused primarily on system alternatives (e.g., making use of existing pipeline infrastructure to accomplish the project purpose), major route alternatives, and a limited set of minor route variations, the majority of which were unrelated to avoiding water resources.[191] Accordingly, the DEIS did not consider construction method

---

[188] DEIS at 4-34.

[189] *See id.* at 4-29 to 4-39.

[190] *See id.* at 2-16 to 2-17.

[191] *Id.* at 3-2 to 3-4 & tbl. 3.5-1.

App-0546

alternatives that would avoid or greatly reduce impacts to aquatic resources for all proposed crossings, as the Corps must in its LEDPA analysis.[192]

The only discussion of the feasibility of using trenchless crossing methods is severely limited and not sufficient for the Corps to satisfy its obligations. FERC acknowledged Tennessee Gas's HDD Feasibility Studies for three proposed crossings.[193] That is, despite purporting to be interested in the feasibility of alternatives,[194] the FERC DEIS addresses only the feasibility of using the HDD method, not conventional bore or other trenchless methods, and only at three crossings.[195] The Corps, on the other hand, must assess the feasibility of avoiding impacts to aquatic resources through the use of trenchless techniques beyond just HDD at *each crossing*.[196]

### c. FERC's DEIS Failed to Analyze Minor Route Variations That Could Avoid Impacts to Aquatic Resources, Including Special Aquatic Sites.

As explained above, Tennessee Gas's application fails to establish that there are not practicable route variations that would cause less damage to

---

[192] *See* 40 C.F.R. §230.10(a)(i).

[193] DEIS at 4-12.

[194] *Id.* at 3-1.

[195] Those crossings are of Jones Creek, Yellow Creek and one of its unnamed tributaries, and Wells Creek. *Id.*, tbl. 4.1-1.

[196] *See* Sections II.A.2.d & II.C, *supra*.

App-0547

aquatic resources.[197] FERC's DEIS suffers from the same flaw, such that additional NEPA analysis by the Corps of minor alternative route variations that would avoid or lessen impacts to waterbodies is required.

The DEIS's alternatives analysis does not assess the feasibility of avoiding or minimizing impacts to aquatic resources at each crossing location. Rather, FERC's assessment of minor routing variations listed only ten such variations.[198] Only three of those variations addressed avoiding surface water resources, and only two others addressed achieving perpendicular stream crossings, presumably to minimize impacts to those resources.[199] Thus, the DEIS falls short of what is required for the Corps' NEPA analysis.

In sum, FERC's DEIS is wholly inadequate to support the Corps' independent obligations under NEPA and the Clean Water Act. Corps reliance on the DEIS would thus be arbitrary and capricious.[200] The Corps cannot grant Tennessee Gas's application without seeing major changes to the final FERC EIS or preparing a supplemental EIS that includes sufficient information to allow the Corps to rationally apply the 404(b)(1) Guidelines, including selection of the least environmentally damaging practicable alternative.

---

[197] *See* Section II.A.3, *supra*.

[198] *Id.*, tbl. 3.5-1.

[199] *Id.*

[200] *See Cowpasture*, 911 F.3d at 168.

**App-0548**

### d. *The Corps Must Prepare An SEIS That Examines the Environmental Impacts of Dry-Ditch, Open-Cut Crossings on Surface Water Resources.*

Like Tennessee Gas's application, FERC's DEIS asserts, without analysis or support, that impacts from Tennessee Gas's proposed stream and wetlands crossings "would be temporary and minor."[201] But the overwhelming weight of the scientific literature discussed in Section II.B.1, *infra*, fatally undermines and precludes the Corps from relying on FERC's *ipse dixet* statements in the DEIS.

Moreover, EPA Region 3 recently warned a different Corps district examining an application for an individual Section 404 permit with similar dry-ditch, open-cut crossing to those proposed by Tennessee Gas that "the direct, secondary, and cumulative impacts from the discharges associated with this project . . . may result in significant degradation of the waters of the United States and reduce the ability for remaining aquatic resources to maintain hydrologic, geochemical, and biologic functions."[202] Regarding dry-ditch, open-cut crossings, EPA Region 3 concluded that, "[w]hile many of the discharges of fill material associated with the proposed construction may be

---

[201] DEIS at 4-34.

[202] Letter from Jeffrey Lapp, Chief, Wetlands Branch, U.S. Envtl. Prot. Agency Region 3, to Michael Hatten, Chief, Regul. Branch, Huntington Dist., U.S. Army Corps of Eng'rs, Re: LRH-2015-00592-GBR, LRP-2015-798, NAO-2015-0898, Mountain Valley Pipeline, LLC; Mountain Valley Pipeline, Wetzel County, West Virginia to Pittsylvania County, Virginia at 2 (May 27, 2021) (attached as Exhibit 13) [hereinafter "Lapp Letter"].

**App-0549**

considered temporary, **the impacts from those discharges may have lasting effects**[.]"[203]

### e. The NEPA Documents For Any Corps Permit Issued for the Cumberland Pipeline Must Examine the Aggregate Effects of the Scores of Crossings Proposed by Tennessee Gas.

Among the factual findings that the Corps must make under the Section 404(b)(1) Guidelines is a "[d]etermination of the cumulative effects on the aquatic ecosystem."[204] Cumulative effects must also be evaluated as part of the factual determinations of the effects of the proposed discharge on the physical substrate, the effects of suspended particulates and turbidity, and the effects on the structure and function of the aquatic ecosystem and organisms."[205]

FERC's DEIS is entirely silent on the cumulative or aggregate impacts from Tennessee Gas's proposed stream crossings. Accordingly, it would arbitrary and capricious for the Corps to adopt and rely on the DEIS; rather the Corps must independently review the cumulative and aggregate impacts

---

[203] *Id.* at 4; *see also* Silvis (2023) at 2–5.

[204] 40 C.F.R. §230.11(g).

[205] *Id.* §230.11(a), (c), & (e).

of Tennessee Gas's proposed stream and wetlands crossings on aquatic resources.[206]

Here, to lawfully support any permit issued by the Corps, the NEPA document must include a detailed statement of the cumulative and aggregate environmental effects of all of the proposed crossings. That is so because:

(1) the Corps, as a cooperating agency, has to ensure that the information in the NEPA document produced for this Project is adequate to fulfill the Corps' statutory requirements, including the requirements of Section 404(b)(1) of the Clean Water Act,[207]

(2) NEPA's implementing regulations require an examination of cumulative effects,[208] and

(3) Tennessee Gas's proposed crossings are all "connected actions" whose impacts require review under NEPA's implementing regulations.[209]

The 404(b)(1) Guidelines recognize that, "[a]lthough the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of

---

[206] *Cowpasture River*, 911 F.3d at 170–73; *see also Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 594–96 (4th Cir. 2018).

[207] 40 C.F.R. §§230.10(a)(4)–(5).

[208] 40 C.F.R. §1508.1(g)(3).

[209] *Id.* §1501.9(e)(1).

App-0551

existing aquatic ecosystems." [210] That description of cumulative effects remarkably tracks the conclusions of the scientific literature on the significant cumulative effects of dry-ditch, open-cut crossings, like those proposed by Tennessee Gas:

> The potential for cumulative effects associated with pipeline crossing construction should be taken into consideration in assessing the impacts of these activities on rivers and streams. Construction of a single crossing on a stream or river, or within a watershed, may not have significant effects on fish and fish habitat in that system. **Construction of multiple crossings on a stream or river, or within a watershed, however, has the potential for cumulative effects on that system. In such cases, the capacity of the system to recover from impact may be exceeded, and the detrimental effects of crossing construction permanent. The same may be said for the frequency of crossing construction within a given system; rivers and streams will have limited capacities to recover from multiple impacts.**[211]

As discussed in Section II.C of these comments, despite the Section 404(b)(1) Guidelines' requirements for factual findings regarding cumulative effects, and despite the scientific literature's clear predictions of significant effects, Tennessee Gas's application to the Corps is devoid of any analysis of the cumulative effects of its proposed crossings. A similar absence of such information from an application for an individual Section 404 permit for dry-

---

[210] *Id.* §230.11(g).

[211] Lévesque and Dubé, *Review of the Effects of In-stream Pipeline Crossing Construction on Aquatic Ecosystems and Examination of Canadian Methodologies for Impact Assessment*, 132 ENVTL. MONITORING & ASSESSMENT 406–07 (2007) (attached as Exhibit 14).

ditch, open-cut pipeline crossings raised concerns for EPA.[212] As a result, EPA recommended "a conclusive evaluation at watershed scale (i.e. HUC 12) be provided to ensure that measures are undertaken to avoid and minimize the potential of cumulative impacts,"[213] and asked the Corps to require special provisions applicable to streams and wetlands impacted multiple times by construction of that pipeline.[214]

Section II.C of these comments details the cumulative effects that the Corps and FERC must consider, including the streams and watersheds that the Cumberland Pipeline would cut multiple times with its proposed open-cut trenches. If the Corps and FERC ignore those comments, they would do so at their peril. Any NEPA review that omits examination of the cumulative effects of Tennessee Gas's crossings will be insufficient to support an agency action on the company's pending applications.

Furthermore, also missing from the DEIS and Tennessee Gas's application to the Corps is any examination of the cumulative and aggregated impacts that would result from the combination of Tennessee Gas's upland activities and proposed stream crossings. Tennessee Gas's upland activities threaten to contribute substantial sediment loads to streams along the

---

[212] Lapp Letter at 1 (noting an "insufficient assessment of secondary and cumulative impacts").

[213] *Id*. at 8.

[214] *Id*. at 7.

**App-0553**

proposed route of the Cumberland Pipeline. Expert Starr Silvis predicts these impacts from upland disturbances:

> The conversion of forested land to maintained right-of-way increases runoff volumes, which will change stream morphology. Lack of intact forest cover has been found to change stream morphology for two to four years post-disturbance (Reid & Anderson 1999). Methods to maintain the right-of-way include the use of pesticides and herbicides which can be mobilized in stormwater runoff and cause degradation of aquatic ecosystems. The construction of temporary and permanent access roads also increases runoff volumes and increases turbidity and sediment migration from upland areas to water bodies. The increases in stormwater runoff volumes can alter stream morphology and stream bed composition. There are also long-term increases in temperature associated with the reduction of forested canopy for both streams and wetlands.[215]

As a result, the NEPA documents for this project must evaluate the cumulative and aggregate effects on the aquatic ecosystems of sedimentation from Tennessee Gas's proposed open-cut stream crossings and sedimentation and runoff from Tennessee Gas's upland construction activities.

In sum, because of the requirements of the Section 404(b)(1) Guidelines, the scientific literature establishing potentially permanent impacts to watersheds from multiple trenched crosses in the same watershed, the inadequacy of the DEIS and Tennessee Gas's application on those issues, and the connected nature of the actions that would occur under the sought FERC certificate and Corps permits, FERC and the Corps must take a hard look at the combined effects of Tennessee Gas's proposed crossings in their NEPA

---

[215] Silvis (2023) at 4.

documents. The DEIS does not do so. Accordingly, it cannot support any agency action authorizing Tennessee Gas to trench through waterbodies in its path.

### f. The DEIS Fails To Address All Of The Impaired Streams That Tennessee Gas Intends to Trench Through.

FERC's DEIS is also deficient because its identification of impaired streams is incomplete. Section 4.3.2.2 of the DEIS recognizes that the State of Tennessee lists streams "that fail to meet their designated beneficial use(s)" on its list of impaired waters under Section 303(d) of the Clean Water Act—the "303(d) List."[216] The DEIS then claims that the Cumberland Pipeline will only affect five waterbodies listed on Tennessee's 303(d) List—Wells Creek, Jones Creek, and three unnamed tributaries to Jones Creek.[217] But there is a sixth.

Neither Tennessee Gas's Section 404 application nor the DEIS acknowledge or discuss the impaired status of that sixth stream. Tennessee's 2022 Section 303(d) list identifies Leatherwood Creek in the Harpeth River Watershed as impaired for unknown causes.[218] Tennessee Gas proposes dry-ditch, open-cut crossings of Leatherwood and eight of its unnamed tributaries

---

[216] DEIS at 4-31.

[217] Id.

[218] Final 2022 List of Impaired and Threatened Waters, TENN. DEP'T OF ENV'T & CONSERVATION (Apr. 2022) [hereinafter, "Tennessee 303(d) List"] (attached as Exhibit 15), available at https://www.tn.gov/content/dam/tn/environment/water/watershed-planning/wr_wq_303d-2022-final.xlsx.

**App-0555**

in its Section 404 application.[219] Tennessee Gas proposes two dry-ditch, open-cut crossings of one of those unnamed tributaries.[220] And Tennessee Gas proposes an access road crossing and a workspace crossing for two of those unnamed tributaries, in addition to the proposed right-of-way crossings.[221] The DEIS's failure to acknowledge or discuss the impaired status of Leatherwood Creek is yet another reason the Corps cannot rely on the DEIS.

### g. Tennessee Gas's Section 404 Permit Application Contradicts FERC's Assertions About Blasting In the DEIS.

Another flaw in FERC's DEIS that prevents the Corps from adopting it to satisfy its NEPA obligations is its assertion that "Tennessee [Gas] has indicated that controlled blasting would not be attempted in Waters of the U.S. or in TDEC-jurisdictional waters."[222] Tennessee Gas contradicts that categorical statement in its Section 404 permit application.[223] For example, in Table 2.7.3 of its application, Tennessee Gas identifies 28 stream crossings as "Candidate[s] for Blasting."[224] And in Attachment 3 to its Section 404

---

[219] Table 1 (rev. Mar. 2023) at 10–11.

[220] *Id.* at 10 (proposing two crossings of Stream ID No. SDKB025).

[221] *Id.* at 10 (access road crossing of Stream ID No. SDKA047); *id.* at 11 (workspace crossing of Stream ID No. SDKB028).

[222] DEIS at 4-17.

[223] IP Application at 14.

[224] *Id.* at 36–53.

**App-0556**

application, Tennessee Gas expressly identifies blasting as the trenching method for 29 dry-ditch, open-cut crossings.[225] Only eight of those crossings appear on both lists—SDKA006, SDKA008, SDKA058, SDKA050, SDKA051, SDKA049, SDKA053, and SDKA055.[226] Accordingly, Tennessee Gas's Section 404 application targets 49 streams for blasting, notwithstanding the statement in the DEIS that Tennessee Gas would not use blasting in waters of the United States.

Moreover, the DEIS asserts that, "[i]n no event would controlled blasting be used in locations characterized by karst-prone geology, wetlands, or with an unacceptable risk of hydrologic loss."[227] Tennessee Gas's Section 404 application also contradicts that categorical statement. Neither the DEIS nor Tennessee Gas's Section 404 application define "an unacceptable risk of hydrologic loss." Nonetheless, Tennessee Gas identifies Nesbitt Branch (Stream ID No. SDKA008) as a stream with at "high" risk of hydrologic loss from a dry-ditch, open-cut crossing, and yet names it as a "Candidate for

---

[225] *Id.*, attachment 3. Those streams are SDKA023 (2 crossings), SDKA024, SDKA026, SDKA027, SDKA004, SDKA006, SDKA008, SDKA058, SDKA050, SDKA051, SDKA049, SDKA053, SDKA055, SDKA033, SDKA034, SDKA036, SDKA037, SDKA038 (2 crossings), SDKA040, SDKA041, SDKA042, SDKB001, SDKB002, SDKB009, SDKB011, SDKB023, and SDKB028. *Id.*

[226] *Compare* IP Application, tbl. 2.7-3 *with* IP Application, attachment 3.

[227] DEIS at 2-12.

App-0557

Blasting" anyway.[228] And Tennessee Gas identifies six other streams as "Candidate[s] for Blasting" that have a "medium" risk of hydrologic loss.[229]

Attachment 3 to Tennessee Gas's Section 404 application also contradicts the DEIS's statement.[230] In that attachment, Tennessee Gas identifies blasting as the trenching method for 29 crossings, 21 of which have the potential for karst and 20 of which have a "high" or "medium" potential for hydrologic loss.[231] Moreover, Attachment 3 leaves open the possibility for blasting at 78 crossings, 62 of which have the potential for karst, and 13 of which have a "high" or "medium" potential for hydrologic loss.[232]

Tennessee Gas's plans to blast through a significant number of streams in its path has implications for the Corps' LEDPA analysis (as explained in Section II.A.2.g) and for its consideration of the potential for water quality standards violations and significant degradation from the proposed activities because of the significant adverse impacts of blasting on aquatic resources (as described by Silvis (2023) at 7–12; see Section II.B). But the applicant's blasting plans also reveal a serious deficiency in the DEIS. Because FERC

---

[228] IP Application at 42.

[229] *Id.* at 37–38.

[230] *Id.*, attachment 3.

[231] *Compare* IP Application, tbl. 2.7-3 *with* IP Application, attachment 3.

[232] *Id.*, attachment 3.

**App-0558**

assumed that Tennessee Gas would not use blasting in waters of the United States, and "[i]n no event" would blasting occur in karst-prone geology or in waters with an "unacceptable risk of hydrologic loss,"[233] the DEIS does not describe or evaluate the potential effects of in-stream blasting. Accordingly, the DEIS cannot satisfy the obligations of either FERC or the Corps to take a hard look at the environmental effects of Tennessee Gas's proposed crossings.

### h. FERC's DEIS Erroneously Predicted That Tennessee Gas Would Use Compensatory Mitigation to Offset The Adverse Effects Of Its Wetlands Construction Plans.

In its consideration of wetland impacts from the Cumberland Pipeline, FERC's DEIS acknowledged that "long-term and permanent effects on wetlands would occur."[234] But it predicted that "Tennessee [Gas] would develop a Project-specific compensatory wetland mitigation plan to address Project impacts on wetlands, which would be completed prior to construction and is subject to approval by the [Corps] as part of Tennessee[ Gas]'s USACE Individual Permit application."[235] FERC further stated:

> We anticipate that if the [Corps] issues a Section 404 permit for the Project, it would be conditioned upon Project-related adverse impacts on Waters of the United States being effectively offset by wetland mitigation. Permanent impacts on wetlands would include the conversion of less than an acre of PFO wetland to

---

[233] DEIS at 2-12, & 4-17.

[234] *Id.* at 4-38.

[235] *Id.*

PEM/PSS wetland within the maintained permanent pipeline easement.[236]

FERC's prediction of mitigation was wrong.

Tennessee Gas's Section 404 application makes clear that the applicant does not think it needs to even "propose compensatory mitigation for impacts to streams or wetlands."[237] Accordingly, the DEIS's reliance on mitigation to offset the permanent conversion of PFO wetlands to PEM/PSS wetlands is misplaced, and if it is not addressed, it will constitute arbitrary and capricious agency action.

When an agency finds that an alternative will have no significant impact on the basis of mitigation, it "shall state any enforceable mitigation requirements or commitments that will be undertaken to avoid significant impacts."[238] "[M]itigation measures must be developed to a reasonable degree," and "[a] perfunctory description or mere listing of mitigation measures, without supporting analytical data, is insufficient to support a finding of 'no significant impact.'"[239]

---

[236] *Id.*

[237] IP Application at 55–56.

[238] 40 C.F.R. §1501.6(c).

[239] *Nat'l Parks Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir. 2001) (cleaned up).

App-0560

Here, FERC's DEIS finds that there will be long-term and permanent impacts to wetlands from the Cumberland Pipeline, but assumes that Tennessee Gas will use compensatory mitigation to "offset" those effects.[240] The DEIS's conclusion that there will not be significant impacts to wetlands is thus unsupported.[241] And given the "longstanding national goal of 'no net loss' of wetland acreage and function,"[242] the conclusion of no significant impact cannot be supported absent mitigation. Accordingly, either the NEPA documents for this project must acknowledge Tennessee Gas's refusal to mitigate its wetlands conversions and evaluate the impacts of that refusal, or the Corps and FERC must require mitigation from Tennessee Gas.

### B. THE CORPS MUST DENY TENNESSEE GAS'S REQUEST FOR AN INDIVIDUAL PERMIT BECAUSE THE PROPOSED DISCHARGES WILL CAUSE OR CONTRIBUTE TO WATER QUALITY STANDARDS VIOLATIONS AND SIGNIFICANT DEGRADATION OF THE WATERS OF THE UNITED STATES.

Under the 404(b)(1) Guidelines, no discharge of dredged or fill material can be permitted if it will, among other things, (1) cause or contribute to

---

[240] DEIS at 4-38.

[241] *Nat'l Parks Conservation Ass'n*, 241 F.3d at 734.

[242] Compensatory Mitigation for Losses of Aquatic Resources, 73 Fed. Reg. 19,594, 19,594 (Apr. 10, 2008), *cited in Butte Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 947 (9th Cir. 2010).

App-0561

violations of applicable water quality standards or (2) cause or contribute to significant degradation of the waters of the United States.[243]

The applicable standards at issue here include the narrative water quality criteria adopted by the State of Tennessee to protect uses such as the propagation and maintenance of aquatic life and the enjoyment of scenic and aesthetic qualities of waters, as well as Tennessee's antidegradation policies.[244] The 404(b)(1) Guidelines provide that "significant degradation" includes significant adverse effects on: municipal water supplies; fish; shellfish; special

---

[243] 40 C.F.R. §230.10(b)–(c).

[244] Specifically, and as discussed further below, those water quality standards include, *inter alia*:

- Tennessee's designated uses such as "sources of water supply for domestic and industrial purposes; propagation and maintenance of fish and other aquatic life; recreation in and on the waters including the safe consumption of fish and shellfish; livestock watering and irrigation; navigation; generation of power; propagation and maintenance of wildlife; and the enjoyment of scenic and aesthetic qualities of waters." TN ADC §0400-40-3-.02(2);

- Tennessee water quality criteria that prohibit distinctly visible solids, the formation of bottom deposits, and turbidity and total suspended solids. *See, e.g.,* TN ADC §0400-40-03-.03(1)(e)–(f); *id.* §0400-40-03-.03(2)(e)–(f); *id.* §0400-40-03-.03(3)(c)–(d); *id.* §0400-40-03-.03(4)(c)–(d); *id.* §0400-40-03-.03(5)(d); *id.* §0400-40-03-.03(6)(d); *id.* §0400-40-03-.03(7)(a); and

- Tennessee's antidegradation statement. TN ADC §0400-40-03-.06.

App-0562

aquatic sites; life stages of aquatic life and other wildlife; and aquatic ecosystem diversity, productivity, and stability.[245]

As explained below, because Tennessee Gas's discharges will cause or contribute to both water quality standards violations and impermissible significant degradation to waters of the United States, the 404(b)(1) Guidelines prohibit the Corps from issuing the permit sought by Tennessee Gas.[246]

### 1. TENNESSEE GAS UNDERSTATES THE IMPACTS ON WATER QUALITY, AQUATIC LIFE, AND AQUATIC ECOSYSTEMS FROM DRY-DITCH, OPEN-CUT CROSSINGS.

Tennessee Gas asserts, without support, that "[c]onstruction of the Project will potentially result in *minor, short-term* impacts, including *temporary localized* increases in turbidity levels and downstream sediment deposition in the waterbodies crossed" [247] and that "[s]treams or wetland activities associated with this Project will result in no more than *de minimis* degradation and no appreciable permanent loss of resource values."[248] But, those categorical assertions are not supported by either Tennessee Gas's own application or the rest of the literature on the ecological effects of dry-ditch,

---

[245] 40 C.F.R. §230.10(c)(1)–(3).

[246] *Id.* §230.10(b)–(c).

[247] IP Application at 16 (emphasis added).

[248] *Id.* at 55.

**App-0563**

open-cut stream crossings.[249] Contrary to Tennessee Gas's repetition of the common industry refrain, the adverse environmental effects of dry-ditch, open-cut crossings are measured in years, not in days.[250]

On another proposed natural gas pipeline, the United States Fish and Wildlife Service ("FWS") reviewed the literature and recently concluded, in a February 2023 Biological Opinion ("BiOp") for the proposed Mountain Valley Pipeline project, that it should assume that "effects to benthic invertebrates in aquatic areas that receive significant increased sedimentation as a result of the MVP project will persist for up to four years."[251] That conclusion stands in

---

[249] As one journal article that examined pipeline crossing effects concluded, "before authoritative statements concerning environmental impact can be made[,] it is essential to have knowledge of the natural variation associated to be expected in streams of differing characteristics." P. D. Armitage & R. J. M. Gunn, *Differential Response of Benthos to Natural and Anthropogenic Disturbances in 3 Lowland Streams*, 81 INT'L REV. HYDROBIOLOGY 161 (1996) (attached as Exhibit 16).

[250] *See, e.g.*, U.S. Fish and Wildlife Serv., Mountain Valley Pipeline, LLC; Revised Biological Opinion 191 (Feb. 28, 2023) [hereinafter "BiOp"] (attached as Exhibit 17) (assuming sedimentation effects on benthics to persist for up to four years). Others have found adverse effects that persist "2-4 years after the construction of water crossings in areas with open forest canopies." Scott M. Reid & Paul G. Anderson, *Effects of Sediment Released During Open-Cut Pipeline Water Crossings*, 24 CANADIAN WATER RES. J. 235, 243 (1999) (attached as Exhibit 18). And Silvis concludes that the impacts associated with sediment deposits from dry-ditch, open-cut crossings can be permanent. Silvis (2023) at 2–5.

[251] BiOp at 191.

stark contrast to Tennessee Gas's prediction of "short term" and "temporary" impacts.[252]

A West Virginia-based FWS biologist examining proposed natural gas pipeline stream crossings once grew so frustrated by the industry refrain that "crossings have only temporary impacts to the stream" that she felt it necessary to develop her own literature review to push back against that refrain.[253] The following is her summary of the literature:

> Pipeline stream crossings can affect fish habitat; food availability; and fish behavior, health, reproduction and survival. The most immediate effect of instream construction is the creation of short term pulses of highly turbid water and total suspended sediments (TSS) downstream of construction (Levesque & Dube 2007, pp. 399-400). Although these pulses are usually of relatively short duration and there is typically a rapid return to background conditions after activities cease, **instream construction has been shown to have considerable effects on stream substrates and benthic invert[ebrate] communities that persist after construction has been completed** (Levesque & Dube 2007, p. 396-397). Commonly documented effects include substrate compaction and silt deposition within the direct impact area and downstream that fills interstitial spaces in gravel substrates and reduces water flow through the substrate, this increases substrate embeddedness and reduces habitat quality (Levesque & Dube 2007, pp. 396-397; Penkal & Phillips 2011, pp. 6-7; Reid & Anderson 1999, p. 243). Construction also directly alters stream channels, beds, and banks resulting in changes in cover, channel morphology, and sediment transport dynamics.

---

[252] IP Application at 16.

[253] Email from Barbara Douglas, Sr. Endangered Species Biologist, W. Va. Field Office, U.S. Fish & Wildlife Serv., to Cindy Shulz, U.S. Fish & Wildlife Serv. (Dec. 11, 2019, 11:44 AM) (attached as Exhibit 19).

Streambank alterations can lead to increased water velocities, stream degradation, and migrations in stream channel. Removal of vegetation from the banks can change temperature regimes, and increase sediment and nutrient loads (Penkal & Phillips 2011, pp. 6-7).

These instream changes not only directly affect the suitability of fish habitat, they also affect the availability and quality of fish forage altering the composition and reducing the density of benthic invertebrate communities within and downstream of the construction area (Levesque & Dube 2007, pp. 396-399; Penkal & Phillips 2011, pp. 6-7; Reid & Anderson 1999, pp. 235, 244). **Various studies have documented adverse effects to the benthic community that have been apparent for between six months and four years post-construction** (Levesque & Dube 2007, pp. 399-400; Reid & Anderson 1999, pp. 235, 244). Stream crossings have also been shown to affect fish physiology, survival, growth, and reproductive success (Levesque & Dube 2007, p. 399). Studies have found decreased abundance of fish downstream of crossings, as well as signs of physiological stress such as increased oxygen consumption and loss of equilibrium in remaining fish downstream of crossings (Levesque & Dube 2007, pp. 399-401; Reid & Anderson 1999, pp. 244-245). Increased sediment deposition and substrate compaction from pipeline crossings can degrade spawning habitat, result in the production of fewer and smaller fish eggs, impair egg and larvae development, limit food availability for young-of-year fish, and increase stress and reduce disease resistance of fish, (Levesque & Dube 2007, pp. 401-402; Reid & Anderson 1999, pp. 244- 245).

The duration and severity of these effects depends on factors such as the duration of disturbance, the length of stream segment directly impacted by construction, and whether there were repeated disturbances (Yount & Niemi 1999, p. 557). Most studies documented recovery of the affected stream reach within one to three years after construction (Reid & Anderson 1999, p. 247; Yount & Niemi 1999, pp. 557-558, 562). **However caution should be used when interpreting results of short-term studies. Yount & Niemi (1999, p. 558) cite an example of one**

**study that made a preliminary determination of stream recovery within one year, but when the site was re-examined six years later, fish biomass, fish populations, macroinvertebrate densities, and species composition were still changing. It was suspected that shifts in sediment and nutrient inputs to the site as a result of construction in and around the stream contributed to the long-term lack of recovery. In another study, alterations in channel morphology, such as increased channel width and reduced water depth, were evident two to four years post-construction at sites that lacked an intact forest canopy** (Reid & Anderson 1999, p. 243). There is also the potential for cumulative effects. **While a single crossing may have only short-term or minor effects, multiple crossings or multiple sources of disturbance and sedimentation in a watershed can have cumulative effects on fish survival and reproduction that exceed the recovery capacity of the river, resulting in permanent detrimental effects** (Levesque & Dube 2007, pp. 406-407). Whether or how quickly a stream population recovers depends on factors such as the life history characteristics of the species, and the availability of unaffected populations upstream and downstream as a source of organisms for recolonization (Yount & Niemi 1999, p. 547). Species such as the diamond darter that are particularly susceptible to the effects of sedimentation and substrate embeddedness, and that have limited distribution and population numbers are likely to be more severely affected by instream disturbances than other more common and resilient species.[254]

And yet another FWS scientist (J.M. Castro) similarly concluded that there are significant and long-term effects from dry-ditch, open-cut pipeline crossings in 2015, stating, "Based on past experience at pipeline crossings, the potential for both short and long-term negative impacts on aquatic habitat and

---

[254] *Id.* (emphasis added).

**App-0567**

species is substantial."[255] Such impacts

> include both short-term, construction related impacts, such as increased turbidity, direct modification of aquatic habitat, and the potential for hydrocarbons to enter the stream through equipment failures and spills (Reid and Anderson, 1999; Reid *et al*, 2002a, 2002b), and long-term impacts that are more directly associated with the stream's response potential, such as channel incision and lateral migration (Thorne *et al.*, 2014).[256]

Among other things, Castro concludes that "the effects of proposed and existing pipeline crossings on aquatic systems are significant because each pipeline may have hundreds or even thousands of stream crossings (Levy, 2009)[.]"[257]

These FWS scientists' conclusions are well-supported by the scientific literature. Open-cut, trenched crossings have long-term and substantial effects on water quality, stream structure, and aquatic life. As early as 1984, scientists recognized the substantial effects on water quality and aquatic life that open-cut trenches through streams can have. Penkal and Phillips (1984) state, "Because of the magnitude of pipeline projects, the number of waterways involved, the high quality of fishery resources in many of these waterways, and the potential for impacts to fisheries from spills or construction activities,

---

[255] J.M. Castro et al., *Risk-Based Approach to Designing and Reviewing Pipeline Stream Crossings to Minimize Impacts to Aquatic Habitats and Species*, River Rsch. & Applications 31, 767 (2015) (attached as Exhibit 20).

[256] *Id.*

[257] *Id.*

App-0568

safeguards must be adopted to protect these important resources."[258] They further state,

> Fishery habitat may be adversely affected by sedimentation from pipeline construction. Sedimentation can occur from (1) trenching to lay pipeline beneath the stream channel, (2) runoff at construction sites, (3) erosion resulting from construction of culverts, roads, bridges, or fords, and (4) hydrostatic testing. Additionally, silt or sand deposition can fill interstices in gravel and reduce water flow through substrate. Equipment operating in the stream can compact substrate, create sediment, and eliminate spawning habitat.[259]

Accordingly, they ultimately conclude that "[c]onstruction and operation of pipelines can cause significant damage to aquatic habitats and fishery resources."[260]

The seminal, peer-reviewed article on the effects of dry-ditch, open-cut crossings reaches similar conclusions. Lévesque and Dubé, in their 2007 *Review of the Effects of In-Stream Pipeline Crossing Construction on Aquatic Ecosystems and Examination of Canadian Methodologies for Impact Assessment*, found the following:

- "Pipeline crossing construction is shown to not only compromise the integrity of the physical and chemical nature of fish habitat, but also to affect biological habitat (e.g., benthic invertebrates and invertebrate drift), and fish behavior and physiology. Indicators of effect include: water quality (total suspended solids TSS), physical habitat (substrate particle size, channel

---

[258] Russ F. Penkal & Glenn R. Phillips, *Construction and Operation of Oil and Gas Pipelines*, 9 FISHERIES 6 (1984) (attached as Exhibit 21).

[259] *Id.*

[260] *Id.* at 8.

**App-0569**

morphology), benthic invertebrate community structure and drift (abundance, species composition, diversity, standing crop), and fish behavior and physiology (hierarchy, feeding, respiration rate, loss of equilibrium, blood hematocrit and leukocrit levels, heart rate and stroke volume)."[261]

- "Construction activities alter river and stream channel beds and banks, directly and indirectly affecting fish and fish habitat."[262]

- "[Dry-ditch, open-cut methods] may impact watercourse ecosystems both during, and for potentially some time after, construction. All in-stream construction activities, particularly trench excavation and pipeline installation and backfill, result in disturbance of channel bed and banks, and have the potential to alter suspended sediment concentration and sedimentation."[263]

- "[A]ny in-stream construction activity has the potential to impact aquatic ecosystems through alteration of stream and river bed and banks and, therefore, may result in direct effects such as physical alteration of channel morphology and habitat, and indirect effects such as alteration of water quality and sediment dynamics, on aquatic ecosystems (e.g., Alberta Environment 2001; Alberta Transportation and Utilities 2000)."[264]

- Even with dry-ditch, open-cut methods, "[m]ean TSS concentrations increased by between 4 and 100 mg l$^{-1}$ above background. Installation of dams and flumes for water diversion generated TSS concentrations on average less than 76 mg l$^{-1}$ greater than background over periods of 2 to 16.5 h (with one crossing experiencing an increase of 520 mg l$^{-1}$ for 3 h). Removal of dams and flumes resulted in TSS increases of between 1 and 703 mg l$^{-1}$ downstream of construction over periods of 20 min to 6.5 hrs. Other stages of construction were associated with average TSS increases of less than 8 mg l$^{-1}$, with the exception of accidental leaks from construction infrastructure (e.g., 820 mg l$^{-1}$

---

[261] Lévesque and Dubé at 395.

[262] *Id.*

[263] *Id.* at 396.

[264] *Id.*

App-0570

over 5.5 h). Plumes of highly turbid water were observed downstream of construction[.]"[265]

- "Armitage and Gunn (1996) noted that pipeline crossing construction in a stream in England resulted in a shift in invertebrate species due to an increased proportion of silt in stream substrates. This effect persisted for 4 years until a high magnitude flow event scoured the stream channel bed, promoting re-establishment of pre-construction invertebrate species. Tsui and McCart (1981) found that crossing construction of Archibald Creek, British Columbia, caused short-term increases in silt and sand accumulations and decreases in invertebrate standing crop and diversity, which lasted 1 to 2 years."[266] and

- "The potential for cumulative effects associated with pipeline crossing construction should be taken into consideration in assessing the impacts of these activities on rivers and streams. Construction of a single crossing on a stream or river, or within a watershed, may not have significant effects on fish and fish habitat in that system. **Construction of multiple crossings on a stream or river, or within a watershed, however, has the potential for cumulative effects on that system. In such cases, the capacity of the system to recover from impact may be exceeded, and the detrimental effects of crossing construction permanent. The same may be said for the frequency of crossing construction within a given system; rivers and streams will have limited capacities to recover from multiple impacts. As well, recurrent stresses on fish, such as those that originate from elevated suspended sediment concentrations, may have cumulative effects on fish health, survival and reproduction. The long-term effects of such impacts are not well known at this time (Reid et al. 2003).**[267]

---

[265] *Id.* at 398.

[266] *Id.* at 399.

[267] *Id.* at 406–07.

**App-0571**

Following their reviews of the literature, Hansen and Betcher (2021) and Silvis (2023) concur that the effects of dry-ditch, open-cut crossings are substantial and long-term. Hansen and Betcher (2021) recognize that data on those effects are "sparse" in the literature, but that the available data in the literature does substantiate long-term effects.[268] And Silvis (2023) describes those effects this way:

> Immediate environmental impacts associated with dry-ditch open-cut methods include death of all fish and benthic macroinvertebrates within the work area and increased turbidity and suspended sediment loads when the diversion is installed, for the duration of the disturbance, as well as when flow is returned to the disturbed channel bed. . . . There are long-term increases in sedimentation due to stream bank and upland disturbances until vegetation can be re-established. Increased turbidity and high suspended sediment loads can cause long-term impacts to invertebrate communities downstream of the disturbance including reducing invertebrate biomass, growth rates, and species diversity and increasing invertebrate mortality. Increased suspended and deposited sediment causes negative impacts in fish populations as well. These impacts can include smothering of fish eggs, changes in stream bed characteristics which can reduce reproductive success, reduction of juvenile survival rates, reduction of food sources, as well as reduction in in-stream dissolved oxygen which causes respiratory distress.[269]

Based on her "experience in stream restoration, hydrology, stream

---

[268] Evan Hansen & Meghan Betcher, *Sedimet Generation and Impacts from Dry-Ditch Open-Cut Stream Crossings Such as Those Proposed for the Mountain Valley Pipeline* 6 (May 26, 2021) (attached as Exhibit 22). That "paucity of current, data-driven documentation of the long-term impacts" requires that, for permitting purposes, an evaluation "at each individual stream [is required] due to stream-specific factors that influence the duration of stream channel and aquatic life impacts." *Id.* at 2.

[269] Silvis (2023) at 3.

**App-0572**

geomorphology, and erosion and sediment control," Silvis concludes "that there are significant permanent impacts associated with trenched methods of stream and wetland crossings."[270]

The inherent adverse effects of dry-ditch, open-cut crossings are exacerbated by improper application of protective measures. Even industry consultants acknowledge that

> [t]he effectiveness of isolated crossing methods is dependent on proper design and application. Reported construction related difficulties include (1) pump failure or insufficient capacity, (2) dam or flume failure, (3) poor dam seal, (4) poor containment of pumped ditch water, and (5) inadequate maintenance of sediment control measures (Macks et al. 1997; CPWCC 1999; this study). During dam and pump crossings, construction related difficulties that resulted in large increases to downstream TSS concentrations were rare (1 of 23 crossings). Alternatively, such difficulties resulted in large increases in downstream TSS concentrations (60-1848 mg L$^{-1}$) during 5 of the 12 flumed crossings. Poor containment of pumped ditch water and poor dam seals were the causes. Flumed crossings are often applied to larger watercourses than dam and pump crossings. Larger water crossings require longer periods of instream activity and the control of larger volumes of both streamflow and trench water. Both characteristics increase the risk of sediment being released into the watercourse (Reid et al. 2002*b*, 2002*c*).[271]

Accordingly, there are a multitude of ways that dry-ditch, open-cut crossings can go wrong, and the Corps cannot rationally assume that Tennessee Gas will flawlessly construct hundreds of such crossings. Rather,

---

[270] *Id.* at 2.

[271] S. M. Reid et al., *Sediment Entrainment During Pipeline Water Crossing Construction: Predictive Models and Crossing Method Comparison*, 3 J. ENV'T ENG. & SCI. 81, 82 (2004) (attached as Exhibit 23).

App-0573

the Corps should expect multiple incidents with impermissible adverse effects, individually and cumulatively, on water quality and aquatic life.

Tennessee Gas's mischaracterization of the effects of its proposed dry-ditch, open-cut crossings is important because of the 404(b)(1) Guidelines' prohibitions on issuing individual permits where they will cause or contribute to water quality standards violations or cause significant degradation of the waters of the United States.[272] As explained below, given that a complete review of the literature reveals that dry-ditch, open-cut crossings have substantial and long-term adverse impacts on waterbodies and aquatic life, the Corps cannot issue an individual Section 404 permit to Tennessee Gas.

## 2. THE CUMBERLAND PROJECT WILL CAUSE OR CONTRIBUTE TO VIOLATIONS OF WATER QUALITY STANDARDS.

The 404(b)(1) Guidelines prohibit the issuance of a discharge permit where the discharge will "cause[] or contribute[] . . . to violations of any applicable State water quality standard."[273] The relevant water quality

---

[272] 40 C.F.R. §230.10(b)–(c). Tennessee Gas's understatement of the significance of the potential environmental impacts is also relevant to the LEDPA analysis. The 404(b)(1) Guidelines provide that, "[a]lthough all requirements in §230.10 must be met, [including the LEDPA analysis,] the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities." *Id.* §230.10. As established above, the seriousness of the potential adverse effects of the hundreds of discharges proposed by Tennessee Gas warrants a robust LEDPA analysis.

[273] *Id.* §230.10(b).

App-0574

standards here are the Tennessee's water quality criteria protecting designated uses from sedimentation and turbidity, as well as the state's antidegradation statement. The scientific literature discussed above establishes that Tennessee Gas will cause or contribute to violations of those standards.

### a. The Corps Must Evaluate Water Quality Standards Impacts.

As a threshold matter, the Corps must address these issues in this permitting decision. Although a Corps regulation purports to allow it to avoid an independent analysis of water quality issues in the context of its public interest review of permit applications where a state has certified an activity under Section 401 of the Clean Water Act, that regulation does not affect the Corps' obligations under the Section 404(b)(1) Guidelines.[274] That regulation, found at 33 C.F.R. §320.4(d), appears in the Corps' public interest review regulations, not the Section 404(b)(1) Guidelines.[275] The Section 404(b)(1) Guidelines independently require factual findings regarding water quality standards and significant degradation.[276] And, as a product of a joint effort by

---

[274] See 33 C.F.R. §320.4(d).

[275] Id.

[276] See 40 C.F.R. §230.11 (requiring the Corps to determine in writing the potential short-term or long-term effects of proposed discharges to be used in finding compliance or noncompliance with the prohibitions on water quality standards violations or significant degradation in §230.10).

EPA and the Corps, the 404(b)(1) Guidelines cannot be altered by unilateral Corps action.[277] The regulation purporting to allow the Corps to avoid water quality analyses was promulgated solely by the Corps.[278] Accordingly, it only applies to the Corps' public interest review of DA permits. Consequently, the Corps must analyze the water quality effects of the project.

### b. Tennessee Gas's Stream Crossings Will Cause or Contribute to Violations of Tennessee's Narrative Standards.

Tennessee's narrative water quality criteria prohibit "distinctly visible solids . . . or the formation of . . . bottom deposits of such size or character as may" impair designated uses.[279] They also prohibit turbidity in amounts that would impair designated uses.[280]

Violations of those narrative standards can be assessed in numerous ways. For example, violations of the narrative criteria protecting the

---

[277] *Id.* §230.1(c) ("No modifications to the basic application, meaning, or intent of these Guidelines will be made without rulemaking by the Administrator [of the Environmental Protection Agency] under the Administrative Procedure Act[.]").

[278] 33 C.F.R. §320.4(d).

[279] TN ADC §0400-40-03-.03(1)(e); *id.* §0400-40-03-.03(2)(e); *id.* §0400-40-03-.03(3)(c); *id.* §0400-40-03-.03(4)(c); *id.* §0400-40-03-.03(5)(d); *id.* §0400-40-03-.03(6)d. For example, the narrative standard protecting the recreational use of Tennessee's waters prohibits such visible solids or deposits "that may be detrimental to recreation." *Id.* §0400-40-03-.03(4)(c).

[280] *Id.* §0400-40-03-.03(1)(f); *id.* §0400-40-03-.03(2)(f); *id.* §0400-40-03-.03(3)(d); *id.* §0400-40-03-.03(4)(d). For example, the narrative standard protecting the fish and aquatic life use of Tennessee's waters prohibits "turbidity, total suspended solids, or color in such amounts or of such character that will material affect fish and aquatic life." *Id.* §0400-40-03-.03(3)(d). And the

App-0576

recreational and aesthetic uses of a stream can be assessed visually, since those criteria prohibit "total suspended solids, turbidity, or color in such amounts or character that will result in *any objectionable appearance to the water*."[281] And because it is a fundamental principal under the Clean Water Act that water quality standards "are legally required to be met [at] all times," [282] even short-term or temporary objectional appearances are prohibited.

Moreover, compliance with water quality standards can be assessed through biological assessments of particular waters, including benthic monitoring.[283] Once a violation of the biological component of the narrative

---

narrative standard protecting the recreational use of Tennessee's waters prohibits "total suspended solids, turbidity, or color in such amounts or character that will result in *any objectionable appearance to the water*." *Id.* §0400-40-03-.03(4)(d) (emphasis added).

[281] *Id.* §0400-40-03-.03(4)(d).

[282] *Sierra Club v. W. Va. Dep't of Envtl. Prot.*, 64 F.4th 487, 503 (4th Cir. 2023) (quoting 49 Fed. Reg. 37,998, 38,038 (Sept. 26, 1984)).

[283] *See* TN ADC §0400-40-03-.03(3)(m); *see also Ohio Valley Envtl. Coalition, Inc. v. Pruitt*, 893 F.3d 225, 228 (4th Cir. 2018) (describing the West Virginia Stream Condition Index as a measure of compliance with narrative criteria); *Ohio Valley Envtl. Coalition v. Fola Coal Co.*, 845 F.3d 133, 138, 144 (4th Cir. 2027) (same); *Ohio Valley Envtl. Coalition, Inc. v. U.S. Army Corps of Eng'rs*, 716 F.3d 119, 124 (4th Cir. 2013) (explaining the use of benthic community metrics to determine that streams are biologically impaired); *S. Appalachian Mountain Stewards v. Red River Coal Co., Inc.*, 420 F. Supp. 3d 481, 489 (W.D. Va. 2019) (explaining that Virginia's "narrative standards include a biological component that is assessed by, among other things, monitoring benthic invertebrates").

App-0577

standards is found, its cause must be identified; sedimentation is frequently the stressor causing the impairment.[284]

Importantly, for purposes of the prohibition on issuing a discharge permit in the face of water quality standards violations, causation is not required; contribution is sufficient.[285] A "contribution" provision "imposes something less stringent than traditional but-for causation."[286] "Contribution" suggests that "more than one factor can be a substantial cause, and no single factor need be the sole causative element."[287] As one federal district court has observed, "Liability cannot be skirted by the mere presence of multiple stressors, lest we enable the simple nature of ecological systems to invariably frustrate the Clean Water Act."[288] Accordingly, if "it is more probable than not that . . . pollution [from stream crossing construction] is among some collection of . . . contributors to" a water quality standard violation, then that pollution

---

[284] *See, e.g.*, 2010 Release of CADDIS (Causal Analysis/Diagnosis Decision Information System), 75 Fed. Reg. 58,374 (Sept. 24, 2010).

[285] 40 C.F.R. §230.10(b).

[286] *Ohio Valley Envtl. Coalition v. Fola Coal Co., LLC*, 120 F. Supp. 3d 509, 542 (S.D. W. Va. 2015) (examining meaning of "material contribution" in West Virginia's narrative criteria). Much of this discussion relies on cases interpreting what it means to "materially contribute." *See, e.g., id.* Because the 404(b)(1) Guidelines do not impose a materiality component, the standard for what it means to contribute is actually less than in the cases discussed here.

[287] *Frito-Lay, Inc. v. Local Union No. 137*, 623 F.2d 1354, 1363 (9th Cir. 1980).

[288] *Fola Coal*, 120 F. Supp. 3d at 542.

App-0578

"contributes" to water quality standards violations.[289] "This standard does not require scientific certainty, but rather legal probability."[290]

Here, it is more probable than not that sedimentation from Tennessee Gas's dry-ditch, open-cut crossings will contribute to violations of Tennessee's narrative water quality criteria. Those criteria prohibit floating solids, sediment deposits, total suspended solids, and turbidity.[291] The literature establishes that dry-ditch, open-cut crossings cause sediment deposits and visible turbidity plumes downstream from the crossing location.[292] For example, Reid and Anderson (1999) find that "large depositions in slow velocity areas such as shallow side pools, behind boulders and instream debris have been observed to require longer periods or higher flows for removal," and note that 30 cm deep deposits have been observed within 100 m of crossings.[293] And Lévesque, L.M., Dubé (2007) found that "[p]lumes of highly turbid water [have been] observed downstream of construction."[294] Such deposits and turbidity

---

[289] *Id.* at 543.

[290] *Id.*

[291] TN ADC §0400-40-03-.03(1)(e)–(f); *id.* §0400-40-03-.03(2)(e)–(f); *id.* §0400-40-03-.03(3)(c)–(d); *id.* §0400-40-03-.03(4)(c)–(d); *id.* §0400-40-03-.03(5)(d); *id.* §0400-40-03-.03(6)d.

[292] Penkal & Phillips (1984) at 6; Reid & Anderson (1999) at 242.

[293] Reid & Anderson (1999) at 243.

[294] Lévesque & Dubé (2007) at 398.

App-0579

readily violate the relatively low threshold set by the narrative criteria protecting the recreational and aesthetic uses of Tennessee waters, which prohibit sediment deposits that "*may be detrimental to recreation*" and "suspended solids, turbidity or color in such amounts or character that will result in *any objectionable appearance to the water*[.]"[295]

Moreover, Tennessee's narrative criteria prohibit visible solids and sediment deposits that "*may be detrimental* to fish and aquatic life" and "turbidity, total suspended solids, or color in such amounts or of such character that will materially affect fish and aquatic life."[296] And the narrative criteria further provide that

> [t]he waters shall not be modified through the addition of pollutants or through physical alteration to the extent that the diversity and/or productivity of aquatic biota within the receiving waters are substantially decreased or, in the case of wadeable streams, substantially different from conditions in reference streams in the same ecoregion.[297]

The literature establishes that dry-ditch, open-cut crossings cause such harm to fish and benthos.[298] As Hansen and Betcher (2021) conclude, sedimentation from pipeline construction

> affects benthic macroinvertebrates in several ways: Sediment accumulation fills interstitial spaces used for refuge, decreases

---

[295] TN ADC §0400-40-03-.03(4)(c)–(d) (emphasis added).

[296] *Id.* §0400-40-03-.03(3)(c)–(d) (emphasis added).

[297] *Id.* §0400-40-03-.03(3)(m).

[298] Lévesque & Dubé (2007) at 395–96; X. Yu et al., *Effects of Pipeline Construction on Wetland Ecosystems: Russia-China Oil Pipeline Project (Mohe-*

App-0580

oxygen availability, and inhibits food sources (Harrison et al. 2007, Leitner et al. 2015). Some species are more susceptible to sediment impacts, which leads to a decrease in benthic biodiversity. Macroinvertebrates of the *Ephemeroptera*, *Plecoptera*, and *Trichoptera* orders are most impacted by sedimentation and are also important food sources for stream fish (Harrison et al. 2007).[299]

That is particularly true where, as here, there would be "multiple crossings on a stream or river, or within a watershed."[300] In those cases, "the detrimental effects of crossing construction [may be] permanent."[301]

The effects described above are more than theoretical. Such violations of state water quality standards caused by open-cut, dry-ditch pipeline crossings have been observed in recent years in West Virginia and Virginia. For example, in 2019, the West Virginia Department of Environmental

---

*Daqing Section*), 39 AMBIO 449 (2010) (attached as Exhibit 24) ("[P]ipeline crossing construction is shown to not only compromise with the integrity of the physical and chemical nature of fish habitat, but also to affect biological habitat and fish behavior and physiology (Lévesque, L.M., Dubé 2007), which will result in the avoidance movement of fish, altered distribution of populations (Newcombe and Jensen 1996) and reduce population size."); Penkal & Phillips (1984) at 7 (noting that blasting attendant to crossing construction kills fish); *id.* at 8 ("Construction and operation of pipelines can cause significant damage to aquatic habitats and fishery resources."); Reid & Anderson (1999) at 244 (finding extirpation of benthic insects and reduced benthic diversity downstream of pipeline crossings).

[299] Hansen & Betcher (2021) at 4.

[300] Lévesque & Dubé (2007) at 406–07. As discussed in Section II.C., *infra*, Tennessee Gas proposes to cut several streams multiple times, and there are multiple of crossings in the same watershed in multiple important systems.

[301] Lévesque & Dubé (2007) at 406–07.

App-0581

Protection ("WVDEP") entered a consent order to Columbia Gas Transmission, LLC, regarding water quality standards violations that occurred when that pipeline company allowed an upstream dam to fail on a dry-ditch, open-cut crossing of a trout stream in Pendleton County, West Virginia.[302] That particular crossing was using the dam-and-pump crossing method,[303] which is supposed to be less likely to fail than the flume crossing method.[304] WVDEP expressly found that the pipeline company had "cause[d] conditions not allowable [*i.e.*, a violation of West Virginia's narrative water quality criteria] by creating distinctly visible settleable solids in the North Fork of the South Branch of the Potomac River . . . , which is a trout stream."[305] The violation persisted through a ***19-mile-long*** reach of the trout stream.[306]

Two completed Mountain Valley Pipeline crossings also contributed to water quality standards violations, one in Virginia and one in West Virginia. In Virginia, Mountain Valley constructed its dry-ditch, open-cut crossing of S-

---

[302] Consent Order Issued Under the West Virginia Water Pollution Control Act to Columbia Gas Transmission, LLC (Jan. 28, 2019) [hereinafter, "Columbia Gas Consent Order"] (attached as Exhibit 25).

[303] *Id.*

[304] Reid et al. (2004) at 87.

[305] Columbia Gas Consent Order at 2.

[306] *Id.*; *see also* Hansen & Betcher (2021) at 5 (concluding that "The 19-mile sediment impact from a failed dry ditch open-cut crossing during construction of the WB Express Pipeline . . . provides a vivid illustration of the scale of problems that can be caused.").

**App-0582**

G36—the North Fork of the Roanoke River—on July 19, 2018.[307] Mountain Valley's inspectors reported problems with sedimentation and turbidity from the pump around outlet.[308] Citizen inspectors, trained by Trout Unlimited in turbidity monitoring, documented sediment deposits and consistent turbidity increases downstream from the crossing location throughout their sampling period from July 19, 2018 through September 9, 2018.[309] Indeed, citizen inspections revealed sediment deposits persisting downstream of that crossing 40 months later.[310] Because sediment deposits and turbidity are harmful to aquatic life and interfere with the aquatic life use by smothering benthic macroinvertebrates, what the citizen inspectors observed constituted violations of Virginia narrative water quality criteria.

In West Virginia, Mountain Valley constructed a pipeline right-of-way crossing through stream S-IJ64 (an unnamed tributary of Little Stony Creek

---

[307] Mountain Valley Pipeline, Visual Site Inspection Report #4841 (July 19, 2018) (attached as Exhibit 26).

[308] *Id.*

[309] Elizabeth Struthers Malbon, Changes in Turbidity of the North Fork of the Roanoke River in Catawba Valley After the Start of Construction of the Mountain Valley Pipeline (2018) (attached as Exhibit 27).

[310] Email from Elizabeth Struthers Malbon to Army Corps of Engineers, Re: Section 10 and Section 404 Permits for Mountain Valley Pipeline (Nov. 18, 2021) (attached as Exhibit 28).

in Monroe County), and its attendant right-of-way bridge, in May 2018.[311] In an inspection on May 9, 2018, a WVDEP inspector documented "conditions not allowable" (that is, a narrative water quality standards violation) that resulted from Mountain Valley's neglect of "[b]ridge matting [that] failed contributing sediment laden water at the right-of-way crossing at S-IJ64[312] The inspector concluded that the resulting sediment deposits caused the "conditions not allowable."[313]

In sum, there is overwhelming evidence that Tennessee Gas's proposed dry-ditch, open-cut crossings will contribute to violations of Tennessee's narrative water criteria, and that those violations will be both substantial and long-term, if not permanent. Accordingly, 40 C.F.R. §230.10(b) prohibits the Corps from issuing the permit sought by Tennessee Gas.

### c. Tennessee Gas's Stream Crossings Will Cause or Contribute to Violations of Tennessee's Antidegradation Policies.

Section 303 of the Clean Water Act establishes an antidegradation policy, "requiring that state standards be sufficient to maintain existing

---

[311] West Va. Dep't of Envtl. Prot., Inspection Report (May 9, 2018) (attached as Exhibit 29).

[312] *Id.*

[313] *Id.*

beneficial uses of navigable waters, preventing their further degradation."[314] Such policies are fundamental elements of a state's water quality standards.[315]

State antidegradation policies must be consistent with 40 C.F.R. §131.12(a), and states must develop implementation methods consistent with that provision.[316] The federal regulations require that antidegradation policies protect existing uses, maintain the existing quality of high-quality waters unless degradation is justified by socio-economic development, and prohibit degradation of outstanding national resource waters.[317]

Tennessee's antidegradation policy has been approved by EPA and is set out in TN ADC §0400-40-03-.06. It categorizes Tennessee's waters into four categories, depending on their existing quality and their state and national significance: "waters with unavailable parameters,"[318] "waters with available

_____

[314] 33 U.S.C. §1313(d).

[315] *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 706 (1994) ("EPA's regulations implementing the Act require that state water quality standards include a 'statewide antidegradation policy'[.]" (quoting 40 C.F.R. §131.12)); *see also Nat. Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency*, 16 F.3d 1395, 1400 (4th Cir. 1993) (noting that the antidegradation policy is one of three elements of a state's water quality standards).

[316] 40 C.F.R. §131.12(b).

[317] *Id.* §131.12(a).

[318] TN ADC §0400-40-03-.06(2).

**App-0585**

parameters," [319] "Exceptional Tennessee Waters," [320] and "Outstanding National Resource Waters." [321] For waters with unavailable parameters, further degradation of the available parameter is prohibited.[322] Degradation of waters with available parameters or Exceptional Tennessee Waters is only allowed if there are no feasible alternatives and there is a socio-economic justification.[323] And the degradation of Outstanding National Resource Waters is strictly prohibited.[324]

Tennessee's antidegradation implementation procedures are codified in TN ADC §0400-40-03-.06. To conduct an antidegradation review to determine an activity's compliance with Tennessee's antidegradation policy, the reviewer must ensure the application is complete and includes an alternatives analysis to "prevent or lessen the degradation associated with the proposed activity[.]"[325]

---

[319] *Id.* §0400-40-03-.06(3).

[320] *Id.* §0400-40-03-.06(4).

[321] *Id.* §0400-40-03-.06(5).

[322] *Id.* §0400-40-03-.06(2)(a), (c).

[323] *Id.* §0400-40-03-.06(3)–(4).

[324] *Id.* §0400-40-03-.06(5).

[325] *Id.* §0400-40-03-.06(1)(b).

For Tennessee waters with unavailable parameters, new discharges cannot "cause measurable degradation of the parameter that is unavailable."[326] And "habitat alterations that cause significant degradation shall not be authorized" where the unavailable parameter is habitat related.[327]

For Tennessee waters with available parameters, new discharges that would cause more than *de minimis* degradation are only authorized in the absence of "practicable alternatives to prevent or lessen degradation" and where "necessary to accommodate important economic or social development in the area."[328] The same is true for habitat alteration of such waters that would cause more than *de minimis* degradation.[329] Thus, an antidegradation review of waters with available parameters cannot be performed without knowing the baseline water quality of a receiving stream and an analysis of effects of the discharge or habitat alteration at issue.

Because antidegradation policies are a part of Tennessee's water quality standards, the Corps must consider whether Tennessee Gas's proposed

---

[326] *Id.* §0400-40-03-.96(2)(a).

[327] *Id.* §0400-40-03-.06(2)(c).

[328] *Id.* §0400-40-03-.06(3)(a).

[329] *Id.* §0400-40-03-.06(3)(c).

activities comply with those policies as part of its review of the pending application under the Section 404(b)(1) Guidelines.[330]

In short, the Corps must conduct a full antidegradation review of each proposed stream crossing under the Section 404(b)(1) Guidelines.[331] That review must determine the status of the scores of waterbodies that would receive discharges from and be altered by the proposed activities. That review must include a determination of the baseline water quality of those waterbodies for parameters of concern: sedimentation and turbidity. As explained below, that review must conclude that Tennessee Gas's proposed activities are impermissible under Tennessee's antidegradation policy.

Tennessee Gas acts as if an antidegradation review begins and ends with determining whether its project will affect Exceptional Tennessee Waters or Outstanding National Resource Waters.[332] But Tennessee waters with and without available parameters must also be protected from degradation caused

---

[330] 40 C.F.R. §230.10(b) (prohibiting the issuance of a Section 404 permit that would "cause[] or contribute[] . . . to violations of any applicable State water quality standard"); 40 C.F.R §230.11 (requiring the permitting authority to make written factual determinations of compliance or noncompliance with the restrictions in §230.10); *see also Arkansas v. Oklahoma*, 503 U.S. 91, 109 (1992) (holding that "state water quality standards . . . are part of the federal law of water pollution control").

[331] *Cf. Sierra Club*, 64 F.3d at ___ (agreeing that refusal to engage in location-specific antidegradation review of pipeline crossing impacts was arbitrary and capricious).

[332] Application at 65–66.

**App-0588**

by dry-ditch, open-cut pipeline crossings. As noted elsewhere in these comments, the degradation caused by Tennessee Gas's construction of dry-ditch, open-cut crossings could be permanent, or at least persist for four years,[333] which cannot be construed as a "short duration."[334]  Indeed, even FERC's deficient DEIS for the Cumberland Project acknowledges that impacts that "require more than 3 years" for recovery are "long term" in duration.[335] For the following reasons, the Corps should deny Tennessee Gas's application on the basis of the projects impacts to such waters.

### *i.* *Antidegradation Rules Protect Already Impaired Streams.*

The Corps must consider the effects of Tennessee Gas's proposed activities on Tennessee streams that are not currently meeting their designated uses or are failing to meet specified water quality criteria. Under Tennessee's antidegradation procedures, "[u]navailable parameters exist where water quality is at, or fails to meet, the levels specified in" Tennessee's

---

[333] Lévesque & Dubé (2007) at 406–07; Silvis at 2–5; BiOp at 210; Armitage & Gunn (1996) at 170 (emphasis added).

[334] TN ADC §0400-40-03-.04(3).

[335] DEIS at 4-5.

**App-0589**

water quality criteria.[336] Tennessee's antidegradation policy prohibits any further degradation when a stream is already impaired.[337]

In accordance with Section 303(d) of the Clean Water Act, Tennessee maintains a list of impaired streams.[338] In its Section 404 permit application, Tennessee Gas did not bother to address the Section 303(d)-listing status of the streams that it intends to trench or blast through. Section 4.3.2.2 of FERC's deficient DEIS for the Cumberland Project, however, claims that there are five waterbodies that do not meet state water quality criteria.[339] Specifically, Jones Creek is identified as impaired due to, *inter alia*, excessive sedimentation and siltation.[340] Two unnamed tributaries of Jones Creek are impaired because of flow alterations, and a third unnamed tributary of Jones Creek is impaired because of excessive sedimentation and siltation.[341] And Wells Creek is impaired because of *E. coli* contamination from sewer overflows.[342]

---

[336] TN ADC §0400-40-03-.06(2).

[337] *Id.*

[338] Tennessee 303(d) List.

[339] DEIS at 4-31.

[340] *Id.*

[341] *Id.* at 4-31 to 4-32.

[342] *Id.* at 4-32.

Tennessee Gas does not intend to use dry-ditch, open-cut crossings on Wells Creek and Jones Creek, so the right-of-way crossings of those streams may not require antidegradation review.[343] But Tennessee Gas does plan to use dry-ditch, open-cut crossings on as many as seven streams that it identifies as unnamed tributaries of Jones Creek.[344] Tennessee Gas's Section 404 permit application does not specify which of those crossings are the impaired unnamed tributaries of Jones Creek discussed in the DEIS, let alone address how the impaired status of those streams affects the antidegradation analysis described in these comments.

Moreover, neither Tennessee Gas's Section 404 application nor the DEIS acknowledge or discuss the impaired status of a sixth stream. Tennessee's 2022 Section 303(d) list identifies Leatherwood Creek in the Harpeth River

---

[343] Table 1 (rev. Mar. 2023) at 2, 17. Tennessee Gas has proposed two access road crossings for Jones Creek, however, which will require antidegradation review.

[344] *Id.* at 2–3. The plan to blast or trench through all unnamed tributaries to Jones Creek contradicts Tennessee Gas's plans that it communicated to FERC contemporaneously with its Section 404 application. Tennessee Gas's Resource Reports to FERC state that the company planned to use HDD to cross three unnamed tributaries to Jones Creek because of their impaired status. Tennessee Gas Pipeline Co., LLC, Final Resource Report 2: Water Use and Quality, Cumberland Project, Docket No, CP22-)))-000 at 2-14 (July 2022) (attached as Exhibit 6). Inexplicably, Tennessee Gas's Section 404 permit application proposes dry-ditch, open-cut crossings for all of the unnamed tributaries of Jones Creek. Table 1 (rev. Mar. 2023) at 2–3. Tennessee Gas must explain that discrepancy before the Corps can act on its Section 404 application.

Watershed as impaired for unknown causes.[345] Tennessee Gas proposes dry-ditch, open-cut crossings of Leatherwood and eight of its unnamed tributaries in its Section 404 application.[346] Tennessee Gas proposes two dry-ditch, open-cut crossings of one of those unnamed tributaries.[347] And Tennessee Gas proposes an access road crossing and a workspace crossing for two of those unnamed tributaries, in addition to the proposed right-of-way crossings.[348] Tennessee Gas's failure to acknowledge or discuss the impaired status of Leatherwood Creek and its unnamed tributaries, as well as its omission of the status of the unnamed tributaries of Jones Creek, is yet another reason its application is incomplete and for Corps denial of the permit.

But in all events, the Corps must consider the effects of sedimentation from Tennessee Gas's proposed crossings on Leatherwood Creek and its unnamed tributaries, as well as on the unnamed tributaries of Jones Creek, because those streams are waters without available parameters under Tennessee's antidegradation standard. And, as discussed elsewhere in these

---

[345] Tennessee 303(d) List.

[346] Table 1 (rev. Mar. 2023) at 10–11.

[347] *Id.* at 12 (proposing two crossings of Stream ID No. SDKB025).

[348] *Id.* at 10 (access road crossing of Stream ID No. SDKA047); *id.* at 11 (workspace crossing of Stream ID No. SDKB028).

comments, Tennessee Gas's stream crossings will result in increased sedimentation in streams.[349]

For the streams discussed above that have been identified as impaired because of sedimentation or biologically impaired for an unknown cause, the antidegradation policy prohibits additional lowering of the water quality for the sedimentation.[350] Because of that strict prohibition, and because of the persistent nature of sedimentation, additional sedimentation in those streams from Tennessee Gas's proposed activities is prohibited by Tennessee's water quality standards. Accordingly, the Corps should deny Tennessee Gas's application under the Section 404(b)(1) guidelines.[351]

### ii. Antidegradation Rules Protect High-Quality Streams that Have Available Parameters.

The Corps should treat any stream that is not impaired because of noncompliance with Tennessee water quality standards that would be affected by Tennessee Gas's proposed crossings as a water with available parameters under TN ADC §0400-40-30-.06(3). Tennessee's antidegradation policy prohibits more than *de minimis* degradation of such streams without conducting an alternatives analysis and a socio-economic evaluation.[352]

---

[349] *See, e.g.*, Section II.B.1, *supra*.

[350] TN ADC §0400-40-03-.06(2).

[351] 40 C.F.R. §230.10(b).

[352] TN ADC §0400-40-30-.06(3).

Whether impermissible degradation will occur cannot be determined without two important quantifications that are absent from Tennessee Gas's application: (1) baseline water quality for the affected streams—such as measures of embeddedness and benthic macroinvertebrate assessment scores, and (2) the quantification through modeling of the amount of additional sediment loading that will result from the proposed activities.

Tennessee Gas has not provided baseline water quality data for sedimentation, turbidity, embeddedness, or other parameters of concern for the streams that will be affected by its proposed activities. Nor has Tennessee Gas made any effort to quantify the increased sediments that would be discharged as a result of its proposed activities.[353] Such a quantification is possible through the use of modeling techniques to predict the turbidity and suspended solids concentrations that would result from pipeline construction.[354]

Without baseline water quality data for sedimentation and turbidity, and without quantification of increased sedimentation and turbidity from

---

[353] Hansen & Betcher (2021) at 5 ("Detailed, site-specific and stream-specific information and modeling would be needed to predict the scale of impacts and the amount of time required to return to pre-construction conditions. This type of information and modeling is absent from MVP's application.").

[354] *See, e.g.*, Fed. Energy Regul. Comm'n, *Final Environmental Impact Statement for the Jordan Cove Energy Project* 4-108 (Nov. 2019) (attached as Exhibit 30), https://www.ferc.gov/sites/default/files/2020-05/11-15-19-FEIS_Part_1.pdf.

Tennessee Gas's proposed activities, the Corps cannot perform an antidegradation review for the waters with available parameters impacted by the proposed activities. Accordingly, the Corps should deny Tennessee Gas's application as incomplete. At minimum, the Corps should require Tennessee Gas to gather the required data and solicit additional public comment—to ensure data quality—prior to acting on Tennessee Gas's application.

### 3. TENNESSEE GAS'S PROPOSED ACTIVITIES WILL CAUSE OR CONTRIBUTE TO SIGNIFICANT DEGRADATION OF THE WATERS OF THE UNITED STATES.

The 404(b)(1) Guidelines prohibit the issuance of a permit where the proposed discharges "will cause or contribute to significant degradation of the waters of the United States."[355] "Significant degradation" includes significant adverse effects on municipal water supplies; fish; shellfish; special aquatic sites; life stages of aquatic life and other wildlife; and aquatic ecosystem diversity, productivity, and stability.[356] As explained below, the discharges proposed by Tennessee Gas will cause or contribute to such degradation. As with the prohibition against water quality standards violations, a contribution

---

[355] 40 C.F.R. §230.10(c).

[356] *Id*. §230.10(c)(1)–(4).

to significant degradation is sufficient to trigger the prohibition. [357] Consequently, the Corps must deny the application.

### a. Tennessee Gas's Stream Crossings Threaten Significant Adverse Effects to Fish and Shellfish.

The 404(b)(1) Guidelines prohibit significant degradation in the form of significant adverse effects on fish and shellfish. [358] The pipeline crossing literature discussed in Section II.B.1, *supra*, establishes that dry-ditch, open-cut crossings like those proposed by Tennessee Gas, contribute to significant adverse effects on fish. Those impacts include, *inter alia*, adverse effects on fishery habitat from sedimentation; [359] lethal effects from blasting; [360] and effects on "fish behavior and physiology (hierarchy, feeding, respiration rate, loss of equilibrium, blood hematocrit and leukocrit levels, heart rate and stroke volume)." [361] Accordingly, Tennessee Gas's proposed discharges threaten to cause or contribute to significant adverse effects on fish, and the permit application should be denied.

---

[357] *Id.* §230.10(c); *see also* Section II.B.2, *supra*.

[358] *Id.* §230.10(c)(1).

[359] Penkal & Phillips (1984) at 6; Reid & Anderson (1999) at 242.

[360] Penkal & Phillips (1984) at 7.

[361] Lévesque & Dubé (2007) at 395.

**App-0596**

### b. *Tennessee Gas's Crossings Threaten Significant Adverse Effects to Special Aquatic Sites.*

Not only do special aquatic sites receive special treatment in the LEDPA analysis, they must be evaluated to determine whether the proposed discharges will cause or contribute to significant adverse effects on them.[362] As discussed above, Tennessee Gas's proposed activities will affect two types of special aquatic sites: wetlands and streams with riffle and pool complexes.

### i. *Tennessee Gas's Crossings Will Cause or Contribute Significant Degradation to Wetlands and Their Functions.*

Tennessee Gas's proposed discharges will cause or contribute to significant adverse impacts to 0.69 acres of wetlands.[363] As a threshold matter, the lack of information in the application about how Tennessee Gas intends to construct dry-ditch, open-cut crossings in standing water in wetlands is concerning. Silvis concludes that that the "application's lack of information on wetland crossing methods to reduce environmental impacts does not meet minimum industry standards and will lead to substantial negative impacts to wetland resources."[364] In other words, Silvis predicts significant degradation to wetlands.

---

[362] 40 C.F.R. §230.10(c)(1).

[363] Table 2.

[364] Silvis (2023) at 18.

The scientific literature concludes that pipeline crossings have the potential to destroy the integrity and background of wetland ecosystems.[365] As a result of the deep trenching required in an open-cut crossing of wetlands, Silvis (2023) states that

> Excavation of material in wetlands alters the hydraulic properties and the soil structure **permanently**. Olson and Doherty (2012) noted that '[i]nstallation of large-scale infrastructure, including pipelines, has the potential to damage soil and vegetation in wetlands within the path of construction by compacting soil, altering hydrology, decreasing plant diversity, and facilitating invasions of unwanted species." In one study, soils consistently showed evidence of compaction and hydrologic alteration eight years after the wetlands were crossed by natural gas pipelines (Olson and Doherty, 2012). Wetland soils take years to form and to function (Jackson et al., 2014). By excavating, stockpiling, and then replacing soils in wetlands, the hydraulic conductivity of the soil changes, the porosity is decreased, connectivity of pores decreases, compaction increases, and soil horizons are altered. All of these characteristics work in conjunction to form a functioning wetland soil (Jackson et al., 2014). Fill associated with trenching changes all of these characteristics. Even with the provision to replace the top layer

---

[365] Yu et al. (2010) at 449.

of wetland soils, the functionality of the wetland is permanently negatively impacted.[366]

Accordingly, Tennessee Gas's proposed wetland trenching will have impermissible significant adverse effects on wetland, particularly given the absence of any proposal from Tennessee Gas for mitigation.[367]

### ii. Tennessee Gas's Crossings Will Significantly Degrade Riffle-and-Pool Complexes.

As discussed above, Tennessee Gas will surely cross streams with riffle-and-pool complexes, but the applicant does not specify where or how many.[368] The 404(b)(1) Guidelines identify a number of adverse effects on riffle-and-pool complexes from sedimentation, including the total elimination of such complexes, the creation of unsuitable habitat, clogging, habitat destruction, and anaerobic conditions.[369]

Effects of Tennessee Gas's proposed project on riffle-and-pool complexes will not be limited to the crossing locations themselves. Sedimentation released from dry-ditch, open-cut crossings fills downstream interstitial spaces.[370] As Sulkin observes, the streams that Tennessee Gas proposes to

---

[366] Silvis (2023) at 3–4 (emphasis added).

[367] Application at 56.

[368] *See* Section II.A.1, *supra.*

[369] 40 C.F.R. §230.45.

[370] Penkal & Phillips (1984) at 6.

**App-0599**

cross are likely rife with riffle-and-pool complexes.[371] Accordingly, Tennessee Gas's stream crossings will lead to adverse significant impacts on riffle-and-pool complexes downstream from the proposed crossing locations.

In any event, the Corps cannot conclude that Tennessee Gas's proposals comply with the prohibition against significant adverse impacts to special aquatic sites because Tennessee Gas has failed to sufficiently quantify or identify the riffle-and-pool complexes it intends to cross. Without that information, the Corps cannot make the requisite factual determinations under 40 C.F.R. §230.11.

### c. Tennessee Gas's Crossings Threaten Significant Adverse Effects to Life Stages of Aquatic Life and Other Wildlife.

The 404(b)(1) Guidelines prohibit significant degradation in the form of serious adverse effects on the life stages of aquatic life and other wildlife.[372] The literature establishes that "silt or sand deposition can fill interstices in gravel," and that "[e]quipment operating in the stream . . . can eliminate spawning habitat."[373] As a result, stream crossings have been shown to affect fish reproductive success.[374] Specifically,

> [i]ncreased sediment deposition and substrate compaction from pipeline crossings can degrade spawning habitat, result in the

---

[371] Sulkin (2023) at 2.

[372] 40 C.F.R. §230.10(c)(2).

[373] Penkal & Phillips (1984) at 6.

[374] Lévesque & Dubé (2007) at 399.

**App-0600**

> production of fewer and smaller fish eggs, impair egg and larvae development, [and] limit food availability for young-of-year fish[.][375]

Notwithstanding all its other flaws, FWS's Revised Biological Opinion for the Mountain Valley Pipeline reaches the same conclusion, stating that sedimentation from pipeline construction, including dry-ditch, open-cut crossings, can be expected to

> cause multiple adverse effects on all life stages of benthic fish, including loss of stream habitat essential for sheltering, foraging, and spawning; increased mortality of eggs, YOY, juveniles, and adults; increased predation on eggs by sediment-dwelling invertebrates; avoidance of previously occupied habitat; increased vulnerability of adults to predation; [and] reduced reproductive success.[376]

Consequently, Tennessee Gas's proposed crossings will cause significant adverse effects on the life stages of aquatic life and cannot be permitted.

### d. Tennessee Gas's Crossings Threaten Significant Adverse Effects to Aquatic Ecosystem Diversity, Productivity, and Stability.

The Corps cannot issue a Section 404 permit where the proposed discharges would cause or contribute to significant adverse effects on "aquatic ecosystem diversity, productivity, and stability."[377] The available stream-crossing literature establishes that such effects should be expected from

---

[375] Ex. 19 at 3.

[376] BiOp at 190.

[377] 40 C.F.R. §203.10(c)(3).

Tennessee Gas's proposed dry-ditch, open-cut crossings. For example, Reid and

Anderson (1999) found:

> Downstream changes to the diversity and structure of benthic invertebrate communities have also occurred after pipeline construction (Anderson *et al.* 1998). One week after construction, the downstream benthic invertebrate community in Findlay Creek, Ontario was generally limited to sediment tolerant species of oligochaetes (aquatic earthworms) (Anderson *et al.*, 1998). At upstream control sites, the benthic invertebrate fauna was characterized as very diverse with over 26 species comprised of chironomids, caddisflies, stoneflies, mayflies, and dragonflies. Observed changes in community structure likely resulted from reductions in habitat availability for species dependent on interstitial spaces between coarse substrates.[378]

And Lévesque and Dubé (2007) observed that

> Armitage and Gunn (1996) noted that pipeline crossing construction in a stream in England **resulted in a shift in invertebrate species** due to an increased proportion of silt in stream substrates. **This effected persisted for 4 years** until a high magnitude flow event scoured the stream channel bed, promoting re-establishment of pre-construction invertebrate species. Tsui and McCart (1981) found that crossing construction of Archibald Creek, British Columbia, caused short-term increases in silt and sand accumulation **and decreases in invertebrate standing crop and diversity, which lasted 1 to 2 years.**[379]

Moreover, "[p]ipeline crossing construction is shown to not only compromise

with the integrity of the physical and chemical nature of fish habitat, but also

to affect biological habitat and fish behavior and physiology (Lévesque and

Dube 2007), which will result in avoidance movement of fish, altered

---

[378] Reid & Anderson (1999) at 244.

[379] Lévesque & Dubé (2007) at 399 (emphasis added).

**App-0602**

distribution of populations (Newcombe and Jensen 1996) and reduce population size and species."[380] And "[t]he integrity and background of wetland ecosystems may be destroyed."[381] Those significant adverse effects on the aquatic ecosystems, diversity, productivity, and stability require the Corps to deny Tennessee Gas's pending application under 40 C.F.R. §230.10(c)(3).

## C. TENNESSEE GAS HAS NOT PROVIDED SUFFICIENT INFORMATION TO ALLOW THE CORPS TO MAKE THE FACTUAL DETERMINATIONS REQUIRED BY THE 404(B)(1) GUIDELINES.

As both EPA and the federal courts recognize, under the 404(b)(1) Guidelines, "[t]he burden of proof to establish compliance with the Guidelines rests with the applicant; where insufficient information is provided to determine compliance, the Guidelines require no permit be issued."[382] That requirement comes from 40 C.F.R. §230.12(a)(3)(4), which requires the Corps to reject proposed disposal sites when "[t]here does not exist sufficient

---

[380] Yu et al. (2010) at 449.

[381] *Id.*; *see also* Section II.B.3.b, *supra.*

[382] Memorandum to the Field, Subject: Appropriate Level of Analysis Required for Evaluating Compliance with the Section 404(b)(1) Guidelines Alternatives Requirements (Aug. 23, 1993), *available at* 62 Fed. Reg. 31,492, 31,497–99 (June 9, 1997); *e.g.*, *Utahns for Better Transp.*, 305 F.3d at 1187 ("The burden of proof to demonstrate compliance with the § 404(b) permit Guidelines rests with the applicant; where insufficient information is provided to determine compliance, the Guidelines require that non permit be issued.").

information to make a reasonable judgment as to whether the proposed discharge will comply with these guidelines."[383]

Tennessee Gas's permit application is far too summary about its proposed discharges and disposal sites. It is almost as if the applicant is relying on the sheer scope of its proposed individual permit to overwhelm the process and allow it to skirt the information requirements. Tennessee Gas attempts to push through an application for 155 stream crossings and seven wetlands crossings that would readily be found insufficient if it were submitted for any single one of its proposed crossings. But Section 404 does not allow Tennessee Gas to generalize about its crossing locations simply because it decided to build a project with scores of proposed discharges at scores of proposed locations. If it were otherwise, the biggest, most destructive projects would face fewer requirements than a project affecting just one stream or wetland.

The Section 404(b)(1) Guidelines require detailed information about **each disposal site**, and Tennessee Gas simply has not met that requirement. That is equally true of the recently added unsurveyed, discharge sites— considered only through a desktop review—and the surveyed sites identified in the July 2022 application. The 404(b)(1) Guidelines provide that "[d]ocumentation to demonstrate knowledge about . . . the candidate disposal

---

[383] 40 C.F.R. §230.12(a)(4)(iv).

**App-0604**

site is an essential component of guideline application."[384] The Corps must make factual findings about the suspended particulates and turbidity that are certain to result from Tennessee Gas's proposed discharges, including "in terms of potential changes in the kinds and concentrations of suspended particulate/turbidity in the vicinity **of the disposal site**."[385] It also must make factual findings regarding the physical substrate, including "the characteristics of the substrate **at the proposed disposal site**."[386] And the Corps must make factual findings about the nature and degree of the effects of the discharge "on the structure and function of the aquatic ecosystem and organisms."[387] To make all of those findings, the Corps needs far more site-specific information than Tennessee Gas has provided.

For example, to make determinations about sedimentation and turbidity, the Corps needs site-specific information about the current water quality at each and every stream, as well as modeling data to determine how much sediment and turbidity each specific crossing will add to the affected streams.[388] To make determinations about the effects on the substrate, the

---

[384] 40 C.F.R. §230.6(a).

[385] *Id.* §230.11(c) (emphasis added).

[386] *Id.* §230.11(a) (emphasis added).

[387] *Id.* §230.11(e).

[388] Hansen & Betcher (2021) at 5 ("Detailed, site-specific and stream-specific information and modeling would be needed to predict the scale of impacts and the amount of time required to return to pre-construction conditions. This type

App-0605

Corps needs to know where the riffle-and-pool complexes are. And to make determinations about the structure and function of the aquatic ecosystem and organisms, the Corps needs benthic assessments and other water quality data from each and every affected stream and confirmation of the fish species present in each and every affected stream.

The Fourth Circuit's opinion in *Ohio Valley Environmental Coalition, Inc. v. U.S. Army Corps of Engineers*, 716 F.3d 119 (4th Cir. 2013), provides examples of the kinds of information that the Corps would need in order to survive a judicial challenge to Tennessee Gas's proposed permit on the basis of insufficient baseline data. In that case, the environmental plaintiffs challenged whether the Corps had misapprehended the baseline conditions at the disposal sites at issue.[389] To determine whether the plaintiffs' claims had merit, the Court examined how the Corps examined the baseline conditions of the watershed at issue.[390] Among the factors the Corps considered were: (1) "the

---

of information and modeling is absent from MVP's application."); *see also* Section II.B.2.c.ii, *supra*.

[389] *Ohio Valley Envtl. Coalition, Inc. v. U.S. Army Corps of Eng'rs*, 716 F.3d 119, 124 (4th Cir. 2013). Accurate information about baseline conditions is essential because "[a] material misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork for an arbitrary and capricious decision." *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012).

[390] *Id.*

conditions at the [proposed] fill site itself,"[391] and (2) an analysis of the impaired conditions of the streams in the relevant watershed."[392]

The Corps' review of the conditions at the disposal site included a review of the flow regime, rapid bioassessment protocols, stream condition index scores, benthic macroinvertebrate analyses, the condition and functions of the receiving streams, and the existing stream quality.[393] From there, the Court noted that the Corps "followed up this summary by detailing the supporting data collected with respect to 'physical habitat,' 'water quality,' 'benthics,' and 'stream functioning.'"[394]

When it turned to the impaired status of the watershed at issue, the Corps examined baseline water-quality testing data from eight sites in the watershed, including the stream to be filled and nearby streams, as well as the forest coverage in the watershed at issue and its ability to absorb the impacts.[395]

Based on what it described as the Corps' "contextual judgment made after considering all relevant data," the Fourth Circuit rejected the

---

[391] *Id.* at 125.

[392] *Id.*

[393] *Id.*

[394] *Id.* at 125–26.

[395] *Id.* at 126–27.

environmental plaintiffs' contention that the Corps misapprehended the baseline conditions.[396]

In contrast, Tennessee Gas has not provided the amount of data held to be sufficient in *Ohio Valley Environmental Coalition* for ***any single disposal site***, let alone the 150+ sites it seeks to permit.[397] For example, Tennessee Gas has not provided *any* water quality data or benthic assessment scores for *any* stream in its path. A robust dataset like that upheld in *Ohio Valley Environmental Coalition* is necessary for every waterbody at issue in order for the Corps to consider all of the relevant factors, determine compliance with the 404(b)(1) Guidelines, and survive judicial review.

The need for baseline data is not just required by the 404(b)(1) Guidelines and federal court caselaw, it is also required by the scientific literature examining pipeline crossings. The authors of the article documenting benthic effects for four years after a pipeline crossing was completed concluded that, "the study has shown . . . that before authoritative statements concerning environmental impact can be made *it is essential to have knowledge of the natural variation to be expected in streams of differing*

---

[396] *Id.* at 127.

[397] *See* Silvis (2023) at 14 (noting lack of site-specific information).

**App-0608**

*characteristics.*"[398] In order to predict the potential effects of dry-ditch, open-cut trenches on *specific* streams,

> **[m]onitoring prior to construction should include both habitat and biological surveys upstream and downstream of the proposed crossing location. . . . Other important habitat measures pertain to . . . water quality (e.g., TSS, turbidity, DO, water temperature, pH, conductivity). Biotic measures provide information on fish and invertebrate communities specific to the river or stream, and/or habitat types, of interest.**[399]

And because of the existence of multi-year impacts from stream crossings, robust baseline data is needed "to identify site-specific sensitivities and responses to disturbance."[400] That sort of information is absent from Tennessee Gas's application,[401] yet it is required for each and every waterbody.

Silvis (2023) predicts dire consequences from that scarcity.[402] She notes that Tennessee Gas has identified two types of dry-ditch, open-cut crossings that it might employ—dam-and-pump and flume—but does not specify which method would be used at which site.[403]

> [Each of these methods] require[s] prior crossing-specific knowledge of velocity, flow rate, soil conditions, contributing

---

[398] Armitage & Gunn (1996) at 161 (emphasis added).

[399] Lévesque & Dubé (2007) at 405–06 (emphasis added).

[400] *Id.* at 406.

[401] Silvis (2023) at 15.

[402] *Id.*

[403] *Id.*

watershed area, seasonal rainfall data, stream plan, profile, and longitudinal surveys, channel cross-section, depth of flow, bank stability, and more because these methods are not fungible and their suitability and the extent of their impacts will vary site by site. … Tennessee Gas's application does not provide the necessary information described above for making or justifying appropriate site-specific selections of dewatering method for each proposed open-cut crossing.[404]

The dearth of information and lack of planning will allow Tennessee Gas's field personnel "to make decisions on the fly with no ability for regulatory agencies to evaluate the efficacy of the proposed crossing for environmental protection."[405] Silvis (2023) concludes,

> **As someone who has evaluated many stream crossing proposals, I conclude that Tennessee Gas's application does not meet minimum industry standards for evaluating site-specific conditions. Furthermore, given the omission of critical site-specific information in the application, it is my professional opinion that there is significant likelihood of water quality violations, including increases in turbidity as well as in-stream sediment deposition, from the proposed crossings.[406]**

Information deficits infect every aspect of Tennessee Gas's application. For example, as flagged elsewhere in these comments, such data gaps affect

---

[404] *Id.*

[405] *Id.*

[406] *Id.* at 17 (emphasis added). Silvis identified similar information gaps regarding Tennessee Gas's proposed waterbody crossings for its roads that would lead to ill-informed "on the fly" decision making. *Id.* at 13. Silvis concluded, "if left to field personnel to install without design documents, there will be excessive impacts and failures which will cause long-term damage to aquatic ecosystems . . . ." *Id.*

**App-0610**

the LEDPA analysis, identification of riffle-and-pool complexes, the determination of whether the project will cause water quality standards violations, and the determination of whether the project will cause significant degradation.

Additionally, more information is needed to determine the cumulative effects of the crossings proposed by Tennessee Gas. Among the factual findings that the Corps must make under the 404(b)(1) Guidelines is a "[d]etermination of cumulative effects on the aquatic ecosystem."[407] Cumulative effects must also be evaluated as part of the factual determinations of the effects of the proposed discharge on the physical substrate, the effects of suspended particulates and turbidity, and the effects on the structure and function of the aquatic ecosystem and organisms.[408]

The 404(b)(1) Guidelines recognize that, "[a]lthough the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems."[409] That description of cumulative effects

---

[407] 40 C.F.R. §230.11(g).

[408] *Id.* §230.11(a), (c), & (e).

[409] *Id.* §230.11(g).

remarkably tracks the conclusions of the scientific literature on the significant

cumulative effects of dry-ditch, open-cut crossings:

> The potential for cumulative effects associated with pipeline crossing construction should be taken into consideration in assessing the impacts of these activities on rivers and streams. Construction of a single crossing on a stream or river, or within a watershed, may not have significant effects on fish and fish habitat in that system. **Construction of multiple crossings on a stream or river, or within a watershed, however, has the potential for cumulative effects on that system. In such cases, the capacity of the system to recover from impact may be exceeded, and the detrimental effects of crossing construction permanent. The same may be said for the frequency of crossing construction within a given system; rivers and streams will have limited capacities to recover from multiple impacts.**[410]

Despite the 404(b)(1) Guidelines' requirements for factual findings

regarding cumulative effects, and despite the scientific literature's clear

predictions of significant effects, Tennessee Gas's application is devoid of any

analysis of the cumulative effects of its proposed crossings. Indeed, it does not

even call the Corps' attention to, or otherwise quantify, the streams and

watersheds that it would cut multiple times with its proposed open-cut

trenches. There are many.

Lickskillet Branch presents an example of a stream poised to suffer

permanent adverse effects if the Corps grants Tennessee Gas's permit.

Tennessee Gas proposes to cross Lickskillet Branch in Houston County with

---

[410] Lévesque & Dubé (2007) at 406–07.

**App-0612**

*three* open-cuts for the Cumberland Pipeline's right-of-way.[411] Tennessee Gas presents no analysis of Lickskillet Branch's capacity to recover from multiple impacts of the scale threatened by the multiple proposed crossings. Although Lickskillet Branch holds the unfortunate distinction of being the stream the Cumberland Pipeline will cross the most, there is a six-way tie for second place between Upper Sugarcamp Branch, Porters Branch, an unnamed tributary of Harris Branch (Stream ID No. SDKA038), an unnamed tributary of Dry Hollow Branch (Stream ID No. SDKR008), an unnamed tributary of Leatherwood Creek (Stream ID No. SDKB025), and an unnamed tributary of Guices Branch (Stream ID No. SHNE004) with two proposed dry-ditch, open-cut crossings each.[412] As with Lickskillet Branch, Tennessee Gas does not provide any information about the capacity of those six streams to recover from multiple open-cuts. Tennessee Gas's silence is particularly problematic for the unnamed tributary of Leatherwood Creek, given that Leatherwood Creek is listed on Tennessee's 303(d) List as impaired for an unknown reason.[413]

Substantial and permanent adverse effects are not limited to multiple open-cuts on the same stream, however; they are also implicated by multiple

---

[411] Table 1 (rev. Mar. 2023) at 16.

[412] Table 1 (rev. Mar. 2023) at 1, 2, 5, 8, 10, 14.

[413] Tennessee 303(d) List.

**App-0613**

crossings in the same watershed.[414] At this level of analysis, numerous river and stream systems face a high-risk of substantial and permanent cumulative effects from open-cut trenches, yet Tennessee Gas does not discuss those risks. Tennessee Gas proposes multiple cuts in small watersheds as follows:

- Two dry-ditch, open-cuts of the mainstem of Upper Sugarcamp Branch and one dry-ditch, open-cut crossing for one of its unnamed tributaries;[415]

- Dry-ditch, open-cut crossings of the mainstem of Jordan Branch and three of its unnamed tributaries;[416]

- Two dry-ditch, open-cut crossings of the mainstem of Porters Branch and four of its unnamed tributaries;[417]

- Dry-ditch, open-cut crossings of six unnamed tributaries of Jones Creek;[418]

- Dry-ditch, open-cut crossings of the mainstem of Gafford Branch and five of its unnamed tributaries;[419]

---

[414] Lévesque & Dubé (2007) at 406–07.

[415] Table 1 (rev. Mar. 2023) at 1.

[416] *Id.* at 1.

[417] *Id.* at 1–2.

[418] *Id.* at 2–3.

[419] *Id.* at 3–4.

- Dry-ditch, open-cut crossings of the mainstem of Johnson Creek and five of its unnamed tributaries;[420]

- A dry-ditch, open-cut crossing of the mainstem of Harris Branch, two dry-ditch, open-cut crossings of one of its unnamed tributaries (SDKA038), and a single dry-ditch, open-cut crossing of two other unnamed tributaries of that stream;[421]

- Dry-ditch, open-cut crossings of the mainstem of Bartons Creek and one of its unnamed tributaries;[422]

- Dry-ditch, open-cut crossings of the mainstem of Nesbitt Branch and four of its unnamed tributaries;[423]

- Dry-ditch, open-cut crossings of Furnace Creek and one of its unnamed tributaries;[424]

- A dry-ditch, open-cut crossing of the mainstem of Dry Hollow Branch, two dry-ditch, open-cut crossings of one of its unnamed tributaries

---

[420] *Id.* at 4–5.

[421] *Id.* at 5.

[422] *Id.* at 5–6.

[423] *Id.* at 6.

[424] *Id.* at 6–7.

**App-0615**

(SDKR008), and a single dry-ditch, open-cut crossing of eight other unnamed tributaries of that stream;[425]

- Dry-ditch, open-cut crossings of Little Bartons Creek and five of its unnamed tributaries;[426]

- A dry-ditch, open-cut crossing of the mainstem of Leatherwood Creek, two dry-ditch, open-cut crossings of one of its unnamed tributaries (SDKA025), and a single dry-ditch, open-cut crossing of eight other unnamed tributaries of that stream;[427]

- Dry-ditch, open-cut crossings of seven unnamed tributaries of Williamson Branch;[428]

- Dry-ditch, open-cut crossings of seven unnamed tributaries of Yellow Creek;[429]

- Dry-ditch, open-cut crossings of the mainstem of Indian Branch and three of its unnamed tributaries;[430]

---

[425] *Id.* at 7–8.

[426] *Id.* at 9.

[427] *Id.* at 10–11.

[428] *Id.* at 11–12.

[429] *Id.* at 12–13.

[430] *Id.* at 13–14.

- A dry-ditch, open-cut crossing of the mainstem of Guices Branch, two dry-ditch, open-cut crossings of one of its unnamed tributaries (SHNE004), and a single dry-ditch, open-cut crossing of 11 other unnamed tributaries of that stream;[431]

- Dry-ditch, open-cut crossings of the mainstem of Guices Creek and two of its unnamed tributaries;[432] and

- Three dry-ditch, open-cut crossings of Lickskillet Branch and one dry-ditch, open-cut crossing each for of its unnamed tributaries.[433]

Tennessee Gas's application does not present any information about the capacity of those watersheds (or any others) to recover from the multiple open-cuts that Tennessee Gas's proposed route would trench through those watersheds.

In sum, because of the requirements of the Section 404(b)(1) Guidelines, the scientific literature establishing potentially permanent impacts to watersheds from multiple trenched crosses in the same watershed, and the silence of Tennessee Gas's application on those issues, the Corps must deny the pending application.[434]

---

[431] *Id.* at 14–15.

[432] *Id.* at 15–16.

[433] *Id.* at 16.

[434] Also missing from Tennessee Gas's application is any evaluation of the cumulative and aggregated impacts that would result from the combination of Tennessee Gas's upland activities and proposed stream crossings. Tennessee

**App-0617**

**D. THE CORPS CANNOT ISSUE THE REQUESTED PERMIT BECAUSE ALL APPRORIATE AND PRACTICABLE STEPS HAVE NOT BEEN TAKEN TO MINIMIZE POTENTIAL ADVERSE IMPACTS TO THE AQUATIC ECOSYSTEM.**

The 404(b)(1) Guidelines prohibit the issuance of a Section 404 permit "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts on the aquatic ecosystem."[435] The 404(b)(1)

---

Gas's upland activities threaten to contribute substantial sediment loads to streams along the proposed route of the Cumberland Pipeline. Expert Starr Silvis predicts these impacts from upland disturbances:

> The conversion of forested land to maintained right-of-way increases runoff volumes, which will change stream morphology. Lack of intact forest cover has been found to change stream morphology for two to four years post-disturbance (Reid & Anderson 1999). Methods to maintain the right-of-way include the use of pesticides and herbicides which can be mobilized in stormwater runoff and cause degradation of aquatic ecosystems. The construction of temporary and permanent access roads also increases runoff volumes and increases turbidity and sediment migration from upland areas to waterbodies. The increases in stormwater runoff volumes can alter stream morphology and stream bed composition. There are also long-term increases in temperature associated with the reduction of forested canopy for both streams and wetlands.

Silvis (2023) at 4. As a result, the Corps must evaluate whether the locations that would be affected by sedimentation from Tennessee Gas's proposed open-cut stream crossings will also be affected by sedimentation and runoff from Tennessee Gas's upland activities and determine the cumulative effects of those discharges on the aquatic ecosystems. *See* 40 C.F.R. §230.11(g).

[435] 40 C.F.R. §230.10(d).

App-0618

Guideline's "Subpart H identifies such possible steps."[436] Tennessee Gas essentially ignores Subpart H in its application.

This is yet another instance where Tennessee Gas has failed to carry its burden to provide sufficient information to determine compliance with the 404(b)(1) Guidelines. Moreover, given the deficiencies in Tennessee Gas's LEDPA analysis discussed *supra*, Tennessee Gas has not implemented all the actions related to technology that would minimize the impacts on its discharges.

In short, Tennessee Gas's compliance with Subpart H's requirements suffers from multiple flaws. This next section of the comments focuses on two of them with more detail: (1) Tennessee Gas's dubious claims that its restoration techniques will minimize adverse effects on aquatic ecosystems,[437] and (2) the company's misplaced reliance on FERC's waterbody and wetland construction manual to minimize the adverse effects of its open-cut crossings.[438] Following that discussion, the comments turn to proposing a risk-based assessment as an appropriate and practicable step that could be taken to minimize the effects of Tennessee Gas's discharges if those discharges were otherwise permissible.

---

[436] *Id.*; *see also id.* §§230.70–230.77 (Subpart H).

[437] Application at 55–56.

[438] *See, e.g.*, *id.* at 11.

App-0619

1. **TENNESSEE GAS'S RESTORATION PLANS ARE INADEQUATE BECAUSE THEY DO NOT INCLUDE APPROPRIATE AND PRACTICABLE STEPS TO MINIMIZE ADVERSE IMPACTS TO WETLANDS AND STREAMS.**

The Corps must deny Tennessee Gas's application because it does not ensure that Tennessee Gas will take "appropriate and practicable steps . . . which will minimize potential adverse effects of the discharge on the aquatic ecosystem[,]" as required by the 404(b)(1) Guidelines.[439] Subpart H of the 404(b)(1) Guidelines "identifies . . . possible steps" to minimize impacts.[440] Tennessee Gas's restoration plans for wetlands and streams[441] do not take the relevant steps listed in Subpart H, nor does the company take other appropriate and practicable steps that would minimize adverse impacts.

> a. *Tennessee Gas's Restoration Plans Would Not Minimize Adverse Impacts to Streams and Wetlands.*
>
> i. *Tennessee Gas's plans are bare-bones and one-size-fits-all.*

Whereas under Subpart H "[d]ischarge technology should be adapted to the needs of each site[,]"[442] Tennessee Gas's restoration plans employ a one-size-fits-all approach, with no site-specific distinctions beyond the broad

---

[439] 40 C.F.R. §230.10(d).

[440] *Id.*

[441] IP Application at 11, 15, 55–56.

[442] 40 C.F.R. §230.74; *see also id.* §230.75(d) ("Use [habitat development and restoration techniques that have been demonstrated to be effective in circumstances similar to those under consideration wherever possible.").

categories of "wetland"[443] or "stream."[444] Scientific literature on restoration emphasizes that "[e]very [restoration] project has unique features" and that, as a result, "[s]urprise is a common element in restoration[.]"[445] However, Tennessee Gas does not address how any site-specific features might affect its restoration efforts or provide any plans for addressing common challenges, such as the invasion and domination of non-native species in the disturbed area, beyond a vague statement that it will conduct post-construction monitoring for such species.[446]

Tennessee Gas's restoration plans pay no attention to site-specific features or ecological functions, even for Special Aquatic Sites, including riffle-and-pool complexes and wetlands.[447] It is clear Tennessee Gas has not considered the needs of each site in its simplistic, one-size-fits-all approach and

---

[443] IP Application at 15.

[444] *Id.* at 11.

[445] Joy B. Zedler & Suzanne Kercher, *Wetland Resources: Status, Trends, Ecosystem Services, and Restorability*, 30 ANN. REV. ENV'T & RES. 39, 65 (2005), *available                                                                                    at* https://www.annualreviews.org/doi/pdf/10.1146/annurev.energy.30.050504.14 4248 (attached as Exhibit 31).

[446] IP Application at 11, 20. Disturbed wetlands are particularly prone to invasive species. Zedler & Kercher (2005) at 41.

[447] *See* 40 C.F.R. §203.45 (riffles and pools); *id.* §230.41 (wetlands). *See also* Section II.A.1 and II.B.3.b.ii, *supra*, for a discussion of other problems with Tennessee Gas's treatment of riffle-and-pool complexes.

thereby will fail to minimize losses in ecosystem function. Of course, the Corps is required to consider the lack of minimization of those losses.[448]

That inadequacy is no less glaring in Tennessee Gas's wetland restoration plans. Tennessee Gas's general statements do not suffice to establish that it has minimized adverse impacts through restoration.

### ii. Tennessee Gas Plans to Gauge Its Restoration Success Based Only On Appearance (Structure), Ignoring Water Quality and Function.

Tennessee Gas's restoration plans focus on (1) achieving "pre-construction elevations and grades" for streams[449] and returning segregated topsoil "to its original location" for wetlands.[450] Post-construction, Tennessee Gas intends to reseed, monitor for revegetation, and keep an eye on stream geomorphology.[451] The company does not appear to have any plans to perform baseline water quality surveys or post-construction water-quality monitoring of the areas to be restored. Baseline surveys or monitoring are not only recommended by experts,[452] but also intuitively necessary, as it is unclear how

---

[448] *Id.* §230.77(d) ("When a significant ecological change in the aquatic environment is proposed by the discharge of dredged or fill material, the permitting authority should consider the ecosystem that will be lost[.]").

[449] IP Application at 11.

[450] *Id.* at 15.

[451] *Id.* at 56.

[452] Leslie Sauer*, Achieving Higher Quality Restoration Along Pipeline Rights-of-Way: An Overview of Pipeline Construction Impacts with Recommendations for Reducing Environmental Damage* 9 (2014), *available at*

**App-0622**

Tennessee Gas would even attempt to return a disturbed area as close as practicable to its previous condition if it has no record of that condition. A true baseline includes not only the area's appearance, but also information about the habitat it provides and its other ecological functions. Tennessee Gas's plans impermissibly conflate structure and function.

### iii. Tennessee Gas Has Not Established that Simply Rebuilding Streambeds Restores Ecological Function.

Tennessee Gas relies exclusively on a "Field of Dreams" restoration plan to minimize effects on aquatic life—"[Re]build it, and they will come." That simplistic approach, even if it were to get the *structure* right, does not ensure a restoration of *function*, and Tennessee Gas's application is impermissibly silent on the latter.

Given that manipulating physical attributes of streams has a very low success rate in promoting stream recovery biologically (as measured by biodiversity),[453] Tennessee Gas cannot assume that function will simply follow form. Indeed, as Palmer (2014) observes, "habitat may be important

---

https://delawareriverkeeper.org/sites/default/files/Documents/SauerL_Achieving_Higher_Quality_Restoration_Along_Pipeline_Rights_of_Way.pdf (attached as Exhibit 32) ("The purpose of baseline monitoring is to inform route selection and the determination of appropriate methods for construction, restoration and management for various segments of the route. Baseline monitoring can help to customize a process that is otherwise a one-size-fits-all approach.").

[453] Palmer et al., *Ecological Restoration of Streams and Rivers: Shifting Strategies and Shifting Goals*, ANN. REV. ECOLOGY, EVOLUTION, & SYSTEMATICS 45, 259 (2014) (attached as Exhibit 33).

**App-0623**

ecologically, but it is not sufficient for assessing ecological outcomes (Doyle & Shields 2012), and in the vast majority of cases restoration of habitat does not lead to restoration biologically (Jahning et al. 2010)."[454] Accordingly, the Corps cannot rely on Tennessee Gas's commitment to restore the form of the stream as a technique to minimize its adverse effects on the aquatic ecosystems through which it will trench.

### b. Even Compliant Restoration Efforts Would Not Reverse Expected and Significant Adverse Impacts, Including Cumulative Impacts.

Because restoration efforts are generally successful only in a limited sense, many of the impacts to wetlands, streams, and streambanks that Tennessee Gas deems "temporary" due to restoration efforts are more likely to be long-term or permanent even if Tennessee Gas follows through with the restoration plans included in its application.[455] According to Zedler and Kercher (2005), "Restoration can reverse some degradation but many damages are not reversible[.]"[456] Zedler and Kercher add that "[m]any local damages to ecosystems are . . . irreversible, at least in the time frame of most restoration projects (often 3 to 5 years, sometimes 10 to 20 years, rarely 50 years)."[457] Even

---

[454] *Id.*

[455] *See* Silvis (2023) at 2–5.

[456] *See, e.g.*, Zedler & Kercher (2005) at 57.

[457] *Id.* at 58.

"[i]f a wetland has survived filling, draining, or diversion, its integrity has not necessarily been preserved, nor is it safe from future degradation."[458] Employing any criteria related to ecological functions—rather than merely the superficial appearance of herbaceous ground cover—undermines Tennessee Gas's optimism. Instead, it is most likely that genuine restoration will still not have occurred long after Tennessee Gas abandons post-construction monitoring.

Wetlands perform valuable ecosystem services of global significance, including biodiversity support, water purification, flood abatement, and carbon storage,[459] yet restorations can be deemed completed and successful even if a wetland's ability to perform those functions has been degraded. One expert report (Sauer 2014) explains:

> Current pipeline construction restoration requirements are very low; they rely primarily on cool grass seeding and erosion blankets and often have poor long term results after the two required maintenance and monitoring seasons for the agencies. Even with such low stabilization standards, the rate of compliance is abysmal. For example, between June 2011 and October 2011, in just two counties in Pennsylvania there were 32 documented sediment discharge violations along the route of the Tennessee Gas Pipe line Company's 300 Line project. Imagine how many such violations go unobserved. Pipelines can also dewater the headwater areas through which they pass and change the hydrology of wetlands areas along the route. Taken with the loss of vegetation and soil compaction, these impacts

---

[458] *Id.* at 49.

[459] *Id.* at 39, 50; *see also* Section II.B.3.b.i, *supra.*

cause landscape-scale changes to the watershed yet they are neither acknowledged nor mitigated.[460]

Solely focusing on the presence or absence of herbaceous ground cover is part of the problem. Sauer explains that, along the pipeline right-of-way, including at stream and wetland crossings,

> [t]he loss of vegetation may be the most apparent impact, but soil changes are the most pernicious. The single biggest problem is soil compaction, which may be as high as 98%, the same as concrete. Rainwater often runs off the ROW like a stream, creating gullies in the adjacent landscape, which leads to erosion and sedimentation locally. Once soil has been disturbed and compacted, it is very difficult to restore its capacity for water infiltration. Re-ripping the soil with a chisel plow is a partial solution to surface compaction, but it leaves behind an exceedingly erodible surface and does not address the issue of recharge. Ripping deep enough to effect recharge would destabilize large areas of the landscape and be almost impossible to re-stabilize. The damage from soil compaction, loss of vegetation, increased runoff, erosion, and resulting pollution has effects well beyond the boundaries of the ROW where it originates[.][461]

Even if restoration efforts are successful enough that soils look the same, soil properties have nonetheless changed due to the disturbance. [462] Additionally, as is common practice for wetland restorations, Tennessee Gas plans to segregate the topsoil up to one foot in depth in wetlands.[463] That helps

---

[460] Sauer (2014) at 6.

[461] *Id.* at 5–6.

[462] *See* Section I.B.3.c.i, *supra*.

[463] IP Application at 15.

**App-0626**

to ensure successful revegetation; however, that soil disturbance alone would result in a large release of carbon, as the greatest density of soil organic carbon is found in the top 30 centimeters of the soil profile.[464]

Another reason that restoration efforts fall short of restoring ecological functions is that the precise previous topography of a disturbed area cannot be re-established. In wetlands, "[a]n elevation difference as small as 10 cm can eliminate some species and allow others to dominate."[465] Hydrology can also be altered by very slight changes in grade, impacting a wetland's water supply and purification services.

Because it is extremely unlikely that restoration efforts will be successful at restoring the stream and wetlands' ecological functions, Tennessee Gas's plans will likely result in very significant cumulative impacts. Just as with Tennessee Gas's lack of concern for cumulative impacts generally, the application downplays the expected damage to streams and wetlands by mislabeling many impacts as "temporary" and claiming that even the admittedly permanent losses are *de minimis*.[466] As discussed above, Tennessee Gas underestimates the permanent loss or degradation of wetlands by treating "restored" wetlands as suffering only temporary impacts.  Furthermore, it does

---

[464] *See* A.M. Nahlik & M.S. Fennessy, *Carbon Storage in U.S. Wetlands*, NATURE COMMC'NS (Dec. 13, 2016) (attached as Exhibit 34).

[465] Zedler & Kercher (2005) at 61.

[466] IP Application at 55–56.

**App-0627**

not matter that many affected wetlands are small, as a wetland's size does not determine its importance; indeed, if there are many small wetlands in an area dominated by drier areas, each wetland may be extremely important to birds and other wildlife.

This problem particularly impacts fauna that move among streams and wetlands. As Zedler and Kercher (2005) have noted, "The entire wetland landscape needs to be restored in order to attract some animal species. Amphibians are a good example because these animals move among ponds and cannot survive where pond-to-pond distances are too great." [467] Stream-associated salamanders also have low dispersal ability and may not be able to travel between forest gaps.[468] The primary factor in amphibian decline in the Southern Appalachians is habitat loss and degradation, and, because these salamanders are "highly influential in community and ecosystem processes," their fate has ripple effects on the whole ecosystem.[469]

In sum, the Corps should deny the permit because Tennessee Gas's restoration plans—even if the company were to comply with all applicable

---

[467] Zedler & Kercher (2005) at 63.

[468] Kristen K. Cecala et al., *Multiple drivers, scales, and interactions influence southern Appalachian stream salamander* occupancy, ECOSPHERE (Mar 14, 2018), https://doi.org/10.1002/ecs2.2150.

[469] *Id.*

**App-0628**

requirements—do not come close to minimizing the project's adverse impacts on streams and wetlands, as required by the 404(b)(1) Guidelines.

## 2. TENNESSEE GAS'S RELIANCE ON FERC'S WATERBODY AND WETLAND PROCEDURES IS INSUFFICIENT TO MINIMIZE THE IMPACTS OF ITS CROSSINGS.

Tennessee Gas relies on FERC's Wetland and Waterbody Construction and Mitigation Procedures (2013) ("FERC Procedures") to support is application. [470] But the scientific literature on stream crossings is highly critical of FERC's procedures. Indeed, a 2015 journal article authored by a FWS biologist stated,

> [C]urrent FERC guidance for Wetland and Waterbody Construction and Mitigation procedures (Procedures; FERC 2013) is national in scope and general in nature and **therefore does not provide sufficient detailed and specific information at a regional level to adequately protect aquatic ecosystems with numerous species in complex geographic and ecologic settings.**
>
> \*\*\*\*\*
>
> While the FERC Procedures do address some predictable pipeline impacts, especially during construction, the guidance does not address the longer term stream response potential, which is highly dependent on characteristics of the stream system rather than the pipeline. Therefore, depending upon the crossing locations, stream and catchment characteristics, timing, extent of activities, and application of Best Management Practices (BMPs—construction conservation measures intended to reduce impacts to the environment), impacts to aquatic species will vary but may include simplification of habitat, loss of aquatic species passage, removal of spawning gravel, increased sediment and turbidity, loss of side channels, disconnection from the floodplain, or change in hyporheic flow patterns (Reid *et al.*, 2002b). These

---

[470] IP Application at 11, 16, 17–20, 30, 32, 56, 60, 62–64.

**App-0629**

impacts may occur at the project site or may propagate upstream, downstream, or laterally into the floodplain.[471]

In other words, adherence to the FERC Procedures is insufficient to ensure the avoidance of significant degradation of the waters of the United States or to otherwise minimize impacts from the discharges attendant pipeline stream crossings. The FERC Procedures are far too generalized. Accordingly, site-specific review and design is required to protect the aquatic ecosystems. As discussed elsewhere in these comments, such information is sorely lacking from Tennessee Gas's application. As a result, neither Tennessee Gas nor the Corps can rely on the FERC Procedures to comply with the Section 404(b)(1) Guidelines' minimization requirements in 40 C.F.R. §230.10(d).

### 3. USE OF A RISK-BASED ASSESSMENT WOULD CONSTITUTE AN APPROPRIATE AND PRACTICABLE STEP TO MINIMIZE THE EFFECTS OF TENNESSEE GAS'S PROPOSED DISCHARGES, IF PERMITTING THOSE DISCHARGES WERE LAWFUL.

The Section 404(b)(1) Guidelines prohibit the issuance of a permit "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."[472] Even assuming that the permit sought by Tennessee Gas could be issued in compliance with the Section 404(b)(1) Guidelines, the Corps should require

---

[471] Castro et al. (2015) at 769.

[472] 40 C.F.R. §230.10(d).

**App-0630**

Tennessee Gas to minimize the effects of its proposed discharges through implementation of a risk-based approach.

Such an approach is endorsed by Castro et al. (2015). In that article, the FWS "developed a pipeline crossing framework and risk analysis approach to stratify potential aquatic impacts, based on both stream characteristics and project types."[473] The approach ranks pipeline crossings "in terms of relative short and long-term risk to aquatic habitat" and then analyzes, designs, and monitors the crossings in ways appropriate to their risk.[474]

To apply this risk based approach, the applicant first gathers a robust dataset to establish baseline data and enable the crossings to be ranked based on their relative risk.[475] That ranking occurs through the application of the Pipeline Screening Risk Matrix to allow a qualitative analysis of risk.[476] The matrix cannot be successful, however, without "site-specific, field observations and measurements."[477] The objective of the matrix is "that pipeline crossings should do no long-term harm to aquatic habitat on-site, upstream, or downstream and that short and long-term negative impacts will be avoided

---

[473] Castro et al. (2015) at 767.

[474] *Id.*

[475] *Id.* at 771.

[476] *Id.*

[477] *Id.*

where possible, minimized to the greatest extent possible, and mitigated where necessary."[478] In other words, the matrix is consistent with the requirements of the Section 404(b)(1) Guidelines.

Although these comments establish elsewhere that the Corps must deny Tennessee Gas's application because the permit sought is prohibited by the Section 404(b)(1) Guidelines, even if that were not true Tennessee Gas's adverse impacts would still have to be minimized and the Corps would need to ensure that they are by requiring Tennessee Gas to implement the risk-based approach discussed in Castro et al. (2015).

### III. THE PUBLIC INTEREST LIES IN DENYING TENNESSEE GAS'S APPLICATION.

The Corps is required to base its decision on an application for any DA permit—including, but not limited to, those like Tennessee Gas's that are required under Section 404—upon an evaluation of the probable impacts, including cumulative impacts, that the proposed activity and its intended use will have on the public interest.[479] If a permit would be contrary to the public interest, the Corps must deny the application.[480]

Evaluating whether permit issuance would be in the public interest requires the Corps to weigh multiple factors and balance a proposed project's

---

[478] *Id.*

[479] 33 C.F.R. §320.4(a)(1).

[480] 33 C.F.R. §320.4(a)(1); *see also* 33 C.F.R. § 320.4(b)(4).

**App-0632**

reasonably expected benefits against its reasonably foreseeable detriments.[481] Corps regulations instruct that "[a]ll factors which may be relevant to the proposal must be considered" along with "the cumulative effects thereof," including "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, . . . recreation, water supply and conservation, water quality, energy needs, safety, . . . considerations of property ownership and, in general, the needs and welfare of the people."[482] This multi-factor inquiry demands that the Corps undertake a comprehensive evaluation, but "[t]he specific weight of each factor is determined by its importance and relevance to the particular proposal," and "a specific factor may be given great weight" for some proposals while not being implicated in others.[483]

In the case of Tennessee Gas's application, many of the issues discussed elsewhere in these comments overlap substantially with the public interest factors the Corps is required to consider. For example, the proposed discharges' significant and long-term effects on: (1)  the structure and function of the

---

[481] 33 C.F.R. §320.4(a)(1). Further, as discussed in Section II.A.5, *supra*, the Corps must ensure that it has a NEPA record to support its regulatory determinations, *see generally* 33 C.F.R. Part 325, App. B, which is particularly critical here because the DEIS that FERC has issued for Tennessee Gas's proposed pipeline is not up to the task.

[482] 33 C.F.R. §320.4(a)(1).

[483] 33 C.F.R. §320.4(a)(3).

App-0633

impacted streams and wetlands; (2) violations of water quality standards; (3) aquatic ecosystems; (4) individual fish and aquatic creatures; (5) fish, shellfish, and benthic macroinvertebrate populations, and other aquatic populations; and (6) aquatic life relate to the following public interest review factors, including conservation, general environmental concerns, wetlands, fish and wildlife values, and water quality.[484] Accordingly, the Corps must consider the previous discussions in these comments as part of their public interest review, and must conclude that those factors favor permit denial.

In addition, at least four additional factors at issue here weigh in favor of permit denial: (1) the lack of need for Tennessee Gas's proposed pipeline from an economic and energy perspective, (2) the proposed pipeline's effects on climate change, (3) considerations of property ownership along and near the proposed pipeline route, and (4) environmental justice.

## A. THE LACK OF PUBLIC NEED FOR THE CUMBERLAND PIPELINE WEIGHS HEAVILY IN FAVOR OF PERMIT DENIAL AND AGAINST FINDING THAT THE PROJECT IS IN THE PUBLIC INTEREST.

The Corps is required to evaluate whether the proposed pipeline is needed and the agency must conclude that it is not. Corps regulations instruct that the agency must consider "the relative extent of the public and private need" for the pipeline and the practicability of "alternative locations and

---

[484] *Id.*

**App-0634**

methods to accomplish the objective" of the project.[485] To be clear, the Corps has an independent obligation to determine whether the project is in the public interest, and the relative extent of the public and private need for the pipeline is just one factor.[486] But here, since neither the Cumberland Pipeline nor the TVA power plant it would serve are needed, the relative lack of need for the project weighed against its environmental and other harms demonstrates that the project is not in the public interest.

The Corps is in a similar position to FERC in that it must evaluate whether the project is needed. However, the Corps has nothing in the administrative record establishing a need for the project beyond the applicant's own say-so. Furthermore, even the evidence that has been put before FERC is insufficient. Commenters incorporate by reference their comments on the FERC DEIS and also highlight several key issues here.[487]

The central problem is that the Cumberland Pipeline exists solely to serve one gas plant, and since that one gas plant is not needed, the pipeline is not needed either. The Corps cannot simply defer to TVA's claim that the plant is needed, nor Tennessee Gas's invocation of TVA's claim. And the Corps

---

[485] 33 C.F.R. §320.4(a)(2).

[486] 33 C.F.R. §320.4(a)(1)–(3).

[487] Comments of Sierra Club et al. on the Federal Energy Regulatory Commission's Draft Environmental Impact Statement for the Cumberland Project; FERC Docket No. CP22-493 (March 27, 2023) (attached as Exhibit 35).

App-0635

cannot simply defer to a potential FERC approval for the Cumberland Pipeline because the Corps and FERC are independent agencies carrying out different regulatory schemes, and the Corps has an independent duty to assess the public interest in the need for the pipeline.

Before FERC, the sole evidence for the claim that the pipeline is needed is a precedent agreement between Tennessee Gas and TVA. However, under the circumstances, that precedent agreement is not reliable evidence of need. Indeed, FERC has already been warned that precedent agreements do not conclusively establish market need,[488] and the Corps finds itself in a similar position with reason to be skeptical here. TVA appears to have committed to this deal long before completing the environmental reviews of its decision that TVA is required to undertake. The precedent agreement was executed one day after TVA published its scoping report describing options for replacing the Cumberland Fossil Plant on August 10, 2021.[489] The agreement, called a "binding precedent agreement" by Tennessee Gas in earlier filings before

---

[488] *Env't Def. Fund v. FERC*, 2 F.4th 953, 973 (D.C. Cir. 2021) (admonishing FERC for failing to engage with "strong arguments as to why the precedent agreement [at issue in this case] was insufficiently probative of market need and benefits of the proposed pipeline.").

[489] *See* TVA, Cumberland Fossil Plant Retirement EIS Scoping Report at 1 (Aug. 10, 2021), https://www.tva.com/docs/default-source/1-float/final_tva_cumberland_eis_scoping_report2b91b738-1fc7-4db7-8cf6-015c504730bd.pdf?sfvrsn=bd3c1ed6_5, [hereinafter "Cumberland Scoping Report"].

**App-0636**

FERC,[490] was in place before any public comment had been heard on any stage of TVA's decision, almost a year and a half before TVA finally announced its definite decision to select the gas plant.[491] Further, the precedent agreement uses "shall" language to obligate TVA to execute the service agreements "similar in all material respects" to the agreements already included with the precedent agreement[492]; already contains TGP's rates for the Project[493]; and obligates TVA to certain undisclosed reimbursement obligations.[494]

In addition, as FERC recognized in the DEIS, TVA is authorized to make unilateral decisions about generation assets without the oversight of a state public utility commission.[495] That allows the agency to make decisions that

---

[490] Tennessee Gas Pipeline Company, L.L.C., Draft Resource Report 10: Alternatives at 10-2 (Apr. 2022) (attached Exhibit 36).

[491] [Record of Decision re:] Cumberland Fossil Plant Retirement Environmental Impact Statement, 88 Fed. Reg. 3767, 3770 (Jan. 20, 2023), [hereinafter "Cumberland Record of Decision"].

[492] Pipeline Precedent Agreement between Tennessee Gas Pipeline Company, L.L.C. and Tennessee Valley Authority dated August 11, 2021 at § 8.A [hereinafter "Redacted Precedent Agreement"] (attached as Exhibit 37).

[493] Memorandum Opinion and Order at 5, Southern Environmental Law Center v. TVA, No. 22-cv-00108 (E.D. Tenn. Mar. 7, 2023) ("[T]he [precedent] Agreement sets out the rates and terms regarding TGP providing service to TVA's power plant.").

[494] Redacted Precedent Agreement at § 7.C.

[495] DEIS at 1-4 ("Although the evaluation of need for additional electrical generation is generally up to the States, under the TVA Act, the TVA Board has the exclusive authority to evaluate a need for generation facilities within TVA's service territory.").

**App-0637**

could be detrimental to ratepayers without regulatory oversight.[496] In the case of this decision in particular, TVA's board delegated its authority to TVA's CEO to "evaluate, decide upon, and complete, if necessary, the retirements of the Cumberland and Kingston plants and replacement generation projects"[497]— abdicating even the internal accountability that would otherwise be a check on TVA's generation decisions. Further, TVA's relationship with its distributors is such that neither FERC nor the Corps can assume the agency is voluntarily behaving as another utility—one subject to market discipline—might: the agency's onerous 20-year distribution contracts have the practical effect of locking in local distributors forever.[498] As a result, there has been little market

---

[496] *Athens Utilities Bd. Gibson Elec. Membership Corp. Joe Wheeler Elec. Membership Corp. Volunteer Energy Coop.*, 177 FERC ¶ 61,021, 61,074 (2021) ("As an instrumentality of the United States, TVA is not . . . subject to Commission regulation under sections 205 or 206 of the [Federal Power Act]."); *see also id.* at 61,090 (2021) (Clements, Commissioner, concurring) ("[Requiring TVA to wheel outside power to its customers] would provide the customers of the relevant not-for-profit cooperative and municipal utilities access to lower cost power than TVA currently provides them with, supplying a modicum of competition and its associated benefits to the region."); *id.* at 61,091 (Christie, Commissioner, concurring) ("Competitive procurements hold the promise of reducing power supply costs to all customers, large and small, while avoiding the threat of potential cost-shifting to small customers."); 16 U.S.C. § 831a(g)(1)(L) (authorizing the TVA Board itself—not a separate regulator—to "establish the electricity rates charged by the Corporation").

[497] TVA, ANNUAL REPORT PURSUANT TO SECTION 13, 15(D), OR 37 OF THE SECURITIES EXCHANGE ACT OF 1934 (Form 10-K) (Nov. 15, 2021) at 79, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001376986/0001376986210 00028/tve-20210930.htm (attached as Exhibit 38).

[498] The contracts are designed in a way that penalizes non-signing distributors and removes local distributors' discretion to invest in renewable power. *See* Motion to Intervene of Sierra Club and Appalachian Voices, Dkt. No CP22-493-

App-0638

discipline or democratic accountability for TVA's decision to invest in this new gas plant, and the Corps cannot rely on TVA's self-serving claims of need for the gas plant to evaluate whether the plant or connected pipeline are, in fact, needed.

Indeed, even EPA is skeptical. In the DEIS, FERC uncritically reported that:

> TVA's financial and system analysis indicated that their Proposed Action (i.e., the new Cumberland Gas Plant) would be the best overall solution to provide low-cost, reliable, and cleaner energy to the TVA power system. TVA states that the proposed combined-cycle plant at the CUF would also provide the flexibility to reliably integrate 10 GW of solar power onto their system by 2035 and enable the remaining coal-fired units to be retired on an accelerated schedule. Therefore, this EIS examines the environmental impacts associated with construction and operation of TVA's Proposed Action (Tennessee[ Gas]'s proposed Cumberland Pipeline Project) to serve TVA's need.[499]

But in comments on TVA's DEIS, EPA found that TVA had failed to completely disclose TVA's underlying assumptions about both the alternatives it did consider (including Alternative C: a portfolio of solar generation and rapidly dispatchable storage assets), and the alternatives TVA rejected wholesale.[500]

---

000                    at                    2-3                    (Oct. 28, 2022), https://elibrary.ferc.gov/eLibrary/docinfo?accession_number=20220819-5146.

[499] DEIS at 3-2.

[500] Environmental Protection Agency, EPA Comments on the Draft Environmental Impact Statement for the Cumberland Fossil Plant Retirement, Stewart County, Tennessee; CEQ No: 20220059 at 2, https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=364841 [hereinafter "EPA DEIS Comments"] (attached as Exhibit 39).

**App-0639**

EPA further recommended that TVA consider how future regulatory, policy, and energy transition trends will impact the assets it proposes to build. Noting "forecasts of declining costs and increasing adoption of renewable generation," EPA urged TVA to consider the long-term financial risk associated with fossil fuel assets that typically have long lifespans and may become uneconomic well before their projected retirement.[501]

TVA failed to rectify these errors in its final EIS, glibly concluding instead that "comments raised by the USEPA [on TVA's Final EIS] reiterated the agency's earlier comments on the Draft EIS and did not raise new issues of relevance that were not already addressed by TVA in the Final EIS or Appendix O of the Final EIS."[502] That's not true. EPA in fact wrote, among other criticisms, that the final EIS's "alternatives analysis continues to rely on inaccurate underlying economic information" [503] ; that "TVA's preferred alternative does not take into account . . . the implications of continued fossil fuel investment for its ratepayers and the cost and public health toll of increasingly disruptive climate-driven weather extremes"[504]; and that "[t]he

---

[501] *Id.* at 4–5.

[502] Cumberland Record of Decision, 86 Fed. Reg. at 3770.

[503] Envtl' Prot. Agency, EPA Comments on the Final Environmental Impact Statement for the Cumberland Fossil Plant Retirement, Stewart County, Tennessee; CEQ No: 20220181 at 1 (Jan. 6, 2023), [hereinafter "EPA FEIS Comments"] (attached as Exhibit 40).

[504] *Id.*

Final EIS did not disclose to what extent each alternative is resilient or vulnerable to outages (e.g., extreme cold weather events) in a manner that allows for comparison across alternatives, with the expectation that climate change will increase impacts that could affect risks to reliability."[505]

In sum, the precedent agreement here contravenes NEPA by precommitting TVA to building its gas plant before completing environmental reviews, and TVA's unique position in the market creates opportunities for it to make decisions that would harm end-use ratepayers with impunity. The record cries out for skepticism that the gas plant and pipeline are needed. The Corps' obligation to consider the public and private need for the pipeline infrastructure is separate from what TVA unilaterally decides or what FERC accepts, and the Corps must use its authority here to protect the public and the environment from the impacts of an unnecessary project.

It goes without saying that the Corps has an independent regulatory obligation and cannot simply defer to whatever FERC may decide about the project. However, to the extent the Corps relies on FERC, the lawfulness of the Corps' determinations would depend in part on the lawfulness of FERC's. In such a scenario, flaws in FERC's determinations—such as a failure by FERC to look beyond the precedent agreement for genuine evidence of market need

---

[505] *Id.*

for the pipeline and downstream gas plant—would also infect the Corps' determinations.

## B. THE PUBLIC'S INTEREST IN COMBATTING CLIMATE CHANGE PRECLUDES BUILDING THE CUMBERLAND PIPELINE.

This project is not in the public interest because it conflicts with the federal policy priority of combatting climate change. To address the climate crisis, President Biden ordered the entire federal government to take decisive, bold action—including swiftly decarbonizing the electricity sector. In Executive Order 14,008, *Tackling the Climate Crisis at Home and Abroad*, President Biden emphasized the urgency of the moment: "The United States and the world face a profound climate crisis. We have a narrow moment to pursue action at home and abroad in order to avoid the most catastrophic impacts of that crisis and to seize the opportunity that tackling climate change presents."[506] Consequently, Executive Order 14,008 calls for a "government-wide approach," as the "Federal Government must drive assessment, disclosure, and mitigation of climate pollution and climate-related risks in every sector of our economy, marshaling the creativity, courage, and capital necessary to make our Nation resilient in the face of this threat."[507] Executive Order 14,008 establishes the goals of "net-zero emissions, economy-wide, by no

---

[506] Executive Order 14,008, 86 Fed. Reg. 7619, 7622 (Jan. 27, 2021).

[507] *Id.*

**App-0642**

later than 2050"[508] and "a carbon pollution-free electricity sector no later than 2035." [509] In Executive Order 13,990, President Biden reestablished the Interagency Working Group on the Social Cost of Greenhouse Gases and instructed agencies "to capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account."[510]

Even more recently, Congress passed the Inflation Reduction Act, the most ambitious and comprehensive climate legislation to date.[511] The Act will invest billions in climate solutions, with the aim of lowering our nation's carbon emissions by 40% by 2030.[512] Among other things, it will provide clean energy tax credits that make it cheaper to deploy renewable generation and expand funding for clean energy in lower wealth communities.[513]

---

[508] *Id.*

[509] *Id.* at 7624.

[510] Executive Order 13,990, 86 Fed. Reg. 7036, 7037 (Jan 20, 2021).

[511] Inflation Reduction Act of 2022, Pub. L. No. 117-169 (2022).

[512] Nadja Popovich and Brad Plumer, *How the New Climate Bill Would Reduce Emissions*, N.Y. Times (Aug. 12, 2022), https://www.nytimes.com/interactive/2022/08/02/climate/manchin-deal-emissions-cuts.html.

[513] *Id.*; *see also* Press Release, The White House, Fact Sheet: Inflation Reduction Act Advances Environmental Justice (Aug. 17, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/17/fact-sheet-inflation-reduction-act-advances-environmental-justice/.

This project conflicts with the nation's climate goals by locking in decades of new fossil fuel assets: the pipeline and the gas plant it would serve.

Critically, the Corps will not be equipped take a hard look at the climate impacts of the project under NEPA or accurately evaluate how the project affects the public interest in combatting the climate crisis unless the Corps demands that FERC cure the manifold deficiencies in the DEIS related to climate change or the Corps prepares its own supplemental EIS. Again, Commenters incorporate by reference their comments on the FERC DEIS and also highlight three flaws in the DEIS here.[514] ***First***, the DEIS ignored the decades of harmful greenhouse gas ("GHG") emissions the project would cause. The Cumberland Pipeline would supply gas to a single customer: a new multi-billion-dollar TVA combined-cycle gas plant that would have a useful life of at least 30 years.[515] Yet FERC failed to publish lifecycle estimates of the GHG emissions for the new plant and pipeline. And FERC does not estimate the total GHG emissions for the Project's useful life.

The DEIS excused itself from assessing the Project's substantial climate effects by pointing to TVA's decision to retire the Cumberland coal plant.[516] Subtracting the coal plant's considerable GHG emissions, the DEIS

---

[514] *See* Comments of Sierra Club et al. on FERC DEIS.

[515] *See* TVA FEIS at 412 ("The Project could continue the current land's industrial use for at least 30 years.").

[516] DEIS at 4-100 to 4-105.

**App-0644**

emphasizes the net annual emission rate of a brand-new gas plant compared to a 50-year-old coal plant. But neither the Corps nor FERC are "excused from making emissions estimates just because the emissions in question might be partially offset by reductions elsewhere," including where some alternatives may "make it possible for utilities to retire dirtier, coal-fired plants."[517] The DEIS cannot take carbon credits for TVA's prior and final decision to retire the Cumberland coal plant. Yet the DEIS did just that, obscuring the climate impacts of the pipeline and precluding any cooperating agencies, including the Corps, from taking a hard look at the issue on the current record.

**Second**, the DEIS also fails to provide essential context to analyze the project's climate effects. FERC's effort "to provide context of the Project's emissions" was to "compare the Project's GHG emissions to the total GHG emissions for the Tennessee GHG inventories."[518] As discussed above, those estimates are flawed by FERC's impermissible use of offsets from the retiring coal plant. But even when accounting for emissions accurately, the DEIS's reliance on facile percentages does not satisfy NEPA's "hard look" requirement. Most recently, the U.S. Court of Appeals for the Tenth Circuit rejected this same approach: "Simply stating what percentage the emissions will make up of regional, national, and global emissions does not meaningfully inform the

---

[517] *Sabal Trail*, 867 F.3d at 1374–75.

[518] DEIS at 4-103.

public or decisionmakers about the impact of the emissions. Indeed, all agency actions causing an increase in GHG emissions will appear de minimis when compared to the regional, national, and global numbers."[519] Similarly, in comments to TVA regarding the gas plant the proposed Project would serve, EPA has objected that this approach "diminishes the significance of substantial project-scale GHG emissions" and is "misleading given the nature of the climate policy challenge to reduce GHG emissions from a multitude of sources, each making a relatively small individual contributions to overall GHG emissions."[520] EPA advises that "NEPA documents [should] instead discuss the conflict between GHG emissions and national, state, and local GHG reduction policies and goals, and—equally important—ways to avoid or address the policy conflict, that increases over time created by projects that otherwise expand or lock-in fossil fuel consumption."[521]

In January 2023, the Council on Environmental Quality ("CEQ") published "National Environmental Policy Act Guidance on Consideration of

---

[519] *Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1043–44 (10th Cir. 2023) (internal citation omitted); *see also 350 Montana v. Haaland*, 50 F.4th 1254, 1269–70 (9th Cir. 2022) ("By relying on an opaque to total global emissions … the 2018 EA hid the ball and frustrated NEPA's purpose.").

[520] EPA DEIS Comments at 12.

[521] *Id.*

App-0646

Greenhouse Gas Emissions and Climate Change."[522] The guidance "applies longstanding NEPA principles to the analysis of climate change effects,"[523] and CEQ has instructed agencies to use the guidance "to inform the NEPA review for all new proposed actions."[524] Echoing EPA's comments to TVA—as well as to FERC[525]—one of CEQ's primary recommendations is that agencies should place GHG emissions "in the context of relevant climate action goals and commitments, including Federal goals, international agreements, state or regional goals, Tribal goals, agency-specific goals, or others as appropriate."[526] CEQ advises that "analysis generally should be complemented with evaluation that compares the proposed action's and reasonable alternatives' energy use against scenarios or energy use trends that are consistent with achieving

---

[522] Council on Environmental Quality, National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1196 (Jan. 9, 2023) [hereinafter "CEQ Climate Guidance"].

[523] *Id.* at 1198.

[524] *Id.* at 1212. FERC published the Draft EIS on February 9, 2023, and this Corps comment period is open until May 10, 2023, well after CEQ published the revised climate guidance on January 4, 2023. Therefore, the Corps must apply CEQ's 2023 climate guidance.

[525] *See* EPA FEIS Comments; Letter from Vicki Arroyo, Associate Administrator, U.S. Envtl. Prot. Agency, to Kimberly Bose, Fed. Energy Regul. Comm'n, Re: Comments on Draft Greenhouse Gas Policy Statement (Apr. 25, 2022) (attached as Exhibit 41).

[526] CEQ Climate Guidance, 88 Fed. Reg. at 1201.

**App-0647**

science-based GHG reduction goals, such as those pursued in the *Long-Term Strategy of the United States*."[527]

The DEIS entirely ignores science-driven federal and local policy goals. In addition to the federal climate policies discussed above, local governments within the TVA service territory have established their own climate goals. The City of Nashville aims to reduce GHG emissions community-wide by 80%.[528] Nashville Electric Service—one of TVA's largest customers—unanimously passed a resolution against the proposed methane gas plant at Cumberland largely because it's out of step with the city's target.[529] The DEIS failed to acknowledge these national and local decarbonization pathways, much less analyze the project's GHG emissions against them. FERC's failure puts the ball in the Corps' court. To analyze the project's emissions, the Corps must provide GHG emissions estimates against these decarbonization pathways,

---

[527] *Id.* at 1205.

[528] Metropolitan Nashville and Davidson County, TN, *A Resolution Adopting a Metropolitan Government Community-Wide Target of an 80% Reduction in Annual Greenhouse Gas Emissions from 2014 Levels by 2050*, RS2022-1358 (approved Feb. 2, 2022 (attached as Exhibit 42).

[529] *See* Nashville Electric Service, *Resolution Recommending TVA Pursue Solar and Storage Investments in Middle Tennessee* (May 25, 2022) (attached Exhibit 43); Caroline Eggers, *NES Board, for the First Time Ever, Comes Out Against TVA Fossil Fuel Plans*, WPLN (May 26, 2022), https://wpln.org/post/nes-board-for-the-first-time-ever-comes-out-against-tva-fossil-fuel-plans/ (attached Exhibit 44).

**App-0648**

assessing the extent to which the Project would or would not align with these science-based targets.

**Third**, the DEIS ignores foreseeable upstream emissions. FERC appears to assume that the impact of switching from coal to methane gas would be a be a net benefit because of relatively smaller emissions generated by burning gas as opposed to coal. [530] But a growing body of literature is providing independent estimates of the fugitive emissions from unconventional natural gas production and it is now abundantly clear that these emissions can eclipse, or at a minimum greatly reduce, the stated climate benefits of switching from coal to natural gas.[531] Rather than simply assuming the project would offer a climate benefit as FERC did, the Corps must acknowledge and account for the ways that fugitive emissions could eclipse any benefit that switching fossil fuels offers.

Further, the Corps must present appropriate metrics to contextualize the longer-term warming potential this project presents. To compare the global warming impacts of various GHGs, the DEIS quantified GHG emissions as carbon dioxide equivalents ("$CO_{2e}$"). To account for varying potency, the DEIS applied the global warming potential ("GWP") of each GHG. The GWP is the

---

[530] DEIS at vii.

[531] Nathan Hultman et al., *The greenhouse gas impact of unconventional gas for electricity generation*, 6 ENVTL. RES. LETT. 044008 (2011) (attached as Exhibit 45).

measure of a particular GHG's ability to absorb solar radiation as well as its residence time within the atmosphere."[532] FERC based these GWPs "on a 100-year period."[533] Omitting the 20-year GWP unreasonably obscures the project's climate impacts. Methane is substantially more potent in its first several decades in the atmosphere. FERC gave methane a GWP of 25 based on a 100-year period—meaning FERC estimates methane to be 25 times as powerful a GHG as carbon dioxide.[534] Yet "[o]ver a 20-year timeframe, methane is about 84 times as potent as carbon dioxide."[535] Methane's short-term potency is a critical factor in assessing the project's climate effects. Using the 20-year GWPs—in addition to the 100-year GWPs—would comply with the agencies' NEPA obligation to use the "best available science and data"[536] and consider "[b]oth short- and long-term effects."[537]

Understanding the project's methane emissions is critical to analyzing its climate effects. Because methane is so potent over its first several decades, methane emissions "significantly erode the potential climate benefits of

---

[532] DEIS at 4-90.

[533] DEIS at 4-90.

[534] Even this 100-year GWP is low. CEQ estimates methane's 100-year GWP to be between 28 and 36. 88 Fed. Reg. at 1199.

[535] 88 Fed. Reg. at 1199.

[536] 88 Fed. Reg. at 1199.

[537] 40 C.F.R. §1502.3(b)(2)(i).

natural gas use" relative to coal.[538] Yet, because methane is shorter lived than carbon dioxide, "achieving significant reductions would have a rapid and significant effect on atmospheric warming potential."[539]

The DEIS touts the climate benefits of TVA's decision to retire the Cumberland coal plant,[540] but the DEIS does not disclose or analyze information essential to determining whether operating a new gas plant will be better or worse for the climate than the 50-year-old coal plant. Not only does FERC omit the 20-year GWP, but FERC unreasonably fails to *mention*—much less analyze—the Project's upstream emissions.[541] Like combustion-related emissions, methane emissions throughout the gas infrastructure are also reasonably foreseeable. Whether through accidental leaks or intentional venting, gas infrastructure leaks significant amounts of methane during both production and transmission. As CEQ has made clear, "NEPA requires agencies to consider the reasonably foreseeable direct and indirect effects of

---

[538] Ramon A. Alvarez et al., *Assessment of Methane Emissions from the U.S. Oil & Gas Supply Chain*, 361 Sci. 186 (2018) ("Alvarez Assessment") (attached As Exhibit 46).

[539] EPA, *Importance of Methane*, https://www.epa.gov/gmi/importance-methane.

[540] *See, e.g.*, DEIS at vii ("However, substantial downstream emissions reductions would be associated with the replacement of coal-fired generation with natural gas-powered generation at TVA's electrical generating facility that the Project is designed to serve.").

[541] *See* DEIS at Sections 4-90 to 4-105.

**App-0651**

their proposed actions and reasonable alternatives (as well as the no-action alternative). . . . Indirect effects generally include reasonably foreseeable emissions related to a proposed action that are **upstream** or downstream of the activity resulting from the proposed action."[542] Yet the DEIS completely ignores this important and foreseeable part of the climate problem. If the final EIS does not cure these errors, it will be incumbent upon the Corps to prepare a supplemental EIS.

## C. CONSIDERATION OF PROPERTY OWNERSHIP FAVORS DENYING TENNESSEE GAS'S PERMIT APPLICATION.

Under 33 C.F.R. §320.4(g), the Corps must include in its public interest review "[c]onsideration of property ownership." Interstate natural gas pipelines are unusual among projects the Corps considers permitting in that the applicant is not the fee-owner of the property at a substantial number of its proposed disposal sites.[543] That is because interstate natural gas pipelines frequently use the extraordinary power of eminent domain to seize vast stretches of their right-of-way.[544]

Considerations of property ownership cut *against* issuing the requested permits in this case. Whereas considerations of private property rights

---

[542] CEQ Climate Guidance, 88 Fed. Reg. at 1204.

[543] *Cf.* 33 C.F.R. §320.4(g)(6).

[544] *See, e.g.*, *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197 (4th Cir. 2019) (appeal by hundreds of landowners of federal court order

**App-0652**

frequently cut in favor of allowing an owner to engage in a regulated activity,[545] here private property rights cut in favor of permit denial. The "power to exclude [others from private property] has traditionally been considered one of the most treasured strands in an owner's bundle of property rights."[546] Landowners in the path of the proposed Cumberland Pipeline may find themselves haled into court so that Tennessee Gas can seize an easement across their lands.

The Corps should also consider the interests of property owners in the surrounding area, as landowners within the pipeline right-of-way are not the only ones who will be affected. Construction and operation of a natural gas pipeline will burden nearby residents with noise pollution, additional traffic, and other disturbance.

Furthermore, even if the Cumberland Pipeline were constructed and placed into operation, the visual blight of the right-of-way would cause ongoing harm to the community, as residents who once had unspoiled, bucolic views will lose them as long as the right-of-way is maintained, and many years after.

---

allowing Mountain Valley to engage in pipeline construction on their property before paying just compensation).

[545] *See* 33 C.F.R. §320.4(g)(1)–(2).

[546] *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435–36 (1982); *see also Rakas v. Illinois*, 439 U.S. 128, 143, (1978) (observing that "one of the main rights attaching to property is the right to exclude others" (citing W. Blackstone, Commentaries, Book 2, ch. 1)).

App-0653

Landowners outside the right-of-way have no recourse for this loss. As the loss of these views decrease the enjoyment of the families who live in the area, it is only common sense that new families (and, as a result, businesses) will either be less likely to move to the area or will pay less to do so.[547]  In other words, residents are also likely to feel these aesthetic losses as losses in property values and/or greater difficulty selling their property,[548] which will persist with the visibility of the right-of-way for decades after the pipeline ceases operating.[549]

Some community members may reasonably fear their families are in greater danger due to the presence of the pipeline.[550] These fears may extend

---

[547] Spencer Phillips et al., *Economic Costs of the Mountain Valley Pipeline: Effects on Property Value, Ecosystem Services, and Economic Development in Virginia and West Virginia* 29–33 (May 2016) (attached as Exhibit 47).

[548] *Id.*

[549] Nick Cropper, *With ACP Canceled, Nelson Residents Look to Environmental Recovery*, NELSON CNTY. TIMES (Sept. 30, 2020), https://newsadvance.com/community/nelson_county_times/news/with-acp-canceled-nelson-residents-look-to-environmental-recovery/article_dc071425-d557-5d94-98ee-3475754d0059.html (director of operations of Virginia Department of Conservation and Recreation remarking, after restoration efforts had begun on the abandoned Atlantic Coast Pipeline right-of-way, "[P]robably in 20 to 40 years there will be some fairly good-sized trees, and somebody new coming to the area won't notice much of an impact from a visual perspective.").

[550] *See*, e.g., Erin Brock Carlson and Martina Angela Caretta, *Living with Natural Gas Pipelines: Appalachian Landowners Describe Fear, Anxiety, and Loss*, THE CONVERSATION (Feb. 3, 2021) (recounting the results of a 2020 survey of 45 respondents living close to natural gas pipelines, reporting that the top concern among respondents was explosions, and noting that between 2010 and

**App-0654**

to any community members living near the pipeline, not just those whose land will be burdened by right-of-way easements. Again, in addition to psychological harm and very real safety risks that community members will be forced to bear, property values are expected to decrease in the entire area perceived as the zone of danger.[551]

In sum, the "considerations of property ownership" factor supports a finding that this project is contrary to the public interest, due to the potential exercise of eminent domain for this project and the detrimental effect the pipeline may have on property owners in the communities near the pipeline route. For these reasons, the public interest in private property rights favors permit denial.

**D.    THE CORPS MUST CONSIDER THE CUMBERLAND PIPELINE'S ENVIRONMENTAL JUSTICE IMPACTS WHEN CONDUCTING ITS PUBLIC INTEREST REVIEW AND FIND THAT THOSE IMPACTS WEIGH IN FAVOR OF DENYING TENNESSEE GAS'S APPLICATION.**

As part of its public interest review,[552] the Corps must consider principles of environmental justice and the Cumberland Pipeline's impacts on environmental justice communities, including minority and low-income

---

2018, a pipeline explosion occurred every 11 days, on average, in the United States).

[551] *See* Phillips et al. (2016) at 24–26.

[552] *See* 33 C.F.R. § 320.4(a)(1) (listing public interest factors, including "the needs and welfare of the people").

communities.[553] Such consideration must include all disproportionate and adverse human health, environmental, climate-related, and cumulative impacts of the Cumberland Pipeline on each environmental justice community that may be affected by the project. Based on a thorough review, the only defensible conclusion that the Corps could reach is that the Cumberland Pipeline's disproportionate and adverse environmental justice impacts outweigh any project benefits. Consequently, the Corps should deny Tennessee Gas's application.

### 1. THE CORPS MUST IDENTIFY AND ANALYZE ALL DISPROPORTIONATE AND ADVERSE EFFECTS OF THE CUMBERLAND PIPELINE ON ENVIRONMENTAL JUSTICE COMMUNITIES AS PART OF ITS PUBLIC INTEREST REVIEW.

In 1994, President Clinton signed Executive Order 12,898, which urged federal agencies to consider environmental justice by "identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities."[554] Building on that foundation, President Biden has made environmental justice a top

---

[553] Exec. Order No. 14,096, Revitalizing Our Nation's Commitment to Environmental Justice for All, 88 Fed. Reg. 25,251 (Apr. 21, 2023); Exec. Order No. 12,898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 7,629 (Feb. 11, 1994); *see also Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 92 (4th Cir. 2020) ("[E]nvironmental justice is not merely a box to be checked … .").

[554] 59 Fed. Reg. at 7,629.

**App-0656**

priority. On his first day in office, President Biden signed an executive order that mandates the advancement of environmental justice across the federal government and directs all federal agencies to "prioritize … environmental justice."[555] One week later, President Biden signed another executive order directing all federal agencies to "make achieving environmental justice part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."[556]

Most recently, on April 21, 2023, President Biden signed Executive Order 14,096, *Revitalizing Our Nation's Commitment to Environmental Justice for All*, which reemphasizes the importance of environmental justice review and directs "[e]ach agency … [to] identify, analyze, and address disproportionate and adverse human health and environmental effects (including risks) and hazards of Federal activities, including those related to climate change and cumulative impacts of environmental and other burdens on communities with environmental justice concerns … ."[557] Executive Order

---

[555] Exec. Order No. 13,990, Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, 86 Fed. Reg. 7,037 (Jan. 20, 2021).

[556] Exec. Order No. 14,008, Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7,619 (Jan. 27, 2021).

[557] 88 Fed. Reg. at 25,253.

**App-0657**

14,096 "uses the term 'disproportionate and adverse' as a simpler, modernized version of the phrase 'disproportionately high and adverse' used in Executive Order 12,898 … [to] eliminate[] potential misunderstanding that agencies should only be considering large disproportionate effects."[558]

Those Executive Orders make crystal clear that the Corps **must** conduct its own environmental justice review as part of its public interest review. The first step is for the Corps to understand the demographics of the populations affected and "determine whether minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action." [559] Although tools like EPA's EJScreen and census data can be important in this effort, there are limitations to what those tools can offer, which can lead to communities with environmental justice concerns being overlooked.[560] EPA guidance has noted this issue, cautioning that "[t]he fact

---

[558] *FACT SHEET: President Biden Signs Executive Order to Revitalize Our Nation's Commitment to Environmental Justice for All*, THE WHITE HOUSE (Apr. 21, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/04/21/fact-sheet-president-biden-signs-executive-order-to-revitalize-our-nations-commitment-to-environmental-justice-for-all/.

[559] *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F.Supp.3d 101, 136–37 (D.D.C. 2017) (quoting CEQ, *Environmental Justice Guidance Under the National Environmental Policy Act* 9 (Dec. 10, 1997), https://www.epa.gov/sites/default/files/2015-02/documents/ej_guidance_nepa_ceq 1297.pdf [hereinafter, "CEQ EJ Guidance"] (attached as Exhibit 48)).

[560] *See* EPA, *EJScreen Fact Sheet* (2021), https://www.epa.gov/system/files/documents/2022-02/ejscreen_fact_sheet_2022.pdf ?msclkid=91181c4eb09311ec8df33f0de535e3b4 (noting that the "EJSCREEN

**App-0658**

that census data can only be disaggregated to certain prescribed levels (e.g., census tracts, census blocks) suggests that pockets of minority or low-income communities, including those that may be experiencing disproportionate[] and adverse effects, may be missed in a traditional census tract-based analysis."[561] Accordingly, an on-the-ground approach or direct outreach to communities along the pipeline route—or other potentially impacted areas—may be necessary to identify all environmental justice communities that could be affected by the Cumberland Pipeline.[562]

In its DEIS, FERC identified several environmental justice communities within the Cumberland Pipeline area.[563] Specifically, FERC identified seven communities that would be considered environmental justice communities based on minority percentage thresholds and low-income thresholds.[564] Although FERC has identified at least seven environmental justice

---

does not cover all environmental or EJ issues," "[c]ensus data has limitations and can obscure small communities," and "[r]esults should be verified on the ground when possible").

[561] EPA, Final Guidance for Incorporating Environmental Justice Concerns in EPA's NEPA Compliance Analyses §2.1.1 (Apr. 1998), https://www.epa.gov/sites/default/files/2015-02/documents/ej_guidance_nepa_epa 0498.pdf.

[562] *See* CEQ EJ Guidance at 4, 9–13.

[563] DEIS at 4-73.

[564] *Id.*

communities that would be impacted by the Cumberland Pipeline, the Corps must conduct its own evaluation. As discussed above, EPA's EJScreen and census data alone may not be sufficient to identify all impacted communities, and direct community outreach or on-the-ground data collection may be necessary. Moreover, FERC only used a 1-mile radius around the proposed route and proposed aboveground facilities to determine the geographic scope of the Cumberland Pipeline's impacts.[565] FERC did not adequately explain or justify why the 1-mile radius was sufficient, and as a result, any Corps reliance on FERC's determination would be unreasonable. Research on environmental justice mapping indicates that use of different geographic units of analysis can yield drastically different results.[566] For example, impacts on transportation, access to public services, or water impacts could easily extend beyond the arbitrary 1-mile radius that FERC used. Drawing different boundaries for the

---

[565] *Id.* at 4-79.

[566] *See, e.g.*, Juliana Maantay, *Mapping Environmental Injustices: Pitfalls and Potential of Geographic Information Systems in Assessing Environmental Health and Equity*, 110 Envtl. Health Perspectives 161, 165 (Apr. 1, 2002), https://ehp.niehs.nih.gov/doi/epdf/10.1289/ehp.02110s2161; Eric Sheppard et al., *GIS-based measures of environmental equity: Exploring their sensitivity and significance*, 9 J. Exposure Analysis & Envtl. Epidemiology 18, 19–20 (Jul. 1999), https://www.researchgate.net/publication/13107786_GIS-based_measures_of_environmental_equity_Exploring_their_sensitivity_and_significance ("In spatial analysis of environmental equity, it has now become clear that the choice of the geographic scale of the study area (e.g., states, metropolitan areas, counties, municipalities) and the spatial resolution of data within that study area (e.g., zip codes, census tracts, block groups) employed, influence the results of the analysis.").

**App-0660**

study area may therefore have dramatic implications. And because FERC did not provide an adequate or reasonable explanation for its delineation of the area potentially affected by the Cumberland Pipeline, the Corps cannot rely on such data.[567]

Once the Corps has adequately identified all communities with environmental justice concerns that may be affected by the Cumberland Pipeline, it must then identify, analyze, and address all disproportionate and adverse impacts—including human health, environmental, climate-related, and cumulative impacts—caused by the project on each of those communities.[568] What constitutes a "disproportionate and adverse" impact necessarily depends on the context and characteristics of the impacted community, and may involve a consideration of whether the risk or rate of the impact to the environmental justice community exceeds or is likely to exceed that to the general population or an appropriate comparison group.[569] In other

---

[567] *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330 (D.C. Cir. 2021) ("When conducting an environmental justice analysis, an agency's delineation of the area potentially affected by the project must be 'reasonable and adequately explained,' … and include 'a rational connection between the facts found and the decision made.'" (internal citations omitted)).

[568] 88 Fed. Reg. at 25,253.

[569] *See* CEQ EJ Guidance at 26; Fed. Interagency Working Grp. On Envtl. Justice & NEPA Comm., *Promising Practices for EJ Methodologies in NEPA Reviews* 38–42 (Mar. 2016), https://www.epa.gov/sites/default/files/2016-08/documents/nepa_prom

**App-0661**

words, impacts may pose "unique or unknown risks" to environmental justice communities that arise as a result of the particular characteristics of those communities.[570]

For example, environmental justice communities may be more vulnerable than the general population to events that are low-probability but catastrophic—like pipeline explosions—due to lack of public or private resources to address such emergencies, inability to evacuate or relocate, lack of access to affordable, high-quality health care, and reliance on affected place-based resources.[571] Even though risk of death or injury from pipeline accidents to the general population may be higher in urban areas—because there are more people living in proximity to pipelines in urban areas than in rural areas—rural communities often have fewer resources to address those risks, and natural gas infrastructure "often exacerbates existing social vulnerability."[572]

---

ising_practices_document_2016.pdf [hereinafter, "*Promising Practices for EJ Methodolgies*"] (attached as Exhibit 49).

[570] *Promising Practices for EJ Methodologies* at 34.

[571] *Id.* at 35.

[572] *See* Ryan E. Emanuel et al., *Natural Gas Gathering and Transmission Pipelines and Social Vulnerability in the United States*, 5 GEOHEALTH, Jun. 2021, at 8, https://agupubs.onlinelibrary.wiley.com/doi/epdf/10.1029/2021GH000442.

**App-0662**

There is no doubt that the Pipeline would result in disproportionate and adverse impacts on environmental justice communities. In its DEIS for the Pipeline, FERC concluded that such impacts to environmental justice communities would occur because "the Project includes the construction and operation of new pipeline facilities in environmental justice communities[.]"[573] In other words, FERC categorically concluded that construction and operation of new interstate methane pipelines necessarily has disproportionate and adverse effects on environmental justice communities along their route. The Corps must consider those impacts in its public interest review of Tennessee Gas's application.

In its DEIS, FERC identifies factors that could affect environmental justice communities, including visual impacts, socioeconomic impacts, including traffic impacts, and air and noise impacts from construction and operation.[574] However, FERC's analysis was insufficient because, among other reasons, it failed to fully account for the impacts of a large influx of temporary workers in small, rural communities along the pipeline route,[575] failed to consider the impacts of climate change,[576] failed to evaluate the risks of

---

[573] DEIS at vi.

[574] DEIS at 4-78.

[575] *See id.* at 4-65–4-66.

[576] *See generally id.* at 4-77–4-82.

**App-0663**

explosions and other pipeline safety failures,[577] and wrongly avoided analyzing impacts—including cumulative impacts—by cursorily characterizing impacts as minor, temporary, or likely to be avoided or mitigated.[578]

FERC's dismissal of the disproportionate and adverse impacts as minor or mitigatable commits a common error that Executive Order 14,906 seeks to rectify—the assumption that agencies only need to concern themselves with "large disproportionate effects."[579] A project might be in compliance with environmental laws or safety regulations and still be a source of disproportionate impacts, because the thresholds for the two questions are not the same.[580] Even small incremental additions to pollution or other environmental impacts in environmental justice communities could be a source of unfair burdens, particularly when cumulative impacts are considered.

Accordingly, the Corps must conduct its own evaluation to identify and analyze the Cumberland Pipeline's disproportionate and adverse impacts to

---

[577] *See id.* at 4-112–4-118 (discussing risks associated with pipeline safety, including potential for fires or explosions, but not accounting for these risks in the environmental justice context).

[578] *Id.* at 4-78.

[579] *FACT SHEET: President Biden Signs Executive Order to Revitalize Our Nation's Commitment to Environmental Justice for All*, THE WHITE HOUSE (Apr. 21, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/04/21/fact-sheet-president-biden-signs-executive-order-to-revitalize-our-nations-commitment-to-environmental-justice-for-all/.

[580] *See, e.g., Friends of Buckhingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 92 (4th Cir. 2020).

**App-0664**

environmental justice communities. Those impacts may include visual impacts, socioeconomic impacts, and air and noise impacts, as identified by FERC.[581] But, they must also include other impacts ignored by FERC.

For example, low-income rural Americans are disproportionately reliant on wells and springs for domestic water supplies,[582] the loss or contamination of which due to pipeline construction or operation could be economically devastating due to the expense of relocation or water replacement. Moreover, Pipeline construction will require 300-400 workers, 90% of which would be non-local.[583] The impact that the influx of these temporary construction workers will have on the environmental justice communities—including the strain on public services, affordable housing, and transportation—must be considered. Additionally, the Cumberland Pipeline will exacerbate the effects of climate change by supporting the continued combustion of fossil fuels, and climate change is known to disproportionately harm environmental justice communities.[584] Furthermore, proximity to natural gas pipelines may reduce

---

[581] DEIS at 4-78.

[582] *See* Erin Arciposki et al., *Clean Water, Clean Life: Promoting Healthier, Accessible Water in Rural Appalachia*, 161 J. Contemporary Water Research & Educ. 1 (Sep. 5, 2017), https://onlinelibrary.wiley.com/doi/10.1111/j.1936-704X.2017.3248.x.

[583] DEIS at 4-65.

[584] *See* Kristie S. Gutierrez & Catherine E. LePrevost, *Climate Justice in Rural Southeastern United States*, 13 INT'L J. ENVTL. RESEARCH & PUB. HEALTH 189 (Feb. 3, 2016), https://www.mdpi.com/1660-4601/13/2/189.

**App-0665**

local property values, which could lower the overall tax base of an impacted area and negatively affect even those who do not have pipeline easements on their property.[585]

### 2. THE DISPROPORTIONATE AND ADVERSE IMPACTS OF THE CUMBERLAND PIPELINE ON ENVIRONMENTAL JUSTICE COMMUNITITES OUTWEIGH THE PROJECT BENEFITS AND WARRANT DENIAL OF THE APPLICATION UNDER THE CORPS' PUBLIC INTEREST REVIEW OBLIGATIONS.

As discussed above, there are at least seven communities along the pipeline route with environmental justice concerns and particular vulnerability to the Cumberland Pipeline's disproportionate and adverse impacts. And there is no question that those communities—with residents who are more likely than the general population to be minorities or low-income—will suffer the disproportionate and adverse impacts from the Cumberland Pipeline noted above.[586] Because those disproportionate and adverse impacts

---

[585] *See* Daniel Walmer, *Pipelines could affect property values*, LEBANON DAILY NEWS (Jan. 2, 2016), https://www.ldnews.com/story/news/local/2016/01/02/pipelines-could-affect-property-values/77984160/; *see also* Martina Angela Caretta & Ryan E. Emanuel, *Does shale gas development impact property values in Central Appalachia? A mixed methods critical exploration*, 14 EXTRACTIVE INDUSTRIES & SOC'Y, Apr. 2023, at 3, https://www.sciencedirect.com/science/article/pii/S2214790X23000424 (noting that "just the announcement of a proposed pipeline in NY showed to impact negatively property values by 9%" and that "a study looking at the impact of 864 gas distribution incidents between 2010 and 2020 shoed a reduction in housing prices between 4 and 6%").

[586] DEIS at vi.

**App-0666**

outweigh the Cumberland Pipeline benefits, the Corps must deny Tennessee Gas's application.

As part of the Corps' public interest review, "[t]he benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments." [587] This requires a consideration of "[a]ll factors which may be relevant to the proposal," including "the needs and welfare of the people."[588] Environmental justice concerns fit squarely in the Corps' consideration of "the needs and welfare of the people." "The specific weight of each factor is determined by its importance and relevance to the particular proposal." [589] Here, the disproportionate and adverse impacts to environmental justice communities as a result of the construction and operation of the Cumberland Pipeline—including those to human health and the environment, as well as all cumulative and climate-related impacts—outweigh any supposed project benefits, which are primarily economic benefits that accrue to Tennessee Gas and are largely dependent upon the unfounded public need for the pipeline.[590]

---

[587] 33 C.F.R. §320.4(a)(1).

[588] 33 C.F.R. §320.4(a)(1).

[589] *Id.* §320.4(a)(3).

[590] *See id.* §320.4(a)(2)(i) (including "[t]he relative extent of the public and private need for the proposed structure or work" as general criteria to be considered in the Corps' public interest review).

Accordingly, after adequate identification and analysis of the Cumberland Pipeline's disproportionate and adverse impacts to environmental justice communities, the Corps must deny Tennessee Gas's application as contrary to the public interest.

## IV. THE CORPS SHOULD HOLD A PUBLIC HEARING IN CONNECTION WITH ITS CONSIDERATION OF THE PERMIT APPLICATION.

Section 404(a) of the Clean Water Act requires the Corps to allow an opportunity for a public hearing prior to issuing an individual discharge permit under that section.[591] The Corps' regulations implementing that provision provide that "[a] public hearing will be held in connection with the consideration of a DA permit application . . . whenever a public hearing is needed for making a decision on such permit application[.]"[592] "Requests for a public hearing . . . *shall be granted*, unless the district engineer determines that the issues raised are insubstantial or there is otherwise no valid interest

---

[591] 33 U.S.C. §1344(a).

[592] 33 C.F.R. §327.4(a).

**App-0668**

to be served by a hearing."[593] "In case of doubt, a public hearing should be held."[594]

As established through these comments and their attachments, there are a host of substantive issues with Tennessee Gas's application that compel the conclusion that a public hearing is needed. The issues raised in these comments are not "insubstantial." The Corps should have a full public airing of the legal and technical defects in Tennessee Gas's application to ensure that it does not issue an unlawful permit to the company.

Moreover, the public controversy over the proposed Cumberland Pipeline and the Tennessee Valley Authority's proposed gas plant that it will serve also compel the conclusion that a public hearing is necessary. The Tennessee Valley Authority received 830 scoping comments on its proposal to build a combined cycle gas plant to replace the retiring coal-fired units at Cumberland.[595] And the Tennessee Valley Authority received an additional 770 comments on its draft NEPA documents—most of which opposed the

---

[593] *Id.* §327.4(b) (emphasis added).

[594] *Id.* §327.4(c).

[595] Tennessee Valley Authority, Cumberland Fossil Plant Retirement: Final Environmental Impact Statement 13 (Dec. 2022), <u>available at</u> <u>https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/environment/cumberland-fossil-plant-retirement-final-eis4eeac6f0-b6bf-4843-9881-75d19ccf8ede.pdf?sfvrsn=d61f6b6f_7.</u>

**App-0669**

proposal to use methane gas for power generation.[596] Moreover, a review of the FERC docket for Tennessee Gas's FERC certificate proceeding reveals that there have been around 30 motions to intervene in the proceeding, and FERC received 82 sets of scoping comments in response to its NEPA notice.[597] Because of the importance of public participation under the Clean Water Act,[598] the Corps should allow the opponents and proponents of this project to present their respective positions in a public hearing.

---

[596] *Id.* at 14.

[597] DEIS, app. B.

[598] *See Sierra Club*, 909 F.3d at 654 (noting "the critical importance of notice-and-comment requirements throughout the Clean Water Act," and citing *United States v. Smithfield Foods, Inc.*, 191 F.3d 516 (4th Cir. 1999)).

## CONCLUSION

For the foregoing reasons, we respectfully request that the Corps hold a public hearing on Tennessee Gas's pending permit application and ultimately deny that application.

Respectfully submitted,

**/s/ Derek O. Teaney**
Derek O. Teaney
Elizabeth A. Bower
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
(304) 646-1182
dteaney@appalmad.org
*Counsel for Sierra Club and*
*Appalachian Voices*

**/s/ Howard Crystal**
Howard Crystal
Center for Biological Diversity
1411 K St., NW, Suite 1300
Washington, D.C. 20005
(202) 849-8401
HCrystal@biologicaldiversity.org
*Counsel for Center for Biological*
*Diversity*

**/s/ Spencer Gall**
Spencer Gall
Southern Environmental Law Center
120 Garrett Street, Suite 400
Charlottesville, VA 22902
(434) 977-4090
sgall@selcva.org

Amanda Garcia
Southern Environmental Law Center
1033 Demonbreun St., Suite 205
Nashville, TN 37203
(615) 921-9470
*Counsel for Sierra Club and*
*Appalachian Voices*

**App-0671**

BARRY SULKIN
ENVIRONMENTAL CONSULTANT
4443 Pecan Valley Road
Nashville, TN 37218
(615)255-2079

**Evaluation of Impacts to Riffle-and-Pool Complexes from the Proposed Cumberland
Pipeline Project**

*March 20, 2023*

***Prepared for the Southern Environmental Law Center***

Introduction

This report provides an opinion as to whether the streams proposed for pipeline crossings with open trench excavation are likely to have riffle-and-pool complexes.

This evaluation is based on Tennessee Gas Pipeline Company, LLC's ("Tennessee Gas") application materials, maps, aerials, field evaluations, and other information related to the proposed Cumberland Pipeline Project. I am very familiar with the project area and some of the involved streams in particular, having worked as a water quality/stream professional in this region of Tennessee since the 1970s, both for the state of Tennessee and as a private consultant.[†] I did my master's thesis at Vanderbilt on the Harpeth River and some of its tributaries, and am currently doing work involving several streams related to the project. In addition, I have been doing stream and river field work for about 40 years across Tennessee, as well as in numerous other states, and am very familiar with stream characteristics at issue.

Riffle-and-pool complexes

Rivers and streams have varying configurations ranging from long, slow channels to a meandering sequence of a pool followed by a drop over gravel or rock to the next pool. This latter stream form typically repeats as water flows downstream in what can be described as a riffle-and-pool complex. Such complexes can vary with longer or shorter pools and riffles, and different types of structure between the pools such as shallows flowing across gravel or rocks, or drops over bedrock, cascades or waterfalls at some locations.

This sequence of fast and slow sections of a stream—riffle then pool, then repeat—is

---

[†] My curriculum vitae is attached as Appendix 1 to this report.

ecologically important to the quality of a stream.  The riffle or drop section provides the greatest aeration and thus elevates dissolved oxygen (DO) in the stream—an essential component and measure of stream health for fish and other aquatic life—as well as habitat for some species with a preference for such sites.  The aerated pools following the riffles provide habitat for species, such as fish, where they live, eat, seek shelter, and reproduce.  Pools below riffles also provide preferential locations for fishing and other recreational activities such as wading and swimming.

Prevalence of riffle-and-pool complexes in Middle Tennessee

Tennessee streams and rivers vary in configuration, but can be generalized by major regions. In the western part of the state, they commonly have long slow pools and mud bottoms with few falls, rapids, or riffles due to the relatively flat slopes, less gravel or exposed bedrock, and past channelization.  In middle and east Tennessee, waterways have greater slopes, and the channels naturally have more rock and gravel, and features such as waterfalls, cascades, rapids, and riffles; thus here riffle-and-pool complexes are more common.  Indeed, in my experience, most streams in middle Tennessee have riffle-and-pool complexes.

Based on the natural topography and geology in middle Tennessee and the project area in particular, many or most of the streams proposed to be crossed by the Cumberland Pipeline Project are likely characterized by riffle-and-pool complexes.

Timing considerations when evaluating riffle-and-pool complexes

The presence of riffle-and-pool complexes can be variable for a given stream or location on a stream based on seasonal and weather conditions.  Particularly for smaller streams—like unnamed tributaries—they may be intermittent or seasonal, or may diminish or go dry due to drought conditions.  Thus a determination of the presence of riffle-and-pool complexes might require multiple field observations during various seasons or flow conditions.  A stream may appear as a dry or nearly dry channel in mid-summer, when any flow may be going under or through gravel bars.  In winter or spring when there is greater flow, that same stream may likely be found to have significant riffle-and-pool complexes at the same observed locations.

Like proving a negative hypothesis, simply finding no riffle-and-pool complex or a dry stream segment at a site on a given visit does not answer the question.  While the reverse may be true – finding a riffle-and-pool complex on a single visit does answer the question – a negative finding requires follow-up during times when there is likely to be flow.

Assessment of riffle-and-pool complexes at specific proposed crossing locations

To evaluate the potential for riffle-and-pool complexes at the planned stream crossing locations for the proposed Cumberland Pipeline Project, I first examined the field sheets and associated photos in Appendix B to Tennessee Gas's Hydrologic Determination (included in Attachment 2 to its Section 404 permit application).  It was noted that the field evaluations and photos were from the warm months of June and August when stream flows would be low or seasonally absent.  From my examination of the field sheets and photographs in Appendix B, I identified a non-exclusive list of sixteen (16) proposed crossings from Table 1 of Tennessee

Gas's permit application that appear to have characteristics of riffle-and-pool complexes likely to be present at or near the site, which are shown in Table A below[*]  Appendix B to Tennessee Gas's Hydrologic Determination  contains only one field sheet and one set of photographs each for Upper Sugarcamp Branch and Lickskillet Branch even though the former is proposed for two crossings and the latter is proposed for three crossings according to Table 1 in Tennessee Gas's permit application. Given the evidence of riffle-and-pool complexes in the available field sheet and photographs, the close proximity of the crossings on each stream, and the prevalence of riffle-and-pool complexes on streams in Middle Tennessee generally, I concluded that all the proposed crossings on both Upper Sugarcamp Branch and Lickskillet Branch likely intersect with riffle-and-pool complexes. Subsequent field evaluations of all three crossings on Lickskillet Branch confirmed my opinion, as discussed below.

**Table A**

| Milepost | Waterbody ID | Waterbody Name |
|---|---|---|
| .01 | SDKA023 | Upper Sugarcamp Branch |
| .03 | SDKA023 | Upper Sugarcamp Branch |
| 0.9 | SDKA026 | Jordan Branch |
| 0.9 | SDKA027 | UT to Jordan Branch |
| 3.0 | SDKA058 | Porters Branch |
| 3.4 | SDKA049 | UT to Jones Creek |
| 4.5 | SDKA013 | Gafford Branch |
| 10.0 | SDKB001 | Miller Branch |
| 10.1 | SDKB002 | Bartons Creek |
| 12.1 | SDKB009 | Furnace Creek |
| 14.0 | SDKB011 | Dry Hollow Branch |
| 19.1 | SDKB026 | Leatherwood Creek |
| 26.9 | SHNA001 | Guices Creek |
| 28.6 | SHNB033-1 | Lickskillet Branch |
| 28.9 | SHNB033-2 | Lickskillet Branch |
| 30.2 | SHNB033-3 | Lickskillet Branch |

---

[*] My examination also identified riffle-and-pool characteristics at SDKA052 (UT to Jones Creek), SDKA044 (Miller Branch), and SHNC014 (Williamson Branch). However, those streams are not included in the Section 404 permit application.

Based on my review of the field sheets and associated photos for the crossings shown in Table A above, it is my opinion that these proposed crossing locations likely intersect with riffle-and-pool complexes on the affected waterbodies.

From the list of crossings identified in Table A above, seven crossings were selected for field observations coordinated by a biology professor from Austin Peay State University. *See* Angela Mummaw, *Field assessment of seven crossing sites of the proposed methane gas pipeline by Tennessee Gas Pipeline Company, L.L.C. (TGP) for the Cumberland Project* (March 2023) (attached as Appendix 2 to this report). Further, an eighth crossing from the list identified in Table A above was the subject of a prior recent field observation from researchers with the Center of Excellence for Field Biology at Austin Peay State University. *See* Dr. Rebecca Johansen, *Field assessment of Big Bartons Creek, located in Cumberland Furnace, Tennessee* (March 2023) (attached as Appendix 3 to this report). These eight crossings are shown in Table B below.

**Table B**

| Milepost | Waterbody ID | Waterbody Name |
|----------|--------------|----------------|
| 0.9 | SDKA026 | Jordan Branch |
| 4.5 | SDKA013 | Gafford Branch |
| 10.1 | SDKB002 | Bartons Creek |
| 12.1 | SDKB009 | Furnace Creek |
| 19.1 | SDKB026 | Leatherwood Creek |
| 28.6 | SHNB033-1 | Lickskillet Branch |
| 28.9 | SHNB033-2 | Lickskillet Branch |
| 30.2 | SHNB033-3 | Lickskillet Branch |

I reviewed the field assessments and photographs gathered for the eight crossings shown in Table B. It is my opinion that the descriptions and photographs of these crossings gathered during field visits confirm my initial evaluation based on the applicant's photos and field sheets—namely, that these proposed crossings intersect with riffle-and-pool complexes on the affected waterbodies.

**Checklist for Preparing an Alternatives Analysis
Under Section 404 of the Clean Water Act
Buffalo District – Regulatory Branch
Pittsburgh District – Regulatory Division
Huntington District – Regulatory Division
May 13, 2020**

Section 404 of the Clean Water Act establishes a dredge and fill permitting program administered by the U.S. Army Corps of Engineers (Corps).  In its evaluation of permit applications to discharge dredged or fill material into waters of the U.S., including wetlands, the Corps is required to analyze alternatives to the proposed project that achieve its purpose. The Corps conducts this analysis pursuant to two main requirements – the 404(b)(1) Guidelines (Guidelines)[1] and the National Environmental Policy Act (NEPA)[2].  The Corps also considers alternatives as part of its public interest review evaluation[3]. This document is intended to assist permit applicants in formatting information into an "Alternatives Analysis" that includes the key items that must be evaluated for permit decisions. It is by no means all-inclusive of the scenarios that can occur with an Alternatives Analysis, but captures many of the most common topics.

The Corps must evaluate alternatives that are practicable[4] and reasonable[5]. The Guidelines are the substantive criteria issued by the U.S. Environmental Protection Agency used in evaluating the discharge of dredged or fill material into waters of the U.S.  The fundamental precept of the Guidelines is that discharges of dredged or fill material into waters of the U.S. should not occur unless it can be demonstrated that such discharges, either individually or cumulatively, will not result in unacceptable adverse effects on the aquatic ecosystem. Furthermore, the Guidelines specifically require that *no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem.* [40 CFR §230.10(a)] The Least Environmentally Damaging Practicable Alternative (LEDPA) must be chosen.  Reasonable alternatives, including alternatives not available to the applicant, must be considered to satisfy the NEPA. Reasonable alternatives must be those that are feasible and such feasibility must focus on the accomplishment of the underlying purpose and need (of the applicant or the public) that would be satisfied by the proposed Federal action (permit issuance)…." (33 CFR §325 Appendix B, paragraph 9(b)(5)). However, there are no requirements with reasonable alternatives relative to the Corps' permit

---

[1] 40 CFR  §230

[2] 33 CFR  § 325 Appendix B and 40 CFR § 1508

[3] 33 CFR  §320.4(a)(2)

[4] 40 CFR  §230.3(q) The term practicable means available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes.

[5] CEQ NEPA Regulations, 40 CFR §1502.14.  Reasonable alternatives are those that substantially meet the agency's purpose and need. If the agency is considering an application for a permit or other federal approval, the agency must still consider all reasonable alternatives. Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant. Agencies are obligated to evaluate all reasonable alternatives or a range of reasonable alternatives in enough detail so that a reader can compare and contrast the environmental effects of the various alternatives.

1

**App-0676**

decision similar to the Guidelines. Evaluations to address the Guidelines and the NEPA normally satisfy the requirements of the public interest review.

The Guidelines include two rebuttable presumptions for projects with discharges of dredged and/or fill material into waters of the U.S. which involve special aquatic sites[6] that do not require access to or siting within the special aquatic site(s) to achieve their basic essence (basic project purpose). All practicable alternatives not involving a discharge into special aquatic sites are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise. The **first presumption** states that alternatives that do not affect special aquatic sites are presumed to be available. The **second presumption** states that practicable alternatives located in non-special aquatic sites (e.g., other waters, uplands, etc.) have less adverse impact on the aquatic ecosystem. **It is the applicant's responsibility to clearly demonstrate to the Corps that both of these presumptions have been rebutted in order to pass the alternatives portion of the Guidelines.**

The amount and detail of information in an alternatives analysis and the level of scrutiny required by the Guidelines is commensurate with the severity of the environmental impact (as determined by the functions of the aquatic resource and the nature of the proposed activity) and the scope/cost of the project[7]. Analysis of projects proposing greater adverse environmental effects need to be more detailed and explore a wider range of alternatives than projects proposing lesser effects.

The extent to which an alternatives analysis incorporates these principles and details, can have substantial effects on the amount of time necessary for the Corps to evaluate a permit application. The applicant will be required to furnish only such additional information as the district engineer deems essential to make a public interest determination, including, where applicable, a determination of compliance with the 404(b)(1) guidelines…may include environmental data and information on alternative methods and sites as may be necessary for the preparation of the required environmental documentation (33 CFR 325.1(a)(9)).

The Corps is responsible for accepting, verifying, and reviewing the information.

Below are recommended steps to follow in providing the necessary information for the Corps to consider in an alternatives analysis:

**Step 1: Describe Need and Define Purpose**

Purpose and Need are inter-dependent terms which are critical to the alternative analysis. Consideration of project purpose is an important element of the Guidelines. Consideration of project need is a requirement of every Corps permit evaluation (33 CFR 320.4(a)(2)(i)). Purpose and need should be articulated individually since the project's purpose is framed in relation to addressing a need. The Corps will use that information to formulate a basic and overall project purpose. The Guidelines make a specific distinction between the basic and overall project purpose (40 CFR 230.10(a)).

---

[6] Special aquatic sites within waters of the U.S. include wetlands, riffle pool complexes, sanctuaries and refuges, mud flats, vegetated shallows, coral reefs (40 CFR 240.40-45).
[7] August 23, 1993 EPA/USACE Memorandum to the Field concerning the Appropriate Level of Analysis Required for Evaluating Compliance with the Section 404(b)(1) Guideline Alternatives Requirements

2

**App-0677**

- **Basic project purpose** is the fundamental, essential and irreducible purpose of the proposed project and is used in situations involving special aquatic sites to raise the presumption against non-water dependent activities.  For example, a commercial development is not a water dependent activity.  Examples of water dependent projects may include, but are not limited to, certain boat launching facilities, mooring facilities, and docks. The basic purpose of these projects is to provide access to the water.
- **Overall project purpose** bounds the applicant's stated purpose in a way that respects the intent of the project and allows for evaluation of a reasonable range of alternatives. Practicable alternatives that satisfy the overall project purpose are used to determine the LEDPA.

The need for a project is a public review factor (33 CFR 320.4(a)(2)) and does not affect the Corps' determination of overall purpose, or directly affect compliance with the 404(b)(1) guidelines.  Indirectly, consideration of need can be appropriate under the 404(b)(1) guidelines when considering practicability of alternatives.

Need is typically the problem or opportunity that the applicant is proposing to meet with their project. It can normally be quantified or measured. Information collected or developed relative to project need is important in the framing of the project purpose. The evaluation of need will vary based on the type of project and will be commensurate with the magnitude of impacts and scope of the proposal. Examples can include:

- Road/highway project – safety issues/needs such as accident rates, congestion levels, regional traffic flow, level of service, etc.
- Commercial/Housing Development – market demands
- Energy project – projected increases in power use

The Corps normally does not require an assessment and documentation associated with economic evaluations for private enterprise and assumes the applicant has undertaken adequate analysis. However, the Corps may require documentation and assessment of the need on a case by case basis.[8] The Corps can also conclude a project is speculative in relation to the need assessment and make deny a permit application.

Based upon the need, the applicant should develop their project purpose and clearly state it. The project purpose statement should be carefully considered and developed, as it will define and drive the complexity of the alternatives analysis, including constraints and practicability considerations. The purpose should not be defined in such a restrictive manner to unduly restrict or preclude other alternatives, nor should it be so broad that a reasonable search of options cannot be accomplished. The applicant is to define the project purpose from their perspective. Inclusion of a geographic limit within the purpose statement is normally justified but subject to the same limits relative to unduly restricting the range of alternatives. This does not mean that site-specific projects do not occur. Additionally, the Corps must develop its own project purpose statement while considering the applicant's as well as the public's perspective. While at times, projects may legitimately be multi-use in nature, statements that are multi-purpose add substantial complexity to the alternatives analysis and can exponentially increase the number of alternatives that will need to be evaluated to capture the full range of practicable alternatives. Below are two examples of defining project purpose:

---

[8] 33 CFR 320.4(q)

3

Example 1

• *To build a profitable 200-lot single-family residential development with 2 Olympic-sized swimming pools, 3 recreational centers and 5 sports fields at the southwest intersection of Interstate 71 and Lucas Road.*

This example is too restrictive because there are no alternative sites to consider. It also unnecessarily details the exact number of lots and pools and other facilities, which unduly reduces the number of practicable and reasonable alternatives. Additionally, the profitability of the project is an inherent aspect of the project but not necessarily germane to the analysis The Corps has to undertake.

• *To provide residential development in Northeast Ohio.*

For the type of action being proposed, this example is too broad in scope if the applicant is focusing on a certain city or county to locate the project. This would also create such a large number of alternatives that evaluating them would be unwieldy.

• *To provide a medium-sized single-family residential development with associated support facilities near Interstate 71 in Mansfield, Ohio to meet local demand.*

This is an appropriate overall project purpose. It clearly defines what the project involves, single-family residences, rather than "housing" which could include multi-family features such as townhouses or apartments, reflects the need to be located near a targeted major transportation corridor (which would need to be explained and supported in the needs analysis), and it defines the geographic scope to a reasonable and justified size addressing the applicant's target area of Mansfield, Ohio while reflecting the public demand.

Example 2

• *To build an economically viable 2-million square foot warehouse facility with a 175-car parking lot and 2-acre aesthetic reflecting pond, at the Southeast corner side of I-70 in Columbus, Ohio.* As with the first example, this example is too restrictive because there are no alternative sites to consider. It also unnecessarily details the exact square footage of the building, the number of parking spaces, and includes a water feature. It is unclear why the proposed water feature would be an essential component of this project. An applicant would have to attempt to justify in the need analysis why such a feature is relevant and needed for the commercial project. Additionally, as with the first example, the economic viability of the project is an inherent aspect of the project but not necessarily germane to the analysis The Corps has to undertake.

• *To provide light industrial/commercial development in the North Central Ohio.*

Although the applicant may have a legitimate need to locate the project in a certain region, this example is likely too broad in scope and would also create such a large number of alternatives that evaluating them would be unwieldy.

• *To provide large commercial warehouse space with access to Interstate Highway in the East Columbus area to meet regional demands.*

This is an appropriate overall project purpose. It clearly defines what the project involves, commercial warehouse space, rather than the broader scope of light industrial/commercial

4

**App-0679**

development. The statement also specifies a legitimate need for access to both Interstate Highway for transportation of goods and targets a reasonable and justifiable geographic target area of Franklin County, Ohio. The needs analysis that supports this statement will provide further details on the building size, the need for warehouse space in this growing area and will describe the specific transportation needs that drive project constraints relative to siting near both Interstate Highway and rail line to serve regional demands.

The applicant's proposed overall project purpose will be carefully considered, but if the Corps cannot concur with it as submitted, the Corps is required to modify it. If the applicant has submitted an alternative analysis using a project purpose the Corps cannot concur with, (e.g., it is too restrictive, contains multiple purposes but treated as one, too broad in geographic scope, etc.), the analysis may need to be revised to appropriately include the proper range of practicable and reasonable alternatives and/or revised alternatives screening. The applicant would be notified of the change to the definition.

Additional information about the proposed overall project purpose and applicant desires may also be provided, including details about the area, location, history, and other factors that influence or constrain the intended nature, size, level of quality, price class, or other characteristics of the project. Information that further describes why particular geographic boundaries were chosen also will assist the Corps in its review.

**Step 2: Identify Alternatives**

The applicant should list all alternatives that were initially considered (the "universe" of options) that could meet the overall project purpose. A brief description of each alternative should also be included. The maximum number of alternatives to study will vary and depends on the nature and scope of the proposed project. The number evaluated should typically be greater for projects involving greater impacts.  Under NEPA, all reasonable alternatives, not just those available to the applicant, must be considered. According to 33 CFR Part 320.1(a)(4) and 325 Appendix B, the Corps is neither an opponent nor a proponent of the applicant's proposal; therefore, the applicant's final proposal will be identified as the applicant's preferred alternative. The list, at a minimum, should be broken into the categories noted below:

- The applicant's preferred alternative (the project proposed in the permit application).
- Alternatives that would not involve the discharge of dredged and/or fill material into WOUS.  (The No Action Alternative(s) includes an alternative that would involve no discharges of dredged or fill material into WOUS (which could involve reconfiguring the project to avoid all wetlands on the site or siting the project entirely in uplands offsite) or permit denial. Although the No Action alternative might not seem reasonable initially, it must always be included in the analysis and can serve several purposes. It is a reasonable alternative, especially for situations where the project does not comply with the regulations and consideration and disclosure of the consequences of a permit denial is warranted. It may also be a reasonable alternative for situations where impacts are great and the need is relatively minor. It can also be used in some circumstances as a benchmark – usually for ongoing actions - enabling decision makers to compare the magnitude of the environmental effects of the action alternatives.
- Offsite locations, including those that might involve less adverse impact to WOUS, or less impact to special aquatic sites or less impact to higher quality aquatic resources.

5

- Offsite locations, including those that might involve greater adverse impact to WOUS, or greater impact to special aquatic sites or greater impact to higher quality aquatic resources.
- Onsite alternatives, particularly those that would involve less adverse impact to WOUS. These include modifications to the alignments, site layouts, or design options in the physical layout and operation of the project to reduce the amount of impacts to WOUS. On-site options can be identified as sub-options.
- Onsite alternatives that would involve greater adverse effects to WOUS, but avoid or minimize other significant adverse environmental consequences, including offsite and onsite options.

**Step 3: Describe and Analyze Alternatives for Practicability (NOTE: It may be more efficient to demonstrate that some alternatives will have greater impact on the aquatic ecosystem compared to the applicant's preferred option than determining their practicability. If it can be easily documented, and clearly described within the narrative and matrix described below, then step 4 can be included in step 3. This is only appropriate for alternatives where this distinction is clear.)**

There may be differing levels of alternatives screening that occur with permit applications. Some applications may require several levels of screening (larger impacting and more complex proposals including multi-purpose projects) while others may have a single level (normal individual permit actions). For multiple level screening scenarios, coarser screens are typically applied at the outset to eliminate clearly impracticable and unreasonable alternatives while the sophistication and refinement of screens increases as the range/list of alternatives narrows. Single level alternatives analyses will normally not include coarse level screens but will have comparable degree screens for all alternatives. Regardless of the type of alternatives analysis, the criteria used to establish screens and how an alternative passes or fails the screen need to be clearly elucidated and supported.

It is important to note that while the terms practicable and reasonable are used and may be synonymous at times, the factors to determine practicability for the Guidelines and reasonability for the NEPA can and typically do differ. Practicable is defined as meaning the alternative is available, and capable of being done after taking into consideration cost, existing technology, and/or logistics in light of the overall project purpose(s).[9] Reasonable is based on consideration of the project purpose as well as technology, economics and common sense.[10] The Guidelines may require more substantive effort to demonstrate compliance compared to NEPA[11], as well as involve limitations relative to how they can be applied to determine practicability. This is further underscored by the rebuttable presumptions previously discussed requiring it be clearly demonstrated by the applicant that the alternatives are not practicable (and not less damaging – see step 4) compared to the applicant's proposed project.

When preparing an alternative analysis, there are potential opportunities to reduce effort and time as noted above relative to impacts to the aquatic ecosystem. This can also occur with alternatives that are not available or obviously impracticable. Such options can be identified and evaluated first and eliminated based on limited screening efforts. For example, attempts to obtain alternate sites but were not available or turned down for purchase, lease, or management can normally be eliminated from further consideration with limited information. Sites that are

---

[9] 40 CFR 230.3(q)
[10] Council on Environmental Quality Guidance 40 Most Asked Questions #2A
[11] 40 CFR 230.10(a)(4)

**App-0681**

obviously too small to accommodate the project or that lie substantially outside the geographic boundaries identified in the overall project purpose are not practicable, and therefore unreasonable, and can be eliminated with little information. Any alternatives that are eliminated from further study because the applicant concluded they failed this first coarse round of screening still require certain descriptive information be provided. However, the level of information should be less than other options that will be subjected to more refined screen efforts. It is imperative the applicant describes why any alternative is eliminated from further analysis so the Corps can independently review and verify the information and each step in the applicant's alternative analysis. The Corps will verify that the criteria used for screening at all levels are objective and comply with regulations, policy, and implementing guidance and ensure they are not so restrictive that they eliminate practicable, which includes reasonable, alternatives.

Alternatives should be clearly listed and numbered for ease of reference and comparison. *At a minimum,* the following information for each alternative site examined should be provided:

*1. General site information:*
    a. specific parcel information including, but not limited to; parcel ID numbers, aerial photos, location maps, and GPS coordinates;
    b. presence, quantity and quality or function of wetlands and/or other WOUS (If demonstrating that a site has more impact than other options, including the applicant's preferred, include potential direct and indirect impacts associated with these improvements in lieu of practicability information);
    c. County/City zoning designation;
    d*. the presence of any federally-listed threatened or endangered species or their critical habitat, state listed species, or other natural or regionally important ecosystem resource factors that may be significantly impacted; and
    e*. site infrastructure and other components for a single and complete project (will the site require new access roads/infrastructure, etc.?).
    (* - Items d and e may not be needed for those alternatives eliminated in the earliest coarse screens.)

*2. The practicability of each alternative:*
    a. Practicability: As previously stated, alternatives that are practicable are those that are available and capable of being done by the applicant after considering the following (in light of the project purpose). **An alternative needs to fail only one practicability factor to be eliminated during the screening process**:

        • Costs - Cost is analyzed in the context of the overall scope/cost of the project and whether it is unreasonably expensive. This determination is typically made in relation to comparable costs for similar actions in the region or analogous markets[12]. If costs of an alternative are clearly exorbitant compared to those similar actions, and possibly the applicant's proposed action, they can be eliminated without the need to establish a cost threshold for practicability determinations. Cost is to be based on an objective, industry-neutral inquiry that does not consider an individual applicant's financial standing. The data used for any cost must be current with respect to the time of the alternatives analysis. For example, the costs associated with various infrastructure components such as

---

[12] National Policy Guidance Old Cutler Bay Associates 404(q) Permit Elevation, September 13, 1990.

roadways or utilities, including upgrades to existing infrastructure components or the need to establish new infrastructure components, may affect the viability of a particular alternative. A location far from all existing infrastructure (roads, water, sewer, and/or electricity) might not be practicable based on the costs associated with upgrading/establishing the infrastructure necessary to use that site. **However, just because one alternative costs more than another does not mean that the more expensive alternative is impracticable**. It is important to note that in the context of this definition, cost does not include economics. Economic considerations, such as job loss or creation, effects to the local tax base, or other effects a project is anticipated to have on the local economy are not part of the cost analysis;

• Existing Technology - The alternatives examined should consider the limitations of existing technology yet incorporate the most efficient/least-impacting construction methods currently available. For example, alternatives to a proposed highway that occur in unstable or dynamic soils may not be practicable due to a lack of technology to ensure the road will not crumble or collapse. Implementation of state of the art technologies might be available and should be considered if applicable. Engineered retaining walls and cantilevered road ways can also be incorporated into an alternative that substantially minimizes wetland or water impacts by eliminating fill slopes. However, it is recognized that such actions may result in the alternative being determined as impracticable due to costs; and,

• Logistics - The alternatives evaluated may incorporate an examination of various logistics associated with the project, i.e., placement of facilities within a specified distance to major thoroughfares, utilization of existing storage or staging areas, and/or safety concerns that cannot be overcome. Examples of alternatives that may not be practicable considering logistics are: no access to a major interstate or rail for manufactured goods; a piece of property is land-locked and cannot be accessed by public roads or utilities and applicant does not have condemnation authority; water supply is needed within a certain time frame and option cannot be implemented with it.

b. Availability: The Guidelines state that if it is otherwise a practicable alternative, an area not presently owned by the applicant that could reasonably be obtained, utilized, expanded, or managed in order to fulfill the overall purpose of the proposed activity can still be considered a practicable alternative. In other words, **the fact that an applicant does not own an alternative parcel, does not preclude that parcel from being considered as a practicable alternative**. This factor is normally a consideration as a logistics and possibly cost limitation. In addition, just because an alternative is not zoned for a certain type of development does not eliminate it from consideration.  Zoning is a planning tool, not an absolute, and is subject to adjustments through variances, as well as through policy changes.  What is involved in a rezone/variance can be considered in terms of logistics, costs, and existing technology.  Generally, for alternative to be practicable, it must be available at the time of the application is under consideration. **The applicant should consider and anticipate alternatives available during the timeframe that the Corps conducts its alternatives analysis. In some circumstances, consideration of the timeframe when property was obtained by the applicant may influence the analysis.**

8

**App-0683**

c. Other Information:  Any other information that conveys the practicability of the alternatives reviewed in consideration of the overall project purpose should be included.

*3. Presentation of alternatives information:* An alternatives comparison matrix (see example on next page) is an effective way to present and compare the main parameters that were considered during the evaluation. To allow for an objective evaluation, the comparison of the plan(s) for the proposed and alternative sites should be framed for "yes" or "no" determinations. A narrative needs to accompany the matrix defining the practicability factors chosen, the data used to support the limitations of the factor or criteria, and explanation of any "no" determinations. Practicability of the No Action alternative also must be addressed in this narrative and, if applicable, also included in the matrix. The information should explain the consequences on the applicant and the public if the project is denied, if an alternative can be implemented that does not involve discharges into WOUS, or is an option that is outside the capability of the applicant. Any remaining alternatives that are found to be practicable will move on to the next and final step.

| Practicability Category | Factor | Alternative 1 Applicant's Preferred | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 | Alternative 6 |
|---|---|---|---|---|---|---|---|
| **Available** | Available for Acquisition | YES<br><br>Applicant owns the parcel | YES<br><br>Listed in multi-list | YES<br><br>Listed in multi-list | NO<br><br>Applicant does not have condemnation authority | YES<br><br>Listed in multi-list | YES<br><br>Listed in multi-list |
| | Existing Zoning Appropriate & Potential for Zoning Change | YES<br><br>Zoned for this project type | YES<br><br>Zoned for this project type | YES<br><br>Zoned for agriculture, City has not denied zone change | N/A | YES<br><br>Zoned for this project type | N/A – failed sufficient parcel size screen |
| **Logistics** | Sufficient Parcel Size | YES<br>800 acres | YES<br>870 acres | YES<br>770 acres | N/A – failed availability screen | YES<br>900 acres | NO<br>600 – did not provide adequate space for size range of project |
| | Availability of Utilities | YES<br><br>Adjacent to site | YES<br><br>0.5 miles to existing water, sewer and power. | YES<br><br>Adjacent to site | N/A | YES<br><br>6 miles to existing water, sewer and power | N/A |
| | Availability for Access | YES<br><br>County ROW on east property boundary | YES<br><br>County ROW to northwest property corner | easement denied, applicant does not have condemnation authority | N/A | YES<br><br>County ROW to northwest property corner | N/A |
| **Existing Technology** | Topography and other Site Conditions Feasible for Construction of Project | YES | YES<br><br>With use of engineered retaining walls and drainage systems | N/A – failed access screen | N/A | YES<br><br>With use of engineered retaining walls, drainage systems and bridges | N/A |

9

**App-0684**

| Practicability Category | Factor | Alternative 1 Applicant's Preferred | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 | Alternative 6 |
|---|---|---|---|---|---|---|---|
| **Cost**<br><br>(No cost threshold established) | Reasonable Acquisition Costs (non- exorbitant) | YES<br><br>Applicant owns the parcel | YES<br><br>Within market normal costs for similar properties | | | NO<br><br>Exorbitant - costs are 10X normal costs for similar land | N/A |

## Step 4: Identify the Least Environmentally Damaging Alternative

All alternatives making it to this step are practicable. Therefore, a comparison and determination of which alternative is the least damaging is required. The Guidelines require that only the LEDPA can be authorized. It is also important to recognize that determining the LEDPA cannot include any aspect of compensatory mitigation.[13]

1.  Using the same numbering system from the step above, identify the impacts to the aquatic ecosystem for each remaining practicable alternate site and option. Because the Guidelines include the consideration as to whether the LEPDA results in "other significant adverse environmental consequences" to other natural ecosystem components, those other natural environmental factors and the significant effects to them can also be discussed as well. For each remaining site, the narrative should include the following information:

   a. describe the direct, indirect, and cumulative impacts (beneficial or adverse) to the aquatic ecosystem (WOUS) associated with each of the remaining alternatives;
   b. identify, specify and quantify the impacts to the aquatic ecosystem. Rather than stating that "Alternative A would result in a large impact to low quality wetlands and ditches that are sparsely vegetated and impact some wildlife" use "Alternative A would result in the discharge of fill material into 2.1 acres of modified riverine wet meadow wetland and realignment and filling of 1.2 acres of channelized intermittent stream that contains scattered emergent wetland vegetation."
   c. describe the **significant** adverse environmental impacts associated with each of the remaining alternatives on other natural ecosystem features and how the determination of significant was made.
   d. in order to ensure an appropriate and meaningful comparison of alternatives in relation to their proposed and predicted impacts, equivalent methods and level of detail are required for all alternatives[14] at similar levels in the screening process. For example, if detailed studies on hydrologic effects are presented for one the alternatives carried forward in an analysis, but not others, the analysis would to be supplemented with the same type and level of data and information for the other options.

2. If multiple practicable alternatives remain, and/or many natural environmental factors are involved that would be significantly impacted, another matrix that contains only environmental parameters (e.g., wetland functional units; Federal and/or state listed species; high

---

[13] 40 CFR 230.5 and February 6, 1990 Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army Concerning the Determination of Mitigation Under the Clean Water Act Section 404(b)(1) Guidelines
[14] 40 CFR 1502.14 and CEQ's 40 Most Asked Questions 5b

functioning/value upland habitat, floodplains, and plant communities; air quality) can be used to assist in illustrating the proposed LEDPA. Emphasis should be placed on impacts to the aquatic environment through acreage and functional unit loss of wetlands or other waters of the U.S. that would be affected or eliminated by each alternative. An example matrix is below.

| Environmental Factors | Alternative 1 Applicant's Preferred Alternative | Alternative 2 |
|---|---|---|
| Wetland Impacts (Acres) ORAM score | 1.5 23 | 4.0 50 |
| Stream Impacts (Linear Feet) | 2,500 | 6,000 |
| Impacts to Federally Listed T & E Upland Species | Yes – not a significant loss | No |
| Floodplain Upland Impacts (Acres) | 0.0 | 5 acres - not a significant loss |
| LEDPA | Yes | No |

## Step 5: Determination of LEDPA

Conclude the alternatives analysis with a description of the alternative proposed to be the LEDPA, reiterating the rationale for this determination. It is noted that if the remaining alternatives have similar impacts to the aquatic ecosystem as the applicant's preferred, Corps can conclude the applicant's proposal is the LEDPA.[15] It is reiterated that no aspect of compensatory mitigation can be utilized in making this determination. In other words, an applicant cannot use compensatory mitigation to "buy down" an alternative in order to meet the LEDPA.

---

[15] August 23, 1993 EPA/USACE Memorandum to the Field concerning the Appropriate Level of Analysis Required for Evaluating Compliance with the Section 404(b)(1) Guideline Alternatives Requirements

11

# Evaluation of Tennessee Gas Pipeline Company, LLC's Application for a Department of the Army Permit for the Cumberland Pipeline Project

**Starr Silvis, M.S., P.E.**[*]

**May 10, 2023**

*Prepared for the Southern Environmental Law Center*

## Overview and Principal Conclusions

This report documents my evaluation of Tennessee Gas Pipeline Company, LLC's ("Tennessee Gas") application to the U.S. Army Corps of Engineers ("Corps") for a Department of the Army ("DA") permit authorizing discharges of dredged or fill material under Section 404 of the Clean Water Act to construct the proposed Cumberland Pipeline Project. This report is based on a review of the permit application and supporting materials that Tennessee Gas submitted to the Corps, as well as documents and records concerning the proposed pipeline that are available from the Tennessee Department of Environment and Conservation ("TDEC") and the Federal Energy Regulatory Commission ("FERC") as of May 8, 2023.

I conclude that the Corps must deny Tennessee Gas's permit application because it does not satisfy applicable regulatory standards. As relevant here, the Environmental Protection Agency's ("EPA") Section 404(b)(1) Guidelines mandate that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem" and/or if the discharge would "cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(a), (c). As EPA explains, permit applicants like Tennessee Gas must show that they "have, to the extent practicable: [t]aken steps to avoid wetland impacts; [m]inimized potential impacts on wetlands; and [p]rovided compensation for any remaining unavoidable impacts." (EPA, 2004).

Tennessee Gas's permit application does not meet these standards. My review of the permit application and associated materials revealed that the application:

1. Mischaracterizes many permanent impacts as temporary;

2. Fails to justify the proposed crossing methods as the least environmentally damaging practicable alternatives;

---

[*] Licensed in North Carolina. My curriculum vitae is attached to this report as Appendix A.

3. Consistently omits critical site-specific information; and

4. Includes significant inconsistencies, discrepancies, and gaps.

Given these defects, I conclude that Tennessee Gas's proposal is likely to result in significant long-term harm to aquatic ecosystems causing significant degradation to the waters of the United States and that less environmentally damaging alternatives exist.

## Permanent v. Temporary Impacts

Tennessee Gas's proposed dry open-cut crossings are likely to be even more environmentally damaging that the company's permit application acknowledges, because the application incorrectly characterizes many permanent impacts as temporary and does not meet minimum industry standards for design and site-specific information.

Tennessee Gas proposes dry open-cut methods for the vast majority of stream and wetland crossings within the project area. Although dry open-cut methods are often less damaging than wet open-cut methods, the former are still associated with long-term negative impacts to aquatic ecosystems. Indeed, based on my experience in stream restoration, hydrology, stream geomorphology, and erosion and sediment control, I understand that there are significant permanent impacts associated with trenched methods of stream and wetland crossings. Trenchless methods are associated with fewer short-term and long-term negative effects on aquatic ecosystems. In general, avoidance of stream and wetland disturbances using trenchless methods is the least damaging alternative for waterbody crossings absent special site-specific conditions.

A key premise of Tennessee Gas's selection of dry open-cut methods for the majority of its proposed crossings is the assertion that "[a]ll impacts on waterbodies due to pipeline construction will be temporary." Application at 12. However, the company presents a skewed picture because the impacts of its proposal will be much greater than the application acknowledges.

The scientific literature shows that even "temporary" in-stream dredge and fill activities cause long-term ecosystem changes as well as changes in stream morphology. As observed by Castro et al. (2015), "[b]ased on past experience at pipeline crossings, the potential for both short and long-term negative impacts on aquatic habitat and species is substantial." Levesque and Dube (2007) noted that "[d]ry-ditch, open-cut methods may impact watercourse ecosystems both during, and for potentially some time after, construction. All in-stream construction activities, particularly trench excavation and pipeline installation and backfill, result in disturbance of channel bed and banks, and have the potential to alter suspended sediment concentration and sedimentation." Damage to aquatic ecosystems associated with installation of pipelines include: immediate mortality of fish and benthic macroinvertebrates in the area of active construction, downstream increases in turbidity and suspended sediment, downstream deposition of sediment, sedimentation from disturbance of stream banks, temperature increases, and increase in stormwater runoff due to change in runoff from upslope areas.

2

The Corps characterizes stream impacts as temporary or permanent for the purposes of Section 404 Clean Water Act permitting. The difference between the designation of temporary and permanent impact is the length of time that the proposed dredge or fill activity will take place. However, these designations do not adequately convey the duration of impacts to the aquatic ecosystem at the location of the impact and downstream from proposed in-stream dredge and fill activities. Castro et al. (2015) reported that the effects of pipeline stream crossings "include both short-term, construction related impacts, such as increased turbidity, direct modification of aquatic habitat, and the potential for hydrocarbons to enter the stream through equipment failures and spills (Reid and Anderson, 1999; Reid *et al*, 2002a, 2002b), and long-term impacts that are more directly associated with the stream's response potential, such as channel incision and lateral migration (Thorne *et al.*, 2014)."

Dry-ditch open-cut methods require routing stream flow around the active trench area. These methods require disturbing stream flow and active work in live channels to install diversion devices, as well as active work in live channels to remove diversion devices. Immediate environmental impacts associated with dry-ditch open-cut methods include death of all fish and benthic macroinvertebrates within the work area and increased turbidity and suspended sediment loads when the diversion is installed, for the duration of the disturbance, as well as when flow is returned to the disturbed channel bed. According to Levesque and Dube (2007):

> Pipeline crossing construction is shown to not only compromise the integrity of the physical and chemical nature of fish habitat, but also to affect biological habitat (e.g., benthic invertebrates and invertebrate drift), and fish behavior and physiology. Indicators of effect include: water quality (total suspended solids TSS), physical habitat (substrate particle size, channel morphology), benthic invertebrate community structure and drift (abundance, species composition, diversity, standing crop), and fish behavior and physiology (hierarchy, feeding, respiration rate, loss of equilibrium, blood hematocrit and leukocrit levels, heart rate and stroke volume).

There are long-term increases in sedimentation due to stream bank and upland disturbances until vegetation can be re-established. Increased turbidity and high suspended sediment loads can cause long-term impacts to invertebrate communities downstream of the disturbance including reducing invertebrate biomass, growth rates, and species diversity and increasing invertebrate mortality. Increased suspended and deposited sediment causes negative impacts in fish populations as well. These impacts can include smothering of fish eggs, changes in stream bed characteristics which can reduce reproductive success, reduction of juvenile survival rates, reduction of food sources, as well as reduction in in-stream dissolved oxygen which causes respiratory distress.

Excavation of material in wetlands alters the hydraulic properties and the soil structure permanently. Olson and Doherty (2012) noted that "Installation of large-scale infrastructure, including pipelines, has the potential to damage soil and vegetation in wetlands within the path

3

**App-0689**

of construction by compacting soil, altering hydrology, decreasing plant diversity, and facilitating invasions of unwanted species". In one study, soils consistently showed evidence of compaction and hydrologic alteration eight years after the wetlands were crossed by natural gas pipelines (Olson and Doherty, 2012). Wetlands soils take years to form and to function (Jackson et al, 2014). By excavating, stockpiling, then replacing soils in wetlands the hydraulic conductivity of the soil changes, the porosity is decreased, connectivity of pores decreases, compaction increases, and soil horizons are altered. All these characteristics work in conjunction to form a functioning wetland soil (Jackson et al., 2014). Fill associated with trenching changes all of these characteristics. Even with a requirement to replace the top layer of wetland soils, the functionality of the wetland is permanently negatively impacted.

Studies on impacts to soils from pipeline crossings in upland areas are more common than those in wetland areas. In upland areas soil changes near pipelines include: higher density, lower water holding capacity, lower organic matter content, higher temperature variation, and higher pH (Olson and Doherty, 2012). Wetland soils generally have high moisture, high organic content, high water holding capacity and unique biochemistry (Olson and Doherty 2012, Jackson et al, 2014). Most of these negative impacts to wetland form and function have been attributed to compaction during construction and mixing of soil when the pipeline was backfilled (Olson and Doherty, 2012). Four studies of wetlands impacted by pipeline construction observed changes in hydrology, including interruptions in flow of surface waters, ponding above or upslope of the pipe, and resulting changes in soil moisture (Boelter and Close, 1974; Kittleson and McDavitt, 1980; Abernethy and Gosselink, 1988; Baumans and Turner, 1990; Olson and Doherty, 2012). In their study of the effects of pipeline crossings on wetlands eight years after constructions activity Olson and Doherty (2012) found "higher bulk density, lower depth of refusal, and lower soil moisture inside the pipeline corridor." Olson and Doherty (2012) concluded that "...construction led to soil compaction. It is also likely that the combinations of compactions and soil mixing (during trench backfilling) changed soil water holding capacity, and thus, altered hydrology, soil/sediment chemistry, and invertebrate and wetland plant habitat…."

In addition to impacts due to the use of trenched methods for stream and wetland crossings, there are also impacts, including cumulative impacts, resulting from associated upland disturbances. Multiple crossings or multiple sources of disturbance and sedimentation in a watershed can have cumulative effects on fish survival and reproduction that exceed the recovery capacity of the river, resulting in permanent detrimental effects (Levesque & Dube, 2007). The conversion of forested land to maintained right-of-way increases runoff volumes, which will change stream morphology. Lack of intact forest cover has been found to change stream morphology for two to four years post-disturbance (Reid & Anderson 1999). Methods to maintain the right-of-way include use of pesticides and herbicides which can be mobilized in stormwater runoff and cause degradation of aquatic ecosystems. The construction of temporary and permanent access roads also increases runoff volumes and increases turbidity and sediment migration from upland areas to water bodies. The increase in stormwater runoff volumes can alter stream morphology and stream-bed composition. There are also long-term increases in temperature associated with the reduction of forested canopy for both streams and wetlands.

4

Removal of vegetation from the banks can change temperature regimes, and increase sediment loads (Penkal & Phillips, 1984).

In my professional opinion, many of the impacts listed as temporary in Tennessee Gas's application will, in fact, be permanent. As detailed in the previous paragraphs, even short-duration activities have permanent negative effects on aquatic ecosystems. Further, as detailed below, I conclude that the proposed stream and wetland crossing plans in Tennessee Gas's application do not meet minimum industry standards for design and site-specific information and will result in long-term harm to waterbodies.

**Stream and Wetland Crossing Methods**

Tennessee Gas has not substantiated that any of the proposed crossings for which the company seeks a permit are the least environmentally damaging practicable alternative ("LEDPA"), as required by the Section 404(b)(1) Guidelines.

   *a.   Trenchless Crossing Methods*

The preferred method for pipelines to cross streams and wetlands to reduce negative environmental impacts is through trenchless construction absent special site-specific factors. Indeed, use of trenchless construction presumptively is the LEDPA because trenchless construction allows the pipeline to cross streams and wetlands without disrupting riparian vegetation, stream bed substrate, wetland soils, and flow in streams and rivers, thereby reducing short- and long-term fish and macroinvertebrate mortality, and allows streams and wetlands to remain intact, thereby reducing turbidity and suspended and settled sediment impacts.

Even though trenchless construction is presumed to be the LEDPA for pipeline waterbody crossings, Tennessee Gas's application proposes to use the dry open-cut construction method for nearly all the company's proposed stream crossings. In fact, Tennessee Gas proposes to use a trenchless technique—specifically, horizontal directional drilling ("HDD")—at only three locations along the route of the proposed pipeline: (1) Jones Creek; (2) Wells Creek; and (3) Yellow Creek and a nearby unnamed tributary ("UNT") to Yellow Creek.

One of the most striking defects in Tennessee Gas's application is the company's failure to address the technical, logistical, and cost practicability of trenchless construction on a crossing-by-crossing basis for any of the proposed crossings beyond the three HDD sites. Similarly, there is no information provided for why the three HDD sites were selected for trenchless crossings compared to other crossings that were not. Although the application at times suggests that Tennessee Gas may have developed an internal rationale for its proposed method at each crossing, those individual rationales are not provided in the application or other available materials. These are glaring omissions because an individualized LEDPA analysis is required under the Section 404(b)(1) Guidelines, and because it is an industry standard in applications for individual DA permits to evaluate trenchless crossing alternatives prior to proposing trenched crossings such as dry open-cut crossings, in order to reduce potential water quality and stream impacts. Since trenchless crossing methods are the least damaging to aquatic resources, it is my professional opinion that trenchless crossing methods must, at a minimum, be evaluated on a

crossing-by-crossing basis for use at all crossings. The application's failure to undertake this individualized evaluation compels the conclusion that Tennessee Gas has not shown its proposed crossings are the LEDPA.

Even where Tennessee Gas's application addresses trenchless construction methods in general terms, the application overlooks important considerations. First, the application presents a false choice between HDD and conventional bore as the two potential trenchless techniques that Tennessee Gas could select. Several other available trenchless crossing techniques such as microtunneling, Direct Pipe®, and guided conventional boring could be practicable at a given site even if HDD or conventional bore would not, and therefore these techniques must be considered in any LEDPA analysis. These different techniques are not interchangeable, and they each come with corresponding advantages and disadvantages that are relevant to whether a particular trenchless method would be the LEDPA at a given crossing. For example, Tennessee Gas's application asserts that HDD and conventional bore carry risks that are not present with trenched construction, including that "[t]here are no risks of inadvertent returns for a conventional open cut crossing as no drilling fluid is used during the process." Application at 35. However, this comparison ignores or elides the fact that conventional boring does not use high-pressure drilling fluid like HDD, nor do microtunneling, Direct Pipe®, and guided conventional boring. Notably, Tennessee Gas's discussion of available trenchless techniques is based on a 2013 feasibility study prepared by the developers of the Constitution Pipeline, which was also briefly summarized in a table for the Constitution Pipeline that Attachment 11 to Tennessee Gas's application recreates almost verbatim. Although Attachment 11 at least mentions Direct Pipe® in addition to conventional boring and HDD, there is no discussion of Direct Pipe® in Tennessee Gas's application itself.

Second, the application overlooks the apparent practicability of trenchless methods across the route as evidenced by statements in the application and associated materials. For example, conventional boring is proposed for multiple road crossings shown in Attachment 3 to Tennessee Gas's application, indicating that this trenchless method is appropriate for substrates found along the project length. However, conventional boring in not evaluated for any waterbody crossings in the application. Similarly, the application states that the "maximum length a [conventional] bore could achieve in ideal soil conditions typically does not exceed 400 feet." Application at 34. Tennessee Gas cannot dismiss the practicability of conventional boring based on width because the widest stream proposed for a dry open-cut crossing, Bartons Creek, is only 62.5 feet wide as shown in Table 1 in the application. To summarize, Tennessee Gas's application establishes that width does not preclude the use of conventional boring at any proposed open-cut crossing. Tennessee Gas also cannot dismiss the practicability of a trenchless technique at any individual crossing based on the presence of karst without additional site-specific analysis and evaluation. Although the application characterizes karst as an obstacle for trenchless techniques, Tennessee Gas's HDD Feasibility Study, Attachment 9 to its application, reveals that Tennessee Gas encountered karst during test bores for the planned HDD crossing of Yellow Creek (SHNC007) and plans to proceed with a trenchless technique at that site, conclusively establishing that karst does not automatically disqualify other proposed crossings from a trenchless technique.

6

**App-0692**

Third, the application effectively concedes that Tennessee Gas did not appropriately tier its consideration of crossing methods at each site in order to select the LEDPA for each. Instead, the application reveals that Tennessee Gas began by prioritizing dry open-cut crossings. For example, the application states that HDD will be used at the three locations discussed above "to overcome obstacles posed by use of other stream crossing construction methods that are impracticable because of channel dimensions, flow, or other constraints." Application at 15. Similarly, the application states that, "[g]iven the potential for weather to affect the flow in the stream and thus the crossing, and the ability to handle flow volume, the use of dry open cut crossing methods may result in the inability to handle stream flow appropriately for certain waterbody crossings. In that case, a trenchless crossing method (HDD or conventional bore method[…]) may be determined to be more appropriate." Application at 34. These statements indicate that Tennessee Gas prioritized trenched crossings except where they are impracticable instead of the other way around, starting with trenchless techniques for all sites unless they are shown to be impracticable. As stated above, trenchless crossings are less environmentally damaging than open-cut (*i.e.* trenched) crossings absent special site-specific circumstances. Therefore, they should be the first option evaluated when determining the LEDPA.

In summary, it is my professional opinion that trenchless methods are likely practicable for many more of the streams and wetlands that would be crossed by the pipeline than Tennessee Gas identifies. At a minimum, the deficiencies the permit application make it impossible to conclude that Tennessee Gas's proposal is, in fact, the LEDPA. Accordingly, it is my professional opinion that Tennessee Gas has not demonstrated that any of its proposed open-cut crossings represents the least environmentally damaging practicable alternative.

### b. *Blasting*

Even assuming a dry open-cut crossing in general is the least environmentally damaging practicable alternative in comparison to trenchless techniques at many of Tennessee Gas's proposed crossing sites, Tennessee Gas's application still fails to demonstrate that its proposed methods for constructing dry open-cut crossings are the LEDPA at each site.

Blasting is a particular concern. Tennessee Gas's application states that the company "anticipates encountering areas of shallow bedrock during [pipeline] construction that may require controlled blasting to remove." Application at 13. Blasting is the most destructive and potentially environmentally damaging of all waterbody crossing methods. Blasting causes permanent changes to stream channel roughness, composition, and function, and may cause deposition of rock debris in channel. Blasting also may cause fissures, cracks, and other alteration of subsurface structure that can lead to hydrologic losses. Additionally, blasting creates dust that may deposit in-stream and contribute to increased turbidity and sedimentation.

Given the LEDPA standard and the magnitude of impacts from blasting, the Corps must not allow blasting unless and until it concludes that no other trenched or trenchless construction techniques are possible based upon determinations made by the Corps prior to permitting. However, Tennessee Gas's application does not establish that blasting will be the LEDPA. In fact, the application lacks critical details, seeks approval for Tennessee Gas's construction

contractor to make decisions about blasting on the fly, and is inconsistent both internally and when compared to other materials about the proposed pipeline available from FERC and TDEC.

The application indicates that Tennessee Gas anticipates encountering bedrock that may require blasting to construct dry open-cut crossings based on the company's "review of surficial geology, soil mapping, and desktop geotechnical survey results." Application at 13. Yet the application does not include any of the "soil mapping" or "desktop geotechnical survey results" used to determine areas where blasting may be necessary, nor does it provide site-specific "surficial geology" investigation results. Geologic investigations to determine the trenching technique to be used at each crossing site should be conducted prior to permitting. However, information was not provided regarding any conducted or proposed geologic investigations.

The need for this information is underscored by Tennessee Gas's request in its application for a permit that would allow its construction contractor to make decisions about blasting on the fly. Blasting implicates the LEDPA standard and decisions about its use must be made prior to permitting. In my experience and professional opinion, allowing contractors to make decisions on the fly results in increased probability of negative impacts to aquatic resources.

Tennessee Gas identifies five techniques that it seeks permission to allow its contractor to choose from when bedrock is encountered during trenching for dry open-cut crossings:

> 1. Conventional excavation with an excavator;
>
> 2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;
>
> 3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;
>
> 4. Removal by rock trencher; or
>
> 5. Controlled blasting and excavation with a backhoe.

The application states that Tennessee Gas's "construction contractor will evaluate and attempt the use of at least one of Techniques 1-4 described above based on the conditions observed at the time of construction to determine the best method for rock removal and excavation." Application at 14. The application further states that the choice of technique "will be dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location." Application at 13.

The evaluation of the potential for use of Techniques 1-4 for rock removal should be conducted prior to permitting, as each method has different environmental impacts associated with it and requires different equipment to be onsite. Similarly, the "relative hardness, fracture susceptibility, and expected volume of bedrock, as well as its location" should be determined by geologic investigations and reporting prior to permitting to reduce negative impacts to aquatic resources.

8

**App-0694**

Notably, Tennessee Gas's application and other materials available from TDEC and FERC reveal considerable uncertainty and inconsistency about Tennessee Gas's proposed use of blasting. First, the application states that, "[i]f the initial technique is unsuccessful for rock removal and excavation at stream crossings, Technique 5 (controlled blasting) will be considered in non-karst areas that are also not in wetlands or streams with an unacceptable risk of hydrologic loss. The risk of karst-prone geology and risk of unacceptable hydrologic loss has been evaluated for each stream crossing location at which a bedrock substrate has been identified." Application at 14. But elsewhere, the application states that blasting "will be considered in non-karst areas or in wetlands or streams with an unacceptable risk of hydrologic loss." Application at 30. These statements are incompatible with each other and the latter appears to reflect a mistake in drafting, because it is incomprehensible that the Corps would allow blasting to "be considered . . . in wetlands or streams with an unacceptable risk of hydrologic loss." Application at 30. Regardless of the reason for the inconsistency, the Corps must obtain clarification from Tennessee Gas.

Second, Tennessee Gas's application and supporting materials are not clear about which stream crossings are proposed for potential blasting. The footnote to Table 2.7-3 of Tennessee Gas's application—"Waterbodies Crossings Hydrologic Risk Analysis"—states that "Controlled Blasting is an option only in areas of karst potential listed as unlikely." In Table 2.7-3, Tennessee Gas identifies 28 proposed crossings as candidates for blasting based on the assertion that "karst potential" for those sites is rated "unlikely."

*Table 1: Crossings Denoted Candidate for Blasting in Application Table 2.7-3*

| Milepost | Waterbody ID | Waterbody Name |
|----------|--------------|----------------|
| 2.13 | SDKA006 | UT to Porters Branch |
| 2.34 | SDKA008 | UT to Porters Branch |
| 2.99 | SDKA058 | Porters Branch |
| 3.20 | SDKA048 | Jones Creek[*] |
| 3.49 | SDKA050 | UT to Jones Creek |
| 3.51 | SDKA051 | UT to Jones Creek |
| 3.79 | SDKA049 | UT to Jones Creek |
| 3.85 | SDKA053 | UT to Jones Creek |
| 4.08 | SDKA055 | UT to Jones Creek |
| 4.34 | SDKA012 | UT to Jones Creek |
| 4.69 | SDKA015 | UT to Gafford Branch |
| 4.70 | SDKA016 | UT to Gafford Branch |
| 5.24 | SDKA017 | UT to Gafford Branch |
| 5.32 | SDKA019 | UT to Gafford Branch |
| 5.89 | SDKA020 | UT to Gafford Branch |
| 11.43 | SDKB008 | Nesbitt Branch |
| 22.36 | SHNC007 | Yellow Creek[*] |
| 22.88 | SHNC018 | UT to Yellow Creek |
| 26.21 | SHNA011 | UT to Guices Branch |
| 26.43 | SHNA012 | UT to Guices Branch |

9

**App-0695**

| | | |
|---|---|---|
| 26.87 | SHNA001 | Guices Branch |
| 28.61 | SHNB033-1 | Lickskillet Branch |
| 28.92 | SHNB033-2 | Lickskillet Branch |
| 29.00 | SHNA013 | UT to Lickskillet Branch |
| 29.02 | SHNB032 | UT to Lickskillet Branch |
| 30.18 | SHNB034 | UT to Lickskillet Branch |
| 30.19 | SHNB033-3 | Lickskillet Branch |
| 30.67 | SHNA010 | Wells Creek* |

The crossings marked with an asterisk in Table 1 above are streams that Tennessee Gas identifies as candidates for blasting notwithstanding that Tennessee Gas proposes to construct these crossings using HDD, suggesting the company may intend to blast at these locations in the event of a failed bore or other contingency.

However, Attachment 3 to Tennessee Gas's application—"Project Design Plans and Permit Drawings"—is not consistent with Table 2.7-3. Attachment 3 provides two permit drawing sheets for each crossing, and the second drawing sheet for each crossing identifies the trenching method proposed to be used at that crossing. According to the Attachment 3 drawing sheets, 29 crossings are already designated "Blast" as the trenching method.

*Table 2: Crossings Designated for Blasting in Attachment 3*

| Waterbody ID | Waterbody Name | Candidate for Blasting in Table 2.7-3? |
|---|---|---|
| SDKA023 | Upper Sugarcamp Branch | No |
| SDKA023 | Upper Sugarcamp Branch | No |
| SDKA024 | UT to Upper Sugarcamp Branch | No |
| SDKA026 | Jordan Branch | No |
| SDKA027 | UT to Jordan Branch | No |
| SDKA004 | UT to Porters Branch | No |
| SDKA006 | UT to Porters Branch | Yes |
| SDKA008 | UT to Porters Branch | Yes |
| SDKA058 | Porters Branch | Yes |
| SDKA050 | UT to Jones Creek | Yes |
| SDKA051 | UT to Jones Creek | Yes |
| SDKA049 | UT to Jones Creek | Yes |
| SDKA053 | UT to Jones Creek | Yes |
| SDKA055 | UT to Jones Creek | Yes |
| SDKA033 | UT to Johnson Creek | No |
| SDKA034 | UT to Johnson Creek | No |
| SDKA036 | Johnson Creek | No |
| SDKA037 | UT to Johnson Creek | No |
| SDKA038 | UT to Harris Branch | No |
| SDKA038 | UT to Harris Branch | No |
| SDKA040 | UT to Harris Branch | No |

10

**App-0696**

| SDKA041 | Harris Branch | No |
| SDKA042 | UT to Bartons Creek | No |
| SDKB001 | Miller Branch | No |
| SDKB002 | Bartons Creek | No |
| SDKB009 | Furnace Creek | No |
| SDKB011 | Dry Hollow Branch | No |
| SDKB023 | Little Bartons Creek | No |
| SDKB028 | UT to Leatherwood Creek | No |

Notably, comparing the Attachment 3 drawing sheets for these crossings with the corresponding hydrologic risk analysis from Table 2.7-3 reveals that 21 of the proposed crossings designated "Blast" in Attachment 3 have "karst potential" rated "possible" in Table 2.7-3. In other words, only 8 of the crossings designated "Blast" in Attachment 3 are identified as candidates for blasting in Table 2.7-3. It therefore appears that Tennessee Gas may anticipate blasting at as many as 49 crossing sites, a total that does not include the numerous sites designated "TBD" in Attachment 3 where Tennessee Gas attempts to reserve the right to blast based upon decisions made in the field. Further, although the remaining 8 crossings designated "Blast" in Attachment 3 have "karst potential" rated "unlikely" in Table 2.7-3, one of those "unlikely" sites nevertheless is rated as having high potential for hydrologic loss. This is perplexing because karst is a principal risk factor for hydrologic loss. To summarize, blasting is designated as the trenching method for numerous sites that, according to Tennessee Gas's application, are potentially karst and/or have high potential for hydrologic loss. This is in direct opposition to the criteria Tennessee Gas claims will be used to determine when blasting may be considered.  Furthermore, blasting in potentially karst locations and locations with high probability of hydrologic loss may cause permanent negative impacts to the environment.

Third, documents from FERC and TDEC reveal that regulators are not in accord about the extent to which Tennessee Gas expects to utilize blasting. The draft environmental impact statement ("DEIS") issued by FERC for the proposed pipeline states that, "[a]lthough Tennessee [Gas] does not anticipate encountering instances of shallow bedrock in streams that would require controlled blasting, this method could be required to remove challenging streambed materials. In no event would controlled blasting be used in locations characterized by karst-prone geology, wetlands, or with an unacceptable risk of hydrologic loss." (FERC, 2023). Further, the DEIS states that "Tennessee [Gas] has indicated that controlled blasting would not be attempted in Waters of the U.S. or in TDEC-jurisdictional waters." (FERC, 2023). These statements in the DEIS are directly contrary to Tennessee Gas's application for a DA permit. As described above, Attachment 3 designates blasting at 21 crossings with potential karst and one additional crossings listed in Table 2.7-3 as having a high risk of hydrologic loss. In addition, the DEIS's categorical statement that controlled blasting would not be attempted in waters of the United States or TDEC-jurisdictional waters is belied by the fact that Tennessee Gas is applying for permission to employ blasting for at least 29, and possibly up to 49, stream crossings as discussed above. Furthermore, Attachment 3 to the application designates the trenching method for all non-blasting sites as "TBD"—to be determined—meaning that allowing Tennessee Gas to

make decisions on the fly could result in the use of blasting at many more stream crossings than are currently identified in the application.

Fourth, correspondence between Tennessee Gas and TDEC reveals that TDEC is concerned about Tennessee Gas's approach to blasting, and Tennessee Gas's responses are not sufficient to ameliorate those concerns. As noted above, Tennessee Gas's DA permit application seeks approval for Tennessee Gas's construction contractor to make decisions on the fly about which of the 5 rock removal techniques to use. In a request for additional information, TDEC informed Tennessee Gas that TDEC "requires that the contractor evaluate and attempt all non-blasting techniques at each stream crossing, as appropriate. For clarity, this language should be made clear in all construction plans as needed." (TDEC, 2023). However, in response, Tennessee Gas did not commit to evaluating and attempting all non-blasting techniques before employing blasting. Instead, Tennessee Gas informed TDEC that the company would evaluate—but not necessarily attempt—non-blasting techniques based on (1) observed conditions at the stream crossing, (2) the technical feasibility and limitations of each particular technique, (3) considerations based on the experience of Tennessee Gas personnel and its construction contractor, (4) logistic, and (5) costs. Tennessee Gas asserts that it will determine which non-blasting alternative is practicable at each stream crossing based on this evaluation.

In my professional opinion, Tennessee Gas's response to TDEC highlights several of the flaws in the company's approach to blasting. First, Tennessee Gas makes no attempt to establish that blasting would be the LEDPA for any given crossing as required by the Section 404(b)(1) Guidelines prior to permitting. Evaluation of non-blasting trench construction techniques as described by Tennessee Gas must be done in the planning phase, not in the construction phase, to select and permit the LEDPA. Furthermore, Tennessee Gas's evaluation criteria do not appear intended to identify the LEDPA because they do not incorporate environmental impacts in the decision-making matrix. Tennessee Gas's response to TDEC response would eliminate attempting non-blasting trench construction techniques based on the evaluation of criteria that are so broad and non-specific in the metrics used as to allow for the company to dismiss all of the non-blasting options as not practicable, including on the basis of cost alone. This is not sufficient. Evaluation must be conducted prior to permitting to assure the LDEPA is selected for each crossing. Once evaluation of non-blasting technique practicability at each stream crossing is complete and is reviewed for accuracy, Tennessee Gas must be required to attempt all non-blasting techniques that were determined to be practicable before attempting blasting. Allowing evaluation to be completed without documentation prior to construction may result in inaccurate characterization of feasibility of the LEDPA for each crossing, which in turn would result in negative water quality and stream impacts.

   *c. Roads*

Tennessee Gas's application does not provide site-specific details of either access road crossings or workspace crossing. It is not clear whether the proposed access roads are intended to be permanent features. Tennessee Gas's application shows several possible methods, including culvert crossings, timber mat and pipe bundle crossings, and bridge crossings. However, no information is provided as to which method will be used at which locations. In addition, the

application does not provide information on waterbody crossing design for site-specific conditions. Engineering Best Practices and industry standards require information on sizing of culverts and crossings for site-specific flow conditions and site characteristics.  However, Tennessee Gas did not include any of the necessary designs for any of the access roads. It is not possible to conclude that any access road crossing will be the LEDPA without this information.

The least environmentally damaging crossing method for road crossings is bridging. That is, the preferred access road method for avoidance of environmental impacts is spanning from dry ground beyond the existing top-of-bank on both sides of the stream. But Tennessee Gas provides no detail on how its road crossings would be accomplished nor how non-bridging options would be designed to reduce the likelihood of permanent impacts. Because Tennessee Gas's application lacks site-specific information about the crossing method for each of its proposed road crossings, it preserves an unreasonable degree of discretion for Tennessee Gas to make complicated and important design decisions "on the fly" and "in the field" at waterway crossings. This is not protective of environmental resources and will lead to permanent impacts to aquatic ecosystems. In my experience, access road crossings must have site-specific design completed to minimize negative environmental impacts. This is because the methods are not fungible, and their advantages, disadvantages, and impacts will vary by site, as shown below.

*Table 3: Advantages and Disadvantages of Proposed Temporary Access Road Methods*

| Access Road Crossing Method | Advantages | Disadvantages |
|---|---|---|
| Mobile Bridge Crossing | Dry crossing with very minimal impact to waterway | — |
| Temporary Bridge | Dry crossing with very minimal impact to waterway | — |
| Culvert Crossing | May be used when dry crossing is not possible | • Requires digging into streambed 6"<br>• Needs extensive design and sizing<br>• Requires installation and removal in the dry to minimize environmental impact<br>• Requires in-stream fill<br>• May be a permanent impact in a variety of conditions |
| Timber Mat and Pipe-Bundle Crossing | Less impactful and less fill required than culvert crossing, and may provide for bank-to-bank crossing with minimal instream disturbance | • Not practical in larger streams<br>• Needs pipe sizing and design<br>• Compacts soils in wetlands |

Tennessee Gas's application does not meet minimum industry standards for its proposed access road crossings. If left to field personnel to install without design documents, there will be excessive impacts and failures which will cause long-term damage to aquatic ecosystems. Furthermore, the application does not commit to installing culverts in dry conditions. Digging by

13

**App-0699**

large machinery in live streams causes plumes of environmentally damaging sediment to be released. Likewise, the application does not commit to requiring that machinery work from the bank to reduce in-stream impacts.

**Lack of Critical Site-Specific Information**

Tennessee Gas's application and supporting materials lack critical site-specific information that is necessary for a regulator to determine the required design criteria for, and evaluate the potential environmental impacts from, pipeline construction.

*a. Flow management*

Tennessee Gas proposes to use a dry open-cut method at the vast majority of its proposed crossing locations. However, dry open-cut construction requires the use of a technique to dewater the streambed, and these dewatering methods are not necessarily interchangeable. Critically, the choice of an appropriate dewatering method for a crossing is always influenced—and often dictated—by site-specific conditions. Selecting from among the various dewatering methods for an open-cut crossing must be part of the LEDPA analysis prior to permitting because the impacts are not equivalent, especially if an inappropriate method is chosen at a given site.

The three most widely used dewatering techniques are "dam-and-pump," "flume," and "coffer dam." The dam-and-pump method involves damming the waterbody to be crossed and transferring the flow of the waterbody downstream past the work site through pumps and hoses. The flume method involves redirecting water flow through one or more flume pipes and conveying it downstream past the work site. The coffer dam method involves a phased approach wherein part of the waterbody (usually half) is surrounded by a temporary dam and dewatered to permit construction in a dry work site while water flow continues downstream in the undammed portion of the waterbody. Tennessee Gas proposes only the dam-and-pump and flume methods in its permit application.

The following is a summary of the site characteristics that will generally govern which of these dewatering methods will be appropriate for a given crossing:

*Table 4: Summary of Open-Cut Dewatering Methods*

| Method | Appropriate site characteristics |
|--------|----------------------------------|
| Dam-and-pump | Used only on small streams with drainage areas of 1 square mile or less. Pump(s) and hose(s) must be sized to convey expected flows. Used only during periods of low flow. |
| Flume | Used on small streams (less than 15 feet wide) with drainage areas of 1 square mile or less. Flume pipe(s) must be sized to convey expected flows. |
| Coffer dam | Used on small to intermediate streams (greater than 10 feet wide but less than 3 feet deep) only during periods of low flow. Culverts or undammed portion must be sized with adequate capacity to convey expected flows. |

14

**App-0700**

Site-specific information for each waterbody is critical to ensuring that an appropriate method is chosen for each crossing and preventing adverse impacts. In particular, the dam-and-pump and flume methods require prior crossing-specific knowledge of velocity, flow rate, soil conditions, contributing watershed area, seasonal rainfall data, stream plan, profile, and longitudinal surveys, channel cross-section, depth of flow, stream bed composition, bank stability, and more because these methods are not fungible and their suitability and the extent of their impacts will vary site by site. For both dam-and-pump and flume methods, site-specific information must be used to determine the sizing of the pumps, pipes, etc., and provisions must be made to conduct work during periods of low flow. It is common knowledge in the industry that both installation and removal of dam-and-pump and flume method equipment causes increases in downstream turbidity and sediment deposition. A lack of site-specific detail and planning will likely lead to increases in turbidity, in-stream sediment deposition, stream instability, and other adverse impacts to water quality and stream function, which will likely cause violations of water quality standards.

Tennessee Gas's application does not provide the necessary information described above for making or justifying appropriate site-specific selections of dewatering method for each proposed open-cut crossing. The application acknowledges the need for site-specific information on soil type, stream flow, and more, but my review of the application and supporting materials did not identify any instances where Tennessee Gas provided the necessary information. Attachment 3 to the application includes estimates of summer mean flow in cubic feet per second from the USGS Streamstats model, but this information does not accurately represent flows that will be present at the time of construction, which may or may not be in the summer. Attachment 3 does not provide any site-specific information that would be necessary to determine the number, length, and diameter of the pipes needed for a flumed stream crossing, nor information about soil types for each crossing that would allow identification of whether or not there are stable stream bank conditions. In my professional opinion the lack of site-specific information will lead to negative aquatic resource impacts.  It is industry standard to have this information for each site.

In addition, there is no information provided in the application about the sizing of the pumps, hoses, or flume pipes to be used, nor is there information about how Tennessee Gas or its construction contractor will determine appropriate sizing. Similarly, there are no details provided on how Tennessee Gas or its construction contractor will determine whether the flow in a waterbody at the time of construction is appropriate for a given method. Furthermore, the dam-and-pump and flume methods often require trench dewatering in addition to flow diversion. Tennessee Gas's application does not include provisions and/or methods for removing silt from pumped water in connection with trench dewatering. These provisions and/or methods must be installed and implemented prior to trenching activities and maintained until backfilling is complete. Without these provisions and/or methods, there is a high likelihood of increased turbidity, and downstream sediment deposition in streams.

AR004404

The lack of site-specific information for each crossing allows a contractor to make decisions on the fly with no ability for regulatory agencies to evaluate the efficacy of the proposed crossing for environmental protection. The probability of serious negative environmental impacts is increased substantially by omission of site-specific design. Negative environmental impacts associated with lack of prior planning and site-specific information may include increases in turbidity, alteration of channel pattern, alteration of bed material, and in-stream sediment deposition. Industry standard is to provide a site-specific flow management method for each crossing determined using clear analysis and consistent criteria.

Furthermore, Tennessee Gas's application does not evaluate the coffer dam method for any proposed crossing. As described above, the flume and dam-and-pump methods are not appropriate dewatering techniques for any crossing with a drainage area that is greater than or equal to 1 square mile. My review of the application—including Table 2.7-3 and Attachment 3—reveals that Tennessee Gas is proposing at least 12 waterbody crossings at sites with drainage areas that are larger than 1 square mile.

*Table 5: Proposed Waterbody Crossings with Drainage Area Greater Than 1 Square Mile*

| Milepost | Waterbody ID | Waterbody Name | Drainage Area (sq miles) | Summer Mean Flow (CFS) |
|---|---|---|---|---|
| 2.99 | SDKA058 | Porters Branch | 2.98 | 2 |
| 4.54 | SDKA013 | Gafford Branch | 1.02 | 0.0565 |
| 10 | SDKB001 | Miller Branch | 1.31 | 0.721 |
| 10.07 | SDKB002 | Bartons Creek | 17.29 | 10.5 |
| 12.13 | SDKB009 | Furnace Creek | 8.41 | 0.029 |
| 14.01 | SDKB011 | Dry Hollow Branch | 2.31 | 1.27 |
| 16.66 | SDKB023 | Little Bartons Creek | 1.6 | 0.916 |
| 19.08 | SDKB026 | Leatherwood Creek | 3.54 | 2.46 |
| 26.43 | SHNA012 | UT to Guices Creek | 6.95 | 4.64 |
| 26.87 | SHNA001 | Guices Creek | 1.79 | 1.12 |
| 28.92 | SHNB033-2 | Lickskillet Branch | 1.29 | 0.798 |
| 30.19 | SHNB033-3 | Lickskillet Branch | 2.17 | 1.37 |

Tennessee Gas must evaluate alternative methods at these crossings because their drainage area indicates the flume and dam-and-pump methods may be overwhelmed by high flow in the event of rainfall. This also underscores the need for Tennessee Gas to provide a LEPDA analysis for each crossing that consider the specific dewatering method that would be used, as well as evaluating the use of a trenchless technique.

In addition, my review of the application reveals that Tennessee Gas is proposing at least one waterbody crossings at a site with a drainage area that is less than 1 square mile, but where Tennessee Gas expects flows that would render the flume or dam-and-pump methods inappropriate.

16

**App-0702**

*Table 6: Proposed Waterbody Crossings with High Expected Flow and Drainage Area Less Than 1 Square Mile*

| Milepost | Waterbody ID | Waterbody Name | Drainage Area (sq miles) | Summer Mean Flow (CFS) |
|---|---|---|---|---|
| 11.43 | SDKB008 | Nesbitt Branch | .01 | 4.94 |

Furthermore, I note that the application appears to include errors that indicate there may be other proposed crossings with drainage areas greater than 1 square mile, high expected flow, or both, but that are not apparent due to errors in the application. For example, the proposed crossing of Furnace Creek (SDKB009) described in Table 4 above includes Tennessee Gas's description of the drainage area as 8.41 square miles and the summer mean flow as 0.029 cubic feet per second. This flow rate is significantly lower than for other streams with similarly sized watersheds, so much so that I conclude it likely reflects a mistake in data collection or transcription. Consequently, it is probable that there are other crossings where the drainage size or flow characteristics make the flume and dam-and-pump methods inappropriate. Overall, regulators must require Tennessee Gas to make provisions to conduct work during periods where no rainfall is anticipated.  No provisions were identified to monitor weather predictions and conduct work only when rain is not forecast. Without information on how activities will be conducted to avoid high flow events there is a high probability of failure of the dam-and-pump and flume methods, which would increase turbidity and in-stream sediment discharge and deposition, leading to a high probability of water quality standards violations.

Similarly, the majority of ephemeral and some intermittent streams listed in Attachment 3 designate "no flow period" as flow management method. It is imperative that Tennessee Gas provide more information about how this be determined and verified prior to mobilizing construction crews to site.  Most pipeline projects proceed in a linear manner, meaning streams will be crossed when crews come to that site. No provision is given for how to assure that construction will occur during a "no flow period," and in my professional experience crews will work when they arrive regardless of conditions. A permit cannot be issued that leaves such critical decisions until the field. Further, it is especially important that crossings designated for construction during "no flow period[s]" be accompanied by a plan to ensure that no construction will occur when rainfall is possible.

As someone who has evaluated many stream crossing proposals, I conclude that Tennessee Gas's application does not meet minimum industry standards for evaluating site-specific conditions. Furthermore, given the omission of critical site-specific information in the application, it is my professional opinion that there is significant likelihood of water quality violations, including increases in turbidity as well as in-stream sediment deposition, from the proposed crossings.

*b. Restoration*

Tennessee Gas's application asserts that streambeds will be restored to their preconstruction elevations and grades following construction. However, I conclude that

Tennessee Gas's application does not provide sufficient information to make any defensible predictions about the efficacy of post-construction restoration for at least two reasons.

First, it appears that Tennessee Gas is focused entirely on stream structure to the exclusion of stream function. This oversight is a critical gap. Stream structure and stream function are not equivalent. Tennessee Gas must be required to conduct pre-construction water quality sampling and testing at all proposed crossing locations to determine existing conditions before any in-stream or upland construction. Additional water quality sampling should be conducted during and after construction to evaluate impacts to water quality due to in-stream construction activities.

Second, detailed pre-construction topographic surveys are needed for each crossing in order to accurately match post-construction elevations to pre-construction elevations. Without detailed pre-construction topographic survey it is not possible to match post-construction grades with any accuracy. Additionally, restoration requires detailed information on pre-construction stream geomorphological and water quality characteristics and post-construction survey and monitoring to assure restoration to pre-construction conditions. Tennessee Gas's application does not provide this necessary information.

**Inconsistencies, Discrepancies, and Gaps**

My review of Tennessee Gas's application revealed a large number of inconsistencies, design deficiencies, and a lack of site-specific crossing information that I would expect in an application for a project applying industry standard practices to avoid or minimize the permanent negative impacts of waterbody crossings on aquatic ecosystems. In addition to the inconsistencies, deficiencies, and omissions discussed elsewhere in this report, Tennessee Gas's application also suffers from the following flaws:

1.      Tennessee Gas's application lacks information about how Tennessee Gas and/or its construction contractor intends to construct dry open-cut crossings through wetlands when standing water is encountered. I conclude based on these omissions that Tennessee Gas is likely to construct wet open-cut crossings in wetlands, which are environmentally devastating. Additionally, the application's lack of information on wetland crossing methods to reduce environmental impacts does not meet minimum industry standards and will lead to substantial negative impacts to wetland resources. In my professional opinion, based on my review of the application and the scientific literature on wetland impacts discussed above, construction of Tennessee Gas's proposed wetland crossings will cause significant degradation to affected wetlands.

2.      The Application states at 10 that "[t] he PFO wetlands are dominated by woody vegetation that is at least six meters tall (Cowardin et al. 1979). Prior to construction, temporary and permanent workspaces will be cleared of woody vegetation." The construction details in Attachment 3 show a 75-foot construction right of way where all woody vegetation would be removed. Such vegetation removal is a permanent impact and requires mitigation.

**App-0704**

3.      Attachment 1, Table 2—Cumberland Wetland Impacts—indicates that the Crossing Method is "Open Cut," and the footnote and the narrative indicate that the crossing method may be "Standard Wetland Construction" ("SWC") or "Conventional Wetland Construction" ("CWC").  The primary difference between SWC and CWC appears to be the use of a timber mat in CWC.  The determination of which method to use is based on whether the soil is "non-saturated and able to support construction equipment at the time of crossing." Application at 15. There is no information on how the ability to support construction equipment will be determined prior to attempting to cross the wetland. Moreover, the Application also states at 15 that, for CWC, timber mats will be used for crossing. In contrast, Attachment 3 at 52 states, "if saturated at time of construction, reduce soil compaction by utilizing wide-track or balloon tire construction equipment or timber, riprap, or mats." This is yet more contradictory information within the application.

4.      The Application states at 15 that, "[w]here present, a maximum of 12 inches of topsoil will be segregated from the area disturbed by trenching, except where standing water is present or if soils are saturated."  No information is provided on how topsoil will be segregated if there is standing water or if soils or saturated. Table 2.1-3 (revised March 17, 2023) of the Application lists pipeline crossings as dry-open cut for 0.51 acres of wetland.  If there is standing water or saturated soils present how will the crossing be accomplished? No details are provided for how Tennessee Gas would dewater the worksite, nor are any details provided regarding a wet-open cut. Soil saturation, standing water potential, and soils information for each wetland impact area should be determined prior to permitting and mobilization. This information does not appear to be included.

5.      It appears Tennessee Gas does not have physical access to 1.15 miles of the pipeline route totaling approximately 16.45 acres containing multiple proposed crossings. Based on Tennessee Gas's March 17, 2023 response to TDEC's February 24, 2023 request for additional information, it appears Tennessee Gas is relying on desktop assessments to obtain information about streams within the portions of the route to which it does not have physical access. Tennessee Gas cannot obtain the necessary information—including information about baseline stream geomorphology and function—from a desktop review. In fact, desktop surveys of the 1.15-mile section of the route to which Tennessee Gas does not have physical access have already proven unreliable. In Tennessee Gas's March 17 response to TDEC's request, Tennessee Gas identified four new pipeline crossings in the inaccessible area, despite ostensibly having conducted desktop reviews of the area before. Accordingly, the crossings in the inaccessible area cannot be permitted until access is obtained and Tennessee Gas provides the necessary information about stream condition.

6.      Tennessee Gas does not provide information about a construction sequence for waterbody crossings. Construction sequencing is necessary to reduce the duration and impacts of crossing construction activities.

7.      My review of the application and supporting materials did not reveal any site-specific designs for impact types listed in Table 1 as "Access Road" or "Workspace Crossing." Although Attachment 3 provides some limited site-specific information about pipeline crossings, it

provides no similar information in the form of a permit drawing or other document for access roads or workspace crossings. Details should include limits of disturbance, topographic contour lines, method of crossing, and specific locations for activities associated with the crossing at a minimum. Attachment 3 also contains alignment sheets that show plan and profile views of the linear project. Streams are not shown or called out on the alignment sheets with the exception of large named water bodies. Access Road stream impacts are not shown on the alignment sheets with anything besides general location.  No site-specific Access Road or Workspace Crossing location or details are depicted on the Attachment 3 permit drawings, nor the alignment sheets in Attachment 3.

8.      The application does not show a route variation for Yellow Creek at MP 22.0 through 22.7. However, Attachment 3 shows a significant route variation for crossing Yellow Creek.

9.      In Tennessee Gas's HDD Feasibility Studies, Attachment 9 to the application, the feasibility study for the proposed HDD crossing of Yellow Creek reports that the stratigraphy is largely homogenous and made up of cherty limestone of the Warsaw Limestone and Fort Payne Formation. However, Attachment 3 indicates that the geologic formation at this location is quaternary alluvium.

10.     The feasibility study for the proposed HDD crossing of Yellow Creek states that "[t]he limestone formation is historically karst prone and may contain eroded voids within the stratigraphy. Soil bore 2B encountered such a void approximately 6 – 8 inches thick and 15.5 deep.  However, there were no sinkholes or visible karst noted during topographic survey or geotechnical investigation. The presence of karst poses risks for lost circulation downhole, as drilling fluid would fill any encountered void before being able to flow through the annulus. The drilling contractor should be aware of karst as lost circulation will ultimately require more mud to be mixed." However, the HDD feasibility studies were prepared to design HDD crossings and it appears no information was provided as to evaluation of other trenchless crossing methods considered for the sites proposed for HDD, with the exception of Attachment 11 which is a general comparison of methods and is not site-specific. The fact that the limestone formation at Yellow Creek is historically karst prone and that borings encountered voids that may cause loss of drilling fluid makes it is crucial to evaluate the feasibility of other trenchless methods to minimize potential environmental impacts. It is also notable that Tennessee Gas encountered karst at Yellow Creek because Table 2.7-3 designates Yellow Creek as "unlikely" to have karst.

11.     Attachment 3 reports Temporary Dry-Open Cut Disturbance Length (LF) as 75 feet for each stream crossing.  However, Table 1 reports pipeline crossing Total Impacts Linear Feet as varying from 10.8 ft to 262.7 feet.  This discrepancy makes it impossible to determine proposed impacts for each stream.

12.     The draft EIS states that flume pipe would be installed *after* blasting. If this statement is correct, blasting will be conducted in-stream while flow is occurring.  This is not an industry standard and could have devasting consequences. Blasting in a live stream (*i.e.* during flow)

would cause increased turbidity, increased downstream sedimentation, as well as fish mortality. This statement from the draft EIS also conflicts with Tennessee Gas's representation in its application that all blasting will occur in dry conditions. This direct contradiction is troubling and requires clarification. The impacts of blasting in dry conditions versus wet conditions are not the same and bear directly on the LEDPA analysis.

13.     No blue line streams are shown in Attachment 3 in the alignment sheets, nor are there any plan views that show topographic lines to the best of my knowledge. Industry standard is to provide topographic information and stream locations on site plan mapping. It is impossible to verify grades or stream crossing locations without this information.

14.     The proposed crossing on Johnson Creek (SDKA036) is emblematic of the inconsistencies, discrepancies, and missing information that characterize the application. This crossing is described significantly differently in Table 1, Table 2.7-3 and Attachment 3, as shown below. It is impossible to determine impacts with such inconsistencies.

*Table 7: Inconsistent Descriptions of SDKA036*

| Source | Pipe Installation Method | Trenching Method | Flow Management Method | Temporary Dry Open-Cut Disturbance (Linear Feet) | Temporary Dry Open-Cut Disturbance (Square Feet) |
|---|---|---|---|---|---|
| Table 1 | Dry Open Cut | — | — | 262.7 | 2613 square feet (0.060 acres) |
| Table 2.7-3 | Dry Open Cut | — | "N.A." | — | — |
| Attachment 3 | HDD | Blast | "N.A." | 75 | 450 (0.010 acres) |

## <u>Conclusion</u>

The lack of site-specific information, incomplete LEDPA analysis, inconsistencies, and deficiencies require denial of the 404 IP application. In my professional opinion, as the application stands now, it is vague and incomplete and proposes activities that will likely cause substantial negative impacts to aquatic resources, including significant risk of violating water quality standards. It is also my professional opinion that, if permitted as proposed, these activities will contribute to significant degradation of waters of the United States.

## References

Abernethy, R.K., & Gosselink, J.G., 1988.Environmental-conditions of a backfilled pipeline canal four years after construction.*Wetlands* 8, 109–121

Baumann, B.H., & Turner, R.E.,1990. Direct impacts of outer continental shelf activities on wetland loss in the central Gulf of Mexico. *Environ.Geol.Water Sci.* 5, 189–198.

Boelter, Don H., &Gordon E. Close, Pipelines in Forested Wetlands: Cross Drainage Needed to Prevent Timber Damage, *Journal of Forestry*, Volume 72, Issue 9, September 1974, Pages 561–563

Castro, J. M., MacDonald, A., Lynch, E., & Thorne, C. R. (2015) Risk-based Approach to Designing and Reviewing Pipeline Stream Crossings to Minimize Impacts to Aquatic Habitats and Species. *River Res. Applic.*, 31: 767– 783

Jackson, C. Rhett,  Thompson, James A. & Kolka, Randall K. Ecology of Freshwater and Estuarine Wetlands Chapter 2. Wetland Soils, Hydrology, and Geomorphology. University of California Press | 2014

Kittleson, K.M. & McDavitt, M.E.,1980. Assessing the impact of pipeline construction on coniferous wetlands in central Michigan with aerial photography. Remote Sensing of Earth Resources vol.VIII. University of Tennessee. pp. 263–275

Levesque, L. M. & Dube, M.G. 2007. Review of the effects of in-stream pipeline crossing construction on aquatic ecosystems and examination of Canadian methodologies for impact assessment. *Environmental Monitoring and Assessment* 132:395-409.

Olson, Erik R., & Doherty, James M. 2012. The legacy of pipeline installation on the soil and vegetation of southeast Wisconsin wetlands. *Ecological Engineering* 39:53-62

Penkal, R. F. & G. R. Phillips. 1984. Construction and Operation of Oil and Gas Pipelines. *Fisheries* 9(3):6-8.

Reid, S. M. & P. G. Anderson. 1999. Effects of Sediment Released During Open-Cut Pipeline Water Crossings. Canadian Water Resources Journal 24(3):235-251.

Reid, Scott, Stoklosar, Scott, Metikosh, Serge & Evans, Jim. 2002 Effectiveness of Isolated Pipeline Crossing Techniques to Mitigate Sediment Impacts on Brook Trout Streams. *Water Quality Research Journal of Canada*. 37. 10.2166

Thorne, C, Castro, J, Cluer, B, Skidmore, P, & Shea, C. 2015. Project Risk Screening Matrix for River Management and Restoration. *River Res. Applic.*, 31, 611– 626





**Office of
Energy Projects**

**August 2021**

Mountain Valley Pipeline, LLC                Docket No. CP21-57-000

# Mountain Valley Pipeline
# Amendment Project

# Environmental

# Assessment

Cooperating Agency:



**U.S. Army
Corps of
Engineers**

**Washington, DC  20426**

**FEDERAL ENERGY REGULATORY COMMISSION**
WASHINGTON, D.C. 20426

OFFICE OF ENERGY PROJECTS

In Reply Refer To:
OEP/DG2E/Gas 3
Mountain Valley Pipeline, LLC
Mountain Valley Pipeline
Amendment Project
Docket No. CP21-57-000

TO THE INTERESTED PARTY:

The staff of the Federal Energy Regulatory Commission (FERC or Commission) has prepared an environmental assessment (EA) for the Mountain Valley Pipeline Amendment Project (Amendment Project), proposed by Mountain Valley Pipeline, LLC (Mountain Valley) in the above-referenced docket. Mountain Valley requests authorization to change the crossing method of specific waterbodies and wetlands from open-cut dry crossings (as authorized by its October 13, 2017 Certificate of Public Convenience and Necessity [Certificate]) to trenchless methods (conventional bore, guided conventional bore, or Direct Pipe®[1]). In addition, Mountain Valley requests authorization for two minor route adjustments to avoid wetlands and waterbodies and authorization to conduct nighttime construction at eight trenchless crossings.

The EA assesses the potential environmental effects of the construction and operation of the Amendment Project in accordance with the requirements of the National Environmental Policy Act (NEPA). The FERC staff concludes that approval of the proposed project, with appropriate mitigating measures, would not constitute a major federal action significantly affecting the quality of the human environment.

The U.S. Army Corps of Engineers (COE) is a federal cooperating agency who assisted us in preparing this EA because they have jurisdiction by law or special expertise with respect to impacts to waters of the U.S. The COE may adopt the EA per 40 CFR 1501.8 if, after an independent review of the document, it concludes that their requirements and/or regulatory responsibilities have been satisfied. However, the COE would present its own conclusions and recommendations in its respective and applicable records of decision or determinations. Otherwise, it may elect to conduct its own supplemental environmental analyses.

---

1    Direct Pipe® is a construction method developed by Herrenknecht AG that combines microtunneling and horizontal direction drill (HDD).

**App-0710**

- 2 -

The proposed Amendment Project includes the following:

- 120 trenchless crossings (117 conventional bores, 2 guided conventional bores, and 1 Direct Pipe®) of 47 wetlands and 136 streams in Wetzel, Lewis, Webster, Nicholas, Greenbrier, Summers, and Monroe counties, West Virginia and Giles, Montgomery, Roanoke, Franklin, and Pittsylvania, counties, Virginia;
- avoidance of one wetland via a shift in the permanent operational right-of-way at MP 0.70;
- avoidance of one waterbody due to a route adjustment at MP 230.8; and
- 24-hour construction activities at the previously authorized Gauley River and Roanoke River, two guided conventional bore crossings, the Direct Pipe® crossing, and three conventional bore locations.

The Commission mailed a copy of the *Notice of Availability* to federal, state, and local government representatives and agencies; elected officials; environmental and public interest groups; Native American tribes; potentially affected landowners and other interested individuals and groups; and newspapers and libraries in the project area. The EA is only available in electronic format. It may be viewed and downloaded from the FERC's website (www.ferc.gov), on the natural gas environmental documents page (https://www.ferc.gov/industries-data/natural-gas/environment/environmental-documents). In addition, the EA may be accessed by using the eLibrary link on the FERC's website. Click on the eLibrary link (https://elibrary.ferc.gov/eLibrary/search), select "General Search" and enter the docket number in the "Docket Number" field, (i.e. CP21-57). Be sure you have selected an appropriate date range. For assistance, please contact FERC Online Support at FercOnlineSupport@ferc.gov or toll free at (866) 208-3676, or for TTY, contact (202) 502-8659.

The EA is not a decision document. It presents Commission staff's independent analysis of the environmental issues for the Commission to consider when addressing the merits of all issues in this proceeding. Any person wishing to comment on the EA may do so. Your comments should focus on the EA's disclosure and discussion of potential environmental effects, reasonable alternatives, and measures to avoid or lessen environmental impacts. The more specific your comments, the more useful they will be. To ensure that the Commission has the opportunity to consider your comments prior to making its decision on this project, it is important that we receive your comments in Washington, DC on or before 5:00pm Eastern Time on **September 13, 2021.**

For your convenience, there are three methods you can use to file your comments to the Commission. The Commission encourages electronic filing of comments and has

**App-0711**

- 3 -

staff available to assist you at (866) 208-3676 or FercOnlineSupport@ferc.gov.  Please carefully follow these instructions so that your comments are properly recorded.

(1)     You can file your comments electronically using the eComment feature on the Commission's website (www.ferc.gov) under the link to FERC Online. This is an easy method for submitting brief, text-only comments on a project;

(2)     You can also file your comments electronically using the eFiling feature on the Commission's website (www.ferc.gov) under the link to FERC Online. With eFiling, you can provide comments in a variety of formats by attaching them as a file with your submission.  New eFiling users must first create an account by clicking on "eRegister."  You must select the type of filing you are making.  If you are filing a comment on a particular project, please select "Comment on a Filing"; or

(3)     You can file a paper copy of your comments by mailing them to the Commission.  Be sure to reference the project docket number (CP21-57-000) on your letter.  Submissions sent via the U.S. Postal Service must be addressed to: Kimberly D. Bose, Secretary, Federal Energy Regulatory Commission, 888 First Street NE, Room 1A, Washington, DC  20426. Submissions sent via any other carrier must be addressed to: Kimberly D. Bose, Secretary, Federal Energy Regulatory Commission, 12225 Wilkins Avenue, Rockville, Maryland 20852.

Filing environmental comments will not give you intervenor status, but you do not need intervenor status to have your comments considered.  Only intervenors have the right to seek rehearing or judicial review of the Commission's decision.  At this point in this proceeding, the timeframe for filing timely intervention requests has expired.  Any person seeking to become a party to the proceeding must file a motion to intervene out-of-time pursuant to Rule 214(b)(3) and (d) of the Commission's Rules of Practice and Procedures (18 CFR 385.214(b)(3) and (d)) and show good cause why the time limitation should be waived.  Motions to intervene are more fully described at https://www.ferc.gov/ferc-online/ferc-online/how-guides.

Additional information about the project is available from the Commission's Office of External Affairs, at **(866) 208-FERC**, or on the FERC website (www.ferc.gov) using the eLibrary link.  The eLibrary link also provides access to the texts of all formal documents issued by the Commission, such as orders, notices, and rulemakings.

- 4 -

In addition, the Commission offers a free service called eSubscription which allows you to keep track of all formal issuances and submittals in specific dockets. This can reduce the amount of time you spend researching proceedings by automatically providing you with notification of these filings, document summaries, and direct links to the documents. Go to https://www.ferc.gov/ferc-online/overview to register for eSubscription.

# MOUNTAIN VALLEY PIPELINE AMENDMENT PROJECT
# ENVIRONMENTAL ASSESSMENT

## TABLE OF CONTENTS

SECTION                                                    PAGE NUMBER

**SECTION A – PROPOSED ACTION** ........................................................ 1
  1.0   Introduction ......................................................................... 1
  2.0   Purpose and Need.................................................................. 3
  3.0   Public Review and Comment .................................................. 4
  4.0   Proposed Facilities and Land Requirements ............................. 7
      4.1   24-Hour Construction.................................................. 7
  5.0   Trenchless Crossing Construction Procedures............................ 8
      5.1   Conventional Bore...................................................... 8
      5.2   Guided Conventional Bore ......................................... 12
      5.3   Direct Pipe®............................................................ 13
      5.4   Microtunneling ........................................................ 14
      5.5   Trenchless Crossing Contingency Plans ....................... 15
      5.6   Trenchless Crossing Schedule..................................... 15
  6.0   Equipment Bridges .............................................................. 15
  7.0   Environmental Compliance Inspection and Monitoring ............. 16
  8.0   Permit Approvals and Regulatory Consultations ...................... 17

**SECTION B – ENVIRONMENTAL ANALYSIS**.................................... 19
  1.0   Geologic Hazards, and Soils .................................................. 22
  2.0   Water Resources ................................................................. 26
      2.1   Groundwater ............................................................ 26
      2.2   Surface Water .......................................................... 33
      2.3   Wetlands................................................................. 38
  3.0   Fisheries, Vegetation, and Wildlife........................................ 41
      3.1   Fisheries and Aquatic Resources ................................. 41
      3.2   Vegetation .............................................................. 43
      3.3   Wildlife.................................................................. 45
      3.4   Migratory Birds ....................................................... 47
      3.5   Special Status Species ............................................... 48
  4.0   Land Use............................................................................ 54
      4.1   Environmental Justice ............................................... 55
  5.0   Cultural Resources .............................................................. 57

        5.1    Consultations ............................................................. 59
        5.2    Identification of Historic Properties ................................. 62
        5.3    Assessment of Effects ................................................. 64
        5.4    Unanticipated Discoveries ............................................ 66
        5.5    Compliance with the NHPA ......................................... 66
    6.0    Air Quality and Noise ...................................................... 67
        6.1    Air Quality ............................................................... 67
        6.2    Noise ..................................................................... 75
    7.0    Reliability and Safety ...................................................... 88

**SECTION C – ALTERNATIVES** ........................................................ **90**
    1.0    No-Action Alternative ..................................................... 90
    2.0    Alternative Crossing Techniques ....................................... 92
        2.1    Screening Criteria ...................................................... 94
        2.2    Alternative Crossing Techniques Conclusion ................... 97
    3.0    Conclusion ................................................................... 98

**SECTION D – STAFF'S CONCLUSIONS AND RECOMMENDATIONS** ............ **99**

**SECTION E – REFERENCES** ........................................................... **103**

**SECTION F – LIST OF PREPARERS** ................................................. **105**

## LIST OF TABLES

TABLE                                                                PAGE NUMBER

Table 1  Issues Identified From Agency and Public Comments ......................... 6
Table 2  Estimated Number of Crews and Duration by Spread for the Amendment
         Project ............................................................................. 12
Table 3  Crossings Requiring Installation of New Equipment Bridges ............... 16
Table 4  Foreseeable and Planned Activities within the Amendment Project Area ......... 21
Table 5.  Waterbodies in the Project Area Subject to Section 10 of the Rivers and
         Harbors Act ....................................................................... 40
Table 6  Total Construction Emissions Comparison for All Open-Cut and Trenchless
         Crossings (tons)................................................................... 69

## LIST OF FIGURES

| FIGURE | | PAGE NUMBER |
|---|---|---|

Figure 1   Predicted 48.6 dBA $L_n$ Contour for the Mitigated Little Stony Creek Conventional Boring Site................................................................ 79

Figure 2   Predicted 48.6 dBA $L_n$ Contour for the Elk River Guided Conventional Bore Crossing.................................................................. 80

Figure 3   Predicted Mitigated 48.6 dBA $L_n$ Contour for the Greenbrier River Direct Pipe® Crossing ................................................................. 81

Figure 4   Predicted 48.6 dBA $L_n$ Contour for the E-012 Railroad Crossing .................. 82

Figure 5   Predicted Mitigated 48.6 dBA $L_n$ Contour for the H-016 Railroad Guided Conventional Bore Crossing Site........................................... 83

Figure 6   Predicted Unmitigated 48.6 dBA $L_n$ Contour for the H-020 Railroad Guided Conventional Bore Crossing .......................................... 84

Figure 7   Predicted Unmitigated 48.6 dBA $L_n$ Contour for the Roanoke River Microtunnel Crossing........................................................ 86

Figure 8   Predicted Unmitigated 48.6 dBA $L_n$ Contour for the Gauley River Microtunnel Crossing........................................................ 87

## APPENDICES

Appendix A:  Proposed Trenchless Crossings

Appendix B:  Project Location Maps

Appendix C:  Construction, Restoration, and Mitigation Plans for the Mountain Valley Pipeline Project and Amendment Project

Appendix D:  Estimated Bore Pit Spoil Volumes

Appendix E:  Bore Pit Underlying Geology, Depths, Aquifer Characteristics, Duration, and Estimated Groundwater Drawdown

Appendix F:  Current Environmental Justice Community Data

**App-0716**

## TECHNICAL ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| AFM | acid forming material |
| AFM Plan | Acid Forming Materials Mitigation Plan |
| Amendment Project | Mountain Valley Pipeline Amendment Project |
| APE | area of potential effects |
| BGEPA | Bald and Golden Eagle Protection Act |
| BIA | Bureau of Indian Affairs |
| CAA | Clean Air Act |
| Certificates | Order Issuing Certificates |
| CFR | Code of Federal Regulations |
| $CH_4$ | methane |
| CO | carbon monoxide |
| $CO_2$ | carbon dioxide |
| $CO_2e$ | carbon dioxide equivalents |
| COE | U.S. Army Corps of Engineers |
| Commission | Federal Energy Regulatory Commission |
| CWA | Clean Water Act |
| dB | decibels |
| dBA | decibels on the A-weighted scale |
| DWWM | Division of Water and Waste Management |
| EA | environmental assessment |
| EPA | U.S. Environmental Protection Agency |
| ESA | Endangered Species Act |
| EI | environmental inspector |
| EEP | Equitrans Expansion Project |
| Equitrans | Equitrans, L.P. |
| EO | Executive Order |
| FERC | Federal Energy Regulatory Commission |
| FEIS | final environmental impact statement |
| FHWA | Federal Highway Administration |
| FWS | U.S. Fish and Wildlife Service |
| GHG | greenhouse gases |
| GPM | gallons per minute |
| HAP | hazardous air pollutants |
| $L_{dn}$ | day-night sound level |
| $L_{eq}$ | equivalent sound level |
| MBTA | Migratory Bird Treaty Act |

iv

| | |
|---|---|
| MP | mileposts |
| Mountain Valley | Mountain Valley Pipeline, LLC |
| $N_2O$ | nitrous oxide |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| NGA | National Gas Act |
| NHPA | National Historic Preservation Act |
| NLAA | not likely to adversely affect |
| NOA | Notice of Application and Establishing Intervention Deadline |
| NOS | Scoping Notice |
| NOSS | Notice of Supplemental Scoping |
| $NO_x$ | oxides of nitrogen |
| NRCS | Natural Resources Conservation Service |
| NRHP | National Register of Historic Places |
| NSA | Noise Sensitive Area |
| OEP | Office of Energy Projects |
| Order | Order Issuing Certificates |
| PA | Programmatic Agreement |
| PEM | Palustrine Emergent |
| PFO | Palustrine Forested |
| Plan | *Upland Erosion Control, Revegetation, and Maintenance Plan* |
| $PM_{2.5}$ | particles with an aerodynamic diameter less than or equal to 2.5 microns |
| $PM_{10}$ | particles with an aerodynamic diameter less than or equal to 10 microns |
| Procedures | *Wetlands and Waterbody Construction and Mitigation Procedures* |
| PSS | Palustrine Scrub-shrub |
| RCNM | Roadway Construction Noise Model |
| $SO_2$ | sulfur dioxide |
| SPCC | Spill Prevention, Control, and Countermeasures Plan |
| SHPO | State Historic Preservation Office |
| SSURGO | Soil Survey Geographic Database |
| U.S.C | U.S. Code |
| USGCRP | U.S. Global Change Research Program |
| VDEQ | Virginia Department of Environmental Quality |
| VADHR | Virginia Department of Historic Resources |
| VOC | volatile organic compounds |
| WVDEP | West Virginia Department of Environmental Protection |
| WVDNR | West Virginia Department of Natural Resources |

v

WVDCH                    West Virginia Division of Culture and History

AR004436

**App-0719**

**SECTION A – PROPOSED ACTION**

**1.0    Introduction**

The staff of the Federal Energy Regulatory Commission (Commission or FERC) prepared this environmental assessment (EA) to assess the environmental impacts of the proposed Mountain Valley Pipeline Amendment Project (Amendment Project).  On October 13, 2017, the FERC published an Order Issuing Certificates (Order) to Mountain Valley Pipeline, LLC (Mountain Valley) and Equitrans, L.P. (Equitrans) to construct and operate pipeline, compression and metering facilities, and their related infrastructure as part of the Mountain Valley Pipeline Project and Equitrans Expansion Project (EEP).[1] The authorized Mountain Valley Pipeline Project facilities consist of approximately 304 miles of new natural gas pipeline and multiple aboveground facilities in West Virginia and Virginia.

Mountain Valley was authorized to begin construction of the Mountain Valley Pipeline Project in January 2018.  Since that date, Mountain Valley has installed and backfilled approximately 81 percent of the pipeline, and more than 52 percent of the Project right-of-way has been fully restored.  Due to permitting challenges, Mountain Valley has not been able to complete construction.  Mountain Valley has subsequently engaged in a comprehensive analysis of each remaining aquatic feature proposed to be crossed.[2]

On February 19, 2021, Mountain Valley, pursuant to section 7(c) of the Natural Gas Act (NGA), in FERC Docket No. CP21-57-000, filed an application seeking to amend the Certificate of Public Convenience and Necessity (Certificate) granted in Docket No. CP16-10-000 for its Mountain Valley Pipeline Project.  Mountain Valley proposes to change the crossing method of specific waterbodies and wetlands from open-cut dry crossings (as authorized by the Certificate) to trenchless methods (conventional bore, guided conventional bore, or Direct Pipe®[3])  Specifically, Mountain Valley proposes to use trenchless methods at 120 locations to cross 183 waterbodies and wetlands that the Commission originally authorized as open-cut dry crossings.  Five

---

1    The Amendment Project would not impact Equitrans or EEP facilities; therefore, Equitrans and EEP are not discussed further.

2    Approximately 460 streams and 183 wetlands remain to be crossed.

3    Direct Pipe® is a construction method developed by Herrenknecht AG that combines microtunneling and horizontal direction drill (HDD).

waterbodies in the Project area would be subject to Section 10 of the Rivers and Harbors Act.  These waterbodies are discussed further in section B.2.3.1 of this EA.

On February 19, 2021, Mountain Valley also voluntarily requested the U.S. Army Corps of Engineers (COE) administratively revoke its September 25, 2020 Nationwide Permit 12 verifications for the Mountain Valley Pipeline Project.  The COE granted Mountain Valley's request and revoked the Nationwide Permit 12 verifications for the Mountain Valley Pipeline Project on March 2, 2021 (Pittsburgh and Huntington Districts) and March 3, 2021 (Norfolk District).  On March 4, 2021, Mountain Valley submitted a Department of the Army application to the COE Huntington, Pittsburgh, and Norfolk Districts requesting an Individual Permit, pursuant to Section 404 of the Clean Water Act (CWA) and Section 10 of the Rivers and Harbors Act, to complete the remaining crossings that Mountain Valley would complete via the open-cut method (i.e., the remaining crossings not covered by the amendment application).  This method is consistent with the Certificate.[4]  In the Individual Permit application, Mountain Valley proposes to permanently discharge dredged and/or fill material into 1,198 linear feet of streams and 0.5 acre of wetlands, to temporarily discharge dredged and/or fill material into 38,332 linear feet of streams and 13.92 acres of wetlands, including the permanent conversion of 3.7 acres of palustrine forested (PFO) and palustrine scrub-shrub (PSS) wetlands to palustrine emergent (PEM) wetlands, and to work in navigable waters of the U.S.

We[5] prepared this EA in compliance with the requirements of the National Environmental Policy Act (NEPA), the Council on Environmental Quality's (CEQ) regulations for implementing NEPA (Title 40 Code of Federal Regulations (CFR), Parts 1500-1508 [40 CFR 1500-1508])[6], and the Commission's regulations for implementing NEPA at 18 CFR 380.

The FERC is the lead federal agency for authorizing interstate natural gas transmission facilities under the NGA, and the lead federal agency for preparation of this EA, in accordance with NEPA (40 CFR 1501) and the Energy Policy Act of 2005.  The COE is a federal cooperating agency who assisted us in preparing this EA because they

---

4     The Individual Permit would include all Section 10 streams including those that would be crossed via a trenchless method (see section B.2.3.1).

5     "We," "us," and "our" refer to the environmental staff of the FERC's Office of Energy Projects.

6     On July 16, 2020, the Council on Environmental Quality issued a final rule, Update to the Regulations Implementing the Procedural Provisions of the NEPA (Final Rule, 85 Fed. Reg. 43,304), which was effective as of September 14, 2020.  Therefore, we are using the new regulations in the preparation of this EA.

have jurisdiction by law or special expertise with respect to impacts to waters of the U.S. The COE may adopt this EA per 40 CFR 1501.8 if, after an independent review of the document, it concludes that their requirements and/or regulatory responsibilities have been satisfied. However, the COE would present its own conclusions and recommendations in its respective and applicable records of decision or determinations. Otherwise, it may elect to conduct its own supplemental environmental analyses.

The assessment of environmental impacts is an integral part of the Commission's decision-making process to determine whether to authorize Mountain Valley's proposal. Our principal purposes in preparing this EA are to:

- identify and assess potential impacts on the natural and human environment that could result from implementation of the proposed action;

- identify and recommend reasonable alternatives and specific mitigation measures, as necessary, to avoid or minimize project-related environmental impacts; and

- facilitate public involvement in the environmental review process.

The trenchless crossing methods, a small route adjustment at milepost (MP) 230.8 and alignment shift at MP 0.7, and a requested modification to allow nighttime noise activities at certain crossings were not considered in the June 23, 2017 final environmental impact statement (FEIS) issued in FERC Docket No. CP16-10-000. In the FEIS, staff assessed the impacts that would result from open-cut dry crossings of the 183 waterbodies and wetlands considered here. The FEIS concluded that no long-term or significant impacts on surface waters were anticipated and that impacts on wetlands would not be significant.

## 2.0    Purpose and Need

On October 13, 2017, the Commission issued a Certificate to Mountain Valley to construct and operate pipeline, compression and metering facilities, and their related infrastructure as part of the Mountain Valley Pipeline Project. In its amendment application, Mountain Valley states it has re-evaluated the approved Mountain Valley Pipeline Project facilities and construction methods and now proposes certain modifications (which are more specifically described below) to facilitate completion of the Mountain Valley Pipeline Project.

This EA supplements the Commission staff's June 23, 2017 FEIS for the Mountain Valley Pipeline Project. As previously mentioned, the purpose of the proposed amendment is to allow Mountain Valley to change the crossing method for specific wetlands and waterbodies that remain to be crossed from open-cut dry crossings that

were authorized by the Certificate to trenchless crossing methods.  In addition, Mountain Valley would complete a route adjustment and a minor alignment shift to avoid specific wetlands and waterbodies.  Lastly, the Amendment Project's purpose includes the ability to complete nighttime construction at certain previously approved and newly proposed trenchless crossings.

Mountain Valley states that the reason for the change in crossing method, the alignment shift, and the route adjustment is to avoid certain waters of the U.S.  As further explained below, Mountain Valley states that it conducted a detailed review of the waterbodies and wetlands that remain to be crossed on the Mountain Valley Pipeline Project route to determine whether the features could feasibly be crossed using a trenchless method or would be more practicable to use the previously authorized open-cut dry crossing method.  Open-cut dry crossings of the waterbodies and wetlands were authorized by the Certificate and do not require additional Commission authorization.  As mentioned above, Mountain Valley has separately submitted a joint Department of the Army Individual Permit application package to the COE Huntington, Pittsburgh, and Norfolk Districts requesting authorization to cross these open-cut crossings under Section 404 of the CWA and Section 10 of the Rivers and Harbors Act (as applicable).

Under section 7(c) of the NGA, the Commission determines whether interstate natural gas transportation facilities are in the public convenience and necessity and, if so, grants a Certificate to construct and operate them.  The Commission bases its decisions on both economic issues, including need, and environmental impacts.

### 3.0    Public Review and Comment

Commission Staff issued four notices soliciting public comment during the NEPA process for the Amendment Project.  On March 1, 2021, the Commission issued a *Notice of Application and Establishing Intervention Deadline* (NOA).  The NOA established a 21-day comment and intervention period and requested comments on specific concerns about the Amendment Project or issues that should be considered during the preparation of the EA.  The comment period ended on March 22, 2021.

On March 16, 2021, the Commission issued a *Notice of Scoping Period and Requesting Comments on Environmental Issues for the Proposed Amendment to the Certificate of Public Convenience and Necessity for the Mountain Valley Pipeline Project* (NOS).  The NOS established a 30-day comment period to assist with the identification of the scope of issues to address in the EA.  The scoping comment period ended on April 15, 2021.

On July 1, 2021, the Commission issued a *Notice of Supplemental Scoping Period for the Proposed Amendment to the Certificate of Public Convenience and Necessity for the Mountain Valley Pipeline Project and Request for Comments on Environmental Issues* (NOSS).  The NOSS established a second 30-day scoping period.  The supplemental scoping comment period ended on August 2, 2021.

On August 13, 2021, we issued a *Notice of Availability of the Environmental Assessment for the Proposed Mountain Valley Pipeline Amendment Project* that established a 30-day comment period on the EA.  The EA comment period will end on September 13, 2021.

In response to the NOA, NOS, and NOSS, the Commission received approximately 398 discrete comments from individuals, environmental non-profit groups, and an industry group.  We also received 1,092 form letters from individuals.  Several commenters request the original scoping comment period be extended.  We have reviewed all comment letters submitted prior to issuance of this EA, regardless of whether comments were received during or after the comment periods identified in the notices.

The pertinent[7] comments received in response to the NOA, NOS, and NOSS are summarized in table 1 below and are further addressed, as applicable, in the relevant sections of this EA.  However, other comments received that are outside the scope of our NEPA analysis are not addressed further in this EA because they are not specific to environmental resources that may be affected by the actions requested in Mountain Valley's amendment application.  Such topics may be addressed, as appropriate, in the subsequent Commission Order in this proceeding.  These comments:

- address the need for the Mountain Valley Pipeline Project and associated amendments and express opposition to fossil fuels in favor of renewable energy;

- request that a Supplemental Environmental Impact Statement be prepared for the Amendment Project;

- request a performance bond for completion of the Project or restoration if the Project is canceled or abandoned;

---

7     As stated previously, the purposes for preparing this EA are to identify and assess potential impacts on the natural and human environment and identify and recommend reasonable alternatives and specific mitigation measures, as necessary, to avoid or minimize project-related environmental impacts.  Comments that inform this analysis are considered pertinent.

- address the potential for community spread of COVID-19 by construction workers;

- request that the Commission not issue a Certificate for the Amendment Project until Mountain Valley obtains all permits necessary for completion of the entire Mountain Valley Pipeline Project, including a permit under Section 404 of the CWA for the COE-jurisdictional activities; and

- determination of whether a Section 401 certification is required for the Amendment Project.

Table 1

**Issues Identified From Agency and Public Comments**

| Issue | EA Section Addressing Issue |
|-------|------------------------------|
| Air quality, greenhouse gases, climate change (including fugitive emissions) | section B.6 Air Quality and Noise |
| Aquatic resources (including sedimentation impacts) | section B.3.1 Fisheries and Aquatic Resources |
| Cultural resources (including adherence to Section 106 of the National Historic Preservation Act [NHPA]) | section B.5 Cultural Resources |
| Geology (including karst; trenchless crossing constructability; blasting; steep terrain; and acid-producing rock) | section B.1 Geologic Hazards and Soils |
| Environmental Justice | section B.4.1 Environmental Justice |
| Noise | section B.6.2 Noise |
| Safety | section B.7 Reliability and Safety |
| Soils (including spoil storage, sedimentation, and constructability) | section B.1 Geologic Hazards and Soils |
| Surface water, groundwater, and wetlands (including water quality, sedimentation, subsidence, dewatering, and riparian buffers) | section B.2 Water Resources |
| Vegetation and wildlife (including riparian impacts) | section B.3 Fisheries, Vegetation, and Wildlife |
| Threatened and endangered species | section B.3.5 Special Status Species |

### 4.0     Proposed Facilities and Land Requirements

Mountain Valley proposes to conduct 120 trenchless crossings (117 conventional bores, 2 guided conventional bores, and 1 Direct Pipe®) of 47 wetlands and 136 streams in Wetzel, Lewis, Webster, Nicholas, Greenbrier, Summers, and Monroe counties, West Virginia and Giles, Montgomery, Roanoke, Franklin, and Pittsylvania, counties, Virginia. Appendix A of this EA provides a list of each of these crossings.  Appendix B includes maps of each of the crossings.  The change in crossing methods would not result in a change of land requirements as authorized by the October 13, 2017 Certificate.  However, Mountain Valley proposes to avoid one wetland, W-A2a, via a shift in the permanent operational right-of-way at MP 0.70, which would modify 0.23 acre that was certificated as temporary construction workspace to permanent workspace.  This is a minor shift that would occur entirely within the previously approved construction workspace and would move the pipeline closer to an existing meter station adjacent to the construction right-of-way.  The total amount of permanent certificated workspace at MP 0.70 would not change.  Mountain Valley also proposes to adjust the originally certificated pipeline centerline to avoid one waterbody (S-OO11) at MP 230.8.  This route adjustment, which also includes the H-016 railroad crossing, would require 0.13 acre for construction right-of-way and 0.04 acre of new permanent operational right-of-way.  The route adjustment at MP 230.8 would not affect new landowners and Mountain Valley has acquired the necessary land rights.

### 4.1     24-Hour Construction

As part of its amendment application, Mountain Valley requests that the Commission allow nighttime microtunneling activities at the Gauley River and Roanoke River crossings.[8]  Commission staff previously authorized Mountain Valley to change the crossing method for the Gauley and Roanoke Rivers to a microtunneling technique under variances D-35 and H-21, respectively.[9]  Additional information regarding these streams can be found in sections B.2.3.1 and B.2.4 of this EA.

Mountain Valley also proposes to conduct 24-hour trenchless crossing activities at both guided conventional bore crossings (Elk River and Little Stony Creek crossings), the Direct Pipe® crossing (Greenbrier River), and three conventional bore locations which also include railroad crossings (E-012, H-016, and H-020).  Mountain Valley states that nighttime trenchless activities would be necessary at these locations in order to reduce the

---

8       See Mountain Valley's April 27, 2021 Response to Environmental Information Request #3 at 7.

9       See accession numbers 20200518-3008 and 20200527-3040.

length of time that the pit excavations would remain open.  Crossings E-012, H-016[10], and H-020 would cross railroads operated by CSX, Roanoke Valley Resource Authority, and Norfolk Southern, respectively.  The owners of these railroads require boring operations to progress on a 24-hour basis, without stopping, until complete.  Nighttime activities would only include boring and welding of the pipe.  Pit excavations at all of these crossings would not occur at night.

### 5.0     Trenchless Crossing Construction Procedures

In contrast to open-cut dry trenching, the use of a trenchless crossing method to cross an environmental resource such as a waterbody or wetland avoids direct impacts associated with working directly within the sensitive resource.  Trenchless crossing methods allow for uninterrupted existing streamflow and undisturbed wetland soils, scrub-shrub, and herbaceous vegetation, thereby minimizing impacts on aquatic resources and wetland and wildlife habitat.  Additionally, the proposed trenchless crossings would result in reduced in-stream sedimentation as compared to the in-water construction approved for the Mountain Valley Pipeline Project.  This reduction results from less disturbance of the riparian areas adjacent to the waterbodies and avoidance of impacts on the streambed.  Lastly, trenchless crossings would avoid the ground disturbance associated with trenching and backfilling in the subject wetlands and reduce longer-term impacts by accelerating the post-construction revegetation period.

Mountain Valley provided plan and profile views of topographic conditions at each of the planned crossings relative to borehole and bore pit depths below the resource, which provides information concerning bank conditions, the depth of the pipe, and the positioning of the bore pits.[11]  Provided below is a summary of the techniques proposed.

### 5.1     Conventional Bore

As previously stated, the conventional bore method would be used for the majority (about 98 percent) of the trenchless crossings.  The conventional bore method is a technology that has been used for decades to install natural gas pipelines.  Mountain

---

10     According to Mountain Valley, the railroad at H-016 is owned by Roanoke Valley Resource Authority and operated under contract with Norfolk Southern.  This railroad provides rail service to the Smith Gap Landfill.  Mountain Valley's current permit requires a bored crossing and 24-hour boring operations.  Roanoke Valley Resource Authority is currently paving over the railroad tracks.  As of July 29, 2021 a base layer of asphalt has been installed.  Mountain Valley is currently working with the Roanoke Valley Resource Authority to modify its permit to eliminate 24-hour boring.

11     See Appendix C of accession number 20210219-5176.

**App-0727**

Valley has already successfully completed 52 conventional bores without incident.  The conventional bore method requires excavation of launching and receiving bore pits located within upland areas of the existing construction right-of-way on each side of the feature(s) being crossed.  We received multiple comments concerning bore pit collapse and maintaining the integrity of the bore pits during construction activities.  The bore pit excavations would be sloped, shored, or shielded to comply with all local, state, and federal safety regulations, including the Occupational Safety and Health Administration (OSHA) regulations for excavations, which would minimize the possibility of collapse or a lack of integrity.  According to Mountain Valley, relatively narrow excavations may use trench boxes while larger excavations may require specially designed shoring systems such as sheet pile walls, soldier pile walls, or secant pile walls.  An excavation competent person, as defined by the OSHA, would determine if excavations within stable rock require supports.  A registered professional engineer would design shoring for excavations greater than 20 feet deep.

Once the bore pits are excavated, the construction crew, working from the launching side, would advance a jacking pipe and a rotating cutting head that is attached to the leading edge of the auger string.  The spoil would be transported back by the rotation of auger flights within the steel jacking pipe.  The conventional bore method is non-steerable.

Conventional boring can be used to install pipes ranging from 4 to 60 inches in diameter and spanning lengths of up to several hundred feet.  The major advantage of conventional auger borings over other boring technologies is that the drill pipe is installed as the boring is advanced and the line pipe is installed immediately behind the bore pipe once the boring is completed, leaving no unsupported borehole.  Because the borehole is continuously supported by pipe throughout the process, the risk of bore collapse is minimized.  Accordingly, the circulation of drilling fluids to transport drill cuttings and to support the wall of the borehole is generally not necessary for the drilling of conventional bores.  However, in some situations, especially in long conventional bores or in conventional bores through mixed ground or clay, Mountain Valley may use small amounts of bentonite or polymer-based lubricant on the cutting head and exterior casing to reduce friction and to increase the success of the crossing.  If the conventional auger bore encounters excessively hard rock, an air-driven rock hammer drill can be deployed at the bore face, as needed.  Boulders and cobbles up to one third of the diameter of the installed pipe can be accommodated.

Conventional auger boring typically requires the least amount of areal footprint (workspace) of mechanical trenchless technologies because large tanks and drilling fluid-mixing systems are not required.  Cuttings (spoil) generated by boring operations would

be stockpiled temporarily at the site but would ultimately be reused to backfill the bore pits. Prior to boring operations, wetlands and waterbodies adjacent to each work site would be protected using the erosion and sediment control devices and best management practices appropriate to the specific site (as discussed in section B.2 of this EA).

We received multiple comments regarding the potential for deflection of the bore intersecting the bottom of the resource (i.e., streambed). A bore deflection that would breach the stream bottom is very unlikely to occur, for the following reasons. Mountain Valley indicates that in order to breach the streambed an average bore length (less than 95 feet) would either have to be misaligned at least 10 percent at initial set up or deflect at least 10 percent due to encountering a large rock, cobble, or interface between two rock types. Bore operators thoroughly check the line and grade prior to beginning bore operations so as to prevent a misalignment.

A deflection of at least 10 percent would measurably increase bore machine resistance which would be detectable by the bore operator. A deflection of this magnitude would also likely damage the auger and halt any forward progress. Bore operators can also detect increased resistance in the bore machine due to deflections smaller than 10 percent for longer than average bores (greater than 95 feet). Additionally, bore operators can change the cutting heads during the bore process in order to select the appropriate cutting head for the expected substrate. Potential impacts on streambeds are further discussed in section B.2.2 of this EA.

We also received comments concerning protection of the external coating of the pipe from damage during installation via a trenchless crossing method. Mountain Valley states that pipe utilized at the trenchless crossings would have an abrasion resistant overlay (ARO) over the standard fusion bonded epoxy (FBE) coating used on all pipe. Most locations would use a mill-applied Powercrete ARO coating. ARO coatings are more durable than FBE coating and designed to protect the pipe from abrasions and gouging. Mountain Valley states that ARO coatings are commonly used in trenchless crossings.

Crews would coat welds with a field-applied Powercrete coating for crossings that would require more than a standard joint of pipe, generally more than about 40 feet long. According to Mountain Valley, the field-applied Powercrete coating is designed for field application and would provide the same protection as a mill-coated ARO. Mountain Valley would check the pipe and weld coatings for pinhole defects immediately prior to installation.

Bore pit dewatering would be required to provide for a dry workspace at all trenchless crossing locations. Dewatering would be conducted in accordance with all existing plans and procedures reviewed and approved for the Mountain Valley Pipeline Project. Mountain Valley would utilize 3-inch to 6-inch diameter submersible pumps in each of the bore pits. These pumps have the ability to control groundwater infiltration rates up to 2,750 gallons per minute, although anticipated infiltration rates are substantially less (see section B.2.1 of this EA for more discussion). In some instances, pumping may require 24-hour operation to keep up with water infiltration and ensure personnel are able to enter the bore pits safely and efficiently when beginning bore activities each day. Mountain Valley provided a qualitative estimate of dewatering conditions encountered at 54 previously completed trenchless crossing locations. Dewatering was not previously necessary at 19 of the 54 locations, while minimal dewatering was necessary at 13 locations. The remaining 22 locations required continuous dewatering with 2 locations reporting extensive dewatering. Any dewatering associated with the Amendment Project would be completed in accordance with the FERC's *Wetlands and Waterbody Construction and Mitigation Procedures* (Procedures), as well as West Virginia Department of Environmental Protection (WVDEP) and Virginia Department of Environmental Quality (VADEQ) specifications. Additional information regarding dewatering can be found in section B.2.1 of this EA.

Based on Mountain Valley's estimates, the average length of time required for a conventional bore (including pit excavation and boring) would be just over 2.5 weeks (18 days), with a median duration of slightly less (13 days). More than half (about 60 percent) of the conventional bores would be completed within 2 weeks. About 26 percent would be completed within 4 weeks, 7 percent would be completed within 4 to 6 weeks, and 7 percent would be completed within 5 to 10 weeks. One conventional bore may require 72 days (10.3 weeks) to complete. Mountain Valley's duration estimates are based primarily on the length of the bore. The actual duration could increase to some extent by weather delays or slow boring rates due to unexpectedly hard rock or changing geological makeup that may necessitate equipment change-outs. Mountain Valley estimates 41 crews would be working on the nine construction spreads[12] to complete all of trenchless crossings in about 4 months. Concurrent work within each spread would occur between 3 (Spreads A and B) and 13 (Spread I) locations (see table 2).

---

12    Construction of the Mountain Valley Pipeline Project is split into nine construction spreads ranging in length from 26.6 miles to 49.2 miles.

**App-0730**

Table 2

**Estimated Number of Crews and Duration by Spread for the Amendment Project**

| Spread | Total Miles | Bore Crews | Duration (months) |
|--------|-------------|------------|-------------------|
| A & B | 65.4 | 3 | 4 |
| C & D | 62.8 | 7 | 4 |
| E & F | 66.9 | 4 | 4 |
| G | 32.3 | 8 | 4 |
| H | 26.6 | 6 | 4 |
| I | 49.2 | 13 | 4 |
| **Total** | **303.1** | **41** | **4** |

## 5.2    Guided Conventional Bore

The guided conventional bore method is a variation of the conventional bore method as discussed in section A.5.1 of this EA. Following preparation of the bore pits (as discussed in section A.5.1 of this EA), a small diameter "guided pilot" would be installed first. The drill string is attached to the front of the conventional auger during the final hole opening phase. Placing the pilot in front of the auger keeps the path of the auger on its intended trajectory during the hole opening phase.

The pilot hole can be created using a small diameter self-propelled, hydraulic steerable drill unit with a tri-cone cutting head. The tri-cone head is about 6 to 12 inches in diameter and is guided using a bottom-hole assembly. The bottom-hole assembly includes an electronic communication device (sonde) which provides location and orientation information to the operator.

The guided conventional bore method may require the use of bentonite drilling fluid to bring drill cuttings back to the surface and to help stabilize the bore hole. Shorter guided conventional bores can use only water to carry cuttings back and cool the cutting head. Extremely hard rock may require an air hammer to create the pilot hole. An air hammer uses air to remove cuttings. Where bentonite drilling fluids are used, fluids are pressurized at levels that are much lower than those used for horizontal directional drills (HDD). However, because the depth of the drill profile below the ground surface is less than what is typical for an HDD, the down-hole pressure would be monitored at the drill rig when drilling fluid or water are used to carry back cuttings and the surface is visually inspected for inadvertent returns.

**App-0731**

Following completion of the pilot hole across the length of the crossing, the drill string remains in place and the conventional auger machine completes the bore to the required diameter attaching to the drill stem to keep the auger in line.  The risk of bore hole collapse is minimized as the drill string remains in place.  The stems are then removed on the exit side as the auger advances from the launching side.

We received multiple comments concerning the storage and use of drilling fluids and the possibility of contamination in resources.  Drilling fluids would be stored in tanks on the right-of-way.  Secondary containment (such as soil berms, straw bales with liners, or prefabricated liners) would be installed around the drilling fluid tanks.  Mountain Valley would utilize vacuums and pumps to remove all fluids from the bore pit.  All drilling fluids would be disposed of at an approved local waste management facility.

Guided conventional bores typically require 24-hour operation to avoid potential collapse of the bore or freezing up of the pipe within the bore.  To reduce potential impacts from 24-hour operation, Mountain Valley would perform as much work as possible during daylight hours, including preparation of the workspace, excavation of bore pits, and moving heavy equipment to the crossing locations.

The two guided conventional bores would require 33 to 79 days to complete.  As stated above, the actual duration could increase to some extent by weather delays or slow boring rates due to unexpectedly hard rock or changing geological makeup that may necessitate equipment change-outs.

### 5.3    Direct Pipe®

Direct Pipe® is a trenchless construction method that can be used to install pipelines underneath rivers or roads without surface impacts.  It is a combination of a micro-tunneling process, described below, and HDD.  Direct Pipe® crossings are completed using an articulated, steerable micro-tunnel boring machine (MTBM) mounted on the leading end of the pipe or casing.  A bentonite slurry is used to increase lubrication and advance the MTBM.  The pipeline is pre-fabricated and welded in sections to the back of subsequent sections as the MTBM advances.  Because the product pipe is attached to and advances with the MTBM, like microtunneling, it benefits from a continuously supported hole during the drilling process, and allows for the product pipe to be installed in varying formations such as boulders and rock.  Additionally, the bentonite lubrication system used to lubricate the annulus between the product pipe and the excavation is introduced at a relatively low pressure, reducing the potential for hydraulic fracture and inadvertent drilling fluid returns.  Because the drilled hole is continuously supported and the risk of hydraulic fracture is low, the Direct Pipe®

alignment can be designed much shallower than is typical for an HDD.  During drilling, Mountain Valley will implement its approved contingency plan for inadvertent returns which includes downhole pressure monitoring.  Installation of a Direct Pipe® typically requires 24-hour operation to avoid freezing up of the pipe within the bore.  To reduce potential impacts from 24-hour operation, Mountain Valley would perform as much work as possible during daylight hours, including the preparation of the workspace, the excavation of bore pits, and moving heavy equipment to the crossing locations.

As with the guided conventional bore, drilling fluids would be stored in tanks on the right-of-way.  Secondary containment (such as soil berms, straw bales with liners, or prefabricated liners) would be installed around the drilling fluid tanks.  Mountain Valley would utilize vacuums and pumps to remove fluids from the bore pit.  All drilling fluids would be disposed of at an approved local waste management facility.

The Direct Pipe® crossing of the Greenbrier River is estimated to require about 103 days total for pit excavation and boring.  As stated above, the actual duration could increase to some extent by weather delays or slow boring rates due to unexpectedly hard rock or changing geological makeup that may necessitate equipment change-outs.

### 5.4    Microtunneling

No crossings utilizing microtunneling are proposed for the Amendment Project. Mountain Valley would utilize microtunneling to cross the Gauley River and the Roanoke River as previously approved under variances D-35 and H-21, respectively.

In a microtunnel crossing, a pipe is jacked behind a remotely controlled, steerable, guided, and articulated MTBM.  Microtunneling can be used in many soil types, including boulders and rock.  Boulders and cobbles up to one third of the diameter of the installed pipe can be accommodated.  The microtunnel technique can range from 10 to 136 inches in diameter and span 200 feet to 1,500 feet.  This technique is often used in longer trenchless crossings because the advanced control and guidance system allows for precise line and grade tolerances.  This technique requires only one bore pass and the bore hole is continuously supported minimizing the chance of a collapse.  A small amount of bentonite drilling fluid is used to cool and lubricate the cutting head.  A dedicated drilling fluid return pipe carries cuttings through the installed line pipe at a low pressure.  The closed drilling fluid return system and pressure-control features at the cutting head minimize inadvertent returns.  In addition, during drilling, Mountain Valley will implement its approved contingency plan for inadvertent returns which includes downhole pressure monitoring.  Microtunneling typically requires 24-hour operation to

avoid any potential for collapse above the bore or freezing up of the pipe within the bore hole.[13]

### 5.5    Trenchless Crossing Contingency Plans

Mountain Valley states that it would implement a contingency plan should insurmountable issues be encountered while using trenchless crossing methods, including excessive torqueing, poor cutting returns, mechanical failure of the drill string or bit assembly, deviation from the planned bore path, and unanticipated geological or hydrological conditions.  Should Mountain Valley encounter one or more of these issues, it would notify the appropriate FERC compliance monitor and attempt another bore 10 feet to either side of the original bore path within the existing right-of-way.  Should the failure involve a stuck pipe and a standard recovery fails, the pipeline in this area would be abandoned in place and backfilled with grout.  Should all attempts at the trenchless crossing fail, Mountain Valley would seek necessary variances or approvals from FERC and any applicable agency including the COE, to revise the crossing method.

### 5.6    Trenchless Crossing Schedule

Mountain Valley would begin trenchless crossings upon receipt of all necessary federal approvals and authorizations and a notice to proceed from the Commission.  Mountain Valley estimates 41 crews would be working on the nine spreads to complete all of the trenchless crossings in about 4 months.

### 6.0    Equipment Bridges

Mountain Valley states that 19 crossings still require the installation of equipment bridges to allow for the passage of equipment across the sensitive resource.  Mountain Valley anticipates that the equipment bridges, listed in table 3, would be installed at the 19 crossings.  These actions would be conducted in accordance with Mountain Valley's Procedures and any applicable agency approvals.  Impacts associated with the installation and removal of equipment bridges, including those listed in table 3, were analyzed in the FEIS.

---

13    The shallow depth profile could lead to ground settlement due to over-excavation by the MTBM leading to the loss of stability at the tunnel face and the formation of empty space above the tunnel.

Table 3

**Crossings Requiring Installation of New Equipment Bridges**

| Crossing Number | Waterbody or Wetland Features to be Bridged | Anticipated Equipment Bridge Type |
|---|---|---|
| E-009 | W-M18 | Timber mat |
| F-022 | S-19 | Clear span bridge |
| G-009 | S-G35 | Bridge |
| G-010 | S-SS4 | Bridge |
| G-017 | S-Y3 | Bridge |
| G-19B | S-E25-downstream and upstream | Bridge |
| H-030 | S-IJ82 | Bridge |
| H-031 | S-IJ83, S-IJ88, S-IJ84 | Bridge |
| H-032 | S-IJ89, S-IJ90 | Bridge |
| H-040 | S-ST9b | Bridge |
| H-042 | S-KL55 | Bridge |
| H-043 | S-IJ12 | Bridge |
| H-044 | S-EF44 | Bridge |
| H-045 | S-IJ43 | Bridge |
| H-046 | S-Y9, S-Y7, S-Y8 | Bridge |
| H-047A | S-B22, S-B23 | Bridge |
| H-048A | S-B25 | Bridge |
| H-054 | S-D11 | Bridge |
| I-121 | S-EF26 | Mat bridge[a] |
| a | As stated in the joint Department of the Army Individual Permit application, the mat bridge would have a temporary discharge of 20 linear feet (0.0092 acres) due to supports located within the ordinary high water mark.  A timber mat is used in wetlands to avoid compaction. | |

## 7.0    Environmental Compliance Inspection and Monitoring

We received multiple comments on environmental compliance and issues surrounding erosion and sediment control during construction activities associated with the Mountain Valley Pipeline Project.  Mountain Valley personnel and its contractors would be required to comply with any conditions of a FERC Order and the existing Mountain Valley Pipeline Project certificate, all mitigation measures identified in its application, and any other federal permits and authorizations.  At least one environmental inspector (EI) per spread would be responsible for Mountain Valley's environmental

compliance.  The EIs performing environmental oversight would serve to monitor the implementation of all environmental requirements during construction.  The EIs would have the authority to enforce compliance with permit conditions, the environmental conditions of a FERC Order, and environmental requirements in landowner agreements.  The FERC third-party compliance monitoring program would also continue to be implemented.[14]  Under this program, a contractor is selected by, managed by, and reports solely to the FERC staff to provide environmental compliance monitoring services.  The FERC Compliance Monitors would provide daily reports to the FERC Project Manager on compliance issues and make recommendations on how to deal with compliance issues and construction changes, should they arise.

Mountain Valley would construct the Amendment Project in accordance with the methods described in the Mountain Valley Pipeline Project FEIS, including implementing its *Erosion and Sediment Control Plan*, our *Upland Erosion Control, Revegetation, and Maintenance Plan* (Plan) and its Procedures, its *Spill Prevention, Control, and Countermeasures Plan (*SPCC*)*, its *General Blasting Plan*, and its *Acid Forming Materials Mitigation Plan* (AFM Plan).  Other resource-specific plans have been developed for the larger Mountain Valley Pipeline Project (see appendix C) and would be implemented as needed for the Amendment Project.

## 8.0    Permit Approvals and Regulatory Consultations

As discussed above, on March 4, 2021, Mountain Valley submitted a joint Department of the Army Individual Permit application package to the COE Huntington, Pittsburgh, and Norfolk Districts to complete the remaining open-cut crossings and to permanently discharge dredged and/or fill material into 1,198 linear feet of streams and 0.5 acre of wetlands, to temporarily discharge dredged and/or fill material into 38,332 linear feet of streams and 13.92 acres of wetlands, including the permanent conversion of 3.7 acres of PFO and PSS wetlands to PEM wetlands, and to work in navigable waters of the U.S.

We received many comments regarding the information contained within Mountain Valley's application to the COE for an Individual Permit.  Review of the application for an Individual Permit and consideration of associated comments will be conducted by the COE and does not fall under the jurisdiction of the Commission.  As mentioned above, the FERC has already analyzed and approved the open-cut dry

---

14    Under the current third-party compliance monitoring program for the Mountain Valley Pipeline Project, nine compliance monitors (one for each construction spread) typically inspect portions of the Project six days a week.

**App-0736**

crossings for the waterbodies and wetlands contained within the requested COE Individual Permit.

Mountain Valley would be required to continue compliance with all authorizations issued for the original Mountain Valley Pipeline Project under Section 7 of Endangered Species Act (ESA), Section 106 of the NHPA, and the pending FERC certificate, if the amendment application is approved. Additional information regarding Section 7 of the ESA can be found in section B.3 of this EA, and information regarding Section 106 of the NHPA can be found in section B.5 of this EA.

We also received multiple comments discussing the possibility of off right-of-way sedimentation caused by dewatering activities.  As noted in the FEIS, water would be discharged through sediment-removal devices in well-vegetated upland areas away from waterbodies and wetlands.  As discussed above, any water pumped from the bore pits during dewatering activities would be released back into the same drainage basin and would not be a consumptive use of groundwater from the basin, or a permanent impact on surface water flow.

Based on these measures and the others described previously, we do not anticipate long-term or significant impacts on groundwater resources as a result of construction or operation of the Amendment Project.

## 2.2    Surface Water

The Amendment Project would require the crossing of 136 surface waterbodies, which are described in appendix A.  The Amendment Project would entirely avoid stream S-OO11 at MP 230.8, which was approved in the certified Mountain Valley Pipeline Project as an open-cut dry crossing, through implementation of a minor route adjustment.  The proposed alignment shift at MP 0.7 would not affect waterbodies.

The conventional bore crossings range in length from 20 feet to 405 feet.  The guided conventional bores range from 296 feet (Elk River) to 331 feet (Little Stony Creek) in length.  The Direct Pipe® crossing of the Greenbrier River would be 1,250 feet long.  The actual waterbody crossing widths, which are shorter than the bore lengths, were listed in the FEIS.[24]  Installing the pipeline beneath these waterbodies via the three trenchless methods described previously (section A.5 of this EA) would avoid all in-water construction at these locations.  Associated waterbody stream beds and banks would also not be disturbed.

During scoping and preparation of the EA, we received comments about surface water resources concerning bore feasibility, bore hole collapse and subsidence, water quality impacts, spills and inadvertent releases, dewatering, and surface water withdrawals.  As appropriate, these comments are addressed herein.

Using trenchless crossing methods greatly reduces potential effects on surface waterbodies, particularly compared to open-cut crossings.  In general, typical pipeline effects on waterbodies are avoided with trenchless methods.  However, using these techniques, as proposed in the Amendment Project, could still affect water quality.  We

---

24    Waterbody crossing lengths are listed in appendix F-1 of the FEIS.

**App-0738**

received multiple comments concerning the possibility of erosion and off right-of-way sedimentation due to the storage of spoil from the bore pits and from the boring activities. The excavated material to create the bore pits would be placed in spoil piles within the existing pipeline right-of-way.  Stockpiled soils would be stored away from existing slopes, in flatter locations or along ridges, and placed such that they do not exceed a stable angle of repose.  Mountain Valley would implement the Project's *Erosion and Sediment Control Plans* to enhance stockpile stability and protect environmental resources downstream of bore pits and stockpiles.  Such measures would include installation of silt fence or super silt fence and temporary mulching of stockpiles.  Any spoil remaining following the completion of the bore and the backing filling of the bore pits would be evenly spread on the right-of-way.  Thus, off right-of-way sedimentation should be unlikely to occur.  Mountain Valley would use an off-site disposal facility for excess spoil as a last resort.  In addition, equipment needed for these crossings could leak, resulting in adverse effects on water quality.  To avoid and reduce these potential impacts on surface waterbodies, Mountain Valley would implement measures within its SPCC, including locating hazardous material storage and equipment refueling activities at least 100 feet from waterbodies.  These measures would reduce the potential for hazardous materials to enter waterbodies.

Regarding bore feasibility, based on available geologic data (Appendix I of Mountain Valley's amendment application[25]) and Mountain Valley's site-specific feasibility studies for the two proposed guided conventional bores (see section B.2.1 of this EA), we conclude that the Direct Pipe® crossing, and all three conventional bores that would be longer than 300 feet are feasible.  Conventional bores less than 300 feet long would be within acceptable soil types and crossing lengths for conventional boring technology and would also be feasible.  Further, Mountain Valley has already successfully completed 54 trenchless crossings of 73 waterbodies and wetlands, including 67 waterbodies and/or wetlands crossed via 52 conventional bores.  Additionally, Mountain Valley successfully crossed the Meadow River and an unnamed tributary to the Meadow River via a single Direct Pipe®, and crossed four additional waterbodies and wetlands via a single HDD at the Pigg River.  Should Mountain Valley encounter difficulties during a trenchless crossing, such as excessive torqueing, poor cutting returns, mechanical failure, deviation of the bore path, or unanticipated site conditions, Mountain Valley would implement contingency measures including shifting the bore entry point over and re-attempting the bore.  Mountain Valley would be required to seek any

---

25      See accession number 20210219-5176.

**App-0739**

necessary authorizations and agency approvals before modifying the proposed crossing method.

Water that would infiltrate into the bore pits would be pumped out as needed (see section B.2.1 of this EA). During construction, water removed from the bore pits would be discharged through sediment removal devices such as filter bags and hay bale-lined dewatering structures[26] and directed to vegetated land surfaces (where available) to control erosion and runoff unless the water was used for boring purposes as described below. Mountain Valley would continuously monitor the structure, flow rate, and volume so as not to cause erosion, compromise the dewatering structures, or result in sediment-laden water entering a sensitive resource. The discharges of water from bore pits would flow back into the same watershed. Implementation of these measures would minimize potential local and temporary effects from turbidity and sedimentation. Dewatering of bore pits would occur in lieu of trench dewatering, which was approved as part of the Mountain Valley Pipeline Project.

Bore or drill hole collapse and resulting impacts on stream bottoms would be very unlikely to occur. As the conventional bore or Direct Pipe® is advanced, the pipeline is installed immediately behind the drill pipe, thereby greatly reducing the potential for borehole collapse or subsidence. There would not be an unsupported hole during these boring or drilling activities. A pilot hole would be bored first for guided conventional bores. The potential for hole collapse would be minimized since the main bore auger would be connected to the in-place pilot hole drill string after completion of the pilot hole. The main bore hole would then be completed with the hole supported at all times. In the unlikely chance of drill or borehole collapse, the overlying streambed could subside. Subsidence of the stream bank or channel could cause erosion or sedimentation, increased turbidity, and altered flow patterns.

A bore deflection that would breach the stream bottom is also very unlikely. As previously stated, in order to breach the streambed, an average bore length (less than 95 feet) would either have to be misaligned at least 10 percent at initial set up or deflect at least 10 percent due to encountering a large rock, cobble, or interface between two rock types. Bore operators thoroughly check the line and grade prior to beginning bore operations so as to prevent a misalignment. Bore operators can also detect increased resistance in the bore machine due to deflections of less than 10 percent for bores greater

---

26    See Appendix C-2_ESCP VA AS&S_113017_Part 1.pdf and Appendix C-2_ESCP VA AS&S_113017_Part 2.pdf at accession number 20171206-5004 for filter bag and dewatering structure typical drawings.

**App-0740**

than 95 feet in length. Deflections were not encountered during the 52 previously performed conventional bores.

In the event that a conventional bore deflected substantially enough to potentially breach the stream bottom, this condition would be readily observed by the bore operator and timely corrections could be made. However, if a deflection were to breach the stream bottom, surface water would then flow into the borehole and into the bore pits. If this were to happen and the water flow could be controlled through pumping, Mountain Valley would grout the hole and reattempt the bore crossing at an adjacent location. If too much water were to enter the bore pit to maintain a dry workspace, Mountain Valley would work with the appropriate agencies to establish a repair methodology. This would most likely include grouting the bore hole and rebuilding the streambed. The guided conventional bore is steerable, thereby greatly reducing the potential for deflection during installation of the pilot hole. The Direct Pipe® also uses an advanced guidance system for steering, thereby effectively limiting the possibility of deflection.

An inadvertent release of drilling fluids could impact surface water quality. An inadvertent release of drilling fluids into a waterbody would increase turbidity and sedimentation within the affected waterbody. The use of conventional bores greatly reduces the potential for an inadvertent return as no high-pressure drilling fluid slurry would be needed. The majority of the conventional bore crossings proposed in the Amendment Project would not require the use of any drilling fluids; however, for some conventional bore crossings, like the longer conventional bores or the conventional bores through mixed ground or clay, Mountain Valley may use small amounts of bentonite or polymer-based lubricants on the cutting head and exterior casing to reduce friction and to increase the success of the crossing. Because the borehole is not filled with drilling fluids under pressure with a conventional bore, hydraulic fracturing leading to an inadvertent release would not occur. However, there is a small chance these drillings fluids could enter surface waterbodies incidentally as a result of an inadvertent spill at a workspace adjacent to the waterbody. Mountain Valley states that the drilling fluids would be of small quantities and would be non-petrochemical-based, non-hazardous, NSF-60 compliant, and that ecotoxicity data would be provided to the FERC staff, and thus are not expected to negatively impact waterbodies. Mountain Valley would submit a request to the FERC for the use of any polymer-based lubricants prior to their use.

A water-bentonite-based drilling mud mixture would be used during installation of the Direct Pipe® crossing. However, for Direct Pipe®, the drilling fluids are utilized only at the cutting face. A pressurized fluid-filled borehole is not required for Direct Pipe® drilling as the product pipe is advanced with the drill bit providing support for the drilled hole and eliminating the potential for hydraulic fracturing of the borehole and an

**App-0741**

inadvertent release of drilling fluids. The drill cuttings suspended in the drilling fluid returns are delivered back to the surface via umbilical piping inside the advancing installation pipe.

For the guided bore crossings (pilot hole drilling phase only), pressurized water or water/bentonite slurry is pumped through drill stem to pilot drill head to facilitate removal of formation cuttings. An inadvertent surface return could occur during the pilot hole drilling phase dependent on geologic strata, down-hole pressure, and overburden confining pressure. However, the drilling fluid pressures would be relatively low. Monitoring of downhole drilling pressure would be conducted by utilizing an annular pressure probe during pilot hole drilling for the guided bore method.

During construction, Mountain Valley would implement the construction practices outlined in its Procedures and its *Direct Pipe® and Horizontal Directional Drilling Contingency Plan* to reduce the potential for an impact to occur. Inadvertent releases that could occur with the pilot hole phase of the guided conventional bore or during drilling by Direct Pipe® would be much smaller compared to other trenchless methods such as HDD, where the volume of drilling fluids under pressure used is considerably higher. As with the conventional bores, any additives used for guided conventional bores and Direct Pipe® would be non-petrochemical-based, non-hazardous, NSF-60 compliant, and that ecotoxicity data would be provided to the FERC staff, and thus are not expected to negatively impact waterbodies.

Pits or containment structures could be constructed around the drilling fluid tanks to contain drilling fluid that may accidently spill on the surface of the ground, and a pump may be required to transfer the released drilling fluid from the pit or structure to a containment vessel. All drilling fluids would be disposed of at an approved local waste management facility.

The guided conventional bores of the Elk River and Little Stony Creek (40,000 gallons each) and the Direct Pipe® crossing of the Greenbrier River (600,000 gallons) would require water to prepare the slurry described above. Mountain Valley states that where possible it would obtain water to prepare the slurry from the bore pits (dewatering) and then store it in aboveground tanks. Mountain Valley stated that the Greenbrier River would serve as a backup source of water for the Greenbrier crossing if the volume obtained from the bore pits is not sufficient. Mountain Valley would coordinate with the West Virginia DEP's Division of Water and Waste Management (DWWM) and West Virginia Department of Natural Resources (WV DNR) regarding guidance, time of year restrictions, and other stream criteria if the backup water source is used. Mountain Valley would use DWWM's water withdrawal guidance tool, limit water withdrawal

from the stream to 10 percent of instantaneous flow, and would not withdraw water during low flow or drought conditions. Mountain Valley would use municipal water supply as a backup water source for the proposed crossings of the Elk River and Little Stony Creek.

The EPA commented that Mountain Valley should implement a water quality monitoring plan. Mountain Valley is in the process of installing water quality monitoring equipment on streams containing or feeding into aquatic habitat supporting listed fish species, in compliance with the U.S. Fish and Wildlife Service's (FWS) September 2020 Biological Opinion (BO).

The Amendment Project would reduce impacts on waterbodies and water quality as compared to the certificated Mountain Valley Pipeline Project. Therefore, given the analyses above, we conclude that the Amendment Project would not have a significant impact on surface waters and would result in a reduction of the impacts already disclosed and analyzed in the FEIS.

## 2.3    Wetlands

The Amendment Project would require the crossing of 47 wetlands, including 37 conventional bore crossings (46 wetlands) and one guided conventional bore crossing. The bore lengths to cross these wetlands range in length from 31 feet to 405 feet. The actual wetland crossing widths, which would be shorter than the bore lengths, were listed in the FEIS.[27] Installing the pipeline across these wetlands via trenchless methods would avoid all in-wetland construction and disturbance (reducing wetland impacts by 4.2 acres). Additionally, the Amendment Project would avoid wetland W-A2a at MP 0.7 entirely through implementation of an alignment shift and the proposed new workspace associated with a minor route adjustment at MP 230.8 would not affect wetlands. The Amendment Project would avoid disturbance and trenching of a variable buffer between the edge of the bore pits and the wetland boundary, unlike the open-cut dry crossing methods associated with the certificated Mountain Valley Pipeline Project.

Using trenchless crossing techniques greatly reduces impacts on wetlands. However, as described previously, trenchless crossing techniques could result in an underlying borehole collapse and/or subsidence or deflection of the bore path resulting in breaching of the wetland bottom. As discussed in the preceding section, the potential for borehole collapse and/or subsidence and deflection is low. Subsidence or breaching of the wetland bottom would be unlikely, but could result in increased turbidity or modified

---

27    Wetland crossing lengths are listed in appendix G-1 of the FEIS.

**App-0743**

**SECTION C – ALTERNATIVES**

In accordance with NEPA and Commission policy, we consider and evaluate alternatives to the proposed action, including the no-action alternative. These alternatives are evaluated using a specific set of criteria. The evaluation criteria applied to each alternative include a determination whether the alternative:

- meets the objective of the proposed Amendment Project;

- is technically and economically feasible and practical; and

- offers a significant environmental advantage over the proposed Amendment Project.

Through environmental comparison and application of our professional judgment, each alternative is considered (in the sequence identified above) to a point where it becomes clear if the alternative could or could not meet the three evaluation criteria. An alternative that cannot achieve the purpose for the Amendment Project cannot be considered as an acceptable replacement for the Amendment Project.

Because the proposed action does not involve the siting and construction of new facilities, our alternatives analyses are limited to considering the no-action alternative and an assessment of alternative crossing techniques.

### 1.0    No-Action Alternative

The no-action alternative is a Commission decision to not authorize the proposal presented by the project proponent in its application. Selecting the no-action alternative means that the impacts resulting from the proposed action of the Amendment Project and disclosed in this EA would not occur, at the cost of not meeting the purpose, need, and goals of the proposed action. If the no-action alternative is selected, Mountain Valley would not be authorized to change the crossing technique from open-cut dry to conventional bore, guided conventional bore, or Direct Pipe® for the 120 trenchless crossings of 183 waterbodies and wetlands.[61] Further, Mountain Valley would not be

---

61    As part of the Amendment Project, Mountain Valley also requests that the Commission allow nighttime microtunneling activities at the Gauley River and Roanoke River. Commission staff previously authorized Mountain Valley to change the crossing method for the Gauley and Roanoke Rivers to a microtunnel technique as part of our variance process. If the no-action alternative is selected, then Mountain Valley would not be authorized to conduct 24-hour microtunneling activities at these locations. Additionally, the Certificate authorized Mountain Valley to utilize a conventional bore at the H-016 railroad crossing. If the no-action *cont'd*

**App-0744**

authorized to implement a minor route adjustment at MP 230.8 to avoid waterbody S-OO11 or a minor alignment shift at MP 0.7 within the previously authorized workspace to avoid wetland W-A2a. As a result of the Commission selecting the no-action alternative, Mountain Valley could conduct the crossings via open-cut dry crossing techniques following appropriate additional Federal approvals; modify and resubmit an application for a similar or different crossing technique(s); or not construct the crossings. Given the status of construction of the Mountain Valley Pipeline Project (approximately 81 percent of the pipeline has been installed and backfilled), it is unlikely that Mountain Valley would choose to not complete the crossings. Consequently, use of the already authorized open-cut dry crossing technique is the likeliest outcome of the Commission selecting the no-action alternative.

As discussed in sections A and B above, the conventional bore, guided conventional bore, and Direct Pipe® crossings would not change the overall footprint of the Mountain Valley Pipeline Project as all trenchless crossing activities, including the bore pit excavations and Direct Pipe® staging areas, would occur entirely within the Mountain Valley Pipeline Project's already certificated right-of-way. The impacts of performing the open-cut dry crossings were discussed in the FEIS, which include temporary increases in sediments mobilized downstream due to in-stream impacts and the clearing and grading of stream banks and wetlands. As indicated in the FEIS,[62] no long-term or significant impacts on surface waters are anticipated from open-cut crossings because Mountain Valley would:

- not permanently affect the designated water uses and would bury the pipeline beneath the bed of all waterbodies;

- implement erosion and sedimentation controls;

- adhere to crossing guidelines in its Procedures; and

- restore the streambanks and streambed contours as close as practical to pre-construction conditions.

For wetland impacts, the FEIS concludes[63] that while adverse and long-term impacts on wetlands would occur, with the implementation of best management practices (BMPs) and mitigation proposed by Mountain Valley, as well as our recommendations,

---

alternative is selected, then Mountain Valley would not be authorized to conduct nighttime conventional boring activities at this location.

62    FEIS at page 4-149.

63    FEIS at page 4-163.

**App-0745**

impacts on wetlands would not be significant.  We maintain that these conclusions would apply should the no-action alternative be adopted.

However, as indicated in section B of this EA, the conventional bore, guided conventional bore, and Direct Pipe® crossing techniques would reduce environmental impacts on surface waterbodies, wetlands, and aquatic resources, as compared to the no-action alternative, because trenchless crossing methods do not result in impacts associated with constructing directly in waterbodies and wetlands, including increased turbidity and disruption to stream bank and wetland vegetation.  The conventional bore, guided conventional bore, and Direct Pipe® crossings would cause increases in air emissions and noise during the excavation and boring activities as compared to the no-action alternative; however, these impacts would be temporary and would persist for only the short duration required to complete the bores.

There would be no risk of inadvertent release of drilling fluids with the 117 conventional bores because the majority of those crossings would not require the use of drilling fluids and for those limited few that would require drilling fluids, the fluids would be of small volume and not pressurized.  Although there is a risk of inadvertent release of drilling fluids into waterbodies or wetlands with the guided conventional bore (two crossings) and Direct Pipe® (one crossing) methods, the risk is small and potential impacts would be reduced due to use of non-hazardous additives and down-hole pressure monitoring.  Further, the comparatively lower drilling pressures and smaller amounts of slurry needed compared to other trenchless crossing methods such as HDD, would also reduce the potential for impacts due to inadvertent releases from the guided conventional bores and the Direct Pipe®.

Neither the no-action alternative nor the proposed Amendment Project are anticipated to result in significant environmental impacts.  Therefore, we have determined that the no-action alternative would not offer a significant environmental advantage over the proposed Amendment Project.

## 2.0    Alternative Crossing Techniques

We received multiple comments concerning the selection of a trenchless crossing method for each waterbody and wetland crossing.  We also received comments noting that Mountain Valley previously rejected boring of waterbodies and wetlands as too costly and risky during the application process for the Mountain Valley Pipeline Project.

As mentioned previously, various legal, regulatory, and permitting challenges have prevented Mountain Valley from completing construction of the Mountain Valley Pipeline Project as previously certificated.  As such, Mountain Valley reevaluated the

crossing method for all remaining crossings.  As part of its Individual Permit application,[64] Mountain Valley provided an explanation, including cost information, for each crossing method determination.

Mountain Valley evaluated a total of eight alternative stream and wetland pipeline crossing methods.  The crossing methods can be generally categorized as either open-cut methods—meaning that a trench is excavated in the stream or wetland to install the pipe—or trenchless methods—meaning the pipe is installed with specialized equipment that bores or tunnels under or bridges over the resource.

As previously indicated, other trenchless technologies, besides the conventional bore methodology, were selected for some streams.  Mountain Valley indicated that a guided conventional bore was selected for the Elk River because there are large boulders within the crossing, the stream depth would reduce available workspace if the stream was diverted for a dry-ditch open-cut crossing, and a trenchless crossing would further minimize impacts on mussel species.  A guided conventional bore was selected for Little Stony Creek and its tributaries because it would minimize impacts on the streams.  Direct Pipe® technology was selected for the Greenbrier River because the stream depth would reduce available workspace if the stream was diverted for a dry-ditch open-cut crossing and a trenchless crossing would further minimize impacts on mussel species.

As discussed in section B.2.2, the Mountain Valley Pipeline Project would cross five Section 10 streams.  All of these streams, except for the Blackwater River, would be crossed via a trenchless crossing method.  We have included the following discussion in order to support the COE's review of the joint application for Section 10 regulated streams.  At the Blackwater River crossing, Mountain Valley stated that site conditions do not provide adequate space to stockpile spoil from bore pits that would be almost 40-feet-deep.  We reviewed the Blackwater River crossing location and confirmed that there may not be space for spoil storage within the limits of disturbance and the slope on one side of the stream may not be conducive to a trenchless crossing.

Although differences exist in the specific construction techniques and associated risks with each type of trenchless crossings, the avoidance of in-stream construction and its protective nature on the sensitive resources and associated riparian zones are generally the same.  As such, we have determined the use of one trenchless crossing method does not offer a significant environmental advantage when compared to another trenchless

---

64    See MVP COE Individual Permit application (table 15) at accession number 20210304-5122.

**App-0747**

crossing method.  As such, alternatives relating to the specific trenchless techniques proposed by Mountain Valley based on the screening criteria below were not considered.

### 2.1    Screening Criteria

The construction method proposed for each crossing in the Amendment Project was the result of a feasibility analysis conducted by Mountain Valley to compare trenchless methods, predominantly conventional and guided bores, with the previously approved open-cut crossing methods for the sensitive resources.  The factors evaluated include bore pit depths, the presence of steep slopes on one or both sides of the crossing, stream width and depth, the presence of karst terrain, other feasibility concerns, and workspace constraints such as the presence of existing utilities and infrastructure.  These factors are more fully described in Mountain Valley's Individual Permit application, and are summarized below.

### Bore Pit Depth

For each crossing, Mountain Valley determined the depth of the two bore pits that would be necessary to complete the crossing.  That determination accounted for the pipe installation depth below the stream or wetland, the steepness and length of the slopes on both sides of the crossing, and the difference in elevation between the launch and receiving bore pit.  Mountain Valley also evaluated the volume of material to be excavated against the available working area to determine the approximate available workspace.  As discussed below, the compounding effect of limited workspace for material storage and site access hindered by long and steep slopes requiring winching of materials, equipment, and trench spoils, was evaluated with respect to its impact on the overall construction time and costs, and potential safety concerns.

Deep bore pits require a greater workspace area for equipment and spoils from the excavations the sides of the bore pit would need to have one or a series of horizontal levels or steps (benching) to create a safe working environment for work crew and equipment.  Additionally, deeper bore pits can expose a greater thickness of saturated subsurface material below the water table necessitating additional dewatering to keep the bore pits dry for the duration of the drill.  If site conditions are acceptable, trenchless crossing methods are generally considered technically and logistically achievable for any crossing where adequate workspace for equipment and trench spoil storage is available.  However, technical and logistical challenges associated with deeper bore pits, along with the resultant additional construction timing and costs when weighed against traditional open-cut crossings, can make conventional bore crossings less practicable.

**App-0748**

**Steep Slopes**

Mountain Valley evaluated each crossing to determine if the presence of steep slopes on one or both approaches to the stream or wetland would make trenchless crossing methods impracticable. That evaluation primarily accounted for two criteria: slope steepness and slope length. Slopes with grades generally in excess of 30 percent typically require winching of equipment to work safely on the slope. Winching can be utilized on shorter slopes to conduct many pipeline construction activities. As slope lengths increase, additional pieces of heavy machinery must be winched together and anchored to the top of the slope, in daisy-chain fashion down the hillside. Based on generally accepted standard industry construction practices and professional pipeline construction experience, operating the equipment necessary to excavate a bore pit on slopes that require winching presents additional complicating factors. In particular, operating excavation equipment on the edge of a bore pit while winched to multiple pieces of equipment presents a heightened safety risk to equipment operators and other crew members.

Similarly, moving and storing spoil piles on steep slopes presents an additional layer of logistical challenges, as well as compounding safety and environmental risks. If there was not sufficient workspace adjacent to a crossing to store excavated materials, Mountain Valley evaluated the logistics of hauling materials to a suitable location for staging. The use of daisy-chained winch tractors to haul excavation materials across steep slopes for long distances requires an increased quantity of equipment. For example, due to limitations in winch cable length, hauling a load of spoil across a steep slope more than 400 feet in length would require four pieces of heavy equipment – one to hold the load and three to winch in daisy-chained fashion. The site logistics of winching multiple pieces of equipment on a 75-foot to 125-foot right-of-way could render such an operation impracticable. This deployment of multiple pieces of equipment on a steep slope increases worker safety risk. In addition, hauling excavation spoils across a steep slope creates an environmental risk of dropping spoils down the slope and potentially off right-of-way.

Therefore, Mountain Valley considered excavating bore pits on steep slopes greater than 30 percent to be generally possible, but would introduce additional safety and environmental risk. However, the compounding effect of unavailable storage space for bore pit excavation materials, steep slopes, and long winch hills over 400 feet generally make a conventional bore crossing in these scenarios impracticable.

**Stream Depth**

Stream depth may be a limiting factor on the use of the dry-ditch open-cut method. The technical, logistical, and safety challenges for the dry-ditch open-cut crossing method increase with stream depth. Based on generally accepted standard industry construction practices, professional pipeline construction experience, and, most significantly, the limited workspace available for Project crossings, Mountain Valley concluded that it is not advisable and may not be practicable, in most cases, to use the dry-ditch open-cut crossing method for streams deeper than 36 inches.

A dry-ditch, open-cut crossing can be accomplished using dam and pump, flume pipe diversion, or cofferdam methods to dewater the stream for pipeline installation. With any of these methods, a dam structure is needed to keep the stream from flowing through the workspace. In order to reduce impacts, the construction right-of-way for stream crossings is reduced from the normal 125-foot-width to 75 feet. Thus, sufficient room for the dam, pump, and construction activities is limited. The dam must be at least as tall as the depth of the stream plus a minimum amount of freeboard to ensure safe working conditions. For deeper streams, such as those greater than 36 inches, the most common and commercially available type of dam utilized is a bladder dam. Based on manufacturer's specifications, a four-foot-tall dam can support a maximum water depth of 36 inches. The footprint and manufacturer recommended clearance for a dam this size is 22-feet-wide. In a non-cofferdam installation, the dam on the back side can usually be lower and constructed with sandbags and is estimated to occupy a 9-foot-wide footprint. After allowing for space for a pump and discharge structure, a 34-foot workspace remains within the reduced 75-foot-wide right-of-way to install the pipe. Assuming the pipe is installed a minimum of five-feet-deep, in type C soil conditions,[65] and performing installation with equipment from an adjacent bridge, this workspace is just sufficient to excavate a trench and lower in pipe. For water depths greater than 36 inches, a larger dam would be necessary, which increases the footprint and manufacturer recommended clearance—further intruding into the limited workspace available.

For these reasons, Mountain Valley concluded that the dry-ditch open-cut crossing method is not a practicable alternative for stream depths greater than three feet deep. Stream depth is not a relevant consideration for trenchless crossing methods as long as it

---

[65] Type C soil is the least stable type of soil. Type C includes granular soils in which particles don't stick together and cohesive soils with a low unconfined compressive strength; 0.5 tons per square foot or less. United States Department of Labor – Occupational Health and Safety Administration Soil Classification Transcript. Accessed at: https://www.osha.gov/dts/vtools/construction/soil_testing_fnl_eng_web_transcript.html.

**App-0750**

is feasible to excavate bore pits for conventional bores to the proper depth to allow for crossing under the stream.

**Karst**

Mature karst bedrock aquifers are characterized by conduit flow systems and rapid transit times for groundwater, which can introduce sediment and surface contamination at long distance over short time frames downgradient from a work area. Additionally, greater rates of pumping may be necessary in these aquifers to keep the bore pits dry for the duration of the bore. However, the risk of boring through karst can be mitigated through avoidance of subsurface karst features that can be identified using geophysical methods.

Work conducted in karst terrain is more easily identified in a dry-ditch open-cut crossing than in a bore. Preference is given to dry-ditch open-cut crossings through karst geology to the extent an open-cut crossing is practicable. However, when a trenchless crossing method is used through karst terrain, any potential karst voids are observable during the trenching process and therefore, immediate mitigation measures can be implemented.

### 2.2    Alternative Crossing Techniques Conclusion

We have reviewed Mountain Valley's feasibility analysis and agree that the trenchless crossing techniques selected for the Amendment Project waterbodies and wetlands are feasible and appropriate.

According to Mountain Valley:

- eight sites were chosen for a conventional bore because they were adjacent to already approved bores of railroads and/or roadways and only required increasing the length of the bores;

- another 35 sites were selected for a conventional bore crossing to avoid direct aquatic impacts on possible orangefin madtom habitat, Roanoke logperch habitat, and/or because the waterbody is considered a trout stream;

- one site was chosen as a conventional bore because it is a wide and deep river with high flow conditions;

- two sites were chosen as guided conventional bore because of large boulders, stream depth, and to avoid direct aquatic impacts on mussel species;

**App-0751**

- one site was chosen as a Direct Pipe® due to stream depth and to avoid direct aquatic impacts on mussel species; and

- the remaining 73 conventional bore locations did not have a significant constraint regarding installation method or a significant environmental impact relevant to the available installation methods.

As such, we have determined that completing the 120 trenchless crossings of 183 waterbodies and wetlands by open-cut dry methods would not offer a significant environmental advantage over the proposed Amendment Project and do not recommend any alternatives to the proposed action.

Waterbodies and wetlands originally approved as open-cut dry crossings that remained open-cut dry crossings following the feasibility analysis were evaluated in the FEIS. As stated in the FEIS, open-cut dry crossing methods would appropriately minimize turbidity and sedimentation and no long-term or significant impacts on surface waters are anticipated as a result of the Mountain Valley Pipeline Project. The features designated for open-cut dry crossings are included in Mountain Valley's Individual Permit application currently under review by the COE.

### 3.0    Conclusion

After reviewing the alternatives to the proposed Amendment Project, we conclude that none of the alternatives would satisfy the evaluation criteria. In summary, we have determined that the proposed action, as modified by our recommended mitigation measures, is the preferred alternative to meet the Amendment Project's objectives.

Environ Monit Assess (2007) 132:395 409
DOI 10.1007/s10661 006 9542 9

EXHIBIT
14

# Review of the effects of in-stream pipeline crossing construction on aquatic ecosystems and examination of Canadian methodologies for impact assessment

**Lucie M. Lévesque · Monique G. Dubé**

Received: 13 June 2006 / Accepted: 26 September 2006 / Published online: 15 February 2007
© Springer Science + Business Media B.V. 2007

**Abstract** Pipeline crossing construction alters river and stream channels, hence may have detrimental effects on aquatic ecosystems. This review examines the effects of crossing construction on fish and fish habitat in rivers and streams, and recommends an approach to monitoring and assessment of impacts associated with these activities. Pipeline crossing construction is shown to not only compromise the integrity of the physical and chemical nature of fish habitat, but also to affect biological habitat (e.g., benthic invertebrates and invertebrate drift), and fish behavior and physiology. Indicators of effect include: water quality (total suspended solids TSS), physical habitat (substrate particle size, channel morphology), benthic invertebrate community structure and drift (abundance, species composition, diversity, standing crop), and fish behavior and physiology (hierarchy, feeding, respiration rate, loss of equilibrium, blood hematocrit and leukocrit levels, heart rate and stroke volume). The Before-After-Control-Impact (BACI) approach, which is often applied in Environmental Effects Monitoring (EEM), is recommended as a basis for impact assessment, as is consideration of site-specific sensitivies, assessment of significance, and cumulative effects.

**Keywords** Environmental effects monitoring · Fish habitat · Impact assessment · Pipeline crossing · Rivers and streams

## 1 Introduction

Pipeline crossing construction has the potential to negatively affect watercourse ecosystems (Zwirn 2002). Construction activities alter river and stream channel beds and banks, directly and indirectly affecting fish and fish habitat. In light of pipeline construction projects that have been proposed for such areas as the Mackenzie River valley in northern Canada, the ecological impacts of these activities, as well as their potential for cumulative effects, need to be understood and their methods of assessment thoroughly considered (Lévesque 2005). This document briefly outlines below-ground pipeline crossing construction methods, their potential to affect aquatic ecosystems, and Canadian regulations surrounding these activities. Impact assessment methodologies applied in Environmental Impact Assessments (EIAs) of pipeline crossing projects in Canadian waters are

L. M. Lévesque (✉)
National Hydrology Research Center,
11 Innovation Blvd.,
Saskatoon, SK S7N 3H5, Canada
e mail: lucie.levesque@ec.gc.ca

M. G. Dubé
University of Saskatchewan,
Toxicology Centre, 44 Campus Drive,
Saskatoon, SK S7N 5B3, Canada
e mail: monique.dube@usask.ca

Springer

App-0753

examined and compared with documented effects of crossing construction and short-term sediment disturbances on aquatic ecosystems. Through this, indicators of impacts associated with pipeline crossing construction are identified, and recommendations for more effective impact assessment methodology are made.

## 2 Pipeline crossing construction methods, potential for effect, and regulation

Pipeline crossings of streams and rivers are conducted using a variety of techniques. These include below- and above-ground methods, which disturb aquatic ecosystems to varying degrees (Zwirn 2002). Below-ground methods of crossing construction have greater potential to impact aquatic ecosystems than do above-ground methods (e.g., bridge), which typically do not involve in-stream activity. Among the most common methods of below-ground crossing construction are i) open-cut, in which crossing construction occurs without diversion of stream flow, ii) isolated, in which the stream channel is isolated for construction, with water temporarily diverted downstream, and iii) horizontal directional drilling (HDD or trenchless), in which a tunnel is drilled beneath the river channel.

Each of these crossing construction methods may impact watercourse ecosystems both during, and for potentially some time after, construction. All in-stream construction activities, particularly trench excavation and pipeline installation and backfill, result in disturbance of channel bed and banks, and have the potential to alter suspended sediment concentrations and sedimentation. Anderson et al. (1996) and Reid et al. (2003) emphasize that such activities are episodic in nature, and generate numerous, short-term pulses of highly concentrated suspended sediments. Selection of construction methods that are less destructive (e.g., HDD), however, will reduce impacts. Reid et al. (2002a, 2004) concluded that isolated construction methods more effectively mitigate increased sediment-loading than do open-cut methods, and eliminate the risk of frac-out (i.e., release of drilling fluids from HDD). Integration of site-specific physical and biological considerations into construction design may also limit impacts. For example, open-cut construction typically generates greater sediment loads than does isolated construction, hence the former is often applied during winter construction and in streams that freeze to the bed. Regardless, any in-stream construction activity has the potential to impact aquatic ecosystems through alteration of stream and river bed and banks and, therefore, may result in direct effects such as physical alteration of channel morphology and habitat, and indirect effects such as alteration of water quality and sediment dynamics, on aquatic ecosystems (e.g., Alberta Environment 2001; Alberta Transportation and Utilities 2000).

As such, crossing construction activities in Canada are regulated under the *Fisheries Act* (Department of Justice Canada 1985). The *Act* is triggered by the potential for crossing construction to result in "harmful alteration, disruption or destruction of fish habitat" (HADD – Section 35). Fish habitat is therein defined as "spawning grounds and nursery, rearing, food supply and migration areas on which fish depend directly or indirectly in order to carry out their life processes." This definition of habitat may, therefore, be considered to include: the organisms upon which fish feed, such as plankton, algae, invertebrates and fish, and the habitat upon which these organisms depend, including overhanging and aquatic vegetation, woody debris and streambed materials; conditions for reproduction including substrate, water temperature and velocity; cover for protection from predators and high flow velocities such as rocks and debris, bed and bank vegetation and pools); and open water for movement between stream and river reaches over various life stages; and appropriate water quality including dissolved oxygen or DO, pH, major ions, metals and toxics. All of these habitat features may affect fish behavior and physiology, and hence survival, growth and reproductive success (Alberta Transportation and Utilities 2000). An Environmental Impact Assessment must be completed for proposed crossings that require approval under Section 35 of the *Fisheries Act*. The *Canadian Environmental Assessment Act* (CEAA; Department of Justice Canada 1992) defines the responsibilities and regulations governing these assessments, including assessment of environmental effects associated with "physical activities carried out in a water body," determination of the significance of the effects, and mitigation of effects.



AR005670                                                                    App-0754

Environ Monit Assess (2007) 132:395 409

## 3 Environmental impact assessment and monitoring of effects

The *Fisheries Act* and the *CEAA* require that physical activities that occur both in and adjacent to water bodies, and that have the potential to alter or harmfully affect fish habitat or fish, be preceded by an Environmental Impact Assessment. The EIA determines the direction, extent, magnitude, duration and significance of impacts. The following examples of EIAs for pipeline crossing construction projects in Canadian waters provide an indication of the potential impacts of these activities on aquatic ecosystems and the proposed monitoring of effects.

The Mackenzie Gas Project (Imperial Oil Resources Ventures Limited 2004) proposed the construction of greater than 1,200 km of pipeline, with more than 500 stream and river crossings, along the Mackenzie Valley in the Northwest Territories. The EIA for this project identified that crossing construction activities have the potential to impact watercourses in three ways. First, construction may affect channel morphology through modification of suspended solids concentrations and hydrological characteristics of the channel. Second, in-stream activities may affect water (and sediment) quality via alteration of TSS, DO, total dissolved solids (TDS), nutrients, water temperature and turbidity, as well as particulate total organic carbon, grain size, metals and polycylic aromatic hydrocarbons (PAHs). Third, crossing construction has the potential to impact fish and fish habitat through modification of (1) fish habitat with changes in cover, channel morphology and sediment deposition, (2) fish health with changes in water quality, and (3) fish abundance and distribution with changes in habitat, health and water quality. Monitoring during construction was to include measurement of turbidity and TSS. Monitoring after the completion of construction was to include evaluation of habitat quality and availability via examination of bed and bank stability and revegetation at, and downstream of, construction. Monitoring of fish health, fish distribution and abundance was also specified, and included measurements of turbidity, DO, pH, fish abnormalities, species composition and diversity, and habitat use. The assessment concluded that pipeline crossing construction would not have significant effects on watercourse hydrology, water and sediment quality,

and fish and fish habitat, due primarily to mitigative measures and the expected short-term nature and localized geographic extent of the effects (Imperial Oil Resources Ventures Limited 2004).

Firebag In-Situ Oil Sands Project (Suncor Energy 2000) proposed numerous pipeline crossings of streams in the province of Alberta. Much like that above, this assessment identified the potential effects of construction on fish and fish habitat as those associated with physical changes to channel bed and banks directly via construction and indirectly via altered sediment deposition. Altered water quality, including TSS and deleterious substances, such as hydrocarbons from the channel bed, and modified hydrology with sediment entrainment and changes to channel morphology were also identified as potential sources of impact. Recommendations to assess the effectiveness of mitigation measures included monitoring of stream bed profile and substrate before and after in-stream construction, and monitoring of TSS and hydrocarbons during in-stream construction activities.

Other small-scale open-cut and isolated pipeline crossings have been proposed for streams and rivers in Alberta (Burlington Resources Canada Energy Ltd. 2001; ConocoPhillips Canada Resources Corp. 2004; Devon Canada Corporation 2004; Petro-Canada Oil and Gas 2005; Talisman Energy Inc. 2004). The potential effects of these proposed crossings on aquatic ecosystems were identified as including those on fish and fish habitat (i.e., bed and banks, hence substrate, sediment, and both in-stream and riparian cover) and water quality (i.e., concentrations of silt and deleterious substances). Measures that were implemented or recommended by these projects to assess the effectiveness of mitigation included monitoring of water quality (TSS, turbidity, DO) and, through site photos before and/or after construction, monitoring of physical stability of bed and banks, vegetation characteristics and erosion/sedimentation. Biological monitoring was also proposed in some cases; this consisted of TSS monitoring upstream and downstream of construction, before, during and after in-stream activity and comparison of TSS levels to guidelines for the protection of freshwater aquatic life.

EIAs have, therefore, identified alteration, disturbance or destruction of fish habitat as the primary potential effect of pipeline crossing construction on

🍀 Springer

aquatic ecosystems. Mitigative measures proposed in the above assessments were considered to be effective in reducing impacts of pipeline crossing construction to levels that were not significant. These measures included: site-specific selection of construction method (e.g., isolated for streams with under-ice water, and HDD for large, fish-inhabited rivers), timing and location (i.e., avoidance of sensitive life stages such as spawning, avoidance of fish habitat); limitation of duration of in-stream activities; establishment of drainage and erosion controls; reclamation of bed and banks, including substrate composition and cover, vegetation establishment, stabilization of slopes; and, biological monitoring during and after construction, often consisting of TSS measurement and comparisons to guidelines for the protection of aquatic life.

## 4 Documented effects of pipeline crossing construction on aquatic ecosystems

The effects of pipeline crossing construction on aquatic ecosystems have been studied by authors including Reid et al. (2004, 2003, 2002a, b), Anderson et al. (1998), Armitage and Gunn (1996), Young and Mackie (1991), and Tsui and McCart (1981). These studies have documented effects of crossing construction on stream and river TSS, invertebrates and fish in association with elevated suspended solids concentrations and increased sediment deposition.

Reid and Anderson (2000) documented the effects of isolated pipeline crossing construction on watercourses in northwestern Alberta. Mean TSS concentrations increased by between 4 and 100 mg l$^{-1}$ above background. Installation of dams and flumes for water diversion generated TSS concentrations on average less than 76 mg l$^{-1}$ greater than background over periods of 2 to 16.5 h (with one crossing experiencing an increase of 520 mg l$^{-1}$ for 3 h). Removal of dams and flumes resulted in TSS increases of between 1 and 703 mg l$^{-1}$ downstream of construction over periods of 20 min to 6.5 h. Other stages of construction were associated with average TSS increases of less than 8 mg l$^{-1}$, with exception of accidental leaks from construction infrastructure (e.g., 820 mg l$^{-1}$ over 5.5 h). Plumes of highly turbid water were observed downstream of construction. This was

particularly evident at crossing sites with bed and bank materials consisting of fine-grained sediments and soils, and at those with rapidly flowing waters. Although suspended sediment concentrations increased with installation and removal of dams and flumes, and with leaks during construction, particle size distribution of bed materials did not change considerably.

Reid et al. (2002a), in examining the effects of isolated crossing construction on sediment, habitat and fish of watercourses in Minnesota (United States), Nova Scotia and Ontario, also found elevated TSS concentrations downstream of crossing sites. These increases were associated with installation and removal of construction infrastructure, as well as with leakage of sediment-laden waters from an upland sump. Total suspended solids concentrations increased downstream of all construction sites by between less than 4 and 80 mg l$^{-1}$ above background, on average, and by up to nearly 1,500 mg l$^{-1}$ with removal of infrastructure. These increases in TSS concentrations were of relatively short duration, with rapid return to background levels as in-stream activities came to completion (e.g., within approximately 1 to 10 h of cessation of in-stream activities). Fine-textured sediments that accumulated on the channel beds were cleared by subsequent stream flows.

Such effects of crossing construction on TSS concentrations and sediment deposition have been shown to have considerable effects on stream and river substrates and benthic invertebrate communities. Young and Mackie (1991) observed that pipeline crossing construction in Hodgson Creek, Northwest Territories, resulted in increased suspended solids concentrations, to levels >300 mg l$^{-1}$ above background on average, peaking near 3,000 mg l$^{-1}$, and dropping to <10 mg l$^{-1}$ within 4 days. The authors also observed increased benthic invertebrate drift density and standing crop downstream of construction, with no change in species richness. These effects lasted up to 5 weeks and were no longer apparent after passage of spring freshet. Anderson et al. (1998), in studying the effects of open-cut crossing construction on channel morphology, invertebrates and fish in Findlay Creek, Ontario, found that construction activities generated elevated suspended sediment concentrations, which reached up to 3,000 mg l$^{-1}$ above background with excavation and backfilling, decreased to <40 mg l$^{-1}$ within 4 h of the completion

AR005672

Environ Monit Assess (2007) 132:395 409                                                                399

of construction, and returned to near background within 24 h. Effects included minimal sediment deposition and erosion downstream of construction, increased invertebrate drift density, and altered species composition of drift and benthic invertebrate communities, the latter of which lasted for a period of at least 1 year. Armitage and Gunn (1996) noted that pipeline crossing construction in a stream in England resulted in a shift in invertebrate species due to an increased proportion of silt in stream substrates. This effect persisted for 4 years until a high magnitude flow event scoured the stream channel bed, promoting re-establishment of pre-construction invertebrate species. Tsui and McCart (1981) found that crossing construction of Archibald Creek, British Columbia, caused short-term increases in silt and sand accumulations and decreases in invertebrate standing crop and diversity, which lasted 1 to 2 years.

Pipeline crossing construction has also been shown to have effects on fish. The study by Anderson et al. (1998), in addition to noting changes in invertebrate communities, found that the abundance of brook trout and forage fish (e.g., yellow perch, northern redbelly dace) decreased downstream of an open-cut crossing. This effect lasted for a period of nearly 12 weeks, with recovery of abundance occurring at the same time as flow-related removal of disturbed sediments from the bed. Reid et al. (2002a, 2004) found that although suspended sediment concentrations increased with the construction of isolated stream crossings in Canada and the United States, fish abundance did not vary in a manner beyond that occurring naturally. Reid et al. (2002b) examined the behavioral responses of fish to open-cut crossing construction in Wildhay River, Alberta. The movement of Arctic grayling and mountain whitefish, which was tracked before, during and after pipeline installation, indicated that fish avoidance of elevated suspended sediment concentrations was minimal. This was attributed to low suspended sediment concentrations, lack of habitat alteration, and the occurrence of, hence adaptation of fish to, high natural sediment-loadings in this river (i.e., spring run-off and storm events).

More recently, Reid et al. (2003) conducted the first detailed examination of the effects of pipeline crossing construction on fish physiology. The study consisted of simulated crossings on a creek in Alberta

and a river in Ontario, in which TSS concentrations upstream and downstream of construction were raised to between 55 and 70 mg l$^{-1}$, peaking at greater than 1,400 mg l$^{-1}$ downstream. Most sand settled out of the water column within 100 m of construction. The study found that gill damage and mortality of rainbow trout did not increase with fish exposure to elevated sediment loading. Physiological stress, however, increased, as reflected by elevated rates of respiration (i.e., oxygen consumption) and loss of equilibrium, as well as by altered blood hematocrit levels (indicating potential damage to, hence lower oxygen transfer across, gills). Reid et al. (2003) found these results to be consistent with acute stress response to high TSS levels as defined by Newcombe and Jensen (1996; see Section 5 for further discussion). The authors also found that elevated physiological stress associated with the simulated crossings was most pronounced in the river than in the creek, likely due to the predominance of coarse-grained sand in the former. The authors suggest that differences in oxygen consumption rates and mean time to death between sites upstream and downstream of the simulated construction may have been attributable to the acute TSS exposure of fish downstream, which impaired the short-term capacity of rainbow trout to tolerate hypoxia.

# 5 Sediment as a stressor

EIAs for pipeline watercourse crossings (Section 3) and literature documenting the effects of crossing construction on aquatic ecosystems (Section 4) both identify sediment as the primary stressor of crossing construction on river and stream ecosystems. The Alberta Transportation and Utilities (2000) *Fish Habitat Manual: Guidelines and Procedures for Watercourse Crossings in Alberta* and the Alberta Environment (2001) *Code of Practice for Pipelines and Telecommunication Lines Crossing a Water Body* also identify sediment as a significant stressor associated with construction of watercourse crossings. Altered sediment transport dynamics have the potential to modify habitat and invertebrate communities, and to directly affect fish behavior and physiology. Please see Wood and Armitage (1997), Anderson et al. (1996), Waters (1995), and Newcombe and MacDonald (1991) for further discussion.

Springer

**App-0757**

Environ Monit Assess (2007) 132:395 409

5.1 Benthic invertebrates (fish habitat)

Many benthic invertebrate species thrive in coarse-grained substrates. River and stream beds of gravel and cobble provide pore spaces that benthic invertebrates use for attachment, protection, feeding, and oxygen consumption (Mayhood 1998; Wood and Armitage 1997). Those species that reside in coarse-rather than fine-grained substrates are typically the preferred prey for fish (DFO 2000). As such, altered sediment-loading and sedimentation will have implications not only for benthic invertebrates, but for fish as well. This section examines the potential effects of increased sediment-loading on invertebrates, and explores documented effects of chronic and acute sediment releases on these biota.

Increased sediment-loading may have detrimental effects on benthic invertebrates in streams (Anderson et al. 1996; DFO 2000). For example, the productivity of invertebrate grazers may decrease in response to reduced food availability as turbidity and scour/burial increase. The efficiency and growth of filter feeders may be reduced with clogging of filter apparatuses. Mortality may increase as sediment accumulates on coarse substrates and in interstitial spaces, increasing oxygen depletion and abrasion of respiratory surfaces. Sediment not only has the potential to directly affect the health and productivity of invertebrates, but may also affect community characteristics. For example, species composition and density of invertebrates are known to vary with substrate porosity and associated exchanges of water, organic matter, nutrients, oxygen and biota between the water column, groundwater and stream bed substrates (Malard et al. 2002).

Chronic increases in sediment-loading occurring in association with catchment land-use practices have been found to affect invertebrate communities in streams. For example, Roy et al. (2003) found that invertebrate diversity in forested and urbanized streams in Georgia, United States, varied with the texture of bed substrates. Less diverse and more tolerant taxa occurred in stream reaches that were exposed to increased turbidity, nutrients, and specific conductance generated by riparian disturbance. In a similar study, Freeman and Schorr (2004) noted that increased TSS concentration and sediment accumulation in small, urban streams in the United States resulted in increased abundance of tolerant, and decreased richness of sensitive invertebrates. Abundance of sensitive taxa, filterers, and predators was also reduced in these streams. Armitage and Gunn (1996) found that benthic invertebrate species composition in English streams that were exposed to various, low-intensity disturbances and short-term construction activities was attributable to altered stream substrate.

Acute increases in sediment-loading have also been documented as having effects on invertebrates. For example, Shaw and Richardson (2001) examined the effects of short-term sediment exposure on invertebrates (and fish) of Moffat Creek, British Columbia. Biota were exposed to sediment pulses of between 0 and 6 h duration over a period of 19 days. Invertebrate communities were most affected by exposure to sediment pulses of long duration (e.g., 6 h), the effects of which were apparent after 9 days (or five events) of exposure. Effects included decreased benthic invertebrate abundance and richness, particularly with respect to more sensitive taxa, as well as increased drift abundance and decreased drift richness. Barton (1977), however, found few effects of short-term sediment exposure on invertebrate communities exposed to culvert crossing construction in an Ontario stream. Although in-stream activities resulted in an increase in TSS concentrations between <5 and 1,390 mg l$^{-1}$ and a ten-fold increase in sediment deposition, the abundance and diversity of benthic invertebrates in riffle habitat did not change. Anderson et al. (1996) draw attention to dose–response work of Newcombe and Jensen (1996) in addressing the effects of sediment pulses on fish habitat, including invertebrates. The authors emphasize the significance of concentration and duration of sediment exposure (i.e., dose) in the study of short-term sediment disturbances (i.e., less than 1 month). Anderson et al. (1996), after the aforementioned authors, developed the following severity-of-ill-effects (SEV) ratings for sediment effects on fish habitat (in order of increasing severity): (1) change in habitat preference, (2) moderate degradation of habitat – modified invertebrate community, (3) moderately severe degradation of habitat – productivity of habitat affected over months or kilometers, (4) severe degradation of habitat – altered ability of habitat to support fish or invertebrates over years, and (5) catastrophic or total destruction of habitat.

## 5.2 Fish

Fish are sensitive to suspended sediment concentrations and the composition of stream bed substrates (DFO 2000; Lloyd 1987; Newcombe and MacDonald 1991; Waters 1995). Fish depend on sediment for many habitat and life requirements, including cover, spawning substrate and forage, and respond behaviorally and physiologically to altered sediment dynamics. As such, fish are sensitive to both the direct and indirect effects of increased sediment-loading. This section briefly examines the sensitivity of fish to increased sediment-loading and provides examples of the effects of long-term and short-term sediment exposure on fish.

Long-term exposure of fish to increased suspended sediment concentrations may cause effects ranging from behavioral responses in individuals to altered abundance and distribution of populations (DFO 2000; Newcombe and Jensen 1996; Newcombe and MacDonald 1991). For example, exposure to increased concentrations of suspended sediment may result in altered movement of fish (e.g., avoidance) and cause damage to gills. Feeding success may decline as turbidity increases and as sedimentation progresses, affecting primary and secondary productivity. Increased sediment deposition may also alter channel morphology and habitat availability. Spawning habitat may degrade, egg and larvae development be impaired, and fry emergence be reduced, with settling of fine-grained sediments onto and into the substrate. Such increases in embeddedness restrict DO and waste exchange between the water column and redds. Increased sediment-loading may, therefore, increase stress and reduce disease resistance, adaptive response, and growth and abundance of fish (DFO 2000).

Gray and Munkittrick (2005) studied sculpin in agricultural and forested reaches of a river in New Brunswick. The authors found that fish in agricultural streams, which were exposed to runoff with higher sediment, nutrient and pesticide loads, as well as higher water temperatures, had reduced abundance of young, smaller and fewer eggs, and smaller organs (i.e., liver, gonads). The authors suggest that these effects may be due, in part, to reduced reproductive effort, resulting from long-term accumulation of fines in spawning and rearing habitat. As well, sediment deposition may have limited food availability for young-of-the-year. Gray et al. (2005) also studied sculpin in agricultural and forested streams and rivers

of New Brunswick. Fish in agricultural watercourses had reduced young-of-the-year density and increased body size relative to those in forested watercourses. These effects were not, however, significantly correlated with sediment accumulation, rather they were most strongly correlated with water temperature.

A number of studies have examined the effects of short-term sediment exposure on fish. Short-term or episodic sediment exposure events are more consistent with the temporal patterns of sediment exposure associated with in-stream construction activity than are more chronic periods of exposure as discussed above. Au et al. (2004) studied the responses of coastal green grouper to suspended sediment concentrations between 0 and 2,000 mg $l^{-1}$ over a period of 6 weeks. The authors found that elevated suspended sediment concentrations did not affect food consumption or growth; however, increased sediment-loading did cause gill damage and increase osmoregulatory and physiological stress. Lake and Hinch (1999) found that fish exposure to suspended sediments at concentrations of greater than 40 g $l^{-1}$ for 96 h caused gill damage and increased stress in salmonids (as reflected by blood leukocrit and hematocrit levels). These effects were particularly pronounced in association with angular, rather than rounded, sediments. Bunt et al. (2004), in exposing rock bass experimentally to incremental increases in silt over a period of 140 min, observed altered cardiovascular performance in fish exposed to low concentrations of suspended particulates. This response was followed by rapid recovery, attributed to adaptive mechanisms. Berg and Northcote (1985) found temporary gill flaring, disruption of dominance hierarchy, reduced reaction to prey, and decreased capture success in fish exposed to experimental sediment pulses of 1 h and 2 days in duration. Barton (1977) attributed a temporary reduction in fish standing crop immediately downstream of a construction disturbance to avoidance.

An important consideration in the determination of sediment-related effects on fish is the duration of exposure to elevated suspended sediment concentrations (as discussed above for invertebrates). Newcombe and Jensen (1996; Newcombe and MacDonald 1991) modeled the severity of ill effects (SEV) of increased sediment loading on six groups of fish. These groups were based on fish species, life stage and life history, and suspended sediment particle size. The SEV ratings included (in order of increasing severity): (1) behavioral

App-0759

effects – alarm, abandonment of cover, avoidance; (2) sublethal effects – short term reduction in feeding rate and success, minor physiological stress, cough and increased respiration rate, moderate physiological stress and habitat degradation, impaired homing, major physiological stress with long-term reduction in feeding rates and success, as well as poor condition; (3) lethal and paralethal effects – reduced growth, delayed hatching, reduced density, and 0–20% mortality with increased predation and moderate to severe habitat degradation, with mortality increasing incrementally from >20 to 100%. Shaw and Richardson (2001) investigated the effects of duration of sediment exposure on rainbow trout from Moffat Creek, British Columbia, and compared their results to those of the aforementioned model. The study found that as duration of exposure increased, the length of, and mass gained by, young fish was reduced. This was likely attributable to impaired vision, hence feeding, and increased physiological stress rather than to alteration of invertebrate (i.e., food) availability. The effects of longer duration exposure (e.g., 6 vs. 1 h) were apparent only after 9 days of dosing; hence the fish were sensitive not only to the duration of exposure, but the frequency as well. Reid et al. (2003) also evaluated the dose–response model. The authors identified that the SEV model was developed based on studies of chronic sediment exposure, hence they questioned it's utility in the prediction of effects associated with acute exposure to high sediment loadings, such as those arising from activities subject to regulation (e.g., pipeline crossing construction; see also Anderson et al. 1996). The authors found, however, that elevated TSS concentrations in crossing construction simulations affected the physiology of fish, elevating respiration rates and promoting loss of equilibrium; these results were consistent with stress as defined by the SEV model, suggesting that the model may be useful in the assessment of effects associated with both chronic and acute exposure of fish to elevated suspended sediment concentrations.

# 6 Impact assessment methodology for pipeline crossing construction

Pipeline crossing construction and short-term sediment disturbances have been shown to affect river and stream ecosystems. Monitoring for the purposes of impact assessment in these cases should ensure that physical, chemical and biological indicators of impact are measured. Also of importance are: the study design of the monitoring program; site-specific vulnerability to, and potential for recovery from, the effects of crossing construction; assessment of the significance of impacts; and, consideration of the potential for cumulative effects.

The above examination of Canadian legislation and EIAs for crossing construction is used to identify information requirements of, and methodologies applied in, the assessment of effects of in-stream construction on aquatic ecosystems. Recommendations for changes to these methods, as discussed below, are based on the review of effects of pipeline crossing construction and sediment disturbance on invertebrates and fish. These methodological recommendations are widely applicable as they are based upon effects that have been documented in a variety of aquatic ecosystems including those outside of Canada (Anderson et al. 1996 – compilation of data from various countries; Armitage and Gunn 1996; Barton 1977; Shaw and Richardson 2001).

## 6.1 Indicators of impact

Regulation of crossing construction activities aims to protect fish habitat (physical, chemical, biological), which affects the health, reproduction and survival of fish. The EIAs reviewed above (see Section 3) have emphasized the assessment and monitoring of fish and physical and chemical characteristics of fish habitat prior to construction. This information has been used to establish baseline conditions with respect to e.g., fish species diversity and abundance, life stages, habitat types, substrate and water quality (TSS concentrations), as well as site-specific construction and mitigation measures. Water quality monitoring has been used during construction for comparison against guidelines for the protection of aquatic life (i.e., CCME 1999). Finally, physical and chemical monitoring has been applied upon completion of construction in order to assess effects. The indicators of effect that have been used in monitoring crossing construction impacts (during and after construction) in Canadian EIAs are listed in Table 1 under "Pipeline EIA Monitoring." These are water chemistry measures, primarily DO and TSS and/or turbidity (and site-specific substances of concern e.g.,

PAHs), and physical habitat measures including stream substrate particle size and bed and bank morphology and cover. Although infrequently used in the EIAs reviewed here, monitoring of fish distribution and abundance before and after construction has also been incorporated into some EIA monitoring programs.

Research studies addressing the effects of pipeline crossing construction have found physical, chemical and biological impacts of this activity on river and stream ecosystems. Indicators of effect that have been measured in these studies (see Section 4) are marked in Table 1 under "Pipeline Research Studies." They include water quality, physical habitat and fish measures, much like those recommended for the EIA monitoring programs. However, these studies also include invertebrate measures including species composition, abundance and diversity of benthic and drift communities. More recent studies of the effects of pipeline crossing construction have made use of behavioral (Reid et al. 2002b) and physiological (Reid et al. 2003) indicators of fish response, which have included avoidance, respiration, equilibrium, and blood hematocrit and leukocrit levels. The majority of these indicators successfully reflected impacts associated with in-stream construction activity (Table 1).

In addition, research studies in the primary literature examining sediment pulses have identified a number of fish and habitat indicators that respond to short-term, potentially intermittent exposures to sediment (e.g., Bunt et al. 2004; Shaw and Richardson 2001; Lake and Hinch 1999; Berg and Northcote 1985; Barton 1977; see Section 5). The indicators identified by these studies are listed in Table 1 under "Sediment Pulse Research Studies" and include not only many of the invertebrate community and fish behavior and physiology measures consistent with the pipeline crossing studies, but other indicators as well (e.g., fish size, gonad, liver and fecundity; hierarchy; feeding; gill damage and flaring; heart rate and stroke volume).

Assessment of the impacts of pipeline crossing construction on aquatic ecosystems should, therefore, incorporate a suite of indicators that effectively identify the impacts of these activities on the physical, chemical and biological properties of rivers and streams. The Canadian EIAs reviewed herein emphasized indicators of water quality and physical habitat in monitoring for effects. It is apparent from research

studies of pipeline crossing construction and sediment pulse experiments that further emphasis must be placed on biological indicators such as invertebrate community measures, as well as measures of fish community, health, reproduction, behavior and physiology. Some of these indicators are part of the Canadian Environmental Effects Monitoring (EEM) framework required under the *Fisheries Act* to assess the effects of complex effluents on aquatic biota (Environment Canada 2002). These indicators are listed in Table 1 under "EEM." Although tailored to monitoring and assessment of chronic effects associated with pulp and paper mill and mining effluents, these indicators have been applied successfully in research addressing the effects of catchment land use (e.g., sedimentation – Gray and Munkittrick 2005; Gray et al. 2005) and pipeline crossing construction (e.g., Reid et al. 2002a; Anderson et al. 1998; Armitage and Gunn 1996; Young and Mackie 1991) on watercourses. The EEM indicators are broadly applicable as they assess fundamental properties of biological health in benthos and fish populations and, as such, are largely stressor-independent. EEM guidance on indicator measurement may, therefore, be useful to the development of a program to monitor and assess impacts associated with pipeline crossing construction.

### 6.2 Monitoring before, during and after construction

A Before-After-Control-Impact experimental design (BACI) is recommended for the assessment of pipeline crossing construction impacts on rivers and streams. This approach has been applied in research studying the effects of pipeline crossing construction on aquatic ecosystems, and control-impact studies have been implemented extensively through the EEM Program in Canada (Environment Canada 2002). This study design incorporates monitoring of relevant indicators both before and after the impact and also includes monitoring at control or background sites and impact sites at and downstream of crossing construction. This design therefore not only allows assessment of impact and system recovery from impact relative to a priori or baseline conditions, but also relative to the control conditions (spatial and temporal reference conditions). The BACI design also addresses site-specific considerations more explicitly than a simple before and after impact assessment design (e.g., site-specific bench-

Environ Monit Assess (2007) 132:395 409

**Table 1** Comparison of indicators to assess effect

| Indicators used to assess effects | (1) Pipeline EIA monitoring | (2) Pipeline research studies | (3) Sediment pulse research studies | (4) EEM |
|---|---|---|---|---|
| DO (dissolved oxygen) | √ | | | √ |
| TSS (total suspended solids) concentration (or turbidity) | √ | √* | √* | |
| Physical habitat: stream bed substrate particle size (and ~ total organic carbon TOC) | √ | √*particle size | | √ |
| Physical habitat: channel morphology, habitat types, bank stability, in stream and bank cover | √ | √*channel morphology | | |
| Benthic invertebrate abundance and species composition | | √* | √* | √ |
| Benthic invertebrate richness | | | √* | √ |
| Benthic invertebrate diversity | | √* | | √ |
| Benthic invertebrate standing crop | | √* | | √ |
| Benthic invertebrate drift density and species | | √* | √* | √ |
| Fish abundance and species composition (and diversity) | √ | √*abundance | | |
| Fish energy use (size at age, relative gonad size, relative fecundity) | | | √*growth | √ |
| Fish energy storage (weight, relative liver size, relative egg size) | | | √*weight | √ |
| Fish behavior (e.g., avoidance, hierarchy, feeding success) | | √*avoidance | √*hierarchy, feeding | |
| Fish physiology (respiration rate, loss of equilibrium, blood hematocrit and leukocrit levels), gill damage/ flaring and cardiovascular performance | | √*physiology | √*hematocrit, leukocrit and gill damage/ flaring, heart rate and stroke volume | |

The indicators listed have been used in: (1) Canadian Environmental Impact Assessments (*EIAs*) for monitoring impacts of pipe line crossing construction, (2) research studies examin ing the effects of pipeline crossing construction on river and stream ecosys tems, (3) research studies determining the effects short term sediment pulses on aquatic ecosystems, and (4) the federally legislated Environmental Effects Monitoring (*EEM*) program in Canada.

√ Identifies endpoints rec ommended in Canadian EIA and EEM programs.

√* Identifies endpoints that have been documented as having responded to short term sediment disturbances (e.g., pipeline crossing con struction, experimental sed iment pulses); fine print indicates, where appropri ate, indicators that respond ed (e.g., √*physiology).

marks against which to evaluate impact include physical, chemical and biological background condi tions for the river or stream in question). For the purposes of assessing impacts of pipeline crossing construction in rivers and streams, this design should also incorporate an intensive period of monitoring during construction and until suspended sediment concentrations return to background levels. Based upon the literature reviewed in Sections 3, 4, and 5 and the BACI design, the following (generalized) design is proposed for the assessment of impacts associated with pipeline crossing construction.

Monitoring prior to construction should include both habitat and biological surveys upstream and downstream of the proposed crossing location. Char acterization and photo documentation of channel bed and banks provides information on such things as habitat types (e.g., run, riffle, pool), substrate charac teristics (e.g., particle-size, embeddedness, porosity, pebble count), and cover. Other important habitat measures pertain to flow characteristics (e.g., wetted width, discharge, flow velocity, water depth, flow regime) and water quality (e.g., TSS, turbidity, DO, water temperature, pH, conductivity). Biotic measures



provide information on fish and invertebrate communities specific to the river or stream, and/or habitat types, of interest. These measures may include species composition, diversity, density and distribution, as well as fish weight, length and energy use/storage, depending on the indicators of effect of interest in the study. Monitoring prior to the start of construction activities will not only provide baseline information for use in effect assessment, but will also provide valuable information on site-specific characteristics such as sensitive species and life stages, and flow ability to carry sediment, as well as natural variability in the system (e.g., frequency and magnitude of spate events in northern rivers – Young and Mackie 1991; fish species adaptations to highly variable sediment loadings – Reid et al. 2002b and Bunt et al. 2004). This information is also useful in tailoring the study design to the river or stream of interest (e.g., selection of similar sites upstream and downstream of construction, lengthened monitoring of recovery in streams of lower flow and gradient).

Monitoring during construction and until suspended sediment concentrations downstream of construction return to background levels should take place upstream and downstream of in-stream activities, and include measures of TSS and biotic indicators of interest that may be affected by elevated suspended sediment concentrations. Frequent monitoring should be conducted immediately downstream of construction, particularly during the release of discrete sediment plumes from construction activities. TSS measurements and monitoring of deleterious substances that may be released from disturbed bed and banks allow quantification of mean and peak concentrations. Anderson et al. (1996) note that TSS concentrations over the course of in-stream construction are heterogeneous and typically episodic in nature, hence suggest that mean TSS concentration for the entire period of crossing construction provides a better measure of effect than do e.g., hourly TSS concentrations. Invertebrate benthic/drift, in particular, as well as fish behavioral/physiological, measures should also be incorporated into the biological monitoring component of the program. This monitoring during construction will provide information for assessment of the nature and magnitude of the effects associated with acute periods of suspended sediment loading and sedimentation due to construction.

Monitoring upon the completion of construction should include habitat and biological surveys much like those completed prior to construction, and should continue, lessening in intensity with time, until recovery of the system to pre-construction conditions. This information may then be used to assess the nature and significance of the effects of pipeline crossing construction on aquatic ecosystems over time and space.

For further guidance see Anderson et al. (1996), who detail issues specific to the study of acute sediment release events and present recommendations for monitoring and data analysis. National EEM guidance documents (Environment Canada 2002), though designed for monitoring effects of chronic stress due to effluents, provide valuable information on monitoring design, sampling and data analyses that may be useful in pipeline crossing studies. The recommended monitoring program suggests a minimum requirement during impact-related activities without consideration of seasonality.

### 6.3 Site-specific sensitivity and recovery

Site-specific conditions have implications for the design of impact monitoring and assessment programs. Physical and biological characteristics of a given stream or river will affect the susceptibility of the system to impacts and the rate of recovery of the ecosystem from disturbance. The intensity and nature of a monitoring program should, therefore, be tailored not only to the nature of the disturbance, but also to this vulnerability of the river or stream to such effects.

For example, site-specific geophysical conditions will determine, in part, the susceptibility of a stream or river channel to impacts from crossing construction (e.g., erosion and the potential adverse effects of altered sediment transport – Imperial Oil Resources Ventures Limited 2004). For example, sites with high percent fines in excavated material may be exposed to very high TSS concentrations and extensive plumes of suspended sediment downstream of construction. Sampling downstream of construction, in such an instance, would require a large number of sites to represent the entire potential zone of effect. Streams and rivers that do not freeze to the bed over winter, and that have low flows, are more susceptible to higher TSS concentrations with

winter construction than are streams that freeze to the bed or that have high under-ice flow. As well, systems with steep banks and melting permafrost will be prone to heavy sediment-loading, hence elevated TSS concentrations and channel accumulations.

Site-specific biology will, in turn, affect the vulnerability of an aquatic ecosystem to the effects of increased sediment loading and deposition (e.g., Bunt et al. 2004; Reid et al. 2002b). For example, some species of fish are well adapted to variable flow and substrate conditions due to such things as life history, with migratory species generally better adapted to variable conditions than forage species, while other species have specific habitat preferences or tolerances (e.g., smaller fish less tolerant of sediment exposure than larger fish, as are salmon when exposed to temperature above/ or below optimal – Servizi and Martens 1991).

The ability of an aquatic system to recover from sediment disturbance will also be site-specific. For example, flow magnitude and frequency are paramount to the rate of recovery of streams and rivers. High flows such as those occurring during freshet or storm runoff events scour sedimented accumulations on channel beds. Lower and less variable flows increase the potential for long-term effects of increased sediment deposition. Also important to the rate of recovery of a stream or river from a sediment release event are: water depth, which affects scour of bed geomorphological features; substrata and sediment type, such as armoured beds; duration of high magnitude flows; and stream gradient effects on sediment mobilization (Anderson et al. 1996). Pipeline crossing studies have found that, for the most part, the effects of crossing construction have been short-term, from near 1 month to 2 years. EIAs described in this document have concluded that, with appropriate mitigative measures, the effects of crossing construction are short-term and local, hence insignificant. Armitage and Gunn (1996), however, found that effects of crossing construction on substrate and invertebrate communities in a stream persisted over 4 years, clearing only after passage of a high magnitude flow. Hence, individual rivers and streams will be affected differently by crossing construction, hence should have a monitoring program tailored to identify site-specific sensitivities and responses to disturbance.

## 6.4 Assessment of significance

The significance of crossing construction impacts may be assessed in a variety of ways. This may include: comparisons between conditions before and after construction and between control and impact sites, identification of appropriate guidelines against which indicators may be measured, or use of effect rankings such as SEVs to assess effects on fish and fish habitat.

The BACI design allows for establishment of site-specific benchmarks against which to measure impact. Assessment of significance may be made by testing for significant differences between conditions before and after impact, and between conditions at the control and impacted sites (Environment Canada 2002).

Guidelines, such as those for the protection of aquatic life, are useful in the identification of harmful impacts of sediment, as well as project- or site-specific deleterious substances of concern, on aquatic ecosystems. For example, the Canadian Council of Ministers for the Environment (1999) guideline for TSS concentration is a maximum 25 mg $l^{-1}$ increase in concentration above background during low flow over a period of <24 h, and 5 mg $l^{-1}$ above background over a period between 24 h and 30 days. Many CCME guidelines, however, are derived from studies of chronic exposure and are based upon a small number of species, hence will likely not apply to short-term, episodic sediment disturbances and to site-specific tolerances or preferences of species in every watercourse. Site-specific objectives may be developed (e.g., objectives based on historical records or for example the 90th percentile of a reference condition in space and/or time – CCME 2003).

Dose–response models for fish and fish habitat, such as those developed by Newcombe and Jensen (1996) and Anderson et al. (1996), may also be useful in the assessment of impact significance. These SEVs (see Sections 5.1 and 5.2 for further discussion) allow quantification of effect significance through severity-of-ill-effects values based on the duration and concentration of sediment exposure for a given sediment release event.

## 6.5 Cumulative impacts

The potential for cumulative effects associated with pipeline crossing construction should be taken into



Environ Monit Assess (2007) 132:395 409                                                     407

consideration in assessing the impacts of these activities on rivers and streams. Construction of a single crossing on a stream or river, or within a watershed, may not have significant effects on fish and fish habitat in that system. Construction of multiple crossings on a stream or river, or within a watershed, however, has the potential for cumulative effects on that system. In such cases, the capacity of the system to recover from impact may be exceeded, and the detrimental effects of crossing construction permanent. The same may be said for the frequency of crossing construction within a given system; rivers and streams will have limited capacities to recover from multiple impacts. As well, recurrent stresses on fish, such as those that originate from elevated suspended sediment concentrations, may have cumulative effects on fish health, survival and reproduction. The long-term effects of such impacts are not well known at this time (Reid et al. 2003).

Employing a consistent monitoring design for multiple watercourse crossings associated with a pipeline (or for that matter other linear features with potential for effect) would allow for any changes associated with each crossing to be quantitatively assessed and integrated to assess cumulative effects for the pipeline along its length. In the Canadian EEM program for example, approximately 100 different pulp and paper facilities conducted monitoring programs of similar design with effect endpoints and approaches for assessing "an effect" defined *a priori*. As a result of this consistency, a national assessment of change associated with this industry could be quantitatively made (Lowell et al. 2005). Although the EEM program did not refer to the national assessment as a cumulative effects assessment per se, certainly application of a consistent design and analyses resulted in an assessment of *accumulating* change. To our knowledge, this type of assessment for a pipeline has not been conducted and would be of great value.

## 7 Conclusions

Pipeline crossing construction affects river and stream ecosystems through disturbance of channel bed and banks, resulting in increased suspended sediment loading and deposition. Canadian EIAs have emphasized monitoring and assessment of the physical and chemical impacts of in-stream construction on fish

habitat, though biological habitat and fish health have also been shown to be affected by such activities. As such, it is recommended that impact assessment for crossing construction projects monitor indicators including: water quality (TSS, and site-specific substances of concern), physical habitat measures (substrate particle size, channel morphology), benthic invertebrate community and drift measures (abundance, species composition, diversity, standing crop), and fish abundance and diversity as well as individual metrics associated with energy storage and energy use. Behavioral and physiological parameters should also be considered. It is also recommended that the BACI approach be applied for assessment of impacts during and after construction, allowing site-specific determination of the nature, significance and longevity of impacts. It is desirable that further study be conducted on the effects of in-stream construction on fish growth, reproduction, physiology and behavior, and the cumulative effects of multiple crossings.

## References

Alberta Environment (2001). *Code of practice for pipelines and telecommunication lines crossing a water body.* Retrieved September 26, 2005, from http://www.qp.gov.ab.ca/documents/codes/pipeline.cfm.

Alberta Transportation and Utilities (2000). *Fish habitat manual: Guidelines and procedures for watercourse cross ings in Alberta.* Retrieved September 09, 2005, from http://www.trans.gov.ab.ca/Content/docType123/Production/fishhabitatmanual.htm.

Anderson, P. G., Fraikin, C. G. J., & Chandler, T. J. (1998). Natural gas pipeline crossing of a coldwater stream: Impacts and recovery. In: *Proceedings of the International Pipeline Conference, vol. 2* (pp. 1013 1020). Calgary, AB, Canada: American Society of Mechanical Engineers.

Anderson, P. G., Taylor, B. R., & Balch, G. C. (1996). *Quantifying the effects of sediment release on fish and their habitats.* Canadian Manuscript Report of Fisheries and Aquatic Sciences no. 2346.

Armitage, P. D., & Gunn, R. J. M. (1996). Differential response of benthos to natural and anthropogenic disturbances in 3 lowland streams. *Internationale Revue der Gesamten Hydrobiologie, 81*(2), 161 181.

Au, D. W. T., Pollino, C. A., Wu, R. S. S., Shin, P. K. S., Lau, S. T. F., & Tang, J. Y. M. (2004). Chronic effects of suspended solids on gill structure, osmoregulation, growth, and triiodothyronine in juvenile green grouper *Epinephelus coioides. Marine Ecology Progress Series, 266*, 255 264.

Barton, B. A. (1977). Short term effects of highway construction on the limnology of a small stream in southern Ontario. *Freshwater Biology, 7*, 99 108.

🌐 Springer

Environ Monit Assess (2007) 132:395 409

Berg, L., & Northcote, T. G. (1985). Changes in territorial, gill flaring, and feeding behavior in juvenile coho salmon (*Oncorhynchus kisutch*) following short term sediment pulses of suspended sediment. *Canadian Journal of Fisheries and Aquatic Sciences, 42*, 1410 1417.

Bunt, C. M., Cooke, S. J., Schreer, J. F., & Phillip, D. P. (2004). Effects of incremental increases in silt load on the cardiovascular performance of riverine and lacustrine rock bass, *Ambloplites rupestris*. *Environmental Pollution, 128*, 437 444.

Burlington Resources Canada Energy Ltd (2001). *Isolated method pipeline crossing of two unnamed creeks at SE 25 53 26 W5M, near Hinton in Alberta*. Calgary, AB, Canada. DFO File no. AB01 096.

CCME (1999). *Canadian environmental quality guidelines*. Winnipeg, MB, Canada: Canadian Council of Ministers of the Environment.

CCME (2003). *Guidance on the site specific application of water quality guidelines in Canada: Procedures for deriving numerical water quality objectives*. Winnipeg, MB, Canada: Canadian Council of Ministers of the Environment.

ConocoPhillips Canada Resources Corp (2004). *Installation of a pipeline crossing using an open cut with isolation method on Doctor Creek at 07 27 52 01 W6M and an unnamed creek at 08 28 52 01 W6M in Alberta*. Calgary, AB, Canada. DFO File no. ED 04 1528.

Department of Justice Canada (1985). *Fisheries Act*. Retrieved July 16, 2005, from http://www.laws.justice.gc.ca/en/F 14/text.html.

Department of Justice Canada (1992). *Canadian Environmental Assessment Act*. Retrieved July, 2005, from http://www.lois.justice.gc.ca/en/C 15.2/.

Devon Canada Corporation (2004). *Daniel Creek isolation open cut in NE 5 6 9*. Calgary, AB, Canada. DFO File no. PC 09 3221.

DFO (2000). *Effects of sediment on fish and their habitat*. Department of Fisheries and Oceans Pacific Region Habitat Status Report 2000/01.

Environment Canada (2002). *The new metal mining effluent regulations*. Canada.

Freeman, P. L., & Schorr, M. S. (2004). Influence of watershed urbanization on fine sediment and macroinvertebrate assemblage characteristics in Tennessee ridge and valley streams. *Journal of Freshwater Ecology, 19*(3), 353 362.

Gray, M. A., Curry, R. A., & Munkittrick, K. R. (2005). Impacts of nonpoint inputs from potato farming on populations of slimy sculpin (*Cottus cognatus*). *Environmental Toxicology and Chemistry, 24*, 2291 2298.

Gray, M. A., & Munkittrick, K. R. (2005). An effects based assessment of slimy sculpin (*Cottus cognatus*) populations in agricultural regions of northwestern New Brunswick. *Water Quality Research Journal of Canada, 40*(1), 16 27.

Imperial Oil Resources Ventures Limited (2004). *Environmental impact statement for the Mackenzie Gas Project* (vols. 2, 3 and 5). Calgary, AB, Canada.

Lake, R. G., & Hinch, S. G. (1999). Acute effects of suspended sediment angularity on juvenile coho salmon (*Oncorhynchus kisutch*). *Canadian Journal of Fisheries and Aquatic Sciences, 56*, 862 867.

Lévesque, L. (2005). *Method and design for assessment of aquatic impacts associated with pipeline crossing construction*. Saskatoon, SK, Canada.

Lloyd, D. S. (1987) Turbidity as a water quality standard for salmonid habitats in Alaska. *North American Journal of Fisheries Management, 7*, 34 45.

Lowell, R. B., Ring, B., Pastershank, G., Walker, S., Trudel, L., & Hedley, K. (2005). *National assessment of pulp and paper environmental effects monitoring data: Findings from cycle 1 through 3*. Burlington, ON, Canada: National Water Research Institute. NWRI Scientific Assessment Report series no. 5.

Malard, F., Tockner, K., Dole Olivier, M J., & Ward, J. V. (2002). A landscape perspective of surface subsurface hydrological exchanges in river corridors. *Freshwater Biology, 47*, 621 640.

Mayhood, D. W. (1998). *Some effects of natural gas operations on fishes and their habitats on Canada's Rocky Mountain east slopes*. Rocky Mountain Ecosystem Coalition, Technical Report 95/1. Retrieved February, 2005, from http://www.fwresearch.ca/RMEC951.pdf.

Newcombe, C. P., & Jensen, J. O. T. (1996). Channel suspended sediment and fisheries: A synthesis for quantitative assessment of risk and impact. *North American Journal of Fisheries Management, 16*, 693 727.

Newcombe, C. P., & MacDonald, D. D. (1991). Effects of suspended sediments on aquatic ecosystems. *North American Journal of Fisheries Management, 11*, 72 82.

Petro Canada Oil and Gas (2005). *Open cut pipeline crossing with isolation of the Livingstone River*. Calgary, AB, Canada. CEAR no. 05 01 11948.

Reid, S. M., Ade, F., & Metikosh, S. (2004). Sediment entrainment during pipeline water crossing construction: Predictive models and crossing method comparison. *Journal of Environmental Engineering and Science, 3*, 81 88.

Reid, S., & Anderson, P. G. (2000). Evaluation of isolated watercourse crossings during winter construction along the Alliance pipeline in northern Alberta. In *Proceedings of the 7th International Symposium, Environmental Concerns in Right of Way Management*, Calgary, AB.

Reid, S. M., Isaac, G., Metikosh, S., & Evans, J. (2003). Physiological response of rainbow trout to sediment released during open cut pipeline water crossing construction. *Water Quality Research Journal of Canada, 38*(3), 473 481.

Reid, S. M., Metikosh, S., & Evans, J. (2002b). Movement of arctic grayling and mountain whitefish during an open cut pipeline water crossing of the Wildhay River, Alberta. *Journal of Freshwater Ecology, 17*(3), 363 368.

Reid, S. M., Stoklosar, S., Metikosh, S., & Evans, J. (2002a). Effectiveness of isolated pipeline crossing techniques to mitigate sediment impacts on brook trout streams. *Water Quality Research Journal of Canada, 37*(2), 473 488.

Roy, A. H., Rosemond, A. D., Paul, M. J., Leigh, D. S., & Wallace, J. B. (2003). Stream macroinvertebrate response to catchment urbanization (Georgia, U.S.A.). *Freshwater Biology, 48*, 329 346.

Servizi, J. A., & Martens, D. W. (1991). Effect of temperature, season, and fish size on acute lethality of suspended sediments on coho salmon (*Oncorhynchus kisutch*). *Canadian Journal of Fisheries and Aquatic Sciences, 48*, 493 497.



AR005682    **App-0766**

Environ Monit Assess (2007) 132:395 409    409

Shaw, E. A., & Richardson, J. S. (2001). Direct and indirect effects of sediment pulse duration on stream invertebrate assemblages and rainbow trout (*Oncorhynchus mykiss*) growth and survival. *Canadian Journal of Fisheries and Aquatic Sciences, 58*, 2213 2221.

Suncor Energy (2000). *Firebag In Situ Oil Sands Project Application*. Canada.

Talisman Energy Inc. (2004). *Wabamum Loop Pipeline Project  Open cut pipeline crossing tributary to Brown Creek (SE 3 44 17 W5M)*. Calgary, AB, Canada. DFO File no. CA 04 0109.

Tsui, P. T. P., & McCart, P. J. (1981). Effects of stream crossing by a pipeline on the benthic macroinvertebrate communities of a small mountain stream. *Hydrobiologia, 79*, 271 276.

Waters, T. F. (1995). *Sediment in streams: Source, biological effects, and control*. Bethesda, MD, USA: American Fisheries Society.

Wood, P. J., & Armitage, P. D. (1997). Biological effects of fine sediment in the lotic environment. *Environmental Management, 21*, 203 217.

Young, R. J., & Mackie, G. L. (1991). Effect of oil pipeline construction on the benthic invertebrate community structure of Hodgson Creek, Northwest Territories. *Cana dian Journal of Zoology, 69*, 2154 2160.

Zwirn, M. (2002). *Pipeline stream crossing installations: Best management practices*. Retrieved February, 2005, from http://www.wildsalmoncenter.org/pipeline stream english.pdf.

Springer



2022-07-22

US Army Corps of Engineers
Nashville District
Regulatory Divison



Cumberland Project

Section 404 Clean Water Act / Section 10 Rivers and Harbors Act Dredge and Fill – Individual Permit Application

July 22, 2022

Prepared for:



Tennessee Gas Pipeline Company, L.L.C.
1001 Louisiana Street, Suite 1000 | Houston, TX 77002

Prepared by:

 Stantec

Stantec
601 Grassmere Park, Suite 22 | Nashville, TN 37211



**App-0768**

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

## Table of Contents

**1.0 INTRODUCTION** ................................................................................................ 1

1.1    Project Description / Nature of Activity ................................................ 1

1.2    Previous USACE Communications ...................................................... 2

1.3    Individual Permit Submittal Process .................................................... 2

1.4    Project Contacts ................................................................................. 2

1.5    Project Location .................................................................................. 3
    1.5.1    County(ies) / State(s) .............................................................5
    1.5.2    Latitude and Longitude Coordinates .......................................5
    1.5.3    Watershed(s) .........................................................................5
    1.5.4    Floodplain ..............................................................................6
    1.5.5    Name of Waterbodies .............................................................6

1.6    Project Purpose and Need .................................................................. 6

**2.0 DREDGE AND FILL REQUEST** ..................................................................... 8

2.1    Jurisdictional Waters of the United States .......................................... 8
    2.1.1    Waterbodies .........................................................................10
    2.1.2    Wetlands ..............................................................................10

2.2    Preliminary Jurisdictional Determination Request ..............................11

2.3    Construction Methods ........................................................................11
    2.3.1    Standard Methods .................................................................11
    2.3.2    Waterbody Methods ..............................................................11
    *2.3.3    Dry Open Cut* .......................................................................12
    2.3.4    Wetland Methods ..................................................................15

2.4    Other Considerations .........................................................................16
    2.4.1    Hazardous Materials .............................................................16
    2.4.2    Erosion & Sedimentation ......................................................16
    2.4.3    Hydrostatic Test Discharges .................................................17

2.5    Operational Maintenance ...................................................................19
    2.5.1    Waterbodies .........................................................................19
    2.5.2    Wetlands ..............................................................................19

2.6    Proposed Stream, Wetland and Pond Characteristics .......................19

2.7    Detailed Alternatives Analysis ...........................................................21
    2.7.1    General Pipeline Construction Considerations .......................21
    2.7.2    Preferred Alternative (Least Environmental Damaging Practicable Alternative) .......................................................22
    2.7.3    No Action Alternative ............................................................22
    2.7.4    Route Alternatives ................................................................23
    2.7.5    Construction Methods Alternatives ........................................27



**App-0769**

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

2.8     Social and Economic Consequences of Each Alternative.............................54

2.9     Mitigation .................................................................................................55

2.10    Post Construction Monitoring....................................................................56
        2.10.1   Qualitative Visual Assessment ...................................................56
        2.10.2   Photo Documentation ................................................................56

**3.0     PROJECT SCHEDULE** ..................................................................................**56**

**4.0     ADJOINING PROPERTY OWNERS** ...............................................................**57**

**5.0     OTHER AGENCY AUTHORIZATIONS** ...........................................................**57**

5.1     United States Fish and Wildlife Service .....................................................58

5.2     State Historic Preservation Office .............................................................58

5.3     Tennessee Valley Authority ......................................................................58

5.4     Tennessee Department of Environment and Conservation..........................58
        5.4.1   Division of Water Resources ......................................................58
        5.4.2   Division of Natural Areas ("DNA"), Natural Heritage Program.......59

5.5     Native American Tribes ............................................................................59

**6.0     ADDITIONAL CONSIDERATIONS** .................................................................**59**

6.1     Navigation ...............................................................................................59

6.2     Aquatic Life Movements ...........................................................................60

6.3     Spawning Areas .......................................................................................60

6.4     Migratory Bird Breeding Areas..................................................................60

6.5     Shellfish Beds ..........................................................................................63

6.6     Suitable Material ......................................................................................63

6.7     Water Supply Intakes ...............................................................................63

6.8     Adverse Effects from Impoundments.........................................................63

6.9     Management of Water Flows .....................................................................63

6.10    Fills within 100-Year Floodplains ..............................................................63

6.11    Equipment ...............................................................................................63

6.12    Soil Erosion and Sediment Controls .........................................................63

6.13    Removal of Temporary Fills ......................................................................64

6.14    Proper Maintenance .................................................................................64

6.15    Wild and Scenic Rivers.............................................................................64



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

6.16    Designated Critical Resource Waters ............................................................65

6.17    Coastal Zone Management ..........................................................................66

**7.0    SIGNATURES AND FORM...........................................................................66**

**8.0    REFERENCES..............................................................................................66**

**LIST OF TABLES**

TABLE 1.5-1    Site Locations of the Cumberland Project Facilities......................................4
TABLE 2.1-1    Summary of USACE WOTUS Crossings......................................................9
TABLE 2.1-2    Summary of USACE WOTUS Crossings by Length (Streams)....................9
TABLE 2.1-3    Summary of USACE WOTUS Crossing by Acreage....................................10
TABLE 2.4-1    Potential Sources of Hydrostatic Pressure Test Water for the Project .........18
TABLE 2.7-1    Cumberland Project Minor Route Variations................................................24
TABLE 2.7-2    Minor Route Variations (Summary MP 30-32)............................................27
TABLE 2.7-3    Waterbodies Crossings Hydrologic Risk Analysis......................................36
TABLE 6.4-1    IPaC-Identified BCCs Potentially Occurring Within the Project Area...........61

**LIST OF ATTACHMENTS**

ATTACHMENT 1 – WETLANDS AND WATERBODIES IMPACTS TABLES

       Table 1. Cumberland Waterbodies Impact
       Table 2. Cumberland Wetland Impacts
       Table 3. Cumberland Pond Impacts


ATTACHMENT 2 – JURISDICTIONAL WATERS DETERMINATIONS AND TENNESSEE
                HYDROLOGIC DETERMINATIONS REPORT

     Appendix A    Jurisdictional Waters Figures
     Appendix B    Hydrologic Determination Field Datasheets
     Appendix C    Wetland Determination Field Datasheets – Eastern Mountains and
                   Piedmont Region
     Appendix D    Waterbody Data Table
     Appendix E    Wetland Data Table
     Appendix F    Antecedent Precipitation Results

ATTACHMENT 3 – PROJECT DESIGN PLANS AND PERMIT DRAWINGS

     Alignment Sheets
     Typical ROW Cross-Section Diagrams, Typical Construction Drawings and Details
     Permit Drawings



ATTACHMENT 4 – AGENCY COORDINATION AND CONCURRENCE LETTERS

ATTACHMENT 5 – ENVIRONMENTAL CONSTRUCTION MANAGEMENT PLAN

> Appendix A    Federal Energy Regulatory Commission Upland Erosion Control, Revegetation, and Maintenance Plan (2013 Version)
> Appendix B    Federal Energy Regulatory Commission Wetland and Waterbody Construction and Mitigation Procedures (2013 Version, with requested deviations to be approved by FERC)
> Appendix C    Spill Prevention and Control Plan
> Appendix D    HDD Contingency Plan
> Appendix E    Blasting Plan
> Appendix F    Hydrostatic Test Plan

ATTACHMENT 6 – RR 2 FIGURE 2.A.3 FEMA FLOODPLAIN MAP

ATTACHMENT 7 – PRELIMINARY JURISDICTIONAL DETERMINATION FORM

ATTACHMENT 8 – ADJOINING PROPERTY OWNERS

ATTACHMENT 9 – HDD Feasibility Studies

> HDD Feasibility Study TGP Cumberland Pipeline - Jones Creek
> HDD Feasibility Study TGP Cumberland Pipeline - Wells Creek
> HDD Feasibility Study TGP Cumberland Pipeline - Yellow Creek

ATTACHMENT 10 – MINOR ROUTE VARIATIONS FIGURES

ATTACHMENT 11 – SUMMARY OF TRENCHLESS CONSTRUCTION METHODS

ATTACHMENT 12 – ENG FORM 4345

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

# 1.0 INTRODUCTION

## 1.1 Project Description / Nature of Activity

Tennessee Gas Pipeline Company, L.L.C. ("TGP") is filing an application with the Federal Energy Regulatory Commission ("Commission" or "FERC") under Section 7(c) of the Natural Gas Act ("NGA") and Part 157 of the Commission's regulations, 18 CFR Part 157 (2022), seeking the issuance of a certificate of public convenience and necessity ("Certificate") for the construction, operation, and maintenance of the proposed Cumberland Project ("Project").

The proposed Project involves the construction and operation of the following facilities, as described in more detail below:

- Approximately 32 miles of new 30-inch-diameter natural gas lateral pipeline, connecting to TGP's existing Lines 100-3 and 100-4 (hereinafter referred to as the "Cumberland Pipeline"), located in Dickson, Houston, and Stewart counties, Tennessee. To the extent that it is practicable, feasible, and legally permitted, TGP will locate the pipeline generally parallel and adjacent to existing electric transmission lines owned and operated by Tennessee Valley Authority ("TVA").

- New bi-directional back pressure regulation facilities on TGP's Lines 100-3 and 100-4 (hereinafter referred to as the "Pressure Regulation Station"), located at the origin of the proposed Cumberland Pipeline in Dickson County, Tennessee.

- A new meter station (hereinafter referred to as the "Cumberland Meter Station"), at the terminus of the proposed Cumberland Pipeline within the TVA property located in Stewart County, Tennessee.

- In-line inspection traps (also referred to as a pig launcher and receiver) at each end of the proposed Cumberland Pipeline.

- Three new mainline valves ("MLV"), with one MLV to be located at an intermediate location along the proposed Cumberland Pipeline, and the remaining two MLVs to be located on TGP's Lines 100-3 and 100-4 (one MLV to be installed on each existing line) within the new Pressure Regulation Station.

These proposed facilities may be collectively referred to herein as the "Project Facilities."

To facilitate the construction of the Project Facilities, TGP has identified two contractor yards: one located in Houston County, Tennessee (Contractor Yard 1) and one located in Dickson County, Tennessee (Contractor Yard 2). Access to the Project's construction workspace and permanent easement for construction and operation purposes will be provided using temporary access roads ("TAR") and permanent access roads ("PAR").

TGP is proposing the Project to provide up to approximately 245,040 dekatherms per day ("Dth/d") of additional firm natural gas transportation capacity to TVA, who has executed a precedent



**App-0773**

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

agreement for all of the firm transportation capacity to be created by the Project (TVA may also be referred to as the "Project Shipper").

TGP is requesting issuance of a certificate order for the Project in November 2023 and, following receipt of all applicable approvals, anticipates beginning construction activities that do not require tree felling in August 2024, felling and clearing trees from the Project construction workspace beginning mid-October 2024, and commencing all remaining construction activities by November 2024. To meet TVA's requested in-service date, TGP plans to place all facilities in-service by September 1, 2025, with final restoration estimated to be completed by December 2025.

## 1.2  Previous USACE Communications

TGP's previous communications with the United States Army Corps of Engineers ("USACE") related to the Project include:

- Project introductory meeting held with the USACE, Tennessee Department of Environment & Conservation ("TDEC"), and Tennessee Valley Authority ("TVA") staff on September 21, 2021.

- Request for participation in the FERC pre-filing process was sent to the USACE staff on September 28, 2021. USACE response received September 28, 2021, agreeing to participate.

- Project meeting with USACE staff to discuss preliminary Project impacts and permitting options held on November 29, 2021.

- Pre-application meeting with the USACE was held on May 4, 2022, and a follow-up meeting was held on May 24, 2022.

As a result of these meetings, Amy Robinson was identified as the primary USACE point of contact for this Project. During the May 24, 2022, pre-application follow-up meeting, the USACE staff informed TGP that an Individual Permit may be requested for this Project. Based on that communication, TGP is requesting that this Project be considered for permit issuance under an Individual Permit even if the work could be covered by a Nationwide Permit.

## 1.3  Individual Permit Submittal Process

TGP is submitting this application electronically and due to file size restrictions, will be requesting access to the Department of Defense Secure Access File Exchange ("SAFE") site (https://safe.apps.mil) via a "drop-off request" email to NashvilleRegulatory@usace.army.mil.

Hardcopies of the TGP application can be provided upon request.

## 1.4  Project Contacts

The official applicant and contact information for this Project is below.

Tennessee Gas Pipeline Company, L.L.C.
1001 Louisiana Street, Houston, Texas 77002



**App-0774**

Gina B. Dorsey - Director, EHS-Project Permitting (signing authority) / email: gina_dorsey@kindermorgan.com / Office: (713) 369-8975

Mike A. Letson - Permitting Compliance Lead (EHS Project representative) / email: michael_letson@kindermorgan.com / Office: (713) 420-5360

TGP's agent for the purpose of the USACE permitting process for this Project is below.

David Jackson - BDY Natural Sciences Consultants
2607 Westwood Drive, Nashville, Tennessee 37204
Email: djackson@bdy-inc.com
Cell: (615) 400-8476

## 1.5  Project Location

The locations of the Project Facilities are set forth in the figures provided in **Attachment 2, Appendix A**., which include U.S. Geological Survey ("USGS") 7.5-minute topographic maps and recent aerial photography.

The Project Facilities are described in more detail in the following sections and are summarized in **Table 1.5-1**.

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

**TABLE 1.5-1**
**Site Locations of the Cumberland Project Facilities**

| Facility Type and Name | Approximate MP | County, State | Facility Description |
|---|---|---|---|
| **Pipelines** | | | |
| Cumberland Pipeline | 0 to 32 | Dickson, Houston, Stewart counties, TN | Install new approximate 32.0-mile, 30-inch-diameter pipeline lateral. |
| **Meter and Regulation Facilities** | | | |
| Pressure Regulation Station | MP 0 | Dickson County, TN | Install new bi-directional back pressure regulation facilities near TGP's Lines 100-3 and 100-4. |
| Cumberland Meter Station | MP 32 | Stewart County, TN | Install new meter station with meters and tie-in facilities. |
| **Other Aboveground Facilities** | | | |
| Pig Launcher/Receiver | MP 0 | Dickson County, TN | Install new pig launcher/receiver within the Pressure Regulation Station permanent footprint. |
| Mainline Valves | MP 0 | Dickson County, TN | Install two new MLVs within existing permanent rights-of-way ("ROW") at the connection of the 100-3 (MP 83-3 0.4) and 100-4 (MP 83-4 0.4) lines, via piping from the Pressure Regulation Station. |
| Mainline Valve | MP 16.6 | Houston County, TN | Install one MLV on the Cumberland Pipeline at MP 16.6. |
| Pig Launcher/Receiver | MP 32 | Stewart County, TN | Install new pig launcher/receiver within the Cumberland Meter Station permanent footprint. |
| **Cathodic Protection System** | | | |
| Cathodic Protection System | MPs 0, 8, 16, 24, 32 | Dickson, Houston, and Stewart counties, TN | Rectifiers and/or anode beds. |
| **Contractor Yards** | | | |
| Contractor Yard 1 | Located approximately 0.25 of a mile northeast of MP 27 | Houston County, TN | Temporary contractor yard to be used during Project construction (approximately 15.24 acres). |



TENNESSEE GAS PIPELINE COMPANY, L.L.C.
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

**TABLE 1.5-1**
**Site Locations of the Cumberland Project Facilities**

| Facility Type and Name | Approximate MP | County, State | Facility Description |
|---|---|---|---|
| Contractor Yard 2 | Located approximately 3.5 miles south of MP 12 | Dickson County, TN | Temporary contractor yard to be used during Project construction (approximately 16.19 acres). |
| **Access Roads** | | | |
| See Table 1.2-2 | N/A | Dickson, Houston, and Stewart counties, TN | New and existing roads to access the construction work areas and for permanent use during operation of the Project Facilities. |
| MP = milepost | | | |
| N/A = not applicable | | | |

### 1.5.1  County(ies) / State(s)

Dickson, Houston, and Stewart counties, Tennessee

### 1.5.2  Latitude and Longitude Coordinates

Cumberland Pipeline Beginning Location: 36.162322, -87.208655

Cumberland Pipeline Ending Location: 36.372929, -87.675659

Latitude and longitude coordinates for each potential Waters of the United States ("WOTUS") in the Project area are provided in the tables in **Attachment 1**.

### 1.5.3  Watershed(s)

The USGS hydrologic units are a hierarchal cataloging system that hydrographically subdivides the U.S. into successively smaller hydrologic units nested within larger units that are used to identify surface water features across the United States. Each hydrologic unit is identified by a unique Hydrologic Unit Code ("HUC") consisting of two to 12 digits based on the six levels of classification: two-digit HUC first-level (region), four-digit HUC second-level (subregion), six-digit HUC third-level (accounting unit), eight-digit HUC fourth-level Cataloguing Unit ("CU"), 10-digit HUC fifth-level (watershed), and 12-digit HUC sixth-level (subwatershed) (NRCS 2007).

The Project lies within the Harpeth River (8-digit HUC 05130204) and the Lower Cumberland River (8-digit HUC 05130205) watersheds. More specifically, the Project area crosses into the Outlet Harpeth River subwatershed defined by the 12-digit HUC 051302040606, the Lower Jones Creek subwatershed (12-digit HUC 051302040503), Johnson Creek-Cumberland River subwatershed (12-digit HUC 051302050302), Upper Bartons Creek subwatershed (12-digit HUC 051302050102), Furnace Creek Subwatershed (12-digit HUC 051302050101), Lower Bartons

Creek subwatershed (05130205010), Lower Yellow Creek subwatershed (12-digit HUC 501302050203), Outlet Yellow Creek subwatershed (12-digit HUC 051302050205), Guices Creek subwatershed (12-digit HUC 051302050401) and the Wells Creek subwatershed (12-digit HUC 051302050402).

### 1.5.4 Floodplain

A floodplain is the land area along a stream or river that is subject to periodic flooding. The area subject to a one percent chance of flooding in any given year is classified as the 100-year floodplain. The 100-year floodplain is divided into two areas: a floodway and a floodway fringe. A floodway is an area within the floodplain where flow velocities and the potential for debris damage are highest during a 100-year flood event, and it represents an area where development is discouraged. The flood fringe is the portion of the floodplain that lies outside the floodway and is usually covered with water from the 100-year flood event but does not experience the high levels of flow velocities and debris damage.

Floodplain data obtained from digital Federal Emergency Management Agency ("FEMA") Flood Insurance Rate Maps indicate that both the Cumberland Meter Station and the Pressure Regulation Station are not within a floodplain, while the MLV falls within Zone AE on the flood fringe and is subject to inundation by a 1-percent-annual-chance flood event (FEMA 2018). TGP will coordinate with the Dickson County Floodplain Administrator concerning the design and construction of the MLV to minimize concerns with future flood events. Mapping provided in **Attachment 6** to this application (from FERC Resource Report 2, Water Use and Quality, Figure 2.A.3-1) shows FEMA flood zones in the vicinity of the Project. A full copy of the Environmental Report (which includes the Resource Reports) will be provided to the USACE after the certificate application for the Project has been filed with the FERC.  be provided to the USACE.

### 1.5.5 Name of Waterbodies

Of the identified streams within the Project area, 19 are named streams: Gafford Branch, Upper Sugarcamp Branch, Jordan Branch, Johnson Creek, Harris Branch, Jones Creek, Porters Branch, Miller Branch, Bartons Creek, Nesbitt Branch, Furnace Creek, Dry Hollow Branch, Little Bartons Creek, Leatherwood Creek, Guices Creek, Wells Creek, Lickskillet Branch, Yellow Creek, and Indian Branch. Additionally, Jones Creek is listed on the USACE Nashville District list of Section 10 Navigable Waters for the Cumberland River and Tributaries (USACE 2021).

## 1.6 Project Purpose and Need

The proposed Project, which consists of the construction of the approximately 32-mile Cumberland Pipeline and appurtenant facilities (Cumberland Meter Station, Pressure Regulation Station, mainline valves, and inline inspection facilities), will allow TGP to transport approximately 245,040 dekatherms per day ("Dth/d") of natural gas from TGP's existing interstate pipeline system for TVA.  TVA has entered into a precedent agreement with TGP for all of the transportation capacity to be created by the Project.  TVA is evaluating several options to replace a coal-fired electric generation capacity at its Cumberland Fossil Plant ("CUF"), including one option that



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

would involve the construction and installation of a combined-cycle natural gas power plant at the CUF as a replacement for one of the coal-fired units to be retired. TGP's Project would serve this option, referred to as "Alternative A" by TVA, if selected by TVA as part of its evaluation process. In its draft Environmental Impact Statement ("DEIS") issued in April 2022, TVA concluded that the construction of a new combined-cycle natural gas power plant to replace one of the existing coal-fired at the CUF, which the Project facilities would serve, is the "best overall solution to provide low-cost, reliable, and cleaner energy to the TVA power system."[1] TGP is the closest interstate natural gas pipeline system to the combined-cycle natural gas power plant proposed by TVA as "Alternative A" and is uniquely positioned to serve TVA's expressed need for additional firm transportation capacity on TGP's system if "Alternative A" is ultimately TVA's selected option.

Contemporaneously with this application (consistent with FERC regulations), TGP is filing an application for a certificate of public convenience and necessity for the Project with the FERC, pursuant to Section 7(c) of the Natural Gas Act. TGP is filing the certificate application for the Project with the FERC at this time in order to be in a position to meet the in-service date requested by TVA in the event "Alternative A" is selected by TVA for its retirement and replacement project.

---

[1] Tennessee Valley Authority, Cumberland Fossil Plant Retirement Draft Environmental Impact Statement, (last accessed July 5, 2022), https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/environment/cuf-deis-report-only-20220421.pdf?sfvrsn=61161246_3, at 55.

**App-0779**

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

## 2.0  DREDGE AND FILL REQUEST

### 2.1  Jurisdictional Waters of the United States

The TGP Cumberland Project Wetland Delineation and Hydrologic Determination Report is provided as **Attachment 2** to this application. Field surveys included 100 percent of all construction workspaces where landowner access has been granted as of the date of this application. Survey access for approximately 1.15 miles of the pipeline route, equating to 16.45 acres of the Project construction right-of-way ("ROW"), has not yet been obtained. Based on desktop information and interpretation of the pipeline route where survey access has not yet been obtained, TGP anticipates potentially adding short, localized reaches of three perennial streams and three ephemeral streams to the Project following field verification of parcels that have not yet been surveyed. TGP will provide supplemental information to the USACE once remaining survey access has been obtained and surveys have been conducted.

Three tables describing waterbody (stream and ponds) and wetland impacts are provided as **Attachment 1** to this application. Summaries of all features identified within the construction workspaces are provided in Tables 2.1-1, 2.1-2, and 2.1-3.

Approximately 0.8 mile of the Cumberland Pipeline will be installed via horizontal directional drill ("HDD") to avoid open cut construction methods for the crossings of three (3) larger and potentially higher-flow streams:  Jones Creek (MP 3.2), Yellow Creek (MP 22.4), and Wells Creek (MP 30.7). The Yellow Creek HDD will also avoid one of its unnamed tributaries. No direct impacts to these streams are anticipated since the HDD crossing method will be used to cross under these four streams.



**App-0780**

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

**TABLE 2.1-1**
**Summary of USACE WOTUS Crossings**

| USACE WOTUS Crossings | | | Pipeline Crossing | | | | |
|---|---|---|---|---|---|---|---|
| Class | Flow Regime or Cowardian Class | Total Crossings | HDD | Dry Open Cut | Workspace Crossing | Access Road Crossings | Assumed Jurisdictional |
| Relatively Permanent Water | Perennial | 35 | 3 | 25 | 1 | 6 | 35 |
| Relatively Permanent Water | Intermittent | 34 | 1 | 25 | 2 | 6 | 34 |
| Non-Relatively Permanent Water | Ephemeral | 80 | 0 | 62 | 12 | 6 | 80 |
| Pond | PUB | 2 | 0 | 2 | 0 | 0 | 2 |
| Wetland | PFO | 2 | 0 | 0 | 2 | 0 | 2 |
| Wetland | PEM | 5 | 0 | 1 | 3 | 1 | 5 |
| **Totals** | | **158** | **4** | **115** | **20** | **19** | **158** |

**TABLE 2.1-2**
**Summary of USACE WOTUS Crossings by Length (Streams)**

| USACE WOTUS Crossings | | | Pipeline Crossing Length Impact | | | |
|---|---|---|---|---|---|---|
| Class | Flow Regime or Cowardian Class | Total Crossings | HDD | Dry Open Cut | Workspace Crossing | Access Road Crossings |
| Relatively Permanent Water (ft) | Perennial | 2,736.20 | 0.00 | 2,438.60 | 43.60 | 254.00 |
| Relatively Permanent Water (ft) | Intermittent | 2,665.80 | N/A | 2,445.80 | 82.40 | 137.60 |
| Non-Relatively Permanent Water (ft) | Ephemeral | 6,091.50 | N/A | 5,358.30 | 599.30 | 133.90 |
| **Totals** | | **11,493.50** | **0.00** | **10,242.70** | **725.30** | **525.50** |

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

**TABLE 2.1-3**
**Summary of USACE WOTUS Crossing by Acreage**

| USACE WOTUS Crossings | | | Pipeline Crossing Acreage Impact | | Workspace Crossing | Access Road Crossings |
|---|---|---|---|---|---|---|
| Class | Flow Regime or Cowardian Class | Total Crossings | HDD | Dry Open Cut | | |
| Relatively Permanent Water (acre) | Perennial | 1.28 | 0.00 | 1.03 | 0.00 | 0.24 |
| Relatively Permanent Water (acre) | Intermittent | 0.57 | N/A | 0.48 | 0.05 | 0.03 |
| Non-Relatively Permanent Water (acre) | Ephemeral | 0.50 | N/A | 0.44 | 0.05 | 0.01 |
| Pond (acre) | PUB | 0.20 | 0.00 | 0.20 | 0.00 | 0.00 |
| Wetland (acre) | PFO | 0.03 | 0.00 | 0.03 | 0.00 | 0.00 |
| Wetland (acre) | PEM | 0.24 | 0.00 | 0.23 | 0.00 | 0.01 |
| | Totals | 2.81 | 0.00 | 2.41 | 0.11 | 0.29 |

### 2.1.1 Waterbodies

The streams identified within the Project area are characterized by predominantly silt/clay and organic substrates. Intermittent and perennial streams within the Project area are characterized by bedrock, cobble, and gravel substrates, sometimes having fish, amphibians, and populations of benthic and macro invertebrates. Ponds are characterized by silt clay substrates and are often situated within pastures and associated with cattle watering.

### 2.1.2 Wetlands

Two broad classes (Cowardin et al. 1979) of palustrine (freshwater) wetland systems are present in the Project area: palustrine forested ("PFO") and palustrine emergent ("PEM"). Descriptions of wetland cover types are provided below.

**Palustrine Forested Wetlands** – The PFO wetlands are dominated by woody vegetation that is at least six meters tall (Cowardin et al. 1979). Prior to construction, temporary and permanent workspaces will be cleared of woody vegetation. During operation, the permanent easement or ROW will be maintained clear of trees and woody shrubs to allow for ongoing pipeline inspection and maintenance as required by the United States Department of Transportation ("USDOT") "Transportation of Natural and Other Gas by Pipeline: Minimum Federal Safety Standards" (49 CFR Part 192), A corridor not exceeding ten feet in width, centered on the pipeline, may be maintained annually in an herbaceous state as required to facilitate periodic corrosion and leak detection surveys. Dominant vegetation in the PFO wetlands along the proposed Project includes

red maple (*Acer rubrum*), sweetgum (*Liquidambar styraciflua*), tulip poplar (*Liriodendron tulipifera*), blackgum/black tupelo (*Nyssa sylvatica*), and loblolly pine (*Pinus taeda*).

**Palustrine Emergent Wetlands –** Construction of the proposed Project will temporarily affect PEM wetlands. PEM wetlands will not be permanently impacted as these areas will revert back to the same type following construction. Post-construction monitoring will be conducted to ensure that the areas are restored and that nuisance or exotic vegetation do not take over the areas. Herbaceous species found in these wetlands include bluestem (*Andropogon* spp.), soft rush (*Juncus effusus*), beaksedge (*Rhynchospora* spp.), blackberry (*Rubus argutus*), goldenrod *(Solidago elliottii*), and dog fennel (*Eupatorium capillifolium)*.

## 2.2  Preliminary Jurisdictional Determination Request

As a part of the Individual Permit application for the Project, TGP requests that a preliminary jurisdictional determination be approved for the Project based on the information submitted in the Delineation Report. The standard USACE Preliminary Jurisdictional Determination ("JD") form is provided as **Attachment 7** to this application.

## 2.3  Construction Methods

### 2.3.1  Standard Methods

Please see **Attachment 3** to this application for Project Design Plans and Permit Drawings for the Project.

### 2.3.2  Waterbody Methods

TGP will cross all waterbodies in accordance with the FERC Procedures (with requested deviations to be approved by the FERC), the Project's Stormwater Pollution Prevention Plan ("SWPPP"), and applicable USACE permit conditions. The proposed construction procedures will ensure that impacts at all stream crossings are minimized to the extent practicable. Prior to waterbody crossing construction, TGP will clear vegetation on each side of the waterbody, install sediment barriers, and prepare prefabricated segments of pipeline for installation. Stream crossings will be perpendicular to stream flow to the extent practicable. Temporary erosion control measures will be installed as necessary to prevent downstream impacts. If necessary, the pipe used for waterbody crossings will be weighted to prevent flotation.

Following construction, streambeds will be restored to their pre-construction elevations and grades. Spoil, debris, piping, construction materials, and any other obstructions resulting from or used during construction of the pipeline will be removed to prevent interference with normal stream flow. Any excavated material not used as backfill will be removed and disposed of in accordance with applicable federal, local, state, and local requirements. Following grading, all waterbody banks will be restored to pre-construction conditions and in accordance with permit requirements.

Waterbody and wetland construction methods may vary according to the physical and environmental characteristics of the crossing location. TGP anticipates that waterbodies will be crossed primarily by dry open cut methods, which may include a flumed crossing or dam-and-pump techniques, depending on site-specific conditions at the time of construction. Approximately 0.8 mile of the Cumberland Pipeline will be installed via HDD to avoid open cut construction methods in three (3) larger and potentially higher-flow streams as well as one associated unnamed tributary. All impacts on waterbodies due to pipeline construction will be temporary. A brief description of crossing methods that may be utilized at impacted waterbodies is provided below.

### 2.3.3  Dry Open Cut

Except for waterbodies that are proposed to be crossed using the trenchless HDD crossing method, TGP is proposing to cross the remaining waterbodies using dry open cut crossing methods. Use of "wet cut" methods, which would be implemented without diverting stream flow, are not anticipated for the Project. Dry open cut crossing methods, which consist of the "dam-and-pump" and "dry-flumed" crossing methods, will be accomplished by temporarily diverting stream flow around or through the work area to minimize contact between stream water and excavation and to minimize sediment suspension during trench excavation, pipeline installation, and backfill activities.

**<u>Flumed Crossing</u>**

A flumed stream crossing redirects the water flow through one or more flume pipes to allow for the trenching and pipe installation to occur in dry conditions. The number, length, and diameter of the pipes are dependent on estimated stream flow for the stream being crossed. This method allows for drier trenching, pipe installation, and restoration, while maintaining continuous downstream flow and passage for aquatic organisms. Soil types must have characteristics that allow stable stream bank conditions, and stream flow must be low enough for this method to be used successfully and safely. The flume pipe(s) must be long enough to account for the potential for the ditch width to increase during excavation (due to sloughing) and over-sized somewhat to accommodate the possibility of high flow conditions. An effective seal must be created around the flume(s) at both the inlet and outlet ends so water will not penetrate and potentially compromise the channelized dam. TGP will implement the following measures where the flumed crossing method is used:

- The flume pipe will be installed before any trenching;

- An effective seal will be created around the flume pipe with sandbags or an equivalent seal mechanism;

- The flume pipe(s) will be aligned parallel with natural water flow to prevent scouring of the bank, preventing erosion and sedimentation;

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

- The flume pipe will not be removed during trenching, pipe-laying, backfilling activities, or initial streambed restoration efforts, except in rare conditions where a severe flow event causes conditions that make it unsafe for the pipe to remain; and

- Flume pipes and dams that are not associated with an equipment bridge will be removed as soon as final clean-up of the stream bed and bank is complete.

<u>**Dam-and-Pump**</u>

The dam-and-pump method may be used for stream crossings where pumps and hoses can adequately transfer stream flow volumes from upstream of the work area to downstream of the work area, and where there are no concerns with preventing the passage of aquatic organisms. TGP will implement the following measures where the dam and pump method is utilized:

- Sufficient pump size, horsepower, and hose capacity, including on site backup pumps, will be used to maintain downstream flows;

- Coffer dams will be constructed with "clean" materials to prevent pollutants from entering the waterbody (e.g., sandbags or clean gravel with plastic liner);

- Water intakes will be suspended in the water column above the stream bed and will be screened to reduce entrainment of aquatic organisms or particles that may clog the pump;

- Pumps will be located within secondary containment structures to catch petroleum liquids and prevent them from entering the waterbody during refueling or if a pump failure occurs;

- For waterbodies with large volumes and strong velocity discharges, water dispersion structures will be placed at the downstream discharge location to prevent streambed scour; and

- The coffer dam, pumps, and hoses will be monitored and maintained to ensure proper operation for the duration of the waterbody crossing.

<u>**Rock Removal**</u>

Bedrock refers to the solid rock that is found beneath the soil layer and other unconsolidated rock or sediment fragments. Shallow and hard bedrock can restrict trenching, requiring special mechanical means or blasting in certain areas to excavate required design depths.

TGP anticipates encountering areas of shallow bedrock during Project construction that may require controlled blasting to remove, based on the following information: review of surficial geology, soil mapping, and desktop geotechnical survey results.

If bedrock is encountered during trenching, TGP plans to remove such bedrock using one of the techniques detailed below. The technique selected by TGP's construction contractor will be dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location. Techniques to be used are the following:



1. Conventional excavation with an excavator;

2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;

3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;

4. Removal by rock trencher; or

5. Controlled blasting and excavation with a backhoe.

At stream crossings, TGP's construction contractor will evaluate and attempt the use of at least one of Techniques 1-4 described above based on the conditions observed at the time of construction to determine the best method for rock removal and excavation. If the initial technique is unsuccessful for rock removal and excavation at stream crossings, Technique 5 (controlled blasting) will be considered in non-karst areas that are also not in wetlands or streams with an unacceptable risk of hydrologic loss. The risk of karst-prone geology and risk of unacceptable hydrologic loss has been evaluated for each stream crossing location at which a bedrock substrate has been identified, and the analysis is summarized in Section 2.7 (**Table 2.7-1**, Waterbodies Crossings Hydrologic Risk Analysis).

TGP has developed a Draft Blasting Plan for the Project, provided in **Attachment 5** – Project Environmental Construction Management Plan, **Appendix E** – Draft Blasting Plan. To avoid potential damage, TGP's blasting contractor will conduct pre-blasting of the rock, as needed, and develop site-specific blasting operations and monitoring plans to be approved by TGP. Control of blasting will limit stresses on existing pipelines, nearby structures, water supply wells, oil and gas wells, electrical transmission tower footings, and other utilities located near the Project area. Blasting activities will not begin until occupants of nearby buildings, stores, residences, businesses, and farms have been notified, and pre-blast inspections have been conducted on structures and water wells.

Special care will be taken to monitor and assess blasting within 200 feet of residences and 200 feet of private or public water supply wells. Blasting mats will be used during blasting to keep the material within the approved workspaces. TGP and its blasting contractor will adhere to the provisions in the Draft Blasting Plan, which identifies blasting procedures, including use, storage, and transportation of explosives (**Attachment 5** – Project Environmental Construction Management Plan, **Appendix E** – Draft Blasting Plan).

Following blasting, where necessary, excess rock will be removed from the Project's construction workspace, subject to affected landowner approval and applicable permit conditions. In areas where rock is predominant and little suitable backfill material is available, rock will be pulverized and placed in the trench as pad material around the pipe.



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

## Horizontal Direction Drill (HDD)

HDD is a specialized construction technique that is used to install pipelines in areas where traditional open cut excavations are not practicable due to technical feasibility, logistics, and costs. With the HDD method, a small diameter pilot hole is drilled from the entry point to the exit point. Drilling fluids are pumped to the drill bit, to cool the bit, remove rock cuttings, seal the drilled path, and lubricate the drill stem. From there, the hole is widened, and the pipeline is pulled into position. Compared to the other crossing methods, the HDD technique minimizes the impacts to an area by drilling down and under a sensitive resource, leaving the portion of land in between the entry and exit point relatively undisturbed. This trenchless construction method is described in detail in **Attachment 5** – Project Environmental Construction Management Plan, **Appendix D** – Draft HDD Contingency Plan.

HDDs are proposed at three locations that will avoid direct impacts to four streams. HDDs are proposed for the crossings of Jones Creek (MP 3.2), Yellow Creek and an unnamed tributary (MP 22.4), and Wells Creek (MP 30.7). The use of HDDs at these three locations will be implemented to overcome obstacles posed by use of other stream crossing construction methods that are impracticable because of channel dimensions, flow, or other constraints. The feasibility of HDDs at these three (3) locations has been confirmed by analysis of geotechnical testing. HDD feasibility studies were conducted in June 2022 and provided as **Attachment 9**.

### 2.3.4  Wetland Methods

TGP will protect and minimize potential adverse impacts on wetlands by using standard wetland construction and conventional wetland construction methods, as discussed below.

## Standard Wetland Construction

The standard wetland construction method will be used in wetlands where soils are non-saturated and able to support construction equipment at the time of crossing. This method requires segregation of topsoil from subsoil along the trench line. Where present, a maximum of 12 inches of topsoil will be segregated from the area disturbed by trenching, except where standing water is present or if soils are saturated. Topsoil segregation is followed by trench excavation, pipe laying, backfilling, and grade restoration. Immediately after backfilling is complete, the segregated topsoil will be restored to its original location. Of the six (6) total wetlands (one crossed twice for a total of seven (7) crossings) identified within the Project area, only one, WSTA001 (PEM, depressional), will be crossed by the proposed pipeline. The remaining six (6) temporary crossings will incur minor, temporary impacts due to workspace disturbances (i.e., equipment/construction staging locations, access roads, and additional workspace areas).

## Conventional Wetland Construction

Conventional wetland construction methods support construction equipment without significant soil disturbance. Prior to crossing and movement of construction equipment through these wetlands, the ROW will be stabilized using timber mats to allow for a stable, safe working condition. Unless soils are saturated, TGP will segregate up to the top 12 inches of wetland topsoil



over the trench line. Trench soil will be temporarily stockpiled in a ridge along the pipeline trench. Gaps in the spoil pile will be left at appropriate intervals to provide for natural circulation or drainage of water. While the trench is dug, the pipeline will be assembled in a staging area located in an upland area. After the pipeline is lowered into the trench, wide-track bulldozers or backhoes supported on timber mats will be used for backfilling, final clean-up, and grading. This method will minimize the amount of equipment and travel in wetland areas.

Where necessary, a drag-section may be used with the conventional wetland construction method. The drag-section involves the trenching, installation and backfill of a prefabricated length of pipeline containing several pipe segments all in one day. The trench is backfilled at the end of each day after the pipe is lowered in, as necessary to ensure safety.

Construction will not begin until all required authorizations are received. Please reference the plans included in **Attachment 5** to this application for further information about the planned construction methods for the Project (Project Environmental Construction Management Plan, which includes the *FERC Upland Erosion Control, Revegetation, and Maintenance Plan, FERC Wetland and Waterbody Construction and Mitigation Procedures (with requested deviations to be approved by the FERC), Draft Spill Prevention and Control Plan, Draft HDD Contingency Plan, Draft Blasting Plan, Draft Hydrostatic Test Plan)*.

## 2.4  Other Considerations

### 2.4.1  Hazardous Materials

Construction of the Project will potentially result in minor, short-term impacts, including temporary localized increases in turbidity levels and downstream sediment deposition in the waterbodies crossed. Furthermore, spills, leaks, or other releases of hazardous materials during construction or operation of the Cumberland Pipeline could adversely impact water quality. Hazardous materials could be flushed by stormwater overland and enter waterbodies that may be outside the immediate work areas, resulting in potential adverse impact on water quality and aquatic organisms. To protect surface and groundwater resources in construction and support areas from inadvertent releases of fuel and other mechanical fluids, TGP has developed a Draft Spill Prevention and Control Plan ("SPCP") (provided in **Attachment 5** to this application). The SPCP will be modified, as necessary, by TGP's environmental inspectors ("EIs") and/or construction contractor(s) to reflect any Project-specific measures needed for the Project and will be provided to FERC and TDEC for approval as well.

### 2.4.2  Erosion & Sedimentation

Stabilization will be achieved according to the limitations of the approved TDEC Construction General Permit and SWPPP. The work will be completed in the dry when practicable. When working in the dry is not practicable, check dams, diversions, or a system of pumps and sediment bags may be used to create dry sections and reduce sedimentation.



### 2.4.3  Hydrostatic Test Discharges

The pipeline will be hydrostatically tested for structural integrity prior to being placed in service. Preliminary sources of hydrostatic test water for the proposed Project are identified in **Table 2.4-1**. Municipal and other private water sources are also being evaluated. Unless deemed necessary, TGP will not add any chemicals to the hydrostatic test water for this Project and will obtain all required regulatory approvals. To the extent possible, test water will be cascaded between test sections to minimize water use. Where the construction sequence does not allow for cascading water from one section to the next (e.g., where a test needs to be conducted prior to the next section being ready for testing), additional water may be used to fill subsequent test sections. Testing will be completed by capping installed pipe segments with test manifolds, filling these segments with available water, and pressurizing this water to levels beyond the maximum operating pressure of the pipeline. Hydrostatic testing will be conducted in a manner that meets or exceeds the USDOT pipeline safety regulations, 49 CFR Part 192, as outlined in TGP's draft Hydrostatic Test Plan (see Draft Hydrostatic Test Plan, located in **Attachment 5** to this application). The water withdrawal locations for hydrostatic testing currently identified are those listed in Table 2.4-1. Like the water uptake for HDD mud preparation, the pumping rate will vary from 250 to 500 gallons per minute ("gpm"), and the water will be passed through a quarter-inch to half-inch mesh screen to block the uptake of various debris and aquatic biota. After pressure testing of the pipeline, the water will undergo water quality analysis to ensure compliance with permits and then will be discharged back into upland areas near the point of withdrawal through an energy dissipating structure. Environmental impacts from the discharge of hydrostatic test water will be minimized by the adoption of the measures prescribed in the FERC Upland Erosion Control, Revegetation, and Maintenance Plan ("Plan") and FERC Procedures (with requested deviations to be approved by the FERC) (**Attachment 5** to this application).



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

**TABLE 2.4-1**
**Potential Sources of Hydrostatic Pressure Test Water for the Project**

| Potential Source(s) | Approximate Milepost | Water Quantity (gallons) | Manifold/Discharge Location (MP)[1] |
|---|---|---|---|
| **Dickson County** | | | |
| Jones Creek | 3.20 | 3,212,000 | 3.20 |
| Barton's Creek | 10.08 | 1,696,000 | 10.08 |
| Furnace Creek | 12.14 | 748,000 | 12.14 |
| Dry Hollow Branch | 14.02 | 357,000 | 14.02 |
| Little Barton's Creek | 16.65 | 499,000 | 16.65 |
| Municipal and/or Private Sources | N/A | Unknown | Unknown |
| **Houston County** | | | |
| Yellow Creek | 22.75 | 3,571,000 | 22.75 |
| Guices Creek | 26.44 | 915,000 | 26.44 |
| Municipal and/or Private Sources | N/A | Unknown | Unknown |
| **Stewart County** | | | |
| Wells Creek | 30.68 | 3,627,000 | 30.6 |
| Cumberland River (offline source) if needed Lat. 36 23'48.82" Long. 87 39'33.29" | | 2,000,000 | TBD |
| Municipal and/or Private Sources | N/A | Unknown | Unknown |
| **Project Total** | | **6,131,000[2]** | -- |
| [1] Water will be discharged to upland areas near the point of withdrawal through an energy dissipating device. | | | |
| [2] Project Total Water needed. Does not represent the column total. | | | |

Following issuance of the FERC certificate authorizing the Project, TGP anticipates filing applications with state agencies for hydrostatic test water uptake and discharge. In accordance with Sections VII.C.2 and VII.D.2 of the FERC Procedures (with requested deviations to be approved by the FERC), hydrostatic test water will not be discharged to streams unless approved by the applicable state permitting agency.

## 2.5  Operational Maintenance

### 2.5.1  Waterbodies

Operational impacts on surface waters are not anticipated for the Project. Operational activities that could impact surface waters are restricted to stormwater discharges. No withdrawals for industrial or potable use are proposed. Following Project construction, the Pressure Regulation Station, Cumberland Meter Station, MLVs, and proposed PARs will include gravelled surfaces, which may result in a potential slight increase in stormwater runoff volumes. TGP will operate the Pressure Regulation Station and Cumberland Meter Station in accordance with permit conditions and regulatory agencies' rules and regulations to ensure that surface water impacts associated with the Project's operations are appropriately permitted and mitigated. Water quality impacts associated with stormwater discharges to surface waters are expected to be minor.

During the operation of the Pressure Regulation Station, Cumberland Meter Station, and MLVs, the potential for a chemical spill that could adversely impact surface waters is low and will be minimized by adherence to TGP's Draft SPCP (see **Appendix 5** to this application).

### 2.5.2  Wetlands

The permanent easement of the pipeline will be maintained by routine vegetation mowing and clearing maintenance activities in accordance with the FERC Plan and FERC Procedures (with requested deviations to be approved by the FERC). No wetlands are located within the Pressure Regulation Station, MLVs, or the Cumberland Meter Station; therefore, there will be no permanent impacts associated with the long-term operation of these facilities.

## 2.6  Proposed Stream, Wetland and Pond Characteristics

A total of 125 streams are located within the construction workspaces, with some streams crossed more than once. There are 35 crossings of perennial streams, 34 crossings of intermittent streams, and 80 crossings of ephemeral streams within the construction workspace for a total of 149 stream crossings for the Project. There is a total of 11,493.5 ft of watercourse crossings within the construction workspace (consisting of 2,736.2 ft of perennial streams, 2,665.8 ft of intermittent streams, and 6,091.5 ft of ephemeral streams). These crossings also account for 1.95 acres within the construction workspace (1.28 acres of perennial streams, 0.57 acre of intermittent streams, and 0.44 acre of ephemeral streams), but do not include the area for four streams (Jones Creek, Yellow Creek and an unnamed tributary, and Wells Creek) proposed to be crossed by HDDs at three locations where no direct impacts to streams are anticipated. All disturbances to streams will be temporary during the course of Project construction.

Construction of the facilities in the Project footprint will also temporarily disturb two ponds (totaling 0.20 acre) and six wetlands (totaling 0.27 acre). Of the total 149 Project stream crossings, 112 involve pipeline crossings. An additional 33 stream crossings will incur minor, temporary impacts due to construction workspace disturbances (i.e., equipment/construction staging locations,

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

access roads, and additional workspace areas). The remaining four (4) stream crossings will have no direct impacts due to the use of the HDD crossing method.

Disturbances to all other resources identified in the Project Study area, outside of the construction workspaces, will be avoided.

No permanent filling or loss of wetlands is proposed for the Project. However, the Project will result in the permanent conversion of 0.02 acre of forested wetlands within the new permanent easement to an herbaceous wetland due to construction clearing and periodic maintenance activities in accordance with the FERC Procedures (with requested deviations to be approved by the FERC). In addition, 0.01 acre of forested wetland in the temporary workspace will be cleared during construction but allowed to revegetate back to its forested state following restoration efforts, also in accordance with the FERC Procedures (with requested deviations to be approved by the FERC).

**Palustrine Forested Wetlands –** Prior to construction, temporary and permanent ROW workspaces will be cleared of woody vegetation. During operation, the permanent easement or ROW will be maintained clear of trees and woody shrubs to allow for ongoing pipeline inspection and maintenance as required by the USDOT's pipeline safety regulations, 49 CFR Part 192. A corridor not exceeding ten feet in width, centered on the pipeline, may be maintained annually in an herbaceous state as required to facilitate periodic corrosion and leak detection surveys. Dominant vegetation in the PFO wetlands along the proposed Project includes red maple (*Acer rubrum*), sweetgum (*Liquidambar styraciflua*), tulip poplar (*Liriodendron tulipifera*), blackgum/black tupelo (*Nyssa sylvatica*), and loblolly pine (*Pinus taeda*).

**Palustrine Emergent Wetlands –** Construction of the proposed Project will temporarily affect PEM wetlands. PEM wetlands will not be permanently impacted as these areas will revert back to the same type following construction. Post-construction monitoring will be conducted to ensure that the areas are restored, and that nuisance or exotic vegetation do not take over the areas. Herbaceous species found in these wetlands include bluestem (*Andropogon* spp), soft rush (*Juncus effusus*), beaksedge (*Rhynchospora* spp.), blackberry (*Rubus argutus*), goldenrod *(Solidago elliottii)*, and dog fennel (*Eupatorium capillifolium)*.

The broad categories of activities associated with the Project that may alter waterbodies include vegetation clearing, soil disturbance, erosion and sedimentation during construction activities, hydrostatic testing, HDDs, temporary fill from construction timber mats, and short- term habitat modification. Temporary wetland and stream impacts will be mitigated by returning impacted areas back to original elevation and condition, to the extent practicable. TGP will follow the FERC Plan and FERC Procedures (with requested deviations to be approved by the FERC), including Best Management Practices ("BMPs") used to prevent the deterioration of protected water resources during Project construction: These BMPs include:

- Minimizing vegetation clearing, use of timber mats, and minimizing soil disturbance;

- Avoiding unnecessary vehicular traffic and equipment use;



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

- Installing and maintaining erosion and sedimentation control devices such as straw bales and silt fences;

- Restricting the duration of construction to the extent practicable;

- Using timber construction mats to create a temporary work surface in wet conditions;

- Using low pressure ground equipment in wet conditions to minimize vegetation damage, soil compaction, and rutting;

- Training employees and contractors regarding the handling of oils and hazardous materials commensurate with their position;

- Inspecting equipment used in construction and operations at regular intervals;

- Using only approved access routes for vehicles transporting oils or fuel to construction sites;;

- Fueling equipment at the construction sites at least 100 feet from any waterbody, at the discretion of the Environmental Inspector;

- Storing hazardous materials, including chemicals, fuels, and oils, further than 100 feet of any waterbody;

- Using secondary containment, as appropriate, for pumps that transfer hazardous materials and liquids within 100 feet of a waterbody to prevent spills and overflow; and

- Keeping spill response materials on site and in designated vehicles.

A summary of proposed stream, wetland, and pond impacts can be found in Tables 1-3, Cumberland Wetlands and Waterbodies Impacts Tables (see **Attachment 1** to this application). Detailed Permit Drawings summarizing waterbody impacts and proposed construction methods at waterbody crossing locations are located in **Attachment 3** to this application.

## 2.7  Detailed Alternatives Analysis

TGP evaluated multiple alternatives in determining the preferred route for the Cumberland Pipeline.  The preferred alternative was chosen not only to minimize environmental impacts, but also to minimize impacts to cultural sites, public lands, landowners, and communities during the construction and operation of this pipeline. To the extent practicable, the proposed pipeline route is co-located with existing powerline ROW and utility corridors, with additional avoidance and minimization measures implemented to further reduce impacts to water resources and the environment where possible. A discussion of the alternatives considered is provided below.

### 2.7.1  General Pipeline Construction Considerations

Trench excavation will be the primary construction method to install the pipeline, although boring and HDDs (i.e., "trenchless") methods may be used for selected roads and waterbody crossings. The pipeline trenching corridor, adjacent work areas, and contractor yards will be cleared of vegetation and graded, as needed, to accommodate mobilization of equipment and materials and to facilitate access. Installation of the proposed pipeline will primarily involve excavation of a



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

trench, approximately 4.5 to 8 feet in depth (averaging approximately 5 feet deep) and 4 to 5 feet in width (averaging approximately 4.5 feet wide).

After the pipe is installed, the pipeline trench will be backfilled to grade by a minimum of 18 to 36 inches of cover (depending on location-specific soil and rock conditions) and vegetatively stabilized. Depth of cover over the pipeline installed beneath stream channels will be in accordance with Section 192.327(e) of the USDOT's pipeline safety regulations (49 CFR Part 192, Section 192.327(e)), which addresses pipeline installations occurring in navigable rivers or streams. Per subpart (e) of this section, all buried pipelines will be installed with a minimum cover of 48 inches of soil or 24 inches of consolidated rock between the top of the pipe and the underwater natural bottom.

### 2.7.2  Preferred Alternative (Least Environmental Damaging Practicable Alternative)

TGP conducted an analysis to determine if alternatives to implement the Project scope are practicable based on environmental considerations, technical feasibility, human safety, logistics, and construction costs. For proposed aquatic resource crossing methods, TGP considered alternatives, including wet open cut and dry open cut trenching crossing methods, as well as trenchless crossing methods, including conventional bore and HDD. TGP has selected proposed crossing methods that take into account the considerations identified above, including a reduction in environmental impacts to the extent practicable. The Cumberland Pipeline is proposed to be co-located for approximately 80 percent of its length with existing TVA transmission line and other utility easements. TGP is also proposing the use primarily of dry open cut crossing methods at 115 waterbodies (113 streams and two ponds) and one wetland, as well as trenchless HDD construction methods for the crossings of Jones Creek (approximate MP 3.2), Yellow Creek and an unnamed tributary (approximate MP 22.4), and Wells Creek (approximate MP 30.7). The remaining 34 crossings are crossed by the construction ROW workspace but not directly crossed by the pipeline.

The route for the Cumberland Pipeline is spatially constrained by two existing and fixed locations: (1) TVA's Cumberland Fossil Plant and (2) TGP's existing natural gas pipeline system (Lines 100-3 and 100-4). A primary routing consideration was co-locating the Cumberland Pipeline with existing utility easements for approximately 80 percent of its length, thereby minimizing environmental and landowner impacts. Based on TGP's analysis, an alternate Project route that is not co-located with existing utility easements would not result in decreased impacts to water quality and would have additional environmental and landowner impacts than the preferred route, where land use and property disruptions have already occurred.

### 2.7.3  No Action Alternative

Under the No-Action Alternative, the Project facilities would not be constructed. Although the No-Action Alternative would avoid the temporary alterations of aquatic resources associated with construction of the proposed Project, under the No-Action Alternative, TGP would not be able to meet TVA's stated need for the Project, as discussed in Section 7.0 above.



The No-Action Alternative was rejected from further consideration because it did not meet the purpose and need for the Project.

## 2.7.4   Route Alternatives

In order to meet the purpose and need for the Project, the Cumberland Pipeline was designed to extend from the Project receipt point on TGP's existing interstate natural gas pipeline system along the Project's eastern beginning point to the Project delivery point at the location of TVA's proposed combined-cycle combustion turbine gas plant to be located on the Cumberland Fossil Plant Reservation at the Project's western terminus. Because these points are fixed as existing facilities, alternate routes with other starting or terminating points are not practicable or feasible to achieve the Project purpose. TGP's preferred route for the Cumberland Pipeline extends between these two points generally along an existing TVA powerline easement and other utility easements. This route is preferred primarily because of its generally co-located alignment between the Project receipt and delivery points.  Further, with regard to Project impacts, disruptions to existing land-use along the TVA powerline easement and other utility easements have already occurred and have been assimilated, minimizing impacts to the environment and to new landowners for alternative routes. Finally, ease of access along the existing TVA easement and other utility easements by use of existing access roads for Project construction and operations provides another advantage for the preferred route as compared to alternative routes.

Because of the ubiquitous occurrence of streams and wetlands in the topographically dissected Western Highland Rim Physiographic Province in which the Project is located, it is unlikely that other routes between the Cumberland Pipeline's receipt and delivery points would encounter substantially fewer aquatic resources than those along the preferred route, which is co-located with an existing TVA powerline easement and other utility easements for approximately 80 percent of its length. Further, alternative routes likely would contain aquatic resources that have not been disturbed by previous utility clearing and maintenance activities. For these reasons, TGP has chosen the route generally extending along the TVA powerline easement and other utility easement as the preferred alternative for the Cumberland Pipeline.

### *2.7.4.1 Major Route Alternatives*

There are no additional major route alternatives to the Cumberland Pipeline.

### *2.7.4.2 Minor Route Variations*

During the process of siting the Cumberland Pipeline, TGP has and will continue to consider multiple minor route variations to refine the pipeline alignment and to address concerns raised by potentially affected landowners. Route variations have been made to accommodate construction limitations, to improve the alignment for features such as roads and waterbody crossings, and to eliminate avoid natural features that would prove to be challenges not only during construction, but also during restoration and operation of the pipeline, as well as to address landowner concerns. **Table 2.7-1** summarizes the route variations that TGP has considered and incorporated in the Project alignment. As of the date of this application, TGP continues to refine the pipeline



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

route and address route variations requested by potentially affected landowners and regulatory agencies, which may necessitate further changes to proposed pipeline route.

**TABLE 2.7-1**
**Cumberland Project Minor Route Variations**

| Mile Post | Variation Description | At Landowner Request |
|---|---|---|
| 0 | Potential sites for Pressure Regulation Station | |
| 2.3 | Rock ledge avoidance | |
| 3 | Landowner request to shift onto TVA easement | X |
| 4.5 | Avoid building on east side of White Oak Flat Road and eliminate additional pipeline points of inflection | |
| 8.5 | Improve crossing angle at two streams on tract 1.055 | |
| 12.5 | Avoid water feature | X |
| 16.5 | Avoid spring well and align the route for improved stream crossing and create a more perpendicular crossing for Little Bartons Creek | |
| 22.7 | Adjust stream crossing away from middle of the stream | |
| 25 | Avoid side hill construction and align the route to parallel the TVA easement | |
| 26 | Improve crossing angle at Highway 13 and stream (encroaches on TVA) | |
| 30-32 | Address multiple HDD routing issues at Wells Creek | |

## Route Variation at MP 0

TGP examined multiple locations for the siting of the Pressure Regulation Station at MP 0, with the tie-in points with the existing TGP 100-3 and 100-4 pipelines, and the placement of the pigging facilities (see **Attachment 10**).

## Route Variation at MP 2.3

The route variation located at approximate MP 2.3 (see **Attachment 10**) was designed to avoid a vertical rock cliff along the original alignment of the pipeline route, east of Jones Creek. Once TGP was able to access the original pipeline route in this area, the shear rock cliff was discovered. After review of this area, TGP determined that rather than physically impacting the cliff slope to construct the pipeline and then restoring the cliff following construction, it would be preferable to consider a route variation in this area. TGP did consider using HDD technology to cross the rock cliff but determined that elevation changes between the entry and exit locations would make execution of the HDD difficult, with a probable low success of successful completion. This route variation deviates from the TVA powerline corridor to the south, avoiding the rock cliff. Once past the cliff area, the pipeline route will then turn north to re-join the original pipeline route at the HDD exit additional temporary workspace ("ATWS") for Jones Creek on the north side of the TVA



powerline easement. This variation results in an additional 0.02 mile of pipeline length as compared to the original pipeline route in this area.

### Route Variation at MP 3

A route variation will be located at MP 3 in response to a request from a potentially affected landowner to minimize tree clearing on his property (see **Attachment 10**). In order to minimize tree clearing on this property, TGP evaluated whether the proposed pipeline could be located within TVA's existing powerline easement. However, based on discussions with TVA's power transmission group, the proximity of constructing a pipeline within an existing powerline easement to the powerline towers and the conductors would raise safety concerns during construction (including during the performance of the HDD to cross Jones Creek) and operation of the pipeline. Therefore, constructing the proposed pipeline within the existing TVA powerline easement is not a viable option. In order to minimize tree clearing, TGP is locating the proposed pipeline route on the southside of TVA's existing powerline easement. This variation results in an increase in pipeline length of 0.05 mile as compared to the original pipeline route in this area.

### Route Variation at MP 4.5

This route variation located at approximate MP 4.5 (see **Attachment 10**) was adopted to avoid a building on the east side of the White Oak Flat Road points of inflection ("PI"). At this location, the original alignment was already not co-located with TVA's existing powerline easement. The original routing of the pipeline away from the existing powerline easement was used to avoid a group of homes and structures located immediately adjacent to the TVA powerline easement. This variation moved the original alignment an additional 150 feet further to the north to avoid a home. The original alignment also contained numerous PIs that would necessitate routing the pipeline across White Oak Flat Road and subsequently back to the TVA easement. This variation avoids the need for those PIs, but still allows a perpendicular crossing of the road. This variation does not result in a change in pipeline length as compared to the original pipeline route in this area.

### Route Variation at MP 8.5

The route variation located at approximate MP 8.5 (see **Attachment 10)** was made to avoid paralleling an unnamed tributary of Harris Branch. The original route paralleled the tributary for approximately 375 feet. The movement of the pipeline to the south by approximately 20 feet eliminates the paralleling the tributary in the construction ROW. This variation results in a reduction in pipeline length of 0.01 mile as compared to the original pipeline route in this area.

### Route Variation at MP 12.5

The route variation located at approximate MP 12.5 (see **Attachment 10**) was made to avoid a pond. The original route paralleled the powerline for approximately 660 feet. This variation results in an additional pipeline length of 38 feet as compared to the original pipeline route.



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

## Route Variation at MP 16.5

The route variation located at approximate MP 16.5 (see **Attachment 10**) involved the realignment of the pipeline route from the north side to the south side of the TVA powerline easement to avoid a spring and to provide an improved perpendicular crossing of Little Bartons Creek. The routing of the pipeline on the south side of the TVA powerline easement maintains co-location with the TVA powerline easement and allows for a more perpendicular crossing of Little Bartons Creek than the original routing. In addition, the route variation provides for ATWS between the creek and Little Bartons Creek Road than the original route. This additional ATWS will allow TGP to safely and efficiently conduct the road bore planned for Little Bartons Creek Road. This variation does not result in a change in pipeline length.

## Route Variation at MP 22.7

The route variation located at approximate MP 22.7 (see **Attachment 10)** was made to accommodate a more perpendicular crossing of Highway 939 and to accommodate more perpendicular crossings for two unnamed tributaries of Yellow Creek. The original alignment placed the pipeline parallel to the TVA powerline easement and would have the pipeline crossing a stream at an angle, thus increasing the length of the stream crossing, and generally not conforming to crossing roads at a 90-degree angle. At the furthest point in the variation, the pipeline was moved approximately 175 feet away from the TVA powerline easement. Both the original route, as well as the route variation, are located within active agricultural areas; thus, there are no additional impacts to any sensitive features with this route variation. This variation does not result in a change in pipeline length.

## Route Variation at MP 25

The route variation located at approximate MP 25 (see **Attachment 10**) avoids difficult side slope and stream construction along the southern side of the TVA powerline easement. Further, the variation will allow for increased co-location with TVA's powerline easement over the original routing. This variation results in a reduction in pipeline length of 0.01 mile as compared to the original pipeline route in this area.

## Route Variation at MP 26

The route variation located at approximate MP 26 (see **Attachment 10**) addresses two items. First, the variation allows for a more perpendicular crossing of Highway 13 and provides more area between the crossing and TVA's powerline easement. Second, the variation allows for a more perpendicular crossing of Guices Creek. At the original crossing location of Guices Creek and Highway 13, which was parallel the south side of the TVA easement, TGP determined that there was insufficient workspace to cross both features at the same time. This would have resulted in a congested construction work area, leading to safety and constructability issues. The variation moved the pipeline to more agricultural land, which allows for more workspace for both the road and waterbody crossings and reduces about 120 feet of forested impacts on the east side of Highway 13. This variation does not result in a change in pipeline length.



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

**Route Variations MPs 30-32**

Three minor route variations were evaluated between MP 30-32 where the pipeline needed to be routed away from the original pipeline route (paralleling the TVA powerline easement) to connect to the Cumberland Meter Station location specified by the Project Shipper on TVA property. To accommodate multiple routing issues, including the preferred location of the HDD of Wells Creek, avoidance of known archaeological sites, and an adjustment to avoid a railroad bridge, the preferred pipeline to the Cumberland Meter Station within the TVA property was selected (see **Attachment 10 - Sheet 10 of 10**). **Table 2.7-2** summarizes the collective items addressed in the interconnected route variations that were considered between MP 30-32 The preferred route, which incorporates the minor route variations set forth in **Table 2.7-2**, results in an increase of approximately 0.12 miles over alternative routes considered between MP 30 and MP 32.

**TABLE 2.7-2**
**Minor Route Variations (Summary MP 30-32)**

| Mile Post | Construction Method | Variation Description (Selected Route) |
|---|---|---|
| 29.8–32 | Upland Construction; Stream-crossing Construction; HDD | Shifted route westward toward TVA's preferred location for the Cumberland Meter Station and to avoid the Stewart Houston Industrial Park. |
| 30.1 | Upland Construction; Stream-crossing Construction | Shifted 50 feet to the south to avoid old railroad bridge supports when crossing abandoned railroad. |
| 30.3–30.8 | Upland Construction; HDD | Moved route to attain a more perpendicular HDD crossing of Wells Creek and avoid crossings of Booster Branch and another tributary to Wells Creek, as well as avoid known cultural resource locations. Moved onto TVA property toward TVA's preferred location for the Cumberland Meter Station. |

### 2.7.5  Construction Methods Alternatives

Pipeline construction across varied terrain and through a variety of materials requires flexibility to select construction methods from a number of potential options. For the Project's crossings of aquatic resources, including those underlain by bedrock and unconsolidated materials, TGP evaluated multiple considerations (safety, potential impacts to water quality, hydrologic loss, cost, existing technology, and logistics). Additionally, preliminary geotechnical and geological studies were undertaken to identify the physical constraints and conditions that are or may be presented by the underlying geology. A summary of the various geologic, hydrologic, and watershed conditions at each waterbody crossing location is presented in **Table 2.7-3,** Waterbodies Crossings Hydrologic Risk Analysis. The information provided in this table has been used to support TGP's selection of the most appropriate construction method at each of the waterbody crossing locations.



TGP evaluated various waterbody crossing alternatives that meet accepted pipeline construction using TGP standards and industry practices. Crossing methods considered for the Project were divided into two main categories: (I) open trench and (II) trenchless. Open trench methods consist of a trench that is excavated within a stream or wetland to allow placement of the pipe. Trenchless methods use specialized equipment to bore or tunnel underneath a waterbody through which the pipe is installed. Open trench and trenchless crossing methods considered for the Project include:

      I.      Open Trench
              A.  Wet Open Cut, consisting of trench excavation across a flowing stream. Because of considerations for adverse water quality consequences (e.g., turbidity, downstream sedimentation), TGP has determined that wet open cut crossing methods will not be used for the Project.
              B. Dry Open Cut

                  i. Flume Crossing
                  ii. Dam and Pump Crossing

      II.     Trenchless Crossing Methods:

              A. Horizontal directional drilling (HDD)
              B. Conventional bore

**Attachment 11** provides an overview of the differences between trenching and trenchless methods (adapted from information prepared for the Constitution Pipeline Company, LLC project in 2013). In general, open trench methods take less time, are less expensive, and present less risk of failure or complications as compared to trenchless methods. However, trenchless methods are proposed for certain crossings for the Project to avoid environmental impacts at two Natural Rivers Inventory stream reaches (Jones Creek and Yellow Creek) and due to the physical characteristics of Wells Creek. As will be discussed in more detail below, the selection of the appropriate crossing method for a particular waterbody is dependent on a variety of factors, including the specific geology of an area.

### *2.7.5.1 Open Trench Crossing Methods*

### <u>Wet Open Cut</u>

The wet open cut construction procedure provides the most rapid and economical method for constructing a pipeline at a stream crossing. For this method, a trench is excavated across the waterbody during times of seasonal normal or below-normal stream flow. A prefabricated section of the pipe is then laid into the trench, which is subsequently backfilled to cover the pipe. The waterbody is then restored to its pre-construction conditions. However, when utilizing the wet open cut method, the waterbody is at an increased risk for negative impacts to the aquatic environment, including an increase in turbidity caused by the exposure of unconsolidated soil material, an increase in erosion rates that may increase turbidity downstream of construction activities, and the potential introduction of contaminants into the waterbody from potential incidental releases during construction activities.

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

While there are advantages to using the wet open cut method, including less time in stream than other crossing methods and less time to prepare before trenching begins, there are disadvantages to this method, including (1) the contactor being unable to inspect the trenchline before the pipeline is installed, (2) downstream sedimentation and turbidity increase, and (3) aquatic species that may be adversely affected.

While the FERC Procedures (with requested deviations to be approved by the FERC) allow for the use of the wet open cut method for waterbody crossings in linear pipeline projects, TGP has removed this crossing method from consideration for the Project's pipeline waterbody crossings due to the potential environmental and water resources risks posed by the technique.

**Dry Open Cut**

The dry open cut construction procedure involves isolating the streambed work area from the stream to allow the construction to be performed in a controlled "dry" state by temporarily diverting the stream around the work area. The most common dry open cut methods include the flumed crossing and the dam and pump crossing methods. The dry open cut method has been selected as the preferred crossing method for the majority of waterbody crossings for the Cumberland Pipeline. The two main types of dry open cut crossing methods are discussed below. Dry open cut methods result in increased time to cross a stream as compared to wet open cut methods. Given the potential for weather to affect the flow in the stream and thus the crossing, and the ability to handle flow volume, the use of dry open cut crossing methods may result in the inability to handle stream flow appropriately for certain waterbody crossings. In that case, a trenchless crossing method (HDD or conventional bore method, as discussed below) may be determined to be more appropriate.

*Flume Crossing*

In the flumed crossing method, a flumed stream crossing redirects the water flow through one or more pipes to allow for the trenching and pipe installation to occur in dry conditions. The number, length, and diameter of the pipes are dependent on estimated stream flow for the stream being crossed. The major advantage of this method is that it allows for dry trenching, pipe installation, and restoration, while maintaining continuous downstream flow and passage for aquatic organisms. Further, because this method isolates the stream flow from the construction activities, the only downstream turbidity that is created is during the dam/flume installation.

*Dam-and-Pump Crossing*

The dam-and-pump crossing method is primarily used for stream crossing where pumps and hoses can adequately transfer stream flow volumes from upstream work to downstream of the work area, and where there are no concerns with preventing the passage of aquatic organisms. The major advantage of this method is that it allows for dry trenching, pipe installation, and restoration, while maintaining continuous downstream flow. Further, because this method isolates the stream flow from the construction activities, the only downstream turbidity that is created is transient conditions of short duration during the dam installation.



**App-0804**

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

Both methods require that the waterway is dewatered in the construction area by pumping the standing water into a dewatering structure on the banks. The streambed material is then segregated and stockpiled to prevent mixing with other materials and used during the stream restoration process. In terms of adverse environmental effects and practicability, these two methods are essentially equivalent.

*Rock Removal*

If bedrock is encountered during trenching, TGP plans to remove such bedrock using one of the techniques detailed below. The technique selected by TGP's construction contractor will be dependent on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location. Techniques to be used are the following:

1. Conventional excavation with an excavator;

2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;

3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;

4. Removal by rock trencher; or

5. Controlled blasting and excavation with a backhoe.

At stream crossings, TGP's construction contractor will evaluate and attempt the use of at least one of Techniques 1-4 described above based on the conditions observed at the time of construction to determine the best method for rock removal and excavation. If the initial technique is unsuccessful for rock removal and excavation at stream crossings, Technique 5 (controlled blasting) will be considered in non-karst areas or in wetlands or streams with an unacceptable risk of hydrologic loss. The risk of karst-prone geology and risk of unacceptable hydrologic loss has been evaluated for each stream crossing location at which a bedrock substrate has been identified (see **Attachment 11**).

If controlled blasting is necessary at a waterbody or wetland crossings, TGP's construction contractor will utilize a dry-ditch crossing method (either dam-and-pump or flume crossing) and adhere to 1) all applicable federal, state, and local regulations, including the FERC Procedures (with requested deviations to be approved by the FERC), applicable USACE and TDEC permit conditions, 2) Draft Blasting Plan (see **Attachment 5**), and 3) karst mitigation measures. Immediately following blasting, TGP would remove rock that impedes stream flow.

<u>Conventional Excavation</u>

This method consists of using a backhoe to dig a trench. It is most effective in poorly or unconsolidated materials, such as a dry stream bed underlain by fluvial materials. In conditions supporting its use, including unconsolidated substrate materials that can be relatively easily removed, Conventional Excavation ("CE") presents little environmental risk to water quality and



is the most practicable alternative considering technical feasibility, logistics, and costs. However, in instances where tougher substrate materials are present, this alternative may not be practicable because of technical infeasibility. Accordingly, CE will not be used to trench across channels with exposed bedrock substrate. For channels covered by unconsolidated materials overlying bedrock at greater depths, CE will be used to depths at which it is practicable, but removal of deeper materials will necessitate selection among the additional methods described below.

*Ripping*

This method makes use of an excavator equipped with concave tooth that is inserted into and dragged through substrate materials. After ripping, a conventional excavator is used to remove the dislodged materials from the trench. For streams at which bedrock is encountered at or beneath the streambed surface, ripping will be the preferred alternative in terms of least environmentally adverse effects because it confers little or no risk of hydrologic loss.

*Hammering*

Hammering entails use of a pneumatic tool attached to a backhoe boom to break apart substrate materials. After hammering, a conventional excavator is used to remove the dislodged materials from the trench. Hammering is time-consuming and increases construction costs considerably in comparison with CE or ripping. Further, hammering exposes equipment operators to prolonged hours on the work-site, potentially resulting in safety risks. Hammering also entails a risk of fracturing potentially resulting in hydrologic loss.

*Rock Trenching*

This method uses a large trenching machine to cut through bedrock. Although costly to mobilize, this method can reduce construction time at the work site. Primary disadvantages are cost and inaccessibility for many sites where tight space or steep slopes prevent the effective use of the equipment.

*Controlled Blasting*

The use of the dry open cut method with controlled blasting will only be used if other rock removal methods have been evaluated but deem impracticable. TGP anticipates that controlled blasting will be used rarely to facilitate waterbody crossings. In no event will controlled blasting be used in karst-prone areas or wetlands. A desktop analysis of the study area has identified a few areas of shallow bedrock where controlled blasting may become necessary to cross certain waterbodies using the dry open cut construction method (see **Attachment 11**). TGP's Draft Blasting Plan is provided in **Attachment 5**, **Appendix E**. In the unlikely event that controlled blasting is needed, a qualified contractor will review and update this plan to address the specific circumstances of each dry open cut waterbody crossing that requires controlled blasting to remove rock. A qualified Project biologist will survey the area immediately in advance of the controlled blasting activities, including any drilling. for the presence of any sensitive species. Once cleared, holes will be drilled into the streambed and carefully loaded with explosives and packed with aggregates. A pre-blast



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

safety check will then be performed followed by the controlled detonation of the explosives, which will result in a small release of dust and mounding of the surface.

The use of controlled blasting would drastically minimize the duration of in-stream work and temporary disruptions to stream flow. The overall area of construction impacts when using controlled blasting is significantly smaller in comparison to other construction methods and results in less costs given reduced time in the workspace. However, the use of controlled blasting may confer a higher risk of loss of stream flow than other crossing construction methods; thus, it is not generally considered to be the LEDPA at locations where other methods are feasible and practicable.

Although TGP expects the use of blasting for the removal of rock at waterbody crossing for the Project to be limited and has eliminated the use of controlled blasting for rock removal for use in karst-prone areas, crossing conditions at non-karst prone locations where CE, ripping, hammering, or rock trenching are technically infeasible to dislodge bedrock materials may require controlled blasting as the only practicable alternative. In these instances, TGP will ensure that controlled basting is localized and isolated to within the trench line to minimize the movement of materials outside of the waterbody. Drill patterns will be set so that they achieve smaller rock fragments, which will allow for the use of as much of the fragmented rock as possible when restoring the trench to its pre-construction condition. Rock fragments also will be shifted, as needed, to maintain the contours and flow patterns of the waterbody after the blasting is complete.

To further avoid or minimize the impacts to wetlands and waterbodies to the extent practicable, TGP will implement the following procedures if it is necessary to use controlled blasting to remove rock with dry open cut trenching:

- Limiting the width of crossing to 75 feet;

- Locating extra workspace at a minimum of 50 feet from waterbodies (except where adjacent land is agricultural or disturbed);

- Conducting all controlled blasting in dry conditions within the 75 feet workspace;

- Expediting each crossing during construction activities by completing stream crossings separate from the mainline construction; and

- Restoring crossings and original contours immediately following installation.

Karst mitigation measures will be implemented during and after controlled blasting operations. These measures are detailed in Section 8. TGP has included dry open cut crossing method with controlled blasting for rock removal in its site-specific analysis of appropriate crossing methods. TGP will not utilize the dry open cut crossing method with controlled blasting for rock removal in wetland habitats.



**App-0804**

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

### *2.7.5.2 Trenchless Crossing Methods*

<u>**Horizontal Directional Drilling**</u>

The HDD method is a trenchless construction procedure in which a waterbody is crossed by pulling the prefabricated pipeline into place using drilled boreholes. In this procedure, a small diameter pilot hole is drilled down from an entry point to an exit point by pumping a slurry mixture of bentonite clay, drilling additives, and water into the ground at high pressure. The hole is then widened, and the pipeline is pulled into position. The HDD method has been a standard construction procedure for linear pipeline installations across large waterbodies since the 1970s. This construction procedure drastically reduces the impacts to waterbodies and their aquatic environments by drilling down and under the sensitive resource, resulting in the surface area between the entry and exit point remaining relatively undisturbed.

While the HDD method is a proven technology for pipeline installations, there is still the potential that the HDD method can fail for reasons such as encountering soil conditions that are not conducive to boring, borehole collapse, and loss of the drill string or drilling fluid return. TGP has performed a feasibility analysis of the study area to determine if HDD is a viable waterbody crossing method. This analysis included geological surveys, reviews of nearby public drinking water sources, private wells, and mining activities (active and abandoned).

Three (3) HDDs are being proposed for the Project at the following waterbodies: (1) Yellow Creek, (2) Jones Creek, and (3) Wells Creek. Prior to the final HDD determination, TGP conducted geotechnical investigations in June 2022 at each of these three crossings to assess the characteristics of the geologic formations. This information was reviewed, and it was confirm that a HDD is technically feasible for each crossing given the specific geology evaluated by project engineers to ensure the HDD has a high rate of success.

TGP has included the HDD crossing method in the site-specific analysis in **Attachment 5**.

<u>**Conventional Bore**</u>

Conventional boring consists of creating a shaft/tunnel for a pipe or conduit to be installed to minimize surface disturbance. This is accomplished by first excavating a bore pit and a receiving pit. The bore pit is excavated to a depth slightly deeper than the depth of the associated trench and is graded such that the bore will follow the proposed angle of the pipe. A boring machine is then lowered to the bottom of the bore pit to tunnel using a cutting head mounted on an auger. The auger rotates through a bore casing, both of which are pushed forward as the hole is cut. The pipeline is then installed through the bored hole and welded to the adjacent pipeline. The typical workspace configurations required for boring operations consist of staging areas (50 feet by 100 feet) for boring machine setup, cuttings/return settlement and storage pits, pipe storage, entrance and exit pit spoil storage, and construction equipment necessary to support the operation.

Major factors limiting the success of a boring operation under waterbodies for the Project include the crossing distance, subsurface soil and geologic conditions, and existing topography. Boring



**App-0805**

operations typically occur over a crossing distance of 50 to 60 feet. The maximum length a bore could achieve in ideal soil conditions typically does not exceed 400 feet. Subsurface soil and geologic conditions must be conducive to establishing and maintaining a safe bore pit excavation, as well as provide the capabilities for the boring equipment to conduct a successful bore. Loose-packed sediment, free of rock material, is preferred when conducting boring operations. The topographic conditions for most waterbody crossing locations on this Project also limit the use of this method, as preferred locations are generally consistent with level or moderately convex terrain, such that the depth of the bore pit does not present concerns relative to constructability or safety constraints.

Based on the factors discussed above, conventional boring under waterbodies is not proposed for pipeline waterbody crossings for the Project.

*HDD/Conventional Bore Methods versus Conventional Dry Open Cut Crossing Methods*

TGP considered six (6) factors when evaluating the use of trenchless HDD or conventional bore crossing methods versus a dry open-cut method for Project waterbody crossings: (1) the length of the crossing, (2) the potential for risk of loss of drilling fluid (i.e., inadvertent/lost returns), (3) geological considerations, (4) duration in time of the crossing, (5) worker safety and technical feasibility, and (6) cost of the crossing method. For a 30-inch diameter pipe, as will be installed for the Project, the minimum distance needed to achieve the necessary radius for the HDD pipe string is approximately 1,300 feet, which means that each HDD must be at least 1,300 feet long, regardless of the width of the feature it is avoiding in order to reduce stress pressure on the pipeline. Considering the undulating topography of the Project area, many HDD entry/exit pads or conventional bore entry/exit pits likely would be located on slopes, which create a construction safety and technical feasibility challenge. Further, given the need for HDD or conventional bore entry and exit pads or pits to be at or near the same elevation to promote drill cutting returns, use of these methods in hilly terrain may not be practicable. For example, if either the entry or exit points is at a higher location than the other, greater annular pressure is needed to facilitate the drill cutting returns. This increase in pressure could contribute to additional risks of inadvertent returns to the formation or to the surface.

Inadvertent returns are characterized by drilling fluid flowing through the underlying formation and finding a pathway of least resistance to the surface or to voids in the formation. These returns may be expressed on land or in the feature that is being avoided. Although the drilling fluid is generally inert bentonite clay that is not toxic or harmful, it may be discharged to downstream waters. In that event, inadvertent returns would be contained and cleaned up once identified.

Costs associated with a HDD and conventional bore, in general, may be five (5) times more per foot than costs for a conventional crossing using open cut methods, which can become prohibitive to the Project budget (see **Attachment 11**).

Geology plays a major role in the success of an HDD or conventional bore. In an area without the appropriate geology to support a HDD or conventional bore, the drilling hole will not maintain its integrity and could collapse, causing delays. In other areas, if the geology contains large boulders



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

or voids, the drilling head cannot negotiate these obstacles and the bore may fail. Further, for a HDD, in order for the radius of the drill and pipe to be maintained, the boring must be made to greater depths in the formation, potentially impacting groundwater resources or karst topography.

HDD and conventional bores take more time to complete than open cut crossings due to the amount of drilling equipment necessary, the mobilization and demobilization of the drilling equipment, the drilling itself, pipe preparation, and for a HDD, the pullback of the pipeline. For the proper pullback of the pipeline, the same length of construction workspace is needed to accommodate a straight entry into the exit point of the HDD. In some cases, due to pipeline inflections, and the lack of available straight construction workspace, a false ROW may be needed, thus increasing potential impacts. A false ROW is a work area approximately 50 feet wide by the length of the HDD pullback section that is prepared to stage the pipeline. Generally, HDDs can take a month or longer to complete. HDDs occur over a longer timeframe with continuous activities throughout the procedure in comparison to open cut methods. During this time, there is the possibility of impacts to noise sensitive areas, inadvertent returns, and equipment failures throughout the duration of the HDD.

When comparing a HDD or conventional bores to conventional open cuts of streams/wetlands, the issues associated with the HDDs and conventional bores are reduced or mitigated by the use of open cut methods. For example, the trench line for open-cut methods is much shallower across a stream, thus minimizing the potential impact to deep geological features. Also, there is no need for long pull back sections for conventional open cut crossings because there is no minimum length of pipeline that is needed to cross a stream. The length of the pipeline is dictated by the stream width, not the necessity to maintain a certain radius to reduce pipe stressors, as is the case with an HDD. There are no risks of inadvertent returns for a conventional open cut crossing as no drilling fluid is used during the process. The conventional open cut crossing is a straightforward digging of the trench line, installing the pipeline, and backfilling with native material. At all times during a conventional dry open cut of a stream, the contactor is able to see the trench line and the surrounding work zone, unlike that of a HDD or conventional bore, which increases the safety factor. Also, in general, it takes one to two days to complete a conventional open cut crossing (if not using controlled blasting for rock removal), as opposed to at least one month for an HDD or up to 10 days for a conventional bore. While the timing of an open cut crossing can be extended for certain reasons, such as weather, stability of the trench line, and water flow, the time for an open cut crossing is still much less than that for an HDD.

Based on the analysis of these factors, TGP has selected the dry open cut crossing method for the majority of waterbody crossings for the Cumberland Pipeline. HDDs are proposed for certain Project crossings to avoid environmental impacts at two Natural Rivers Inventory stream reaches (Jones Creek and Yellow Creek) and due to the physical characteristics of Wells Creek. The HDD at Yellow Creek will also avoid direct impacts to one of its unnamed tributaries.



App-0807

**TABLE 2.7-3**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 0.09 | SDKA023 | Upper Sugarcamp Branch | Perennial/ Spring | Bedrock | Mfp | Possible | U | 0.02 | 0.010 | M | Dry Open Cut | Dam & Pump |
| 0.29 | SDKA023 | Upper Sugarcamp Branch | Perennial | Bedrock | Mfp | Possible | U | 0.05 | 0.052 | M | Dry Open Cut | Dam & Pump |
| 0.37 | SDKA024 | UT to Upper Sugarcamp Branch | Ephemeral / WWC | Silt/Clay | Mfp | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 0.87 | SDKA026 | Jordan Branch | Perennial | Bedrock | Mfp | Possible | U | 0.46 | 0.257 | M | Dry Open Cut | Dam & Pump |
| 0.89 | SDKA027 | UT to Jordan Branch | Perennial | Bedrock | Mfp | Possible | U | 0.07 | 0.036 | M | Dry Open Cut | Dam & Pump |
| 1.18 | SDKA001 | UT to Jordan Branch | Ephemeral / WWC | Silt / Clay / Organic | Msw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - <u>Pipe Installation Method</u>: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
    <u>Flow Management Method</u>: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
    <u>Rock/Material Removal Methods</u>: Conventional Excava ion (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
    Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst poten ial listed as unlikely.
[5] **Candidate for Blasting**



**TABLE 2.7-3**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 1.20 | SDKA002 | UT to Jordan Branch | Ephemeral / WWC | Silt / Clay / Organic | Msw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 1.59 | SDKA004 | UT to Porters Branch | Perennial | Bedrock | Msw | Possible | U | 0.05 | 0.025 | H | Dry Open Cut | Dam & Pump |
| 2.13 | SDKA006 | UT to Porters Branch | Intermittent | Bedrock | Mfp | Unlikely[5] | I | 0.12 | 0.070 | M | Dry Open Cut | NFP or D&P |
| 2.34 | SDKA008 | UT to Porters Branch | Perennial / Spring | Bedrock | Mfp | Unlikely[5] | I | 0.01 | 0.006 | M | Dry Open Cut | Dam & Pump |
| 2.99 | SDKA058 | Porters Branch | Perennial | Gravel / Cobble / Silt clay | Mfp | Unlikely[5] | L | 2.98 | 2.000 | R | Dry Open Cut | D&P or Flume |
| 3.20 | SDKA048 | Jones Creek | Perennial | Bedrock / Cobble / Gravel / loam | QAL | Unlikely[5] | L | 92.34 | 63.900 | R | HDD | N.A. |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
    Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
    Rock/Material Removal Methods: Conventional Excava ion (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
    Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst poten ial listed as unlikely.
[5] **Candidate for Blasting**



Case: 24-3831    Document: 25-3    Filed: 10/25/2024    Page: 812

**TABLE 2.7-3**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Pipe Install Method | Flow Mgmt. Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | **Proposed Construction Method[4]** | |
| 3.49 | SDKA050 | UT to Jones Creek | Ephemeral / WWC | Silt / Clay/ Organic | Mfp | Unlikely[5] | L | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 3.51 | SDKA051 | UT to Jones Creek | Intermittent | Silt Clay / Gravel/ Organic | Mfp | Unlikely[5] | I | 0.03 | 0.018 | M | Dry Open Cut | NFP or D&P |
| 3.79 | SDKA049 | UT to Jones Creek | Perennial | Bedrock / Cobble / Gravel | Mfp | Unlikely[5] | I | 0.20 | 0.130 | M | Dry Open Cut | Dam & Pump |
| 3.85 | SDKA053 | UT to Jones Creek | Intermittent | Silt Clay / Gravel / Organic | Mfp | Unlikely[5] | I | 0.03 | 0.018 | M | Dry Open Cut | NFP or D&P |
| 4.08 | SDKA055 | UT to Jones Creek | Intermittent | Silt Clay / Gravel / Organic | Mfp | Unlikely[5] | U | 0.02 | 0.000 | M | Dry Open Cut | NFP or D&P |
| 4.34 | SDKA012 | UT to Jones Creek | Ephemeral / WWC | Silt / Clay | Mfp | Unlikely[5] | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 4.5 | SDKA014 | UT to Gafford Branch | Perennial / Spring | Cobble | Mfp | Possible | I | 0.01 | NA | M | Dry Open Cut | D&P or Flume |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
    Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
    Rock/Material Removal Methods: Conventional Excava ion (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
    Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst poten ial listed as unlikely.
[5] **Candidate for Blasting**



**TABLE 2.7-3**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 4.54 | SDKA013 | Gafford Branch | Perennial | Bedrock | Mfp | Possible | I | 1.02 | 0.565 | R | Dry Open Cut | D&P or Flume |
| 4.69 | SDKA015 | UT to Gafford Branch | Ephemeral / WWC | Organic | Mfp | Unlikely[5] | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 4.7 | SDKA016 | UT to Gafford Branch | Ephemeral / WWC | Organic | Mfp | Unlikely[5] | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 5.24 | SDKA017 | UT to Gafford Branch | Ephemeral / WWC | Silt/Clay | Mfp | Unlikely[5] | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 5.32 | SDKA019 | UT to Gafford Branch | Ephemeral / WWC | Gravel | Mfp | Unlikely[5] | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 5.89 | SDKA020 | UT to Gafford Branch | Ephemeral / WWC | Gravel | Mfp | Unlikely[5] | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 6.43 | SDKA029 | UT to Johnson Creek | Ephemeral / WWC | Silt / Clay / Gravel | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
　　　Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
　　　Rock/Material Removal Methods: Conventional Excava ion (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
　　　Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst poten ial listed as unlikely.
[5] **Candidate for Blasting**



Case: 24-3831　　Document: 25-3　　Filed: 10/25/2024　　Page: 814

**TABLE 2.7-3**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 6.66 | SDKA030 | UT to Johnson Creek | Ephemeral / WWC | Organic | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 7.08 | SDKA033 | UT to Johnson Creek | Intermittent | Bedrock | Mw | Possible | U | 0.16 | 0.080 | H | Dry Open Cut | NFP or D&P |
| 7.31 | SDKA034 | UT to Johnson Creek | Perennial | Cobble | Mw | Possible | U | 0.62 | 0.327 | H | Dry Open Cut | Dam & Pump |
| 7.97 | SDKA036 | Johnson Creek | Perennial | Bedrock / Cobble | Mw | Possible | U | 0.78 | 0.416 | H | Dry Open Cut | N.A. |
| 8.07 | SDKA037 | UT to Johnson Creek | Ephemeral / WWC | Gravel | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 8.4 | SDKA038 | UT to Johnson Creek | Intermittent | Cobble / Gravel | Msl | Possible | U | 0.02 | NA | H | Dry Open Cut | NFP or D&P |
| 8.5 | SDKA038 | UT to Johnson Creek | Intermittent | Cobble / Gravel | Msl | Possible | U | 0.01 | NA | H | Dry Open Cut | NFP or D&P |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - <u>Pipe Installation Method:</u> Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
      <u>Flow Management Method:</u> Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
      <u>Rock/Material Removal Methods:</u> Conventional Excava ion (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
      Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst poten ial listed as unlikely.
[5] **Candidate for Blasting**



Case: 24-3831    Document: 25-3    Filed: 10/25/2024    Page: 815

**TABLE 2.7-3**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 8.64 | SDKA040 | UT to Harris Branch | Ephemeral / WWC | Organic | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 8.76 | SDKA041 | Harris Branch | Perennial | Cobble / Gravel | Mw | Possible | U | 0.28 | 0.143 | H | Dry Open Cut | Dam & Pump |
| 9.48 | SDKA042 | UT to Bartons Creek | Perennial | Cobble / Gravel | Mw | Possible | I | 0.23 | 0.111 | H | Dry Open Cut | Dam & Pump |
| 10.00 | SDKB001 | Miller Branch | Perennial | Gravel | Mw | Possible | L | 1.31 | 0.721 | R | Dry Open Cut | D&P or Flume |
| 10.07 | SDKB002 | Bartons Creek | Perennial | Cobble / Gravel | Mw | Possible | L | 17.29 | 10.500 | R | Dry Open Cut | D&P or Flume |
| 10.96 | SDKB004 | UT to Nesbitt Branch | Intermittent | Silt / Gravel / Cobble | Msl | Possible | U | 0.03 | NA | H | Dry Open Cut | NFP or D&P |
| 11.14 | SDKB005 | UT to Nesbitt Branch | Intermittent | Silt / Gravel / Cobble | Msl | Possible | U | 0.04 | 0.019 | H | Dry Open Cut | NFP or D&P |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
        Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
        Rock/Material Removal Methods: Conventional Excavation (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
        Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potential listed as unlikely.
[5] **Candidate for Blasting**



Case: 24-3831   Document: 25-3   Filed: 10/25/2024   Page: 816

**TABLE 2.7-3**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] — Pipe Install Method | Proposed Construction Method[4] — Flow Mgmt. Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11.24 | SDKB006 | UT to Nesbitt Branch | Ephemeral / WWC | Silt / Clay | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 11.42 | SDKB007 | UT to Nesbitt Branch | Ephemeral / WWC | Silt / Clay | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 11.43 | SDKB008 | Nesbitt Branch | Perennial | Silt / Clay | Msl | Unlikely[5] | U | 0.1 | 4.94 | H | Dry Open Cut | Dam & Pump |
| 11.86 | SDKR002 | UT to Furnace Creek | Ephemeral / WWC | Silt / Clay | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 12.13 | SDKB009 | Furnace Creek | Perennial | Cobble | Mw | Possible | L | 8.41 | 0.029 | R | Dry Open Cut | D&P or Flume |
| 13.56 | SDKB010 | UT to Dry Hollow Branch | Ephemeral / WWC | Silt / Clay | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 13.91 | SDKR003 | UT to Dry Hollow Branch | Ephemeral / WWC | Silt/ Clay | Mw | Possible | I | <0.06 | NA | NA | Dry Open Cut | No Flow |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
        Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
        Rock/Material Removal Methods: Conventional Excavation (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
        Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potential listed as unlikely.
[5] **Candidate for Blasting**


Case: 24-3831    Document: 25-3    Filed: 10/25/2024    Page: 817

**TABLE 2.7-3**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Pipe Install Method | Flow Mgmt. Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | **Proposed Construction Method[4]** | |
| 14.01 | SDKB011 | Dry Hollow Branch | Perennial | Gravel | Mw | Possible | L | 2.31 | 1.27 | R | Dry Open Cut | D&P or Flume |
| 14.34 | SDKR006 | UT to Dry Hollow Branch | Ephemeral / WWC | Silt / Clay | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 14.59 | SDKA046 | UT to Dry Hollow Branch | Intermittent | Gravel / Cobble / Silt Clay | Msl | Possible | U | 0.22 | 0.109 | H | Dry Open Cut | NFP or D&P |
| 14.64 | SDKB013 | UT to Woods Valley Branch | Ephemeral / WWC | Gravel | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 14.81 | SDKB007 | UT to Dry Hollow Branch | Ephemeral / WWC | Organic | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 14.96 | SDKB014 | UT to Woods Valley Branch | Intermittent | Gravel | Msl | Possible | U | <0.05 | NA | H | Dry Open Cut | No Flow Period |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
　　　　Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
　　　　Rock/Material Removal Methods: Conventional Excava ion (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
　　　　Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst poten ial listed as unlikely.
[5] **Candidate for Blasting**



Case: 24-3831　　Document: 25-3　　Filed: 10/25/2024　　Page: 818

**TABLE 2.7-3**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 15.1 | SDKB008 | UT to Woods Valley Branch | Intermittent | Silt / gravel | Msl | Possible | U | 0.03 | 0.014 | H | Dry Open Cut | NFP or D&P |
| 15.11 | SDKB008 | UT to Woods Valley Branch | Intermittent | Silt / gravel | Msl | Possible | U | 0.03 | 0.014 | H | Dry Open Cut | NFP or D&P |
| 15.19 | SDKB015 | UT to Woods Valley Branch | Ephemeral / WWC | Silt / Clay | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 15.48 | SDKB016 | UT to Little Bartons Creek | Ephemeral / WWC | Gravel | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 15.6 | SDKB017 | UT to Little Bartons Creek | Ephemeral / WWC | Gravel | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 15.97 | SDKB019 | UT to Little Bartons Creek | Ephemeral / WWC | Silt / Clay / Sand | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
   Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
   Rock/Material Removal Methods: Conventional Excava ion (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
   Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst poten ial listed as unlikely.
[5] **Candidate for Blasting**



**TABLE 2.7-3**

**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 16.11 | SDKB020 | UT to Little Bartons Creek | Ephemeral / WWC | Silt / Clay / Sand | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 16.66 | SDKB023 | Little Bartons Creek | Perennial | Silt / Clay | Mw | Possible | U | 1.6 | 0.916 | H | Dry Open Cut | D&P or Flume |
| 16.99 | SDKB024 | UT to Little Bartons Creek | Ephemeral / WWC | Silt / Clay | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 17.21 | SDKA056 | UT to Leatherwood Creek | Ephemeral / WWC | Silt Clay / Organic / Gravel | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 17.24 | SDKA057 | UT to Leatherwood Creek | Ephemeral / WWC | Silt Clay / Organic / Gravel | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 17.47 | SDKA047 | UT to Leatherwood Creek | Ephemeral / WWC | Silt Clay / Organic / Gravel | Msl | Possible | U | 0.13 | 0.068 | NA | Dry Open Cut | No Flow |
| 18.93 | SDKB025 | UT to Leatherwood Creek | Intermittent | Cobble / Gravel | Mw | Possible | I | 0.13 | 0.0793 | H | Dry Open Cut | NFP or D&P |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
        Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
        Rock/Material Removal Methods: Conventional Excava ion (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
        Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst poten ial listed as unlikely.
[5] **Candidate for Blasting**



Case: 24-3831   Document: 25-3   Filed: 10/25/2024   Page: 820

**TABLE 2.7-3**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 19 | SDKB025 | UT to Leatherwood Creek | Intermittent | Cobble / Gravel | Mw | Possible | I | 0.15 | 0.0921 | H | Dry Open Cut | NFP or D&P |
| 19.08 | SDKB026 | Leatherwood Creek | Perennial | Cobble / Gravel | Mw | Possible | I | 3.54 | 2.46 | M | Dry Open Cut | D&P or Flume |
| 19.18 | SDKB027 | UT to Leatherwood Creek | Ephemeral / WWC | Cobble / Gravel | Mw | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 19.3 | SDKB028 | UT to Leatherwood Creek | Intermittent | Cobble / Gravel | Mw | Possible | I | 0.16 | 0.0985 | H | Dry Open Cut | NFP or D&P |
| 19.81 | SDKR010 | UT to Leatherwood Creek | Ephemeral / WWC | Silt / Clay / Organic | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 20.03 | SDKR011 | UT to Williamson Branch | Ephemeral / WWC | Silt / Clay / Organic | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 20.69 | SHNW003a | UT to Williamson Branch | Ephemeral / WWC | Silt / Clay / Organic | Msl | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
  Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
  Rock/Material Removal Methods: Conventional Excavation (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
  Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potential listed as unlikely.
[5] **Candidate for Blasting**



Case: 24-3831    Document: 25-3    Filed: 10/25/2024    Page: 821

**TABLE 2.7-3**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 20.81 | SHNW004a | UT to Williamson Branch | Ephemeral / WWC | Silt / Clay / Organic | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 21.08 | SHNC042 | UT to Williamson Branch | Ephemeral / WWC | Silt / Clay / Organic | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 21.21 | SHNC041 | UT to Williamson Branch | Ephemeral / WWC | Organic | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 21.56 | SHNC003 | UT to Williamson Branch | Ephemeral / WWC | Organic | Mw | Possible | U | 0.22 | 0.137 | NA | Dry Open Cut | No Flow |
| 21.64 | SHNC001 | UT to Williamson Branch | Ephemeral / WWC | Organic | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 21.74 | SHNC004 | UT to Williamson Branch | Ephemeral / WWC | Organic | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 21.93 | SHNC006 | UT to Yellow Creek | Ephemeral / WWC | Organic | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
    Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
    Rock/Material Removal Methods: Conventional Excava ion (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
    Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst poten ial listed as unlikely.
[5] **Candidate for Blasting**



Case: 24-3831    Document: 25-3    Filed: 10/25/2024    Page: 822

**TABLE 2.7-3**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 22 | SHNC006 | UT to Yellow Creek | Ephemeral / WWC | Organic | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 22.32 | SHNC010-1 | UT to Yellow Creek | Intermittent | Organic | Mw | Possible | L | 0.15 | 0.090 | M | HDD | NFP or D&P |
| 22.36 | SHNC007 | Yellow Creek | Perennial | Cobble | Qal | Unlikely[5] | L | 101.27 | 86.1 | R | HDD | N.A. |
| 22.88 | SHNC018 | UT to Yellow Creek | Intermittent | Cobble | Qal | Unlikely[5] | I | 0.65 | 0.39 | R | Dry Open Cut | NFP or D&P |
| 23.18 | SHNC017 | UT to Yellow Creek | Ephemeral / WWC | Silt / Clay | Mw | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 23.23 | SHNC016 | UT to Yellow Creek | Ephemeral / WWC | Organic | Mw | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 23.24 | SHNC015 | UT to Yellow Creek | Ephemeral / WWC | Cobble | Mw | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
      Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
      Rock/Material Removal Methods: Conventional Excavaion (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
      Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potenial listed as unlikely.
[5] **Candidate for Blasting**

Case: 24-3831   Document: 25-3   Filed: 10/25/2024   Page: 823



**TABLE 2.7-3**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 23.72 | SHNE001 | UT to Yellow Creek | Ephemeral / WWC | Cobble | Mw | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 24.07 | SHNC019 | UT to Indian Branch | Ephemeral / WWC | Cobble | Mw | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 24.12 | SHNE002 | UT to Indian Branch | Ephemeral / WWC | Silt / Clay | Mw | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 24.12 | SHNC020* | Indian Branch | Intermittent | Silt / Clay | Mw | Possible | I | 0.07 | 0.038 | H | Dry Open Cut | NFP or D&P |
| 24.28 | SHNC021 | UT to Indian Branch | Ephemeral / WWC | Silt / Clay | Mw | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 24.41 | SHNC022 | UT from Guices Branch | Ephemeral / WWC | Cobble | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 24.47 | SHNC023 | UT from Guices Branch | Intermittent | Silt / Clay | Mw | Possible | U | 0.15 | 0.084 | H | Dry Open Cut | No Flow Period |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
　　　　Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
　　　　Rock/Material Removal Methods: Conventional Excava ion (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
　　　　Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst poten ial listed as unlikely.
[5] **Candidate for Blasting**



Case: 24-3831　　　Document: 25-3　　　Filed: 10/25/2024　　　Page: 824

**TABLE 2.7-3**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Pipe Install Method | Flow Mgmt. Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Proposed Construction Method[4] | |
| 24.62 | SHNC024 | UT from Guices Branch | Ephemeral / WWC | Cobble | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 24.72 | SHNC025 | UT from Guices Branch | Ephemeral / WWC | Silt / Clay | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 25.37 | SHNC030 | UT from Guices Branch | Intermittent | Gravel | Mw | Possible | U | 0.43 | 0.253 | H | Dry Open Cut | NFP or D&P |
| 25.43 | SHNE007 | UT from Guices Branch | Ephemeral / WWC | Cobble | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 25.59 | SHNE003 | UT from Guices Branch | Intermittent | Coble / Gravel / Silt / Organics | Mw | Possible | U | <0.05 | NA | NA | H | Dry Open Cut | NFP or D&P |
| 25.68 | SHNE004 | UT from Guices Branch | Ephemeral / WWC | Gravel / Cobble | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 25.69 | SHNE004 | UT from Guices Branch | Ephemeral / WWC | Gravel / Cobble | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
　　　　　Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
　　　　　Rock/Material Removal Methods: Conventional Excava ion (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
　　　　　Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst poten ial listed as unlikely.
[5] **Candidate for Blasting**



Case: 24-3831   Document: 25-3   Filed: 10/25/2024   Page: 825

**TABLE 2.7-3**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Pipe Install Method | Flow Mgmt. Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25.79 | SHNE005 | UT from Guices Branch | Ephemeral / WWC | Gravel / Cobble | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 25.8 | SHNE006 | UT from Guices Branch | Ephemeral / WWC | Gravel / Cobble | Mw | Possible | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 26.21 | SHNA011 | UT from Guices Branch | Intermittent | Gravel / Cobble | Qal | Unlikely[5] | I | 1 | 0.611 | R | Dry Open Cut | NFP or D&P |
| 26.43 | SHNA012 | UT from Guices Branch | Intermittent | Gravel/Cobble | Qal | Unlikely[5] | I | 6.95 | 4.64 | R | Dry Open Cut | NFP or D&P |
| 26.87 | SHNA001 | Guices Creek | Perennial | Cobble | Qal | Unlikely[5] | I | 1.79 | 1.12 | R | Dry Open Cut | D&P or Flume |
| 27.26 | SHNA003 | UT from Guices Branch | Ephemeral / WWC | Silt / Clay / Cobble / Gravel | Msl | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 27.52 | SHNB031 | UT to Lickskillet Branch | Ephemeral / WWC | Silt / Clay | Msl | Possible | I | <0.05 | NA | NA | Dry Open Cut | No Flow |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
   Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
   Rock/Material Removal Methods: Conventional Excavation (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
   Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potential listed as unlikely.
[5] **Candidate for Blasting**


Case: 24-3831   Document: 25-3   Filed: 10/25/2024   Page: 826

**TABLE 2.7-3**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 28.02 | SHNB030 | UT to Lickskillet Branch | Intermittent | Silt / Clay | Mw | Possible | U | 0.08 | 0.0437 | H | Dry Open Cut | NFP or D&P |
| 28.61 | SHNB033-1 | Lickskillet Branch | Perennial | Cobble / Gravel | Qal | Unlikely[5] | U | 0.67 | 0.403 | R | Dry Open Cut | D&P or Flume |
| 28.92 | SHNB033-2 | Lickskillet Branch | Perennial | Cobble / Gravel | Qal | Unlikely[5] | U | 1.29 | 0.798 | R | Dry Open Cut | D&P or Flume |
| 29 | SHNA013 | UT to Lickskillet Branch | Ephemeral / WWC | Silt / Clay | Qal | Unlikely[5] | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 29.02 | SHNB032 | UT to Lickskillet Branch | Ephemeral / WWC | Silt / Clay | Qal | Unlikely[5] | U | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 30.18 | SHNB034 | UT to Lickskillet Branch | Ephemeral / WWC | Silt / Clay | Qal | Unlikely[5] | I | <0.05 | NA | NA | Dry Open Cut | No Flow |
| 30.19 | SHNB033-3 | Lickskillet Branch | Perennial | Cobble / Gravel | Qal | Unlikely[5] | I | 2.17 | 1.37 | R | Dry Open Cut | D&P or Flume |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
       Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
       Rock/Material Removal Methods: Conventional Excavaion (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
       Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst potenial listed as unlikely.
[5] **Candidate for Blasting**



Case: 24-3831   Document: 25-3   Filed: 10/25/2024   Page: 827

**TABLE 2.7-3**
**Waterbodies Crossings Hydrologic Risk Analysis**

| M.P | Waterbody Name | Local Water | Flow Type | Substrate | Geologic Formation[1] | Karst Potential | Watershed Position (U, I, L)[2] | Drainage Area (sq mi) | Summer Mean Flow (cfs) | Hydrologic Loss Potential (H, M, R)[3] | Proposed Construction Method[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Pipe Install Method | Flow Mgmt. Method |
| 30.67 | SHNA010 | Wells Creek | Perennial | Loam / Gravel / Organic / Cobble | Qal | Unlikely[5] | I | 49.39 | 39.7 | R | HDD | N.A. |

[1] **Geologic Formation** - Mfp (Ft. Payne formation); Mw (Warsaw formation); Msl (St. Louis formation); Qal (Quaternary alluvium)
[2] **Watershed Position** - Upper, Intermediate, Lower (U, I, L)
[3] **Hydrologic Loss Potential** - High, Medium, Reduced (H, M, R)
[4] **Proposed Construction Methods** - Pipe Installation Method: Horizontal Directional Drilling (HDD), Dry Open Cut/Trenching (Open Cut)
    Flow Management Method: Flume, Dam and Pump (D&P), No Flow Present at time of construction (NFP)
    Rock/Material Removal Methods: Conventional Excava ion (CE), Ripping (R), Rock Trencher (RT), Hoe & Hammer (H&H), Controlled Blasting (CB).
    Method used will depend on site conditions at time of construction (see Section 8.2.1.1 above). Controlled Blasting is an option only in areas of karst poten ial listed as unlikely.
[5] **Candidate for Blasting**



Case: 24-3831   Document: 25-3   Filed: 10/25/2024   Page: 828

## 2.8 Social and Economic Consequences of Each Alternative.

This social and economic consequences section is an adaptation of Resource Report 5 – *Socioeconomics* provided as part of the certificate application for the Project to be filed with the FERC on July 22, 2022. A copy of the full Environmental Report (including all Resource Reports) will be provided to the USACE following the filing of the certificate application with the FERC.

As discussed above, the Project will provide a broad benefit of meeting future power generation demand in and beyond the Project area by supporting TVA's replacement of existing coal-fired electric generation plant capacity with a natural gas-fired electric generation plant (if "Alternative A" is TVA's selected option as part of its ongoing NEPA review for its retirement and replacement project). Moreover, construction of the Project will have a net positive impact on local and regional businesses within counties impacted by the Project. TGP estimates that approximately $17,300,000 in Dickson County, $8,100,000 in Houston County, and $1,300,000 in Stewart County ($26,700,000 total) will be distributed in construction payroll for personnel working at the various Project sites over the 12-month construction period. During construction, it is anticipated that 20 to 30 percent of worker payroll will be spent locally by both local and non-local workers for the purchase of housing, food, gasoline, entertainment, and luxury items. The dollar amount would be dependent on the number of construction workers employed at any given time and the duration of the non-local worker's residence in the Project area.

It is also anticipated that some portion of construction materials will be purchased locally. Material purchases, including construction equipment, pipe, and valves, are estimated at $16,500,000 in Dickson County, $6,800,000 in Houston County, and $2,200,000 in Stewart County ($25,500,000 total), including freight and taxes. An additional estimated $71,000,000 in Dickson County, $34,500,000 in Houston County, $3,900,000 in Stewart County ($109,400,000 total) will be spent by TGP on other construction-related expenditures, for a total estimated construction cost of $161,600,000. These payroll and materials expenditures will have a positive impact on the local economy.

Construction and operation will result in increased tax revenues for the state of Tennessee, Dickson County, Houston County, and Stewart County, and potentially other local taxing authorities. The prevailing state sales tax rate for most items in Tennessee is seven percent. An additional 2.75 percent county sales tax is levied in Dickson and Houston counties. In Stewart County, an additional 2.25 percent sales tax is levied. Assuming all material purchases are taxed at an effective sales tax rate of 9.25 percent, TGP will pay approximately $2,300,000 in sales tax during construction. Once in operation, TGP will also pay ad valorem taxes based on the assessed value of the Project facilities. TGP estimates paying approximately $2,400,000 annually in ad valorem taxes on average over the first 10 years of Project operations. Ad valorem taxes are anticipated to be paid annually at similar or higher levels for the remaining life of the Project.



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

Although the preferred Cumberland Pipeline route that is co-located generally with an existing TVA powerline easement and other utility easements (for approximately 80 percent of its length) is the LEDPA, other routes extending from TGP's existing interstate natural gas pipeline system to TVA's Cumberland Fossil Plant would not vary in terms of socioeconomic benefits. Use of an alternate route would unnecessarily result in land-use disruptions that have primarily already occurred in constructing and maintaining the TVA powerline and easement and other utility easements. Social and economic consequences to property owners or local communities of the considered crossing methodologies summarized in **Table 2.7-3** would be minor, and would not materially vary, as the method to be implemented at each crossing is limited in area and length with no more than localized, temporary effects.

The Project is not anticipated to have significant adverse impacts during construction or operation on population, employment, regional or local services, traffic or transportation, residences or businesses, or minority communities. In addition, TGP has identified environmental justice communities near the location of the Project and will continue to identify and address any concerns of these environmental justice communities (designated below poverty level but not with disproportionately high minority populations). TGP's communication and involvement with the environment justice communities is ongoing and will continue through the certificate, permitting, construction, and restoration phases of the Project. TGP will continue its engagement of minority and low-income populations in proximity to the proposed Project through meaningful participation and coordination with community leaders and groups within environmental justice communities. TGP plans to take the following steps during the certificate, permitting, construction, and restoration phases of the Project to continue to inform and engage environmental justice communities: (1) beginning in the third quarter 2022, conduct small group discussions (e.g., 5-10 people) with community leaders and organizations in environmental justice communities to discuss the Project and any concerns or issues; (2) beginning in the third quarter 2022, provide formal presentations to groups in the impacted environmental justice communities; (3) distribute Project information to community partners for further distribution within their communities; and (4) translate certain Project materials for distribution within environmental justice communities, as well as portions of the Project website, Overall, Project construction activities are anticipated to have temporary, short-term impacts on population, housing, public services, and traffic and transportation, and will provide an overall net positive impact on employment and the local economy when the Project is operational.

## 2.9  Mitigation

Streams or wetland activities associated with this Project will result in no more than *de minimis* degradation and no appreciable permanent loss of resource values. Therefore, TGP does not propose compensatory mitigation (e.g., purchase of mitigation credits) for the temporary impacts to aquatic resources.

Project activities will not result in permanent alterations to streams or wetlands. Although less than 0.03-acre of PFO wetlands will be converted to PEM wetlands (0.02-acre permanent and 0.01-acre temporary), this alteration will not result in loss of resource function nor appreciable



55
**App-0827**

**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

permanent loss. Stream impacts from the proposed Project activities will be limited to short-term and localized alterations. Therefore, TGP does not propose compensatory mitigation for impacts to streams or wetlands. Waterbodies temporarily impacted by construction activities will be reseeded along their banks and restored to pre-construction conditions, to the extent practicable.

## 2.10  Post Construction Monitoring

Annual monitoring in accordance with the FERC Procedures (with requested deviations to be approved by FERC) and any applicable USACE and TDEC permit conditions, will be conducted to ensure all aquatic resources are properly restored to pre-construction conditions. Aquatic crossings will be monitored after the completion of construction and restoration activities to ensure successful revegetation of channel stream buffers and wetlands, stabilization of previously disturbed stream geomorphology (i.e., channel bed and bank, dimension, and profile), and to ensure no loss to streams' hydrologic regimes.

Features meeting success criteria will be excluded from future annual monitoring events. It is expected that features will rebound quickly so that fewer features will need to be monitored in successive years.

### 2.10.1 Qualitative Visual Assessment

Visual assessments will be used to qualitatively evaluate previous wetland and waterbody crossing locations. Evaluations using the TDEC's Hydrologic Determination Field Data Sheets will be performed at each stream crossing location. An overall qualitative assessment of each reach will also be conducted to ensure that areas that are not otherwise measured or documented do not contain conditions that may require further analysis or attention. For wetlands, USACE datasheets completed during pre-construction surveys will be used for comparative purposes to determine restoration success with regards to aerial cover and species composition. Conditions observed during the overall visual assessment will be documented, photographed, and described in a final mitigation monitoring report.

### 2.10.2 Photo Documentation

Photographs will be taken upstream and downstream at the crossing locations to characterize the streams and to support the evaluation of the monitoring efforts. Each photo will be taken at the same bearing/orientation as the wetland and waterbody delineation field surveys.

## 3.0  Project Schedule

No work requested in this application has been initiated or completed.

TGP is requesting issuance of a FERC Certificate Order for the Project in November 2023 and, following receipt of all applicable approvals, anticipates beginning construction activities that do not require tree felling in August 2024, felling and clearing trees from the Project construction workspace beginning mid-October 2024, and commencing all remaining construction activities by November 2024. To meet TVA's requested in-service date, TGP plans to place all facilities in-



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

service by September 1, 2025, with final restoration estimated to be completed by December 2025.

Most Project construction activities will be conducted between the hours of 7:00 a.m. to 7:00 p.m., Monday through Saturday; however, weather conditions, site conditions, specialized construction techniques such as HDDs, hydrostatic testing, emergencies, stream crossing timing windows, or blasting may necessitate nighttime work, extended work hours, or extended work on Sundays and holidays. In the event that TGP conducts these construction activities on a 24-hour/day, 7-day/week schedule, as described above, TGP will notify the landowners and obtain any necessary regulatory approvals. TGP has conducted noise surveys at the Jones Creek and Yellow Creek HDD sites. Ambient measurements at Yellow Creek were used as being representative of the acoustic environment at Wells Creek because the NSAs at Wells Creek are more than 0.5 mile away. TGP will evaluate if 24-hour/day, 7-day/week HDD activities would have an impact at any NSA and mitigate accordingly, should the need for 24/7 HDD operations be necessary. Noise mitigation may include, but is not limited to, equipment modifications to reduce noise, sound barriers, and offering NSA residents local hotel accommodations until the HDD activities are complete. TGP will notify all affected landowners, including the NSAs, prior to conducting the construction activities described above during extended work hours. TGP may seek approval from FERC for extended work hours for other activities that may require extended work hours and will notify all affected landowners prior to requesting FERC approval for any such construction activities (including hydrostatic testing, tie-ins, commissioning, inspections, and any other activity requiring extended construction hours).

## 4.0  Adjoining Property Owners

A list of adjoining property owners is provided as **Attachment 8**. **Attachment 8 is provided as privileged information and TGP requests that it not be released**. To facilitate the public notice process, TGP can provide a set of pre-printed mailing labels with or without mailing envelopes at the USACE's request.

## 5.0  Other Agency Authorizations

FERC is the recognized lead federal agency for the Project and will be conducting the National Environmental Protection Act review of the Project, as well as the consultations under Section 7 of the Endangered Species Act, Section 106 of the National Historic Preservation Act, and consultations with Native American Tribes. TGP has initiated consultation with the United States Fish and Wildlife Service ("USFWS") and Tennessee Historical Commission ("THC"), in coordination with and on FERC's behalf (as a designated non-federal representative) as part of the lead federal agency's pre-filing process and has also provided notification about the Project to Native American Tribes.

Correspondence with regulatory agencies and final agency actions (if completed) are provided in **Attachment 4** to this application. A summary of consultations and coordination with other agencies is provided below.



## 5.1  United States Fish and Wildlife Service

The USFWS concurred on March 10, 2022, that the Project is not likely to adversely affect the gray bat (*Myotis grisescens*), Indiana bat (*Myotis sodalis*), northern long-eared bat (*Myotis septentrionalis*), rabbitsfoot (*Quadrula cylindrica cylindrica*), tan riffleshell (*Epioblasma florentina walkeri*), Price's potato-bean (*Apios priceana*), and Short's bladderpod (*Physaria globosa*) (**Attachment 4 to this application**).

## 5.2  State Historic Preservation Office

The THC fulfills the duties of the State Historic Preservation Office in the state of Tennessee. The THC performs NHPA Section 106 review and compliance in conjunction with the Tennessee Division of Archaeology. All correspondence with the THC is provided in **Attachment 4**. The draft Phase I cultural resources report that documents the results of the initial surveys for the Project was submitted to the THC on October 28, 2021 (Simpson and Donaldson 2021). Comments provided by the THC following review of the Phase I report were received on November 3, 2021. The THC concurred with all recommendations in that report, except one recommendation regarding archaeological Site 40SW63. The THC found the report's recommendation of additional Phase II testing to be inappropriate, given a previous determination of the site as eligible for the NRHP. TVA, on whose property Site 40SW63 exists, provided documentation that the site was only determined potentially eligible in the past, thus making Phase II testing an appropriate approach. In an email dated December 3, 2021, the THC confirmed that Site 40SW63 had not been formally determined eligible for the NRHP and agreed that the recommended Phase II testing was appropriate. Also, in its November 3, 2021 letter, the THC indicated that sites 40HO87 and 40HO96 would require additional evaluations if there were any Project changes to those locations. TGP has not made any Project changes within the vicinity of either of those sites. Additional correspondence with the THC will be filed with the FERC and the USACE following its receipt.

## 5.3  Tennessee Valley Authority

TGP has confirmed that a Shoreline Construction Permit under Section 26a of the TVA Act is not required for this Project because the Project is not located in watersheds under TVA's jurisdiction.

## 5.4  Tennessee Department of Environment and Conservation

### 5.4.1  Division of Water Resources

Concurrent with the submittal of this USACE Individual Permit Application, TGP will be requesting that the TDEC, Division of Water Pollution Control approve an ARAP for the Project which will also serve as the Project's 401 Water Quality Certification.

Authorizations for the use of National Pollutant Discharge Elimination System ("NDPES") Construction General Permit No. TNR 100000 and NPDES Hydrostatic Test Water General Permit No. TNG670000 following the issuance of the FERC certificate order and prior to the



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

commencement of construction. TGP will also comply with the Division's Water Withdrawal Registration Program.

### 5.4.2  Division of Natural Areas ("DNA"), Natural Heritage Program

TGP initiated consultation on May 18, 2021, and received a response on June 28, 2021, indicating the DNA did not anticipate any impacts to protected species.

## 5.5  Native American Tribes

Notifications about the Project were provided to the following tribes on September 13, 2021: Absentee-Shawnee Tribe of Indians of Oklahoma, Alabama-Quassarte Tribal Town, Catawba Indian Nation, Cherokee Nation, The Chickasaw Nation, Division of Historic Preservation, Department of Culture & Humanities, Choctaw Nation of Oklahoma, Coushatta Tribe of Louisiana, Eastern Band of Cherokee Indians, Eastern Shawnee Tribe of Oklahoma, Jena Band of Choctaw Indians, Kialegee Tribal Town Mississippi Band of Choctaw Indians, The Muscogee Nation, The Osage Nation, Osage Nation Historic Preservation Office, Quapaw Nation, Shawnee Tribe, Thlopthlocco Tribal Town and United Keetoowah Bank of Cherokee Indians in Oklahoma.

As of the date of this application, responses have been received from the Catawba Indian Nation, Cherokee Nation, The Chickasaw Nation, Division of Historic Preservation, Department of Culture & Human ties, Eastern Shawnee Tribe of Oklahoma, and Quapaw Nation. The Quapaw Nation responded on October 13, 2021 that the Project area is outside of the tribe's current area of interest. The Catawba Indian Nation responded on October 14, 2021 that they had no concerns. The Eastern Shawnee Tribe of Oklahoma responded on September 30, 2021, stating no adverse effects. Communications with the Cherokee Nation, The Chickasaw Nation, Division of Historic Preservation, Department of Culture & Humanities, and other tribes will continue as correspondence is received.

FERC, as the lead federal agency for the Project, will be responsible for NHPA Section 106 consultations with the tribes. FERC sent out consultation letters to tribes on June 14, 2022.

# 6.0  Additional Considerations

## 6.1  Navigation

Jones Creek is listed on the USACE Nashville District list of Section 10 Navigable Waters for the Cumberland River and Tributaries (USACE 2021). The Cumberland Pipeline will cross Jones Creek by HDD. No impoundments are proposed as part of the Project. As designed, the Project will not affect navigation.



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

## 6.2 Aquatic Life Movements

Since Project construction activities will be conducted in in accordance with the FERC Procedures (with requested deviations to be approved by the FERC) and the procedures discussed above, TGP does not anticipate that aquatic life movements will be affected by the Project.

## 6.3 Spawning Areas

Streams within the Project area have not been identified directly as spawning areas. FERC construction timing restrictions for coldwater fisheries are from June 1 through September 30 and from June 1 through November 30 for cold water and warm water fisheries, unless expressly permitted or further restricted by the appropriate federal or state agency in writing (FERC 2013). The Project crosses only warm water fisheries. TGP has consulted with the Tennessee Wildlife Resources Agency ("TWRA") to determine if time-of-year restrictions are warranted for this Project. The TWRA recommends that if potential habitat for the state endangered and threatened fish species is observed within the Project area, instream work will be restricted from April 1 through June 30. TGP is requesting clarification from TWRA on this recommendation and will provide an update to the USACE after further communications with TWRA.TGP is requesting confirmation that no time of year restrictions are warranted for this Project.

In September 2021, Dinkins Biological Consulting, LLC., on behalf of TGP, conducted mussel surveys at streams with potential for habitat crossed by the Project under USFWS permit TE-21570C-0 and Tennessee state collecting permit 5073. During the survey, only one relic mussel shell of a common species (painted creekshell [*Villosa taeniata*]) was identified. The substrate in the streams at the survey sites was either shifting gravel/sand or bedrock. These substrate types are not preferred mussel habitat. Standard erosion and sediment control measures are recommended to reduce the impact on any potential freshwater mussel species located in waterways in the Project area.

Habitat for endangered and threatened fish species have not been identified within the Project area. Imposing the time of year restriction is not anticipated at this time.

TGP is requesting the TWRA and USFWS confirm there are no time of year restrictions for the Project.

## 6.4 Migratory Bird Breeding Areas

The USFWS manages and protects the nation's native migratory birds under the Migratory Bird Treaty Act ("MBTA") (16 USC 703–712). Further, Executive Order No. 13186 emphasizes the responsibilities of all federal agencies, including the FERC, to plan and implement actions to conserve birds in the conduct of their other federally mandated responsibilities. To that end, the FERC and the USFWS entered into a Memorandum of Understanding ("MOU") regarding the implementation of Executive Order 13186, which focuses on avoiding or minimizing adverse impacts on migratory birds and strengthening migratory bird conservation through enhanced collaboration between the FERC and USFWS by identifying areas of cooperation. On December



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

22, 2017, the Department of the Interior ("DOI") released a Memorandum of Opinion ("M-Opinion") clarifying the DOI legal interpretation on enforcement of the MBTA (M-Opinion 37050). This M-Opinion does not repeal Executive Order 13186. Instead, it concluded that violations of the MBTA had to arise from "direct and purposeful actions," meaning that federal agencies under the DOI will not impose criminal liability for actions that cause unintentional or incidental impacts (i.e., those whose purpose is not intentional harm to migratory birds and that arise from an otherwise lawful activity). Executive Order 13186 remains in effect, as does the MOU between the FERC and USFWS, and federal agencies may still impose mitigation requirements to prevent incidental or unintentional migratory bird take.

The Fish and Wildlife Coordination Act, as amended in 1988, requires the USFWS to identify Birds of Conservation Concern ("BCC"), which include species, subspecies, and populations of all migratory nongame birds that could become candidates for listing under the Endangered Species Act if additional conservation actions are not taken. BCCs identified by the IPaC (USFWS 2021) with the potential to occur in the area of the Project are listed in **Table 6.4-1**.

**TABLE 6.4-1**
**IPaC-Identified BCCs Potentially Occurring Within the Project Area**

| Common Name | Scientific Name |
|---|---|
| Bald Eagle | *Haliaeetus leucocephalus* |
| Blue-winged Warbler | *Vermivora cyanoptera* |
| Kentucky Warbler | *Oporornis formosus* |
| Prairie Warbler | *Dendroica discolor* |
| Red-headed Woodpecker | *Melanerpes erythrocephalus* |
| Wood Thrush | *Hylocichla mustelina* |

TGP anticipates that primary construction impacts would result from the cutting, clearing, and/or removal of existing vegetation that provides migratory bird habitat within the construction work areas. These actions could remove nesting habitat and could impact migratory birds through the loss of nests (including those with eggs and/or young), possible loss of migratory birds themselves, reduction in migratory bird productivity, and displacement or loss of second nesting opportunities.

Any migratory bird species that solely rely on large, unfragmented tracts of forested habitat most likely do not utilize the habitat in the vicinity of the Project due to the presence of TVA's powerline easement, other utility ROWs, and the periodic vegetation maintenance activities conducted thereon. Subsequently, no additional impacts on these migratory bird populations or behaviors are anticipated as a result of the proposed Project. Conversely, migratory bird species that utilize edge habitats may benefit from the effects of construction clearing and maintenance activities. TGP proposes to commence tree felling and clearing in the Project ROW in August 2024 to minimize impacts on breeding birds. Habitat loss has been minimized by co-locating the Project with an existing TVA powerline easement, to the extent practicable and feasible; further



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

disturbance will be minimized by adhering to the FERC Plan and FERC Procedures (with requested deviations to be approved by the FERC).

To comply with the MBTA (16 USC 703–712), if an active nest is located before or during construction, measures would be taken to avoid destroying the nest and violating the MBTA. Measures to protect migratory birds, active nests, and their habitats during Project construction and operation include:

- conducting vegetation clearing for Project construction outside of the nesting season to discourage nest establishment in impacted areas, when possible;

- conducting operational (routine maintenance) vegetation clearing from October 15 to March 31, which is outside the greater nesting bird season, when possible;

- conducting pre-construction migratory bird nest surveys by qualified biologists prior to initiating construction activities if vegetation clearing must occur within the nesting season;

- identifying active nests within areas to be cleared plus a 10-foot buffer adjacent to affected areas by a qualified biologist when migratory bird habitat cannot be avoided during nesting season;

- consulting with the USFWS Cookville Ecological Services Field Office to obtain additional guidance on conducting surveys if active bird nests are found;

- deferring work activities within the designated 10-foot buffer zone of an active nest until young have fledged, if possible, with the exception of motor vehicle traffic on previously existing public or private roads where this activity does not generate noise levels or disturbance such that it could result in take;

- using a licensed bird rehabilitation facility to facilitate removal of eggs and/or young birds from an active nest if it is determined in consultation with the USFWS that eggs and/or young birds need to be removed from an active nest;

- grading areas that would not be encumbered by permanent aboveground facilities to match pre-construction contours and drainage patterns to the extent practicable;

- to the greatest extent feasible, the proposed pipeline route is co-located parallel and adjacent to an existing powerline easement and other utility easements to minimize impacts to previously non-disturbed lands;

- adhering to the measures outlined in the FERC Plan and FERC Procedures (with requested deviations to be approved by the FERC) during construction and operation of the Project Facilities; and

- having an Environmental Inspector present during the construction of the Project.



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

## 6.5  Shellfish Beds

No shellfish beds are found within the Project area and the Project therefore will not affect shellfish beds.

## 6.6  Suitable Material

No unsuitable material will be used for fill. All material used for construction will be free from toxic pollutants in toxic amounts. Trash and debris will be disposed of properly in accordance with all applicable federal, state, and local regulations.

## 6.7  Water Supply Intakes

TDEC has confirmed that there are no surface water intakes within six miles of the Project area (TDEC 2020).

## 6.8  Adverse Effects from Impoundments

Water impoundments are not proposed for the Project and therefore, no adverse effects from impoundments will occur.

## 6.9  Management of Water Flows

Construction of the Project has been designed to not restrict or impede the passage of normal or high flows.

## 6.10  Fills within 100-Year Floodplains

As stated in Section 1.5.4 above, one of the Project MLVs falls within Zone AE on the flood fringe and is subject to inundation by a 1-percent-annual-chance flood event (FEMA 2018). TGP will coordinate with the Dickson County Floodplain Administrator concerning the design and construction of this MLV to minimize concerns with future flood events.

## 6.11  Equipment

Work within waterbodies and wetlands will be conducted in accordance with the FERC Procedures (with requested deviations to be approved by the FERC) and any applicable permits. Temporary matting and or other measures will be taken in wetlands to minimize soil disturbance.

## 6.12  Soil Erosion and Sediment Controls

TGP will install temporary soil erosion and sediment control devices ("ECDs") along the proposed construction ROW, ATWS, access roads, and contractor yards, as applicable, in accordance with the Project's ECMP, FERC Plan and FERC Procedures (with requested deviations to be approved by the FERC), and any permit-specific conditions. The ECDs will be inspected as follows: (1) on



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

a daily basis in areas of active construction; (2) on a weekly basis in areas with no construction or equipment operation; (3) within 24 hours of the end of a storm event that is 0.5 inch of rain or greater. The EIs will document the condition of the ECDs and ensure any necessary repairs or maintenance is completed.

## 6.13   Removal of Temporary Fills

Temporary fills due to side casting of materials in wetlands and waterbodies will be restored in accordance with the FERC Procedures (with requested deviations to be approved by the FERC). No temporary fills are currently proposed aside from temporary matting and/or equipment bridges. Access paths along the main construction ROW corridor may require deployment of temporary matting and/or equipment bridges to allow for safe passage of equipment. All temporary matting and/or equipment bridges will be removed during restoration efforts prior to operation.

Several access roads cross waterbodies or wetlands. At temporary road crossings, where required, TGP will install a temporary equipment bridge for all access roads across waterbodies to provide a means for construction equipment to cross the waterbody while minimizing impacts to the channel bottom or banks. Minor upgrading of existing, non-paved roads may be required to support construction equipment. This may include grading/blading the road surface, installation of gravel or rock (temporarily in waterbodies or wetlands), limited tree clearing and tree trimming. TGP is not proposing to install any permanent culverts or permanent installation of gravel or rock into waterbodies or wetlands crossed by the Project's access roads. All activities along the proposed access roads will be conducted in accordance with the FERC Plan and FERC Procedures (with requested deviations to be approved by the FERC) and the SPCP in order to minimize or avoid potential impacts to sensitive resources that may be located in proximity to these roads.

## 6.14   Proper Maintenance

The Project will be designed in accordance with USDOT pipeline safety regulations (49 CFR Part 192) for material selection and qualification, minimum design requirements, and protection from internal, external, and atmospheric corrosion. All pipe will be USDOT PHMSA Class 1, 2, or 3 rated as applicable.

All authorized structures will be properly maintained to ensure public safety.

## 6.15   Wild and Scenic Rivers

The National Rivers Inventory ("NRI") designates free-flowing river segments in the U.S. that possess outstandingly remarkable natural or cultural values, which are considered to be of national significance. In addition, the NRI is maintained by the National Parks Service ("NPS") as a list of river segments that potentially qualify as national wild, scenic, or recreational river areas. All federal agencies must seek to avoid or mitigate actions that would adversely affect any NRI segments. Yellow Creek and Jones Creek are the only waterbodies within the Project area that were identified on the NRI as having protected river segments (NPS 2022 and NPS 2021). Jones



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

Creek is listed on the NRI for its outstandingly remarkable fish, geologic, recreational, scenic, and wildlife value, and Yellow Creek is listed for its outstandingly remarkable fish, recreational, and scenic value (NPS 2022). Jones Creek is a high-quality perennial stream that is 40 ft wide and 2 ft deep with a summer mean flow of 63.9 cubic feet per second ("cfs"). The substrate is composed of bedrock, cobble, and silt/clay. The area surrounding Jones Creek is a mixture of forested uplands and agricultural pastures currently utilized for soybean cultivation. A healthy population of fish, crayfish, macrobenthos, and amphibian species were observed within the stream at the time of survey.

Yellow Creek is a high-quality perennial stream that is 111 ft wide and 6 ft deep with a summer mean flow of 86.1 cfs. The substrate is composed of cobble, bedrock, gravel, and riprap. The area surrounding Yellow Creek is a mixture of forested uplands, agricultural pastures, and residential housing. A healthy population macrobenthos, crayfish, amphibians, and fish including bass, sunfish, perch, and various minnow species were noted at the time of survey.

Jones Creek crosses into the Project area at MP 3.2. On the entry side of Jones Creek, a 10-foot-wide path located in the permanent easement will be cleared from the entry box to within 50-feet of the creek to allow for hydrostatic test water and HDD makeup water withdrawal. Most of this path consists of agricultural land, and the path will be located within the permanent easement. Only a 5-foot-wide path will be cleared within 50 feet of the creek to allow for hydrostatic test water equipment. Staging of the hydrostatic test pumps will be outside the creek side riparian vegetation, within or near the agricultural field that is located between the entry box and the creek. Yellow Creek crosses into the Project area at MP 22.35. At the Yellow Creek crossing, no clearing of the permanent easement between the entry/exit locations will be necessary. The water source for this crossing is located upstream at an access road crossing of the creek. Only the tracking system path will be cleared.

No protected rare, threatened, or endangered species were observed or are known to occur in Jones Creek or Yellow Creek, and neither waterbody was listed as essential fish habitat, a commercial fishery, or a cold water fishery stocking location (Commercial Fishing 2022; NOAA Fisheries 2022; TVA, 2021; USFWS, 2021). Jones Creek is currently listed on TDEC's 2022 List of Impaired and Threatened Waters in Tennessee for increased levels of nitrate/nitrite, phosphorus, and *E. coli* caused by municipal point source discharges, site clearances from land development or land redevelopment, and grazing in riparian zones. No previous impacts to water quality were identified for Yellow Creek. TGP plans to cross these protected segments by HDD; therefore, TGP anticipates that no impacts to protected segments will occur from the proposed Project. The proposed Project will not adversely affect these NRI segments and TGP has notified the NPS as provided in Agency Communication, **Attachment 4** to this application.

## 6.16   Designated Critical Resource Waters

No designated federal critical resource waters, including National Oceanic and Atmospheric Administration managed marine sanctuaries and marine monuments, and National Estuarine Research Reserves are encountered by the Project.



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

The state of Tennessee has afforded protections to surface waters that satisfy the characteristics as defined by the Water Quality Control Board as Exceptional Tennessee Waters ("ETW") and Outstanding National Resource Waters ("ONRW") including waters that provide habitat for ecologically significant populations of certain aquatic or semi-aquatic plants or animals, waters that provide specialized recreational opportunities, waters that possess outstanding scenic or geologic values, or waters where existing conditions are better than water quality standards. No ETWs or ONRWs were identified within one mile of the Project area (TDEC 2022). Additionally, TDEC has confirmed that there are no surface water intakes within six miles of the Project area (TDEC 2020).

## 6.17  Coastal Zone Management

The Project is not located within a Coastal Zone.

## 7.0  SIGNATURES AND FORM

The Application for Department of the Army Permit form (ENG FORM 4345) with signatures is provided as **Attachment 12** to this application. Original (wet ink) signature versions of the form will be provided upon request.

## 8.0  REFERENCES

Commercial Fishing. 2022. Tennessee Commercial Fishing. Available at: http://www.commercial-fishing.org/regional/usa/. Accessed January 2022.

Constitution Pipeline Company, LLC. November 2013. Supplemental FERC filing in Docket CP13-499-000. Volume II Appendix N. Feasibility Study: Trenchless Construction Methods for Sensitive Environmental Resource Crossings.

Cowardin, L.M., V. Carter, F.C. Golet, and E.T. LaRoe. 1979. Classification of Wetlands and Deepwater Habitats of the United States. U.S. Department of the Interior, Fish and Wildlife Service, Washington, D.C. FWS/OBS-79/31.

Federal Emergency Management Agency ("FEMA"). 2018. Flood Map. Available at: https://msc.fema.gov/portal/. Accessed January 2022.

Federal Energy Regulatory Commission ("FERC"). 2013a. Upland Erosion Control, Revegetation, and Maintenance Plan. Available at: https://www.ferc.gov/industries/gas/enviro/plan.pdf. Accessed January 2022.

———. 2013b. Wetland and Waterbody Construction and Mitigation Procedures. Available at: https://www.ferc.gov/industries/gas/enviro/guidelines/wetland-pocket-guide.pdf. Accessed January 2022.

NOAA Fisheries. 2022. Essential Fish Habitat Mapper. Available at: https://www.habitat.noaa.gov/apps/efhmapper/. Accessed January 2022.



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
JULY 2022

National Park Service ("NPS"). 2021. Interactive Map of NPS Wild and Scenic Rivers. Available at: https://www.nps.gov/orgs/1912/plan-your-visit.htm. Accessed January 2022.

———. 2022. Nationwide River Inventory. Available at: Nationwide Rivers Inventory (nps.gov). Accessed January 2022.

Natural Resources Conservation Service. 2007. Watersheds, Hydrologic Units, Hydrologic Unit Codes, Watershed Approach and Rapid Watershed Assessments. Available at: Watersheds, Hydrologic Units, Hydrologic Unit Codes, Watershed Approach (usda.gov). Accessed June 2022.

Simpson, Duane, and Tyler Donaldson. 2021. *Phase I Cultural Resources Investigation for the Cumberland Project, Dickson, Houston, and Stewart Counties, Tennessee*. Prepared for Tennessee Gas Pipeline Company, L.L.C., Houston, Texas. Prepared by Cardno, Louisville, Kentucky.

Tennessee Department of Environment and Conservation ("TDEC"). 2022a. Tennessee Division of Water Resources Exceptional Waters. Available at: https://dataviewers.tdec.tn.gov/pls/enf_reports/f?p=9034:34304. Accessed January 2022.

———. 2020. Division of Water Resources 2020 Annual Compliance Report. Available at: wr_wq_dw_2020-annual-compliance-report.pdf (tn.gov). Accessed January 2022.

TVA. 2021. TVA's Natural Heritage Database. Available at: https://www.natureserve.org/products/biotics-5. Accessed July 2021.

U.S. Army Corps of Engineers ("USACE"). 2007. Regulatory Guidance Letter 07-01: Practices for Documenting Jurisdictional Determinations under Section 404 of the Clean Water Act (CWA) and Sections 9 and 10 of the Rivers and Harbors Act ("RHA") of 1899.

———. 2012a. Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Atlantic and Gulf Coastal Plain Region (Version 2.0), ed. J.S. Lichvar, and C.V. Noble. ERFC/EL TR-10-20. Vicksburg, MS: U.S. Army Engineer Research and Development Center.

———. 2012b. Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Eastern Mountains and Piedmont Region (Version 2.0), ed Vicksburg, MS: U.S. Army Engineer Research and Development Center.

———. 1987. Corps of Engineers Wetland Delineation Manual. Vicksburg, MS: U.S. Army Engineer Research and Development Center. Available at: 1987 Army Corps Wetlands Delineation Manual (rutgers.edu). Accessed January 2022.

———. 2021. List of Navigable Waters of the United States within the Nashville District: Cumberland River and Tributaries. Available at: Navigable Waters List (army.mil). Accessed February 2022.



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

USFWS. May 25, 2021. Information for Planning and Consultation (IPaC) Report. Consultation Code: 04ET1000-2021-SLI-0814. Project Name: TVA Cumberland Project. List of threatened and endangered species that may occur in your proposed project location or may be affected by your proposed project. Cookeville, TN. Tennessee Ecological Services Field Office. (See Resource Report 1, Appendix 1.F).



**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**Section 404 Clean Water Act / Section 10 Rivers and Harbors Act**
Dredge and Fill – Individual Permit Application
**JULY 2022**

**Attachment 11** – Summary of Trenchless Construction Methods



## Summary of Trenchless Construction Methods for the Cumberland Project

| Type | Max Distance (feet) | Min Distance (feet) | Typical workspace requirements (Square Feet) | Typical Duration Compared to Open Cut Construction | Typical construction cost compared to an Open Cut Design | Advantages | Limitations | Risks |
|---|---|---|---|---|---|---|---|---|
| Conventional Bore | 400 | N/A | 10,000 (entry and exit workspace) | Three times slower than typical duration for open-cut excavations. | ~$1,550 more per foot when compared to the cost associated with open cut. | Avoidance of surface disturbance, ideal for shore crossing distances with no rock. | Limited by crossing distance, subsurface soil and geological conditions, and existing topography and groundwater. | Safety constraints related to excavation and shoring of bore pit locations. Potential drill failure resulting in abandonment and implementation of an open cut design. |
| Horizontal Directional Drill | 7000 | 1,300 | 100,000 (entry and exit pit workspaces) as well as additional false ROW for pull back locations. False ROW is generally 150 feet wide with a length dictated by the crossing segment. | Five times slower than typical duration for open-cut excavations. | Approximately $2,050 more per foot when compared to the cost associated with conventional surface installation methods. | Avoidance of surface disturbances, significant crossing lengths. | Geotechnical investigation requires access road development, and potential tree clearing, wetland/waterbody crossings prior to pipeline construction, large workspace requirements. Continuous day and night noise disturbances associated with drilling equipment, generator, water and drill fluid pumps, construction vehicles and other additional equipment. Water allocation for drilling operation and disposal requirements of drilling fluids. Pipeline accessibility for visual inspection and repairs and uneven cathodic protection on the pipeline. | Potential inadvertent returns of drilling fluids and tailing and associated additional workspace for access and mitigation, potential hole collapse or subsequent settlement following installation. Potential drill failure resulting in abandonment and implementation of an open cut design. |
| Direct Pipe | 900 | 200 | 80,000 (entry and exit pit workspace) as well as additional false ROW for pull back locations. False ROW is generally 150 feet wide with a length dictated by the crossing segment. | Four times slower than typical durations for open-cut excavations. | Approximately $3,050 more per foot when compared to the cost associated with conventional surface installation methods. | Avoidance of surface disturbances, significant crossing lengths at shallower evaluations. Decreased drilling fluid pressure requirement when compared to HDD. | Sensitive to soil conditions. Cannot tunnel through rocky substrate. Large workspace requirements. Continuous day and night noise disturbance associated with drilling equipment, generator, water and drill fluid pumps, construction vehicles and other equipment. Water allocations for drilling operations and disposal requirements for drilling fluids. Pipeline inaccessibility for visual inspection and repairs and uneven cathodic protection on the pipeline. | Potential inadvertent return of drilling fluids and tailing associated additional workspace for access and mitigation. Potential drill failure resulting in abandonment and implementation of an open-cut design. Requires construction personnel to periodically enter pipe to monitor and adjust settings underground. |

*Source: Constitution Pipeline: Trenchless Construction Methods for Sensitive Environmental Resource Crossings*

**Corps of Engineers**
**Nashville District**



**MEMORANDUM FOR RECORD**                    **Date:** 24 May 2022

**Subject:** PRE-APPLICATION MEETING
**File No:** LRN-2021-00866
**Applicant:** TN Gas Pipeline Company
**Project Description and Location:** Proposed Wetland and Stream Impacts for Natural Gas Line to be Installed for TVA Cumberland Fossil Plant, throughout Dickson, Houston, and Stewart Counties, TN
**Attendees (in-person):**
Amy Robinson (the undersigned); Regulatory Division, Project Manager
Tim Wilder; RD West Branch Chief
David Jackson; BDY
Rhett Bagett; Stantec
Michael Staggs; Waller Law
Jeff Hagen; Kinder-Morgan (KM), Project Management
Blake Amos; KM, Permitting Compliance, Project Permitting

This pre-application meeting was a follow-up to another pre-app meeting (held on 5/4/2022) regarding the proposed natural gas pipeline from I-40 to TVA Cumberland Fossil Plant. It would involve approximately 32 miles of pipeline crossing 117 streams and wetlands. KM presented a chart with the crossings that provided the geology description, karst, and potential method of construction. Discussion was held on the types of construction of an open trench cut method and why this method would be performed due to geology characteristics. Some notes taken from the meeting are as follows:

1. Ongoing lawsuits and controversy facing other natural gas pipelines (by Southern Env Law) based on processing as NWPs. They state the NWPs lack public comment period specifically for environmental justice, climate change, and drinking water impacts.
2. The applicant can request the project to be evaluated as an SP.
3. Hydrologic loss was a discussion based on the types of geology at the crossing sites.
4. Blasting would consist of "controlled blasting" in areas that would be safe depending on geological conditions/non-karst geology.
5. There are 3 HDD crossings of streams. Major roadways would also be crossed by HDD.
6. Different types of open cut method include excavator, hydrologic hammer, rock trencher, hone comb and hammer, rock saw and blasting.

7. The applicant now would propose to dam and pump dry the pipeline trench during installation (i.e., pipe would be placed in the dry). Also, the trenches would be constructed in dry conditions by dam and pump.
8. In areas susceptible for metals, the back fill material would consist of clean rock material. Other locations would be backfilled with the native material.
9. A contingency plan will be provided for construction methods.
10. FERC has draft environmental documents on their website submitted during the pre-filing. KM expects to submit an application to FERC and Corps on July 8, 2022.
11. FERC's documentation will include the pipeline only including what is to be located on TVA property. TVA's documentation will include their property but also the transmission, etc.
12. We stressed that alternative analysis should be provided that would demonstrate LEDPA with quantitively criteria and in accordance with 404(b)(1) guidelines.


**Signed:**

Amy Robinson
Project Manager
Regulatory Division



**Corps of Engineers**
**Nashville District**

**MEMORANDUM FOR RECORD**                              **Date:** 29 NOV 2021

**Subject:** PRE-APPLICATION MEETING
**File No:** LRN-2021-00866
**Applicant:** TVA Cumberland Fossil Plant Gas Pipeline
**Project Description and Location:** Proposed Gas Pipeline through multiple
Counties in Tennessee
**Attendees by Teams Teleconference:**
Amy Robinson (the undersigned); Regulatory Division, Project Manager
Tim Wilder, RD, Chief West Branch
Mike Letson, Kinder Morgan
Jeff Hagan, Kinder Morgan
David Jackson, BDY Environmental

A pre-application meeting was held to discuss the proposed gas line installation
for TVA Cumberland Fossil Plant.  The following provides highlights from the
teleconference:

1. The proposed natural gas line is approximately 32 miles long and would
   be co-located along TVA's power transmission line.  It would be abutting
   the powerline's ROW.
2. To date, approximately 30 miles have been surveyed for wetlands, waters,
   state listed species, mussels, bat surveys, and Phase 1 cultural resource
   study.
3. Wetlands have been identified and would involve converting forested to
   emergent wetlands.  109 waterbodies were identified that consist
   approximately of 27 perennial streams (including larger streams such as
   Jones Creek, Yellow Creek, and Bartons Creek), intermittent, ephemerals,
   and open waters/ponds.   We discussed requesting a JD especially for
   any features that may not be jurisdictional.
4. No mussels species were identified.  No state listed species were
   identified. No habitat found for Indiana bat or Northern long-eared bat.
   Some habitat for Grey bat was identified and they are investigating into
   this further.
5. The Phase 1 cultural survey identified 7 sites potentially eligible for NRHP
   and will require a Phase 2.  Of these, 2 sites are located on TVA property.
   Consultation has been initiated with THPO and to 20 tribes.  Some tribes
   have provided feedback which they are addressing. Kinder Morgan
   initiated consultation for FERC.
6. FERC is the lead federal agency for the project and will prepare an EIS for
   the project.  We have previously agreed to be a cooperating agency for

the NEPA document.  FERC is accepted bids for a third party consultant to develop the EIS and Burns & Mac, Inc. will be preparer.  They advised us that they may reach out to us occasionally.

7. Discussion was held of NWP vs SP permit evaluation for the pipeline.  At this time, it is unsure but typically we would evaluate each crossing separately.

8. Mitigation would likely be required such as for wetland conversion. The mitigation hierarchy guidance was discussed and they stated they will search into any available mitigation banks and/or ILF programs in-service area and then out of service area.

9. We can expect a DA application in second quarter of 2022.  We advised that we would need the FERC NEPA document to be finalized before we would issue a permit.

10. Copies of the presentation slides are attached.

**Signed:**

Amy Robinson
Project Manager
Regulatory Division



# erland Project Route

**KINDER**

2021



# ct Overview

**KINDE**

, 2021

Project includes construction of an approximate 32 miles of 30-inch natural gas pipeline I and appurtenant facilities in Dickson, Houston and Stewart Counties, Tennessee.  Projec ncludes a regulatory station at the intersection with the existing TGP lines, and a meter s vithin the tentatively new TVA power station.

Approximately 85% of the proposed natural gas pipeline lateral is co-located with an exis TVA transmission line easement.

Status of Surveys:

- Surveys were conducted during the appropriate RTE survey windows.  All surveys conducted in summer/fall of 2021.  Approximately 30 miles of the proposed pipeline I has been surveyed.  Contractor yards, no access areas, and new/revised access roa remain to be surveyed.
- Natural Resources (summer/fall 2021):
    - Wetland/waterbodies
    - Listed species, including mussel and bat surveys
- Phase I Cultural Resources (summery/fall 2021)
    - Phase I Cultural Resources report filed/approved with the TN SHPO.  TN SHPO approved the associated Phase II workplan for 5 sites.
    - Consultation letters have been sent to THPOs with interest in the Project area.

## ct Overview/Current Status (con't)

**KINDI**

ERC is the lead federal agency for the Project.

GP submitted a request to FERC to use the pre-filing review process for the Project ctober 29, 2021 (Docket No. PF22-2-000); FERC accepted the request on Novembe 021.

he pre-filing process will continue until the certificate application is filed. The pre-filin rocess involves open houses for stakeholders (conducted by TGP) and scoping mee conducted by FERC), identification of stakeholder issues and concerns, coordination deral and state agencies and Indian Tribes, and the development of the Environmer eport for the Project.

SACE has agreed to participate in the FERC pre-filing process. The USACE will ordinate directly with the FERC staff to identify and resolve issues and develop the ocument (likely an Environmental Impact Statement).

entative filing date for TGP to submit the USACE permit application is 2nd quarter 202 ontemporaneous with filing the formal certificate application for the Project with FER

## ated Project Impacts

**KINDER**

Wetland acreage:
- Temporary impacts approximately 0.08 acres of PFO
- Impacts associated with conversion of PFO to PEM is approximately 0.02 acres

Waterbodies:
- Total of 109 waterbodies, consisting of:
  - 27 perennial
  - 15 intermittent
  - 61 ephemeral streams
  - 6 ponds

Cultural sites:
- 7 Phase II sites identified for further evaluation, two of which are located on the TVA reservation

Listed species:
- Gray bat

Aquatic surveys found no listed species



**App-0848**

ed Permitting Strategy

KINDER



| | |
|---|---|
| **From:** | Letson, Michael A (Mike) |
| **To:** | Robinson, Amy M CIV USARMY CELRN (USA) |
| **Subject:** | [Non-DoD Source] FW: Tennessee Gas Pipeline Company, L.L.C.: Cumberland Project |
| **Start:** | Monday, November 29, 2021 1:00:00 PM |
| **End:** | Monday, November 29, 2021 2:00:00 PM |
| **Location:** | Microsoft Teams Meeting |

-----Original Appointment-----
From: Letson, Michael A (Mike)
Sent: Monday, October 04, 2021 9:15 AM
To: Letson, Michael A (Mike); Robinson, Amy M CIV USARMY CELRN (USA); Wilder, Timothy C CIV USARMY CELRN (USA); Rocan, Jacquelyne M; Margaret G Coffman (Meghan) (Meghan_Coffman@kindermorgan com); Hagen, Jeff; Michael Stagg; 'David Jackson'; Blake Amos (Blake_Amos@kindermorgan com)
Cc: Rachel Bell (rachel bell@cardno com)
Subject: Tennessee Gas Pipeline Company, L L C : Cumberland Project
When: Monday, November 29, 2021 1:00 PM-2:00 PM (UTC-06:00) Central Time (US & Canada)
Where: Microsoft Teams Meeting

Good morning   Tennessee would like to discuss the proposed Cumberland project, specifically the preliminary project impacts and the permitting mechanism   We greatly appreciate the USACE assistance   Kindest Regards   Mike

_____

Microsoft Teams meeting

Join on your computer or mobile app

Click here to join the meeting <Blockedhttps://teams microsoft com/l/meetup-join/19%3ameeting_MWQ3ZmM4ZjgtNWIxMy00YzQyLWFiMzAtYTA1ZDM2ZDgwNDc5%40thread v2/0? context=%7b%22Tid%22%3a%226264083e-3421-458b-886b-69ca1fc46f5b%22%2c%22Oid%22%3a%22cc60c1f4-4196-47a9-92d3-b9c593a84538%22%7d>

Or call in (audio only)

+1 346-410-0970,,241289250# <tel:+13464100970,,241289250#>   United States, Houston

Phone Conference ID: 241 289 250#

Find a local number <Blockedhttps://dialin teams microsoft com/33362f0f-64b5-4b53-9a8d-4b19578fb1ea?id=241289250> | Reset PIN <Blockedhttps://mysettings lync com/pstnconferencing>

Learn More <Blockedhttps://aka ms/JoinTeamsMeeting> | Meeting options <Blockedhttps://teams microsoft com/meetingOptions/? organizerId=cc60c1f4-4196-47a9-92d3-b9c593a84538&tenantId=6264083e-3421-458b-886b-69ca1fc46f5b&threadId=19_meeting_MWQ3ZmM4ZjgtNWIxMy00YzQyLWFiMzAtYTA1ZDM2ZDgwNDc5@thread v2&messageId=0&language=en-US>

_____

**App-0850**

# CERTIFCATION

Pursuant to 6 Circuit R. 30(b)(4)(E), I certify that the documents contained in this Appendix are properly part of the Agency Record as certified on October 18, 2024. ECF #18.

/s/ James S. Whitlock
James S. Whitlock

DATED: October 25, 2024

## CERTIFICATE OF SERVICE

I hereby certify that, on October 25, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

**/s/ JAMES S. WHITLOCK**

JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org