No. 24-3831

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

APPALACHIAN VOICES and SIERRA CLUB,
*Petitioners*

v.

UNITED STATES ARMY CORPS OF ENGINEERS, CHRISTINE E.
WORMUTH, in her official capacity as Secretary of the U.S. Army;
LIEUTENANT GENERAL WILLIAM H. GRAHAM, JR., in his official capacity
as U.S. Army Chief of Engineers and Commanding General of the U.S. Army
Corps of Engineers; LIEUTENANT COLONEL ROBERT W. GREEN, in his
official capacity as District Commander of the U.S. Army Corps of Engineers,
Nashville District, and JOSHUA FROST, in his official capacity as Chief,
Regulatory Division, U.S. Army Corps of Engineers, Nashville District,
*Respondents*

On Petition for Review from the
United States Army Corps of Engineers
Department of Army Permit LRN-2021-00866 (July 25, 2024)

## PETITIONERS' OPENING BRIEF

JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org

O.W. "TREY" BUSSEY
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
Email: tbussey@selctn.org

DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES
PO BOX 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email: dteaney@appalmad.org

*Counsel for Petitioners*

# Selected docket entries for case 24−3831

Generated: 10/25/2024 14:12:24

| Filed | Document Description | Page | Docket Text |
|-------|---------------------|------|-------------|
| 10/03/2024 | | | CORPORATE DISCLOSURE STATEMENT. Name of Counsel: *James S. Whitlock*; *Appalachian Voices and Sierra Club* makes the following disclosure: 1. Is said party a subsidiary or affiliate of a publicly owned corporation? *NO* 2. Is there a publicly owned corporation, not a party to the appeal, with a financial interest in the outcome? *NO* Certificate of Service: 10/03/2024. [24−3831] (JSW) |

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................1

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................5

STATEMENT OF THE CASE....................................................................5

   Legal Framework...................................................................................5

   Statement of Facts ..............................................................................11

SUMMARY OF THE ARGUMENT ........................................................16

ARGUMENT .............................................................................................21

   Standard of Review ...........................................................................21

   Discussion of the Issues.....................................................................23

  I.   THE CORPS FAILED TO APPLY THE PRESUMPTION OF PRACTICABLE ALTERNATIVES. ...............................................23

    A.   TGP Failed to Prove With Detailed, Clear and Convincing Evidence That No Trenchless Crossing Method Was Practicable At Any Open-Cut Crossing Location.........................................................................26

    B.   The Corps Failed to Independently Verify that the Presumption Had Been Rebutted. ....................................................................................30

  II.  THE CORPS FAILED TO DETERMINE THE LEAST ENVIRONMENTALLY DAMAGING PRACTICABLE ROCK-REMOVAL ALTERNATIVE AND MINIMIZE POTENTIAL ADVERSE IMPACTS. ................................................................37

    A.   The Corps Unlawfully Assigned the LEDPA Determination To TGP During Pipeline Construction...........................................................38

    B.   The Corps Failed to Take Appropriate and Practicable Steps to Minimize Adverse Impacts From TGP's Rock-Removal Methods....43

  III.  THE CORPS ARBITRARILY AND CAPRICIOUSLY INTERPRETED THE SCOPE OF TENNESSEE'S §401 CERTIFICATION. ....................45

    A.   TDEC Certified Some of the Pipeline's Crossings, Waived its Authority to Certify Others, and the Corps Misinterpreted Those Actions...................................................................................................46

B.     The Corps's Reliance on Its Mistaken Interpretation of the Certification to Make Key Regulatory Findings Was Arbitrary and Capricious...........................................................................49

C.     If TDEC Could Not Waive §401 Authority for Newly Discovered Crossings, Then The Corps Violated its Own Regulations in Issuing the 404 Permit. ....................................................................51

IV.  THE CORPS'S DECISION RELIED ON ITS MISTAKEN BELIEF IN A NONEXISTENT PERMIT. ........................................................................52

V.   THE CORPS ENTIRELY FAILED TO CONSIDER AN IMPORTANT ASPECT OF THE PROBLEM. .................................................................54

CONCLUSION .......................................................................................57

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*AES Sparrows Point LNG v. Wilson*,
    589 F.3d 721 (4th Cir. 2009) .......................................................49, 50

*All. for Cmty. Media v. FCC*,
    529 F.3d 763 (6th Cir. 2008) ...............................................................22

*All. for Legal Action v. U.S. Army Corps of Eng'rs*,
    314 F.Supp.2d 534 (M.D.N.C. 2004) ....................................................7

*Am. Rivers, Inc. v. FERC*,
    129 F.3d 99 (2d Cir. 1997) ....................................................................9

*Carabell v. U.S. Army Corps of Engineers*,
    391 F.3d 704 (6th Cir. 2004), *vacated on other grounds sub nom.*
    *Rapanos v. United States,* 547 U.S. 715 (2006) ................................24

*Coeur Alaska, Inc. v. Se. Alaska Conservation Council*,
    557 U.S. 261 (2009)..........................................................11, 20, 52, 53

*Davidson v. U.S. Dep't of Energy*,
    838 F.2d 850 (6th Cir. 1988) ...............................................................40

*Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*,
    869 F.3d 148 (3d Cir. 2017) .................................................................34

*F.E.C. v. Akins*,
    524 U.S. 11 (1998)................................................................................51

*Fred Meyer Stores, Inc. v. NLRB*,
    865 F.3d 630 (D.C. Cir. 2017)..............................................................22

*Friends of the Earth v. Hintz*,
    800 F.2d 822 (9th Cir. 1986) ........................................................*passim*

*Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*,
    887 F.3d 906 (9th Cir. 2018) .........................................................18, 38

*Greater Yellowstone Coalition v. Flowers* (*Greater Yellowstone I*),
321 F.3d 1250 (10th Cir. 2003) ............................................................25

*Greater Yellowstone Coalition v. Flowers* (*Greater Yellowstone II*),
359 F.3d 1257 (10th Cir. 2004) ...............................................8, 17, 24

*Hillsdale Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
702 F.3d 1156 (10th Cir. 2012) ............................................................39

*Ky. Waterways All. v. Johnson*,
540 F.3d 466 (6th Cir. 2008) ................................................21, 22, 37

*Loper Bright Enters. v. Raimondo*,
144 S.Ct. 2244 (2024) ...........................................................................21

*Louisville Gas & Electric Co. v. FERC*,
988 F.3d 841 (6th Cir. 2021) ........................................................21, 22

*Meister v. U.S. Dep't of Agric.*,
623 F.3d 363 (6th Cir. 2010) ...............................................................21

*Nat. Res. Defense Council v. EPA*,
526 F.3d 591 (9th Cir. 2008) ...............................................................11

*Nat'l Wildlife Fed'n v. Whistler*,
27 F.3d 1341 (8th Cir. 1994) ......................................................7, 16, 24

*Ohio v. Becerra*,
87 F.4th 759 (6th Cir. 2023) ...........................................20, 22, 49, 52

*Ohio Valley Env't Coalition, Inc. v. U.S. Army Corps of Eng'rs*,
883 F.Supp.2d 627 (S.D. W. Va. 2012)................................................50

*Ohio Valley Env't Coalition v. Aracoma Coal Co.*,
556 F.3d 177 (4th Cir. 2009) ...............................................................44

*Or. Nat. Desert Ass'n v. B.L.M.*,
625 F.3d 1092 (9th Cir. 2010) .............................................................34

*Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.*,
894 F.3d 235 (6th Cir. 2018) ........................................................27, 35

*Sierra Club v. EPA*,
   793 F.3d 656 (6th Cir. 2015) ..................................................................2

*Sierra Club v. State Water Control Bd.*,
   898 F.3d 383 (4th Cir. 2018) ..........................................................29, 53

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   909 F.3d 635 (4th Cir. 2018) .....................................................9, 21, 46

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   981 F.3d 251 (4th Cir. 2020) ..................................................................6

*Sierra Club v. U.S. Dep't of Interior*,
   899 F.3d 260 (4th Cir. 2018) ................................................................22

*Sierra Club v. U.S. Forest Serv.*,
   897 F.3d 582 (4th Cir. 2018) ..........................................................31, 32

*Sierra Club v. W. Va. Dep't of Envtl. Prot.*,
   64 F.4th 487 (4th Cir. 2023) .........................................................*passim*

*Simms v. Nat'l Traffic Safety Admin.*,
   45 F.3d 999 (6th Cir. 1995) ..................................................................22

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
   305 F.3d 1152 (10th Cir. 2002), *modified on reh'g*, 319 F.3d 1207
   (10th Cir. 2003)............................................................................*passim*

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
   6 F.4th 1321, 1331 (D.C. Cir. 2021).....................................19, 50, 54

*Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*,
   475 F.3d 319 (D.C. Cir. 2006)..............................................................49

*Wilson v. Comm'r of Soc. Sec.*,
   378 F.3d 541 (6th Cir. 2004) ................................................................43

**Constitutional Provisions**

United States Constitution Article III .........................................................2

**Federal Statutes**

5 U.S.C. § 706(2)(A)...............................................................................21

15 U.S.C. § 717f.............................................................................................1

15 U.S.C. § 717r(d)(1) ...................................................................................2

33 U.S.C. § 1251(a)(1)..................................................................................10

33 U.S.C. § 1313 .............................................................................................8

33 U.S.C. § 1341 ......................................................................................*passim*

33 U.S.C. § 1341(a) ........................................................................................9

33 U.S.C. § 1342 .......................................................................10, 11, 52, 53

33 U.S.C. § 1342(*l*)(2) ............................................................11, 20, 53

33 U.S.C. § 1344 .............................................................................................6

33 U.S.C. § 1344(a) ..............................................................................2, 6, 48

33 U.S.C. §1344(b)(1)....................................................................................6

33 U.S.C. § 1362(24) ...................................................................................11

**State Statutes**

Tenn. Code Ann. § 69-3-108(b)(1) ..............................................................10

**Regulations**

33 C.F.R. § 320.4(a)(1) ................................................................................43

33 C.F.R. § 320.4(d) ...........................................................................10, 50, 51

33 C.F.R. § 323.6(a) ......................................................................................43

33 C.F.R. § 325.2(b)(ii) .......................................................................10, 45, 51

33 C.F.R. § 325.4 ...........................................................................................41

33 C.F.R. § 330.2(i) .......................................................................................48

40 C.F.R. Part 230...........................................................................................6

40 C.F.R. § 121.1(f) ....................................................................................9, 48

40 C.F.R. § 121.7 ...................................................................................9

40 C.F.R. § 121.9 ...................................................................................9

40 C.F.R. § 121.12 ................................................................................47

40 C.F.R. § 230.2(c) .............................................................................51

40 C.F.R. § 230.10(a)......................................................................*passim*

40 C.F.R. § 230.10(b) .............................................................................6

40 C.F.R. § 230.10(b)(1) .........................................................................8

40 C.F.R. § 230.10(d) .....................................................................*passim*

40 C.F.R. § 230.11 .................................................................................7

40 C.F.R. § 230.11(a)............................................................................44

40 C.F.R. § 230.11(g) ....................................................................*passim*

40 C.F.R. § 230.12 ...............................................................7, 18, 23, 44

40 C.F.R. § 230.21 .....................................................................8, 19, 52

40 C.F.R. § 230.41 ...............................................................................23

40 C.F.R. § 230.45 ...............................................................................24

40 C.F.R. § 230.45(a)......................................................................12, 23

40 C.F.R. § 230.74 .........................................................................18, 44

40 C.F.R. § 230.74(a) .............................................................................9

40 C.F.R. § 1508.1(i)(3).........................................................................56

Subpart C NOTE.............................................................................8, 52

Tenn. Comp. R. & Regs. 0400-40-7-.04(1) ...........................................10

Tenn. Comp. R. & Regs. 0400-40-7-.04(3) ...........................................10

**Other Authorities**

*Mountain Valley Pipeline, LLC*, 179 FERC ¶ 61,013 (2022)...................................29

*Sierra Club v. Tenn. Dep't of Env't & Conservation*, No. 23-3682,
    ECF #58-1 (6th Cir. Aug. 26, 2024)......................................................................1

*Tennessee Gas Pipeline Co., L.L.C.*, 186 FERC ¶ 61,046 (2024)...........................35

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Petitioners concur with the Court's decision to set this petition for review for oral argument on December 10, 2024. ECF #15-2 at 7.

**INTRODUCTION**

The permit at issue on this petition for review is another example of agency action unsupported by reasoned decisionmaking regarding Tennessee Gas Pipeline, LLC's ("TGP") proposed Cumberland Pipeline (the "Pipeline"). In the companion case, "[t]he Tennessee Department of Environment and Conservation ("TDEC") committed nearly every cardinal sin of administrative law" when it issued its July 21, 2023 Clean Water Act ("CWA") §401 certification ("Certification") for some of the Cumberland Pipeline's stream and wetland crossings. Pet'rs' Final Opening Br., *Sierra Club v. Tenn. Dep't of Env't & Conservation*, No. 23-3682, ECF #58-1 at 1 (6th Cir. Aug. 26, 2024). Not to be outdone, the United States Army Corps of Engineers (the "Corps") found additional ways to act arbitrarily, capriciously, and otherwise not in accordance with law when it issued a CWA §404 (the "404 Permit") to TGP for the Pipeline. For the following reasons, the 404 Permit should be vacated.

**JURISDICTIONAL STATEMENT**

On July 25, 2024, the Corps issued the 404 Permit to TGP for the proposed Cumberland Pipeline. App-0002-08. On September 24, 2024, Petitioners filed a timely petition for review of the 404 Permit, which was docketed on September 26, 2024. ECF #1-1 (App-0197-200).

The Cumberland Pipeline is subject to Section 7 of the Natural Gas Act ("NGA"), 15 U.S.C. §717f, and is being constructed in this Circuit. App-0002. The

404 Permit is a federal agency approval required under federal law. 33 U.S.C. §1344(a). (AD026). Accordingly, this Court has jurisdiction under NGA Section 19(d)(1). 15 U.S.C. §717r(d)(1). (AD004).

Petitioners have standing under Article III of the United States Constitution. For Article III standing, a petitioner must establish (1) injury-in-fact, (2) traceability, and (3) redressability. *Sierra Club v. EPA*, 793 F.3d 656, 661-62 (6th Cir. 2015). An organization has representational standing when (1) its members would have standing in their own right, (2) the organization's purpose is germane to the interests it seeks to protect, and (3) there is no need for direct participation by individual members in the action. *Id.* at 661. To establish injury-in-fact in the environmental context, petitioners need only show that their members "use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Id.* at 663 (cleaned up).

The addendum to this brief includes the Declarations of Robert Connor, Charles Crow, Jerry Steven Shafer, Bonnie Swinford, and Angela Mummaw. The declarations from Petitioners' members establish judicially cognizable harms to their aesthetic, recreational, and property interests threatened by the Pipeline.

Connor owns a multi-generational family farm which contains several creeks that the Cumberland Pipeline will cross. Connor Decl., ¶¶4, 8 (AD080-82). Connor enjoys hiking and seeing wildlife around those creeks, and he has expended

significant time and resources obtaining grant money to improve the habitat on his farm. *Id.* ¶¶9, 13 (AD082-84). TGP plans to trench through the creeks on Connor's property and clearcut some of the forestland he has improved. *Id.* ¶¶8, 13 (AD081-84). Connor is concerned that increased sedimentation in those creeks will cause "long-term harm to water quality and aquatic life" and "disrupt wildlife habitat," and those concerns harm his aesthetic, recreational, and property interests. *Id.* ¶9 (AD082). Moreover, "[a]ll of the work that [he] did to improve that forestland will be wasted if the area is cleared for construction of the Cumberland Pipeline," diminishing his enjoyment of his property. *Id.* ¶13 (AD083-84).

TGP plans to cross Yellow Creek and its tributaries multiple times upstream from Crow's home. Crow Decl., ¶7 (AD090). Buying his home on Yellow Creek "has been the realization of a dream," and Crow "get[s] so much joy" from spending time with his family and friends swimming and fishing in Yellow Creek and hosting cookouts on its banks. *Id.* ¶¶8, 9, 14 (AD090-93). Crow's aesthetic and recreational interests in Yellow Creek are harmed by his concerns about sedimentation threats from pipeline construction. *Id.* ¶11 (AD092). In fact, Crow does not believe "any amount of money would compensate losing [his] use and enjoyment and Yellow Creek in its current state." *Id.* ¶18 (AD094).

Shafer regularly takes his grandchildren swimming at the confluence of Gafford Branch and Peabody Branch. Shafer Decl., ¶5 (AD102-03). Gafford Branch

is hemmed in by steep and wooded terrain, and Shafer is concerned that TGP's plans to clearcut this area, as well as TGP's plans to cross Gafford Branch and its tributaries upstream from the family swimming spot, will pollute the stream with sediment. *Id.* ¶¶6, 7 (AD103-04). Shafer's recreational and aesthetic interests are already harmed by his concerns, and he will not take his grandchildren there to swim if that pollution occurs. *Id.* ¶¶7, 8 (AD103-04).

The above-described injuries are fairly traceable to the 404 Permit. Without the 404 Permit, TGP cannot trench through streams owned or used by Petitioners' members. Connor Decl., ¶19 (AD086); Crow Decl., ¶21 (AD095); Shafer Decl., ¶16 (AD107). Moreover, judicial relief would redress those injuries. Connor Decl., ¶20 (AD086); Crow Decl., ¶22 (AD096); Shafer Decl., ¶17 (AD107).

Because their members have standing, Petitioners have organizational standing. Their members' interests in protecting Tennessee's waters and land are germane to their organizational purposes. Swinford Decl., ¶¶7-8, 16 (AD111-14); Mummaw Decl., ¶¶4-5, 9 (AD098-100). Moreover, the members' individual participation is unnecessary because this case seeks *vacatur* of agency action, not individualized relief. Accordingly, Petitioners have standing, and this Court has jurisdiction.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the 404 Permit's issuance was arbitrary and capricious or otherwise not in accordance with law because the Corps failed to independently verify TGP's claims that it had rebutted the presumption of practicable alternatives to open-cut trenching through special aquatic sites.

2. Whether the 404 Permit's issuance was arbitrary and capricious or otherwise not in accordance with law because the Corps, prior to issuing the permit, failed to determine that TGP's rock-removal methods for its trenched crossings were the least environmentally damaging practicable alternative and take steps to minimize potential adverse impacts on the aquatic ecosystem.

3. Whether the 404 Permit's issuance was arbitrary and capricious because the Corps misunderstood the scope of Tennessee's §401 Certification and relied on that misunderstanding to make key regulatory determinations.

4. Whether the 404 Permit's issuance was arbitrary and capricious because the Corps mistakenly relied on a nonexistent National Pollution Discharge Elimination System permit to make key regulatory determinations.

5. Whether the 404 Permit's issuance was arbitrary and capricious or otherwise not in accordance with law because the Corps failed to evaluate the requisite cumulative effects.

## STATEMENT OF THE CASE

### *Legal Framework*

This petition for review involves the application of the three foundational permitting sections of the CWA (Section 404, Section 401, and Section 402) to an interstate natural gas pipeline.

*Clean Water Act Section 404 (33 U.S.C. §1344)*

Because Pipeline construction would require fill material discharge into jurisdictional waters, the CWA required TGP to obtain a §404 permit. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d 251, 256 (4th Cir. 2020).

CWA §404 authorizes the Secretary of the Army—through the Corps—to issue permits to discharge dredged or fill material "at specific disposal sites." 33 U.S.C. §1344(a) (AD026). Congress directed the Environmental Protection Agency ("EPA")—"in conjunction with [the Corps]"—to develop regulatory guidelines to implement §404 (hereinafter, the "EPA Guidelines" or "EPA's Guidelines"). *Id.* §1344(b)(1) (AD026); 40 C.F.R., Part 230.

Among other things, EPA's Guidelines prohibit permit issuance "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem," if the activity will cause or contribute to water quality standards violations, or if "appropriate and practicable steps have [not] been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. §§230.10(a)-(b), (d) (AD061-63). Each of those prohibitions is at issue in this case.

<u>The "LEDPA"</u>

The Corps cannot issue a §404 permit where there is a practicable alternative that would cause less damage to aquatic resources. 40 C.F.R. §230.10(a) (AD061).

- 6 -

The applicant for a §404 permit bears the burden to demonstrate that the proposed activity is the least environmentally damaging practicable alternative, or "LEDPA." *See, e.g.*, *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1187 (10th Cir. 2002), *modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003); *see also All. for Legal Action v. U.S. Army Corps of Eng'rs*, 314 F.Supp.2d 534, 543 (M.D.N.C. 2004) (holding "the burden to clearly demonstrate a lack of practicable alternatives lies with the project applicant"). But, in performing the LEDPA analysis, the Corps has "an obligation to independently verify the information supplied to it." *Friends of the Earth v. Hintz*, 800 F.2d 822, 835 (9th Cir. 1986). EPA's Guidelines require the Corps to make certain factual determinations and compliance findings about each disposal site in its pre-permit LEDPA analysis. 40 C.F.R. §§230.11-230.12 (AD064-69).

EPA's Guidelines also impose a presumption of available and less-damaging alternatives for projects that are not water dependent. For such projects, practicable alternatives to discharge into special aquatic sites—such as wetlands and streams with riffle-and-pool complexes—"are presumed to be available, unless clearly demonstrated otherwise," and alternatives that do not discharge into special aquatic sites are presumed to cause less damage to aquatic resources. *Id.* §230.10(a)(3) (AD061). That presumption is "very strong," *Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d 1341, 1344 (8th Cir. 1994) (cleaned up), and must be rebutted by the applicant

with "detailed, clear and convincing information" that is independently verified by the Corps. *Greater Yellowstone Coalition v. Flowers* (*Greater Yellowstone II*), 359 F.3d 1257, 1269 (10th Cir. 2004) (internal quotation omitted).

## Water Quality Standards Compliance

The CWA requires states to promulgate, with EPA approval, water quality standards for the nation's waters. *See generally* 33 U.S.C. §1313. EPA's Guidelines prohibit the Corps from issuing a §404 permit that would cause or contribute to violations of those standards. 40 C.F.R. §230.10(b)(1) (AD062). As part of its obligations to ensure water quality standards compliance, EPA's Guidelines require the Corps to consider an activity's effects on suspended particulates and turbidity when making factual determinations and compliance findings. 40 C.F.R. §230.21 (AD072); *Id.*, Subpart C NOTE (AD073). EPA's Guidelines also require the Corps to make factual findings about cumulative effects on the aquatic ecosystem as it is evaluating water quality standards compliance. 40 C.F.R. §230.11(g) (AD066).

## Minimization Steps

Before it issues a §404 Permit, the Corps must find that all appropriate and practicable steps have been taken to minimize adverse effects on aquatic resources at each disposal site. 40 C.F.R. §§230.10(d) (AD063), 230.11 (AD064), 230.12 (AD068). Subpart H of EPA's Guidelines identifies some of the actions that can

minimize such adverse effects, including the use of appropriate equipment and machinery. 40 C.F.R. §230.74(a) (AD077).

*Clean Water Act Section 401 (33 U.S.C. §1341)*

CWA §401(a) requires applicants for federal permits for activities that will discharge into jurisdictional waters to obtain "a certification from the State in which the discharge originates … that any such discharge will comply with" water quality requirements. 33 U.S.C. §1341(a) (AD009). Such permits are those "granted by an agency of the Federal Government to conduct *any* activity which may result in a discharge into waters of the United States." 40 C.F.R. §121.1(f) (AD055) (emphasis added). Such activities include disposal of fill material at specific disposal sites under CWA §404, and construction of interstate gas pipelines under certificates of public convenience and necessity issued by FERC under the Natural Gas Act. States can waive the §401 certification requirement affirmatively or through inaction. 40 C.F.R. §§121.7, 121.9 (AD057-60). Certifications and waivers, however, cannot be treated as equivalents or interchangeable. *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 652-53 (4th Cir. 2018). Although a federal agency may not be able to review the substance of a state's §401 action, the agency nonetheless must understand the scope of the state's action. *Am. Rivers, Inc. v. FERC*, 129 F.3d 99, 109-11 (2d Cir. 1997).

Corps regulations prohibit §404 permit issuance until §401 certification has been obtained or waived. 33 C.F.R. §325.2(b)(ii) (AD047-48). The Corps has also promulgated a regulation that in its (mistaken) view allows it to treat a §401 certification as conclusive with regard to water quality effects of permitted activities and to forego independent water quality analysis of permit applications. *See* 33 C.F.R. §320.4(d) (AD037).

Tennessee administers §401 through its Aquatic Resources Alteration Permit ("ARAP") program, which requires an applicant to obtain a permit to carry out any activity that results in alteration of the properties of any waters of the State. Tenn. Code Ann. §69-3-108(b)(1); Tenn. Comp. R. & Regs. 0400-40-7-.04(3). Although an ARAP can also serve as an activity's §401 certification, Tenn. Comp. R. & Regs. 0400-40-7-.04(1), nothing in Tennessee's regulatory program restricts Tennessee's authority to both issue an ARAP and waive §401 certification.

*Clean Water Act Section 402 (33 U.S.C. §1342)*

In the 1972 amendments to the Federal Water Pollution Control Act, Congress created the National Pollutant Discharge Elimination System ("NPDES"). 33 U.S.C. §1342 (AD012). The system was designed to serve the national goal of eliminating the discharge of pollutants into the nation's waters by 1985. *Id.* §1251(a)(1) (AD006). The foundation of that system is the NPDES permit program, under which

EPA or delegated states can issue permits for pollutant discharges. *Id.* §1342(a)-(b) (AD012-13).

But, the permitting authority of EPA and the states does not overlap the Corps's permitting authority under §404. The latter trumps the former because the latter is expressly excepted from the NPDES permit program. *Id.* §1342(a)(1). Accordingly, the Supreme Court has held that §402 forbids EPA and states from issuing NPDES permits for §404 discharges regulated by the Corps. *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 273 (2009).

In 1987, Congress amended the CWA to exempt stormwater runoff from, *inter alia*, oil and gas transmission facilities from NPDES permit requirements. 33 U.S.C. §1342(*l*)(2). And through the Energy Policy Act of 2005, Congress clarified that the construction of gas transmission facilities is exempt from NPDES permitting requirements. *See Nat. Res. Defense Council v. EPA*, 526 F.3d 591, 599 (9th Cir. 2008) (discussing 33 U.S.C. §1362(24) and 33 U.S.C. §1342(*l*)(2)).

### Statement of Facts

TGP's proposed Cumberland Pipeline would be a 32-mile long, 30-inch diameter methane gas pipeline traversing portions of Dickson, Houston, and Stewart Counties and terminating at the Tennessee Valley Authority's Cumberland Fossil Plant in Cumberland City, Tennessee. App-0211. On July 22, 2022, TGP submitted an application to the Corps for a §404 permit seeking authorization to construct the

Pipeline across 146 jurisdictional waters, including 139 streams and 7 wetlands. App-0781, App-0212. Each of the streams the Pipeline would cross includes riffle-and-pool complexes. App-0296. Such complexes characterize gradient sections of streams where rapid water flow over coarse streambed causes "a rough flow, a turbulent surface, and high dissolved oxygen levels," followed by pools with slower water velocity, a smooth surface, and finer materials on the streambed. 40 C.F.R. §230.45(a) (AD076).

In response to TGP's application, Petitioners submitted lengthy technical comments to the Corps alerting the Agency to the many deficiencies apparent on the face of TGP's application. App-0484-671. Those comments were supported by expert opinion, scientific literature, and other information. AR004215-7554.

In pipeline construction, there are two main ways to cross waterbodies. *Sierra Club v. W. Va. Dep't of Env't Prot.*, 64 F.4th 487, 494 (4th Cir. 2023). The developer can trench *through* the waterbody using an open-cut crossing, or it can tunnel *under* the waterbody using a trenchless crossing. *Id.* There are multiple trenchless crossing methods. For example, horizontal directional drilling ("HDD") involves tunneling under a waterbody with a drill from one side to the other using pressurized drilling fluid and then pulling the pipe into position. App-0805. As TGP concedes, that technique "drastically reduces the impacts to waterbodies and their aquatic

- 12 -

environments by drilling down and under the sensitive resource, resulting in the [streambed] remaining relatively undisturbed." *Id.*

Another well-established trenchless method for pipeline stream crossings is conventional boring. App-0727 (noting that conventional boring "is a technology that has been used for decades to install natural gas pipelines"). In conventional boring, a pit is dug on either side of the resource, a tunnel is bored under the stream, and the pipe is jacked through the tunnel. App-0728. Conventional bore has several environmental and logistical advantages over HDD, including reduced workspace requirements (*id.*), no risk of drilling fluid spills (App-0746), and reduced time and cost requirements (App-0476, App-0842). Additional types of trenchless crossing methods commonly used in the pipeline industry include guided conventional boring, Direct Pipe®, microtunneling, and directional microtunneling. App-0517-20.

Here, TGP proposes to trench through all but four waterbodies in the Pipeline's path with dry, open-cut crossings. App-0780-81, App-0212. TGP would construct those crossings by blasting or excavating a 4.5 to 8-feet-deep and 4 to 5-feet-wide trench through streambeds to bury a 30" diameter pipe. App-0793-94. TGP's application proposed five alternatives for rock removal while trenching through streambeds, each using different equipment and causing escalating levels of risk to aquatic resources: (1) conventional excavation (using backhoes), (2) ripping

(using a "concave tooth … inserted into and dragged through" the streambed), (3) hammering (using a "pneumatic tool attached to a backhoe boom to break apart" streambed materials), (4) rock trenching (using a "large trenching machine"), and (5) controlled blasting (using explosives). App-802-04.

However, TGP's application only discussed two trenchless methods—HDD and conventional bore—and only at a conceptual level of generality rather than a site-specific basis.[1] App-0805-07. Notwithstanding the fact that TGP intends to use conventional boring to cross eight public roads in the Pipeline's path (App-0480), TGP summarily dismissed that method for waterbody crossings based on unsubstantiated and internally contradictory project-level contentions. App-0805-06. Indeed, TGP only proposed the three HDD crossings (under 4 streams) "*to avoid environmental impacts* at two National Rivers Inventory Stream reaches (Jones Creek and Yellow Creek) and due to physical characteristics of Wells Creek." App-0051 (emphasis added). TGP did not evaluate the practicability of HDD or other trenchless methods on a site-specific basis at any other waterbody crossing.

On July 21, 2023, TDEC issued a §401 certification to TGP. App-0009. TDEC did not have information about all of TGP's stream crossings when it issued the Certification, and thus only certified some of the crossings. App-0019, App-

---

[1] TGP also recognized Direct Pipe® as an available trenchless method in an attachment to its application but did not discuss that technique in any detail. App-0842.

0391. On April 24, 2024, TDEC issued a modified ARAP that permitted the additional crossings under Tennessee state law but expressly waived §401 certification for the newly permitted crossings. App-0335, App-0345. On June 13, 2024, FERC notified EPA that it agreed that TDEC had waived §401 certification for the new crossings in the modified ARAP. App-0313.

On July 25, 2024, the Corps issued the §404 Permit sought by TGP. App-0002-08. In the 404 Permit and supporting decision documents, the Agency uncritically accepted TGP's proposal to undertake only three trenchless HDD crossings (under four streams) and to open cut the balance of waterbodies in the Pipeline's proposed path. App-0212, App-0234, App-0286-89. Through inclusion of Special Condition 9 in the 404 Permit, the Corps permitted TGP's contractors to select the least environmentally damaging and practicable rock-removal method during Pipeline construction. App-0007. And, despite the fact that TDEC had not issued a §401 certification for all of the Pipeline's stream crossings, the Corps relied on the Certification to support its finding of water quality compliance at every crossing. App-0249. The Corps also relied on a nonexistent NPDES permit to conclude that effects from suspended particulates and turbidity would be negligible, App-0238-39, and ignored the cumulative effects of multiple Pipeline crossings on individual streams. App-0312.

On September 24, 2024, Petitioners filed this timely petition for review of the

404 Permit, which was docketed on September 26, 2024. ECF #1-1 (App-0197-200).

## SUMMARY OF THE ARGUMENT

Before the Corps could issue the 404 Permit to TGP, it was required to, among

other things, **(1)** presume that trenchless crossings were practicable at each crossing,

unless TGP clearly demonstrated otherwise, **(2)** select the least environmentally

damaging and practicable rock-removal method that would minimize potential

adverse effects on aquatic resources for each crossing, **(3)** determine whether TGP's

activities would cause or contribute to water quality standards violations, **(4)**

evaluate those activities' effect on suspended particulates and turbidity, and **(5)**

determine the cumulative effect of multiple crossings of the same stream. The

Corps's attempts to perform each of those tasks were arbitrary, capricious, and

otherwise not in accordance with law. This Court should vacate the 404 Permit.

1.      EPA's Guidelines presume that there are practicable alternatives to

activities in special aquatic sites—like the riffle-and-pool complexes omnipresent at

TGP's stream crossings—and that those alternatives would have less adverse impact

on aquatic ecosystems. 40 C.F.R. §230.10(a)(3) (AD061). That "presumption of

practicable alternatives is very strong." *Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d

1341, 1344 (8th Cir. 1994) (cleaned up). An applicant must rebut the presumption

with "detailed, clear and convincing information," and the Corps must independently

- 16 -

verify the applicant's submission. *Greater Yellowstone Coalition v. Flowers* (*Greater Yellowstone II*), 359 F.3d 1257, 1269 (10th Cir. 2004) (internal quotation omitted).

TGP failed to rebut the presumption. The company failed to consider each of several trenchless-crossing methods on a site-by-site basis. And the information it provided to the Corps about conventional boring was demonstrably wrong.

The Corps's efforts fared no better. The Agency uncritically accepted TGP's assertions and failed to grapple with contrary record evidence. Such agency action is arbitrary and capricious. *Sierra Club v. W. Va. Dep't of Env't Prot.*, 64 F.4th 487, 502 (4th Cir. 2023); *Friends of the Earth v. Hintz*, 800 F.2d 822, 836 (9th Cir. 1986). The Corps backed down from its demands that TGP rebut the presumption and instead adopted TGP's incomplete answers to the pertinent question of whether the presumption that a trenchless crossing was practicable was rebutted at each crossing.

2.      Rather than performing the regulatory oversight required of it under EPA's Guidelines, the Corps impermissibly abdicated to TGP its obligations to select the least environmentally damaging practicable rock-removal method and to minimize potential adverse effects on aquatic resources at each crossing. The 404 Permit's Special Condition 9 allows TGP to "select the least impactful trenching technique practicable" from a list of five rock-removal methods. App-0007.

But it is the Corps's responsibility to "select the least environmentally

damaging practicable alternative." *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 911 (9th Cir. 2018) (internal quotation omitted). And the Corps must do so *before* permit issuance in order to ensure compliance with the EPA Guidelines's prohibition on permit issuance for anything *but* the LEDPA.

The Corps and TGP may suggest (as they did in stay briefing) that rock-removal methods are not part of the LEDPA evaluation. Not so. The Corps cannot use a synonym for LEDPA, do it wrong, and then insist it was not performing a LEDPA analysis in the first place.

Moreover, EPA's Guidelines also prohibit permit issuance unless appropriate and practicable steps—including using appropriate equipment and machinery during construction activities—are implemented. 40 C.F.R. §§230.10(d), 230.74 (AD063, AD077). The Corps must make factual findings about equipment and machinery to minimize impacts *before* permit issuance. *Id.* §§230.11(a), 230.12 (AD064, AD068). Accordingly, the Corps needed to prescribe the appropriate rock-removal equipment and machinery and select the LEDPA among rock-removal methods prior to permit issuance. It did not.

**3.**     To reach its conclusion that TGP's proposed activities will not cause or contribute to water quality standards violations, the Corps relied on a demonstrably false impression of the scope of TDEC's §401 Certification. The Corps believed that TDEC had evaluated all of TGP's proposed crossings and determined that they

- 18 -

would not violate water quality standards. App-0389-90. Not so. TDEC did not have information about all of TGP's crossings when it issued its Certification. App-0391. Consequently, TDEC only certified *some* of TGP's crossings, and waived its authority to evaluate the remainder. *Compare* App-0012-17 *with* App-0318-23 (highlighting newly identified crossings not authorized in the Certification); *see also* App-0335, App-0345.

When an agency relies on a demonstrably false impression about the scope of a related permit regime to perform its own regulatory obligations, it acts arbitrarily and capriciously. *W. Va. Dep't of Env't Prot.*, 64 F.4th at 508. And when an agency rests its determination on even one infirm ground it is arbitrary and capricious. *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021).

**4.**    The Corps was also under a demonstrably false impression that a Clean Water Act Permit—specifically an NPDES permit—would limit suspended solids discharges from in-stream pipeline installation and thus limit suspended particulates and turbidity. As part of its EPA Guidelines' determinations about pipeline crossing effects on suspended solids and particulates under 40 C.F.R. §230.21 (AD072), the Corps stated that "[d]ischarges from installation of the pipe and other attendant structures are subject to TDEC NPDES permitting. The NPDES permit contains limits on the amount of total suspended solids." App-0238-39.

But there is no such permit and no such limit. Indeed, because the fill discharges associated with pipeline construction are regulated by CWA §404, they cannot be subject to NPDES requirements. *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 273-74 (2009). And gas pipeline construction is largely exempt from NPDES permitting requirements in any event. 33 U.S.C. §1342(*l*)(2). When an agency "offer[s] an explanation for its decision that runs counter to the evidence before the agency," its decision is arbitrary and capricious. *Ohio v. Becerra*, 87 F.4th 759, 772 (6th Cir. 2023).

**5.** EPA's Guidelines require the Corps to make specific determinations about the "collective effect of a number of individual discharges of dredged or fill material." 40 C.F.R. §230.11(g)(1)-(2) (AD066). That is because, "[a]lthough the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems." *Id.*

Such is the case here. "Construction of multiple crossings on a stream or river, or within a watershed … has the potential for cumulative effects on that system. In such cases, the capacity of the system to recover from impact may be exceeded, and the detrimental effects of crossing construction permanent." App-0765.

Despite warnings about potentially permanent impacts to streams that the Pipeline would cross multiple times, the Corps entirely ignored that aspect of Pipeline construction. Such agency action is arbitrary and capricious. *Ky. Waterways All. v. Johnson*, 540 F.3d 466, 474 (6th Cir. 2008).

## **ARGUMENT**

### *Standard of Review*

In NGA proceedings reviewing §404 permits, federal circuit courts apply the Administrative Procedure Act ("APA"). *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 643 (4th Cir. 2018). Under that statute, courts must set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

Although the APA "mandate[s] that judicial review of agency policymaking and factfinding be deferential," an agency still has to "engage[] in reasoned decisionmaking" within the APA's boundaries. *Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2261, 2263 (2024) (cleaned up); *see also Louisville Gas & Electric Co. v. FERC*, 988 F.3d 841, 846 (6th Cir. 2021). However, "deferential" review does not mean "inconsequential" review, and a reviewing court must always be mindful not to simply rubberstamp agency decisions. *Ky. Waterways All. v. Johnson*, 540 F.3d 466, 474 (6th Cir. 2008) (quotation omitted); *see also Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 367 (6th Cir. 2010) (agency must, among many other things,

reasonably apply relevant statutory and regulatory criteria to be entitled to deference). Consequently, "'[d]eferential review is not no review, and deference need not be abject.'" *Ky. Waterways All.*, 540 F.3d at 474 (quoting *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)).

To survive arbitrary and capricious review, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Louisville Gas*, 988 F.3d at 846 (quotation omitted); *see also Simms v. Nat'l Traffic Safety Admin.*, 45 F.3d 999, 1004 (6th Cir. 1995). A satisfactory explanation requires more than bare recitals, particularly where there is contradictory evidence in the record. *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 293 (4th Cir. 2018). Indeed, an agency acts arbitrarily and capriciously when it fails to "grapple with contrary evidence." *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638-39 (D.C. Cir. 2017). Agency action that misapplies an applicable statute or regulation is not in accordance with law. *See, e.g.*, *All. for Cmty. Media v. FCC*, 529 F.3d 763, 786 (6th Cir. 2008). Agency actions are also arbitrary and capricious when they fail to address important aspects of the problem or run counter to the record. *Simms*, 45 F.3d at 1004; *see also Ohio v. Becerra*, 87 F.4th 759, 772 (6th Cir. 2023).

*Discussion of the Issues*

## I.  THE CORPS FAILED TO APPLY THE PRESUMPTION OF PRACTICABLE ALTERNATIVES.

An applicant for a §404 permit bears the burden to demonstrate its proposed alternative is the least environmentally damaging practicable alternative, or "LEDPA." *See Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1187 (10th Cir. 2002), *modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003) ("The burden of proof to demonstrate compliance with the §404(b) permit Guidelines rests with the applicant; where insufficient information is provided to determine compliance, the Guidelines require that no permit be issued."). In performing its LEDPA analysis, the Corps has "an obligation to independently verify the information supplied to it," and can neither "blind[ly]" nor "uncritically" accept an applicant's alternatives analysis. *Friends of the Earth v. Hintz*, 800 F.2d 822, 835-36 (9th Cir. 1986). Indeed, EPA's Guidelines require the Corps to make specific factual findings about a proposed activity's compliance with the LEDPA requirement. 40 C.F.R. §230.12 (AD068).

EPA's Guidelines require the Corps to provide extra protections for "special aquatic sites" like wetlands and riffle-and-pool complexes.[2] 40 C.F.R. §§230.41

---

[2]  EPA's Guidelines describe riffle-and-pool complexes at 40 C.F.R. §230.45(a) (AD076).

(AD074), 230.45 (AD076). Among those protections is a presumption of practicable alternatives for non-water-dependent projects like the Pipeline. Specifically, EPA's Guidelines provide that,

> Where the activity associated with a discharge which is proposed for a special aquatic site … is not "water dependent" … practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

*Id.* §230.10(a)(3) (AD061). The presumption has two components: (1) "that there are 'practicable alternatives that do not involve special aquatic sites,'" and (2) that such alternatives "'have less adverse impact on the aquatic ecosystem.'" *Greater Yellowstone Coalition v. Flowers* (*Greater Yellowstone II*), 359 F.3d 1257, 1269 (10th Cir. 2004) (quoting 40 C.F.R. §230.10(a)(3)).

"The presumption of practicable alternatives is very strong." *Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d 1341, 1344 (8th Cir. 1994) (cleaned up). Where the presumption applies, "the Corps may not issue a §404 permit unless the applicant, with independent verification by the [Corps], provides detailed, clear and convincing information proving that an alternative with less adverse impact is impracticable." *Greater Yellowstone II*, 359 F.3d at 1269 (cleaned up); *see also Carabell v. U.S. Army Corps of Engineers*, 391 F.3d 704, 707 (6th Cir. 2004) (affirming the Corps's denial of a 404 permit based in part on the applicant's "failure to overcome the

presumption that there were less damaging practicable alternatives available"), *vacated on other grounds sub nom. Rapanos v. United States,* 547 U.S. 715 (2006). And, "under the CWA, it is not sufficient for the Corps to consider a range of alternatives to the proposed project: the Corps must rebut the presumption that there are practicable alternatives with less adverse environmental impact." *Greater Yellowstone Coalition v. Flowers* (*Greater Yellowstone I*), 321 F.3d 1250, 1262 n.12 (10th Cir. 2003).

Here, the Corps correctly "assumed each stream crossed by the proposed pipeline" would have riffle-and-pool complexes because of regional geography. App-0296.[3] Thus, TGP bore the burden to rebut the presumption at each disposal site based on clear evidence independently verified by the Corps. And, because EPA's Guidelines expressly recognize that activities that do not require fill material discharges into waters of the United States—like trenchless crossings[4]—are

---

[3] Even if the Corps's assumption were not well-founded (it is), without that assumption the 404 Permit would be arbitrary and capricious because the Corps would have failed to determine the presence or absence of special aquatic sites, and there is record evidence of riffle-and-pool complexes at multiple crossing locations. App-0672-75. Moreover, the Corps's inadequate evaluation of the LEDPA at each crossing would render its EPA Guideline's compliance finding arbitrary and capricious even if the presumption of practicable alternatives were not applicable.

[4] All Parties agree trenchless crossings like conventional boring do not require fill material discharges and thus entirely avoid special aquatic sites. App-0226; App-0800; App-0688. And alternatives that avoid special aquatic sites are presumed

practicable alternatives (40 C.F.R. §230.10(a)(1)(i) (AD061)), TGP bore the burden to clearly demonstrate that trenchless methods commonly employed on similar pipelines (including conventional boring) were impracticable. Ultimately, the Corps bore the burden to independently verify TGP's contentions. Neither TGP nor the Corps did its job.

### A. TGP Failed to Prove With Detailed, Clear and Convincing Evidence That No Trenchless Crossing Method Was Practicable At Any Open-Cut Crossing Location.

Despite multiple opportunities to present detailed, clear and convincing information demonstrating that no trenchless crossing method was practicable at any location where it wanted to blast or trench through a stream, TGP failed to do so. Stated otherwise, TGP entirely failed to demonstrate that trenchless crossings were impracticable on a crossing-by-crossing basis.

As a preliminary matter, TGP all but ignored trenchless methods used on other pipeline projects (including by TGP) except for two: HDD and conventional bore. As Petitioners' comments alerted the Corps, there are numerous other possible trenchless crossing methods for the Pipeline, including (1) guided conventional boring, (2) microtunneling, (3) Direct Pipe®, and (4) directional microtunneling. App-0517-20. TGP's application was silent about the existence—let alone

---

to have less adverse impact under the applicable presumptions. 40 C.F.R. §230.10(a)(3).

practicability—of guided conventional boring, microtunneling, and directional microtunneling. And TGP presented only cursory and unsupported details about Direct Pipe®. App-0842. Those deficiencies alone should have doomed its application from the outset.

For an example of a "detailed location-specific review of practicable alternatives to open-cut crossings," *Sierra Club v. W. Va. Dep't of Env't Prot.*, 64 F.4th 487, 499 (4th Cir. 2023) (quotation omitted), the Court should look to record evidence about and take judicial notice of the publicly available crossing-by-crossing analysis prepared by the operator of the Mountain Valley Pipeline ("MVP").[5] *See* Mountain Valley Pipeline LLC, Accession Number 20210304-5122, *a MVP USACE Individual Permit Application* 128-76 (Table 15) [hereinafter, "MVP's Table 15"], *available at*: https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20210304-5122&optimized=false. Even a cursory review of MVP's Table 15 and its crossing-by-crossing analysis exposes glaring deficiencies in TGP's application.

MVP's Table 15 scrutinizes hundreds of stream crossings, identifies potential crossing methods, evaluates numerous logistical factors (including crossing length,

---

[5] This Court can take judicial notice of this analysis because it is a "public record" available FERC's docket and Petitioners offer it only as a point of comparison, and not "for the truth of the matter[s] asserted" therein. *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.*, 894 F.3d 235, 245 (6th Cir. 2018) (citation omitted).

required bore-pit depth, stream depth, maximum slope steepness, average slope steepness, maximum length of equipment winches needed on steep slopes, whether karst terrain is present, and whether sufficient soil/rock stockpile storage is available), and presents cross-specific cost estimates. App-0748-51. Table 15 also includes a narrative explanation of the company's rationale for its selected crossing method. *See generally* MVP's Table 15. Although Petitioners disagree with many of the crossing methods selected in MVP's Table 15, the table nonetheless presents information on all relevant factors on a site-specific basis.

Although TGP's disregard of most practicable trenchless methods alone precluded it from rebutting EPA's Guidelines' presumptions, its treatment of the conventional bore method was particularly egregious given that method's widespread use in the region and for road crossings *on this very Pipeline*. App-0480, App-0692. Unlike with other trenchless methods, TGP did some hand waving about conventional bore in its application materials, but the information it presented was demonstrably wrong.

Record evidence fatally undermines TGP's generalizations about conventional boring. App-0691-93; App-0521-30. TGP warns of three phantom technical challenges with conventional bores: crossing distance, geologic conditions, and topography. App-0805. But, as FERC has observed, "[t]he conventional bore method is a technology that has been used for decades to install

natural gas pipelines." App-0727. The method has several environmental and logistical advantages over HDD, including reduced workspace requirements (App-0728), no risk of drilling fluid spills (App-0746), and reduced time and cost requirements (App-0476; App-0842). Moreover, as FERC concluded when it approved 120 additional trenchless crossings for the MVP,

> conventional bore construction is suitable for construction through a wide variety of materials, as is evidenced by the fifty-four trenchless crossings that have been successfully completed for the Mountain Valley Pipeline Project. The [additional] conventional bore crossings proposed in the amendment application range between 20 and 405 feet in length.

*Mountain Valley Pipeline, LLC*, 179 FERC ¶61,013, ¶61,055 (2022). And "much of the [MVP] Project crosses topography with steep slopes[.]" *Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 384 (4th Cir. 2018). The widespread use of conventional boring after a site-by-site analysis on the MVP, across streams of similar width to those crossed by the Pipeline, and in even steeper topography, reveals TGP's high-level generalizations to be inapt.

Moreover, nothing in the record shows a crossing-by-crossing evaluation of the "general limitations" TGP identified. App-0476. Finally, TGP's assertion that the topography and geology of the region precludes the use of conventional bore is wholly inconsistent with its proposed use of conventional boring for multiple road crossings. App-0480, App-0692. In sum, the method is hardly impracticable, and

TGP certainly did not clearly demonstrate that it was. Moreover, as explained below, the Corps failed in its analysis of TGP's claims.

## B. The Corps Failed to Independently Verify that the Presumption Had Been Rebutted.

The Corps impermissibly blindly and uncritically accepted TGP's assertions, *Hintz*, 800 F.2d at 836, and failed to grapple with contrary record evidence or to independently verify TGP's assertions, *W. Va. Dep't of Env't Prot.*, 64 F.4th at 502. Accordingly, the 404 Permit is not the product of reasoned decisionmaking.

The Corps appears to have started out with good intentions, stressing to TGP at a pre-application meeting "that alternatives analysis should be provided that would demonstrate LEDPA with quantitative criteria and in accordance with 404(b)(1) guidelines." App-0844. When TGP's application fell short of the Corps's expectations, the Corps specifically reminded TGP that "[t]he proposal must be shown to be the" LEDPA and directed TGP to further evaluate trenchless crossing methods, including HDD, microtunneling, conventional boring, and directional microtunneling. App-0226. When providing comments to FERC on the Commission's NEPA analysis, the Corps told FERC that it:

> believe[d] the applicant needs to provide more information for alternatives including on-site minimization measures especially for additional HDD installation methods especially on perennial streams in order to minimize impacts to [waters of the United States]. [The Corps] has sent a letter to the applicant requesting additional information on

the alternatives to include review of HDD and/or justification of why
more HDD methods are not proposed.

App-0482. But the Corps's commitment to hold TGP's feet to the fire did not last,

inexplicably vanishing with the issuance of the 404 Permit.

TGP's response to the Corps's request for additional analysis of trenchless

methods remained as generic as its initial assertions about those methods. App-0473-

77. As discussed above, TGP entirely failed to explain why conditions at any

particular crossing rendered trenchless crossings impracticable. *Id.* Instead, TGP

continued to assert broad, unsupported generalizations about trenchless methods, *id.*,

that were contradicted by existing record evidence, App-0691-93; App-0521-30.

At that point, the Corps apparently lost the will to hold TGP to its burden to

rebut the presumption of practicable alternatives. Instead, the Corps waived the

white flag, blindly and uncritically accepting TGP's unsupported, general

contentions that broader use of trenchless methods was impracticable. App-0234-

35.

Where an agency abandons previously expressed "steadfast concerns" about

a pipeline company's proposals and assents to those proposals without a clear

explanation of how its previous concerns were alleviated, it fails to engage in

reasoned decisionmaking. *Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 596 (4th

Cir. 2018). Here, the Corps initially wanted to see additional use of trenchless

crossing methods, yet without a clear explanation, acquiesced to TGP's insistence

that it be permitted to blast or trench through almost all of the streams in the Pipeline's path. That was arbitrary and capricious.

The absence of a clear explanation of the Corps's about face is demonstrated by the Corps rejection of what it called "Onsite Alternative 3." App-0234-35. Like TGP, the Corps was silent about any trenchless method beyond HDD or conventional bore. And the Corps largely conflated those. The Corps rejected Onsite Alternative 3—the broader use of HDD—because "the additional cost and time of construction is not reasonable and not a practicable alternative." *Id.* The Corps's discussion of Onsite Alternative 3 focused almost exclusively on HDD, with conventional boring being only an afterthought at best. *Id.* Indeed, beyond a reference to conventional bore in the heading for Onsite Alternative 3, the Corps only discussed conventional bore in the context of construction duration—and even then, the Corps equated conventional bore with HDD. App-0234 ("The applicant states that the timeline associated with an [*sic*] HDD/conventional bore crossings are approximately 10 days to 1 month[.]").

Again, the question before the Corps was whether the presumption that a trenchless crossing was practicable was rebutted at every crossing. The Corps incompletely answered that question at least four times in its crossing-methods discussions. ***First***, the Corps's Onsite Alternative 3 discussion asserted that "using HDD at every crossing … is … not a practicable alternative." App-0235. Even if

that were correct, it is incomplete. For purposes of the disposal-site–by–disposal-site analysis required by EPA's Guidelines, the query is whether a trenchless crossing like a conventional bore is practicable at *any* given crossing. This is not an all-or-nothing exercise.

Expert engineer Starr Silvis warned the Corps that conventional boring should be considered at each crossing because TGP proposed that method "for multiple road crossings … indicating that this trenchless method is appropriate for substrates found along the project length." App-0692. After receiving Silvis's comments, the Corps asked TGP to evaluate conventional boring. App-0226. Even then, TGP failed to clearly demonstrate that conventional boring was impracticable at *any* (let alone every) crossing location. *See generally* App-0462-77.

**Second**, The Corps asserts that TGP evaluated the practicability of HDD at every crossing. App-0234-35, App-0295. Not so. Nothing in the record shows site-by-site consideration of factors relevant to HDD's practicability. But even if the Corps were correct, that too is an incomplete answer that falls short of what EPA's Guidelines require: a clear demonstration that the presumption of practicable alternatives is wrong. Here, that required a crossing-by-crossing analysis of the practicability of trenchless crossings like conventional bore, not just HDD. Neither the Corps nor TGP conducted such an evaluation.

***Third***, the Corps concluded that the "additional cost and time of construction" of "using HDD at every crossing" is "not reasonable and is therefore not a practicable alternative." App-0234-35. Again: incomplete answer. The Corps made no similar conclusion about other trenchless methods like conventional boring. Because the Corps made no factual determinations about the cost and time of conventional boring or other trenchless methods, there is nothing to which the Court could defer. *Or. Nat. Desert Ass'n v. B.L.M.*, 625 F.3d 1092, 1121 (9th Cir. 2010) (courts "cannot defer to a void").

Even if the Corps had made similar findings regarding conventional boring, those findings would be due no deference because they would be unsupported by the record and, hence, arbitrary and capricious. On practicability generally, conventional boring has been used for decades for pipeline crossings. App-0727. On the time factor, even TGP admits that conventional "bores generally do not take the same amount of time as would a[n] HDD." App-0476. And on cost, TGP failed to evaluate the cost of a conventional bore for any single crossing, let alone for each crossing (as was done for the Mountain Valley Pipeline). *See, e.g.*, App-0747. The decade-old cost information TGP provided in its application is stale, but even it shows that conventional boring is at least 25% less expensive than HDD. App-0842. Regardless, just because an alternative costs more or takes longer does not mean it is impracticable. *See Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*, 869

F.3d 148, 159 (3d Cir. 2017). And even if conventional bore were to cost "up to five (5) times more" than open-cut trenching—as claimed by TGP (App-0806), that differential is not unreasonable in the context of an interstate gas pipeline with a guaranteed rate of return.[6] For example, the Mountain Valley Pipeline's proponent—which constructed well more than 100 conventional bore crossings—told the Corps that its general threshold for a practicable cost was when a trenchless crossing "would exceed the construction cost[] of an open cut by a factor of roughly five," except in the case of sensitive aquatic resources, where the company would tolerate an even higher ratio.[7] In any event, nothing in the record shows the Corps took any steps to verify TGP's assertions of conventional boring's cost, which alone renders its decision arbitrary and capricious. *Utahns for Better Transp.*, 305 F.3d at 1187.

**Fourth**, the Corps's conclusion that "the selective use of HDD may be practicable to address the peculiarities of certain crossings" (App-0235) might get closer to answering the key question, but still falls short. Once more, the Corps fails

---

[6]   *See Tennessee Gas Pipeline Co., L.L.C.*, 186 FERC ¶ 61,046, P24 (2024).

[7]   *See* Mountain Valley Pipeline, LLC, Accession Number 20211015-5213, Attachment 6: Mountain Valley Pipeline Responses to Comments on the 404 Individual Permit Application 34, *available at* https://elibrary.ferc.gov/eLibrary/filedownload?fileid=FA35367E-0714-C78D-8C4D-7C9372000000. This Court may take judicial notice of this statement because it is a "public record" available on FERC's docket and Petitioners offer it only as a point of comparison, and not "for the truth of the matter[s] asserted" therein. *Platt*, 894 F.3d at 245 (citation omitted).

to address the practicability of the selective use of other trenchless methods like conventional boring. Not only does that failure ignore expert record evidence, it ignores TGP's own admission that conventional boring would be practicable in certain circumstances. TGP told the Corps that, if it encountered high flow conditions, the "conventional bore method … may be determined to be more appropriate." App-0801. Expert engineer Starr Silvis highlighted that admission in her report to the Corps, concluding that TGP's statements indicated that it had inappropriately begun its consideration "by prioritizing dry open-cut crossings … except where they are impracticable instead of the other way around." App-0693. Nonetheless, the Corps was silent about the selective use of conventional bores where practicable.

*     *     *

At bottom, the Corps misunderstood its assignment. In response to Petitioners' comments about the need to evaluate all trenchless crossing methods, the Corps proclaimed that was not its job. Specifically, the Corps recognized that trenchless crossing methods would not result in fill material discharge into waters of the United States and, thus, would not require a §404 permit. App-0294. Although that is true, the Corps then leapt to the conclusion that "the choice of trenchless methods by the applicant is outside the scope of the Corps assessment of effects of fill in waters of the United States." *Id.* Not so. Under EPA's Guidelines, for the

special aquatic sites present at this Pipeline's crossing sites, the Corps was required to presume that alternatives that do not result in fill material discharge were practicable and less environmentally damaging. 40 C.F.R. §230.10(a)(3) (AD061). Accordingly, the choice of trenchless methods was squarely within the scope of the Corps's assessment, and its contrary conclusion was contrary to law.

Moreover, under EPA's Guidelines the Corps had an obligation to compare HDD with conventional boring, since each has unique practicability factors. *See* App-0692.  Instead, it presented them as if they were equivalents. That conclusion is impermissibly contrary to the record, *Ky. Waterways All.*, 540 F.3d at 474, which establishes that conventional bores are practicable and have fewer environmental impacts than either HDD or open-cut crossings, (*see, e.g.*, App-0727-31, App-0739-43). Because the Corps must independently verify an applicant's assertions, *Hintz*, 800 F.2d at 834-36, it was obligated to grapple with contrary record evidence rather than blindly accepting TGP's word, *W. Va. Dep't of Env't Prot.*, 64 F.4th at 502. Its failure to do so renders the 404 Permit arbitrary and capricious.

## II.   THE CORPS FAILED TO DETERMINE THE LEAST ENVIRONMENTALLY DAMAGING PRACTICABLE ROCK-REMOVAL ALTERNATIVE AND MINIMIZE POTENTIAL ADVERSE IMPACTS.

TGP 's proposed rock-removal methods for its trenched crossings also require pre-permitting evaluation under the EPA Guidelines, both as part of the LEDPA

analysis under 40 C.F.R. §230.10(a) (AD061) and as minimization techniques under 40 C.F.R. §230.10(d) (AD063) and Subpart H. The Corps failed to conduct those required evaluations, and instead included Special Condition 9 in the 404 Permit, which provides in pertinent part:

> For each crossing, *the permittee shall select* the least impactful trenching technique practicable, as described in the application submitted August 22, 2022.

App-0007 (emphasis added). Through inclusion of that condition, the Corps unlawfully empowered TGP to make the regulatory determination—during Pipeline construction—of what non-blasting rock-removal method is the LEDPA. In so doing, the Corps also failed to take appropriate and practicable steps to minimize potential adverse impacts on the aquatic ecosystem.

### A. The Corps Unlawfully Assigned the LEDPA Determination To TGP During Pipeline Construction.

As discussed above, an applicant bears the burden to demonstrate its proposed alternative is the LEDPA, and the Corps, in performing its LEDPA analysis, has "an obligation to independently verify the information supplied to it." *Hintz*, 800 F.2d at 835. Stated otherwise, it is the Corps's responsibility—not a permittee's—to "analyze alternatives and *select* the least environmentally damaging practicable alternative." *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 911 (9th Cir. 2018) (cleaned up; emphasis added). And, because no §404 permit can issue except for the LEDPA, the Corps must select the LEDPA *before* permit

issuance. 40 C.F.R. §230.10(a) (AD061). "Practicability is thus a threshold determination." *Hillsdale Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1168 (10th Cir. 2012).

TGP anticipates encountering bedrock while trenching through Tennessee's streams to construct the Pipeline. App-0785. Thus, it included in its application's alternatives analysis a list of various rock-removal techniques it might use. App-0785-86, App-0802-04. TGP proposed allowing its construction contractor to select one of five alternatives based on what the contractor encounters in the field. App-0802. Those five techniques, in order of least environmentally damaging to most environmentally damaging, are:

1. Conventional excavation with an excavator;

2. Ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator;

3. Hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation;

4. Removal by rock trencher; or

5. Controlled blasting and excavation with a backhoe.

App-0802-04, App-0019, App-0041-42.

Each of those techniques—including the four non-blasting alternatives— poses escalating risks to aquatic resources, including streambed fracturing leading

to stream dewatering or hydrologic loss. App-0802-03, App-0047-49, App-0694.[8]

Nonetheless, Special Condition 9 requires TGP to seek approval from the Corps only before employing the most impactful alternative—blasting—and it need only attempt *one* non-blasting alternative before doing so. App-0786, App-0802-04, App-0007, App-0019-20.

Expert engineer Starr Silvis reviewed TGP's application and alerted the Corps to the serious deficiencies in TGP's treatment of rock-removal methods. Silvis opined that "[g]eologic investigations to determine the trenching technique to be used at each crossing site should be conducted *prior to permitting*" because

---

[8] In stay briefing, TGP inappropriately relied on extra-record "evidence" about its non-blasting rock-removal methods to claim that such methods "would have similar impacts on water quality with regard to sediment releases." ECF #12-1 at 11 (citing Jackson Decl., ¶9). Such litigation affidavits must be disregarded on record review under the APA. *E.g., Davidson v. U.S. Dep't of Energy*, 838 F.2d 850, 855-56 (6th Cir. 1988). Regardless, the legal question presented by EPA's Guidelines is whether there are practicable alternatives with fewer adverse impacts "on the aquatic ecosystem," 40 C.F.R. §230.10(a) (AD061), not alternatives with fewer sediment releases. Even TGP concedes there is an escalating risk of streambed fracturing and stream dewatering among the four non-blasting rock-removal methods. App-0802-03.

Regardless, the degree of practicability would remain irrelevant. The LEDPA analysis is only *comparative* on the question of environmental damage; practicability is binary—it either is or is not. *See Utahns for Better Transp.*, 305 F.3d at 1186. Stated otherwise, if an alternative is both less environmentally damaging and practicable, it must be used even if there were a more practicable alternative. Indeed, that principle is reflected in a Corps checklist used for LEDPA analysis, which prescribes determining practicability before conducting "a comparison and determination of which alternative is the least damaging." App-0685.

"allowing contractors to make decisions on the fly results in increased probability of negative impacts to aquatic resources." App-0694 (emphasis added). However, TGP failed to conduct—and the Corps failed to require—any such investigation or evaluation. Instead, the Corps included Special Condition 9 in the 404 Permit, App-0007, which violates the legal requirements that *the Corps* select the least environmentally damaging practicable alternative prior to permit issuance and independently verify an applicant's submissions.

There is a reason EPA's Guideline's require the Corps to select the least environmentally damaging practicable alternative prior to issuing a §404 Permit. Pursuant to Special Condition 9, TGP can—with no oversight from the Corps and in full compliance with the 404 Permit—choose to trench through every stream in the Pipeline's path (except those where it utilizes blasting) with a rock trencher, the *most impactful* non-blasting technique. App-0007, App-0019-20.[9] And, TGP can make practicability and impact determinations based on highly subjective criteria including its contractors' "best professional judgment." *Id*. But EPA's Guidelines do not put blind faith in an applicant's judgment, rather they require that the Corps

---

[9]    Special Condition 9 is not an appropriate special condition within the meaning of 33 C.F.R. §325.4 because it fails to ensure compliance with EPA's Guidelines, *i.e.,* that the least environmentally damaging practicable non-blasting rock-removal alternative will be utilized.

exercise its own judgment. By allowing TGP to make regulatory determinations after permit issuance, the Corps abdicated its regulatory responsibilities to TGP.

TGP and the Corps agreed—at least until the commencement of this litigation—that TGP's proposed rock-removal techniques are alternatives to be evaluated in the LEDPA analysis. As noted above, TGP included rock-removal methods as part of the alternatives analysis in its application, App-0802-04, and stated that blasting was not "the *LEDPA* at locations where other methods are feasible and practicable." App-0804 (emphasis added). Likewise, the Corps described non-blasting rock-removal methods as "practicable alternatives" in response to public comments. App-0297. And Special Condition 9 of the 404 Permit requires TGP to "select the least impactful trenching technique practicable." App-0007. At bottom, the different verbiage is just semantics, as Tennessee's equivalent of a "least environmentally damaging practicable alternative" is the "least impactful practicable alternative." App-0019, App-0043, App-0051.

Hypothetically, the Corps might be able to prospectively authorize multiple rock-removal methods and allow the permittee to choose between them based on practicability. However, to comply with EPA's Guidelines, it could only do so if each of the authorized methods had the same environmental effects. That is because, "if there is a practicable alternative with less adverse impact on the aquatic ecosystem," more damaging alternatives are prohibited. 40 C.F.R. §230.10(a)

(AD061). Here, the record plainly establishes that the four non-blasting rock-removal methods authorized by Special Condition 9 do not have equivalent adverse impacts on aquatic resources. *See* App-0802-03, App-0047-49, App-0694.

By failing to make the requisite pre-issuance determination as to the least environmentally damaging and practicable non-blasting rock-removal method, and instead authorizing TGP to make this determination during Pipeline construction and without Corps supervision, the Corps violated EPA's Guidelines. In turn, that violation flouted Corps regulations. *See* 33 C.F.R. §320.4(a)(1) (AD035) (requiring Corps's compliance with EPA's Guidelines); *id.* §323.6(a) (AD044) (same). Because agencies must follow their own regulations, *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004), the 404 Permit should be vacated.

## B.    The Corps Failed to Take Appropriate and Practicable Steps to Minimize Adverse Impacts From TGP's Rock-Removal Methods.

Because the Corps—as mandated by EPA's Guidelines—failed to select the least environmentally damaging practicable non-blasting rock-removal method prior to issuing the 404 Permit to TGP, it also failed to comply with the EPA Guidelines' minimization requirements.

The Corps is prohibited from issuing a §404 permit "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." *Utahns for Better Transp.*, 305 F.3d at 1163

(quoting 40 C.F.R. §230.10(d)). Minimization is achieved through "practicable project modifications and permit conditions that minimize adverse impacts," *Ohio Valley Env't Coalition v. Aracoma Coal Co*., 556 F.3d 177, 202 (4th Cir. 2009), and Subpart H identifies such possible steps. *See* 40 C.F.R. §230.10(d).[10] Pertinent here, Subpart H specifically identifies using appropriate equipment and machinery during activities related to discharging fill material as steps for minimizing adverse effects and provides that such technology "should be adapted to the needs of each site." 40 C.F.R. §230.74 (AD077).

Consequently, TGP was required to consider—and the Corps was required to prescribe prior to permit issuance—minimization steps for rock-removal at each crossing, including using appropriate equipment and machinery during rock-removal activities. As part of Petitioners' technical comments on TGP's application, expert engineer Silvis warned the Corps that evaluation of TGP's proposed non-blasting rock-removal techniques should be conducted prior to permitting due to the fact that each method "has different environmental impacts associated with it and requires different equipment to be onsite." App-0694. However, as discussed above, no such evaluation was conducted and in its place the Corps included Special Condition 9 in the 404 Permit.

---

[10] The Corps must also make factual determinations about Subpart H minimization steps under 40 C.F.R. §230.11(a) (AD064) and make required compliance findings under 40 C.F.R. § 230.12 (AD068).

The Corps thus failed to take *any* steps to minimize potential adverse impacts associated with TGP's non-blasting rock-removal methods, much less any appropriate and practicable ones pertaining to use of appropriate equipment and machinery. In fact, since the Corps does not know which non-blasting alternative TGP might utilize at any crossing, the Agency has no way of knowing what equipment or machinery will be onsite at each crossing. Thus, the Corps could not possibly have identified appropriate and practicable steps to minimize adverse impacts caused by such equipment or machinery prior to issuance of the 404 Permit. It thus comes as little surprise that the only minimization steps mentioned by TGP in its application pertain solely to blasting and not the non-blasting alternatives. App-0804.

## III.   THE CORPS ARBITRARILY AND CAPRICIOUSLY INTERPRETED THE SCOPE OF TENNESSEE'S §401 CERTIFICATION.

Although the Corps may not have been required to evaluate TDEC's §401 Certification for substantive compliance with federal or state law, the agency was required to understand what TDEC had done. But instead, the Corps purported to examine TDEC's actions for consistency with the federal regulations and announced an interpretation divorced from the Certification's plain text.

The Corps cannot issue a §404 permit for a disposal site without §401 certification or waiver thereof. 33 C.F.R. §325.2(b)(ii) (AD047-48). Importantly,

certification and waiver are not equivalents or interchangeable, and the latter cannot be construed as the former. *Sierra Club*, 909 F.3d at 652-53. That is because, under CWA §401, the term "certification" does not encompass "waiver;" indeed, the certification requirements do not even apply when a state waives certification authority. *Id.*

As discussed below, the Corps misunderstood the scope of the Certification and that misunderstanding led to prejudicial, unreasoned decisionmaking. Moreover, even if the Corps were correct, it would still be fatal to the 404 Permit.

**A.    TDEC Certified Some of the Pipeline's Crossings, Waived its Authority to Certify Others, and the Corps Misinterpreted Those Actions.**

TDEC issued the Certification to TGP on July 21, 2023. App-0009. But that Certification does not cover stream crossings TGP identified after it was issued. TDEC had not reviewed those stream crossings as of July 21, 2023, and (as discussed below) they do not appear in the table of "Authorized Work" in the July 21, 2023 Certification. App-0012-17.

On August 24, 2023, TGP advised the Corps and TDEC that it had completed fieldwork in previously unsurveyed areas. App-0391. That communication identified additional stream crossings that were not part of TGP's previous applications to either the Corps or TDEC. *Id.*

On January 30, 2024, TDEC released a draft permit in which it proclaimed its waiver of §401 certification authority for the new stream crossings. App-0414, App-0424. On February 22, 2024, Petitioners warned the Corps of that waiver's consequences. App-0458-61.

On April 11, 2024, the Corps began rewriting the July 21, 2023 Certification's history. It told TDEC that it construed that Certification as the only valid §401 action. App-0391-92. But TDEC disputed the Corps's contention and informed the Corps it considered its §401 authority for the newly identified streams waived. App-0392. On April 23, 2024, the Corps sent a letter to TDEC reiterating the fiction that, contrary to (1) the plain language of the July 21, 2023 §401 Certification, (2) TDEC's draft modification, and (3) TDEC's clearly communicated disagreement with the Corps, the July 21, 2023 Certification was "valid for the entire 32-mile pipeline." App-0389-90. The very next day, however, TDEC issued a final modification reiterating—twice—that TDEC waived the §401 certification requirement for the new crossings. App-0335, App-0345. And on June 13, 2024, FERC concurred in the view that TDEC waived §401 certification for new crossings in a notice to EPA required under 40 C.F.R. §121.12. App-0313.

On July 25, 2024, when the Corps issued the 404 Permit, the Agency relied on the Certification's existence to support its finding of water quality standards

compliance at every crossing, App-0249, notwithstanding the fact that the Certification did not cover every crossing.

The Corps's interpretation of the Certification is contrary to law and the Certification's plain language. The Corps does not permit pipeline projects as a whole, and States do not certify them as a whole either. Congress authorized the Corps to issue §404 permits for "specified disposal sites." 33 U.S.C. §1344(a). The Corps agrees. In a November 2021 pre-application meeting, the Corps informed TGP that "typically we would evaluate each crossing separately." App-0846. And twice in its decision document, the Corps acknowledges each stream crossing is a separate disposal site. App-0236, App-0301. And Corps regulations treat "each crossing of a separate water of the United States" as a "single and complete project." 33 C.F.R. §330.2(i) (AD054). Thus, although pipeline operators might apply for and receive a single "individual permit" under §404, that permit in fact authorizes numerous disposal sites, each subject to individualized scrutiny under EPA's Guidelines. Likewise, under §401, a state must certify each individual disposal site proposed for authorization under a §404 permit. *See, e.g.*, 40 C.F.R. §121.1(f) (AD055).

That is what TDEC did. The Certification expressly defines the scope of what it certifies in a table setting out "Authorized Work." App-0012-17. Table 1 lists authorized stream crossings. *Id.* TDEC omitted from that table the stream crossings

that TGP had not surveyed prior to the Certification's issuance. *Compare id. with*

App-0318-23 (highlighting newly identified crossings not authorized in the July

2023 Certification).

Because TDEC waived §401 certification for the newly identified crossings

not addressed in the Certification, there is no certification for those crossings.

Nonetheless, in issuing the 404 Permit, the Corps reiterated its misinterpretation of

the Certification and relied on it substantially and repeatedly to support its

conclusions about water quality standards compliance. App-0239, App-0249, App-

0258, App-0274-75, App-0306-07, App-0311. Indeed, the Corps dismissed

comments that it must evaluate water quality standards compliance, pointing to the

Certification and stating "TDEC is the authority in determining whether the

proposed project would violate water quality standards." App-0311.

### B.    The Corps's Reliance on Its Mistaken Interpretation of the Certification to Make Key Regulatory Findings Was Arbitrary and Capricious.

The Corps's explanation runs counter to the record because TDEC never

certified the newly identified crossings. *See Ohio*, 87 F.4th at 772. Where an agency

"rest[s] its determination, at least in part, on [an] infirm … ground," the action is

arbitrary and capricious, *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*,

475 F.3d 319, 329-30 (D.C. Cir. 2006), unless "the agency would have acted on [an

alternative valid ground] even if the [infirm ground] were unavailable," *AES*

*Sparrows Point LNG v. Wilson*, 589 F.3d 721, 730 (4th Cir. 2009) (quotation omitted). Here, the Corps did not identify "independent and alternative grounds" for its water quality determinations. *Id.* at 726, 730. Rather, it repeatedly and mistakenly relied on the July 21, 2023 Certification for every crossing. App-0239, App-0249, App-0258, App-0274-75, App-0306-07, App-0311. Because that ground is infirm, the 404 Permit is arbitrary and capricious. *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021).

Moreover, the Corps's misconstruction of the Certification was prejudicial. The Corps frequently takes the (mistaken) position that it can ignore its EPA Guidelines obligations to make findings about water quality standards compliance if there is a §401 certification, based on its misinterpretation of 33 C.F.R. §320.4(d) (AD037). *See, e.g.*, *Ohio Valley Env't Coalition, Inc. v. U.S. Army Corps of Eng'rs*, 883 F.Supp.2d 627, 638-41 (S.D. W. Va. 2012). That regulation, promulgated by the Corps to govern its public interest review of permit applications, allows the Corps to treat a §401 certification as conclusive for purposes of water quality considerations in its public interest review (in most circumstances). 33 C.F.R. §320.4(d) (AD037). The Corps misinterprets 33 C.F.R. §320.4(d) to override its EPA Guidelines obligation to evaluate water quality standards compliance if there

is a §401 certification.[11] Stated otherwise, the Corps thinks its evaluations under EPA's Guidelines are substantively different if there is no §401 certification. Here, the Corps's misunderstanding of the Certification's scope led it to believe that it TDEC had conclusively resolved water quality standards compliance issues. But, TDEC had not done so. Because there is a realistic possibility that the Corps's evaluation may have reached a different result if the Corps had properly construed the Certification, the harmless error rule does not apply. *Cf. F.E.C. v. Akins*, 524 U.S. 11, 25 (1998).

### C. If TDEC Could Not Waive §401 Authority for Newly Discovered Crossings, Then The Corps Violated its Own Regulations in Issuing the 404 Permit.

Alternatively, if the Corps were correct that TDEC could not waive §401 certification in response to TGP's modification application because that submission "was not a new 401 request requiring state action," App-0392, then the 404 Permit would still be unlawful. Because TDEC could not and did not certify the newly identified stream crossings in July 2023, if TDEC did not waive that authority then there is neither a §401 certification nor a waiver for those crossings. In that case, the Corps unlawfully issued the 404 Permit in violation of 33 C.F.R. §325.2(b)(ii)

---

[11] EPA's Guidelines cannot be altered by unilateral Corps action, such as the promulgation of 33 C.F.R. §320.4(d) or the Corps's interpretation of it. *See* 40 C.F.R. §230.2(c) (AD070) ("No modification to the basic application, meaning, or intent of these Guidelines will be made without rulemaking by the Administrator [of the EPA] under the Administrative Procedure Act[.]").

(AD047-48) because it authorized discharges at disposal sites without §401 certification or valid waiver thereof.

## IV.    THE CORPS'S DECISION RELIED ON ITS MISTAKEN BELIEF IN A NONEXISTENT PERMIT.

Under EPA's Guidelines, the Corps must evaluate the activity's effects on suspended particulates and turbidity. 40 C.F.R. §230.21 (AD072); *id.*, Subpart C NOTE (AD073). Here, the Corps committed a fatal factual error in that evaluation. When an agency "offer[s] an explanation for its decision that runs counter to the evidence before the agency," its decision is arbitrary and capricious. *Ohio*, 87 F.4th at 772.

Here, the Corps relied, at least in part, on its belief in a nonexistent NPDES permit under CWA §402, 33 U.S.C. §1342 (AD012), to conclude effects from suspended particulates and turbidity would be negligible. App-0238-39. In its Memorandum for Record, the Corps states, "Discharges from installation of the pipe and other attendant structures are subject to TDEC NPDES permitting. The NPDES permit contains limits on the amount of total suspended solids." App-0238. The problem is there is no such NPDES permit for instream construction and no such limit on total suspended solids. Nor could there be.

Under *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 273-74 (2009), discharges subject to §404 permitting—like those associated with

open-cut crossings—cannot also be subject to a §402 NPDES permit. In that case, the Supreme Court held that the CWA "forbids" the issuance of NPDES permits for discharges regulated by the Corps under §404. *Id.* at 273. Moreover, Congress largely exempted gas pipeline construction from NPDES permitting requirements. 33 U.S.C. §1342(*l*)(2); *Sierra Club v. State Water Control Bd.*, 898 F.3d at 391 (citing 33 U.S.C. §1342(*l*)(2) for the proposition that "the CWA exempts natural gas pipeline construction projects from regulation"). Accordingly, the Corps's assertion that a NPDES permit with sediment limitations would protect Tennessee's streams from sedimentation and turbidity resulting from dry, open-cut crossings is flat wrong. In fact, it is little surprise that the Administrative Record for the 404 permit does not include *any* NPDES permits—with total suspended solids limits or otherwise. *See* ECF #18.[12]

---

[12] In stay briefing, the Corps attempted to explain its legal error by suggesting it was referring to an authorization under a general permit for construction stormwater. ECF #13-1 at 27-28. But the Corps has admitted it could not have been referring to that authorization because it did not exist when the 404 Permit was issued. ECF #9-11 at 14-15. Moreover, that authorization is not a NPDES permit under CWA §402 because §402—which governs NPDES permits whether issued by EPA or states—exempts gas pipeline construction. 33 U.S.C. §1342(*l*)(2).

Regardless, general construction stormwater permits do not regulate the instream construction activities the Corps was evaluating, so even if the Corps was referring to that permit, reliance on it would be arbitrary and capricious. *See W. Va. Dep't of Env't Prot.*, 64 F.4th at 507-08.

When an agency relies on a demonstrably false impression about other permitting regimes as part of its water quality analysis, it acts arbitrarily and capriciously. *Sierra Club*, 64 F.4th at 508. The Corps's reliance on an imaginary NPDES permit "betrayed the [Corps's] ignorance" and its arbitrary and capricious false impression. *Id.* Furthermore, whether the nonexistent permit was one ground among many is irrelevant. The Corps did not offer independent bases, and where a determination rests even in part on an infirm ground it is arbitrary and capricious. *Vecinos*, 6 F.4th at 1331.

## V.    THE CORPS ENTIRELY FAILED TO CONSIDER AN IMPORTANT ASPECT OF THE PROBLEM.

Another important aspect of the problem presented by TGP's application was the cumulative effect of multiple crossings of the same stream. EPA's Guidelines require a cumulative effects determination. 40 C.F.R. §230.11(g)(2) (AD066). Such impacts "are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material." *Id.* §230.11(g)(1) (AD066). And, "[a]lthough the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such

---

Finally, before TGP places the Pipeline in-service, it will test pipe integrity hydrostatically. Discharging water from that testing will require a NPDES permit, App-0830-31, but that permit does not regulate instream construction either.

piecemeal changes can result in major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems." *Id.*

The scientific literature before the Corps warned of permanent detrimental effects that aggregate from multiple crossings of the same stream. App-0765. Specifically, the literature concluded:

> Construction of multiple crossings on a stream or river, or within a watershed … has the potential for cumulative effects on that system. In such cases, the capacity of the system to recover from impact may be exceeded, and the detrimental effects of crossing construction permanent.

*Id.*

In its response to comments about those aggregate effects, the Corps directed readers to its "evaluation" of cumulative impacts "in Section 9.0 of the Corps decision document." App-0312. But nothing in Section 9.0—or any other section of the Corps decision document—addresses impacts to streams that would be crossed by the Pipeline multiple times. *See generally* App-0210-0312.

The Corps conflates its obligations under two different statutes. "Cumulative effects" is a term of art with distinct meanings under EPA's Guidelines and the National Environmental Policy Act ("NEPA"). Under EPA's Guidelines, "cumulative effects" means "the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material," 40 C.F.R. §230.11(g)(1) (AD066), and includes the accumulating burden of multiple discharges within a larger project. Under NEPA, the term

- 55 -

"cumulative effects" refers more broadly to the "incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions." 40 C.F.R. §1508.1(i)(3). The Corps approached cumulative effects only through NEPA. The Corps did not make the findings required by 40 C.F.R. §230.11(g).

The record establishes that the Corps was obligated to evaluate cumulative impacts to streams targeted for multiple Pipeline crossings because those impacts are an important aspect of the problem, as demonstrated by the scientific literature discussed above. App-0765. In the face of that study and its duty under 40 C.F.R. §230.11(g), the Corps could not ignore the cumulative impact of multiple Pipeline crossings on individual streams. Yet it did.

The Corps's discussion of stream-channel isolation to work "in-the-dry" cannot be sufficient to meet the EPA Guidelines' requirements for cumulative impacts findings. Those requirements command the Corps to address cumulative (*e.g.*, multiple) crossings for *single* streams. 40 C.F.R. §230.11(g) (AD066). Discussion of dry-crossing techniques generally was not sufficient given that the scientific literature establishing permanent cumulative effects did not differentiate between such effects at wet or dry crossings. App-0765.

# CONCLUSION

For the foregoing reasons, Petitioners respectfully request that this Court vacate the 404 Permit.

Dated:    October 25, 2024

Respectfully submitted,

**/s/ JAMES S. WHITLOCK**         **/S/ DEREK O. TEANEY**

JAMES S. WHITLOCK         DEREK O. TEANEY
SOUTHERN ENVIRONMENTAL LAW CENTER    APPALACHIAN MOUNTAIN ADVOCATES
48 Patton Avenue, Suite 304         P.O. Box 507
Asheville, NC 28801-3321         Lewisburg, WV 24901
Telephone: (828) 258-2023         Telephone: (304) 646-1182
Email: jwhitlock@selcnc.org         Email: dteaney@appalmad.org


O.W. "TREY" BUSSEY
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
Email: tbussey@selctn.org

*Counsel for Petitioners*

# CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMIT

This brief complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-volume limits of this Court's October 16, 2024, amended expedited briefing schedule (ECF #17), because this brief contains 12,517 words and has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

**/s/ JAMES S. WHITLOCK**
JAMES S. WHITLOCK
Southern Environmental Law Center
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org

## CERTIFICATE OF SERVICE

I hereby certify that, on October 25, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

**/s/ JAMES S. WHITLOCK**
JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org

**No. 24-3831**

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

APPALACHIAN VOICES and SIERRA CLUB,
*Petitioners*

v.

UNITED STATES ARMY CORPS OF ENGINEERS, CHRISTINE E.
WORMUTH, in her official capacity as Secretary of the U.S. Army;
LIEUTENANT GENERAL WILLIAM H. GRAHAM, JR., in his official capacity
as U.S. Army Chief of Engineers and Commanding General of the U.S. Army
Corps of Engineers; LIEUTENANT COLONEL ROBERT W. GREEN, in his
official capacity as District Commander of the U.S. Army Corps of Engineers,
Nashville District, and JOSHUA FROST, in his official capacity as Chief,
Regulatory Division, U.S. Army Corps of Engineers, Nashville District,
*Respondents*

On Petition for Review from the
United States Army Corps of Engineers
Department of Army Permit LRN-2021-00866 (July 25, 2024)

### ADDENDUM TO PETITIONERS' OPENING BRIEF

JAMES S. WHITLOCK
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801-3321
Telephone: (828) 258-2023
Email: jwhitlock@selcnc.org

DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES
PO BOX 507
Lewisburg, WV 24901
Telephone: (304) 646-1182
Email: dteaney@appalmad.org

O.W. "TREY" BUSSEY
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
Email: tbussey@selctn.org

*Counsel for Petitioners*

## ADDENDUM TABLE OF CONTENTS

### FEDERAL STATUTES

15 U.S.C. § 717r..........................................................................AD003

33 U.S.C. § 1251..........................................................................AD006

33 U.S.C. § 1341..........................................................................AD009

33 U.S.C. § 1342..........................................................................AD012

33 U.S.C. § 1344..........................................................................AD026

### FEDERAL REGULATIONS

33 C.F.R. § 320.4..........................................................................AD035

33 C.F.R. § 323.6..........................................................................AD044

33 C.F.R. § 325.2..........................................................................AD045

33 C.F.R. § 330.2..........................................................................AD053

40 C.F.R. § 121.1..........................................................................AD055

40 C.F.R. § 121.7..........................................................................AD057

40 C.F.R. § 121.9..........................................................................AD060

40 C.F.R. § 230.10........................................................................AD061

40 C.F.R. § 230.11........................................................................AD064

40 C.F.R. § 230.12........................................................................AD068

40 C.F.R. § 230.2..........................................................................AD070

40 C.F.R. § 230.21........................................................................AD072

C.F.R. T. 40, Ch. I, Subch. H, Pt. 230, Subpt. C, Refs & Annos ...................AD073

40 C.F.R. § 230.41........................................................................AD074

40 C.F.R. § 230.45........................................................................AD076

40 C.F.R. § 230.74........................................................................AD077

### STANDING DECLARATIONS

Robert Connor................................................................................AD079

Charles Crow..................................................................................AD088

Angela Mummaw.............................................................................AD097

Jerry Steven Shafer ........................................................................AD101

Bonnie Swinford ............................................................................AD109

**ADDENDUM**

**FEDERAL STATUTES**

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717r

§ 717r. Rehearing and review

Effective: August 8, 2005
Currentness

## (a) Application for rehearing; time

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

## (b) Review of Commission order

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation,

## AD003

if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

**(c) Stay of Commission order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

**(d) Judicial review**

**(1) In general**

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

**(2) Agency delay**

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

**(3) Court action**

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

**(4) Commission action**

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**(5) Expedited review**

The Court shall set any action brought under this subsection for expedited consideration.

**CREDIT(S)**

(June 21, 1938, c. 556, § 19, 52 Stat. 831; June 25, 1948, c. 646, § 32(a), 62 Stat. 991; May 24, 1949, c. 139, § 127, 63 Stat. 107; Pub.L. 85-791, § 19, Aug. 28, 1958, 72 Stat. 947; Pub.L. 109-58, Title III, § 313(b), Aug. 8, 2005, 119 Stat. 689.)

Notes of Decisions (791)

15 U.S.C.A. § 717r, 15 USCA § 717r
Current through P.L.118-7. Some statute sections may be more current, see credits for details.

                                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

AD005

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   3

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
Title 33. Navigation and Navigable Waters (Refs & Annos)
Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
Subchapter I. Research and Related Programs (Refs & Annos)

33 U.S.C.A. § 1251

§ 1251. Congressional declaration of goals and policy

Currentness

**(a) Restoration and maintenance of chemical, physical and biological integrity of Nation's waters; national goals for achievement of objective**

The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter--

**(1)** it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;

**(2)** it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;

**(3)** it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited;

**(4)** it is the national policy that Federal financial assistance be provided to construct publicly owned waste treatment works;

**(5)** it is the national policy that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each State;

**(6)** it is the national policy that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters, waters of the contiguous zone, and the oceans; and

**(7)** it is the national policy that programs for the control of nonpoint sources of pollution be developed and implemented in an expeditious manner so as to enable the goals of this chapter to be met through the control of both point and nonpoint sources of pollution.

**(b) Congressional recognition, preservation, and protection of primary responsibilities and rights of States**

**AD006**

It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter. It is the policy of Congress that the States manage the construction grant program under this chapter and implement the permit programs under sections 1342 and 1344 of this title. It is further the policy of the Congress to support and aid research relating to the prevention, reduction, and elimination of pollution and to provide Federal technical services and financial aid to State and interstate agencies and municipalities in connection with the prevention, reduction, and elimination of pollution.

**(c) Congressional policy toward Presidential activities with foreign countries**

It is further the policy of Congress that the President, acting through the Secretary of State and such national and international organizations as he determines appropriate, shall take such action as may be necessary to insure that to the fullest extent possible all foreign countries shall take meaningful action for the prevention, reduction, and elimination of pollution in their waters and in international waters and for the achievement of goals regarding the elimination of discharge of pollutants and the improvement of water quality to at least the same extent as the United States does under its laws.

**(d) Administrator of Environmental Protection Agency to administer chapter**

Except as otherwise expressly provided in this chapter, the Administrator of the Environmental Protection Agency (hereinafter in this chapter called "Administrator") shall administer this chapter.

**(e) Public participation in development, revision, and enforcement of any regulation, etc.**

Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.

**(f) Procedures utilized for implementing chapter**

It is the national policy that to the maximum extent possible the procedures utilized for implementing this chapter shall encourage the drastic minimization of paperwork and interagency decision procedures, and the best use of available manpower and funds, so as to prevent needless duplication and unnecessary delays at all levels of government.

**(g) Authority of States over water**

It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter. It is the further policy of Congress that nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State. Federal agencies shall co-operate with State and local agencies to develop comprehensive solutions to prevent, reduce and eliminate pollution in concert with programs for managing water resources.

**CREDIT(S)**

AD007

(June 30, 1948, c. 758, Title I, § 101, as added Pub.L. 92-500, § 2, Oct. 18, 1972, 86 Stat. 816; amended Pub.L. 95-217, §§ 5(a), 26(b), Dec. 27, 1977, 91 Stat. 1567, 1575; Pub.L. 100-4, Title III, § 316(b), Feb. 4, 1987, 101 Stat. 60.)

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 11548

Ex. Ord. No. 11548, July 20, 1970, 35 F.R. 11677, which related to the delegation of Presidential functions, was superseded by Ex. Ord. No. 11735, Aug. 3, 1973, 38 F.R. 21243, set out as a note under section 1321 of this title.

### EXECUTIVE ORDER NO. 11742

<Oct. 23, 1973, 38 F.R. 29457>

**Delegation of Functions to Secretary of State Respecting Negotiation
of International Agreements Relating to Enhancement of Environment**

Under and by virtue of the authority vested in me by section 301 of title 3 of the United States Code and as President of the United States, I hereby authorize and empower the Secretary of State, in coordination with the Council on Environmental Quality, the Environmental Protection Agency, and other appropriate Federal agencies, to perform, without the approval, ratification, or other action of the President, the functions vested in the President by Section 7 of the Federal Water Pollution Control Act Amendments of 1972 (Public Law 92-500; 86 Stat. 898) with respect to international agreements relating to the enhancement of the environment.

RICHARD NIXON.

Notes of Decisions (159)

33 U.S.C.A. § 1251, 33 USCA § 1251
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD008



KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
      Subchapter IV. Permits and Licenses (Refs & Annos)

33 U.S.C.A. § 1341

§ 1341. Certification

Currentness

**(a) Compliance with applicable requirements; application; procedures; license suspension**

**(1)** Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title. In the case of any such activity for which there is not an applicable effluent limitation or other limitation under sections 1311(b) and 1312 of this title, and there is not an applicable standard under sections 1316 and 1317 of this title, the State shall so certify, except that any such certification shall not be deemed to satisfy section 1371(c) of this title. Such State or interstate agency shall establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications. In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator. If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.

**(2)** Upon receipt of such application and certification the licensing or permitting agency shall immediately notify the Administrator of such application and certification. Whenever such a discharge may affect, as determined by the Administrator, the quality of the waters of any other State, the Administrator within thirty days of the date of notice of application for such Federal license or permit shall so notify such other State, the licensing or permitting agency, and the applicant. If, within sixty days after receipt of such notification, such other State determines that such discharge will affect the quality of its waters so as to violate any water quality requirements in such State, and within such sixty-day period notifies the Administrator and the licensing or permitting agency in writing of its objection to the issuance of such license or permit and requests a public hearing on such objection, the licensing or permitting agency shall hold such a hearing. The Administrator shall at such hearing submit his evaluation and recommendations with respect to any such objection to the licensing or permitting agency. Such agency, based upon the recommendations of such State, the Administrator, and upon any additional evidence, if any, presented to the agency at the hearing, shall condition such license or permit in such manner as may be necessary to insure compliance with applicable water quality requirements. If the imposition of conditions cannot insure such compliance such agency shall not issue such license or permit.

AD009

**(3)** The certification obtained pursuant to paragraph (1) of this subsection with respect to the construction of any facility shall fulfill the requirements of this subsection with respect to certification in connection with any other Federal license or permit required for the operation of such facility unless, after notice to the certifying State, agency, or Administrator, as the case may be, which shall be given by the Federal agency to whom application is made for such operating license or permit, the State, or if appropriate, the interstate agency or the Administrator, notifies such agency within sixty days after receipt of such notice that there is no longer reasonable assurance that there will be compliance with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title because of changes since the construction license or permit certification was issued in (A) the construction or operation of the facility, (B) the characteristics of the waters into which such discharge is made, (C) the water quality criteria applicable to such waters or (D) applicable effluent limitations or other requirements. This paragraph shall be inapplicable in any case where the applicant for such operating license or permit has failed to provide the certifying State, or, if appropriate, the interstate agency or the Administrator, with notice of any proposed changes in the construction or operation of the facility with respect to which a construction license or permit has been granted, which changes may result in violation of section 1311, 1312, 1313, 1316, or 1317 of this title.

**(4)** Prior to the initial operation of any federally licensed or permitted facility or activity which may result in any discharge into the navigable waters and with respect to which a certification has been obtained pursuant to paragraph (1) of this subsection, which facility or activity is not subject to a Federal operating license or permit, the licensee or permittee shall provide an opportunity for such certifying State, or, if appropriate, the interstate agency or the Administrator to review the manner in which the facility or activity shall be operated or conducted for the purposes of assuring that applicable effluent limitations or other limitations or other applicable water quality requirements will not be violated. Upon notification by the certifying State, or if appropriate, the interstate agency or the Administrator that the operation of any such federally licensed or permitted facility or activity will violate applicable effluent limitations or other limitations or other water quality requirements such Federal agency may, after public hearing, suspend such license or permit. If such license or permit is suspended, it shall remain suspended until notification is received from the certifying State, agency, or Administrator, as the case may be, that there is reasonable assurance that such facility or activity will not violate the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

**(5)** Any Federal license or permit with respect to which a certification has been obtained under paragraph (1) of this subsection may be suspended or revoked by the Federal agency issuing such license or permit upon the entering of a judgment under this chapter that such facility or activity has been operated in violation of the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

**(6)** Except with respect to a permit issued under section 1342 of this title, in any case where actual construction of a facility has been lawfully commenced prior to April 3, 1970, no certification shall be required under this subsection for a license or permit issued after April 3, 1970, to operate such facility, except that any such license or permit issued without certification shall terminate April 3, 1973, unless prior to such termination date the person having such license or permit submits to the Federal agency which issued such license or permit a certification and otherwise meets the requirements of this section.

**(b) Compliance with other provisions of law setting applicable water quality requirements**

Nothing in this section shall be construed to limit the authority of any department or agency pursuant to any other provision of law to require compliance with any applicable water quality requirements. The Administrator shall, upon the request of any Federal department or agency, or State or interstate agency, or applicant, provide, for the purpose of this section, any relevant information on applicable effluent limitations, or other limitations, standards, regulations, or requirements, or water quality criteria, and shall, when requested by any such department or agency or State or interstate agency, or applicant, comment on any methods to comply with such limitations, standards, regulations, requirements, or criteria.

AD010

**(c) Authority of Secretary of the Army to permit use of spoil disposal areas by Federal licensees or permittees**

In order to implement the provisions of this section, the Secretary of the Army, acting through the Chief of Engineers, is authorized, if he deems it to be in the public interest, to permit the use of spoil disposal areas under his jurisdiction by Federal licensees or permittees, and to make an appropriate charge for such use. Moneys received from such licensees or permittees shall be deposited in the Treasury as miscellaneous receipts.

**(d) Limitations and monitoring requirements of certification**

Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section.

**CREDIT(S)**

(June 30, 1948, c. 758, Title IV, § 401, as added Pub.L. 92-500, § 2, Oct. 18, 1972, 86 Stat. 877; amended Pub.L. 95-217, §§ 61(b), 64, Dec. 27, 1977, 91 Stat. 1598, 1599.)

Notes of Decisions (163)

33 U.S.C.A. § 1341, 33 USCA § 1341
Current through P.L.118-13. Some statute sections may be more current, see credits for details.

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

AD011

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
      Subchapter IV. Permits and Licenses (Refs & Annos)

33 U.S.C.A. § 1342

§ 1342. National pollutant discharge elimination system

Effective: January 14, 2019
Currentness

**(a) Permits for discharge of pollutants**

**(1)** Except as provided in sections 1328 and 1344 of this title, the Administrator may, after opportunity for public hearing issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

**(2)** The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate.

**(3)** The permit program of the Administrator under paragraph (1) of this subsection, and permits issued thereunder, shall be subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section.

**(4)** All permits for discharges into the navigable waters issued pursuant to section 407 of this title shall be deemed to be permits issued under this subchapter, and permits issued under this subchapter shall be deemed to be permits issued under section 407 of this title, and shall continue in force and effect for their term unless revoked, modified, or suspended in accordance with the provisions of this chapter.

**(5)** No permit for a discharge into the navigable waters shall be issued under section 407 of this title after October 18, 1972. Each application for a permit under section 407 of this title, pending on October 18, 1972, shall be deemed to be an application for a permit under this section. The Administrator shall authorize a State, which he determines has the capability of administering a permit program which will carry out the objectives of this chapter to issue permits for discharges into the navigable waters within the jurisdiction of such State. The Administrator may exercise the authority granted him by the preceding sentence only during the period which begins on October 18, 1972, and ends either on the ninetieth day after the date of the first promulgation of guidelines required by section 1314(i)(2) of this title, or the date of approval by the Administrator of a permit program for such State under subsection (b) of this section, whichever date first occurs, and no such authorization to a State shall extend

AD012

beyond the last day of such period. Each such permit shall be subject to such conditions as the Administrator determines are necessary to carry out the provisions of this chapter. No such permit shall issue if the Administrator objects to such issuance.

**(b) State permit programs**

At any time after the promulgation of the guidelines required by subsection (i)(2) of section 1314 of this title, the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program. The Administrator shall approve each submitted program unless he determines that adequate authority does not exist:

**(1)** To issue permits which--

   **(A)** apply, and insure compliance with, any applicable requirements of sections 1311, 1312, 1316, 1317, and 1343 of this title;

   **(B)** are for fixed terms not exceeding five years; and

   **(C)** can be terminated or modified for cause including, but not limited to, the following:

      **(i)** violation of any condition of the permit;

      **(ii)** obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

      **(iii)** change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;

   **(D)** control the disposal of pollutants into wells;

**(2)(A)** To issue permits which apply, and insure compliance with, all applicable requirements of section 1318 of this title; or

**(B)** To inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title;

**(3)** To insure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application;

**(4)** To insure that the Administrator receives notice of each application (including a copy thereof) for a permit;

AD013

**(5)** To insure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing;

**(6)** To insure that no permit will be issued if, in the judgment of the Secretary of the Army acting through the Chief of Engineers, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby;

**(7)** To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement;

**(8)** To insure that any permit for a discharge from a publicly owned treatment works includes conditions to require the identification in terms of character and volume of pollutants of any significant source introducing pollutants subject to pretreatment standards under section 1317(b) of this title into such works and a program to assure compliance with such pretreatment standards by each such source, in addition to adequate notice to the permitting agency of (A) new introductions into such works of pollutants from any source which would be a new source as defined in section 1316 of this title if such source were discharging pollutants, (B) new introductions of pollutants into such works from a source which would be subject to section 1311 of this title if it were discharging such pollutants, or (C) a substantial change in volume or character of pollutants being introduced into such works by a source introducing pollutants into such works at the time of issuance of the permit. Such notice shall include information on the quality and quantity of effluent to be introduced into such treatment works and any anticipated impact of such change in the quantity or quality of effluent to be discharged from such publicly owned treatment works; and

**(9)** To insure that any industrial user of any publicly owned treatment works will comply with sections 1284(b), 1317, and 1318 of this title.

**(c) Suspension of Federal program upon submission of State program; withdrawal of approval of State program; return of State program to Administrator**

**(1)** Not later than ninety days after the date on which a State has submitted a program (or revision thereof) pursuant to subsection (b) of this section, the Administrator shall suspend the issuance of permits under subsection (a) of this section as to those discharges subject to such program unless he determines that the State permit program does not meet the requirements of subsection (b) of this section or does not conform to the guidelines issued under section 1314(i)(2) of this title. If the Administrator so determines, he shall notify the State of any revisions or modifications necessary to conform to such requirements or guidelines.

**(2)** Any State permit program under this section shall at all times be in accordance with this section and guidelines promulgated pursuant to section 1314(i)(2) of this title.

**(3)** Whenever the Administrator determines after public hearing that a State is not administering a program approved under this section in accordance with requirements of this section, he shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator shall withdraw approval of such program. The

AD014

Administrator shall not withdraw approval of any such program unless he shall first have notified the State, and made public, in writing, the reasons for such withdrawal.

### (4) Limitations on partial permit program returns and withdrawals

A State may return to the Administrator administration, and the Administrator may withdraw under paragraph (3) of this subsection approval, of--

(A) a State partial permit program approved under subsection (n)(3) only if the entire permit program being administered by the State department or agency at the time is returned or withdrawn; and

(B) a State partial permit program approved under subsection (n)(4) only if an entire phased component of the permit program being administered by the State at the time is returned or withdrawn.

### (d) Notification of Administrator

(1) Each State shall transmit to the Administrator a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such State.

(2) No permit shall issue (A) if the Administrator within ninety days of the date of his notification under subsection (b)(5) of this section objects in writing to the issuance of such permit, or (B) if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permit as being outside the guidelines and requirements of this chapter. Whenever the Administrator objects to the issuance of a permit under this paragraph such written objection shall contain a statement of the reasons for such objection and the effluent limitations and conditions which such permit would include if it were issued by the Administrator.

(3) The Administrator may, as to any permit application, waive paragraph (2) of this subsection.

(4) In any case where, after December 27, 1977, the Administrator, pursuant to paragraph (2) of this subsection, objects to the issuance of a permit, on request of the State, a public hearing shall be held by the Administrator on such objection. If the State does not resubmit such permit revised to meet such objection within 30 days after completion of the hearing, or, if no hearing is requested within 90 days after the date of such objection, the Administrator may issue the permit pursuant to subsection (a) of this section for such source in accordance with the guidelines and requirements of this chapter.

### (e) Waiver of notification requirement

In accordance with guidelines promulgated pursuant to subsection (i)(2) of section 1314 of this title, the Administrator is authorized to waive the requirements of subsection (d) of this section at the time he approves a program pursuant to subsection (b) of this section for any category (including any class, type, or size within such category) of point sources within the State submitting such program.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                4

**(f) Point source categories**

The Administrator shall promulgate regulations establishing categories of point sources which he determines shall not be subject to the requirements of subsection (d) of this section in any State with a program approved pursuant to subsection (b) of this section. The Administrator may distinguish among classes, types, and sizes within any category of point sources.

**(g) Other regulations for safe transportation, handling, carriage, storage, and stowage of pollutants**

Any permit issued under this section for the discharge of pollutants into the navigable waters from a vessel or other floating craft shall be subject to any applicable regulations promulgated by the Secretary of the department in which the Coast Guard is operating, establishing specifications for safe transportation, handling, carriage, storage, and stowage of pollutants.

**(h) Violation of permit conditions; restriction or prohibition upon introduction of pollutant by source not previously utilizing treatment works**

In the event any condition of a permit for discharges from a treatment works (as defined in section 1292 of this title) which is publicly owned is violated, a State with a program approved under subsection (b) of this section or the Administrator, where no State program is approved or where the Administrator determines pursuant to section 1319(a) of this title that a State with an approved program has not commenced appropriate enforcement action with respect to such permit, may proceed in a court of competent jurisdiction to restrict or prohibit the introduction of any pollutant into such treatment works by a source not utilizing such treatment works prior to the finding that such condition was violated.

**(i) Federal enforcement not limited**

Nothing in this section shall be construed to limit the authority of the Administrator to take action pursuant to section 1319 of this title.

**(j) Public information**

A copy of each permit application and each permit issued under this section shall be available to the public. Such permit application or permit, or portion thereof, shall further be available on request for the purpose of reproduction.

**(k) Compliance with permits**

Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1312, 1316, 1317, and 1343 of this title, except any standard imposed under section 1317 of this title for a toxic pollutant injurious to human health. Until December 31, 1974, in any case where a permit for discharge has been applied for pursuant to this section, but final administrative disposition of such application has not been made, such discharge shall not be a violation of (1) section 1311, 1316, or 1342 of this title, or (2) section 407 of this title, unless the Administrator or other plaintiff proves that final administrative disposition of such application has not been made because of the failure of the applicant to furnish information reasonably required or requested in order to process the application. For the 180-day period beginning on October 18, 1972, in the case of any point source discharging any pollutant or combination of pollutants immediately prior to such date which source is not subject to section 407 of this title, the discharge by such source shall not be a violation of this chapter if such a source applies for a permit for discharge pursuant to this section within such 180-day period.

AD016

**(l) Limitation on permit requirement**

**(1) Agricultural return flows**

The Administrator shall not require a permit under this section for discharges composed entirely of return flows from irrigated agriculture, nor shall the Administrator directly or indirectly, require any State to require such a permit.

**(2) Stormwater runoff from oil, gas, and mining operations**

The Administrator shall not require a permit under this section, nor shall the Administrator directly or indirectly require any State to require a permit, for discharges of stormwater runoff from mining operations or oil and gas exploration, production, processing, or treatment operations or transmission facilities, composed entirely of flows which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) used for collecting and conveying precipitation runoff and which are not contaminated by contact with, or do not come into contact with, any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of such operations.

**(3) Silvicultural activities**

**(A) NPDES permit requirements for silvicultural activities**

The Administrator shall not require a permit under this section nor directly or indirectly require any State to require a permit under this section for a discharge from runoff resulting from the conduct of the following silviculture activities conducted in accordance with standard industry practice: nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, surface drainage, or road construction and maintenance.

**(B) Other requirements**

Nothing in this paragraph exempts a discharge from silvicultural activity from any permitting requirement under section 1344 of this title, existing permitting requirements under section 1342 of this title, or from any other federal law.

**(C)** The authorization provided in Section [1] 1365(a) of this title does not apply to any non-permitting program established under 1342(p)(6) [2] of this title for the silviculture activities listed in 1342(l)(3)(A) [2] of this title, or to any other limitations that might be deemed to apply to the silviculture activities listed in 1342(l)(3)(A) [2] of this title.

**(m) Additional pretreatment of conventional pollutants not required**

To the extent a treatment works (as defined in section 1292 of this title) which is publicly owned is not meeting the requirements of a permit issued under this section for such treatment works as a result of inadequate design or operation of such treatment works, the Administrator, in issuing a permit under this section, shall not require pretreatment by a person introducing conventional pollutants identified pursuant to section 1314(a)(4) of this title into such treatment works other than pretreatment required to assure compliance with pretreatment standards under subsection (b)(8) of this section and section 1317(b)(1) of this title. Nothing in this subsection shall affect the Administrator's authority under sections 1317 and 1319 of this title, affect

AD017

State and local authority under sections 1317(b)(4) and 1370 of this title, relieve such treatment works of its obligations to meet requirements established under this chapter, or otherwise preclude such works from pursuing whatever feasible options are available to meet its responsibility to comply with its permit under this section.

**(n) Partial permit program**

**(1) State submission**

The Governor of a State may submit under subsection (b) of this section a permit program for a portion of the discharges into the navigable waters in such State.

**(2) Minimum coverage**

A partial permit program under this subsection shall cover, at a minimum, administration of a major category of the discharges into the navigable waters of the State or a major component of the permit program required by subsection (b).

**(3) Approval of major category partial permit programs**

The Administrator may approve a partial permit program covering administration of a major category of discharges under this subsection if--

**(A)** such program represents a complete permit program and covers all of the discharges under the jurisdiction of a department or agency of the State; and

**(B)** the Administrator determines that the partial program represents a significant and identifiable part of the State program required by subsection (b).

**(4) Approval of major component partial permit programs**

The Administrator may approve under this subsection a partial and phased permit program covering administration of a major component (including discharge categories) of a State permit program required by subsection (b) if--

**(A)** the Administrator determines that the partial program represents a significant and identifiable part of the State program required by subsection (b); and

**(B)** the State submits, and the Administrator approves, a plan for the State to assume administration by phases of the remainder of the State program required by subsection (b) by a specified date not more than 5 years after submission of the partial program under this subsection and agrees to make all reasonable efforts to assume such administration by such date.

**(o) Anti-backsliding**

AD018

**(1) General prohibition**

In the case of effluent limitations established on the basis of subsection (a)(1)(B) of this section, a permit may not be renewed, reissued, or modified on the basis of effluent guidelines promulgated under section 1314(b) of this title subsequent to the original issuance of such permit, to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit. In the case of effluent limitations established on the basis of section 1311(b)(1)(C) or section 1313(d) or (e) of this title, a permit may not be renewed, reissued, or modified to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit except in compliance with section 1313(d)(4) of this title.

**(2) Exceptions**

A permit with respect to which paragraph (1) applies may be renewed, reissued, or modified to contain a less stringent effluent limitation applicable to a pollutant if--

**(A)** material and substantial alterations or additions to the permitted facility occurred after permit issuance which justify the application of a less stringent effluent limitation;

**(B)(i)** information is available which was not available at the time of permit issuance (other than revised regulations, guidance, or test methods) and which would have justified the application of a less stringent effluent limitation at the time of permit issuance; or

**(ii)** the Administrator determines that technical mistakes or mistaken interpretations of law were made in issuing the permit under subsection (a)(1)(B);

**(C)** a less stringent effluent limitation is necessary because of events over which the permittee has no control and for which there is no reasonably available remedy;

**(D)** the permittee has received a permit modification under section 1311(c), 1311(g), 1311(h), 1311(i), 1311(k), 1311(n), or 1326(a) of this title; or

**(E)** the permittee has installed the treatment facilities required to meet the effluent limitations in the previous permit and has properly operated and maintained the facilities but has nevertheless been unable to achieve the previous effluent limitations, in which case the limitations in the reviewed, reissued, or modified permit may reflect the level of pollutant control actually achieved (but shall not be less stringent than required by effluent guidelines in effect at the time of permit renewal, reissuance, or modification).

Subparagraph (B) shall not apply to any revised waste load allocations or any alternative grounds for translating water quality standards into effluent limitations, except where the cumulative effect of such revised allocations results in a decrease in the amount of pollutants discharged into the concerned waters, and such revised allocations are not the result of a discharger eliminating or substantially reducing its discharge of pollutants due to complying with the requirements of this chapter or for reasons otherwise unrelated to water quality.

AD019

**(3) Limitations**

In no event may a permit with respect to which paragraph (1) applies be renewed, reissued, or modified to contain an effluent limitation which is less stringent than required by effluent guidelines in effect at the time the permit is renewed, reissued, or modified. In no event may such a permit to discharge into waters be renewed, reissued, or modified to contain a less stringent effluent limitation if the implementation of such limitation would result in a violation of a water quality standard under section 1313 of this title applicable to such waters.

**(p) Municipal and industrial stormwater discharges**

**(1) General rule**

Prior to October 1, 1994, the Administrator or the State (in the case of a permit program approved under this section) shall not require a permit under this section for discharges composed entirely of stormwater.

**(2) Exceptions**

Paragraph (1) shall not apply with respect to the following stormwater discharges:

**(A)** A discharge with respect to which a permit has been issued under this section before February 4, 1987.

**(B)** A discharge associated with industrial activity.

**(C)** A discharge from a municipal separate storm sewer system serving a population of 250,000 or more.

**(D)** A discharge from a municipal separate storm sewer system serving a population of 100,000 or more but less than 250,000.

**(E)** A discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

**(3) Permit requirements**

**(A) Industrial discharges**

Permits for discharges associated with industrial activity shall meet all applicable provisions of this section and section 1311 of this title.

**(B) Municipal discharge**

AD020

Permits for discharges from municipal storm sewers--

**(i)** may be issued on a system- or jurisdiction-wide basis;

**(ii)** shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers; and

**(iii)** shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants.

**(4) Permit application requirements**

**(A) Industrial and large municipal discharges**

Not later than 2 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraphs (2)(B) and (2)(C). Applications for permits for such discharges shall be filed no later than 3 years after February 4, 1987. Not later than 4 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

**(B) Other municipal discharges**

Not later than 4 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraph (2)(D). Applications for permits for such discharges shall be filed no later than 5 years after February 4, 1987. Not later than 6 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

**(5) Studies**

The Administrator, in consultation with the States, shall conduct a study for the purposes of--

**(A)** identifying those stormwater discharges or classes of stormwater discharges for which permits are not required pursuant to paragraphs (1) and (2) of this subsection;

**(B)** determining, to the maximum extent practicable, the nature and extent of pollutants in such discharges; and

**(C)** establishing procedures and methods to control stormwater discharges to the extent necessary to mitigate impacts on water quality.

AD021

Not later than October 1, 1988, the Administrator shall submit to Congress a report on the results of the study described in subparagraphs (A) and (B). Not later than October 1, 1989, the Administrator shall submit to Congress a report on the results of the study described in subparagraph (C).

**(6) Regulations**

Not later than October 1, 1993, the Administrator, in consultation with State and local officials, shall issue regulations (based on the results of the studies conducted under paragraph (5)) which designate stormwater discharges, other than those discharges described in paragraph (2), to be regulated to protect water quality and shall establish a comprehensive program to regulate such designated sources. The program shall, at a minimum, (A) establish priorities, (B) establish requirements for State stormwater management programs, and (C) establish expeditious deadlines. The program may include performance standards, guidelines, guidance, and management practices and treatment requirements, as appropriate.

**(q) Combined sewer overflows**

**(1) Requirement for permits, orders, and decrees**

Each permit, order, or decree issued pursuant to this chapter after December 21, 2000, for a discharge from a municipal combined storm and sanitary sewer shall conform to the Combined Sewer Overflow Control Policy signed by the Administrator on April 11, 1994 (in this subsection referred to as the "CSO control policy").

**(2) Water quality and designated use review guidance**

Not later than July 31, 2001, and after providing notice and opportunity for public comment, the Administrator shall issue guidance to facilitate the conduct of water quality and designated use reviews for municipal combined sewer overflow receiving waters.

**(3) Report**

Not later than September 1, 2001, the Administrator shall transmit to Congress a report on the progress made by the Environmental Protection Agency, States, and municipalities in implementing and enforcing the CSO control policy.

**(r) Discharges incidental to the normal operation of recreational vessels**

No permit shall be required under this chapter by the Administrator (or a State, in the case of a permit program approved under subsection (b)) for the discharge of any graywater, bilge water, cooling water, weather deck runoff, oil water separator effluent, or effluent from properly functioning marine engines, or any other discharge that is incidental to the normal operation of a vessel, if the discharge is from a recreational vessel.

**(s) Integrated plans**

**(1) Definition of integrated plan**

AD022

In this subsection, the term "integrated plan" means a plan developed in accordance with the Integrated Municipal Stormwater and Wastewater Planning Approach Framework, issued by the Environmental Protection Agency and dated June 5, 2012.

**(2) In general**

The Administrator (or a State, in the case of a permit program approved by the Administrator) shall inform municipalities of the opportunity to develop an integrated plan that may be incorporated into a permit under this section.

**(3) Scope**

**(A) Scope of permit incorporating integrated plan**

A permit issued under this section that incorporates an integrated plan may integrate all requirements under this chapter addressed in the integrated plan, including requirements relating to--

**(i)** a combined sewer overflow;

**(ii)** a capacity, management, operation, and maintenance program for sanitary sewer collection systems;

**(iii)** a municipal stormwater discharge;

**(iv)** a municipal wastewater discharge; and

**(v)** a water quality-based effluent limitation to implement an applicable wasteload allocation in a total maximum daily load.

**(B) Inclusions in integrated plan**

An integrated plan incorporated into a permit issued under this section may include the implementation of--

**(i)** projects, including innovative projects, to reclaim, recycle, or reuse water; and

**(ii)** green infrastructure.

**(4) Compliance schedules**

**(A) In general**

AD023

A permit issued under this section that incorporates an integrated plan may include a schedule of compliance, under which actions taken to meet any applicable water quality-based effluent limitation may be implemented over more than 1 permit term if the schedule of compliance--

**(i)** is authorized by State water quality standards; and

**(ii)** meets the requirements of section 122.47 of title 40, Code of Federal Regulations (as in effect on January 14, 2019).

**(B) Time for compliance**

For purposes of subparagraph (A)(ii), the requirement of section 122.47 of title 40, Code of Federal Regulations, for compliance by an applicable statutory deadline under this chapter does not prohibit implementation of an applicable water quality-based effluent limitation over more than 1 permit term.

**(C) Review**

A schedule of compliance incorporated into a permit issued under this section may be reviewed at the time the permit is renewed to determine whether the schedule should be modified.

**(5) Existing authorities retained**

**(A) Applicable standards**

Nothing in this subsection modifies any obligation to comply with applicable technology and water quality-based effluent limitations under this chapter.

**(B) Flexibility**

Nothing in this subsection reduces or eliminates any flexibility available under this chapter, including the authority of a State to revise a water quality standard after a use attainability analysis under section 131.10(g) of title 40, Code of Federal Regulations (or a successor regulation), subject to the approval of the Administrator under section 1313(c) of this title.

**(6) Clarification of State authority**

**(A) In general**

Nothing in section 1311(b)(1)(C) of this title precludes a State from authorizing in the water quality standards of the State the issuance of a schedule of compliance to meet water quality-based effluent limitations in permits that incorporate provisions of an integrated plan.

**(B) Transition rule**

AD024

In any case in which a discharge is subject to a judicial order or consent decree, as of January 14, 2019, resolving an enforcement action under this chapter, any schedule of compliance issued pursuant to an authorization in a State water quality standard may not revise a schedule of compliance in that order or decree to be less stringent, unless the order or decree is modified by agreement of the parties and the court.

### CREDIT(S)

(June 30, 1948, c. 758, Title IV, § 402, as added Pub.L. 92-500, § 2, Oct. 18, 1972, 86 Stat. 880; amended Pub.L. 95-217, §§ 33(c), 50, 54(c)(1), 65, 66, Dec. 27, 1977, 91 Stat. 1577, 1588, 1591, 1599, 1600; Pub.L. 100-4, Title IV, §§ 401 to 404(a), (c), formerly (d), 405, Feb. 4, 1987, 101 Stat. 65 to 67, 69; Pub.L. 102-580, Title III, § 364, Oct. 31, 1992, 106 Stat. 4862; Pub.L. 104-66, Title II, § 2021(e)(2), Dec. 21, 1995, 109 Stat. 727; Pub.L. 106-554, § 1(a)(4) [Div. B, Title I, § 112(a)], Dec. 21, 2000, 114 Stat. 2763, 2763A-224; Pub.L. 110-288, § 2, July 29, 2008, 122 Stat. 2650; Pub.L. 113-79, Title XII, § 12313, Feb. 7, 2014, 128 Stat. 992; Pub.L. 115-436, § 3(a), Jan. 14, 2019, 132 Stat. 5558.)

### U.S. SUPREME COURT OCTOBER TERM 2024

<U.S. Supreme Court, Oct. Term 2024, Oral Argument - Question Presented: >

<Whether the Clean Water Act allows EPA (or an authorized state) to impose generic prohibitions in NPDES permits that subject permitholders to enforcement for exceedances of water quality standards without identifying specific limits to which their discharges must conform. >

Notes of Decisions (318)

### Footnotes

1    So in original. Probably should not be capitalized.

2    So in original. Probably should be preceded by "section".

33 U.S.C.A. § 1342, 33 USCA § 1342
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

End of Document                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
      Subchapter IV. Permits and Licenses (Refs & Annos)

33 U.S.C.A. § 1344

§ 1344. Permits for dredged or fill material

Currentness

**(a) Discharge into navigable waters at specified disposal sites**

The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites. Not later than the fifteenth day after the date an applicant submits all the information required to complete an application for a permit under this subsection, the Secretary shall publish the notice required by this subsection.

**(b) Specification for disposal sites**

Subject to subsection (c) of this section, each such disposal site shall be specified for each such permit by the Secretary (1) through the application of guidelines developed by the Administrator, in conjunction with the Secretary, which guidelines shall be based upon criteria comparable to the criteria applicable to the territorial seas, the contiguous zone, and the ocean under section 1343(c) of this title, and (2) in any case where such guidelines under clause (1) alone would prohibit the specification of a site, through the application additionally of the economic impact of the site on navigation and anchorage.

**(c) Denial or restriction of use of defined areas as disposal sites**

The Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection.

**(d) "Secretary" defined**

The term "Secretary" as used in this section means the Secretary of the Army, acting through the Chief of Engineers.

**(e) General permits on State, regional, or nationwide basis**

AD026

**(1)** In carrying out his functions relating to the discharge of dredged or fill material under this section, the Secretary may, after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment. Any general permit issued under this subsection shall (A) be based on the guidelines described in subsection (b)(1) of this section, and (B) set forth the requirements and standards which shall apply to any activity authorized by such general permit.

**(2)** No general permit issued under this subsection shall be for a period of more than five years after the date of its issuance and such general permit may be revoked or modified by the Secretary if, after opportunity for public hearing, the Secretary determines that the activities authorized by such general permit have an adverse impact on the environment or such activities are more appropriately authorized by individual permits.

**(f) Non-prohibited discharge of dredged or fill material**

**(1)** Except as provided in paragraph (2) of this subsection, the discharge of dredged or fill material--

**(A)** from normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices;

**(B)** for the purpose of maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures;

**(C)** for the purpose of construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches;

**(D)** for the purpose of construction of temporary sedimentation basins on a construction site which does not include placement of fill material into the navigable waters;

**(E)** for the purpose of construction or maintenance of farm roads or forest roads, or temporary roads for moving mining equipment, where such roads are constructed and maintained, in accordance with best management practices, to assure that flow and circulation patterns and chemical and biological characteristics of the navigable waters are not impaired, that the reach of the navigable waters is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized;

**(F)** resulting from any activity with respect to which a State has an approved program under section 1288(b)(4) of this title which meets the requirements of subparagraphs (B) and (C) of such section,

is not prohibited by or otherwise subject to regulation under this section or section 1311(a) or 1342 of this title (except for effluent standards or prohibitions under section 1317 of this title).

AD027

**(2)** Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

**(g) State administration**

**(1)** The Governor of any State desiring to administer its own individual and general permit program for the discharge of dredged or fill material into the navigable waters (other than those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto) within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program.

**(2)** Not later than the tenth day after the date of the receipt of the program and statement submitted by any State under paragraph (1) of this subsection, the Administrator shall provide copies of such program and statement to the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service.

**(3)** Not later than the ninetieth day after the date of the receipt by the Administrator of the program and statement submitted by any State, under paragraph (1) of this subsection, the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, shall submit any comments with respect to such program and statement to the Administrator in writing.

**(h) Determination of State's authority to issue permits under State program; approval; notification; transfers to State program**

**(1)** Not later than the one-hundred-twentieth day after the date of the receipt by the Administrator of a program and statement submitted by any State under paragraph (1) of this subsection, the Administrator shall determine, taking into account any comments submitted by the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, pursuant to subsection (g) of this section, whether such State has the following authority with respect to the issuance of permits pursuant to such program:

**(A)** To issue permits which--

**(i)** apply, and assure compliance with, any applicable requirements of this section, including, but not limited to, the guidelines established under subsection (b)(1) of this section, and sections 1317 and 1343 of this title;

**(ii)** are for fixed terms not exceeding five years; and

**(iii)** can be terminated or modified for cause including, but not limited to, the following:

**(I)** violation of any condition of the permit;

**(II)** obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

**(III)** change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge.

**(B)** To issue permits which apply, and assure compliance with, all applicable requirements of section 1318 of this title, or to inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title.

**(C)** To assure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application.

**(D)** To assure that the Administrator receives notice of each application (including a copy thereof) for a permit.

**(E)** To assure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing.

**(F)** To assure that no permit will be issued if, in the judgment of the Secretary, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby.

**(G)** To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement.

**(H)** To assure continued coordination with Federal and Federal-State water-related planning and review processes.

**(2)** If, with respect to a State program submitted under subsection (g)(1) of this section, the Administrator determines that such State--

**(A)** has the authority set forth in paragraph (1) of this subsection, the Administrator shall approve the program and so notify (i) such State and (ii) the Secretary, who upon subsequent notification from such State that it is administering such program, shall suspend the issuance of permits under subsections (a) and (e) of this section for activities with respect to which a permit may be issued pursuant to such State program; or

AD029

**(B)** does not have the authority set forth in paragraph (1) of this subsection, the Administrator shall so notify such State, which notification shall also describe the revisions or modifications necessary so that such State may resubmit such program for a determination by the Administrator under this subsection.

**(3)** If the Administrator fails to make a determination with respect to any program submitted by a State under subsection (g) (1) of this section within one-hundred-twenty days after the date of the receipt of such program, such program shall be deemed approved pursuant to paragraph (2)(A) of this subsection and the Administrator shall so notify such State and the Secretary who, upon subsequent notification from such State that it is administering such program, shall suspend the issuance of permits under subsection (a) and (e) of this section for activities with respect to which a permit may be issued by such State.

**(4)** After the Secretary receives notification from the Administrator under paragraph (2) or (3) of this subsection that a State permit program has been approved, the Secretary shall transfer any applications for permits pending before the Secretary for activities with respect to which a permit may be issued pursuant to such State program to such State for appropriate action.

**(5)** Upon notification from a State with a permit program approved under this subsection that such State intends to administer and enforce the terms and conditions of a general permit issued by the Secretary under subsection (e) of this section with respect to activities in such State to which such general permit applies, the Secretary shall suspend the administration and enforcement of such general permit with respect to such activities.

**(i) Withdrawal of approval**

Whenever the Administrator determines after public hearing that a State is not administering a program approved under subsection (h)(2)(A) of this section, in accordance with this section, including, but not limited to, the guidelines established under subsection (b)(1) of this section, the Administrator shall so notify the State, and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days after the date of the receipt of such notification, the Administrator shall (1) withdraw approval of such program until the Administrator determines such corrective action has been taken, and (2) notify the Secretary that the Secretary shall resume the program for the issuance of permits under subsections (a) and (e) of this section for activities with respect to which the State was issuing permits and that such authority of the Secretary shall continue in effect until such time as the Administrator makes the determination described in clause (1) of this subsection and such State again has an approved program.

**(j) Copies of applications for State permits and proposed general permits to be transmitted to Administrator**

Each State which is administering a permit program pursuant to this section shall transmit to the Administrator (1) a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such State, and (2) a copy of each proposed general permit which such State intends to issue. Not later than the tenth day after the date of the receipt of such permit application or such proposed general permit, the Administrator shall provide copies of such permit application or such proposed general permit to the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service. If the Administrator intends to provide written comments to such State with respect to such permit application or such proposed general permit, he shall so notify such State not later than the thirtieth day after the date of the receipt of such application or such proposed general permit and provide such written comments to such State, after consideration of any comments made in writing with respect to such application or such proposed general permit by the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, not later than the ninetieth day after the date of such receipt.

AD030

If such State is so notified by the Administrator, it shall not issue the proposed permit until after the receipt of such comments from the Administrator, or after such ninetieth day, whichever first occurs. Such State shall not issue such proposed permit after such ninetieth day if it has received such written comments in which the Administrator objects (A) to the issuance of such proposed permit and such proposed permit is one that has been submitted to the Administrator pursuant to subsection (h)(1)(E), or (B) to the issuance of such proposed permit as being outside the requirements of this section, including, but not limited to, the guidelines developed under subsection (b)(1) of this section unless it modifies such proposed permit in accordance with such comments. Whenever the Administrator objects to the issuance of a permit under the preceding sentence such written objection shall contain a statement of the reasons for such objection and the conditions which such permit would include if it were issued by the Administrator. In any case where the Administrator objects to the issuance of a permit, on request of the State, a public hearing shall be held by the Administrator on such objection. If the State does not resubmit such permit revised to meet such objection within 30 days after completion of the hearing or, if no hearing is requested within 90 days after the date of such objection, the Secretary may issue the permit pursuant to subsection (a) or (e) of this section, as the case may be, for such source in accordance with the guidelines and requirements of this chapter.

**(k) Waiver**

In accordance with guidelines promulgated pursuant to subsection (i)(2) of section 1314 of this title, the Administrator is authorized to waive the requirements of subsection (j) of this section at the time of the approval of a program pursuant to subsection (h)(2)(A) of this section for any category (including any class, type, or size within such category) of discharge within the State submitting such program.

**(l) Categories of discharges not subject to requirements**

The Administrator shall promulgate regulations establishing categories of discharges which he determines shall not be subject to the requirements of subsection (j) of this section in any State with a program approved pursuant to subsection (h)(2)(A) of this section. The Administrator may distinguish among classes, types, and sizes within any category of discharges.

**(m) Comments on permit applications or proposed general permits by Secretary of the Interior acting through Director of United States Fish and Wildlife Service**

Not later than the ninetieth day after the date on which the Secretary notifies the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service that (1) an application for a permit under subsection (a) of this section has been received by the Secretary, or (2) the Secretary proposes to issue a general permit under subsection (e) of this section, the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, shall submit any comments with respect to such application or such proposed general permit in writing to the Secretary.

**(n) Enforcement authority not limited**

Nothing in this section shall be construed to limit the authority of the Administrator to take action pursuant to section 1319 of this title.

**(o) Public availability of permits and permit applications**

A copy of each permit application and each permit issued under this section shall be available to the public. Such permit application or portion thereof, shall further be available on request for the purpose of reproduction.

AD031

**(p) Compliance**

Compliance with a permit issued pursuant to this section, including any activity carried out pursuant to a general permit issued under this section, shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1317, and 1343 of this title.

**(q) Minimization of duplication, needless paperwork, and delays in issuance; agreements**

Not later than the one-hundred-eightieth day after December 27, 1977, the Secretary shall enter into agreements with the Administrator, the Secretaries of the Departments of Agriculture, Commerce, Interior, and Transportation, and the heads of other appropriate Federal agencies to minimize, to the maximum extent practicable, duplication, needless paperwork, and delays in the issuance of permits under this section. Such agreements shall be developed to assure that, to the maximum extent practicable, a decision with respect to an application for a permit under subsection (a) of this section will be made not later than the ninetieth day after the date the notice for such application is published under subsection (a) of this section.

**(r) Federal projects specifically authorized by Congress**

The discharge of dredged or fill material as part of the construction of a Federal project specifically authorized by Congress, whether prior to or on or after December 27, 1977, is not prohibited by or otherwise subject to regulation under this section, or a State program approved under this section, or section 1311(a) or 1342 of this title (except for effluent standards or prohibitions under section 1317 of this title), if information on the effects of such discharge, including consideration of the guidelines developed under subsection (b)(1) of this section, is included in an environmental impact statement for such project pursuant to the National Environmental Policy Act of 1969 and such environmental impact statement has been submitted to Congress before the actual discharge of dredged or fill material in connection with the construction of such project and prior to either authorization of such project or an appropriation of funds for such construction.

**(s) Violation of permits**

**(1)** Whenever on the basis of any information available to him the Secretary finds that any person is in violation of any condition or limitation set forth in a permit issued by the Secretary under this section, the Secretary shall issue an order requiring such person to comply with such condition or limitation, or the Secretary shall bring a civil action in accordance with paragraph (3) of this subsection.

**(2)** A copy of any order issued under this subsection shall be sent immediately by the Secretary to the State in which the violation occurs and other affected States. Any order issued under this subsection shall be by personal service and shall state with reasonable specificity the nature of the violation, specify a time for compliance, not to exceed thirty days, which the Secretary determines is reasonable, taking into account the seriousness of the violation and any good faith efforts to comply with applicable requirements. In any case in which an order under this subsection is issued to a corporation, a copy of such order shall be served on any appropriate corporate officers.

**(3)** The Secretary is authorized to commence a civil action for appropriate relief, including a permanent or temporary injunction for any violation for which he is authorized to issue a compliance order under paragraph (1) of this subsection. Any action under this paragraph may be brought in the district court of the United States for the district in which the defendant is located or

AD032

resides or is doing business, and such court shall have jurisdiction to restrain such violation and to require compliance. Notice of the commencement of such acton [1] shall be given immediately to the appropriate State.

**(4)** Any person who violates any condition or limitation in a permit issued by the Secretary under this section, and any person who violates any order issued by the Secretary under paragraph (1) of this subsection, shall be subject to a civil penalty not to exceed $25,000 per day for each violation. In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

**(t) Navigable waters within State jurisdiction**

Nothing in this section shall preclude or deny the right of any State or interstate agency to control the discharge of dredged or fill material in any portion of the navigable waters within the jurisdiction of such State, including any activity of any Federal agency, and each such agency shall comply with such State or interstate requirements both substantive and procedural to control the discharge of dredged or fill material to the same extent that any person is subject to such requirements. This section shall not be construed as affecting or impairing the authority of the Secretary to maintain navigation.

## CREDIT(S)

(June 30, 1948, c. 758, Title IV, § 404, as added Pub.L. 92-500, § 2, Oct. 18, 1972, 86 Stat. 884; amended Pub.L. 95-217, § 67(a), (b), Dec. 27, 1977, 91 Stat. 1600; Pub.L. 100-4, Title III, § 313(d), Feb. 4, 1987, 101 Stat. 45.)

Notes of Decisions (574)

## Footnotes

1       So in original. Probably should be "action".

33 U.S.C.A. § 1344, 33 USCA § 1344
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

## AD033

**FEDERAL REGULATIONS**

Code of Federal Regulations
    Title 33. Navigation and Navigable Waters
        Chapter II. Corps of Engineers, Department of the Army
            Part 320. General Regulatory Policies (Refs & Annos)

33 C.F.R. § 320.4

§ 320.4 General policies for evaluating permit applications.

Currentness

The following policies shall be applicable to the review of all applications for DA permits. Additional policies specifically applicable to certain types of activities are identified in 33 CFR parts 321 through 324.

(a) Public interest review.

(1) The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process. That decision should reflect the national concern for both protection and utilization of important resources. All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people. For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the Environmental Protection Agency's 404(b)(1) guidelines. Subject to the preceding sentence and any other applicable guidelines and criteria (see §§ 320.2 and 320.3), a permit will be granted unless the district engineer determines that it would be contrary to the public interest.

(2) The following general criteria will be considered in the evaluation of every application:

(i) The relative extent of the public and private need for the proposed structure or work;

(ii) Where there are unresolved conflicts as to resource use, the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work; and

(iii) The extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work is likely to have on the public and private uses to which the area is suited.

(3) The specific weight of each factor is determined by its importance and relevance to the particular proposal. Accordingly, how important a factor is and how much consideration it deserves will vary with each proposal. A specific factor may be given great weight on one proposal, while it may not be present or as important on another. However, full consideration and appropriate weight will be given to all comments, including those of federal, state, and local agencies, and other experts on matters within their expertise.

(b) Effect on wetlands.

(1) Most wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest. For projects to be undertaken or partially or entirely funded by a federal, state, or local agency, additional requirements on wetlands considerations are stated in Executive Order 11990, dated 24 May 1977.

(2) Wetlands considered to perform functions important to the public interest include:

(i) Wetlands which serve significant natural biological functions, including food chain production, general habitat and nesting, spawning, rearing and resting sites for aquatic or land species;

(ii) Wetlands set aside for study of the aquatic environment or as sanctuaries or refuges;

(iii) Wetlands the destruction or alteration of which would affect detrimentally natural drainage characteristics, sedimentation patterns, salinity distribution, flushing characteristics, current patterns, or other environmental characteristics;

(iv) Wetlands which are significant in shielding other areas from wave action, erosion, or storm damage. Such wetlands are often associated with barrier beaches, islands, reefs and bars;

(v) Wetlands which serve as valuable storage areas for storm and flood waters;

(vi) Wetlands which are ground water discharge areas that maintain minimum baseflows important to aquatic resources and those which are prime natural recharge areas;

(vii) Wetlands which serve significant water purification functions; and

(viii) Wetlands which are unique in nature or scarce in quantity to the region or local area.

(3) Although a particular alteration of a wetland may constitute a minor change, the cumulative effect of numerous piecemeal changes can result in a major impairment of wetland resources. Thus, the particular wetland site for which an application is made will be evaluated with the recognition that it may be part of a complete and interrelated wetland area. In addition, the district engineer may undertake, where appropriate, reviews of particular wetland areas in consultation with

AD036

the Regional Director of the U.S. Fish and Wildlife Service, the Regional Director of the National Marine Fisheries Service of the National Oceanic and Atmospheric Administration, the Regional Administrator of the Environmental Protection Agency, the local representative of the Soil Conservation Service of the Department of Agriculture, and the head of the appropriate state agency to assess the cumulative effect of activities in such areas.

(4) No permit will be granted which involves the alteration of wetlands identified as important by paragraph (b)(2) of this section or because of provisions of paragraph (b)(3), of this section unless the district engineer concludes, on the basis of the analysis required in paragraph (a) of this section, that the benefits of the proposed alteration outweigh the damage to the wetlands resource. In evaluating whether a particular discharge activity should be permitted, the district engineer shall apply the section 404(b)(1) guidelines (40 CFR part 230.10(a)(1), (2), (3)).

(5) In addition to the policies expressed in this subpart, the Congressional policy expressed in the Estuary Protection Act, Pub.L. 90–454, and state regulatory laws or programs for classification and protection of wetlands will be considered.

(c) Fish and wildlife. In accordance with the Fish and Wildlife Coordination Act (paragraph 320.3(e) of this section) district engineers will consult with the Regional Director, U.S. Fish and Wildlife Service, the Regional Director, National Marine Fisheries Service, and the head of the agency responsible for fish and wildlife for the state in which work is to be performed, with a view to the conservation of wildlife resources by prevention of their direct and indirect loss and damage due to the activity proposed in a permit application. The Army will give full consideration to the views of those agencies on fish and wildlife matters in deciding on the issuance, denial, or conditioning of individual or general permits.

(d) Water quality. Applications for permits for activities which may adversely affect the quality of waters of the United States will be evaluated for compliance with applicable effluent limitations and water quality standards, during the construction and subsequent operation of the proposed activity. The evaluation should include the consideration of both point and non-point sources of pollution. It should be noted, however, that the Clean Water Act assigns responsibility for control of non-point sources of pollution to the states. Certification of compliance with applicable effluent limitations and water quality standards required under provisions of section 401 of the Clean Water Act will be considered conclusive with respect to water quality considerations unless the Regional Administrator, Environmental Protection Agency (EPA), advises of other water quality aspects to be taken into consideration.

(e) Historic, cultural, scenic, and recreational values. Applications for DA permits may involve areas which possess recognized historic, cultural, scenic, conservation, recreational or similar values. Full evaluation of the general public interest requires that due consideration be given to the effect which the proposed structure or activity may have on values such as those associated with wild and scenic rivers, historic properties and National Landmarks, National Rivers, National Wilderness Areas, National Seashores, National Recreation Areas, National Lakeshores, National Parks, National Monuments, estuarine and marine sanctuaries, archeological resources, including Indian religious or cultural sites, and such other areas as may be established under federal or state law for similar and related purposes. Recognition of those values is often reflected by state, regional, or local land use classifications, or by similar federal controls or policies. Action on permit applications should, insofar as possible, be consistent with, and avoid significant adverse effects on the values or purposes for which those classifications, controls, or policies were established.

(f) Effects on limits of the territorial sea. Structures or work affecting coastal waters may modify the coast line or base line from which the territorial sea is measured for purposes of the Submerged Lands Act and international law. Generally, the coast line or base line is the line of ordinary low water on the mainland; however, there are exceptions where there are islands or lowtide elevations offshore (the Submerged Lands Act, 43 U.S.C. 1301(a) and United States v. California, 381 U.S.C. 139 (1965),

AD037

382 U.S. 448 (1966)). Applications for structures or work affecting coastal waters will therefore be reviewed specifically to determine whether the coast line or base line might be altered. If it is determined that such a change might occur, coordination with the Attorney General and the Solicitor of the Department of the Interior is required before final action is taken. The district engineer will submit a description of the proposed work and a copy of the plans to the Solicitor, Department of the Interior, Washington, DC 20240, and request his comments concerning the effects of the proposed work on the outer continental rights of the United States. These comments will be included in the administrative record of the application. After completion of standard processing procedures, the record will be forwarded to the Chief of Engineers. The decision on the application will be made by the Secretary of the Army after coordination with the Attorney General.

(g) Consideration of property ownership. Authorization of work or structures by DA does not convey a property right, nor authorize any injury to property or invasion of other rights.

(1) An inherent aspect of property ownership is a right to reasonable private use. However, this right is subject to the rights and interests of the public in the navigable and other waters of the United States, including the federal navigation servitude and federal regulation for environmental protection.

(2) Because a landowner has the general right to protect property from erosion, applications to erect protective structures will usually receive favorable consideration. However, if the protective structure may cause damage to the property of others, adversely affect public health and safety, adversely impact floodplain or wetland values, or otherwise appears contrary to the public interest, the district engineer will so advise the applicant and inform him of possible alternative methods of protecting his property. Such advice will be given in terms of general guidance only so as not to compete with private engineering firms nor require undue use of government resources.

(3) A riparian landowner's general right of access to navigable waters of the United States is subject to the similar rights of access held by nearby riparian landowners and to the general public's right of navigation on the water surface. In the case of proposals which create undue interference with access to, or use of, navigable waters, the authorization will generally be denied.

(4) Where it is found that the work for which a permit is desired is in navigable waters of the United States (see 33 CFR part 329) and may interfere with an authorized federal project, the applicant should be apprised in writing of the fact and of the possibility that a federal project which may be constructed in the vicinity of the proposed work might necessitate its removal or reconstruction. The applicant should also be informed that the United States will in no case be liable for any damage or injury to the structures or work authorized by Sections 9 or 10 of the Rivers and Harbors Act of 1899 or by section 404 of the Clean Water Act which may be caused by, or result from, future operations undertaken by the Government for the conservation or improvement of navigation or for other purposes, and no claims or right to compensation will accrue from any such damage.

(5) Proposed activities in the area of a federal project which exists or is under construction will be evaluated to insure that they are compatible with the purposes of the project.

(6) A DA permit does not convey any property rights, either in real estate or material, or any exclusive privileges. Furthermore, a DA permit does not authorize any injury to property or invasion of rights or any infringement of Federal, state or local laws or regulations. The applicant's signature on an application is an affirmation that the applicant possesses or will possess the requisite property interest to undertake the activity proposed in the application. The district engineer

AD038

will not enter into disputes but will remind the applicant of the above. The dispute over property ownership will not be a factor in the Corps public interest decision.

(h) Activities affecting coastal zones. Applications for DA permits for activities affecting the coastal zones of those states having a coastal zone management program approved by the Secretary of Commerce will be evaluated with respect to compliance with that program. No permit will be issued to a non-federal applicant until certification has been provided that the proposed activity complies with the coastal zone management program and the appropriate state agency has concurred with the certification or has waived its right to do so. However, a permit may be issued to a non-federal applicant if the Secretary of Commerce, on his own initiative or upon appeal by the applicant, finds that the proposed activity is consistent with the objectives of the Coastal Zone Management Act of 1972 or is otherwise necessary in the interest of national security. Federal agency and Indian tribe applicants for DA permits are responsible for complying with the Coastal Zone Management Act's directives for assuring that their activities directly affecting the coastal zone are consistent, to the maximum extent practicable, with approved state coastal zone management programs.

(i) Activities in marine sanctuaries. Applications for DA authorization for activities in a marine sanctuary established by the Secretary of Commerce under authority of section 302 of the Marine Protection, Research and Sanctuaries Act of 1972, as amended, will be evaluated for impact on the marine sanctuary. No permit will be issued until the applicant provides a certification from the Secretary of Commerce that the proposed activity is consistent with the purposes of Title III of the Marine Protection, Research and Sanctuaries Act of 1972, as amended, and can be carried out within the regulations promulgated by the Secretary of Commerce to control activities within the marine sanctuary.

(j) Other Federal, state, or local requirements.

(1) Processing of an application for a DA permit normally will proceed concurrently with the processing of other required Federal, state, and/or local authorizations or certifications. Final action on the DA permit will normally not be delayed pending action by another Federal, state or local agency (See 33 CFR 325.2 (d)(4)). However, where the required Federal, state and/or local authorization and/or certification has been denied for activities which also require a Department of the Army permit before final action has been taken on the Army permit application, the district engineer will, after considering the likelihood of subsequent approval of the other authorization and/or certification and the time and effort remaining to complete processing the Army permit application, either immediately deny the Army permit without prejudice or continue processing the application to a conclusion. If the district engineer continues processing the application, he will conclude by either denying the permit as contrary to the public interest, or denying it without prejudice indicating that except for the other Federal, state or local denial the Army permit could, under appropriate conditions, be issued. Denial without prejudice means that there is no prejudice to the right of the applicant to reinstate processing of the Army permit application if subsequent approval is received from the appropriate Federal, state and/or local agency on a previously denied authorization and/or certification. Even if official certification and/or authorization is not required by state or federal law, but a state, regional, or local agency having jurisdiction or interest over the particular activity comments on the application, due consideration shall be given to those official views as a reflection of local factors of the public interest.

(2) The primary responsibility for determining zoning and land use matters rests with state, local and tribal governments. The district engineer will normally accept decisions by such governments on those matters unless there are significant issues of overriding national importance. Such issues would include but are not necessarily limited to national security, navigation, national economic development, water quality, preservation of special aquatic areas, including wetlands, with significant interstate importance, and national energy needs. Whether a factor has overriding importance will depend on the degree of impact in an individual case.

AD039

(3) A proposed activity may result in conflicting comments from several agencies within the same state. Where a state has not designated a single responsible coordinating agency, district engineers will ask the Governor to express his views or to designate one state agency to represent the official state position in the particular case.

(4) In the absence of overriding national factors of the public interest that may be revealed during the evaluation of the permit application, a permit will generally be issued following receipt of a favorable state determination provided the concerns, policies, goals, and requirements as expressed in 33 CFR parts 320–324, and the applicable statutes have been considered and followed: e.g., the National Environmental Policy Act; the Fish and Wildlife Coordination Act; the Historical and Archeological Preservation Act; the National Historic Preservation Act; the Endangered Species Act; the Coastal Zone Management Act; the Marine Protection, Research and Sanctuaries Act of 1972, as amended; the Clean Water Act, the Archeological Resources Act, and the American Indian Religious Freedom Act. Similarly, a permit will generally be issued for Federal and Federally-authorized activities; another federal agency's determination to proceed is entitled to substantial consideration in the Corps' public interest review.

(5) Where general permits to avoid duplication are not practical, district engineers shall develop joint procedures with those local, state, and other Federal agencies having ongoing permit programs for activities also regulated by the Department of the Army. In such cases, applications for DA permits may be processed jointly with the state or other federal applications to an independent conclusion and decision by the district engineer and the appropriate Federal or state agency. (See 33 CFR 325.2(e).)

(6) The district engineer shall develop operating procedures for establishing official communications with Indian Tribes within the district. The procedures shall provide for appointment of a tribal representative who will receive all pertinent public notices, and respond to such notices with the official tribal position on the proposed activity. This procedure shall apply only to those tribes which accept this option. Any adopted operating procedures shall be distributed by public notice to inform the tribes of this option.

(k) Safety of impoundment structures. To insure that all impoundment structures are designed for safety, non-Federal applicants may be required to demonstrate that the structures comply with established state dam safety criteria or have been designed by qualified persons and, in appropriate cases, that the design has been independently reviewed (and modified as the review would indicate) by similarly qualified persons.

(l) Floodplain management.

(1) Floodplains possess significant natural values and carry out numerous functions important to the public interest. These include:

(i) Water resources values (natural moderation of floods, water quality maintenance, and groundwater recharge);

(ii) Living resource values (fish, wildlife, and plant resources);

(iii) Cultural resource values (open space, natural beauty, scientific study, outdoor education, and recreation); and

AD040

(iv) Cultivated resource values (agriculture, aquaculture, and forestry).

(2) Although a particular alteration to a floodplain may constitute a minor change, the cumulative impact of such changes may result in a significant degradation of floodplain values and functions and in increased potential for harm to upstream and downstream activities. In accordance with the requirements of Executive Order 11988, district engineers, as part of their public interest review, should avoid to the extent practicable, long and short term significant adverse impacts associated with the occupancy and modification of floodplains, as well as the direct and indirect support of floodplain development whenever there is a practicable alternative. For those activities which in the public interest must occur in or impact upon floodplains, the district engineer shall ensure, to the maximum extent practicable, that the impacts of potential flooding on human health, safety, and welfare are minimized, the risks of flood losses are minimized, and, whenever practicable the natural and beneficial values served by floodplains are restored and preserved.

(3) In accordance with Executive Order 11988, the district engineer should avoid authorizing floodplain developments whenever practicable alternatives exist outside the floodplain. If there are no such practicable alternatives, the district engineer shall consider, as a means of mitigation, alternatives within the floodplain which will lessen any significant adverse impact to the floodplain.

(m) Water supply and conservation. Water is an essential resource, basic to human survival, economic growth, and the natural environment. Water conservation requires the efficient use of water resources in all actions which involve the significant use of water or that significantly affect the availability of water for alternative uses including opportunities to reduce demand and improve efficiency in order to minimize new supply requirements. Actions affecting water quantities are subject to Congressional policy as stated in section 101(g) of the Clean Water Act which provides that the authority of states to allocate water quantities shall not be superseded, abrogated, or otherwise impaired.

(n) Energy conservation and development. Energy conservation and development are major national objectives. District engineers will give high priority to the processing of permit actions involving energy projects.

(o) Navigation.

(1) Section 11 of the Rivers and Harbors Act of 1899 authorized establishment of harbor lines shoreward of which no individual permits were required. Because harbor lines were established on the basis of navigation impacts only, the Corps of Engineers published a regulation on 27 May 1970 (33 CFR 209.150) which declared that permits would thereafter be required for activities shoreward of the harbor lines. Review of applications would be based on a full public interest evaluation and harbor lines would serve as guidance for assessing navigation impacts. Accordingly, activities constructed shoreward of harbor lines prior to 27 May 1970 do not require specific authorization.

(2) The policy of considering harbor lines as guidance for assessing impacts on navigation continues.

(3) Protection of navigation in all navigable waters of the United States continues to be a primary concern of the federal government.

AD041

(4) District engineers should protect navigational and anchorage interests in connection with the NPDES program by recommending to EPA or to the state, if the program has been delegated, that a permit be denied unless appropriate conditions can be included to avoid any substantial impairment of navigation and anchorage.

(p) Environmental benefits. Some activities that require Department of the Army permits result in beneficial effects to the quality of the environment. The district engineer will weigh these benefits as well as environmental detriments along with other factors of the public interest.

(q) Economics. When private enterprise makes application for a permit, it will generally be assumed that appropriate economic evaluations have been completed, the proposal is economically viable, and is needed in the market place. However, the district engineer in appropriate cases, may make an independent review of the need for the project from the perspective of the overall public interest. The economic benefits of many projects are important to the local community and contribute to needed improvements in the local economic base, affecting such factors as employment, tax revenues, community cohesion, community services, and property values. Many projects also contribute to the National Economic Development (NED), (i.e., the increase in the net value of the national output of goods and services).

(r) Mitigation. [1]

(1) Mitigation is an important aspect of the review and balancing process on many Department of the Army permit applications. Consideration of mitigation will occur throughout the permit application review process and includes avoiding, minimizing, rectifying, reducing, or compensating for resource losses. Losses will be avoided to the extent practicable. Compensation may occur on-site or at an off-site location. Mitigation requirements generally fall into three categories.

(i) Project modifications to minimize adverse project impacts should be discussed with the applicant at pre-application meetings and during application processing. As a result of these discussions and as the district engineer's evaluation proceeds, the district engineer may require minor project modifications. Minor project modifications are those that are considered feasible (cost, constructability, etc.) to the applicant and that, if adopted, will result in a project that generally meets the applicant's purpose and need. Such modifications can include reductions in scope and size; changes in construction methods, materials or timing; and operation and maintenance practices or other similar modifications that reflect a sensitivity to environmental quality within the context of the work proposed. For example, erosion control features could be required on a fill project to reduce sedimentation impacts or a pier could be reoriented to minimize navigational problems even though those projects may satisfy all legal requirements (paragraph (r)(1)(ii) of this section) and the public interest review test (paragraph (r)(1)(iii) of this section) without such modifications.

(ii) Further mitigation measures may be required to satisfy legal requirements. For Section 404 applications, mitigation shall be required to ensure that the project complies with the 404(b)(1) Guidelines. Some mitigation measures are enumerated at 40 CFR 230.70 through 40 CFR 230.77 (Subpart H of the 404(b)(1) Guidelines).

(iii) Mitigation measures in addition to those under paragraphs (r)(1)(i) and (ii) of this section may be required as a result of the public interest review process. (See 33 CFR 325.4(a).) Mitigation should be developed and incorporated within the public interest review process to the extent that the mitigation is found by the district engineer to be reasonable and

AD042

justified. Only those measures required to ensure that the project is not contrary to the public interest may be required under this subparagraph.

(2) All compensatory mitigation will be for significant resource losses which are specifically identifiable, reasonably likely to occur, and of importance to the human or aquatic environment. Also, all mitigation will be directly related to the impacts of the proposal, appropriate to the scope and degree of those impacts, and reasonably enforceable. District engineers will require all forms of mitigation, including compensatory mitigation, only as provided in paragraphs (r)(1)(i) through (iii) of this section. Additional mitigation may be added at the applicants' request.

SOURCE: 51 FR 41220, Nov. 13, 1986, unless otherwise noted.

AUTHORITY: 33 U.S.C. 401 et seq.; 33 U.S.C. 1344; 33 U.S.C. 1413.

Notes of Decisions (453)

Current through October 21, 2024, 89 FR 84107. Some sections may be more current. See credits for details.

---

## Footnotes

1    This is a general statement of mitigation policy which applies to all Corps of Engineers regulatory authorities covered by these regulations (33 CFR parts 320–330). It is not a substitute for the mitigation requirements necessary to ensure that a permit action under section 404 of the Clean Water Act complies with the section 404(b)(1) Guidelines. There is currently an interagency Working Group formed to develop guidance on implementing mitigation requirements of the Guidelines.

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD043

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   9

Code of Federal Regulations
    Title 33. Navigation and Navigable Waters
        Chapter II. Corps of Engineers, Department of the Army
            Part 323. Permits for Discharges of Dredged or Fill Material into Waters of the United States (Refs & Annos)

33 C.F.R. § 323.6

§ 323.6 Special policies and procedures.

Currentness

(a) The Secretary of the Army has delegated to the Chief of Engineers the authority to issue or deny section 404 permits. The district engineer will review applications for permits for the discharge of dredged or fill material into waters of the United States in accordance with guidelines promulgated by the Administrator, EPA, under authority of section 404(b)(1) of the CWA. (see 40 CFR part 230.) Subject to consideration of any economic impact on navigation and anchorage pursuant to section 404(b)(2), a permit will be denied if the discharge that would be authorized by such a permit would not comply with the 404(b)(1) guidelines. If the district engineer determines that the proposed discharge would comply with the 404(b)(1) guidelines, he will grant the permit unless issuance would be contrary to the public interest.

(b) The Corps will not issue a permit where the regional administrator of EPA has notified the district engineer and applicant in writing pursuant to 40 CFR 231.3(a)(1) that he intends to issue a public notice of a proposed determination to prohibit or withdraw the specification, or to deny, restrict or withdraw the use for specification, of any defined area as a disposal site in accordance with section 404(c) of the Clean Water Act. However the Corps will continue to complete the administrative processing of the application while the section 404(c) procedures are underway including completion of final coordination with EPA under 33 CFR part 325.

SOURCE: 51 FR 41232, Nov. 13, 1986, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1344.

Notes of Decisions (11)

Current through October 22, 2024, 89 FR 84303. Some sections may be more current. See credits for details.

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD044

KeyCite Yellow Flag - Negative Treatment

Proposed Regulation

Code of Federal Regulations
    Title 33. Navigation and Navigable Waters
        Chapter II. Corps of Engineers, Department of the Army
            Part 325. Processing of Department of the Army Permits (Refs & Annos)

33 C.F.R. § 325.2

§ 325.2 Processing of applications.

Currentness

(a) Standard procedures.

(1) When an application for a permit is received the district engineer shall immediately assign it a number for identification, acknowledge receipt thereof, and advise the applicant of the number assigned to it. He shall review the application for completeness, and if the application is incomplete, request from the applicant within 15 days of receipt of the application any additional information necessary for further processing.

(2) Within 15 days of receipt of an application the district engineer will either determine that the application is complete (see 33 CFR 325.1(d)(9) and issue a public notice as described in § 325.3 of this part, unless specifically exempted by other provisions of this regulation or that it is incomplete and notify the applicant of the information necessary for a complete application. The district engineer will issue a supplemental, revised, or corrected public notice if in his view there is a change in the application data that would affect the public's review of the proposal.

(3) The district engineer will consider all comments received in response to the public notice in his subsequent actions on the permit application. Receipt of the comments will be acknowledged, if appropriate, and they will be made a part of the administrative record of the application. Comments received as form letters or petitions may be acknowledged as a group to the person or organization responsible for the form letter or petition. If comments relate to matters within the special expertise of another federal agency, the district engineer may seek the advice of that agency. If the district engineer determines, based on comments received, that he must have the views of the applicant on a particular issue to make a public interest determination, the applicant will be given the opportunity to furnish his views on such issue to the district engineer (see § 325.2(d)(5)). At the earliest practicable time other substantive comments will be furnished to the applicant for his information and any views he may wish to offer. A summary of the comments, the actual letters or portions thereof, or representative comment letters may be furnished to the applicant. The applicant may voluntarily elect to contact objectors in an attempt to resolve objections but will not be required to do so. District engineers will ensure that all parties are informed that the Corps alone is responsible for reaching a decision on the merits of any application. The district engineer may also offer Corps regulatory staff to be present at meetings between applicants and objectors, where appropriate, to provide information on the process, to mediate differences, or to gather information to aid in the decision process. The district engineer should not delay processing of the application unless the applicant requests a reasonable delay, normally not to exceed 30 days, to provide additional information or comments.

AD045

(4) The district engineer will follow Appendix B of 33 CFR part 230 for environmental procedures and documentation required by the National Environmental Policy Act of 1969. A decision on a permit application will require either an environmental assessment or an environmental impact statement unless it is included within a categorical exclusion.

(5) The district engineer will also evaluate the application to determine the need for a public hearing pursuant to 33 CFR part 327.

(6) After all above actions have been completed, the district engineer will determine in accordance with the record and applicable regulations whether or not the permit should be issued. He shall prepare a statement of findings (SOF) or, where an EIS has been prepared, a record of decision (ROD), on all permit decisions. The SOF or ROD shall include the district engineer's views on the probable effect of the proposed work on the public interest including conformity with the guidelines published for the discharge of dredged or fill material into waters of the United States (40 CFR part 230) or with the criteria for dumping of dredged material in ocean waters (40 CFR parts 220 to 229), if applicable, and the conclusions of the district engineer. The SOF or ROD shall be dated, signed, and included in the record prior to final action on the application. Where the district engineer has delegated authority to sign permits for and in his behalf, he may similarly delegate the signing of the SOF or ROD. If a district engineer makes a decision on a permit application which is contrary to state or local decisions (33 CFR 320.4(j)(2) & (4)), the district engineer will include in the decision document the significant national issues and explain how they are overriding in importance. If a permit is warranted, the district engineer will determine the special conditions, if any, and duration which should be incorporated into the permit. In accordance with the authorities specified in § 325.8 of this part, the district engineer will take final action or forward the application with all pertinent comments, records, and studies, including the final EIS or environmental assessment, through channels to the official authorized to make the final decision. The report forwarding the application for decision will be in a format prescribed by the Chief of Engineers. District and division engineers will notify the applicant and interested federal and state agencies that the application has been forwarded to higher headquarters. The district or division engineer may, at his option, disclose his recommendation to the news media and other interested parties, with the caution that it is only a recommendation and not a final decision. Such disclosure is encouraged in permit cases which have become controversial and have been the subject of stories in the media or have generated strong public interest. In those cases where the application is forwarded for decision in the format prescribed by the Chief of Engineers, the report will serve as the SOF or ROD. District engineers will generally combine the SOF, environmental assessment, and findings of no significant impact (FONSI), 404(b)(1) guideline analysis, and/or the criteria for dumping of dredged material in ocean waters into a single document.

(7) If the final decision is to deny the permit, the applicant will be advised in writing of the reason(s) for denial. If the final decision is to issue the permit and a standard individual permit form will be used, the issuing official will forward the permit to the applicant for signature accepting the conditions of the permit. The permit is not valid until signed by the issuing official. Letters of permission require only the signature of the issuing official. Final action on the permit application is the signature on the letter notifying the applicant of the denial of the permit or signature of the issuing official on the authorizing document.

(8) The district engineer will publish monthly a list of permits issued or denied during the previous month. The list will identify each action by public notice number, name of applicant, and brief description of activity involved. It will also note that relevant environmental documents and the SOF's or ROD's are available upon written request and, where applicable, upon the payment of administrative fees. This list will be distributed to all persons who may have an interest in any of the public notices listed.

(9) Copies of permits will be furnished to other agencies in appropriate cases as follows:

(i) If the activity involves the construction of artificial islands, installations or other devices on the outer continental shelf, to the Director, Defense Mapping Agency, Hydrographic Center, Washington, DC 20390 Attention, Code NS12, and to the National Ocean Service, Office of Coast Survey, N/CS261, 1315 East West Highway, Silver Spring, Maryland 20910–3282.

(ii) If the activity involves the construction of structures to enhance fish propagation (e.g., fishing reefs) along the coasts of the United States, to the Defense Mapping Agency, Hydrographic Center and National Ocean Service as in paragraph (a)(9)(i) of this section and to the Director, Office of Marine Recreational Fisheries, National Marine Fisheries Service, Washington, DC 20235.

(iii) If the activity involves the erection of an aerial transmission line, submerged cable, or submerged pipeline across a navigable water of the United States, to the National Ocean Service, Office of Coast Survey, N/CS261, 1315 East West Highway, Silver Spring, Maryland 20910–3282.

(iv) If the activity is listed in paragraphs (a)(9)(i), (ii), or (iii) of this section, or involves the transportation of dredged material for the purpose of dumping it in ocean waters, to the appropriate District Commander, U.S. Coast Guard.

(b) Procedures for particular types of permit situations—

(1) Section 401 Water Quality Certification. If the district engineer determines that water quality certification for the proposed activity is necessary under the provisions of section 401 of the Clean Water Act, he shall so notify the applicant and obtain from him or the certifying agency a copy of such certification.

(i) The public notice for such activity, which will contain a statement on certification requirements (see § 325.3(a)(8)), will serve as the notification to the Administrator of the Environmental Protection Agency (EPA) pursuant to section 401(a)(2) of the Clean Water Act. If EPA determines that the proposed discharge may affect the quality of the waters of any state other than the state in which the discharge will originate, it will so notify such other state, the district engineer, and the applicant. If such notice or a request for supplemental information is not received within 30 days of issuance of the public notice, the district engineer will assume EPA has made a negative determination with respect to section 401(a)(2). If EPA determines another state's waters may be affected, such state has 60 days from receipt of EPA's notice to determine if the proposed discharge will affect the quality of its waters so as to violate any water quality requirement in such state, to notify EPA and the district engineer in writing of its objection to permit issuance, and to request a public hearing. If such occurs, the district engineer will hold a public hearing in the objecting state. Except as stated below, the hearing will be conducted in accordance with 33 CFR part 327. The issues to be considered at the public hearing will be limited to water quality impacts. EPA will submit its evaluation and recommendations at the hearing with respect to the state's objection to permit issuance. Based upon the recommendations of the objecting state, EPA, and any additional evidence presented at the hearing, the district engineer will condition the permit, if issued, in such a manner as may be necessary to insure compliance with applicable water quality requirements. If the imposition of conditions cannot, in the district engineer's opinion, insure such compliance, he will deny the permit.

(ii) No permit will be granted until required certification has been obtained or has been waived. A waiver may be explicit, or will be deemed to occur if the certifying agency fails or refuses to act on a request for certification within sixty days

AD047

after receipt of such a request unless the district engineer determines a shorter or longer period is reasonable for the state to act. In determining whether or not a waiver period has commenced or waiver has occurred, the district engineer will verify that the certifying agency has received a valid request for certification. If, however, special circumstances identified by the district engineer require that action on an application be taken within a more limited period of time, the district engineer shall determine a reasonable lesser period of time, advise the certifying agency of the need for action by a particular date, and that, if certification is not received by that date, it will be considered that the requirement for certification has been waived. Similarly, if it appears that circumstances may reasonably require a period of time longer than sixty days, the district engineer, based on information provided by the certifying agency, will determine a longer reasonable period of time, not to exceed one year, at which time a waiver will be deemed to occur.

(2) Coastal Zone Management consistency. If the proposed activity is to be undertaken in a state operating under a coastal zone management program approved by the Secretary of Commerce pursuant to the Coastal Zone Management (CZM) Act (see 33 CFR 320.3(b)), the district engineer shall proceed as follows:

(i) If the applicant is a federal agency, and the application involves a federal activity in or affecting the coastal zone, the district engineer shall forward a copy of the public notice to the agency of the state responsible for reviewing the consistency of federal activities. The federal agency applicant shall be responsible for complying with the CZM Act's directive for ensuring that federal agency activities are undertaken in a manner which is consistent, to the maximum extent practicable, with approved CZM Programs. (See 15 CFR part 930.) If the state coastal zone agency objects to the proposed federal activity on the basis of its inconsistency with the state's approved CZM Program, the district engineer shall not make a final decision on the application until the disagreeing parties have had an opportunity to utilize the procedures specified by the CZM Act for resolving such disagreements.

(ii) If the applicant is not a federal agency and the application involves an activity affecting the coastal zone, the district engineer shall obtain from the applicant a certification that his proposed activity complies with and will be conducted in a manner that is consistent with the approved state CZM Program. Upon receipt of the certification, the district engineer will forward a copy of the public notice (which will include the applicant's certification statement) to the state coastal zone agency and request its concurrence or objection. If the state agency objects to the certification or issues a decision indicating that the proposed activity requires further review, the district engineer shall not issue the permit until the state concurs with the certification statement or the Secretary of Commerce determines that the proposed activity is consistent with the purposes of the CZM Act or is necessary in the interest of national security. If the state agency fails to concur or object to a certification statement within six months of the state agency's receipt of the certification statement, state agency concurrence with the certification statement shall be conclusively presumed. District engineers will seek agreements with state CZM agencies that the agency's failure to provide comments during the public notice comment period will be considered as a concurrence with the certification or waiver of the right to concur or non-concur.

(iii) If the applicant is requesting a permit for work on Indian reservation lands which are in the coastal zone, the district engineer shall treat the application in the same manner as prescribed for a Federal applicant in paragraph (b)(2)(i) of this section. However, if the applicant is requesting a permit on non-trust Indian lands, and the state CZM agency has decided to assert jurisdiction over such lands, the district engineer shall treat the application in the same manner as prescribed for a non-Federal applicant in paragraph (b)(2)(ii) of this section.

(3) Historic properties. If the proposed activity would involve any property listed or eligible for listing in the National Register of Historic Places, the district engineer will proceed in accordance with Corps National Historic Preservation Act implementing regulations.

AD048

(4) Activities associated with Federal projects. If the proposed activity would consist of the dredging of an access channel and/or berthing facility associated with an authorized federal navigation project, the activity will be included in the planning and coordination of the construction or maintenance of the federal project to the maximum extent feasible. Separate notice, hearing, and environmental documentation will not be required for activities so included and coordinated, and the public notice issued by the district engineer for these federal and associated non-federal activities will be the notice of intent to issue permits for those included non-federal dredging activities. The decision whether to issue or deny such a permit will be consistent with the decision on the federal project unless special considerations applicable to the proposed activity are identified. (See § 322.5(c).)

(5) Endangered Species. Applications will be reviewed for the potential impact on threatened or endangered species pursuant to section 7 of the Endangered Species Act as amended. The district engineer will include a statement in the public notice of his current knowledge of endangered species based on his initial review of the application (see 33 CFR 325.2(a)(2)). If the district engineer determines that the proposed activity would not affect listed species or their critical habitat, he will include a statement to this effect in the public notice. If he finds the proposed activity may affect an endangered or threatened species or their critical habitat, he will initiate formal consultation procedures with the U.S. Fish and Wildlife Service or National Marine Fisheries Service. Public notices forwarded to the U.S. Fish and Wildlife Service or National Marine Fisheries Service will serve as the request for information on whether any listed or proposed to be listed endangered or threatened species may be present in the area which would be affected by the proposed activity, pursuant to section 7(c) of the Act. References, definitions, and consultation procedures are found in 50 CFR part 402.

(c) [Reserved]

(d) Timing of processing of applications. The district engineer will be guided by the following time limits for the indicated steps in the evaluation process:

(1) The public notice will be issued within 15 days of receipt of all information required to be submitted by the applicant in accordance with paragraph 325.1.(d) of this part.

(2) The comment period on the public notice should be for a reasonable period of time within which interested parties may express their views concerning the permit. The comment period should not be more than 30 days nor less than 15 days from the date of the notice. Before designating comment periods less than 30 days, the district engineer will consider:

(i) Whether the proposal is routine or noncontroversial,

(ii) Mail time and need for comments from remote areas,

(iii) Comments from similar proposals, and

(iv) The need for a site visit. After considering the length of the original comment period, paragraphs (a)(2)(i) through (iv) of this section, and other pertinent factors, the district engineer may extend the comment period up to an additional 30 days if warranted.

AD049

(3) District engineers will decide on all applications not later than 60 days after receipt of a complete application, unless

(i) precluded as a matter of law or procedures required by law (see below),

(ii) The case must be referred to higher authority (see § 325.8 of this part),

(iii) The comment period is extended,

(iv) A timely submittal of information or comments is not received from the applicant,

(v) The processing is suspended at the request of the applicant, or

(vi) Information needed by the district engineer for a decision on the application cannot reasonably be obtained within the 60–day period. Once the cause for preventing the decision from being made within the normal 60–day period has been satisfied or eliminated, the 60–day clock will start running again from where it was suspended. For example, if the comment period is extended by 30 days, the district engineer will, absent other restraints, decide on the application within 90 days of receipt of a complete application. Certain laws (e.g., the Clean Water Act, the CZM Act, the National Environmental Policy Act, the National Historic Preservation Act, the Preservation of Historical and Archeological Data Act, the Endangered Species Act, the Wild and Scenic Rivers Act, and the Marine Protection, Research and Sanctuaries Act) require procedures such as state or other federal agency certifications, public hearings, environmental impact statements, consultation, special studies, and testing which may prevent district engineers from being able to decide certain applications within 60 days.

(4) Once the district engineer has sufficient information to make his public interest determination, he should decide the permit application even though other agencies which may have regulatory jurisdiction have not yet granted their authorizations, except where such authorizations are, by federal law, a prerequisite to making a decision on the DA permit application. Permits granted prior to other (non-prerequisite) authorizations by other agencies should, where appropriate, be conditioned in such manner as to give those other authorities an opportunity to undertake their review without the applicant biasing such review by making substantial resource commitments on the basis of the DA permit. In unusual cases the district engineer may decide that due to the nature or scope of a specific proposal, it would be prudent to defer taking final action until another agency has acted on its authorization. In such cases, he may advise the other agency of his position on the DA permit while deferring his final decision.

(5) The applicant will be given a reasonable time, not to exceed 30 days, to respond to requests of the district engineer. The district engineer may make such requests by certified letter and clearly inform the applicant that if he does not respond with the requested information or a justification why additional time is necessary, then his application will be considered withdrawn or a final decision will be made, whichever is appropriate. If additional time is requested, the district engineer will either grant the time, make a final decision, or consider the application as withdrawn.

(6) The time requirements in these regulations are in terms of calendar days rather than in terms of working days.

(e) Alternative procedures. Division and district engineers are authorized to use alternative procedures as follows:

AD050

(1) Letters of permission. Letters of permission are a type of permit issued through an abbreviated processing procedure which includes coordination with Federal and state fish and wildlife agencies, as required by the Fish and Wildlife Coordination Act, and a public interest evaluation, but without the publishing of an individual public notice. The letter of permission will not be used to authorize the transportation of dredged material for the purpose of dumping it in ocean waters. Letters of permission may be used:

(i) In those cases subject to section 10 of the Rivers and Harbors Act of 1899 when, in the opinion of the district engineer, the proposed work would be minor, would not have significant individual or cumulative impacts on environmental values, and should encounter no appreciable opposition.

(ii) In those cases subject to section 404 of the Clean Water Act after:

(A) The district engineer, through consultation with Federal and state fish and wildlife agencies, the Regional Administrator, Environmental Protection Agency, the state water quality certifying agency, and, if appropriate, the state Coastal Zone Management Agency, develops a list of categories of activities proposed for authorization under LOP procedures;

(B) The district engineer issues a public notice advertising the proposed list and the LOP procedures, requesting comments and offering an opportunity for public hearing; and

(C) A 401 certification has been issued or waived and, if appropriate, CZM consistency concurrence obtained or presumed either on a generic or individual basis.

(2) Regional permits. Regional permits are a type of general permit as defined in 33 CFR 322.2(f) and 33 CFR 323.2(n). They may be issued by a division or district engineer after compliance with the other procedures of this regulation. After a regional permit has been issued, individual activities falling within those categories that are authorized by such regional permits do not have to be further authorized by the procedures of this regulation. The issuing authority will determine and add appropriate conditions to protect the public interest. When the issuing authority determines on a case-by-case basis that the concerns for the aquatic environment so indicate, he may exercise discretionary authority to override the regional permit and require an individual application and review. A regional permit may be revoked by the issuing authority if it is determined that it is contrary to the public interest provided the procedures of § 325.7 of this part are followed. Following revocation, applications for future activities in areas covered by the regional permit shall be processed as applications for individual permits. No regional permit shall be issued for a period of more than five years.

(3) Joint procedures. Division and district engineers are authorized and encouraged to develop joint procedures with states and other Federal agencies with ongoing permit programs for activities also regulated by the Department of the Army. Such procedures may be substituted for the procedures in paragraphs (a)(1) through (a)(5) of this section provided that the substantive requirements of those sections are maintained. Division and district engineers are also encouraged to develop management techniques such as joint agency review meetings to expedite the decision-making process. However, in doing so, the applicant's rights to a full public interest review and independent decision by the district or division engineer must be strictly observed.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.          7

(4) Emergency procedures. Division engineers are authorized to approve special processing procedures in emergency situations. An "emergency" is a situation which would result in an unacceptable hazard to life, a significant loss of property, or an immediate, unforeseen, and significant economic hardship if corrective action requiring a permit is not undertaken within a time period less than the normal time needed to process the application under standard procedures. In emergency situations, the district engineer will explain the circumstances and recommend special procedures to the division engineer who will instruct the district engineer as to further processing of the application. Even in an emergency situation, reasonable efforts will be made to receive comments from interested Federal, state, and local agencies and the affected public. Also, notice of any special procedures authorized and their rationale is to be appropriately published as soon as practicable.

**Credits**

[62 FR 26230, May 13, 1997]

SOURCE: 51 FR 41236, Nov. 13, 1986; 55 FR 27821, July 6, 1990, unless otherwise noted.

AUTHORITY: 33 U.S.C. 401 et seq.: 33 U.S.C. 1344; 33 U.S.C. 1413.

Notes of Decisions (180)

Current through October 11, 2024, 89 FR 82872. Some sections may be more current. See credits for details.

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 33. Navigation and Navigable Waters
        Chapter II. Corps of Engineers, Department of the Army
            Part 330. Nationwide Permit Program (Refs & Annos)

33 C.F.R. § 330.2

§ 330.2 Definitions.

Currentness

(a) The definitions found in 33 CFR parts 320–329 are applicable to the terms used in this part.

(b) Nationwide permit refers to a type of general permit which authorizes activities on a nationwide basis unless specifically limited. (Another type of general permit is a "regional permit" which is issued by division or district engineers on a regional basis in accordance with 33 CFR part 325). (See 33 CFR 322.2(f) and 323.2(h) for the definition of a general permit.)

(c) Authorization means that specific activities that qualify for an NWP may proceed, provided that the terms and conditions of the NWP are met. After determining that the activity complies with all applicable terms and conditions, the prospective permittee may assume an authorization under an NWP. This assumption is subject to the DE's authority to determine if an activity complies with the terms and conditions of an NWP. If requested by the permittee in writing, the DE will verify in writing that the permittee's proposed activity complies with the terms and conditions of the NWP. A written verification may contain activity-specific conditions and regional conditions which a permittee must satisfy for the authorization to be valid.

(d) Headwaters means non-tidal rivers, streams, and their lakes and impoundments, including adjacent wetlands, that are part of a surface tributary system to an interstate or navigable water of the United States upstream of the point on the river or stream at which the average annual flow is less than five cubic feet per second. The DE may estimate this point from available data by using the mean annual area precipitation, area drainage basin maps, and the average runoff coefficient, or by similar means. For streams that are dry for long periods of the year, DEs may establish the point where headwaters begin as that point on the stream where a flow of five cubic feet per second is equaled or exceeded 50 percent of the time.

(e) Isolated waters means those non-tidal waters of the United States that are:

(1) Not part of a surface tributary system to interstate or navigable waters of the United States; and

(2) Not adjacent to such tributary waterbodies.

(f) Filled area means the area within jurisdictional waters which is eliminated or covered as a direct result of the discharge (i.e., the area actually covered by the discharged material). It does not include areas excavated nor areas impacted as an indirect effect of the fill.

AD053

(g) Discretionary authority means the authority described in §§ 330.1(d) and 330.4(e) which the Chief of Engineers delegates to division or district engineers to modify an NWP authorization by adding conditions, to suspend an NWP authorization, or to revoke an NWP authorization and thus require individual permit authorization.

(h) Terms and conditions. The "terms" of an NWP are the limitations and provisions included in the description of the NWP itself. The "conditions" of NWPs are additional provisions which place restrictions or limitations on all of the NWPs. These are published with the NWPs. Other conditions may be imposed by district or division engineers on a geographic, category-of-activity, or activity-specific basis (See 33 CFR 330.4(e)).

(i) Single and complete project means the total project proposed or accomplished by one owner/developer or partnership or other association of owners/developers. For example, if construction of a residential development affects several different areas of a headwater or isolated water, or several different headwaters or isolated waters, the cumulative total of all filled areas should be the basis for deciding whether or not the project will be covered by an NWP. For linear projects, the "single and complete project" (i.e., single and complete crossing) will apply to each crossing of a separate water of the United States (i.e., single waterbody) at that location; except that for linear projects crossing a single waterbody several times at separate and distant locations, each crossing is considered a single and complete project. However, individual channels in a braided stream or river, or individual arms of a large, irregularly-shaped wetland or lake, etc., are not separate waterbodies.

(j) Special aquatic sites means wetlands, mudflats, vegetated shallows, coral reefs, riffle and pool complexes, sanctuaries, and refuges as defined at 40 CFR 230.40 through 230.45.

SOURCE: 56 FR 59134, Nov. 22, 1991, unless otherwise noted.

AUTHORITY: 33 U.S.C. 401 et seq.; 33 U.S.C. 1344; 33 U.S.C. 1413.

Notes of Decisions (19)

Current through October 21, 2024, 89 FR 84107. Some sections may be more current. See credits for details.

End of Document    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD054

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Prior Version Held Invalid  In re Clean Water Act Rulemaking,  N.D.Cal.,  Oct. 21, 2021

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter D. Water Programs
        Part 121. State Certification of Activities Requiring a Federal License or Permit (Refs & Annos)
          Subpart A. General

40 C.F.R. § 121.1

§ 121.1 Definitions.

Effective: November 27, 2023
Currentness

As used in this part, the following terms shall have the meanings indicated:

(a) Administrator means the Administrator, Environmental Protection Agency (EPA).

(b) Certifying authority means the entity responsible for certifying compliance with applicable water quality requirements in accordance with Clean Water Act section 401.

(c) Federal agency means any agency of the Federal Government to which application is made for a Federal license or permit that is subject to Clean Water Act section 401.

(d) Federal Indian Reservation, Indian reservation, or reservation means all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation.

(e) Indian Tribe or Tribe means any Indian Tribe, band, group, or community recognized by the Secretary of the Interior and exercising governmental authority over a Federal Indian Reservation.

(f) License or permit means any license or permit issued or granted by an agency of the Federal Government to conduct any activity which may result in any discharge into waters of the United States.

(g) Neighboring jurisdiction means any state, or Tribe with treatment in a similar manner as a state for Clean Water Act section 401 in its entirety or only for Clean Water Act section 401(a)(2), other than the jurisdiction in which the discharge originates or will originate.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.     1

(h) Project proponent means the applicant for a Federal license or permit, or the entity seeking certification.

(i) Regional Administrator means the Regional designee appointed by the Administrator, Environmental Protection Agency.

(j) Water quality requirements means any limitation, standard, or other requirement under sections 301, 302, 303, 306, and 307 of the Clean Water Act, any Federal and state or Tribal laws or regulations implementing those sections, and any other water quality-related requirement of state or Tribal law.

SOURCE: 88 FR 66661, Sept. 27, 2023, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Current through October 21, 2024, 89 FR 84107. Some sections may be more current. See credits for details.

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD056

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter D. Water Programs
        Part 121. State Certification of Activities Requiring a Federal License or Permit (Refs & Annos)
          Subpart B. Certification Procedures

This section has been updated. Click here for the updated version.

40 C.F.R. § 121.7

§ 121.7 Action on a certification request.

Effective: September 11, 2020 to November 26, 2023

<In Louisiana v. American Rivers, 2022 WL 1019417, the US Supreme Court on April 6, 2022, ordered, "The district court's October 21, 2021 order, insofar as it vacates the current certification rule, 40 C.F.R. Part 121, is stayed pending disposition of the appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the petition for a writ of certiorari, if such a writ is timely sought. Should the petition for a writ of certiorari be denied, this order shall terminate automatically. In the event the petition for a writ of certiorari is granted, the order shall terminate upon the sending down of the judgment of this Court." See district court's order at In re Clean Water Act Rulemaking, 2021 WL 4924844 (N.D. Cal. 2021). See, also, Ninth Circuit's order at In re Clean Water Act Rulemaking, 2023 WL 2129631, 60 F.4th 583 (9th Cir. Feb. 21, 2023). See, now, amendments included in 88 FR 66558.>

(a) Any action by the certifying authority to grant, grant with conditions, or deny a certification request must be within the scope of certification, must be completed within the reasonable period of time, and must otherwise be in accordance with section 401 of the Clean Water Act. Alternatively, a certifying authority may expressly waive certification.

(b) If the certifying authority determines that a discharge from a proposed project will comply with water quality requirements, it may issue or waive certification. If the certifying authority cannot certify that the discharge from a proposed project will comply with water quality requirements, it may deny or waive certification.

(c) Any grant of certification shall be in writing and shall include a statement that the discharge from the proposed project will comply with water quality requirements.

(d) Any grant of certification with conditions shall be in writing and shall for each condition include, at a minimum:

(1) For certification conditions on an individual license or permit,

(i) A statement explaining why the condition is necessary to assure that the discharge from the proposed project will comply with water quality requirements; and

AD057

(ii) A citation to federal, state, or tribal law that authorizes the condition.

(2) For certification conditions on issuance of a general license or permit,

(i) A statement explaining why the condition is necessary to assure that any discharge authorized under the general license or permit will comply with water quality requirements; and

(ii) A citation to federal, state, or tribal law that authorizes the condition.

(e) Any denial of certification shall be in writing and shall include:

(1) For denial of certification for an individual license or permit,

(i) The specific water quality requirements with which the discharge will not comply;

(ii) A statement explaining why the discharge will not comply with the identified water quality requirements; and

(iii) If the denial is due to insufficient information, the denial must describe the specific water quality data or information, if any, that would be needed to assure that the discharge from the proposed project will comply with water quality requirements.

(2) For denial of certification for issuance of a general license or permit,

(i) The specific water quality requirements with which discharges that could be authorized by the general license or permit will not comply;

(ii) A statement explaining why discharges that could be authorized by the general license or permit will not comply with the identified water quality requirements; and

(iii) If the denial is due to insufficient information, the denial must describe the types of water quality data or information, if any, that would be needed to assure that the range of discharges from potential projects will comply with water quality requirements.

(f) If the certifying authority determines that no water quality requirements are applicable to the waters receiving the discharge from the proposed project, the certifying authority shall grant certification.

<Part effective until Nov. 27, 2023.>

AD058

SOURCE: 85 FR 42284, July 13, 2020, unless otherwise noted.


AUTHORITY: 33 U.S.C. 1251 et seq.

**End of Document**                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD059

 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Prior Version Held Invalid  In re Clean Water Act Rulemaking,  N.D.Cal.,  Oct. 21, 2021

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter D. Water Programs
                Part 121. State Certification of Activities Requiring a Federal License or Permit (Refs & Annos)
                    Subpart A. General

40 C.F.R. § 121.9

§ 121.9 Failure or refusal to act.

Effective: November 27, 2023

Currentness

(a) The certification requirement shall be waived only if a certifying authority fails or refuses to act on a request for certification within the reasonable period of time.

(b) If the Federal agency determines that the certifying authority did not act on a request for certification within the reasonable period of time, the Federal agency shall promptly notify the certifying authority and project proponent in writing that the certification requirement has been waived in accordance with § 121.8. Such notice shall satisfy the project proponent's requirement to obtain certification.

SOURCE: 88 FR 66661, Sept. 27, 2023, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Current through October 11, 2024, 89 FR 82872. Some sections may be more current. See credits for details.

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD060

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter H. Ocean Dumping
Part 230. Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material (Refs & Annos)
Subpart B. Compliance with the Guidelines

40 C.F.R. § 230.10

§ 230.10 Restrictions on discharge.

Currentness

Note: Because other laws may apply to particular discharges and because the Corps of Engineers or State 404 agency may have additional procedural and substantive requirements, a discharge complying with the requirement of these Guidelines will not automatically receive a permit.

Although all requirements in § 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities.

(a) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

(1) For the purpose of this requirement, practicable alternatives include, but are not limited to:

(i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters;

(ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters;

(2) An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.

(3) Where the activity associated with a discharge which is proposed for a special aquatic site (as defined in subpart E) does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

AD061

(4) For actions subject to NEPA, where the Corps of Engineers is the permitting agency, the analysis of alternatives required for NEPA environmental documents, including supplemental Corps NEPA documents, will in most cases provide the information for the evaluation of alternatives under these Guidelines. On occasion, these NEPA documents may address a broader range of alternatives than required to be considered under this paragraph or may not have considered the alternatives in sufficient detail to respond to the requirements of these Guidelines. In the latter case, it may be necessary to supplement these NEPA documents with this additional information.

(5) To the extent that practicable alternatives have been identified and evaluated under a Coastal Zone Management program, a section 208 program, or other planning process, such evaluation shall be considered by the permitting authority as part of the consideration of alternatives under the Guidelines. Where such evaluation is less complete than that contemplated under this subsection, it must be supplemented accordingly.

(b) No discharge of dredged or fill material shall be permitted if it:

(1) Causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard;

(2) Violates any applicable toxic effluent standard or prohibition under section 307 of the Act;

(3) Jeopardizes the continued existence of species listed as endangered or threatened under the Endangered Species Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of a habitat which is determined by the Secretary of Interior or Commerce, as appropriate, to be a critical habitat under the Endangered Species Act of 1973, as amended. If an exemption has been granted by the Endangered Species Committee, the terms of such exemption shall apply in lieu of this subparagraph;

(4) Violates any requirement imposed by the Secretary of Commerce to protect any marine sanctuary designated under title III of the Marine Protection, Research, and Sanctuaries Act of 1972.

(c) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States. Findings of significant degradation related to the proposed discharge shall be based upon appropriate factual determinations, evaluations, and tests required by subparts B and G, after consideration of subparts C through F, with special emphasis on the persistence and permanence of the effects outlined in those subparts. Under these Guidelines, effects contributing to significant degradation considered individually or collectively, include:

(1) Significantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites;

(2) Significantly adverse effects of the discharge of pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site through biological, physical, and chemical processes;

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

(3) Significantly adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy; or

(4) Significantly adverse effects of discharge of pollutants on recreational, aesthetic, and economic values.

(d) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem. Subpart H identifies such possible steps.

SOURCE: 45 FR 85344, Dec. 24, 1980; 80 FR 37115, June 29, 2015; 84 FR 56669, Oct. 22, 2019; 85 FR 22341, April 21, 2020, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Notes of Decisions (314)

Current through October 11, 2024, 89 FR 82872. Some sections may be more current. See credits for details.

---

**End of Document**                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter H. Ocean Dumping
        Part 230. Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material (Refs & Annos)
          Subpart B. Compliance with the Guidelines

40 C.F.R. § 230.11

§ 230.11 Factual determinations.

Currentness

The permitting authority shall determine in writing the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment in light of subparts C through F. Such factual determinations shall be used in § 230.12 in making findings of compliance or non-compliance with the restrictions on discharge in § 230.10. The evaluation and testing procedures described in § 230.60 and § 230.61 of subpart G shall be used as necessary to make, and shall be described in, such determination. The determinations of effects of each proposed discharge shall include the following:

(a) Physical substrate determinations. Determine the nature and degree of effect that the proposed discharge will have, individually and cumulatively, on the characteristics of the substrate at the proposed disposal site. Consideration shall be given to the similarity in particle size, shape, and degree of compaction of the material proposed for discharge and the material constituting the substrate at the disposal site, and any potential changes in substrate elevation and bottom contours, including changes outside of the disposal site which may occur as a result of erosion, slumpage, or other movement of the discharged material. The duration and physical extent of substrate changes shall be considered. The possible loss of environmental values (§ 230.20) and actions to minimize impact (subpart H) shall also be considered in making these determinations. Potential changes in substrate elevation and bottom contours shall be predicted on the basis of the proposed method, volume, location, and rate of discharge, as well as on the individual and combined effects of current patterns, water circulation, wind and wave action, and other physical factors that may affect the movement of the discharged material.

(b) Water circulation, fluctuation, and salinity determinations. Determine the nature and degree of effect that the proposed discharge will have individually and cumulatively on water, current patterns, circulation including downstream flows, and normal water fluctuation. Consideration shall be given to water chemistry, salinity, clarity, color, odor, taste, dissolved gas levels, temperature, nutrients, and eutrophication plus other appropriate characteristics. Consideration shall also be given to the potential diversion or obstruction of flow, alterations of bottom contours, or other significant changes in the hydrologic regime. Additional consideration of the possible loss of environmental values (§§ 230.23 through 230.25) and actions to minimize impacts (subpart H), shall be used in making these determinations. Potential significant effects on the current patterns, water circulation, normal water fluctuation and salinity shall be evaluated on the basis of the proposed method, volume, location, and rate of discharge.

(c) Suspended particulate/turbidity determinations. Determine the nature and degree of effect that the proposed discharge will have, individually and cumulatively, in terms of potential changes in the kinds and concentrations of suspended particulate/turbidity in the vicinity of the disposal site. Consideration shall be given to the grain size of the material proposed for discharge,

AD064

the shape and size of the plume of suspended particulates, the duration of the discharge and resulting plume and whether or not the potential changes will cause violations of applicable water quality standards. Consideration should also be given to the possible loss of environmental values (§ 230.21) and to actions for minimizing impacts (subpart H). Consideration shall include the proposed method, volume, location, and rate of discharge, as well as the individual and combined effects of current patterns, water circulation and fluctuations, wind and wave action, and other physical factors on the movement of suspended particulates.

(d) Contaminant determinations. Determine the degree to which the material proposed for discharge will introduce, relocate, or increase contaminants. This determination shall consider the material to be discharged, the aquatic environment at the proposed disposal site, and the availability of contaminants.

(e) Aquatic ecosystem and organism determinations. Determine the nature and degree of effect that the proposed discharge will have, both individually and cumulatively, on the structure and function of the aquatic ecosystem and organisms. Consideration shall be given to the effect at the proposed disposal site of potential changes in substrate characteristics and elevation, water or substrate chemistry, nutrients, currents, circulation, fluctuation, and salinity, on the recolonization and existence of indigenous aquatic organisms or communities. Possible loss of environmental values (§ 230.31), and actions to minimize impacts (subpart H) shall be examined. Tests as described in § 230.61 (Evaluation and Testing), may be required to provide information on the effect of the discharge material on communities or populations of organisms expected to be exposed to it.

(f) Proposed disposal site determinations.

(1) Each disposal site shall be specified through the application of these Guidelines. The mixing zone shall be confined to the smallest practicable zone within each specified disposal site that is consistent with the type of dispersion determined to be appropriate by the application of these Guidelines. In a few special cases under unique environmental conditions, where there is adequate justification to show that widespread dispersion by natural means will result in no significantly adverse environmental effects, the discharged material may be intended to be spread naturally in a very thin layer over a large area of the substrate rather than be contained within the disposal site.

(2) The permitting authority and the Regional Administrator shall consider the following factors in determining the acceptability of a proposed mixing zone:

(i) Depth of water at the disposal site;

(ii) Current velocity, direction, and variability at the disposal site;

(iii) Degree of turbulence;

(iv) Stratification attributable to causes such as obstructions, salinity or density profiles at the disposal site;

(v) Discharge vessel speed and direction, if appropriate;

(vi) Rate of discharge;

AD065

(vii) Ambient concentration of constituents of interest;

(viii) Dredged material characteristics, particularly concentrations of constituents, amount of material, type of material (sand, silt, clay, etc.) and settling velocities;

(ix) Number of discharge actions per unit of time;

(x) Other factors of the disposal site that affect the rates and patterns of mixing.

(g) Determination of cumulative effects on the aquatic ecosystem.

(1) Cumulative impacts are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material. Although the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems.

(2) Cumulative effects attributable to the discharge of dredged or fill material in waters of the United States should be predicted to the extent reasonable and practical. The permitting authority shall collect information and solicit information from other sources about the cumulative impacts on the aquatic ecosystem. This information shall be documented and considered during the decision-making process concerning the evaluation of individual permit applications, the issuance of a General permit, and monitoring and enforcement of existing permits.

(h) Determination of secondary effects on the aquatic ecosystem.

(1) Secondary effects are effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material. Information about secondary effects on aquatic ecosystems shall be considered prior to the time final section 404 action is taken by permitting authorities.

(2) Some examples of secondary effects on an aquatic ecosystem are fluctuating water levels in an impoundment and downstream associated with the operation of a dam, septic tank leaching and surface runoff from residential or commercial developments on fill, and leachate and runoff from a sanitary landfill located in waters of the U.S. Activities to be conducted on fast land created by the discharge of dredged or fill material in waters of the United States may have secondary impacts within those waters which should be considered in evaluating the impact of creating those fast lands.

SOURCE: 45 FR 85344, Dec. 24, 1980; 80 FR 37115, June 29, 2015; 84 FR 56669, Oct. 22, 2019; 85 FR 22341, April 21, 2020, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

AD066

Notes of Decisions (38)

Current through October 11, 2024, 89 FR 82872. Some sections may be more current. See credits for details.

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    4

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter H. Ocean Dumping
Part 230. Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material (Refs & Annos)
Subpart B. Compliance with the Guidelines

40 C.F.R. § 230.12

§ 230.12 Findings of compliance or noncompliance with the restrictions on discharge.

Effective: June 9, 2008

Currentness

(a) On the basis of these Guidelines (subparts C through G) the proposed disposal sites for the discharge of dredged or fill material must be:

(1) Specified as complying with the requirements of these Guidelines; or

(2) Specified as complying with the requirements of these Guidelines with the inclusion of appropriate and practicable discharge conditions (see subparts H and J) to minimize pollution or adverse effects to the affected aquatic ecosystems; or

(3) Specified as failing to comply with the requirements of these Guidelines where:

(i) There is a practicable alternative to the proposed discharge that would have less adverse effect on the aquatic ecosystem, so long as such alternative does not have other significant adverse environmental consequences; or

(ii) The proposed discharge will result in significant degradation of the aquatic ecosystem under § 230.10(b) or (c); or

(iii) The proposed discharge does not include all appropriate and practicable measures to minimize potential harm to the aquatic ecosystem; or

(iv) There does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with these Guidelines.

(b) Findings under this section shall be set forth in writing by the permitting authority for each proposed discharge and made available to the permit applicant. These findings shall include the factual determinations required by § 230.11, and a brief explanation of any adaptation of these Guidelines to the activity under consideration. In the case of a General permit, such findings shall be prepared at the time of issuance of that permit rather than for each subsequent discharge under the authority of that permit.

AD068

**Credits**

[73 FR 19687, April 10, 2008]


SOURCE: 45 FR 85344, Dec. 24, 1980; 80 FR 37115, June 29, 2015; 84 FR 56669, Oct. 22, 2019; 85 FR 22341, April 21, 2020, unless otherwise noted.


AUTHORITY: 33 U.S.C. 1251 et seq.


Notes of Decisions (11)

Current through October 11, 2024, 89 FR 82872. Some sections may be more current. See credits for details.

    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter H. Ocean Dumping
Part 230. Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material (Refs & Annos)
Subpart A. General

40 C.F.R. § 230.2

§ 230.2 Applicability.

Currentness

(a) These Guidelines have been developed by the Administrator of the Environmental Protection Agency in conjunction with the Secretary of the Army acting through the Chief of Engineers under section 404(b)(1) of the Clean Water Act (33 U.S.C. 1344). The Guidelines are applicable to the specification of disposal sites for discharges of dredged or fill material into waters of the United States. Sites may be specified through:

(1) The regulatory program of the U.S. Army Corps of Engineers under sections 404(a) and (e) of the Act (see 33 CFR Parts 320, 323 and 325);

(2) The civil works program of the U.S. Army Corps of Engineers (see 33 CFR 209.145 and section 150 of Pub.L. 94–587, Water Resources Development Act of 1976);

(3) Permit programs of States approved by the Administrator of the Environmental Protection Agency in accordance with section 404(g) and (h) of the Act (see 40 CFR parts 122, 123 and 124);

(4) Statewide dredged or fill material regulatory programs with best management practices approved under section 208(b) (4)(B) and (C) of the Act (see 40 CFR 35.1560);

(5) Federal construction projects which meet criteria specified in section 404(r) of the Act.

(b) These Guidelines will be applied in the review of proposed discharges of dredged or fill material into navigable waters which lie inside the baseline from which the territorial sea is measured, and the discharge of fill material into the territorial sea, pursuant to the procedures referred to in paragraphs (a)(1) and (2) of this section. The discharge of dredged material into the territorial sea is governed by the Marine Protection, Research, and Sanctuaries Act of 1972, Pub.L. 92–532, and regulations and criteria issued pursuant thereto (40 CFR parts 220 through 228).

(c) Guidance on interpreting and implementing these Guidelines may be prepared jointly by EPA and the Corps at the national or regional level from time to time. No modifications to the basic application, meaning, or intent of these Guidelines will be made without rulemaking by the Administrator under the Administrative Procedure Act (5 U.S.C. 551 et seq.).

AD070

SOURCE: 45 FR 85344, Dec. 24, 1980; 80 FR 37115, June 29, 2015; 84 FR 56669, Oct. 22, 2019; 85 FR 22341, April 21, 2020, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Notes of Decisions (35)

Current through October 22, 2024, 89 FR 84303. Some sections may be more current. See credits for details.

     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD071

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter H. Ocean Dumping
        Part 230. Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material (Refs & Annos)
          Subpart C. Potential Impacts on Physical and Chemical Characteristics of the Aquatic Ecosystem (Refs & Annos)

40 C.F.R. § 230.21

§ 230.21 Suspended particulates/turbidity.

Currentness

(a) Suspended particulates in the aquatic ecosystem consist of fine-grained mineral particles, usually smaller than silt, and organic particles. Suspended particulates may enter water bodies as a result of land runoff, flooding, vegetative and planktonic breakdown, resuspension of bottom sediments, and man's activities including dredging and filling. Particulates may remain suspended in the water column for variable periods of time as a result of such factors as agitation of the water mass, particulate specific gravity, particle shape, and physical and chemical properties of particle surfaces.

(b) Possible loss of environmental characteristics and values: The discharge of dredged or fill material can result in greatly elevated levels of suspended particulates in the water column for varying lengths of time. These new levels may reduce light penetration and lower the rate of photosynthesis and the primary productivity of an aquatic area if they last long enough. Sight-dependent species may suffer reduced feeding ability leading to limited growth and lowered resistance to disease if high levels of suspended particulates persist. The biological and the chemical content of the suspended material may react with the dissolved oxygen in the water, which can result in oxygen depletion. Toxic metals and organics, pathogens, and viruses absorbed or adsorbed to fine-grained particulates in the material may become biologically available to organisms either in the water column or on the substrate. Significant increases in suspended particulate levels create turbid plumes which are highly visible and aesthetically displeasing. The extent and persistence of these adverse impacts caused by discharges depend upon the relative increase in suspended particulates above the amount occurring naturally, the duration of the higher levels, the current patterns, water level, and fluctuations present when such discharges occur, the volume, rate, and duration of the discharge, particulate deposition, and the seasonal timing of the discharge.

SOURCE: 45 FR 85344, Dec. 24, 1980; 80 FR 37115, June 29, 2015; 84 FR 56669, Oct. 22, 2019; 85 FR 22341, April 21, 2020, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Current through October 11, 2024, 89 FR 82872. Some sections may be more current. See credits for details.

     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD072

Case: 24-3831    Document: 26    Filed: 10/28/2024    Page: 146

T. 40, Ch. I, Subch. H, Pt. 230, Subpt. C, Refs & Annos, C.F.R. T. 40, Ch. I, Subch. H,...

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency
      Subchapter H. Ocean Dumping
        Part 230. Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material
          Subpart C. Potential Impacts on Physical and Chemical Characteristics of the Aquatic Ecosystem

C.F.R. T. 40, Ch. I, Subch. H, Pt. 230, Subpt. C, Refs & Annos

Currentness

Note: The effects described in this subpart should be considered in making the factual determinations and the findings of compliance or non-compliance in Subpart B.

Current through October 11, 2024, 89 FR 82872. Some sections may be more current. See credits for details.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter H. Ocean Dumping
        Part 230. Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material (Refs & Annos)
          Subpart E. Potential Impacts on Special Aquatic Sites (Refs & Annos)

40 C.F.R. § 230.41

§ 230.41 Wetlands.

Currentness

(a)(1) Wetlands consist of areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.

(2) Where wetlands are adjacent to open water, they generally constitute the transition to upland. The margin between wetland and open water can best be established by specialists familiar with the local environment, particularly where emergent vegetation merges with submerged vegetation over a broad area in such places as the lateral margins of open water, headwaters, rainwater catch basins, and groundwater seeps. The landward margin of wetlands also can best be identified by specialists familiar with the local environment when vegetation from the two regions merges over a broad area.

(3) Wetland vegetation consists of plants that require saturated soils to survive (obligate wetland plants) as well as plants, including certain trees, that gain a competitive advantage over others because they can tolerate prolonged wet soil conditions and their competitors cannot. In addition to plant populations and communities, wetlands are delimited by hydrological and physical characteristics of the environment. These characteristics should be considered when information about them is needed to supplement information available about vegetation, or where wetland vegetation has been removed or is dormant.

(b) Possible loss of values: The discharge of dredged or fill material in wetlands is likely to damage or destroy habitat and adversely affect the biological productivity of wetlands ecosystems by smothering, by dewatering, by permanently flooding, or by altering substrate elevation or periodicity of water movement. The addition of dredged or fill material may destroy wetland vegetation or result in advancement of succession to dry land species. It may reduce or eliminate nutrient exchange by a reduction of the system's productivity, or by altering current patterns and velocities. Disruption or elimination of the wetland system can degrade water quality by obstructing circulation patterns that flush large expanses of wetland systems, by interfering with the filtration function of wetlands, or by changing the aquifer recharge capability of a wetland. Discharges can also change the wetland habitat value for fish and wildlife as discussed in subpart D. When disruptions in flow and circulation patterns occur, apparently minor loss of wetland acreage may result in major losses through secondary impacts. Discharging fill material in wetlands as part of municipal, industrial or recreational development may modify the capacity of wetlands to retain and store floodwaters and to serve as a buffer zone shielding upland areas from wave actions, storm damage and erosion.

AD074

SOURCE: 45 FR 85344, Dec. 24, 1980; 80 FR 37115, June 29, 2015; 84 FR 56669, Oct. 22, 2019; 85 FR 22341, April 21, 2020, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Notes of Decisions (62)

Current through October 11, 2024, 89 FR 82872. Some sections may be more current. See credits for details.

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD075

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter H. Ocean Dumping
        Part 230. Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material (Refs & Annos)
          Subpart E. Potential Impacts on Special Aquatic Sites (Refs & Annos)

40 C.F.R. § 230.45

§ 230.45 Riffle and pool complexes.

Currentness

(a) Steep gradient sections of streams are sometimes characterized by riffle and pool complexes. Such stream sections are recognizable by their hydraulic characteristics. The rapid movement of water over a coarse substrate in riffles results in a rough flow, a turbulent surface, and high dissolved oxygen levels in the water. Pools are deeper areas associated with riffles. Pools are characterized by a slower stream velocity, a steaming flow, a smooth surface, and a finer substrate. Riffle and pool complexes are particularly valuable habitat for fish and wildlife.

(b) Possible loss of values: Discharge of dredged or fill material can eliminate riffle and pool areas by displacement, hydrologic modification, or sedimentation. Activities which affect riffle and pool areas and especially riffle/pool ratios, may reduce the aeration and filtration capabilities at the discharge site and downstream, may reduce stream habitat diversity, and may retard repopulation of the disposal site and downstream waters through sedimentation and the creation of unsuitable habitat. The discharge of dredged or fill material which alters stream hydrology may cause scouring or sedimentation of riffles and pools. Sedimentation induced through hydrological modification or as a direct result of the deposition of unconsolidated dredged or fill material may clog riffle and pool areas, destroy habitats, and create anaerobic conditions. Eliminating pools and meanders by the discharge of dredged or fill material can reduce water holding capacity of streams and cause rapid runoff from a watershed. Rapid runoff can deliver large quantities of flood water in a short time to downstream areas resulting in the destruction of natural habitat, high property loss, and the need for further hydraulic modification.

Note: Possible actions to minimize adverse impacts on site or material characteristics can be found in subpart H.

SOURCE: 45 FR 85344, Dec. 24, 1980; 80 FR 37115, June 29, 2015; 84 FR 56669, Oct. 22, 2019; 85 FR 22341, April 21, 2020, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Current through October 11, 2024, 89 FR 82872. Some sections may be more current. See credits for details.

End of Document                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD076

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    1

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter H. Ocean Dumping
        Part 230. Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material (Refs & Annos)
          Subpart H. Actions to Minimize Adverse Effects (Refs & Annos)

40 C.F.R. § 230.74

§ 230.74 Actions related to technology.

Currentness

Discharge technology should be adapted to the needs of each site. In determining whether the discharge operation sufficiently minimizes adverse environmental impacts, the applicant should consider:

(a) Using appropriate equipment or machinery, including protective devices, and the use of such equipment or machinery in activities related to the discharge of dredged or fill material;

(b) Employing appropriate maintenance and operation on equipment or machinery, including adequate training, staffing, and working procedures;

(c) Using machinery and techniques that are especially designed to reduce damage to wetlands. This may include machines equipped with devices that scatter rather than mound excavated materials, machines with specially designed wheels or tracks, and the use of mats under heavy machines to reduce wetland surface compaction and rutting;

(d) Designing access roads and channel spanning structures using culverts, open channels, and diversions that will pass both low and high water flows, accommodate fluctuating water levels, and maintain circulation and faunal movement;

(e) Employing appropriate machinery and methods of transport of the material for discharge.

SOURCE: 45 FR 85344, Dec. 24, 1980; 73 FR 19687, April 10, 2008; 80 FR 37115, June 29, 2015; 84 FR 56669, Oct. 22, 2019; 85 FR 22341, April 21, 2020, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1251 et seq.

Current through October 17, 2024, 89 FR 83631. Some sections may be more current. See credits for details.

End of Document                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

AD077

**STANDING DECLARATIONS**

No.  24-3831

---

IN THE UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

SIERRA CLUB and APPALACHIAN VOICES,

*Petitioners,*

v.

UNITED STATES ARMY CORPS OF ENGINEERS, CHRISTINE E.
WORMUTH, in her official capacity as Secretary of the U.S. Army;
LIEUTENANT GENERAL WILLIAM H. GRAHAM, JR., in his official capacity
as U.S. Army Chief of Engineers and Commanding General of the U.S. Army
Corps of Engineers; LIEUTENANT COLONEL ROBERT W. GREEN, in his
official capacity as District Commander of the U.S. Army Corps of Engineers,
Nashville District, and JOSHUA FROST, in his official capacity as Chief,
Regulatory Division, U.S. Army Corps of Engineers, Nashville District

*Respondents.*

---

**DECLARATION OF ROBERT CONNOR**

I, Robert Connor, hereby declare and state as follows:

     1.    This declaration is based on my personal knowledge, information, and

belief. I am over the age of eighteen and competent to testify.

2.      I am a current member of the Sierra Club. I have supported the organization for a long time and officially became a member in 2023. I joined the Sierra Club because of my interest in the environment and concern for my local environment. I actively participate in my local Sierra Club chapter's events.

3.      I understand that Sierra Club is challenging a Clean Water Act Section 404 Permit issued by the United States Army Corps of Engineers (the "Corps") to Tennessee Gas Pipeline Company, LLC ("TGP") for the construction of a gas pipeline ("the Cumberland Pipeline") meant to service the Tennessee Valley Authority's ("TVA") proposed new gas plant at its Cumberland City, Tennessee facility.

4.      I own a 160-acre farm located in Cumberland Furnace, Tennessee. The proposed Cumberland Pipeline is slated to cross my farm, running parallel to TVA's existing transmission lines. As proposed, the Cumberland Pipeline will cross three creeks on my property as well as a fourth creek that constitutes the property boundary between me and a neighboring landowner. All four of these creeks are tributaries to Dry Hollow Branch.

5.      My father purchased the farm in 1983 and lived there until his death. My sister and I inherited the farm in 2010, and I have since purchased my sister's share. There is an old, unoccupied farmhouse on the property as well as a barn and some outbuildings. I keep some farm equipment in the barn, including a tractor. I

use my farm primarily to grow hay and lumber. I have an agreement with a neighboring Mennonite family who clears the hay in exchange for a share of it. There are also a number of trails on my property that I frequently hike. I spend as much of my time at the farm as I can.

6.      I have aesthetic, recreational, and property interests in the unnamed tributaries to Dry Hollow Branch located on my property. The areas around the creeks are my favorite areas to walk, hike, and observe wildlife, which I enjoy doing when I am at the farm. A multitude of wildlife tends to congregate along these waterways, including rabbits, deer, turkey, and a variety of birds. Occasionally, I will see bald eagles. In addition to regularly walking or hiking along these waterways and looking at the wildlife, I also occasionally hunt for deer in these areas.

7.      I am currently retired. Before retiring in 2015, I worked at Chevron for 34 years in various capacities, including as a drilling engineer, facilities engineer, and field superintendent. In my roles, I oversaw the construction of various projects, including gas pipelines. I also worked to ensure safety and environmental compliance at such projects. As a former pipeline engineer, I am very aware of the risks and dangers presented by construction and operation of infrastructure like the proposed Cumberland Pipeline.

8.      The Section 404 Permit would authorize TGP to use open-cut, dry-ditch crossing methods to construct the pipeline across the creeks on my farm. Based on

my experience as a pipeline engineer, my review of scientific literature, and pictures I have seen of other pipeline construction projects utilizing this method, I know that this trenched crossing method often causes increased sedimentation in waterbodies which harms, among other things, water quality and aquatic life. I also understand that multiple waterbody crossings in the same watershed can cause permanent impacts to waters.

9.    I am concerned that construction of the Cumberland Pipeline will cause increased sedimentation in the creeks on my property and long-term harm to water quality and aquatic life in these and downstream waters. I am also concerned that these impacts, as well as the noise from pipeline construction, will disrupt wildlife habitat or drive wildlife away altogether so that I won't be able to enjoy viewing wildlife when hiking and walking on my property. These concerns harm my aesthetic, recreational, and property interests in these creeks as well as my use and enjoyment of my property.

10.    When my family comes to visit, I enjoy taking the kids fishing in a spring-fed creek on my property. I have reviewed an environmental analysis concerning the construction of another pipeline which recognizes that both groundwater quality and quantity can be negatively impacted during pipeline construction activity. I am concerned that construction of the Cumberland Pipeline could negatively impact groundwater, which could adversely affect this spring-fed

creek. If the creek's water quantity or quality were negatively impacted by construction of the Cumberland Pipeline, I would fish less, if at all, in this creek.

11.    I also have recreational interests in Furnace Creek. The creeks on my property flow to Dry Hollow Branch, which is a tributary of Furnace Creek. Furnace Creek will also be crossed by the Cumberland Pipeline using a dry open-cut method. Downstream of where the Cumberland Pipeline will cross Furnace Creek, there is a local park abutting Furnace Creek called Cumberland Furnace Park. My relatives visit me on the farm multiple times a year, and when they visit, I enjoy taking the kids to play in the park and swim in Furnace Creek. Given the multiple trenched pipeline crossings upstream of this park, I am concerned that the area where I take my relatives to swim will become degraded due to increased sedimentation and related impacts. These concerns harm my recreational interests in Furnace Creek. If that creek becomes muddy and sediment laden, I will not take my family to swim at that park as frequently as I do now.

12.    The Cumberland Pipeline right-of-way will require a 50-foot permanent easement on my land. TGP will also utilize an additional 50-foot to 100-foot temporary easement for its construction work. TGP will remove all of the trees for this temporary easement. That land is currently heavily forested.

13.    I have been working with the Natural Resources Conservation Service ("NRCS"), part of the U.S. Department of Agriculture, to improve the timber and

forest health and to promote wildlife on my property. As part of that effort, I have spent considerable time and resources working on and submitting grant requests to NRCS, and I have commissioned a Forest Management Plan to guide this work. I was recently awarded a $38,528.14 grant by NRCS to engage in forest stand improvement and habitat development on approximately 100 acres my land. I recently completed that work, which includes brush management, invasive vegetation removal, and tree planting. I used part of that money to improve approximately 1.1 acres of forestland that now falls within TGP's construction right-of-way easement. All of the work that I did to improve that forestland will be wasted if the area is cleared for construction of the Cumberland Pipeline. My enjoyment of my time on my farm will be diminished by the clearing of that area.

14.    I have also been approved for more grant money from NRCS to establish better quality deer habitat on my property. I planned to improve an additional six-acre lot that is also now part of the Cumberland Pipeline construction right-of-way. I have been forced to put that project on hold as I wait to see whether the Cumberland Pipeline will be constructed across my property.

15.    As a former pipeline engineer, I am very aware of the risks and dangers of operation of the proposed Cumberland Pipeline. I understand that TGP intends to bury the pipeline at a depth of between 30 to 36 inches. Given the area's hilly terrain, the constant water runoff and erosion, and my and others' use of farm equipment

like cultivators and plows, the risk of rupturing the pipeline underground is a serious concern. If the pipeline were to rupture in or near the waterbodies on my property, the pipeline would leak not only methane gas, but also liquid hydrocarbons into the waterbodies. Release of these substances could cause long-term damage to water quality and aquatic life in my creeks and downstream waterways.

16.     I am also very concerned about the Cumberland Pipeline's placement adjacent to the existing transmission lines that cross my property. These transmission lines in particular are among the highest voltage lines in TVA's transmission system at 500 kV. I can feel the hairs on my arms stand up whenever I walk under the lines. The particularly strong current running through these transmission lines has the potential to induce a current in any surrounding metal. This poses a number of risks, including the potential to erode the Cumberland Pipeline's cathodic protections, thereby heightening the risk of a leak, as well as the potential to ignite any leaked gas if the pipeline were to rupture.

17.     Given the high voltage of the transmission lines that cross my property, and based on my experience as a pipeline engineer, I am concerned about the heightened risk of an incident and a pipeline explosion occurring. The potential damage of such an ignition is tremendous. I estimate that anything within 500 feet of the pipeline would be incinerated and anything within 1000 feet would be seriously burned. Such an explosion would negatively impact my property for a long

time, including by damaging my commercial hay crop, timber, equipment, and the buildings on my property, as well as degrading my waterways and driving away wildlife. An explosion also poses a threat to my safety. I spend a significant amount of time on the farm and so am in danger of personal harm or death in the event of a pipeline malfunction. Even if the Cumberland Pipeline does not explode, I will visit my property less frequently and avoid the pipeline right-of-way if the pipeline is constructed due to my concerns about the risk of explosion.

18.    I do not want to give up an easement for the Cumberland Pipeline. A pipeline easement would impair my land and creeks, prevent me from further improving my forestland, drive away wildlife, and interfere with my ability to use and enjoy this property that is so important to me and my family.

19.    Because the Section 404 Permit is necessary for pipeline construction, the Corps's issuance of that permit to TGP is a cause of my concerns about the Cumberland Pipeline's threats to my aesthetic, recreational, and property interests.

20.    I believe that a favorable decision in this matter, including, but not limited to, a decision to vacate the Corps's issuance of the Section 404 Permit to TGP, would provide redress for the injuries to my aesthetic, recreational, and property interests as described above.

21.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 26, 2024.

Robert Connor

No.  24-3831

IN THE UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

SIERRA CLUB and APPALACHIAN VOICES,

*Petitioners,*

v.

UNITED STATES ARMY CORPS OF ENGINEERS, CHRISTINE E.
WORMUTH, in her official capacity as Secretary of the U.S. Army;
LIEUTENANT GENERAL WILLIAM H. GRAHAM, JR., in his official capacity
as U.S. Army Chief of Engineers and Commanding General of the U.S. Army
Corps of Engineers; LIEUTENANT COLONEL ROBERT W. GREEN, in his
official capacity as District Commander of the U.S. Army Corps of Engineers,
Nashville District, and JOSHUA FROST, in his official capacity as Chief,
Regulatory Division, U.S. Army Corps of Engineers, Nashville District

*Respondents.*

**DECLARATION OF CHARLES CROW**

I, Charles Crow, hereby declare and state as follows:

1.     This declaration is based on my personal knowledge, information, and belief. I am over the age of 18 and competent to testify. If called upon to testify, I would testify under oath to the statements below.

2.     I am a member of the Sierra Club. I joined the Sierra Club in 2001 so that my deeply held conservation values are represented by an organization with the ability to protect the environment, not just document its decline.

3.     I understand that Sierra Club is challenging a Clean Water Act Section 404 Permit issued by the United States Army Corps of Engineers (the "Corps") to Tennessee Gas Pipeline Company, LLC ("TGP") for the construction of a gas pipeline ("the Cumberland Pipeline") meant to service the Tennessee Valley Authority's ("TVA") proposed new gas plant at its Cumberland City, Tennessee facility.

4.     My interest in and desire to protect the environment are based on my love for my community and the environment, but they also stem from my education and professional experiences.

5.     After attending Clarksville High School, I received a Bachelor of Science degree from Austin Peay State University, where I majored in biology and minored in geology and chemistry. Following college, I began a graduate program in environmental sciences, but I did not complete the degree because I entered the National Guard. Upon returning from my National Guard service, I began working

at the Tennessee Department of Health—now known as TDEC—as an environmental specialist.

6.      I retired from TDEC in 2004 after thirty-two years of work. I was a supervisor for environmental specialists in Montgomery County when I retired. During my career at TDEC, I worked in the groundwater protection division.

7.      I live on an 87-acre property about seven miles from the Cumberland Fossil Plant. My property is mostly wooded with a few open fields, and it abuts Yellow Creek, which runs along the entire back portion of my property. The Cumberland Pipeline is proposed to cross Yellow Creek approximately a mile and a half upstream from my property, and it will also cross several tributaries of Yellow Creek upstream from my property. I understand that TGP intends to cross Yellow Creek using a Horizontal Directional Drilling ("HDD") crossing method but will use a dry-ditch, open-cut crossing method on Yellow Creek's tributaries upstream from my property. I also understand that TGP will have to trench through at least one of these tributaries multiple times.

8.      I have personal aesthetic, recreational, and property interests in the waters of Yellow Creek and its tributaries. I, along with my family, frequently recreate in Yellow Creek, and we spend a lot of time in its waters and along its banks near my property. We commonly invite friends and family over and have cook-outs along Yellow Creek, go swimming, and entertain guests on the gravel bar in the

creek. I also help my great-nieces and great-nephews look for crawdads and salamanders in the creek, as the water is clear enough that you can see the bottom up to six or seven feet deep. The kids snorkel and swim around looking at the aquatic life in the creek and find minnows and interesting rocks, fossils, and arrowheads. They will bring their discovered treasures to me, and I enjoy helping them identify what they have found. I get so much joy from spending time with my family and friends in and around the creek, teaching the next generation about nature, and seeing everyone enjoy it. I want to continue to be able to use and enjoy Yellow Creek in these ways.

9.      I also frequently fish in Yellow Creek, which is a fantastic smallmouth bass fishery. I have fished in the creek for many years, even before I bought my property, and I would like to continue doing so in the future. I usually wet wade into Yellow Creek and fly fish from my property. My great-nieces and great-nephews will sometimes fish with me, and I am currently teaching several of them to fish. We enjoy spending this time with each other in Yellow Creek.

10.     I used to paddle often in Yellow Creek. I would paddle upstream and downstream from our property, and I have explored by boat some of the tributaries to Yellow Creek that the Cumberland Pipeline will cross. I had surgery on my knee last year, so I cannot currently paddle as much as I used to. My family and guests

still paddle in Yellow Creek, and I enjoy seeing them using our kayaks and exploring our natural surroundings.

11.    I am concerned that construction impacts due to sedimentation from open-cut crossing methods and drilling mud releases from HDD will burden Yellow Creek and its tributaries. Increased sediment loads will adversely impact these waterways and the aquatic life that resides in them, including the portion of Yellow Creek abutting my property. I have seen pictures from an open-cut pipeline construction crossing in West Virginia where sediment was visible in a stream 19 miles downstream from the crossing. I have also reviewed scientific literature which concludes that open-cut crossing methods can cause both short- and long-term impacts to aquatic life, its habitat, and its reproductive success. This literature also finds that multiple crossings in the same watershed can have permanent effects on streams. My aesthetic and recreational interests in Yellow Creek and my enjoyment of that stream are harmed by my concerns about the serious sedimentation threats to Yellow Creek from construction of the proposed Cumberland Pipeline.

12.    If construction of the Cumberland Pipeline proceeds as authorized by the Section 404 Permit, I will not fish as often in Yellow Creek in the future or enjoy that activity as much as I do now. To remain a great fishery, Yellow Creek needs abundant minnows and crawdads which in turn rely on healthy insect populations and clean water. Right now, those critters are all there, but pipeline construction

activity in and around the creek seriously threatens invertebrates directly and adversely, which would in turn harm the vertebrate population.

13.    Likewise, my use and enjoyment of Yellow Creek will be impaired by the risks created by pipeline construction. This includes the risk that the waters may become so muddy from construction of the Cumberland Pipeline that my great-nieces and great-nephews are no longer able to find crawdads, minnows, and interesting artifacts in the creek to share with me due to loss of habitat and poor visibility underwater.

14.    Buying and living on this property has been the realization of a dream for me and my wife. We spent our careers working in order to find a place like this where we could retire. We loved coming to Yellow Creek before we ever bought this land, and when this property along the creek came up for sale, we knew that this was the place where we wanted to live.

15.    My house is located on a bluff overlooking Yellow Creek. The side of my house overlooking the creek is full of windows, and I enjoy looking out of those windows or standing on my back porch and seeing the clear water in the creek down below. The view is gorgeous. Yellow Creek is one of the first things I see when I wake up every morning, and it is the backdrop to my day as I move around the house. On clear and bright days, I can see the water sparkling in Yellow Creek from sunlight and shiner minnows.

16.     One of my favorite pastimes at home is to watch all of the birds and wildlife that reside in the area and use Yellow Creek. A great blue heron frequently fishes in Yellow Creek just below my house, and I really enjoy watching him at work. Canada geese nest here, and I enjoy hearing them flying up and down the creek. Recently I've been really excited to see nesting bald eagles move into the area, and I believe they came here primarily to be close to Yellow Creek. Over the past year, I have seen bald eagles while sitting on my porch.

17.     Construction impacts from the Cumberland Pipeline will reduce my use and enjoyment of not only Yellow Creek but also my property. I will be really sad to look out of my window and think about the serious threat that the Cumberland Pipeline poses to the clear waters of Yellow Creek below. Sediment in Yellow Creek would destroy the creek's natural beauty that I so value.

18.     The risk of a sediment-choked Yellow Creek also threatens my ability to observe the wildlife that use the creek and reside on my property. I worry that it will be difficult for the great blue heron and bald eagles to fish in cloudy, dirty water, and that these birds will abandon the area. I also worry that the other wildlife I so enjoy seeing on my property—critters like deer and turkey—will leave to search for cleaner drinking water, and that I won't be able to see these animals as often from my house or along the trails on my property. I don't believe any amount of money would compensate losing my use and enjoyment of Yellow Creek in its current state.

19.    I am also concerned about the health impacts of operating a gas pipeline. Methane is a deadly gas, and I think leaks from the Cumberland Pipeline could have harmful consequences on Yellow Creek, wildlife in the area, and human health, including my own.

20.    I utilize a private water well on my property. This well used to be our drinking water source, but my house is now hooked up to city water. However, I still use this well to irrigate my vegetable and flower gardens. I have reviewed a Federal Energy Regulatory Commission Environmental Impact Statement for a pipeline that acknowledges that blasting when constructing a pipeline can negatively impact both the quality and quantity of nearby groundwater, which can in turn negatively affect wells. As a result, I am concerned that blasting for the Cumberland Pipeline could decrease the amount of water I have available to use for irrigation on my property. City water is expensive, and if I am no longer able to use my private well water, my water bill will go up dramatically, as I will need to use city water to irrigate my gardens.

21.    Because the Section 404 Permit is necessary for pipeline construction and the crossing of Yellow Creek and its tributaries, the Corps's issuance of that permit to TGP is a cause of my concerns about the Cumberland Pipeline's threats to my aesthetic, recreational, and property interests.

22.    I believe that a favorable decision in this matter, including, but not limited to, a decision to vacate the Corps's issuance of the Section 404 Permit to TGP, would provide redress for the injuries to my aesthetic, recreational, and property interests as described above.

23.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on September 25, 2024.

Charles Crow

No. 24-3831

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

SIERRA CLUB and APPALACHIAN VOICES,

*Petitioners,*

v.

UNITED STATES ARMY CORPS OF ENGINEERS, CHRISTINE E.
WORMUTH, in her official capacity as Secretary of the U.S. Army;
LIEUTENANT GENERAL WILLIAM H. GRAHAM, JR., in his official capacity
as U.S. Army Chief of Engineers and Commanding General of the U.S. Army
Corps of Engineers; LIEUTENANT COLONEL ROBERT W. GREEN, in his
official capacity as District Commander of the U.S. Army Corps of Engineers,
Nashville District, and JOSHUA FROST, in his official capacity as Chief,
Regulatory Division, U.S. Army Corps of Engineers, Nashville District

*Respondents.*

**DECLARATION OF ANGELA MUMMAW**

I, Angela Mummaw, hereby do declare and state as follows:

1.      I have personal knowledge of the following and could competently testify thereto
if called as a witness.

2.      I am a member of Appalachian Voices and currently serve as Appalachian Voices'
Middle Tennessee Organizer. I spend nearly all my time in that role organizing opposition to the
Tennessee Valley Authority's ("TVA") proposed gas plant in Cumberland City, Tennessee and
Tennessee Gas Pipeline, LLC's ("TGP") proposed pipeline ("Cumberland Pipeline"), which
would service that plant. This work includes speaking to affected landowners and community
members, attending public meetings, and submitting comments advocating that TVA replace its

aging coal-fired power plant in Cumberland City with clean energy sources.

3.      As an employee of Appalachian Voices, I am familiar with the membership roster for the organization. Currently, Appalachian Voices has 908 members in Central and Southern Appalachia, including Tennessee. Based on my role, I also have access to and am aware of membership data for specific members, and I know that Steven Schafer was a member on September 24, 2024, and remains a current and active member of Appalachian Voices.

4.      Appalachian Voices is a grassroots advocacy organization which seeks to advance healthy communities and environmental protection in the Appalachian region. As part of its work, Appalachian Voices seeks to shift the region away from fossil fuel dependency to a clean and just energy future. Part of that work includes opposing unnecessary gas pipelines.

5.      Appalachian Voices and its members have a robust presence in Tennessee. Appalachian Voices has an office in Knoxville, Tennessee, and its employees and members are very concerned about TVA's proposed gas buildout in the state and the pipeline infrastructure that is necessary to support that buildout. Instead of doubling down on gas plants, Appalachian Voices and its members want TVA to provide renewable and clean energy to the region as well as renewable and clean energy jobs to the citizens of Tennessee.

6.      As part of our opposition to TVA's proposal to build a gas plant at its Cumberland facility, Appalachian Voices submitted comments on TVA's environmental review of its proposal and has filed a lawsuit challenging the sufficiency of that review under the National Environmental Policy Act ("NEPA").

7.      Appalachian Voices also intervened in proceedings before the Federal Energy Regulatory Commission ("FERC") opposing TGP's plans to construct and operate the Cumberland Pipeline to service TVA's gas plant. Appalachian Voices submitted comments to

FERC during the scoping process of its NEPA review for the project and has also submitted comments to the Tennessee Department of Environment & Conservation opposing the issuance of necessary Clean Water Act permits to allow construction of the Cumberland Pipeline.

8.    Appalachian Voices submitted comments to the United States Army Corps of Engineers (the "Corps") on TGP's application for a Department of the Army permit under Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act (Public Notice Number 23-13; File Number LRN-2021-00866). Appalachian Voices raised concerns with, among other things, TGP's failure to appropriately consider the cumulative impacts the Cumberland Pipeline will have on impacted waterbodies. Appalachian Voices also pointed out that TGP had not demonstrated that its proposed water-crossing methods to construct the pipeline are the least environmentally damaging practicable alternatives. Based on these and other deficiencies, Appalachian Voices asked the Corps to deny TGP's permit application. The Corps did not sufficiently address Appalachian Voices' comments and instead issued a final version of Department of the Army Permit LRN-2021-00866 ("the 404 Permit") without fixing these deficiencies.

9.    Appalachian Voices has members who live, work, and recreate along the proposed route of TGP's Cumberland Pipeline and who have environmental, recreational, aesthetic, and property interests in areas along that route, including in many of the waterbodies which TGP must cross to construct the pipeline.  The Corps's issuance of the 404 Permit to TGP—which will allow TGP to, among other things, trench through scores of these waterbodies rather than using less damaging alternatives—will adversely affect the environmental, recreational, aesthetic and property interests of Appalachian Voices' members and is inconsistent with the mission of

Appalachian Voices. These injuries would be redressed by a favorable decision in this matter, including, but not limited to, a decision to vacate the Corps's issuance of the 404 Permit to TGP.

10.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on October __21__, 2024.

*angela Mummaw*

Angela Mummaw

AD100

No.  24-3831

IN THE UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

SIERRA CLUB and APPALACHIAN VOICES,

*Petitioners,*

v.

UNITED STATES ARMY CORPS OF ENGINEERS, CHRISTINE E.
WORMUTH, in her official capacity as Secretary of the U.S. Army;
LIEUTENANT GENERAL WILLIAM H. GRAHAM, JR., in his official capacity
as U.S. Army Chief of Engineers and Commanding General of the U.S. Army
Corps of Engineers; LIEUTENANT COLONEL ROBERT W. GREEN, in his
official capacity as District Commander of the U.S. Army Corps of Engineers,
Nashville District, and JOSHUA FROST, in his official capacity as Chief,
Regulatory Division, U.S. Army Corps of Engineers, Nashville District

*Respondents.*

## DECLARATION OF JERRY STEVEN SHAFER

I, Jerry Steven Shafer, hereby declare and state as follows:

1.      This declaration is based on my personal knowledge, information, and
belief. I am over the age of eighteen and competent to testify.

AD101

2.     I am a member of Appalachian Voices and have been continuously since 2021.

3.     I understand that Appalachian Voices is challenging a Clean Water Act Section 404 Permit issued by the United States Army Corps of Engineers ("the Corps") to Tennessee Gas Pipeline Company, LLC ("TGP") for the construction of a gas pipeline ("the Cumberland Pipeline") meant to service the Tennessee Valley Authority's ("TVA") proposed new gas plant at its Cumberland City, Tennessee facility.

4.     I am a retired teacher and have lived on my farm in Charlotte, Tennessee, for approximately 33 years. My home is about a quarter of a mile from the proposed route of the Cumberland Pipeline. My property borders Peabody Branch upstream from where it merges with Gafford Branch. Gafford Branch—as well as several of its tributaries—will be crossed by the Cumberland Pipeline. Peabody Branch and Gafford Branch join prior to emptying into Jones Creek, another waterway which will be crossed by the Cumberland Pipeline.

5.     I have personal aesthetic and recreational interests in Peabody Branch and Gafford Branch and its tributaries. The confluence of Gafford Branch and Peabody Branch is a short drive from my home, and I regularly take my grandchildren there to swim, recreate, and explore nature—as often as every week when the weather is nice. My grandchildren and I enjoy swimming, hunting for

crawdads, looking for fish and other aquatic life in the stream, and generally taking pleasure in these waters in their current state. I have been visiting this beautiful spot for many years and would like to continue doing so. I know other families in the area who also regularly swim and recreate there.

6.    The banks of Gafford Branch and its tributaries upstream of its confluence with Peabody Branch are very steep and wooded. It is difficult to even walk down these banks to get to the water. I know that the Cumberland Pipeline route deviates from TVA's transmission line right-of-way along Gafford Branch because of the steep banks along that waterway. Construction of the Cumberland Pipeline will require clear-cutting the steep and wooded terrain along Gafford Branch and its tributaries. Cutting down trees in this area will cause erosion and result in sediment running into and damaging these and downstream waters.

7.    I am concerned that construction of the Cumberland Pipeline will adversely affect Peabody Branch and Gafford Branch. I understand that TGP plans to use a dry-ditch, open-cut crossing method to construct its pipeline through Gafford Branch and its tributaries. I have reviewed scientific literature which finds that this pipeline construction method can cause both short- and long-term impacts to aquatic life, habitat, and species' reproductive success due to increased sedimentation. I have also seen pictures of the environmental damage which occurred during another pipeline construction project in West Virginia which used

the same crossing technique. There, the river downstream from the crossing was filled with visible sediment for almost twenty miles. My recreational and aesthetic interests in Peabody Branch and Gafford Branch are harmed by my concerns about runoff and sedimentation—and their effects on these waters—caused by construction of the Cumberland Pipeline.

8.      I want to continue visiting Peabody Branch and Gafford Branch with my grandchildren to swim, explore, and enjoy the beautiful scenery. However, the threats to these waterways posed by construction and operation of the Cumberland Pipeline—including increased sedimentation negatively affecting water quality and aquatic life—diminishes my current use and enjoyment of them. Further, if those harms occur, I would visit Peabody Branch and Gafford Branch less often. I would not take my grandchildren to swim or recreate in these streams if they turn into muddy waterways impacted by sediment pollution.

9.      I enjoy living on my farm in part because I enjoy observing the wildlife that lives nearby. About three quarters of my property is wooded, and I see bald eagles, various birds, turkey, deer, racoons, and possums. I like to take my grandchildren for walks around my land to see all of the wildlife and listen for birdsong. I have an app on my phone which helps us to identify birds and plants, and I use that tool to help my grandchildren learn about nature.

10.     I am concerned that construction of the Cumberland Pipeline will disturb local wildlife and impair their habitat. Animals flee from construction noises, and local wildlife habitat will be negatively impacted by the tree clearing necessary to build the Cumberland Pipeline. I am also concerned about wildlife being harmed if the Cumberland Pipeline causes a gas explosion. The resulting fire would be really difficult to contain in this area, with its heavy forest cover and steep terrain. Wildlife as well as people would be harmed during such a disaster. These concerns, which will stay with me even after the Cumberland Pipeline is constructed, cause harm to my interests in observing wildlife on my property and enjoying nature in this way with my family.

11.     I was living here on my farm in 1992 when a gas pipeline exploded in nearby White Bluff, Tennessee. I heard a roaring sound like a jet engine stuck in one place. I climbed a hill about four or five miles from the site of the explosion, and even from that distance, I was able to see the flames. I understand the pipeline that exploded in 1992 had a 12-inch diameter, but the Cumberland Pipeline would have a much larger, 30-inch diameter.

12.     We cut hay on my farm and also keep sheep, goats, and chickens. I also teach blacksmithing classes from a forge I have on the farm. My home is next to the "evacuation zone" for the pipeline, so I am concerned for my safety if the pipeline were to explode. If there was an explosion, I may not have time to

evacuate myself, my family, or our animals. If the explosion damaged my property, I would not be able to farm or continue teaching blacksmithing classes as I currently do. The Cumberland Pipeline thus puts my life, my property, and my use and enjoyment of my property at risk. These safety concerns will significantly impact my daily use and enjoyment of my property.

13.    Even if a pipeline explosion did not directly affect myself or my property, a fire started by the pipeline would endanger me and my family. The area between my farm and the pipeline route is wooded and difficult to reach. Firefighters do not have adequate access to prevent any fire from rapidly spreading to my home. I have spoken to people who work at my local fire department, and they have told me they are not trained or equipped to deal with a pipeline fire.

14.    I am also concerned that placing this pipeline under the extremely high voltage TVA transmission line increases the risk of an accident. I understand the transmission line along the pipeline route has among the highest voltage of any in the country, and that static electricity can increase the danger of an explosion or leak in a pipeline located underneath such a transmission line.

15.    I am also concerned that the Cumberland Pipeline could contaminate and jeopardize my drinking water supply. City water is not available to me, so all of my water is supplied by a well on my property. I use that well both for personal use in my home and to water the livestock I have on my farm. I have reviewed

environmental analyses which show that blasting during pipeline construction can negatively impact both the quality and quantity of well water. If the quantity of my well water is negatively impacted by construction of the Cumberland Pipeline, I will not have enough water for personal and farm uses. Also, when there is heavy rain, my well water can have elevated sediment levels for a period of time. If sediment-laden well water occurs just from heavy rain events, I worry what could happen to my water supply due to major construction activities like blasting for pipeline construction.

16.     Because the Section 404 Permit is necessary for pipeline construction and the crossing of Gafford Branch and its tributaries, the Corps's issuance of that permit to TGP is a cause of my concerns about the effects of the pipeline on my aesthetic and recreational interests.

17.     I believe that a favorable decision in this matter, including, but not limited to, a decision to vacate the Corps's issuance of the Section 404 Permit to TGP, would provide redress for the injuries to my recreational, aesthetic, and property interests as described above.

18.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on September 2⅄ , 2024.

Jerry Steven Shafer

No. 24-3831

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

SIERRA CLUB and APPALACHIAN VOICES,

*Petitioners,*

v.

UNITED STATES ARMY CORPS OF ENGINEERS, CHRISTINE E.
WORMUTH, in her official capacity as Secretary of the U.S. Army;
LIEUTENANT GENERAL WILLIAM H. GRAHAM, JR., in his official capacity
as U.S. Army Chief of Engineers and Commanding General of the U.S. Army
Corps of Engineers; LIEUTENANT COLONEL ROBERT W. GREEN, in his
official capacity as District Commander of the U.S. Army Corps of Engineers,
Nashville District, and JOSHUA FROST, in his official capacity as Chief,
Regulatory Division, U.S. Army Corps of Engineers, Nashville District

*Respondents.*

### DECLARATION OF BONNIE SWINFORD

I, Bonnie Swinford, hereby declare and state as follows:

      1.     This declaration is based on my personal knowledge, information, and belief. I am

over the age of eighteen and competent to testify.

      2.     I submit this declaration in support of the Sierra Club in the above-captioned

petition seeking review of Department of the Army Permit LRN-2021-00866 under Clean Water

Act § 404 (the "404 Permit") issued by the United States Army Corps of Engineers (the "Corps")

to Tennessee Gas Pipeline, LLC ("TGP"). This 404 Permit authorizes TGP to impact water

resources during its construction of a methane gas pipeline ("the Cumberland Pipeline") intended

to service the Tennessee Valley Authority's ("TVA") proposed gas plant in Cumberland City, Tennessee.

3.     I am a Tennessee resident and live in Knoxville, Tennessee.

4.     I am the Tennessee Valley Region Campaign Organizing Strategist for the Sierra Club, and my work focuses on the Club's Beyond Coal and Beyond Dirty Fuels Campaigns. The Campaigns are projects of the Sierra Club, a non-profit organization organized under the laws of the State of California. I am responsible for overseeing the Campaigns' operations in Tennessee, which focus on promoting clean energy. My work includes advocacy to ensure that TVA does not replace aging coal-fired power plants with new investments in fossil fuels like coal and gas. I work closely with the Sierra Club's Tennessee Chapter in promoting clean energy throughout the state.

5.     I have been working at the Sierra Club since January 2017, and I previously worked with the Sierra Club Tennessee Chapter beginning in 2012. In my position, I am responsible for directing the activities of the Campaign in Tennessee. These activities include community outreach, public education, legislative lobbying, and litigation. In order to perform the responsibilities of my job, my staff and I interact on a daily basis with the Sierra Club's members in Tennessee. Because of my position and responsibilities, and through my regular interaction with members, I am familiar with the Sierra Club's purpose, organization, and activities, and with the environmental interests and concerns of Sierra Club members.

6.     As part of my position, I am familiar with membership statistics for the Sierra Club in the areas in which I work. Sierra Club currently has 7,288 members in Tennessee. I am also familiar with and have access to membership data for specific members. As such, I am

aware that Robert Connor and Charles Crow were members on September 24, 2024, and remain current and active members of the Sierra Club.

7.    Sierra Club's purposes are to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's ecosystems and resources; to educate and enlist humanity in the protection and restoration of the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

8.    Sierra Club and its members work on environmental issues in Tennessee, including impacts from the power sector such as land use, air and water pollution, and climate change. Among other things, the Sierra Club advocates for a clean-energy transition for TVA and other utilities nationwide to reduce or eliminate climate-warming emissions and provide affordable renewable energy and clean jobs.

9.    To advance these goals, Sierra Club advocates for a clean-energy portfolio during the development every several years of TVA's integrated resource plan ("IRP"), a statutorily mandated forward-looking process in which TVA is supposed to make decisions about its future power supply that are intended to guide project-level decision making. Sierra Club has participated actively during every recent IRP process TVA has undertaken. We are currently participating in the ongoing development of TVA's next IRP, including by serving on an IRP working group.

10.    Sierra Club is a member of the Regional Energy Resource Council, which is a stakeholder group TVA established and first convened in 2013. The purpose of the Council is for TVA to obtain advice from stakeholders about how to develop and manage energy resources in the Tennessee Valley. Sierra Club advocates in Council proceedings for TVA to pursue and invest in affordable clean energy instead of fossil fuels.

11.     Sierra Club staff and members regularly attend the meetings of TVA's Board of Directors and TVA listening sessions. In these forums, the Sierra Club submits comments on the direction of TVA's strategic plans, its operations, and individual project decisions.

12.     Sierra Club also advocates for policies that support affordable clean energy through outreach to the public and engagement with federal, state, and municipal governmental bodies. For example, Sierra Club has worked in recent years to educate the public and the Board of Memphis Light, Gas, and Water ("MLGW") about the benefits of a clean energy portfolio as a way to protect the environment, lower energy costs, and address Memphis's energy burden, as well as ways Memphis could acquire more renewable energy and decrease its reliance on dirty fossil power.

13.     Sierra Club routinely advocates directly to TVA, other federal and state agencies with permitting authority over TVA, and federal and state agencies with permitting authority over companies which provide infrastructure to service TVA's energy facilities. For example, Sierra Club participates in the administrative processes for proposed TVA projects—including but not limited to new power plants like the proposed gas facility in Cumberland City, Tennessee—and encourages TVA to pursue carbon-free alternatives to fossil fuels such as solar and wind generation, battery storage, energy efficiency programs, and more. As part of this advocacy, Sierra Club submitted comments during TVA's environmental review of its proposal to build a large combined-cycle plant at its Cumberland facility and has filed a lawsuit challenging the sufficiency of that review under the National Environmental Policy Act ("NEPA").

14.     Sierra Club intervened in the proceeding before the Federal Energy Regulatory Commission ("FERC") regarding TGP's plans to construct and operate the Cumberland Pipeline

to service TVA's Cumberland gas plant. Sierra Club submitted comments to FERC as part of the Commission's NEPA review to advocate that FERC, among other things, further analyze the purpose and need as well as alternatives for TGP's proposed pipeline. After FERC issued a final NEPA document and a certificate of public convenience and necessity, Sierra Club filed a petition to review FERC's decision in the D.C. Circuit Court of Appeals. Sierra Club submitted comments to the Tennessee Department of Environment & Conservation opposing the issuance of necessary Clean Water Act permits to allow construction of the Cumberland Pipeline.

15.     Sierra Club also submitted comments to the United States Army Corps of Engineers on TGP's application for a Department of the Army permit under Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act (Public Notice Number 23-13; File Number LRN-2021-00866). Sierra Club raised concerns with, among other issues, TGP's failure to appropriately consider the cumulative impacts the Cumberland Pipeline will have on impacted waterbodies. Sierra Club also pointed out that TGP had not demonstrated that its proposed water-crossing methods to construct the pipeline are the least environmentally damaging practicable alternatives. Based on these and other deficiencies, Sierra Club asked the Corps to deny TGP's permit application. The Corps did not sufficiently address Sierra Club's comments and instead issued a final version of the 404 Permit without fixing these deficiencies.

16.     Sierra Club has members who live, work, and recreate along the proposed route of TGP's Cumberland Pipeline and who have environmental, recreational, aesthetic, and property interests in areas along that route, including in many of the waterbodies which TGP must cross in order to construct the pipeline. The Corps's issuance of the 404 Permit to TGP—which will allow TGP to, among other things, trench through scores of these waterbodies rather than using less damaging alternatives—will adversely affect the environmental, recreational, aesthetic, and

property interests of Sierra Club's members and is inconsistent with the mission of the Sierra Club. These injuries would be redressed by a favorable decision in this matter, including, but not limited to, a decision to vacate the Corps's issuance of the 404 Permit to TGP.

17.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on October 21, 2024.

Bonnie Swinford