**Case No. 24-3831**

I**N THE**
U**NITED** S**TATES** C**OURT OF** A**PPEALS**
**FOR THE** S**IXTH** C**IRCUIT**

A**PPALACHIAN** V**OICES AND** S**IERRA** C**LUB,**
*P*ETITIONERS,

**V.**

U**NITED** S**TATES** A**RMY** C**ORPS OF** E**NGINEERS, ET AL.,**
*R*ESPONDENTS.

On Petition for Review of
Department of the Army Permit No. LRN-2021-00866

**BRIEF OF INTERVENOR-RESPONDENT**
**TENNESSEE GAS PIPELINE COMPANY, L.L.C.**
**IN SUPPORT OF RESPONDENTS**

Scott Burnett Smith
B**RADLEY** A**RANT** B**OULT** C**UMMINGS** LLP
200 Clinton Avenue West
Huntsville, AL 35801
(256) 517-5100
ssmith@bradley.com

David A. Super
Ann D. Navaro
Kevin A. Ewing
B**RACEWELL** LLP
2001 M Street, NW, Suite 900
Washington, D.C. 20036
Telephone: (202) 828-5800
Facsimile: (800) 404-3970
david.super@bracewell.com
ann.navaro@bracewell.com
kevin.ewing@bracewell.com

*Counsel for Intervenor-Respondent*
*Tennessee Gas Pipeline Company, L.L.C.*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number:  24-3831          Case Name:  Appalachian Voices et al. v. USACE

Name of counsel:  David A. Super

Pursuant to 6th Cir. R. 26.1,  Intervenor Tennessee Gas Pipeline Company, L.L.C.

*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> Yes. Kinder Morgan, Inc. (NYSE ticker: KMI) owns 100% Kinder Morgan GP LLC, which is the general partner of Kinder Morgan Energy Partners, L.P., owning the 1% general partner interest (the limited partner interest is owned by Kinder Morgan, Inc. (97.5842%) and Kinder Morgan GP LLC (1.4158%). Kinder Morgan Energy Partners, L.P. owns 100% of Kinder Morgan Operating LLC "A", which is the immediate parent and owner of all the outstanding membership interests of Tennessee Gas Pipeline Company, L.L.C.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> Yes. Kinder Morgan, Inc. (NYSE ticker: KMI) owns 100% Kinder Morgan GP LLC, which is the general partner of Kinder Morgan Energy Partners, L.P., owning the 1% general partner interest (the limited partner interest is owned by Kinder Morgan, Inc. (97.5842%) and Kinder Morgan GP LLC (1.4158%). Kinder Morgan Energy Partners, L.P. owns 100% of Kinder Morgan Operating LLC "A", which is the immediate parent and owner of all the outstanding membership interests of Tennessee Gas Pipeline Company, L.L.C.

---

CERTIFICATE OF SERVICE

I certify that on _____ October 31, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ David A. Super

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES ...................................................iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT .........................ix

INTRODUCTION ...........................................................1

STATEMENT OF JURISDICTION........................................3

STATEMENT OF ISSUE PRESENTED FOR REVIEW .....................4

STATEMENT OF THE CASE.............................................4

    A.    The Cumberland Project.........................................4

    B.    The Federal Permitting Process.................................5

        1.    The Federal Energy Regulatory Commission authorized the Project. ...................................5

        2.    The Corps issued a Permit for the temporary discharge of fill into waters of the United States. ...........8

SUMMARY OF ARGUMENT .............................................14

ARGUMENT ...............................................................17

    A.    Standard of Review. ...........................................17

    B.    The Underlying Premise of Sierra Club's Arguments—That The Activities Authorized By The Permit Will Cause Long-Term Harms—Is Refuted By The Record. .........................17

    C.    The Corps Properly Identified The Least Environmentally Damaging Practicable Alternative. ......................21

        1.    The Corps had sufficient information from TGP regarding trenchless crossing methods to make a reasoned decision. ................24

2.    The Corps reasonably determined that the record rebutted the presumption of an available, less environmentally damaging alternative. ...............................32

D.    The Corps Was Not Required To Determine The Specific Rock Removal Method In Advance. ...............................37

E.    The Corps Properly Relied On TDEC's Section 401 Certification But Also Independently Addressed The Purported Deficiency Of Which Sierra Club Complains ....................39

F.    TGP Has A NPDES Permit For Stormwater Discharge. ...................43

G.    The Corps Properly Considered Cumulative Impacts.......................45

H.    If The Court Finds That The Corps' Analysis Is Deficient, It Should Remand The Permit To The Corps Without Vacatur. ...........45

1.    The Corps can readily cure any deficiencies in the Permit based upon further information, analysis, and explanation. ...............................47

2.    Vacatur of the Permit would be highly disruptive. ..................49

CONCLUSION ...............................................................................51

CERTIFICATE OF COMPLIANCE .......................................................53

CERTIFICATE OF SERVICE ..............................................................54

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ............................................................46, 47, 49, 51

*Am. Rivers, Inc. v. FERC*,
   129 F.3d 99 (2d Cir. 1997) ...............................................................................40

*Appalachian Voices v. TVA*,
   No. 3:23-CV-00604 (M.D. Tenn.) .......................................................................2

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
   781 F.3d 1271 (11th Cir. 2015) ..........................................................................47

*City of Olmsted Falls v. EPA*,
   435 F.3d 632 (6th Cir. 2006) .......................................................................17, 41

*City of Tacoma v. FERC*,
   460 F.3d 53 (D.C. Cir. 2006) ............................................................................40

*Ctr. for Biological Diversity v. Fed. Highway Admin.*,
   290 F.Supp.2d 1175 (S.D. Cal. 2003) ................................................................34

*El Puente v. U.S. Army Corps of Eng'rs*,
   100 F.4th 236 (D.C. Cir. 2024) ...........................................................................1

*Elec. Merch. Sys. LLC v. Gaal*,
   58 F.4th 877 (6th Cir. 2023) .............................................................................44

*Kelley v. Selin*,
   42 F.3d 1501 (6th Cir. 1995) ............................................................................17

*Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*,
   746 F.3d 698 (6th Cir. 2014) ...................................................................8, 17, 45

*Klein v. U.S. Dep't of Energy*,
   753 F.3d 576 (6th Cir. 2014) ............................................................................24

*Ky. Waterways All. v. Johnson*,
   540 F.3d 466 (6th Cir. 2008) .......................................................................16, 47

*Long Island Power Auth. v. FERC*,
    27 F.4th 705 (D.C. Cir. 2022)................................................................46

*Loper Bright Enterprises v. Raimondo*,
    144 S.Ct. 2244 (2024)................................................................17

*Louisville Gas & Elec. Co. v. FERC*,
    988 F.3d 841 (6th Cir. 2021) ................................................................46, 47

*NAACP v. Fed. Power Comm'n*,
    425 U.S. 662 (1976)................................................................51

*NRDC v. EPA*,
    808 F.3d 556 (2d Cir. 2015) ................................................................47

*Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*,
    556 F.3d 177 (4th Cir. 2009) ................................................................34

*Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme
    Ct.*,
    894 F.3d 235 (6th Cir. 2018) ................................................................45

*Red Lake Band of Chippewa Indians v. United States Army Corps of
    Eng'rs*,
    636 F. Supp. 3d 33 (D.D.C. 2022)................................................................32, 36

*Salmi v. Sec'y of Health and Human Servs.*,
    774 F.2d 685 (6th Cir. 1985) ................................................................47

*Shands Jacksonville Med. Ctr. v. Burwell*,
    139 F.Supp.3d 240 (D.D.C. 2015)................................................................46

*Sierra Club v. Bostick*,
    787 F.3d 1043 (10th Cir. 2015) ................................................................19

*Sierra Club v. Dep't of Energy*,
    867 F.3d 189 (D.C. Cir. 2017)................................................................1, 46, 47

*Sierra Club v. EPA*,
    60 F.4th 1008 (6th Cir. 2023) ................................................................46, 47, 49, 51

*Sierra Club v. FERC*,
    No. 24-1099 (D.C. Cir.)................................................................2

*Sierra Club v. Slater*,
    120 F.3d 623 (6th Cir. 1997) ...............................................................24

*Sierra Club v. State Water Control Bd.*,
    No. 21-2425 (4th Cir.) ........................................................................31

*Sierra Club v. Tenn. Dep't Envt'l Conservation*,
    No. 23-3682 (6th Cir.) .....................................................................2, 46

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    803 F.3d 31 (D.C. Cir. 2015).............................................................8, 19

*Summit Petroleum Corp. v. EPA*,
    690 F.3d 733 (6th Cir. 2012) ...............................................................17

**Statutes**

5 U.S.C. § 706......................................................................................17

5 U.S.C. § 706(2)(A)..............................................................................17

5 U.S.C. § 706(2)(E)..............................................................................17

15 U.S.C. § 717r(d)(5) .............................................................................3

33 U.S.C. § 403......................................................................................9

33 U.S.C. § 1311(a) ................................................................................8

33 U.S.C. § 1341(a)(1)...........................................................................40

33 U.S.C. § 1341(d) ..............................................................................40

33 U.S.C. § 1342 ...................................................................................43

33 U.S.C. § 1344(a) ..........................................................................4, 8, 9

33 U.S.C. § 1344(e) ................................................................................9

33 U.S.C. § 1362(6) ................................................................................8

33 U.S.C. § 1362(7) ................................................................................8

33 U.S.C. § 1362(7) ................................................................................9

33 U.S.C. § 1362(12) ...................................................................8

Clean Water Act of 1977 (33 U.S.C. 1251, *et seq*.) .................................44

Clean Water Act, § 401.......................................... 9, 12, 39, 40, 41, 42, 44

Clean Water Act, § 402...............................................................43, 47

Clean Water Act, § 404.................... 1, 3, 8, 9, 11, 15, 21, 37, 40, 41, 42, 43, 44, 45

Clean Water Act, § 404(b)(1) ...................................... 12, 22, 23, 34, 37, 39, 45, 48

Natural Gas Act, 15 U.S.C. § 717f(c)(1) ..............................................5, 6

Natural Gas Act, 15 U.S.C. § 717r(d)(1) ...............................................3

Tennessee Water Quality Control Act of 1977
    (T.C.A. 69-3-101 et seq.)..................................................42, 44

Water Quality Act of 1987..............................................................44

**Rules**

Sixth Circuit Rule 30(b)(4) ............................................................3

Sixth Circuit Rule 30(c)(1) ............................................................3

Fed. R. App. P. 28(f)...................................................................3

Fed. R. Evid. 201(d).................................................................44

**Regulations**

33 C.F.R. Parts 323, 325 ...............................................................9

33 C.F.R. § 320.4(a)(1).................................................................22

33 C.F.R. § 325.4 .......................................................................38

33 C.F.R. § 325.7 .....................................................................48, 49

33 C.F.R. § 326.4(d) ...................................................................39

33 C.F.R. § 328.3(a).....................................................................9

40 C.F.R. §§ 121.7(a), (b), (e)(3) ...........................................................40

40 C.F.R. § 230.10 ................................................................................34

40 C.F.R. § 230.10(a) ...........................................................................22

40 C.F.R. § 230.10(a)(2) .......................................................................22

40 C.F.R. § 230.10(a)(3) .......................................................................22

40 C.F.R.§ 230.10(b)(1) ........................................................................42

40 C.F.R. § 230.11 ................................................................................42

40 C.F.R. § 230.45 ................................................................................23

40 C.F.R. § 230.45(a) ...........................................................................22

40 C.F.R. § 230.45(b) .......................................................................22, 23

40 C.F.R. § 230.61 ................................................................................28

40 C.F.R. § 230.74 ................................................................................37

88 Fed. Reg. 43333 (Jul. 7, 2023) ..........................................................6

## Administrative Authorities

Order Issuing Certificate of Public Convenience and Necessity for the
  Cumberland Project, 186 FERC ¶ 61,046 (Jan. 18, 2024)
  ("FERC Certificate Order") ..................................................................7

*Tenn. Gas Pipeline*,
  Order on Rehearing, Dkt. #22-493-001) .............................................7

*Tenn. Gas Pipeline*,
  Letter Order, Dkt. #CP22-493 ............................................................8

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Because it will aid with the Court's decisional process, Tennessee Gas Pipeline Company, L.L.C. agrees with Court's decision to hear oral argument on December 10, 2024.  Doc. 28.

## **INTRODUCTION**

Petitioners Sierra Club and Appalachian Voices (collectively "Sierra Club") attack the Clean Water Act ("CWA") Section 404 Permit ("Permit") issued by the U.S. Army Corps of Engineers ("the Corps") by "flyspecking"[1] the Corps' efforts and obscuring the limited impacts of the 32-mile pipeline project ("Project") proposed by Tennessee Gas Pipeline Company, L.L.C. ("TGP").  The Permit authorizes the temporary discharge of fill in 5,400 linear feet of streambed and 0.69 acres of wetlands, and TGP is required to restore all affected waterbodies.  The permitted activities will result in a permanent change of vegetation type in 0.03 acres of wetland—or roughly 1,300 square feet—for which the Corps required mitigation.  In full satisfaction of the mitigation requirement, on August 23, 2024, TGP purchased 1.44 wetland credits in the Lower Cumberland Service Area from the Tennessee Mitigation Fund.  App-1166-1167 (Wetland Mitigation Verification).

Notwithstanding Sierra Club's hyperbole, the Permit contemplates no permanent fill of waterbodies and will not have the dramatic impacts to waterbodies of concern to Sierra Club.  The Corps reached this conclusion based on thorough analysis, lengthy engagement with TGP, the Federal Energy Regulatory

---

[1] *El Puente v. U.S. Army Corps of Eng'rs*, 100 F.4th 236, 246 (D.C. Cir. 2024) (quoting *Sierra Club v. Dep't of Energy*, 867 F.3d 189, 196 (D.C. Cir. 2017)) ("[O]ur task is not to flyspeck [the agencies'] environmental analysis for any deficiency no matter how minor," but instead "to ensure that the agency has adequately considered and disclosed the environmental impact of its actions.").

Commission ("FERC"), and the public (including Sierra Club), and adherence to its statutory authority—all of which is documented in the record. In short, the Permit has achieved the essential purpose of the CWA permitting process—to minimize impacts to waters subject to the CWA in order to ensure that the activity will not have an unacceptable adverse impact on those waters. This purpose was achieved, resulting in a Project with extremely minimal impacts on waters subject to the CWA.

The Project that Sierra Club seeks to block is squarely within the public interest—and it is urgently needed. The pipeline will serve a Tennessee Valley Authority ("TVA") power plant under construction in Stewart County, Tennessee, to replace the generation capacity from one of the two units of a coal-fired plant at the same location. The timely completion of the Project is critical to facilitating the transition from coal to natural gas while responsibly serving power to local communities.[2] The Corps properly carried out its duties in issuing the Permit. The Court should reject Sierra Club's challenge and uphold the Permit.

---

[2] Sierra Club's efforts to impede the Project include three other lawsuits: one challenging the water quality certification issued by TDEC, *Sierra Club v. Tenn. Dep't Envt'l Conservation*, No. 23-3682 (6th Cir.); another challenging TVA's decision to build the new TVA plant, *Appalachian Voices v. TVA*, No. 3:23-CV-00604 (M.D. Tenn.); and a third challenging the certificate of public convenience and necessity issued by the FERC for the Project, *Sierra Club v. FERC*, No. 24-1099 (D.C. Cir.). Sierra Club has not sought a stay in the TVA or FERC actions, even though the new TVA plant needs the gas transported by the Project and FERC authorized the Project's construction.

## STATEMENT OF JURISDICTION

On September 24, 2024, Sierra Club filed a petition for review in this Court under Section 16(d)(1) of the Natural Gas Act ("NGA"), 15 U.S.C. § 717r(d)(1) (AD004).[3]  The pertinent part of Section 717r(d)(1) gives this Court—as the circuit court in which the Project is "proposed to be constructed, expanded, or operated"—"original and exclusive jurisdiction over any civil action for the review of an order or action" of a "Federal agency (other than the [Federal Energy Regulatory] Commission) ... acting pursuant to Federal law to issue, condition, or deny any permit" required "under Federal law."  15 U.S.C. § 717r(d)(1) (AD004).  Section 717r(d)(5) requires a court to set any action under the provision for "expedited consideration."

Under Section 404 of the CWA, the Secretary of the Army, acting through the Corps, "may issue permits, after notice and opportunity for public hearings for the

---

[3] Pursuant to Federal Rule of Appellate Procedure 28(f), TGP has included relevant statutes, and regulations and materials issued by the Corps, FERC and TDEC, in the Addendum included with this brief.  Materials in the Addendum bear the prefix "AD" and are paginated with the number following the final number used in Sierra Club's Addendum.  In addition, for the Court's convenience and pursuant to Sixth Circuit Rules 30(b)(4) and 30(c)(1), TGP has filed an Appendix concurrently with this brief containing copies of documents from the Certified Administrative Record that were not already included in the Appendix filed with Sierra Club's initial brief.  Materials in the Appendix bear the prefix "App-" and are paginated with the number following the final number used in Sierra Club's Appendix.

discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a) (AD026).  Sierra Club seeks review of the Permit.

Accordingly, this action arises out of a federal agency's issuance of a permit under federal law, and jurisdiction is appropriate in this Court.

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

Whether the Corps acted in accordance with law when it issued the Permit for the Project by reasonably analyzing alternatives, water quality, and cumulative effects as required under the CWA.

## STATEMENT OF THE CASE

### A.    The Cumberland Project.

The Project is a 32-mile natural gas pipeline that will provide gas to TVA's electrical generating facility in Stewart County, Tennessee.  App-0220 (Corps Memorandum for Record ("Corps MFR")).  TVA has decided to construct and operate a new natural gas-fueled combined cycle plant, the TVA Cumberland Plant, to replace the generation capacity of one of two coal-fired units to be retired.  *Id.*

TVA decided to retire the coal-fired unit because of its age and contribution to "environmental, economic, and reliability risks."  App-1076 (12/2022 TVA Final Environmental Impact Statement).  TVA determined that the new natural gas-fueled combined cycle plant will "provide low-cost, reliable, and cleaner energy."  *Id.*  It "enables the accelerated retirement of the first [Cumberland Fossil Plant] coal-fired unit; provides the flexibility needed to reliably integrate 10,000 MW of solar into

-4-

the system by 2035; and could be built and made operational in the timeframe needed to reduce economic, reliability, and environmental risks." *Id.* at App-1076-1077. The new natural gas-fired unit must be operational before the coal unit can be retired. *Id.* at App-1105. In order for the new natural gas-fired unit to operate, TVA must have a natural gas supply.

The Project will provide the pipeline capacity for the natural gas necessary for TVA to retire its coal-fired unit and will be the only pipeline supplying TVA's plant. *Id.* The Project will originate from TGP's existing natural-gas pipeline system in Dickson County, Tennessee, and end at the TVA delivery point. App-0211 (Corps MFR). Slightly more than 80 percent of the pipeline route will follow the route of an existing pipeline right-of-way or a TVA electric transmission line right-of-way. *Id.* at App-0212, App-0220, App-0245. In other words, the Project was designed to largely avoid disturbing resources that have not been disturbed by previous utility clearing and maintenance activities. *Id.* at App-0212, App-0245, App-0306.

**B.    The Federal Permitting Process.**

**1.    The Federal Energy Regulatory Commission authorized the Project.**

The Project is subject to the plenary authority of FERC, which has exclusive authority to approve the siting, construction, and operation of facilities used to transport natural gas in interstate commerce under Section 7(c) of the NGA. 15 U.S.C. § 717f(c)(1) (AD117-118). FERC's authority includes siting of the

pipeline.  *See id*.  TGP was therefore required to apply for and receive a certificate of public convenience and necessity from FERC to authorize the construction and operation of the Project facilities.  *Id.  See also* App-0967.

FERC conducted an extensive review of the Project, including numerous opportunities for the public to participate in FERC's review of the application.  App-0970, App-0973 (FERC Final Environmental Impact Statement for the Cumberland Project ("FERC FEIS")).  FERC was the lead agency for conducting environmental review required by the National Environmental Policy Act ("NEPA") with the Corps and the U.S. Environmental Protection Agency ("EPA") participating as cooperating agencies.  In cooperation with other federal agencies, including the Corps, FERC considered the environmental impacts resulting from the construction and operation of the Project and prepared the FERC FEIS.  88 Fed. Reg. 43333 (Jul. 7, 2023) (FERC FEIS Notice of Availability) (AD152-153).

As a cooperating agency, the Corps participated in the development of the FEIS.  *Id.* at App-0945, App-0969 (FERC FEIS).  FERC issued the FERC FEIS in June 2023, and the Corps relied on it in the course of its own review.  *Id.* at App-0954-0964.  The FERC FEIS addressed Project impacts and mitigation of impacts on a variety of environmental resources, including geology, soils, water resources, fisheries, vegetation, wildlife, protected species, land use, recreation, visual resources, cultural resources, socioeconomics, environmental justice, air quality, and

noise.  *Id.*  The FERC FEIS also analyzed cumulative impacts and alternatives to the proposed Project, as required by NEPA.  *Id.*  The Corps was a cooperating agency in the NEPA process led by FERC.

On January 18, 2024, FERC issued a Certificate for the Project, which authorizes construction and operation of the Project.  App-0854-0875 (Order Issuing Certificate of Public Convenience and Necessity, 186 FERC ¶ 61,046 (Jan. 18, 2024) ("FERC Certificate Order")).[4]  FERC found the Project to be in the public interest because it enables TGP to serve TVA's new natural gas-fired power plant, which will "meet the energy needs of the Tennessee Valley region over a 20-year planning period."  *Id.* at ¶¶ 77–78 (App-0874).  FERC balanced this need against the impacts of the Project and ultimately decided to authorize the Project, recognizing that the Project "is an environmentally acceptable action" that will result in a "net reduction of GHG emissions" and "have minimal impacts on the interests of landowners and surrounding communities...."  *Id.* at ¶¶ 49, 77–78 (App-0870, App-0874).

Consistent with its policy for evaluating whether proposed pipelines are in the public interest, FERC considered all of the benefits of the proposed Project together with all of the adverse impacts, including the economic and environmental impacts, and concluded that the Project was in the public interest because its benefits

---

[4] FERC issued an Order on Rehearing on June 7, 2024.  *Tenn. Gas Pipeline*, Order on Rehearing, Dkt. #22-493-001) (AD154-155).

outweighed its impacts.  *See id.* at App-0857, App-0873-0874.  On August 29, 2024, after TGP demonstrated compliance with pre-construction conditions, including the receipt of the Section 404 permit from the Corps, FERC issued the Notice to Proceed with construction.  *Tenn. Gas Pipeline*, Letter Order, Dkt. #CP22-493 (AD156-157).

### 2. The Corps issued a Permit for the temporary discharge of fill into waters of the United States.

The Corps' permitting authority is narrow and limited to activities that impact "waters of the United States" under the CWA.  *See Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 707-08 (6th Cir. 2014); *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 47-48 (D.C. Cir. 2015).  The Corps does not permit pipelines and its authority does not extend to use and operation of the pipeline at issue here.  *See* App-0216-0217 (Corps MFR).  In this instance, the Corps issued an individual permit authorizing the temporary discharge of fill material into waterbodies subject to the CWA incident to the crossing of those waterbodies by the Project.  App-0002 (Permit).

The CWA prohibits unpermitted discharges into "navigable waters," which are defined as "waters of the United States."  33 U.S.C. §§ 1311(a) (AD120), 1362(6) (AD135), 1362(7) (AD135), 1362(12) (AD136).  Section 404 of the CWA authorizes the Corps to issue permits for otherwise prohibited discharges of "dredged or fill material" into waters of the United States.  33 U.S.C. § 1344(a) (AD026).  "[N]avigable waters" include, by regulation, certain streams and

wetlands.  *Id.* § 1362(7) (AD135); 33 C.F.R. § 328.3(a) (AD146-147).[5]  Under

Section 404 of the CWA, the Corps authorizes discharges of dredged or fill material

into waters of the United States through individual and general permits.  33 U.S.C.

§§ 1344(a), (e) (AD026-027).  Assessment of applications for individual permits

requires a case-by-case review and involves an opportunity for public comment.  *Id.*

§ 1344(a) (AD026); *see* 33 C.F.R. Parts 323, 325.

Less than 1 percent of the total Project area—approximately 0.6 percent—is

within the Corps' permitting jurisdiction because such area consists of waters of the

United States subject to the provisions of the CWA.  App-0217 (Corps MFR).  These

jurisdictional waters are predominantly streams.  *See id.* at App-0212.  Roughly

99.4 percent of the total pipeline project area is outside the Corps' permitting

jurisdiction.  *See id.* at App-0217 (Corps MFR).

The Corps encourages pre-application meetings to help potential applicants

minimize impacts in advance of submitting an application.  *See* App-0227 (Corps

MFR).  TGP met with the Corps many times, including three formal pre-application

---

[5] The Permit also applies to one stream crossing under Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, which prohibits actions that may affect the "course, location, condition, or capacity" of traditional navigable waters.  In this instance, the Project required a Section 10 permit for the crossing under Jones Creek.  App-0212 (Corps MFR).  Sierra Club has not challenged this aspect of the Permit.

meetings to discuss ways to minimize Project impacts.[6]    During these pre-application meetings, the Corps raised several issues for discussion including the minimization of impacts by choosing a less impactful method of crossing waterbodies than that originally planned by TGP.  App-0845-0849 (Nov. 29 Pre-App MFR); App-0843-0844 (May 24 Pre-App MFR).

Upon hearing the Corps' concerns, TGP determined that it would use only "dry crossing" methods for waterbody crossings because the Corps stated that working "in the wet" (installing the pipeline through flowing water) may cause more than minimal adverse effects.  App-0845-0849 (Nov. 29 Pre-App MFR); App-1165-1166 (May 4 Pre-App MFR); *see also* App-0227-228 (Corps MFR).  Using "dry crossing" construction methods minimizes the potential for adverse effects.  App-214 (Corps MFR).  This method involves isolating any stream flow present from construction by installing coffer dams across streams up and downstream.  App-0981 (FERC FEIS).  Any water flow is routed around the trenches using flumes or pumps.  *Id*.  This type of "dry crossing" construction is routinely permitted under the CWA.  App-0905 (8/17/2023 TGP Response to Corps Request for Additional Information Enclosure 1 ("TGP Aug. 2023 RAI Responses")).

---

[6] *See* App-0843-0844 (May 24, 2022 Corps Pre-Application Meeting MFR ("May 24 Pre-App MFR")); App-0845-0849 (Nov. 29, 2021 Corps Pre-App MFR ("Nov. 29 Pre-App MFR")); App-1165-1166 (May 4, 2022 Corps Pre-App MFR ("May 4 Pre-App MFR")).

On July 22, 2022, TGP applied for the CWA permit.  App-0768-840 (TGP Permit App.).  In its permit application, TGP provided information regarding, among other things, construction methods, erosion and sedimentation, alternatives, mitigation, and environmental impacts.  App-0768 (TGP Permit App.).  TGP's application identified each proposed waterbody crossing and its characteristics such as the flow regime, substrate material, and a description.  *Id.* at App-1120-1136 (TGP Permit App.).  TGP's application included a 900-plus-page document entitled "Jurisdictional Waters Determinations and Tennessee Hydraulic Determinations Report," which describes each surface waterbody affected by the Project.  App-1137-1142 (TGP Permit App. Att. 2); *see* App-1059-1071 (1/30/2023 Jurisdictional Determination Reverification).  TGP also provided, and the Corps considered, an Upland Erosion Control, Revegetation, and Maintenance Plan and Wetland and Waterbody Construction and Mitigation Procedures—both of which are plans promulgated by FERC and adopted by TGP as part of the FERC Certification Process—and a description of the risks and limitations of trenchless crossing methods.  App-1143-1164 (TGP Permit App. Att. 5 Erosion Plan), App-0841 (TGP Permit App. Att. 11 (trenchless crossing summary)).

The Corps reviewed the application for over two years before making its decision.  During that timeframe, the Corps sought public comment twice—on February 14 and April 11, 2023.  App-1027-1058 (2/14/2023 Public Notice), App-

0994-1023 (4/11/2023 Public Notice); *see also* App-0222-25 (Corps MFR). While considering TGP's application, the Corps sought substantial additional information from TGP, including additional details on waterbody crossings, construction plans, and responses to specific public comments.[7]

As part of the approval process, the Corps prepared the MFR, which contains an Environmental Assessment, Section 404(b)(1) Guidelines Evaluation, Public Interest Review, and Statement of Findings. App-0210-0312 (Corps MFR). In the MFR, the Corps explained that it relied on the FERC FEIS and worked with other regulatory agencies to "leverage expertise and information," minimize "impacts to aquatic resources," and "reduce duplication in regulatory requirements. *Id.* at App-0210. Based on its analysis, the Corps determined that the "proposed construction of the pipeline would *not result in permanent, adverse effects to streams, nor permanent fill in wetlands.*" *Id.* at App-0215 (emphasis added). The Corps noted that the Project would result in permanent conversion of 0.03 acres—roughly 1,300 square feet—of forested wetlands to emergent wetlands. *Id.*[8] The Corps

---

[7] *See*, *e.g.*, App-0851-853 (2/22/2024 Email between TGP and Corps), App-0876-880 (TGP Supplemental Field Survey Data ("TGP Aug. 2023 Data Supplement")), App-0881-884 (TGP Aug. 2023 RAI Responses), App-1024-1026 (3/17/2023 TGP's response to Corps' RAI), App-1106-1118 (9/26/2022 TGP Revised Table D-1).

[8] In previously granting Sierra Club's motion to stay in this case and in Sierra Club's separate challenge to the Section 401 Certification issued by the Tennessee

determined that "[r]estoration of areas impacted by stream crossings should return any functions lost during the relatively short construction period." *Id.* at App-0266.

On July 25, 2024, the Corps issued the Permit to TGP, subject to several conditions. App-0001 (Permit). The Permit authorizes only temporary discharges of "fill material" into a total of 0.69 acres of wetlands and 5,400 linear feet of stream spread across multiple waterbody crossing locations. App-0002 (Permit); App-0212 (Corps MFR). Among many other conditions, TGP's construction activity on the Project must be "isolated from active streamflow" (*i.e.*, through use of the dry-cross method described above), all waters must be restored to pre-construction contours, and any tree clearing may only occur between October 15 and March 31 to avoid impacting protected bat species. App-0007, App-0020 (Permit). In addition, the Permit requires TGP to purchase wetland credits to offset the permanent conversion of vegetation in 0.03 acres of wetland that will result from the permitted temporary discharges. *Id.* at App-0009. TGP satisfied this requirement.

_____

Department of Environment and Conservation ("TDEC"), the Court referenced TDEC's authorization of "'permanent impacts' to 0.03 acres (approximately 1,300 square feet) of wetland and 490 linear feet of stream." Doc. 15 at 6. It is important to note that those "permanent impacts" constitute solely the conversion of vegetation—not discharge of fill material permanently into a stream or wetland. App-0012-16 (list of temporary and permanent impacts). And, as noted above, the Corps required mitigation for this 0.03 acres of vegetation conversion.

## SUMMARY OF ARGUMENT

This Court should find that the Corps properly carried out its legal duties in issuing the Permit, reject Sierra Club's challenge to the Permit, and uphold the Permit.

First, Sierra Club's arguments grossly overstate the minimal impacts resulting from the Permit's authorization of the temporary discharge of fill material. Sierra Club tries to create the impression that the Project, as authorized by the Permit, will cause long-term aquatic harms which should have been reduced through the permitting process. But the impacts authorized by the Permit *are minimal and temporary*. While the permitted activities will result in a change of vegetation type to roughly 1,300 square feet of wetland, the Corps has required TGP to mitigate that harm. The bottom line is, the Corps did its job, and all of Sierra Club's attacks on the Corps' permitting process must be viewed in that light.

Second, the Corps properly identified the least environmentally damaging practicable alternative ("LEDPA") for waterbody crossings. As a threshold matter, the Corps correctly found that the Project will not result in permanent impacts to special aquatic sites (here, riffle and pool complexes) that are protected by a rebuttable "no practicable alternatives" presumption. In any event, TGP provided the Corps with sufficient information for it to reasonably conclude that TGP *did* rebut the presumption on riffle and pool complexes because TGP clearly

demonstrated the lack of practicable alternatives.    TGP provided detailed information regarding trenchless crossing methods, including conventional boring, to allow the Corps to properly identify the LEDPA.  TGP "clearly demonstrated"— and the Corps correctly found—that no practicable alternative was available that would not require crossing waterbodies and, critically, would have less adverse impacts on those waterbodies than the crossing methods proposed by TGP.

Third, Sierra Club is incorrect that the Permit violates the CWA by including Special Condition 9, by which the Corps established a framework for evaluating the specific rock removal technique based on site-specific conditions encountered during construction, rather than choosing a specific rock removal technique as part of the LEDPA.  Contrary to Sierra Club's complaints about procedure, TGP *is required* to use the least impactful method of rock removal to further minimize the already minimal environmental impacts of the Project.

Fourth, in issuing the Permit, the Corps properly relied on TDEC's 401 Certification as issued in July 2023.  As a matter of law, when it received TDEC's 401 Certification, the Corps' sole obligation was to determine whether TDEC had taken action on TGP's application, and, if so, to incorporate TDEC's conditions in the 401 Certification into the Section 404 Permit.  That is what the Corps did.  Moreover, the Corps also evaluated water quality impacts associated with the stream crossings that Sierra Club argues were not covered by the 401 Certification and

determined that proposed discharges would not cause or contribute to violations of any applicable water quality standards. Thus, Sierra Club's assertions regarding the scope of the 401 Certification are immaterial because the Corps reasonably evaluated water-quality impacts for *all* stream crossings associated with the Project.

Next, contrary to Sierra Club's assertion, the Project is subject to a National Pollution Discharge Elimination System ("NPDES") permit, which was properly considered by the Corps. And Sierra Club's arguments on cumulative impacts are wrong: the Corps did address cumulative effects of the Project and concluded they will be "minor" and "short term."

For all these reasons, Sierra Club's arguments should be rejected, and the Permit should be upheld. However, if the Court determines that the Corps' analysis in issuing the Permit was deficient in some respect, then the Court should not vacate the Permit but should remand the matter to the Corps for further analysis and action. The standard for remand without vacatur is satisfied here. First, Sierra Club's allegations of deficiencies are narrowly tailored to a few aspects of the Corps' analysis, which the Corps should be able to cure through further information, analysis, and explanation. At the same time, vacating the Permit would be highly disruptive because it would jeopardize the timely completion of the Project, and thereby interfere with TVA's plan to retire one of the coal units at the Cumberland

Fossil Plant and replace it with a natural gas-fired unit, which is squarely in the public interest.

## ARGUMENT

### A.    Standard of Review.

This Court reviews an agency's decision under the Administrative Procedure Act's arbitrary and capricious standard.   5 U.S.C. § 706(2)(A) (AD115); *see Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 705–06 (6th Cir. 2014); *City of Olmsted Falls v. EPA*, 435 F.3d 632, 636–37 (6th Cir. 2006).  The Court must "credit an agency action unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Summit Petroleum Corp. v. EPA*, 690 F.3d 733, 740 (6th Cir. 2012) (cleaned up).

This Court will not "substitute [its] judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue." *Kelley v. Selin*, 42 F.3d 1501, 1518 (6th Cir. 1995).  The Supreme Court recently reiterated that 5 U.S.C. § 706 mandates that review of agency factfinding, as at issue here, remain deferential.  *See Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244, 2261 (2024) (citing 5 U.S.C. § 706(2)(A), (E)).

### B.    The Underlying Premise of Sierra Club's Arguments—That The Activities Authorized By The Permit Will Cause Long-Term Harms—Is Refuted By The Record.

Sierra Club repeatedly asserts that the Project will cause long-term, even permanent, harm to the aquatic environment.  *See, e.g.*, Sierra Club Brief at 2-4.

-17-

This is wrong.  Sierra Club's allegations of harm to the aquatic environment suffer from two fatal flaws: (1) the record evidence before the Court negates any allegations of long-term or permanent harm; and (2) the "expert" analysis on which Sierra Club relies actually disproves Sierra Club's argument because it relies upon studies that support the Corps' own conclusions regarding the minimal and temporary nature of expected impacts.  Contrary to Sierra Club's counterfactual hyperbole regarding alleged permanent harms, the Project is, in fact, a routine project, to be constructed predominantly along existing utilities, which will have minimal and temporary impacts to the waterbodies it will cross.  Where a permanent impact will occur, the conversion of 1,300 square feet of vegetation in a wetland, the Corps required mitigation.

Specifically, the Permit authorizes only the *temporary* discharge of fill material which will have attendant *temporary* impacts to these waters.  App-0002 (Permit).  Further, as described above, *see supra* at 10-11, the Permit allows only dry open-cut crossings, which are used to avoid the exact types of harms alleged by Sierra Club.  App-0276 (Corps MFR).  The Permit requires that "[a]ll streams and stream banks will be restored to original contours immediately following pipeline installation."  App-0003 (Permit).  TGP must also take measures to avoid erosion and downstream impacts from tree clearing, such as installing sediment barriers prior to ground-disturbing activities and stabilizing the right-of-way with mats.  *Id.*  No

work is authorized in water that could result in the type of long-term and permanent harm alleged by Sierra Club. App-0215, App-0242 (Corps MFR).[9]

Likewise, TGP's crossing methods will not result in long-term or permanent impacts to waterbodies as speculated by Sierra Club's expert ("Silvis Report"). Critically, the publications on which the Silvis Report relies "do not describe impacts as inevitable or unavoidable," but rather describe them as "*short-term*." App-0903-904 (TGP Aug. 2023 RAI Responses) (emphasis added). But the Silvis Report inexplicably disregards these publications' characterization of the impacts as "short-term," and instead misleadingly describes the impacts as "permanent" throughout the Report. *Id*.

In fact, the publications on which the Silvis Report relies upon do "provide guidance to prevent and minimize such impacts by careful use of construction techniques, stringent implementation of best management practices ("BMP") and monitoring." App-0903 (TGP Aug. 2023 RAI Responses). Critically, however, these techniques and BMP that the Silvis Report touts as appropriate *are all techniques and practices that the Project incorporates*. *Id*. For example, a study

---

[9] Courts uphold use of a Corps general permit, which authorizes activities with only minimal impacts without the process required by the individual permit, for pipeline projects much larger than this one. *See, e.g., Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 52 (D.C. Cir. 2015); *Sierra Club v. Bostick*, 787 F.3d 1043 (10th Cir. 2015).

that the Silvis Report cites as key support for the assertion that turbidity and sediment will create long term impacts actually concludes the *opposite* for a pipeline like the Project, expressly stating that the mitigation measures to be utilized by the Project "'were considered to be effective in reducing impacts of pipeline crossing construction to levels that were not significant." *Id.* at App-0904 (quoting Levesque and Dube, 2007, at 398). Indeed, that study relied upon by Silvis Report repeatedly found any "temporary increases in suspended sediment concentrations" to be short-term with minor impacts. *Id.* at App-0903.[10]

Similarly, based on nothing more than generalized and speculative assertions, Sierra Club also alleges that the Project will impact wildlife and "disrupt wildlife habitat," resulting in harm. Sierra Club Brief at 3. However, both FERC and the Corps considered the Project's impacts on wildlife and concluded that such "cumulative impacts … would be negligible." App-0993 (FERC FEIS); App-0255-256 (Corps MFR). Contrary to Sierra Club's speculation, the Corps concluded that the Project's impacts on wildlife will be only temporary and may result in only a

---

[10] Other conclusions in the Silvis Report are similarly unfounded or refuted based on the actual facts underlying the Project. *Id.* at App-0905 (addressing implications of upland vegetation disturbances, channel work, and wetland impacts).

short-term displacement of wildlife from construction areas.  App-0255-256 (Corps MFR).[11]

In short, Sierra Club has grossly overstated the nature of the minimal, temporary impacts authorized by the Permit.  Through all its arguments, Sierra Club tries to create the impression that the Project, as authorized by the Permit, will cause long-term harms which should have been reduced through the permitting process. In reality, the harms authorized by the Permit are *already* minimal and temporary and Sierra Club's arguments attacking the Permit should be viewed in that light.

## C.    The Corps Properly Identified The Least Environmentally Damaging Practicable Alternative.

Sierra Club argues that the Corps violated Section 404 by failing to properly identify the least environmentally damaging practicable alternative ("LEDPA"). Sierra Club Brief at 23-37.  Specifically, Sierra Club argues that (i) TGP did not rebut regulatory presumptions applicable to "special aquatic sites," and (ii) the Corps failed to verify TGP's satisfaction of the rebuttable presumptions.  Sierra Club is wrong on both counts.

---

[11] Limited permanent impacts on wildlife could occur due to tree and shrub clearing needed for the pipeline's right-of-way and occasional maintenance activities when the pipeline is operational, but these impacts would be both minimal and only occasional.  More fundamentally, those are not activities authorized by the Permit and, thus, are not relevant to this action.

The Corps reviews permit applications under the EPA CWA Section 404(b)(1) Regulatory Guidelines ("Section 404(b)(1) Guidelines"). 33 C.F.R. § 320.4(a)(1) (AD035). The Section 404(b)(1) Guidelines prohibit the issuance of a permit unless the proposed discharge is the LEDPA, provided that the LEDPA does not have other significant adverse environmental consequences. 40 C.F.R. § 230.10(a) (AD061).[12] In the case of "special aquatic sites," including "riffle and pool" complexes,[13] the Corps presumes (i) that practicable alternatives not involving "special aquatic site" are available unless "clearly demonstrated otherwise," and (ii) that the practicable alternatives, *if they exist*, have less adverse impact on the aquatic ecosystem unless "clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3) (AD061).

The purpose of the presumption related to regulated discharges into riffle and pool complexes is to avoid the potential loss of values that could be caused by the discharge of fill material. 40 C.F.R. § 230.45(b) (AD074). In particular,

---

[12] An alternative is "practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2) (AD061).

[13] The Section 404(b)(1) Guidelines explain that "[s]teep gradient sections of streams are sometimes characterized by riffle and pool complexes … recognizable by their hydrologic characteristics." 40 C.F.R. § 230.45(a) (AD-074). Those characteristics include "rapid movement of water of a coarse substrate in riffles" and associated deeper areas, the pools. *Id.*

"[d]ischarge of dredged or fill material can eliminate riffle and pool areas by displacement, hydrologic modification, or sedimentation." *Id*.

Critically, the Project will not result in permanent impacts to riffle and pool complexes of the types of impacts described in the Section 404(b)(1) Guidelines—stream hydrology will not be altered, sedimentation will not "clog riffle and pool areas, destroy habitats, and create anaerobic conditions," and "pools and meanders" will not be eliminated. 40 C.F.R. § 230.45 (AD074) (describing values of riffle and pool complexes); *see* App-0244, App-0292-94, App-0296, App-0299-300 (Corps MFR). In this case, the Permit ensures that the method of construction and mitigation measures to be utilized by the Project will avoid permanent impacts. *Id.* at App-0213-14.

The Corps considered potential effects on riffle and pool complexes and found those impacts to be "negligible" based on temporary disturbance that will soon be restored, concluding that "the major channel processes that form and maintain riffle and pool complexes and other stream-channel features will remain intact." App-0243-44, App-0296, App-0298-99 (Corps MFR); *see also* App-0927-929 (TGP Aug. 2023 RAI Responses).

In addition, the Corps had before it sufficient information to reasonably conclude that TGP had rebutted the presumptions applicable to riffle and pool complexes because TGP clearly demonstrated the lack of practicable alternatives.

-23-

App-0236 (Corps MFR) ("the applicant has demonstrated that there are no practicable alternatives that do not involve special aquatic sites"); App-0235 (Corps MFR) (summarizing the alternatives considered practicable); *see Sierra Club v. Slater*, 120 F.3d 623, 637-38 (6th Cir. 1997) (Corps not arbitrary in weighing and rejecting alternatives). And following the regulations, the Corps identified the LEDPA as the 32-mile pipeline route approved by FERC after conducting an "independent review" of alternatives. App-0229-36 (Corps MFR). The Corps concluded that the "proposed discharge in this evaluation is the practicable alternative with the least adverse impact on the aquatic ecosystem, and it does not have other significant environmental consequences." *Id.* at App-0236.

### 1. The Corps had sufficient information from TGP regarding trenchless crossing methods to make a reasoned decision.

Sierra Club is wrong that TGP failed to provide sufficient information regarding trenchless crossing methods. Sierra Club Brief at 26-30.[14] The record before the Corps supports its decision.

---

[14] Sierra Club argues that an applicant must submit information in support of its permit application to demonstrate to the agency how the applicant meets the regulatory requirements to allow issuance of the permit and that TGP failed. Sierra Club Brief at 23, 26. This is not the correct standard—the only question before the Court is whether the Corps' decision complied with the CWA based on the information that the agency had at the time of the decision. *See Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 580 (6th Cir. 2014) (APA mandates judicial review of agency's decision to consider record before the agency at the time of its decision) (citation omitted).

TGP's permit application addresses alternatives in substantial detail, explaining that for the waterbody crossings, "including those underlain by bedrock and unconsolidated materials, TGP evaluated multiple considerations (safety, potential impacts to water quality, hydrologic loss, cost, existing technology, and logistics)." App-0799 (TGP Permit App.). TGP undertook geotechnical and geological studies "to identify the physical constraints and conditions that are or may be presented by the underlying geology." *Id*. TGP provided detailed information about each waterbody crossing. App-0808-825 (TGP Permit App.).

Using this information, TGP considered open trench methods of construction and trenchless crossing methods: horizontal directional drill ("HDD") and conventional bore. *Id.* at App-0800, App-0805-07. For the crossings of three "larger and potentially higher-flow streams," TGP decided to use HDD to install the pipeline to avoid open cut construction methods. *Id.* at App-0780. HDD involves drilling a pilot hole from an entry point to an exit point "by pumping a slurry mixture of bentonite clay, drilling additives, and water into the ground at high pressure." *Id.* at App-0805 (TGP Permit App). The hole is then enlarged and the pipeline is pulled into the hole. *Id*. at 805-06.

Based on its feasibility analysis, which included "geological surveys, reviews of nearby public drinking water sources, private wells, and mining activities (active and abandoned)," TGP limited its use of HDD to those three crossings. *Id.* at App-

0805. TGP explained that while HDD can be useful in appropriate circumstances, "there is still the potential that the HDD method can fail for reasons such as encountering soil conditions that are not conducive to boring, borehole collapse, and loss of the drill string or drilling fluid return." *Id*.

Sierra Club devotes most of its argument to another trenchless crossing method, conventional boring. But while touting the potential benefits of conventional boring, Sierra Club effectively ignores its downsides, particularly as they apply to *this Project*. Conventional boring requires the excavation of a bore pit and a receiving pit on either side of the waterbody to be crossed. App-0805-06 (TGP Permit App.). A boring machine is lowered to the bottom of the bore pit to bore the hole. *Id*. "The typical workspace configurations required for boring operations consist of staging areas (50 feet by 100 feet) for boring machine set up, cuttings/return settlement and storage pits, pipe storage, entrance and exist pit spoil storage, and construction equipment necessary to support the operation." *Id*. at 805. Preferred sites "are generally consistent with level or moderately convex terrain, such that the depth of the bore pit does not present concerns relative to constructability or safety constrains." *Id*. at App-0806. This is a time consuming and impactful construction method.

Sierra Club accuses TGP of "hand waving" on this topic (Sierra Club Brief at 28-29), but it is Sierra Club that offers a generalized discussion of conventional

boring on generic pipeline projects, rather than engaging with TGP's explanation for this specific Project. TGP's permit application addresses conventional bore in detail, explaining that it requires a workspace to accommodate the activity that is typically 50-by-100 feet. App-0805 (TGP Permit App.). TGP explained that "major factors" limiting the suitability of conventional boring for the Project "include the crossing distance, subsurface soil and geologic conditions, and existing topography." *Id*. TGP explained that it considered six factors to evaluate the use of HDD or conventional bore: "(1) the length of the crossing, (2) the potential risk for loss of drilling fluid (i.e. inadvertent/lost returns), (3) geological consideration, (4) duration in time of the crossing, (5) worker safety and technical feasibility, and (6) cost of the crossing method." *Id*. at App-0806. Based on its analysis of those factors, TGP ruled out conventional boring for waterbody crossings. *Id*.

TGP's analysis was further supported by detailed technical appendices to TGP's application. Attachment 1 to the application characterizes the nature of each proposed crossing location separately with an explanation of the flow regime, substrate, dimensions, and description of the site. App-1120-36 (TGP Permit App. Att. 1).[15]   Attachment 11 to the application is a "Summary of Trenchless

---

[15] For example, waterbody SDKA001 is an ephemeral waterbody with "silt/clay/organic" substrate. App-0808 (TGP Permit App.). It is an "[e]phemeral stream with moderately dense forest buffer. Moderate alteration to channel within

Construction Methods," which summarizes advantages, limitations, and risks of various methods. App-0841-42 (TGP Permit App. Att. 11). In addition, the FERC FEIS describes TGP's geotechnical investigations, undertaken "to characterize the underlying geologic conditions in the Project area and gather geotechnical information on the subsurface lithology to assess feasibility of the proposed HDD crossings," as well as the applicable soil characteristics. App-0986-987 (FERC FEIS).

During its review of TGP's application, the Corps requested additional information related to a wide variety of technical topics, including information relating to crossing techniques, and TGP provided that information over the course of four submissions.[16] All this information contributed to TGP's and the Corps' understanding of site conditions at each crossing. *See* 40 C.F.R. § 230.61 (AD149-50) (chemical, biological, and physical evaluation and testing). Regarding trenchless methods, TGP again addressed those issues specifically in its submission on August 17, 2023. App-0885-943 (TGP Aug. 2023 RAI Responses). TGP explained that "HDD and related boring methods … although costly, are

---

powerline [right-of-way]. Weak hydrology and biology, eroded slopes. Surrounding gradual slopage." App-1121 (TGP Permit App. Att. 1).

[16] App-1106-1119 (TGP Revised Waterbodies Table); App-0885-943 (TGP Aug. 2023 RAI Responses); App-0876-880 (TGP Aug. 2023 Data Supplement); App-851-853 (2/22/2024 Email between TGP and Corps).

recommended at locations where they are logistically feasible (e.g. broader valleys in which equipment mobilization can be facilitated), and where alternative methods may impose increased risk of environmental harm." *Id* at App-0898.

TGP went on to explain, at length, why it determined that HDD or other boring methods, which include conventional boring, are not practicable based on information about waterbody crossings for the Project:

> [I]mplementation of HDD or related methods at the Project's remaining group of waterbody crossings was determined by TGP to not be practicable because of feasibility concerns (e.g., topography not suited to HDD, bore-pit construction constraints dictating the possible length of the bore), as well as the extensive time and cost necessary to conduct HDD or related techniques, and the cumulative delay and expense that would accrue from use of these technologies at every crossing. Cumulative delays include HDD rig mobilization, pipeline pullback section makeup and placement, clearing and stabilizing the entry and exit pits and work areas, installation of tracking systems, and management of HDD drilling fluids. TGP estimates that use of HDD or related methods for each waterbody crossing along the route of the proposed pipeline would increase costs an estimated 10 times the value for each crossing as compared to the cost of the alternative, traditional crossing methods. Moreover, because of the steep and wooded slopes flanking many of the Project's waterbody crossings, mobilizing HDD or related equipment to each crossing sites would be logistically impracticable because of steep slopes, longer boring distances, mobilization difficulty, and would result in additional environmental risks associated with construction stormwater sediment releases, tree clearing, grading, and drilling mud staging and preparation. Further, additional risks to the environment, including aquatic resources, would result from the possible inadvertent instream loss of drilling mud, hydrocarbon spills, and other mishaps occurring during the prolonged drilling operations necessary to complete HDDs or bores. Finally, use of the HDD method requires a longer presence on the properties where the HDD method would be implemented.

*Id.* at App-0898.

Further, TGP explained why HDD and conventional bore "are not applicable for every waterbody crossing" and that the impacts of using those methods for crossing small streams, such as those the Project will encounter, are actually greater than the minimal impacts from the temporary discharge of fill material during a dry trenched crossing. *Id.* at App-0899. TGP explained that "bores of smaller waterbodies will impact areas greater than dry open cut crossings." *Id.* (emphasis added). TGP explained: "Because bores are generally straight, with no radius curve as with an HDD, pits are needed on both side of the waterbody to accommodate the boring machine and the receipt of the carrier pipe. These excavations can be up to 50 feet wide by 150 feet long. The size of the workspace needed for bores limits the feasibility of bores in in areas of steep slopes, deep water, shallow groundwater, and high waterbody banks." *Id.*[17]

Despite all this analysis, Sierra Club asserts that TGP should have presented its analysis in a different format—specifically, that TGP should have produced a

---

[17] Sierra Club misleadingly asserts that because TGP is using HDD or conventional bore to cross roadways, it necessarily means that TGP could use those methods at additional stream crossings. Sierra Club Brief at 30-32. That is an "apples to oranges" comparison because crossing roads raises a host of different issues compared to stream crossings. Paved roads must be crossed by boring to avoid disrupting the paved surface with attendant traffic disruption while the road is rebuilt and repaved. Unpaved road, "would be crossed by either boring under the roadbed or by open-cut methods." App-0983, App-0989 (FERC FEIS). As explained above, topography constrains the use of boring and roads are crossed at locations that accommodate that method.

table like the one summarizing potential crossing methods for a different project in a different State, the Mountain Valley Pipeline. According to Sierra Club, that table ("Table 15") "presents information on all relevant factors on a site-specific basis." Sierra Club Brief at 28. But Sierra Club is elevating form over substance, as TGP *did* provide detailed information to the Corps, as described above.

Moreover, contrary to its new embrace of Table 15, in its lawsuit challenging the 401 Certification for the Mountain Valley Pipeline, Sierra Club argued that Table 15 was fatally flawed and should not have been relied upon. *See* Pets' Brief (Doc. 91) & Pets' Reply (Doc. 95-1), *Sierra Club v. State Water Control Bd.*, No. 21-2425 (4th Cir.). For example, Sierra Club argued that Mountain Valley Pipeline "purported to include a crossing-by-crossing review" in Table 15, but that in reality Table 15 was "opaque, conclusory, and unsupported." Pets' Brief, Doc. 91, at 46. Sierra Club argued further that "MVP's crossing-technique selection methodology is a black box," and that agencies "arbitrarily and capriciously failed to examine and resolve those problems with Table 15 and with MVP's underlying crossing-technique selection methodology." Pets' Reply Brief, Doc. 95-1 at 46, 48. Thus, Sierra Club's reliance here on Table 15 as the *sine qua non* method of presenting information is undercut by Sierra Club's own prior rejection of that approach.

Here, TGP "clearly demonstrated" that no practicable alternative was available that did not require crossing the waterbodies. In sum, the pipeline must

run from point "a" to point "b," non-pipeline alternatives are not practicable, trenchless crossing is not practicable at the majority of waterbody crossings, the impacts of trenched crossings are minimal and temporary, and trenchless crossings have other environmental consequences as well as practicability constraints. App-0040-43 (Permit). When the reviewing agency considers information submitted by the applicant, analyzes practicability of alternatives, and draws reasoned conclusions regarding whether certain alternatives are practicable, the agency's decision is not arbitrary or capricious. *Red Lake Band of Chippewa Indians v. United States Army Corps of Eng'rs*, 636 F. Supp. 3d 33, 66-69 (D.D.C. 2022).

> **2.**    **The Corps reasonably determined that the record rebutted the presumption of an available, less environmentally damaging alternative.**

Sierra Club argues that the Corps' decision to issue the Permit was flawed because the Corps (i) "uncritically" accepted TGP's "general contentions" regarding trenchless methods and (ii) made insufficient findings regarding whether the presumption that a trenchless crossing was practicable was rebutted at every crossing. Sierra Club Brief at 30-37. TGP expects that the Corps will fully address this argument. However, the record before the Court shows that TGP offered substantial detail in response to information requests from the Corps (*see supra* at 12, 28-30), that the Corps was satisfied that it had the information it needed after TGP's final submission, and that the Corps made the required findings.

The record contradicts Sierra Club's attempt to paint the Corps as a weak regulator in the face of TGP's alleged refusal to carry its "burden" to rebut the presumption. In response to the Corps' requests, TGP provided additional information numerous times and established that HDD (except for crossing three "larger and potentially higher-flow streams") and conventional bore were not "practicable" for the Project. Indeed, the Corps' comment to FERC that the Corps needed additional information about HDD (*see* Sierra Club Brief at 30-31) *pre-dated* TGP's subsequent submission of that very information. *Compare* App-0482 (6/15/2023 Email from FERC to Corps) to App-0885 (TGP Aug. 2023 RAI Responses).

Sierra Club's characterization of TGP's supplemental submission as "unsupported generalizations" "contradicted by record evidence" relies *solely* on Sierra Club's own May 2023 comments and the Silvis Report. But the Silvis Report failed to consider the Project's mitigation measures and the study on which the Silvis Report relied recommended the very type of construction method planned for the Project to minimize impacts.[18] *See* Sierra Club Brief at 31 (citing App-0691-93, App-0521-30). Notably, Sierra Club's May 2023 comments pre-date TGP's

---

[18] Studies relied on by the Silvis Report recommend HDD only for high-risk stream crossings and conclude that implementation of the construction methods proposed for the Project will minimize impacts. App-0903-905 (TGP Aug. 2023 RAI Responses).

submittal of additional information, which happened three months later in August 2023. App-0885 (TGP Aug. 2023 RAI Responses). Nothing in the record indicates that the Corps was dissatisfied with this information despite continuing its review for another eleven months and receiving additional data from TGP over the course of that review. *See, e.g.*, App-0851-853 (2/22/24 Email between TGP and Corps) (providing updated waterbody crossing information), App-0876-880 (TGP Aug. 2023 Data Supplement).

Further, Sierra Club simply disregards a critical component of the analysis required under the Section 404(b)(1) Guidelines: that the Corps identify the *least environmentally damaging* practicable alternative considering other adverse environmental consequences. 40 C.F.R. § 230.10 (AD061-63). In determining the LEDPA, and having concluded that no practicable alternatives are available that would not cross "special aquatic sites," the Corps is required to consider *other environmental consequences*. *Id.; see also Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009) (Corps required to weigh beneficial and adverse effects of each alternative and balance compelling policy interests); *see Ctr. for Biological Diversity v. Fed. Highway Admin.*, 290 F.Supp.2d 1175, 1194-95 (S.D. Cal. 2003) (Corps adequately balanced all impacts, and mitigation of impacts, and reasonably concluded project alternative represented the LEDPA).

Sierra Club's argument utterly disregards this requirement. But the Corps did not. The Corps determined that the temporary discharge of fill material into dry waterbodies would have only minimal temporary impacts, with negligible impacts on riffle and pool complexes, and that stream function would quickly return. *See* App-0248 (Corps MFR) ("Minor effects to flow patterns across the affected stream reach are expected to occur during and immediately after the construction of the crossing but are expected to return to normal post construction as the stream morphology and substrates adjust naturally."); *see also id.* ("Restoration of areas impacted by stream crossings should return any functions lost during the relatively short construction period."). The crossings will be constructed without water present and will take 2-3 days to complete. App-0899 (TGP Aug. 2023 RAI Responses).

In contrast, both HDD and conventional bore would have a larger impact to the area than dry open cut crossings. *Id*. Those methods take much more time, so the activity is disruptive to the area for a longer period. Each HDD crossing may require up to a month given the need to set up a drill rig and associated workspace, drill under the waterbody, install the pipeline, and demobilize. *Id.* While conventional bore does not take as long as HDD, in "areas with slopes, the preparation time is significantly increased due to the amount of excavation needed to create a safe and effective workspace." *Id*.

-35-

With respect to on-the-ground impacts, workspaces for HDD "are generally 150-by-250 feet and are needed on both sides of a waterbody." *Id*. For conventional bore, large pits are required at each side, and these pits can be up to 50 feet wide and 150 feet long. *Id*. These methods have additional implications for tree clearing as well. For example, HDD crossings require long cleared stretches of land not associated with the installed pipe; for the Project, more than 1,000 feet would be needed to allow the sections of pipe to be staged. *Id*.

In short, based on the information TGP provided, the Corps reasonably assessed whether practicable alternatives exist that would have less adverse impacts on resource values. *See Red Lake Band of Chippewa Indians*, 636 F. Supp. 3d 33 at 47, 66-69. The Corps explained that HDD and other types of trenchless crossings, including conventional bore, are not practicable at each crossing. Not only are such crossings unsuited logistically and more environmentally impactful in certain respects, but they take anywhere from ten days to one month longer than dry trenching to complete each crossing with accompanying sustained disruption, and they are more expensive. App-0234-36, App-0294-95 (Corps MFR). In sum, the Corps reasonably determined based on the record that trenchless crossings are not an available, less environmentally damaging alternative.

**D.     The Corps Was Not Required To Determine The Specific Rock Removal Method In Advance.**

Sierra Club is wrong that the Corps violated the CWA by imposing Special Condition 9, which establishes a framework for evaluating the specific rock removal technique in the field, rather than choosing one specific rock removal technique as part of the LEDPA.  Sierra Club Brief at 37-45.  First, the Corps identified the LEDPA as the 32-mile route—not the rock removal technique necessary to facilitate trenching along the 32-mile route.  App-0236 (Corps MFR).  Second, the Corps did require TGP to use the least impactful rock removal technique in Special Condition 9 to further minimize the already minimal environmental impacts of the Project. [19] App-0007 (Permit).  This did not amount to the "unlawful assignment" of the LEDPA determination to TGP.

In constructing the Project, TGP will encounter shallow bedrock, a conclusion reached after review of "surficial geology, soil mapping, and desktop geotechnical surveys."  App-0238 (Corps MFR).  If bedrock is present at a waterbody crossing, TGP will remove it "by a technique dependent on the relative hardness, fracture,

---

[19] Sierra Club cites to 40 C.F.R. § 230.74 to argue that the Corps was required to designate the "appropriate equipment and machinery" for each crossing.  *Id.* at 8-9. Sierra Club exaggerates the meaning of this provision of the Section 404(b)(1) Guidelines.  Section 230.74 provides that "[d]ischarge technology should be adapted to the needs of each site"—exactly what the Corps required for the Project—and provides topics that the "applicant should consider," including using machinery to minimize impacts.  40 C.F.R. § 230.74 (AD077).

susceptibility, and expected volume of bedrock." *Id*. The possible rock removal techniques are conventional excavation, ripping, hammering, and rock trenching. App-0803 (TGP Permit App.); App-0238 (Corps MFR).   The rock removal technique selected for each waterbody crossing must be based on site-specific conditions encountered during construction, and controlled blasting cannot be employed or even proposed to the Corps unless another techniques fails. App-0277-78 (Corps MFR).  Controlled blasting will only be used, if the Corps approves, in areas "in which the risk of hydrologic loss has been determined to be low." App-0238 (Corps MFR); *see also* App-0007 (Permit); App-0897, App-0900 (TGP Aug. 2023 RAI Responses).  This approach comports with the Corps' regulations allowing the imposition of special conditions related to the impacts of the proposal.  33 C.F.R. § 325.4 (AD140) (conditioning of permits).

Sierra Club relies on the Silvis Report to argue that the Corps should have investigated in advance the geological conditions at each crossing to specify the precise rock removal technique needed so as to avoid what the Silvis Report characterizes as permanent impacts to waterbodies from sedimentation and turbidity. Sierra Club Brief at 40-41.  The Corps considered that assertion during its evaluation of public comments but found it lacked merit.   App-0298-299 (Corps MFR). Further, as discussed above, *see supra* at 19-20, 33-34, the Silvis Report is based on incorrect assumptions regarding stream impacts, including the unfounded

assumption that the Project will create "acute or chronic stream impacts."  App-0899-905 (TGP Aug. 2023 RAI Responses).  The Corps appropriately rejected that unfounded assertion.

Finally, Sierra Club asserts that Special Condition 9 violates the Section 404(b)(1) Guidelines because the Corps has not taken all practicable steps to "minimize" adverse impacts.  Sierra Club Brief at 41-45.  But Sierra Club's argument collapses by virtue of its internal contradiction.  The entire purpose of Special Condition 9 is to ensure that impacts are minimized by requiring TGP to use the least impactful method practicable, considering conditions discovered during excavation.  App-0007 (Permit).  And if TGP violates Special Condition 9, it is subject to an enforcement action by the government.  33 C.F.R. § 326.4(d) (AD144-45). (noncompliance with permit terms grounds for enforcement).

### E.   The Corps Properly Relied On TDEC's Section 401 Certification But Also Independently Addressed The Purported Deficiency Of Which Sierra Club Complains.

Sierra Club asserts that the Corps unlawfully issued the Permit because it wrongly interpreted the scope of the CWA 401 Certification issued by TDEC.  Sierra Club Brief at 46-52.  According to Sierra Club, because certain stream crossings were not listed in the 401 Certification, the Corps improperly "relied on the [401] Certification's existence to support its finding of water quality standards compliance at every crossing."  *Id.* at 47-48.  While TGP expects that the Federal Respondents

will fully address Sierra Club's claims on this point, Sierra Club's "scoope" argument is both wrong *and* immaterial.   Regardless of the scope of the 401 Certification, the Corps did what was required: (1) the Corps waited for TDEC to act under Section 401 and it incorporated the conditions from the Section 401 Certification into its Permit; and (ii) the Corps evaluated water quality impacts associated with the stream crossings authorized by the Corps.

Under Section 401, an applicant seeking a Section 404 permit must provide the Corps "a certification from the State," which the State may issue (with or without conditions), deny,  or  waive.    33  U.S.C.  §  1341(a)(1)  (AD009);  40  C.F.R. §§ 121.7(a), (b), (e)(3) (AD057-58); 121.9 (AD060).   If the state includes any conditions in its Section 401 certification, then those requirements "shall become a condition" of the Section 404 permit.  33 U.S.C. § 1341(d) (AD009).  If the state "fails or refuses to act" within at most one year, the Section 401 certification requirements "shall be waived."  *Id.*

With respect to the 401 Certification, the Corps' only obligation here was to wait for TDEC to act, assuming it did so before the one-year time period expired, and then to incorporate the conditions from the Certification into the 404 Permit. *See City of Tacoma v. FERC*, 460 F.3d 53, 67-68 (D.C. Cir. 2006); *Am. Rivers, Inc. v. FERC*, 129 F.3d 99, 110–11 (2d Cir. 1997).   Here, TDEC issued the

401 Certification, and the Corps incorporated the associated conditions into the Permit.  No more is needed—or allowed—from the Corps under Section 401.

Specifically, TDEC issued the 401 Certification, with conditions, for temporary impacts to 0.69 acres of wetlands and temporary impacts to 5,400 linear feet of stream—the very same impacts ultimately permitted by the Corps.  App-0009 (401 Certification).[20]  The 401 Certification responded to TGP's application covering all waterbody crossings associated with the Project subject to the CWA, including a limited number for which TGP had desktop data but not field data.  AR002575-592 (401 Certification).  For this reason, as a condition of the 401 Certification, TDEC required TGP to seek a modified state Aquatic Resource Alteration Permit ("ARAP").  App-0019 (401 Certification).  After reviewing supplemental data and finding that the crossings would not violate state water quality standards, TGP issued a modified ARAP and concurrently stated that it waived its further review of those crossings under Section 401.  App-0345 (Modified ARAP).  The scope of TDEC's 401 Certification is exclusively for the State to determine, not the Corps.  *City of Olmsted Falls v. EPA*, 435 F.3d 632, 636 (6th Cir. 2006).  In short, the Corps took final action under Section 404 after fulfilling its responsibilities

---

[20] The 401 Certification also covers the permanent vegetation conversion in 490 linear feet of stream and 0.03 acres of wetland for which the Corps required mitigation.  App-0029 (401 Certification).

to await TDEC's timely decisions under Section 401 and to incorporate the conditions from the Section 401 Certification into the Section 404 Permit.

The Corps also fulfilled its Section 404 responsibilities, which are not affected by TDEC's chosen scope of review under Section 401. Before issuing the Permit, the Corps was required to determine "the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment." 40 C.F.R. § 230.11 (AD064-66). The Corps may not permit a discharge that "[c]auses or contributes ... to violations of any applicable State water quality standard." *Id.* § 230.10(b)(1).

 Here, the Corps reviewed every crossing, including the crossings for which TGP submitted additional information after TDEC issued the 401 Certification.[21] In issuing the Permit, the Corps had a full record that included both the 401 Certification and TDEC's modified ARAP based on the supplemental field data. In the modified ARAP, TDEC determined that the Project construction is compliant with the Tennessee Water Quality Control Act. App-0314-388 (Modified ARAP). In addition, the Corps had "information that was verified through the ecological field surveys" for tracts where waterbody and wetland surveys had been outstanding due

---

[21] AR001459-460 (TGP Aug. 2023 Data Supplement); see also App-0286-89 (crossing-by-crossing analysis impact table), App-0237-240 (evaluation of impacts on physical and chemical characteristics), App-0266-69 (evaluation of cumulative effects on aquatic ecosystem) (Corps MFR).

to landowners refusing access (the new survey information supplemented the desktop information that had been provided previously).   App-0876-880 (TGP Aug. 2023 Data Supplement).   After evaluating that information, the Corps exercised its expertise and acted within its discretion to determine that the proposed discharge would not "[c]ause or contribute to violations of any applicable water quality standards."  App-0249 (Corps MFR).

**F.     TGP Has A NPDES Permit For Stormwater Discharge.**

Sierra Club argues that the Corps erred by relying on a "nonexistent" permit issued by TDEC under Section 402 of the CWA, 33 U.S.C. § 1342 (AD012), a National Pollutant Discharge Elimination System ("NPDES") permit.  Sierra Club Brief at 52.  TGP anticipates that the Corps will respond fully to Sierra Club's argument, but Sierra Club is wrong that the permit is "nonexistent."

The Corps' Permit requires TGP to comply with the 401 Certification, as discussed above and the 401 Certification provides that TGP "must comply with the conditions of the National Pollutant Discharge (NPDES) General Permit for Discharges of Stormwater Associated with Construction Activities (CGP), TNR 100000, for the entire area of disturbance associated with the construction project."  App-0024 (401 Certification).  The NPDES permit prohibits stormwater discharge that contains (i) "total suspended solids, turbidity, or color in such amounts or character that will result in any objectionable appearance compared to the turbidity

or color of the receiving water, considering the nature and location of the water," and "pollutants in quantities that will be hazardous or otherwise detrimental to humans, livestock, wildlife, plant life, or fish and aquatic life in the receiving stream." App-1216 (NPDES Permit No. TNR100000). TGP has obtained its Notice of Coverage under the General Permit. *See* App-1262 (NPDES Notice of Coverage). Thus, contrary to Sierra Club's assertion, the existence and applicability of the NPDES permit were properly considered by the Corps.

Sierra Club argues that the NPDES permit is not required under the CWA. Sierra Club Brief at 53. But the Court need not reach that question. States are free to impose stricter requirements under state law and, here, Tennessee has made the permit a requirement of its Section 401 Certification.[22] The Court can take judicial notice that the NPDES permit, in fact, exists and that TGP is required to comply with it as the Permit applies to discharges of stormwater associated with the entire Project.[23] Sierra Club is simply incorrect that such a permit does not exist and that TGP is not required to follow it.

---

[22] The General Permit explains that it is based in the "authority of the Tennessee Water Quality Control Act of 1977 (T.C.A. 69-3-101 et seq.) and the authorization by the U.S. Environmental Protection Agency under the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977 (33 U.S.C. 1251, *et seq*.) and the Water Quality Act of 1987, P.L. 100-4." NPDES Permit at 45.

[23] Fed. R. Evid. 201(d); *see also Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023) (court may take judicial notice of matters of public record, including

**G.      The Corps Properly Considered Cumulative Impacts.**

Sierra Club's final argument is that the Corps failed to properly consider cumulative impacts.  Sierra Club Brief at 54.  Although TGP expects that the Corps will fully address this point, Sierra Club is clearly wrong.  The Corps did address cumulative effects, both in its review under NEPA, which included participation in the FERC FEIS, and in its analysis under the Section 404(b)(1) Guidelines.  App-0991-993 (FERC FEIS); App-0266-269, App-0278-284 (Corps MFR).  Because the Corps concluded that the impacts of the Project will be "minor" and "short term," the Corps was not required to engage in the type of analysis Sierra Club demands, especially in light of the detailed information the Corps considered.  App-0247 (Corps MFR); *see Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 706-07 (6th Cir. 2014) (finding analysis of impacts was reasonable, "albeit not as comprehensive and wide in scope as that demanded by the plaintiffs," where Corps concluded project would have minor impacts).

**H.      If The Court Finds That The Corps' Analysis Is Deficient, It Should Remand The Permit To The Corps Without Vacatur.**

For the reasons discussed above, this Court should uphold the Permit because the Corps complied with the CWA in issuing the Permit.  However, if the Court

---

those available online); *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.*, 894 F.3d 235, 245 (6th Cir. 2018) (noting courts may take judicial notice of documents of public record).

determines that the Corps' analysis in issuing the Permit was deficient in some respect, then the Court should not vacate the Permit but should remand the matter to the Corps for further consideration and analysis.

In determining the appropriate remedy on review of an agency action, this Court applies the well-established *Allied-Signal* standard. *See Sierra Club v. EPA*, 60 F.4th 1008, 1022 (6th Cir. 2023) (applying two-factor standard from *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). Under that standard, the decision whether to vacate depends "on the seriousness of the agency error and the disruptive consequences of vacatur." *Id.* (quoting *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022) (citing *Allied-Signal*)). "Neither *Allied-Signal* factor is dispositive; rather 'resolution of the question turns on the [c]ourt's assessment of the overall equities and practicality of the alternatives.'" *Id.* (quoting *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F.Supp.3d 240, 270 (D.D.C. 2015) (collecting cases)). Here, if the Court finds there are deficiencies in the Corps' analysis underlying the Permit, both *Allied-Signal* factors strongly favor remand without vacatur.[24]

---

[24] In its reply brief in the action challenging TDEC's 401 Certification, Sierra Club argued that, notwithstanding this Court's direct application of the two-factor *Allied-Signal* test for remand without vacatur in 2023's *Sierra Club* opinion, this Court is nonetheless precluded from considering a remand without vacatur here due to prior opinions that did not grant such a remedy. *See Sierra Club v. TDEC*, No. 23-3682, Doc. 62-1 at 47-48 (citing *Louisville Gas & Elec. Co. v. FERC*, 988 F.3d 841, 846

**1.   The Corps can readily cure any deficiencies in the Permit based upon further information, analysis, and explanation.**

If the Court decides the Corps' analysis in issuing the Permit was deficient, the Corps should be afforded an opportunity on remand to cure any deficiency in its analysis regarding the Permit.  "The seriousness of the agency's error depends on how likely it is the agency will be able to justify its decision on remand." *Sierra Club*, 60 F.4th at 1022 (quotation omitted).  "When an agency may be able readily to cure a defect in its reasoning of a decision, the first factor counsels remand without vacatur." *Id.* (cleaned up).

To order remand without vacatur, this Court need not know with certainty that the Corps will be able to cure the defect; rather, the Court need only identify "a serious possibility" that the Corps' analysis and decision on the Permit may be cured. *Allied-Signal*, 988 F.2d at 151 (remanding without vacatur where there was a "possibility" that the agency would be able to justify its inadequately supported decision); *NRDC v. EPA*, 808 F.3d 556, 584 (2d Cir. 2015) (citing *Allied-Signal* and remanding CWA section 402 permit to EPA without vacatur); *Black Warrior*

_____

(6th Cir. 2021), and *Ky. Waterways All. v. Johnson*, 540 F.3d 466, 473 (6th Cir. 2008)).  That is plainly wrong.  There is no "panel conflict" here because *Louisville Gas* and *Kentucky Waterways* did not even address the question of remand without vacatur, as this Court subsequently and thoroughly did in *Sierra Club*.  Thus, contrary to Sierra Club's suggestion, this Court's 2023 opinion in *Sierra Club* did not "overrule the decision of another panel," *Salmi v. Sec'y of Health and Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985), and this Court is free to apply the two-factor *Allied-Signal* standard for remand without vacatur.

*Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (where there is an incomplete record and "it is not at all clear that the agency's error incurably tainted the agency's decisionmaking process, the remedy of remand without vacatur is surely appropriate").

Here, as a threshold matter, the Corps' regulations expressly provide the agency with a specific framework to address any identified deficiencies in a permitting decision. *See* 33 C.F.R. § 325.7 (AD142-43) (addressing "modification, suspension, or revocation of permits"). Under these regulations, the Corps has the discretion to "reevaluate the circumstances and conditions of any permit" and thereafter modify, suspend, or revoke permits in appropriate circumstances. *Id*. In the event of a remand, the Corps should be afforded the opportunity to decide how to address any identified deficiencies in the Permit in accordance with this established regulatory process.

Further, there is substantial reason to conclude that the Corps will be able to cure any defects in its analysis and conclusions regarding the Permit. Sierra Club's allegations of deficiencies are narrowly tailored to a few aspects of the Corps' analysis. Notably, Sierra Club has not raised any issues regarding the Corps' substantial analysis and conclusions pertaining to NEPA and many aspects of its analysis under the Section 404(b)(1) Guidelines.

Moreover, Sierra Club's allegations of deficiencies are all based on the alleged absence of complete information and/or analysis. As this Court has recognized, defects in explanation can "counsel[] remand without vacatur." *Sierra Club*, 60 F.4th at 1022. On remand, and under the procedures set forth in Section 325.7, the Corps can require that TGP provide additional information, and the Corps, in turn, can expand upon its own analyses and explanations underlying the Permit before making a decision on the Permit. Under the circumstances, it is extremely likely—far beyond the mere "possibility" the first factor requires—that the Corps will be able to gather and analyze sufficient information to fully justify its decision on the Permit. The first *Allied-Signal* factor strongly supports remand without vacatur.

## 2. Vacatur of the Permit would be highly disruptive.

As to the second *Allied-Signal* factor—the extent to which vacatur would be disruptive—vacating the Permit here would have potentially calamitous consequences on TGP, TVA, and the citizens of Tennessee. Vacating the Permit is tantamount to requiring TGP to restart the Corps permitting process. Although it is unclear how much time such a "do-over" would require, it took more than two years for TGP to obtain the existing Permit. In contrast, remanding without vacatur, and allowing the Corps an opportunity to gather additional information and conduct

further analysis to cure any deficiencies in the Permit, would take far less time, perhaps weeks or a few months.

This timing differential is critical because of the Project's tight schedule for meeting its legal obligation in support of the public's need for power from TVA. As TGP explained in briefing the stay motion in this action, the Project's construction commencement date of October 15, 2024, was carefully calibrated to allow TGP to meet the September 1, 2025, in-service date for the pipeline, which is TGP's contractual obligation to TVA. *See* Doc. 12-1 at 17.

Moreover, the timing of the Project is critical to TVA and, by extension, the public served by TVA. TVA's plan to retire one of the coal units at the Cumberland Fossil Plant and replace it with a natural gas-fired unit depends on the timely completion of the Project to supply natural gas. *Id.* at 19-20. A delay in TVA's scheduled retirement of one of the coal units at the Cumberland Fossil Plant will lead to additional construction, repairs, maintenance upgrades, and costs to maintain reliability and comply with environmental regulatory requirements. *Id.* A substantial disruption in the timing of the Project would also jeopardize tens of millions of dollars in benefits resulting from the Project to Tennessee and three local counties. *Id.*

The public interest supports honoring Congress's mandate in the NGA that the Nation continue to benefit from "the orderly development of plentiful supplies

of ... natural gas at reasonable prices." *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669–70 (1976). Sierra Club has offered no reason why one alleged public interest should trump the significant public interests served by the Project. In sum, because vacating the Permit, and the substantial delay to the Project it would cause, would be highly disruptive, the second *Allied-Signal* factor supports remand without vacatur.

Finally, given the minimal and temporary harms authorized by the Permit, the substantial likelihood that the Corps on remand could address any deficiencies in the Permit, and the strong public interest in TGP completing the Project and supporting TVA's plan to transition its plant from coal to natural gas, TGP respectfully submits that the "overall equities" of this case support remand without vacatur. *Sierra Club*, 60 F.4th at 1022.

## CONCLUSION

For the foregoing reasons, the Court should deny Sierra Club's Petition for Review and affirm the Corps' Permit.

Date:   October 31, 2024                    Respectfully submitted,


Scott Burnett Smith                          _/s/ David A. Super_____
BRADLEY ARANT BOULT CUMMINGS LLP             David A. Super
200 Clinton Avenue West                      Ann D. Navaro
Huntsville, AL 35801                         Kevin A. Ewing
(256) 517-5100                               BRACEWELL LLP
ssmith@bradley.com                           2001 M Street, NW, Suite 900
                                             Washington, D.C. 20036
                                             Telephone: (202) 828-5800
                                             Facsimile: (800) 404-3970
                                             david.super@bracewell.com
                                             ann.navaro@bracewell.com
                                             kevin.ewing@bracewell.com

**_Counsel for Intervenor-Respondent_**
**_Tennessee Gas Pipeline Company, L.L.C._**

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This document complies with the type-volume limits of Fed. R. App.

P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App.

P. 32(f), this document contains **12,082 words**.

2.      This document complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this

document has been prepared in a proportionally spaced typeface using Microsoft

Word 365 in 14-point Times New Roman.


 Date:   October 31, 2024                           /s/ David A. Super_____
                                                   David A. Super

                                                   ***Counsel for Intervenor-Respondent***
                                                   ***Tennessee Gas Pipeline Company, L.L.C.***

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule 25(d) of the Federal Rules of Appellate Procedure, Rule 25(c) of the Circuit Rules, I hereby certify that on this 31st day of October 2024, I electronically filed the foregoing BRIEF OF INTERVENOR-RESPONDENT TENNESSEE GAS PIPELINE COMPANY, L.L.C. and ADDENDUM thereto with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ David A. Super*
David A. Super

**Counsel for Intervenor-Respondent**
**Tennessee Gas Pipeline Company, L.L.C.**